UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

JILL STEIN and RANDALL REITZ,

               Plaintiffs,

    v.

PEDRO A. CORTÉS, in his official capacity as
Secretary of the Commonwealth; and JONATHAN
MARKS, in his official capacity as Commissioner
of the Bureau of Commissions, Elections, and
Legislation,

               Defendants.

No. 16-CV-8287

---

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-7684

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Lawrence M. Otter, Esq.
PO Box 575
Silverdale, PA 18901
(267) 261-2984

TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ..................................................................................................................... 2

I.      VOTING MACHINES ARE SUSCEPTIBLE TO ATTACK AND ERROR ........ 2

II.     PENNSYLVANIA'S ELECTRONIC VOTING MACHINES:
        ANTIQUATED, VULNERABLE, DANGEROUS ............................................... 4

        A.    Election Systems & Software iVotronic ...................................... 5

        B.    Danaher Shouptronic 1242 ......................................................... 5

        C.    Premier/Diebold (Dominion) AccuVote TSX ............................. 7

        D.    Hart InterCivic eSlate ................................................................. 7

        E.    Sequoia (Dominion) AVC Advantage ......................................... 9

        F.    Sequoia (Dominion) AVC Edge ................................................. 9

III.    THE 2016 ELECTION: UNPRECEDENTED FOREIGN INTERFERENCE
        AND HACKING OF AMERICAN ELECTION SYSTEMS ............................... 10

IV.     THE STATUTORY SCHEME FOR RECOUNTS IN PENNSYLVANIA:
        AN ILLUSORY FRAUD ON THE VOTER ..................................................... 10

        A.    Statewide County Board Recounts Are Virtually Impossible, and No
              One Knows the Deadline for Filing ........................................... 10

        B.    Court-Ordered Recounts Are Virtually Impossible to Obtain ................... 12

              The Recount Procedure ............................................................. 14

              The Contest Procedure ............................................................. 14

V.      THE 2016 RECOUNT: VOTERS ARE DEFEATED BY AN IMPOSSIBLY
        BURDENSOME ELECTION CODE, THE DEPARTMENT OF STATE,
        AND 67 BOARDS OF ELECTION ................................................................. 15

        A.    Election Day: Malfunctioning Machines and Missing Ballots ................ 16

        B.    Voters Mobilize to Seek Recounts and Forensic Evaluations of the
              Voting ...................................................................................... 17

i

Voters Search in Vain To Find Reliable Information About
Deadlines and Filing Requirements...........................................................17

The Department of State Sends Inconsistent, Incomplete, and False
Information Concerning Deadlines and the Activity of County Boards ... 18

Voters Jump Through Enormous Obstacles to File Recount Petitions ..... 19

Chaos: Voters Attempt to File Petitions with County Boards of
Elections .....................................................................................................20

DoS Pulls the Rug Out of the Recount Effort ...........................................21

VI.     COUNTY BOARD AND COURT PROCEEDINGS: VOTERS AND STEIN
ARE REPEATEDLY DENIED A RIGHT TO EXAMINE THE VOTE .............22

LEGAL STANDARD ..........................................................................................26

ARGUMENT .......................................................................................................27

I.      THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION .................27

II.     PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS ......28

        A.      Pennsylvania's Election System Violates the Fundamental Right to
        Have Votes Be Counted ....................................................................28

        B.      The Pennsylvania Election System Is Fundamentally Unfair And
        Violates Due Process ........................................................................34

III.    PLAINTIFFS WILL SUFFER DEVASTATING HARM THAT CAN ONLY
BE REMEDIED BY AN IMMEDIATE ORDER..................................................37

IV.     THE INJUNCTION WOULD NOT CAUSE EVEN GREATER HARM TO
THE DEFENDANTS .........................................................................................39

V.      THE PUBLIC INTEREST WOULD BE SERVED BY THE INJUNCTION......40

CONCLUSION ....................................................................................................41

<u>TABLE OF AUTHORITIES</u>

**CASES:**

*ACLU v. Reno,*
    217 F.3d 162 (3d Cir. 2000) ........................................................................37

*Adams v. Freedom Forge Corp.,*
    204 F.3d 475 (3d Cir. 2000) ........................................................................38

*Anderson v. Celebreeze,*
    460 U.S. 795-796 (1983) .............................................................................32

*Ashcroft v. ACLU*
    535 U.S. 564 (2002); ..................................................................................37

*Balboa Threadworks, Inc. v. Stucky,*
    No. 05-1157-JTM-DWB, 2006 WL 763668 (D. Kan. Mar. 24, 2006) ............39

*Banfield v. Cortes,*
    631 Pa. 229 (2015) .....................................................................................33

*Belitskus v. Pizzingrilli,*
    343 F.3d 632 (3d Cir. 2003) ...................................................................29-31

*Bonas v. Town of N. Smithfield,*
    265 F.3d 69 (1st Cir. 2001) .........................................................................36

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ...............................................................................30, 31

*Bush v. Gore,*
    531 U.S. 98 (2000) ......................................................................................29

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twshp. Sch. Dist.,*
    386 F.3d 514 (3d Cir. 2004) ...............................................................26, 28, 40

*Const. Party of Pa.,*
    116 F. Supp. 3d 486 (E.D. Pa. 2015)...................................................27, 29, 33

*Cooper v. City of Philadelphia, 18th Dist.,*
    No. 93-3007, 1993 WL 274192 (E.D. Pa. July 2, 1993) ..........................26, 28

*Duncan v. Poythress,*
    657 F.2d 691 (5th Cir. 1981) .......................................................................36

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ....................................................................................31

*Elrod v. Burns,*
    427 U.S. 347 (1976) ....................................................................................................37

*Forum for Academic and Institutional Rights ("FAIR") v. Rumsfeld,*
    390 F.3d 219 (3d Cir. 2004) ..................................................................................37, 40

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) ........................................................................34, 35, 38

*Hoblock v. Albany Cnty. Bd. of Elections,*
    487 F. Supp. 2d 90 (N.D.N.Y. 2006) .....................................................................29, 31

*In re Reading Sch. Bd. Election,*
    634 A.2d 170 (Pa. 1993) ........................................................................................11, 22

*Jill Stein v. Thomas,*
    No. 16-14233, (E.D. Mich. Dec. 5, 2016) ........................................................31, 32, 40

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951) ....................................................................................................35

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) ......................................................................................36

*Lewis v. Kugler,*
    446 F.2d 1343 (3d Cir. 1971) .....................................................................................37

*Marks v. Stinton,*
    19 F.3d 873 (3d Cir. 1994) ..........................................................................30, 35, 36, 38

*McCormick v. Hirsch,*
    460 F. Supp. 1337 (M.D. Pa. 1978) ...........................................................................37

*Miller v. Blackwell,*
    348 F. Supp. 2d 916 (S.D. Ohio 2004) .......................................................................37

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ..................................................................................................37, 40

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ...............................................................................................28, 29

*Rogers v. Corbett,*
    468 F.3d 188 (3d Cir. 2006) ...................................................................................29, 30

*Shaw by Strain v. Strackhouse,*
    920 F.2d 1135 (3d Cir. 1990) .....................................................................................28

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ...................................................................36

*Stream Cos., Inc. v. Windward Advert.,*
    No. 12-CV-4549, 2013 WL 3761281 (E.D. Pa. July 17, 2013) ........................39

*Touchston v. McDermott,*
    234 F.3d 1133 (11th Cir. 2000) ...................................................................37

*United States v. Classic,*
    313 U.S. 299 (1941) ...................................................................................29

*United States v. Mosley,*
    238 U.S. 383 (1915) ...................................................................................34

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986) .......................................................................37

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ...................................................................................28

**STATUTES:**

25 P.S. § 2650(c) ...............................................................................14, 23

25 P.S. § 2650(e)(3)(i) ..............................................................................15

25 P.S. § 3154 ...................................................................................11, 12

25 P.S. § 3261 ........................................................................................13

25 P.S. § 3262(a)(1) .................................................................................13

25 P.S. § 3261(b) ....................................................................................13

25 P.S. § 3262(f) .....................................................................................13

25 P.S. § 3263(a)(1) .................................................................................13

25 P.S. § 3263(a)(1)(i)(A-B) ......................................................................14

25 P.S. § 3456 ...................................................................................15, 26

25 P.S. § 3457 ........................................................................................15

Plaintiffs respectfully submit this Memorandum of Law in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction requiring Defendants to institute an immediate recount of paper ballots in optical scan counties in Pennsylvania and permit plaintiffs two to three days to do a thorough, forensic examination of a sample of direct-recording electronic ("DRE") voting systems in Pennsylvania.

## PRELIMINARY STATEMENT

The Pennsylvania election system is a national disgrace. Voters are forced to use vulnerable, hackable, antiquated technology banned in other states, then rely on the kindness of machines. There is no paper trail. Voting machines are electoral black sites: no one permits voters or candidates to examine them.

After election day, voters are equally helpless to make sure their votes are counted. The Election Code requires 27,474 voters in 9,158 districts to bring notarized petitions to county boards, in time for shifting, divergent, and secret deadlines known to no one except, perhaps, 67 separate county election boards. In court recounts, voters must pay exorbitant fees, and (according to boards of elections) should only one voter fail to sign a single petition in a single district anywhere in the State, no one can seek a recount anywhere.

