## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| JILL STEIN AND RANDALL REITZ, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 16-CV-06287 |
| | : | |
| PEDRO A. CORTÉS, *et al.* | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| President-Elect Donald Trump, *et al.*, | : | |
| | : | |
| Defendant-Intervenors. | : | |

**INTERVENORS PRESIDENT-ELECT DONALD TRUMP; VICE PRESIDENT-ELECT MICHAEL PENCE; ALL OF THE PENNSYLVANIA ELECTORS OF PRESIDENT-ELECT DONALD TRUMP AND VICE PRESIDENT-ELECT MICHAEL PENCE; DONALD J. TRUMP FOR PRESIDENT, INC.; AND THE REPUBLICAN PARTY OF PENNSYLVANIA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Lawrence J. Tabas, I.D. No. 27815
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL
& HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
(215) 665-3158

Chad Readler*
JONES DAY
325 John H. McConnell Blvd., Ste. 600
Columbus, OH 43215
(614) 469-3939

David Morrell*
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3939
*Admitted *pro hac vice*

# **TABLE OF CONTENTS**

Table of Authorities……………………………………………………………. ii

Introduction…………………………………………………………………  1

Statement of Facts……………………………………………………….…...  10

Argument ……………………………………………………...............  15

I. This Court Lacks Jurisdiction Over This Suit …………………………  16

    A. Plaintiffs lack standing……………………………………………  16

    B. The *Rooker-Feldman* doctrine deprives the Court of jurisdiction
    over Plaintiffs' claims  …………………………………………  17

II. Plaintiffs Are Not Entitled To Injunctive Relief …………………………  21

    A. Stein has not established any likelihood of success on her
    constitutional claims ………………………………………………  22

    B. Plaintiffs do not face any irreparable injury ………………………  30

    C. Plaintiffs' requested relief would seriously harm Intervenors…….  31

    D. Granting an injunction would be contrary to the public interest…...  31

CONCLUSION  …………………………………………………...35

CERTIFICATE OF SERVICE…………………………………………..38

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ........................................................................... 25

*AT&T v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3rd Cir. 1994) ............................................................ 22

*Banfield v. Cortés*,
    110 A.3d 155 (Pa. 2015) ...................................................................... 3

*Belitskus v. Pizzingrilli*,
    343 F.3d 632 (3d Cir. 2003) ............................................................. 25

*Bonas v. Town of N. Smithfield*,
    265 F.3d 69 (1st Cir. 2001) .............................................................. 25

*Bush v. Gore*,
    531 U.S. 98 (2000) ..................................................................... 5, 15

*Caudill v. Eubanks Farms, Inc.*,
    301 F.3d 658 (6th Cir. 2002) ........................................................... 34

*Constitution Party of Penn. v. Cortes*,
    116 F. Supp. 3d 486 (E.D. Pa. 2015) ............................................... 25

*D.C. Court of Appeal v. Feldman*,
    460 U.S. 462 (1983) .................................................................. 19, 21

*Duncan v. Poythress*,
    657 F.2d 691 (5th Cir. 1981) ........................................................... 25

*FMC Corp. v. AMVAC Chem. Corp.*,
    379 F. Supp. 2d 733 (E.D. Pa. 2005) ......................................... 27, 28

*Gollmar's Election Case*,
175 A. 510 (Pa. 1934) .......................................................................... 13

*Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.*,
615 F.3d 159 (3d Cir. 2010) ................................................... 18, 19, 20

*Griffin v. Burns*,
570 F.2d 1065 (1st Cir. 1978) .......................................................... 25, 26

*Harper v. Bd. of Educ.*,
383 U.S. 663 (1966) ............................................................................ 23

*Hoblock v. Albany Cty. Bd. of Elections*,
487 F. Supp. 2d 90 (N.D.N.Y. 2006) .................................................... 25

*Huffman v. Pursue, Ltd.*,
420 U.S. 592 (1975) ............................................................................ 33

*League of Women Voters of Ohio v. Brunner*,
548 F.3d 463 (6th Cir. 2008) .......................................................... 25, 26

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................ 17

*Madera v. Ameriquest Mortg. Co. (In re Madera)*,
586 F.3d 228 (3d Cir. 2009) ................................................................ 18

*Marks v. Stinson*,
19 F.3d 873 (3d Cir. 1994) .................................................................. 26

*Moore v. Sims*,
442 U.S. 415 (1979) ............................................................................ 33

*Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N. Y. & N.J.
Police Dept't*,
973 F.2d 169 (3d Cir. 1992) ........................................................... 18, 33

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ........................................................... 25

*United States v. Koreh*,
  59 F.3d 431 (3d Cir. 1995) ...................................................................28

*United States v. Mosley*,
  238 U.S. 383 (1915)...........................................................................25

*Wittman v. Personhuballah*,
  136 S. Ct. 1732 (2016).......................................................................16

## STATUTES

3 U.S.C. § 5 ...............................................................................5, 15, 31

3 U.S.C. § 7 ......................................................................................15

25 P.S. § 3192 ..................................................................................31

25 P.S. § 3456 ..................................................................................29

## INTRODUCTION

Green Party presidential candidate Jill Stein finished fourth in the Pennsylvania presidential election, garnering less than 1% of the votes cast by Pennsylvanians.  Yet despite being no more than a blip on the electoral radar, Stein (along with one Pennsylvania voter) asks the Court to join them in commandeering Pennsylvania's electoral process, first by ordering a recount of each of the nearly six million ballots cast in the election, and second by requiring a forensic examination of voting machines, all with the final Electoral College deadlines just days away.

The gravity of Stein's allegations, particularly in the context of a presidential election, give rise to numerous threshold questions.

*What evidence does Stein have to back her claims?*  None, really.  Stein demands a recount due to the *possibility* of foreign-sourced hacking.  She admits that "[a] majority of machines voted for Donald Trump in Pennsylvania."  (Mem. of Law In Support of Mot. for a Preliminary Injunction (ECF 5) [hereinafter "PI Mot."] at 2.)  But she nevertheless demands a recount to answer what she believes to be a distinct question: "who did *the people* vote for?"  *Id.* (emphasis added).

