EXHIBIT 1



**Remarks by Secretary of State Pedro A. Cortés**
**Press Conference, Capitol Media Center, Harrisburg, PA**
**October 20, 2016**

Thank you for joining us for this press conference where I will discuss the steps that the DOS and counties are taking to ensure a fair, secure and smooth election. I will provide remarks and then open the floor for questions.

I want to thank Jerry Feaser, Dauphin County Director of Elections for being with us this afternoon.

Voting is one of our most fundamental rights as citizens. We must ensure that all eligible voters who want to exercise their franchise can do so well informed about the process and their rights.

Governor Wolf and I strongly believe that one of our roles as public servants is to encourage as many people as possible to engage in the electoral process, exercise their right to vote and have a say in what happens in their municipality, county, state and nation.

Unfortunately, in recent weeks, some have decided to take a different approach. Some have suggested that our system lacks integrity and security. Some have suggested that fraud is rampant and election officials at the local and state level have ill intended motives.

This is not only wrong and uninformed – it is dangerous. To imply that fraud is rampant – at any level – from the precinct-level to an entire city or state – is without merit and lacks any credence or proof within the modern history of elections in this country or commonwealth.

It is also not backed up by any science or research. To the contrary, a study by Loyola University looked at one billion votes – a billion – and found just 31, unrelated and small-scale examples of improper activity.

Applying singular, unconnected and rare instances of fraud to claim a widespread conspiracy is irresponsible and destructive to the democratic process. Efforts to suppress voting or seek for citizens to call into question the value of their participation is counter to our core values of freedom and liberty. A good democracy hinges on well-informed voters, and all of us have an obligation to speak about this process with honesty and objectivity.

I want to applaud my colleagues across the state and country who are speaking out on these outrageous claims. Democrats, Republicans, third parties and non-partisans have rejected conspiracy theorizing. They have put our democracy above politics.

One such voice Philadelphia City Commissioner Al Schmidt, a Republican, has said: "The real threat to the integrity of elections in Philadelphia isn't voter fraud, though it does rarely occur. The real threat to the integrity of elections is irresponsible accusations that undermine confidence in the electoral process."

Ohio Secretary of State Jon Husted, a Republican, said "there are many safeguards in place in our election system" and that "this kind of conversation moves America backward, and it should be dismissed. Don't make people feel despair. Make them feel uplifted, and hopeful that there is a better day ahead for all of us."

I am here today to deliver the same message to the people of Pennsylvania. Our voting systems are secure. Historically we have seen very, very minimal improper activity; so little that it is statistically non-existent. The people who oversee our elections take pride in ensuring the system is fair and accountable. From our staff at the Department of State to county election workers to poll-workers in the more than 9,100 precincts across Pennsylvania.

To suggest that these hardworking public servants are participating in something nefarious is not just unfair – it is offensive to me. I am proud of the hard work done by our county and state election officials to protect and promote the democratic process.

I take these unfounded and misleading statements very, very seriously. Those who run our elections at the local and precinct level come from every walk of life and include people of every gender, creed, and ethnicity. To demean their efforts is unacceptable and I want to reassure anyone who has reservations about working this election that the counties and my department will do everything we can to ensure they can work without interruption, or undue stress.

Now I want to address a few other issues that have arisen in the last few weeks:

**Voting Systems**

The Pennsylvania Department of State and Pennsylvania's 67 county election boards work diligently to safeguard and promote the integrity of elections in the Commonwealth.

All of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards.  These standards include an audit capability independent from the

way in which the votes are tabulated on election night.  There is in fact an audit trail.

The voting systems used in Pennsylvania are also equipped with redundant memory, meaning that cast vote records are encrypted and stored in at least one other location on the voting machine in addition to being stored on the removable media.

Very important – voting machines in Pennsylvania are not connected to the Internet.  In fact, they are not even connected to one another.

In addition, voting machines are kept under a strict chain of custody.  Prior to every election the machines are tested for logic and accuracy.  After successful testing, the machines are locked down and physical tapes/locks are applied that would detect equipment tampering.  Furthermore, the voting machines are keep separate from the tabulation equipment.

