

November 2016

**POST-ELECTION GENERAL RECONCILIATION CHECKLIST**

Please review this checklist of items for the return board to follow during the official canvass of votes:

- ☐ First, compare the number of registered voters in each precinct to the numbered list of voters created at the polls on Election Day. Second, compare the numbered list of voters to the number of votes recorded on the voting machines that appears on the results tapes printed at the close of polls. The return Board must investigate any discrepancies or irregularities among those records. *See* 25 P.S. § 3154(b).
  - The return board has the authority to summon the district election officers, machine inspectors, clerks and overseers during its investigation of any discrepancies.
  - If warranted, the return board must turn over a report of the facts to the district attorney.
- ☐ For counties with paper ballots, the return board must account for and reconcile all balloting materials, including the following:
  - Extra ballots printed in accordance with the Election Code
  - The number of ballots issued
  - The number of spoiled ballots
  - The number of ballots cast

  *See* 25 P.S. § 3154(c). All counties must also verify the number of cancelled absentee ballots.
- ☐ The return board must carefully review the tally papers, or district totals cards and compare them to the totals tapes from the machines and reconcile them with the numbers on the general return sheets. *See* 25 P.S. § 3154(d). During this process, the return board should ensure that all votes were properly compiled from all of the removable storage media associated with the voting machines in each precinct.



D2

- ☐ As part of its canvass, and before they certify the totals, the return board must conduct a statistical recount of a random sample of ballots. *See* 25 P.S. § 3031.17.
    - o Counties using optical scan voting systems must conduct the statistical recount via a hand count of ballots and must count every race on the ballot.
    - o Counties using direct recording electronic (DRE) voting systems must conduct the statistical recount via a hand count of the ballot images, or cast vote records, contained in the system, rather than the "totals tapes." Again, all races must be counted.

    *See* Paragraph 10 of the *Directive Concerning the Use, Implementation and Operation of Electronic Voting Systems by County Boards of Elections*, attached.

- ☐ Voting systems must remain locked after the completion of the canvass, unless the return board is required to open them by court order or for purposes of an election contest. *See* 25 P.S. § 3070.
- ☐ If a county board of elections re-formats the memory cards used in an election, the county board must prepare and maintain a printed or electronic copy of the ballot images, also known as cast vote records, for 22 months after the election. *See* 52 U.S.C.A. § 20701

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL STEIN, et al.,

Plaintiffs,

Case No. 16-14233
Hon. Mark A. Goldsmith

vs.

CHRISTOPHER M. THOMAS,
et al.,

Defendants.
_____________________________/

**ORDER DISSOLVING TEMPORARY RESTRAINING ORDER (Dkt. 16)**

On December 5, 2016, this Court entered a temporary restraining order ("TRO") requiring Defendants "to cease any delay in the commencement of the recount of the presidential vote cast in Michigan" and to "continue [the recount] until further order of this Court." 12/5/2016 Op. & Order at 7 (Dkt. 16). Defendants appealed that order to the United States Court of Appeals for the Sixth Circuit (Dkts. 22, 25).

On December 6, 2016, the U.S. Court of Appeals affirmed this Court's grant of the TRO, holding that it was not an abuse of discretion to "halt[ ] operation of the waiting period law," Mich. Comp. Laws § 168.882(3).[1] See Stein v. Thomas, 12/6/2016 Order at 8, Case No. 16-2690 (6th Cir. Dec. 6, 2016). The majority further stated that "[i]f, subsequently, the Michigan courts determine that Plaintiffs' recount is improper under Michigan state law for any reason, we

[1] Mich. Comp. Laws § 168.882(3) requires that "the board of state canvassers shall not begin a recount unless 2 or more business days have elapsed since the board ruled on the objections under this subsection . . . ." On Friday, December 2, 2016, the Board of State Canvassers ruled on objections to the recount filed by Donald J. Trump on that same day. See Compl. ¶ 27. By operation of the statute, the Board, therefore, could not commence the recount until two business had passed, i.e., until Wednesday, December 7, 2016. Id. ¶¶ 28-29.



D3

expect the district court to entertain any properly filed motions to dissolve or modify its order in this case." Id.

