UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

JILL STEIN, RANDALL REITZ, ROBIN HOWE,
SHANNON KNIGHT, EMILY COOK, and
KIMBERLY KUPKA,

                        Plaintiffs,

           v.                                                    No. 16-CV-6287 (PD)

PEDRO A. CORTÉS, in his official capacity as
Secretary of the Commonwealth; and JONATHAN
MARKS, in his official capacity as Commissioner
of the Bureau of Commissions, Elections, and
Legislation,

                        Defendants.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

   NOW COME Plaintiffs Jill Stein, Randall Reitz, Robin Howe, Shannon Knight, Emily

Cook, and Kimberly Kupka (collectively "Plaintiffs"), by and through their attorneys,

Montgomery McCracken Walker & Rhoads LLP and Emery Celli Brinckerhoff & Abady LLP,

and for their Complaint for declaratory and injunctive relief against Pedro A. Cortés, in his

official capacity as Secretary of the Commonwealth; and Jonathan M. Marks, in his official

capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation, hereby

allege as follows.

## INTRODUCTION

   1.     The Pennsylvania election system is a national disgrace.  Voters are forced to use

vulnerable, hackable, antiquated technology banned in other states, essentially relying on the

kindness of machines.  That kindness is misplaced.  At least some of the plaintiffs' votes were almost certainly not counted in the 2016 election.  They were disenfranchised.

2.      Compounding the problem, there is no paper trail in the majority of Pennsylvania election districts.  Voting machines are electoral black sites: No one permits voters or candidates to examine them.

3.      After election day, voters are equally helpless to make sure their votes are counted.  The Election Code requires 27,474 voters in 9,158 districts to bring notarized petitions to county boards, in time for shifting, divergent, and secret deadlines known to no one except, perhaps, 67 separate county election boards.  In court recounts, voters must pay exorbitant fees, and (according to boards of elections) should only one voter fail to sign a single petition in a single district anywhere in the State, no one can seek a recount anywhere.

4.      This labyrinthine, incomprehensible, and impossibly burdensome election regime might make Kafka proud.  But for ordinary voters, it is a disaster.

5.       These arbitrary, unreasonable rules place an impossible burden on the right to vote, the right to have one's vote counted, and the right to pursue recounts in Pennsylvania.  As a result, Defendants have violated the United States Constitution.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1357; and 42 U.S.C. § 1983.

7.       This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.      Venue is in this district is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff Jill Stein was the Green Party presidential candidate for the November 2016 election, and her name appeared on the ballot in Pennsylvania.

10.     Plaintiff Randall Reitz is a voter in Montgomery County of the State of Pennsylvania, and voted in the 2016 presidential election.  After the election, Mr. Reitz was one of 100 voters to file petitions formally contesting the election results.

11.     Plaintiff Robin Howe is a voter in Montgomery County in the State of Pennsylvania, and voted in the 2016 presidential election.  She attempted to vote on a direct recording election ("DRE") machine.  However, her vote for President and for other candidates was almost certainly counted as a "no vote" by the machine.  Ms. Howe was disenfranchised in the 2016 election.

12.     Plaintiff Shannon Knight is a voter in Montgomery County in the State of Pennsylvania, and voted in the 2016 presidential election.  She attempted to vote on a DRE machine.  However, her vote for President and for other candidates was almost certainly counted as a "no vote" by the machine.  Ms. Knight was disenfranchised in the 2016 election.

13.     Plaintiff Emily Cook is a voter in Montgomery County in the State of Pennsylvania, and voted in the 2016 presidential election.  Ms. Cook is a registered Green Party member, and at least attempted to vote for Jill Stein in the 2016 presidential election.

14.     Plaintiff Kimberly Kupka is a voter in Montgomery County in the State of Pennsylvania, and voted in the 2016 presidential election.  She attempted to vote on a DRE machine.  However, her vote for President and for other candidates was almost certainly counted as a "no vote" by the machine.  Ms. Kupka was disenfranchised in the 2016 election.  Ms. Kupka also served as a volunteer coordinator for the post-election recount effort in Montgomery

County.  She organized hundreds of Montgomery County voters to sign petitions and helped to compile those petitions and deliver them for filing.  She personally petitioned the Court of Common Pleas for a recount in her precinct, but her petition was rejected.

15.     Mr. Reitz, Ms. Howe, Ms. Knight, Ms. Cook, and Ms. Kupka are collectively referred to as the "Voter Plaintiffs."

16.     Defendant Pedro Cortés is the Secretary of the Commonwealth and is being sued in his official capacity.  In his capacity as Secretary of the Commonwealth, Mr. Cortés heads the Pennsylvania Department of State ("DoS") and is the chief election official in Pennsylvania.

17.     Defendant Jonathan Marks is the Commissioner of the Bureau of Commissions, Elections, and Legislation in the DoS, and is being sued in his official capacity.  In his capacity as Commissioner, Mr. Marks oversees the administration of elections in Pennsylvania and is responsible for planning, developing, and coordinating statewide implementation of the Pennsylvania Election Code.

18.     Both Defendants enforce and implement the Pennsylvania Election Code.

## STANDING

19.     All Pennsylvania voters have the constitutional right to make sure their votes are counted, and have standing to vindicate that constitutional right.  In addition, given that Pennsylvania voters (at least on paper) have a right to a recount under Pennsylvania law, the U.S. Constitution makes "clear that the State could not use arbitrary or unreasonable procedural rules to make that right a nullity."  *Stein v. Thomas*, --- Fed. App'x ---, 2016 WL 7131508, at *3 (6th Cir. 2016).  Pennsylvania voters, including the Voter Plaintiffs, have standing to pursue their right to a recount, and to ensure that their recount rights are not subject to "arbitrary or unreasonable procedural rules."

4

20.     As set forth below, none of the Voter Plaintiffs was able to ensure his or her vote was counted in the 2016 election.  Nor, absent relief from the Court, will the Voter Plaintiffs be able to ensure their votes are counted in future elections.  In the case of Plaintiffs Knight, Howe, and Kupka, it is almost certain that their votes for President and for other candidates were **not** counted in the 2016 election.

21.     In addition, Pennsylvania voters, including the Voter Plaintiffs, were unable to pursue their right to a recount, or to ensure their votes were counted in any way, as a result of arbitrary, unreasonable, byzantine, and absurdly burdensome election rules, as well as Defendants' conduct set forth below.  Nor, absent relief from the Court, will the Voter Plaintiffs be able to ensure their right under Pennsylvania law to a recount in future elections, unburdened by an arbitrary and unreasonable election regime.

22.     Stein has standing to ensure that every vote cast for her was actually counted.  In addition, whether or not Stein had a "realistic" possibility of winning the entire Pennsylvania vote, the number of votes counted for Stein affects, *inter alia*, (i) her ability to run as a viable presidential candidate in future elections; (ii) her ability to be renominated as a candidate by the Green Party; (iii) fundraising for her and the Green Party; and (iv) public perception of her candidacy and of the Green Party.

23.     Stein also has standing derivative of Pennsylvania voters (such as Plaintiff Emily Cook) who attempted to vote for her in the 2016 election.

## FACTUAL ALLEGATIONS

### *Voting Machines Are Susceptible to Attack and Error*

24.     In Pennsylvania, more than 85% of voters vote on DRE machines with no paper trail. Ex. 41. The remaining Pennsylvania voters fill out paper ballots tabulated on optical scan

machines.  *Id.*  In contrast, 70% of voters nationwide have their votes recorded on some form of paper.  Declaration of J. Alex Halderman, dated Dec. 5, 2016 ("Halderman Decl."), Dkt. #8 ¶ 18.[1]  Pennsylvania thus relies disproportionately and primarily on electronic voting with no paper trail.  Though the Commonwealth uses a wide variety of electronic voting machines, all are unreliable, vulnerable to interference and error, and susceptible to hacking.

