# Exhibit 43

RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
EARL S. WARD
ILANN M. MAAZEL
HAL R. LIEBERMAN
DANIEL J. KORNSTEIN
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
DEBRA L. GREENBERGER
ZOE SALZMAN
SAM SHAPIRO
ALISON FRICK
DAVID LEBOWITZ
HAYLEY HOROWITZ
DOUGLAS E. LIEB
ALANNA SMALL
JESSICA CLARKE

EMERY CELLI BRINCKERHOFF & ABADY LLP

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE
(212) 763-5000
FACSIMILE
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

CHARLES J. OGLETREE, JR.
DIANE L. HOUK

December 4, 2016

*Via Email*

Mark Wolosik
Division Manager
Allegheny County Elections Division
mark.wolosik@alleghenycounty.us

   Re: Examination of Voting Machines During December 5 Recount

Dear Mr. Wolosik:

   This firm represents presidential candidate Jill Stein and her campaign, in support of the efforts of hundreds of Allegheny County voters who have sought a recount and recanvass in Allegheny County of the 2016 vote for President and Senate. As ordered by the Honorable Joseph M. James on Friday, December 2, that recount and recanvass is scheduled to take place on Monday, December 5 at 10:00 am.

   I write to explain why the Election Division, as agent of the Allegheny County Board of Elections, has the authority and in fact the duty to permit forensic examination by independent experts of the election management computers and a sampling of the electronic voting machines and removable media used in the 2016 general election. This letter will serve as a formal request, on behalf of Dr. Stein and her campaign, to allow such a forensic examination at the campaign's expense and under the supervision of the Elections Division.

***Candidates Are Statutorily "Entitled" to "Examine" the DRE Voting System***

   The rights of candidates during recounts are broad: "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines *shall be entitled to examine . . . the voting machine and to raise any objections regarding the same*, which shall be decided by the county board, subject to appeal, in the manner provided by this act." 25 P.S. § 2650(c) (italics added.) The statute does not define "examine," but plainly an examination is considerably more searching than simply watching a recanvass. To examine means "to inspect

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 2

closely," to "test the condition of," to "inquire into carefully." *See Examine*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/examine.

Allegheny County, of course, uses a DRE electronic voting system, and in particular the iVotronics system. Dr. Stein is entitled under the statute to "test the condition" of that system, and to "inspect" it "closely." That necessarily *requires* a forensic examination of the DRE software, removable media, and electronic management system. The only way to "test the condition" of the DRE system is to examine the software. As explained in the affidavit of J. Alex Halderman attached to the petitions for a recount or recanvass, "Paperless DRE voting machines do not create any physical record of each vote, so forensic examination of the equipment is the only way to assures that the machines were not manipulated in a cyberattack." Halderman Aff. ¶ 15.

At the hearing on Friday, you testified about the importance of ensuring that the firmware associated with the system is in good working order and is in fact the same version of the firmware certified for use in the machines. That is why Allegheny County admirably chooses to conduct pre-election checks of the firmware on a random sample of its DRE machines sixty days before every election. You also testified that this process is neither logistically nor financially burdensome. Forensic experts agree. *See* Buell Aff. ¶¶ 32-38. We are asking for an essentially similar process to the one you conduct before the election to occur on a larger sample of machines, at the expense of Dr. Stein's campaign, and *after* the election to ensure the integrity of the vote with certainty.

The statute is plain, as is the duty of the Board. Dr. Stein, by her representatives, is entitled to examine the DRE voting system used in Allegheny County in connection with the recanvass Allegheny County will conduct. We have top computer experts ready to do so, on one day's notice, under the careful supervision of the Elections Division. Dr. Stein's campaign will even pay for these experts. Between a voter and the election result is the DRE system. The system must be examined.

***The Supreme Court of Pennsylvania Gives the Board Broad Power to Permit Forensic Examination of the DRE System***

"Nothing can be more vital towards the accomplishment of an honest and just selection than the ascertainment of the intention of the voter." *Appeal of McCracken*, 370 Pa. 562, 566 (1952). Mere recanvassing of the DRE voting machines is insufficient to fulfill the Board's "apparent and impelling" duty to ascertain[] *for whom* votes were cast." *McCracken*, 370 Pa. at 566 (emphasis in original). As the Pennsylvania Supreme Court has held, "[i]n the computation of the vote, [the Board's] functions are not limited to those of a humanized adding machine. The Board is not a multiple comptometer." *Id.* at 565. Rather, "canvassing and computing necessarily embrace acts of discretion." *Id.*; *see In re Recount of Ballots of Rome Twp., Crawford Cty.*, 397 Pa. 331, 332 (1959) (the Pennsylvania Election Code is "a *highly remedial statute* which should be *liberally construed* in order to secure a proper computation of the votes cast at an election.").

