IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL STEIN, et al. | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | |
| PEDRO A. CORTÉS, in his capacity as | : | |
| Secretary of the Commonwealth, et al. | : | NO. 16-6287 (PD) |
| Defendants. | : | |

## **ORDER**

AND NOW, this            day of               , 2017, upon consideration of the motion of

the Defendants Secretary of the Commonwealth Cortés and Commissioner Marks to dismiss

Plaintiffs' Amended Complaint, it is hereby ORDERED that the motion is GRANTED.  Plaintiffs'

Amended Complaint is hereby DISMISSED with prejudice.


BY THE COURT:


_____

PAUL DIAMOND,  J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL STEIN , et al. | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | |
| PEDRO A. CORTÉS, in his capacity as | : | |
| Secretary of the Commonwealth, et al. | : | NO. 16-6287 |
| Defendants. | : | |

## MOTION TO DISMISS AMENDED COMPLAINT

Defendants Secretary Pedro A. Cortés and Commissioner Jonathan Marks move to dismiss

Plaintiffs' Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(1), (6), and (7), and incorporate

by reference the attached memorandum of law.

Wherefore, this Court should grant the relief as set forth in the proposed order.

Respectfully submitted,

JOSH SHAPIRO
Attorney General


/s/ Sue Ann Unger
_____

|  |  |
|---|---|
| | Sue Ann Unger |
| Office of Attorney General | Senior Deputy Attorney General |
| 21 S. 12th Street, 3rd Floor | Attorney I.D. No. 39009 |
| Philadelphia, PA 19107 | Kenneth Joel |
| 215-560-2127; fx: 717-772-4526 | Chief Deputy Attorney General |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JILL STEIN , et al.                               :
      Plaintiffs,                          :          CIVIL ACTION
          v.                             :
PEDRO A. CORTÉS, in his capacity as                :
Secretary of the Commonwealth, et al.              :          NO. 16-6287
      Defendants.                          :

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT**

Rather than responding to the arguments that we presented in our Motion to Dismiss and the reasoning of this Court when it denied Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have chosen to file an Amended Complaint.  This pleading improperly tries to add other challengers but, other than that, this pleading adds little to the mix and fails to state a claim on which relief may be granted.  Accordingly, Defendants again file a Motion to Dismiss and this Brief supports that Motion.  For any of the reasons below, Plaintiffs' Amended Complaint must be dismissed with prejudice and this case closed.

## I.    PROCEDURAL HISTORY

Jill Stein, an unsuccessful political body presidential candidate, and Randall Reitz, a Pennsylvania voter (together "Original Plaintiffs") filed a Complaint pursuant to 42 U.S.C. § 1983, claiming that Secretary of the Commonwealth Pedro A. Cortés and Commissioner of the Bureau of Commissions, Elections, and Legislation Jonathan M. Marks, in their official capacities ("Defendants") impeded Mr. Reitz's right to vote and have his vote verified.  As a result, Original Plaintiffs argue that Defendants violated their rights to equal protection and substantive due process as well as their rights under the First Amendment.  Original Plaintiffs moved for an expedited emergency hearing and for a preliminary injunction to compel Defendants to order a

hand count of all ballots in all precincts that use optical scan machines and a forensic examination of a sample of the election management system computers for direct recording electronic (DRE) voting systems.[1]

The Court granted the motion to intervene of then-President-Elect Donald Trump, then-Vice President-Elect Michael Pence, all of their Pennsylvania Electors, Donald J. Trump for President, Inc., and the Republican Party of Pennsylvania (collectively "Intervenors"). After the Defendants and Intervenors responded to the motion for preliminary injunction, the Court held a hearing and subsequently denied the motion for a preliminary injunction. As particularly relevant here, this Court concluded that Original Plaintiffs lacked standing to pursue their claims and that they were unlikely to succeed on the merits of their constitutional attacks. The Intervenors then withdrew.

Defendants moved to dismiss and, in response, Original Plaintiffs filed an Amended Complaint. ECF 71. In that pleading, Original Plaintiffs try to add new voters as plaintiffs and some additional allegations; however, the underlying nature of the constitutional challenges remains the same.[2] For example, the new plaintiffs, like plaintiff Reitz, are Montgomery County voters. ECF 71, ¶¶ 10-15. The first cause of action (¶¶ 118-124) asserts an equal protection claim—claiming an unequal burden for political bodies and parties with unequal financial support relating to voters' ability to ensure that they can vote and that their votes are counted. Based upon the same allegations, the second cause of action (¶¶ 125-127) asserts a substantive due process claim, and the third cause of action (¶¶ 128-130) asserts a First Amendment claim. The fourth

---

[1] Original Plaintiffs sought additional relief; however, at the hearing, they abandoned many of these additional demands.

[2] For ease, we will refer to all of the plaintiffs as "Plaintiffs" and, where appropriate, denote the initial litigants as "Original Plaintiffs."

cause of action raises equal protection, substantive due process and First Amendment challenges related to voters' ability to obtain recounts/recanvasses.

As in the original Complaint, Plaintiffs seek permanent injunctive relief mandating a forensic examination—whatever that may mean in this context—of electronic voting machines and systems used by various counties in the Commonwealth to verify whether machines were hacked and whether machines were defective.   Plaintiffs also seek a declaration that certain sections of the Pennsylvania Election Code are unconstitutional—seemingly challenging 25 P.S. §§ 3254(e), 3261(a), 3262(b), 3262(a)(i), 3263(a)(i), 3457,  3459, which relate to the process for a recount/recanvass.  *See*, *e.g.*, ECF 71 at 38-39.  Finally, in alleging that paper ballots are the most secure technology for voting, they also seem to challenge the provision of the Election Code that requires the use of electronic voting systems—even though the statutory provisions relating to this type of voting are nowhere to be found in the Amended Complaint.[3]  ECF 71 at 7 ¶ 3-1l*; see Kuznik v. Westmoreland Cty. Bd. of Comm'rs*, 902 A.2d 476, 501, 508 (Pa. 2006).

In denying the preliminary injunction, the Court held that Dr. Stein and Mr. Reitz lack standing and the Court reasoned that the right to have one's vote counted does not create a constitutional right to have one's vote verified through a paper trail or a mandatory statewide recount.  The Court also noted other jurisdictional defects to the Complaint.  The Court concluded that Pennsylvania's recount procedures are not impermissibly "arbitrary or unreasonable."   The Court explained that "reasonable, nondiscriminatory restrictions" on initiating recounts serve an "important regulatory interest"—ensuring that election challenges are swiftly and fairly resolved

---

[3] Notably, the Green Party and some of its members once argued the contrary—that the use of paper ballots rather than voting machines violates their constitutional rights.  *Green Party of the State of N.Y. v. Weiner*, 216 F.Supp.2d 176, 189 (S.D. N.Y. 2002).

to preserve "the integrity of the vote."  Plaintiffs' amended pleading does not undermine any of this Court's conclusions or its reasoning.

Defendants, therefore, move to dismiss the Amended Complaint.

## II.    RELEVANT FACTUAL BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint and also the testimony and exhibits introduced at the December 9, 2016 hearing.  Additionally, since this is a constitutional challenge, we provide the relevant statutory provisions of the Election Code.  Of course, the factual allegations of the Amended Complaint are taken as true for purposes of this motion only.[4]  This Court may take judicial notice of the facts elicited at the hearing and the provisions of Pennsylvania's Election Code.

### A.  Alleged facts

Plaintiff Stein's name appeared on the ballot in Pennsylvania as the Green Party presidential candidate.  ECF 71, ¶ 9.  Plaintiff Reitz, registered as an Independent:  (i) voted in the 2016 general election in Montgomery County; (ii) was one of the petitioners who petitioned the Commonwealth Court to contest the election results in 2016; and (iii) claims he experienced difficulty in seeking a recount in Montgomery County.  ECF 71, ¶ 10, ECF 71-2 at 2-3.  Mr. Reitz does not allege that he encountered any problem while voting.  ECF 71-2.

The four new plaintiffs are also Montgomery County voters who voted on a DRE voting system and did not receive a paper receipt.  ECF  71-21, 71 *passim*.  The only allegation specific to Ms. Cook, without any declaration by her, is that she attempted to vote for Dr. Stein in Montgomery County.  ECF 71 ¶ 13.  Like Mr. Reitz, she does not allege that she encountered any problem at the polls or that she failed to vote.

---

[4] This Court cannot consider Plaintiffs' legal assertions and conclusions in addressing our motion to dismiss.

The other three new plaintiffs—Kupka, Knight and Howe—conclude that they were disenfranchised in the 2016 election.  As alleged in the Amended Complaint, when Ms. Kupka voted, the box stating "I do not want to vote on any office, candidate or issue" lit up.  When she cast her vote, the candidates and the "No vote" box remained lit.  ECF 71, ¶ 86, ECF 71-21.  Ms. Howe alleges that she voted straight Democratic but that the "No vote" box remained lit as she cast her ballot.  ECF 71, ¶ 84; ECF  71-18.  For Ms. Knight, the voting experience was purportedly different.  While the "choose not to vote" button allegedly remained lit up when she pressed buttons next to candidates, Ms. Knight does not allege that the light next to the words "no vote" lit when she cast her ballot.  ECF 71, ¶ 85, ECF 71-20 ¶ 5.[5]  Also, Kupka alleges that Montgomery County rejected Ms. Kupka's recount petition as untimely, when it was submitted in accordance with 25 Pa.C.S. § 3154(e).  ECF 71-21 ¶ 7.

