UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

JILL STEIN, RANDALL REITZ, ROBIN HOWE,
SHANNON KNIGHT, EMILY COOK, and
KIMBERLY KUPKA,

     Plaintiffs,

  -against-             No. 16-CV-6287 (PD)

PEDRO A. CORTÉS, in his official capacity as
Secretary of the Commonwealth; and JONATHAN
MARKS, in his official capacity as Commissioner
of the Bureau of Commissions, Elections, and
Legislation,

     Defendants.

---

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-7684

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ........................................................................... ii- vi

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ........................................................................... 2

ARGUMENT ........................................................................... 5

I.      THE COURT SHOULD CONVERT THE MOTION TO DISMISS INTO A
        MOTION FOR SUMMARY JUDGMENT........................................................... 5

II.     PLAINTIFFS HAVE STANDING BECAUSE THEY WERE INJURED BY
        THE FAILURE TO COUNT VOTES ........................................................... 7

        A.      Stein Has Standing Because Votes Cast for Her Did Not Count ................. 7

                1.      Stein Has Standing on Her Own ..................................... 7

                2.      Stein Has Standing to Assert the Rights of Voters ................ 10

        B.      Reitz Has Standing Because He Was Treated Unequally and Arbitrarily
                Deprived of a State-Law Right ........................................... 11

        C.      Howe, Knight, and Kupka Have Standing Because They Were
                Disenfranchised........................................................... 14

        D.      A Favorable Decision Will Redress Plaintiffs' Injuries ................... 16

III.    THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY ............................. 17

IV.     PLAINTIFFS SUED THE CORRECT DEFENDANTS ......................................... 19

V.      PENNSYLVANIA'S ELECTION SCHEME VIOLATES THE
        CONSTITUTION ........................................................................... 22

        A.      Pennsylvania's Election System Violates the Fundamental Right to Have
                Votes Be Counted ........................................................... 22

        B.      The Pennsylvania Election System Is Fundamentally Unfair and Violates
                Due Process ................................................................ 28

VI.     DEFENDANTS' ARGUMENTS ABOUT REMEDIES ARE PREMATURE ........ 32

CONCLUSION ........................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Civil Liberties Union of N.M. v. Santillanes*,
  546 F.3d 1313 (10th Cir. 2008) ..................................................... 12

*Anderson v. Celebreeze*,
  460 U.S. 780 (1983)...................................................................... 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................ 2

*AstraZeneca AB v. Mut. Pharm. Co.*,
  No. 00-CV-4731, 2003 WL 22794868 (E.D. Pa. Nov. 12, 2003) ................... 33

*Banfield v. Cortés*,
  631 Pa. 229 (2015)......................................................... 30, 31, 32

*Belitskus v. Pizzingrilli*,
  343 F.3d 632 (3d Cir. 2003).................................................. *passim*

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014)............................................................ 8

*Bush v. Gore*,
  531 U.S. 98 (2000)................................................................... 8, 23

*Cantrell v. City of Long Beach*,
  241 F.3d 674 (9th Cir. 2001) ...................................................... 13

*Cf. Weber v. Shelley*,
  347 F.3d 1101 (9th Cir. 2003) .................................................... 31

*Citizen Ctr. v. Gessler*,
  770 F.3d 900 (10th Cir. 2014) .................................................... 12

*Clay v. Dep't of Army*,
  239 Fed. App'x 705 (3d Cir. 2007)................................................. 5

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) .................................................. 13

*Connelly v. Lane Constr. Corp.*,
  809 F.3d 780 (3d Cir. 2016)......................................................... 7

*Const. Party of Pa. v. Aichele* (*Constitution Party I*),
  757 F.3d 347 (3d Cir. 2014)............................................. 9, 18, 27

*Const. Party of Pa. v. Cortés* (*Constitution Party II*),
    824 F.3d 386 (3d Cir. 2016)...................................................................*passim*

*Const. Party of Pa. v. Cortes*,
    116 F. Supp. 3d 486 (E.D. Pa. 2015) .................................................... 23, 26

*County of Riverside v. McLaughlin*,
    500 U.S. 44 (1991).............................................................................. 15

*Danvers Motor Co. v. Ford Motor Co.*,
    432 F.3d 286 (3d Cir. 2005).................................................................. 8

*Davis v. Wells Fargo*,
    824 F.3d 333 (3d Cir. 2016).................................................................. 1

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
    635 F.3d 87 (3d Cir. 2011)................................................................ 19, 20

*Dorsey v. Pa. Dep't of Corr.*,
    No. 1:16-CV-588, 2016 WL 6124420 (M.D. Pa. Oct. 20, 2016) ........................ 6

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)............................................................................. 25

*eBay Inc. v. MercExchange*, L.L.C.,
    547 U.S. 388 (2006)............................................................................. 33

*Evancho v. Pine-Richland Sch. Dist.*,
    --- F. Supp. 3d ----, 2017 WL 770619 (W.D. Pa. Feb. 27, 2017) ..................... 12

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005)............................................................................. 17

*FEC v. Akins*,
    524 U.S. 11 (1998).............................................................................. 11

*FMC Corp. v. Boesky*,
    852 F.2d 981 (7th Cir. 1988) ................................................................ 13

*Great Lakes Dredge & Dock Co. v. Huffman*,
    319 U.S. 293 (1943)............................................................................. 34

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010)................................................................. 17

*Hassan v. City of N.Y.*,
    804 F.3d 277 (3d Cir. 2015).................................................................. 12

*Heinzl v. Starbucks Corp.*,
No. 14-CV-1316, 2015 WL 1021125 (W.D. Pa. Mar. 9, 2015) ..................................... 21

*Hoblock v. Albany Cnty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005)........................................................................................ 23, 25

*In re Ace Sec. Corp. RMBS Litig.*,
2015 WL 1408837 (S.D.N.Y. Mar. 26, 2015) ................................................................ 15

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2016)............................................................................................. 8

*In re Reading Sch. Bd. Election*,
535 Pa. 32 (1993) ........................................................................................................... 12

*In re Rockefeller Props., Inc. Sec. Litig.*,
184 F.3d 280 (3d Cir. 1999)............................................................................................. 5

*Lance v. Dennis*,
546 U.S. 459 (2006)........................................................................................................ 17

*LaRoque v. Holder*,
650 F.3d 777 (D.C. Cir. 2011) ..................................................................................... 9, 13

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ....................................................................................................... 34

*Mancuso v. Taft*,
476 F.2d 187 (1st Cir. 1973) .......................................................................................... 10

*Marks v. Stinton*,
19 F.3d 873 (3d Cir. 1994) ............................................................................................. 24

*Mathews v. Eldridge*,
424 U.S. 319 (1976)........................................................................................................ 29

*McTernan v. City of York*,
577 F.3d 521 (3d Cir. 2009)............................................................................................. 6

*Mullaney v. Anderson*,
342 U.S. 415 (1952)........................................................................................................ 15

*Nader v. Blackwell*,
545 F.3d 459, 471 (6th Cir. 2008) ................................................................................ 8, 9

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989)........................................................................................................ 15

*Oetting v. Heffler*,
  No. 11-CV-4757, 2015 WL 9190629 (E.D. Pa. Dec. 17, 2015)....................... 15

*Oh v. Philadelphia County Board of Elections*,
  No. 08-CV-0081, 2008 WL 4787583 (E.D. Pa. Oct. 31, 2008) ...................... 11

*Pa. Psych. Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002)........................................................... 10, 11

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ........................................................................... 32

*Reynolds v. Sims*,
  377 U.S. 533 (1964).............................................................. 1, 22, 23

*Rogers v. Corbett*,
  468 F.3d 188 (3d Cir. 2006)............................................................ 22, 23

*Samuels v. Mackell*,
  401 U.S. 66 (1971)........................................................................ 34

*Scanlan v. Eisenberg*,
  669 F.3d 838 (7th Cir. 2012) ........................................................... 13

*Schulz v. Williams*,
  44 F.3d 48 (2d Cir. 1994) .............................................................. 8, 9

*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2007) ............................................................ 9

*Singleton v. Wulff*,
  428 U.S. 106 (1976)....................................................................... 11

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016).................................................................... 13

*Stein v. Thomas*,
  --- F. App'x ----, 2016 WL 7131508 (6th Cir. 2016)............................... 13, 28

*Stewart v. Blackwell*,
  444 F.3d 843 (6th Cir. 2006) ........................................................... 14

*Trowbridge v. Cuomo*,
  No. 16-CV-3455, 2016 WL 7489098 (S.D.N.Y. Dec. 21, 2016) ...................... 15

*United States v. Classic*,
  313 U.S. 299 (1941)....................................................................... 23

*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) ................................................................... 34

*White v. Regester*,
  412 U.S. 755 (1973) ................................................................... 33

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................... 22

**Statutes & Codes**

25 P.S. § 2621 ............................................................................. 20

25 P.S. § 2831 ............................................................................. 9

25 P.S. § 2872.2 .......................................................................... 10

25 P.S. § 3031.4 .......................................................................... 21

25 P.S. § 3031.5 ............................................................. 20, 21, 31, 32

26 U.S.C. § 9004 .......................................................................... 10

Fed. R. Civ. P. 19 ........................................................................ 22

Fed. R. Civ. P. 21 ........................................................................ 15

Fed. R. Civ. P. 56 ........................................................................ 6

Pa. Const. Art. VII, § 4 ................................................................ 11

**Other Authorities**

Charles A. Wright et al.,
  5C Fed. Prac. & Proc. § 1359 (3d ed. 2017) .......................... 28

Charles A. Wright et al.,
  13A Fed. Prac. & Proc. § 3531.4 (3d ed. 2017) ..................... 14

Plaintiffs Jill Stein, Randall Reitz, Robin Howe, Shannon Knight, Emily Cook, and Kimberly Kupka submit this memorandum of law in opposition to Defendants' motion to dismiss, which should be converted to a motion for summary judgment, and in support of their cross-motion for summary judgment.

