### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JILL STEIN, et al.,** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **Civ. No. 16-6287** |
| | : | |
| **PEDRO A. CORTÉS,** | : | |
| *in his official capacity as Secretary of the* | : | |
| *Commonwealth of Pennsylvania*, **et al.,** | : | |
| **Defendants.** | : | |

## O R D E R

On December 5, 2016, Plaintiffs Jill Stein and Randall Reitz brought this challenge to Pennsylvania's tabulation of votes in the 2016 Presidential election.  Plaintiffs alleged that because Pennsylvania's voting machines were susceptible to hacking, and its recount provisions difficult to invoke, the Commonwealth had unconstitutionally abridged the right to vote.  They asked me to order an immediate recount of all paper ballots cast in the 2016 Presidential Election and a forensic review of Pennsylvania's electronic voting machine systems.  On December 12, 2016, I denied their request.

Dr. Stein and Mr. Reitz—now joined by four Pennsylvania voters—subsequently filed the instant Amended Complaint.  Plaintiffs renew their request for a forensic review of Pennsylvania's electronic voting machine systems, and also ask me to enjoin as unconstitutional the recount provisions of the Pennsylvania Election Code.

Defendants have moved to dismiss Plaintiff's Amended Complaint; Plaintiffs have cross-moved for summary judgment.  (<u>See</u> Doc. Nos. 74, 75.)  As set out below, I will grant Defendant's Motion in part and deny Plaintiff's cross-motion.

## I.      BACKGROUND

I set forth the factual and procedural background of this dispute in my December 12, 2016 Memorandum denying Plaintiffs' preliminary injunction motion.  (See PI Mem., Doc. No. 55.)  I will here recite only those facts germane to the Motions at issue.

### A.  The 2016 Election and State Recount Efforts

On November 8, 2016, the United States held its presidential election.  Donald Trump won a majority of the popular vote both in Pennsylvania and in states comprising a majority of the Electoral College.  Dr. Stein, the Green Party's Presidential nominee, finished fourth both in Pennsylvania and nationally.  See Unofficial Returns, Pa. Dep't of State, http://www.electionreturns.pa.gov (last visited June 19, 2017).

Approximately three weeks after Election Day, Dr. Stein initiated efforts to seek recounts in Pennsylvania, Michigan, and Wisconsin, the three states won by President Trump with the closest reported popular vote counts.  (See, e.g., Am. Compl., ¶¶ 91–92, Doc. No. 71); see also Stein v. Thomas, No. 16-14233 (E.D. Mich. 2016); Great Am. PAC v. Wis. Election Comm'n, No. 16-795 (W.D. Wis. 2016); Fed. Election Comm'n, OFFICIAL 2016 PRESIDENTIAL GENERAL ELECTION RESULTS (Jan. 30, 2017), available at https://transition.fec.gov/pubrec/fe2016/2016presgeresults.pdf.  Dr. Stein and her supporters alleged that because Direct Recording Electronic (DRE) voting machines are susceptible to cyberattacks, recounts were necessary to confirm that the reported vote totals were accurate.  (See., e.g., Am. Compl. ¶¶ 1–5, Doc. No. 71.)  They did not allege that any cyberattacks actually took place or that any DRE machines had been compromised.

In Pennsylvania, state officials must conduct a recount at the public's expense if the unofficial returns show that the difference between the winning and second-place presidential

candidate is less than 0.5%.  See 25 P.S. § 3154(g)(1)(i).  Because President Trump defeated

Secretary Hillary Clinton by more than 0.5% in Pennsylvania, a recount thus was not mandatory.

See Unofficial Returns, supra.  Pennsylvania law otherwise offers three avenues by which voters

may challenge election results: the Commonwealth Court election contest, County Board

petitions, or Common Pleas Court petitions.  As I previously explained:

> To initiate an election contest, one hundred or more voters must file a petition in
> the Pennsylvania Commonwealth Court within twenty days after Election Day
> and supplement that petition with at least five affidavits that the "election was
> illegal and the return thereof not correct." 25 P.S. §§ 3456–3457.  The petitioners
> must also post a bond "conditioned for the payment of all costs which may accrue
> in said contested nomination or election proceeding." Id. § 3459. . . .

> [V]oters may [also] petition their County Board of Elections.  See id. § 3154(e).
> County Board petitions must be supported by affidavits from three voters in an
> individual precinct that fraud or error not apparent on the face of the returns has
> occurred.  See id.  The petition must be filed "prior to the completion of the
> computation of all of the returns for the county." Id.  If the Board rejects the
> request for recount or recanvass, the aggrieved petitioners may appeal the Board's
> decision to the Common Pleas Court.  See id. § 3157(a); Rinaldi v. Ferrett, 941
> A.2d 73, 76–77 (Pa. Commw. Ct. 2007).

> [Finally], voters may petition the Common Pleas Court for a recount or recanvass.
> See 25 P.S. §§ 3261–3262.  Three voters in the same precinct must verify that
> fraud or error not apparent from the returns was committed in the vote tabulation.
> See id. § 3261(a).  These petitioners must remit a $50 cash payment or a $100
> bond.  See id. § 3262(b.2).  Unless the petitioners plead fraud or error with
> particularity and offer prima facie evidence supporting that allegation, they must
> also file qualified petitions in every single precinct in which ballots were cast for
> the office in question.  See id. § 3263(a)(1)(i)–(ii).  To contest a statewide election
> in the Common Pleas Court without evidence of fraud, three petitioners must file
> affidavits from voters in over nine thousand precincts.  (See Pls.' Br. 12–13, Doc.
> No. 5.)  These petitions must be filed within five days after completion of the
> County Board's computation of the vote.  See 25 P.S. § 3263(a)(1); Rinaldi, 941
> A.2d at 77.

(PI Mem. 4–5, Doc. No. 55.)

Dr. Stein was unsuccessful in her attempts simultaneously to pursue all three state-law

recount processes.  (See id. at 5–7; see also Am. Compl. ¶ 97, Doc. No. 71 ("There would have

been no way for voters to file these petitions without the assistance of professional legal counsel provided by the Stein campaign."); Am. Compl. Ex. 1, ¶ 21, Doc. No. 71-1 ("Jill Stein's ability to raise funds adequate to pay election lawyers to sort out the law over several days and draft an affidavit for voters to use was essential to making voter initiated recounts possible."); Am. Compl. Ex. 31, at 7, Doc. No. 71-31 (in Montgomery County, "Miss Stein actually paid those fees on these petitioners' behalf").)

Efforts to invoke the County Board and Common Pleas recount processes largely failed. As alleged, because Pennsylvania has over 9,000 election districts, voters were unable to initiate County Board or Common Pleas recounts in every district before the time to file such petitions expired.  (See Am. Compl. ¶¶ 96–97, 111–113, Doc. No. 71.)  Furthermore, the recanvasses of DRE machines that voters successfully obtained did not include the forensic review of election management software that Dr. Stein alleged was necessary to determine whether any cyberattacks actually occurred.  (Id. ¶ 56.)

Dr. Stein had initial success with the contest process.  On November 28, 2016, one hundred petitioners organized by Dr. Stein and represented by her counsel filed a contest petition in Commonwealth Court.  (Id. Ex. 37, Doc. No. 71-40.)  After the Court set a December 5, 2016 hearing, the contest petitioners asked to continue the hearing until December 8, so that they could obtain evidence of DRE machine hacking.  (Id. Ex. 38, Doc. No. 71-41.)  The Court refused the continuance, requiring the contest petitioners to post $1,000,000 bond.  (Id. Ex. 39, Doc. No. 71-42.)   The Court indicated that it would modify the bond for "good cause shown" and would not require the bond to be posted until the hearing was complete.  (Id.)  In response, the contest petitioners withdrew their petition, claiming that, as "regular citizens of ordinary means," they could not afford to post the bond.  (Id. Ex. 40, Doc. No. 71-43.)  During the

subsequent hearing before me, Plaintiffs' Counsel conceded that the Court's bond requirement was effectively a denial of the contest petition.  (Hr'g Tr. 31:14–22, Doc. No. 57.)

### B.  The Instant Suit

On December 5, 2016, Dr. Stein and Mr. Reitz brought suit and, on December 6, sought a preliminary injunction.  (See Doc. Nos. 1, 4.)  Alleging that Pennsylvania's use of "hackable" DRE machines and its "labyrinthine" recount procedures had together unconstitutionally infringed upon their right to vote, Plaintiffs asked me to order a recount of all paper ballots cast for President in Pennsylvania and a forensic examination of a reasonable sample of the central computers for DRE voting machines.  (See Doc. No. 4.)  Over the next two days, I received briefing from Plaintiffs, Defendants Jonathan Marks and Pedro Cortés, Intervenors, and various amici.  I conducted a preliminary injunction hearing on the afternoon of Friday, December 9, 2016.  (See Doc. Nos. 5–14, 34–43, 46, 58.)

