# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JILL STEIN, et al.,

                Plaintiffs,

                v.

KATHY BOOCKVAR, in her official capacity
as Secretary of the Commonwealth, and
JONATHAN MARKS, in his official capacity
as Commissioner of the Bureau of
Commissions, Elections and Legislation,

                Defendants.

CIVIL ACTION

No. 16-cv-6287(PD)

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 4

    A.   Plaintiffs Pursue This Litigation, Seeking to Replace Pennsylvania's Direct-Recording Electronic Machines With Systems that Provide Voter-Verifiable Paper Records ................................................................................................ 4

        1.   Plaintiffs Seek a Preliminary Injunction, Complaining About DREs' Lack of a "Paper Trail" ................................................................ 4

        2.   In Their Amended Complaint, Plaintiffs Continue to Criticize "DRE Machines With No Paper Trail" ................................................ 6

        3.   Plaintiffs Never Specified Any Particular Format for the Paper Records They Sought ........................................................................ 7

    B.   The Parties Reach a Settlement That Advances Their Shared Desire for Auditable, Voter-Verifiable Paper Records ............................................. 9

        1.   DOS's Longstanding Efforts to Phase Out DREs............................ 9

        2.   During Settlement Discussions, Plaintiffs Tell Defendants That They "Do Not Disapprove" of the ExpressVote XL if Certain Conditions Are Met .............................................................................. 11

        3.   The Settlement Agreement ...................................................... 14

    C.   Two Days After the Settlement, the Acting Secretary Certifies the ExpressVote XL................................................................................. 15

    D.   During the Year That Plaintiffs Wait to File Their Motion, Counties Consider, Purchase, and Deploy the ExpressVote XL........................................ 16

III.   ARGUMENT................................................................................................... 18

    A.   Plaintiffs' Contractual Arguments Fail................................................. 18

        1.   The ExpressVote XL Plainly Complies With the Unambiguous Terms of the Settlement Agreement .................................................. 19

            (a)   The ExpressVote XL "produce[s] a voter-verifiable record of each vote".......................................................................... 20

            (b)   The "ballot on which each [ExpressVote XL] vote is recorded is paper" ......................................................................... 22

(c)    The ExpressVote XL is "capable of supporting a robust pre-certification auditing process" ...................................................... 26

2.    The Indisputable Parol Evidence Also Dooms Plaintiffs' Contractual Arguments ................................................................................... 27

3.    Plaintiffs' Miscellany of Other Criticisms Is Irrelevant to the Question of Whether the ExpressVote XL Complies With the Settlement Agreement ................................................................................... 28

B.    The Doctrine of Laches Bars Any Grant of Equitable Relief .............................. 31

C.    The Balance of Harms and the Public Interest Weigh Against Granting Plaintiffs an Injunction ............................................................................. 35

D.    Principles of Federalism Counsel Against a Grant of an Injunction ................... 37

E.    Plaintiffs Have Come to Court With Unclean Hands ........................................... 38

IV.    CONCLUSION .................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir. 1994) ............................................................................35

*Banfield v. Aichele*,
    51 A.3d 300 (Pa. Commw. Ct. 2012), *aff'd sub nom. Banfield v. Cortes*, 110
    A.3d 155 (Pa. 2015) .....................................................................................4, 8

*Banfield v. Cortes*,
    110 A.3d 155 (Pa. 2015) .........................................................................1, 4, 8, 21

*Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*,
    612 F. Supp. 2d 562 (E.D. Pa. 2009) ..........................................................21, 25

*In re Bressman*,
    874 F.3d 142 (3d Cir. 2017) .......................................................................32, 33

*Carr v. Thomas*,
    586 P.2d 622 (Alaska 1978) ..............................................................................24

*Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*,
    747 F.2d 844 (3d Cir. 1984) ............................................................................36

*In re Columbia Gas Sys. Inc.*,
    50 F.3d 233 (3d Cir. 1995) ..............................................................................27

*Constitution Bank v. Kalinowski*,
    38 F. Supp. 2d 384 (E.D. Pa. 1999) ..................................................................19

*Crookston v. Johnson*,
    841 F.3d 396 (6th Cir. 2016) ...........................................................33, 34, 35, 38

*Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*,
    650 F. Supp. 2d 387, *aff'd*, 399 F. App'x 711 (3d Cir. 2010) ...............................29

*In re Diet Drug Prod. Liab. Litig.*,
    525 F. App'x 140 (3d Cir. 2013) ...................................................................19, 27

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) .........................................................................................36

*Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*,
    680 F.Supp. 159 (D.N.J. 1988) .........................................................................35

*Gusciora v. Christie*,
    No. A-5608-10T3, 2013 WL 5015499 (N.J. Super. Ct. App. Div. Sept. 16,
    2013) ........................................................................................................................26

*Halpin v. LaSalle Univ.*,
    639 A.2d 37 (Pa. Super. Ct. 1994)............................................................................19

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
    276 F.3d 160 (3d Cir. 2001)......................................................................................39

*Kane v. Union of Soviet Socialist Republics*,
    189 F.2d 303 (3d Cir. 1951)......................................................................................33

*Maryland v. King*,
    567 U.S. 1 (2012).......................................................................................................36

*McDonough v. Toys R Us, Inc.*,
    795 F. Supp. 2d 329 (E.D. Pa. 2011) ........................................................................19

*Norfolk S. Ry. Co. v. G.W.S.I., Inc.*,
    No. 16-2094, 2018 WL 4466008 (E.D. Pa. Sept. 18, 2018) ......................................28

*Page v. Bartels*,
    248 F.3d 175 (3d Cir. 2001)......................................................................................37

*Pennsylvania Democratic Party v. Republican Party of Pennsylvania*,
    No. 16-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) ........................................38

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).........................................................................................33, 34, 38

*Republican Party v. Cortes*,
    218 F. Supp. 3d 396 (E.D. Pa. 2016) ..........................................................34, 37, 38

*Reynolds v. Sims*,
    377 U.S. 533 (1964)...................................................................................................33

*Romero v. Allstate Ins. Co.*,
    158 F.Supp. 3d 369 (E.D. Pa. 2016) .........................................................................39

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,
    137 S. Ct. 954 (2017).................................................................................................32

*Shaw by Strain v. Strackhouse*,
    920 F.2d 1135 (3d Cir. 1990).....................................................................................29

*Snyder v. Millersville University*,
    2008 WL 5093140 (E.D. Pa. Dec. 3, 2008) ..............................................................35

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019)..................................................................................36

*United States v. City of Philadelphia*,
    No. 2:06-cv-4592, 2006 WL 3922115 (E.D. Pa. Nov. 7, 2006) .......................33, 38

*Williams v. Metzler*,
    132 F.3d 937 (3d Cir. 1997)............................................................................19

**Statutes**

Pa. Stat. § 3006 ..................................................................................................... 36

Pa. Stat. § 3007 .....................................................................................................36

Pa. Stat. § 3031.5 ..................................................................................................36

Pa. Stat. § 3031.7 ..................................................................................................36

Pa. Stat. § 3031.1 ............................................................................................. *passim*

**Other Authorities**

*Ballot*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th
    ed. 2000) ........................................................................................................23

*Ballot*, BLACK'S LAW DICTIONARY (11th ed. 2019) ...................................................23

*Ballot*, DICTIONARY.COM, https://www.dictionary.com/browse/ballot .........................23

Mich. Telecomm. Tech. L. Rev. 247, 285 (2006), available at
    http://www.mttlr.org/volthriteen/transcript.pdf ..............................................25, 26

I.      INTRODUCTION

A little more than a year ago, with great fanfare, Plaintiffs achieved one of their stated

goals in this litigation.  Throughout the lawsuit, Plaintiffs had asserted that Pennsylvania

counties should not use direct-recording electronic voting systems ("DREs") in elections.

Plaintiffs contended that DREs are vulnerable to hacking because they do not produce a

contemporaneous paper record that a voter can review before casting a vote.  Accordingly,

Plaintiffs argued, DREs provided no assurance to voters that their votes had been recorded

correctly and did not allow for meaningful audits and recounts.

The Pennsylvania Supreme Court has held that use of DREs complies with the

Pennsylvania Election Code.  *See Banfield v. Cortes*, 110 A.3d 155 (Pa. 2015).  And in 2016, this

Court rejected Plaintiffs' motion for preliminary injunctive relief, finding that Plaintiffs had

shown "little more than a theoretical possibility" of hacking.  (ECF 55, at 29.)  Nonetheless,

Defendants, the Pennsylvania Secretary of State and the Department of State's Deputy Secretary

for Elections and Commissions (formerly the Commissioner of the Bureau of Commissions,

Elections and Legislation), agreed that DREs should be phased out and replaced with voting

systems that provided a voter-verifiable, auditable paper record.  Defendants and the

Pennsylvania Department of State ("DOS") set this process in motion in early 2018, announcing

that all new voting systems procured in the Commonwealth would have voter-verifiable paper

records.  On November 28, 2018, Plaintiffs and Defendants entered into a Settlement Agreement

that reflected, *inter alia*, their shared goal of replacing DREs with voting systems with auditable

paper records.  The Settlement Agreement provided that DOS would not certify any new voting

system for use in the Commonwealth unless it provided a paper "voter-verifiable record of each

vote."

At the time, Plaintiffs treated the settlement as a triumph, announcing a "[h]uge victory for election integrity!"  (Wiygul Decl., Ex. 1.)  Now, however, they appear to have second thoughts.  As the settlement talks progressed, DOS had been in the process of certifying a voting system that included the Election Systems & Software ("ES&S") ExpressVote XL (the "ExpressVote XL"); Plaintiffs knew this.  DOS certified the system on November 30, 2018, just two days after the execution of the Settlement Agreement, and Plaintiffs made no complaint that this certification violated their newly inked agreement.  It was not until many months had passed that Plaintiffs first contended that the Settlement Agreement prohibited certification of this equipment; they filed their Motion to Enforce the Settlement Agreement (the "Motion") nearly a year after the certification.