This labyrinthine, incomprehensible, and impossibly burdensome election regime might make Kafka proud. But for ordinary voters, it is a disaster.

In the 2016 presidential election, rife with foreign interference documented by American intelligence agencies and hacks of voter rolls in multiple states, voters deserve the truth. Were Pennsylvania votes counted accurately? That truth is not difficult to learn: simply count the paper ballots in optical scan districts, and permit forensic examination of the electronic voting systems in DRE districts. This can be done in days, by top experts, if necessary at the Stein

campaign's expense, under the supervision of election officials, and without endangering a single vote.

A majority of machines voted for Donald Trump in Pennsylvania. But who did the people vote for? Absent this Court's intervention, Pennsylvanians will never know that truth.

## FACTS

### I.   VOTING MACHINES ARE SUSCEPTIBLE TO ATTACK AND ERROR

In Pennsylvania, more than 85% of voters vote on direct recording electronic ("DRE") machines with no paper trail. Ex. 41. The remaining Pennsylvania voters fill out paper ballots tabulated on optical scan machines. *Id.* In contrast, 70% of voters nationwide have their votes recorded on some form of paper. Affidavit of J. Alex Halderman ¶ 18. Pennsylvania thus relies disproportionately and primarily on electronic voting with no paper trail. Though the Commonwealth uses a wide variety of electronic voting machines, all are unreliable, vulnerable to interference and error, and susceptible to hacking.

Experts have repeatedly documented in peer-reviewed and state-sponsored studies that electronic voting machines—including both DRE machines *and* optical scan machines—have serious cybersecurity problems. "Voting machines are computers with reprogrammable software. An attacker who can modify that software by infecting the machines with malware can cause the machines to provide any result of the attacker's choosing." Halderman Aff. ¶ 11. As demonstrated in laboratory tests, in just a few seconds, anyone can install vote-stealing malware on a voting machine that silently alters the electronic records of every vote. *Id.*[1]

That the machines themselves may never be connected to the Internet is irrelevant; memory media and other devices are routinely connected to the machines, and those provide

---

[1] A video documenting this result is publicly available at https://youtu.be/aZws98jw67g.

opportunities for the insertion of malware. *See, e.g.*, Halderman Aff. ¶ 12; Affidavit of Daniel Lopresti ¶ 13 (viruses can be spread through the use of contaminated memory cards); Affidavit of Harri Hursti ¶¶ 15-18 (fraudulent firmware can be installed through the audio-ballot cartridge); Affidavit of Duncan A. Buell ¶¶ 17-24 (malware can be spread by removable media connected to voting machines).

For example, shortly before each election—after the candidates have been chosen—poll workers copy the ballot design from a regular desktop computer in a government office (or at a company that services the voting machines) and use removable media (akin to the memory card in a digital camera) to load the ballot design on to each machine. Halderman Aff. ¶ 12. "That initial computer is almost certainly not well enough secured to guard against attacks by foreign governments. If technically sophisticated attackers infect that computer, they can spread vote-stealing malware to every voting machine in the area." *Id.* Sophisticated attackers including nation-states have developed a variety of techniques to attack non-Internet-connected systems. *Id.* (discussing the Stuxnet virus, apparently spread through flash drives).

Most voting machines also have reprogrammable software ("firmware") easily manipulated in advance of the election to introduce vote-sealing malware. *Id.* "Technically sophisticated attackers can accomplish this with ease." *Id.*

Optical scan machines can also be attacked in a number of ways, including attacks on the precinct scanners, election media processors, high-speed scanners, and central tabulators. Hursti Aff. ¶¶ 40-58 (detailing various attack vectors to which optical scan voting systems are vulnerable).

Because of these vulnerabilities, *paper* ballots are the best and most secure technology available for casting votes. Paper cannot be hacked. It is the only method that allows voters to

be 100% confident that their vote is recorded accurately. DREs with voter-verifiable paper audit trails ("VVPAT") are the next best option. A DRE with a VVPAT at least allows the voter to review a printed record of the vote he has just cast on a computer. That paper record is then stored in the machine for later audit and recount purposes. "Only a paper record documents the vote in a manner that cannot later be modified by malware or other forms of cyberattacks." Halderman Aff. ¶ 17.

## II.     PENNSYLVANIA'S ELECTRONIC VOTING MACHINES: ANTIQUATED, VULNERABLE, DANGEROUS

In the 2016 general election, Pennsylvania used six different models of DREs. Ex. 41. Each has been examined by security researchers, and all have security vulnerabilities easily exploited by attackers to alter the outcome of elections. Halderman Aff. ¶ 20 ("[E]very DRE in use in Pennsylvania is vulnerable to cyberattacks.").

Each of the six systems used in Pennsylvania is outdated and susceptible to malicious or inadvertent interference.

### A.     Election Systems & Software iVotronic

The iVotronic is used by 30% of Pennsylvania's registered voters, including in Allegheny County, one of the state's largest counties. Ex. 41.[2]  The machine was studied by security experts as part of Project EVEREST, commissioned by the Ohio Secretary of State. Halderman Aff. ¶¶ 27; *see also* EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing (Dec. 7, 2007) [hereinafter "EVEREST"], *available at*

---

[2] According to publicly available data, 2,491,769 voters were registered in counties that use primarily iVotronics voting machines, out of a total of 8,072,589 registered voters. Ex. 41.

http://www.patrickmcdaniel.org/pubs/everest.pdf.[3]  The investigation found that firmware on these machines contained buffer overflow vulnerabilities, which could be exploited to infect the machines with malware and alter the election outcome.  Halderman Aff. ¶ 27.  Further vulnerabilities in the machines include that the Personalized Electronic Ballot module ("PEB"), used to program the ballot design before the election, had easily circumventable security protections.  *Id.*  As Professor Duncan Buell explains, an attacker could use a PEB or another device that emulates a PEB, like a Palm Pilot, to upload malicious code to an iVotronic machine.  Buell Aff. ¶ 15.  The EVEREST researchers also found that the cryptographic keys used by the machines to encrypt votes could be easily extracted by attackers, who could then read or manipulate the vote data.  Halderman Aff. ¶ 27.  The machines are also susceptible to inadvertent error, as the complexity of the system invites mistakes from poll workers, and software failures can disrupt the accurate tally of votes.  Buell Aff. ¶¶ 25-26.

**B.    Danaher Shouptronic 1242**

Approximately 29% of registered Pennsylvania voters rely on the Shouptronic machines. Ex. 41.[4]  These DRE machines are used in Philadelphia, among other places.  *Id.* This model was introduced in the 1980s.  Its security features have not been updated in more than 30 years.  Halderman Aff. ¶ 24.  Researchers at Lehigh University, led by computer science professor Daniel Lopresti, analyzed the Shouptronic's computer architecture and found that the firmware used to direct the machine's operation and the voting records stored in the machine's memory are vulnerable to tampering in multiple ways.  Lopresti Aff. ¶ 13.  "The machines' design makes it extremely likely that malware can infect the machines via the removable

---

[3] The EVEREST report was prepared by teams from Pennsylvania State University, the University of Pennsylvania, and WebWise Security, Inc.

[4] According to publicly available data, 2,315,151 voters were registered in counties that primarily use Shouptronic voting machines, out of a total of 8,072,589 registered voters.  Ex. 41.

memory cartridges that are used to program the ballot design and retrieve vote totals."

Halderman Aff. ¶ 24; *see also* Lopresti Aff. ¶ 13. These machines have already caused

documented problems in Pennsylvania, losing around 200 votes in 2005. *Berks County May Ask*

*People to Vote Again in Two Precincts*, May 18, 2005, *available at*

http://www.votersunite.org/article.asp?id=5408. The machines have only grown older and more

out of date since then.

### C. Premier/Diebold (Dominion) AccuVote TSX

Approximately 10% of Pennsylvania voters rely on the AccuVote TSX. Ex. 41.[5] Mr.

Halderman performed a security analysis of the AccuVote TSX as part of the California Top-to-

Bottom review; the machine was also studied as part of Ohio's Project EVEREST and by

independent security researchers. Halderman Aff. ¶ 25. All of these studies found serious

security problems. The security features built into the machines are inadequate to defend against

cyberattacks, and vote-stealing malware can spread on the machines' removable memory cards.

*Id.* "If attackers infect counties' election management system computers, the attacker can spread

vote-stealing malware to every voting machine in the county." *Id.* A local attacker with physical

access to the machines can additionally tamper with them by manipulating the machines'

removable memory cards—and a hacker can pick the lock to the memory cards using only a BIC

pen. *Id.* The AccuVote TSX's problems are well-known. In 2007, California reviewed the

system, and found that the machines' security mechanisms were "inadequate" and that the

system was "susceptible to computer viruses . . . which could allow an attacker with access to

only one voting unit or memory card to spread malicious code, between elections, to many, if not

---

[5] According to publicly available data, 851,515 voters were registered in counties that primarily use Shouptronic voting machines, out of a total of 8,072,589 registered voters. Ex. 41.

all, of a county's voting units."[6]  At the conclusion of this review, the state deemed the AccuVote

TSX system "defective or unacceptable" and withdrew the machine's certification for use in

most California elections.