Despite its ominous nature, Stein's complaint is entirely devoid of factual grounding.  There is no evidence—or even an allegation—that any tampering with Pennsylvania's voting systems actually occurred.  To be sure, Stein claims there

are vulnerabilities in Pennsylvania's voting machines and references election-related hacking *outside of* Pennsylvania.  But she does not offer any evidence or allegations that a single voting machine in Pennsylvania was hacked, let alone on a scale sufficient to flip the Pennsylvania election.  And don't take our word for it alone:  Stein herself recently admitted that "there is no evidence of fraud at the ballot box."  Daniella Diaz, *Jill Stein defends her recount efforts*, cnn.com (Nov. 28, 2016).[1]

The absence of any evidence of tampering is no surprise.  Before the election, Pennsylvania Secretary of State Pedro Cortés assured Pennsylvania voters that Pennsylvania's voting systems are "secure," and criticized contrary suggestions as "not only wrong and uninformed," but also "dangerous."  *See* Remarks by Secretary of State Pedro A. Cortés, Press Conference, Capitol Media Center, Harrisburg, PA (Oct. 20, 2016) (attached as Exhibit 1).  He explained that all voting systems in Pennsylvania were "examined and certified to federal and state standards," and that voting machines were "not connected to the Internet" or "to one another," thus reducing the risk of compromise.  *Id.*  And even though already "recognized [as a] leader among states in cybersecurity," the State adopted a belt-and-suspenders approach by partnering with federal agencies, including the Department of Homeland Security, "to ensure the integrity of [its] systems and

---

[1] *Available at* http://www.cnn.com/2016/11/28/politics/jill-stein-recount-2016-election/.

networks." *Id.*  And all of this comports with the conclusions reached in previous

litigation involving a challenge to the integrity of the same voting machines

Plaintiff challenges here.  *See Banfield v. Cortés*, 110 A.3d 155, 174 (Pa. 2015)

("[T]he Commonwealth Court found … the Appellants had not shown any more

than the mere possibility that the certified DREs in theory could be subject to

tampering, presenting no evidence that the challenged devices have failed to

accurately record votes or experienced a security breach in an actual election.").

 *Does anyone other than Stein and her small band of voters believe a recount

is necessary?*  No.  To start, unlike the 1% candidate Stein, Secretary Cortés has

not lost confidence in the election's integrity.  Indeed, much the opposite.  Asked

whether there was any evidence of voting irregularities during the November 8

contest, his answer was as adamant as it was unequivocal: "There is *no evidence

whatsoever* that points to any type of irregularity in any way, shape or form."  *See*

Dan McQuade, *Here's How the Jill Stein-Led Recount Effort Is Going In Philly*,

phillymag.com (Nov. 29, 2016) (emphasis added).[2]  The White House, notably, has

said the same.  *See* Geller, *White House insists hackers didn't sway election, even

as recount begins*, POLITICO (Nov. 26, 2016).[3]  And so has the runner-up Clinton

campaign.  Despite a flood of requests for the Clinton campaign to investigate the

election results, the campaign declined to challenge the election because it was

---

[2] *Available at* http://www.phillymag.com/news/2016/11/29/jill-stein-recount-philadelphia/.
[3] *Available at* https://perma.cc/5Z5C-Z59S.

unable to uncover "any actionable evidence of hacking or outside attempts to alter the voting technology."  *See* Marc Erik Elias, *Listening and Responding To Calls for an Audit and Recount*, medium.com (Nov. 26, 2016).[4]

Even Stein's biggest proponents lack confidence in her claims.  Professor Alex Halderman—an expert Stein has enlisted in this case—published an article just two weeks ago, stating: "Were this year's deviations from pre-election polls the results of a cyberattack?  *Probably not*."  *See* J. Alex Halderman, *Want to Know if the Election was Hacked? Look at the Ballots*, medium.com (Nov. 23, 2016) (emphasis added).[5]

This chorus of voices explains why the only evidence of election-related hacking or attempted hacking Stein references here concerns entities or persons outside of Pennsylvania—the Democratic National Committee, Illinois, and Arizona.  Allegations relating to these entities plainly cannot justify upsetting the election results in Pennsylvania.

*What are the ramifications of Stein's requested relief?*  Pennsylvania's absence from the Electoral College.  Even with heroic efforts by state and local elections officials, Stein's proposed process would last weeks, perhaps even months.  Either way, her requested relief would virtually guarantee that

---

[4] *Available at* https://medium.com/@marceelias/listening-and-responding-to-calls-for-an-audit-and-recount-2a904717ea39#.8qzvzno97.
[5] *Available at* https://medium.com/@jhalderm/want-to-know-if-the-election-was-hacked-look-at-the-ballots-c61a6113b0ba#.umbgt1gvq.

Pennsylvania would not be able to certify its Presidential Electors by December 13, the federal safe-harbor deadline for doing so. *See* 3 U.S.C. § 5 (requiring disputes over electors to be resolved by December 13); *Bush v. Gore*, 531 U.S. 98, 110 (2000) (this statute "requires that any controversy or contest that is designed to lead to a conclusive selection of electors be completed by" that date). If this occurs, Pennsylvania's very seat at the Electoral College is jeopardized, which in turn risks disenfranchising *all* of the Pennsylvania voters whose constitutional rights Stein purports to vindicate. In fact, Stein acknowledged this risk in advancing similar recount efforts in Michigan, telling the Sixth Circuit that "Michigan *must* complete a recount of votes by December 13, the federally imposed deadline for the selection of electors to the Electoral College." Stein's Mem. of Law at 1, *Stein v. Thomas*, No. 16-2690 (6th Cir. Dec. 6, 2016) (ECF 12) (emphasis added). Stein omits any such language in her filings here, likely because she knows that her demands all but ensure that Pennsylvania could not possibly meet that deadline.

     *What are Pennsylvanians' reaction to Stein's last-minute recount request?* Shock and dismay, most likely. Having endured a lengthy, expensive, hard-fought Presidential election, Pennsylvania voters surely expected their votes would be accounted for when the Electoral College meets this December. Yet the legal antics of a 1% candidate call all of that into question.