On Election Day, a zero tape is run on every machine to ensure they do not contain prior votes.  This is done in the presence of poll workers and watchers.

Once the polls close, a physical tally of votes is run for every machine and posted at the polling place.  A copy of that paper tally is also included with the electronic memory card for each machine, which are transported to the county board of elections in individual security/tamper proof bags. The Judge of Elections and the Minority Inspector also get a copy.

Election night reporting of unofficial results takes place using the Commonwealth's secured network.  Pennsylvania is a recognized leader among states in cybersecurity.

In addition to the Commonwealth cybersecurity tool and procedures, the Commonwealth has partnered with federal agencies, including the Department of Homeland Security, to ensure the integrity of our systems and networks.

The Department of State and the counties take very seriously their responsibility to ensure fair, secure and smooth elections.  We are confident the November election will meet those high standards; as it has been the case in years past.

## Poll-watching

The Department of State is committed to ensuring that elections run as smoothly and fairly as possible. In recent weeks, poll-watching has been widely discussed and I want to reaffirm the guidelines for who can be in the polling place. Those people are:

1. Precinct Election Officials. These include the Judge of Election, the Inspectors (Majority

and Minority), appointed clerks and machine operators.
2. Voters in the process of voting but no more than 10 voters at a time.
3. Persons lawfully providing assistance to voters.
4. Overseers that are registered voters of the precinct appointed by a County judge
5. Constables and Deputy Constables for preserving the peace.
6. And Poll watchers

Poll watchers must be identified in advance and assigned to specific precincts. Watchers receive a credential from the county Board of Elections and must present the credential upon demand.

Each party is entitled to appoint three watchers per precinct and each candidate is entitled to appoint two watchers per precinct. The watcher must be a registered voter of the county in which the watcher is appointed. Of those, only one poll watcher per party and candidate can be inside the polling place at the same time.

Watchers may not engage voters or otherwise interfere with the orderly process of voting. Watchers should direct all challenges and other comments directly to the Judge of Elections who is the official in charge at the polling place.

**Voter Intimidation**

Voter intimidation and discriminatory conduct is illegal under federal and Pennsylvania law. Any activity that threatens, harasses or intimidates voters, including any activity that is intended to, or has the effect of, interfering with any voter's right to vote, whether it occurs outside the polling place or inside the polling place is illegal.

It is illegal for any person or corporation to directly or indirectly practice intimidation or coercion through the use of force, violence, restraint, or threats in order to induce or compel a person to vote or refrain from voting for a particular candidate or on a particular political issue.

Further, it is illegal for a person or corporation to use abduction, duress, coercion, or any other forcible or fraudulent means to impede, prevent or otherwise interfere with a person's right to vote.

Individuals who intimidate voters can be fined up to $5,000 and face up to two years in prison.

I have full faith in our law enforcement officers, working in concert with election workers, to protect voters and ensure no citizen in terrorized or intimidated in their pursuit of their civic duty.

Individuals who witness voter intimidation or who are victims of voter intimidation should report the incident to their precinct/division, Judge of Elections, County Board of Elections and County District Attorney.

**END**

That is the conclusion of my prepared remarks and I would be happy to take your questions. I just want to reiterate the faith, confidence and respect that I have for our county, local and precinct election workers who are among some of the best public servants I have ever met. We are committed to delivering fair, secure and smooth elections for the people of Pennsylvania and the nation.

EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JILL STEIN, et al.,

                    Plaintiffs,                             Case No. 16-14233
                                                                  Hon. Mark A. Goldsmith

vs.

CHRISTOPHER M. THOMAS,
et al.,

                    Defendants.

_____/

**ORDER DISSOLVING TEMPORARY RESTRAINING ORDER (Dkt. 16)**

On December 5, 2016, this Court entered a temporary restraining order ("TRO") requiring Defendants "to cease any delay in the commencement of the recount of the presidential vote cast in Michigan" and to "continue [the recount] until further order of this Court." 12/5/2016 Op. & Order at 7 (Dkt. 16). Defendants appealed that order to the United States Court of Appeals for the Sixth Circuit (Dkts. 22, 25).