Shortly after the Sixth Circuit issued its order, the Michigan Court of Appeals held that the recount of the votes case in the presidential election should never have been initiated in the first place, because Stein was not an "aggrieved candidate" as required to initiate a recount under Mich. Comp. Laws § 168.879. See generally Attorney Gen. v. Bd. of State Canvassers, 12/6/2016 Op. & Order, Case Nos. 335947 & 335958 (Mich. Ct. App. Dec. 6, 2016). The Michigan court found that the statute accorded "aggrieved" status only to a candidate who could state in good faith that "but for mistake or fraud, the candidate would have had a reasonable chance of winning the election" – a standard the Michigan court said the recount petitioner could not satisfy. Id. at 5. Shortly after that ruling, Michigan Attorney General Bill Schuette, the Michigan Republican Party, and the original Defendants each filed in this Court emergency motions to dissolve the TRO (Dkts. 26, 28, 29). This Court immediately entered an order for a hearing on the motions, which was conducted earlier today.

All agree that the initial justification for the TRO — i.e., Plaintiffs' challenge to the two-day rule — is no longer at issue. Recognizing this fact, Plaintiffs filed an amended complaint (Dkt. 30) before filing their response to Defendants' motions to dissolve the TRO (Dkt. 33), broadening their claims in this case. Based on the assertion that there may have been fraud or other mistakes in the recordation of the votes, they now assert that any act by Defendants that "jeopardizes completion" of a recount amounts to maintaining a system of voting that denies Michigan voters the right to have their votes counted, in violation of their rights under the equal protection clause, the due process clause, and the First Amendment.

In tandem with their new claims, Plaintiffs' response to the motions to dissolve argues that the TRO should be preserved on either of two alternative bases: (i) that the Michigan Court of Appeals' ruling on the "aggrieved party" issue represents a "distorted interpretation of the text" of Mich. Comp. Laws § 168.879, see Pls. Resp. at 3-4; and (ii) that Plaintiffs have a federal constitutional right to a recount independent of the state statutory scheme providing for a recount, see id. at 10. The Court finds neither argument persuasive.[2]

Plaintiffs argue that the Michigan Court of Appeals abrogated the authority of the Michigan Legislature by interpreting the term "aggrieved" incorrectly. Id. at 2-3. Recognizing that federal courts typically avoid overruling a state court's interpretation of state law, Plaintiffs invoke precedents from the momentous litigation surrounding the 2000 presidential election, in which the Supreme Court addressed when such traditional deference need not be accorded. Plaintiffs' theory is that those cases establish an allowance for federal courts to ignore certain state court pronouncements on state election laws concerning presidential elections in certain circumstances. However, Plaintiffs overstate the impact of these precedents and, in any case, ignore crucial differences between those cases and ours.

---

[2] As to the first issue, Intervenor Schuette argues that the law of the case doctrine requires this Court to simply accept the decision of the Michigan Court of Appeals without further analysis, on the theory that the Sixth Circuit has already decided that any ruling from the Michigan courts would be dispositive on Michigan law. However, in the present circumstances, the application of the law of the case doctrine is less than clear. It comes into play with respect to issues "previously determined" by a higher court. Bowling v. Pfizer, Inc., 132 F.3d 1147 (6th Cir. 1998). Here, the Sixth Circuit's decision did not require an answer to whether a forthcoming Michigan court ruling would have to be accepted without further analysis; nor was the Sixth Circuit presented with the arguments Plaintiffs have made in response to the motions to dissolve the TRO. Further, it did not specifically direct this Court to accept any ruling by a Michigan court without further analysis. Instead, it directed this Court to "entertain" any motion to dissolve the TRO should there be a Michigan court ruling denying a right to a recount. This Court has done precisely that. Because the applicability of the doctrine is less than certain, this Court proceeds to consider Plaintiffs' arguments on the merits.

In Bush v. Palm Beach County Canvassing Board, 531 U.S. 70 (2000) (Bush I), a Florida election official had declined to waive the statutory deadline for submitting recount returns, but the Florida Supreme Court nevertheless extended the deadline by 12 days. In reviewing the Florida Supreme Court's decision, which had interpreted Florida election laws, the Supreme Court expressed its apprehension that, in interpreting the election laws enacted by the Florida Legislature, the Florida Supreme Court had concluded that its legislature potentially was "circumscribe[d]" by the state constitution. Id. at 78. The U.S. Supreme Court recognized that Article II, § 1 grants the authority to select electors directly to the state legislatures, id. at 76-77, notwithstanding any limitations on that authority purporting to flow from another source of law, such as the state constitution. Accordingly, it remanded to the Florida Supreme Court for clarification of the basis of the ruling. Importantly, however, Bush I did not purport to overrule a state court ruling – rather, it sought clarification whether the state court had viewed itself constrained by its state constitution to the extent that its organic law was at variance with the legislative intent as evidenced by the statute itself. See Bush I, 531 U.S. at 77-78.