25.    DRE machines with no paper trail give voters no way to ensure that their intended choices were accurately recorded by the machine, and no way for election officials to verify those choices in the case of a recount.

26.    Experts have repeatedly documented in peer-reviewed and state-sponsored studies that electronic voting machines—including both DRE machines *and* optical scan machines— have serious cybersecurity problems.  "Voting machines are computers with reprogrammable software.  An attacker who can modify that software by infecting the machines with malware can cause the machines to provide any result of the attacker's choosing."  Halderman Decl. ¶ 11.  As demonstrated in laboratory tests, in just a few seconds, anyone can install vote-stealing malware on a voting machine that silently alters the electronic records of every vote.  *Id.*[2]

27.    That the machines themselves may never be connected to the Internet is irrelevant; memory media and other devices are routinely connected to the machines, and those provide opportunities for the insertion of malware.  *See, e.g.*, *id.* ¶ 12; Affidavit of Daniel Lopresti, dated Dec. 2, 2016 ("Lopresti Aff."), Dkt. #11 ¶ 13 (viruses can be spread through the use of contaminated memory cards); Affidavit of Harri Hursti, dated Dec. 5, 2016 ("Hursti Aff."), Dkt. #10 ¶¶ 15-18 (fraudulent firmware can be installed through the audio-ballot

---

[1] All previously docketed materials cited in the Amended Complaint are incorporated by reference into the Amended Complaint.

[2] A video documenting this result is publicly available at https://youtu.be/aZws98jw67g.

cartridge); Affidavit of Duncan A. Buell, dated Dec. 2, 2016 ("Buell Aff."), Dkt. #12 ¶¶ 17-24
(malware can be spread by removable media connected to voting machines).

28.     For example, shortly before each election—after the candidates have been
chosen—poll workers copy the ballot design from a regular desktop computer in a government
office (or at a company that services the voting machines) and use removable media (akin to the
memory card in a digital camera) to load the ballot design on to each machine.  Halderman Decl.
¶ 12.  "That initial computer is almost certainly not well enough secured to guard against attacks
by foreign governments.  If technically sophisticated attackers infect that computer, they can
spread vote-stealing malware to every voting machine in the area."  *Id.*  Sophisticated attackers
including nation-states have developed a variety of techniques to attack non-Internet-connected
systems.  *Id.* (discussing the Stuxnet virus, which is spread through flash drives).

29.     Most voting machines also have reprogrammable software ("firmware") easily
manipulated in advance of the election to introduce vote-sealing malware.  *Id.*  "Technically
sophisticated attackers can accomplish this with ease."  *Id.*

30.     Optical scan machines can also be attacked in a number of ways, including attacks
on the precinct scanners, election media processors, high-speed scanners, and central tabulators.
Hursti Aff. ¶¶ 40-58 (detailing various attack vectors to which optical scan voting systems are
vulnerable).

31.     Because of these vulnerabilities, *paper* ballots are the best and most secure
technology available for casting votes.  Paper cannot be hacked.  It is the only method that
allows voters to be confident that their vote is recorded accurately.

32.     DREs with voter-verifiable paper audit trails ("VVPAT") are the next best option.
A DRE with a VVPAT at least allows the voter to review a printed record of the vote he has just

cast on a computer.  That paper record is then stored in the machine for later audit and recount

purposes.  "Only a paper record documents the vote in a manner that cannot later be modified by

malware or other forms of cyberattacks."  Halderman Decl. ¶ 17.  None of the DREs used by

Pennsylvania has VVPAT, meaning none gives voters any way to verify that their votes were

accurately recorded.

***Pennsylvania's Electronic Voting Machines: Antiquated, Vulnerable, Dangerous***

33.     In the 2016 general election, Pennsylvania used six different models of DREs.

Ex. 41.  Each has been examined by security researchers, and all have security vulnerabilities

easily exploited by attackers to alter the outcome of elections Halderman Decl. ¶ 20 ("[E]very

DRE in use in Pennsylvania is vulnerable to cyberattacks.").

34.     Each of the six systems used in Pennsylvania is outdated and susceptible to

malicious or inadvertent interference or error.

Election Systems & Software iVotronic

35.     The iVotronic is used by 35% of Pennsylvania's registered voters, including in

Allegheny County, one of the state's largest counties.  Ex. 41.[3]

36.     The machine was studied by security experts as part of Project EVEREST,

commissioned by the Ohio Secretary of State.  Halderman Decl. ¶ 27; *see also* EVEREST:

Evaluation and Validation of Election-Related Equipment, Standards and Testing (Dec. 7, 2007)

[hereinafter "EVEREST"], *available at* http://www.patrickmcdaniel.org/pubs/everest.pdf.[4]  The

investigation found that firmware on these machines contained buffer overflow vulnerabilities,

---

[3] According to publicly available data, 2,813,186 voters were registered in counties that use
primarily iVotronic voting machines, out of a total of 8,077,727 registered voters.  Ex. 41.

[4] The EVEREST report was prepared by teams from Pennsylvania State University, the
University of Pennsylvania, and WebWise Security, Inc.

which could be exploited to infect the machines with malware and alter the election outcome. Halderman Decl. ¶ 27.

37.     Further vulnerabilities in the machines include that the Personalized Electronic Ballot module ("PEB"), used to program the ballot design before the election, has easily circumventable security protections.  *Id.*  As Professor Duncan Buell explains, an attacker could use a PEB or another device that emulates a PEB, like a Palm Pilot, to upload malicious code to an iVotronic machine.  Buell Aff. ¶ 15.

38.     The EVEREST researchers also found that the cryptographic keys used by the machines to encrypt votes could be easily extracted by attackers, who could then read or manipulate the vote data.  Halderman Decl. ¶ 27.

39.     The machines are also susceptible to inadvertent error, as the complexity of the system invites mistakes from poll workers, and software failures can disrupt the accurate tally of votes.  Buell Aff. ¶¶ 25-26.

Danaher Shouptronic 1242

40.     Approximately 29% of registered Pennsylvania voters rely on the Shouptronic machines.  Ex. 41.[5]  These DRE machines are used in Philadelphia, among other counties.  *Id*.

41.     This model was introduced in the 1980s.  Its security features have not been updated in more than 30 years.  Halderman Decl. ¶ 24.

42.     Researchers at Lehigh University, led by computer science professor Daniel Lopresti, analyzed the Shouptronic's computer architecture and found that the firmware used to direct the machine's operation and the voting records stored in the machine's memory are vulnerable to tampering in multiple ways.  Lopresti Aff. ¶ 13.  "The machines' design makes it

---

[5] According to publicly available data, 2,316,151 voters were registered in counties that primarily use Shouptronic voting machines, out of a total of 8,077,727 registered voters.  Ex. 41.

extremely likely that malware can infect the machines via the removable memory cartridges that are used to program the ballot design and retrieve vote totals."  Halderman Decl. ¶ 24; *see also* Lopresti Aff. ¶ 13.

43.     These machines have already caused documented problems in Pennsylvania, losing around 200 votes in 2005.  *Berks County May Ask People to Vote Again in Two Precincts*, May 18, 2005, *available at* http://www.votersunite.org/article.asp?id=5408.  The machines have only grown older and more out of date since then.

Premier/Diebold (Dominion) AccuVote TSX

44.     Approximately 10% of Pennsylvania voters rely on the AccuVote TSX.  Ex. 41.[6]

45.     Dr. Halderman performed a security analysis of the AccuVote TSX as part of the California Top-to-Bottom review; the machine was also studied as part of Ohio's Project EVEREST and by independent security researchers.  Halderman Decl. ¶ 25.  All of these studies found serious security problems.