"There could scarcely be a duty more apparent and impelling on an Election

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 3

Board than that of ascertaining *for whom* votes were cast." *McCracken*, 370 Pa. at 565.  In counties with optical scan ballots, the Board can fulfill that "impelling" duty by manually counting the papers ballots.  Allegheny County, though, has no paper ballots.  Without paper verification, the *only* way for the Board to fulfill that duty is to permit a complete, sophisticated forensic analysis by computer experts of DRE machines, removable media, and the election management computers used to program the machines and tally results.

"The needs of our democracy require accurate and rapid ascertainment of the people's will.  And it is for that reason that the Legislature has entrusted the County Board of Elections with plenary powers in the administration of the election code."  *Id*.  In this case, in this election, and with these machines, the only way to ensure the integrity of the vote in this county is a comprehensive forensic exam.

*Conclusion: The Board Should and Must Permit A Forensic Examination of the DRE System*

We therefore request that, in connection with the recanvass and recount scheduled to proceed on December 5, 2016, the Commission permit forensic examination of the DRE electronic voting system.  In support of this request, attached please find the affidavits of leading computer experts Duncan Buell, J. Alex Halderman, Harri Hursti, Daniel Lopresti, Candice Hoke, and Matthew Bishop, all of which speak to the vulnerabilities of electronic voting systems, including the DRE system used in Allegheny County in the 2016 election, and the desirability and feasibility of a forensic audit.

Thank you for your consideration.

Respectfully,

/s/

Douglas E. Lieb*

* *Admitted pro hac vice*

Encl.

c.	Al Opsitnick, Esq.
	Ronald L. Hicks and Nicholas L. Bell, Esqs.
	Stuart C. Gaul, Jr., Esq.

## AFFIDAVIT OF DUNCAN A. BUELL

DUNCAN A. BUELL, being duly sworn, deposes and says the following under penalty of perjury.

1. I am a professor of Computer Science and Engineering at the University of South Carolina. I submit this affidavit in support of petitions to recount/recanvass the vote in Allegheny County.

2. In my opinion, the electronic voting system used by Allegheny County, called the iVotronics system, is vulnerable to malicious interference and inadvertent error. The system is unreliable. The only way to be sure of an accurate tally of the vote in this election is to conduct a forensic analysis of the machines and software. Such an evaluation could be accomplished expeditiously, in a few short hours, and would allow us to know whether the vote tally in Allegheny County was accurate.

### Qualifications and Relevant Employment History

3. In 1971, I earned a B.S. in Mathematics from the University of Arizona. The following year, I earned an M.A. in Mathematics from the University of Michigan. In 1976, I earned a doctorate in Mathematics, with an emphasis in number theory, from the University of Illinois at Chicago. A copy of my resume is available on my university website at http://www.cse.sc.edu/duncanbuell.

4. Since 2000, I have been a Professor in the Department of Computer Science and Engineering at the University of South Carolina. From 2000 to 2009, I served as Chair of that department. During 2005-2006, I served as Interim Dean of the College of Engineering and Information Technology at the University of South Carolina.

In my management capacity as department chair, my duties also included the management of the college's information technology staff and its network and computer center, which included 9 instructional labs with approximately 250 desktop computers. I was also responsible for the management and operation of cluster computers, file and mail servers, and the college's network infrastructure.

5. Prior to 2000, I was for just under 15 years employed (with various job titles and duties) at the Supercomputing Research Center (later named the Center for Computing Sciences) of the Institute for Defense Analyses, a Federally Funded Research and Development Center (FFRDC) supporting the National Security Agency. Our mission at SRC/CCS was primarily to conduct research on high performance computing systems and computational mathematics to ensure that those computing systems would be suitable for use by NSA, since the NSA workload has technical characteristics different from most high-end computations like weather modeling. While at IDA I played a leading role in a group that received a Meritorious Unit Citation from Director of Central Intelligence George Tenet for what was then "the largest single computation ever made" in the U.S. intelligence community.