According to the Amended Complaint, a majority of Pennsylvania counties use direct electronic recording (DRE) voting machines, while others use optical scan machines.  ECF 71, ¶¶ 24, 33-56.  While Plaintiffs allege how all the types of DRE's may be hackable, they fail to acknowledge the various security measures employed relating to the storage, seals, procedures, security or other measures that protect DREs from hacking.  ECF 71 ¶¶ 24-57; *see* ECF 57 at 49, 81 (Shamos testimony).  Further, Plaintiffs make no factual allegation that any DRE was actually hacked in the Commonwealth.  They make no factual allegation that any DRE was defective and merely conclude as much by alleging that Howe's, Knight's and Kupka's votes likely were improperly recorded as "no votes." ECF 71 at 3 ¶¶ 11, 12, 14.

---

[5] Notably, Plaintiffs do not refer to the light next to the words "No Vote," (which would mean that a no vote was actually chosen) but rather refer to the "No Vote" box light itself (which properly would light up when the ballot is activated so as to allow a voter the opportunity to register a "protest" vote).

In an attempt to bolster their argument, Plaintiffs allege that about 0.9% of the Montgomery County votes in the 2016 presidential election were "no" votes or protest votes. From this, Plaintiffs jump to the conclusion that the machines were either hacked or did not properly work and that thousands of Pennsylvania voters were disenfranchised.  ECF 71, ¶¶ 87-88; ECF 71-46; ECF 71-46.[6]  Pennsylvania, however, was not unique in its 2016 experience.  For example, protest votes in the 2016 presidential election exceeded past protest votes in other states as well.  *See e.g.* Sean Holstege, 107,257 Arizonans Cast Protest Votes for President. Did They Help Trump Win the Election?, *Phoenix New Times* (Feb. 8, 2017), available at www.phoenixnewtimes.com/news/107-257-arizonans-cast-protest-votes-for-president-did-they-help-trump-win-the-election-9062318 (citing statistics in Arizona and Florida).[7]

Plaintiffs conclude that the DRE machines leave no paper trail; however, their actual factual allegation specifies that a voter receives no paper receipt of her vote.  ECF 71, 71-20 *e.g.* ¶¶ 24-25; *see also* Shamos Testimony ECF 57 at 57-58 ("there is not a single paperless voting machine in Pennsylvania, and I don't know of any in the rest of the country" and "[i]n fact, it's a requirement of the Pennsylvania election code that every machine be capable of maintaining a permanent physical record of every vote cast").[8]

---

[6]Interestingly, the 2014 primary noted a 1.6% "protest" vote.  See www.montcopa.org/ArchiveCenter/ViewFile/Item/1863 (last visited March 7, 2017) (792 Republicans and 704 Democrats chose the "no vote" option out of an in-person turnout of 91,326—a rate of 1.6%).

[7] The Arizona article reports that in Maricopa County, Arizona where over half of all Arizonans live, "the number of protest votes quadrupled those from the past two presidential elections, according to figures released by the Elections Department in the Maricopa County Recorder's Office.  More than 50,000 voters — 3 percent of all the voters who turned out — chose none of the above, either by writing in a valid candidate, an invalid candidate, or no name at all."  As that county's elections director stated, "We just have to mark this as an event that's outside all norms, . . .. It's an election that sets all its own statistics."

[8] Plaintiffs make other assertions regarding what other states may or may not do and also allege that there were problems with absentee voting.  Plaintiffs did not request or vote absentee ballots in the general election.  Moreover, the law does not mandate that states adopt identical voting

Plaintiffs' continued failure to allege actual facts is significant as they filed their initial complaint, provided affidavits to this Court to support their positions, introduced testimony and exhibits at a preliminary injunction hearing, cross-examined Defendants' expert, had their motion for injunctive relief denied in a thorough opinion, and filed an amended complaint incorporating their previous affidavits and tendering even more.  Despite all of these opportunities, Plaintiffs still cannot factually assert that any voting machine in the Commonwealth was compromised in such a way as to alter votes.[9]

Beyond this, Plaintiffs argue that the county-based recount petitions of 25 P.S. § 3154 as well as court-ordered recounts under 25 P.S. §§ 3261 and 3162 are "shams."[10]  They previously acknowledged that Pennsylvania provides for an automatic statewide recount when the vote is decided by 0.5% or less.   ECF 1, ¶ 32.   However, they complain about what was allegedly experienced in the two additional routes that the Election Code provides for voters to seek recounts under 25 P.S. § 3154 and § 3261.  ECF 71, ¶ 59-101; ECF 71-2.   They claim that some

---

processes, and Plaintiffs raise no constitutional claim to Pennsylvania's absentee process.   *See*, *e.g.*, *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932)  (Brandeis, J., dissenting) ("it is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments").    Thus, these allegations are irrelevant.

[9] In fact, the entirety of the Plaintiffs' challenge to the machines is based on the speculation that Pennsylvania's DRE machines, which have been used for years, might be defective and/or may have been hacked by foreign interests and that the votes cast by millions of Pennsylvanians may have been altered.  At the hearing, Plaintiffs' expert admitted that he had no evidence to back up his speculation that any Pennsylvania voting machine was hacked in such a way so as to alter a single vote.  ECF 57 at 25-26.  In fact, on cross-examination, Plaintiffs' expert admitted that the outcome of the election was probably not altered by any purported hacking.  ECF 57 at 26-27.  And, Dr. Shamos described Plaintiffs' scenarios to be about as likely as androids living among us.  ECF 57 at 64.

[10] The amended complaint lacks some of the details relating to the withdrawn contest proceedings in Commonwealth Court.  This seems to be an attempt to rebut this Court's conclusion that it lacked jurisdiction either pursuant to the *Rooker-Feldman* doctrine or other abstention doctrines.  Plaintiffs cannot shore up this case by ignoring their state court efforts.

7

counties provided bad information about filing procedures and that deadline dates[11] and filing fees were obstacles.  ECF 71, ¶¶91-101. They claim that there was chaos in county boards of elections and allege noncompliance by other specific counties with required procedures.  Significantly, however, none of the alleged noncompliance refers to Montgomery County, where the voter Plaintiffs voted, and Plaintiffs have not sued a single county.  *Ibid.*

Plaintiffs also assert that the Department of State provided alleged misdirection about the required deadline for recount petitions.  ECF 71, ¶¶ 102-04.  They make no allegation that the "misdirection" affected Mr. Reitz's or Ms. Kupka's recount attempts—and they are the only voter Plaintiffs alleged to have made such attempts.

In addition to those processes, Pennsylvania voters—just 100 voters are enough—can contest an election by petitioning the Commonwealth Court to claim the election is illegal.  ECF 71; ¶¶ 7781-101; 25 P.S. § 3351.  The petition must include specified language that the "election was illegal and the return thereof not correct, and that the petition to contest the same is made in good faith."  ECF 71, ¶ 77; 25 P.S. § 3351.  Notably, this allegation must be sworn to under oath and, given the seriousness of a contest and the ramifications of a successful contest, the party raising the contest must post a bond.   25 P.S. § 3459.[12]  Many Pennsylvania voters were unsuccessful in their attempts to file local petitions to have a recount in November 2016.  ECF 71, ¶¶ 92-96.  One group of more than 100 voters contested the election in Commonwealth Court.

---

[11] All the counties pursuant to the Election Code start to canvass the votes in a general election on the same day, which simplifies the calculation of when counties are within their recount window.

[12] Plaintiffs do not allege that the Stein contest provided the required five affidavits.

ECF 1, ¶¶ 84-92.  That court imposed a $1 million bond in order for the petitioners to proceed, and

the petitioners withdrew their petition.  ECF 1, ¶ 92.[13]

### B.  Pennsylvania's Relevant Statutory and Constitutional Provisions

The Pennsylvania Election Code, enacted in 1937, was amended in 1980 to allow for the

use of electronic voting systems, which were subsequently required pursuant to the federal Help

America Vote Act (HAVA).  42 U.S.C. § 15481; *Kuznik v. Westmoreland Cty. Bd. of Comm'rs*,

902 A.2d 475 (Pa. 2006); 25 P.S. §§ 3031.1 - 3031.22.  The Secretary of the Commonwealth is

charged with the duty "to examine and re-examine voting machines, and to approve or disapprove

them for use in this State, in accordance with the provisions of [the Election Code]."  25 P.S. §

2621(b).  Section 1105-A(b) of the Election Code, 25 P.S. § 3031.5(b), specifically requires that

the Secretary of the Commonwealth examine all electronic voting systems used in any election in

Pennsylvania and further requires that the Secretary make and file a report stating whether, in the

Secretary's opinion, the electronic voting system can be safely used by voters and meets all of the

applicable requirements of the Election Code.  Before a voting system can even be examined by

the Secretary, however, it must first be examined and approved at the federal level to federal

standards.  *See* 25 P.S. § 3031.5(a).  There is no allegation that the Secretary failed to properly

certify the voting machines that were used in the 2016 general election.

The Secretary certifies the electronic voting systems, but—consistent with the Election

Code's framework of decentralizing elections—each of Pennsylvania's 67 counties independently

selects and purchases the certified voting system that best meets its needs.  *See* 25 P.S. §§ 2642(c),

3031.4(a), 3031.8.  The Election Code contemplates the certification and use of both DRE and

---

[13]  As this Court previously found, Commonwealth Court permitted Plaintiffs to challenge the
amount of the bond and also did not require the bond until after the hearing was conducted.
Plaintiffs have not alleged that they made any attempt to reduce this bond.

optical-scan electronic voting systems.  *See* 25 P.S. § 3031.1.  As the Pennsylvania Supreme Court recently explained:

> Optical scanners (akin to standardized testing methods) and punch card voting allows voters to mark selections on a paper ballot that is subsequently scanned and counted by an automatic tabulation device.  In contrast, DREs display an electronic ballot on a screen and allow an individual to vote using a button, dial, or touch screen.