## PRELIMINARY STATEMENT

Every vote counts.  Every vote matters.  This principle is "the essence of a democratic society."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  In a deeply fractured nation, it is, perhaps, one of the few articles of civic faith that endures.

Unfortunately, not every vote matters to the chief election officials of the Commonwealth of Pennsylvania.  The Election Code administered by Defendants disenfranchised voters in the 2016 presidential election.  It did so by authorizing the use of junk voting machines that did not accurately count votes, and then erecting a series of impossible barriers to voters' efforts to have their votes counted.  Voters will be disenfranchised again unless this Court intervenes.

Plaintiffs in this case are disenfranchised voters and a presidential candidate who, as a result of that disenfranchisement, was deprived of votes she earned.  They are precisely the right people to bring this systemic challenge to Pennsylvania's dysfunctional system.  *See Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016).  If Plaintiffs do not have standing, no one does.

Defendants do not question that the Election Code places insurmountable obstacles in the path of voters who try to make their votes count.  Voters must gather thousands of signatures precinct-by-precinct.  If they somehow succeed in gathering signatures, they are expected to meet shifting, secret deadlines unknown even to the Secretary of the Commonwealth.  Even when they meet those deadlines, election officials wrongly tell them they are too late.  And when they end up in court, they are slapped with prohibitive fees and costs and sent away without notice.

A system that forces voters to use unreliable machines that fail to count their votes, and then deprives them of their right to make the votes count, is no system at all.  That system stripped Kimberly Kupka, Robin Howe, and Shannon Knight of their votes.  It deprived Jill Stein of votes she earned.  And it eviscerated Randall Reitz's rights as a citizen of the Commonwealth.

Pennsylvania's election system is undemocratic.  It is unfair.  And it is unconstitutional.

## STATEMENT OF FACTS

The voluminous factual details set forth in Plaintiffs' Amended Complaint need not be repeated here.  Those factual allegations must be taken as true for purposes of Defendants' motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Those details place in stark relief the unconstitutional scheme created by the confluence of (i) vulnerable and hackable electronic voting machines that give voters no way to ensure the accuracy of their votes, Am. Compl. ¶¶ 24-56; (ii) machines that failed to record actual votes on Election Day, *id.* ¶¶ 82-89; (iii) the practical impossibility of securing a statewide recount or contest, *id.* ¶¶ 59-67, 77-80, 115; (iv) the burdensome Election Code procedures that makes meaningful recounts illusory, *id.* ¶¶ 68-80, 90, 96-104; (v) the absence of accurate information from the Secretary of the Commonwealth or other election officials about recount procedures and deadlines, *id.* ¶¶ 91-95; and (vi) the herculean (but ultimately almost entirely fruitless) efforts required of voters seeking county-board-sanctioned or court-ordered recounts, *id.* ¶¶ 96-116.  Contrary to Defendants' characterization, *see, e.g.*, Defs.' Mem. 30-31,[1] Plaintiffs' claims are *not* limited to the electronic voting machines.  Rather, Plaintiffs challenge the failings of the entire election system—a system that provides no way for voters who cast ballots on electronic voting machines to ensure that their votes were accurately recorded and counted—as a whole.

---

[1] "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of Memorandum to Dismiss Amended Complaint, dated March 8, 2017, Dkt. #74.

In support of their motion, Defendants rely heavily on the testimony of their expert, Dr. Michael Shamos, in an attempt to refute Plaintiffs' factual assertions about the vulnerability of electronic voting machines. *See* Defs.' Mem. 5-7, 13-15. These "facts" should be disregarded should Defendants' motion be construed as a motion to dismiss. *See infra* Argument § I.

Regardless, Shamos's testimony is incredible and sharply contested by the four experts Plaintiffs present to this Court. *See* Dkt. #8 (Decl. of J. Alexander Halderman); Dkt. #10 (Aff. of Harri Hursti); Dkt. #11 (Aff. of Daniel Lopresti); Dkt. #12 (Aff. of Duncan A. Buell); Am. Compl. ¶ 24 n.1 (incorporating all previously docketed material cited in the Amended Complaint); *id.* ¶¶ 24 (citing Halderman Decl.), 27 (citing Hursti Aff., Lopresti Aff., Buell Aff.). Shamos has not presented any affidavit or declaration supporting Defendants' motion. Rather, he testified at the preliminary injunction hearing, when he was qualified as an expert in the limited field of "the electronic voting provisions of the Pennsylvania Election Code." Hr'g Tr. (Dkt. #57) 45:12-14. The opinions he subsequently offered during direct examination on all other subjects—including "the insuperable logistical difficulties involved in installing malware" on voting machines, Defs.' Mem. 15 (quoting PI Mem.[2] 27); whether "any attempts to place malware onto the DRE [direct-recording electronic] machines . . . would . . . fail," *id.*; and that a concern about "widespread hacking borders on the irrational," Defs.' Mem. 16 (quoting PI Mem. 28)—should be disregarded.

Shamos's opinions on these matters are in any event unreliable. For example, Defendants highlight Shamos's assertion that the electronic voting machines in Pennsylvania "maintain[] a permanent physical record of every vote cast." Defs.' Mem. 6 (quoting Hr'g Tr. 58:9-10). The claim is highly misleading. The "physical record" of votes that Shamos

---

[2] "PI Mem." refers to this Court's Memorandum regarding Plaintiffs' request for a preliminary injunction, dated Dec. 12, 2016, Dkt. #55.

references is merely a print-out of the votes recorded by the software on the machine.  Am. Compl. ¶ 56.  There is no paper receipt that can be verified by the voter, nor any other paper trail generated independently from the software of the machine.  *Id.* ¶¶ 24, 56.  Any bugs or malware in the software will simply reappear on the printed receipt.  *Id.* ¶ 56.  "The result will necessarily be identical to the initial computation.  This achieves nothing by way of verifying the accuracy or integrity of the results."  Hursti Aff. ¶ 36.  In addition, Shamos admitted that he had received hundreds of thousands of dollars from the manufacturer of one of the voting machines in question, Hr'g Tr. 66:14-67:8; that he has never conducted an examination of the firmware used in Pennsylvania's election systems, *id.* at 78:25-79:5; and that he has not examined the Pennsylvania voting systems since 2007, *id.* at 79:6-9.  To the extent this Court deems Dr. Shamos reliable, notwithstanding these issues, it must note that he testified before Congress in 2004 and 2006 that the system for testing and certifying voting equipment "is not only broken, but it is virtually nonexistent," *id.* at 68:15-18, and admitted that one million Pennsylvania voters are registered in counties that rely on machines that have been banned as unreliable in California, *id.* at 84:12-15.

In short, Plaintiffs have alleged extensive facts that are more than sufficient to make out their constitutional claims.  Defendants' attempts to counter those facts are inappropriate on a motion to dismiss.  To the extent this Court construes the motion as one for summary judgment, *see infra* Argument § I, Defendants have failed to rebut Plaintiffs' factual allegations, supported by sworn affidavits, *see* Am. Compl. Exs. 1-30, detailing the numerous barriers that the Pennsylvania Election Code, as implemented by Defendants, places in front of voters seeking to verify that their votes were accurately recorded and counted.

## ARGUMENT

## I.   THE COURT SHOULD CONVERT THE MOTION TO DISMISS INTO A MOTION FOR SUMMARY JUDGMENT

Defendants pay lip service to the requirement that they must "[o]f course" accept the factual allegations of the Amended Complaint as true on a motion to dismiss, Defs.' Mem. 4, but they dispute the allegations of the Amended Complaint at every turn.  For example:

- On the basis of nothing but counsel's say-so, Defendants assert that there is a distinction between "the light next to the words 'No Vote'" and "the 'No Vote' box light itself."  Defs.' Mem. 5 n.5.  The implication is that the "No Vote" light that Plaintiffs saw does not matter.  But Plaintiffs Howe, Knight, and Kupka alleged and testified that the machines appeared to record their votes as "No Votes" each time they tried to vote for an actual candidate.  *See* Am. Compl. ¶¶ 84-86 & Exs. 19-21.  Rather than draw all reasonable inferences in Plaintiffs' favor, as required, Defendants parse Plaintiffs' description of a tiny bulb and assert that everything is fine.