On the morning of Monday, December 12, 2016, I denied preliminary injunctive relief on five alternative grounds:  (1) Plaintiffs lacked standing to pursue their claims; (2) the Rooker-Feldman doctrine divested this Court of jurisdiction; (3) Younger v. Harris required me to abstain until state court recount proceedings concluded; (4) Plaintiffs had waited too long to seek relief; and (5) Plaintiffs had failed to satisfy the requirements for obtaining a preliminary injunction.  (PI Mem. 12–31, Doc. No. 55.)  Plaintiffs did not appeal that decision.

The Intervenors then withdrew.  (Doc. Nos. 66, 67.)  Pennsylvania certified its electors, who cast valid votes in the Electoral College; and, on January 20, 2017, President Trump was sworn into office.

On January 10, 2017, Defendants moved to dismiss.  (Doc. No. 68.)  On February 14, 2017, Plaintiffs filed the instant Amended Complaint in response.  (Doc. Nos. 77, 78.)

### C.  The Instant Complaint

On February 14, 2017, Plaintiffs filed their Amended Complaint and exhibits, which are substantially the same as the initial Complaint and the evidence Plaintiffs presented to support their preliminary injunction motion.  (Compare Doc. Nos. 71-1–71-53, 73, 73-1–73-4, with Doc. Nos. 8–13.)  Plaintiffs allege that 85% of Pennsylvania voters cast their ballots on six DRE voting machine models that are "unreliable, vulnerable to interference and error, and susceptible to hacking."  (Am. Compl. ¶¶ 24–56, Doc. No. 71.)  Because these DRE machines do not generate "paper trails" of votes cast, election officials and voters cannot ensure that the machines properly recorded votes.  (See id. ¶ 25.)  The remaining 15% of Pennsylvania voters cast paper ballots, which are then tabulated using optical scan machines that are also purportedly susceptible to hacking and error.  (See id. ¶¶ 24, 30.)

Once again, Plaintiffs do not allege that any DRE machine or optical scan machine in Pennsylvania was actually hacked.

Plaintiffs charge that the Commonwealth's "recount process is byzantine, opaque, inconsistently administered, and hopelessly confusing even to Defendants, the officials in charge."  (Id. ¶ 58.)  They believe that the time limits, fees, voter residency requirements, and petition requirements operate in tandem to make Common Pleas or County Board recounts impossible for voters to challenge state-wide election outcomes.   (See id. ¶¶ 59–61, 68–74); 25 P.S. §§ 3154, 3261–3263.   Moreover, according to Plaintiffs, various County Boards inconsistently enforced the time limits for the filing of recount petitions, and failed to provide notice as to when such petitions must be filed.  (See Am. Compl. ¶¶ 62–67, Doc. No. 71.)  Plaintiffs received conflicting instructions from state officials and "could find no consistent guidance regarding when each county had computed its vote and when the deadlines to file

recount petitions would expire." (Id. ¶¶ 92–95, 98–100.) Moreover, Defendant Marks—the Commissioner of the Commonwealth's Bureau of Commissions, Elections, and Legislation—allegedly gave the County Boards guidance as to whether to accept County Board petitions that purportedly was inconsistent with Pennsylvania law. (Id. ¶¶ 17, 102–104.)

Plaintiffs thus could not initiate a recount or recanvass in the majority of the Commonwealth's sixty-seven counties. (Id. ¶¶ 105–114.) Even recounts and recanvasses that were granted, however, "reveal[ed] nothing" because they were simply reviews of images retrieved from the same machines that might have been hacked. (Id. ¶ 56.)

Plaintiffs also allege that the Commonwealth Court contest proceeding is not an adequate method of obtaining a recount because it must be filed within 20 days of the election, "before there is any meaningful opportunity to recount the ballots, recanvass the machines, or examine the voting system," unless the Commonwealth Court agrees to delay the contest. (Id. ¶ 78.) Further, Pennsylvania law "gives the Commonwealth Court unfettered discretion to impose punishing and financially-prohibitive bonds on ordinary voters, effectively defeating contest petitions irrespective of the merits." (Id. ¶¶ 77–80, 115); 25 P.S. §§ 3456–3457, 3459.

Dr. Stein and Mr. Reitz seek to add as Plaintiffs four Montgomery County voters—Robin Howe, Shannon Knight, Emily Cook, and Kimberly Kupka—three of whom had submitted declarations in support of the unsuccessful preliminary injunction motion. (Am. Compl. ¶¶ 11–15, Doc. No. 71; compare Doc. Nos. 9-19–9-21.) As alleged, when Ms. Howe, Ms. Knight, and Ms. Kupka attempted to cast their ballots on Montgomery County DRE machines, a box with the words "[n]o vote," next to a line stating "I do not want to vote for any office, candidate or issue," lit up, causing each to conclude that her vote was not recorded. (Am. Compl. ¶¶ 83–86, Doc. No. 71.) Montgomery County election returns indicate that voters cast 4,087 of these "no votes,"

purportedly demonstrating that some of Montgomery County's DRE machines failed.  (Id. ¶¶ 87–88 & Ex. 46, Doc. No. 71-46.)   Although Ms. Howe, Ms. Knight, and Ms. Kupka did not attempt to vote for Dr. Stein, Plaintiffs nonetheless allege that some of those 4,087 voters who cast "no votes" "almost certain[ly]" attempted to cast their ballots for Dr. Stein.  (Id. ¶ 89.) Plaintiffs also allege irregularities respecting the casting of absentee ballots.  (Id. ¶ 82.)

Ms. Cook voted for Dr. Stein, but does not allege that her vote was uncounted.  (Id. ¶ 13.)

Plaintiffs allege that Defendants have violated the First Amendment, the Due Process Clause, and the Equal Protection Clause.  (Id. ¶¶ 118–134); 42 U.S.C. § 1983.  They ask me to declare that Defendants violated the First and Fourteenth Amendments, to declare the "applicable sections of the Pennsylvania Election Code" unconstitutional both facially and as applied to the 2016 Presidential Election, to enjoin Defendants from enforcing those provisions in future statewide elections, and to enjoin Defendants to allow Plaintiffs to conduct a forensic examination of Pennsylvania's electronic voting machines and systems.  (Am. Compl., Prayer for Relief, ¶¶ 1–8, Doc. No. 71.)

On March 8, 2017, Defendants moved to dismiss, arguing that Plaintiffs lacked standing, that they had failed to join necessary parties, and that they had failed to state a claim.  (Defs.' Br., Doc. No. 74.)   On March 29, 2017, Plaintiffs responded and cross-moved for summary judgment.  (Pls.' Resp., Doc. No. 75-1.)   I denied Defendants' Motion without prejudice and ordered the Parties to brief the question of whether Plaintiffs' claims had become moot.  (Doc. No. 81.)   On February 9, 2018, Defendants renewed their Motion to dismiss, arguing that Plaintiffs lacked standing, failed to state a viable claim for relief, and that Plaintiffs' claims were moot.  (Doc. No. 87.)   On February 23, 2018, Plaintiffs again responded and cross-moved for

summary judgment.  (Doc. No. 88, 89.)  The Parties have fully briefed both Motions.  (<u>See</u> Doc. Nos. 76, 78–80, 87, 88, 89.)

## II.     NEW PLAINTIFFS

Dr. Stein and Mr. Reitz may amend their Complaint to add new Plaintiffs.  <u>Compare County of Riverside v. McLaughlin</u>, 500 U.S. 44, 48–49 (1991) (plaintiffs added to complaint by subsequent amendment had standing to pursue § 1983 claims even though initial plaintiffs did not have standing), <u>with</u> <u>Pressroom Union-Printers League Income Sec. Fund</u>, 700 F.2d 889, 893 (2d Cir. 1983) ("The longstanding and clear rule is that 'if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim.'" (quoting <u>Pianta v. H.M. Reich Co.</u>, 77 F.2d 888, 890 (2d Cir. 1935))).  Even assuming that there is a logical connection between the standing of an original plaintiff and the joinder of additional parties, Dr. Stein and Mr. Reitz amended their Complaint, and, as I will explain, have standing to bring some of their claims.

On August 29, 2018, Ms. Kupka voluntarily withdrew her claims.  (Doc. No. 95.)  <u>See</u> Fed. R. Civ. P. 41(a)(1)(A)(i).

## III.    LEGAL STANDARDS

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  <u>Ballentine v. United States</u>, 486 F.3d 806, 810 (3d Cir. 2007).  Because Defendants have moved to dismiss for lack of standing before answering and have not otherwise contested the factual allegations of the Amended Complaint in this Motion, their Motion is a facial attack.  <u>See</u> <u>Const. Party of Pa. v. Aichele</u>, 757 F.3d 347, 357–58 (3d Cir. 2014).  When considering a facial attack, I "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most

favorable to the plaintiff."  In re Schering Plough Corp., 678 F.3d 235, 243 (3d Cir. 2012)).