The Court should deny the Motion.  The Settlement Agreement's terms are unambiguous, and the ExpressVote XL complies with them.  Plaintiffs ask the Court to ignore some of the Agreement's plain terms, apply implausible definitions to others, and factor in random criticisms of the ExpressVote XL that have no possible connection to the Settlement Agreement.  Even if the Settlement Agreement's material terms were ambiguous, parol evidence compellingly shows that both Plaintiffs and Defendants believed that the ExpressVote XL complied with those terms.  As the parties were negotiating the Settlement Agreement, Defendants gave Plaintiffs a list of the voting systems Defendants were preparing to certify; significantly, this list included the ExpressVote system.  Plaintiffs, through their lead counsel and their expert, J. Alex Halderman, explained that they did not object to certification of the system as long as DOS imposed certain conditions, which DOS imposed.

Therefore, Plaintiffs cannot show that Defendants have breached the Settlement Agreement.  Moreover, the Court should deny their Motion for other reasons.  First, Plaintiffs

could have made every argument in their Motion on November 30, 2018, the day that DOS certified the ExpressVote XL.  Instead, they inexplicably sat on their hands while counties across the Commonwealth invested enormous amounts of time and money in evaluating, purchasing, and introducing their voters to the ExpressVote XL.  Two counties, Philadelphia and Northampton, have already used the system in elections.  It is too late for the counties that have purchased the ExpressVote XL to adopt new systems in time for the 2020 elections, and decertification of the system at this late point will cause upheaval that could threaten those elections.  In its 2016 holding that the doctrine of laches barred Plaintiffs' claim for injunctive relief, the Court noted that Plaintiffs' "unexplained, highly prejudicial delay" in bringing their claims had caused an unnecessary "judicial fire drill." (ECF 55, at 1, 20.)  Once again, for no apparent reason, Plaintiffs have delayed seeking relief until the point where relief would inflict devastating harm on the public.  Once again, the Court should find that the doctrine of laches bars Plaintiffs' requested relief.

Second, Plaintiffs' requested relief is barred by the doctrine of unclean hands.  Third, principles of federalism weigh against granting the requested injunction.  Finally, Plaintiffs cannot make out the factors necessary to grant a mandatory permanent injunction; indeed, they do not even discuss these factors in their Motion.  Given the harm that decertification of the ExpressVote XL would inflict upon the Commonwealth and its citizens, the balance of hardships weighs heavily against Plaintiffs and an injunction would disserve the public interest.

## II.    BACKGROUND

### A.    Plaintiffs Pursue This Litigation, Seeking to Replace Pennsylvania's Direct-Recording Electronic Machines With Systems that Provide Voter-Verifiable Paper Records

#### 1.    Plaintiffs Seek a Preliminary Injunction, Complaining About DREs' Lack of a "Paper Trail"

Unsuccessful Green Party Presidential Candidate Jill Stein and Randall Reitz, a Montgomery County voter, filed this lawsuit on December 5, 2016, nearly a month after the November 8, 2016 Presidential Election.  Although much of Plaintiffs' Complaint focused on potential recounts or contests of Pennsylvania's election results, Plaintiffs also criticized Pennsylvania's voting machines – in particular, the "six DRE machine models" that then-Secretary of State Pedro Cortés had certified.  (ECF 55, at 9; *see also* Compl. ¶ 14 (ECF 1) ("The State of Pennsylvania relies primarily on direct electronic recording ('DRE') machines to record the vote.")).[1]  The first paragraph of Plaintiffs' Complaint asserted the gist of their grievance: "There is no paper trail."  (Compl. ¶ 1; *see also id.* ¶ 15 ("DRE machines in Pennsylvania do not leave a paper trail accessible to voters or to anyone else.  Voters touch boxes on a screen, get no paper confirmation of their vote, and hope their votes were counted accurately."); *id.* ¶ 21 ("[F]or counties that use DRE machines, there is no paper ballot.  It is impossible for voters to verify even a single DRE vote on a piece of paper.").)  Plaintiffs asked this Court "to declare several

---

[1] In *Banfield v. Aichele*, 51 A.3d 300, 302 (Pa. Commw. Ct. 2012), *aff'd sub nom. Banfield v. Cortes*, 110 A.3d 155 (Pa. 2015), the Commonwealth Court described DREs as follows:  "DREs do not use a document/paper ballot in the vote process.  Rather, DREs display ballots electronically on an interface screen and allow a voter to make choices with a push button, dial or touch screen and then cast his or her vote."  51 A.3d at 302.  Significantly, although the DREs were "capable of printing the vote data at the close of the election," they did "not produce a contemporaneous paper record of an individual's vote."  110 A.3d at 159.  Instead, the DREs "recorded each vote as digital markings in various forms of internal memory."  51 A.3d at 302.  "[E]lectronic vote data [could then] be removed from the DRE on external memory devices, such as flash drives and memory cards, and connected to a different electronic system to tally the votes."  110 A.3d at 160.

sections of the Pennsylvania Election Code unconstitutional, and to issue a preliminary injunction ordering Defendants to 'institute an immediate recount of paper ballots,'" and a "'thorough, forensic examination of a reasonable sample of DRE voting systems,'" with respect to the results of the 2016 Presidential Election.  (ECF 55, at 7-8; *see* Compl. at 18-19.)

On December 12, 2016, this Court denied Plaintiffs' preliminary injunction motion on multiple independent grounds.  First, the Court found that Plaintiffs lacked standing.  (ECF 55, at 13-14.)  Second, it held that the doctrine of laches provided grounds to deny the relief Plaintiffs sought.  Plaintiffs had "inexcusably waited well past the eleventh hour to seek [injunctive relief]."  (*Id.* at 21.)  As the Court observed, the voting machines at issue had been in use for years before the 2016 Presidential Election, and Plaintiffs' expert, Dr. Halderman, "knew before the 2016 election all the information on which he based his opinion respecting the DRE machines' purported vulnerabilities."  (*Id.* at 20.)  Plaintiffs' delay in seeking relief had caused "a 'judicial fire drill'" that was "unnecessary and unfair to all concerned."  (*Id.*)

Third, the Court held, Plaintiffs were unlikely to prevail on the merits of their claims (*id.* at 22-24) and had failed to show irreparable harm.  Despite their allegations, "Plaintiffs had presented no credible evidence … that any … tampering [with Pennsylvania vote totals] occurred or could occur."  (*Id.* at 25.)  Even if it credited all of Plaintiffs' experts' opinions, the Court noted, "they [would] make out little more than the theoretical possibility a voting machine somewhere in the Commonwealth might be susceptible to tampering."  (*Id.* at 29.)   "Plaintiffs have raised only spectral fears that machines were hacked or votes miscounted ….  [S]uspicion of a 'hacked' Pennsylvania election borders on the irrational."  (*Id.* at 30, 31.)

For these and other reasons, the Court denied Plaintiffs' motion for preliminary injunctive relief.  (*Id.* at 31.)

**2.      In Their Amended Complaint, Plaintiffs Continue to Criticize "DRE Machines With No Paper Trail"**

Plaintiffs filed an Amended Complaint (ECF 71) on February 24, 2017, which joined "four Montgomery County voters" as additional plaintiffs (ECF 98, at 7 (citing Am. Compl. ¶¶ 11-15)).  Like the original Complaint, the Amended Complaint alleged that the vast majority of Pennsylvania voters "vote on DRE machines with no paper trail," which "give voters no way to ensure that their intended choices were accurately recorded by the machine, and no way for election officials to verify those choices in the case of a recount."  (Am. Compl. ¶¶ 24-25.) Plaintiffs still did not allege "that any DRE machine … in Pennsylvania was actually hacked." (ECF 98, at 6.)  But they averred that the fact that votes were recorded solely in digital, electronic form, with no paper record, made paperless DREs uniquely vulnerable to malicious attack.  (Am. Compl. ¶¶ 26-29.)  According to Plaintiffs, "*paper* ballots are the best and most secure technology available for casting votes" because "[p]aper cannot be hacked."  (*Id.* ¶ 31 (emphasis in original).)  "[T]he next best option," Plaintiffs opined, are "DREs with voter-verifiable paper audit trails ('VVPAT')," which "allow[] the voter to review a printed record of the vote he has just cast on a computer."  (*Id.* ¶ 32.)

Noting that "[n]one of the DREs used by Pennsylvania has VVPAT," Plaintiffs contended that voters using Pennsylvania DREs thus had no way "to verify that their votes were accurately recorded."  (*Id.*; *see also id.* ¶ 119.c ("In all of the DRE counties, there is a total lack of a voter-verifiable paper trial.  Voters in these counties can do nothing on Election Day to verify that their votes were counted.").)  Moreover, Plaintiffs complained, recounts and recanvasses of votes recorded by paperless DRE machines "reveal nothing" because "they [are] simply reviews of images retrieved from the same machines that [purportedly] might have been hacked."  (ECF 98, at 7 (citing Am. Compl. ¶ 56).)

On September 27, 2018, the Court dismissed Plaintiffs' claims in part.  The Court denied the motions to dismiss with respect to (as relevant here) Plaintiffs' claims that the use of "paperless DRE … machines," combined with the Commonwealth's recount procedures, unconstitutionally burdened Voter-Plaintiffs' right to vote by "subject[ing] [them] to an unconstitutional risk that [their] vote will not be counted."  (*Id.* at 37.)  The Court observed that "Plaintiffs do not, and could not, allege that any voting mechanism is error free."  (*Id.* at 31.) Indeed, Plaintiffs conceded that "[t]he issue in this case is not whether the Commonwealth may properly choose between electronic and paper voting systems."  (ECF 79, at 9.)  Rather, Plaintiffs alleged that their rights were unconstitutionally burdened because they were forced to use "DRE machines [that] have no way to verify that the machine properly recorded [voters'] votes, and no way to determine whether the machine was compromised."  (ECF 75-1, at 24; *see also id.* at 25 (contending that "there is no reason that Pennsylvania cannot follow the lead of its sister states and provide paper verification (preferably by paper ballot, or at least a paper trail of DRE machines), as 33 states do").

### 3. Plaintiffs Never Specified Any Particular Format for the Paper Records They Sought

Throughout the litigation, Plaintiffs, like the general public, used the terms "paper ballots" and "ballots" loosely.  Although they sometimes seemed to give the term "paper ballot" a more precise, technical meaning (so as to refer to, for example, a "traditional" paper ballot containing the entire menu of all electoral choices), they often appeared to use it to mean simply any vote recorded contemporaneously on paper – in contrast to what they attacked in the lawsuit, namely, paperless DREs.  *See, e.g.*:

- Plaintiffs' Complaint.  (*E.g.*, Compl. ¶ 21 ("For counties that use DRE machines, there is no paper ballot.  It is impossible for voters to verify even a single DRE vote on a piece of paper."); *id.* ¶ 64 ("In DRE counties, there is nothing to 'count.'  There is no paper ballot.