### D.      Hart InterCivic eSlate

Approximately 6% of voters in Pennsylvania are registered in counties that rely on the

Hart InterCivic eSlate machine.[7]  This model was examined by security experts as part of the

California "Top to Bottom" election technology review[8] and the Ohio EVEREST election system

security review.  Both studies found significant vulnerabilities, and California subsequently

decertified the machine.  Halderman Aff. ¶ 22; *see also* EVEREST, *supra.*  "The memory cards

used by eSlates to transfer votes to a central counting computer are vulnerable to undetectable

tampering.  The internal security mechanisms of the machines are easily defeated, enabling

malicious software to change or erase votes, cast extra votes, or modify the eSlate's software or

the software of the machine used to tabulate votes.  These vulnerabilities could allow attackers to

compromise large numbers of machines and alter the election outcome."  Halderman Aff. ¶ 22.

### E.      Sequoia (Dominion) AVC Advantage

Approximately 9% of registered Pennsylvania voters vote in counties that rely primarily

on the AVC Advantage.[9]  This model has been studied by multiple groups of security

---

[6] Withdrawal of Approval of Diebold Election Systems, Inc., Cal. Sec'y of State (Oct. 25, 2007), *available at* http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-102507.pdf.

[7] According to publicly available data 490,472 voters were registered in counties that primarily use eSlate voting machines, out of a total of 8,072,589 registered voters.  Ex. 41.

[8] Withdrawal of Approval of Hart InterCivic System 6.2.1 DRE & Optical Scan Voting System and Conditional Re-Approval of Use of Hart InterCivic System 6.2.1 DRE & Optical Scan Voting System, Cal. Sec'y of State (Dec. 6, 2007), *available at* http://votingsystems .cdn.sos.ca.gov/oversight/ttbr/hart-amended-recert-final-120707.pdf.

[9] According to publicly available data, 728,029 voters were registered in counties that primarily use AVC Advantage voting machines, out of a total of 8,072,589 registered voters.  Ex. 41.

researchers, including J. Alex Halderman and Daniel Lopresti.  Halderman Aff. ¶ 23; Lopresti

Aff. ¶ 5.  A peer-reviewed security study of the machine in 2009 demonstrated that malware can

infect the machines and alter votes.  Halderman Aff. ¶ 23.  Such malware can spread to the

machines via the removable memory cartridges used to program the ballot design and offload

votes.  *Id.*  Halderman's research further showed that such malware can defeat all of the

hardware and software security features used by the machines.  *Id.*  Other researchers also

concluded that the AVC Advantage has significant vulnerabilities, and that it would be

straightforward to install vote-stealing malware by replacing one firmware chip.  *Id.* (citing

Andrew W. Appel et al., Insecurities and Inaccuracies of the Sequoia AVC Advantage DRE

Voting Machine (Oct. 17, 2008), *available at* https://mbernhard.com/advantage-insecurities-

redacted.pdf).  Those researchers found, among other things, that the machine can be easily

hacked with vote-stealing firmware, that fraudulent firmware can be installed into many AVC

Advantage machines by viral propagation through the audio-ballot cartridges, and that the

Results Cartridges can be easily manipulated to change votes.  Appel et al., *supra*, at 2; *see also*

Hursti Aff. ¶¶ 15-24.

     This voting machine's deficiencies are not limited to security vulnerabilities.  In the 2008

New Jersey Republican primary, 37 of these machines exhibited a software bug in which the

number of votes recorded was higher than the number of voters.  Andrew W. Appel et al., The

New Jersey Voting-Machine Lawsuit and the AVC Advantage DRE Voting Machine, *available*

*at* https://www.usenix.org/legacy/event/evtwote09/tech/full_papers/appel.pdf.

**F.**     **Sequoia (Dominion) AVC Edge**

Also decertified by California in 2007,[10] this machine has vulnerabilities similar to those of the TSX and the eSlate.  In the California Top-to-Bottom review, security experts found that remote attacks could spread malware to the machines and change, steal, or add votes. Halderman Aff. ¶ 26.  "Furthermore, such malware can persist even if election workers reinstall an uncorrupted version of the election software." *Id.*  The California study further discovered that malicious software on the machines could conceal vote-tampering from pre-election testing, hiding manipulation of votes and making the machine output appear otherwise normal. *Id.*  The election software running inside the AVC Edge can also be tampered with by a local attacker with physical access to the machine by replacing a memory card inside the machine's case. *Id.* Halderman himself demonstrated this vulnerability by hacking an AVC Edge machine to make it run the arcade game Pac-Man. *Id.*  A real attacker could just as easily modify the software to alter votes.

Given the dismal performance of all of the Pennsylvania DRE systems, no Pennsylvania voter can know whether his or her vote on a paperless DRE is recorded accurately.  Ordinary recanvass or recount methods reveal nothing: Such recanvasses simply review the "ballot images" retrieved from the machines' computer memory—images created by the exact same code that creates the vote tally in the machine.  Lopresti Aff. ¶ 15; Hursti Aff. ¶ 35.  This is like seeking a second opinion from the same doctor.  It is virtually useless.  Only a forensic examination of the DRE system would allow examiners to determine whether the information

---

[10] Withdrawal of Approval of Sequoia Voting Systems, Inc., Wineds V 3.1.012/AVC Edge/Insight/Optech 400-C DRE & Optical Scan Voting System and Conditional Re-Approval of Use of Sequoia Voting Systems, Inc., Wineds V 3.1.012/AVC Edge/Insight/Optech 400-C DRE & Optical Scan Voting System, Cal. Sec'y of State (Oct. 1, 2009), *available at* http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/sequoia-100109.pdf.

stored in the computer memory represents an accurate record of the votes cast on those machines.

## III. THE 2016 ELECTION: UNPRECEDENTED FOREIGN INTERFERENCE AND HACKING OF AMERICAN ELECTION SYSTEMS

The experts' concerns about Pennsylvania's use of antiquated and vulnerable technology have risen to alarm in the context of this year's election. The 2016 presidential election was subject to unprecedented cyber attacks intended to interfere with the election. Attackers infiltrated the voter registration systems of Illinois and Arizona and stole voter data. Attackers attempted to breach election offices in more than 20 other states. Attackers broke into the email system of the Democratic National Committee. In an extraordinary statement, both the Director of Intelligence and Department of Homeland Security have said they are "confident" that a foreign government engaged in hacking "to interfere with the US elections process." *See* Halderman Aff. ¶ 7 & attached exhibits.

## IV. THE STATUTORY SCHEME FOR RECOUNTS IN PENNSYLVANIA: AN ILLUSORY FRAUD ON THE VOTER

In theory, the Pennsylvania Election Code promises voters the ability to seek a recount directly, based upon good-faith allegations of fraud or mistake. In reality, that promise is illusory in a statewide election. The recount process is byzantine, opaque, inconsistently administered, and hopelessly confusing even to defendants, the officials in charge.

### A. Statewide County Board Recounts Are Virtually Impossible, and No One Knows the Deadline for Filing

Section 1404 of the Election Code, 25 P.S. § 3154, permits voters to request recounts from their county boards of elections. To request a county board recount, three voters in a single election district (often called a precinct) must sign a petition "that an error, although not apparent

on the face of the returns, has been committed therein." *Id.* § 3154(e). The petition must be "verified by affidavit" in front of a notary. *Id.* The petition only activates a recount *in that district. Id.*

Pennsylvania has 9,158 election districts in 67 counties. For voters to request a statewide recount in Pennsylvania, 27,474 voters evenly spread throughout 9,158 districts must print and sign petitions, get them notarized, and bring them to their local county board of elections. Some counties are over 1,000 square miles; the distance to travel to a board of elections can be substantial.[11]

The deadlines for voters to accomplish this herculean feat are, at best, short. Either the deadline is "prior to the completion of all of the returns for the county," 25 P.S. § 3154(e), or "[a]t the expiration of five (5) days after the completion of the computation of votes," *id.* § 3154(f).[12] The Pennsylvania Supreme Court has strongly suggested that the latter deadline applies. *See In re Reading Sch. Bd. Election*, 634 A.2d 170, 172-73 (Pa. 1993). Until last week, the Pennsylvania Department of State ("DoS") apparently had not given guidance to the 67 boards of elections as to which one of these two deadlines applies; counties arbitrarily picked one or the other.

Because every county counts votes at its own pace, they complete the count on different dates. Therefore the deadlines for county board recounts vary from county to county, and from election to election. It is impossible for voters to know when a county will reach "the completion of all of the returns for the county." *Id.* § 3154(e). Election boards do not give notice of this date in advance. Ex. 1 ¶¶ 13-18; 27.

---

[11] The Court can take judicial notice that Lycoming County, for example, is 1,228.59 square miles of land area. *See* http://www.census.gov/quickfacts/table/PST045215/42081.

[12] If the fifth day falls on a holiday or weekend, it is moved to the first weekday thereafter.

Election boards often give no notice of this date even *after* it has passed.  Counties may (or may not) post unofficial election results on the Internet.  *Id.*; Ex. 26 ¶ 7.  But that does not show that the county has complied with all of the procedural requirements for "the completion of all of the returns," including the signatures of all members of the county board.  *See id.* § 3154(f).  Election boards also often give no notice of the 5-day period following computation of the vote.  Voters are therefore left to guess when the deadline might be to request a Section 1404 recount in any county.  It is a guessing game, and voters are often wrong.