*Has Stein asked local voting officials to conduct recounts themselves*?  Yes, and the results there contradict her claims here.  Stein's first initiative was to corral voters and fund them to file recount petitions in voting precincts across the State.  Virtually all of those are complete, and they have shown very little change in the final vote tally.  Nor, critically, have they shown any evidence of the diabolical plot imagined by Stein.

*Is this the first court to hear Stein's claims?*  No.  Before this case, she pursued similar claims as part of an election contest filed with the Commonwealth Court of Pennsylvania.  There, like here, Stein cited "grave concerns" about the integrity of the election.  Despite weeks' worth of time and energy, however, Stein and her allies could not even allege—much less prove—a single instance of fraud or tampering *anywhere* in the State.  She ultimately dismissed her action as a result, clamoring that "the fix was in."  Caroline Kenny, *Jill Stein says she'll 'escalate' Pennsylvania recount case after earlier plans to drop it*, cnn.com (Dec. 5, 2016).[6]  That "fix" apparently necessitated Stein "escalating" her claims to this Court.  *Id.*

*Has Stein accurately characterized her prior court proceedings?*  Unfortunately, no.  Facing the certainty of dismissal of her election contest due to a complete absence of evidence of fraud, Stein and her allies voluntarily dismissed

---

[6]*Available at*  http://www.cnn.com/2016/12/03/politics/jill-stein-drops-pennsylvania-recount/.

the case the weekend before her Monday morning hearing (presumably to avoid a published order rejecting her claims). At the time, Stein and her allies told the state court the dismissal was due to the fact that the petitioners could not "afford" to post the $1 million bond required by the Commonwealth Court. We now know that is false.

Asked in an interview why she decided to pursue an "action in federal court instead of paying out the $1 million bond," Stein replied: "Well, the problem was *not that it was too expensive*, but that it was a dead-end course of action." Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[7] She complained that the state court was being "political" by demanding evidence of election-related tampering she simply did not possess. *See id.* So she strategically dismissed her case.

This has not stopped Stein from advancing a contrary position in this Court, however. Consistent with what petitioners told the Commonwealth Court—but in direct contradiction to what Stein has since told the media and the public—Stein claims that the Commonwealth Court's decision to set bond at $1 million "forced" petitioners "to withdraw the contest proceeding," because they "could not possibly post an exorbitant $1 million bond." (Complt. (ECF 1) at ¶¶91-92.) She cites this

---

[7] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

fact to tee up her constitutional claims here—namely, that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount and thus an unconstitutional abridgment of the right to vote.  (PI Mot. at 30.)  So she had no choice, we are told, to "escalate" her legal claims.

*Setting aside the reason Stein failed to pursue state statutory remedies, have Stein and Reitz satisfied Article III  standing requirements for asserting claims in federal court?*  No.  Neither she nor Plaintiff Reitz have Article III standing to seek such relief.  As to Stein, she has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount.  She does not contend that a Pennsylvania recount will result in her securing Pennsylvania's electoral votes, and in fact has conceded it will not.  *See* Stein, *Why the recount matters: Jill Stein*, USA Today (Dec. 1, 2016) (conceding that the "goal" of the recount "is not to change the result of the election").[8]  Reitz has no better claim to standing.  Even if he voted in the election, there are no factual allegations or evidence that give rise to a plausible assumption that his vote was not properly counted.

*Assuming they do have standing, what relief do Stein and Reitz seek?*  That Pennsylvania comply with a procedure she and her own experts devised—a hand recount of "the paper ballots in optical scan counties," and a "forensic examination" in counties using direct-recording electronic systems.  (PI Mot. at 1.)

---

[8] *Available at* https://perma.cc/VZK4-5BVF.

Those procedures, we learn from Stein, are compelled by the Constitution of the United States to ensure election "integrity."  And that is true, we are told, even where a plaintiff (like Stein) maintains only the mere suspicion of electoral improprieties

  *Where in the United States Constitution can one find the blanket constitutional right to a recount to ensure election integrity?*  Nowhere.  No one doubts the fundamental nature of the right to vote.  But no court, to our knowledge, has read that privilege to include not only the right to cast one's vote, but also the right to request a recount *after* the vote to ensure an election's integrity.  It thus should come as no surprise that a federal court in Michigan just yesterday rejected Stein's claims there, finding no constitutional right to a speculation-fueled recount. *See* Order, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF 36) (attached as Exhibit 2).  Which only makes sense.  After all, if all Americans do enjoy that right, ballot counting could become year-round sport.

  *Will Stein be irreparably harmed absent the Court's intervention?*  No, a conclusion bolstered by Stein's own actions.  Despite having suspicions about the integrity of Pennsylvania's voting systems *before* the November 8 election, and having an opportunity to seek relief immediately after the election, Stein waited until November 28—the last possible day—to file her election contest in the Commonwealth Court, and December 5, nearly a month after the election, to file

this suit.  Anyone fearing an irreparable injury of the magnitude suggested here surely would have acted sooner.  Stein did not, and she now has only herself to blame for much of the purported emergency she now asserts.

*Finally, does Stein satisfy any of the other elements that must be met before emergency relief is granted?*  No, most notably because her request does not serve the public interest.  If granted, her requested relief is certain to harm election officials, voters, and vote counters forced hastily to take up recounts, creating confusion and uncertainty in an already challenging environment.  Such relief would also harm all Pennsylvanians, who would not only be on the hook for a multi-million-dollar recount tab, but who would also face the risk of disenfranchisement, should their Electoral votes not be counted.

The one thing over which there should be no question is that Stein's claims are baseless and legally flawed.  Accordingly, the Court should deny a preliminary injunction and dismiss the Complaint.

## **STATEMENT OF FACTS**

For most, the November 8, 2016 presidential election concluded early the next morning, when the major news outlets declared President-elect Donald Trump the winner and Secretary Hillary Clinton graciously conceded.   But not for Dr. Jill Stein.  After an aggressive online fundraising push, Stein and her campaign attorney, through voters they corralled, filed recount petitions throughout the State,

and also brought an election contest in Pennsylvania's Commonwealth Court on November 28, the statutory deadline for filing such a case.