On December 6, 2016, the U.S. Court of Appeals affirmed this Court's grant of the TRO, holding that it was not an abuse of discretion to "halt[ ] operation of the waiting period law," Mich. Comp. Laws § 168.882(3).[1]  See Stein v. Thomas, 12/6/2016 Order at 8, Case No. 16-2690 (6th Cir. Dec. 6, 2016). The majority further stated that "[i]f, subsequently, the Michigan courts determine that Plaintiffs' recount is improper under Michigan state law for any reason, we

---

[1] Mich. Comp. Laws § 168.882(3) requires that "the board of state canvassers shall not begin a recount unless 2 or more business days have elapsed since the board ruled on the objections under this subsection . . . ." On Friday, December 2, 2016, the Board of State Canvassers ruled on objections to the recount filed by Donald J. Trump on that same day.  See Compl. ¶ 27. By operation of the statute, the Board, therefore, could not commence the recount until two business had passed, i.e., until Wednesday, December 7, 2016. Id. ¶¶ 28-29.

expect the district court to entertain any properly filed motions to dissolve or modify its order in this case." Id.

Shortly after the Sixth Circuit issued its order, the Michigan Court of Appeals held that the recount of the votes case in the presidential election should never have been initiated in the first place, because Stein was not an "aggrieved candidate" as required to initiate a recount under Mich. Comp. Laws § 168.879.   See generally Attorney Gen. v. Bd. of State Canvassers, 12/6/2016 Op. & Order, Case Nos. 335947 & 335958 (Mich. Ct. App. Dec. 6, 2016). The Michigan court found that the statute accorded "aggrieved" status only to a candidate who could state in good faith that "but for mistake or fraud, the candidate would have had a reasonable chance of winning the election" – a standard the Michigan court said the recount petitioner could not satisfy. Id. at 5.   Shortly after that ruling, Michigan Attorney General Bill Schuette, the Michigan Republican Party, and the original Defendants each filed in this Court emergency motions to dissolve the TRO (Dkts. 26, 28, 29). This Court immediately entered an order for a hearing on the motions, which was conducted earlier today.

All agree that the initial justification for the TRO — i.e., Plaintiffs' challenge to the two-day rule — is no longer at issue.  Recognizing this fact, Plaintiffs filed an amended complaint (Dkt. 30) before filing their response to Defendants' motions to dissolve the TRO (Dkt. 33), broadening their claims in this case. Based on the assertion that there may have been fraud or other mistakes in the recordation of the votes, they now assert that any act by Defendants that "jeopardizes completion" of a recount amounts to maintaining a system of voting that denies Michigan voters the right to have their votes counted, in violation of their rights under the equal protection clause, the due process clause, and the First Amendment.

2

In tandem with their new claims, Plaintiffs' response to the motions to dissolve argues that the TRO should be preserved on either of two alternative bases: (i) that the Michigan Court of Appeals' ruling on the "aggrieved party" issue represents a "distorted interpretation of the text" of Mich. Comp. Laws § 168.879, see Pls. Resp. at 3-4; and (ii) that Plaintiffs have a federal constitutional right to a recount independent of the state statutory scheme providing for a recount, see id. at 10. The Court finds neither argument persuasive.[2]

Plaintiffs argue that the Michigan Court of Appeals abrogated the authority or the Michigan Legislature by interpreting the term "aggrieved" incorrectly. Id. at 2-3. Recognizing that federal courts typically avoid overruling a state court's interpretation of state law, Plaintiffs invoke precedents from the momentous litigation surrounding the 2000 presidential election, in which the Supreme Court addressed when such traditional deference need not be accorded. Plaintiffs' theory is that those cases establish an allowance for federal courts to ignore certain state court pronouncements on state election laws concerning presidential elections in certain circumstances. However, Plaintiffs overstate the impact of these precedents and, in any case, ignore crucial differences between those cases and ours.