In Bush v. Gore, 531 U.S. 98, 101 (2000) (Bush II), the Supreme Court concluded (under a variety of theories endorsed by different Justices) that continuation of the Florida recount could not be conducted consistent with the U.S. Constitution in sufficient time to take advantage of the "safe harbor" provision in 3 U.S.C. § 5. In a concurrence to the per curiam opinion in Bush II, Chief Justice Rehnquist, joined by Justices Thomas and Scalia, elaborated further, stating that, with respect to statutes enacted pursuant to Article II, § 1's grant of authority,

> the general coherence of the legislative scheme may not be altered by judicial interpretation so as to wholly change the statutorily provided apportionment of responsibility among these various bodies. In any election but a Presidential election, the Florida Supreme Court can give as little or as much deference to Florida's executives as it chooses, so far as Article II is concerned, and this

> Court will have no cause to question the court's actions. But, with respect to a Presidential election, the court must be both mindful of the legislature's role under Article II in choosing the manner of appointing electors and deferential to those bodies expressly empowered by the legislature to carry out its constitutional mandate.

Id. at 114 (Rehnquist, C.J., concurring).

The theory of the concurrence — a federal judicial override of state court determinations of state election laws in presidential elections — was not endorsed by a majority of the court. Indeed, it sparked disagreement by Justice Stevens (joined by Justices Ginsberg and Breyer). Id. at 124 ("Neither [3 U.S.C.] § 5 nor Article II grants federal judges any special authority to substitute their views for those of the state judiciary on matters of state law."). Thus, it is unclear to what extent a federal court may utilize the less deferential approach that may be located in some of the Bush opinions.

Whatever may be the vitality of the doctrine that Plaintiffs invoke, it has no application here. The Michigan Court of Appeals' interpretation of its election laws does not alter "the general coherence" of the legislative recount scheme enacted in Mich. Comp. Laws § 168.879. It is at least arguable that the Michigan Legislature intended to confine costly and disruptive recounts to cases where a losing candidate stood a reasonable chance of changing the outcome of the election. That is certainly the typical petitioner for a recount, and nothing has been placed in the record to suggest that the Legislature may have had in mind a petitioner simply wishing to confirm the voting results, notwithstanding the absence of any reasonable likelihood of changing the result. Further, the Michigan court utilized traditional tools of analysis to reach that result, pointing to dictionaries and precedents in other contexts where the "aggrieved" concept is utilized in Michigan law. Plaintiffs offer cogent reasons to challenge the Michigan court's

conclusions, but none leads to the conclusion that the Michigan court disregarded or plainly misread the legislature's intent.

This is a far cry from the Bush litigation. In Bush I, the Florida Supreme Court invoked its "equitable powers" to override an express 7-day deadline found in the statute and extend it by 12 days. See Bush I, 531 U.S. at 75-76. The U.S. Supreme Court's remand was based on its suspicion that the Florida Supreme Court arguably had impermissibly attributed its decision to an irrelevant source of law — that is, something other than the state legislature exercising its delegated Article II powers. Id. Here, the Michigan Court of Appeals neither ignored a statutory term, nor is there a hint that it was basing its decision on something other than the statute; it merely made an arguable interpretation of the statute before it. It cannot be said that the Michigan Court of Appeals "departed from the statutory meaning," Bush II, 531 U.S. at 115, or recognized a limitation on the legislature's Article II powers in the same way that the Florida Supreme Court may have attempted to do in Bush I.

Because there is no basis for this Court to ignore the Michigan court's ruling and make an independent judgment regarding what the Michigan Legislature intended by the term "aggrieved," Plaintiffs have not shown an entitlement to a recount under Michigan's statutory scheme.

Nor have Plaintiffs shown an entitlement to a recount that derives from a source other than the recount procedures established by the Michigan Legislature. It is true that presidential candidates and voters, once enfranchised by a state legislature, have a general right to have the vote counted fairly. See, e.g., Bush II at 104-105. But unlike Plaintiffs' first argument — which invokes the right to have a state's statutory election machinery applied as the legislature dictated, and may be made whenever the statute is violated — Plaintiff's second argument certainly

requires facts amounting to an actual impact on the right to vote. There is no case law recognizing an independent federal right to a recount that either this Court or the parties have come across, in the absence of actual deprivation of voting rights. Rather, Plaintiffs' asserted right to a recount is just a restatement of her right to participate in a fair election, free from tampering or mistake. But, to date, Plaintiffs have not presented evidence of tampering or mistake. Instead, they present speculative claims going to the vulnerability of the voting machinery -- but not actual injury. Because mere potentiality does not amount to a claim that the vote was not fairly conducted, Plaintiffs' new claims are insufficient to maintain the existing TRO. No likelihood of success on that claim has been shown.