46.     The security features built into the machines are inadequate to defend against cyberattacks, and vote-stealing malware can spread on the machines' removable memory cards. *Id.*  "If attackers infect counties' election management system computers, the attacker can spread vote-stealing malware to every voting machine in the county."  *Id.*  A local attacker with physical access to the machines can additionally tamper with them by manipulating the machines' removable memory cards—and a hacker can pick the lock to the memory cards using only a BIC pen.  *Id.*

47.     The AccuVote TSX's problems are well-known.  In 2007, California reviewed the system, and found that the machines' security mechanisms were "inadequate" and that the

---

[6] According to publicly available data, 851,515 voters were registered in counties that primarily use AccuVote voting machines, out of a total of 8,077,727 registered voters.  Ex. 41.

system was "susceptible to computer viruses . . . which could allow an attacker with access to only one voting unit or memory card to spread malicious code, between elections, to many, if not all, of a county's voting units."[7]  At the conclusion of this review, the state deemed the AccuVote TSX system "defective or unacceptable" and withdrew the machine's certification for use in most California elections.

### Hart InterCivic eSlate

48.    Approximately 6% of voters in Pennsylvania are registered in counties that rely on the Hart InterCivic eSlate machine.[8]  Ex. 41.

49.    This model was examined by security experts as part of the California "Top to Bottom" election technology review[9] and the Ohio EVEREST election system security review. Both studies found significant vulnerabilities, and California subsequently decertified the machine.  Halderman Decl. ¶ 22; *see also* EVEREST, *supra*.  "The memory cards used by eSlates to transfer votes to a central counting computer are vulnerable to undetectable tampering. The internal security mechanisms of the machines are easily defeated, enabling malicious software to change or erase votes, cast extra votes, or modify the eSlate's software or the software of the machine used to tabulate votes.  These vulnerabilities could allow attackers to compromise large numbers of machines and alter the election outcome."  Halderman Decl. ¶ 22.

---

[7] Withdrawal of Approval of Diebold Election Systems, Inc., Cal. Sec'y of State (Oct. 25, 2007), *available at* http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-102507.pdf.

[8] According to publicly available data 490,472 voters were registered in counties that primarily use eSlate voting machines, out of a total of 8,077,727 registered voters.  Ex. 41.

[9] Withdrawal of Approval of Hart InterCivic System 6.2.1 DRE & Optical Scan Voting System and Conditional Re-Approval of Use of Hart InterCivic System 6.2.1 DRE & Optical Scan Voting System, Cal. Sec'y of State (Dec. 6, 2007), *available at* http://votingsystems .cdn.sos.ca.gov/oversight/ttbr/hart-amended-recert-final-120707.pdf.

Sequoia (Dominion) AVC Advantage

50.    Approximately 9% of registered Pennsylvania voters vote in counties that rely primarily on the AVC Advantage.[10]  Ex. 41.

51.    This model has been studied by multiple groups of security researchers, including J. Alex Halderman and Daniel Lopresti.  Halderman Decl. ¶ 23; Lopresti Aff. ¶ 5.  A peer-reviewed security study of the machine in 2009 demonstrated that malware can infect the machines and alter votes.  Halderman Decl. ¶ 23.  Such malware can spread to the machines via the removable memory cartridges used to program the ballot design and offload votes.  *Id.*  Dr. Halderman's research further showed that such malware can defeat all of the hardware and software security features used by the machines.  *Id.*

52.    Other researchers also concluded that the AVC Advantage has significant vulnerabilities, and that it would be straightforward to install vote-stealing malware by replacing one firmware chip.  *Id.* (citing Andrew W. Appel et al., Insecurities and Inaccuracies of the Sequoia AVC Advantage 9.00H DRE Voting Machine (Oct. 17, 2008), *available at* https://mbernhard.com/advantage-insecurities-redacted.pdf).  Those researchers found, among other things, that the machine can be easily hacked with vote-stealing firmware, that fraudulent firmware can be installed into many AVC Advantage machines by viral propagation through the audio-ballot cartridges, and that the Results Cartridges can be easily manipulated to change votes.  Appel et al., *supra*, at 2; *see also* Hursti Aff. ¶¶ 15-24.

53.    This voting machine's deficiencies are not limited to security vulnerabilities.  In the 2008 New Jersey Republican primary, 37 of these machines exhibited a software bug in which the number of votes recorded was higher than the number of voters.  Andrew W. Appel et

---

[10] According to publicly available data, 728,029 voters were registered in counties that primarily use AVC Advantage voting machines, out of a total of 8,077,727 registered voters.  Ex. 41.

al., The New Jersey Voting-machine Lawsuit and the AVC Advantage DRE Voting Machine, *available at* https://www.usenix.org/legacy/event/evtwote09/tech/full_papers/appel.pdf.

Sequoia (Dominion) AVC Edge

54.     Also decertified by California in 2007,[11] this machine has vulnerabilities similar to those of the TSX and the eSlate.  In the California Top-to-Bottom review, security experts found that remote attacks could spread malware to the machines and change, steal, or add votes. Halderman Decl. ¶ 26.  "Furthermore, such malware can persist even if election workers reinstall an uncorrupted version of the election software."  *Id.*

55.     The California study further discovered that malicious software on the machines could conceal vote-tampering from pre-election testing, hiding manipulation of votes and making the machine output appear otherwise normal.  *Id.*  The election software running inside the AVC Edge can also be tampered with by a local attacker with physical access to the machine by replacing a memory card inside the machine's case.  *Id.*  Dr. Halderman himself demonstrated this vulnerability by hacking an AVC Edge machine to make it run the arcade game Pac-Man. *Id.*  A real attacker could just as easily modify the software to alter votes.

56.     Given the dismal performance of all of the Pennsylvania DRE systems, no Pennsylvania voter can know whether his or her vote on a paperless DRE is recorded accurately. Ordinary recanvass or recount methods reveal nothing: Such recanvasses simply review the "ballot images" retrieved from the machines' computer memory—images created by the exact same code that creates the vote tally in the machine.  Lopresti Aff. ¶ 15; Hursti Aff. ¶¶ 35-37.

---

[11] Withdrawal of Approval of Sequoia Voting Systems, Inc., Wineds V 3.1.012/AVC Edge/Insight/Optech 400-C DRE & Optical Scan Voting System and Conditional Re-Approval of Use of Sequoia Voting Systems, Inc., Wineds V 3.1.012/AVC Edge/Insight/Optech 400-C DRE & Optical Scan Voting System, Cal. Sec'y of State (Oct. 1, 2009), *available at* http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/sequoia-100109.pdf.

This is like seeking a second opinion from the same doctor.  It is virtually useless.  Only a forensic examination of the DRE system would allow examiners to determine whether the information stored in the computer memory represents an accurate record of the votes cast on those machines.

### *The 2016 Election: Unprecedented Interference and Hacking of American Election Systems*

57.     The experts' concerns about Pennsylvania's use of antiquated and vulnerable technology have risen to alarm in the context of this year's election.  The 2016 presidential election was subject to unprecedented cyberattacks.  Attackers infiltrated the voter registration systems of Illinois and Arizona and stole voter data.  Attackers attempted to breach election offices in more than 20 other states.  Attackers broke into the email system of the Democratic National Committee.

### *The Statutory Scheme for Recounts in Pennsylvania: An Illusory Fraud on the Voter*

58.     In theory, the Pennsylvania Election Code promises voters the ability to seek a recount directly, based upon good-faith allegations of fraud or mistake.  In reality, that promise is illusory in a statewide election.  The recount process is byzantine, opaque, inconsistently administered, and hopelessly confusing even to Defendants, the officials in charge.