6. In 2013, I was elected a Fellow of the American Association for the Advancement of Science. In 2016, I was appointed to the NCR Chair in Computer Science and Engineering at the University of South Carolina.

7. My current research interests include electronic voting systems, digital humanities, high performance computing applications, parallel algorithms and architecture, computer security, computational number theory, and information retrieval.

2

Over the past 40 years, I have published articles in peer-reviewed journals and/or lectured on each of these topics.

8. Since about 2004 I have been working with the League of Women Voters of South Carolina (LWVSC) as an unpaid consultant on the issue of electronic voting machines. South Carolina uses statewide the ES&S iVotronic terminals and the corresponding Unity[1] software. Beginning in summer 2010, I worked with citizen volunteer activists Frank Heindel, Chip Moore, Eleanor Hare, and Barbara Zia on acquisition by FOIA of the election data from the November 2010 general elections in South Carolina and on the analysis of that data. That work, based on data we acquired by FOIA, culminated in an academic paper that was presented at the annual USENIX EVT/WOTE (Electronic Voting Technology Workshop/Workshop on Trustworthy Elections) conference in August 2011. My work with the LWVSC has continued, in that when the state of South Carolina acquired the 2010 election data from the counties and posted it on the SCSEC website, I analyzed that data as well.

## Basis for My Opinions

9. I base the opinions in this affidavit on my knowledge, skill, training, education, and experience: I have been programming computers for more than 45 years and have been employed as a computer scientist for more than 35 years, working with

---

[1] Unity is the election management software suite, a number of programs that run on a Microsoft computer at county headquarters and perform such tasks as initializing the database with jurisdiction and candidate information, configuring the ballot styles, collecting the vote totals from the PEBs into the master database of votes and log information, and producing reports of votes by candidate and precinct as well as the log files and cast vote record files referred to below.

3

computers and computer applications and operations and management of large computer networks, including file and mail servers that utilize the Internet.

10. I have also used for my opinions the analysis of the ES&S iVotronic system and the Unity software done for Ohio Secretary of State Jennifer Brunner and published 7 December 2007. This is the "EVEREST Report" and is still the best and most complete analysis of the iVotronics and their accompanying software and procedures. I am also familiar with the report produced for the state of Florida ("the Yasinsac report") after the 2006 election in Sarasota, Florida resulted in a very high undervote in the race for U. S. Representative.

11. I also base my opinions on my analysis of ES&S election data using computer programs I have written. I first wrote these programs to analyze the 2010 General Election data from South Carolina. I have subsequently analyzed the 2012, 2014, and 2016 data from South Carolina. I have also used my programs to analyze data from from Hidalgo County, Texas and from Venango County, Pennsylvania, at the request of election officials there. I believe I have more experience in doing this analysis of ES&S iVotronic data than anyone else, possibly including employees of ES&S itself.

**The ES&S iVotronics Machines and Accompanying System Are Riddled with Software and Procedural Vulnerabilities**

12. The iVotronics machines and software systems[2] are not secure or reliable. They are susceptible to both intentional and malicious interference as well as errors

---

[2] I will refer throughout this affidavit to "the iVotronics" and mean by that the entire system of which the iVotronic is the voting machine itself. The system includes also the handheld PEB devices, the flash memory cards inserted into and removed from the iVotronic, and the Unity software and stored data used (usually) at county headquarters.

4

resulting from inadvertent or sloppy mistakes. The only way to be sure of the accuracy of the vote is to carefully examine the machines and the systems they ran.

*The Machines Are Vulnerable to Intentional Interference*

13. The EVEREST report documented a number of software flaws, many of which relate to the reliability or security of the system. The Yasinsac report describes a naïve, indeed juvenile, password structure that could easily be circumvented by any insider and that could be circumvented without enormous difficulty by an outside attacker.

14. The EVEREST report also refers to numerous buffer overflow vulnerabilities that would permit the installation of malicious software. And, when done by a skilled attacker, the malicious code could eventually erase itself to leave no trace.

15. In addition, an attacker could use a PEB[3] or a PEB emulator (a Palm Pilot with the same infrared protocol was used in the test) to masquerade as a valid PEB, open an iVotronic as if for voting, and upload malicious code.