*Banfield v. Cortés*, 110 A.3d 155, 159-60 (Pa. 2015).

The Election Code provides multiple ways to challenge elections and challenge voting machines.  Indeed, when an election is close, there is no need for a challenge because a recount is automatic and at the Commonwealth's expense.  25 P.S. § 3154.  That provision applies to an election where a candidate is defeated by 0.5% or less.  In addition to the automatic recount, voters have several options which are discussed next.

First, the Election Code allows for challenges to be filed with the county boards of elections.  The board, at any time prior to the completion of the computation of all the returns for the county, may recount or recanvass the votes, pursuant to 25 P.S. § 3154(e), based on any of three reasons:

(1) on its own motion;

(2) where there is a discrepancy in the election returns; or

(3) upon the petition of three voters in an election district where there appears to be a discrepancy in the votes.

As this Court explained:

> Pennsylvania law provides two additional methods by which voters may seek a recount and recanvass. First, voters may petition their County Board of Elections. *See id.* § 3154(e). County Board petitions must be supported by affidavits from three voters in an individual precinct that fraud or error not apparent on the face of the returns has occurred. *See id.* The petition must be filed "prior to the completion of the computation of all of the returns for the county." *Id.*  If the Board rejects the request for recount or recanvass, the aggrieved petitioners may appeal the Board's

decision to the Common Pleas Court. *See id*. § 3157(a); *Rinaldi v. Ferrett*, 941 A.2d 73, 76-77 (Pa. Commw. Ct. 2007).

ECF 55, 2016 WL 7188624, at *2.

The Election Code also allows for challenges to be filed with the courts of common pleas for the county whose returns are at issue.  Within five days of the computing of all returns by the board, three qualified electors of the election district may petition the court of common pleas to conduct a recount or recanvassing of the returns.  25 P.S. § 3263(a)(1).  Before a recount or recanvassing can occur, political parties and candidates must receive reasonable notice.  25 P.S. §§ 3261(c), 3262(b).

As this Court explained:

Second, voters may petition the Common Pleas Court for a recount or recanvass. *See* 25 P.S. §§ 3261–3262. Three voters in the same precinct must verify that fraud or error not apparent from the returns was committed in the vote tabulation. See id. § 3261(a). These petitioners must remit a $50 cash payment or a $100 bond. See id. § 3262(b.2). Unless the petitioners plead fraud or error with particularity and offer prima facie evidence supporting that allegation, they must also file qualified petitions in every single precinct in which ballots were cast for the office in question. *See id.* § 3263(a)(1)(i)-(ii). To contest a statewide election in the Common Pleas Court without evidence of fraud, three petitioners must file affidavits from voters in over nine thousand precincts. . . . These petitions must be filed within five days after completion of the County Board's computation of the vote. *See* 25 P.S. § 3263(a)(1); *Rinaldi,* 941 A.2d at 77.

ECF 55, 2016 WL 7188624, at *2.

Second, the Election Code also provides for registered voters in a county—ten suffice—to submit a petition and payment of $450 to the Secretary of the Commonwealth to require the Secretary to reexamine the county's voting system. 25 P.S. § 3031.5.  That provision gives the Secretary authority and discretion as to the examination.   Moreover, 25 P.S. § 2621(e)(1) authorizes the Secretary to require information from counties regarding voting systems including possible errors or difficulties or other election data.  Even after amendment, Plaintiffs do not assert that they petitioned for the Secretary to examine Montgomery County's voting system.

11

Third, the Election Code also provides for an election contest, where the remedy would be a new election.  The classes of election contest are set forth in the Election Code.  25 P.S. § 3291.  A contest regarding presidential electors is a Class II election contest.  *Id*.  An election contest questions the process itself, such as method of balloting, tabulations of results and returns.  *Appeal of Lord*, 41 A.2d 661, 662 ("[t]he contest of an election is a remedy given to the people when the expression of their choice of a public officer has been frustrated by fraud or mistake").  Defects in ballots or the mechanical failure of voting system are examples of matters that have been addressed in election contests.  *See In re Gen. Election of Nov. 4, 1975*, 71 Pa. D. & C.2d 68, 82 (Pa. Pike Com. Pl. 1975) (contest filed where voting machines allegedly failed to record votes cast); *In re Wallingford-Swarthmore Sch. Dist. Election*, 66 Pa. D. & C.2d 616, 618 (Pa. Del. Com. Pl. 1974) ("one of the machines used, failed to operate properly;" "[a]n internal mechanical malfunction made it impossible to pull the Republican Party lever").

Commonwealth Court has jurisdiction over a contest of a statewide election.  42 Pa.C.S. § 764(a).  As this Court explains:

> State law sets out the procedures by which voters may contest an election. *See* 25 P.S. §§ 3291, 3351, 3456; 42 Pa. C.S. § 764. To initiate an election contest, one hundred or more voters must file a petition in the Pennsylvania Commonwealth Court within twenty days after Election Day and supplement that petition with at least five affidavits that the "election was illegal and the return thereof not correct." 25 P.S. §§ 3456–3457. The petitioners must also post a bond "conditioned for the payment of all costs which may accrue in said contested nomination or election proceeding." *Id*. § 3459.

ECF 55, 2016 WL 7188624, at *3.

The Pennsylvania Constitution provides that votes are private.  Pa. Const. art. VII, § 4 ("secrecy in voting [shall] be preserved").

### C.  Evidentiary Hearing Record

Despite the multiple options available, Plaintiffs brought this lawsuit and requested an emergency hearing.  On December 9, 2016, the parties appeared before this Court and a hearing was held.  During that proceeding, evidence—testimony and exhibits—was introduced.  Other exhibits and affidavits were introduced in Plaintiffs' motion for a preliminary injunction, and the responses of Defendants and the Republican intervenors.  Below are the exhibits that Defendants presented and key facts and legal background—as found by this Court in its opinion denying Plaintiffs' emergency motion—derived from the hearing.

> Exhibit D1 (ECF 42-1):  the various electronic voting systems by county in Pennsylvania showing a total of 50 counties use DREs, while the other 17 counties use an optical scan voting system.
>
> Exhibit D2 (ECF 42-2):  November 2016 post-election general reconciliation checklist--an example of the many security measures taken to ensure the integrity of the voting process.
>
> Exhibit D3 (ECF 42-3):  the Eastern District of Michigan Order Dissolving Temporary Restraining Order that had permitted a recount of Michigan's presidential vote.
>
> Exhibit  D4 (ECF 42-4):  the Philadelphia County Court of Common Pleas' affirmance of the decision of the Philadelphia Board of Electors denying a forensic examination of Philadelphia's electronic voting system.
>
> Exhibit D5 (introduced at the hearing):  shows the qualifications and report of Defendants' expert—Michael I. Shamos Ph.D., J.D.
>
> Exhibit D6 (introduced at the hearing):  in 2012, then-Secretary of the Commonwealth Carol Aichele examined all of the DREs in detail, and re-certified that each voting system meets all of the requirements of the Pennsylvania Election Code and can be safely used by voters.

ECF 55, 2016 WL 7188624, at *2.

> As this Court found:
>
> Only 0.82% of Pennsylvania voters cast their ballots for Dr. Stein, who does not allege that a recount might change the election results. . . . Fifty-four Pennsylvania Counties used one of six DRE machine models. . . . Seventeen Counties used paper

ballots that were then counted using optical-scan machines. . . . Four Counties used both DRE and optical-scan machines. (*See id*.) . . . With Dr. Stein's financial, legal, and organizational support, Pennsylvania voters have pursued [recounts and forensic analysis of voting machines] in judicial and administrative proceedings across the Commonwealth.

ECF 55, 2016 WL 7188624, at *2.

This Court summarized state law providing for contesting an election and for seeking a

recount and recanvass.  The Court then found regarding Stein's contest:

[Stein's supported petitioners' Commonwealth Court filing lacked] any of the five required affidavits" . . . and did not include any allegation that hacking had actually occurred. " . . . [When the Commonwealth Court ordered the posting of a bond, it] stated that it would modify the amount of the bond for good cause, [and the] petitioners never asked the Commonwealth Court to reduce the size of the bond.

ECF 55, 2016 WL 7188624, at *3.

Some counties refused Dr. Stein's supported petitioners; others were still considering

petitions; Philadelphia, Allegheny, and Lehigh Counties completed recanvasses; Chester County

concluded its hand recount.  No state court, however, ordered forensic review of DREs.  ECF 55,

2016 WL 7188624, at *3.

In 1980, Pennsylvania amended its Election Code to permit the use of DRE machines.  *See* 25 P.S. §§ 3031.3, *et seq*.  The Code requires the Commonwealth Secretary to "examine and re-examine voting machines" and to make a determination as to whether they meet federal standards and can be safely used.  *Id*. §§ 2621(b), 3031.5(a).  In 2012, Secretary Cortés's predecessor certified each of Pennsylvania's six DRE machine models as reliable and secure. . . . The Secretary similarly certified as safe Pennsylvania's optical-scan machines. *See* 25 P.S. §§ 2621(b), 3031.5(a). Plaintiffs allege that these certifications notwithstanding, the DRE and optical-scan machines' possible vulnerabilities have abrogated their right to vote.

ECF 55, 2016 WL 7188624, at *4.