- Relying on media reports about elections in other states, Defendants claim that the 4,087 "No Votes" recorded in Montgomery County were a "protest vote" in the presidential race consistent with the results in other jurisdictions.  Defs.' Mem. 6 & nn. 6-7, 32-33.  In addition to being improper on a motion to dismiss, this assertion is inaccurate.  "No Vote" means no vote in *any race*, in contrast to the 7,389 "Under Votes" from voters who declined to cast a vote for president, perhaps dissatisfied with their choices, but voted in other races.  Am. Compl. Ex. 46.

- Invoking the preliminary hearing testimony of Dr. Shamos, Defendants assert that Pennsylvania's voting machines are secure.  Defs.' Mem. 5-7 & n.9, 14-16.  That is the opposite of what the Amended Complaint and its incorporated materials allege: the machines are antiquated, unsecure, and vulnerable to malfunction and malfeasance.  *See* Am. Compl. ¶¶ 24-56; Halderman Decl.; Hursti Aff.; Lopresti Aff.; Buell Aff.

Defendants' heavy reliance on materials outside the pleadings to support their Rule 12(b)(6) motion leaves the Court with two choices: first, exclude from consideration everything beyond the pleadings and the materials incorporated therein; or second, convert Defendants' motion into a motion for summary judgment after providing clear notice to the parties.  *See, e.g.*, *Clay v. Dep't of Army*, 239 Fed. App'x 705, 706 (3d Cir. 2007); *In re Rockefeller Props., Inc. Sec. Litig.*, 184 F.3d 280, 287-88 (3d Cir. 1999).

Here, conversion into a summary judgment motion is preferable. Plaintiffs have incorporated a substantial amount of evidence into the pleadings. Defendants have responded with extra-record materials of their own.[3] Under these circumstances, conversion is the most prudent course. *See Dorsey v. Pa. Dep't of Corr.*, No. 1:16-CV-588, 2016 WL 6124420, at \*3-4 (M.D. Pa. Oct. 20, 2016).

If the Court does convert Defendants' motion into a motion for summary judgment, Plaintiffs have filed a cross-motion for the Court to consider at the same time. If the Court declines to convert this motion, Plaintiffs' cross-motion should be deemed withdrawn.

Finally, this is not one of the "rare" cases in which fact-finding on a motion for a preliminary injunction may have preclusive effect on later dispositive motions. *McTernan v. City of York*, 577 F.3d 521, 531 (3d Cir. 2009). The Third Circuit has explained that such preclusion is appropriate where "the issues on the two motions [are] exactly the same." *Id*. The principal issues at the preliminary injunction hearing were whether Pennsylvania voting machines were hacked during the 2016 Presidential Election and whether preliminary relief was logistically feasible. *See generally* Hr'g Tr. Neither of those questions is essential to, or even raised by, Defendants' motion. *See infra* Argument § II.D (explaining that the Amended Complaint does not rely upon any allegation that a hack occurred).

---

[3] Many of those materials, like the media reports on which Defendants base their inaccurate claim that the Montgomery County "No Vote" was a protest vote, are not actually evidence, and cannot be considered on a summary judgment motion either. *Cf.* Fed. R. Civ. P. 56(c) (evidentiary requirements for summary judgment).

II.    **PLAINTIFFS HAVE STANDING BECAUSE THEY WERE INJURED BY THE FAILURE TO COUNT VOTES**

The Amended Complaint plausibly alleges—and the evidence accompanying it supports a reasonable inference—that some Pennsylvania voters' votes did not count.  Their votes did not count because of the unconstitutional election regime that Defendants administered: error-prone machines with no paper trail, coupled with an Election Code that makes it effectively impossible to verify machine-recorded totals.  Plaintiffs include voters whose votes did not count and a political candidate who won votes that did not count.  Defendants' attack on standing, which rests principally on Article III's injury-in-fact requirement, therefore fails.  Plaintiffs are personally injured by, among other things, the failure to count the votes that they cast and that they earned.

A.    **Stein Has Standing Because Votes Cast for Her Did Not Count**

1.    **Stein Has Standing on Her Own**

Pennsylvania voters cast votes for Jill Stein, among other candidates, that were not counted.  Every vote cast for Stein that goes uncounted constitutes an injury to Stein herself.

Pennsylvania voters attempted to cast votes for presidential candidates but were denied the ability to do so by malfunctioning, inadequate machines.  For example, Montgomery County voters tried to vote for candidates but were thwarted when the "No Vote" light repeatedly illuminated instead.  Am. Compl. ¶¶ 84-86 & Exs. 19-21.  In Montgomery County, there were 4,087 "No Votes" for *any* office—an unusually, even absurdly, high number.  *See id.* ¶¶ 87-88 & Ex. 46.  It is at the very least more probable than not that the machines failed to count the votes.[4] *See, e.g.*, *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (all reasonable

---

[4] *Why* the machines malfunctioned—whether they were tampered with or simply misfired—is a question to be answered later that is not relevant on these motions.  *See infra* Argument § II.D.

inferences must be drawn in non-movant's favor on motion to dismiss); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (same on summary judgment).  It is a virtual statistical certainty that some of the uncounted votes were for Stein.  Am. Compl. ¶ 89.

Injury-in-fact must be "concrete and particularized" and "actual or imminent," but it need not be "pecuniary," and "this standard does not demand that a plaintiff suffer any particular type of harm to have standing."  *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134 (3d Cir. 2016).  "The injury-in-fact requirement exists to ensure that litigants have a 'personal stake' in the litigation."  *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (quoting *Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000)).

Few people could have a more personal stake in the results of an election than a candidate who was on the ballot.[5]  *See* Charles A. Wright et al., 13A Fed. Prac. & Proc. § 3531.4 (3d ed. 2017) ("Candidates . . . achieve standing without difficulty.").  It is "well-established" that political candidates and their representatives have standing to challenge election administration practices that affect their ability to compete for votes.  *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994).  In *Schulz*, for example, a third-party official had standing to challenge the placement of another third-party candidate on the ballot because "loss of votes" from vote-siphoning constituted injury-in-fact.  *See id.* at 52-53.  Similarly, there was "little argument" that Ralph Nader's removal from the ballot in Ohio during the 2008 presidential election constituted injury-in-fact sufficient to confer standing.  *See Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir. 2008).

In ruling on Plaintiffs' motion for a preliminary injunction, *see* PI Mem. 13, the Court suggested that Stein lacked standing because she did not "allege that a recount [would] change

---

[5] Of course, in a presidential election, electors to the Electoral College are formally on the ballot, but no one doubts that the candidates are the real parties in interest and may litigate disputes. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000).

the Pennsylvania vote total in her favor."  PI Mem. 13.  Defendants echo that position here.  *See*

Defs.' Mem. 24.  But a "realistic chance of winning" requirement has no foundation in standing

jurisprudence.  This notion that a candidate must be close to victory to challenge the

administration of an election would be wrong and fundamentally undemocratic.

Federal courts do not consider candidates' chances of victory in evaluating whether they

have Article III standing to challenge election administration practices.  Because of our electoral

system's many structural barriers to third parties, third parties and their candidates are often

plaintiffs in election administration cases, and they are routinely found to have standing without

regard to their ultimate chances of success.  *See, e.g.*, *Const. Party of Pa. v. Aichele* (*Constitution

Party I*), 757 F.3d 347, 361-63 (3d Cir. 2014) (non-major political parties had standing to

challenge Pennsylvania statute governing signature-gathering requirements); *Belitskus v.

Pizzingrilli*, 343 F.3d 632, 639-41 (3d Cir. 2003) (Green Party candidates had standing to

challenge Pennsylvania ballot access fees).  The Court of Appeals for the District of Columbia

Circuit has repeatedly held that a political candidate has standing to challenge "'illegally

structured' campaign environments'" even if he cannot establish that the challenged structure

harms his chances of winning.  *LaRoque v. Holder*, 650 F.3d 777, 787 (D.C. Cir. 2011); *accord

Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2007).

Stein's loss of votes that she earned therefore constitutes injury-in-fact, regardless of

whether she was likely to win the election.  *See Nader*, 545 F.3d at 471; *Schulz*, 44 F.3d at 53.

Moreover, while *every* uncounted vote is itself an injury, depriving a candidate of votes she

earned has other adverse effects even if the candidate is not close to victory.  For example, the

Green Party is considered a "party" under the Pennsylvania Election Code if its candidate in a

statewide race wins two percent of the vote, 25 P.S. § 2831, entitling it to certain benefits, *see id.*

§ 2872.2.  A candidate who reaches five percent of the vote qualifies his party for federal

matching funds.  *See* 26 U.S.C. § 9004(a)(2)(B).  And, more generally, the better a candidate's

showing, the better positioned she is to raise funds and attract political support in future races.