In deciding a motion to dismiss brought pursuant to Rule 12(b)(6), I must accept factual allegations, and disregard legal conclusions or mere recitations of the elements.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  I must then determine whether the facts alleged make out a "plausible" claim.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The burden is on Defendants to show that the Plaintiff has failed to allege facts sufficiently detailed to "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).  In resolving Defendants' Motion, I may consider the exhibits to the Amended Complaint.  See, e.g., Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp., 823 F.3d 184, 189 (3d Cir. 2016).

In evaluating a motion to dismiss for failure to join a party pursuant to Rule 12(b)(7), I may consider "relevant, extra-pleading evidence," but "must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." Cummings v. Allstate Ins. Co., No. 11-2691, 2011 WL 6779321, at *3 (E.D. Pa. Dec. 27, 2011) (collecting cases).

## IV.    INDISPENSABLE PARTIES

Defendants argue that Plaintiffs have failed to join indispensable parties:  the county officials with the authority to order the forensic review that Plaintiffs seek.  (Defs.' Br. at 28–30.) Under Rule 19, I may dismiss a case only if the missing party is indispensable and cannot feasibly be joined.  See Fed. R. Civ. P. 19(b); Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007); Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 402 (3d Cir. 1993).  Even if the county officials are necessary parties here, Defendants have

10

not articulated why their joinder would not be feasible.  I thus will deny their Motion to dismiss on these grounds.

## V.    STANDING

To establish Article III standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Aichele, 757 F.3d at 360 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

In my December 12 Memorandum, I concluded that Dr. Stein and Mr. Reitz lacked standing for three reasons.  First, they had failed to allege that they had suffered any cognizable injury-in-fact:  Dr. Stein was not a Commonwealth voter and did not allege a recount would change the vote total in her favor; Mr. Reitz did not allege that his vote was miscounted.  (PI Mem. 13, Doc. No. 55.)  Second, to the extent that they sought "to protect the rights of all Pennsylvania voters," their claim was a non-cognizable generalized grievance.  (Id. at 13–15.) Third, the hand recount of paper ballots and forensic examination of election management systems that Plaintiffs requested could not redress Dr. Stein's or Mr. Reitz's purported injuries. (Id. at 15.)

In their Amended Complaint, Plaintiffs have made new allegations that they believe afford them standing.  I conclude that Plaintiffs have standing to bring some of their claims.

### A.  Dr. Stein

#### *Counting Every Vote*

Dr. Stein first argues that she has standing because "[e]very vote cast for [her] that goes

uncounted constitutes an injury to [Dr.] Stein herself" that could be redressed by a favorable decision.  (See Pls.' Resp. at 7–10.)  Significantly, Dr. Stein does not allege that a recount could result in her winning the Pennsylvania vote in the 2016 election.  Indeed, Dr. Stein does not even allege that a recount would increase her Pennsylvania vote total *vis-à-vis* her competitors. Accordingly, the cognizability of this alleged injury depends on whether she has an independent interest in counting every vote cast for her, regardless of whether she wins or loses.

There is no law even suggesting that a candidate has suffered a cognizable injury merely because the Commonwealth did not count a vote that was cast for her, let alone that an unsuccessful candidate could trigger a state-wide recount—with its resulting uncertainty and cost—simply to determine if her votes were accurately counted.  In each of the cases on which Dr. Stein relies, the plaintiff-candidate had standing to challenge an election because she alleged something more than this retrospective desire to count single votes in a concededly losing cause. Indeed, in each case, the candidate alleged an actual wrong that might cause an actual competitive injury.  For example, a plaintiff-candidate may obtain standing by alleging that a challenged election regulation disproportionately harms her vis-à-vis her competitors:  where a competitor has violated an election regulation, that competitor may siphon votes that would otherwise be cast in favor of the plaintiff-candidate.  See Schultz v. Williams, 44 F.3d 48, 52–53 (2d Cir. 1994) (candidate had standing to challenge opposing candidate's illegal placement on ballot because "competition on the ballot from candidates" could "result[ in] a loss of votes"); see also Texas Dem. Party v. Benkiser, 459 F.3d 582, 587, 587 n.4 (5th Cir. 2006) (party had standing to challenge state's decision denying its candidate a position on the ballot because of "harm to its election prospects") (collecting cases); Drake v. Obama, 664 F.3d 774, 784 (9th Cir. 2011) (acknowledging viability of competitor standing, but concluding that opposing candidates

no longer had competitor standing because election had concluded before they filed suit).

Similarly, a plaintiff-candidate may obtain standing by alleging that she was unlawfully forbidden from appearing on the ballot.  See Belitskus v. Pizzingrilli, 343 F.3d 632, 639–41 (3d Cir. 2003) (indigent candidate had standing to challenge Pennsylvania ballot access fee requirements); Biener v. Calio, 361 F.3d 206, 211 (3d Cir. 2004) (candidate had standing to challenge Delaware ballot access fee requirements); see also Aichele, 757 F.3d at 361–63 (political parties had standing to challenge Pennsylvania ballot access laws); Nader v. Blackwell, 545 F.3d 459, 471 (6th Cir. 2008) ("Removal from the ballot surely constitutes a cognizable injury-in-fact.").  This has a direct and obvious effect on the number of votes that candidate might receive vis-à-vis her competitors.  See Gottlieb v. Fed. Election Comm'n, 143 F.3d 618, 622 (D.C. Cir. 1998) ("Ballot eligibility requirements . . . prevent candidates from appearing on the ballot, directly impinging on the voters' ability to support that candidate.").

Here, Dr. Stein unquestionably appeared on the 2016 Pennsylvania ballot and does not allege that the purported defects in the Montgomery County voting machines (or elsewhere) harmed her percentage vote total as compared to her competitors.  Dr. Stein has also alleged more direct injuries arising from Pennsylvania's alleged failure to count votes:  i.e., that her party receives certain state-law benefits if it wins two percent of the vote in a statewide race, and that a candidate who receives five percent of the vote qualifies her party for federal matching funds.  These allegations also do not make out standing because Dr. Stein has not alleged that her percentage vote total would be at all affected had the Commonwealth counted all the purportedly uncounted votes.  (See Pls. Resp. at 9–10); 26 U.S.C. § 9004(a)(2)(B); 25 P.S. § 2831; Gottlieb, 143 F.3d at 622 (voters and opposing candidates lacked standing to challenge campaign's purportedly improper use of donations to fund compliance and legal activities); cf. Schultz, 44

13

F.3d at 53 (candidate had standing under regulatory system in which "a minority [that] fails to poll enough votes [counted in the absolute sense] in the gubernatorial election . . . loses its place on the ballot").

In sum, the Commonwealth's purported failure to count an unknown number of votes that may or may not have been cast for Dr. Stein alone is a speculative injury that does not confer standing upon her.

### The Competitive Environment

Dr. Stein also argues that she has suffered injury-in-fact because she has been forced to compete in an "illegally structured campaign environment," and thus is not required to show that the voting machines affected her chances at victory.  (Pls.' Resp. at 9.)  Dr. Stein relies on the D.C. Circuit's decisions in *Shays v. Federal Election Commission* 414 F.3d 76 (D.C. Cir. 2005), and *LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011).

In *Shays*, members of the United States House of Representatives alleged that they had standing to challenge FEC campaign finance regulations that illegally resurrected "soft money" and "sham issue ad" practices prohibited by the Bipartisan Campaign Reform Act of 2002, thus "injur[ing] . . . their interest (protected by that statute) in seeking reelection through contests untainted by BCRA-banned practices.  Shays, 414 F.3d at 79, 85.  The FEC argued that the Representatives did not have standing because:  (1) they had not shown "specific use of the rules by their political opponent"; and (2) "the rules grant [the Representatives] the same legal options as their opponents."  Id. at 84.  The Representatives responded that the regulations created a "strong risk that unregulated soft money contributions will again be used in an attempt to influence federal elections in which [they are] candidate[s]," and "open [them] to attack, during critical time periods just before the primary and general elections, in broadcast advertising

14

campaigns mounted by groups seeking to evade" the BCRA.  Id.

The *Shays* Court held that "illegal structuring of a competitive environment . . . [is] sufficient to support Article III standing."  Id. at 85.  Although the regulations "create[d] neither more nor different rival candidates" and did not give the Representatives' rivals "special benefits," the Court ruled that the Representatives "face[d] *intensified* competition" because they "must anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow," thus "fundamentally alter[ing] the environment in which rival parties defend their concrete interests (e.g., their interest in . . . winning reelection)."  Id. at 86.  Because it would be unreasonable to "require candidates to establish that but for certain campaign finance rules they could have won an election," the Court held that the Representatives could "challenge the FEC subversion of BCRA's guarantees without 'establish[ing] with any certainty' . . . that the challenged rules will disadvantage their reelection campaigns."  Id. at 91 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)) (alteration in original).  "Because BCRA establishes campaign procedures 'designed to protect [the Representatives'] threatened concrete interest' . . . in winning reelection, [they] possess standing to insist on those procedures based on the 'distinct risk' . . . that political rivals will exploit the challenged rules to their disadvantage."  Id. at 92.