> All a candidate or a voter can do to ensure the integrity of the vote is examine the DRE voting system.").

- Statements by Plaintiffs' counsel at the December 9, 2016 hearing on the motion for preliminary injunction. (*E.g.*, Wiygul Decl., Ex. 2, at 40:21-41:6 (asserting that "[b]ecause there are no paper ballots[,] there is no way to examine [DREs]" other than "through a forensic examination"; "that really is the way to make sure that your vote counted in a DRE district where there is no paper ballot"); *id.* at 113:12-18 (referring to "the reality of voters having no way to verify their own votes in these DRE machines … their complete and utter inability to have any method in Pennsylvania to make sure their votes counted when they can't verify it in any way themselves with a paper ballot").

Notably, the *Banfield* decision was similarly loose in its use of the term "paper ballot." Even though it sometimes cited the statutory definition in 25 Pa. Stat. § 3101.1 (which distinguished a "paper ballot" from a "ballot card" and "ballot label"), it elsewhere used "paper ballot" to mean simply what the petitioners wanted, *i.e.*, a paper record of a vote, in contrast to paperless DRE machines, which record votes electronically and do not permit contemporaneous voter-verification or auditing. *See, e.g.*, *Banfield*, 110 A.3d at 167 (describing petitioners' argument "that the Election Code requires an electronic voting system to produce a software-independent, voter-verified paper record at the time each vote is cast" as an argument that "the Election Code require[s] an electronic voting system to print a paper ballot for each individual to view"); *id.* at 168 (explaining that petitioners' suggestion that "counties should purchase optical scanners or DREs equipped with new VVPAT (Voter-Verified Paper Audit Trail) technology … does not affect our finding that the Legislature clearly authorized electronic voting systems that do not utilize paper ballots"); *id.* at 170 ("[petitioners'] argument that a statistical recount requires election officials to assess whether a DRE has correctly captured voter intent is another reformulation of their contention that DREs must produce voter-verified paper ballots"); *see also Banfield*, 51 A.3d at 302 ("DREs do not use a document/paper ballot in the vote process.").

B.    **The Parties Reach a Settlement That Advances Their Shared Desire for Auditable, Voter-Verifiable Paper Records**

1.    **DOS's Longstanding Efforts to Phase Out DREs**

Long before the settlement, the Department of State was moving toward its goal of phasing out DREs and adopting machines that would produce the sort of voter-verifiable, contemporaneous paper record Plaintiffs appeared to desire.  (Boockvar Decl. ¶¶ 12-18.)  At a Pennsylvania Senate Committee hearing on September 25, 2018, Deputy Secretary Jonathan Marks, then the Commissioner of DOS's Bureau of Commissions, Elections and Legislation, explained the reasons for the Department's initiative: "Professionals in national security, intelligence, computer science, elections, and more, have urged states to act as quickly as possible, to replace older voting machines with voting systems that produce a paper record that voters can verify, and which enable robust post-election audits."  (Unger Decl., Ex. 3, at 1.)  Commissioner Marks noted that the U.S. Homeland Security Secretary had "called on 'every state in the Union to ensure that by the 2020 election, they have election systems'" employing "'a physical paper trail and effective audits.'"  (*Id.*)  Furthermore, Commissioner Marks pointed out, earlier in September 2018, the National Academies of Sciences, Engineering, and Medicine had issued a leading and widely cited report, "Securing the Vote: Protecting American Democracy" (the "Securing the Vote Report" or "Report").  (*Id.* at 2.)  "The report assesses current technology and standards for voting, and recommends steps that federal, state, and local governments, election administrators, and vendors of voting technology should take to improve the security of election infrastructure, including that all elections should be conducted with paper ballots by 2020, and states should mandate risk-limiting audits within a decade."  (*Id.*)

Significantly, the Report provides a specific definition of "paper ballots":

> Because records of ballots may take many forms, it is important to clearly define what is meant by 'paper ballot.'  For the purposes of this report, references

9

to paper ballots refer to original records that are produced by hand or *a ballot-marking device*, which are human-readable in a manner that is easily accessible for inspection and review by the voter without any computer intermediary (i.e., voter-verifiable), countable by machine (such as a scanner) or by hand, and which may be recounted or audited by manual examination of the human-readable portion of the ballot.

A paper ballot-based voting system makes the paper ballot the official "ballot of record" of the voter's expressed intentions.  Other representations (e.g., an electronic representation produced by a scanner) are derivative and are not voter-verifiable.  The human-readable portion of the cast paper ballot provides the basis for audits and recounts.

(Wiygul Decl., Ex. 3, at 42-43 (emphasis added).)  As discussed below, this is precisely the meaning of "paper ballot" as it is used in the Settlement Agreement, and the ExpressVote XL machine at issue here satisfies every aspect of this definition.

Commissioner Marks testified that, to meet these new standards, the Department had, in February 2018, issued "a directive requiring that all new voting systems procured by Pennsylvania counties have a voter-verifiable paper record," with the goal of having Pennsylvania counties transition to using such systems during elections in "2019 or early 2020." (Unger Decl., Ex. 3, at 2.)  Furthermore, "[n]ew voting equipment must not only include voter-verifiable paper records and achieve U.S. Election Assistance Commission (EAC) certification, but must also be assessed" under "new voting system security and accessibility standards" issued in Spring 2018.  (*Id.* at 3; *see* Boockvar Decl. ¶¶ 43, 46.)

Commissioner Marks also advised the legislative committee that one such new voting system had "already completed state and federal certification."  (*Id.* at 3.)  Another one – which happened to be the ExpressVote system – was then "wrapping up its testing after addressing issues identified during Kansas's primary election in August; [the Department] expect[ed] this testing to be complete in September [2018] and the system to be ready for certification."  (*Id.*)

10

2.    **During Settlement Discussions, Plaintiffs Tell Defendants That They "Do Not Disapprove" of the ExpressVote XL if Certain Conditions Are Met**

Given that the Department had decided to adopt the very type of voting machines systems Plaintiffs professed to want, a settlement appeared within reach. On September 28, 2018, Defendants' counsel sent Plaintiffs' counsel an email "forwarding some documents that [Defendants are] hoping could favorably influence settlement discussions." (Unger Decl., Ex. **1.**) Included among these documents was Jonathan Marks' September 25, 2018 testimony before the Senate State Government Committee. (Unger Decl., Ex. 3.) Also attached was the "[m]ost recent Pennsylvania Voting System and E-Poll Book Status Report which includes the specific voting systems (with model numbers) that [the Department of State] expects will be presented for examination in Pennsylvania." (Unger Decl., Ex. 1; *see id.*, Ex. 2.) One of the systems listed was the ES&S EVS Model 6.0.2.1, which includes the exact ExpressVote XL machine challenged in Plaintiffs' Motion. (Unger Decl., Ex. 2; Boockvar Decl. ¶ 57; Baumert Decl. ¶ 15.) Consistent with then-Commissioner Marks' Senate Committee testimony, the document noted that Pennsylvania was currently testing "new release EVS 6021 with fixes to anomalies scheduling during the week of Sep[tember] 24, 2018." (Unger Decl., Ex. 2.)

On October 9, 2018, just two days before the parties' settlement conference before Magistrate Judge Rice, Plaintiffs' counsel responded with "some feedback" on the "list of models in the 'PA voting systems & electronic poll book report.'" (Unger Decl., Ex. 4.) Notably, in his email, Plaintiffs' counsel used the term "paper ballot" in a way consistent with the Securing the Vote Report: he contrasted "election systems … [that] don't use paper ballots" with "paperless DRE system[s]." (*Id.*) Even more significantly, the email forwarded an evaluation by Alex Halderman – who had provided expert testimony in support of Plaintiffs' unsuccessful preliminary injunction motion, and who submitted a declaration in support of

11

Plaintiffs' present Motion – of the machines listed in the report sent to Plaintiffs on September 28.  Dr. Halderman stated: "I reviewed the voting systems that PA is considering, and I don't *disapprove* of any of them in their entirety."  (Unger Decl., Ex. 4 (emphasis in original).)  Dr. Halderman also used the term "paper ballot" consistently with the definition of the term in the Securing the Vote Report; he explained that "[a]ll of them [*i.e.*, the voting systems under consideration] (that use paper ballots) can be used with reasonable security if implemented with voter-verified paper ballots and robust manual audits."  (*Id.*)

Dr. Halderman further stated that "there are features of each of these voting systems that can render them unsafe if activated."  (Unger Decl., Ex. 4.)  But he did not contend that these features should *disqualify* any of the systems from certification.  To the contrary, he suggested that Defendants' counsel "urge PA *to certify them* [*i.e.*, the systems] with restrictions that prohibit these dangerous features."  (*Id.* (emphasis added).)  With specific respect to the "ExpressVote machines," Dr. Halderman agreed that they "can work as traditional ballot marking devices," but he warned that it was "also possible to configure them in ways that defeat the purpose of the paper trail."  (*Id.*)

Dr. Halderman then listed the specific potential configurations that he found problematic.  First, he noted that the machines could be "set up to print the ballot but not show it to the vote[r] at all (the machine just scans it internally and stores it in a ballot box).  This means there's paper but it's not voter-verified, so it's of no use in an audit."  (*Id.*)  Second, the ExpressVote could be configured so that "it asks voters whether they want to verify their ballots *before* printing them, and only allows the voter to inspect the paper if they say yes."  (*Id.* (emphasis in original).)  "[T]his also defeats the value of an audit, since malware could be programmed to cheat only if the voter opts not to see the paper."  (*Id.*)  Accordingly, Dr. Halderman explained, "PA should

require the machines to be configured so that every voter has an opportunity to see their completed ballot *after* it's been printed."  (*Id.* (emphasis in original).)