Even the Pennsylvania DoS, which in theory supervises the county boards of elections, has no idea and does not publish when the 67 counties complete computation of the votes, or when the 5-day period ends.  *See* Exs. 32A-32D (correspondence with DoS and related spreadsheets generated and produced by DoS showing shifting, inconsistent, and incomplete deadlines).

### B.    Court-Ordered Recounts Are Virtually Impossible to Obtain

The second option is for voters to seek recounts conducted by the Court of Common Pleas under Sections 1701 and 1702 of the Election Code.  *See* 25 P.S. § 3261 (for districts that use paper ballots, such as optical scan districts); *id.* § 3262 (for districts that have no paper ballots, such as DRE districts).  This method is even more of a sham than the county-board recount.

In a court recount, again three voters in a single election district must print, sign, and deliver a verified petition alleging, "upon information which they consider reliable, they believe that fraud or error . . . was committed" in the canvassing or the computation of the votes.  25 P.S. §§ 3261(a), 3262(a)(1).  In addition, every single petition must be accompanied by a deposit of $50 in cash or a $100 bond.  25 P.S. §§ 3261(b), 3262(a)(1).  Thus, in total, 27,474 voters must

12

verify 9,158 petitions in 9,158 districts and pay at minimum $457,900 in order to request a statewide recount.  In addition, county courts typically treat every petition as a separate court filing and proceeding, with additional filing fees of over $100 or even over $200 per petition. *See* Declaration of Douglas E. Lieb dated December 5, 2016 ("Lieb Decl.") ¶ 6.  Thus, voters must file 9,158 court proceedings, at a cost of millions of dollars.

For DRE precincts, the deadline to file is the later of 20 days after election day, or "5 days after the completion of the computational canvassing of all returns" by the county board, which again, is unknown to voters, or even to DoS.  25 P.S. §§ 3262(f), 3263(a)(1).  For optical scan precincts, the deadline to file is the later of 4 months after election day, or "5 days after the completion of the computational canvassing of all returns" by the county board, which again, is unknown to voters, or even to the DoS.  25 P.S. §§ 3261(f), 3263(a)(1).

Even worse, 25 P.S. § 3263 provides that, in any court-ordered recount, unless a petitioner "pleads that a particular act of fraud or error occurred and offers prima facie evidence supporting the allegation," "a recount or recanvass shall include *all* election districts in which ballots were cast for the office in question," and "petitions . . . must be filed in *each* election district in accordance with this act."  25 P.S. § 3263(a)(1)(i)(A-B) (emphasis added).

The Republican Party of Pennsylvania, at least one board of elections, and apparently one Court of Common Pleas, interpret this section to require that 27,474 voters in Pennsylvania must *all* verify 9,158 petitions in 9,158 districts, and if even a single district anywhere in the State has only two petitioners instead of three, or if a single petitioner pays less than $50, then *no one* in the entire State is entitled to a recount in *any* district, *anywhere*. Ex. 31 at 6-8 (Montgomery Court of Common Pleas), 22:23-23:4 (Montgomery Board of Elections position), 26:20-27:9 (Republican Party position).  If this is correct, then the court-ordered recount statute is a sham in

any statewide election.  It is impossible for 27,474 voters evenly distributed in 9,158 election

districts in 67 counties to file recount petitions within these deadlines, or perhaps any deadlines.

### The Recount Procedure

"Any candidate, attorney or watcher present at any recount of ballots or recanvass of

voting machines shall be entitled to *examine* . . . the voting machine and to raise any objections

regarding the same, which shall be decided by the county board, subject to appeal, in the manner

provided by this act." 25 P.S. § 2650(c) (emphasis added).  Notwithstanding this language, none

of the county boards in the 2016 election has permitted the candidates to "examine" the DRE

voting system, notwithstanding multiple requests from voters and Jill Stein.  Nor has any

Pennsylvania court yet permitted such an examination.

In DRE counties, there is nothing to "count."  There is no paper ballot.  All a candidate or

a voter can do to ensure the integrity of the vote is examine the DRE voting system.

In optical scan counties, assuming voters have somehow overcome all the many statutory

obstacles in their path, the county board "shall recount all ballots using manual, mechanical *or*

electronic devices of a different type used for the specific election." 25 P.S. § 2650(e)(3)(i)

(emphasis added).  Perhaps the county does a manual recount; perhaps it feeds the ballots into a

separate high-speech machine.  It all depends on the moment and the county.  Whatever the

method, the county board only counts the ballots for the specific districts for which the required

number of voters submitted notarized petitions in time.

### The Contest Procedure

The Election Code also permits voters in theory to claim the "election is illegal" in a

filing in Commonwealth Court. 25 P.S. § 3456.  At least 100 voters must petition, and 5 of them

must set forth affidavits alleging that the "election was illegal and the return thereof not correct, and that the petition to contest the same is made in good faith." 25 P.S. § 3457.

The contest proceeding, however, must be filed within 20 days of the election, 25 P.S. § 3456, *i.e.*, before there is any meaningful opportunity to recount the ballots, recanvass the machines, or examine the voting system, and before the election is even certified. This early deadline makes almost any contest petition all but impossible, unless the court agrees to hold the proceeding in abeyance pending development of a fuller record. Unless the court agrees to put a contest proceeding on hold, petitioners are forced to put on an election challenge before the results have *even been certified*, and if the case is dismissed for lack of evidence at that early stage, would have no recourse even if evidence later established that the election and the result were a fraud.

In short, the contest statute is designed to prevent voters from contesting elections in any meaningful way. Unless the Commonwealth Court agrees to delay the contest, the statute is illusory. There is no statute governing when or under what circumstances the Commonwealth Court should or will delay a contest proceeding.

## V.   THE 2016 RECOUNT: VOTERS ARE DEFEATED BY AN IMPOSSIBLY BURDENSOME ELECTION CODE, THE DEPARTMENT OF STATE, AND 67 BOARDS OF ELECTION

Over six millions Pennsylvanians voted in the 2016 presidential election. Before Election Day, many voters struggled to obtain absentee ballots in time for the election. On Election Day on November 8, the great majority of voters voted on DRE machines. Pennsylvania voters experienced machine malfunctions that may have erased their votes. And after the election, when over 1,300 voters across the state sought recounts to ensure the accuracy of the vote, Ex. 1 ¶ 5, they ran head-first into the brick wall that is Pennsylvania's recount

system.  Despite a massive effort, these voters' reasonable requests to ensure the accuracy of the vote have been denied.

A.     **Election Day: Malfunctioning Machines and Missing Ballots**

Pennsylvania has no early voting and limited absentee voting.  Many voters who requested absentee ballots never received them in time to cast their vote.  Ex. 14; Ex. 23.  For example, a voter who requested his absentee ballot in early September in advance of a trip to the United Kingdom in late October, and made multiple phone calls to the Montgomery County Board of Elections, received no ballot until after the election.  Ex. 14.  Another voter spent days calling the county board regarding her absentee ballot, only to receive an electronic ballot that permitted her to vote only in federal races, not the state and local races for her home town.  Ex. 23. These were not isolated incidents: There were so many problems with absentee ballots that just days before the election, a Montgomery County judge ordered that the deadline to return absentee ballots would be extended by four days, noting that "we run the risk that 17,000 people could be disenfranchised unless there's some extension."  Laura McCrystal, *Montco Judge Extends Deadline for Absentee Ballots*, Phila. Inquirer, Nov. 4, 2016, http://www.philly.com /philly/news/politics/20161104_Montco_seeks_to_extend_deadline_for_absentee_ballots.html.

Voters in Pennsylvania on Election Day faced other problems: Many reported issues with the electronic voting machines that appeared to inaccurately record their votes or make no recording at all.  *See* Exs. 16-21.  Voters reported that, while voting on touch screen machines, the "NO VOTE" button was lit up, even after the voter had made his or her selections.  Ex. 16-21. When voters tried to unselect the "no vote" button, the button remained lit up, giving the voter no way to know whether her vote was actually cast and counted.  Exs. 20-21.  At least one voter believes that her vote was inaccurately counted as a "no vote," after seeing four "no votes"

recorded in her voting district.  Ex. 21.  There were over 4,000 "no votes," for every elected

office, in Montgomery County alone.  General Election Unofficial Results, Montgomery County,

Pennsylvania, http://webapp.montcopa.org/election/2016%20General

%20Election%20Result.htm (bottom of page: "no vote – 4,062").

Either 4,062 people in one county took the time to go their polling place, wait in line,

sign the voting book, walk into a voting booth, and decide not to cast a vote for anyone in any

election, or *the machines did not work. Id.*; Ex. 46.

**B.      Voters Mobilize to Seek Recounts and Forensic Evaluations of the Voting Systems**

Given widespread voting problems in Pennsylvania and voters' concerns about the

integrity of voting machines, voters throughout the state sought recounts and forensic review of

voting machines.  But the obstacles were insurmountable.  With over 1,000 voters filing petitions

with local county boards and courts for recounts, to date, only a handful of precincts in the State

have agreed to recount their votes—and no forensic examination has been permitted anywhere.

<u>Voters Search in Vain To Find Reliable Information About Deadlines and Filing
Requirements</u>

Voters interested in seeking recounts began organizing in mid-November.  Some voters

called their local county board in the days and weeks after Election Day, Exs. 11, 26, but were

provided no information on whether or when the boards had completed or would complete their

computation or certification of the vote.  *Id.*  When voters in Delaware County attended a board

of election meeting to request a recount, they were told to hold questions until the end; then the

board promptly certified the vote, stopping any effort to file requests for a recount.  Ex. 11.