As in this case, the election-contest petition invited the Commonwealth Court to revisit the November 8 election for United States President and Vice-President due to the alleged possibility of foreign-sourced hacking. The petition did not allege a single known or even a single suspected incident of hacking in Pennsylvania. Nor did it identify which foreign entities would have engaged in the hypothesized hacking, or indicate which presidential candidates would have benefited or been harmed from such conduct. Instead, it merely expressed a belief that the possibility for hacking existed, and, on this basis, requested a statewide recount.

On November 29, the Commonwealth Court scheduled a hearing on the election-contest petition for Monday, December 5, at 10 a.m. *See* Order (attached as Exhibit 3). On December 2, the court issued another order setting the statutorily required bond at $1,000,000, which it directed to be posted by 5:00 p.m. on December 5. *See* Order (attached as Exhibit 4). The schedule thus allowed petitioners to argue their case and potentially obtain a ruling on Monday morning before having to post a bond that evening. The Commonwealth Court also gave the parties the opportunity to address the bond amount in the meantime if they were unhappy with it. *See id.* ("Upon good cause shown, the amount of the bond

11

may be modified by the Court.").  To make this remedy easily available over the weekend, the Chief Clerk of the Commonwealth Court notified counsel that the court would accept filings submitted through PACFile (Pennsylvania's electronic-filing system) after hours, and in turn would docket them before the hearing.

On Saturday, December 3, petitioners moved to withdraw their petition. Even though (1) Stein had raised nearly $7 million at the time (and has since exceeded that number), (2) the court expressly authorized petitioners to request a different bond amount for good cause, and (3) petitioners could have argued their case before having to post a bond, petitioners simply asserted that they could not afford to post the bond.  "Petitioners are regular citizens of ordinary means," they claimed, and thus could not "afford to post the $1,000,000 bond required by the Court."  *See* Praecipe to Discontinue and Withdraw (attached as Exhibit 5).  The court thus closed the case that day.  *See* Order (attached as Exhibit 6).

While petitioners' much-publicized explanation for their voluntary withdrawal was on its face implausible given the considerable resources Stein had raised, Stein has since confirmed that the explanation was in fact false.  She explained that "the problem was not that [the $1 million bond] was too expensive," but that the state-court proceeding "was a dead-end course of action" since she had no evidence of election-related tampering to present at the hearing.  Prachi Gupta, *Jill Stein on What's Next With the Recount Effort in Wisconsin, Michigan, and*

*Pennsylvania*, Cosmopolitan.com (Dec. 6, 2016) (emphasis added).[9]  The withdrawal, in other words, was strategic.

This makes sense.  As Stein's public comments confirm, she and her allies knew that petitioners could not possibly meet the substantive requirements for contesting the election.  Under the governing election-contest standards, they were required to exercise "due diligence to ascertain and specify the facts which, if sustained by proof, would require the court to set aside the result of the election." *Gollmar's Election Case*, 175 A. 510, 512 (Pa. 1934).  This standard required allegations of particular acts of fraud, that such fraud increased the vote of the victor, and that it affected the outcome of the election.  *See id.*  Yet the election-contest petition failed to meet even these basic pleading standards.  It did not allege any specific acts of fraud or tampering in Pennsylvania, much less that any such fraud increased the votes of President-elect Trump, let alone to such degree that it affected the outcome of the election.  Nor did the petition identify any basis for believing that Stein's ongoing recount efforts would uncover even a shred of evidence of election tampering.  But rather than risk a court stating these conclusions on the record and thereby undermining her three-state recount efforts, Stein opted instead to withdraw and try her hand in yet another forum, this time a federal one.

---

[9] *Available at* http://www.cosmopolitan.com/politics/a8467128/jill-stein-voter-recount-wisconsin-michigan-pennsylvania/.

On December 5, Stein filed suit in this Court.  In her complaint, Stein alleged that the very state-devised system she invoked in the previous weeks was unconstitutional because, in her estimation, it makes a statewide recount too difficult.  But despite allegations of imminent and irreparable harm to her alleged constitutional rights, Stein waited a day to file her motion for preliminary injunction seeking a statewide recount and forensic examination of Pennsylvania's voting systems.  The premise of Stein's argument—in direct contradiction to what she told the media and the public—is that the $1 million bond was an "insurmountable barrier[]" to obtaining a recount, and thus an unconstitutional abridgment of the right to vote.  (Mot. for PI at 30.)

Finally, while Stein's county-level efforts to force a recount and obtain forensic examinations are too numerous to describe here, one such proceeding is worth noting—specifically, Stein's request for recounts and forensic examinations in Philadelphia County.  The Philadelphia County Board of Elections granted her recount requests, but denied her request to conduct forensic examinations during that process.  Stein appealed and, on December 7, the Pennsylvania Court of Common Pleas affirmed, concluding that Stein possessed no state-law right to the forensic examinations she requested.  *See* Opinion, *Stein v. Philadelphia Cnty. Bd. of Elections*, No. 161103335 (Ct. of Common Pleas) (attached as Exhibit 7).

14

In the course of reaching that conclusion, the court made several observations that bear repeating here. The court explained that Stein had a statutory right not only to be present when the county board tested its voting systems both before and after the election, but also "to have a technically qualified person there to make independent tests of the equipment prior to, during, and following the vote count." *Id.* at 3. But, the court noted, there was no evidence that "Dr. Stein took advantage of these provisions." *Id.* The court added that the Board's recount efforts "revealed no discrepancies in the electronic tallies," and that there was "absolutely no evidence of any voting irregularities." *Id.* at 4.

## ARGUMENT

The Court should deny Plaintiffs' request for a preliminary injunction, both because this Court lacks jurisdiction over the asserted claims and because Stein cannot possibly satisfy the standards for obtaining such relief.

But before addressing these issues, Intervenors note the mandatory deadline imposed by the federal safe harbor set forth in 3 U.S.C. § 5. This provision requires certification of the Presidential Electors by Pennsylvania's Governor on or before December 13, 2016. *See also Bush v. Gore*, 531 U.S. 98, 110 (2000). Meeting this deadline is critical to participating in the formal Electoral College vote on December 19, 2016. *See* 3 U.S.C. § 7. The remedies Plaintiffs request,

even if merited, could thus never be implemented in time, a fact that alone justifies denying Plaintiffs' requested relief.