---

[2] As to the first issue, Intervenor Schuette argues that the law of the case doctrine requires this Court to simply accept the decision of the Michigan Court of Appeals without further analysis, on the theory that the Sixth Circuit has already decided that any ruling from the Michigan courts would be dispositive on Michigan law. However, in the present circumstances, the application of the law of the case doctrine is less than clear. It comes into play with respect to issues "previously determined" by a higher court. Bowling v. Pfizer, Inc., 132 F.3d 1147 (6th Cir. 1998). Here, the Sixth Circuit's decision did not require an answer to whether a forthcoming Michigan court ruling would have to be accepted without further analysis; nor was the Sixth Circuit presented with the arguments Plaintiffs have made in response to the motions to dissolve the TRO. Further, it did not specifically direct this Court to accept any ruling by a Michigan court without further analysis. Instead, it directed this Court to "entertain" any motion to dissolve the TRO should there be a Michigan court ruling denying a right to a recount. This Court has done precisely that. Because the applicability of the doctrine is less than certain, this Court proceeds to consider Plaintiffs' arguments on the merits.

In <u>Bush v. Palm Beach County Canvassing Board</u>, 531 U.S. 70 (2000) (<u>Bush I</u>), a Florida election official had declined to waive the statutory deadline for submitting recount returns, but the Florida Supreme Court nevertheless extended the deadline by 12 days. In reviewing the Florida Supreme Court's decision, which had interpreted Florida election laws, the Supreme Court expressed its apprehension that, in interpreting the election laws enacted by the Florida Legislature, the Florida Supreme Court had concluded that its legislature potentially was "circumscribe[d]" by the state constitution. <u>Id.</u> at 78. The U.S. Supreme Court recognized that Article II, § 1 grants the authority to select electors <u>directly</u> to the state legislatures, <u>id.</u> at 76-77, notwithstanding any limitations on that authority purporting to flow from another source of law, such as the state constitution. Accordingly, it remanded to the Florida Supreme Court for clarification of the basis of the ruling. Importantly, however, <u>Bush I</u> did not purport to overrule a state court ruling – rather, it sought clarification whether the state court had viewed itself constrained by its state constitution to the extent that its organic law was at variance with the legislative intent as evidenced by the statute itself. <u>See</u> <u>Bush I</u>, 531 U.S. at 77-78.

In <u>Bush v. Gore</u>, 531 U.S. 98, 101 (2000) (<u>Bush II</u>), the Supreme Court concluded (under a variety of theories endorsed by different Justices) that continuation of the Florida recount could not be conducted consistent with the U.S. Constitution in sufficient time to take advantage of the "safe harbor" provision in 3 U.S.C. § 5. In a concurrence to the per curiam opinion in <u>Bush II</u>, Chief Justice Rehnquist, joined by Justices Thomas and Scalia, elaborated further, stating that, with respect to statutes enacted pursuant to Article II, § 1's grant of authority,

> the general coherence of the legislative scheme may not be altered by judicial interpretation so as to wholly change the statutorily provided apportionment of responsibility among these various bodies. In any election but a Presidential election, the Florida Supreme Court can give as little or as much deference to Florida's executives as it chooses, so far as Article II is concerned, and this

> Court will have no cause to question the court's actions. But, with respect to a Presidential election, the court must be both mindful of the legislature's role under Article II in choosing the manner of appointing electors and deferential to those bodies expressly empowered by the legislature to carry out its constitutional mandate.

Id. at 114 (Rehnquist, C.J., concurring).

The theory of the concurrence — a federal judicial override of state court determinations of state election laws in presidential elections — was not endorsed by a majority of the court. Indeed, it sparked disagreement by Justice Stevens (joined by Justices Ginsberg and Breyer). Id. at 124 ("Neither [3 U.S.C.] § 5 nor Article II grants federal judges any special authority to substitute their views for those of the state judiciary on matters of state law.").  Thus, it is unclear to what extent a federal court may utilize the less deferential approach that may be located in some of the Bush opinions.