The issues that Plaintiffs raise are serious indeed. The vulnerability of our system of voting poses the threat of a potentially devastating attack on the integrity of our election system. But invoking a court's aid to remedy that problem in the manner Plaintiffs have chosen — seeking a recount as an audit of the election to test whether the vulnerability led to actual compromise of the voting system — has never been endorsed by any court, and would require, at a minimum, evidence of significant fraud or mistake — and not speculative fear of them. Such evidence has not been presented here.

For all these reasons, this Court dissolves the TRO effective immediately.

SO ORDERED.

Dated: December 7, 2016
Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 7, 2016.

s/Karri Sandusky
Case Manager

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**
**CIVIL TRIAL DIVISION**

RECEIVED
DEC 07 2016
OFFICE OF JUDICIAL RECORDS

| | | |
|---|---|---|
| **STEIN** | : | |
| | : | |
| **v.** | : | **No.** 161103335 |
| | : | |
| **PHILADELPHIA COUNTY BOARD OF ELECTIONS** | : | |
| | : | |

AND NOW, this 7th day of December 2016, upon consideration of the partial appeal of petitioner, it is hereby ORDERED that the appeal is DENIED and the decision of the Philadelphia County Board of Elections is AFFIRMED. The reasons for denial are set forth in the attached opinion.

BY THE COURT:

Abbe F. Fletman, Judge

Stein Vs Philadelphia C-ORDRF
16110333500016

D4

Case No: 161103335

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**
**CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| **STEIN** | : | |
| | : | |
| **v.** | : | **No.** 161103335 |
| | : | |
| **PHILADELPHIA COUNTY BOARD OF ELECTIONS** | : | |

## OPINION

Before the Court is the partial appeal of appellant Jill Stein of the decision of the Philadelphia County Board of Elections (the "Board") not to permit a forensic examination of the electronic voting system Philadelphia employs. For the reasons explained below, the Court affirms the Board's decision and dismisses Dr. Stein's appeal.

## FACTS

Appellant Jill Stein was a presidential candidate in the federal election held on November 8, 2016. Before the Board finished computing the vote, 297 Philadelphia voters filed petitions (the "Petitions") for a recount under 25 P.S. § 3154(e)(West 2004). Each of the Petitions requested that "a reasonable subset of the DRE [direct-recording electronic voting system] machines be forensically analyzed by appropriate computer experts for potential tampering, malware, and/or hacking." *See* Ex. A to Appellant's Partial Appeal of Decision of Philadelphia Board of Elections (December 2, 2016) (the "Appeal"). At a public meeting on December 1, 2016, the Board announced that its staff had evaluated the Petitions and determined that 282 of them met the requirements of the Pennsylvania Election Code. Based on those Petitions, the Board voted to recanvass and recount the votes in 75 of the City's 1,686 polling divisions.

In advance of the December 1st Board meeting, Dr. Stein requested that the Board allow "forensic examination by independent experts of the election management computers and a

sampling of the electronic voting machines and movable media used in the 2016 general election." November 30, 2016 letter from Ilann M. Maazel to Deputy Commissioner Fred Voigt, attached as Ex. B to the Appeal. The Board heard argument by counsel to Dr. Stein and counsel for the electors for President Elect Donald Trump, Vice President Elect Mike Pence and the Republican Party of Pennsylvania. The Board denied Dr. Stein's request.[1]

Dr. Stein timely appealed the Board's denial to this Court on December 2, 2016.[2] Dr. Stein's Appeal requested that "she be permitted to perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12. The Court heard argument on December 6, 2016.

**DISCUSSION**

Dr. Stein argues that she is entitled to the requested forensic examination under Section 2650(c) of the Election Code, which provides: "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act." 25 P.S. § 2650(c)(West 2004). Dr. Stein is mistaken.

Our country is based on a federal system in which individual states govern the voting process within their borders.[3] The Legislature in this Commonwealth has enacted a comprehensive Election Code that entrusts the integrity of elections to the Secretary of the

[1] The Board did not announce its reasoning.

[2] This Court has jurisdiction over this appeal pursuant to 25 P.S. § 3157 (West 2004), which provides for an appeal to the Court of Common Pleas from "any order or decision" of a County Board of Elections "regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under" 25 P.S. §§ 3261, 3262 and 3263.

[3] The conduct of elections, of course, is also governed by the Constitution and federal voting statutes. The relief requested in this appeal, however, rests solely upon state law.