<u>Statewide County Board Recounts Are Virtually Impossible, and No One Knows the Deadline for Filing</u>

59.     Section 1404 of the Election Code, 25 P.S. § 3154, permits voters to request recounts from their county boards of elections.  To request a county board recount, three voters in a single election district (often called a precinct) must sign a petition "that an error, although not apparent on the face of the returns, has been committed therein."  *Id.* § 3154(e).  The petition

14

must be "verified by affidavit" in front of a notary.  *Id.*  The petition only activates a recount *in that district*.  *Id.*

60.     Pennsylvania has 9,158 election districts in 67 counties.  For voters to request a statewide recount in Pennsylvania, 27,474 voters evenly spread throughout all 9,158 districts must write, print, and sign petitions, get them notarized, and bring them to their local county board of elections.  Some counties are over 1,000 square miles; the distance to travel to a board of elections can be substantial.[12]

61.     The deadlines for voters to accomplish this herculean feat are, at best, short. Either the deadline is "prior to the completion of the computation all of the returns for the county," 25 P.S. § 3154(e), or "[a]t the expiration of five (5) days after the completion of the computation of votes," *id.* § 3154(f).[13]  The Pennsylvania Supreme Court has strongly suggested that the latter deadline applies.  *See In re Reading Sch. Bd. Election*, 634 A.2d 170, 172-73 (Pa. 1993).  Until early December 2016, the Pennsylvania Department of State ("DoS") apparently had not given guidance to the 67 boards of elections as to which one of these two deadlines applies; after the 2016 election, counties arbitrarily picked one or the other.

62.     Because every county counts votes at its own pace, they complete the counts on different dates.  Therefore the deadlines for county board recounts vary from county to county, and from election to election.  It is impossible for voters to know when a county will reach "the completion of the computation of all of the returns for the county."  25 P.S. § 3154(e).  Election boards do not give notice of this date in advance.  Ex. 1 ¶¶ 13-18; 27.

---

[12] The Court can take judicial notice that Lycoming County, for example, is 1,228.59 square miles of land area.  *See* http://www.census.gov/quickfacts/table/PST045215/42081.

[13] If the fifth day falls on a holiday or weekend, it is moved to the first weekday thereafter.

63.     Election boards often give no notice of this date even *after* it has passed. Counties may (or may not) post unofficial election results on the Internet.  *Id.* ¶ 27; Ex. 26 ¶ 7. Even if a county does post unofficial election results, those results still will not show that the county has complied with all of the procedural requirements for "the completion of the computation of votes," including the signatures of all members of the county board.  25 P.S. § 3154(f).  Election boards also often give no notice of the 5-day period following computation of the vote.  Voters are therefore left to guess when the deadline might be to request a Section 1404 recount in any county.  It is a guessing game, and voters are often wrong.

64.     At least two large Pennsylvania counties have admitted in open court that, as a matter of standard practice, they do not comply with the requirements to complete the initial computation of the returns *at all.*  Instead, they proceed straight to final computation.  Delaware County has taken the position that unofficial returns are something that "doesn't exist."  Ex. 51 at 18.  *But see* 25 P.S. § 3154(f).  Allegheny County has represented that it typically completes the initial computation at the same time as the final computation, without the mandatory five-day gap between the two. Ex. 50 at 37-38 (testimony of Allegheny County Director of Elections that initial computation and final computation are completed at the same meeting).  In these counties—home to nearly two million Pennsylvanians—the event that supposedly determines where and when voters must seek a recount never even occurs.

65.     Even the Pennsylvania DoS, which in theory supervises the county boards of elections, has no idea and does not publish when the 67 counties complete computation of the votes, or when the 5-day period ends.  *See* Exs. 32A-32D (correspondence with DoS and related spreadsheets generated and produced by DoS showing shifting, inconsistent, and incomplete deadlines).

66.     For example, as of November 28, 2016 at 2:55pm, DoS/Defendant Marks were unable to determine when computation was complete in 22 counties, when the 5-day period ended in 22 counties, or when certification of the vote occurred in 30 counties.  Ex. 32-A.  In addition, its computation of the 5-day period was incorrect in at least 11 counties.  *Id.*  As just two examples, DoS stated that Indiana and Jefferson counties completed the computation on November 18, but calculated that the 5-day period after computation was November 21.  *Id.*  Plainly, a 5-day period can never be as short as 3 days.

67.     After repeated inquiries, and even as of December 1, 2016, DoS/Defendant Marks had little idea when deadlines were expiring in various counties.  They were unable to determine when computation was complete in 12 counties, when the 5-day period ended in 22 counties, or when certification of the vote occurred in 13 counties.  Ex. 32-D.  Again, what information they did provide was, at least in part, misleading and/or wrong.  *Id.* (*see*, *e.g.*, 5-day expiration for Northampton, which according to DoS "expired" on November 21, before the November 22 computation was even complete).

<u>Court-Ordered Recounts Are Virtually Impossible to Obtain</u>

68.     The second option is for voters to seek recounts conducted by the Court of Common Pleas under Sections 1701 and 1702 of the Election Code.  *See* 25 P.S. § 3261 (for districts that use paper ballots, such as optical scan districts); *id.* § 3262 (for districts that have no paper ballots, such as DRE districts).  This method is even more of a sham than the county-board recount.

69.     In a court recount, again three voters in a single election district must write, print, sign, and deliver a verified petition alleging, "upon information which they consider reliable, they believe that fraud or error . . . was committed" in the canvassing or the computation of the

votes.  25 P.S. §§ 3261(a), 3262(a)(1).  In addition, every single petition must be accompanied by a deposit of $50 in cash or a $100 bond.  25 P.S. §§ 3261(b), 3262(a.1).

70.     Thus, to seek a statewide court recount, a total of 27,474 voters must verify 9,158 petitions in 9,158 districts and pay at minimum $457,900.  In addition, county courts typically treat every petition as a separate court filing and proceeding, with additional filing fees of over $100 or even over $200 per petition.  *See* Ex. 49, Declaration of Douglas E. Lieb dated February 14, 2017 ("Lieb Decl.") ¶ 5.  Thus, voters must file 9,158 court proceedings, at a cost of millions of dollars, simply to use this statutorily-created recount mechanism.

71.     For DRE precincts, the deadline to file is the later of 20 days after election day, or "5 days after the completion of the computational canvassing of all returns" by the county board, which, again, is unknown to voters or even to DoS.  25 P.S. §§ 3262(f), 3263(a)(1).  For optical scan precincts, the deadline to file is the later of 4 months after election day or "5 days after the completion of the computational canvassing of all returns" by the county board, which, again, is unknown to voters, or even to the DoS.  25 P.S. §§ 3261(f), 3263(a)(1).

72.     Even worse, 25 P.S. § 3263 provides that, in any court-ordered recount, unless a petitioner "pleads that a particular act of fraud or error occurred and offers prima facie evidence supporting the allegation," "a recount or recanvass shall include *all* election districts in which ballots were cast for the office in question," and "petitions . . . must be filed in *each* election district in accordance with this act."  25 P.S. § 3263(a)(1)(i)(A-B) (emphasis added).

73.     The Republican Party of Pennsylvania, at least one board of elections, and apparently one Court of Common Pleas, interpret this section to mean that, unless there are 27,474 voters in Pennsylvania who have verified 9,158 petitions in 9,158 districts—enough for a statewide recount—then there can be *no* court-ordered recount of *any* district or county.  Thus, if

even a single district anywhere in the State has only two petitioners instead of three, or if a single petitioner pays less than $50, then *no one* in the entire State is entitled to a recount in *any* district, *anywhere*. Ex. 31 at 6-8 (Montgomery Court of Common Pleas), 22:23-23:4 (Montgomery Board of Elections position), 26:20-27:9 (Republican Party position). If this is correct, then the court-ordered recount statute is a sham in any statewide election. It is impossible for 27,474 voters evenly distributed in 9,158 election districts in 67 counties to file recount petitions within these deadlines, or perhaps any deadlines.