16. Election officials and vendors often justify the security of their systems by pointing to the proprietary nature of the hardware and software, suggesting that no one who was not permitted to use a voting system could get access to one. This argument is incorrect; I purchased two iVotronics with PEBs myself on eBay. It would be relatively straightforward to create a rogue PEB through which to spread malware (thus not needing

---

[3] Personal Electronic Ballot: This is a handheld device slightly smaller than a paperback novel. Proper procedure is that the precinct poll manager will use one particular PEB to open and close the iVotronics at the beginning and ending of Election Day, and that regular poll workers will use a different set of PEBs to open the iVotronic for each voter and to load onto the machine the particular ballot style for that voter's jurisdictions.

5

the Palm Pilot or similar device). In my experience as a poll observer in South Carolina in the 2016 General Election, I noticed that it would have been easy for a voter to shield from view the PEB slot while voting and thus insert a rogue PEB to upload malicious code.

### *The Machines Are Vulnerable Even If They Are Not Connected to the Internet*

17. It is a frequent claim by election officials that the voting machines cannot be corrupted because they are never "connected" to the Internet. This is a statement that is only true if literally none of the computing hardware—or any removable media connected to the computer—has ever been connected to any computer that has been connected to the Internet.

18. To provide background for what is really meant by "not connected," one must remember what apparently took place with the Stuxnet virus. Stuxnet was apparently a joint US and Israeli effort to sabotage the Iranian efforts to produce nuclear weapons. Part of the Iranian nuclear program involved specific centrifuges for concentrating uranium. None of those centrifuges were ever "connected" to the Internet, and yet Stuxnet was inserted into the Iranian nuclear network and caused a large number of centrifuges to self-destruct. Part of the distribution of the Stuxnet virus apparently involved hiding it on flash memory drives that were sprinkled in parking lots. When curious people picked them up and inserted them into computers inside the nuclear program network, Stuxnet was inserted into the system.

19. Indeed, this vulnerability is well known. My colleagues and I received a briefing from the FBI a few years ago warning faculty travelling to conferences not to

6

allow a "friend" to offer us a flash drive to share documents, because the "friend" could easily install a virus in this way.

20. In short, any sort of electronic connection can lead to the insertion of malware into the computer thus connected.

21. In most electronic voting systems in the United States, including the iVotronics, a county election official uses the computer running Unity to prepare the ballot styles for each of the precincts and jurisdictions. The county computer then prepares the PEBs for use on Election Day by loading the PEBs with the ballot styles for the individual precincts. The county computer would normally also erase the files on the memory cards to be inserted into the iVotronics. That represents the outward path from county headquarters to the individual iVotronics.

22. On the inbound path, at the end of Election Day, the memory cards and the PEBs come back from the individual precincts and are connected to the county computer. Presumably this is the same computer from which results are provided to the media and the public at the end of Election Day.

23. It can only be argued that this voting system as a system is "not connected" to the Internet if it is the case that none of the computing equipment has been connected at any time. This means that the Unity computer will never have had its operating system or its code updated since the system was first brought up (unless, of course, the updates were to come on some medium like a CD from a trusted source like the ES&S vendor). This means that flash drives that carry results from the Unity system to a computer on the network that sends the results to the news media (or any flash drive that has ever been

inserted into a computer on a network) must never be reused and inserted back into the Unity system.

24.  It is possible that all these security measures are in place in every single county in the state. In my experience, however, this is extremely unlikely, and thus a forensic analysis would need to look at and verify that all these protocols were followed.

*The Machines Are Also Vulnerable to Inadvertent Errors that Render Them Unreliable*

25.  The complexity of the iVotronics system itself leaves it vulnerable to error. For example, the iVotronics are supposed to be opened and closed with a single PEB in each precinct, with that PEB used only for opening and closing. Since at closing the vote totals are collected into the PEB, and the totals from the closing PEB are used for totaling into the Unity database at county headquarters, it can (and does) happen that poll managers don't follow directions and use multiple PEBs for opening and closing, and that not all the vote totals are accumulated into the county database. PEBs can also fail in a precinct.