This Court found that Plaintiffs present no credible evidence that tampering with voting

machines occurred or could occur.  The Court found that Defendants presented credible evidence,

through Dr. Shamos' testimony, that showed security measures against hacking, including

14

"parallel testing" of electronic voting machines, showed the extreme unlikelihood that

Pennsylvania's DREs were hacked:

> Dr. Shamos made clear . . . that, given Pennsylvania's highly dispersed system of taking and tabulating votes and the numerous integrity checks provided by law and practice, no such "hack" could be effected.
>
> The Commonwealth employs many thousands of DRE machines (4,200 in Allegheny County alone). (*See* Hr'g Tr. 62:20-24.) Before Pennsylvania's DRE machines are first put into use, independent testing authorities check them for malware. (*See* Hr'g Tr. 62:12-24.) These authorities also conduct "a forensic examination of the code" for any software updates for the DRE machines. (Hr'g Tr. 74:4-17.) The Commonwealth again tests the machines before each election; any machine with a malware infection will fail the test. (*See* Hr'g Tr. 49:13-16.) If malware is on the machine after the election, examiners may compare "hash functions" to determine if the "malware is still there." (Hr'g Tr. 49:23-50:3.)
>
> Even if the malware were specially programmed (as Plaintiffs conjure) to activate only on Election Day and delete itself when its work concludes (a programming feat Dr. Shamos has never seen accomplished), it would be detected by "parallel testing"—a process by which County employees conduct a simulated test vote on specially sequestered machines. (Hr'g Tr. 49:16-22, 55:22-56:20.) Allegheny County conducted parallel testing during the 2016 election and did not report any irregularities. (*See* Hr'g Tr. 85:15-20.)
>
> Dr. Shamos also described the insuperable logistical difficulties involved in installing malware on each of Pennsylvania's many thousands of DRE machines. Because DREs do not connect to the Internet, hackers cannot upload malware onto them remotely. . . . Physically hacking DREs to influence an election is practically impossible. . . .
>
> Dr. Shamos credibly explained that any attempts to place malware onto the DRE machines through other methods would also fail. . . .
> Moreover, because each Pennsylvania County uses a different central election management computer system, there is no single location through which hackers could introduce malware that would infect all of Pennsylvania's DRE machines. (*See* Hr'g Tr. 59:21-24, 60:17-61:2.) Instead, hackers would have to attack separately the systems of each of the fifty-four Counties that use DRE machines.
>
> Finally, Dr. Shamos clearly and credibly explained that suggestions of foreign hacking influencing the 2016 Election . . . had nothing to do with the integrity of Pennsylvania's voting machines. (*See* Hr'g Tr. 58:24-59:9.)
>
> Although Dr. Shamos acknowledged the theoretical possibility that an individual DRE machine could be hacked, he credibly explained that in light of all of the

15

protections in place, the suggestion of widespread hacking borders on the irrational. (*See* Hr'g Tr. 63:23-64:9)

## III.   ARGUMENT

### A. Introduction

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections" because "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (further quotations omitted). "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357-58, 364 (1997); *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) (citing *Burdick[*, 504 U.S. at 433]; *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)). As decided shortly before the election by Judge Pappert, Pennsylvania's "Election Code contains numerous provisions designed to maintain and uphold the integrity of the vote." *Republican Party of Pa. v. Cortés*, No. CV 16-05524, 2016 WL 6525409, at *2 (E.D. Pa. Nov. 3, 2016).

As the Ninth Circuit astutely observed:

We cannot say that use of paperless, touchscreen voting systems severely restricts the right to vote. No balloting system is perfect. Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, "hanging chads," and other mechanical and human errors that may thwart voter intent. *See generally Bush v. Gore*, 531 U.S. 98 . . . (2000). Meanwhile, touchscreen voting systems remedy a number of these problems, albeit at the hypothetical price of vulnerability to programming "worms."

[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing.

*Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

**B.  Summary of Argument**

The two Original Plaintiffs lack standing and, thus, cannot add new Plaintiffs to this litigation.  Plaintiffs not only lack standing, but their theories regarding the purported vulnerability of the voting machines are nothing more than speculation and do not warrant invalidating provisions of the Election Code—that have not even been specifically challenged—that have been in place for years.  Their speculation also does not alter the Pennsylvania Supreme Court's holdings and rationale in *Banfield*, 110 A.3d 155 ("[T]he Commonwealth Court found . . . the Appellants had not shown any more than the mere possibility that the certified DREs in theory could be subject to tampering, presenting no evidence that the challenged devices have failed to accurately record votes or experienced a security breach in an actual election.").

The General Assembly has the authority (pursuant to the Constitution and Supreme Court precedent) to significantly regulate elections so as to promote order, fairness and openness.  Here, the General Assembly has set forth a comprehensive framework for doing that.  For example, there exists a process for an automatic state-wide recount if the vote is within 0.5% and this is clearly reasonable given the size of the Commonwealth and the costs and time associated with such an endeavor and the legitimate need to resolve elections quickly.[14]  In the last dozen year, state-wide elections have been within this margin and resulted in state-wide recounts.  While the numbers changed at the margins, the winner did not.[15]

---

[14] The quick challenge/objection process in the primaries further supports the need to have finality in elections and prompt resolution of challenges.

[15] *See*, *e.g.*, http://www.philly.com/philly/blogs/harrisburg_politics/Lazarus_confirmed_Superior_Court_winner_in_recount.html (last visited March 3, 2017--2009 recount ordered); http://www.prnewswire.com/news-releases/recount-confirms-winner-in-democratic-commonwealth-court-primary-election-123478219.html (last visited March 3, 2017----2011 recount ordered; http://http%3A%2F%2Farticles.herald-mail.com%2F2006-05-31%2Fnews%2F25036317_1_petition-write-in-votes-pennsylvania-

In addition, if one has an interest in her vote being properly counted, then she can petition a recount in her precinct. Pennsylvania's Election Code demonstrates, time and time again, the General Assembly's intent to have a decentralized election system where the 67 counties control much of the election processes. Plaintiffs' argument reduces to the claim that they should have the ability to more easily raise these challenges on a state-wide basis because they have an "interest" in the accuracy of voting in the Commonwealth. Of course, this argument has absolutely no limit—a voter from Alaska certainly could have an interest in the Presidency (or the balance of power in the United States Senate or House of Representatives) and, thus, could make the same argument. So, too, could a citizen from Mexico or Canada who has an interest in our borders and, thus, has an interest in who is President or the balance of power in the Congress. There is simply no end point to Plaintiffs' contention that "interest in counting all votes means I can object."

Voters also have the option that Dr. Stein and some of her party members pursued and abandoned—petitioning Commonwealth Court for a new election—the contest provision detailed in the above fact section.

In addition to the above options applicable during an election period, voters can also petition the Secretary of the Commonwealth to re-examine a county's voting process, including its machines. 25 P.S. § 3031.5. This method is not onerous and costs only slightly more than Plaintiffs paid to file their federal lawsuit.

Clearly, then, Pennsylvania has provided many ways for voters to challenge election results and to challenge voting machines. Despite these various avenues, Plaintiffs argue that the Constitution requires this Court to rewrite Pennsylvania law so as to provide additional ways for

---

house/#.WLDXOGanvys.email (last visited February 27, 2017);
http://http%3A%2F%2Farticles.herald-mail.com%2F2006-06-06%2Fnews%2F25046883_1_opening-of-ballot-boxes-petition-write-in-votes/#.WLDX2Dw7QI8.email (last visited February 27, 2017).

Plaintiffs to challenge an election and mandate forensic examination on machines owned and operated by non-parties.  There is no authority for such a result.

### C.  Applicable Standards

A Rule 12(b)(1) motion is the proper mechanism for raising the issue of standing or of whether Eleventh Amendment immunity bars federal jurisdiction.  *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996), (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984) (Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction)).  When a motion to dismiss is based on lack of subject matter jurisdiction in addition to other defenses, "[a]n actual determination must be made whether subject matter jurisdiction exists before a court may turn to the merits of the case."  *Tagayun v. Stolzenberg,* 239 Fed. Appx. 708, 710 (3d Cir. 2007); *see McCurdy v. Esmonde,* No. 02CV4614, 2003 WL 223412, at *4 (E.D. Pa. Jan. 30, 2003) ("[w]ithout jurisdiction the court cannot proceed at all in any cause") (citation omitted).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir. 2007).  "The concept of standing is drawn directly from Article III, Section 2 of the Constitution . . . [and] goes to the very heart of a court's subject matter jurisdiction."  *Schaub v. Geico Ins. Co.*, No. CIV.A. 14-5570 MAS, 2015 WL 3452917, at *2 (D.N.J. May 29, 2015) (citing *In re Franklin Mut. Funds Fee Litig.,* 388 F. Supp. 2d 451, 460 (D.N.J. 2005) (internal citation omitted).

A motion to dismiss challenging the "actual controversy" requirement under the Declaratory Judgment Act and Article III is properly brought under Rule 12(b)(1) because "'standing is a jurisdictional matter.'"  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir.2014) (quoting *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir.2007)).