**2.      Stein Has Standing to Assert the Rights of Voters**

"Our jurisprudence recognizes third-party standing under certain circumstances." *Pa.*

*Psych. Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002).  "For

instance, doctors may be able to assert the rights of patients, lawyers may be able to assert the

rights of clients, and candidates for public office may be able to assert the rights of voters." *Id.*

at 288 n.10.  Stein satisfies all three requirements to do so.

First, she suffered injury-in-fact.  *See id.* at 288-89.  As explained above, Stein herself

was injured when votes for her were not counted.  *See supra* Argument § II.A.1.

Second, she has a sufficiently close relationship with voters—particularly voters who

voted for her—because she is "fully, or very nearly, as effective a proponent" of the voters'

rights as they are.  *Pa. Psych. Soc'y*, 280 F.3d at 289 (quoting *Powers v. Ohio*, 499 U.S. 400, 413

(1991)).  As the First Circuit has explained, in reasoning endorsed by the Third Circuit, "[a]

candidate for public office . . . is so closely related to and dependent upon those who wish to vote

for him and his litigation will so vitally affect their rights that courts will . . . permit a candidate

to raise the constitutional rights of voters." *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973);

*see Pa. Psych. Soc'y*, 280 F.3d at 288 n.10 (citing *Mancuso* with approval).

Third, while some voters are willing and able to bring claims on their own behalf (as

evidenced by this lawsuit), there is "some hindrance" to other voters' ability to protect their own

interests: ballot secrecy.  *Pa. Psych. Soc'y*, 280 F.3d at 290-91 (quoting *Powers*, 499 U.S. at

411).  That hindrance is a powerful one, as the confidentiality of a voter's ballot is sacrosanct.

*See, e.g.*, Pa. Const. Art. VII, § 4 ("All elections by the citizens shall be by ballot or by such other method as may be prescribed by law; Provided, That secrecy in voting shall be preserved."). Many people are uncomfortable disclosing whom they voted for—especially to high-ranking state officials under oath in discovery—and it cannot be determined whether a voter's vote was not counted or miscounted without knowing for whom that vote was cast in the first place. The desire to keep legitimately private information private is the quintessential "hindrance" to bringing litigation that justifies third-party standing. *Pa. Psych. Soc'y*, 289 F.3d at 290; *accord Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976).[6]

### B. Reitz Has Standing Because He Was Treated Unequally and Arbitrarily Deprived of a State-Law Right

Randall Reitz, the other named Plaintiff in the original Complaint, is a registered Montgomery County voter who voted in the 2016 presidential election. Am. Compl. ¶ 10. He attempted to petition for a recount in his district but was denied, and he was also one of 100 voters who petitioned the Commonwealth Court to contest the election results. *Id*. ¶ 10 & Ex. 2.

The right to vote is "the most basic of political rights." *FEC v. Akins*, 524 U.S. 11, 25 (1998). In the context of voting rights, broadly applicable electoral rules will often cause the same injury to millions of citizens in a given jurisdiction. *See id.* It does not follow that their injury is too generalized for those citizens to invoke the power of Article III courts. *See id.* Here, Reitz has standing on four independent grounds.

---

[6] Defendants' reliance on *Oh v. Philadelphia County Board of Elections*, No. 08-CV-0081, 2008 WL 4787583, at *6-7 (E.D. Pa. Oct. 31, 2008), is misplaced. *See* Defs.' Mem. 25; PI Mem. 14. *Oh* addressed a statutory claim under the Voting Rights Act. The Court explained that the Act was specifically intended to protect the voting rights of minority voters and to prevent infringements of the right to vote on the basis of race and was not a vehicle for general challenges to the administration of elections. *See Oh*, 2008 WL 4787583, at *6-7. As such, the candidate was not within the same zone of interests as the voters on whose behalf he claimed to speak. *See id.* Indeed, the candidate failed to allege that the voters suffered any injury. *See id.* at *7. Here, in contrast, the candidate and the voters suffered an identical injury: the failure to count votes. That injury is equally abhorrent to the Constitution regardless of who asserts it.

First, Reitz suffers injury-in-fact because, as a Montgomery County resident forced to vote on unsecure, error-prone machines, *see* Am. Compl. ¶¶ 50-53, he is treated unequally from Pennsylvania voters in counties with well-functioning voting systems.  In voting rights cases alleging violations of the Equal Protection Clause, like this one, the unequal treatment of voters itself constitutes injury-in-fact.  *See, e.g.*, *Citizen Ctr. v. Gessler*, 770 F.3d 900, 913-914 (10th Cir. 2014) ("[Voters] who live in counties that use traceable ballots are treated differently than voters living in counties that use untraceable ballots.  Through these allegations, [Plaintiff] has sufficiently pleaded an injury in fact . . . ." (citation omitted)); *Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) (unequal treatment of absentee and non-absentee voters).  The principle that unequal treatment itself confers standing applies outside the voting rights context, too.  *See, e.g.*, *Hassan v. City of N.Y.*, 804 F.3d 277, 289-90 (3d Cir. 2015); *Evancho v. Pine-Richland Sch. Dist.*, --- F. Supp. 3d ----, 2017 WL 770619, at *17 n.44 (W.D. Pa. Feb. 27, 2017).

Second, Reitz suffered injury-in-fact because he was arbitrarily prevented from exercising a right conferred by state law.  The Amended Complaint alleges that the Pennsylvania Election Code confers upon voters a right to seek a recount, but that the arbitrary procedural obstacles to obtaining a recount—like secret deadlines, prohibitive monetary costs, and inconsistent administration of the statute—effectively nullify that right.  Am. Compl. ¶¶ 58-116, 131-34.  Reitz attempted to exercise his state-law right, but he was thwarted by these procedural obstacles.  As Reitz explains in his affidavit, he tried to submit a recount petition to the Montgomery County Board of Elections; was rejected because he was supposedly too late, although he was not, *see In re Reading Sch. Bd. Election*, 535 Pa. 32, 37 (1993); and then had his petition dismissed in court without notice for failure to pay a fee.  *See* Am. Compl. Ex. 2.  Reitz

also tried to petition the Commonwealth Court to contest the election but withdrew because of the imposition of a $1 million bond. *Id.*; *see also* Am Compl. Exs. 39-40.

In other litigation arising from Plaintiff Stein's 2016 presidential election recount efforts, the Sixth Circuit has held that a voter plaintiff who alleges an arbitrary deprivation of the state-law right to a recount has standing. *See Stein v. Thomas*, --- F. App'x ----, 2016 WL 7131508, at *2 (6th Cir. 2016); *see also LaRoque*, 650 F.3d at 786-87 (candidate had standing because defendants' deprivation of his state-law right to participate in nonpartisan referendum constituted injury-in-fact). This holding is consistent with the well-established principle that the deprivation of a state-law right can constitute injury-in-fact sufficient to establish standing. *See Scanlan v. Eisenberg*, 669 F.3d 838, 846 (7th Cir. 2012); *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001); *FMC Corp. v. Boesky*, 852 F.2d 981, 992 (7th Cir. 1988). That deprivation may be intangible as long as it is sufficiently concrete and particularized. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549-50 (2016). Here, the injury to Reitz is both concrete and particularized: He was denied a recount for which he *personally* petitioned; in the process, he spent time and effort getting affidavits notarized and filed; and as a result, *his vote* was not recounted. *See id.*

Third, Reitz suffered injury-in-fact when he had to cast his vote under unconstitutional circumstances. A voter need not be denied the franchise, or be at risk of being denied the franchise, to suffer injury-in-fact necessary to challenge a burden on voting. For example, a voter who is forced to produce photo identification to vote has standing to challenge the statute requiring photo identification, even if she succeeds in voting. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009). It is therefore immaterial that Reitz, unlike other named Plaintiffs, does not have an individualized basis to conclude that his vote was not counted in the 2016 presidential election. *Cf.* Defs.' Mem. 24; PI Mem. 13.

13

Finally, Reitz has standing because Defendants' challenged conduct increases the risk that his vote will be miscounted in future elections. *See Stewart v. Blackwell*, 444 F.3d 843, 854-55 (6th Cir. 2006), *vacated as moot*, 473 F.3d 692 (6th Cir. 2007). By allowing the use of unreliable machines and making it impossible for voters to check whether the machines accurately recorded their votes, Defendants make it more likely that Reitz will experience in future elections what Howe, Knight, and Kupka experienced in this one: disenfranchisement.[7]

## C. Howe, Knight, and Kupka Have Standing Because They Were Disenfranchised

There can be no doubt that Plaintiffs Howe, Knight, and Kupka suffered injury-in-fact: Their votes did not count. Contrary to Defendants' assertion, these Plaintiffs do not merely "speculate" that they were disenfranchised. Defs.' Mem. 27. They provide first-hand eyewitness testimony explaining that the machines visibly malfunctioned when they attempted to cast their votes. Am. Compl. Exs. 19-21. This evidence is corroborated by the inexplicably high number of "No Votes" in all races in Montgomery County. *Id.* Ex. 46. In response, Defendants introduce no evidence tending to show that Howe, Knight, and Kupka's votes were counted. They merely speculate—without evidence—that the "No Votes" were "protest votes" in the presidential race; in fact, those are "Under Votes." *Id.*

While it is unnecessary to address the issue because Stein and Reitz have (and always have had) standing, standing can be established by the addition of Howe, Knight, and Kupka as Plaintiffs in the Amended Complaint.