In *LaRoque*, the United States Attorney General, acting pursuant to Section 5 of the Voting Rights Act of 1965, stopped the implementation of a referendum to make Kinston, North Carolina's mayoral and city council elections non-partisan.  LaRoque, 650 F.3d at 780–82.  A candidate argued that he had standing to challenge the constitutionality of Section 5 because the partisan election system:  (1) constituted a "ballot-access requirement" that either "prevents candidates from appear[ing] on the . . . ballot" or "makes the process of getting on the general-election ballot more costly and time consuming"; and (2) "provid[ed] a competitive advantage to

[the candidate's] Democratic opponents, who enjoy benefits from straight-ticket voting and party loyalty." Id. at 786.

The *LaRoque* Court held that because the referendum created an interest in nonpartisan city elections, the candidate "ha[d] a cognizable interest in reaping the benefits he claims would flow from the nonpartisan system." Id. In response to the Attorney General's argument that the above-mentioned harms were too "abstract, contingent, and speculative," the Court ruled that "the Attorney General cites no support for the proposition that [the candidate's] standing can be defeated by the possibility that the partisan system, though imposing greater ballot-access costs, might ultimately improve [the candidate's] chances of electoral success by limiting competition in the general election." Id. at 787. Importantly, the Court *did not* hold that a candidate can challenge every election procedure he dislikes under the guise of challenging the "competitive environment." Rather, relying on *Shays*, the Court ruled that because the candidate had alleged "that he is being forced to compete in an 'illegally structured' environment"—*i.e.*, that "the threat of the Attorney General's [presumptively unconstitutional] enforcement of section 5 . . . is preventing the Kinston city council from carrying out its state-law duty to implement the nonpartisan referendum"—the candidate "ha[d] no obligation to demonstrate definitively that he has less chance of victory under the partisan than the nonpartisan system." Id. As in *Shays*, the "illegal environment" was thus premised on the existence of a legislatively created interest. Moreover, the *LaRoque* Court added that the candidate's "allegation that partisan elections will substantially harm . . . [his] chances for election . . . *is far from 'speculative,'*" and that he *had* alleged an injury *vis-à-vis* "ballot-access costs" and a "competitive injury." Id. (emphasis supplied) (quotation marks omitted) (alteration in original).

In both *Shays* and *LaRoque*, a plaintiff-candidate thus alleged that a challenged statute

had illegally interfered with a specific electioneering environment that had been established and guaranteed by a statute or referendum.

Here, Dr. Stein alleges that the competitive environment in Pennsylvania elections (including the 2016 presidential election) is "illegally structured" because Pennsylvania's voting machines and recount procedures violated and will continue to violate *voters'* First Amendment, Due Process, and Equal Protection rights.  As I will explain, the Voter-Plaintiffs unquestionably have standing to challenge an election regime that interferes with those rights.  (See Part V.B. infra.)  The interest of every voter to have her vote accurately recorded, however, is not the same as a candidate's interest in a 100% accurate vote count.  No court has equated the two in determining who has standing to challenge a state's election regime.

Nonetheless, erring on the side of caution at this early stage, I conclude that Dr. Stein's allegations, generously read, are sufficient to confer standing upon her.  Compare Shays, 414 F.3d at 89 ("[B]ecause Shays and Meehan fall within the 'zone of interests' protected by the BCRA . . . the Congressmen hold a 'legally cognizable right' to enforce the statute's prohibitions."), with Bullock v. Carter, 405 U.S. 134, 142 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation.").  At the conclusion of discovery, I will be better able to determine if the injuries Dr. Stein believes she may have suffered occurred at all:  whether Dr. Stein will have shown that Pennsylvania's machines are so unreliable or easily manipulated, and the recount procedures so burdensome, that a candidate could reasonably be expected to divert funds or alter her competitive tactics in anticipation of her opponents exploiting these illegalities.  In such circumstances, Dr. Stein may have suffered a cognizable injury.  See Shays, 414 F.3d at 87 ("Shays and Meehan . . . face an equivalent need to adjust their campaign strategy.").  Of course, although she is not required to show that her opponents

actually exploited these illegalities, Dr. Stein bears the significant burden of showing that candidates realistically had to anticipate such exploitation by their opponents.

Because Dr. Stein does not seek a new election, however, I cannot remedy Dr. Stein's purported competitive injuries caused by Pennsylvania's election regime in the 2016 presidential election. Dr. Stein thus has standing to bring only a facial challenge to the use of Pennsylvania's election regime in future elections. Accordingly, at summary judgment, she also must show that she expects to compete for votes in future Pennsylvania elections (whether on the local, state, or national level).

### *The Rights of Dr. Stein's Voters*

Dr. Stein may not invoke third-party standing on behalf of her voters. (See Pls.' Resp. at 10–11.) The Third Circuit has not directly addressed whether candidates have such rights. See Pa. Psych. Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 288 n.10 (3d Cir. 2002) (observing in *dicta* that "candidates may be able to assert the rights of voters"). That Court has held, however, that a plaintiff seeking to invoke third-party standing must establish that the third party "face[s] some obstacles that prevent it from pursuing its own claims." Id. at 288–89. The only explanation alleged for the inability of Dr. Stein's voters to assert their own claims is their interest in "ballot secrecy." (Pls.' Resp. at 10.) Plaintiffs' own submissions, however, refute the argument that ballot secrecy hinders voters from bringing election challenges: five other plaintiffs, several of whom revealed their selections, joined Dr. Stein in this suit. (Am. Compl. ¶¶ 9–14, Doc. No. 71; see also Howe Aff., Am. Compl. Ex. 19 ¶ 5, Doc. No. 71-19). But see Mancuso v. Taft, 476 F.2d 187, 190 (1st Cir. 1973) (candidate had third-party standing to raise rights of voters). Accordingly, Dr. Stein may not invoke third-party standing to bring claims on behalf of her voters.

18

### B.  The Voter-Plaintiffs

Mr. Reitz, Ms. Cook, Ms. Knight, and Ms. Howe jointly allege four standing grounds. (Pls. Resp. at 11–14, 14 n.7.)  They have standing to bring some of their claims.

The Voter-Plaintiffs first allege that because they cast their ballots on defective Montgomery County DRE machines, they have been treated unequally *vis-à-vis* Pennsylvania voters in non-DRE counties.  (Pls.' Resp. at 12.)  Accordingly, their right to vote was burdened in ways that non-DRE voters' rights were not.

Unequal treatment is an injury-in-fact sufficient to confer standing to bring an Equal Protection challenge.  See Citizen Ctr. v. Gessler, 770 F.3d 900, 914 (10th Cir. 2014) (voter had standing to raise equal protection challenge to his district's use of traceable ballots because of the "unequal imposition of a risk of a traceable ballot and the related ability to discover how a member voted, depending on the location of the voter's residence"); Am. Civ. Liberties Union of N.M. v. Santillanes, 546 F.3d 1313, 1319 (10th Cir. 2008) (in equal protection challenge to photo identification requirement for in-person voting, "Plaintiffs' claim of unequal treatment of in-person voters vis-à-vis absentee voters is sufficient to confer standing"); see also Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656, 666 (1993) ("'[I]njury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); Hassan v. City of N.Y., 804 F.3d 277, 284 (3d Cir. 2015), as amended (Feb. 2, 2016) ("Unequal treatment . . . qualifies as an actual injury for standing purposes.").

The Voter-Plaintiffs' alleged "unequal treatment" injury thus confers standing to bring an Equal Protection challenge to Montgomery County's use of its particular DRE machine model or, construed exceptionally broadly, the Commonwealth's use of DRE machines as compared to

its use of paper ballots counted by optical scan machines.

The Voter-Plaintiffs also allege that they were injured because they "had to cast [their] vote[s] under unconstitutional circumstances." (Pls.' Br. at 13.) As I will explain, in their First Amendment and Equal Protection claims, the Voter-Plaintiffs allege, *inter alia*, that the voting machines subject them to a risk of casting an ineffective ballot. (See Part VIII.B, infra.) Because this is a cognizable interest, the Voter-Plaintiffs may have sustained a cognizable injury.

Similarly, the Voter-Plaintiffs allege that they have standing because "Defendants' challenged conduct increases the risk that [their] vote[s] will be miscounted in future elections." (Pls.' Resp. at 14); see also Stewart v. Blackwell, 444 F.3d 843, 854 (6th Cir. 2006), vacated (July 21, 2006) (plaintiff voters had standing to challenge voting technology based on "the probability that their votes will be miscounted in upcoming elections"), superseded, 473 F.3d 692 (6th Cir. 2007). The Secretary continues to authorize the use of the challenged machines, and, as registered Montgomery County voters, the Voter-Plaintiffs will continue to be subjected to the same risks of having their votes miscounted and the same obstacles either to verifying or correcting the votes cast on the voting machines. See Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (plaintiffs had standing "because they are registered voters who do not possess an acceptable photo identification and would be required to make a special trip to the county registrar's office that is not required of voters who have driver's licenses or passports" (quotation mark omitted)); cf. Black v. McGuffage, 209 F. Supp. 2d 889, 896 (N.D. Ill. 2002) ("Plaintiffs do not have to wait for yet another opportunity for their votes not to be counted before bringing suit."). Accordingly, the Voter-Plaintiffs have standing to bring their Equal Protection and First Amendment claims based on the risks they face in future elections.