Dr. Halderman's guidance was, of course, consistent with the Secretary's February 2018 directive and Commissioner Marks's September 25 testimony, which called for all newly certified electronic voting machines to produce voter-verifiable paper records supporting robust audits.  And, in fact, when the Department certified the ExpressVote XL on November 30, 2018, it adopted Dr. Halderman's guidance, requiring "[j]urisdictions implementing ExpressVote XL [to] ensure that the configuration allows voters to review their vote selections on the screen and on the printed ballot card before it is cast."  (Boockvar Decl., Ex. 1, at 42.)

Dr. Halderman did not cite any other issues with the ExpressVote machines.  (*See id.*) *He did not mention **any** of the issues Plaintiffs raise in their Motion.*  In summary: In the settlement discussions, DOS informed Plaintiffs of the specific machines it was planning to certify, including the ExpressVote XL; Plaintiffs' expert reviewed those machines; Plaintiffs' expert agreed that the ExpressVote XL machine used "paper ballots"; and Plaintiffs' expert blessed the certification of the XL machine so long as it was required to be configured "so that every voter has an opportunity to [verify] their completed ballot *after* it's been printed."  (Unger Decl., Ex. 4.)  Thus, long before they signed the Settlement Agreement, Plaintiffs knew, or should have known, everything about the ExpressVote XL that they now claim is a violation of that agreement – that the vote was recorded on barcodes and voter-verifiable text records printed on paper; that the machine scans the barcode before presenting the ballot to the voter for verification; and that the verified ballot travels past the printhead on its way to the secure collection box.  (Boockvar Decl. ¶ 59; Baumert Decl. ¶¶ 4, 39, 50-54.)

### 3.      The Settlement Agreement

Two days after the October 9 email from Defendants' counsel, the parties participated in a settlement conference, in which they agreed to the criteria that would be set forth in Paragraphs 2 and 3 of the Settlement Agreement on which Plaintiffs have focused.  (Boockvar Decl. ¶ 40.) At no point during the settlement conference did the Plaintiffs assert that only voting systems that use hand-marked paper ballots were acceptable, that ballot-marking devices ("BMDs") or systems using barcodes were not, or that Plaintiffs opposed the certification of any system that was then going through the certification process.  (Boockvar Decl. ¶ 41.)  The Agreement was ultimately signed on November 28, 2018.  (*See* ECF 112-1, Ex. A.)

Paragraph 2 of the Agreement provides that "[t]he Secretary will only certify new voting systems for use in Pennsylvania if they meet [three] criteria."  (*Id.* ¶ 2.)  First, "[t]he ballot on which each vote is recorded [must be] paper."  (*Id.* ¶ 2.a.)  To this criterion is appended a footnote stating that "[a] VVPAT receipt generated by a DRE machine is not a paper ballot." (*Id.* at 2 n.3.)  Second, "[t]hey [*i.e.*, the voting machines] [must] produce a voter-verifiable record of each vote."  (*Id.* ¶ 2.b.)  And, third, "they [must be] capable of supporting a robust pre-certification auditing process."  (*Id.* ¶ 2.c.)  Paragraph 3 of the Agreement then states that "[t]he Secretary will *continue* to direct each county in Pennsylvania to implement these voting systems by the 2020 primaries, so that every Pennsylvania voter in 2020 uses a voter-verifiable paper ballot."  (*Id.* ¶ 3 (emphasis added).)

The Settlement Agreement also provides, among other things, that "[t]he Secretary will direct each county to audit all unofficial election results using robust pre-certification audit methods to be determined based on the recommendations of a Work Group established by the Secretary …."  (*Id.* ¶ 5.)  With respect to enforcement, the parties agreed that, "if Plaintiffs have a reasonable basis to believe that Defendants are in non-compliance with a material term of this

Agreement, Plaintiffs will notify the Defendants in writing of the specific compliance issue(s)." (*Id.* ¶ 14.)  Defendants would then have 30 days to "provide a good-faith written response."  (*Id.* ¶ 15.)

Plaintiff Stein announced the settlement as a "[h]uge victory for election integrity!" (Wiygul Decl., Ex. 1.)  Devotees of hand-counted, hand-marked paper ballots immediately attacked the settlement on social media, arguing that the settlement would permit use of the ExpressVote XL and similar systems.  (*See, e.g.*, Wiygul Decl., Ex. 4 (Twitter thread beginning with "I hate to be Debbie Downer, but this agreement allows PA to buy awful "universal use" touchscreen ballot markers and scanners, which generate the COMPUTER marked so-called 'paper ballots' w/barcodes that I've been warning about.").  Had Plaintiffs believed at the time that the settlement did not permit the ExpressVote XL system, one might have expected them to say that in response to this criticism.  They do not appear to have done so.

### C.    Two Days After the Settlement, the Acting Secretary Certifies the ExpressVote XL

On November 30, 2018, two days after the Settlement Agreement was signed, then-Acting Secretary Robert Torres certified the ES&S Model 6.0.2.1, the system that included the ExpressVote XL machine.  (Boockvar Decl. ¶ 60; Baumert Decl. ¶¶ 15, 19.)  As the Acting Secretary's certification report stated, "ExpressVote XL create[s] *a paper ballot* based on a voter's selections, which is tabulated when the voter affirms that he/she is ready to cast a vote." (Boockvar Decl., Ex. 1, at 24 (emphasis added).)  The certification report included a number of conditions.  One of these was that counties using the ExpressVote XL machine must conduct a "statistical recount of a random sample of ballots after each election."  (*Id.* at 38.)  "This audit must be conducted *via a manual count of the voter marked paper ballots exclusively.*"  (*Id.* (emphasis added).)  Notably, in the audit, it is the text of the paper ballots that is reviewed.

(Boockvar Decl. ¶¶ 34-36.)  In the event of any conflict between the text and the electronically recorded vote totals, or between the textual record of the vote and the barcode record, the voter-verified textual record on the paper ballots will control.  (Boockvar Decl. ¶¶ 35-36.)  Another condition was that requested by Dr. Halderman: that the system be configured to ensure that a voter cannot opt out of seeing the paper record.  (Boockvar Decl. ¶ 62, Ex. 1, at 42.)

The mechanics of voting on the XL machine are relatively simple.  The voter makes her selection of candidate(s) on the touchscreen and then presses "print."  (Boockvar Decl., Ex. 1, at 5; Baumert Decl. ¶ 4.)  The machine then prints a paper record on which the voter's selections are recorded both as barcodes and as human-readable text.  (Boockvar Decl., Ex. 1, at 5; Baumert Decl. ¶¶ 4, 39.)  The barcodes are scanned by the machine, and the paper record is then displayed behind glass for the voter to review and verify.  (Boockvar Decl. ¶ 62 & Ex. 1, at 42; Baumert Decl. ¶ 4.)  At that point, the voter has the option of using the touchscreen to either "cast" or "spoil" her ballot.  If she elects to cast her ballot, the scanned selections are tabulated by the machine electronically, and the paper record is deposited into a secure collection box attached to the voting system.  (Boockvar Decl., Ex. 1, at 5; Baumert Decl. ¶ 4.)

**D.** **During the Year That Plaintiffs Wait to File Their Motion, Counties Consider, Purchase, and Deploy the ExpressVote XL**

If Plaintiffs had a valid claim that the Secretary's certification of the XL machine was a breach of the Settlement Agreement, they could have raised it on November 30, 2018.  But almost a year passed before they filed their Motion.  In the interim, several Pennsylvania counties – including Philadelphia, the largest county in the Commonwealth – considered the XL voting system and decided to purchase it.  (Boockvar Decl. ¶¶ 75-77.)  Philadelphia began the procurement process in February 2018.  (Nesmith-Joyner Decl. ¶ 7; Boockvar Decl. ¶ 76.)  After a lengthy and complex procurement process, involving at least eight City departments, it selected

the machines in February 2019.  (Nesmith-Joyner Decl. ¶¶ 3-21; Lynch Decl. ¶ 7 & Ex. 1.)

Additional processes were required to secure appropriate warehouse space for the new machines

(Lynch Decl. ¶ 9) and put contractual arrangements in place for their deployment to polling

places (Nesmith-Joyner Decl. ¶ 28).  The machines – nearly 4,000 of them – were delivered over

a four-month period beginning in April 2019.  (Lynch Decl. ¶¶ 8, 10-11.)  The intense process of

training poll workers, educating voters, and rolling out the new voting systems lasted through

October 2019, and Philadelphia deployed the machines for use in the November 5, 2019 election.

(Lynch Decl. ¶¶ 7-22.)  Cumberland County began its search for a new voting system in August

2018; its Board of Elections voted to select the ExpressVote XL in June 2019, and its Board of

Commissioners approved the procurement in September 2019.  (Salzarulo Decl. ¶¶ 3-8.)

On July 16, 2019, several voters petitioned for the Secretary to reexamine the XL system.

The petitioners argued, as Plaintiffs do in their Motion, that the ExpressVote XL did not comply

with the Settlement Agreement in this case because it does not include a "paper ballot" as

defined in Pa. Stat. § 3031.1.  (ECF 112-1, at page 43 of 188.)  The petitioners did not otherwise

argue that the XL system failed to comply with the Settlement Agreement.  (*See id.* at pages 32-

43 of 188.)  The Secretary determined that this claim, along with most of the petitioners' other

claims, was a legal argument that did not apply to the reexamination or certification process.

(Boockvar Decl. ¶¶ 65-67.)  To address the claims that related to the certification process, the

Department engaged a consultant to conduct a focused reexamination of the ExpressVote XL.

(Boockvar Decl. ¶ 68.)

On July 29, 2019 – eight months after the ExpressVote XL system was certified by the

Secretary – Plaintiffs first notified Defendants that they believed the system did not comply with

the Settlement Agreement.  (ECF 112-1, Ex. C.)  On September 3, 2019, the Department

released the Reexamination Report for the ExpressVote XL, which maintained its certification but imposed additional conditions for its use.  (ECF 112-1, Ex. B.)  On September 12, 2019, Defendants responded to Plaintiffs, explaining, in no uncertain terms, that the XL machine complied with the Settlement Agreement.  (ECF 112-1, Ex. D.)  Rather than returning to Court, Plaintiffs communicated with DOS several more times, letting an *additional* two-and-one-half months pass before filing their Motion.  (Memorandum of Law in Support of Plaintiffs' Motion to Enforce the Settlement Agreement at 3 (ECF 112) ("Pls. Memo.").)