Volunteers devoted days to organizing and mobilizing voters who wished to seek

recounts, attempting to navigate the web of rules surrounding Pennsylvania's recount statutes.

Ex. 1 ¶ 12.  They made repeated inquiries to DoS and county boards, but could find no consistent guidance regarding when each county had computed its vote and when the deadlines to file recount petitions would expire.  Different county board officials offered different interpretations of the law and its requirements.  *Id.* ¶¶ 13-15; Ex. 9.  For most counties, there was no publicly available information or notice of when the county completed its computation of the vote.  By the time volunteers were ready to file—Monday, November 28, the first work day following Thanksgiving—organizers *still* could not determine the deadlines from any website or government source in the vast majority of Pennsylvania counties.  Ex. 1 ¶¶ 16, 27-30.  As to DoS, statewide information about deadlines had not been updated since 2014.  Ex. 26 ¶ 7.

> ### The Department of State Sends Inconsistent, Incomplete, and False Information Concerning Deadlines and the Activity of County Boards

Beginning on the morning of November 28, and continuing over the next few days, DoS provided incomplete, contradictory, and inaccurate information about the various deadlines for petitioning for recounts in counties around the state.  It became clear that DoS was no less confused and no better informed than were ordinary citizens.

For instance, on the morning of November 28, defendant Marks at DoS provided a partial list of dates on which counties had supposedly finished counting votes.  Ex. 32A.  There were significant gaps—including Delaware and Montgomery Counties, two of the state's largest—and the list was internally inconsistent.  *Id.*  It claimed, for example, that Northampton County finished computing votes on November 22, but that the five-day period after computation would end on November 21.  *Id.*  Deadlines in Berks, Bradford, Cambria, Indiana, Jefferson, Mercer, and Schuylkill Counties were also mathematically impossible.  Gaps and errors remained even as DoS provided more information over the course of several days.  Exs. 32B, 32D.

Finally, counsel for Stein wrote Mr. Marks: "[t]here doesn't seem to be any rhyme or reason to the 'expiration date of 5-day period after computation.'" Ex. 33. Plaintiffs also asked whether the information compiled by DoS was publicly available anywhere to voters, noting that "[v]oters have tried calling county boards of elections across the state and received either no information, conflicting information, or confusing information." *Id.*

DoS did not respond.

<u>Voters Jump Through Enormous Obstacles to File Recount Petitions</u>

Over Thanksgiving weekend, volunteers and voters mobilized to sign petitions seeking manual recounts of the paper ballots and a forensic analysis of the DRE machines, in counties throughout the Commonwealth. Ex. 1 Exs. A & B (sample petitions for recounts of electronic voting machines and optical scan machines, respectively). To file petitions, voters first needed to find two other voters in their individual voting precinct or district; petitions were complete only with three notarized affidavits from three voters in a given precinct. Over 2,000 people volunteered to help gather petitions; organizers printed hundreds of pages and hired notaries to be available to voters over the weekend. Ex. 1 ¶¶ 19-20; Ex. 3 ¶¶ 7-8; Ex. 26; Ex. 27. Many voters interested in seeking recounts were unable to file petitions, because they could not find two other voters in their precinct, could not find and/or pay for a notary, could not print the materials at home, or could not take time off of work or childcare to file petitions. Ex. 1 ¶ 19-22; Ex. 27.

Even in the face of these hurdles, over 1,300 voters filed recount petitions in at least 375 precincts in 16 different counties throughout the state. Ex. 1 ¶ 4. There would have been no way for voters to file these petitions without the assistance of professional legal counsel provided by the Stein campaign. *Id.* ¶ 12. Notwithstanding this massive effort by hundreds of volunteers and

thousands of voters, they filed petitions in only a small fraction of precincts in the Commonwealth. Pennsylvania's rules—particularly the requirement of three voters per district in over 9,000 districts—made it impossible for voters to trigger anything close to a statewide recount.

### Chaos: Voters Attempt to File Petitions with County Boards of Elections

When voters showed up to seek relief from their county boards of elections on November 28, 2016, all hell broke loose. Upon arrival, many were given conflicting instruction; it was clear that many county boards had no idea what to do with the petitions. Some county boards simply refused to accept petitions, Ex. 1 ¶ 30; Ex. 22; others told voters to file with the prothonotary in court, Ex. 1 ¶¶ 32-33, 38; other boards that accepted petitions at the beginning of the day rejected them by the end, and vice versa, *id.* ¶ 30; Ex. 24; Ex. 25. When voters asked for guidance as to the proper procedure, many county boards refused to provide any information at all, sometimes telling voters that they should consult with attorneys. Ex. 1 ¶ 39; Ex. 7; Ex. 28. The Delaware County Board of Elections posted a notice to voters stating that the election law "has become increasingly complex," and advising that the "**burden of accuracy** of all filings" rests with the voter, with no other information provided. Ex. 1-C.

Many boards of elections sent voters to the courts, where they were required to pay filing fees. Ex. 1 ¶ 31. One voter was sent to the prothonotary from the Berks County Board of Elections; the prothonotary first told the voter he belonged at the Board of Elections, then informed him that he would need a cover sheet, a proposed order, more than $320 in filing fees, and three copies of his petition—and that he needed to have these materials ready by 4 p.m. Ex. 4. Since the instructions were not conveyed until about 3:30 p.m., there was no time for the voter to assemble these documents. *Id.* The Butler County Board of Elections similarly referred

a voter to the prothonotary's office in court, and warned him that it would cost a lot of money to file. Ex. 7. Voters who did successfully file in court were given no instructions about next steps; many heard nothing further, or did not hear about scheduled hearings until after they had taken place. Exs. 2, 22.

Boards throughout the State issued similar conflicting instructions and raised similar roadblocks in the path of voters seeking recounts. Ex. 1 ¶¶ 27-43; *see generally* Exs. 1-30. For example:

- In Bucks County, the Board of Elections told voters it had no idea what to do with the petitions and that it was waiting for guidance from DoS. Exs. 5, 6.

- The Butler County Solicitor refused to provide information to a voter, saying the Board of Elections needed to remain "neutral" and would not "get involved" in the citizen's legal request for a recount. Ex. 7.

- The Centre County Board of Elections accepted petitions from voters all day. At 4:45 p.m., after about 100 petitions had been submitted, the Board announced that the petitions had all been submitted too late and would be rejected. Ex. 8.

- A Delaware County Board of Elections employee demanded the name and attorney identification number of a voter seeking to file petitions. Ex. 12.

- In Philadelphia, a City Hall employee incorrectly told a voter that she would have to pay $50 per petition to file recount petitions, and incorrectly stated that the deadline to file petitions was November 28, 2016. Ex. 26.

- In York County, a voter attempted to file petitions with the prothonotary in court, where other petitions had been filed earlier in the day. She was sent to the Board of Elections, where she learned that the board had certified the county's vote that day at noon. Ex. 30.

In short, the entire process was a Kafkaesque nightmare.

<u>DoS Pulls the Rug Out of the Recount Effort</u>

Into this nightmare stepped the Department of State, which somehow managed to make the situation even worse. In the middle of the afternoon on November 28, as thousands of Pennsylvania citizens filed recount requests in county boards in counties around the State, the DoS sent a surprise guidance memo to the 67 county boards. Ex. 34. The memo advised county

boards that recount requests were timely *only* "[i]f your county has not completed its initial computation of the returns." *Id.* For filings made within 5 days after computation, DoS advised that "the petition for recount must be filed with the court of common pleas." *Id.*

However: (i) Many voters had already filed petitions with the county board: County boards did not then contact voters, or tell them their petitions were untimely, or that they should file with the county court, *see* Exs. 8, 9, 24, 25; and (ii) DoS was almost certainly wrong, as the Pennsylvania Supreme Court held that voters *may* file petitions with the county board within 5 days of the computation of the vote. *See In re Reading School Bd. Election,* 535 Pa. 32, 37 (1993) (computation complete on Nov. 20; voter petitioned county board on Nov. 25; court held: "Appellant cannot complain that he was misled into filing his challenge with the county board of elections, because, as our research has indicated, the suggestion that he [the voter] proceed before that body [the county board] was *correct.*").

As a result, *inter alia,* of this DoS misdirection, many county boards that received recount requests within 5 days of the computation did not conduct recounts. All of those recount petitions were for naught.

## VI. COUNTY BOARD AND COURT PROCEEDINGS: VOTERS AND STEIN ARE REPEATEDLY DENIED A RIGHT TO EXAMINE THE VOTE

**Montgomery** is a DRE county. Apparently following the faulty DoS guidance, the county board refused to accept complete petitions from nearly 78 districts and instead told voters to file in the Court of Common Pleas. The board did this even though voters filed the petitions within five days of the computation of unofficial results. *See* 25 P.S. § 3154(f); *In re Reading,* 535 Pa. at 37. The voters were forced to file in the Court of Common Pleas at a cost of $269.50/petition (or $89.83/voter), demanded by the prothonotary, who treated every petition as a separate court filing. The total cost for the 78 petitions was $21,021, which the Stein campaign

paid on the voters' behalf. Lieb Decl. ¶ 6. At an average of $269.50/petition, in 9,158 districts, the cost to voters of a statewide recount would be $2,468,081.