The following are additional grounds for reaching the same result.

## I.    This Court Lacks Jurisdiction Over This Suit.

### A.    Plaintiffs lack standing.

"A party has standing only if he shows that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will likely be 'redressed' by a favorable decision." *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016).  Stein, however, has not alleged an injury-in-fact likely to be redressed by any ruling related to the need for a recount. She does not contend that she will (or even might) win Pennsylvania's electoral votes after a recount.  Nor, in any event, would a victory in Pennsylvania send Stein to the White House.  After all, Stein gained no more than three percent of the vote in any state where she appeared on the ballot.  *See* America's Election Headquarters, Fox News, http://www.foxnews.com/politics/elections/2016/ presidential-election-headquarters (last visited Nov. 29, 2016).  Accordingly, she has failed to allege facts showing that she has suffered a constitutionally cognizable injury.

Nor does Plaintiff Reitz satisfy Article III standing requirements.  Reitz describes himself as a "voter in the State of Pennsylvania."  Assuming Reitz did

vote, he still has not alleged any facts giving rise to a plausible assumption that his vote was not properly counted.  He is left with only a "merely speculative" injury, one that does not meet Article III's injury-in-fact requirement for establishing standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Insofar as Plaintiffs seek to defend the interest in a free and fair election, they have no standing to assert that grievance either.  It is a "generally available grievance," one for which relief benefits Plaintiffs no more "than it does the public at large."  *Id.* at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance,"—"claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").  That generalized grievance "does not state an Article III case or controversy."  *Id.* at 574.  And even if Plaintiffs could seek relief for a generalized grievance, they failed to allege any facts plausibly suggesting that fraud or mistake tainted the election results.

This Court thus has no jurisdiction over this case, which alone warrants denying Plaintiffs' request for a preliminary injunction.

### B.    The *Rooker-Feldman* Doctrine deprives this Court of jurisdiction over Plaintiff's claims.

In addition to Plaintiffs' standing problem, the *Rooker-Feldman* doctrine independently deprives this Court of jurisdiction over Plaintiffs' claims.

**1.** The *Rooker-Feldman* doctrine provides that "lower federal courts lack subject matter jurisdiction to engage in appellate review of state-court determinations or to evaluate constitutional claims that are inextricably intertwined with the state court's decisions in a judicial proceeding." *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N. Y. & N.J. Police Dept't,*, 973 F.2d 169, 177 (3d Cir. 1992) (citing *D.C. Court of Appeal v. Feldman*, 460 U.S. 462, 483 n.16 (1983)). The doctrine "precludes lower federal courts from exercising appellate jurisdiction over final state-court judgments because such appellate jurisdiction rests solely with the United States Supreme Court." *Madera v. Ameriquest Mortg. Co. (In re Madera)*, 586 F.3d 228, 232 (3d Cir. 2009) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)).

"[T]here are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild L.L.P.*, 615 F.3d 159, 166 (3d Cir. 2010).

"The second requirement—that a plaintiff must be complaining of injuries caused by a state-court judgment—may also be thought of as an inquiry into the source of the plaintiff's injury." *Id.* Under this requirement, "[t]he critical task is

… to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 167 (quoting *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). "A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Id.*

"[C]losely related" to the second requirement, the fourth element "targets [] whether the plaintiff's claims will require appellate review of state-court decisions by the district court." *Id.* at 169. Prohibited appellate review "consists of a review of the proceedings already conducted by the lower tribunal to determine whether it reached its result in accordance with law." *Id.* (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)). Prohibited appellate review also includes constitutional claims that a plaintiff declined to assert in state court but are "inextricably intertwined with" the state court's decision. *Feldman*, 460 U.S. at 482 n. 16.

**2.** Here, all four requirements of the *Rooker-Feldman* test are met. *First*, Plaintiffs lost their election contest. They sought a statewide recount and a declaration that the presidential election was "illegal," but they failed to obtain either. They also requested a bond amount of $25,000, which the Commonwealth

Court rejected in setting the bond at $1,000,000.  While Reitz was a formal party in that proceeding and Stein was not, Stein has been the driving force behind all of the recount efforts in Pennsylvania, Michigan, and Wisconsin.  Having publicly owned that role and raised millions as a result, she should be estopped from claiming that she was not a party in the state-court proceeding, especially where doing so would allow her to evade subject-matter limitations on this Court's jurisdiction.

*Second*, it is the Commonwealth Court's decision to set bond at $1,000,000 that (according to their pleadings) caused petitioners to withdraw their election contest—the same decision Plaintiffs allege caused their injuries here.  Indeed, Plaintiffs repeatedly cite the bond amount as one of the "insurmountable barriers" to vindicating their alleged constitutional right to a recount and forensic examination.  (PI Mot. at 30, 35.)  And the fact that this barrier did not "exist[]" prior to the state-court proceedings" (*Great W. Mining & Mineral Co.*, 615 F.3d at 166) reinforces that the state-court judgment caused Plaintiffs' asserted injuries.

*Third*, the state-court judgments were rendered before the federal suit was filed.  The Commonwealth Court established the bond amount on December 2 and closed the case on December 3.  This suit was not filed until December 5.

*Finally*, Plaintiffs are inviting this Court to review and reject a state judgment—namely, the Commonwealth Court's decision to set a $1,000,000 bond.

Plaintiffs have alleged that this decision abridged their constitutional rights by imposing an onerous burden on obtaining a statewide recount.  To state the argument is to demonstrate that Plaintiffs' constitutional claims and the bond amount are "inextricably intertwined."  *Feldman*, 460 U.S. at 482 n.16.  Plaintiffs' theory here would thus necessarily entail review of the state court's decision, which is precisely what the *Rooker-Feldman* doctrine prohibits.

Enforcing this doctrine is particularly important in today's case.  In setting the bond, the Commonwealth Court expressly indicated that it was open to modifying the amount upon a showing of "good cause."  Plainly, avoiding a constitutional violation would amount to "good cause."  The Commonwealth Court even allowed the parties to file after hours and over the weekend.  While petitioners took advantage of this concession to withdraw their petition, they declined to request a lower bond amount.  Having made the decision not to raise their constitutional concerns in the state forum, Plaintiffs should not be permitted to obtain review of the bond amount here.  That would effectively allow an end-run around the state judiciary, and impermissibly expand this Court's subject-matter jurisdiction.