Whatever may be the vitality of the doctrine that Plaintiffs invoke, it has no application here. The Michigan Court of Appeals' interpretation of its election laws does not alter "the general coherence" of the legislative recount scheme enacted in Mich. Comp. Laws § 168.879. It is at least arguable that the Michigan Legislature intended to confine costly and disruptive recounts to cases where a losing candidate stood a reasonable chance of changing the outcome of the election. That is certainly the typical petitioner for a recount, and nothing has been placed in the record to suggest that the Legislature may have had in mind a petitioner simply wishing to confirm the voting results, notwithstanding the absence of any reasonable likelihood of changing the result. Further, the Michigan court utilized traditional tools of analysis to reach that result, pointing to dictionaries and precedents in other contexts where the "aggrieved" concept is utilized in Michigan law. Plaintiffs offer cogent reasons to challenge the Michigan court's

conclusions, but none leads to the conclusion that the Michigan court disregarded or plainly misread the legislature's intent.

This is a far cry from the <u>Bush</u> litigation. In <u>Bush I</u>, the Florida Supreme Court invoked its "equitable powers" to override an express 7-day deadline found in the statute and extend it by 12 days. <u>See</u> <u>Bush I</u>, 531 U.S. at 75-76. The U.S. Supreme Court's remand was based on its suspicion that the Florida Supreme Court arguably had impermissibly attributed its decision to an irrelevant source of law — that is, something other than the state legislature exercising its delegated Article II powers. <u>Id.</u> Here, the Michigan Court of Appeals neither ignored a statutory term, nor is there a hint that it was basing its decision on something other than the statute; it merely made an arguable interpretation of the statute before it. It cannot be said that the Michigan Court of Appeals "departed from the statutory meaning," <u>Bush II</u>, 531 U.S. at 115, or recognized a limitation on the legislature's Article II powers in the same way that the Florida Supreme Court may have attempted to do in <u>Bush I</u>.

Because there is no basis for this Court to ignore the Michigan court's ruling and make an independent judgment regarding what the Michigan Legislature intended by the term "aggrieved," Plaintiffs have not shown an entitlement to a recount under Michigan's statutory scheme.

Nor have Plaintiffs shown an entitlement to a recount that derives from a source <u>other than</u> the recount procedures established by the Michigan Legislature. It is true that presidential candidates and voters, once enfranchised by a state legislature, have a general right to have the vote counted fairly. <u>See, e.g.</u>, <u>Bush II</u> at 104-105. But unlike Plaintiffs' first argument — which invokes the right to have a state's statutory election machinery applied as the legislature dictated, and may be made whenever the statute is violated — Plaintiff's second argument certainly

requires facts amounting to an actual impact on the right to vote.   There is no case law recognizing an independent federal right to a recount that either this Court or the parties have come across, in the absence of actual deprivation of voting rights.  Rather, Plaintiffs' asserted right to a recount is just a restatement of her right to participate in a fair election, free from tampering or mistake.  But, to date, Plaintiffs have not presented evidence of tampering or mistake.  Instead, they present speculative claims going to the vulnerability of the voting machinery -- but not actual injury.  Because mere potentiality does not amount to a claim that the vote was not fairly conducted, Plaintiffs' new claims are insufficient to maintain the existing TRO.  No likelihood of success on that claim has been shown.

The issues that Plaintiffs raise are serious indeed. The vulnerability of our system of voting poses the threat of a potentially devastating attack on the integrity of our election system. But invoking a court's aid to remedy that problem in the manner Plaintiffs have chosen — seeking a recount as an audit of the election to test whether the vulnerability led to actual compromise of the voting system — has never been endorsed by any court, and would require, at a minimum, evidence of significant fraud or mistake — and not speculative fear of them.  Such evidence has not been presented here.

For all these reasons, this Court dissolves the TRO effective immediately.

SO ORDERED.

Dated:  December 7, 2016
    Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 7, 2016.

s/Karri Sandusky

Case Manager

EXHIBIT 3

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Matter of the 2016       :
Presidential Election           :
                           :
Petition of: One Hundred (100)   :
or more unnamed registered voters of :
the Commonwealth of Pennsylvania  :    No. 659 M.D. 2016

**PER CURIAM**        **O R D E R**

AND NOW, this 29th day of November 29, 2016, upon review of the Class II Election Contest Petition (Contest Petition) and the Praecipe to Substitute and Attach Verifications thereto, and it appearing that a conclusive decision must be entered by December 13, 2016, it is hereby ORDERED:

1) Pennsylvania's Electors for President and Vice-President as identified by the Pennsylvania Department of State shall respond to the factual averments in the Contest Petition and file dispositive applications for relief on or before 12:00 noon on Friday, December 2, 2016.