Commonwealth and county election boards. The Secretary of the Commonwealth, after examination, must approve any electronic voting system before it may be put to use. *Id.* at § 3031.7. Further, it is the Board's solemn duty to "inspect systematically and thoroughly the conduct of . . . elections . . . to the end that . . . elections may be honestly, efficiently, and uniformly conducted." *Id.* at § 2642(g). The Board further is compelled to "investigate election frauds, irregularities and violations of this act. . . ." *Id.* at § 2642(i).

The Election Code further requires the Board to test the "central automatic tabulating equipment" both before and after the election. *Id.* at § 3031.14(a). Each political party or body represented on the ballot is permitted to be present during the testing of the vote tabulating equipment, the actual counting of ballots and the recounting or recanvassing of ballots." *Id.* at §§ 2650(c) and 3031.14(b)(2). They also are permitted to have "a technically qualified person" there "to make independent tests of the equipment prior to, during, and following the vote count; Provided, however, That such testing shall in no way interfere with the official tabulation of the ballots and district totals cards." *Id.* at § 3031.14(b)(2). Nothing in the record evidences whether Dr. Stein took advantage of these provisions, which allowed her representatives, including those with technical knowledge, to be present during the testing of the vote tabulating equipment.

Section 2650(c) is part of a provision entitled, "Watchers or attorneys at sessions of county board; candidates may be present". Subsection (a) provides that "[a]ny party or political body or body of citizens . . . entitled to have watchers at any . . . election" shall also be entitled to appoint watchers "at any recount of ballots or recanvass of voting machines. . . ." *Id.* at § 2650(a). It is in this context that § 2650(c) entitles "[a]ny candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines" to "examine . . . the voting machine and to raise any objections regarding the same. . . ." *Id.* Section 2650(c), by its own terms, is

limited to examination of **voting machines.** When a court is called upon to interpret a statute, "[t]he best indication of legislative intent is the plain language of the statute." *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013). This statute simply does not mandate or allow a candidate to "perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12.

In 1980, the General Assembly amended the Election Code to allow the use of electronic voting systems, which include DREs. 25 P.S. §§ 3031.1-3031.22 (electronic voting systems). The Legislature could have enacted legislation providing candidates with unbridled rights to examine electronic voting systems before, during and after elections. It did not and has not. This Court will not impose requirements the Legislature has not seen fit to establish.

This is especially true when, as in this case, there is absolutely no evidence of any voting irregularities. To the contrary, the elected and appointed officials charged with safeguarding our voting system, uniformly maintain its integrity. Secretary of State Pedro A. Cortés publicly stated before the election that "[a]ll of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards." Remarks by Secretary of State Pedro A. Cortés Press Conference, October 20, 2016.[4] More specifically, the Board's review of the 75 recanvassed divisions in Philadelphia revealed no discrepancies in the electronic tallies. Dr. Stein's brief cites cyber-attacks in Arizona and Illinois, and against the Democratic National Committee, but none affecting the voting system in Philadelphia.

Dr. Stein further raises concerns about hacking by a foreign government to interfere with the U.S. election process. *See* Ex. A to the Appeal, Halderman Aff. ¶ 6 & attached exhibits.

---

[4] Respondent, the Republican State Committee of Pennsylvania, entered Secretary Cortés's remarks into evidence as R-1 at the December 6, 2016 hearing.

These instances, while of course of concern, do not establish any wrongdoing in Philadelphia and do not compel a different result.

Indeed, just last year our Supreme Court address the security of electronic voting systems in *Banfield v. Cortes*, 110 A.3d 115 (Pa. 2015). In affirming the Commonwealth Court's decision upholding the Secretary of State's certification of the use of DREs in Pennsylvania elections, the Court noted that "all voting systems are imperfect and not immune from tampering. . . ." *Id.* at 174. In that case, the Secretary had determined that the DREs satisfied the Election Code's requirements. *Id.* As those appellants had not alleged fraud, bad faith, an abuse of discretion, or an arbitrary decision, the Supreme Court declined to disturb the Secretary's administrative discretion. *Id.* Similarly, in this case, appellants have raised no specter of fraud, bad faith, abuse of discretion or arbitrariness. Accordingly, this Court will not disturb the Board's decision.

**CONCLUSION**

"The needs of our democracy require accurate and rapid ascertainment of the people's will. And it is for that reason that the Legislature has entrusted the County Board of Elections with plenary powers in the administration of the election code." *Appeal of McCracken*, 88 A.2d 787, 788 (Pa. 1952). The Philadelphia Board of Elections, after a public hearing, determined not to allow a forensic review that the Election Code does not require. For all the foregoing reasons, the Court affirms the decision of the Philadelphia Board of Elections and dismisses the appeal of appellant Jill Stein.

Abbe F. Fo______________ J.

Dated: December 7, 2016