The Recount Procedure

74.     "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine . . . the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act." 25 P.S. § 2650(c). Notwithstanding this language, none of the county boards in the 2016 election has permitted the candidates to "examine" the DRE voting system, notwithstanding multiple requests from voters and Jill Stein. Nor has any Pennsylvania court yet permitted such an examination. To the contrary, at least one Pennsylvania court has held that there is no such right under Pennsylvania law. *Stein v. Phila. Cnty. Bd. of Elections*, No. 161103335, at *4 (Phila. Cnty. Ct. Common Pleas, Dec. 7, 2016). That is also the position of Defendants in this case. Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. (Dkt. #42) at 8 ("[T]he legislature . . . chose not to provide for a forensic examination of DRE's or of country central computers."); *see also, id.* at 19-20.

75.     In DRE counties, there is nothing to "count." There is no paper ballot. All a candidate or a voter can do to ensure the integrity of the vote is examine the DRE voting system.

76.     In optical scan counties, assuming voters have somehow overcome all the many statutory obstacles in their path, the county board "shall recount all ballots using manual, mechanical *or* electronic devices of a different type used for the specific election."  25 P.S. § 3154(e)(3)(i) (emphasis added).  Perhaps the county does a manual recount; perhaps it feeds the ballots into a separate high-speech machine.  It all depends on the moment and the county. Whatever the method, the county board only counts the ballots for the specific districts for which the required number of voters submitted notarized petitions in time.

The Contest Procedure

77.     The Election Code also permits voters in theory to claim the "election is illegal" in a filing in Commonwealth Court.  25 P.S. § 3456.  At least 100 voters must petition, and 5 of them must set forth affidavits alleging that the "election was illegal and the return thereof not correct, and that the petition to contest the same is made in good faith."  25 P.S. § 3457.

78.     The contest proceeding, however, must be filed within 20 days of the election, 25 P.S. § 3456, *i.e.*, before there is any meaningful opportunity to recount the ballots, recanvass the machines, or examine the voting system, and before the election is even certified.  This early deadline makes almost any contest petition all but impossible, unless the court agrees to hold the proceeding in abeyance pending development of a fuller record.  Unless the court agrees to put a contest proceeding on hold, petitioners are forced to put on an election challenge before the results have *even been certified*, and if the case is dismissed for lack of evidence at that early stage, voters would have no recourse even if evidence later established that the election and the result were a fraud.

79.     In short, the contest statute is designed to *prevent* voters from contesting elections in any meaningful way.  Unless the Commonwealth Court agrees to delay the contest, the statute

is illusory.  There is no statute governing when or under what circumstances the Commonwealth Court should or will delay a contest proceeding.

80.     In addition, the contest statute gives the Commonwealth Court unfettered discretion to impose punishing and financially-prohibitive bonds on ordinary voters, effectively defeating contest petitions irrespective of the merits.  25 P.S. § 3459 (petitioners must file a bond "in such sum as the presiding officer of the Senate or said court shall designate").

### The 2016 Recount: Voters Are Defeated by an Impossibly Burdensome Election Code, the Department of State, and 67 Boards of Election

81.     Over six millions Pennsylvanians voted in the 2016 presidential election.  Before Election Day, many voters struggled to obtain absentee ballots in time for the election.  On Election Day on November 8, the great majority of voters voted on DRE machines. Pennsylvania voters experienced machine malfunctions that may have erased their votes.  And after the election, when over 1,300 voters across the state sought recounts to ensure the accuracy of the vote, Ex. 1 ¶ 5, they ran head-first into the brick wall that is Pennsylvania's recount system.  Despite a massive effort, these voters' reasonable requests to ensure the accuracy of the vote were denied.

#### Election Day: Malfunctioning Machines and Missing Ballots

82.     Pennsylvania has no early voting and limited absentee voting.  Many voters who requested absentee ballots never received them in time to cast their vote.  Ex. 14; Ex. 23.  For example, a voter who requested his absentee ballot in early September in advance of a trip to the United Kingdom in late October and made multiple phone calls to the Montgomery County Board of Elections received no ballot until after the election.  Ex. 14.  Another voter spent days calling the county board regarding her absentee ballot, only to receive an electronic ballot that permitted her to vote only in federal races, not the state and local races for her home town.  Ex.

23.  These were not isolated incidents: There were so many problems with absentee ballots that just days before the election, a Montgomery County judge ordered that the deadline to return absentee ballots would be extended by four days, noting that "we run the risk that 17,000 people could be disenfranchised unless there's some extension."  Laura McCrystal, *Montco Judge Extends Deadline for Absentee Ballots*, Phila. Inquirer, Nov. 4, 2016, http://www.philly.com /philly/news/politics/20161104_Montco_seeks_to_extend_deadline_for_absentee_ballots.html.

83.     Voters in Pennsylvania on Election Day faced other problems: Many—including Plaintiffs Howe, Knight, and Kupka—report issues with the electronic voting machines that almost certainly did not record their votes.  *See* Exs. 16-21.

84.     Plaintiff Howe, voting in Montgomery County on a Sequoia AVC Advantage machine, attempted to vote a straight Democratic ticket. The ballot included a line stating, in sum and substance, "I do not want to vote for any office, candidate, or issue," with a box next to it with the words "No Vote."  When Ms. Howe attempted to make her ballot selections, the box next to the "No Vote" entry lit up, as if to indicate that she had selected the "No Vote" option. The box remained lit as she confirmed her vote for the straight Democratic ticket and finished voting.  Ms. Howe was concerned that her vote was not counted, and asked a poll worker about the "No Vote" light; the poll worker did not have any information to provide, and no way to verify that Ms. Howe's vote had been accurately counted.  *See* Ex.19.

85.     Plaintiff Knight encountered a similar situation.  Ms. Knight also attempted to vote in Montgomery County on a Sequoia AVC Advantage machine.  The same box—for the option when a voter chooses not to vote for any candidate or office—remained lit green, even though she had chosen specific options for each race and question on the ballot.  When she tried to unselect the "No Vote" button, it would not unselect.  It remained lit, along with all of her

other selections, when she submitted her final vote.  She had no way to confirm that her actual selections had been counted.  *See* Ex. 20.

86.     Plaintiff Kupka attempted to vote in Montgomery County on a Sequoia AVC Advantage machine.  When she was finished selecting the candidates for whom she wanted to vote, the box corresponding with the selection, "I do not want to vote on any office, candidate, or issue" (*i.e.*, the "No Vote" button) was lit up green.  She unselected one of her candidate choices, and the green "No Vote" light went out for that candidate.  But when she reselected the candidate of her choice, the green light next to the No Vote button became lit again for that candidate.  Despite having selected multiple candidates, the "No Vote" button remained lit.  She was forced to cast her vote with the candidates *and* the No Vote button selected.  She had no way to confirm that her actual selections were counted.  She believes that her vote was inaccurately tabulated as a "No Vote," as there were four "No Votes" recorded in her voting district.  *See* Ex. 21.

87.     Other voters experienced the same problems.  *See* Exs. 16-21.  There were 4,087 "no votes"—meaning no selections made for *any* candidate, office, or ballot question—in Montgomery County alone.  Ex. 46.  Either 4,087 people in one county took the time to go their polling place, wait in line, sign the voting book, walk into a voting booth, and decide not to cast a vote for anyone in any election, or *the machines did not work*.

88.     Plainly, the machines did not work.  Thousands of Pennsylvania voters were disenfranchised.

89.     It is almost certain, given Stein's percentage of the vote in Montgomery County (.85%, *see* Ex. 46), that a number of those disenfranchised voters attempted to vote for Stein.