26.  I have also seen examples when iVotronics would not open normally at the beginning of Election Day, were opened later by a technician, but then at the end of Election Day the paper tape produced by the precinct poll manager said "Machine not opened". This has led to the votes in those machines not being accumulated into the official count at the county level and thus effectively not being counted.

27.  Another failure in the software comes when the ballot definition in the iVotronic is different from that at county headquarters. If the county system lists two

8

races for county council, say, and the ballot definition in the iVotronic only has one race, then what happens is essentially that vote totals from that point on down to the bottom of the ballot are shifted up one row and added into the wrong row's totals.

28. Similar failures can occur when memory cards fail, or when iVotronics will not allow themselves to be closed for some reason.

### *Only a Forensic Evaluation Can Determine Whether Votes Were Properly Counted*

29. Only a forensic evaluation, including an examination of the election management system and software, will reveal whether the official tally of votes is reliable or whether the voting process was disrupted by malicious attack or other error.

30. With respect to malicious interference, a forensic evaluation would allow investigators certainly to determine if a systematic failure of proper procedures had occurred. I would expect random failures to occur, reflecting the chaos of Election Day and the imperfections of poll workers. Systematic issues, however, would show up as anomalies that might well be intentional. The ability to drill down to precinct level data allows one to compare anomalies and "errors" against voting preferences and demographics, and a forensic analysis with statistics would spot such anomalies.

31. Such an investigation could be accomplished expeditiously. For the purpose of my data analysis, I would need the EL152 event log file, the EL155 cast vote record, the EL68A system file, and the EL30A results file. I have never been told in South Carolina, Hidalgo County (TX), or Venango County (PA)—each places I have worked and performed analyses of election data—that obtaining this data was difficult; it can be produced using the Unity software from the county database. Analysis of this data using

9

my programs for the entire 2016 South Carolina data (2.1 million total votes) took about *three hours*' compute time. Depending on the number of exceptional cases to be looked into, an in-depth examination of these cases should take only a small number of days, much less time if the exceptions are usually benign. (For example, I produce a list of iVotronics that appear in the event log but have no cast vote record. It has happened that such a machine has not had its votes counted, which is a serious error, but what I usually see here is that such a machine never did get properly opened and was never used; that fact can be determined by a very quick scan of the event log that takes only seconds.)

32. I have conducted forensic analyses of these machines to ensure that the voting tallies were accurate. Beginning with the 2010 General Election in South Carolina, I obtained the voting data and wrote my own programs to verify that all the votes had in fact been counted and that the election data was at least internally consistent. I have rewritten my programs several times, most recently following the 2016 General Election. I have used four data sources in my analysis, which are data files published as public records by the South Carolina State Election Commission on their website http://scvotes.org.

33. First, I examine the event log file from each iVotronic. It lists the events recorded in each machine since the most recent time the internal file was erased. From this file I get the serial number of the iVotronic machine, the serial numbers of the PEBs used for most of the events, the timestamp when the events occurred, and the code number and expanded English text of the event itself. For example, code 1510 is "Vote cast by voter." From this file I can determine that the internal memory was zeroed before

10

use for this election, how many votes were cast on each iVotronic, which PEB was used for opening and for closing, verify that the iVotronic was closed and its internal data written to the memory card, and so forth. This allows me to determine the number of votes cast on each machine, the fact that the machines were cleared of votes and that the data was written to the memory cards, and whether or not the machine was functioning properly on Election Day. By knowing which PEB was used for closing I also know which PEB serial numbers to look for in the system log to verify that the vote totals were correctly uploaded to the county database. I have repeatedly observed instances of "cranky" iVotronics that could not be closed or that had bad memory cards, or were not functioning properly; knowing that such machines exist (by serial number) allows me to verify elsewhere that other methods have been used to account properly for the votes in those iVotronics.

34. Second, I examine the system log for the Unity software running on a Microsoft computer at county headquarters. From this file I can determine that the county database was cleared before Election Day, that the correct number of votes were uploaded from the PEBs (by serial number) for a given precinct, that the memory card data was uploaded to the county database, and so forth. It is in this file that one can find the log of ballot definition differences between the county version and the version in each iVotronic. This allows me to determine that the data (including vote counts) from machines known to have been used for voting has been uploaded correctly.

35. Next, I look at the data of the actual cast vote record, in a randomized order, and with no identifying information about which voter cast which ballot. From this