In deciding a Rule 12(b)(1) motion to dismiss, courts first determine whether the motion presents a "'facial' attack" or a "'factual' attack" on the claim in issue because that distinction determines "how the pleading must be reviewed." *Constitution Party of Pa.* at 357-58 (citation omitted). A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the [subject-matter] jurisdiction of the court" because "some . . . jurisdictional defect," e.g., failure to present a justiciable controversy, "is present." *Id.*, 757 F.3d at 358. In reviewing a facial attack, the court applies the same standard of review used for Rule 12(b)(6) motions—it "'must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" *Id.* When the defendant challenges jurisdiction in its Rule 12(b)(1) motion before answering the complaint or "otherwise present[ing] competing facts," the Rule 12(b)(1) motion is "by definition, a facial attack." *Id.* (citations omitted). Here, Plaintiffs present a facial challenge, and a factual challenge based on the pleadings alone. *See Constitution Party of Pa.*, 757 F.3d at 358 (citations omitted), *cited in Team Angry Filmworks, Inc. v. Geer*, 171 F. Supp. 3d 437, 440-41 (W.D. Pa. 2016).

Under Rule 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). Although the plausibility standard "does not impose a probability requirement," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint that pleads facts "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* The plausibility

20

determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint takes three steps.  First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim."  *Iqbal*, 556 U.S. at 675.  Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Id*., at 679; *see also Burtch v. Milberg Factors, Inc*., 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679; *see Connelly v. Lane Const. Corp*., No. 14-3792, 2016 WL 106159, at *3-4 (3d Cir. Jan. 11,2016).  A complaint must "show" such an entitlement with its facts.  *Iqbal*, 556 U.S. at 678-79; *see Connelly*, 2016 WL 106159, at *3-4; *Santiago v. Warminster Twp*., 629 F. 3d 121, 130 (3d Cir. 2010); *Phillips v. County of Allegheny*, 515 F. 3d 224, 234-235 (3d Cir. 2008).

In considering a motion to dismiss for failure to join a party under Rule 12(b)(7), the Court first determines whether the party is a necessary party under Rule 19(a).  *Moretti v. The Hertz Corp*., No. CV 14-469-LPS, 2016 WL 1238712, at *2-3 (D. Del. Mar. 29, 2016) (citing *Gen. Refractories Co. v. First State Ins. Co*., 500 F.3d 306, 312 (3d Cir 2007)).  A party is necessary if, in the absence of the party, (1) complete relief cannot be afforded to the present parties, (2) the disposition of the action would impair the party's ability to protect its own interest, or (3) any of the present parties would be subject to a substantial risk of multiple or inconsistent obligations. *Id*.  If the party is necessary under Rule 19(a), the party must be joined, if joinder is feasible.  If joinder is necessary, but infeasible, the Court must then determine whether the party is "indispensable" under Rule 19(b).  This inquiry requires a balancing of the interests of the

plaintiff, the defendant, the absent party, the courts, and the public. *See Feriozzi Co. v. Ashworks*, Inc., 130 F. App'x 535, 538-39 (3d Cir.2005) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-11 (1968)).  If an absent party is indispensable, the Court must dismiss the action. *Gen. Refractories Co*., 500 F.3d at 312.  The movant bears the burden of establishing that dismissal is appropriate based on the failure to join an indispensable party.

Procedurally, this Court has the benefit of having presided over the emergency hearing and it may take judicial notice of its own findings as well as uncontroverted exhibits admitted without objection during the evidentiary hearing.[16]  The Third Circuit has reasoned that "a district court's findings and conclusions on a preliminary injunction motion could 'have preclusive effect if the circumstances make it likely that the findings are "sufficiently firm" to persuade the court that there is no compelling reason for permitting them to be litigated again." *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency*, 126 F.3d 461, 474 n.11 (3d Cir. 1997) (citations omitted) (cited in *McTernan v. City of York, Penn*., 577 F.3d 521, 530-31 (3d Cir. 2009)).  *Hawksbill* quotes *Commodity Futures Trading Commission v. Board of Trade*, 701 F.2d 653, 657 (7th Cir. 1983): "findings made in preliminary injunction decisions have preclusive effect 'if the circumstances make it likely that the findings are accurate [and] reliable.'" 126 F.3d at 474 n.11.

As in *McTernan*, Plaintiffs had a full opportunity to present their arguments at the hearing on the preliminary injunction "and there is no reason to prolong the inquiry." *McTernan* 577 F.3d at 531.  Defendants request that the Court take notice of the uncontroverted exhibits admitted at the evidentiary hearing as well as the Court's own findings, while recognizing that the Court may choose to take notice of either or both of them.

---

[16]  The Court may consider such evidence without converting the instant motion to dismiss to a motion for summary judgment.

### D.  Plaintiffs Lack Standing.

The "existence of a case or controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief."  *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003) (citation omitted); *see also* U.S. Const. art. III, § 2 (jurisdiction of federal courts limited to "Cases" or "Controversies").   The "party invoking federal jurisdiction bears the burden of establishing" standing.  *Wittman v. Personhuballah*,  136 S.Ct. 1732, 1737  (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), *quoted in Stein v. Cortés,* ECF 55,  2016 WL 7188624, at *6 (E.D. Pa. Dec. 12, 2016).

To make out Article III standing, a plaintiff has the burden of showing (1) that it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000) (citing *Lujan,* 504 U.S. at 560-61).

### 1.  This Court Ruled that Dr. Stein and Mr. Reitz Lack Standing.

This Court has already ruled that Dr. Stein and Mr. Reitz lack standing.  No new facts have been alleged that would alter that ruling.   Indeed, even after the injunction hearing, Original Plaintiff's Amended Complaint fails to factually allege that they have suffered an "injury in fact" that meets any of the criteria delineated above in *Friends of the Earth,* 528 U.S. at 180-81.  "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *DaimlerChrysler,* 547 U.S. 332*,* 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984) (internal quotation marks omitted)).   In assessing standing, the courts' "primary project is to separate those with a true stake in the controversy from those asserting 'the generalized interest of all citizens in constitutional

governance.'" *Valley Forge Christian Coll. v. Americans United For Separation of Church & State, Inc*., 454 U.S. 464, 483 (1982) (citation omitted).

Dr. Stein cannot show injury in fact because she is not a registered Pennsylvania voter and thus has no constitutional right to seek a state-wide recount or a forensic audit. She garnered less than 1% of the vote in Pennsylvania and can only speculate that she will run for the presidency four years from now and that her political body or minor political party would be in a better financial position if she could now show that she had received more votes. The requested relief could provide her with no meaningful relief other than a public relations windfall and perhaps a related increase in financial contributions for her political body if she were to win. Put bluntly, she has no injury in fact that could be cured by a forensic examination or a recount in Pennsylvania or a change in the recount/recanvass process. This Court correctly found that "Dr. Stein is not a Pennsylvania voter and does not allege that a recount will change the Pennsylvania vote total in her favor."

The Court also reasoned:

Although Mr. Reitz is a Pennsylvania voter, he has not alleged that his vote was inaccurately recorded or tallied in the final Pennsylvania vote count. Plaintiffs' allegation that voting machines may be "hackable," and the seemingly rhetorical question they pose respecting the accuracy of the vote count, simply do not constitute injury-in-fact.

ECF 55, 2016 WL 7188624, at *6 (citing cases). Thus, the Court concluded that, "[n]either Plaintiff has alleged that she or he has suffered an actual injury." Mr. Reitz has not cured this defect.

Further, Plaintiffs lack the ability to assert the constitutional rights of others. *See*, *e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (collecting cases and concluding that a "closely related principle is that constitutional rights are personal and may not be asserted vicariously"). This Court focused on the reasoning in *Broadrick v. Oklahoma*, 413 U.S. at 610-11 (1973)), and

24

concluded that there is no authority to support an invocation of standing based upon Plaintiffs'

seeking to protect the rights of all Pennsylvania voters:

> [C]onstitutional rights are personal and may not be asserted vicariously. . . .
> Constitutional judgments . . . are justified only out of the necessity of adjudicating
> rights in particular cases between the litigants brought before the Court.".  The
> Supreme Court's reasoning here is instructive:  First, the Court has held that when
> the asserted harm is a "generalized grievance" shared in substantially equal
> measure by all or a large class of citizens, that harm alone normally does not
> warrant exercise of jurisdiction.  Second, even when the plaintiff has alleged injury
> sufficient to meet the "case or controversy" requirement, this Court has held that
> the plaintiff generally must assert his own legal rights and interests, and cannot rest
> his claim to relief on the legal rights or interests of third parties.  Without such
> limitations ... the courts would be called upon to decide abstract questions of wide
> public significance even though other governmental institutions may be more
> competent to address the questions and even though judicial intervention may be
> unnecessary to protect individual rights.  *Warth v. Seldin*, 422 U.S. 490, 499-500
> (1975) (citations omitted).  The Court astutely cited *Oh v. Phila. Cnty. Bd. of
> Elections,* No. 08-81, 2008 WL 4787583, at *7 (E.D. Pa. Oct. 31, 2008) ("The
> prudential principles support that [a losing candidate] cannot rest his claim to relief
> on the legal rights or interests of the voters. The claim plaintiff alleges on behalf of
> these voters, even if substantiated, would amount to a ' "generalized grievance"
> shared in substantially equal measure by all or a large class of citizens' and is not
> sufficient to confer standing." (quoting *Warth*, 422 U.S. at 499)). *Cf. Pa.
> Psychiatric Soc'y v. Green Spring Health Svcs., Inc.*, 280 F.3d 278, 288 & n.10 (3d
> Cir. 2002) (suggesting that plaintiff "candidates for public office may be able to
> assert the rights of voters," but only where the plaintiff herself suffers an injury and
> voters are "hindered from asserting [their] own rights and share[ ] an identity of
> interests with the plaintiff").

ECF 55, 2016 WL 7188624, at *8.