Defendants' argument that standing cannot be established by amending a complaint to add new plaintiffs is at odds with Supreme Court precedent. In *County of Riverside v.*

---

[7] Plaintiff Emily Cook, a Montgomery County registered voter who attempted to vote for Jill Stein in the 2016 presidential election, has standing for all of the same reasons as Reitz except the second, as she did not petition for a recount or sign the contest petition.

*McLaughlin*, 500 U.S. 44 (1991), the Supreme Court held that three plaintiffs who were newly added to the case in the second amended complaint had standing to sue, without regard for whether any original plaintiffs had standing. *Id.* at 51. In keeping with *County of Riverside*, courts allow the addition of plaintiffs to establish standing. *See, e.g.*, *Trowbridge v. Cuomo*, No. 16-CV-3455, 2016 WL 7489098, at *14 & n.14 (S.D.N.Y. Dec. 21, 2016); *Oetting v. Heffler*, No. 11-CV-4757, 2015 WL 9190629, at *6-7 (E.D. Pa. Dec. 17, 2015). That is particularly true where, as here, the substantive allegations of the Complaint remain fundamentally the same. *See In re Ace Sec. Corp. RMBS Litig.*, 2015 WL 1408837, at *5 (S.D.N.Y. Mar. 26, 2015). As the court explained in *Oetting*, there is no principled distinction between amending to add *allegations* to establish standing (which is unquestionably permitted) and amending to add parties to establish standing. *See* 2015 WL 9190629, at *6. Either way, Article III jurisdiction is being invoked by amendment where none existed before. *Cf.* Defs.' Mem. 26.

In the alternative, the Court has the clear authority under Federal Rule of Civil Procedure 21 to allow the addition of new Plaintiffs to establish standing. *See* Fed. R. Civ. P. 21 (court may add or drop a party at any time on just terms); *Mullaney v. Anderson*, 342 U.S. 415, 416-17 (1952); *see also Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 834 n.8 (1989) (noting that *Mullaney* pertains to the use of Rule 21 "to establish the existence of a justiciable case"). To the extent it is necessary, the Court should exercise that authority here. Dismissing this action for lack of standing and having Plaintiffs Howe, Knight, and Kupka re-file the same lawsuit in the same court accomplishes nothing, except wasting time and judicial resources.

15

### D.      A Favorable Decision Will Redress Plaintiffs' Injuries

Defendants cursorily claim that Plaintiffs cannot obtain redress from the Court because, they speculate, any "malware" that caused votes not to be counted "would have disappeared after the election." Defs.' Mem. 27-28.  This assertion is contrary to the allegations of the Amended Complaint and the evidence: a forensic examination of direct-recording electronic ("DRE") machines "could produce evidence that the software resident on the cartridges had been infected with a virus capable of switching votes . . . or rendering the affected . . . machine inoperable." Hursti Aff. ¶ 38; *accord* Halderman Decl. ¶ 10.  In any event, the Amended Complaint does not allege that the failure to count votes was caused by malware.  It alleges the observable fact that votes were not counted and the well-documented fact that the machines used throughout most of Pennsylvania are prone to inadvertent error and intentional malfeasance.  *Why* the votes were not counted—whether through intentional misconduct, simple machine error, or both—is an open question at this point.  Defendants' assertion that "there would be nothing to find" is pure speculation.  Defs.' Mem. 27-28.

More important, Defendants' attempt to reduce Plaintiffs' requested relief to "a future recount," *id.*, is inaccurate.  The *other* relief that Plaintiffs seek, beyond a forensic examination or a recount, will surely redress their injuries.  The central point of Plaintiffs' case is that the election system in Pennsylvania, in its totality, is unconstitutional because it deprives voters of their right to have their votes counted through a combination of unreliable machines and an inability to verify the vote.  Declaring that Plaintiffs' constitutional rights were violated, declaring applicable portions of the Pennsylvania Election Code unconstitutional, and enjoining the enforcement of those provisions will provide Plaintiffs with relief.  *See* Am. Compl. 38-39.

### III.    THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY

In denying Plaintiffs' motion for a preliminary injunction, the Court suggested that the *Rooker-Feldman* doctrine bars Plaintiffs' claims because Plaintiffs effectively sought review of the Commonwealth Court's decision to require a $1 million bond to contest the election.  *See* PI Mem. 15-17.  Defendants do not advance this argument on their motion—for good reason.  The Court was, respectfully, mistaken.

The *Rooker-Feldman* doctrine occupies a "narrow ground" and applies only in "limited circumstances."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 291 (2005).  It is "confined to cases . . . brought by state-court *losers* complaining of injuries *caused by* state-court *judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 284 (emphasis added).

First, the doctrine cannot apply to Plaintiffs Cook, Howe, Knight, and Kupka because they did not participate, much less "lose[]," in the contest proceeding.  *See Lance v. Dennis*, 546 U.S. 459, 463-66 (2006).

Second, there was no Commonwealth Court "judgment" at all.  Plaintiffs here do not and cannot seek review of a non-existent judgment.

Third, Plaintiffs do not "complain[] of injuries caused" by the Commonwealth Court.  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010).  To invoke *Rooker-Feldman*, the injury must be "produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it."  *Id.* at 167 (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)).  Here, the principal injury to Plaintiffs is the failure to count votes and the denial of a state-law right to a recount.  The Commonwealth Court is not the source of those injuries.  At most, the Commonwealth Court's imposition of a bond hindered Plaintiffs Stein and Reitz from pursuing a *remedy* for those injuries.

17

Nor are Plaintiffs seeking "review and rejection" of the Commonwealth Court's bond decision. *Id.* at 168. This element of the *Rooker-Feldman* doctrine is only met when the plaintiff asks the federal court to engage in "appellate review" of the state-court decision to determine whether it was reached "'in accordance with law.'" *Id.* at 169 (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1143 (10th Cir. 2006)). Even if the federal court reaches a decision "contrary" to a state-court decision that would "make it impossible to comply" with the state-court decision, *Rooker-Feldman* is not implicated unless the federal court is asked to *review* the "bona fides" of the state court decision. *Id.* (quoting *Bolden*, 441 F.3d at 1143).

Plaintiffs do not question that the Commonwealth Court acted in accordance with Pennsylvania law in imposing a bond and therefore do not seek "appellate review" of its decision. The Election Code allows the imposition of prohibitive monetary costs, among a host of other burdens, on voters seeking to ensure their votes counted; those burdens, taken together, collectively violate Plaintiffs' constitutional rights. The Commonwealth Court did not address any of these other issues. Plaintiffs are not seeking "review and rejection" of its decision. *Id.* at 168. Similarly, when third-party candidates challenged prohibitively high ballot-access costs assessed by the Commonwealth Court pursuant to statute, the Third Circuit never suggested that their claims were barred by *Rooker-Feldman*. *See Const. Party of Pa. v. Cortés* (*Constitution Party II*), 824 F.3d 386, 391 (3d Cir. 2016); *see generally Constitution Party I*, 757 F.3d 347. To the contrary, the costs imposed by the state court were *evidence* of the unconstitutionality of a statutory scheme that permitted imposition of costs in the first instance. *Id.* Similarly, the Commonwealth Court's imposition of a bond is evidence of the unconstitutionality of a statutory scheme that, *inter alia,* gives that court the unfettered ability to impose financially-prohibitive bonds on voters seeking to contest an election.

18

IV.     **PLAINTIFFS SUED THE CORRECT DEFENDANTS**

"The Commonwealth cannot hide behind the behavior of third parties when its officials are responsible for administering the election code that empowers those third parties to have the pernicious influence alleged in the Complaint." *Constitution Party II*, 824 F.3d at 398.  That statement was addressed to Messrs. Cortés and Marks, the defendants sued in this case.  Yet here they go again.

Without even citing Federal Rule of Civil Procedure 19, Defendants ask this Court to dismiss the Amended Complaint because, they allege, Plaintiffs failed to sue unidentified "necessary parties."  Defs.' Mem. 28-30.  Nowhere do Defendants identify who these necessary parties are.  Instead, they suggest that proper Defendants include "those in control of the actual machines" without explaining whether they mean each member of each county's Board of Elections, the manufacturers of each type of voting machine in question, or other unidentified "third parties" who hold "propriety information."  *Id.* at 28.  Regardless, Defendants' arguments fail.

Defendants "bear[] the burden of showing why an absent party should be joined under Rule 19." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011).  First, Defendants have failed even to identify who the "necessary parties" are.  Having failed to do so, they cannot demonstrate that any absent party is indispensable under Rule 19.