I cannot redress the Voter-Plaintiffs' alleged injuries flowing from the purported

disparate treatment and risks of error they faced in the 2016 election.  The only way to remedy the purported disparate treatment or risks of error they faced in the 2016 election would be to allow them to recast their votes in a new election.  Plaintiffs have not asked me to order a new election.  Accordingly, they do not have standing to challenge the alleged disparate treatment or risks of error they faced in the 2016 election.

By contrast, I may redress the Voter-Plaintiffs' Equal Protection and First Amendment claims based on future elections by enjoining the use of the challenged machines and/or recount procedures and requiring the Commonwealth to use similar machines throughout the state.  (See Am. Compl., Prayer for Relief ¶ 5, Doc. No. 71 ("Enjoin permanently Defendants, their agents, officers and employees to comply with Equal Protection, Due Process, and the First Amendment in future statewide elections.").)

Ms. Howe and Ms. Knight also allege that they have standing because Montgomery County's DRE machines did not properly record their votes.  (Pls.' Resp. at 14–15.)  The deprivation of their right to vote is a viable injury-in-fact.  See, e.g. Bishop v. Bartlett, 579 F.3d 419, 425 (4th Cir. 2009) ("The deprivation of the right to vote is a concrete harm, and thus its widely shared nature does not preclude a finding that [plaintiff] has suffered an injury in fact."); see also Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 223 n.13 (1974) (a "concrete injury to fundamental voting rights" is "sufficient to support standing" (citing Baker v. Carr, 369 U.S. 186 (1962))).

In my December 12, 2016 Memorandum, I observed that "[t]here [was] no evidence before me even suggesting that a recount or audit of any kind would confirm whether the vote [of anyone] was counted inaccurately, or would somehow correct an inaccurately recorded vote." (PI Mem. 15, Doc. No. 55.)  Plaintiffs now allege that votes were miscounted, however, and

because they are not now seeking a preliminary injunction, they are not, at this stage, required to support their allegations with evidence. Moreover, they have presented evidence that their votes were miscounted: Ms. Howe and Ms. Knight's sworn affidavits. (See Doc. Nos. 71-19, 71-20.) Finally, Plaintiffs allege that a forensic examination of the voting machines "would allow examiners to determine whether the information stored in the computer memory represents an accurate record of the votes cast on those machines." (Am. Compl. ¶ 56, Doc. No. 71.) I cannot determine, at this early stage, whether (as Defendants argue) this is mere speculation. Accordingly, the Voter-Plaintiffs have standing to challenge their miscounted votes.

Plaintiffs also allege that the Commonwealth's recount procedures unequally burden "recount initiatives led by small party candidates such as Stein, who have fewer logistical and financial resources." (Id. at ¶ 120.) Because Ms. Cook is the only Voter-Plaintiff who allegedly voted for a "small party candidate," only Ms. Cook (and, by extension, Dr. Stein) have standing to challenge this alleged unequal treatment.

Finally, Mr. Reitz also alleges that he has suffered injury because he was "arbitrarily prevented from exercising" his state-law right to a recount. (Pls.' Resp. at 12–13.) The other Voter-Plaintiffs do not allege that they sought a recount. Separate and apart from whether Mr. Reitz was entitled to any recount under state law (or any remedy in this Court), he has standing to allege that he himself was arbitrarily denied the ability to exercise his state-law right to a recount. Indeed, the arbitrary denial of a right affirmatively afforded by law is the essence of a due process violation. Again, Plaintiffs allege that the voting record can be corrected through a forensic audit of the voting machines.

In sum, the Voter-Plaintiffs have standing to bring their claims, except: (1) none of the Voter-Plaintiffs has standing to bring First Amendment and Equal Protection claims that she was

subjected to an unconstitutional risk of casting an ineffective ballot in the 2016 election; and (2) Mr. Reitz, Ms. Howe, and Ms. Knight do not have standing to bring an Equal Protection challenge to the burdens that Pennsylvania's recount procedures impose on small-party voters.

## VI.    MOOTNESS

"The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (quotation mark omitted). "A case becomes moot . . . only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 669 (2016) (quotation marks omitted). Because there have been no material changes since Plaintiffs' filed their Amended Complaint, this action is not moot.

## VII.    ABSTENTION

In my December 12 Memorandum, I concluded that the *Rooker-Feldman* doctrine divested this Court of jurisdiction, and that *Younger v. Harris* required me to abstain while Plaintiffs' state-court efforts to obtain a recount proceeded. (See PI Mem. 15–20, Doc. No. 55.) Although Defendants have not moved to dismiss Plaintiff's Amended Complaint on either ground, I am obligated to reconsider them.

*Rooker-Feldman* no longer bars Plaintiffs' suit. The doctrine applies where: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by [the] state-court judgment[]; (3) [that] judgment [was] rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgment[]." See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010) (quotation marks omitted) (first alteration in original).

23

Because Plaintiffs no longer ask me to review and reject the Commonwealth Court's decision requiring them to post a $1 million bond to proceed with their contest petition, but rather now claim only a violation of their fundamental right to vote, *Rooker-Feldman* no longer bars their suit.  (Am. Compl. ¶ 116, Doc. No. 71; cf. Dec. 9, 2016 Hr'g Tr. at 31:14–22, Doc. No. 57); see also Marks, 19 F.3d at 882 n.11 (*Rooker-Feldman* did not bar federal constitutional challenge to alleged miscounting of votes in local election).

*Younger* also no longer requires abstention.  *Younger* abstention is proper where federal court action would "interfer[e] with an ongoing state proceeding."  Lazaridis v Wehmer, 591 F.3d 666, 670 (3d Cir. 2010) (per curiam).  Because there are no longer ongoing state-court proceedings arising from the 2016 election, abstention is no longer appropriate.  (Am. Compl. ¶ 117, Doc. No. 71.)

## VIII.   VIABILITY

Plaintiffs allege that:   (1) the use of allegedly defective and easily-hacked voting machines and the Commonwealth's recount procedures unduly burdens the right to have Plaintiffs' votes counted, in violation of the First Amendment and Due Process; (2) the Commonwealth's recount procedures and use of paperless DRE machines in certain counties violates Equal Protection; and (3) the Commonwealth arbitrarily denied Plaintiffs' right to a recount under state law, in violation of Due Process.  I will dismiss in part.  See Reilly v. Ceridien Corp., No. 10-5142, 2011 WL 735512, at *5 (D.N.J. Feb. 22, 2011) (dismissing for want of standing before addressing merits as an alternate ground for dismissal), aff'd 664 F.3d 38 (3d Cir. 2011).

### A.  The "Right" to Verify Votes

Plaintiffs first allege that their First Amendment and Due Process right to vote was

unduly burdened because:  (1) "[v]oters using DRE machines have no way to *verify* that the machine properly recorded their vote, and no way to *determine* whether the machine was compromised"; and (2) "[t]here is . . . no feasible process for voters to obtain a statewide recount."  (See, e.g., Pls. Resp.' 24, Doc. No. 76 (emphases supplied); accord id. at 24, 27 ("Pennsylvanians effectively face the risk 'of a ballot box "falling off of a truck,"' without any procedural safeguards to locate those votes—or even notice they are missing. . . .  These voting systems are a black box, inside which lies Pennsylvanian democracy.").)  Plaintiffs thus allege that their inability to *verify* that their votes were correctly counted—because of the Commonwealth's recount procedures and use of unreliable voting machines—violates the Constitution.

As I noted in my December 12 Memorandum, however, "[t]he right to have one's vote counted does not . . . encompass the right to have one's vote verified through a mandatory statewide recount."  (PI Mem. 22, Doc. No. 55 (citing Stein v. Thomas, No. 16-14233 (E.D. Mich. Nov. 7, 2016)).)  Indeed, other than Plaintiffs' alleged state law rights, Plaintiffs provide no authority recognizing a right to have one's vote verified through *any* procedure. Accordingly, the burdens that the Commonwealth has placed on Plaintiffs' ability to initiate a recount cannot create a constitutional violation, and, for this reason alone, Plaintiffs' verification claim fails. Rather, Plaintiffs must show that the Commonwealth unconstitutionally burdened their right to *vote* under the First Amendment or their rights to Equal Protection or Due Process, which I discuss below.