## III.    ARGUMENT

### A.    Plaintiffs' Contractual Arguments Fail

Plaintiffs' Motion presents a straightforward issue of contractual interpretation. Notwithstanding Plaintiffs' attempt to twist and torture the language of the Settlement Agreement, and to divert the Court into scholastic hair-splitting regarding the metaphysics of a "vote," the unambiguous plain terms of the Settlement Agreement are all that is needed to resolve this dispute.  ExpressVote XL machines comply with the Settlement Agreement because the ballot on which each vote is recorded is paper; they produce a voter-verifiable record of each vote; and they are capable of supporting a robust pre-certification auditing process.  The hodgepodge of complaints Plaintiffs throw up – conjuring spectral theories that the machines could be hacked or malfunction in certain ways, and noting that another state opted for machines without QR codes (which, in any event, the XL does not use) – do not and cannot change that fundamental, dispositive fact.

Moreover, even if the material terms of the Agreement were somehow ambiguous, the result would be the same.  If anything, the parol evidence of the parties' intentions only tilts the scales *more* heavily in favor of Defendants.  As shown above, during the settlement negotiations, Defendants disclosed to Plaintiffs the specific voting systems they were then preparing to certify,

including the ExpressVote XL.  Plaintiffs, through the very expert that has submitted a

declaration in support of their current Motion, made clear that they did not object to certification

of the XL machine so long as the Secretary prohibited certain configurations.  The Secretary

certified the machine – with the exact restrictions Plaintiffs requested.

Plaintiffs' current arguments, which they did not bring to this Court until a year after the

Secretary's certification, are a disappointing, *post hoc* attempt to move the goalposts that the

parties clearly agreed on.  Plaintiffs' Motion should be denied.

### 1.   The ExpressVote XL Plainly Complies With the Unambiguous Terms of the Settlement Agreement

"Settlement agreements are interpreted according to basic contract principles."  *In re Diet

Drug Prod. Liab. Litig.*, 525 F. App'x 140, 142 (3d Cir. 2013) (internal quotation marks

omitted).  The Settlement Agreement here is to be construed under Pennsylvania law.  (ECF 112-

1, Ex. A ¶ 23.)  "In Pennsylvania, the fundamental rule of contract interpretation is to ascertain

the intent of the contracting parties."  *McDonough v. Toys R Us, Inc.*, 795 F. Supp. 2d 329, 333

(E.D. Pa. 2011) (internal quotation marks omitted).  "In ascertaining contractual intent, the plain

language of the agreement controls.  Proper construction also requires consideration of 'the

situation of the parties, the attendant circumstances and the ends they sought to achieve.'"

*Constitution Bank v. Kalinowski*, 38 F. Supp. 2d 384, 385-86 (E.D. Pa. 1999) (quoting *Williams

v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997)).  "[W]hen a term in an agreement is clear and

unambiguous, its meaning must be determined from the four corners of the contract" as a matter

of law.  *In re Diet Drugs Prods. Liab. Litig.*, 525 F. App'x 140, 142 (3d Cir. 2013).  In turn,

"[w]hen determining whether a contract is ambiguous, a court must view the contract as a whole

and not in discrete units."  *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. Super. Ct. 1994).  To

conclude that the Secretary's certification of the ExpressVote XL did not comply with the

Settlement Agreement criteria, Plaintiffs are forced to adopt a tortured reading that cannot be reconciled with the Agreement's plain language.

        **(a)**        **The ExpressVote XL "produce[s] a voter-verifiable record of each vote"**

Plaintiffs' first argument addresses the second certification criterion in the Settlement Agreement, namely, that newly certified voting systems must "produce a voter-verifiable record of each vote." The ExpressVote XL plainly does exactly that. As described above, each of the voter's selections is recorded on paper in two different forms: machine-readable barcodes and human-readable text. (Baumert Decl. ¶ 39.) And – as Plaintiffs requested during the settlement negotiations – the Secretary has required that the machines be configured so that the voter is shown and may verify the text record of her votes before casting her ballot. (*See supra* Section II.C.) Accordingly, under any reasonable construction of Paragraph 2.b of the Settlement Agreement, the Secretary's certification of the ExpressVote XL is compliant.

Plaintiffs' contrary arguments miss the mark. Their chief complaint is that an ordinary voter can verify only the text record and not the barcode. According to Plaintiffs, "the 'vote' is the bar code," so the voter purportedly cannot verify her vote. (Pls. Memo. at 7.) Plaintiffs' assertion that "the 'vote' is the bar code" is based on the fact that the machine scans the barcodes to tabulate vote totals. But, as explained above, Pennsylvania requires manual, statistical recounts of the XL's paper records *using the text records*, to ensure the integrity of the vote count. (*See supra* Section II.C.) Furthermore, if there is any discrepancy between the text and the electronic vote count, or between the text and the barcodes, *the voter-verifiable text will*

control.  (*See supra* Section II.C.)[2]  Accordingly, in the final analysis, "the vote" is the voter-verifiable text.

But even if Plaintiffs were right that "the vote" is the barcode, it would not change the fact that the ExpressVote XL complies with Paragraph 2.b.  That provision, by its plain terms, does not require that "the vote is voter-verifiable"; it requires only that the voting system "produce a voter-verifiable *record of* the vote."  Plaintiffs' interpretation would render the words "record of" superfluous, in violation of basic Pennsylvania-law principles of contract interpretation.  *See Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 579 (E.D. Pa. 2009) ("the court  must … giv[e] effect to all of the contractual language if at all possible," and "[n]o provision … is to be treated as surplusage"); *see also Banfield*, 110 A.3d at 167 (rejecting petitioners' interpretation of "provide for" in 25 Pa. Stat. § 3031.1 because it "would render the word 'for' … mere surplusage").

Furthermore, Plaintiffs' argument, if accepted, would also disqualify systems employing hand-marked paper ballots read by an optical scanner, *i.e.*, the very systems Plaintiffs profess to prefer.  (*See* Pls. Memo. at 2, 12.)  When a voting machine scans a hand-marked ballot (for example, a filled-in oval or drawn line next to a candidate's name) the machine is not reading the text.  It is reading the marks.  (Baumert Decl. ¶¶ 41-43; Boockvar Decl. ¶ 28.)  And the voter cannot verify how the marks are being read and registered by the machine.  That depends on software – and voter-inscrutable coding marks, which are often printed on the margins of the ballots themselves – that tell the machine how to interpret a mark at a particular coordinate on

---

[2] As previously noted, these procedures fully accord with the Secure the Vote Report's recommendation that "[t]he human-readable portion of the cast paper ballot provide[] the basis for audits and recounts."  (Wiygul Decl., Ex. 3, at 43.)

the page.[3]  Functionally, this is no different than the barcodes printed on the ExpressVote XL ballot.  (Baumert Decl. ¶¶ 41-45; Boockvar Decl. ¶ 20.)  In sum, not only is Plaintiffs' proposed standard divorced from the plain language of the Settlement Agreement; it is so exacting that it would disqualify the alternative voting systems proposed by Plaintiffs (and virtually any voting system, other than humans manually counting every vote on every ballot in every election, which would be impracticable from a resources standpoint and susceptible to human error[4]).  (Boockvar Decl. ¶ 29.)

> **(b)** **The "ballot on which each [ExpressVote XL] vote is recorded is paper"**

The Secretary's certification of the ExpressVote XL also complies with Paragraph 2.a of the Settlement Agreement, which requires that "[t]he ballot on which each vote is recorded is paper."  Plaintiffs do not (and cannot) dispute that the XL machine, like other BMDs, records each official vote on paper (whether "the vote" is best understood as the barcode or the text) – unlike paperless DREs, and also unlike DREs with a Voter Verifiable Paper Audit Trail (VVPAT), where the DRE's digital vote record is the official tabulation.  As set forth in the Securing the Vote Report, this feature allows for manual audits of official, contemporaneously-generated paper voting records and protects against the risk that the machine's internal electronic tabulation somehow becomes corrupted.  (Wiygul Decl., Ex. 3, at 42-43.)  In denying the obvious proposition that the "ballot on which each [XL] vote is recorded is paper," Plaintiffs put

---

[3] And, of course, in theory, the software could malfunction/be hacked or the coding marks could be altered, so that the machine's tabulation of a given mark would differ from what the voter intended.

[4] "For a discussion of the inherent weaknesses in human vote counting, see Goggin, Stephen N., Micheal D. Byrne, and Juan E. Gilbert, 'Post-election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence,' *Election Law Journal: Rules, Politics, and Policy*, 2012, Vol. 11, No. 1, pp. 36-51."  (Wiygul Decl., Ex. 3 (Securing the Vote Report), at 44.)

themselves at odds with the unambiguous meaning of the Settlement Agreement (as well as the overwhelming extrinsic evidence of the parties' intent).

Plaintiffs' interpretation of Paragraph 2.a rests on two definitional assertions.  First, Plaintiffs contend that the term "ballot" must be read narrowly to refer only to "the [entire] menu of options from which the voter chooses."  (Pls. Memo. at 9.)  Second, Plaintiffs argue that "[t]he ballot on which each vote is recorded is paper" should be given the same meaning as the defined term "paper ballot" in 25 Pa. Stat. § 3031.1, *i.e.*, a "paper printed ballot which conforms in layout and format to the voting device at issue."  Neither assertion is tenable.

As an initial matter, Plaintiffs cite no authority for their surpassingly narrow definition of "ballot."  (*See* Pls. Memo. at 9-10.)  In fact, the term is defined far more broadly as "[a]n instrument, such as a paper or ball, used for casting a vote."  *Ballot*, BLACK'S LAW DICTIONARY (11th ed. 2019); *accord, e.g.*, *Ballot*, DICTIONARY.COM, https://www.dictionary.com/browse/ballot ("a slip or sheet of paper, cardboard, or the like, on which a voter marks his or her vote"); *Ballot*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) ("A sheet of paper or card used to cast or register a vote, especially a secret one.").  Indeed, the Election Code provision on which Plaintiffs rely for the definition of "paper ballot" directly contradicts Plaintiffs' assertion.  It defines "ballot" broadly as "ballot cards or paper ballots upon which a voter registers or records his vote or the apparatus by which the voter registers his vote electronically and shall include *any ballot envelope, paper or other material* on which a vote is recorded for persons whose names do not appear on the ballet labels."  25 Pa. Stat. § 3031.1 (emphasis added).[5]  Undeniably, the paper on which the XL

---

[5] Furthermore, Plaintiffs provide no reason why the Settlement Agreement would incorporate such a narrow definition of "ballot," which would mean the paper used to record votes in candidate- and contest-heavy jurisdictions like Philadelphia would have to be either

machine records each vote is a "ballot," and thus the "ballot on which each [XL] vote is recorded is paper." *See Carr v. Thomas*, 586 P.2d 622, 624 (Alaska 1978) (although petitioners assumed that a particular type of a ballot "is not a 'paper ballot,'" those ballots "are constructed of paper, so that literally they are 'paper ballots'").