On November 30, the Montgomery Court of Common Pleas held a hearing, without notice to the voter-petitioners. Ex. 2. At the hearing, the county board argued that the petitions were defective because a petition was not filed from every single election district in the entire county and perhaps even the State, Ex. 31 at 22:24-23:4, and because voters did not pay $50 each *in addition* to the $269.50/petition, *id.* at 19:18-25. Without explanation or reasoning, the Court dismissed all of the petitions orally on November 30, and by order dated December 1. *Id.* at 47; Ex. 42. As a result, Montgomery has not recounted or recanvassed a single vote, much less permitted voters or Stein to do a forensic exam of the voting system.

In **Bucks** County, a DRE county, the county board refused to accept petitions filed within 5 days of the computation of the vote, claiming they were untimely. Ex. 5. Voters were forced to file in the Court of Common Pleas instead, as instructed by the county board. Exs. 5-6. A court hearing on those petitions is scheduled for December 6.

In **Delaware** (DRE) and **Lancaster** (optical scan) counties, county boards initially accepted voters' petitions but later sent the voters notices that the petitions were untimely, apparently on advice of DoS. Exs. 11-13. We believe those petitions were filed within 5 days of the computation of the vote. Those decisions are being appealed.

In **Northampton** (DRE), the county board also rejected petitions filed within 5 days of the computation as untimely. Exs. 24-25. After a notice of appeal was filed on November 30, 2016, the Northampton Court of Common Pleas failed to set the hearing for an appeal within three days as required by statute. *See* 25 P.S. § 3157(a).

In **Lehigh** County, a DRE county, the county board did accept petitions fewer than five days after the computation of unofficial results.  On Wednesday, December 1, Lehigh County conducted a recanvass but it failed to provide all candidates with notice as legally required.  *See* 25 P.S. § 3154(e).  The county board then rejected the voters' and Stein's requests for a forensic examination of the DRE voting system.  Declaration of Alison Frick dated December 5, 2016.

In **Allegheny** County, another DRE county, the county board did accept voter petitions filed fewer than five days after the board purportedly completed computing the unofficial results.  It announced it would conduct a recanvass.  The state and county Republican Party appealed that decision, arguing that the petitions were untimely.  At a hearing in the Court of Common Pleas, the county solicitor refused to defend the petitions' timeliness.  Lieb Decl. ¶ 10.  The Elections Director testified, however, that the members of the Board of Elections had not signed the unofficial results, as required to complete the initial computation.  *See* 25 P.S. § 3154(f).  The Court therefore dismissed the appeal and allowed the recanvass to proceed.  Ex. 35.  The county did a meaningless recanvass on December 5.  It refused Stein's timely request for a forensic examination of the voting machines, and the same request from voters in the petitions themselves.  Exs. 43, 44.  As a result, no voter or candidate was permitted to examine the DRE system in Allegheny, either.

**Philadelphia**, another DRE county, did not finish counting votes by November 28, and therefore accepted recount petitions.  Notwithstanding written requests from voters and the Stein campaign, Ex. 36, and another oral request from the Stein campaign at a county board proceeding on December 1, the county board refused to permit voters or candidates to examine their DRE voting system.  Declaration of Ilann M. Maazel dated December 5, 2016.  The county board then conducted an essentially meaningless machine recanvass.  Stein appealed the board's

denial of the request for examination, and that appeal will be heard in Philadelphia Court of Common Pleas on December 6.

**Chester** did not finish counting votes, and therefore accepted recount petitions. Chester is an optical scan county. A hand recount of paper ballots in Chester County is supposed to begin this week. As of now, Chester is the one and *only* county in the State of Pennsylvania where even a subset of voters can expect any meaningful opportunity to make sure their votes were counted accurately. However, on December 5, the Republican Party moved to quash the entire recount before the county board.

This list is not exhaustive. Voters in counties across the State faced similar issues: lack of public information about whether counties completed the computation of votes, state officials confused about the law, and court hearings without notice.

Meanwhile, 100 voters signed a petition in the Commonwealth Court to contest the election on November 28, the statutory deadline. *See* 25 P.S. § 3456. The deadline required that the petition be filed before voters could determine through recounts whether their votes were accurately counted. The contest petition was explicitly a placeholder, designed to preserve petitioners' rights as they sought "[f]urther supportive evidence" through recounts. Ex. 37. The next day, the Commonwealth Court set a December 5 hearing. The petitioners requested that the hearing be continued and the contest petition be held in abeyance while requests for recounts were pending throughout the state to allow for the development of a fuller record. Ex. 38. The Commonwealth Court denied the request and required the voters to post a $1 million bond to continue the case. Ex. 39. In response, the voters withdrew the case: "Your Honor: Petitioners are regular citizens of ordinary means. They cannot afford to post the $1,000,000 bond required by the Court. Accordingly, the petition is withdrawn." Ex. 40.

## LEGAL STANDARD

On this preliminary injunction motion, the Court must consider four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2) whether plaintiffs would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would result in an even greater harm to the nonmoving party; and (4) whether the public interest would be served by issuance of the injunction. *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twshp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004) (Alito, J.) (affirming grant of preliminary injunction and remanding for entry of permanent injunctive relief); *Cooper v. City of Philadelphia, 18th Dist.*, No. 93-3007, 1993 WL 274192, at *1 (E.D. Pa. July 2, 1993).

Because plaintiffs have a strong likelihood of success on the merits and because the failure to order a recount and forensic exam of DRE voting systems would violate plaintiffs' constitutional rights and cause irreparable harm, this Court should issue a preliminary injunction.

## ARGUMENT

## I.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

The Pennsylvania Election Code, as applied by defendants and the election boards, poses such barriers to verifying the vote as to deny the people of Pennsylvania the fundamental right to have their vote counted.  This frustration of democracy violates Substantive Due Process, Equal Protection, and the First Amendment.

Pennsylvania uses antiquated, vulnerable voting machines easy to hack; gives voters no paper trail to verify their vote; denies voters any meaningful opportunity to seek a recount, through labyrinthine and burdensome procedures (the requirement for 27,474 voters to sign, notarize, and deliver 9,158 petitions in 9,158 districts), phantom, shifting, and unknowable deadlines, and massive financial costs on voters ($457,900 to well over $2 million, not including printing, copying, and notary costs); fails in practice to give voters or candidates any meaningful opportunity to examine the DRE voting systems; and gives voters no meaningful opportunity to contest an election.  This complete collapse of any voting verification system is compounded in this election cycle, where foreign operatives breached multiple computer systems in an apparent attempt to alter the results of this election.

Even if any one of these infirmities—the antiquated and vulnerable machines, the lack of a verifiable paper trail, the effective unavailability of any recount, and the inability to examine the voting system—survives constitutional scrutiny, they "operate in tandem to produce impermissible barriers to constitutional rights." *Const. Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 505 (E.D. Pa. 2015) (quoting *Storer v. Brown*, 415 U.S. 724, 737), *aff'd*, 824 F.3d 386 (3d Cir. 2016).  This requires federal intervention. *Id.*

To ensure that the votes of Pennsylvania residents are properly counted, plaintiffs ask this court to issue an emergency preliminary injunction: (1) ordering an immediate hand recount of

papers ballots in optical scan counties in Pennsylvania; and (2) permitting plaintiffs immediate access to a reasonable sample of the central computers for DRE voting systems in Pennsylvania to do a thorough, forensic examination.

In ruling on this preliminary injunction motion, the Court must consider four factors: (1) whether plaintiffs have a strong likelihood of success on the merits; (2) whether plaintiffs would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would result in an even greater harm to the nonmoving party; and (4) whether the public interest would be served by issuance of the injunction. *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twshp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004) (Alito, J.) (affirming grant of preliminary injunction and remanding for entry of permanent injunctive relief); *Cooper v. City of Philadelphia, 18th Dist.*, No. 93-3007, 1993 WL 274192, at *1 (E.D.Pa. July 2, 1993).

## II.   PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS

To prevail on their 42 U.S.C. § 1983 claims, plaintiffs must demonstrate (1) action under color of state law; that (2) deprived plaintiffs of a federal right, either statutory or constitutional. *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1141-42 (3d Cir. 1990).  Here, there is no dispute that all action in this case was "under color" of Pennsylvania law.  As set forth below, defendants deprived plaintiffs of a federal right.

### A.   Pennsylvania's Election System Violates the Fundamental Right to Have Votes Be Counted

The Pennsylvania election system severely burdens plaintiffs' constitutional right to vote, specifically the right to have one's vote counted.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356,

370 (1886) ("the political franchise of voting" is a "fundamental political right, because [it is] preservative of all rights.").[13]  This fundamental right to vote applies equally (if not more so) in presidential elections: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

The right to vote would be meaningless if it meant only the right to *cast* a vote on Election Day, with no assurance that the vote was accurately *counted*.  As the Supreme Court makes clear, "[o]bviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . ." *United States v. Classic*, 313 U.S. 299, 315 (1941); *see also Reynolds*, 377 U.S. at 554 ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, . . . and to have their votes counted.").  If "one's franchise extended only so far as placing one's ballot in the ballot box, . . . the situation of a ballot box subsequently 'falling off of a truck' would be of no constitutional moment.  That is an unacceptable result." *Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 98 (N.D.N.Y. 2006).