## II.    Plaintiffs Are Not Entitled To Injunctive Relief.

Even setting aside the fundamental jurisdictional problems inherent in the Complaint, Stein's request for a preliminary injunction fails on the merits: there is

no constitutional right to a recount and, even if there were, her request is much too late to justify such relief.   And because the other preliminary-injunction factors weigh against her request, she has not carried her burden to obtain the "extraordinary remedy" she seeks.  *AT&T  v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3rd Cir. 1994).

### A.   Stein has not established any likelihood of success on her constitutional claims.

**1.**  Boiled down, Plaintiffs charge that Pennsylvania's Election Code is unconstitutional because, in Stein's estimation, it makes obtaining a statewide recount too difficult, especially for 1% candidates like herself.  This argument borders on the frivolous, as there is no constitutional right to a recount, especially so where there is no evidence of fraud or tampering.

The First Amendment gives a right to political association.  The Fourteenth Amendment requires that, if states permit voters to vote for president, they must fairly tabulate the votes.  And the Due Process Clause prohibits voting procedures that are fundamentally unfair.  But the mere absence of an easily invoked, mandatory statewide recount provision does not jeopardize any of these rights.  There is no dispute that every Pennsylvania voter had the legal right and ability to cast his or her vote.  Nor is there evidence—or even an allegation—that the votes already cast have not been fairly and accurately tabulated.  Indeed, Plaintiffs cite no evidence of tampering or fraud, but instead invoke the *possibility* that someone,

somewhere tampered with a voting machine (or machines!) in Pennsylvania. Who?  We are not told.  To help which candidate?  Again, we are not told.  How did they do it?  Silence.

We are thus left solely with speculation that the results *could* have been inaccurate, which Stein insists triggers a constitutional right to a recount to show that they are not.  By that logic, however, every person, in every state, has the constitutional right to a recount anytime one thinks votes might have been inaccurately counted, without regard to whether that person has evidence suggesting as much.  And the tab for those recounts would be the state's alone, calling into question ubiquitous state laws requiring recount requestors to pay some or all of the recount fee.  After all, just as the right to cast a ballot cannot be infringed by a poll tax, *see generally Harper v. Bd. of Educ.*, 383 U.S. 663 (1966), the recount right similarly could not encumbered by state fees.

All of this explains why the only court to address the precise claims Stein raises here rejected them in full.  On Wednesday, a federal district court in Michigan denied Stein's request for a statewide recount in that state.  *See* Order, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 7, 2016) (ECF 36) (attached as Exhibit 2).  The reasons for doing so was eminently clear: "[t]here is no case law recognizing an independent federal right to a recount that either this Court or the parties have come across, in the absence of actual deprivation of voting rights."

*Id.* at 7.  And "to date," the court explained, "Plaintiffs have not presented

evidence of tampering or mistake."  *Id.*  "Instead," as in this case, "they present

speculative claims going to the vulnerability of the voting machinery—but not

actual injury."  *Id.*  And "because mere potentiality does not amount to a claim that

the vote was not fairly conducted," the court concluded that plaintiffs had shown

"[n]o likelihood of success" on the merits.  *Id.*  Indeed, Plaintiff's theory "has

never been endorsed by any court":

> [I]nvoking a court's aid to remedy that problem in the manner
> Plaintiffs have chosen—seeking a recount as an audit of the election
> to test whether the vulnerability led to actual compromise of the
> voting system—has never been endorsed by any court, and would
> require, at a minimum, evidence of significant fraud or mistake—and
> not speculative fear of them.  Such evidence has not been presented
> here.

*Id.*  The court did not engage in the balancing test Plaintiffs invite here (PI Mot. 29-

30), but rightly dismissed the claims out of hand since (as here) there was no

evidence that Stein's rights were burdened *at all*.[10]

Nothing in Plaintiffs' 41 pages of briefing here undermines these

conclusions.  Indeed, Plaintiffs do not cite a *single* case suggesting that there is a

---

[10] Plaintiffs cite an earlier, now-dissolved TRO order from the same federal district court.  (PI Mot. 32-33.)  But that order is wholly inapposite, because it merely addressed the *timing* of a statewide recount that had already been ordered by the state elections board on state-law grounds (the district court did not, as Plaintiffs misleadingly suggest, order the statewide recount in the first place).  *See* Order at 4, *Stein v. Thomas*, No. 2:16-cv-14233 (E.D. Mich. Dec. 5, 2016) (ECF 16).  Shortly after the TRO was issued, the Michigan Court of Appeals ruled that Stein lacked a right to a recount under state law.  Within 24 hours of that ruling, the federal district court promptly dissolved its TRO and issued the opinion (discussed above) rejecting Stein's alleged *constitutional* right to a recount.

constitutionally protected right to a recount.  Plaintiffs' decisions are not even close.  Some involved challenges to a decision not to count a voter's ballot in the first place.  *See Hoblock v. Albany Cty. Bd. of Elections*, 487 F. Supp. 2d 90, 98 (N.D.N.Y. 2006); *Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978).  Others involved challenges to provisions governing candidates' ability to appear on the ballot.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Belitskus v. Pizzingrilli*, 343 F.3d 632, 636 (3d Cir. 2003); *Constitution Party of Penn. v. Cortes*, 116 F. Supp. 3d 486 (E.D. Pa. 2015).  One case involved constitutional claims based on deficiencies in the state system that allegedly precluded plaintiffs from voting or resulted in their votes not being counted.  *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 469 (6th Cir. 2008).  Still others involved a decision to cancel or refuse to hold an election altogether.  *See Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001); *Duncan v. Poythress*, 657 F.2d 691, 693 (5th Cir. 1981).

Others are even further afield.  One case declined a request by voters for a preliminary injunction stopping a manual recount provided under state law.  *Siegel v. LePore*, 234 F.3d 1163, 1187 (11th Cir. 2000).  Another case concerned the validity of an indictment that alleged violations of the Enforcement Act of 1870, which protects voters from intimidation.  *United States v. Mosley*, 238 U.S. 383 (1915).  And another involved a conspiracy between a candidate and members of

25

the county election board "to cause numerous illegally obtained absentee ballots to be cast." *Marks v. Stinson*, 19 F.3d 873, 875 (3d Cir. 1994).