2) Applications to intervene must be filed on or before 12:00 noon on Friday, December 2, 2016, and shall be accompanied by a response to the Contest Petition.

3) Hearing is set for Monday, December 5, 2016, at 10:00 a.m. in Courtroom 5001, Fifth Floor, Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania. Argument on any dispositive applications shall be heard at the same time.

Certified from the Record

NOV 2 9 2016

And Order Exit

EXHIBIT 4

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Matter of the 2016     :
Presidential Election     :
    :
Petition of: One Hundred (100)     :
or more unnamed registered voters of     :
the Commonwealth of Pennsylvania     :    No. 659 M.D. 2016

## PER CURIAM

## O R D E R

AND NOW, this 2nd day of December, 2016, upon consideration of Petitioners' request that the Court set the statutory bond required in this matter in the amount of $25,000, and the response thereto filed by the Pennsylvania Electors of President-Elect Donald J. Trump and Vice-President-Elect Michael Pence, *et al.*, that the bond be set at $10,000,000, it is hereby ORDERED as follows:

1. By no later than 5:00 p.m. on Monday, December 5, 2016, Petitioners must file a bond in the amount of $1,000,000 that complies with Section 1759 of the Pennsylvania Election Code, Act of June 3, 1937, *as amended*, P.L. 1333, 25 P.S. §3459.

2. Upon good cause shown, the amount of the bond may be modified by the Court.

Certified from the Record

DEC 0 2 2016

And Order Exit

EXHIBIT 5

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

**HARRSIBURG, PENNSYLVANIA**

**In re: The matter of the 2016 Presidential Election: Docket No: 659 MD 2016**

                                             **: ELECTION MATTER**

**PRAECIPE TO DISCONTINUE AND WITHDRAW**


TO THE PROTHONOTARY:

Petitioners are regular citizens of ordinary means.  They cannot afford to post the $1,000,000

bond required by the Court.  Accordingly, kindly mark the above captioned matter withdrawn

and discontinued.


                          Respectfully submitted,

                          /s/ LAWRENCE M. OTTER, ESQ.
                          _____
                          LAWRENCE M. OTTER, ESQUIRE
                          ATTORNEY FOR PETITIONERS
                          PA ATTORNEY ID  31383
                          PO Box 575
                          SILVERDALE, PA 18901
                          267-261-2984
                          Email: larryotter@hotmail.com

Date:  December 3, 2016

Of counsel:  Emery Celli Brimcerhoff & Abady, LLP

        600 Fifth Avenue
        New York NY 10019
        212-763-5000
        by:    Andrew G. Celli, Jr.*
               Ilann M. Maazel*
        Alison Frick*
        Douglas Lieb*

    * pro hac vice pending

EXHIBIT 6

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In Re: Matter of the 2016 | : |
| Presidential Election | : |
| | : |
| Petition of: One Hundred (100) | : |
| or more unnamed registered voters of | : |
| the Commonwealth of Pennsylvania | : No. 659 M.D. 2016 |

**PER CURIAM**

# O R D E R

AND NOW, this 3rd day of December, 2016, Petitioners having filed a Praecipe to Discontinue and Withdraw the above-captioned matter, the hearing scheduled for Monday, December 5, 2016, at 10:00 a.m. is CANCELLED, and the Chief Clerk is directed to mark this matter CLOSED.

EXHIBIT 7

# COURT OF COMMON PLEAS
## PHILADELPHIA COUNTY
### CIVIL TRIAL DIVISION

RECEIVED

DEC 0 7 2016

OFFICE OF JUDICIAL
RECORDS

STEIN                              :
                                   :
    v.                             :        **No.** 161103335
                                   :
**PHILADELPHIA COUNTY BOARD**      :
**OF ELECTIONS**                   :


AND NOW, this 7th day of December 2016, upon consideration of the partial appeal of

petitioner, it is hereby ORDERED that the appeal is DENIED and the decision of the

Philadelphia County Board of Elections is AFFIRMED. The reasons for denial are set forth in

the attached opinion.