<u>Voters Mobilize to Seek Recounts and Forensic Evaluations of the Voting Systems</u>

90.     Given widespread voting problems in Pennsylvania and voters' concerns about the integrity of voting machines, voters throughout the state sought recounts and forensic review of voting machines.  But the obstacles were insurmountable.  With over 1,000 voters filing petitions with local county boards and courts for recounts, only a handful of precincts in the State agreed to recount their votes—and no forensic examination was permitted anywhere.

<u>Voters Search in Vain To Find Reliable Information About Deadlines and Filing Requirements</u>

91.     Voters interested in seeking recounts began organizing in mid-November.  Some voters called their local county board in the days and weeks after Election Day, Exs. 11, 26, but were provided no information on whether or when the boards had completed or would complete their computation or certification of the vote.  *Id.*  When voters in Delaware County attended a board of election meeting to request a recount, they were told to hold questions until the end; then the board promptly certified the vote, stopping any effort to file requests for a recount.  Ex. 11.

92.     Volunteers devoted days to organizing and mobilizing voters who wished to seek recounts, attempting to navigate the web of rules surrounding Pennsylvania's recount statutes.  Ex. 1 ¶ 12.  They made repeated inquiries to DoS and county boards, but could find no consistent guidance regarding when each county had computed its vote and when the deadlines to file recount petitions would expire.  Different county board officials offered different interpretations of the law and its requirements.  *Id.* ¶¶ 13-15; Ex. 9.  For most counties, there was no publicly available information or notice of when the county completed its computation of the vote.  By the time volunteers were ready to file their petitions—Monday, November 28, the first work day following Thanksgiving—organizers *still* could not determine the deadlines from any website or

government source in the vast majority of Pennsylvania counties.  Ex. 1 ¶¶ 16, 27-30.  As to

DoS, statewide information about deadlines had not been updated since 2014.  Ex. 26 ¶ 7.

<u>The Department of State Sends Inconsistent, Incomplete, and False Information
Concerning Deadlines and the Activity of County Boards</u>

93.    Beginning on the morning of November 28, and continuing over the next few

days, DoS provided incomplete, contradictory, and inaccurate information about the various

deadlines for petitioning for recounts in counties around the state.  It became clear that DoS was

no less confused and no better informed than were ordinary citizens.

94.    For instance, on the morning of November 28, Defendant Marks at DoS provided

a partial list of dates on which counties had supposedly finished counting votes.  Ex. 32A.  There

were significant gaps—including Delaware and Montgomery Counties, two of the state's

largest—and the list was internally inconsistent.  *Id.*  It claimed, for example, that Northampton

County finished computing votes on November 22, but that the five-day period after computation

would end on November 21.  *Id.*  Deadlines noted in Crawford, Indiana, Jefferson, Mercer,

Northampton, and Schuylkill Counties were also mathematically impossible.  Exs. 32A-D.  Gaps

and errors remained even as DoS provided more information over the course of several

days.  Exs. 32B, 32D.

95.    Finally, counsel for Stein wrote Mr. Marks: "[t]here doesn't seem to be any

rhyme or reason to the 'expiration date of 5-day period after computation.'"  Ex. 33.  Counsel

also asked whether the information compiled by DoS was publicly available anywhere to voters,

noting that "[v]oters have tried calling county boards of elections across the state and received

either no information, conflicting information, or confusing information."  *Id.*  DoS did not

respond.

<u>Voters Jump Through Enormous Obstacles to File Recount Petitions</u>

96.     Over Thanksgiving weekend, volunteers and voters mobilized to sign petitions seeking manual recounts of the paper ballots and forensic analyses of the DRE machines in counties throughout the Commonwealth.  Ex. 1-A & 1-B (sample petitions for recounts of electronic voting machines and optical scan machines, respectively).  To file petitions, voters first needed to find two other voters in their individual voting precinct or district; petitions were complete only with three notarized affidavits from three voters in a given precinct.  Over 2,000 people volunteered to help gather petitions; organizers printed hundreds of pages and hired notaries to be available to voters over the weekend.  Ex. 1 ¶¶ 19-20; Ex. 3 ¶¶ 7-8; Ex. 26; Ex. 27. Many voters interested in seeking recounts were unable to file petitions, because they could not find two other voters in their precinct, could not find and/or pay for a notary, could not print the materials at home, or could not take time off of work or childcare to file petitions.  Ex. 1 ¶ 19-22; Ex. 27.

97.     Even in the face of these hurdles, over 1,300 voters filed recount petitions in at least 375 precincts in 16 different counties throughout the state.  Ex. 1 ¶ 5.  There would have been no way for voters to file these petitions without the assistance of professional legal counsel provided by the Stein campaign.  *Id.* ¶ 12.  Notwithstanding this massive effort by hundreds of volunteers and thousands of voters, they filed petitions in only a small fraction of precincts in the Commonwealth.  Pennsylvania's rules—particularly the requirement of three voters per district in over 9,000 districts—made it impossible for voters to trigger anything close to a statewide recount.

<u>Chaos: Voters Attempt to File Petitions with County Boards of Elections</u>

98.     When voters showed up to seek relief from their county boards of elections on November 28, 2016, all hell broke loose.  Upon arrival, many were given conflicting instructions; it was clear that many county boards had no idea what to do with the petitions.  Some county boards simply refused to accept petitions, Ex. 1 ¶ 30; Ex. 22; others told voters to file with the prothonotary in court, Ex. 1 ¶¶ 32-33, 38; other boards that accepted petitions at the beginning of the day rejected them by the end, and vice versa, *id*. ¶ 30; Ex. 24; Ex. 25.  When voters asked for guidance as to the proper procedure, many county boards refused to provide any information at all, sometimes telling voters that they should consult with attorneys.  Ex. 1 ¶ 39; Ex. 7; Ex. 28.  The Delaware County Board of Elections posted a notice to voters stating that the election law "has become increasingly complex," and advising that the "burden of accuracy of all filings" rests with the voter, with no other information provided.  Ex. 1-C.

99.     Many boards of elections sent voters to the courts, where they were required to pay filing fees.  Ex. 1 ¶ 31.  One voter was sent to the prothonotary from the Berks County Board of Elections; the prothonotary first told the voter he belonged at the board of elections, then informed him that he would need a cover sheet, a proposed order, more than $320 in filing fees, and three copies of his petition—and that he needed to have these materials ready by 4 p.m.  Ex. 4.  Since the instructions were not conveyed until about 3:30 p.m., there was no time for the voter to assemble these documents.  *Id.*  The Butler County board of elections similarly referred a voter to the prothonotary's office in court, and warned him that it would cost a lot of money to file.  Ex. 7.  Voters who did successfully file in court were given no instructions about next steps; many heard nothing further, or did not hear about scheduled hearings until after they had taken place.  Exs. 2, 22.

100.     Boards throughout the State issued similar conflicting instructions and raised similar roadblocks in the path of voters seeking recounts. Ex. 1 ¶¶ 27-43; *see generally* Exs. 1-30.  For example:

      a.     In Bucks County, the board of elections told voters it had no idea what to do with the petitions and that it was waiting for guidance from DoS.  Exs. 5, 6.

      b.     The Butler County Solicitor refused to provide information to a voter, saying the board of elections needed to remain "neutral" and would not "get involved" in the citizen's legal request for a recount.  Ex. 7.

      c.     The Centre County board of elections accepted petitions from voters all day.  At 4:45 p.m., after about 100 petitions had been submitted, the board announced that the petitions had all been submitted too late and would be rejected.  Ex. 8.

      d.     A Delaware County board of elections employee demanded the name and attorney identification number of a voter seeking to file petitions.  Ex. 12.

      e.     In Philadelphia, a City Hall employee incorrectly told a voter that she would have to pay $50 per petition to file recount petitions, and incorrectly stated that the deadline to file petitions was November 28, 2016.  Ex. 26.

      f.     In York County, a voter attempted to file petitions with the prothonotary in court, where other petitions had been filed earlier in the day.  She was sent to the board of elections, where she learned that the board had certified the county's vote that day at noon.  Ex. 30.