> **2. Dr. Stein and Mr. Reitz Lack Standing to Add New Plaintiffs—and If the New
> Plaintiffs Had Standing, It Would Be Limited To Challenging The Voting System
> In Montgomery County.**

Because Dr. Stein and Mr. Reitz lack standing, they cannot properly add more Plaintiffs to

their amended complaint.[17]   While the Third Circuit has not explicitly addressed whether a

plaintiff lacking standing to bring a case may amend the complaint to add a plaintiff in an attempt

to cure a standing defect, courts in this District have found that a "party who lacks standing to

---

[17] The stipulation to extend Mr. Reitz' and Dr. Stein's right to amend their complaint as of right
includes a reservation of all arguments and defenses to the amended pleading. ECF 70.

prosecute an action also lacks standing to amend his complaint." *Slaughter v. Nat'l Sec. Agency*, No. 15-CV-5047, 2015 WL 7180511, at *3 (E.D. Pa. Nov. 16, 2015).   In a decision affirmed by the Third Circuit, the court in *Arrow Drilling Co., v. Carpenter,* No. 02-CV-9097, 2003 WL 23100808, at *5 (E.D. Pa. Sep. 23, 2003), *aff'd*, 125 F. App'x 423, 424 (3d Cir. 2005) found no abuse of discretion when the district court reasoned that a "plaintiff . . . may not amend the complaint to substitute a new plaintiff in order to cure a lack of jurisdiction, because a plaintiff may not create jurisdiction by amendment where none exists."

The Second and Fifth Circuits have similarly concluded that plaintiffs who lack standing to prosecute an action lack standing to amend.   *Slaughter*, 2015 WL 7180511, at *2 (citing *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 893 (2d Cir. 1983) ("The longstanding and clear rule is that if jurisdiction is lacking at the commencement of [a] suit, it cannot be aided by the intervention of a [plaintiff] with a sufficient claim.") (internal quotation marks omitted); *Summit Office Park, Inc. v. U.S. Steel Corp.*, 639 F.2d 1278, 1282-83 (5th Cir. 1981) ("Where a plaintiff never had standing to assert a claim against the Defendants, it does not have standing to amend the complaint and control the litigation by substituting new Plaintiffs . . . ."); *Jackson v. Fid. Nat. Title Ins.*, 2008 WL 508489, *3 (N.D. Tex. 2008) ("Without standing to bring suit, the plaintiff lacks the power to bring in a new plaintiff and continue the litigation."); *Epic Sporting Goods, Inc. v. Fungoman LLC*, No. 09-CV-1981, 2011 WL 588496, at *4 (W.D. La. Feb. 10, 2011). [18]

Beyond this, the four new "voter" Plaintiffs are no better positioned than Mr. Reitz—and this Court already ruled that Mr. Reitz lacks standing.  Moreover, even if they had standing, that

---

[18] The rationale is analogous to a plaintiff whose claim is barred by a statute of limitations, attempting to amend to add a new plaintiff who learned of a common injury more recently and whose claim would not be barred by the statute of limitations.

standing necessarily would be limited to their challenging the voting machines where they voted in Montgomery County, which has not been sued.

The fact is that the Election Code provides avenues to challenge an election. For example, one can contest the election. *See* 25 P.S. §§ 3291-3474. In short, if a sufficient number of electors file the appropriate petition and affidavits, and ultimately prove their case, an election may be successfully contested. *Id*. Mr. Reitz participated as well in the Stein-supported contest petition in Commonwealth Court, which was abandoned. While Plaintiffs complain about the bond imposed, the reality is that a process whereby the election throughout the entire Commonwealth would be litigated would be costly. Moreover, as in Dr. Stein's Commonwealth Court challenge, Plaintiffs could have sought a reduction in any bond imposed. (The court order setting the bond even noted that "[u]pon good cause shown, the amount of the bond may be modified"). Beyond the contest route, the Election Code allows for a recount and Mr. Reitz participated in a petition for a recount in Montgomery County, which resulted in a hearing and a denial of the petition, while Ms. Kupka's petition for a recount was untimely and there are no facts alleged as to the other individuals on this score.

### 3. Plaintiffs do not show that the relief requested relates to or will redress alleged injuries.

In the end, despite their amendment, all Plaintiffs do is speculate that maybe the votes of Mr. Reitz and the new voter Plaintiffs as well as non-parties may not have counted. Indeed, Plaintiffs cannot even logically conclude that a future recount could determine whether the voter Plaintiffs' votes are properly counted because, according to the speculative declarations, the malware would have disappeared after the election and, with its disappearance, there would be

nothing to find.[19]   *See* ECF 71 at 39.    Neither the Original Plaintiffs nor the new Plaintiffs allege—nor can they plausibly allege—personal injury at all, let alone an injury "likely to be redressed by the requested relief."  *See Allen v. Wright*, 468 U.S. 737, 751 (1984).  Plaintiffs' lack of Article III standing means that the Amended Complaint must be dismissed.

Therefore, the Court's conclusion in its standing analysis for the preliminary injunction motion applies as well to the Amended Complaint as a whole.  "In sum, because Plaintiffs have alleged speculative injuries that are not personal to them and could not be redressed by the relief they seek (or any relief I could order), they are without standing to bring their claims."  ECF 55, 2016 WL 7188624, at *8.[20]  Plaintiffs have had multiple opportunities to allege specific facts to establish standing.  They have not done so and the amended complaint should now be dismissed with prejudice.

###   E.        Plaintiffs Have Failed to Sue Necessary Parties

Plaintiffs have sued only Secretary Cortés and Commissioner Marks.  The requested relief, however, addresses not only the constitutionality of portions of the Election Code but also seeks a mandatory forensic examination of county-owned and county-controlled voting machines and computers that may contain proprietary information held by third-parties.[21]  Without suing those in control of the actual machines, they cannot reasonably request relief imposing on all 67 counties a requirement to open up their machines and computers to a forensic examination.

---

[19] Further, because of the requirements for secrecy in voting—Pa. Const. art. VII, § 4—there is no way to tell which ballot was submitted by which voter and, thus, it would be impossible to determine if his/her vote were altered.

[20] This Court, in its Opinion denying Plaintiffs' Motion for Preliminary Injunction, also concluded that it lacked jurisdiction under the *Rooker-Feldman* doctrine and any other number of abstention doctrines.

[21] As such, Plaintiffs seek mandatory equitable relief against Defendants in their official capacities to purportedly remedy alleged past unconstitutional actions.  Such affirmative relief is barred by the Eleventh Amendment.  *See Edelman v. Jordan*, 415 U.S. 651 (1974).

Defendants have no authority to permit or force the requested access. *See Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir.2001); *see also Snyder v. Millersville Univ.*, No. 07-cv-1660, 2008 WL 5093140, at 12 (E.D. Pa. Dec. 3, 2008) (request for a mandatory injunction necessarily fails where Defendants do not have the authority to afford her the desired relief); *Williams v. Doyle*, 494 F.Supp.2d 1019, 1024 (W.D. Wis. 2007) ("a claim for injunctive relief can stand only against someone who has the authority to grant it"); *Scott v. DiGuglielmo*, 615 F.Supp.2d 368, 373 -374 (E.D. Pa. 2009); *Libertarian Party of Ind. v. Marion Cty. Bd. of Voter Regis.*, 778 F.Supp. 1458, 1461 (S.D. Ind. 1991) (plaintiff lacked standing as to certain Defendants because they did not have the authority to carry out the relief requested); *McDaniel v. Bd. of Educ. of Chi.,* 956 F.Supp.2d 887, 893 (N.D. Ill. 2013); *but see The Constitution Party of Pa. v. Cortes*, 433 F. App'x 89, 90 (3d Cir. 2011).

Because Plaintiffs have failed to join those needed parties, and because an injunction against Defendants cannot provide the relief Plaintiffs ostensibly seeks, an injunction that has been requested as the ultimate relief in this litigation cannot be granted. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir.1996) (noting the "general rule that a court may not enter an injunction against a person who has not been made a party to the case before it"); *see also Scott v. Donald*, 165 U.S. 107, 117 (1897) ("[t]he decree is also objectionable because it enjoins persons not parties to the suit"); *Banks v. Good*, Civ. A. No. 06–253, 2011 WL 2437061, *2-3 (W.D. Pa. Apr. 20, 2011), *adopted*, 2011 WL 2418699 (W.D. Pa. Jun. 14, 2011) (citing cases) (same).

Another way of assessing the Amended Complaint is that the Defendants are not responsible for maintaining the central computers and voting machines, and are not responsible for counting votes. Indeed, as the Supreme Court made clear over 100 years ago, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be

unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex Parte Young*, 209 U.S. 123, 157 (1908); *see also Mexicana v. Indiana*, No. 2:11-cv-0482 (2013 WL 4088690) (N.D. Ind., Aug. 13, 2013) (dismissing constitutional challenge to Indiana's immigration law because the individuals sued had no role in enforcing the provisions challenged).

At this stage, where Plaintiffs have already amended their complaint after Defendants already pointed out their failure to sue necessary parties, the Amended Complaint should be dismissed with prejudice.

### F.     The Constitutional Claims Relating To The Voting Machines Fail.

Not only do all Plaintiffs lack standing for this Court to even reach the merits, not only have they failed to include counties whose practices are challenged, not only have they failed to include third parties who have proprietary rights and who conduct the recounts and control the computers that they seek to inspect, but also the claims alleged are without merit.  As it relates to their claim that the DRE's have been hacked and, thus, have unconstitutionally altered votes, their premise is without support and their rationale is circular.  Indeed, Plaintiffs' rationale is nothing more than a federal rehashing of the premise rejected in *Banfield*, 110 A.3d 155.