Second, construing Defendants' argument to require joinder of each of Pennsylvania's sixty-seven county boards of elections, it fails.  Plaintiffs allege that Pennsylvania's election scheme violates Plaintiffs' rights to due process, equal protection, and freedom of association by arbitrarily denying them the right to have their votes accurately counted.  Am. Compl. ¶¶ 118-134.  Defendants Cortés and Marks—in their official capacities as the Secretary of the Commonwealth and the Commissioner of the Bureau of Commissions, Elections, and

19

Legislation, respectively—are the proper parties in challenges to state election laws.  *See, e.g.,*

*Belitskus*, 343 F.3d 632 (suing the Secretary of the Commonwealth and the Commissioner of the

Bureau of Commissions, Elections, and Legislation in their official capacities in constitutional

challenge to candidate filing fees imposed by state law).  As the Third Circuit has noted, the

Secretary of the Commonwealth "is responsible for overseeing various aspects of the

Commonwealth's election process," and the Commissioner for the Bureau of Commissions,

Elections and Legislation "has administrative responsibility for various aspects of the election

process, including ballot access."  *Id.* at 638; *see also* 25 P.S. § 2621(b) (charging the Secretary

of the Commonwealth with the duty "to examine and re-examine voting machines, and to

approve or disapprove them for use in this State").

Third, Defendants' claim that they "have no authority to permit or force" examination of

the voting machines is belied by their own brief.  Defendants claim that 25 P.S. § 3031.5(b)

"specifically requires that the Secretary of the Commonwealth examine all electronic voting

systems used in any election in Pennsylvania."  Defs.' Mem. 9; *see id.* at 33 ("Plaintiffs . . .

ignore the remedy that is plainly available to them, without this Court's involvement—the ability

of ten voters within a county to pay a total of $450 and *petition the Secretary* to re-examine their

county's voting process." (emphasis added)).  Plainly Defendant Cortés has the power, if ordered

by this Court, to examine any election machine or voting system in Pennsylvania.

Fourth, even if Defendants would require the cooperation of the county boards to execute

certain injunctive relief, that is insufficient to render the boards necessary parties.  The Third

Circuit faced a similar argument in the *Disabled in Action* case, in which advocates for

individuals with disabilities sued the Southeast Pennsylvania Transportation Authority

("SEPTA") for maintaining inaccessible subway stations in Philadelphia.  635 F.3d 87.  On

appeal, SEPTA argued that the City of Philadelphia was a necessary party because SEPTA

would need the City's agreement to install elevators at the stations in question as part of the

injunctive relief sought. *Id.* at 97. The Third Circuit rejected this argument. It noted that the

"City's normal procedures in dealing with SEPTA construction projects that impinge upon City

property . . . should be sufficient to protect its interests here." *Id.* at 98. And it rejected the

notion that, without joinder, injunctive relief granted by the court would be "hollow." *Id.* While

it was true that the City's ownership of the property would affect SEPTA's ability to carry out a

court order, the court held, "it simply means that SEPTA will have to work with the City in

complying with our decision." *Id.*

The same reasoning applies here: if complying with court-ordered injunctive relief will

require coordination with the county boards of elections, Defendants are well positioned to

arrange that, as the Election Code makes repeated reference to Defendants' authority over the

individual boards. *See, e.g.*, 25 P.S. § 3031.4(d) (authorizing the Secretary to make contracts for

electronic voting systems on behalf of the county board of elections); *id.* § 3031.5(b) (requiring

county boards of elections to "comply with the requirements for the use of the electronic voting

system" as set forth by the Secretary). There is no basis to conclude—and certainly Defendants

have not proven—that the county boards are indispensable parties without whom the action must

be dismissed.

Fifth, even if these parties are necessary, "the remedy . . . is for the defendant in the case

to implead or join the missing party, not move for dismissal." *Heinzl v. Starbucks Corp.*, No. 14-

CV-1316, 2015 WL 1021125, at *12 (W.D. Pa. Mar. 9, 2015).

Finally, and only *after* determining that the party must be joined *and* joinder is not

feasible, the court must weigh the factors set forth in Rule 19. "[I]f the absentee cannot be

joined, the court must then determine, by balancing the guiding factors set forth in Rule 19(b),

whether to proceed without him or to dismiss the action." Charles A. Wright et al., 5C Fed. Prac.

& Proc. § 1359 (3d ed. 2017). Those factors include potential prejudice to the missing and

existing parties, whether that prejudice can be avoided by measures other than dismissal, and

whether Plaintiffs would have an adequate remedy if the case were dismissed. Fed. R. Civ. P.

19(b). Defendants bear the burden of showing that dismissal is appropriate under Rule 19, and

"it may be necessary to present affidavits of persons having knowledge of these interests [of the

absent individuals] as well as other relevant extra-pleading evidence." Wright, 5C Fed. Prac. &

Proc. § 1359. Defendants failed to submit any such evidence—just as they failed to identify the

parties they claim are necessary, show that those individuals were unavailable to be joined, or

make any convincing arguments as to why dismissal would be appropriate under Rule 19(b).

Defendants never even mention Rule 19. Their motion fails.

## V.   PENNSYLVANIA'S ELECTION SCHEME VIOLATES THE CONSTITUTION

### A.   Pennsylvania's Election System Violates the Fundamental Right to Have Votes Be Counted

The Pennsylvania election system severely burdens Plaintiffs' constitutional right to vote,

specifically the right to have their votes counted.

"The right to vote freely for the candidate of one's choice is of the essence of a

democratic society, and any restrictions on that right strike at the heart of representative

government." *Reynolds*, 377 U.S. at 555; *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the

political franchise of voting" is a "fundamental political right, because [it is] preservative of all

rights").[8] This fundamental right to vote applies equally (if not more so) in presidential

---

[8] The right to vote derives from multiple sources in the Constitution. As the Third Circuit explained: "In election cases, equal protection challenges essentially constitute a branch of the associational rights tree." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006) (citation and internal quotation marks omitted).

elections: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental."  *Bush v. Gore*, 531 U.S. at 104.

The right to vote would be meaningless if it meant only the right to *cast* a vote on Election Day, with no assurance that the vote was accurately *counted*.  As the Supreme Court makes clear, "[o]bviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted."  *United States v. Classic*, 313 U.S. 299, 315 (1941); *see also Reynolds*, 377 U.S. at 554 ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, . . . and to have their votes counted.").  If "one's franchise extended only so far as placing one's ballot in the ballot box, . . . the situation of a ballot box subsequently 'falling off of a truck' would be of no constitutional moment.  That is an unacceptable result."  *Hoblock*, 487 F. Supp. 2d at 98.

Admittedly, "not every burden on the right to vote and freedom to associate can offend the Constitution if we are going to have a workable Election Code."  *Const. Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 500 (E.D. Pa. 2015) (citing *Belitskus*, 343 F.3d at 643).  The Third Circuit Court of Appeals described the constitutional test in election cases as follows:

> [The Court's] scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened.  Only after weighing these factors can we decide whether the challenged [action] is unconstitutional.

*Rogers*, 468 F.3d at 194.  Where, as here, the burden on the right to have the votes be counted is "severe," courts must apply strict scrutiny to ensure that Pennsylvania's regulations are "narrowly drawn to advance a state interest of compelling importance."  *Belitskus*, 343 F.3d at 643 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

Here, the burdens placed on Plaintiffs' rights are immense.  Over 70% of Pennsylvania voters are forced to vote on antiquated and insecure DRE machines banned or decertified in multiple states.  Voters using DRE machines have no way to verify that the machine properly recorded their vote, and no way to determine whether the machine was compromised.  There is no process for a candidate to seek any recount, and no feasible process for the voters to obtain a statewide recount.  The Election Code and Defendants have interposed insurmountable barriers: a three-person-per-precinct requirement in a state with over 9,000 precincts, secret and shifting deadlines to request recounts, fees between $450,000 and over $2 million assessed directly to voters rather than to a candidate, and a state court contest process that gives the Commonwealth Court the unfettered ability to impose financially prohibitive bonds on ordinary voters (in the 2016 election, a $1 million bond).

The high fees alone make anything close to a statewide recount practically impossible. *See Belitskus*, 343 F.3d at 636, 647 (invalidating Pennsylvania's filing fees which ranged from $5 to $200 when applied to indigent candidates because no alternative means to ballot access was provided).  In *Belitskus*, the Third Circuit held that a filing fee as low as *five dollars* "clearly violates the Equal Protection Clause." *Id.*  Here the fees collectively are at least $450,000, and including court fees for 9,158 lawsuits, in the millions, in addition to the costs of printing, paying notaries, and travel.  For individuals, the fees are at least $50, and including court fees hundreds of dollars, in addition to the costs of printing, paying notaries, and travel.  The fees and costs alone "clearly violate the Equal Protection Clause." *Id.*

The onerous state court recount process is equally burdensome. *See Marks v. Stinton*, 19 F.3d 873, 879-91 (3d Cir. 1994) (election was fundamentally unfair when election board did not provide adequate opportunity to present evidence of fraud and demanded excessive $50,000

bond, thus denying a "realistic opportunity to fully and fairly litigate constitutional claims in state court").  When combined with the unreliable, vulnerable voting systems and the lack of *any* meaningful way to verify the votes cast, Pennsylvanians effectively face the risk "of a ballot box subsequently 'falling off of a truck,'" without any procedural safeguards to locate those votes— or even notice they are missing.  *Hoblock*, 487 F. Supp. 2d at 98.