**B.  First Amendment and Due Process**

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'"  Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting Ill. Bd. of

Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979)).  The fundamental right to vote is "protected by the First and Fourteenth Amendments."  Id. at 434.  "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental."  Bush v. Gore, 531 U.S. 98, 104 (2000) (per curiam).  The right to vote includes the right to have one's vote fairly counted.  See Reynolds v. Sims, 377 U.S. 533, 554 (1964) ("[Q]ualified voters have a constitutionally protected . . . right to have their votes counted." (citing United States v. Mosley, 238 U.S. 383, 386 (1915))); United States v. Classic, 313 U.S. 299, 315 (1941) (right to vote includes right of "qualified voters within a state to cast their ballots and have them counted").

Yet, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . 'if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process[].'" Burdick, 504 U.S. at 433 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)).  When considering a First Amendment or Equal Protection challenge to state election regulation, a court must thus weigh "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications . . . imposed by its rule.'"  Id. at 434 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)); see also Rogers v. Corbett, 468 F.3d 188, 194 (3d Cir. 2006) ("Anderson sets out the proper method for balancing both [First Amendment] associational and equal protection concerns and the burdens that the challenged law creates on these protections as weighed against the proffered state interests.").  Where a constitutionally-protected right is subject to severe restriction, the regulation must be "narrowly drawn to advance a state interest of compelling importance.'"  Burdick, 504 U.S. at 434 (quoting Norman

v. Reed, 502 U.S. 279, 289 (1992)).  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  Id. (quoting Anderson, 460 U.S. at 788).

Finally, an election may violate due process "[i]f the election process itself reaches the point of patent and fundamental unfairness."  Griffin v. Burns, 570 F.2d 1065, 107 (1st Cir. 1978).

### Plaintiffs' Claims

In the First Amendment context, the *Anderson-Burdick* test generally applies to statutes and regulations (or, to use Plaintiffs' phrase, "election systems") that burden the right to vote. See Burdick, 504 U.S. at 434 (election regulations burden the right to vote); cf. Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 469 (2d Cir. 2006) ("When, as here, a plaintiff challenges a Board of Election decision not as stemming from a constitutionally or statutorily invalid law or regulation, but rather as contravening a law or regulation whose validity the plaintiff does not contest, there is no independent burden on First Amendment rights when the state provides adequate procedures by which to remedy the alleged illegality.").  Here, Plaintiffs challenge the statutes and regulations:  (1) authorizing the use of voting machines that have what Plaintiffs consider to be an unacceptable risk of hacking or malfunctioning with no voter-verifiable paper trail (or, alternatively, the Secretary's decision to authorize the use of machines in question);  and (2) setting out the Commonwealth's recount/recanvassing procedures, (collectively, "the Election Code").  Plaintiffs argue that "[t]he issue in this case is . . . whether": (1) "the burdens placed upon Plaintiffs' right to have their votes count fall within the realm of 'reasonable' or rise to the level of the 'severe'"; and (2) "the state's regulatory interests [are]

sufficient to justify those burdens."  (Pls.' Reply 9, Doc. No. 79.)

Ms. Howe and Ms. Knight also allege, however, that their votes were in fact not counted, and that the Commonwealth's recount procedures prevented them from correcting the voting record.  Courts usually have analyzed failure-to-count cases under the rubric for substantive Due Process, not the First Amendment.  But see United States v. Classic, 313 U.S. 229, 314 (1941) (Article I, Section 2 of the Constitution); Powell v. Power, 436 F.2d 84, 88 (2d Cir. 1970) (Article I, Section 2, and Due Process); Bodine v. Elkhart Cty. Elec. Bd., 788 F.2d 1270, 1270–72 (7th Cir. 1986) (claims under First and Fourteenth Amendments analyzed as Due Process claims).  Accordingly, to the extent Plaintiffs' limit their claim to the machines' errors—as opposed to challenging the statutes, regulations, and decisions of the Secretary that allowed the machines to be used—they must do so under the rubric of Due Process.

*Miscounted Votes*

Because § 1983 Due Process actions include the element of intentional conduct, courts have generally rejected claims based on "garden variety" election errors.  See, e.g., Curry v. Baker, 802 F.2d 1302, 1316 (11th Cir. 1986); Hennings v. Grafton, 523 F.2d 861, 864 (7th Cir. 1975) (section 1983 is implicated only when there is "*willful* conduct which undermines the organic process by which candidates are elected"); Hendon v. N.C. Bd. of Elec., 710 F.2d 177, 182 (4th Cir. 1983); see also Bodine, 788 F.2d at 1271–72 (under First and Fourteenth Amendment, defendants' willful failure "to test the [voting card] system, count the votes, and certify the results" in accordance with state law "is at most willful neglect" where plaintiffs did not "alleg[e] that the computer control cards were somehow manipulated by the defendants to undermine the election").

In *Gold v. Feinberg*, 101 F.3d 796 (2d Cir. 1996), the Second Circuit concluded that an

election that was "marked with irregularities"—"including, *inter alia*, (1) delays in the arrival of voting machines at approximately one-third of the election districts, (2) a miscounting of votes resulting from their improper placement of templates over ballots, and (3) the presence of ineligible candidates on the ballot"—did not violate the plaintiff-voters' due process rights. Gold, 101 F.3d at 798.  The Court reasoned that because "not every human error rises to the level of a constitutional violation," "plaintiffs who can establish nothing more than 'unintended irregularities' in the conduct of elections are barred from obtaining § 1983 relief in federal court."  Id. at 800–01 (citing Powell, 436 F.2d at 85, 88); see also Shannon v. Jacobowitz, 394 F.3d 90 (2d Cir. 2005) (denying voters' due process claim challenging voting machine malfunctions and clarifying that "more than negligent conduct by the state actor is needed in order for a cognizable § 1983 claim to exist based on violations of the due process clause"); Welker v. Clarke, 239 F.3d 596, 597 (3d Cir. 2001) (observing that without a "specific allegation . . . that election officials conspired . . . to violate election laws in order to dilute . . . votes . . . it is not clear that claims [of ballot stuffing and voter dilution] would support intervention by a federal court in this election"); Bennett v. Yoshina, 140 F.3d 1218, 1226 (9th Cir. 1998), as amended on denial of reh'g and reh'g en banc (June 23, 1998) ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." (collecting cases)).

Moreover, courts have rejected claims based on garden variety errors regardless of whether the state's recount procedures were adequate to correct them.   See Shannon, 394 F.3d at 97 ("Courts may consider the adequacy and fairness of the state remedy [such as a recount procedure] *only after* they first conclude that the due process clause is implicated by intentional state action.").

Here, there is no indication or allegation that Defendants intentionally caused Plaintiffs' votes to be miscounted.  Rather, the purported "voting machine malfunction [resulting in the alleged failure to count certain votes in Montgomery County] is the paradigmatic example of a 'garden variety' election dispute" that does not violate due process.  Id. at 96 (quoting Griffin, 570 F.2d at 1076); (see also Am. Compl. ¶¶ 92–97, Doc. No. 71.)  Because Due Process is not implicated, the adequacy of the Commonwealth's recount procedures to correct the alleged errors is beside the point.  Accordingly, Plaintiffs' Due Process claim fails to the extent they do not challenge the parts of the Election Code authorizing the use of the voting machines.

### Challenges to the Election Code

Again, Plaintiffs also challenge, under the First Amendment and Due Process, those parts of the Election Code authorizing the use of the DRE and optical scan machines and the Commonwealth's recount/recanvassing procedures.

If a "government body's" decision—whether in the form of a law or the decision of an election official—foreseeably causes the deprivation of the right to vote, it is actionable under § 1983, even if the deprivation was unintentional.  See Fleming v. Gutierrez, No. 13-222, 2014 WL 12652303, at *4 (D.N.M. Aug. 20, 2014) ("Defendant Gutierrez testified that although he was aware that there is generally a significantly greater amount of voters in the general election than there is in the primary, he still made a conscious decision not to add more voting equipment for the general election."); Rivera-Powell v. N.Y. City Bd. of Elec., 470 F.3d 458, 465 n.7 (2d Cir. 2006); cf. Griffin v. Burns, 570 F.2d 1065, 1078–79 (1st Cir. 1978) ("The district court was not asked to examine the validity of individual ballots or to supervise the administrative details of a local election.  It was asked to remedy a broad-gauged unfairness that infected the results of a local election." (Due Process)); Hoblock v. Albany Cty Bd. of Elec., 487 F. Supp. 2d 90, 97–98

(N.D.N.Y. 2006). Because the Secretary is required to approve each voting machine, it was foreseeable that allowing the use of these voting machines might cause votes to be miscounted and require voters to seek a recount if they wished to correct the voting record. Accordingly, Plaintiffs may challenge the Commonwealth's Election Code under § 1983.