Plaintiffs' second argument is slightly more elaborate but no less wrong.  Plaintiffs point to Paragraph 3 of the Settlement Agreement, which provides that "[t]he Secretary will continue to direct each county in Pennsylvania to implement these voting systems by the 2020 primaries, so that every Pennsylvania voter in 2020 uses a voter-verifiable paper ballot," and make a two-step argument.  First, they argue that the definition of the term "paper ballot" in Paragraph 3 controls the meaning of the term "ballot" in Paragraph 2; second, they argue that the definition of "paper ballot" in 25 Pa. Stat. § 3031.1 controls the meaning of that term in Paragraph 3.

This complicated reading gets things exactly backwards, making the tail wag the definitional dog.  As is obvious from the structure of the Settlement Agreement, the term "voter-verifiable paper ballot" in Paragraph 3 is not importing a new concept into the Agreement; it is shorthand for a ballot that meets the three criteria enumerated in Paragraph 2.  (ECF 112-1, Ex. A ¶¶ 2-3.)  In other words, Paragraph 2 sets forth the criteria all new voting systems will have to satisfy to be certified, and Paragraph 3 commits the Commonwealth to a timeline for implementing these systems.  As the plain language and structure make clear, Paragraph 3's "paper ballot" requirement is nothing other than a shorthand restatement of Paragraph 2.a's requirement that "[t]he ballot on which each vote is recorded [be] paper."

---

enormous (the ExpressVote XL has a 32-inch screen) or broken into multiple pages.  Either of these configurations would cause significant administrative problems, assuming they were feasible at all.

Moreover, interpreting the reference to "voter-verifiable paper ballot" in Paragraph 3 to incorporate the definition in 25 Pa. Stat. § 3031.1, rather than simply encapsulating the criteria set forth in Paragraph 2, would lead to absurd results.  It would mean that the Secretary is allowed to certify machines that lack "paper ballots" within the meaning of § 3031.1, but that she has to direct the counties to implement only a much narrower subset of those machines by 2020. (*See* ECF 112-1, Ex. A ¶¶ 2-3.)  That simply makes no sense.

There is yet another plain-language obstacle to Plaintiffs' attempt to engraft 25 Pa. Stat. § 3031.1's definition of "paper ballot" onto the Settlement Agreement.  The Agreement expressly provides that "[a] VVPAT receipt generated by a DRE machine is not a paper ballot." (ECF 112-1, Ex. A, at 2 n.3.)  If the parties intended the meaning of "paper ballot" to be limited to ballots displaying the entire menu of all candidates and choices, that provision would be completely superfluous – not to mention oddly, and misleadingly, under-inclusive.  *See Benchmark*, 612 F. Supp. 2d at 579 (rejecting interpretation of one contractual provision that "would render [a] second clause wholly unnecessary and entirely meaningless").  On the other hand, if the parties intended "paper ballot" to refer merely to a contemporaneous paper record of the vote, the decision to specifically exclude VVPATs makes perfect sense.[6]  For one thing, it makes clear that although Plaintiffs ranked VVPATs as "the next best option" in their Amended Complaint (ECF 71 ¶ 32), they were not agreeing to VVPATs for purposes of settlement.  For another thing, courts and commentators have sometimes used the term "voter-verified paper

---

[6] Critics of VVPATs have alleged that their design creates privacy concerns.  *See 21st Century Copyright Law in the Digitial Domain Symposium Transcript*, 13 Mich. Telecomm. Tech. L. Rev. 247, 285 (2006), available at http://www.mttlr.org/volthriteen/transcript.pdf ("Unfortunately, really bad engineering has been used to retrofit the DREs [with VVPATs]…. Because votes are stored consecutively on the continuous rolls, there are privacy concerns.").

ballot" to include VVPATs.[7]  Accordingly, to avoid any ambiguity about the parties' intent, it was necessary expressly to carve out DREs with VVPATs from the definition of certifiable voting machines.

> **(c)      The ExpressVote XL is "capable of supporting a robust pre-certification auditing process"**

The ExpressVote XL also clearly satisfies the third criterion in Paragraph 2 of the Settlement Agreement: it is "capable of supporting a robust pre-certification auditing process." (ECF 112-1, Ex. A ¶ 2.c.)  As previously explained, because the system records votes in voter-verifiable text on the paper ballot, a random, statistically appropriate sample of ballots can be hand-counted before the vote totals are certified, to ensure that the machine-counted result is accurate.  (*See supra* Section II.C.)  In fact, the certification of the ExpressVote XL's system requires such audits for counties using the system.  (*See supra* Section II.C.)

Plaintiffs' argument that the XL is *not* capable of supporting robust pre-certification audits rests exclusively on their theoretical supposition that the machines could be "hacked" to (a) cast rejected votes, *i.e.*, electronically tabulate votes scanned from a certain ballot, even though the voter opted to spoil the paper ballot itself, or (b) somehow print additional or different selections on the ballot after the voter has already verified it.  (Pls. Memo., at 12-13.)  As discussed below, these arguments are not supported by any admissible evidence, and there is simply no realistic prospect that the scenarios envisioned by Plaintiffs could ever come to pass.

---

[7] *See, e.g.*, *Gusciora v. Christie*, No. A-5608-10T3, 2013 WL 5015499, at *5 (N.J. Super. Ct. App. Div. Sept. 16, 2013) (observing that plaintiffs noted "they have always sought an order that 'the State … comply with … voter verified paper ballot laws' regardless of whether that occurred through retrofitting existing DREs [with a VVPAT] or using optical scan voting systems"); *21st Century Copyright Law in the Digitial Domain Symposium Transcript*, 13 Mich. Telecomm. Tech. L. Rev. 247, 285 (2006), available at http://www.mttlr.org/volthriteen/transcript.pdf ("Voting machine vendors have been retrofitting DREs with paper that is supposed to make a record of the voter's ballot that the voter can either accept or reject.  This is called a Voter Verified Paper Ballot or Audit Trail (VVPAT).  ").

In any event, the first theoretical vulnerability only *underscores* that the ExpressVote XL allows for robust audits.  If the machine somehow tabulated electronic votes associated with paper ballots the voter had rejected, the machine count would differ from the votes tabulated from the pile of cast paper ballots.  The audit process described above would expose this discrepancy, and an accurate vote count could be obtained by tabulating the paper ballots.  (Baumert Decl. ¶ 25; Boockvar Decl. ¶¶ 35-36.)

With respect to the second theoretical "vulnerability," Plaintiffs rely entirely on Dr. Halderman's speculation that "malware" could "cause the printhead to add additional races or selections to the paper [ballot] after the voter has reviewed it."  (ECF 112-2 ¶ 6.)  Among other flaws, this conjecture ignores that the text on the paper ballot is intentionally printed to allow no blank spaces between the selections made by the voter.  (*See, e.g.*, Pls. Memo. at 6.)  Accordingly, any additional marks printed post-verification would be apparent from an inspection of the ballots.  (Baumert Decl. ¶ 59.)  In this way, too, the ExpressVote XL's voter-verifiable paper ballots support robust pre-certification audits.

### 2.   The Indisputable Parol Evidence Also Dooms Plaintiffs' Contractual Arguments

Even if the Agreement's material terms *were* somehow ambiguous, Plaintiffs would fare no better.  If, after applying principles of construction, a "written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties." *Diet Drugs*, 525 F. App'x at 142.  Notably, "if the court finds that a contract is ambiguous *and* that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law." *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 241 (3d Cir. 1995) (emphasis added).  Here, the undisputed parol evidence shows that any ambiguous terms must be interpreted in favor of allowing the ExpressVote XL certification to stand.

For example, contrary to Plaintiffs' assertion (*see* Pls. Memo. at 10), Defendants *do* refer to the XL's paper vote record as a "paper ballot."  Indeed, that description appears in the November 30, 2018 certification report.  (Boockvar Decl., Ex. 1, at 24 ("ExpressVote XL create[s] a paper ballot based on a voter's selections").)  In February 2019, when it selected the ExpressVote XL as its new voting system, Philadelphia likewise described the XL's paper records as "auditable voter-verifiable paper ballot[s]."  (Wiygul Decl., Ex. 5, at 1.)  Even more importantly, Defendants clearly communicated this understanding of "paper ballot" to Plaintiffs during the parties' settlement discussions, when, by way of example only, they sent Plaintiffs the September 25, 2018 Senate Committee testimony of Jonathan Marks, which cited the Secure the Vote Report.  (*See* Unger Decl**.**, Ex. 1, 3.)  And most importantly of all, *Plaintiffs themselves* made clear to Defendants that they shared this understanding of "paper ballot."  (*See* **Unger Decl.**, Ex. 4.)  Indeed, Plaintiffs *expressly stated they did not object to certification of the ExpressVote XL machine*.  (*See id.* (emphasis added).)  For Plaintiffs to argue, as they now do, that the parties intended to allow certification only of machines that record votes on paper records containing the entire menu of all electoral options, strains credulity.[8]

### 3.    Plaintiffs' Miscellany of Other Criticisms Is Irrelevant to the Question of Whether the ExpressVote XL Complies With the Settlement Agreement

Throughout their Motion, Plaintiffs make various attempts to bootstrap their own opinions about the "best" type of voting machines into an argument about the requirements of the Settlement Agreement.  These arguments are not on point.  The Court's task is, again, a

---

[8] Additionally, Plaintiffs' failure to object that the Commonwealth's certification of the ExpressVote XL would violate the Settlement Agreement, either in the days leading up to certification or for many months afterwards, constitutes a waiver of that position that precludes Plaintiffs from asserting it now.  *See Norfolk S. Ry. Co. v. G.W.S.I., Inc.*, No. 16-2094, 2018 WL 4466008, at *6 (E.D. Pa. Sept. 18, 2018).

narrow one: To determine whether the ExpressVote XL meets the criteria set forth in the Settlement Agreement.  It is the Secretary and Pennsylvania counties – not Plaintiffs or this Court – who have the discretionary authority to weigh the trade-offs among the various voting systems that satisfy those criteria.  Put differently, the Court's role here is solely to enforce the terms of the Settlement Agreement, not to intrude on the decision-making of administrative officials.