Admittedly, "not every burden on the right to vote and freedom to associate can offend the Constitution if we are going to have a workable Election Code." *Const. Party of Pa.*, 116 F. Supp. 3d at 500 (citing *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003)).  The Third Circuit Court of Appeals described the constitutional test in election cases as follows:

> [The Court's] scrutiny is a weighing process: We consider what
> burden is placed on the rights which plaintiffs seek to assert and
> then we balance that burden against the precise interests identified

---

[13] The right to vote derives from multiple sources in the Constitution.  As the Third Circuit explained: "In election cases, equal protection challenges essentially constitute a branch of the associational rights tree." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006) (citation and internal quotation marks omitted).

> by the state and the extent to which these interests require that
> plaintiffs' rights be burdened. Only after weighing these factors
> can we decide whether the challenged [action] is unconstitutional.

*Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006). Where, as here, the burden on the right to

have the votes be counted is "severe," courts must apply strict scrutiny to ensure that

Pennsylvania's regulations are "narrowly drawn to advance a state interest of compelling

importance." *Belitskus*, 343 F.3d at 643 (quoting *Burdick v. Takushi*, 504 U.S. 428, 438 (1992)).

Here, the burdens placed on plaintiffs' rights are immense. Over 70% of Pennsylvania

voters are forced to vote on antiquated and insecure DRE machines banned or decertified in

multiple states. Halderman Aff. ¶ 18. Voters using DRE machines have no way to verify that

the machine properly recorded their vote, and no way to determine whether the machine was

compromised, a particular concern given the foreign interference in this year's presidential

election documented by U.S. intelligence agencies. There is no process for a candidate to seek

any recount, and no feasible process for the voters to obtain a statewide recount. The election

code and defendants have interposed insurmountable barriers: a 3-person/precinct requirement in

a state with over 9,000 precincts, secret and shifting deadlines to request recounts, fees between

$450,000 and over $2 million assessed directly to voters rather than to a candidate, and a state

court contest process that demanded a $1 million bond from ordinary voters.

The high fees alone—statutory fees, filing fees, and the $1 million bond demanded by the

Commonwealth Court—are financial burdens so severe that they make anything close to a

statewide recount practically impossible. *See Belitskus*, 343 F.3d at 636, 647 (invalidating

Pennsylvania's filing fees which ranged from $5 to $200 when applied to indigent candidates

because no alternative means to ballot access was provided). The onerous state court recount

process is equally burdensome. *See Marks v. Stinton*, 19 F.3d 873, 879-91 (3d Cir. 1994)

(election was fundamentally unfair when election board did not provide adequate opportunity to present evidence of fraud and demanded excessive $50,000 bond, thus denying a "realistic opportunity to fully and fairly litigate constitutional claims in state court"). When combined with the lack of *any* meaningful way to verify the votes cast, Pennsylvanians effectively face the risk "of a ballot box subsequently 'falling off of a truck,'" without any procedural safeguards to locate those votes—or even notice they are missing. *Hoblock*, 487 F. Supp. 2d at 98.

Because these burdens are severe, the Court must consider whether the state's interest is of "'compelling importance'" and ensure that Pennsylvania's regulations are "'narrowly drawn'" to advance that interest. *Belitskus*, 343 F.3d at 643 (quoting *Burdick*, 504 U.S. at 438). It is unclear what interest the State could have in using antiquated, vulnerable, hackable machines with no paper trail, which nationally-recognized experts agree are a danger to the integrity of the vote in Pennsylvania. Nor can there be any reasonable state interest in forcing 27,474 voters equally spread out in 9,158 districts to create, print, notarize, and deliver recount requests in 67 counties. The only apparent interest in such an absurd regime is to deny anyone the ability to request a recount. The punishing costs the Commonwealth places on voters also cannot be justified. As the Michigan district court held this Sunday when ordering an immediate state-wide recount, "with the perceived integrity of the presidential election as it was conducted . . . at stake, concerns with cost pale in comparison." *Jill Stein v. Thomas*, No. 16-14233, (E.D. Mich. Dec. 5, 2016) (attached as Ex. 45 at 4).

Whatever the State's goals, "there are other, reasonable ways to achieve [Pennsylvania's] goals with a lesser burden on constitutionally protected activity." Pennsylvania "may not choose the way of greater interference." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972). Here, there is no reason that Pennsylvania cannot follow the lead of its sister states and provide paper verification

(preferably by paper ballot, or at least a paper trail of DRE machines), as 33 states do. Nor is there any reason why it could not allow candidate to seek a statewide recount. Pennsylvania is one of only ten states nationwide that never permit candidates, as opposed to voters, to seek a recount.[14] And even if the State decided for whatever reason to permit only voters to request recounts, there is absolutely no reason why the process must be so burdensome and obscure.

As the Supreme Court has held, "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest" because "the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson v. Celebreeze*, 460 U.S. at 780, 795-96 (1983). "[T]he State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.* at 796.

This Monday, December 5, 2016, a Michigan district court balanced many of the same burdens and state interests and ordered an immediate state-wide recount. *Jill Stein v. Thomas* (E.D. Mich. Dec. 5, 2016). It explained the fundamental importance of election integrity: "Without elections that are conducted fairly—and perceived to be fairly conducted—public confidence in our political institutions will swiftly erode." *Id.* at 5-6. It held that because Michigan provides a "right to a recount . . . designed to ensure a fair and accurate election," "the loss of a recount right would impair the right to vote." *Id.* at 4. The court ordered an immediate recount to protect the "fundamental right invoked by Plaintiffs—the right to vote, and to have that vote *counted fairly and counted accurately*." *Id.* (emphasis added). Here, while

---

[14] *See* Rob Richie & Hayley Smith, FairVote, An In-Depth Look at Statewide Election Recount Outcomes and Practices in the United States 11 (2016), *available at* http://www.fairvote.org/recounts.

Pennsylvania provides voters a right to request a recount "to ensure a fair and accurate election," the many barriers set forth above make that right illusory and thus impair the right to have the "vote counted fairly and counted accurately." *Id.* The severe burdens placed on the right to have one's vote counted in Pennsylvania are far greater than those imposed by Michigan. They must be struck down.

The multiple burdens imposed here are also significantly more severe than the burden imposed by two Pennsylvania election regulations recently struck down in *Constitution Party v. Cortes*, 116 F. Supp. 3d 486. In that case, the district court struck down two requirements of the Pennsylvania election law—one that required minor parties to gather signatures from 2% of voters to get on the ballot, and another that permitted courts to award costs against the candidate if objectors successfully challenged the candidate's signatures. *Id.* at 490-492, 507. As a result of those regulations, minor parties had to obtain approximately 16,000 to 67,000 signatures in five months (depending on the election), spend up to $50,000 to defend the nomination papers, pay in excess of $80,000 of the challenger's costs, and make a "substantial investment in time and resources" including the time of 70 volunteers to validate signatures. *Id.* at 502-503. While each regulation standing alone might not violate the Constitution, the court found that the "combined effect" of the two regulations imposed a "severe burden" and could not withstand strict scrutiny. *Id.* at 505-507.[15] The Third Circuit affirmed this decision, calling it "well-reasoned." 824 F.3d at 393.

---

[15] Notably, the court also found that the fact that the Pennsylvania Supreme Court had previously upheld the constitutionality of one of the two challenged regulations was not dispositive because "the Pennsylvania high court did not have the benefit of facts developed in this litigation." *Const. Party*, 116 F. Supp. 3d at 505. Similarly, the decision in *Banfield v. Cortes*, 631 Pa. 229 (2015), upholding some of the practices challenged here is not dispositive because the court did not consider foreign interference with this election or the combined effect of the challenged practices. Nor did the case apply the U.S. Constitution.

Similarly, even assuming that each of the provisions of the Election Law challenged here did not alone burden the right to vote and have the votes count, their combined effect imposes a severe and unjustified burden. The burdens here are far greater than in the *Constitution Party* case. Voters have only weeks, not five months, to mount a massive, statewide recount campaign. Tens of thousands of people must find notaries, and pay for them. Those who miss unknowable county board deadlines must pay substantial costs in almost ten thousand court proceedings. It has never been done. It is not doable. Even worse, no county board in the State will apparently let voters or candidates examine these voting systems. They are a black box, inside which lies Pennsylvanian democracy. The burden on Pennsylvania voters is immense and unconstitutional.

## B.   The Pennsylvania Election System Is Fundamentally Unfair And Violates Due Process

Pennsylvania's vote tabulation and recount process is so flawed that it also violates the substantive Due Process Clause. Given the fundamental importance of the right to have votes counted in our democracy, Due Process requires that the state's electoral procedures be fundamentally fair. *See United States v. Mosley*, 238 U.S. 383, 386 (1915).

In the seminal case of *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), the First Circuit explained when federal courts would act to prevent a violation of due process in the context of election irregularities:

> [Federal courts have properly intervened when] the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, '(r)epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' . . . is implicated in such a situation. . . . In cases falling within such confines, we think that a federal judge need not be timid, but may and should do what common sense and justice require.

*Griffin*, 570 F.2d at 1078 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 163 (1951) (Frankfurter, J., concurring)).