Regarding this last case, Stein suggests that the Third Circuit court found the state-law proceedings themselves unconstitutional (for example, because they required a $50,000 bond). (PI Mot. 35.) That is false. Setting aside that the Commonwealth Court specifically set a hearing for Stein to present her fraud claims here (which Stein declined to attend by dismissing the action), *Marks* cited the difficulties plaintiffs faced in the state proceedings solely as background for its *abstention* ruling. *See Marks*, 19 F.3d at 879 ("In order to understand the first of these issues [abstention], some knowledge of the state proceedings in this controversy is required."). And, in any event, *Marks* did not involve a recount, let alone a constitutionally required recount.

Thus, none of Plaintiffs' cases involved a court-ordered recount. In fact, some of the cases—to the extent they touched on recounts—undermine her position. *See Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (suggesting a claim is more likely to succeed where the federal court is "not asked to count and validate ballots"); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (expressly contrasting the case before it, which alleged a plausible constitutional claim, with a claim requesting "a recount of the 2004 electoral results," which the court suggested would not be proper). At the very least, the

absence of even a single case granting the relief Plaintiffs demand—and one squarely rejecting it—is good evidence that they in fact have no constitutional right to a recount.

Finally, it is worth reminding the Court of the discrepancies between Stein's public comments and the constitutional arguments raised here. The premise of Stein's constitutional argument is that the $1 million bond set by the Commonwealth Court created an "insurmountable barrier[]" to obtaining a constitutionally required recount through the state system. Yet Stein, who instigated and directed the state-court litigation, has since admitted that petitioners' asserted plight—that they were "regular citizens of ordinary means" who could not "afford to post the $1,000,000 bond"—was a farce. Posting the bond was not the problem, she explained. *Supra*, note 7. Rather, it was the virtual certainty that petitioners would lose on the merits due to their inability to prove fraud or tampering. *Id.* Stein has admitted, in other words, that she has no valid constitutional grievance, but is simply unhappy that the state court would not roll over and grant a statewide recount without any evidence of actual fraud.

With these facts in view, it is clear there is no constitutional violation. Moreover, even if there were, this Court should decline to grant a preliminary injunction due to Stein's decision to make a mockery of the state and federal courts. "Courts condone neither forum shopping nor forum avoidance." *FMC*

*Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, (E.D. Pa. 2005).  "Attempting to avoid a particular judge or precedent is exactly the kind of forum shopping anticipated and expressly prohibited by the local rules of many districts."  *Id.* Because there is good reason to believe this occurred here, Stein's efforts should not be rewarded with a preliminary injunction.

**2.**  There is another problem with Plaintiffs' request: it comes much too late in the day and is thus barred by the doctrine of laches.

A party asserting the defense of laches must show: "(1) lack of diligence by party against whom the defense is asserted and (2) prejudice to the party asserting the defense."  *United States v. Koreh*, 59 F.3d 431, 445 (3d Cir. 1995).  Both elements are satisfied here.

First, Stein's conduct is a study in "lack of diligence."  The premise of Stein's claim is that Pennsylvania's election machinery is vulnerable to attack.  But the machinery has not changed in years.  Nor has the evidence that Stein relies upon in an attempt to support her theory.  (*See, e.g.*, PI Mot. at 4, 6-7 (citing studies, events, and research from 2005, 2007, 2008, and 2009).  Thus, if Stein's motivation for this recount was truly to ensure election integrity, she could have raised these issues *before* the election.  And if she had specific concerns about what had occurred during Pennsylvania's election on November 8, she could have

raised these concerns on *November 9*, immediately following the election. Pennsylvania law allows for such a challenge. *See* 25 P.S. § 3456.

But Stein did not do so.  She did not raise her concerns before the election, as she could have done.  She did not raise these concerns immediately following the election, as she could have done.  Instead, she waited until November 28—just hours before the deadline—to file her election-contest petition, which she then dismissed before the court-ordered hearing.  She then waited two more days to file her complaint here and three days to file her motion seeking a preliminary injunction.  She now has the audacity to argue that the entire recount and election-contest process under the Pennsylvania Election Code is unconstitutional, and that this Court should intervene on an emergency basis.   But it is Stein's own unjustified delay that has caused the concerns she now raises.  If ever there were a case of "lack of diligence" by a party, this is it.

Second, the prejudice to a host of parties—including Intervenors—is clear. A last-minute, unexpected statewide recount would have the enormous financial impact of causing Pennsylvania's taxpayers to shoulder massive expenses to complete the undertaking in less than a week.  It would also cause a logistical nightmare for both state officials and political parties, who would have to train and recruit volunteers to assist in conducting and overseeing an accurate recount.  And if this process failed to conclude by December 13 (which it almost certainly

would), it would jeopardize Pennsylvania's ability to identify and certify its Presidential Electors and thus the State's place at the Electoral College table. This could disenfranchise millions of Pennsylvania voters, all while robbing the presidential and vice-presidential candidates of the added electoral heft that Pennsylvania's twenty electoral votes would provide. Because this morass could have been easily avoided by a prompt filing of Stein's claims, laches independently bars her requested relief.

> **B.     Plaintiffs do not face any irreparable injury.**

Plaintiffs cannot demonstrate any harm, much less irreparable harm, which explains why their brief struggles to identify any *concrete* impending injury (invoking constitutional platitudes instead) and quickly pivots to discussing the supposed reasonableness of the requested relief (to be clear: in the section on irreparable harm). (*See* PI Mot. at 37-39.) This is not surprising. For Stein, there is no possible outcome of a recount that would cause her to win the statewide election in Pennsylvania for President of the United States. She received less than 1% of the Pennsylvania vote, and there is simply no conceivable way for any recanvass or recount to change the more than 2.8 million votes necessary for Stein to earn Pennsylvania's twenty electoral votes. Indeed, Stein herself has admitted that her aim is not to change the election result. *Supra*, at note 8.