                        BY THE COURT:


                        4bde  F. F0
                        Abbe F. Fletman, Judge

# COURT OF COMMON PLEAS
# PHILADELPHIA COUNTY
# CIVIL TRIAL DIVISION

STEIN                      :
                                :
      v.                    :       **No.** 161103335
                                  :

**PHILADELPHIA COUNTY BOARD**    :
**OF ELECTIONS**                     :

## OPINION

Before the Court is the partial appeal of appellant Jill Stein of the decision of the

Philadelphia County Board of Elections (the "Board") not to permit a forensic examination of the

electronic voting system Philadelphia employs. For the reasons explained below, the Court

affirms the Board's decision and dismisses Dr. Stein's appeal.

## FACTS

Appellant Jill Stein was a presidential candidate in the federal election held on November

8, 2016. Before the Board finished computing the vote, 297 Philadelphia voters filed petitions

(the "Petitions") for a recount under 25 P.S. § 3154(e)(West 2004). Each of the Petitions

requested that "a reasonable subset of the DRE [direct-recording electronic voting system]

machines be forensically analyzed by appropriate computer experts for potential tampering,

malware, and/or hacking." *See* Ex. A to Appellant's Partial Appeal of Decision of Philadelphia

Board of Elections (December 2, 2016) (the "Appeal"). At a public meeting on December 1,

2016, the Board announced that its staff had evaluated the Petitions and determined that 282 of

them met the requirements of the Pennsylvania Election Code. Based on those Petitions, the

Board voted to recanvass and recount the votes in 75 of the City's 1,686 polling divisions.

In advance of the December 1st Board meeting, Dr. Stein requested that the Board allow

"forensic examination by independent experts of the election management computers and a

sampling of the electronic voting machines and movable media used in the 2016 general election." November 30, 2016 letter from Ilann M. Maazel to Deputy Commissioner Fred Voigt, attached as Ex. B to the Appeal. The Board heard argument by counsel to Dr. Stein and counsel for the electors for President Elect Donald Trump, Vice President Elect Mike Pence and the Republican Party of Pennsylvania. The Board denied Dr. Stein's request.[1]

Dr. Stein timely appealed the Board's denial to this Court on December 2, 2016.[2] Dr. Stein's Appeal requested that "she be permitted to perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12. The Court heard argument on December 6, 2016.

## DISCUSSION

Dr. Stein argues that she is entitled to the requested forensic examination under Section 2650(c) of the Election Code, which provides: "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act." 25 P.S. § 2650(c)(West 2004). Dr. Stein is mistaken.

Our country is based on a federal system in which individual states govern the voting process within their borders.[3] The Legislature in this Commonwealth has enacted a comprehensive Election Code that entrusts the integrity of elections to the Secretary of the

---

[1] The Board did not announce its reasoning.

[2] This Court has jurisdiction over this appeal pursuant to 25 P.S. § 3157 (West 2004), which provides for an appeal to the Court of Common Pleas from "any order or decision" of a County Board of Elections "regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under" 25 P.S. §§ 3261, 3262 and 3263.

[3] The conduct of elections, of course, is also governed by the Constitution and federal voting statutes. The relief requested in this appeal, however, rests solely upon state law.

Commonwealth and county election boards. The Secretary of the Commonwealth, after examination, must approve any electronic voting system before it may be put to use. *Id.* at § 3031.7. Further, it is the Board's solemn duty to "inspect systematically and thoroughly the conduct of . . . elections . . . to the end that . . . elections may be honestly, efficiently, and uniformly conducted." *Id.* at § 2642(g). The Board further is compelled to "investigate election frauds, irregularities and violations of this act. . . ." *Id.* at § 2642(i).