101.     In short, the entire process was a Kafkaesque nightmare.

<u>DoS Pulls the Rug Out of the Recount Effort</u>

102.    Into this nightmare stepped the Department of State, which somehow managed to make the situation even worse.  In the middle of the afternoon on November 28, as thousands of Pennsylvania citizens filed recount requests in county boards in counties around the State, Defendant Marks, on behalf of the DoS, sent a surprise guidance memo to the 67 county boards. Ex. 34.  The memo advised county boards that recount requests were timely *only* "[i]f your county has not completed its initial computation of the returns." *Id.*  For filings made within 5 days after computation, DoS advised that "the petition for recount must be filed with the court of common pleas." *Id.*

103.    However: (i) Many voters had already filed petitions with the county board, and county boards did not then contact voters to tell them their petitions were untimely or advise that they should file with the county court, *see* Exs. 8, 9, 24, 25; and (ii) DoS was almost certainly wrong, as the Pennsylvania Supreme Court held that voters *may* file petitions with the county board within 5 days of the computation of the vote.  *See In re Reading School Bd. Election*, 535 Pa. 32, 37 (1993) (computation complete on Nov. 20; voter petitioned county board on Nov. 25; court held: "Appellant cannot complain that he was misled into filing his challenge with the county board of elections, because, as our research has indicated, the suggestion that he [the voter] proceed before that body [the county board] was *correct*.").

104.    As a result, *inter alia*, of this DoS misdirection, many county boards that received recount requests within 5 days of the computation did not conduct recounts.  All of those recount petitions were for naught.

**County Board and Court Proceedings: Voters and Stein are Repeatedly Denied a Right to Examine the Vote**

105.    **Montgomery** is a DRE county.  Apparently following the faulty DoS guidance, the county board refused to accept complete petitions from nearly 78 districts and instead told voters to file in the Court of Common Pleas.  The board did this even though voters filed the petitions within five days of the computation of unofficial results.  *See* 25 P.S. § 3154(f); *In re Reading*, 535 Pa. at 37.  The voters were forced to file in the Court of Common Pleas at a cost of $269.50/petition (or $89.83/voter), demanded by the prothonotary, who treated every petition as a separate court filing.  The total cost for the 78 petitions was $21,021, which the Stein campaign paid on the voters' behalf.  Ex. 49, Lieb Decl. ¶ 6.  At an average of $269.50/petition, in 9,158 districts, the cost to voters of a statewide recount would be $2,468,081.

106.    On November 30, the Montgomery Court of Common Pleas held a hearing, without notice to the voter-petitioners.  Ex. 2.  At the hearing, the county board argued that the petitions were defective because a petition was not filed from every single election district in the entire county and perhaps even the State, Ex. 31 at 22:24-23:4, and because voters did not pay $50 each *in addition* to the $269.50/petition, *id.* at 19:18-25.  The Court dismissed all of the petitions orally on November 30, and by order dated December 1.  *Id.* at 47; Ex. 42.  In a later order, the Court held that unless petitions were filed in every district in every county, no one could file a petition in Pennsylvania.  Ex. 52 at 7-8.[14]  As a result, Montgomery did not recount or recanvass a single vote, much less permit voters or Stein to do a forensic exam of the voting system.

107.    In **Bucks** County, a DRE county, the county board refused to accept petitions filed within 5 days of the computation of the vote, claiming they were untimely.  Ex. 5.  Voters

---

[14] The decision was affirmed on other grounds.

were forced to file in the Court of Common Pleas instead, as instructed by the county board. Exs. 5-6.  At a court hearing, the petitions were dismissed.

108.     In **Delaware** (DRE) and **Lancaster** (optical scan) counties, county boards initially accepted voters' petitions but later sent the voters notices that the petitions were untimely, apparently on advice of DoS.  Exs. 11-13.  On information and belief, those petitions were filed within 5 days of the initial computation of the vote.  They certainly were in Delaware County, as the initial computation of the vote never even occurred.

109.     In **Northampton**, a DRE county, the county board also rejected petitions filed within 5 days of the computation as untimely.  Exs. 24-25.  After a notice of appeal was filed on November 30, 2016, the Northampton Court of Common Pleas failed to set the hearing for an appeal within three days as required by statute.  *See* 25 P.S. § 3157(a).  Later, the County Solicitor informed Stein's counsel that a recanvass had occurred, but admitted that it was not "official" because no one—including the Solicitor himself—had received notice.

110.     In **Lehigh** County, a DRE county, the county board did accept petitions fewer than five days after the computation of unofficial results.  On Wednesday, December 1, Lehigh County conducted a recanvass but it failed to provide all candidates with notice as legally required.  *See* 25 P.S. § 3154(e).  The county board then rejected the voters' and Stein's requests for a forensic examination of the DRE voting system.  Ex. 48, Declaration of Alison Frick dated February 14, 2017, at ¶ 11.

111.     In **Allegheny** County, another DRE county, the county board did accept voter petitions filed fewer than five days after the board purportedly completed computing the unofficial results.  It announced it would conduct a recanvass.  The state and county Republican Party appealed that decision, arguing that the petitions were untimely.  At a hearing in the Court

of Common Pleas, the county solicitor refused to defend the petitions' validity.  Ex. 50 at 63-64.

The Elections Director testified, however, that the members of the board of elections had not

signed the unofficial results, as required to complete the initial computation.  *See* 25 P.S. §

3154(f).  The Court therefore dismissed the appeal and allowed the recanvass to proceed.  Ex. 35.

The county did a meaningless recanvass on December 5.  It refused Stein's timely request for a

forensic examination of the voting machines, and the same request from voters in the petitions

themselves.  Exs. 43, 44.  The Court of Common Pleas then rejected an appeal from the board's

refusal to allow a forensic examination, holding that any argument on that point had been waived

even though the Court had deemed it "not relevant" on the previous appeal, Ex. 50 at 54.  As a

result, no voter or candidate was permitted to examine the DRE system in Allegheny, either.

112.    **Philadelphia**, another DRE county, did not finish counting votes by November

28, and therefore accepted recount petitions.  Notwithstanding written requests from voters and

the Stein campaign, Ex. 36, and another oral request from the Stein campaign at a county board

proceeding on December 1, the county board refused to permit voters or candidates to examine

their DRE voting system.  Ex. 47 at 5-6.  The county board then conducted an essentially

meaningless machine recanvass.  Stein appealed the board's denial of the request for

examination; that appeal was denied by the Philadelphia Court of Common Pleas.

113.    **Chester**, an optical scan county, did not finish counting votes, and therefore

accepted recount petitions.  A hand recount of paper ballots in 143 Chester County precincts was

completed on December 10, 2016.  Chester is the one and *only* county in the State of

Pennsylvania where a substantial subset of voters had any meaningful opportunity to make sure

their votes were counted accurately.

114.    This list is not exhaustive.  Voters in counties across the State faced similar issues: lack of public information about whether counties completed the computation of votes, state officials confused about the law, and court hearings without notice.

115.    Meanwhile, 100 voters, including Plaintiff Reitz, signed a petition in the Commonwealth Court to contest the election on November 28, the statutory deadline.  *See* 25 P.S. § 3456.  The deadline required that the contest be filed before voters could determine through recounts whether their votes were accurately counted.  The contest petition was explicitly a placeholder, designed to preserve petitioners' rights as they sought "[f]urther evidence supportive of [their] concern" through recounts.  Ex. 37.  The next day, the Commonwealth Court set a December 5 hearing.  The petitioners requested that the hearing be continued and the contest petition be held in abeyance while requests for recounts were pending throughout the state to allow for the development of a fuller record.  Ex. 38.  The Commonwealth Court denied the request and required the voters to post a $1 million bond to continue the case.  Ex. 39.  In response, the voters withdrew the case: "Your Honor: Petitioners are regular citizens of ordinary means.  They cannot afford to post the $1,000,000 bond required by the Court.  Accordingly, the petition is withdrawn."  Ex. 40.