Two years ago, the Pennsylvania Supreme Court addressed the substantive due process and equal protection claims challenging the Election Code in *Banfield*, 110 A.3d 155.[22]  While *Banfield* was decided based on Pennsylvania's Constitution, that is a distinction without a difference because the standard under the Pennsylvania Constitution and our federal

---

[22] Moreover, the question of the existence of voter fraud in Pennsylvania was also recently fully adjudicated as a myth.  *See Applewhite v. Commonwealth,* 2014 Pa. Commw. LEXIS 756 (unpublished) (finding no evidence of voter fraud or integrity in elections as a compelling or legitimate state interest for the Voter ID Law).

constitution is the same.  *See Commonwealth v. Wallace*, 97 A.3d 310, 320 (Pa. 2014) (same

standard for due process); *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991)

(same standards for equal protection); *Commonwealth by Preate v. Cancer Fund of America,

Inc.*, 620 A.2d 647, 649-51 (Pa. Cmwlth. 1993) (using the same standard for First Amendment

claim).

Indeed, *Banfield'*s constitutional analysis is based on federal case law: "[w]e find

persuasive the decisions of federal circuit courts that have held that DREs that register votes

electronically without a voter-verified ballot do not severely restrict the right to vote."  *Id*. at

266.[23]   And the decision in *Banfield* was issued after a full examination by the Court and a

sound rejection of the same unsupported (and unsupportable) opinions offered by the Plaintiffs'

experts here which speculate as to possible foreign interference.

Moreover, even after amendment, Plaintiffs fail to provide a single factual allegation to

support their speculation; and they circularly argue that they need information to get

information to provide information.  The Plaintiffs have the burden of alleging sufficient facts

to show a plausible constitutional violation at the "commencement of the litigation," and must

do so "separately for each form of relief sought."   *Friends of the Earth*, at 170, 184-85.

Plaintiffs ask for the injunctive relief in the desperate hope that a forensic audit may prove their

case even though they must factually allege an existing injury for them to file their lawsuit.

And, as explained previously, that injury has to be particularized as to the Plaintiffs, not as to

---

[23] *Banfield* relies on several other federal cases such as *Weber v. Shelley*, 347 F.3d 1101, 1106-07
(9th Cir. 2003), which emphasized that state officials have the power to substantially regulate the
election process as it is "the job of democratically-elected representatives to weigh the pros and
cons of various balloting systems."  Refusing to interfere with this discretion, the *Weber* Court
found that "[s]o long as their choice is reasonable and neutral, it is free from judicial second-
guessing."   *Banfield* at 266 (citing *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir.1975)
(providing that "[v]oting device malfunction [and] the failure of election officials to take
statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices
might be tampered with . . . fall far short of constitutional infractions")).

Pennsylvanians or all Americans, or all people worldwide who might claim an "interest" in the results of Pennsylvania elections.

If Plaintiffs were entitled to access central computers in Montgomery County or multiple counties, based simply on their unfounded suspicions, then so would be every single voter who suspects for any reason whatsoever that her vote was not properly counted, and this challenge could be reasserted after each and every election. Significantly, the Plaintiffs argue that what they are looking for—in terms of evidence of hacking—may not even exist because sophisticated malware may be designed to disappear after it has done its job. In other words, the Plaintiffs want to forensically audit machines even though they concede that there may be no evidence of anything when they look. This is the epitome of a fishing expedition and cannot be sanctioned. Indeed, Dr. Stein's attempt to have a forensic audit was denied because state law simply does not allow voters to petition a court for it. Exh. D4.

In the end, Plaintiffs assert speculation layered upon speculation to claim the certification and use of the DREs directly interfere with the right to vote because maybe there was hacking by foreign governments. Yet Plaintiffs present "no evidence that any Pennsylvania county using DREs had experienced lost or miscounted votes, tampering of their election result, or malfunction preventing voters from casting their vote." *Banfield*, 110 A.3d at 176. *Banfield* was decided in 2015. Ms. Kupka and Ms. Howe—both new to this litigation— assert that the no-vote box was lit when they cast their votes, not the light next to the words "No Vote," (which would mean that a no-vote was chosen). With no paper trail identifying them and denoting the specifics of their votes, they speculate that maybe the two votes were not counted.

To try and buttress their argument, Plaintiffs refer to the 4,087 "no votes" in Montgomery County and conclude that this means that the machines were hacked or defective.

ECF 71, ¶ 87.  First, it is illogical to assert that a purported hacker would hack a machine to favor his/her candidate but have those votes moved to a "no" vote category.  Second, at the preliminary injunction hearing, the "no" vote information was available; however, Plaintiffs' expert still admitted that the election results in Pennsylvania were not the product of hacking. Third, the level of "no" votes in Montgomery County is not out of line with previous elections and is not out of line with results from other states in the 2016 general election.  *See* www.phoenixnewtimes.com/news/107-257-arizonans-cast-protest-votes-for-president-did-they-help-trump-win-the-election-9062318; www.montcopa.org/ArchiveCenter/ViewFile/Item/1863 (last visited March 7, 2017) (792 Republicans and 704 Democrats chose the "no vote" option, out of an in-person turnout of 91,326—a rate of 1.6%).  Finally, even if the presence of these "no" votes could be viewed as suggesting that some machines in Montgomery County were defective, a method exists under the Election Code for voters to request an examination of those machines.  25 P.S. § 3031.5.

What processes for voting the General Assembly authorizes, what machines the Secretary certifies for use, and what actual machines the counties select are all policy decisions that weigh various factors.  As the Ninth Circuit aptly acknowledged, using electronic voting machines that lack a voter verified paper ballot "brings about numerous positive changes (increasing voter turnout, having greater accuracy than traditional systems, being user-friendly, decreasing the number of mismarked ballots, saving money, etc.) . . .  [I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems.  So long as their choice is reasonable and neutral, it is free from judicial second-guessing.  *Weber*, 347 F.3d at 1106-07 (note omitted); *see also In re Petition to Contest the Gen. Election for Dist. Justice in Judicial Dist. 36-3-03 Nunc Pro Tunc.*, 695 A.2d 476, 480 (Pa. Commw. Ct. 1997) (hand ballots can be

altered; machine counts result in differing results).  But, in the end, such policy decisions are best left to other branches of government.

###     G.     Plaintiffs' Constitutional Claims Relating to Provisions of Pennsylvania's Election Code Fail.

As it relates to the claim that the recount process is unconstitutional, again, Plaintiffs' assertions veer wide of the mark.  The fact is that since 1937, Pennsylvania has placed the responsibility for elections at the county level.  Further, the General Assembly has in place provisions allowing for an automatic recount if the vote is close enough—which, here, it was not.  There is no argument—nor could there be—that the General Assembly's decision to draw the line at 0.5% for an automatic recount is unconstitutional.  A state-wide recount in a state as large and populous as Pennsylvania certainly will cost the Commonwealth and the 67 non-party counties significant sums of money.   Further, it takes time to conduct such a recount. Balancing the costs and burdens of such a process with the benefit of doing so and setting the number where a recount may actually result in a different result is certainly rational and good public policy.

The ability to get a recount is not a constitutional right.  Indeed, it is provided for by state law only.  *See Republican Party of Pa. v. Cortés*, No. 16-5524 (E.D. Pa., Nov. 3, 2016) (concluding that there was no constitutional right to have poll watchers but that the ability to do so was created solely by state law); *Stein v. Thomas*, No. 16-14233 (E.D. Mich., Dec. 7, 2016) (concluding that there is no constitutional right to a state-wide recount and that any right was derived solely from state law).

Further, Plaintiffs' argument means that if any voter could demand a state-wide recount simply by filing a petition in a single precinct.  Such a filing could be by a supporter of any candidate regardless of how well (or how poorly) that candidate did at the ballot box.  Put

another way, Plaintiffs' proposal is that the supporter of a candidate that only she voted for could demand a state-wide recount.   This would not only impose significant burdens—administrative and financial—on the Commonwealth and the 67 counties, but also sabotage the smooth transition from one set of elected officials to another.   In other words, Plaintiffs' solution to the speculative problem is to eliminate any line and impose significant burdens. This certainly cannot be the right result.[24]

As this Court has reasoned:

The right to have one's vote counted does not . . . encompass the right to have one's vote verified through a mandatory statewide recount.  [citation omitted] . . . No authority suggests otherwise. Courts have explained ballot access restrictions can "limit the field of candidates from which voters might choose." [citations omitted]  Recount restrictions impose no such burden.

Due process limitations on the manner by which elections may be conducted are also separate from any "right" to a mandatory recount. The (rare) decisions that sustain due process challenges to elections involve documented instances of improperly cast ballots, wholesale refusal to count properly cast ballots, direct infringements of the right to cast ballots, or a total failure to conduct the election. Due process was impugned in these cases because the challenged government actions had impaired or outright barred voters from casting a first, constitutionally protected ballot.

. . . Pennsylvania's recount procedures are not impermissibly "arbitrary or unreasonable." *Stein v. Thomas*, No. 16-2690, 2016 WL 7131508, at *3 (6th Cir. Dec. 6, 2016). "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Concomitant with the principles of federalism, Pennsylvania has developed its own statutory framework by which voters may challenge elections, a framework courts have applied for decades without any hint that the required procedures might violate the Constitution. *See, e.g., Olshansky v. Montgomery Cty. Election Bd.*, 412 A.2d 552 (Pa. 1980) (bond provision); *In re Recount of Ballots Cast in General Election on Nov. 6, 1973*, 325 A.2d 303 (Pa. 1974) (time limits and verification requirement); *Pfuhl v. Coppersmith*, 253 A.2d 271 (Pa. 1969) (verification provision); *Appeal of Bradley*, 42 A.2d 155 (Pa. 1945) (time limits); *In re Pazdrak's Contested Election*,

---

[24] Plaintiffs' logic—that if a voter has an interest in the outcome of the election he/she should be permitted to get a recount—can certainly be extended in any federal election because a voter in Alaska may have an interest in the Presidency or the balance of power in the Senate or the House. *See* argument at 18 *supra*. All legislation requires line-drawing and this is no different.