Because these burdens are severe, the Court must consider whether the state's interest is of "'compelling importance'" and ensure that Pennsylvania's regulations are "'narrowly drawn'" to advance that interest.  *Belitskus*, 343 F.3d at 643 (quoting *Burdick*, 504 U.S. at 434).  It is unclear what interest the State could have in using antiquated, vulnerable, hackable machines with no paper trail, which nationally-recognized experts agree are a danger to the integrity of the vote in Pennsylvania.  Nor can there be any reasonable state interest in forcing 27,474 voters equally spread out in 9,158 districts to create, print, notarize, and deliver recount requests in 67 counties.  The only apparent interest in such an absurd regime is to deny anyone the ability to request a recount.  And there is certainly no interest in hiding deadlines from voters.

Whatever the State's goals, "there are other, reasonable ways to achieve [Pennsylvania's] goals with a lesser burden on constitutionally protected activity."  *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972).  Pennsylvania "may not choose the way of greater interference."  *Id.*  Here, there is no reason that Pennsylvania cannot follow the lead of its sister states and provide paper verification (preferably by paper ballot, or at least a paper trail of DRE machines), as 33 states do.  Nor is there any reason why it could not allow candidates to seek a statewide recount.  Pennsylvania is one of only ten states nationwide that never permit candidates, as opposed to

voters, to seek a recount.[9]  And even if the State decided for whatever reason to permit only

voters to request recounts, there is absolutely no reason why the process must be so burdensome

and obscure.

As the Supreme Court has held, "in the context of a Presidential election, state-imposed

restrictions implicate a uniquely important national interest" because "the President and the Vice

President of the United States are the only elected officials who represent all the voters in the

Nation."  *Anderson v. Celebreeze*, 460 U.S. 780, 794-95 (1983).  "[T]he State has a less

important interest in regulating Presidential elections than statewide or local elections, because

the outcome of the former will be largely determined by voters beyond the State's boundaries."

*Id.* at 796.

The multiple burdens imposed here are significantly more severe than the burden

imposed by two Pennsylvania election regulations struck down in *Constitution Party v. Cortes*,

116 F. Supp. 3d 486.  In that case, the district court struck down two requirements of the

Pennsylvania election law—one that required minor parties to gather signatures from 2% of

voters to get on the ballot, and another that permitted courts to award costs against the candidate

if objectors successfully challenged the candidate's signatures.  *Id*. at 490-492, 507.  As a result

of those requirements, minor parties had to obtain approximately 16,000 to 67,000 signatures in

five months (depending on the election), spend up to $50,000 to defend the nomination papers,

pay in excess of $80,000 of the challenger's costs, and make a "substantial investment in time

and resources," including the time of 70 volunteers to validate signatures.  *Id*. at 502-503.  While

each provision standing alone might not violate the Constitution, the court found that the

---

[9] *See* Rob Richie & Hayley Smith, FairVote, A Survey and Analysis of Statewide Election Recounts, 2000-2015: An In-Depth Look at Statewide Election Recount Outcomes and Practices in the United States (2016), *available at* https://fairvote.app.box.com/v/recounts.

"combined effect" of the two provisions imposed a "severe burden" and could not withstand strict scrutiny.  *Id*. at 505-507.[10]  The Third Circuit affirmed this "well-reasoned" decision.  *Constitution Party II*, 824 F.3d at 393.

Similarly, even if the many hurdles in front of Plaintiffs did not alone burden the right to vote and have the votes count, their combined effect imposes a severe and unjustified burden.  For this reason, Defendants' attempt to segregate "claims relating to the voting machines" and "claims relating to provisions of Pennsylvania's Election Code" is misguided.  Defs.' Mem. 30, 34.  All of Plaintiffs' claims attack an entire election scheme that, in combination, violates the Constitution.  This scheme begins with unreliable, vulnerable voting systems that lack any voter-verifiable paper trail, compounded by the burdens imposed by the Election Code and by Defendants.

Collectively, these burdens are far greater than in the *Constitution Party* case.  Voters have only weeks, not five months, to mount a massive, statewide recount campaign.  Tens of thousands of people must find notaries, and pay for them.  Those who miss unknowable county board deadlines must pay substantial costs in almost ten thousand court proceedings.  It has never been done.  It is not doable.  Even worse, no county board in the State will let voters or candidates examine these voting systems, and as Defendants admit, Pennsylvania law "simply does not allow voters to petition a court for it."  Defs.' Mem. 32.  These voting systems are a black box, inside which lies Pennsylvanian democracy.  The burden on Pennsylvania voters is immense and unconstitutional.

---

[10] The court also found that the fact that the Pennsylvania Supreme Court had previously upheld the constitutionality of one of the two challenged provisions was not dispositive because "the Pennsylvania high court did not have the benefit of facts developed in this litigation."  *Const. Party*, 116 F. Supp. 3d at 505.

###### B.      The Pennsylvania Election System Is Fundamentally Unfair and Violates Due Process

Pennsylvania's vote tabulation and recount process is so flawed that it also violates the substantive Due Process Clause.  Defendants concede that voters' right to a recount "is provided for by state law."  Defs.' Mem. 34.  Where a state grants voters the right to a recount, it is "clear that the State could not use arbitrary or unreasonable procedural rules to make that right a nullity."  *Stein*, 2016 WL 7131508, at *3.

There can be little dispute that the election regime in Pennsylvania imposes arbitrary and unreasonable hurdles that make the right to a recount "a nullity" in any statewide race.  One need only consider the predicament of Pennsylvania voter Kimberly Kupka.  Because she lives in Montgomery County, Kupka was forced to vote on a DRE machine.  On November 8, 2016, Kupka went to the polls and voted for President, but her vote almost certainly did not count.  Instead, it was counted as a "no vote," cast for no one.  Nor could she verify that her voted counted.  Like millions of Pennsylvanians, she could neither fill out a paper ballot nor receive any paper verification of her vote.  Faced with the upsetting realization that her vote likely did not count, she sought to recanvass voting machines in her election district.  But Kupka did not and could not know the deadline to seek a recanvass of DRE machines, because deadlines were kept secret from voters.  The Montgomery County Board of Elections thought the deadline had passed when it had not.  Even Defendant Marks did not know the deadline.  In any event, a recanvass would have been virtually meaningless, because it involves no examination of the election software, and does nothing to determine for whom Kupka and others *actually* cast a vote.  Her attempts to seek a more meaningful remedy—a forensic examination of the DRE voting system—were rejected by the state courts, and now Defendants concede there is no such right under Pennsylvania law.  *See* Am. Compl. Ex. 21.

What could Kupka do to vindicate her constitutional right to have her 2016 election vote count? *Nothing*. The same is true for Howe, and for Knight, and for thousands of Pennsylvania voters. Their votes did not count, and Defendants offer no response other than "tough luck."

From the perspective of all Pennsylvania voters, these are just some of the "arbitrary or unreasonable procedural rules" that individually, and certainly in combination, make the right to a statewide recount "a nullity." *Id*. *All* are undisputed:

- The complete lack of notice to voters as to when to seek recounts before county boards. The deadlines change from county to county, from election to election, are not published, and are unknown even to the Secretary of State. Notice is perhaps the most fundamental requirement of Due Process. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Though they have had many opportunities to do so, Defendants failed to offer any excuse or justification for this glaring procedural unfairness. It is indefensible. For this reason alone, Defendants violate the Constitution.

- The requirement that three voters in each of 9,158 election districts sign, notarize, and deliver affidavits seeking recounts/recanvassing to county boards or courts, within weeks of Election Day. Defendants have never disputed that this is an impossible burden.

- For court-ordered recounts, the requirement to file over 9,000 separate lawsuits. Again, an impossible and absurd burden.

- For court-ordered recounts, the apparent Pennsylvania rule that if even one recount petition is missing in any *one* of 9,158 election districts, *all* of the other recount petitions filed throughout the Commonwealth are null and void. PI Mem. 5.

- For court-ordered recounts, the requirement to pay $50 (or a $100 bond), in addition to court filing fees of hundreds of dollars, for every single one of the over 9,000 separate lawsuits required, making the recount process prohibitively expensive (between $450,000 and over $2 million).

The state court contest process is equally arbitrary and unreasonable. As Defendants concede, it is the only procedure under Pennsylvania law to challenge the outcome of an election. Yet the Election Code requires election contests to be filed *before elections are even certified*, before recounts and recanvassing are complete, and in some cases, before they have

even begun.  Voters are forced to challenge an election outcome before there is an election outcome.