The Supreme Court has recognized that states must be allowed to administer elections. See Bush v. Gore, 531 U.S. 98, 104 (2000) ("When the state legislature vests the right to vote for President in its people, the right to vote *as the legislature has prescribed* is fundamental." (emphasis supplied)); see also id. at 109 ("The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."). Plaintiffs do not, and could not, allege that any voting mechanism is error free. Cf. Curry v. Baker, 802 F.2d 1302, (11th Cir. 1986) ("[A]ny deviation from absolute accuracy occurred as an incidental result of the Democratic Committee's attempt to determine the lawful primary winner in circumstances where plaintiffs had created the situation making absolute accuracy impossible."). To the contrary, Plaintiffs concede that "[t]he issue in this case is not whether the Commonwealth may properly choose between electronic and paper voting systems." (Pls.' Reply 9, Doc. No. 79); see also Bodine v. Elkhart Cty. Elec. Bd., 788 F.2d 1270, 1272 (7th Cir. 1986) ("[F]ederalism concerns caution against excessive entanglement of federal courts in state election matters.").

I must first determine whether the First Amendment *Anderson-Burdick* standard applies at all and, if so, the precise burden imposed by the Election Code that Defendants must justify.

Although no court has applied the First Amendment *Anderson-Burdick* standard to a failure-to-count claim, the Supreme Court has stated that "all election regulations . . . have an impact on the right to vote." Burdick v. Takushi, 504 U.S. 428, 434 (1992). Compare Crawford

v. Marion Cty. Elec. Bd., 553 U.S. 181, 191 (2008) ("However slight that burden may appear . . . it must be justified by relevant and legitimate state interests . . . ."), Northeast Ohio Coalition for the Homeless v. Husted, 696 F.3d 580, 592 (6th Cir. 2012) (*Anderson-Burdick* test applies to "Equal Protection" voting claim challenging failure to count "wrong-precinct ballots" cast at the correct polling location regardless of the cause of the error, where some or all improper ballots resulted from poll workers negligently exercising their state-law duty to guide voters to the correct voting precinct), and Obama for America v. Husted, 697 F.3d 423, 428 (6th Cir. 2012) ("The Equal Protection Clause applies when a state either classifies voters in disparate ways . . . or places restrictions on the right to vote." (citation omitted)), with Griffin, 570 F.2d at 1078–79 (analyzing failure-to-count claim for fundamental unfairness).   Accordingly, I will apply the *Anderson-Burdick* standard to the challenged Election Code provisions.   See Husted, 696 F.3d at 592.

I first must identify the precise "burden" the Election Code allegedly imposed on Plaintiffs' right to vote.   Molinari v. Bloomberg, 564 F.3d 587, 596 (2d Cir. 2009).

Plaintiffs describe the "burdens" imposed by the Election Code as follows:   (1) voters were required to cast their ballots on allegedly defective and hackable voting machines that "actually disenfranchised voters in the 2016 presidential election"; and (2) voters who are "disenfranchised" are unable to correct the voting record because (a) the voting machines do not produce a paper trail, preventing voters from learning that their votes were miscounted; and (b) even if they learn that their votes were miscounted, a statewide recount is illusory because the Commonwealth requires impracticable levels of coordination throughout 9,158 districts, the "voters in any given county cannot know when the deadline falls to seek a recount," and "courts have unlimited discretion to impose prohibitive costs and fees."   (Pls.' Reply 9–10, Doc. No. 79.)

Plaintiffs thus allege that, under the First Amendment, a state must either justify its choice of voting mechanism and recount procedures, or provide more reliable voting mechanisms and more lenient recount procedures when those machines in fact miscount votes. See Constitution Party of Pa. v. Cortes, 116 F. Supp. 3d 486, 502 (E.D. Pa. 2015) (the effects of multiple election regulations may be considered collectively when challenged as applied).

Again, whether an election regulation burdens the right to vote does not always depend on whether a voter was actually disenfranchised. Cf. Common Cause/Georgia v. Billups, 554 F.3d 1340, 1354–55 (11th Cir. 2009) (requiring voters to have a photo identification burdened the right to vote, although that burden was "limited" because voters could easily obtain a free voter identification card). Yet, in each First Amendment case—including those cited by Plaintiffs—voters and candidates complained of: (1) specific obstacles to casting a ballot or putting a candidate on the ballot; or (2) dilution of the vote. See, e.g., Burdick v. Takushi, 504 U.S. 428, 434–35 (1992) (challenge to prohibition on write-in candidates); Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (challenge to candidate filing deadline); Crawford v. Marion Cty. Elec. Bd., 553 U.S. 181, 191 (2008) (challenge to voter ID law); Rogers v. Corbett, 468 F.3d 188, 190 (3d Cir. 2006) (challenge to ballot access based on Equal Protection); Belitskus v. Pizzingrilli, 343 F.3d 632, 635–36 (3d Cir. 2003) (challenge to candidate filing fee); Constitution Party of Pennsylvania, 116 F. Supp. 3d at 488–89 (challenge to ballot access requirements).

A voting mechanism's risk of error or hacking does not burden the right to vote in any of these ways. Plaintiffs do not allege: that anyone was prevented from casting ballots; that voters using the Commonwealth's voting machines (whether a DRE machine or an optical scanner) were required to perform any additional tasks to cast their ballots; or that any candidates were

33

prevented from appearing on the ballot.  Cf. Belitskus, 343 F.3d at 643.  Plaintiffs also do not allege that any voting machine was actually hacked or that any vote cast for President was miscounted due to voting machine tampering.  See Bodine v. Elkhart Cty. Elec. Bd., 788 F.2d 1270, 1273 (7th Cir. 1986) ("Fraudulent manipulation of the vote totals was not alleged in the complaint.").  Even if they had so alleged, I have already found that the fear of vote tampering in Pennsylvania during the 2016 Presidential election "borders on the irrational"—a finding Plaintiffs have offered no reason to revisit.  (PI Mem. 31, Doc. No. 55; see also id. at 25–30); McTernan v. City of York, 577 F.3d 521, 531-32 (3d Cir. 2009) (permitting district court to accord preclusive weight to findings reached during a preliminary injunction hearing on a subsequent motion to dismiss where "the circumstances make it likely that the findings are sufficiently firm to persuade the court that there is no compelling reason for permitting them to be litigated again" (quoting Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 126 F.3d 461, 474 n.11 (3d Cir. 1997))).

Nonetheless, in *Weber v. Shelley*, the Court indicated that challenges to a voting mechanism's risk of hacking are cognizable under the First Amendment.  347 F.3d 1101, 1106 (9th Cir. 2003).  In the Equal Protection context, courts have also recognized a burden on the right to vote where voters in one county are "less likely to cast an effective vote than voters in" other counties within the same state.  Wexler v. Anderson, 452 F.3d 1226, 1231 (11th Cir. 2006); see also Stewart v. Blackwell, 444 F.3d 843, 869 (6th Cir. 2006), vacated (July 21, 2006), superseded, 473 F.3d 692 (6th Cir. 2007); Black v. McGuffage, 209 F. Supp. 2d 889, 898–99 (N.D. Ill. 2002); Common Cause S. Christian Leadership Conf. of Greater L.A. v. Jones, 213 F. Supp. 2d 1106, 1107 (C.D. Cal. 2001); cf. Bush v. Gore, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate

34

treatment, value one person's vote over another."). <u>But see</u> <u>S.W. Voter Registration Educ. Proj.</u> <u>v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003).   If a comparatively high risk of casting an ineffective ballot constitutes a burden on the right to vote, it follows that any risk (whether or not compared to the risk faced by other voters in the state) is a cognizable "burden" on the right to vote.   <u>Cf.</u> <u>Rogers v. Corbett</u>, 468 F.3d 188, 193 (3d Cir. 2006) (the *Anderson-Burdick* burden analysis applies to both Equal Protection and First Amendment voting claims).   Otherwise, the comparative risk recognized in the Equal Protection voting cases would not trigger the *Anderson-Burdick* standard.

Accordingly, a risk of casting an ineffective vote is a cognizable burden under the First Amendment.

Requiring voters to engage in large organizing efforts and pay a bond to have their votes counted in the first instance are also cognizable burdens on the right to vote.   <u>See</u> <u>Harper v.</u> <u>Virginia Bd. of Elecs.</u>, 383 U.S. 663, 667 (1966) (poll tax is unconstitutional).   The Commonwealth imposes these burdens on voters' recount efforts, however, not on voters' ability to have their ballots counted in the first instance.   Indeed, the Commonwealth's recount procedures are exactly that:   *recount* procedures.   Although the availability of a recount informs the severity of the burden imposed by using faulty voting machines, recount procedures ordinarily are not "election regulations":   they do not regulate the casting or counting (as opposed to *re*counting) of ballots, except, perhaps, where ballots were in fact miscounted in the first instance.

As I have explained, however, Plaintiffs challenge the recount procedures in "combination" with the voting machines.   Plaintiffs argue that because the voting machines in fact miscounted votes, any obstacle to obtaining a recount burdens the right to vote, and the

Commonwealth is required to justify that burden.  Plaintiffs reach this result by characterizing the burden imposed by the voting machines as the "disenfranchisement" of particular voters—rather than the *risk* of casting an ineffective ballot imposed on all voters who use the machines—thus challenging the use of the voting machines as applied to Ms. Howe and Ms. Knight.  They further allege that, measured from the perspective of a voter whose vote was miscounted, the Commonwealth's recount procedures impose severe burdens, and are thus subject to strict scrutiny.