As noted, much of Plaintiffs' Motion rests on the asserted theoretical possibility that the machines could somehow be hacked, and that the barcodes printed on the paper ballots might therefore not match the voter-verifiable text; the machines might electronically tabulate votes from ballots rejected by voters; or the ballot might be further marked after voter verification. But Plaintiffs do no more than to assert these risks, in conclusory statements by Dr. Halderman, as bare theoretical possibilities.  (*See* ECF 112-2 ¶¶ 6-8.)  Plaintiffs provide absolutely no evidence that such scenarios have actually occurred or that there is any realistic prospect of their occurring despite the phalanx of security measures required by the Commonwealth.  (*See* Boockvar Decl. ¶¶ 31-36, ¶¶ 61-64)  *See Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir. 1990) (expert affidavit that was "'essentially conclusory' and lacking in specific facts" was "insufficient to create a genuine issue of material fact"); *Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 F. Supp. 2d 387, 403 ("opinion evidence that is 'connected to existing data only by the ipse dixit of the expert'" is properly excluded), *aff'd*, 399 F. App'x 711 (3d Cir. 2010).  In fact, there is no such prospect, and even if there were, the design of the machines and the Commonwealth's pre-certified audits would ensure that any such problems were detected: the voter-verified text records would not match the internal electronic or scanned-bar code counts, and any additional marks on the densely packed textual portion of the ballot

would be apparent.  (Baumert Decl. ¶¶ 24, 59; Boockvar Decl. ¶¶ 34-36.)  As this Court previously held, "suspicion of a 'hacked' Pennsylvania election borders on the irrational" (ECF 55, at 29), and evidence supporting no "more than the theoretical possibility a voting machine … might be susceptible to tampering" is insufficient to obtain relief (*id.* at 31).

More broadly, as previously noted, the hand-marked ballots Plaintiffs portray as a panacea involve machines that scan the marks, and thus are also theoretically susceptible to hacking.  (Baumert Decl. ¶¶ 41-49.)  The ExpressVote XL addresses this issue in exactly the way contemplated by the Settlement Agreement: utilizing paper records with voter-verifiable text that supports robust pre-certification audits.  Again, the question is not which voting machine design is the best.  The question is simply whether the machines certified by the Secretary satisfy the criteria in the Settlement Agreement.  The ExpressVote XL does.

Plaintiffs' "scattershot allegations" (ECF 55, at 7) also refer to a recent decision by Colorado not to use QR codes on ballots.  (Pls. Memo. at 7.)  But the discretionary policy judgments made by officials in Colorado simply have no bearing on whether the ExpressVote XL meets the requirements of the Settlement Agreement.  Furthermore, the very article Plaintiffs attach to their Motion indicates that Colorado will simply scan "marked ovals on the ballot rather than information from a QR code."  (ECF 112-1, Ex. K, at 2.)  As noted above, because software and other human-inscrutable coding determine how the tabulating machine reads the marks (Baumert Decl. ¶¶ 41-43), Colorado voters cannot verify the electronic meaning of the mark any more than Pennsylvania voters can verify barcodes.

Plaintiffs also submit a declaration regarding anecdotal "difficulties" in reading the paper ballots in the XL machine.  But this "evidence" is plainly inadmissible and fails to raise any issue for the Court.  The declaration, made by a non-expert witness, purports to describe an "informal

30

survey" of 150 voters who used the ExpressVote XL on November 5, 2019.  (Pls. Memo. at 8;

*see* ECF 112-3.)  The voters were ostensibly asked "whether they had *any difficulty*" viewing the

printed voter summary card.  (ECF 112-3 ¶ 6 (emphasis added).)  "Approximately half"

purportedly reported having some unspecified difficulty.  All this is, of course, inadmissible

hearsay.  But even taken at face value, the declaration does not claim that a single voter was

actually unable to verify her vote.  (*See* ECF 112-3.)  The purported fact that the lighting in some

polling places could be improved may be useful feedback for Philadelphia election officials, but

has nothing to do with whether the ExpressVote XL meets the criteria of the Settlement

Agreement.

Finally, Plaintiffs try to make hay out of certain issues that reportedly occurred in the

most recent Northampton County election.  Tellingly, however, Plaintiffs' discussion is limited

to the background section of their brief; they do not connect these issues to any of their legal

arguments.  In fact, there is no connection.  The Northampton issues were a product of human

error; they have nothing to do with any of the theoretical "vulnerabilities" described in Plaintiffs'

brief.  (Baumert Decl. ¶¶ 60-68.)  Indeed, notwithstanding the issues with the electronic

tabulation of the vote totals, Northampton officials were able to obtain an accurate count of the

vote using the paper records produced by the machines.  (Baumert Decl. ¶¶ 69-70.)  In sum, the

Northampton election showed that the ExpressVote XL provides exactly what the Settlement

Agreement requires – a voter-verifiable, auditable paper record of each vote.

### B.     The Doctrine of Laches Bars Any Grant of Equitable Relief

Plaintiffs inexplicably waited a year to seek relief from this Court.  Plaintiffs knew,

during the settlement negotiations, that the Commonwealth intended to certify the ExpressVote

XL, and they knew the ExpressVote XL's features.  (Unger Decl., Exs. 1, 2, 4; *see also*

Boockvar Decl. ¶¶ 54-60.)  Once the Commonwealth certified the ExpressVote XL on

November 30, 2018 – just two days after the parties signed the Settlement Agreement – Plaintiffs could have pursued relief.  But Plaintiffs waited approximately eight months, until July 29, 2019, to send written notice to the Commonwealth that, in Plaintiffs' view, the certification of the ExpressVote XL violated the terms of the Settlement Agreement.  (*See* ECF 112-1, Ex. C.)  Under the terms of the Settlement Agreement, sending that notice was the only prerequisite to Plaintiffs' seeking assistance from this Court.  But Plaintiffs chose to wait another four months, sending follow-up letters and emails to DOS but not filing their Motion until the day before Thanksgiving.[9]

During the one-year gap between the ExpressVote XL's certification and Plaintiffs' Motion, several Pennsylvania counties moved forward with purchases of ExpressVote XL systems.  (Boockvar Decl. ¶¶ 75-77,)  Facing DOS's December 31, 2019 deadline for replacement of DREs, these counties expended significant funds and time on reviewing and procuring ExpressVote XL machines, and training personnel and educating voters in their use.  (Lynch Decl. ¶¶ 7-22; Salzarulo Decl. ¶¶ 3-8, 10-12; Boockvar Decl. ¶¶ 15, 19, 73-74, 78-79, 81-82.)  Under these circumstances, the doctrine of laches applies and precludes the relief Plaintiffs seek.

Laches is an equitable defense developed to "protect defendants against 'unreasonable, prejudicial delay in commencing suit.'"  *In re Bressman*, 874 F.3d 142, 149 (3d Cir. 2017) (quoting *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S. Ct. 954, 960 (2017)).  The elements of the defense – (1) "inexcusable delay in instituting suit," and (2)

---

[9] The Commonwealth responded to Plaintiffs' initial letter on September 12, 2019, affirming that the ExpressVote XL complies with the Settlement Agreement.  The Settlement Agreement does not require Plaintiffs to wait for the Commonwealth's response before presenting a claim of noncompliance to this Court.  However, even assuming Plaintiffs did reasonably await a response from the Commonwealth, they had no justification for waiting an additional two and a half months to file their Motion.

"prejudice resulting to the respondent from such delay," *id.* (quoting *Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 305 (3d Cir. 1951)) – are clearly present.  First, Plaintiffs' one-year delay is inexcusable.  Indeed, Plaintiffs do not even attempt to excuse it; they offer no explanation for their delay at all.  Second, the prejudice to the Commonwealth, its citizens, and the counties who have purchased the ExpressVote XL is undeniable and substantial.  A grant of the relief Plaintiffs request would mean that millions of tax dollars and months of effort by the Commonwealth and the counties had been spent fruitlessly (Nesmith-Joyner Decl. ¶¶ 6-21; Lynch Decl. ¶¶ 7-22; Salzarulo Decl. ¶¶ 3-8; Boockvar Decl. ¶¶ 15, 19, 73-74, 78-79, 81-82), and would require government officials to devote significant additional time and attention to replacing the ExpressVote XL machines (Nesmith-Joyner Decl. ¶¶ 22-30).  Further, an injunction would prejudice the Commonwealth's and the counties' interest in carrying out orderly elections, force the counties to make intricate policy decisions in a short amount of time, and distract government officials from other important work on behalf of citizens.  (Nesmith-Joyner Decl. ¶¶ 6-21; Lynch Decl. ¶¶ 7-22; 31-32; Salzarulo Decl. ¶¶ 15-17; Boockvar Decl. ¶¶ 76-84.)

The doctrine of laches is particularly applicable here because Plaintiffs' delay in seeking relief could disrupt an impending election.  "The U.S. Supreme Court has long acknowledged that the timing in cases involving upcoming elections is a relevant consideration in determining the propriety of immediately effective relief."  *United States v. City of Philadelphia*, No. 2:06-cv-4592, 2006 WL 3922115, at *2 (E.D. Pa. Nov. 7, 2006) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)); *see also Crookston v. Johnson*, 841 F.3d 396, 397-98 (6th Cir. 2016) (entering a stay of a preliminary injunction against certain

Michigan election laws in light of plaintiff's delay in seeking relief, and emphasizing plaintiff's

failure to offer any explanation for his "belated challenge.").