Pennsylvania's election process is fundamentally flawed and constitutionally defective: from vulnerable and antiquated election machines that leave no paper trail, to an illusory and impossibly burdensome recount petition procedure, to a state court contest process that in this case provided no "realistic opportunity to fully and fairly litigate constitutional claims in state court." *See Marks*, 19 F.3d at 881.

In *Marks,* the Third Circuit held that an election was fundamentally unfair and violated substantive due process when absentee ballots were fraudulently cast, and the election board "conducted nothing more than mock hearings" that did not provide plaintiff with an opportunity to present evidence of the fraud.  In *Marks*, the state imposed a $50,000 bond.  The Third Circuit held that the $50,000 bond that plaintiff could not raise was excessive, violated the Constitution, and denied a "realistic opportunity to fully and fairly litigate constitutional claims in state court." *Id.* at 879-81.  Here, the bond was *twenty times* more.  The Third Circuit upheld the district court's decision to prevent the other candidate from exercising the powers of the office and remanded the case for an appropriate remedy, suggesting that the court might order a special election, leave the seat vacant until the next regular election, or if possible conduct further hearings to determine the winner of the election.  *Id.* at 886-90.

Similarly, the court in *Griffin v. Burns* found a violation of due process because of "patent and fundamental unfairness" when Rhode Island deviated from its established practice of counting absentee ballots in state primary elections.  570 F.2d at 1067.  Because the state court's decision to invalidate the absentee ballots disenfranchised those voters, the First Circuit took the drastic step of ordering a new primary election.  *Id.* at 1080.

35

In *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit found that Ohio's voting system would violate substantive due process if, as alleged, "Ohio utilizes non-uniform rules, standards, and procedures that result in massive disenfranchisement and unreasonable dilution of the vote." *Id.* at 463, 477-78 (internal quotation marks omitted).  In that case, the plaintiffs alleged long wait times at the polls that caused some voters to leave without voting, poll workers refused to assist disabled voters, voters' names were missing from the ballot, provisional ballots were not distributed to appropriate voters, malfunctioning touchscreen machines, and other problems that severely burdened the right to vote. *Id.* at 478.

Other courts have uniformly agreed that where "organic failures in a state or local election process threaten to work patent and fundamental unfairness, a . . . claim lies for a violation of substantive due process." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *Duncan v. Poythress*, 657 F.3d 691, 700 (5th Cir. 1981) ("the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process"); *Siegel v. LePore*, 234 F.3d 1163, 1187 (11th Cir. 2000) (a federally protected right is implicated "where the entire election process including—as part thereof the state's administrative and judicial corrective process—fails on its face to afford fundamental fairness") (citations and internal quotation marks omitted).

Here, the raft of evidence that the machines are antiquated and vulnerable, the lack of a paper trail, foreign hacking of U.S. voting systems in this election cycle, a sham recount process, a total lack of any ability to meaningfully examine DRE voting systems anywhere in the Commonwealth, and in this particular election an illusory and unfair contest process, all create a fundamentally unfair election system.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).  Absent relief, Pennsylvania voters can have no confidence in the integrity of the vote in this election cycle.

## III.   PLAINTIFFS WILL SUFFER DEVASTATING HARM THAT CAN ONLY BE REMEDIED BY AN IMMEDIATE ORDER

Because plaintiffs have demonstrated a likelihood of success on the merits, the Court's inquiry is effectively at an end.  Where constitutional rights are concerned, a successful showing of likelihood of success on the merits mandates a finding of irreparable harm.  *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Forum for Academic and Institutional Rights ("FAIR") v. Rumsfeld*, 390 F.3d 219, 246 (3d Cir. 2004) ("By establishing a likelihood of success on the merits of its unconstitutional condition claim . . . [plaintiff] has necessarily satisfied the second element: irreparable harm."), *rev'd on other grounds*, 547 U.S. 47 (2006); *ACLU v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000), *vacated on other grounds*, *Ashcroft v. ACLU*, 535 U.S. 564 (2002); *Lewis v. Kugler*, 446 F.2d 1343, 1350 n.12 (3d Cir. 1971) (deprivation of constitutional rights raises "presumption of irreparable harm"); *McCormick v. Hirsch*, 460 F. Supp. 1337, 1349 (M.D. Pa. 1978).

Abridgement of the right to vote is an acute constitutional violation that constitutes irreparable injury *per se.  Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) ("[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (unjustified infringement of the right to vote constitutes "irreparable harm"); *Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004) ("Because this Court has found that the Defendants' challenged actions threaten or impair both Plaintiffs' constitutional right to

37

due process and constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury if the temporary restraining order does not issue.").

Even without such a presumption, plaintiffs have shown that they will suffer irreparable harm absent immediate court intervention. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). No monetary damages or retroactive relief could make any difference if voters are denied the right to have their vote count in the 2016 presidential Electoral College.

The only way to prevent this irreparable harm to every voter in the Commonwealth is to order Defendants to (1) initiate an immediate statewide hand recount of paper ballots in optical scan counties, and (2) permit plaintiffs immediate access to a reasonable sample of the central computers for DRE voting systems in Pennsylvania to do a thorough, forensic examination. This requested emergency relief is much narrower than relief ordered in other cases. In *Marks*, for example, the Third Circuit upheld a preliminary injunction enjoining the winning candidate from exercising the authority of his office and suggested that on remand the court could order a special election or leave the office vacant until the next regular election. 19 F.3d at 886-90; *see also Griffin*, 570 F.2d at 1080 (ordering a new election).

This requested relief is also narrowly tailored. Plaintiffs request a hand count only in those precincts that use optical scan machines—the only relief here that can reliably detect any cyberattack that might have altered the election outcome. Halderman Aff. ¶¶ 30-34. In DRE counties, plaintiffs do not seek to examine all DRE machines, or anything close. On this motion, plaintiffs ask only to examine a small sample of the election management systems computers.

These are the central computers "used prior to the election to program ballot designs and download them onto the removable media used by the voting machines," and are generally operated by each county or third-party contractors. *Id.* ¶ 37. "Such an examination would not touch a single DRE voting machine." *Id.* The process is simple: first, copy the hard drive of the central election management computers to an external hard drive, known as a forensic imaging. Then, computer experts examine the copy. *Id.* ¶ 38. The process of forensic imaging is well established in civil discovery to detect tampering of computer systems.[16] The process is also quick: our computer security expert suggests examining the central computer in six counties (the largest county that used each model of DRE machine), a process that could "could commence immediately using six teams of computer experts (one per identified county) and produce results within two days." *Id.* ¶ 42.

## IV.   THE INJUNCTION WOULD NOT CAUSE EVEN GREATER HARM TO THE DEFENDANTS

Defendants cannot claim any significant harm resulting from this injunction, let alone "even greater harm" than harm suffered by plaintiffs in the absence of the injunction. *Child Evangelism Fellowship*, 386 F.3d at 524. Without an injunction, many voters will effectively be denied the right to vote, which would cause harm to Pennsylvania's voters, to the Presidential candidates, to the integrity of Pennsylvania's electoral process, and, given Pennsylvania's important role in this election, to the integrity of the Presidential election itself. Defendants, "on the other hand, do[] not lose the opportunity, in a proceeding on the merits, to shoulder [their]

---

[16] *See, e.g., Stream Cos., Inc. v. Windward Advert.*, No. 12-CV-4549, 2013 WL 3761281, at *1 (E.D. Pa. July 17, 2013) ("requiring Defendants to produce electronic devices for imaging"); *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157-JTM-DWB, 2006 WL 763668, at *3 (D. Kan. Mar. 24, 2006) ("It is not unusual for a court to enter an order requiring the mirror imaging of the hard drives of any computers that contain documents responsive to an opposing party's request for production of documents" (citing cases)).

full constitutional burden of proof of showing that a less restrictive alternative would not be as effective" in safeguarding citizens' access to the franchise. *FAIR*, 390 F.3d at 246 (internal quotation omitted). The balance of interests tips overwhelmingly in plaintiffs' favor. *Id.*

## V.      THE PUBLIC INTEREST WOULD BE SERVED BY THE INJUNCTION

The public's paramount interest is to ensure the trustworthiness of our elections. Thousands of ordinary Pennsylvanians sought recounts all over the state but have been stymied by Pennsylvania's antiquated and fundamentally unfair election laws. These voters interrupted their busy lives because they believed strongly in election integrity.

The injunctive relief sought here serves the highest public interest: "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell,* 549 U.S. at 4. Like the court in Michigan, this court should order this relief to prevent "public confidence in our political system" from "swiftly erod[ing]." *Stein v. Thomas*, Ex. 45, at 4.

## CONCLUSION

For all of these reasons, plaintiffs' motion for a preliminary injunction should be granted, and the Court should order such other relief as is just and proper.

Dated: December 6, 2016

Respectfully submitted,

*Gregory M. Harvey*

Gregory M. Harvey
PA Attorney ID 4445
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Phone: 215-772-7684
Fax: 215-772-7620
Email: gharvey@mmwr.com

Ilann M. Maazel*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbalaw.com

Of counsel:
Andrew G. Celli*
Alison E. Frick*
Douglas E. Lieb*
* *Not admitted in E.D. Pa.; motion for
pro hac vice admission forthcoming*

Lawrence M. Otter, Esq.
PA Attorney ID  31383
PO Box 575
SILVERDALE, PA 18901
Phone: 267-261-2984
Email: larryotter@hotmail.com