As for Reitz, he has not identified *any* evidence—or, for that matter, even alleged—that his vote was not properly tabulated.  On this record, there is simply no basis for concluding that either faces irreparable harm.

### C.    Plaintiffs' requested relief would seriously harm Intervenors.

Intervenors, Defendants, and all citizens of Pennsylvania face almost certain irreparable harm if a preliminary injunction is entered, as it would run the risk of preventing Pennsylvania from meeting state and federal deadlines for participating in the Electoral College.

As noted, the federal safe harbor requires Pennsylvania to certify its electors by December 13.  *See* 3 U.S.C. § 5.  State law requires the electors to vote on the federally scheduled date, December 19.  *See* 25 P.S. § 3192.  At this point, however, time is short, especially given the nature of the requested relief.  The State would have just four days to put together a massive workforce capable of conducting the recounts in over 9,100 election districts, and oversee that the recount is conducted properly.  This is not possible.  And to order it creates the very real possibility of disenfranchising every Pennsylvania voter who exercised their right to vote on election day.

### D.    Granting an injunction would be contrary to the public interest.

The recount in question would also undermine confidence in Pennsylvania's elections, and force the State to pay potentially millions for a recount admittedly

undertaken for completely academic reasons. Perhaps Pennsylvania's courts would have concluded that Pennsylvania's laws required the State to bear those costs. Stein, however, made certain we would never find out; she and her allies aborted the state-law process before it was even concluded. But what is clear is that declining Plaintiffs' request now will save the State from wasting millions of dollars of taxpayer money, and thousands of hours of manpower, and will avoid the chaos that a hurried, last-minute recount would create. Indeed, it is difficult to emphasize enough the disruption an eleventh-hour recount order would cause to state electoral processes already underway. Most counties have already certified their election results. The rest will do so any day now. All must be completed by December 13, the critical federal safe-harbor deadline. A statewide recount would thwart that process, and virtually guarantee that the State would not certify its Presidential Electors by state and federal deadlines, and disenfranchising millions of voters who voted honestly this election.

At a minimum, the availability of state-court proceedings (even if Stein elected to bail out of them for strategic considerations) suggests that this Court should abstain from deciding this matter. It could do so under the *Younger* abstention doctrine, which applies where there are ongoing state proceedings that are judicial in nature, the state proceedings implicate important state interests, and the state proceedings afford an adequate opportunity to raise federal claims. *Port*

*Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 173.  Here, it is beyond dispute that Pennsylvania's regulation of its election process and an individual's right to vote is a state interest of great importance.  Additionally, the state-court election contest certainly afforded Plaintiffs sufficient opportunity to raise their constitutional claims.  Although Plaintiffs voluntarily discontinued the state election contest, abstention is nevertheless warranted because they had the ability to pursue remedies in that forum.  *See id.* at 174 ("One cannot escape *Younger* abstention by failing to assert remedies in a timely manner in state court."); *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (*Younger* abstention appropriate where plaintiff sought injunctive relief in federal court rather than appealing state trial court judgment within the state system).  It is also warranted because Plaintiffs in effect are requesting this Court to stand in judgment of the Commonwealth Court's bond order.  *See Port Auth. Police Benev. Ass'n, Inc.*, 973 F.2d at 174 ("the federal courts must also generally abstain from reviewing the state court orders themselves, where the state provides an adequate forum for appellate review of all claims of a federal nature").

This Court could also abstain under the *Pullman* abstention doctrine, which applies in cases where a litigant asks a federal court to reach a constitutional question predicated on the federal court's own, non-binding interpretation of state law.  *Moore v. Sims*, 442 U.S. 415, 423 (1979).  Or, alternatively, the Court could

apply the *Burford* abstention doctrine, which is proper "where timely and adequate state-court review is available and (1) a case presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002).  At the very least, the spirit of these doctrines—that federal courts not needlessly interfere with states' prerogatives—suggests that the Court's decision to stay its hand would advance the public interest.

*     *     *

Stein's law-defying efforts to enlist this Court's assistance in upsetting an election she could not possibly win prompts the question: What is the reason for Stein's request?  We know it has nothing to do with changing the election's outcome.  Stein did not win the State of Pennsylvania.  Not by a longshot.  She finished over 2.8 million votes behind the winner in the 2016 Presidential election.

Nor could her request have rested on ensuring the fairness and accuracy of Pennsylvania's presidential election.  All available evidence indicates that the 2016 general election was not tainted by fraud or mistake.

34

So why is Stein seeking a recount?  All we know for certain is that she is using it to line her pockets with funds donated from those she has scared into believing that Pennsylvania's electoral process was hijacked by nameless foreign entities.  It would be bad enough if she were wasting only her own time and resources as part of her electoral farce.  But she is also wasting millions of dollars in taxpayer money and calling into doubt Pennsylvania's ability to meet the deadline for certifying its electors in accordance with federal and state law.

With Stein having made the same demands in neighboring states as well, she threatened to put at risk confirmation of the entire election's outcome when Congress meets in January 2017.  Ultimately, Stein cannot change the outcome of the presidential election.  She apparently has no qualms, however, with creating chaos in her attempts to do so.  Rejection of today's case should amount to the final blow to Stein's self-interested electoral odyssey.

## **CONCLUSION**

For these reasons, Intervenors respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction and dismiss their Complaint with prejudice.

Respectfully submitted,

/s/ *Lawrence J. Tabas*
Lawrence J. Tabas, I.D. No. 27815
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 215-665-3158
Email: lawrence.tabas@obermayer.com

/s/ *Rebecca L. Warren*
Rebecca L. Warren, I.D. No. 63669
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Phone: 717-221-1602
Email: rebecca.warren@obermayer.com

*/s/ Chad Readler*
Chad A. Readler*
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH  43215
Phone: 614-469-3939
careadler@jonesday.com
* Admitted *pro hac vice*

*/s/ David M. Morrell*
David M. Morrell*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3717 (direct)
Email: dmorrell@jonesday.com
*Admitted *pro hac vice*

36

Donald F. McGahn II (I.D. No. 73796)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 879-3748 (direct)
Email: dmcgahn@jonesday.com

Dated:    December 8, 2016