The Election Code further requires the Board to test the "central automatic tabulating equipment" both before and after the election. *Id.* at § 3031.14(a). Each political party or body represented on the ballot is permitted to be present during the testing of the vote tabulating equipment, the actual counting of ballots and the recounting or recanvassing of ballots." *Id.* at §§ 2650(c) and 3031.14(b)(2). They also are permitted to have "a technically qualified person" there "to make independent tests of the equipment prior to, during, and following the vote count; Provided, however, That such testing shall in no way interfere with the official tabulation of the ballots and district totals cards." *Id.* at § 3031.14(b)(2). Nothing in the record evidences whether Dr. Stein took advantage of these provisions, which allowed her representatives, including those with technical knowledge, to be present during the testing of the vote tabulating equipment.

Section 2650(c) is part of a provision entitled, "Watchers or attorneys at sessions of county board; candidates may be present". Subsection (a) provides that "[a]ny party or political body or body of citizens . . . entitled to have watchers at any . . . election" shall also be entitled to appoint watchers "at any recount of ballots or recanvass of voting machines. . . ." *Id.* at § 2650(a). It is in this context that § 2650(c) entitles "[a]ny candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines" to "examine . . . the voting machine and to raise any objections regarding the same. . . ." *Id.* Section 2650(c), by its own terms, is

3

limited to examination of **voting machines.** When a court is called upon to interpret a statute, "[t]he best indication of legislative intent is the plain language of the statute." *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013). This statute simply does not mandate or allow a candidate to "perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12.

In 1980, the General Assembly amended the Election Code to allow the use of electronic voting systems, which include DREs. 25 P.S. §§ 3031.1-3031.22 (electronic voting systems). The Legislature could have enacted legislation providing candidates with unbridled rights to examine electronic voting systems before, during and after elections. It did not and has not. This Court will not impose requirements the Legislature has not seen fit to establish.

This is especially true when, as in this case, there is absolutely no evidence of any voting irregularities. To the contrary, the elected and appointed officials charged with safeguarding our voting system, uniformly maintain its integrity. Secretary of State Pedro A. Cortés publicly stated before the election that "[a]ll of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards." Remarks by Secretary of State Pedro A. Cortés Press Conference, October 20, 2016.[4] More specifically, the Board's review of the 75 recanvassed divisions in Philadelphia revealed no discrepancies in the electronic tallies. Dr. Stein's brief cites cyber-attacks in Arizona and Illinois, and against the Democratic National Committee, but none affecting the voting system in Philadelphia.

Dr. Stein further raises concerns about hacking by a foreign government to interfere with the U.S. election process. *See* Ex. A to the Appeal, Halderman Aff. ¶ 6 & attached exhibits.

---

[4] Respondent, the Republican State Committee of Pennsylvania, entered Secretary Cortés's remarks into evidence as R-1 at the December 6, 2016 hearing.

These instances, while of course of concern, do not establish any wrongdoing in Philadelphia and do not compel a different result.

Indeed, just last year our Supreme Court address the security of electronic voting systems in *Banfield v. Cortes,* 110 A.3d 115 (Pa. 2015). In affirming the Commonwealth Court's decision upholding the Secretary of State's certification of the use of DREs in Pennsylvania elections, the Court noted that "all voting systems are imperfect and not immune from tampering. . . ." *Id.* at 174. In that case, the Secretary had determined that the DREs satisfied the Election Code's requirements. *Id.* As those appellants had not alleged fraud, bad faith, an abuse of discretion, or an arbitrary decision, the Supreme Court declined to disturb the Secretary's administrative discretion. *Id.* Similarly, in this case, appellants have raised no specter of fraud, bad faith, abuse of discretion or arbitrariness. Accordingly, this Court will not disturb the Board's decision.

## CONCLUSION

"The needs of our democracy require accurate and rapid ascertainment of the people's will. And it is for that reason that the Legislature has entrusted the County Board of Elections with plenary powers in the administration of the election code." *Appeal of McCracken,* 88 A.2d 787, 788 (Pa. 1952). The Philadelphia Board of Elections, after a public hearing, determined not to allow a forensic review that the Election Code does not require. For all the foregoing reasons, the Court affirms the decision of the Philadelphia Board of Elections and dismisses the appeal of appellant Jill Stein.

_____
                                         J.

Dated: December 7, 2016