116.    This federal case does not seek review of the Commonwealth Court's imposition of a $1 million bond on the parties in that case, only one of whom (Reitz) is a plaintiff here.  This case, however, does seek review, *inter alia*, of an election scheme that, among many other burdens, (i) requires contest proceedings to be filed before elections are certified, before recounts are concluded, and before evidence of mistake or fraud can be fully developed, and (ii) gives state courts unfettered discretion to impose punishing bonds on ordinary voters that effectively make contest proceedings financially prohibitive.

## STATE COURT PROCEEDINGS

117.     To Plaintiffs' knowledge, there are no pending or ongoing Pennsylvania state court proceedings related to this case or to the 2016 presidential election.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983; Fourteenth Amendment, Equal Protection

118.     Plaintiffs incorporate by reference the foregoing as if set forth word for word.

119.     Pennsylvania voters have the right to vote, to have their votes counted, and seek recounts of their votes.  All of these rights are impossibly burdened in Pennsylvania, and subjected to arbitrary and unreasonable procedural rules that makes these rights a nullity.  These burdens include, among others:

      a.     Pennsylvania voting machines often do not work; they fail to register votes actually cast by voters.  For example, Plaintiffs Knight, Howe, and Kupka cast their votes on DRE machines, but their votes were almost certainly not counted by the machines.  Thousands of voters in Montgomery County were also disenfranchised because of faulty DRE machines.

      b.     Pennsylvania voting machines are vulnerable, hackable, and more easy to penetrate and manipulate than an iPhone.

      c.     In all of the DRE counties, there is a total lack of a voter-verifiable paper trail.  Voters in these counties can do nothing on Election Day to verify that their votes were counted.

      d.     Deadlines to seek recounts/recanvassing are kept secret from voters.  Deadlines vary from county to county, and from election to election.  Deadlines often

change arbitrarily, and in secret.  In short, voters have no notice as to when they can or must seek recounts/recanvassing of the vote.

  e. As set forth above, voters face insurmountable logistical and practical obstacles to seek recounts/recanvassing of the vote.  The right exists on paper; in practice it is illusory.

  f. As set forth above, voters face insurmountable financial obstacles to seek recounts/recanvassing of the vote.  Again the right exists on paper; in practice it is illusory.

  g. The recanvassing of DREs permitted under Pennsylvania law is a substantially useless exercise.  It does not help voters or candidates know whether votes that were cast were actually counted.

  h. Pennsylvania law apparently does not provide for any meaningful inspection or examination of DRE or optical scan machines by voters or candidates, before or after an election.  As a practical matter, voters in DRE counties can do nothing after Election Day to verify that their votes were counted.

  i. Voters in different districts and counties are treated differently in arbitrary and unreasonable ways, including different deadlines, different fees, different election boards with different recount/recanvassing policies, and different methods of voting.

  120. The burdens on seeking a state-wide recount/recanvassing are greater for recount initiatives led by small party candidates such as Stein, who have fewer logistical and financial resources to mobilize thousands of voters throughout the Commonwealth in a short period of time.

121.     Defendants cannot identify precise interests that require Plaintiffs' rights to be burdened.  For example, Defendants have no valid interest in failing to provide notice of deadlines to seek recounts, in changing deadlines arbitrarily, or in imposing insurmountable logistical and financial obstacles for voters to seek anything approaching a statewide recount. Nor do Defendants have any valid interest in imposing arbitrary, unreasonable, and insurmountable burdens on voters' rights under Pennsylvania law to ensure their votes were counted.

122.     Acting under color of state law, Defendants, by the above, are maintaining and implementing a system of voting that denies Pennsylvania voters the right to vote, to have their votes counted, and to seek recounts/recanvassing of the vote.

123.     Defendants, acting under color of state law, have deprived and severely burdened and threatened to deprive and will severely burden and deprive Pennsylvania voters, including Voter Plaintiffs, of their fundamental right to vote.  The state's interest does not justify that severe burden.

124.     This burden falls unequally on smaller political parties, such as the Green Party; their candidates, such as Jill Stein; and their members.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983; Fourteenth Amendment, Due Process

125.     Plaintiffs incorporate by reference the foregoing as if set forth word for word.

126.     Acting under color of state law, Defendants, by the above, are maintaining and implementing a system of voting that is fundamentally unfair and that denies and severely burdens the right to vote, to have votes counted, and to recounts/recanvassing of the vote, and that violates substantive Due Process under the Fourteenth Amendment to the United States Constitution.

127.    As a result, Pennsylvania citizens, including Voter Plaintiffs, have been and will be denied the right to vote.

### THIRD CAUSE OF ACTION
**42 U.S.C. § 1983; First Amendment**

128.    Plaintiffs incorporate by reference the foregoing as if set forth word for word.

129.    Acting under color of state law, Defendants, by the above, are maintaining and implementing a system of voting that is fundamentally unfair and that denies and severely burdens the right to vote, to have votes counted, and to recounts/recanvassing of the vote, and that violates the First Amendment to the United States Constitution.  The state's interest does not justify that severe burden.

130.    As a result, Pennsylvania citizens, including Voter Plaintiffs, will be denied the right to vote.

### FOURTH CAUSE OF ACTION
**42 U.S.C. § 1983; Fourteenth Amendment, Due Process/Equal Protection**

131.    Plaintiffs incorporate by reference the foregoing as if set forth word for word.

132.    Pennsylvania voters have statutory rights to a recount of the vote.

133.    Acting under color of state law, Defendants, by the above, are maintaining and implementing a system of vote recount procedures that are fundamentally arbitrary, unreasonable, and unfair and that deny, severely burden, and nullify the right to a recount of the vote, and that violates Due Process and Equal Protection under the Fourteenth Amendment to the United States Constitution.

134.    As a result, Pennsylvania citizens, including Voter Plaintiffs, have been and will be denied the right to recounts/recanvassing of the vote.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court:

1. Declare that Defendants:

    a. Violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by unreasonably burdening the right to vote of all Pennsylvania citizens;

    b. Violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by instituting a fundamentally unfair process that denies and severely burdens the right to vote;

    c. Violated the First Amendment to the United States Constitution by effectively denying the right to vote of all Pennsylvania citizens;

2. Declare applicable sections of the Pennsylvania Election Code in violation of Equal Protection, Due Process, and the First Amendment in statewide elections, both on their face and as applied in the 2016 presidential election;

3. Declare that the rights and privileges of Plaintiffs and other citizens will be irreparably harmed without the intervention of this Court to secure those rights for the exercise thereof in a timely and meaningful manner;

4. Enjoin permanently the Defendants, their agents, officers and employees from enforcing applicable sections of the Pennsylvania Election Code that violate Equal Protection, Due Process, and the First Amendment in future statewide elections;

5. Enjoin permanently the Defendants, their agents, officers and employees to comply with Equal Protection, Due Process, and the First Amendment in future statewide elections;

6. Enjoin Defendants to permit forensic examination by Plaintiffs of electronic voting machines and systems used in Pennsylvania, including in Montgomery County;

7. Award Plaintiffs disbursements, costs, and attorneys' fees; and

8. Grant such other relief as the Court deems just and proper.

Dated: February 14, 2017

Respectfully submitted,

Gregory M. Harvey
PA Attorney ID 4445
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Phone: 215-772-7684
Fax: 215-772-7620
Email: gharvey@mmwr.com

Ilann M. Maazel*
Andrew G. Celli, Jr.*
Alison E. Frick*
Douglas E. Lieb*

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbalaw.com

* *Admitted pro hac vice*