137 A. 109 (Pa. 1927) (verification provision). The "reasonable, nondiscriminatory restrictions" on initiating recounts serve an "important regulatory interest": ensuring that election challenges are swiftly and fairly resolved to preserve "the integrity of the vote." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788)); (see also Pa. Senate Majority Caucus Amicus Br. 4, Doc. No. 46.)

ECF 55, 2016 WL 7188624, *11-12.

Now that a recount of the 2016 Presidential election is moot, Plaintiffs focus on examination of voting machines but ignore the remedy that is plainly available to them, without this Court's involvement—the ability of ten voters within a county to pay a total of $450 and petition the Secretary to re-examine their county's voting process. 25 P.S. § 3031.5. The extent of that re-examination depends upon the circumstances and would be within the Secretary's discretion.

And, besides providing for automatic recounts if elections are sufficiently close and besides providing a voter the opportunity to get a recount in his/her precinct if he/she feels that votes were not properly tabulated and besides providing for the ability to petition the Secretary to re-examine a county's voting process, is the fact that the Election Code also provides the ability for voters to contest the election. As noted, plaintiff Reitz was part of a group of 100 voters who petitioned the Commonwealth Court to claim that the 2016 Presidential election was illegal. ECF 71; *See* 25 P.S. §§ 3291, 3351, 3456; 42 Pa. C.S. § 764; *see gen'ly* ECF 55, 2016 WL 7188624, at *3. The filing lacked the five required affidavits of illegality because the petitioners in Commonwealth Court including the Original Plaintiffs could not reasonably allege that hacking had actually occurred. The petitioners in Commonwealth Court also never asked the Commonwealth Court to reduce the size of the bond; although, that court stated that it would modify the amount of the bond for good cause shown. Plaintiffs then abandoned their contest. While they would like the election process to plod slowly and give them more time to

obtain county recounts that speculatively might somehow show hacking, they cannot reasonable put brakes on the public's interest in having a speedy, peaceful transition of power. In light of the above, Plaintiffs cannot reasonably now contest the contest provisions.

Despite their failure to meet multiple factors required for their sought-after relief, Plaintiffs also attempt to impose a higher standard than applicable for their claims.  Election regulations should be found constitutional if they are "reasonable, neutral, and do not work a severe restriction on the right to vote."  *Weber*, 347 F.3d at 1106; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (the general rule that "evenhanded restrictions that protect the  integrity and reliability of the electoral process itself" are not invidious and satisfy the standard set forth in *Harper*. 460 U.S., at 788, n.9, 103 S.Ct. 1564); *see Anderson v. Celebrezze*, 460 U.S. 780 (1983).

### H.   Plaintiffs Cannot Obtain Permanent Injunctive Relief Or Declaratory Relief

We have demonstrated any number of reasons why the Amended Complaint must be dismissed.  Since Plaintiffs seek permanent injunctive and declaratory relief, we end by discussing the failures in the complaint as it relates to those two forms of relief.

The grant of injunctive relief is an "extraordinary remedy which should be granted only in limited circumstances."  *Am. Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir.1994) (quoting *Frank's GMC Truck Ctr. v. General Motor Corp.*, 847 F.2d 100, 102 (3d Cir.1988)), *cert. den'd*, 514 U.S. 1103 (1995).  A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  *26eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).  The plaintiff must demonstrate all of the following four factors: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *Id*.

Put another way, "technicalities of the Election Code are necessary for the preservation of secrecy and the sanctity of the ballot, even when enforcement of the technicalities may disenfranchise some . . . voters." *In re Canvass of Absentee Ballots of November 4, 2003 General Election*, 843 A.2d 1223 (Pa.2004) (referring to absentee voters).

As the Pennsylvania Supreme Court reasoned in *Banfield*:

> Our resolution of this claim turns on Appellants' narrow argument that the DREs at issue should be decertified and prohibited from use in Pennsylvania elections based on the possibility that such systems are not tamper-proof. Appellants do not recognize they are advocating that the DREs be held to an impossible standard of invulnerability. We agree with the Commonwealth Court's finding that the mere possibility of error cannot bar the use of a voting system as "the unfortunate reality is that the possibility of electoral fraud can never be *completely* eliminated, no matter which type of ballot is used." *Banfield III*, 442 M.D. 2006, at *8 (citing *Weber v. Shelley*, 347 F.3d 1101, 1106-107 (9th Cir.2003) (emphasis in original)). While Appellants claim traditional paper ballots and optical scan voting are preferable alternatives, they fail to acknowledge that such systems are also vulnerable to tampering as paper ballots can be easily destroyed or altered by an individual intending to manipulate the election result. Moreover, paper ballots may fail to accurately record voter intent as a result of mechanical or human error that leads to the invalidation of votes, in cases where ballots have not been completed in a correct and comprehensible manner, contain an overvote or undervote based on the number of permitted selections in an election, or contain markings that cannot be read by an optical scanner. As all voting systems are imperfect and not immune from tampering, the Election Code cannot be read to impose a requirement that cannot be achieved.

*Banfield*, 110 A.3d at 173-74.

No remedy in equity is required where Plaintiffs have not even petitioned the Secretary to examine the voting process that occurred in Montgomery County. Once such a petition is filed, the Secretary is required to investigate; and the Secretary has discretion to determine the extent of

his investigation, which would then be secure (as opposed to a court ordering that Plaintiffs' experts have access to voting machines for their own examination).

Moreover, Plaintiffs' attack on Pennsylvania's processes for recounts and recanvasses ignores the public good related to the integrity of the election process which requires immediate resolution of disputes that prevent certification. *In re Petition of Jones*, 346 A.2d 260 (Pa. 1975). "The Election Code reflects a clear intention of the General Assembly to expeditiously resolve election disputes and provide for the prompt certification of the vote. *Id.*; *quoted in In re 2003 Election for Jackson Twp. Sup'r,* 840 A.2d 1044, 1046 (Pa. Commw. 2003); *see Weber*, 347 F.3d at 1105 ("it is . . . clear that states are entitled to broad leeway to enacting reasonable, even handed legislation to ensure that elections are carried out in a fair and orderly manner")(citing cases).

Indeed, requesting the invalidation of Pennsylvania's recount process or its contest process constitutes a thinly disguised invitation for the Court to rewrite the statute to Plaintiffs' liking. In other words, if these provisions are stricken, what will be the result? No recount process and no contest process. Having no process does not mean that a single person can demand a state-wide recount based on speculation. There needs to be something in its place and this Court is not authorized to rewrite the law. That is the job of the General Assembly.

"The Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, permits a federal court to declare the rights of a party whether or not further relief is or could be sought, and we have held that under this Act declaratory relief may be available even though an injunction is not." *Green v. Mansour*, 474 U.S. 64, 72 (1985) (citation omitted). The statute "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* (citation omitted.). As *Green* points out, "a declaratory judgment is not available in a number of instances." *Id*. The Supreme Court in *Green* cites *Great Lakes Co. v. Huffman*, 319 U.S. 293 (1943) (holding that a declaratory judgment was not available to obtain a determination of the

39

constitutionality of a state tax even though the relevant federal statute prohibited federal courts only from issuing injunctions against the collection of such taxes). It also cites *Samuels v. Mackell*, 401 U.S. 66, 73 (1971) (holding that a declaratory judgment declaring a state criminal statute unconstitutional was unavailable where it would have much the same effect as an injunction prohibiting enforcement of the statute). As such, *Green* bars Stein's request for a declaratory judgment. *See also N.J. Educ. Ass'n v. New Jersey*, No. 11-cv-5024, 2012 WL 715284, at *11 (D.N.J. Mar. 5, 2012).

## IV.   CONCLUSION

This Court should dismiss Plaintiffs' Amended Complaint with prejudice, as set forth in the attached proposed order.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

/s/ Sue Ann Unger
_____

Office of Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Phone:  215-560-2127
Fax:  717-772-4526

Sue Ann Unger
Senior Deputy Attorney General
Attorney I.D. No. 39009

Kenneth Joel
Chief Deputy Attorney General

**CERTIFICATE OF SERVICE**

I, Sue Ann Unger, hereby certify that the Defendants' motion has been filed electronically

on March 8, 2017, and is available for viewing and downloading from the Court's Electronic Case

Filing System.  Plaintiffs' counsel is on the Court's electronic email notice list and has thus been

served.

<table>
<tr><td></td><td>By:</td><td>/s/ Sue Ann Unger</td></tr>
<tr><td></td><td></td><td>Sue Ann Unger</td></tr>
<tr><td>Office of Attorney General</td><td></td><td>Senior Deputy Attorney General</td></tr>
<tr><td>21 S. 12th Street, 3rd Floor</td><td></td><td>Attorney I.D. No. 39009</td></tr>
<tr><td>Philadelphia, PA  19107</td><td></td><td></td></tr>
<tr><td>Telephone:  (215) 560-2127</td><td></td><td></td></tr>
<tr><td>Fax:  717-772-4526</td><td></td><td></td></tr>
</table>