It is also undisputed that the Election Code gives the Commonwealth Court the unfettered ability to impose any bond, no matter how financially punishing, on ordinary voters who file an election contest.  In the 2016 election, the Commonwealth Court imposed a $1 million bond, but there was nothing to prevent the Court from imposing a $10 million, or a $100 million bond.  Just as in *Constitution Party II*, in which the state court had wide discretion to impose costs on candidates, here the state court has apparently unlimited discretion to impose bonds on voters.  In both cases, the scheme is unconstitutional.

The statewide recount procedure in Pennsylvania is a sham.  Not once have Defendants claimed a statewide recount is even *possible*.  The contest process is also unreasonable and unfair.  If ever a state election regime were "arbitrary or unreasonable," it is this one.

Rather than defend the indefensible, Defendants advance a hodge-podge of irrelevant or misleading arguments.  They claim that *Banfield v. Cortés*, 631 Pa. 229 (2015), somehow controls, but a federal court applying the United States Constitution is not bound by a state court applying the state constitution.  In any event, *Banfield* dealt with a narrow attack on the integrity of certain voting machines, not the cumulative, unconstitutional effect of the entire Pennsylvania election regime (of which the unreliable, vulnerable machines are only one part).  As the Third Circuit has explained, even if one voting provision is constitutional, it can become unconstitutional in combination with other voting provisions.  This was exactly the result in *Constitution Party II*.  There, even though a signature requirement was upheld, the signature requirement "in combination with" a provision allowing costs as part of ballot challenges was unconstitutional.  "[I]t is not *solely* the signature requirement nor *solely* the challenge provision

30

that creates the unconstitutional burden . . . it is the interaction of both provisions that causes problems." 824 F.3d at 393 (emphasis in original). *Banfield* did not deal with the overall election scheme; it is of little relevance here.

Defendants next claim, without citation to anything, that "Plaintiffs' argument means that . . . any voter could demand a state-wide recount simply by filing a petition in a single precinct." Defs.' Mem. 34. Plaintiffs argue nothing of the sort. Of course the legislature can engage in "line-drawing," *id.* at 35 n.24, but the lines the legislature draws cannot be unreasonable, arbitrary, punishing, unfair, and unconstitutional. May the legislature require some indicia of statewide mobilization to trigger a statewide recount? Yes. May the legislature require over 27,000 people, evenly distributed in 9,158 election districts, to print, notarize and deliver affidavits to county boards as far as hundreds of miles away, within mysterious and shifting deadlines unknown even to the Secretary of the Commonwealth, apparently within weeks of an election? No. May the legislature require over 27,000 people, evenly distributed in 9,158 election districts, to print, notarize and deliver affidavits to county clerks, *and* file 9,158 lawsuits, *and* pay millions of dollars in fees, all within a period of weeks, just to trigger a statewide recount? Of course not. The legislature may draw lines, but not when those lines make a complete mockery of Due Process, nor when the Election Code's promise of a right to recount is the promise to Sisyphus that he will roll the boulder to the summit. There is nothing remotely "reasonable" about this regime. *Cf. Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003) (cited by Defendants).

Finally, Defendants advance a new argument, citing 25 P.S. § 3031.5 as the panacea for all of their election ills. Their faith in this single provision is misplaced. First, it does nothing to fix the illusory recount process, as it allows for a reexamination of only a given voting system

and not the specific machines actually used in an election.  25 P.S. § 3031.5(a) (authorizing

examination of voting system).   Second, it does nothing to address the unfair contest process.

Third, it gives voters no way to verify *their* votes were counted correctly, or at all.  Fourth, it

does not even allow voters to test machines or voting systems *actually used in the election*.

Neither Plaintiffs nor any other Pennsylvania voter can now (or could ever) use this provision to

determine whether the voting machines or systems used in the 2016 election worked or failed, or

whether they were hacked or not.  Fifth, it does not provide for a forensic examination.  Rather,

the Secretary must merely determine whether the system "can be safely used by voters at

elections."  *Id.* § 3031.5(b).  The method of the examination is entirely within the Secretary's

discretion.  *See Banfield*, 631 Pa. at 263.  There is no review or redetermination of any actual

votes cast.

Here, the raft of evidence that the machines are antiquated and vulnerable, the lack of a

paper trail, a sham recount process, a total lack of any ability to meaningfully examine DRE

voting systems anywhere in the Commonwealth, and an unfair contest process, all create a

fundamentally unfair election system.  "Confidence in the integrity of our electoral processes is

essential to the functioning of our participatory democracy."  *Purcell v. Gonzalez,* 549 U.S. 1, 4

(2006).  The Court should deny Defendants' motion and grant Plaintiffs' cross-motion.

## VI.   DEFENDANTS' ARGUMENTS ABOUT REMEDIES ARE PREMATURE

Defendants make extraneous arguments, apparently not connected to their motion to

dismiss, that Plaintiffs are not entitled to a permanent injunction or declaratory judgment.  These

arguments are irrelevant to both Defendants' motion and Plaintiffs' cross-motion and are

premature.

First, ruling on the appropriateness of a permanent injunction—or the suitability of any

remedy—is best deferred until after liability has been determined.  *See, e.g.*, *AstraZeneca AB v.*

*Mut. Pharm. Co.*, No. 00-CV-4731, 2003 WL 22794868, at *1 (E.D. Pa. Nov. 12, 2003) (once

liability was established, court may address plaintiff's motion for permanent injunction), *appeal*

*dismissed as premature*, 89 F. App'x 239 (Fed. Cir. 2004).  Indeed, before granting a permanent

injunction the court must first find that the plaintiff has suffered an irreparable injury—a finding

a court cannot make at the motion to dismiss stage—and that remedies available at law are

inadequate to compensate for that injury—a finding that would be premature even if summary

judgment on liability were granted now.  *See eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388,

391 (2006) (setting out four-factor test).  If and when Defendants have been found liable in this

case, the Court can determine how best to tailor any appropriate remedies.  The time for that

determination has not yet arrived.

Defendants' substantive objections are not only premature, but also make little sense.

They accuse Plaintiffs of making "a thinly disguised invitation for the Court to rewrite the

statute."  Defs.' Mem. 39.  This is an odd charge: every constitutional challenge to a state law

asks the courts to strike it down or excise the unconstitutional portions.  Courts are used to facing

this challenge and routinely order injunctive relief, including in election cases.  *See, e.g.*,

*Constitution Party II*, 824 F.3d at 399 ("Our holding, of course, does not prevent the legislature

from amending its election code to create new, constitutional[] provisions that regulate access to

the general election ballot.  Nor do we express any view as to whether the Commonwealth could

choose to enforce only one or the other provision . . . .  We simply hold that what the

Commonwealth *cannot* do is avoid the clear import of the District Court's order . . . : that [25 Pa.

Stat. Ann.] §§ 2911(b) and 2937, when enforced together, are unconstitutional as applied to the

[Plaintiffs]."); *Belitskus*, 343 F.3d 632 (striking down election provision); *White v. Register*, 412

U.S. 755, 765 (1973) (invalidating certain multimember districts in Texas as violating the equal

protection clause); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 442 (2006) (declaring that multiple Texas legislative districts "will have to be redrawn"); *Whitcomb v. Chavis*, 403 U.S. 124, 162 (1971) (plurality opinion) (district court properly ordered statewide redistricting).

Defendants' argument that declaratory judgment is unavailable is similarly misplaced. They rely on two cases that simply stand for the proposition that declaratory judgment is unavailable where injunctive relief is statutorily barred, *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293 (1943), or where "deeply rooted and long-settled principles of equity" bar federal equitable intervention in state criminal proceedings, *Samuels v. Mackell*, 401 U.S. 66, 72 (1971).  Neither situation is applicable here, where Plaintiffs bring a standard civil rights action challenging the constitutionality of state laws.  Adjudicating these claims is what federal courts routinely do.

**CONCLUSION**

Defendants argue that this Court is powerless to address an election system that forces Pennsylvania voters to vote on unreliable and vulnerable machines that malfunction on Election Day, then denies them the ability to ensure their votes counted or to pursue the recounts that state law promises them.  This system violates Plaintiffs' constitutional rights, as Plaintiffs have sufficiently alleged in their Amended Complaint.  Defendants' motion should be denied.  And because Plaintiffs have presented uncontroverted evidence that Pennsylvania's election system violates their constitutional rights, the Court should grant Plaintiffs summary judgment on liability.

Dated: March 29, 2017

                                     MONTGOMERY McCRACKEN WALKER &
RHOADS LLP

Gregory M. Harvey
PA Attorney ID 4445
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Phone: 215-772-7684
Fax: 215-772-7620
Email: gharvey@mmwr.com


EMERY CELLI BRINCKERHOFF & ABADY
LLP

_____/s/_____
Ilann M. Maazel*
Andrew G. Celli, Jr.*
Alison E. Frick*
Douglas E. Lieb*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbalaw.com

* *Admitted pro hac vice*