Only one voter (Ms. Kupka) alleged that she sought a recount after her vote was miscounted.  Ms. Kupka voluntarily dismissed her claims, however.

Because Mr. Reitz does not allege that his vote was miscounted, Plaintiffs' "disenfranchisement" argument does not apply to him.  Accordingly, he (and Dr. Stein) may not challenge the recount provisions under the First Amendment, and may challenge the voting machines only insofar as they will subject him to an unconstitutional *risk* of malfunctioning or hacking.  The recount procedures are relevant to such a claim only insofar as the ability to obtain a recount mitigates the risks created by the machines' rate of error.

Moreover, it does not appear that Ms. Knight and Ms. Howe's "disenfranchisement" challenge to Pennsylvania's voting machines is viable in light of the limitations on Due Process claims involving garden-variety errors.  Cf. Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 469 (2d Cir. 2006) ("[A] contrary holding would permit any plaintiff to obtain federal court review of even the most mundane election dispute merely by adding a First Amendment claim to his or her due process claim.").  Nonetheless, because Defendants have not addressed whether Ms. Knight and Ms. Howe's "disenfranchisement" argument is viable, I will assume without deciding that they may challenge the recount procedures.  Accordingly, I need not at this

time determine the precise contours of Ms. Knight and Ms. Howe's First Amendment claims.

I also need not at this time determine whether and to what degree Defendants are required to justify their choice of voting machines, the recount procedures, or some "combination" of the two.  Even under the most generous formulation, Defendants have not justified the challenged Election Code provisions.  Defendants offer no justification whatsoever for employing paperless DRE or optical scan machines.  They offer only vague justifications for the Commonwealth's recount procedures, none of which address the voting machines' risk of error.  Defendants merely assert that their regulations are "reasonable and neutral," without offering any support for the reasonableness of the voting machines or recount procedures.

Defendants' reliance on *Weber* is thus misplaced.  The *Weber* Court made specific findings after discovery about the reasonableness of the voting machines at issue in that case. See Weber, 347 F.3d at 1106 ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny *simply* because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect. . . . Rather, the question is whether using a system *that brings about numerous positive changes* . . . but lacks a voter-verified paper ballot, constitutes a 'severe' restriction on the right to vote." (emphases supplied) (citation omitted)).  Moreover, the plaintiff in *Weber* did not allege that her vote was miscounted, or that multiple election regulations had operated in tandem to deprive anyone of their right to have their vote counted.

Because Defendants provide no justifications for the Commonwealth's choice of voting machines, I will deny their Motion as to Ms. Knight and Ms. Howe's First Amendment claims, and Mr. Reitz's claim that the voting machines alone will subject him to an unconstitutional risk that his vote will not be counted.

Finally, Plaintiffs have not made out a fundamental-unfairness claim.  As I explained in denying Plaintiffs' Preliminary Injunction Motion, "[t]he rare decisions that sustain due process challenges to elections involve documented instances of improperly cast ballots, wholesale refusal to count properly cast ballots, direct infringements of the right to cast ballots, or a total failure to conduct the election."  (PI Mem. 23, Doc. No. 55 (citing Marks, 19 F.3d at 887; Bonas v. Town of N. Smithfield, 265 F.3d 69 (1st Cir. 2001); Duncan v. Poythress, 657 F.2d 691 (5th Cir. Unit B Sept. 1981); League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008)); see also Warf v. Bd. of Elec. of Green Cty., 619 F.3d 553, 559 (6th Cir. 2010) (although state court's decision to void all absentee ballots altered outcome of election and disenfranchised eleven percent of voters, election was not fundamentally unfair because the decision was not "an unreasonable application of controlling [state] law").  Here, there was no wholesale refusal to count properly cast ballots.  Rather, the Commonwealth permitted the use of voting machines that purportedly malfunctioned in a way that had no effect on the election.  Accordingly, I will dismiss Plaintiffs' fundamental-unfairness Due Process claim.

In sum, I will:  (1) dismiss Mr. Reitz's First Amendment claims, except for his claim that the voting machines alone expose him to an unconstitutional risk that his vote will not be counted; (2) decline to dismiss Dr. Stein's claim that the voting machines alone expose voters to an unconstitutional risk that their votes will not be counted; and (3) decline to dismiss Ms. Howe and Ms. Knight's First Amendment claims, without deciding the scope of those claims.

### C.  Equal Protection

Plaintiffs allege that DRE machines are less reliable and more easily hacked than optical scanners, and lack a paper trail.  They thus allege that their right to vote will be subjected to unequal burdens in upcoming elections than voters in optical scan counties.  As I have explained,

Equal Protection is implicated where the state burdens one group of voters in a way that it does not burden another group of voters, including where one group of voters is "less likely to cast an effective vote than" other groups of voters within the state.  Wexler v. Anderson, 452 F.3d 1126, 1232 (11th Cir. 2006); see also League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 476 (6th Cir. 2008) ("[T]he only question before us is whether the amended complaint pleads fact, if proven, sufficient to establish that the defendants arbitrarily deny Ohioans the right to vote depending on where they live."); cf. Bush v. Gore, 531 U.S. 98, 109 (2000) (there must be "minimal procedural safeguards" and "at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied" that are "well calculated to sustain the confidence that all citizens must have in the outcome of elections").  Because Defendants do not address these claims in their Motion, I will not dismiss them.

Plaintiffs also allege that the Commonwealth's recount procedures unequally burden "recount initiatives led by small party candidates such as Stein, who have fewer logistical and financial resources."  (Am. Compl. ¶ 120, Doc. No. 71.)  Ms. Cook thus has made out an Equal Protection claim as to the 2016 presidential election and future elections, and Dr. Stein has made out an Equal Protection claim as to future elections.  Again, because Defendants do not address this claim, I will not dismiss it.

To the extent that Dr. Stein separately alleges that the recount procedures burden "small party candidates" (as opposed to voters), however, her claim is not viable.  As I have explained, *no* candidate has a right to seek a recount under Pennsylvania law, regardless of the size or resources of their party.  Moreover, these restrictions (apart from whatever implications they might have on the Voter-Plaintiffs' right to vote) are justified by the Commonwealth's need for finality and to guard against frivolous recount requests from candidates who have no serious

prospect of winning the election.   Accordingly, I will dismiss Dr. Stein's separate Equal Protection claim as non-viable.

### D.  State Right to a Recount

Plaintiffs also allege that they arbitrarily have been denied their state-law right to a recount, in violation of Due Process.  As I have explained, Dr. Stein has no such state-law right.  Moreover, as I have also explained, Ms. Howe, Ms. Knight, and Ms. Cook did not seek a recount.  Accordingly, I will dismiss this claim as non-viable as to Dr. Stein, Ms. Howe, Ms. Knight, and Ms. Cook.

Mr. Reitz does have a state-law right to a recount and did seek to exercise that right.  As I explained in my Order denying preliminary injunctive relief, however, the Commonwealth's recount provisions are not arbitrary:  they help ensure "that election challenges are swiftly and fairly resolved."  (See PI Mem. 24, Doc. No. 55.)  Outside the First Amendment context, this is sufficient.  Accordingly, I will dismiss this claim insofar as it is based on Due Process grounds.

### IX.   CONCLUSIONS

For the foregoing reasons, I will:  (1) dismiss for lack of standing Dr. Stein's claims based on the 2016 presidential election; (2) dismiss for lack of standing the Voter-Plaintiffs' First Amendment and Equal Protection claims that they were subjected to an unconstitutional risk of casting an ineffective vote in the 2016 election; (3) dismiss with prejudice Ms. Cook and Mr. Reitz's First Amendment claim that the Commonwealth's recount procedures unduly burdened their rights to vote; (4) dismiss with prejudice Dr. Stein's claim that the recount procedures denied her Equal Protection; and (5) dismiss with prejudice Plaintiffs' Due Process claim that they were arbitrarily denied their state-law right to a recount.

I will otherwise deny Defendants' Motion as to:  (1) Dr. Stein's First Amendment, Due Process, and Equal Protection claims based on the risks the Election Code will impose on the

Voter-Plaintiffs' rights in future elections; (2) the Voter-Plaintiffs' First Amendment claims based on the risk of casting an ineffective vote in upcoming Pennsylvania elections; (3) Ms. Howe and Ms. Knight's First Amendment claims; (4) Plaintiffs' Equal Protection claim based on the use of the DRE machines in some counties but not others; and (5) Ms. Cook's Equal Protection claim that the recount procedures unduly burdened "small party" voters.

An appropriate Judgment follows.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

September 7, 2018                                        Paul S. Diamond, J.