In *Republican Party v. Cortes*, 218 F. Supp. 3d 396 (E.D. Pa. 2016), Judge Pappert

denied a request for a preliminary injunction of certain state election laws in part because, in

filing their lawsuit eighteen days before the election, "Plaintiffs unreasonably delayed filing their

Complaint and Motion, something which weighs decidedly against granting the extraordinary

relief they [sought]." *Id.* at 404. Judge Pappert explained that "[t]he delay is particularly

relevant where, as here, an election is looming." *Id.* Given the amount of time that it takes to

purchase and launch a new voting system (Nesmith-Joyner Decl. ¶¶ 22-30; Lynch Decl. ¶¶ 7-22;

31-32; Salzarulo Decl. ¶¶ 3-12, 15-17; Boockvar Decl. ¶¶ 78-83), the primary election scheduled

for April 28, 2020, and even the general election scheduled for November 3, 2020, are

"looming." Accordingly, Plaintiffs' delay is particularly damaging.

The Sixth Circuit's decision in *Crookston v. Johnson* tells a similar story. Less than two

months before an election, the plaintiff sought to enjoin certain state laws governing conduct in

polling places. The district court entered a preliminary injunction, but the Sixth Circuit stayed it.

The court explained that "[w]hen an election is 'imminent' and when there is 'inadequate time to

resolve factual disputes' and legal disputes, courts will generally decline to grant an injunction to

alter a State's established election procedures." *Crookston v. Johnson*, 841 F.3d 396, 397-98

(6th Cir. 2016) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam) (internal

citations omitted). Plaintiff's delay in seeking relief, the court concluded, prejudiced the state's

interest in the orderly operation of elections as it threatened to upend well-laid election

preparations, and put the state in the unfair position of having to make "nuanced policy decisions

34

that no one should be making at the eleventh hour—absent a good explanation for the delay." *Id.* at 399.

Two years ago in this case, this Court held that Plaintiffs' "unexplained, highly prejudicial delay in seeking a recount" of the 2016 election results was "fatal to their claims for immediate relief." (ECF 55, at 1.) Plaintiffs had long had all the information they needed to make their claims, this Court wrote, but instead waited, creating a "judicial fire drill" that was "unnecessary and unfair to all concerned." (*Id.* at 20.) Plaintiffs' counsel was "unable to offer a credible justification for this delay." (*Id.* at 21.) This Court concluded that "Plaintiffs are not entitled to the 'emergency' relief they seek because they have inexcusably waited well past the eleventh hour to seek it." (*Id.*) Unfortunately, once again, Plaintiffs have delayed seeking relief for so long that they are burdening the Court and threatening the rights of Pennsylvania voters. Once again, they have no explanation for their conduct. Therefore, this Court should once again deny them relief.

### C.    The Balance of Harms and the Public Interest Weigh Against Granting Plaintiffs an Injunction

"Injunctive relief is an 'extraordinary remedy which should be granted only in limited circumstances.'" *Snyder v. Millersville University*, 2008 WL 5093140, * (E.D. Pa. Dec. 3, 2008) (J. Diamond) (quoting *Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427–28 (3d Cir. 1994)). Even more so, "[m]andatory injunctions, which require defendants to take some affirmative action," are not readily ordered; rather, they are "'looked upon disfavorably and are generally only granted in compelling circumstances.'" *Snyder v. Millersville University*, 2008 WL 5093140, * (E.D. Pa. Dec. 3, 2008) (J. Diamond) (quoting *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F.Supp. 159, 166 (D.N.J. 1988)).

Plaintiffs are not entitled to the relief they seek because they have failed to set forth allegations sufficient to meet these demanding standards.

In order to obtain a permanent injunction Plaintiffs must, as a threshold matter, prevail on the merits, *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 850 (3d Cir. 1984), and additionally must demonstrate "(1) [they] will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in their favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Even if this Court were to find that the certification of the ExpressVote XL violates the Settlement Agreement (as set forth in Sections III.A.1-3 above, it should not), a permanent injunction should not issue. The balance of harms weighs heavily against entry of a permanent injunction, and an injunction is not in the public interest.

Entry of the requested mandatory permanent injunction would impose severe harms on the Commonwealth, the counties, and the citizenry of Pennsylvania. First, entry of a mandatory permanent injunction would be harmful to the Commonwealth's counties and taxpayers, and would put the orderly administration of the 2020 elections at risk. (*See supra* Section III.B.) Second, an injunction that prevents the Commonwealth from effectuating one of its duly enacted laws would harm the Commonwealth. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1, 3 (2012). By limiting the Commonwealth's right to engage in the voting machine approval process according to the mandates of the relevant election code sections, 25 Pa. Stat. §§ 3006, 3007, 3031.5, and 3031.7, the requested permanent injunction

would prevent the Commonwealth from fully effectuating the election statutes enacted by Pennsylvania's elected representatives.

Conversely, the Plaintiffs would not suffer any harm as a result of this Court's denial of their request for a mandatory permanent injunction.  As in the 2016 preliminary injunction proceedings, Plaintiffs "have raised only spectral fears" that the ExpressVote XL machines could be compromised, based on Dr. Halderman's speculation that the machines could in theory be vulnerable.  (ECF 55, at 28, 30.)  Moreover, even assuming *arguendo* that the ExpressVote XL machines are exposed to the kinds of risks the Settlement Agreement was designed to avoid, the Plaintiffs face no realistic prospect of being affected by the use of the machines.  Plaintiff Jill Stein has not indicated an intent to run in the 2020 presidential election, and thus has no interest in Pennsylvania voting systems.  The other individual Plaintiffs live in Montgomery County, Pennsylvania.  Montgomery County has not purchased ExpressVote XL machines and has not indicated any intent to do so.  (Boockvar Decl. ¶ 53.)

### D.  Principles of Federalism Counsel Against a Grant of an Injunction

A grant of the mandatory permanent injunction that Plaintiffs request would directly undermine the Commonwealth's and the counties' abilities to prepare for and carry out upcoming elections.  As such, it would constitute improper and damaging federal court interference in the state elections process that would violate principles of federalism.  *See Page v. Bartels*, 248 F.3d 175, 195-96 (3d Cir. 2001) ("Federal court intervention that would create [ ] a disruption in the state electoral process" in the form of a delay or suspension of state elections at a high cost to taxpayers, "is not to be taken lightly."); *see also Republican Party*, 218 F. Supp. 3d at 404-05 ("Comity between the state and federal governments also counsels against last-minute meddling.  Federal intervention at this late hour risks 'a disruption in the state electoral process ….'  'This important equitable consideration goes to the heart of our notions of

federalism.'") (quoting *City of Philadelphia*, 2006 WL 3922115, at *2).  Moreover, "there is

good reason to avoid last-minute intervention in a state's election process.  Any intervention at

this point risks practical concerns including disruption, confusion or other unforeseen deleterious

effects.'"  *Republic Party*, 218 F. Supp. 3d at 404-05.

      Federal courts' general disinclination against granting injunctive relief that would affect

state elections is especially forceful where the party has delayed seeking relief.  *See Crookston v.*

*Johnson*, 841 F.3d 396, 397-98 (6th Cir. 2016) ("When an election is 'imminent' and when there

is 'inadequate time to resolve factual disputes' and legal disputes, courts will generally decline to

grant an injunction to alter a State's established election procedures.  That is especially true when

a plaintiff has unreasonably delayed bringing his claim… Call it what you will—laches, the

*Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections

absent a powerful reason for doing so.") (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006)

(per curiam) (internal modification omitted) (internal citations omitted); *see also, Pennsylvania*

*Democratic Party v. Republican Party of Pennsylvania*, No. 16-5664, 2016 WL 6582659 (E.D.

Pa. Nov. 7, 2016).

      **E.**    **Plaintiffs Have Come to Court With Unclean Hands**

      Throughout this litigation, Plaintiffs have insisted that their only goal is to improve the

election system and ensure that voters' voices are heard.  Their actions with respect to the

Settlement Agreement, however, could almost be designed to have the opposite effect.  First,

during the settlement negotiations, Plaintiffs and their experts had every opportunity to consider

the voting systems that were in DOS's certification pipeline.  (Unger Decl., Ex. 1, 2, 4; *see also*

Boockvar Decl. ¶¶ 54-59.)  If the ExpressVote XL's design were as flawed as Plaintiffs now

claim, Plaintiffs could have, and should have, raised their concerns then.  But they did not.

Plaintiffs also could have spoken up two days after they signed the Settlement Agreement, when

DOS certified the ExpressVote XL.  (Boockvar Decl. ¶ 60.)  Again, they did not, then or in the months that followed.  Instead, they waited for month after month, as counties around the state invested time and money in selecting and purchasing new voting systems.  (Lynch Decl. ¶¶ 7-22; Salzarulo Decl. ¶¶ 3-8, 10-12; Boockvar Decl. ¶¶ 15, 19, 73-74, 78-79, 81-82.)  If Plaintiffs truly believed that the ExpressVote XL were putting Pennsylvania's votes at risk, this delay would be inexplicable.  As shown above and in the attached declarations, by the time Plaintiffs finally filed their Motion (accompanied by a press conference in front of the courthouse), it was much too late to decertify the ExpressVote XL without severely disrupting the 2020 elections and possibly disenfranchising Pennsylvania voters.

Thus, if Plaintiffs' goal was to replace the ExpressVote XL with other voting systems, their tactics have been remarkably ineffective and irresponsible.  These tactics appear well designed, on the other hand, to disrupt preparations for the 2020 elections and sow doubts in the minds of voters.  Either way – whether Plaintiffs filed their Motion in irresponsible pursuit of a legitimate goal, or in an attempt to use the Court to pursue an illegitimate one – they have come into court with unclean hands.

Unclean hands is "an equitable doctrine which applies 'when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation.'"  *Romero v. Allstate Ins. Co.*, 158 F.Supp. 3d 369, 375 (E.D. Pa. 2016) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001)).  Whether Plaintiffs have acted recklessly or cynically, they should now be barred under principles of equity from obtaining the requested injunctive relief.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court deny

Plaintiffs' Motion.

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

By: */s/ Mark A. Aronchick*
    Mark A. Aronchick
    Robert A. Wiygul
    Christina C. Matthias
    One Logan Square, 27th Floor
    Philadelphia, PA 19103
    (215) 568-6200

TUCKER LAW GROUP
    Joe H. Tucker
    Dimitrios Mavroudis
    1801 Market Street, Suite 2500
    Philadelphia, PA  19103
    (215) 875-0609

    *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2019, I caused the foregoing Defendants' Response in Opposition to Plaintiffs' Motion to Enforce the Settlement Agreement to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Mark Aronchick*
Mark Aronchick