# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL STEIN, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | No. 16-cv-6287(PD) |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections and Legislation, | : | |
| Defendants. | : | |

## DECLARATION OF KATHY BOOCKVAR IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

I, Kathy Boockvar, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that:

I am the Secretary of State (commonly known as the Secretary of the Commonwealth) of the Commonwealth of Pennsylvania. I make this declaration in support of Defendants' Response in Opposition to Plaintiffs' Motion to Enforce the Settlement Agreement.

**Background**

1.      I was appointed Acting Secretary of the Commonwealth on January 5, 2019 and confirmed by the Senate on November 19, 2019.

2.      In this role, I lead the Pennsylvania Department of State's efforts to promote the integrity and security of the electoral process. I work with election directors and personnel in the Commonwealth's 67 counties, as well as other Secretaries of State across the country, to ensure that our elections are free, fair, secure, and accessible to all eligible voters.

3.      I am an attorney with an extensive background in election administration.

4.      From March 5, 2018, until the date I was appointed as Secretary, I served as Senior Advisor to Pennsylvania Governor Tom Wolf on Election Modernization, leading and managing initiatives to improve security and technology in Pennsylvania's elections, in collaboration with federal, state, and county officials.

5.      In August 2019, I was appointed to serve as the Elections Committee Co-Chair for the National Association of Secretaries of State ("NASS").

6.      One of my responsibilities as Co-Chair is to serve as a NASS representative on the Election Infrastructure Subsector Government Coordinating Council ("EIS-GCC"). The EIS-GCC is a first-of-its-kind collaboration among federal, state, and local officials to secure elections, working to formalize and improve information-sharing and communication protocols to ensure that timely threat information, support, and resources reach all election officials so they can respond to threats as they emerge.

7.      Between 2008 and 2010, I served as senior voting rights counsel for Advancement Project, a national nonprofit civil rights organization.  In this position, I worked in collaboration with local, state, and national government officials, agencies, legislators, and nonprofit organizations, to ensure that election laws were administered fairly, effectively, and accurately.

8.      I also served as a poll worker for a number of years in Bucks County.

9.      Since 2018, I have gained significant experience with voting system technology, including attending some portion of most of the certification examinations in Pennsylvania, participating in multiple voting system demonstrations, reviewing certification reports,

consulting with experts, attending conferences, and reading documentation relating to these systems.

**Pennsylvania's Transition to Voting Systems With Voter-Verifiable Paper Records**

10.     At the beginning of 2019, Pennsylvania was one of only 12 states still using Direct Recording Electronic ("DRE") voting machines.  DREs do not generate a paper record that voters can review and verify before their vote is tabulated.

11.     Voter-verifiable paper records enable accurate recounts and robust post-election audits, because they ensure that election officials have access to a physical record of each vote, confirmed by the voter who cast it.

12.     For several years, DOS has been committed to phasing out DREs and replacing them with voting systems that provide voter-verifiable paper records, in order to ensure that there is a voter-verifiable paper record of every vote cast in Pennsylvania.

13.     To advance this process, in December 2017, DOS held a voting systems vendor forum that was open to the public, county election officials, and other stakeholders, to begin exploring new voting machine options for Pennsylvania.  ES&S participated in this forum.

14.     In February 2018, the Department issued a directive requiring that all new voting systems procured by Pennsylvania counties have voter-verifiable paper records of votes cast.

15.     On April 12, 2018, DOS directed Pennsylvania's counties to purchase voting systems with voter-verifiable paper records no later than December 31, 2019, and preferably have them in place by the November 2019 general election.

16.     On April 26, 2018, DOS held a voting systems vendor demonstration, allowing the public, legislators, county officials, press, and all stakeholders to view and try the new voting

systems under consideration.  Election Systems & Software ("ES&S") participated in this demonstration.

17.      Five additional DOS-sponsored vendor demonstrations were held around the state between Fall 2018 and January 2019, all of which included ES&S.

18.      Since January 1, 2018, DOS has certified seven systems that meet DOS's February 2018 directive and have undergone enhanced security testing, as explained below.

19.      As of today, nearly 90% of the Counties have complied with the Secretary's April 2018 mandate, and the remaining 8 counties are expecting to select their new paper-record voting systems in the next few weeks.

20.      At present, there are two broad categories of voting systems that can provide voter-verifiable paper records.  The first, optical or digital scan paper ballot systems, requires voters to hand mark paper ballots, which are then scanned and tabulated by scanning devices.  In order to tabulate the votes, the scanners sense the marks the voters have made, along with timing marks and/or other machine-generated markings on the paper ballots.

21.      The second category of voting systems that can provide voter-verifiable paper records of the voter's selections are ballot marking devices ("BMDs").  These systems provide an interface to assist each voter in marking a paper document reflecting the voter's choices, which is then scanned into a tabulator or counted by hand.

22.      Because voters with disabilities may be unable to hand mark paper ballots independently and privately, federal law requires every polling place that uses optical scan equipment to have at least one BMD for use by voters with disabilities.

23.      All systems certified for use in Pennsylvania since January 1, 2018, produce paper records with human-readable text that voters can review before casting their ballots.

24.     In the systems certified in Pennsylvania that use hand-marked paper ballots, those ballots contain not only human-readable text but also barcodes, QR codes, and/or other non-human-readable pattern codes.

25.     Hand-marked paper ballots contain information in three formats: The candidates' names in human-readable text, the marks that the voter makes (usually filled-in ovals next to the candidates' names), and a barcode or other pattern code that contains instructions as to how the scanner should interpret the voter's marks.

26.     The scanner uses barcode or other pattern codes to interpret the voter's marks. The pattern code tells the scanner what a mark in a certain location of the ballot means and how that mark should be tabulated.

27.     In Paragraph 3 of his Declaration in support of Plaintiffs' Motion, J. Alex Halderman states that a voting system that uses hand marked paper ballots "does not place a hackable computer between the voter and the official record of her vote."

28.     If Dr. Halderman is stating that optical scan voting systems do not use computers to interpret and record votes, he is incorrect.  As described above, optical scan systems, like BMDs, use computers to interpret the paper record of the voter's vote and tabulate that vote. These computers use non-human-readable pattern codes to make that interpretation.

29.     The only alternative to using computers to translate the voter's actions into tabulated votes is to hand count paper ballots – an expensive, time-consuming, and unreliable process.

30.     As described above, the advantage of systems with voter-verifiable paper records is that they allow election officials to catch errors in the computerized processes and conduct accurate recounts of the vote.

**Recounts and Audits**

31.     Pennsylvania has formed a statewide post-election audit working group, which includes election officials from six counties, as well as expert advisors on audits and elections. This working group is studying audit models such as risk-limiting audits and is developing best practice recommendations for post-election audits that will review the plain text on the paper records and the tabulated votes to confirm to a reasonable degree of statistical certainty the accuracy of the outcome of the election.

32.     One of the members of the working group, Mark Lindeman, Senior Science and Technology Policy Office for Verified Voting, was designated by the Plaintiffs in this lawsuit.

33.     Following the 2019 elections, Mercer County and Philadelphia County performed pilot risk-limiting audits.  County election officials, Department of State staff, and elections experts from the U.S. Election Assistance Commission, the University of Michigan, the Brennan Center for Justice at NYU School of Law, the Democracy Fund, VotingWorks, and Verified Voting participated in developing and implementing the pilot audit process using the new paper-based voting systems.

34.     Independent of the audit working group, and pursuant to existing statutory provisions, DOS has conditioned certification of certain voting systems, including the ExpressVote XL, on the use of post-election, manual audits of the paper records. *See infra* ¶ 61.

35.     I will require that any audit procedure the Commonwealth adopts will require review of the plain text of the paper records.

36.     In the event of any conflict between the plain text and the non-human-readable information on the paper record, the plain text will control.

**"Paper Ballots"**

37.     In the discussion above, I have used the term "paper ballots" to refer to the ballots, showing all the choices available in an election, that voters hand mark for use in optical scanning voting systems, and the term "paper record" to refer to the record of votes that a BMD prints, and a voter may verify, before the votes are cast.

38.     However, in the context of the transition from DRE voting systems to voting systems with paper records that can be verified by the voter and audited by election officials, observers often use the term "paper ballots" as a catchall term for the benefit that DREs do not provide – verifiable, auditable, contemporaneous paper records of votes.  In public statements, many in the election security community – including myself and others in Governor Tom Wolf's administration – sometimes distinguish between "paper records" and "paper ballots," but sometimes describe all such paper records as "paper ballots."

39.     For example, in testimony to the Pennsylvania State Senate Government Committee on March 26, 2019, I stated:  "As you know, last April, the department directed counties to purchase new voting systems that meet current security and accessibility standards, including an auditable paper ballot that voters can review and verify before casting their ballot."[1] *See also, e.g.*, Commissioner Marks's statement to the Senate State Government Committee dated September 25, 2018,[2] at 2 (describing professionals' view that elections "should be conducted with paper ballots by 2020"); interview with Commissioner Marks held at voting equipment expo on November 29, 2018 ("all of this voting equipment has a voter verified paper

---

[1] *See* https://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2019/03/boockvar.pdf.

[2] *See* https://stategovernment.pasenategop.com/wp-content/uploads/sites/30/2018/09/MarksTestimony925.pdf

ballot … that's the most important component that we're focusing on relative to security …")[3];

Statement of Governor Tom Wolf dated Feb. 21, 2019 (lauding voting officials' commitment to

"ensuring that all voters will be voting on systems with voter-verifiable paper ballots and

meeting the highest standards of security and accessibility by 2020").

40.     I attended and participated in the settlement conference in this case before

Magistrate Judge Rice on October 11, 2018, at which the parties agreed to the terms set forth in

Paragraphs 2 and 3 of the November 28, 2018 Settlement Agreement, a copy of which is

attached as Exhibit A to the Declaration of Ilann M. Maazel docketed at ECF 112-1.

41.     At no point during the settlement conference did the Plaintiffs assert that only

voting systems that used hand-marked paper ballots were acceptable, that BMDs or systems

using barcodes were not, or that Plaintiffs opposed the certification of any system that was then

going through the certification process.

**Pennsylvania's Voting Machine Certification Process**

42.      In order to become available to Pennsylvania counties, every voting machine

system must go through an exhaustive process.

43.     First, pursuant to the Pennsylvania Election Code at 25 P.S. § 3031.5, the system

must be evaluated by a federally approved voting system test laboratory and certified by the U.S.

Election Assistance Commission ("EAC") for conformance with either the 2005 Voluntary

Voting System Guidelines or the Voluntary Voting Systems Guidelines 1.1 published by the

EAC, or any subsequent iteration of federal voting system standards.

---

[3] *See* video posted at https://www.centredaily.com/latest-news/article222397975.html.

44.    Once a system completes EAC testing, the vendor submits an application to DOS that includes testing reports, a list of all components of the system that require examination, and complete documentation for the system, including manuals and other technical data.

45.    DOS then conducts an examination and testing to determine whether the system conforms to state law and any Commonwealth regulations or standards regarding the following criteria:  confidentiality, security, accuracy, safety, reliability, usability, accessibility, durability, resiliency, and auditability.

46.    Under updated Commonwealth security standards adopted in 2018, the certification process includes additional security testing, such as:

- Penetration testing evaluates the security of the voting system by seeking out and trying to exploit potential vulnerabilities that an attacker could exploit;

- Access control testing to confirm that the voting system can detect and prevent unauthorized access to the system and election data;

- Evaluation of voting system audit logging capabilities to confirm that the system logs will allow auditing, as well as investigation of any apparent fraudulent or malicious activity; and

- Tests that ensure every physical access point is well secured and system software and firmware is protected from tampering.

47.    In conformance with protocols for protecting critical infrastructure election security information, since 2018, security testing of all systems has been and continues to be conducted offsite in the system examiner's laboratory.

48.    DOS's examiners, SLI Global Solutions ("SLI"), have extensive experience with preventing, identifying and mitigating vulnerabilities and security risks in both computer system hardware and software.  SLI is qualified as an EAC accredited Voting System Test Lab, experienced with multiple voting system manufacturers, and they maintain certification from

professional organizations like the International Organization for Standardization ("ISO") and the Institute of Electrical and Electronics Engineers ("IEEE").

49.     As part of its certification, DOS may impose limitations or conditions on use of a particular voting system.

50.     DOS's role in this certification process is not to determine which voting system is the "best" overall, but to ensure that each system used in the Commonwealth meets the Commonwealth's stringent standards.

51.     Each County faces different challenges in election administration, and a voting machine system that works well in one County may not meet another County's needs. Therefore, DOS attempts to ensure that a range of modern voting technologies is available to the Counties.

52.     The fact that the Commonwealth's Counties do not all use the same system also provides a security benefit, because it limits the effect of any effort to compromise a particular system.

53.     I understand that the Plaintiffs in this litigation, other than Jill Stein, are residents of Montgomery County.  Montgomery County has not purchased the ExpressVote XL, and has not indicated any plans to do so.  To my knowledge, Jill Stein has never lived in Pennsylvania and is not currently a candidate for any public office.

**Certification and Reexamination of the ExpressVote XL**

54.     Upon the application of Elections Systems & Software ("ES&S"), DOS held a functional and accessibility examination of the system known as EVS 6000, which included the ExpressVote XL.  The examination, which was open to the public, commenced on June 25,

2018, and lasted for approximately four days. DOS's examiners also carried out security testing of the EVS 6000.

55. During these examinations, DOS identified functional issues with the EVS 6000 software (it did not accommodate straight ticket voting or write-ins in accordance with the Pennsylvania Election Code), and the security testing identified an installation issue.

56. ES&S corrected these issues, along with another issue noted during a primary election in Kansas, and resubmitted a new release, EVS 6021. Only the system's software was updated; its hardware components remained the same as those shown in the public examination of June 2018.

57. On September 21, 2018, DOS released a "Pennsylvania Voting System & Electronic Poll Book Report." This report noted that testing of the EVS 6021 was scheduled during the week of September 24.

58. An examination of the EVS 6021 took place on September 25 through 28, 2018.

59. All of the features of the ExpressVote XL that Plaintiffs criticize in their Motion – bar codes, printer head location, and tabulation process – were public knowledge by at least June 2018. The fact that the Commonwealth of Pennsylvania had been asked to certify the system was also public knowledge.

60. DOS issued its report and certification of the EVS 6021 system on November 30, 2018. A true and correct copy of DOS's report is attached as Exhibit 1.

61. The certification included a number of conditions. First, it required that after each election, counties must conduct a "statistical recount of a random sample of ballots" with a "manual count of the voter marked paper ballots." *Id.* at 38.

62.     A second condition of certification was that "[t]he system **must not** be configured to have the voter validate the selections on the screen and "Autocast" the ballot, thus causing a situation where the voter has not verified what was printed on the paper ballot." *Id.* at 42.  In other words, in Pennsylvania, the certified use of this system **requires** that all voters must be permitted to verify the plain text on the paper record before casting their vote.  The "autocast" option skipping this step is prohibited in Pennsylvania.

63.     Third, the certification required that "[i]n the event of a recount, the voter verified paper ballots must be used for the count." *Id.* at 40.

64.     A fourth condition involved the machines' communications with other systems: "No components of the EVS 6021 shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired network 80-configuration in which all connected devices are certified voting system components. Transmission of unofficial results can be accomplished by writing results to media, and moving the media to a different computer that may be connected to a network. Any wireless access points in the district components of EVS 6021, including wireless LAN cards, network adapters, etc. must be uninstalled or disabled prior to delivery or upon delivery of the voting equipment to a county board of elections." *Id.* at 37-38.

65.     On July 17, 2019, I received a Petition to Reexamine the ExpressVote XL.

66.     The petitioners argued, as Plaintiffs do in their Motion, that the ExpressVote XL did not comply with the Settlement Agreement in this case because it does not include a "printed ballot" as defined in 25 P.S. § 3031.1.  They did not make any other arguments that the ExpressVote XL did not comply with the Settlement Agreement.

67.     I determined that this claim, along with most of the petitioners' other claims, was a legal argument that did not apply to the reexamination or certification process.

68.     DOS engaged a consultant to conduct a focused reexamination of the ExpressVote XL to address the petitioners' claims that related to certification requirements under state law.  DOS requested that the consultants use their best efforts to try to create the issues that the petitioners alleged were theoretically possible.  The consultants were unable to do so.

69.     On September 3, 2019, DOS released the Reexamination Report for the ExpressVote XL, which maintained its certification but imposed additional conditions for its use.

**Issues With the ExpressVote XL in Northampton County Elections**

70.     There were widely reported problems with the operation of the ExpressVote XL system in Northampton County in the November 2019 election.

71.     Northampton County officials and ES&S have confirmed that the election day issues with their voting systems were caused by 1) human error in programming the details of the election into the system, and 2) imprecise factory configuration of a limited number of machines. The first issue caused an error in the end-of-night tally report, but did not impact the paper records or voting system screens.  The second issue caused some machines to have some buttons that were difficult to select.

72.     The situation underscored the importance of having a paper record of each ballot cast, as the county was able to re-scan every paper record of votes cast.  Because the Northampton County voting systems included voter-verifiable, auditable paper records of the votes, the County was able to successfully recount the votes and avoid the need for a new election.

**The Consequences of Decertification of the ExpressVote XL**

73.     As discussed above, the Commonwealth imposed a December 31, 2019 deadline for the Counties' purchase of voting systems with voter verifiable paper records.

74.     In order to meet that deadline, the Counties moved quickly to evaluate and purchase new systems and put them in place.

75.     In the year since the Commonwealth certified the EVS 6021 system, a number of Counties have purchased and installed the ExpressVote XL machines.

76.     For example, Philadelphia County issued a request for proposals in November 2018, with a submission deadline of December 28, 2018.  In February 2019, Philadelphia's City Commissioners voted to purchase the ExpressVote XL system.

77.     Northampton County selected the ExpressVote XL system on March 6, 2019; Cumberland County's Board of Elections voted to select the system on June 26, 2019.

78.     Putting a new voting system in place takes a great deal of time.  Counties must go through the procurement process, select a system, physically acquire the machines, make any changes to the voting infrastructure that the machines require, and hold training sessions for poll workers and the public, and much more.

79.     This entire process typically takes many months, and often over a year.

80.     It is already too late for Counties to replace ExpressVote XL machines in time for the 2020 primary, which will be held on April 28, 2020.

81.     For example, Counties have usually taken about three to twelve months to review and compare voting system options, assess equipment and storage needs, explore funding, leasing, and financing options, and negotiate/procure contracts.

14

82.    Counties have typically taken at least three to eight months to seek delivery of the new systems, conduct acceptance testing on the new systems, provide training of county election personnel and poll workers, finalize and print ballots, conduct voter education campaigns, program details of the elections into the equipment, and perform logic and accuracy testing.

83.    Depending on the system selected, the county may also need to reevaluate polling locations to ensure that those locations can accommodate the system's hardware configuration, the system's physical footprint, or the system's unique power source needs.  Because many polling locations are housed in schools, municipal buildings, and churches, they are scheduled months in advance of the day of the election.

84.    Given the complexity of the system and the short timeline involved, changing voting systems in short time risks confusing voters and election personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2019.

Kathy Boockvar

# EXHIBIT 1

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF STATE

### REPORT CONCERNING THE EXAMINATION RESULTS OF ELECTIONS SYSTEMS AND SOFTWARE EVS 6021 WITH DS200 PRECINCT SCANNER, DS450 AND DS850 CENTRAL SCANNERS, EXPRESSVOTE HW 2.1 MARKER AND TABULATOR, EXPRESSVOTE XL TABULATOR AND ELECTIONWARE EMS



Issued By:

Robert Torres
Acting Secretary of the Commonwealth
November 30, 2018

**EXAMINATION RESULTS OF ELECTION SYSTEMS AND SOFTWARE EVS 6021 WITH DS200 PRECINCT SCANNER, DS450 AND DS850 CENTRAL SCANNERS, EXPRESSVOTE HW 2.1 MARKER AND TABULATOR EXPRESSVOTE XL TABULATOR AND ELECTIONWARE EMS**

## I.      INTRODUCTION

Article XI-A of the Pennsylvania Election Code, 25 P.S. §§ 3031.1 *et seq.*, authorizes the use of electronic voting systems. Section 1105-A of the Pennsylvania Election Code, 25 P.S. § 3031.5, requires that the Secretary of the Commonwealth (Secretary) examine all electronic voting systems used in any election in Pennsylvania and that the Secretary make and file a report stating whether, in his opinion, the electronic voting system can be safely used by voters and meets all applicable requirements of the Election Code.

Upon the request of Election Systems and Software (ES&S), the Department of State's Bureau of Commissions, Elections and Legislation (Department) scheduled an examination for June 25, 2018 of EVS 6.0.0.0 (EVS 6000). The system presented for certification in Pennsylvania included the following components - Electionware® (Electionware) election management software used in conjunction with the following components: 1) the ExpressVote XL™ (ExpressVote XL) hybrid paper-based polling place voting device; 2) the ExpressVote® Hardware 2.1 (ExpressVote 2.1) a hybrid paper-based polling place voting device that provides touch screen vote capture that can be configured as a ballot marking device (BMD) or a BMD and tabulation unit; 3) DS200® (DS200) precinct scanner; 4) DS450®(DS450) central scanner; and 5) DS850® high speed central scanner.

The Secretary of the Commonwealth (Secretary) appointed SLI Global Solutions and Center for Civic Design (CCD) as professional consultants to conduct an examination of EVS 6000. The examination process included a public demonstration and functional examination (functional examination), accessibility examination and security testing. The functional and accessibility examinations were performed in Room G24A/B of the Commonwealth Capitol Complex - Finance Building, 613 North Street, Harrisburg, PA 17120. Mike Santos, Senior Test Manager, and Kyle Johnson, Senior Test Engineer, (Functional Examiner) of SLI Global Solutions, conducted the functional examination of the

EVS 6000 pursuant to Section 1105-A(a) of the Election Code, 25 P.S. § 3031.5(a). Whitney Quesenbery, Denis Anson and Colin Macarthur (Accessibility Examiner) representing CCD performed an accessibility examination of the EVS 6000 system. The examinations commenced on June 25, 2018, and lasted approximately four days.  Jonathan Marks, Commissioner of the Bureau of Commissions, Elections and Legislation; Kathryn Boockvar, Senior Advisor to the Governor on Election Modernization; Jessica Myers, Deputy Director, Office of Policy; Kathleen Kotula, Executive Deputy Chief Counsel, Office of Chief Counsel; and Sindhu Ramachandran, Voting Systems Analyst, represented the Secretary of the Commonwealth.  Steve Pearson, Senior Vice-President of Certification, Benjamin Swartz and TJ Burns, State Certification Managers, represented ES&S. Additional staff members from the Department also attended the examination.  The functional examination was open to the public and was videotaped by Department staff. Security testing of the EVS 6000 system was performed at SLI facilities located at 4720 Independence Street, Wheat Ridge, Colorado, prior to the functional examination. Mike Santos, Senior Test Manager, and Jesse Peterson, Security Specialist, at SLI Global Solutions, served as the Security Examiner for the EVS 6000 security testing.  The Functional Examiner concluded that the EVS 6000 did not comply with Sections 1107-A(3) and (13) of the Pennsylvania Election Code, 25 P.S. §§ 3031.7(3) & (13), because the ExpressVote XL and ExpressVote 2.1 did not accurately implement the Pennsylvania Method (PA Method) of straight party voting and the general election results did not allow adjudicating two write-in votes from ExpressVote XL ballots. The security testing identified the need to modify the hardening procedures on Electionware for a more secure installation.

Thereafter, ES&S incorporated corrections for the issues identified during the EVS 6000 examination and a performance enhancement fix to a field anomaly noted during the use of the system in a primary election in the State of Kansas, and re-submitted the new release, EVS 6.0.2.1 (EVS 6021), to both the U.S. Election Assistance Commission (EAC) for federal approval and the Department for state certification.  The system components remained the same and the only change in the new release was the software enhancements to remediate the identified anomalies.  The Functional Examiner performed a follow-up

3

examination of EVS 6021 on September 25 through 28, 2018, at SLI Global Solutions located in Wheat Ridge, Colorado. Department staff observed the examination via web conference. The examination was videotaped by SLI and the video is on file at the Department. The Security Examiner validated that the hardening procedures were modified for a secure installation. Since the software changes made to the EVS 6021 system were specifically to remediate the identified anomalies in EVS 6000 and did not impact accessibility of the system, it was determined that the results of the accessibility examination conducted as part of the EVS 6000 examination may be utilized for EVS 6021 certification.

## II.   THE EVS 6021 VOTING SYSTEM

EVS 6021 is a paper-based voting system that provides end-to-end election support; from defining an election to generating final reports. The system is comprised of both precinct and central count tabulators and Universal Voting System and/or Ballot Marking Devices as ADA component. The system hardware components include: ExpressVote XL™ Full-Faced Universal Voting System, ExpressVote Universal Voting System hardware 2.1, DS450 High-Throughput Central Tabulator, DS850 High-Speed Central Tabulator and DS200 Precinct-Based Tabulator[1].

The following is a description of the EVS 6021 components summarized from Section 2.0 (System Overview) of the Test Report for Examination of EVS 6021(Report id - PES-002-FTR-01), prepared by the Functional Examiner and the System Overview document submitted by ES&S as part of the Technical Data Package (TDP).

---

[1] The EAC certified system also includes ExpressTouch Electronic Universal Voting System and ExpressVote Universal Voting System hardware 1.0, but those components are not part of the system presented for certification in Pennsylvania.

**Electionware®**

Electionware election management software is an end-to-end election management software application that provides election definition, ballot formation, equipment configuration, result consolidation, adjudication and report creation. Electionware is composed of five software groups: Define, Design, Deliver, Results and Manage. Electionware can be configured as a Standalone EMS Workstation or as a closed Local Area network with EMS server and client/s.

**ExpressVote XL™**

ExpressVote XL is a hybrid paper-based polling place voting device that provides touch screen vote capture that incorporates the printing of the voter's selections as a cast vote record (CVR), and tabulation scanning into a single unit. The screen provides a display of the full ballot. This device can serve all voters, including those with special needs, allowing all voters to cast vote summary cards autonomously. Voters navigate ballot selections using the touch screen, detachable UVC keypad or ADA support peripherals, such as a sip and puff device. ExpressVote XL guides voters through the ballot selection process with screen prompts, symbols and ballot audio. The voter can print the vote summary card once they are ready to cast the vote. Once printed, the ExpressVote XL internally processes the vote summary card for tabulation. The tabulated vote summary card is deposited into a removable, secure card container attached to the ExpressVote XL cart.

**ExpressVote® Hardware 2.1**

ExpressVote Universal Voting System Hardware 2.1 (ExpressVote HW2.1) is a hybrid paper-based polling place voting device that provides touch screen vote capture and incorporates the printing of the voter's selections as a Cast Vote Record (CVR), and tabulation scanning into a single unit. This system, capable of serving all voters, can operate in either marker or tabulator mode, depending on the configuration that is selected in

Electionware. In marker mode, the voter marks a ballot and prints the vote summary card using the internal thermal printer. The vote summary card is then scanned on DS200 precinct scanner or the central scanners DS450 or DS850. When utilized as a tabulator, the ExpressVote 2.1 provides the capability of tabulating printed vote summary cards. ExpressVote 2.1 incorporates an attached removable, secure container to hold the ballots, allowing the voters to cast the ballots. ExpressVote as a Tabulator uses a Master Media USB device for Poll Open and Poll Close functions.

**DS200®**

DS200 is a polling place paper-based system, specifically a digital scanner and tabulator that simultaneously scans the front and back of a paper ballot and/or vote summary card in any of four orientations for conversion of voter selection marks to electronic CVR's to be saved on USB media. DS200 scans and tabulates hand marked paper ballots and ballot cards produced from ExpressVote 2.1. It also has a touch screen for voter communication, an integrated thermal printer for printing reports and internal battery backup.

**DS450®**

DS450 is a central scanner and tabulator that simultaneously scans the front and back of a hand marked paper ballots and/or vote summary cards from ExpressVote and ExpressVote XL in any of four orientations for conversion of voter selection marks to electronic CVR's. It sorts tabulated ballots into discrete output bins without interrupting scanning. The tabulation results can be physically transported using USB drives or the device may be configured to transmit tabulation results to the results server through a closed network connection.

**DS850®**

DS850 is a central scanner and tabulator that simultaneously scans the front and back of hand marked paper ballots and/or vote summary cards from ExpressVote and ExpressVote XL in any of four orientations for conversion of voter selection marks to

electronic CVR's. The tabulation results can be physically transported using USB drives or the device may be configured to transmit tabulation results to the results server through a closed network connection. DS850 provides higher throughput than DS450.

The following is a listing of the software/firmware components that comprise the entire ES&S 6021 system:

**Manufacturer Software/Firmware**

The **ES&S EVS 6.0.2.1** voting system consists of the following software and firmware components:

| Application | Version |
|---|---|
| Electionware – Client/Server | 5.0.2.0 |
| Event Log Service | 1.6.0.0 |
| Removable Media Service | 1.5.0.0 |
| DS450 | 3.1.0.0 |
| DS850 | 3.1.0.0 |
| DS200 | 2.17.0.0 |
| ExpressVote HW2.1 | 2.4.3.0 |
| ExpressVote XL | 1.0.1.0 |
| Optional Utility: ExpressLink | 1.4.0.0 |
| Optional Utility: Toolbox | 3.3.0.0 |

- **Electionware** Election database creation, media programming and tally/reporting software
- **DS450** Central Count scanner and tabulator, Central Tabulator firmware
- **DS850** Central Count scanner and tabulator, Central Tabulator firmware
- **DS200** Precinct scanner and tabulator, Precinct Tabulator firmware
- **ExpressVote HW2.1** Precinct ballot marker and/or Precinct scanner and tabulator, Universal Voting System firmware
- **ExpressVote XL** Precinct ballot marker and/or Precinct scanner and tabulator, using a full-face touchscreen and Universal Voting System firmware
- **ExpressLink™** standalone application that interfaces with voter registration (e.g. electronic Pollbook) systems and the ExpressVote Activation Card Printer to print the ballot activation code on an ExpressVote and ExpressVote XLcards

- **Electionware Toolbox** set of utilities that can be integrated into the Electionware EMS to enhance the software usability experience and streamline various processes. These add-on utilities include Test Deck and Text to Speech.

## COTS Software/Firmware

Additional COTS software and firmware included in the system has been defined as part of the EAC system certification scope added to this report as Attachment A.

## Hardware

Below is a listing of the hardware components that comprise the entire ES&S EVS 6.0.2.1 system categorized by system functionality:

| Hardware | HW Revision |
|---|---|
| ExpressVote Universal Voting System | 2.1 |
| DS200 Precinct-based Scanner and Tabulator | 1.2, 1.3 |
| DS450 Scanner and Tabulator | 1.0 |
| DS850 Scanner and Tabulator | 1.0 |
| ExpressVote XL Full-Faced Universal Voting System | 1.0 |
| ExpressVote Rolling Kiosk | 1.0 |
| ExpressVote Voting Booth | N/A |
| ExpressVote ADA Table | N/A |
| DS200 Collapsible Ballot Box | 1.0 |
| DS200 Plastic Ballot Box | 1.2, 1.3, 1.4, 1.5 |
| DS200 Metal Ballot Box | 1.0, 1.1, 1.2 |
| DS450 Cart | N/A |
| DS850 Cart | N/A |
| Universal Voting Console | 1.0 |

## Test Materials

Test support materials utilized during the examination included:

- Thermal receipt paper for the **ExpressVote 2.1** Marking Only, **ExpressVote 2.1** Marking and Tabulating, and the **ExpressVote XL**.
- Ballot card stock for processing ballots on the **ExpressVote 2.1** Marking Only, **ExpressVote 2.1** Marking and Tabulating, and the **ExpressVote XL**.
- Ballot stock, for printing of ballots to be processed by the **DS200, DS450** and **DS850**
- Activation cards
- Smart cards
- USB thumb drives
- Ballot pens
- Printer paper rolls

## III.   EXAMINATION APPROACH, PROCEDURES AND RESULTS

### A.   Examination Approach

To ascertain whether EVS 6021 can be safely used by voters at elections in the Commonwealth and meets all the requirements of the Pennsylvania Election Code, the Examiners developed test protocols for the examination. The initial functional examination of EVS 6000 determined that the system did not comply with Sections 1107-A(3) and (13), 25 P.S. §§ 3031.7(3) & (13). The Examiners also observed that system documentation for validating the installed components and hardening procedures needed to be updated for a secure implementation. After the initial examination for PA state certification in June 2018, EVS 6000 field use in the State of Kansas's primary elections also identified performance anomalies that necessitated remediation. The Examiners then performed a follow-up examination of EVS 6021 to confirm that the anomalies identified in EVS 60000 were corrected and the system complies with all the requirements of the Pennsylvania Election Code. The examination approach followed for EVS 6000 and EVS 6021 is discussed in the below sections.

**EVS 6000 Examination Approach**

**Functional Examination**

The test protocols separated the requirements of Article XI-A of the Pennsylvania Election Code, Sections 1101-A to 1122-A, 25 P.S. §§ 3031.1 - 3031.22, into six main areas of test execution: (1) Source Code Review; (2) Documentation Review; (3) System Level Testing; (4) Security/Penetration Testing; (5) Privacy Analysis; and (6) Usability Analysis.

Source Code Review was performed prior to the functional examination to determine if there are any vulnerabilities found that would warrant additional security examination.

Documentation Review was performed to verify that the portions of the Pennsylvania Election Code, which reference documentation detail, are sufficiently met by the ES&S EVS 6000 documentation. The Functional Examiner validated compliance of the system to the following sections of the Election Code during the documentation review.

- 1105-A(a), 25 P.S. § 3031.5(a), requiring that an electronic voting system has been examined and approved by a federally recognized ITA;

- 1107-A(11), 25 P.S. § 3031.7(11), requiring an electronic voting system to be suitably designed in terms of usability and durability, and capable of absolute accuracy;

- 1107-A(13), 25 P.S. § 3031.7(13), requiring an electronic voting system to correctly tabulate every vote;

- 1107-A(14), 25 P.S. § 3031.7(14), requiring an electronic voting system to be safely transportable; and

- 1107-A(15), 25 P.S. § 3031.7(15), requiring an electronic voting system to be designed so voters may readily understand how it is operated.

System Level Analysis examined the ES&S EVS 6000 voting system in terms of conducting an election. The Functional Examiner created election definitions using Electionware and populated the voting devices (ExpressVote XL - Tabulator, ExpressVote 2.1 - Ballot Marking Device and Tabulator, DS200 – Precinct Scanner, DS450 Central Count Scanner and DS850 Central Count Scanner) with election definitions using transport

10

media. Votes were captured and ballots were printed and tabulated via ExpressVote XL and ExpressVote 2.1 configured as tabulator. Ballots were marked manually as well as via the ExpressVote 2.1 in marking mode, then tabulated through the polling place DS200 scanner. All ballots (hand marked paper ballots, ExpressVote 2.1 in marking mode, ExpressVote 2.1 in tabulator mode, and ExpressVote XL) created were then tabulated through the DS450 and DS850. Tabulation results for ExpressVote 2.1 in Tabulator mode, ExpressVote XL, DS200, DS450 and DS850 were then processed into Electionware, write-in votes were adjudicated, and reports were generated with results for the election. The results reports were validated against the expected results of the voted ballots.

All components of the EVS 6000 system were exercised to verify that they meet all pertinent requirements of the Pennsylvania Election Code. The test cases were designed to ascertain compliance to the following sections of the Election Code:

- 1101-A, 25 P.S. § 3031.1, requiring an electronic voting system to provide for a permanent physical record of all votes cast;

- 1107-A(2), 25 P.S. § 3031.7(2), requiring an electronic voting system to permit voting on both candidates and ballot questions, according to the official ballot;

- 1107-A(3), 25 P.S. § 3031.7(3), requiring an electronic voting system to permit straight party voting, including the "Pennsylvania method" of straight party voting;

- 1107-A(4), 25 P.S. § 3031.7(4), requiring an electronic voting system to permit a voter to vote for candidates of all different parties, and write-in candidates;

- 1107-A(5), 25 P.S. § 3031.7(5), requiring an electronic voting system to permit a voter to enter write-in votes;

- 1107-A(6), 25 P.S. § 3031.7(6), requiring an electronic voting system to permit a voter to cast votes for candidates and ballot questions he or she is entitled to vote for, and prevents a voter from casting votes the voter is not entitled to vote on;

- 1107-A(7), 25 P.S. § 3031.7(7), requiring an electronic voting system to prevent over-votes;

- 1107-A(8), 25 P.S. § 3031.7(8), requiring an electronic voting system to prevent a person from casting more than one vote for a candidate or question, except where this type of cumulative voting is permitted by law;

- 1107-A(9), 25 P.S. § 3031.7(9), requiring an electronic voting system to permit

11

voters to vote in their own parties' primaries, and prevents them from voting in other parties' primaries, while also permitting voters to vote for any nonpartisan nomination or ballot question they are qualified to vote on; and

- 1107-A(10), 25 P.S. § 3031.7(10), requiring an electronic voting system that registers votes electronically to permit voters to change their votes up until taking the final step to register the vote, and for systems that use paper ballots or ballot cards, permits a voter to get a new ballot in the case of a spoiled ballot, and to mark and cancel the spoiled ballot;

- Parts of 1107-A(16), 25 P.S. § 3031.7(16), requiring an electronic voting system which provides for district-level tabulation to include (i) a public counter to register how many ballots are submitted to be counted; (iv) will not tabulate an over-vote, with an option to notify a voter of an over-vote if used during voting hours; and (v) generates a printed record that counters are set to zero before voting commences; and

- Parts of 1107-A(17), 25 P.S. § 3031.7(17), requiring an electronic voting system which provides for central-count tabulation to (ii) preclude tabulation of an over-vote; and (iii) indicate that counters are set to zero before processing ballots, either by district or with the capability to generate cumulative reports.

The Functional Examiner also used the System Level Testing to further evaluate the design and accuracy aspects of the system as required by Sections 1107-A(11) and (13), 25 P.S. §§ 3031.7(11) & (13), through his use at public demonstration, even though the requirements were already validated in the documentation review phase by reviewing EAC certification reports.

The Security/Penetration Analysis examined the voting system's compliance with the requirements of the Pennsylvania Election Code by analyzing physical security procedures and impoundment of ballots. Precinct tabulation devices were installed for delivery to the precinct, and the Functional Examiner analyzed the pertinent security procedures performed on each device to ascertain compliance to Section 1107-A(12), 25 P.S. § 3031.7(12), requiring an electronic voting system to provide acceptable ballot security procedures and impoundment of ballots to prevent tampering with or substitution of any ballots or ballot cards. The Functional Examiner also used the security analysis phase of testing to validate

12

compliance to parts of Sections 1107-A(16) and (17), 25 P.S. §§ 3031.7(16) & (17) that relate to system security.

The Privacy Analysis examined the voting system's compliance to Section 1107-A(l) of the Election Code, 25 P.S. § 3031.7(1), requiring that an electronic voting system provide for absolute secrecy of the vote, by analyzing how the polling place devices met the pertinent privacy requirements.

The Usability analysis evaluated the compliance of the voting system to Sections 1107-A(14) and (15), 25 P.S. §§ 3031.7(14) & (15). The results from the tests were used by the Functional Examiner to supplement his conclusions from the documentation review phase.

### Accessibility Examination

The accessibility examination was designed to provide insight and information on each voting system's usability and accessibility, especially for voters with disabilities and for poll workers responsible for managing the system on Election Day. The Accessibility Examination included a team of three examiners with accessibility, usability and election process experience (collectively referred as "Accessibility Examiner"). The examination process was divided into three parts:

- **Expert review** by the Accessibility Examiner, using scenarios based on personas of people with disabilities from National Institute of Standards and Technology (NIST) and their professional experience.

- **Voters with disabilities used** the system voting a reasonable length PA ballot and completed a questionnaire about their experience. The Accessibility Examiner observed and made notes.

- **Election officials and poll workers tested the accessibility features** to evaluate how they would be activated during an election. They commented on the system based on their experience.

The testing team constructed a typical PA ballot, with a mix of contest types and variation in the number of candidates to be voted for each contest. The Accessibility Examiner conducted an expert review, observed 7 voters with disabilities, and worked with 10 poll workers in a guided review of the systems. Voters alternated between using the ExpressVote/DS200 and ExpressVote XL and some voters tried both systems.

### Security Testing

The Security testing provided a means to assess the required security properties of the voting system under examination and ascertain compliance with the Pennsylvania Election Code requirements, including 25 P.S. §§ 3031.7(11), (12), (16), & (17). The security tests specifically addressed confidentiality, vote anonymity, integrity, availability, and auditability of the voting systems. The Security Examiner also conducted a vulnerability assessment and penetration testing against systems that were configured and secured in the same manner that would be used in a live election.

### EVS 6021 Examination Approach

EVS 6021 is a release to correct the anomalies noted in EVS 6000 system. The examiners evaluated the changes submitted by ES&S and developed test protocols to validate the modifications to EVS 6000 to ensure that the fixes resolved the identified anomalies and that the modified system maintained compliance with all the Pennsylvania Election Code requirements.

### Functional Examination

The Functional Examiner and Department agreed that the test approach must include Source Code Review, System Level Testing and Documentation review. Security/Penetration, Privacy and Usability analysis results were leveraged from the EVS 6000 examination since those aspects of the system remained unaffected by the isolated code changes made to the system.

Source code review was done to determine if there were any vulnerabilities that warranted additional testing. System Level Testing examined EVS 6021 in terms of conducting a general election and closed primary election. The election runs were to (a) test and confirm that the anomalies identified during EVS 6000 examination were remediated and (b) to perform regression testing of all components of the system. The election runs allowed the Functional Examiner to ascertain that compliance with the Election Code requirements determined during the System Level Testing of EVS 6000 is maintained in the new release. The Documentation review was conducted to ensure that that the system documentation for EVS 6021 provided accurate validation procedures for verifying installation of correct system components.

**Accessibility Examination**

The Department of State in consultation with the Accessibility Examiner decided that the findings from EVS 6000 Accessibility Examination could be used for EVS 6021, since there were no hardware changes and the isolated code changes were for performance improvements and fixing the anomalies identified during EVS 6000 Functional Examination.

**Security Testing**

The Security Examiner evaluated the system changes, specifically the changes to the Electionware hardening scripts to confirm that the script changes would secure the Election Management installation further.

**B.    Examination Process and Procedures**

The examination process and procedures followed for EVS 6000 and EVS 6021 examinations are listed in the below sections. The final determination in this report is based on the combined analysis of the results and conclusions from both examinations.

**EVS 6000 Examination**

**Functional Examination**

15

The public demonstration and functional examination portion commenced on June 25, 2018, at Room G24A/B of the Commonwealth Capitol Complex - Finance Building, 613 North Street, Harrisburg PA 17120. The test execution tasks took approximately two and one-half days. Members of the public were allowed as observers for the examination. The Functional Examiner performed System Level Testing, Security/Penetration Testing and Privacy and Usability Analysis during the examination. Source code and Documentation review were completed prior to the public examination at SLI lab facilities in Wheat Ridge, Colorado.

ES&S supplied all the hardware equipment required for the examination. All software and firmware necessary to perform the examination was received directly from the Voting System Test Laboratories (VSTL) that tested the voting system for EAC certification. The trusted build of the software and firmware for each device being evaluated were installed using the appropriate media for installation. The hash codes for all system components were captured using the process listed in the manufacturer's Technical Data Package (TDP) by the Functional Examiner with assistance from ES&S representative. The Functional Examiner further compared and confirmed that all the captured hash codes matched the hash codes for the EAC certified system executables before executing the test scripts.

The Functional Examiner created the election definition using Electionware and prepared the precinct tabulation device DS200, polling place vote capture devices ExpressVote XL and Express Vote 2.1 and central scanners DS450 and DS850 using transport media. The polling place was set up using ExpressVote XL, ExpressVote 2.1 Marker, ExpressVote 2.1 Tabulator and DS200. A primary and general election were then run using polling place devices and central scanners. Ballots were tabulated via the polling place tabulation devices and central scanners. Results were then tabulated using Electionware and validated against expected results.

**Accessibility Examination**

The accessibility examination portion commenced on June 25, 2018, at Room

G24A/B of the Commonwealth Capitol Complex - Finance Building, 613 North Street, Harrisburg, PA 17120.  The examination lasted approximately three days followed by a debrief meeting on June 28, 2018 with DOS and CCD to discuss initial findings. The examination included expert review by the Accessibility Examiner, sessions with 3 poll worker groups from Dauphin County, PA, and sessions with 7 voters with disabilities using different assistive devices for voting. The voter sessions each took approximately an hour and the poll worker sessions took approximately 90 minutes each.  ES&S supplied the hardware and supplies for the Accessibility Examination. The equipment was prepared for the examination by loading the required election definition using transport media. The Accessibility Examiner prepared voting scenarios for each voting session to allow comparison of results between each session. The scenarios were constructed to provide a structured opportunity to explore how the system works in all interaction modes, using:

- visual touch screen with default settings;
- visual touch screen with text size and contrast changes;
- audio and the tactile keypad;
- audio and the visual touch screen; and
- audio or visual display with the dual switch.

Both the ballot contents and the instructions for marking the ballot were designed to exercise different types of interactions (navigation in ballot, navigation in contest, undervotes, overvotes, straight party). The ballot included both very short contests, and those long enough to potentially fill more than one screen, even at the default text size.

### Expert Review by Accessibility Examiner

The Accessibility Examiner used the same ballot and instructions to be used for voter and poll worker review, for their expert review, so they would be familiar with the interaction voters would experience.

### Sessions with voters

The voter sessions all took about an hour. They included:

17

- An opening interview about their previous voting experience and the types of assistive technology they used in both daily life and in voting.

- Orientation to the system with an opportunity for voters to ask questions about any assistive technology available.  For example, one participant asked if she would be able to use her own audio to connect directly to her hearing aids.

- Voting a ballot, following instructions given verbally by the Accessibility Examiner. Voters were encouraged to give feedback as they went through the ballot. The Accessibility Examiner and the voters discussed any feedback and questions that occurred during the voting sessions and re-evaluated any findings as necessary.

- A closing interview about their reactions to the experience of using the voting system.

**Sessions with poll worker groups**

The sessions took 60-90 minutes, depending on how many people were in each group. The session included:

- A brief orientation to the voting system and the access features, similar to the way a poll worker trainer might introduce the system.

- The poll workers each then marked a ballot, tried out the access features if they wanted, and were given an opportunity to read the "During Election Day" instructions provided with the system

- The Accessibility Examiner presented them with 6 scenarios of different access needs and asked them to help set up the system for one of the facilitators acting as the voter in each of the scenarios.

The Accessibility Examiner took notes about aspects of the system that worked well and problems they encountered during all three phases of the examination.  The issues were then categorized based on their impact on a voter's ability to vote independently and

18

privately.

- Positives – things that voters mentioned as meeting or exceeding their expectations
- Annoyances – things voters mentioned as problems, but which did not significantly slow their progress in marking their ballot
- Problem solving – instances where voters had to pause to figure out how to complete an action or task, but were able to do so on their own, by exploring the system or relying on past experience with technology
- Needs assistance - problems that could only be solved with help, such as instructions or assistance from a poll worker
- Show stoppers - problems that could prevent successful independent and private voting, even with good knowledge about how to use the system and accessibility features

The Accessibility Examiner then compiled the findings including categorizations from the examination into a report submitted to the Secretary.

**Security Testing**

The Security Testing was done at SLI lab facilities in Wheat Ridge, Colorado. The Security Examiner received the hardware devices from ES&S and the software and firmware was obtained from the Voting System Test Lab (VSTL) which tested the system for EAC certification testing. The Examiner installed the Trusted Build prior to the evaluation using the appropriate media for installation. The Security Testing is comprised of a series of test suites which are utilized for verifying that a voting system will correspond to applicable security requirements within the Pennsylvania Election Code. The Security Examiner evaluated each component of the EVS 6000 system and the system as a whole for interactions between components. These test suites covered areas of confidentiality, vote anonymity, integrity, availability, and auditability of the voting systems.

The requirements associated to each area of testing were applied to the EVS 6000 system in the following manner. The Security Examiner did a review of the EAC testing reports of the system and also executed tests for a cross section of VVSG 2005 requirements to reconfirm compliance. The Security Examiner then designed tests that included in depth verification and validation of reports, audit logs and physical access controls for each of the components of the voting system. The physical security examination included security seals, lock/key combinations, measures for collection of voting in the event of an extended power outage, ballot box and system access points.  Tests were done to ensure that election results, media used, reports and audit logs were protected from attempts to decrypt, manipulate or corrupt election data. The Security Examiner also created a vulnerability assessment and performed penetration testing of the EVS 6000 system.

**ES&S EVS 6021 examination**

**Functional Examination**

The follow-up examination commenced on September 25, 2018, at SLI Global Solutions facility, 4720 Independence Street, Wheat Ridge, Colorado, and was observed by Department staff in a conference room in BCEL, 210 North Office Building, 401 North Street, Harrisburg, Pennsylvania via web conference.  ES&S supplied all the hardware equipment required for the examination. All software and firmware necessary to perform the examination was received directly from the VSTL that tested the voting system for EAC certification. The Functional Examiner installed and/or verified the Trusted Build for each system component. A primary and general election were then run using ExpressVote XL, ExpressVote 2.1 (Marker and Tabulator), DS200, DS450 and DS850. Results were then tabulated and validated against expected results. The Functional Examiner performed the Source Code and Documentation Review before the witnessed examination.

**Security Testing**

The follow-up Security testing verified the changes to the documentation for appropriately hardening the Electionware EMS for secure installation.

20

### C.    Examination Results

**EVS 60000 Functional Examination**

On July 16, 2018, the Functional Examiner issued his draft report for the testing of EVS 6000 with a recommendation that the system was not in compliance with Sections 1107-A(3) and (13) of the Pennsylvania Election Code, 25 P.S. §§ 3031.7(3) & (13). The report noted the following concerns for PA method implementation:

1) On the ExpressVote XL, when voting a straight party ballot and the voter modified a straight party contest that was a "vote for no more than N" and has "N" candidates for the selected party, with a write-in candidate, the voter was incorrectly notified that they were attempting to overvote. In fact, following the PA method implementation, the "N" straight party selected candidates should have been deselected and the voter should have been able to proceed with the write-in.

2) On the ExpressVote 2.1, in the general election, an issue was encountered when voting a straight party ballot and the voter modified a straight party contest that was a "vote for no more than N" and had less than "N" candidates for the selected party. In this scenario, the ExpressVote 2.1 continuously instantiated the PA method any time when the marks on the ballot were the same candidate selections as the straight party selection, irrespective of whether it was the first time a selection was made in the contest after straight party voting or not.

The Functional Examiner noted that the test results were not as expected for the tests executed to verify compliance to Section 1107-A(3), 25 P.S. § 3031.7(13); since an issue was encountered when a general election ballot was scanned through the ExpressVote XL but scanned at an unexpected orientation such that the implemented image area capture parameters were too tight and that Electionware was unable to parse two write-ins from the ballot image, so those write-ins could not be adjudicated.

The Functional Examiner also noted that the EVS 6000 system TDP needed to be

updated to provide accurate validation procedures for verifying installation of correct system components. The EVS 6000 documentation did not accurately reflect system verification procedures for ExpressVote 2.1.

The Functional Examiner's report indicated successful completion of tests executed to ascertain compliance to all other requirements mandated by the Pennsylvania Election Code. The Examiner report for EVS 6000 (Test Report – PES-002-FTR-01) included details of the test cases, execution and successful completion.   The following section is a summary of the results of the examination as set forth in fuller detail in the Examiner's Report.

      1.    Source Code Review

Source Code Review for EVS 6000 was performed, with a focus on determining whether any vulnerabilities could be found. The Functional Examiner reported that the code review was completed with no identified malicious software, cryptographic software, process control or password management vulnerabilities. The Examiner concluded that no deficiencies were found during source code review.

      2.    Documentation Review

The Documentation Review testing performed by the Functional Examiner demonstrates that the EVS 6000 meets the relevant requirements of the Pennsylvania Election Code. The Examiner reviewed the "Test Report for EAC 2005 VVSG Certification Testing of ES&S EVS 6.0.0.0 Voting System" (report number ESS-7001-CTR-01).

The review of the EAC test reports by the Functional Examiner and the EAC certifications submitted by ES&S satisfy the requirements of Section 1105-A(a) of the Election Code, 25 P.S. § 3031.5(a): requiring that an electronic voting system has been examined and approved by a federally recognized independent testing authority (ITA), or VSTL as such authorities are now called, as meeting the applicable performance and test standards established by the federal government.

Functional Examiner concluded that the design requirements of Sections 1107-A(11) and (14) of the Pennsylvania Election Code, 25 P.S. §§ 3031.7(11) & (14), are met by the combination of EAC hardware Non-Operating Environmental Tests, which included bench handling, vibration, low temperature, high temperature, humidity and product safety tests. The system accuracy testing during EAC certification testing provided confirmation of system accuracy as required by Section 1107-A(11) of the Pennsylvania Election Code, 25 P.S. § 3031.7(11).

The system summative usability test reports were accepted by the EAC as part of the Federal Certification. This, along with the Functional Examiner's use of the system, demonstrates that the system can be readily learned and hence satisfied the usability requirement of Section 1107-A(15) of the Pennsylvania Election Code, 25 P.S. § 3031.7(15).

3.   System Level Testing

As set forth in the examination approach, System Level Testing was divided into two separate tests, a closed primary election and a general election. The ballots defined had contests with voting variations supported in Pennsylvania.

A closed primary election consisting of two parties (Republican, Democratic), three precincts, and 16 contests (14 partisan contests and 2 referendums - 8 "Vote for One", 1 "Vote for no more than Two", 3 "Vote for no more than Three", 1 "Vote for no more than Four" and 1 "Vote for no more than Fifteen") was run utilizing Electionware, ExpressVote 2.1, ExpressVote XL, DS200, DS450 and DS850. Referendum contests were added to test the generation of non-partisan ballots. The Functional Examiner validated compliance of the system to Sections 1101-A and 1107-A(2), (5)-(11), 25 P.S. §§ 3031.1, 3031.7(2), (5)-(11). No issues or anomalies were experienced during these tests, and the objective criteria established in the test protocols were met.

A general election consisting of four parties (Republican, Democratic, Green and Libertarian), three precincts (one of which was a split precinct), and 16 contests (13 partisan contests, 1 non-partisan and 2 retention contests, 9 "Vote for One", 1 "Vote for no more

than Two", 3 "Vote for no more than Three", and 1 "Vote for no more than Fifteen") was run utilizing Electionware, ExpressVote 2.1, ExpressVote XL, DS200, DS450 and DS850. The Functional Examiner examined the compliance of the system to Sections 1101-A and 1107-A(2)-(8), (10)-(11) and (13), 25 P.S. §§ 3031.1, 3031.7(2)-(8), (10)-(11) & (13).

The Functional Examiner included test cases to validate Sections 1107-A(16) and (17), 25 P.S. §§ 3031.7(16) & (17), that mandate voting systems to generate zero proof reports and correctly handle over-votes during the election runs. The remainder of the requirements of 25 P.S. §§ 3031.7(16) and (17) were validated by the Functional Examiner during the Security/Penetration Analysis.

Election definitions for both primary and general elections were created within Electionware, and transport media was created to populate ExpressVote 2.1, ExpressVote XL, DS200, DS450 and DS850. Polls were opened and ballots were marked manually, as well as electronically via the ExpressVote 2.1 in Marking mode, then tabulated through the polling place DS200 scanner. Ballots were marked and tabulated utilizing the polling place ExpressVote 2.1 in Tabulator mode and the ExpressVote XL devices. All ballots (hand marked, ExpressVote 2.1 in Marking mode, ExpressVote 2.1 in Tabulator mode, and ExpressVote XL) created were then tabulated through the DS450 and DS850. Thus, each ballot was tabulated three times.

The Functional Examiner used English and Spanish ballots for the test. Reports were generated after closing polls and results were validated against expected results. Each specific hardware and software component was tested for compliance with the required sections of the Election Code.

The EVS 6000 is a paper-based system and paper ballots provide a permanent physical record of each vote cast adhering to Section 1101-A, 25 P.S. § 3031.1. Hand marked paper ballots and ExpressVote 2.1 in marker mode allow voters to use the precinct scanner DS200 for tabulation. ExpressVote 2.1 in tabulator mode and ExpressVote XL create a paper ballot based on a voter's selections, which is tabulated when the voter affirms that he/she is ready to cast a vote.

The primary and general election definitions were created using Electionware and loaded to polling place devices and central scanners, which provided assurance that the system can perform ballot creation activities. The Functional Examiner successfully added contests including straight party, parties, choices, precincts, districts, ballot styles, referendum questions and retention contests with appropriate candidates and choices. The ExpressVote 2.1 (marker and tabulator), ExpressVote XL and DS200 components of the EVS 6000 successfully permitted votes for "1 of 1," "N of M," and "Question" contests for a standard and ADA voting session. The Functional Examiner also exercised a straight party vote to confirm that all appropriate candidates were selected.  The Functional Examiner thus concluded that the system is in compliance with Section 1107-A(2), 25 P.S. § 3031.7(2).

Each of the applicable components of EVS 6000 allowed the test voter to cast a write-in vote and demonstrated compliance with Section 1107-A(5), 25 P.S. § 3031.7(5).

EVS 6000 meets the requirements for Section 1107-A(6), 25 P.S. § 3031.7(6), because the test voters cast votes on different ballot styles for candidates and questions and the ExpressVote 2.1 and ExpressVote XL displayed only contests for which the voter was entitled to vote.

The system's compliance to Section 1107-A(7), 25 P.S. § 3031.7(7), was demonstrated since DS200 has the capability to indicate overvotes for any office and the voter has the ability to either spoil the ballot or cast the ballot with overvotes if the voter decides to do so.  ExpressVote XL and ExpressVote 2.1 (marker and tabulator) did not allow overvotes. The Functional Examiner also noted that the system allowed undervotes, but warned the user about the undervote when configured to do so.

The successful validation of the election results shows that central scanners DS450 and DS850, as well as precinct tabulator DS200, include the capability to reject all choices recorded on the ballot for an office or question if the number of choices exceeds the number for which the voter is entitled to vote, adhering to Section 1107-A(8), 25 P.S. § 3031.7(8).

The EVS 6000 complies with Section 1107-A(9), 25 P.S. § 3031.7(9), because test

voters in the closed primary election were only able to vote for referendum questions and candidates seeking the nomination of their party.

Adherence to Section 1107-A(10), 25 P.S. § 3031.7(10), was demonstrated for both ADA and standard voting sessions. ExpressVote 2.1 and ExpressVote XL allowed the voters to review their ballots before printing for tabulation on DS200 or central scanners DS450 or DS850. The Functional Examiner attempted to change votes on ExpressVote 2.1 and ExpressVote XL for candidates within the contest, as well as after leaving the contest and then returning to other contests and while reviewing the summary screen. The tests demonstrated that ExpressVote and ExpressVote XL allowed changing the selections until the voter decides to print or cast the ballot. The DS200 precinct scanner of EVS 6000 provides the voter with a caution message when the ballot contains potential errors, such as the presence of overvotes or undervotes. The voter is also presented an error report on the screen when the tabulator detects potential errors. The voter can either decide to affirm their intent by casting the ballot, or they can spoil the ballot and fill out another ballot.

Accuracy requirements of 1107-A(11), 25 P.S. § 3031.7(11), that were ascertained by reviewing EAC test reports were further validated by the successful tabulation and validation of the primary and general elections run by the Functional Examiner.

The Functional Examiner validated via test cases during the primary and general election that the tabulating devices DS200, DS450 and DS850 generated zero proof reports only before ballots were cast, the system rejected all votes for the contest in an overvote situation, and produced a results report when appropriately configured as required under Sections 1107-A(16) and (17), 25 P.S. §§ 3031.7(16) & (17). The Functional Examiner confirmed that the zero-proof report cannot be generated on demand after a ballot is cast.

Ballots were marked by hand including write-in votes during the general election to examine the system's ability to properly enact the PA method. The DS200, DS450 and DS850 demonstrated compliance to Sections 1107-A(3) and (4), 25 P.S. §§ 3031.7(3) & (4), by appropriately tabulating the votes. The Functional Examiner identified anomalies in the

implementation of the PA Method on ExpressVote 2.1 and Expressvote XL.

The voting variations used for the examination included write-in votes to ensure that all components of the system will identify the appropriate write-ins and allow the election official to tabulate all cast votes, including write-in votes. On the ExpressVote XL and Electionware, an issue was encountered when a ballot was scanned through the XL but scanned at an unexpected orientation such that the implemented image area capture parameters were too tight; consequently, the Electionware was unable to parse two write-in votes from the ballot image, so the votes could not be adjudicated. The Functional Examiner hence concluded that EVS 6000 did not comply to Section 1107-A(13), 25 P.S. § 3031.7(13).

4.    Security/Penetration Analysis

The Functional Examiner adopted a strategy to review each pertinent requirement for this test individually and then created test cases to address it in either in a documentation review, a functional test, or both.

Precinct tabulation devices and ballot marking devices were configured for delivery to a polling place from warehouse including all seals and locks recommended by the manufacturer. The central scanners were configured for operation in a county office. The devices were inspected for the ability to be tampered with: the inspection examined ports, outer case and memory devices to confirm that they are all secure and the locks and seals are tamper proof and evident. The Functional Examiner also examined the components of the EVS 6000 system for password management of administrative functions and ensured that the system counter could not be reset by unauthorized persons. In addition, the Functional Examiner also reviewed "ES&S System Security Specification" document for ballot security procedures at the polling place and central location to ensure that the manufacturer recommended the required steps for configuring the EVS 6000 securely for the election. Based on the tests, the Functional Examiner concluded that that the system complies to Section 1107-A(12), 25 P.S. § 3031.7(12).

The Functional Examiner included test cases during the Security/Penetration analysis phase of the testing to evaluate the security requirements mandated by Sections 1107-A(16) and (17), 25 P.S. §§ 3031.7(16) & (17). The Functional Examiner validated that the tabulation devices ExpressVote XL, ExpressVote 2.1 (tabulator) and DS200 had a visible public counter and the system prevented authorized and unauthorized users any access to vote data while polls are open. Tests were completed to determine that USB ports do not allow any data or information to be transferred to the ExpressVote XL, ExpressVote 2.1 (tabulator) and DS200 and no maintenance, poll worker or administrative modes allow tampering with the tabulating element. The system did not allow polls to be opened without running a zeroproof report and the content of the report showed that all candidate positions, each question and the public counter were all set to zero. The functionality of the system to generate the close of polls report was verified and the report contents were analyzed to ensure that it contained the total number of ballots tabulated and total number of votes for each candidate and question on the ballot.  Based on the above tests and the test cases executed while running the elections, the Functional Examiner concluded that EVS 6000 complies with all requirements mandated by 25 P.S. §§ 3031.7(16) and (17).

5.    Privacy Analysis

The Functional Examiner reviewed and inspected the privacy aspects of EVS 6000 system to determine compliance with Section 1101-A(1) of the Election Code, 25 P.S. § 3031.7(1). The Functional Examiner determined that the components of the system used at the polling place comply with 25 P.S. § 3031.7(1) by review of system documentation and physical inspection. Central scanners were physically examined by the Functional Examiner for adequate visual secrecy. The Functional Examiner also verified that no voter data, including stored ballot images are tied back to any specific voter in a manner that would compromise voter secrecy.

6.    Usability Analysis

The Functional Examiner determined that EVS 6000 demonstrated compliance with the usability requirements of Section 1107-A(14) and (15) of the Election Code, 25 P.S. §§

3031.7(14) & (15), by reviewing appropriate EAC certification reports and from his experience of using all the functionalities of the system during the examination.

### EVS 60000 Accessibility Examination

The tests included examiner review, sessions with voters and poll workers. A summary of the test details and findings is discussed in this section.

#### Examiner Review

The Accessibility Examiner conducted a review of the voting system under examination prior to sessions with voters and poll workers. The Accessibility Examination team included both accessibility and usability expertise to ensure background and knowledge of the issues for accessible voting. The Accessibility Examiner had experience working with people with a wide variety of disabilities and their impact on daily life, knowledge of the range and use of assistive technologies that voters with disabilities might rely on for access, experience conducting usability evaluations with voters, and strong knowledge of best practices and design principles for digital technology and voting systems. The expert review by the Accessibility Examiner gave a chance to make sure they understand how the system and accessibility features work and to note anything that could inform preparation for other testing.

#### Voter Sessions

The following voter population was represented in the test sessions:

- 2 blind from birth
- 1 acquired blindness
- 1 very low vision
- 1 low vision + hard of hearing using a personal assistive device
- 1 cognitive disability
- 1 limited mobility ESL speaker (also a non-voter because not yet a citizen).

29

**Age Ranges:**  35 thru 70. All but one (a 70-year old) were in the 35-60 year-old age range.

**Counties:**  Allegheny, Bucks, Cumberland, Dauphin, and Philadelphia

The voters had a range of voting habits. One was a non-voter. One last voted in the 2016 Presidential election. Two last voted in November 2017, and three who voted in the May 2018 Primary.

Poll worker Sessions

Poll workers were invited to come in teams. We had three sessions with poll worker teams of 2, 3, and 5 for a total of 10 people. These poll workers:

- were from Dauphin county
- had between one and twenty-four years of experience and included one election judge
- had limited experience serving voters with disabilities

The examiner compiled the findings from the examiner review, voter sessions and poll worker sessions into positives, annoyances, problem solving, needs assistance and show stoppers.

This section depicts the summarized findings of the most significant issues identified, and the Accessibility Examiner's analysis and recommendations.  Attachment B of this document lists these issues in fuller detail and also describes all the observations from the Accessibility Examination.

Automatic selection and deselection and accompanying audio navigation-  Some voters using audio ballots were confused by the automatic selection and deselection that is part of the straight party voting. The Accessibility Examiner noted that the audio ballot did not announce all deselections and deselects may not always be visible on screen if the contest has a long list of candidates. The Accessibility Examiner noted that in some cases this issue may lead to voters casting ballots without knowing all their choices. The problem was exacerbated by the inability

of a blind voter to successfully validate the printed ballot on the ballot viewing window on ExpressVote XL. The Accessibility Examiner also noted that the system doesn't allow deselecting all candidates in a contest, if there is an eligible candidate selected by straight party vote. Due to the confusion in selection/deselection, the voters using audio ballot were not able to perceive and understand the system behavior, leading voters into time-consuming problem solving that takes away from their primary task of voting and may lead to requesting assistance. The Accessibility Examiner noted that even though the voting systems must legally comply with the PA method of straight party voting, the interaction should fully inform the voter of what happened including number and names of the candidates being selected/deselected on screen as well as audio ballot.

Inconsistency in navigation - In both the visual and audio navigation, there were enough small problems of inconsistency or poor instructions to create a cumulative effect. This issue is most serious for voters using the audio ballot without the visual display. Every participant had at least one problem, despite relatively high election knowledge and digital experience, suggesting that the issue would be more severe for voters without these personal resources to help them understand what it is happening. This may cause the need to ask for assistance. The Accessibility Examiner recommended that all instructions must be reviewed thoroughly and have consistent language without unnecessarily repetitive instruction.

Verification is possible, but challenging – The Accessibility Examiner tested whether verification can be part of the normal course of voting for voters with disabilities and noted the results for both ExpressVote 2.1 and ExpressVote XL.

ExpressVote 2.1 – If configured as marker (without tabulation) the system ejects the ballot after printing and the ballot can be scanned in the DS200 to complete the voting process. This allows voters to review the paper ballot and also makes it possible to use personal devices like magnifiers or text readers to read the paper ballot. The ballot also can be reinserted into the ExpressVote 2.1 for review. The review by reinserting the ballot did not read back the write-in options to the voter. The Accessibility Examiner also suggested that the verification may require the ballots to be moved to a stable surface for review using magnifiers or text readers. The

examiner also noted that removing the ballot from the ExpressVote 2.1 system requires some force and some voters may require assistance.

ExpressVote XL – allows the voter to validate the paper ballot thru a glass window before casting. The Accessibility Examiner noted that this presents a problem for verification for users especially who require personal assistive devices for verification.

Despite these challenges, it is the opinion of the voters and experts that these systems are much more useable and accessible than the current ADA voting systems used in Pennsylvania and allowed most voters to vote independently.

**EVS 60000 Security Examination**

As mentioned in the Examination Approach section of this document, the Security Examiner defined the Security Testing to be comprised of a series of test suites which are utilized for verifying that a voting system will correspond to applicable security requirements within the Pennsylvania Election Code. The examiner analyzed the test results and summarized any identified deficiencies into 4 major categories documentation, source code, hardware, and functional. The Security Examiner then evaluated the physical security, software hardening and existing system controls in place prior to identifying items that require remediation before the system is certified for use in Pennsylvania. The examiner also provided recommendations on secure implementation and deployment.

**EVS 6021 Examination Results**

**EVS 6021 Functional Examination**

As identified in the test approach section of this document the follow-up examination of EVS 6021 included Source Code Review, Documentation Review and System Level Testing.

1.  Source Code Review

A Source Code Review for the code modifications for EVS 6021 was performed,

32

with a focus on determining whether any vulnerabilities could be found. It was concluded that the code review was completed with no malicious software, cryptographic software, process control or password management vulnerabilities being found. The Functional Examiner concluded that no deficiencies were found during source code review.

### 2.    Documentation Review

The Functional Examiner reviewed ES&S submitted documentation for system validation procedures.  The Functional Examiner concluded that system documentation was updated to provide accurate procedures for verifying installation of correct system components on the ExpressVote 2.1.

### 3.    System Level Testing

The System Level Testing was divided into two tests, a primary election and general election. The Functional Examiner included test cases to specifically test the PA method anomalies identified during EVS 6000 testing as part of the general election.

A closed primary election consisting of two parties (Republican, Democratic), three precincts, and 16 contests (14 partisan contests and 2 referendums -  8 "Vote for One", 1 "Vote for no more than Two", 3 "Vote for no more than Three", 1 "Vote for no more than Four" and 1 "Vote for no more than Fifteen") was run utilizing Electionware, ExpressVote 2.1, ExpressVote XL, DS200, DS450 and DS850. Referendum contests were added to test the generation of non-partisan ballots.  The Functional Examiner validated compliance of the system to Sections 1101-A and 1107-A(2), (5)-(11) and (13), 25 P.S. §§ 3031.1, 3031.7(2), (5)-(11) & (13).  No issues or anomalies were experienced during these tests, and the objective criteria established in the test protocols were met.

A general election consisting of four parties (Republican, Democratic, Green and Libertarian), three precincts (one of which was a split precinct), and 16 contests (13 partisan contests, 1 non-partisan and 2 retention referendum, 9 "Vote for One", 1 "Vote for no more than Two", 3 "Vote for no more than Three", and 1 "Vote for no more than Fifteen") was run utilizing Electionware, ExpressVote 2.1, ExpressVote XL, DS200, DS450 and DS850.

The Functional Examiner examined the compliance of the system to Sections 1101-A and 1107-A(2)-(8), (10)-(11) and (13), 25 P.S. §§ 3031.1, 3031.7(2)-(8), (10)-(11) & (13).

The Functional Examiner created election definitions and executed appropriate test cases on all components of EVS 6021 to ensure that the modified system satisfies all requirements of the Pennsylvania Election Code. The Functional Examiner used English and Spanish ballots for the test. Reports were generated after closing polls and results were validated against expected results. Each specific hardware and software component was tested for compliance with the required sections of the Election Code.

Ballots were marked on ExpressVote XL and ExpressVote 2.1 to examine the system's ability to properly effectuate the PA method of straight party voting. The test cases included different voting patterns that selected either a candidate from the same political party, a different political party or a write in when the contest had a full slate of candidates or less than full slate of candidates. The issue found on ExpressVote 2.1 and ExpressVote XL during Examination of EVS 6.0.0.0, were verified to be resolved.  The votes were tabulated accurately following the PA method rules. The Functional Examiner concluded that the EVS 6021 complies with Section 1107-A(3), 25 P.S. § 3031.7(3), since the components ExpressVoteXL, ExpressVote 2.1, DS20, DS 450 and DS 850 all handled the PA method test cases done as part of the general election test appropriately.

The issue found during the examination of EVS 6.0.0.0, on the ExpressVote XL and Electionware, when a ballot was scanned through the XL but scanned at an unexpected orientation such that the implemented image area capture parameters were too tight, that Electionware was unable to parse two write-ins from the ballot image, so could not be adjudicated, was verified to be resolved. To validate this, the Functional Examiner imported the scanned ballot data from the EVS 6000 to EVS 6021 Electionware and the write-ins were visible to be adjudicated appropriately.

The Functional Examiner confirmed with appropriate test cases and voting patterns that EVS 6021 maintains compliance to Sections 1101-A and 1107-A(2), (4)-(11) and (16)-

34

(17), 25 P.S. §§ 3031.1, 3031.7(2), (4)-(11), & (16)-(17), via tests cases in a similar manner as done during the EVS 6021 examination.

The Functional Examiner also noted that the paper ballots will allow statistical recounts as required by Sections 1117-A, 25 P.S. § 3031.17.

EVS 6021 was certified by EAC on November 12, 2018, and hence compiles with Section 1105-A(a) of the Election Code, 25 P.S.§ 3031.5(a), which requires that a voting system must be examined and approved by a federally recognized independent testing authority (ITA), or VSTL as such authorities are now called. The final EAC certification scope is added to this report as Attachment A.

Additional Security/Penetration Analysis, Privacy and Usability results were not conducted during the EVS 6021 examination since the test cases validated during these tests were not affected by the isolated modification done to the OVI-VC to adequately handle the PA method.

The Functional Examiner identified that the following within Article XI-A of the Pennsylvania Election Code, Sections 1101-A to 1122-A, 25 P.S. §§ 3031.1 – 3031.22. are not applicable to the current examination, as each deal with non-functional testing aspects of acquisition, and use and maintenance aspects of a voting system:

- 25 P.S. § 3031.2;
- 25 P.S. § 3031.3;
- 25 P.S. § 3031.4;
- 25 P.S. § 3031.6;
- 25 P.S. § 3031.8;
- 25 P.S. § 3031.9;
- 25 P.S. § 3031.10;
- 25 P.S. § 3031.11;
- 25 P.S. § 3031.12;
- 25 P.S. § 3031.13;
- 25 P.S. § 3031.14;
- 25 P.S. § 3031.15;
- 25 P.S. § 3031.16;
- 25 P.S. § 3031.18;
- 25 P.S. § 3031.19;

- 25 P.S. § 3031.20;
- 25 P.S. § 3031.21; and
- 25 P.S. § 3031.22.

After all the testing activities, the Examiners and Department concluded that the EVS 6021 demonstrates compliance with all requirements as delineated in Article XI-A of the Pennsylvania Election Code, Sections 1101-A to 1122-A, 25 P.S. §§ 3031.1 – 3031.22. The conclusion was drawn based on the examination of EVS 6021 in conjunction with the EVS 6000 examination.

### D.    Observations

During the examination, and in the review of documentation, the Examiner and/or Department staff noted the following observations:

1.      The ExpressVote XL and ExpressVote 2.1 doesn't intuitively allow a voter to deselect all candidates after straight party voting if there is an eligible candidate selected by straight party vote. This will make it difficult for a voter to vote for no candidate in a contest after voting straight party. The system presents the voter with a pop-up message suggesting that the voter cannot deselect all candidates when using the straight party option to mark the ballot. The voter must undo their straight party selection and mark individual contests if they intend to cast a "no vote" in a contest.

2.      The system presented for examination had undervote warnings turned on for straight party contest on ExpressVote XL and ExpressVote 2.1. This may make the voter believe that there is a need to make a selection in that contest.

3.      ES&S EVS 6021 does not support cumulative voting.

4.      The system allows a configuration on ExpressVote 2.1 as tabulator where the voter can proceed to cast a vote without reviewing the paper ballot. If the system is configured to do so, the voter after reviewing the ballot on the ExpressVote 2.1 screen, can cast the ballot. With this configuration, the voter doesn't have the opportunity to verify the paper ballot before casting the vote.

5.      The ExpressVote XL can be configured without the vote summary and review screen.

6.      The Functional Examiner noted that ExpressVote XL must be configured to print terminal level reports to be compliant with the requirements mandated by 25 P.S. § 3031.7(16) when only one device is used at a polling place.

7.      The configuration of the system complying with the Pennsylvania Election Code requirements including the PA method will require the use of appropriate selections of configurable parameters.

8.      The USB devices and other portable media used with the voting system components need to be reformatted or replaced with new media before every Election use. The vendor recommendations only suggest a reformat, but doesn't specify that it needs to be a full reformat.

## IV.    Conditions for Certification

Given the results of the examination that occurred in June and September 2018, and the findings of the Examiners as set forth in his reports, **the Secretary of the Commonwealth certifies the EVS 6021 subject to the following conditions:**

A.      Pennsylvania counties using the EVS 6021 must comply with the Directive Concerning the Use, Implementation and Operations of Electronic Voting Systems by the County Boards of Elections issued by the Secretary of the Commonwealth on June 9, 2011, and any future revisions or directives. In particular, Pennsylvania counties must adhere to item four (4) of the directive when setting up and positioning the ExpressVote 2.1 and ExpressVote XL in the polling place to assure compliance with the constitutional and statutory requirements that secrecy in voting be preserved (*see* Pa. Const Art. VII § 4; and Section 1107-A(l) of the Election Code, 25 P.S. § 3031.7(1)).

B.      No components of the EVS 6021 shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired

network configuration in which all connected devices are certified voting system components. Transmission of unofficial results can be accomplished by writing results to media, and moving the media to a different computer that may be connected to a network. Any wireless access points in the district components of EVS 6021, including wireless LAN cards, network adapters, etc. must be uninstalled or disabled prior to delivery or upon delivery of the voting equipment to a county board of elections.

C.      Because EVS 6021 is a paper-based system, counties using the EVS 6021 must comply at a minimum with Section 1117-A of the Election Code, 25 P.S. § 3031.17, that requires a "statistical recount of a random sample of ballots after each election using manual, mechanical or electronic devices of a type different than those used for the specific election." This audit must be conducted via a manual count of the voter marked paper ballots exclusively. Counties must include in the sample ballots such samples as may be marked by ADA compliant components. Counties are advised to consult the Directive Concerning the Use, Implementation and Operations of Electronic Voting Systems by the County Boards of Elections issued by the Secretary of the Commonwealth on June 9, 2011 and any future revisions or directives that may apply to audits of electronic voting systems.

D.      All jurisdictions implementing the EVS 6021 need to carry out a full Logic and Accuracy test on each device without fail and maintain evidence of Logic and Accuracy (L&A) testing in accordance with the statutory requirements for pre-election and post-election testing. The Department does not recommend automated L&A testing, and discourages the use of preprinted ballots provided by vendors. All components being used on election day, including any Electronic Poll Books being used, must be part of the L&A testing. Counties must ensure that the L&A test cases include all applicable scenarios of PA straight party method identified in Attachment C to the Directive for electronic voting systems published by BCEL on September 11, 2017.

E.      EVS 6021 is a paper-based system, and hence, implementation of the system for precinct or central count scanning is scalable. Jurisdictions should calculate the number of voting booths necessary to accommodate the number of registered voters in a precinct to

avoid long lines. Jurisdictions must include the ExpressVote 2.1 or ExpressVote XL as an ADA compliant device in configuring a precinct polling place. Jurisdictions must also take into consideration the ballot box capacities on polling place components when deciding on the number of voting booths. Jurisdictions must also take into consideration that ExpressVote XL and ExpressVote 2.1 as a tabulator requires the ballot bin to be changed or emptied after about 300 ballots. For DS200 ballot box capacities, jurisdictions can refer to DS200 operators guide from ES&S.

F.     All jurisdictions implementing the EVS 6021 must implement administrative safeguards and proper chain of custody to facilitate the safety and security of electronic systems pursuant to the Guidance on electronic Voting System Preparation and Security, September 2016.

G.     Jurisdictions implementing the EVS 6021 with the Central Count Tabulator as the primary system where votes are counted only at the central counting location using central scanners, must comply with Section 301(a) of Help America Vote Act of 2002. The mandate requires counties using central count paper-based systems to develop voting system specific voter education programs that inform voters of the effect of over voting, and instruct voters on how to correct a ballot before it is cast, including instructions on obtaining a replacement ballot. Additionally, the mandate requires that the central count voting system must be designed to preserve voter confidentiality.

H.     All jurisdictions implementing the EVS 6021 must ensure that no default passwords are used on any devices and that all passwords are complex and secured. Counties must implement an audit process to review and ensure that no default passwords are used upon equipment install/reinstall and routinely change passwords (at least once prior to preparing for each primary and election) to avoid any password compromise. The passwords and permissions management must at a minimum comply to the password requirements outlined in NIST 800-63. This publication can be accessed at https://pages.nist.gov/800-63-3/sp800-63-3.html

I.     All jurisdictions implementing EVS 6021 must configure the polling place components of the voting system to notify voters when they attempt to cast overvotes. The

DS200 tabulation device options must be set to "Query Voter Preference" for overvoted hand marked paper ballot. This is to ensure that the system implementation adheres to the requirement of notifying the voter of overvotes as mandated by 25 P.S. § 3031.7(16).

J.     All jurisdictions implementing EVS 6021 must work with ES&S to ensure that only the certified system configuration is installed on purchase or anytime a system component is replaced or upgraded. Jurisdictions must as part of their user acceptance test verify the implementation to ensure that the components, software and firmware belong to the certified system. Jurisdictions must also perform a trusted build validation as part of the election preparation activities and post-election canvass activities utilizing the vendor supplied methods of validation and verification of voting system integrity. A sample format that can be used for the attestation is added Attachment C to this document.

K.     ExpressVote 1.0 and ExpressTouch devices are not certified for use in Pennsylvania with EVS 6021. These devices were not presented to the Secretary for certification by ES&S.

L.     Jurisdictions can make use of the Electionware adjudication functionality to adjudicate write-ins and evaluate questionable ballots, contests or selections to determine voter intent. Any decisions made during review of the ballot must be agreed upon by a team of at least two reviewers authorized by the election official. The election official can also consult the paper ballot to assist with determinations made during adjudication. In the event of a recount, the voter verified paper ballots must be used for the count.

M.     Jurisdictions implementing EVS 6021 must work with ES&S to ensure that the implemented configuration is capable of operating for a period of at least two hours on backup power as required by the VVSG. If the system components don't include internal battery packs for reliable power, the Uninterruptible Power Supply (UPS) specified in the EAC certified configuration must be purchased and used at the polling places.

N.     Jurisdictions using the services of ES&S or a third-party vendor for election preparation activities must work with ES&S or the vendor to ensure that systems used for

ballot definition activities are considered part of the voting system and use certified voting system components. The systems used for ballot definition must be configured securely following conditions outlined in this report and following any Directives and Guidance issued by the Secretary. Any data transfer between the vendor and county must be done using encrypted physical media or secure file transfer process. The file transfer and download must be tracked and audited to make sure that data has not been accessed by unauthorized personnel.

O.    Jurisdictions must work with ES&S to thoroughly test and review audio ballot instructions to ensure that the voters using an audio ballot can cast the ballot without requesting assistance. Jurisdictions must consider the following while reviewing the ballot:

- The audio ballot must fully inform the voter what has happened and how to select/deselect their choices

- The feedback messages must explain to voters what is happening, including the number and names of candidates being deselected

- The audio ballot must provide feedback on the reason for the changes in any selections and the interaction with straight-party choices.

- The audio ballot instructions on messages on the system must have the specific information for the task or screen before the general, repeated instructions.

P.    Jurisdictions must make voters aware that voting straight party is optional via clear instructions on paper, on screen and on audio ballots. This is to ensure that the voter doesn't assume that he/she must make a selection for the straight party contest. The ballot instructions must be approved by the Department and follow any directives and/or guidance issued by the Department.

Q.    The ExpressVote XL and ExpressVote 2.1 components of the EVS 6021 system does not allow the voter to deselect all candidates after voting straight party as noted

41

on Page 36, Observation 1 of this document. Jurisdictions must ensure that the message used in the pop up window to the voter is clear enough to communicate the system behavior to the voters. The message content must be approved by the Department and follow any directives and/or guidance issued by the Department.

R.     Jurisdictions implementing ExpressVote XL must ensure that the configuration allows voters to review their vote selections on the screen and on the printed ballot card before it is cast.

S.     Jurisdictions implementing the ExpressVote 2.1 as a Tabulator must ensure that the system is implemented in a configuration that allows physical review of the printed paper ballot, before casting the vote. The system **must not** be configured to have the voter validate the selections on the screen and "Autocast" the ballot, thus causing a situation where the voter has not verified what was printed on the paper ballot. The system must be configured to always return the marked ballot card ("Always Return Card" option) to the voter for review before tabulation.

T.     Jurisdictions implementing ExpressVoteXL and ExpressVote 2.1 as tabulator must ensure that the system is configured to generate a printed report at the close of polls. The report must at a minimum indicate of the total number of voters whose ballots have been tabulated, the total number of votes cast for each candidate whose name appears on the ballot, and the total number of votes cast for, or against, any question appearing on the ballot.

U.     The electronic voting system must be physically secured while in transit, storage, or while in use at their respective locations.  Unmonitored physical access to devices can lead to compromise, tampering, and/or planned attacks.

V.     Jurisdictions must implement processes and procedures involving management, monitoring and verification of seals, locks/keys, before, during and after the election.

W.     Jurisdictions must seal any unused ports on the voting system components

using tamper evident seals even if the port is inside a locked compartment. Jurisdictions must work with ES&S and use physical port blocking plugs to close unused ports whenever possible before placing the tamper evident seal. The Department also recommends using port blocking plugs for exposed ports for components of the voting system housed in county office that can be removed by authorized personnel when the port is needed.

X.     Jurisdictions using standalone installation of the EMS server on portable devices must protect the laptops to prevent lost or stolen device.

Y.     Jurisdictions must implement processes to gather and safekeep system logs for each component of the voting system after each election. Consistent auditing of system logs and reports is vital to maintain system transparency and to ensure that any compromise or malfunction is observed and reported in a timely manner.

Z.     Jurisdictions implementing EVS 6021 must ensure that the USB devices and any other removable media used for election activities is maintained with strict chain of custody. There must be a process to manage the removable media inventory to avoid misplaced and lost media. The devices must be reformatted before use in each election. Appropriate steps must be taken to ensure that the format is a full reformat of the USB devices.

AA.    Jurisdictions implementing EVS 6021 must work with ES&S to ensure appropriate levels of training for election officials is planned on implementation. Counties must ensure that the trainings adhere to the "Minimum Training Requirements" specified in Attachment D of this document.

BB.    Jurisdictions implementing EVS 6021 must include voter and poll worker training as part of the implementation plan. The training must include hands on practice for both voters and poll workers. Specific consideration must be given to voters using assistive devices and also poll worker education to assist voters with disabilities. Refer to Appendix B, listing detailed recommendations for deployment noted by the Accessibility Examiner.

CC.    Jurisdictions implementing EVS 6021 must consider the following during

voting booth set up for serving voters requiring assistive devices

- o Voters with disabilities may have assistive technology or personal notes that they need to place within reach. They may also need room to place the printed ballot on a flat surface to use personal technology such as magnifiers or text readers to verify it.

- o For the ExpressVote,2.1 as marker, the path to the scanner should be as easy as possible, ideally a straight line with no obstructions. The path should include ample room to turn a wheelchair if the machine is positioned with the screen facing the wall. The ADA standards suggest a minimum of 60x60 inches for this.

Refer to Appendix B, listing detailed recommendations for deployment noted by the Accessibility Examiner.

DD.   ES&S must submit the following system education materials to the Department of State and must consent to the publication and use of the video on any websites hosted by any Pennsylvania counties and the Pennsylvania Secretary of the Commonwealth or publicly available social media platform. The videos must be closed captioned for the visually impaired.

- o A video (in an electronic format) for voters that demonstrates how to cast a vote and ballot using the Voting System.

- o A video (in an electronic format) for precinct election officials that demonstrates how to setup, operate, and shutdown the Voting System components on an Election Day. The video must demonstrate how to set up and operate the voting system accessible devices for use by voters.

- o A "quick reference guide" for precinct election officials to consult on Election Day. The guide must be specific to the purchasing county's setup and use of the Voting System including accessible options.

o   A "quick reference guide" with images that demonstrates to voters how to cast a vote. Must be provided in additional languages for any jurisdictions required to meet thresholds in the Voting Rights Act.

EE.   ES&S must adhere to the following reporting requirements and submit the following to the Secretary:

o   Equipment Reporting. Reported field issues or anomalies that occur in Pennsylvania or elsewhere with any piece of equipment deployed in the Commonwealth of Pennsylvania within 3 days of the occurrence;

o   Advisory Notices. System advisory notices issued for any piece of equipment deployed in the Commonwealth of Pennsylvania regardless of whether the incident behind the notice occurred in Pennsylvania;

o   Ownership, Financing, Employees, Hosting Location. Any changes to information on the Supplier's employees and affiliates, locations, company size and ability to provide technical support simultaneously to several counties in the Commonwealth of Pennsylvania and other jurisdictions that use its Voting System. Additionally, ES&S must provide information on foreign ownership/financing, data hosting, and production for any equipment or ancillary products, including any potential conflict of interest that may have developed for employees and affiliates;

o   Security Measures and any updated security testing or risk/vulnerability assessments conducted by the Supplier or a third-party;

o   SOC 2 Reporting – ES&S shall provide the Secretary with its annual American Institute of Certified Public Accountants (AICPA) Attestation Standard (AT) Sec. 101 Service Organization Control ("SOC") 2, Type 2 certification (AT Sec. 101 SOC 2, Type 2), or an equivalent certification approved by the Commonwealth. Equivalent certifications include, but are not

45

limited to: International Organization of Standards (ISO) 2700x certification; certification under the Federal Information Security Management Act (FISMA); and AT Sec. 101 SOC 3 (SysTrust/WebTrust) certification.

FF. ES&S must adhere to the "Source Code and Escrow Items Obligations" specified in Attachement F of this document.

GG.    ES&S must work with jurisdictions to ensure that the system is configured to comply with all applicable requirements of the Pennsylvania Election Code delineated in Section Article XI-A of the Pennsylvania Election Code, Sections 1101-A to 1122-A, 25 P.S. §§ 3031.1 – 3031.22.

HH.    Jurisdictions implementing the EVS 6021 and ES&S must work together to implement the system under this certification and must comply with the conditions found in this report, and any directives issued by the Secretary of the Commonwealth regarding the use of this System, in accordance with Section 1105-A(a)-(b) of the Election Code, 25 P.S. § 3031.5(a)-(b). ES&S must ensure that future releases of the voting system with enhanced security and accessibility features are presented for approval to the Secretary.

II. In addition, pursuant to the Directive on Electronic Voting Systems issued by the Secretary of the Commonwealth on August 8, 2006, the Directive Concerning the Use, Implementation and Operation of Electronic Voting Systems by the County Boards of Elections issued on June 9, 2011 and Section 1105-A(d) of the Pennsylvania Election Code, 25 P.S. § 3031.5(d), this certification and approval is valid only for EVS 6021. If the vendor or a County Board of Elections makes any changes to the EVS 6021 Voting System subsequent to the date of its examination, it must immediately notify both the Pennsylvania Department of State and the relevant federal testing authority or laboratory, or their successors. Failure to do so may result in the decertification of the EVS 6021 Voting System in the Commonwealth of Pennsylvania.

## V.    Recommendations

A. All jurisdictions implementing EVS 6021 Voting System should ensure that the system is correctly set up pursuant to all the recommendations of the Directive Concerning the Use, Implementation and Operations of Electronic Voting Systems by the County Boards of Elections issued by the Secretary of the Commonwealth on June 9, 2011 and Guidance on Electronic Voting System Preparation and Security, September 2016.

B. All jurisdictions implementing EVS 6021 should take appropriate steps to ensure that voter education is part of the implementation plan.

C. All jurisdictions implementing the EVS 6021 should ensure that precinct election officials and poll workers receive appropriate training and are comfortable using the system.

D. All jurisdictions considering purchase of the EVS 6021 should review the System Limits as mentioned in the EAC certification scope added as Attachment A to this report.

E. The Secretary recommends that ES&S and counties work with the Department on any changes to their voting equipment including, but not limited to, purchase and upgrades.

F. Secretary recommends in-house ballot definition activities at a county location whenever possible. If an external vendor location is used, the county should implement oversight measures to ensure that election data including ballot definition files and audit logs stored on devices outside of the county are protected from unauthorized access.

## VI.    Conclusion

As a result of the examination, and after consultation with the Department's staff, counsel and the examiners, the Secretary of the Commonwealth concludes that the EVS 6021 can be safely used by voters at elections as provided in the Pennsylvania Election Code and meets all of the requirements set forth in the Election Code, **provided the voting system is implemented under the conditions listed in Section IV of this report**.

Accordingly, the Secretary certifies EVS 6021 for use in this Commonwealth.

The ExpressVote XL and ExpressVote 2.1 can accommodate 10-12 voters with disabilities during an election day or 20-60 voters an hour when used as the primary voting system depending on size of the ballot. DS200 can serve 120-180 voters per hour. The ExpressVote XL and ExpressVote 2.1 ballot box will hold approximately 300 ballots and DS 200 ballot boxes can hold 1250 to 3000, 19-inch ballots depending on the type of ballot box used. After the capacity is reached the poll workers will need to change the ballot box or empty the contents to a secure box and replace the ballot box.

**Attachment A – EAC Certification Scope**

EVS6021_Scope&Ce
rt.pdf



**United States Election Assistance Commission**

## Certificate of Conformance

### ES&S EVS 6.0.2.1



The voting system identified on this certificate has been evaluated at an accredited voting system testing laboratory for conformance to the *Voluntary Voting System Guidelines Version 1.0 (VVSG 1.0)* . Components evaluated for this certification are detailed in the attached Scope of Certification document. This certificate applies only to the specific version and release of the product in its evaluated configuration. The evaluation has been verified by the EAC in accordance with the provisions of the EAC *Voting System Testing an*d *Certification Program Manual* and the conclusions of the testing laboratory in the test report are consistent with the evidence adduced. This certificate is not an endorsement of the product by any agency of the U.S. Government and no warranty of the product is either expressed or implied.

**Product Name:** EVS

**Model or Version:** 6.0.2.1

**Name of VSTL:** SLI Compliance

**EAC Certification Number:** ESSEVS6021

**Date Issued:** November 12, 2018

*Executive Director*

**Scope of Certification Attached**

**Manufacturer:** *Election Systems & Software*
**System Name:** *EVS 6.0.2.1*
**Certificate:** *ESSEVS6021*

**Laboratory:** *SLI Compliance*
**Standard:** *VVSG 1.0 (2005)*
**Date:** *November 12, 2018*



# Scope of Certification

This document describes the scope of the validation and certification of the system defined above. Any use, configuration changes, revision changes, additions or subtractions from the described system are not included in this evaluation.

## Significance of EAC Certification

An EAC certification is an official recognition that a voting system (in a specific configuration or configurations) has been tested to and has met an identified set of Federal voting system standards. An EAC certification is **not**:

- An endorsement of a Manufacturer, voting system, or any of the system's components.
- A Federal warranty of the voting system or any of its components.
- A determination that a voting system, when fielded, will be operated in a manner that meets all HAVA requirements.
- A substitute for State or local certification and testing.
- A determination that the system is ready for use in an election.
- A determination that any particular component of a certified system is itself certified for use outside the certified configuration.

## Representation of EAC Certification

Manufacturers may not represent or imply that a voting system is certified unless it has received a Certificate of Conformance for that system. Statements regarding EAC certification in brochures, on Web sites, on displays, and in advertising/sales literature must be made solely in reference to specific systems. Any action by a Manufacturer to suggest EAC endorsement of its product or organization is strictly prohibited and may result in a Manufacturer's suspension or other action pursuant to Federal civil and criminal law.

## System Overview

The ES&S EVS 6.0.2.1 voting system is a modification of the ES&S EVS 6.0.0.0 voting system, certified on July 2, 2018, which contains limited changes to the Electionware application. The ES&S EVS 6.0.2.1 voting system is composed of software applications, central count location devices and polling place devices with accompanying firmware, and COTS hardware and software.

### Electionware®

Electionware election management software is an end-to-end election management software application that provides election definition creation, ballot formation, equipment

configuration, result consolidation, adjudication and report creation. Electionware is composed of five software groups: Define, Design, Deliver, Results and Manage.

### ExpressVote XL™

ExpressVote XL is a hybrid paper-based polling place voting device that provides a full-face touchscreen vote capture that incorporates the printing of the voter's selections as a cast vote record, and tabulation scanning into a single unit.

### ExpressTouch®

ExpressTouch Electronic Universal Voting System (ExpressTouch) is a DRE voting system which supports electronic vote capture for all individuals at the polling place.

### ExpressVote® Hardware 1.0

ExpressVote Universal Voting System Hardware 1.0 (ExpressVote HW1.0) is a hybrid paper-based polling place voting device that provides touch screen vote capture that incorporates the printing of the voter's selections as a cast vote record, to be scanned for tabulation in any one of the ES&S precinct or central scanners.

### ExpressVote® Hardware 2.1

ExpressVote Universal Voting System Hardware 2.1 (ExpressVote HW2.1) is a hybrid paper-based polling place voting device that provides touch screen vote capture that incorporates the printing of the voter's selections as a cast vote record, and tabulation scanning into a single unit. ExpressVote HW2.1 is capable of operating in either marker or tabulator mode, depending on the configurable mode that is selected in Electionware.

There are two separate versions of the ExpressVote hardware version 2.1: 2.1.0.0 and version 2.1.2.0 (6.4 & 6.8). Please note that all future references to ExpressVote HW 2.1 as used throughout the document refers to both hardware versions.

### DS200®

DS200 is a polling place paper-based voting system, specifically a digital scanner and tabulator that simultaneously scans the front and back of a paper ballot and/or vote summary card in any of four orientations for conversion of voter selection marks to electronic Cast Vote Records (CVR).

### DS450®

DS450 is a central scanner and tabulator that simultaneously scans the front and back of a paper ballot and/or vote summary card in any of four orientations for conversion of voter selection marks to electronic Cast Vote Records (CVR).

### DS850®

DS850 is a central scanner and tabulator that simultaneously scans the front and back of a paper ballot and/or vote summary card in any of four orientations for conversion of voter selection marks to electronic Cast Vote Records (CVR).

**Event Log Service (ELS)**

ELS monitors and logs users' interactions with the Election Management System. Events that happen when a connection to the database is not available are logged to the Windows Operating System log through the ELS.

**Removable Media Service (RMS)**

RMS is a utility that runs in the background of the Windows operating system. RMS reads specific information from any attached USB devices so that ES&S applications such as Electionware can use that information for media validation purposes.

## Configurations

Within the scope of the ES&S EVS 6.0.2.1 voting system, three unique configurations are supported, in order to accommodate limitations of components with the ES&S EVS 6.0.2.1 voting system.

**Configuration A**

ES&S EVS 6.0.2.1: Test Configuration A is comprised of the entire suite of voting system products.

- Electionware
- ExpressVote Marker (HW 1.0)
- ExpressVote Marker/Tabulator (HW 2.1)
- ExpressVote XL
- ExpressTouch
- DS200
- DS450
- DS850

**Configuration B**

- Electionware
- ExpressVote Marker (HW 1.0)
- ExpressVote Marker/Tabulator (HW 2.1)
- DS200
- DS450
- DS850

**Configuration C**

- Electionware
- ExpressVote XL

## Mark Definition

ES&S' declared level mark recognition for the DS200, DS450 and DS850 is a mark across the oval that is 0.02" long x 0.03" wide at any direction.

## Tested Marking Devices

Bic Grip Roller Pen

## Language Capability

EVS 6.0.2.1 supports English, Spanish, Chinese (Cantonese), Korean, Japanese, Hindi, Bengali, Vietnamese, Tagalog, Creole, Russian, and French. Configuration C also supports Punjabi and Gujarati.

## Proprietary Components Included

This section provides information describing the components and revision level of the primary components included in this Certification.

| System Component | Software or Firmware Version | Hardware Version | Model | Comments |
|---|---|---|---|---|
| Electionware | 5.0.2.0 | | | |
| ES&S Event Log Service | 1.6.0.0 | | | |
| Removable Media Service | 1.5.0.0 | | | |
| ExpressVote HW 1.0 | 1.5.1.0 | 1.0 | | Paper-based vote capture and selection device |
| ExpressVote Previewer (1.0) | 1.5.1.0 | | | |
| ExpressVote HW 2.1 | 2.4.3.0 | 2.1.0.0 2.1.2.0 | | Hybrid paper-based vote capture and selection device and precinct count tabulator |
| ExpressVote Previewer (2.1) | 2.4.3.0 | | | |
| DS200 | 2.17.0.0 | 1.2.1, 1.2.3, 1.3 | | Precinct Count Tabulator |
| DS450 | 3.1.0.0 | 1.0 | | Central Count Scanner and Tabulator |
| DS850 | 3.1.0.0 | 1.0 | | Central Count Scanner and Tabulator |
| ExpressVote XL | 1.0.1.0 | 1.0 | | Hybrid full-faced paper-based vote capture and selection device and precinct count tabulator |
| ExpressTouch | 1.0.0.0 | 1.0 | | DRE |
| ExpressVote Rolling Kiosk | | 1.0 | 98-00049 | Portable Voting Booth |
| Voting Booth | | N/A | 98-00051 | Stationary Voting Booth |
| ExpressVote Single Table | | N/A | 87033 | Voting Table for One Unit |
| ExpressVote Double Table | | N/A | 87032 | Voting Table for Two Units |
| ADA Table | | N/A | 87031 | Voting Table for One Unit |

| System Component | Software or Firmware Version | Hardware Version | Model | Comments |
|---|---|---|---|---|
| DS200 Ballot Box | | 1.0 | 98-00009 | Collapsible Ballot Box |
| DS200 Ballot Box | | 1.2, 1.3, 1.4, 1.5 | 57521 | Plastic ballot box |
| DS200 Ballot Box | | 1.0, 1.1, 1.2 | 76245 | Metal ballot box |
| DS200 Tote Bin | | 1.0 | 00074 | Tote Bin Ballot Box |
| DS450 Cart | | N/A | 3002 | |
| DS850 Cart | | N/A | 6823 | |
| Universal Voting Console | | 1.0 | 98-00077 | Detachable ADA support peripheral |
| Tabletop Easel | | N/A | 14040 | |
| ExpressTouch Voting Booth | | N/A | 98-00081 | Stationary Voting Booth |
| SecureSetup | 2.0.0.1 | | | Proprietary Hardening Script |

## COTS Software

| Manufacturer | Application | Version |
|---|---|---|
| Microsoft Corporation | Server 2008 | R2 w/ SP1 (64-bit) |
| Microsoft Corporation | Windows 7 Professional | SP1 (64-bit) |
| Microsoft Corporation | WSUS Microsoft Windows Offline Update Utility | 11.1.1 |
| Symantec | Endpoint Protection | 14.0.1 (64-bit) |
| Symantec | Symantec Endpoint Protection Intelligent Updater (File-Based Protection) | 20180116-002-core3dsdsv5i64.exe |
| Symantec | Symantec Endpoint Protection Intelligent Updater (Network-Based Protection) | 20180115-040-IPS_IU_SEP_14RU1.exe |
| Symantec | Symantec Endpoint Protection Intelligent Updater (Behavior-Based Protection) | 20180108-003-SONAR_IU_SEP.exe |
| Cerberus | CerberusFTP Server – Enterprise | 9.0.3.1 (64-bit) |
| Adobe | Acrobat | XI |
| Microsoft Corporation | Visual C++ Redistributable | vc_redist.x86.exe (32-bit) |
| RSA Security | RSA BSAFE Crypto-C ME for Windows 32-bit | 4.1 |
| OpenSSL | OpenSSL | 2.0.12 |
| OpenSSL | OpenSSL | 2.0.16 |
| OpenSSL | OpenSSL | 1.02d |
| OpenSSL | OpenSSL | 1.02h |
| OpenSSL | OpenSSL | 1.02k |

## COTS Hardware

| Manufacturer | Hardware | Model/Version |
|---|---|---|
| EMS Server | | |
| EMS Client or Standalone Workstation | | |
| Innodisk | USB EDC H2SE (1GB) for ExpressVote 1.0 | DEEUH 1-01GI72AC1SB |
| Innodisk | USB EDC H2SE (16GB) for ExpressVote 2.1 | DEEUH 1-16GI72AC1SB |
| Delkin | USB Flash Drive | 512MB, 1 GB, 2 GB, 4 GB, 8 GB |
| Delkin | Validation USB Flash Drive | 16 GB |

| Delkin | USB Embedded 2.0 Module Flash Drive | MY16MGFSY-RA000-D / 16 GB |
|---|---|---|
| Delkin | Compact Flash Memory Card | 1 GB |
| Delkin | Compact Flash Memory Card Reader/Writer | 6381 |
| Delkin | CFAST Card | 2GB, 4GB |
| Delkin | CFAST Card Reader/Writer | DDREADER-48 |
| CardLogix | Smart Card | CLXSU128kC7/ AED C7 |
| SCM Microsystems | Smart Card Writer | SCR3310 |
| Avid | Headphones | 86002 |
| Zebra Technologies | QR code scanner (Integrated) | DS457-SR20009 |
| Symbol | QR Code scanner (External) | DS9208 |
| Dell | DS450 Report Printer | S2810dn |
| OKI | DS450 and DS850 Report Printer | B431dn/B431d |
| OKI | DS450 and DS850 Audit Printer | Microline 420 |
| APC | DS450 UPS | Back-UPS Pro 1500 |
| APC | DS850 UPS | Back-UPS RS 1500 or Pro 1500 |
| Tripp Lite | DS450 and DS850 Surge Protector | Spike Cube |
| Seiko Instruments | Thermal Printer | LTPD-347B |
| NCR/Nashua | Paper Roll | 2320 |
| Fujitsu | Thermal Printer | FTP-62GDSL001/ FTP-63GMCL153 |

## Configuration Diagrams

### Configuration A



## Configuration B



## Configuration C



## System Limitations

This table depicts the limits the system has been tested and certified to meet.

| System Characteristic | Boundary or Limitation | Limiting Component |
|---|---|---|
| Max. precincts allowed in an election | 9,900 | Electionware |
| Max. ballot styles in an election | 15,000 | Electionware |
| Max. candidates allowed per election | 10,000 | Electionware |
| Max. contests allowed in an election | 10,000 | Electionware |
| Max. number of parties allowed | General election: 75<br>Primary election: 30 | Electionware |
| Max. District Types/Groups | 25 | Electionware |
| Max. districts of a given type | 250 | Electionware |
| Max. Contests allowed per ballot style | 500 | N/A |
| Max. Reporting Groups in an election | 14 | Electionware |
| Max. candidates allowed per contest | 230 | Electionware |
| Max. "Vote For" per contest | 230 | Electionware |
| Max. ballots per batch | 1,500 | DS450/DS850 |

## Component Limitations:

**Electionware**
1. Electionware capacities exceed the boundaries and limitations documented for ES&S voting equipment and election reporting software.  For this reason, ballot tabulator limitations define the boundaries and capabilities of Electionware system.
2. Electionware software field limits were calculated using default text sizes for ballot and report elements. Some uses and conditions, such as magnified ballot views or combining elements on printed media or ballot displays, may result in limits lower than those listed in the System Overview.
3. The Electionware Export Ballot Images function is limited to 250 districts per export.
4. Electionware is limited to the language special characters listed in the System Overview. Language special characters other than those on this list may not appear properly when viewed on equipment displays or reports.

5. The Straight Party feature must not be used in conjunction with the Single or Multiple Target Cross Endorsement features.
6. The 'MasterFile.txt' and the 'Votes File.txt' do not support results for elections that contain multiple sheets or multiple ExpressVote cards per voter. These files can be produced using the Electionware > Reporting > Tools > Export Results menu option.  This menu option is available when the Rules Profile is set to "Illinois".

**Paper Ballot Limitations**
1. The paper ballot code channel, which is the series of black boxes that appear between the timing track and ballot contents, limits the number of available ballot variations depending on how a jurisdiction uses this code to differentiate ballots.  The code can be used to differentiate ballots using three different fields defined as: Sequence (available codes 1-16,300), Type (available codes 1-30) or Split (available codes 1-18).
2. If Sequence is used as a ballot style ID, it must be unique election-wide and the Split code will always be 1. In this case the practical style limit would be 16,300.
3. The ExpressVote activation card has a limited ballot ID based on the three different fields defined as: Sequence (available codes 1-16,300), Type (available codes 1-30) or Split (available codes 1-18).
4. Grid Portrait and Grid Landscape ballot types are New York specific and not for general use.

**ExpressVote**
1. ExpressVote capacities exceed all documented limitations for the ES&S election management, vote tabulation and reporting system. For this reason, Election Management System and ballot tabulator limitations define the boundaries and capabilities of the ExpressVote system as the maximum capacities of the ES&S ExpressVote are never approached during testing.

**ExpressVote XL**
1. ExpressVote XL capacities exceed all documented limitations for the ES&S election management, vote tabulation and reporting systems. For this reason, Election Management System and ballot tabulator limitations define the boundaries and capabilities of the ExpressVote XL system as the maximum capacities of the ES&S ExpressVote XL are never approached during testing.
2. ExpressVote XL does not offer open primary support based on the ES&S definition of Open Primary, which is the ability to select a party and vote based on that party.
3. ExpressVote XL does not support Massachusetts Group Vote.
4. ExpressVote XL does not support Universal Primary Contest.
5. ExpressVote XL does not support Multiple Target Cross Endorsement.
6. ExpressVote XL does not support Reviewer or Judges Initials boxes.
7. ExpressVote XL does not support multi-card ballots.
8. In a General election, one ExpressVote XL screen can hold 32 party columns if set up as columns or 16 party rows if set up as rows.
9. ExpressVote XL does not support Team Write-In.

**ExpressTouch**
1. ExpressTouch capacities exceed all documented limitations for the ES&S election management, vote tabulation and reporting systems.  For this reason, Election Management System limitations define the boundaries and capabilities of the

ExpressTouch system as the maximum capacities of the ES&S ExpressTouch are never approached during testing.

2. ExpressTouch does not offer open primary support, which is the ability to select a party and vote based on that party.
3. ExpressTouch does not support Massachusetts Group Vote.
4. ExpressTouch does not support Universal Primary Contest.
5. ExpressTouch does not support Multiple Target Cross Endorsement.
6. ExpressTouch does not support Team Write-In.

**DS200**

1. The ES&S DS200 configured for an early vote station does not support precinct level results reporting. An election summary report of tabulated vote totals is supported.
2. The DS200 storage limitation for write-in ballot images is 3,600 images. Each ballot image includes a single ballot face, or one side of one page.
3. Write-in image review requires a minimum 1GB of onboard RAM.
4. To successfully use the Write-In Report, ballots must span at least three vertical columns. If the column is greater than 1/3 of the ballot width (two columns or less), the write-in image will be too wide to print on the tabulator report tape.

## Functionality

### VVSG 1.0 Supported Functionality Declaration

| Feature/Characteristic | Yes/No | Comment |
|---|---|---|
| Voter Verified Paper Audit Trails | | |
| VVPAT | No | |
| Accessibility | | |
| Forward Approach | Yes | |
| Parallel (Side) Approach | Yes | |
| Closed Primary | | |
| Primary: Closed | Yes | |
| Open Primary | | |
| Primary: Open Standard  (provide definition of how supported) | Yes | Configuration B only |
| Primary: Open Blanket  (provide definition of how supported) | No | |
| Partisan & Non-Partisan: | | |
| Partisan & Non-Partisan:  Vote for 1 of N race | Yes | |
| Partisan & Non-Partisan: Multi-member ("vote for N of M") board races | Yes | |
| Partisan & Non-Partisan:  "vote for 1" race with a single candidate and write-in voting | Yes | |
| Partisan & Non-Partisan "vote for 1" race with no declared candidates and write-in voting | Yes | |
| Write-In Voting: | | |
| Write-in Voting: System default is a voting position identified for write-ins. | Yes | |
| Write-in Voting: Without selecting a write in position. | Yes | |
| Write-in: With No Declared Candidates | Yes | |
| Write-in: Identification of write-ins for resolution at central count | Yes | |
| Primary Presidential Delegation Nominations & Slates: | | |

| Feature/Characteristic | Yes/No | Comment |
|---|---|---|
| Primary Presidential Delegation Nominations:  Displayed delegate slates for each presidential party | No | |
| Slate & Group Voting: one selection votes the slate. | No | |
| Ballot Rotation: | | |
| Rotation of Names within an Office; define all supported rotation methods for location on the ballot and vote tabulation/reporting | Yes | |
| Straight Party Voting: | | |
| Straight Party: A single selection for partisan races in a general election | Yes | |
| Straight Party: Vote for each candidate individually | Yes | |
| Straight Party: Modify straight party selections with crossover votes | Yes | |
| Straight Party: A race without a candidate for one party | Yes | |
| Straight Party: N of M race (where "N">1) | Yes | |
| Straight Party: Excludes a partisan contest from the straight party selection | Yes | |
| Cross-Party Endorsement: | | |
| Cross party endorsements, multiple parties endorse one candidate. | Yes | |
| Split Precincts: | | |
| Split Precincts: Multiple ballot styles | Yes | |
| Split Precincts: P & M system support splits with correct contests and ballot identification of each split | Yes | |
| Split Precincts: DRE matches voter to all applicable races. | Yes | |
| Split Precincts: Reporting of voter counts (# of voters) to the precinct split level; Reporting of vote totals is to the precinct level | Yes | It is possible to list the number of voters. |
| Vote N of M: | | |
| Vote for N of M: Counts each selected candidate, if the maximum is not exceeded. | Yes | |
| Vote for N of M: Invalidates all candidates in an overvote (paper) | Yes | |
| Recall Issues, with options: | | |
| Recall Issues with Options: Simple Yes/No with separate race/election. (Vote Yes or No Question) | No | |
| Recall Issues with Options: Retain is the first option, Replacement candidate for the second or more options (Vote 1 of M) | No | |
| Recall Issues with Options: Two contests with access to a second contest conditional upon a specific vote in contest one. (Must vote Yes to vote in 2nd contest.) | No | |
| Recall Issues with Options: Two contests with access to a second contest conditional upon any vote in contest one. (Must vote Yes to vote in 2nd contest.) | No | |
| Cumulative Voting | | |
| Cumulative Voting: Voters are permitted to cast, as many votes as there are seats to be filled for one or more candidates. Voters are not limited to giving only one vote to a candidate. Instead, they can put multiple votes on one or more candidate. | No | |
| Ranked Order Voting | | |

| Feature/Characteristic | Yes/No | Comment |
|---|---|---|
| Ranked Order Voting: Voters can write in a ranked vote. | No | |
| Ranked Order Voting: A ballot stops being counting when all ranked choices have been eliminated | No | |
| Ranked Order Voting: A ballot with a skipped rank counts the vote for the next rank. | No | |
| Ranked Order Voting: Voters rank candidates in a contest in order of choice. A candidate receiving a majority of the first choice votes wins. If no candidate receives a majority of first choice votes, the last place candidate is deleted, each ballot cast for the deleted candidate counts for the second choice candidate listed on the ballot. The process of eliminating the last place candidate and recounting the ballots continues until one candidate receives a majority of the vote | No | |
| Ranked Order Voting: A ballot with two choices ranked the same, stops being counted at the point of two similarly ranked choices. | No | |
| Ranked Order Voting: The total number of votes for two or more candidates with the least votes is less than the votes of the candidate with the next highest number of votes, the candidates with the least votes are eliminated simultaneously and their votes transferred to the next-ranked continuing candidate. | No | |
| Provisional or Challenged Ballots | | |
| Provisional/Challenged Ballots: A voted provisional ballots is identified but not included in the tabulation, but can be added in the central count. | Yes | |
| Provisional/Challenged Ballots: A voted provisional ballots is included in the tabulation, but is identified and can be subtracted in the central count | Yes | |
| Provisional/Challenged Ballots: Provisional ballots maintain the secrecy of the ballot. | Yes | |
| Overvotes (must support for specific type of voting system) | | |
| Overvotes: P & M: Overvote invalidates the vote. Define how overvotes are counted. | Yes | |
| Overvotes: DRE: Prevented from or requires correction of overvoting. | Yes | |
| Overvotes: If a system does not prevent overvotes, it must count them. Define how overvotes are counted. | Yes | |
| Overvotes: DRE systems that provide a method to data enter absentee votes must account for overvotes. | Yes | |
| Undervotes | | |
| Undervotes: System counts undervotes cast for accounting purposes | Yes | |
| Blank Ballots | | |
| Totally Blank Ballots: Any blank ballot alert is tested. | Yes | |
| Totally Blank Ballots: If blank ballots are not immediately processed, there must be a provision to recognize and accept them | Yes | |
| Totally Blank Ballots: If operators can access a blank ballot, there must be a provision for resolution. | Yes | |
| Networking | | |
| Wide Area Network – Use of Modems | No | |

| Feature/Characteristic | Yes/No | Comment |
|---|---|---|
| Wide Area Network – Use of Wireless | No | |
| Local Area Network  – Use of TCP/IP | No | |
| Local Area Network  – Use of Infrared | No | |
| Local Area Network  – Use of Wireless | No | |
| FIPS 140-2 validated cryptographic module | Yes | |
| Used as (if applicable): | | |
| Precinct counting device | Yes | DS200, ExpressTouch, ExpressVote HW2.1, ExpressVote XL |
| Central counting device | Yes | DS450 and/or DS850 |

# Baseline Certification Engineering Change Order's (ECO)

There are not any ECO's certified with the voting system.

**Attachment B – Accessibility Examination Findings and Recommendations**

**A) Top problems and Recommendations as listed in the accessibility examiner's report**



Top problems.pdf

**B) All observations from Accessibility Examination**



All
observations.pdf

**C) Recommendations for Deployment from Accessibility Examiner report**



Recommendations
for deployment.pdf

# Top problems

The examination identified three problems that could reduce the ability of people with disabilities to vote independently and privately.

# 1. Automatic selection and deselection

## What happened

- Voters were confused by the automatic selection and deselection that is part of straight party voting.
  - When you make a manual selection to override your straight party, all the straight party choices are deselected automatically. The XL does not completely announce the deselections. Deselects may not be visible onscreen, if happen on a screen.
  - If you want to vote for no one, you cannot deselect all candidates if there's an eligible candidate selected by straight party vote.
  - Touching a straight party candidate (for emphasis or deselection), deselected the other candidates.
- In some cases, this led voters to cast a ballot without knowing all of the candidates that had been selected. This problem is exacerbated by the inability of any of our voters or poll-workers to successfully validate the printed ballot on the XL.
- Voters marking choices manually, with no straight party selection, were *always* clear what was selected and deselected.

## Why this is a problem

The system relies on voters both perceiving the change in selections and understanding why those changes happened.

The effect is that the voting system appears to act in inconsistent ways, forcing voters into time-consuming problem-solving that takes them away from their primary task of voting.

Depending on how easily they can use the technology or how confused they are about what is happening, some voters would have to ask for assistance. This is not only a failure to vote independently, but identifying and solving the problem requires revealing their votes to a poll worker or assistant.

This problem affected voters with a variety of disabilities.

| Type of disability | Impact of the problem |
| --- | --- |
| Cognitive | Seemingly unpredictable and inconsistent machine response can be confusing and frustrating. |
| Low vision | Changes to selections may be made out of their view because they are made off-screen or because they are not focused on the part of the screen where the change happens. |
| Low literacy | Voters with low digital or reading literacy also have a narrow range of focus and can miss cues on different parts of the screen |
| Blind or very low vision | Because the audio does not announce the deselections, changes to candidates higher on the list are not identified unless the voter cycles back through the list. If they don't cycle back, they may never notice the problem. |

## Recommendations

Legally, the machines must comply with the Pennsylvania Method, but that interaction should happen in ways that fully inform the voter of what has happened, and how to express their preferences.

- Put voters in control and do not allow the system to make any automatic selections or deselections after straight-party voting selections are applied..
- Improve the feedback messages to tell voters what is happening – including number and names of the candidates being deselected.

- Provide feedback on the reason for the changes in selections and the interaction with straight-party choices.

# 2. Inconsistency in navigation

In both the visual and audio navigation, there were enough small problems of inconsistency or poor instructions to create a cumulative effect. This issue is most serious for voters using the audio ballot without the visual display.

Every participant had at least one problem, despite relatively high election knowledge and digital experience, suggesting that the issue would be more severe for voters without these personal resources to help them understand what it happening.

## What happened

Small inconsistencies in the navigation patterns or the audio instructions forced participants to stop and figure out what was wrong or how to do something.

Many of these small issues caused them to need to ask for assistance – easy to do in the examination, but much harder in a polling place.

In some cases, their attempts to guess at a solution caused even more problems.

### Example: reviewing and correcting a write-in

An example of this cascading of problems occurred when blind voters tried to write in the name of a candidate. Throughout the system, voters can push the left arrow key to review their previous selection. As a result, two voters used the left arrow to try to review what they'd typed in a write-in. When they pushed the key, they exited the write-in screen and lost the characters they had typed.

This problem was compounded by other challenges of using the tactile keypad for write-ins:

- Using the tactile keypad to enter text is a slow process requiring voters to scan through the alphabet one letter at a time to spell a name.
- When they were not sure of the letters that had been selected, or wanted to check their spelling, they could not find a way to do this.
- All of the participants knew that a misspelled write-in would not be counted, but could not figure out how to review what was typed.
- If they had not listened carefully to the full instructions or had not cycled through all 26 letters, they did not know that there was a backspace key.

**Example: Overvote messages**

Throughout the system, voters can push the right and up/down arrows to proceed forward. But when the user attempts a selection that would result in an overvote, the error message is shown on a new screen, without audio notification of the change of context. The only way to move forward after the message is using the *left* arrow.

The problem was hardest on people using the audio ballot:

- The instructions on the error message include general instructions for navigating within the contest, so it's not clear that the user must use the left (back) arrow to return to the contest.
- These instructions included using the up and down arrows to move through the contest.
- When voters tried using the arrows immediately a message announced that the up and down arrows did not work here, but then repeated the instructions to use the arrows to deselect a candidate before selecting a new one.

**Example: Button labeling**

Buttons for different actions in different screens sometimes have the same labels.

- On the XL, the "Cast" button on the review screen prints the ballot for review. The "Cast" button on subsequent screens actually casts ballot into the built-in box.
- The audio narration often doesn't use the same words as the on-screen buttons. On the XL, it says "print" your ballot instead of "casting it."

## Why this is a problem

People who use assistive technology rely on quickly learning patterns for basic navigation. An example is this comment from a voter: "If it is true to what it did before, I should be able to push the arrow to move to the next issue."

Breaking these patterns is a usability problem that is amplified for voters using the audio ballot or with cognitive limitations. In both cases, they have fewer resources to perceive and solve the problem.

These problems often happen in the middle of the ballot where assistance could also violate privacy.

## Recommendations

Many of these problems were relatively easy to find during the expert review, and confirmed through observing voters.

- Examine all audio instructions on messages to be sure critical information is in an order that puts specific information for the current task or screen before general, repeated instructions.
- No destructive action should ever take place without explicit confirmation from the voter.  In the example above, the system could save write-in entry until the voter leaves that contest so that moving back to the contest using the left-arrow is not destructive. It could also warn voters when partially completed write-in entries will be discarded.

Review the visual interface to make sure buttons that do similar things have the same label. Also use key words like "cast" and "print" consistently throughout the system. Better usability testing with voters with a range of

disabilities during system development would have prevented many of these problems.

# 3. Verification is possible, but challenging

The move to voting systems with paper ballots provides voters with an opportunity to verify their ballot. We wanted to know whether verification can be part of the normal course of voting for voters with disabilities on systems being examined.

## What happened

In this examination, we tested systems with two different models for paper handling and verification.

### Model 1. Voters can handle the printed ballot

In this model, tested on the ExpressVote, the system ejects the ballot after printing, so it can be cast in the ES&S scanner. This method requires voters to handle the ballot, but also makes it possible for voters to use personal technology such as magnifiers or text readers to read the paper ballot.

- All our participants were able to verify the ballot if they wanted to.
- 2 blind voters tried using personal text readers and were generally successful, though one with more difficulty.
- Voters with vision were able to read the small text with difficulty.

The ballot can be read back to the screen by reinserting it and reviewing (but not changing) selections.
- Some participants tried reviewing their ballots this way and were happy with it.
- 1 blind voter, who had struggled to enter a write-in and wanted to confirm what was on the ballot, found that the actual text of the write-in is not included in the review because it is not encoded in the paper ballot barcodes.

Although we were not able to test with voters with limited dexterity, we believe:

- Most would be able to move the ballot to a stable surface for examination
- The ballot requires some force to remove it from the system. We did not test the amount of force required, but some voters might require assistance.

**Model 2. The ballot is presented behind glass**

In this model, tested on the ExpressVote XL, the system prints the ballot, displays it under a glass panel, and then casts the ballot by automatically depositing the paper ballot in a container while it records the vote electronically. This means that voters do not have to handle the ballot, but also makes it impossible for voters to use personal technology such as magnifiers or text readers to read the paper ballot.

Some of the participants were surprised that they did not get the ballot back when they pressed "cast." As the ballot went into the XL ballot box, one voter said, "It didn't come out!"

- None of the participants could verify the ballot in the glass cage:
  - Blind voters had no access to the ballot to use personal technology
  - Low vision voters could not position the ballot so they could read the small text
  - Other voters had problems reading the ballot because of glare and because the sides of the ballot were obscured by the cage.
- Although it is possible to have the ballot ejected to handle it while verifying, the procedure is unclear and it requires voters to tell the system they want to "Quit" and call a poll worker.

## Why this is a problem

The purpose of accessible voting options is to give people with disabilities the same opportunity to mark, verify and cast their ballot as other voters.

## Recommendations

- Require the paper ballot to include an encoding of write-in text so it can be read back when the ballot is reinserted.

- Change the process for ejecting a ballot on the XL (or the auto-cast option on the ExpressVote) so that it can be done independently by the voter.

- Ensure that the systems with an auto-cast capability are set up so that they can work for people with no use of their hands.

# All observations

## Positives

| Function | Observation | System | Severity |
|---|---|---|---|
| Keypads | The layout of the primary navigation keys was familiar to all participants who use tactile controls. | Both | Positives |
| Audio | The audio running when the voter approaches the system tells them how and where to insert the ballot making it possible for them to start the voting session independently.<br><br>This included (on the Express Vote) giving instructions to correct the orientation of the ballot | EV | Positives |
| Audio | Several participants said the synthesized voices are clear and easy to hear, with enough volume. | Both | Positives |
| Audio | The range of speech speeds provided was adequate, though some of our voters indicated that they would prefer faster speech. | Both | Positives |
| Display | Blind voters liked the option to hide the visual display or not at any time.<br>(This feature is not available on the XL.) | EV | Positive |
| Display | The XL screen can be physically adjusted to change the angle of the screen to make it easier to reach or remove glare. | XL | Positive |
| Audio / Display | One voter favorably compared the option for simultaneous, synchronized audio and visual display to the system she currently uses, where this is not an option.<br><br>Note: Synchronized audio and video is required in VVSG 1.0+ | Both | Positive |

| Function | Observation | System | Severity |
|---|---|---|---|
| Audio messages | Some of the messages were helpful and elicited comments. For example, after checking a vote by going from the review screen to the contest and then back to the review screen, one participant liked that the audio confirmed what screen it was on. | EV | Positives |
| Navigation | The "out-and-back" navigation from the review screen to a contest and back was helpful and made it easy to quickly correct a selection. | Both | Positives |
| Messages | A blind participant liked the message about not having seen all of the candidates in a contest, so that she didn't miss anyone. | EV | Positives |

## Ambiguous issues

| Function | Observation | System | Severity |
|---|---|---|---|
| Keypads | The XL keypad is used by poll workers to activate the ballot. Even though ballot activation buttons appear on screen, the poll worker has to use the keypad to continue.<br><br>• The advantage is that every XL system will have a tactile keypad available and working,<br><br>• The disadvantage is that this means it can be difficult to handle while giving it to a voter.<br><br>A longer cord would make it easier to hand the keypad to a voter without having to pass it under the screen and around the support structure.<br><br>There should be easy to reach racks to place the keypad in between uses, rather than balancing it on the top of the base of the machine. | XL | Set up |
| Keypads | Both systems have an audio jack that is positioned so a voter can easily plug in their own headset and can be found by feel.<br><br>• On the XL, the jack is on the keypad | Both | Needs assistance |

| Function | Observation | System | Severity |
|---|---|---|---|
| | • On the EV, it is on the front of the device below the screen<br><br>However, on both systems:<br><br>• The labels are black text on a white strip and not tactilely discernable.<br><br>• The jacks can easily be confused with the similarly labeled jack for the dual switch or other personal technology.<br><br>A blind advocate participant suggested that a raised headset icon would be an easily recognized symbol to solve this problem | | |
| Messages | Some of the participants thought a screen required them to take action when it didn't<br><br>• Selecting a party. One poll worker asked if it was possible to vote without a straight party when they reached the straight party screen<br><br>• The undervote warning screen led several voters to believe that they were forced to vote the full count. They did not listen long enough to know that they could go forward from that screen.<br><br>• Trying to not vote for anyone, a participant tried putting in a blank write-in. They felt the process seems to be forcing a vote, commenting, "I guess you have to put something." | Both | Problem solving |
| Keypads | On the XL, voters felt that the keypad was "busy," containing too many keys.  While the Braille labels were easily read their positioning was not always clearly related to the controls. | XL | Annoyance |
| Keypads | On the XL, the buttons may trigger twice, making them too "responsive." Voters with a mild tremor might, for example, move back two contests, not just one. A small latency in the key response coding would prevent this. | XL | Annoyance |

| Function | Observation | System | Severity |
|---|---|---|---|
| Messages | Both systems gave users a message if they had undervoted as they left a contest. This is a generic message which inserts the name of the contest, but not how many candidates can be or have already been selected.<br><br>• The message itself was initially confusing, but then easily understood.<br>• Once the message was understood, it quickly became mildly annoying.<br>• The same message is repeated as the voter leaves the review screen. Some of the participants took this as a strong nudge to fully vote in every contest.<br><br>However, the EV audio does announce when a multi-select contest is "fully voted," which participants who heard this message found helpful. | Both | Annoyance<br>Or<br>Problem solving |
| Display | We have not done a detailed analysis, but we noticed several places where button labels were not consistent between the two systems. This is not a problem for a voter using just one system, but adds to the complexity of creating voter education and poll worker materials across the state, or for voters who move between counties using different systems. | Both | Annoyance<br>Or<br>Problem solving |

## Problems

| Function | Observation | System | Severity |
|---|---|---|---|
| Display | The EV screen cannot be physically adjusted to change the angle of the screen to make it easier to reach or remove glare. There is a stand on the back of the device, but it is not adjustable. | EV | Potential Show stopper |

| Function | Observation | System | Severity |
|---|---|---|---|
| Display | The visual cues for the location of the cursor (the indication of what's currently selected) are difficult to interpret, especially for people with low vision.<br><br>• On the XL, the dotted-line perimeter was not visible at all for participants with low vision and difficult to see for others.<br><br>• On the EV, using the same background color for the cursor location and selected candidates was confusing. Voters thought the item with focus was selected and would try to deselect it, resulting in the candidate being selected. | Both | Potential Show stopper |
| Keypads | The labels on the XL tactile keypad are black on black making them almost impossible for anyone to read. | XL | Need assistance |
| Display | On the XL, the transition between screens was very subtle and participants often changed screens without noticing. Having the contest title in the center of the screen and the contests at the far left added to the problem. A low-vision users said, "I saw some shaded areas here (on the left) but thought that these were from the previous vote. I thought the middle was where I was voting now." (The shaded area is actually the current contest." | XL | Problem solving |
| Display | In several places, the button labels are inconsistent within a system, especially error messages. These small inconsistencies are magnified for a voter who cannot see the screen, where the position of the button or any icons on them are additional cues. | Both | Annoyance or Problem solving |
| Keypads | Some of the Braille labels on the EV tactile keypad are abbreviated, making them difficult to | EV | Need assistance |

| Function | Observation | System | Severity |
|---|---|---|---|
| | understand: "TPO" for Tempo, the label on volume, and "PS" for pause | | |
| Keypads | One participant (P5) was concerned that the controls on the EV tactile keypad are too small for some blind users with limited feeling in their fingers, for example from diabetic-related blindness. | EV | Need assistance |
| Keypads | Using the XL, a low vision voter tried to follow instructions to press the "square" button. Unfortunately, there are two, and he ended up in the keypad tutorial rather than having pressed select. | XL | Needs assistance or Problem solving |
| Keypads | The Home key works in different ways, depending on where the cursor is on the screen.<br>• From the list of selections, it goes back to the contest header to begin reading again from the top of the page.<br>• From the contest header, it goes back to the first (straight-party) contest.<br>For the blind voter (the intended user of this button), there is no clear indication of where the cursor is currently located, so it is not possible to predict the action. | Both | Problem-solving |
| Keypads | There were some concerns about the number of the keys:<br>• [P3] Thought the XL pad has too many keys<br>• [P6] thought the EV pad had too many keys and was too small | Both | Annoyances |
| Keypads | The "Repeat" key only repeats the last action or audio instruction. Several participants wanted to use this to go back to the top of the contest. | Both | Annoyance |
| Keypads | There is a key to blank the screen on the [EV] but not the [XL]. | EV | Annoyance |

| Function | Observation | System | Severity |
|---|---|---|---|
| Keypads | The Home button on the EV is used like the Info on the XL, so the label is not helpful. | EV | Annoyance |
| Keypads | Audio instructions are on the initial screen. If the voter decides that they would like audio after they get to the ballot, the audio is silent until the voter changes selections. | EV | Annoyance |
| Keypads | There is no feedback when the volume or tempo buttons are pressed. A sound or confirmation (such as "volume up" or "tempo faster") would be helpful.<br><br>On the XL, the volume keys announce "Volume up/down." | EV | Annoyance |
| Keypads | When the audio is paused, a participant was confused when the audio did not begin again when she navigated to a new contest.<br><br>"If I move to another candidate or contest, it should start speaking again without having to press Pause again (to restart it)" | EV | Annoyance |
| Keypads (Audio) | The audio includes instructions for the dual switch and sip-and-puff, even if no device is plugged into the jack.  An ideal system would detect input device and adjust the audio to the combination of controls. | Both | Annoyance |
| Keypads (Audio) | The audio reads all instructions for using the keypads even if the voter is using the touch screen. An ideal system would detect this and adjust the audio to the combination of controls to avoid the lengthy instructions that are not needed. | Both | Annoyance |
| Ballot Text size | On the XL, selecting "Large Text" changes the screen to a contest-by-contest display, but does not make the text size very much larger.<br><br>This forces low vision users who simply need slightly larger text into using the audio ballot. | XL | Showstopper |

| Function | Observation | System | Severity |
|---|---|---|---|
| | One participant with very low vision put his face so close to the screen that he accidentally made selections with his nose. | | |
| Ballot Layout | Reading the judicial retention instructions and the referendum question, the line length is so long that participants had to swivel their head to visually track across a line of text. | XL | Annoyance |
| Ballot Layout | The layout of the contest on the very wide screen meant that the title of the contest (centered on the screen) and the number of selections was very far from the list of candidates(on the left margin). | XL | Annoyance |
| Ballot (Audio) | The audio on the XL does not announce the party of each candidate. This made it impossible to complete tasks based on party, including confirming straight party selections. "I'd assume that is the Democrat because I picked them for straight party." [P3] | XL | Show stopper |
| Ballot (Audio) | If a voter attempted to make too many selections on a vote-for-N-of-M contest (overvote), a message informs them of the problem. It was not clear to blind voters that they were on a separate message screen. The audio on the overvote message includes the general instructions for using the arrow keys, even though these keys are not active on the message. The message about how to return to the contest screen comes after the general instructions, where voters missed it They needed either extensive problems solving or support to get back to the contest. | XL Both? | Needs assistance |
| Ballot (Audio) | In the audio announcement of each contest, the information about how many can be selected is easy to miss, and the information about how many candidates have already been selected is | Both | Problem solving |

| Function | Observation | System | Severity |
|---|---|---|---|
| | either missing, or placed at the end of the standard instructions where none of the participants heard it. This is especially important if a straight party option was selected. Changing the order of the instructions would make it easier for blind voters to keep track of their progress | | |
| Ballot (Audio) | After returning to the contest from the overvote message, participants were confused that the last candidate was not selected and had to puzzle their way through the problem | Both | Problem solving |
| Ballot (Audio) | There is no option to ask the system to spell out a candidate name.<br>• This is not normally a problem, but could make it difficult to distinguish candidates with very similar-sounding names (Smith and Schmidt, for example).<br>• This capability is a standard feature of screen readers, so voters who use that technology may expect it. | Both | Annoyance |
| Ballot | A candidate endorsed by both parties was only visually identified as being from one of them. The straight party logic, however, selected here for each of the two parties.<br>On the full-face ballot, this was visually confusing because it showed a candidate selected in the "wrong" column. | XL | Problem solving |
| Ballot (Audio) | Listening to the list of candidates, participants often skipped to the next one as soon as they heard the name, sometimes missing the announcement that the candidate was selected.<br><br>One voter suggested announcing "You selected" *before* the name of the candidate in these cases. | Both | Annoyance |

| Function | Observation | System | Severity |
|---|---|---|---|
| Ballot (Audio) | When the voter has reached the last choice, the audio announces this, but pressing the down-arrow does nothing. A participant suggested that it should repeat "Last choice" or "You have heard all of the choices." | XL | Annoyance |
| Ballot (Straight Party) | Several participants, including poll workers, hesitated at the screen for straight party, wondering if you had to select a party to continue.<br><br>Better instructions or an option for "No straight party selection" would be helpful | EV<br>XL (large) | Problem solving |
| Ballot (Straight Party) | The interaction with changing straight party selections was confusing in several ways:<br><br>• Trying to select just one candidate from a group selected by straight party produced inconsistent results, depending on the exact configuration of the candidates.<br><br>  o If a participant tries to deselect a candidate, it resulted in that candidate being selected and others deselected.<br><br>  o If they tied to select a candidate from another party, all of the straight party selections were deselected, even if the new selection was within the number of options available.<br><br>• Participants using the audio ballot did not always notice when candidates were deselected, especially if they were higher in the list when the deselection occurred.<br><br>  o When multiple candidates were deselected by this process, only the first was announced on the XL.<br><br>• Participants using the audio ballot were surprised to hear that other candidates were deselected and only found that out when | Both | Problem solving<br>Or<br>Needs assistance |

| Function | Observation | System | Severity |
|---|---|---|---|
| | they reviewed the contest or were told they overvoted. | | |
| Ballot (Straight Party) | Not being able to clear all selections on a contest with an available straight party option was very confusing.<br>• One participant described it as having candidates "popping up" and was unable to figure out why this was so.<br>• One participant did not understand why she was not able to deselect a candidate, not understanding that it was related to her straight party selection.<br>• 2 participants created a write-in for "None" as a way of being able to clear all candidates and vote for no one.<br>• When participants deselected all the straight party options, the resulting alert message was very confusing. Several participants did not figure out that the problem was related to straight party voting.<br>   o None of the participants wanted to go back, change their straight party choice and recreate their selections to vote for no one, as the message suggested.<br>• On the XL, this would be a show-stopper for someone using the audio ballot because party affiliations were not read out.<br>   o One voter described her current voting machine as having a clear way to vote for none on each contest. | Both | Needs assistance<br>Or<br>Show stopper |
| Write-in | When trying to enter a write-in, participants paused and had to figure out how to actually select the write-in choice to enter a name, in many cases needing assistance. On the EV, the audio narration does not explain that you must push the select key to enter a write-in. | Both | Needs assistance |

| Function | Observation | System | Severity |
|----------|-------------|--------|----------|
| Write-in | One participant did not see where the candidate name was written on the contest screen. | XL | Needs assistance |
| Write-in (Audio) | Using the tactile keypad and audio, it was not clear how to correct a misspelling because participants did not realize that there were keys for space, backspace and so on. The initial audio instructions don't mention the backspace and space keys. | Both | Needs assistance |
| Write-in (Audio) | The Info (XL) or Home (EV) button makes the system read what's been entered, but no participants found this even though they wanted it. | Both | Needs assistance |
| Write-in (Audio + Visual) | When returning to the write-in screen with an entry already made, there is no indication of where the cursor is placed, that is, where the next character will be entered. | Both | Needs assistance |
| Write-in (Audio) | Participants struggled to find the "Space" button (located after punctuation and backspace buttons in the scanning sequence). | Both | Problem solving |
| Write-in | On the ExpressVote, the buttons for leaving the write-in are visually opposite to the location of the keys on the keypads:<br>• Accept: left on screen, right on keys<br>• Cancel: right on screen, left on keys | EV | Annoyance |
| Write-in (Audio) | Participants struggled to find the backspace button to erase a letter. One tried using the left arrow, which took her back to the contest, and destroyed all the text she had already typed. | Both | Problem solving or Show stopper |
| Review screen | The judicial retention and ballot measures had uninformative headings:<br>• The judicial retention contest did not list the name of the judge to be retained.<br>• The ballot measure did not have a short identifier or title, nor show the full text. | Both | Problem solving |

| Function | Observation | System | Severity |
|---|---|---|---|
| Review screen | A participant with a cognitive disability was initially confused by the review screen. She had never seen something like this. But after looking at it, was able to explain it reasonably well. | XL | Problem solving |
| Review screen | Using the audio ballot, a participant went back to the contest to check who she had voted for in a contest, even though it was displayed (and read) on the review screen itself. | EV | Annoyance |
| Review screen | When voter returns to ballot measure from the review screen to change or confirm a vote, they are always returned to the top measure of the review screen, and have to "down arrow" through the ballot to get back to where they were. Participants assumed they would be returned to the ballot measure they had departed from. | XL | Annoyance |
| Review screen | Participants were surprised to get a message about undervoted contests after completing the review screen. For some, it made it feel that they were required to completely vote all contests. | Both | Annoyance Or Problem solving |
| Print, verify, cast | If you eject the ballot and then reinsert it to verify what has been printed, the content of the write-in is lost, because the text entered is not encoded in a barcode, and the system is not reading the text through OCR. <br>• This means that it is not possible for a blind or low-vision voter to completely verify their ballot using just the voting system. <br>• Two participants tried reading the ballot using personal technology. The one who used this technology found it easy. The other struggled, but was successful. | Both | Show stopper |

| Function | Observation | System | Severity |
|----------|-------------|--------|----------|
| Print, verify, cast | Voters used to the Danaher Shouptronics expected to find a "Vote" button available to them at any time.<br>• Using the XL in full-face mode means that there is no navigation between screens, so that there is a button to print and cast the ballot always available.<br>• This is an issue that will require voter education. | EV | Problem solving |
| Print, verify, cast | On the XL, blind participants were not sure what was happening during the printing process.<br>• They understood that something would print.<br>• They heard the printer.<br>• But they did not know where the ballot was or what to do next. | XL | Problem solving |
| Print, verify, cast | On the XL, it was not clear how to get to the print button. At this point in the process, participants wanted clarity and accuracy.<br>• One participant thought the down arrow should get to the print button, but the correct control is the right arrow. | XL | Problem solving or Needs assistance |
| Print, verify, cast | On the XL, it was not clear how participants could get their ballot back so they could verify it. This concern was raised even when the XL was the first or only system they used, so it is not simply a comparison to the EV.<br>• The process to review the printed ballot requires that the ballot be "cancelled" to eject it from the machine.  It can then be read back in after verification, but there is no audio (or onscreen) description of this process.<br>• One participant thought "Quit" was how to say she was done voting. | XL | Problem solving<br>or Needs assistance<br>Or<br>Show stopper |

| Function | Observation | System | Severity |
|----------|-------------|--------|----------|
| | • Another could not figure it out, and ended up casting their ballot without verifying.<br>• There is no indication in the audio that this is an option for blind or low vision voters who don't want to "cancel" their ballot, but just review it manually. | | |
| Print, verify, cast | None of the participants were able to verify their paper ballot on the XL.<br>• The ballot is partially obscured by the cover.<br>• The ballot is behind glass making it harder to see.<br>• The text is too small.<br>• Several participants never saw the ballot to verify. | XL | Show stopper |
| Print, verify, cast | On the ExpressVote, most participants simply followed the instructions to complete the printing and verifying process, but a few were confused because it wasn't clear that the ballot would be returned to them. | EV | Problem solving |
| Scanner | There are no audio instructions to help a blind or low-vision voter insert and cast their ballot | DS200 | Needs assistance |
| Scanner | There is no way for a blind or low vision voter to read any of the messages on the scanner. This is a low-frequency problem when using the EV because there are no overvotes possible on the ballot, and the scanner was programmed to ignore undervotes. However, it is possible to cast a blank ballot. | DS200 | Needs assistance |
| Scanner | There is no audio equivalent to the final screen to communicate that the ballot has been cast. Blind participants heard the ballot drop into the box, but in a noisy polling place or when there is a pile of ballots already in the box this sound would not be available. | DS200 | Needs assistance |

# Recommendations for deployment

The participants – and examiners – saw the systems being tested for the first time during the examination. Many voters will also try using a new system for the first time in the voting booth, so our test was realistic for Pennsylvania voters.

The problems we encountered also suggest ideas for how election officials can support voters and poll workers as they introduce the new system and design their processes and procedures.

The recommendations here are based on observations of how both poll workers and voters used the system and direct suggestions they made.

## Advance training and hands-on practice

The need for an introduction and a chance to try out the system before Election Day was the strongest recommendation from every poll worker participant. As an election judge said, when we asked what he would tell his poll workers, "Go to the training!"

Poll workers felt strongly that any new system – particularly these digital interfaces  –  would be intimidating to voters and fellow poll workers who were not used to computers. They recommended:

- Longer training sessions for poll workers to give them more time to familiarize themselves with a new system.
- Opportunities for hands-on experience, including scenarios for different situations they might have to handle.
- An aggressive voter education program to give voters a chance to try out the new system.
- Outreach to voters with disabilities, including those who regularly vote with assistance to let them know about the capabilities of a new system that might help them.

- Instructions or a practice system in the polling place, especially in districts with many older people.

# Training to support voters with disabilities

Poll workers may not be familiar with how to help people with disabilities. Most of the poll worker participants said that they had no blind or disabled voters in their polling places, although one pointed out that the features on these systems might enable their "assisted voters" to try voting independently.

In addition to a good training module on ways to help voters with disabilities, the training should focus on how to give instructions before and during a voting session to avoid compromising the privacy. For example:

- A "what if" troubleshooting guide could include specific questions to ask and prompts that poll workers can use to help a voter with problem solving without looking at the screen.

- Give poll workers guidance on where to stand while supporting voters. For example, standing behind the ExpressVote and facing the voter would make it clear that they are not looking at the screen.

- Using the procedures for initiating a voting session, including the screens to select a language or acknowledge that assistive technology has been activated, to make sure that the voter has found the basic navigation keys on the keypad. On the ExpressVote, there is a screen with a diagram of the keys that the poll worker can review with the voter (reading the instructions to be sure they are consistent and accurate).

# Poll worker procedures

Poll workers procedures can also help bridge any information gaps for voters, with instructions embedded in the voting process.

- Tell voters how to insert their ballot: identify the corner notch and the location of the slot, and tell them the ballot is inserted directly into the machine, not just slid forward.
- Remind voters to check both the review screen and their paper ballot before casting.
- Tell voters that if they make a mistake, they can get a new ballot.
- Instruct voters to insert their ballot with the corner notch on the bottom right so others can't see their selections. The ballot can be inserted into the scanner in any orientation.

Support for voters using the tactile keypad or dual switch and audio ballot might include:

- A keypad they can try out before entering the voting booth.
- Instructions for how to use the keypad in both Braille and large print. The illustration on the ExpressVote help screen could be the basis for these instructions.

As a voter approaches the voting station, poll workers can help voters adjust the voting system or attach personal assistive technology:

- Help voters get positioned at the voting system so they can reach all controls. The XL screen can be adjusted to change its angle for a closer approach, adapting to standing or sitting postures, and avoiding glare.
- Provide assistance plugging in personal headsets or switches with verbal instructions or by doing it for the voter.
  - A voter with a disability is likely to know how to plug in their personal headset or switch, but they will not know the location of the jacks on the machine.

- Make sure voters are oriented and know where all parts of the voting system are, including the privacy shields. The ExpressVote includes a dedicated key on the tactile keypad to blank the screen.
- Remind voters how to cast their ballot and how to know when they are done.

## Voting booth setup

Voters with disabilities may have assistive technology or personal notes that they need to place within reach. They may also need room to place the printed ballot on a flat surface to use personal technology such as magnifiers or text readers to verify it.

- work well with the printed ballot layout

For the ExpressVote, the path to the scanner should be as easy as possible, ideally a straight line with no obstructions. The path should include ample room to turn a wheelchair if the machine is positioned with the screen facing the wall. The ADA standards suggest a minimum of 60x60 inches for this.

**Attachment C – Implementation Attestation**



Implementation
.attestation.pdf



## Voting System Implementation Attestation

**System Name:** _____

**County:** _____

**Date Installed/Upgraded:** _____

*The below hardware/software was installed and verified on the system implemented:*

| System Component | Software or Firmware Version | Hardware Version | Model | Comments |
|---|---|---|---|---|
| Electionware | | | | (Please specify the implementation, single device (desktop/laptop), Client/server |
| ES&S Event Log Service | | | | |
| Removable Media Service | | | | |
| ExpressVote HW 2.1 | | | | |
| ExpressVote Previewer (2.1) | | | | |
| DS200 | | | | |
| DS450 | | | | |
| DS850 | | | | |
| ExpressVote XL | | | | |

| ExpressLink | | | | |
|---|---|---|---|---|
| Toolbox | | | | |

*Further to the key hardware/software components listed above, any of the COTS software installed on the voting system adheres to the EAC certificate of conformance for the EVS 6021 system. Any ancillary components like switches, ballot boxes, charging carts sold on this contract are EAC certified components of the EVS 6021 electronic voting system. (Attach a list of items sold on this contract.)*

*ES&S also has validated that the systems have been installed and hardened following the EAC certified system hardening instructions and no software other than the voting system software has been installed on any of the components.*

**Vendor Representative Signature:** _____

**Vendor Representative Name:**_____        **Title:**_____

**Telephone:**_____        **Email:**_____

**County Representative Signature:** _____

**County Representative Name:**_____        **Title:**_____

**Attachment D –**  Minimum Training Requirements

ES&S must provide training and training materials as set forth below prior to the first use of the voting system in a primary or general election.

a) A demonstration of and training on the setup and operation of the Voting System to the purchasing county's board of elections' members and staff and the county's precinct election officials.

b) A training session on the Voting System's election management system and/or EPBs for the purchasing county's board of elections' members and no less than two and no more than six staff members chosen by the board of elections. The training sessions must afford the board members and its staff the opportunity to learn how to setup and program an election, and if applicable design and layout ballots independently of the Supplier's assistance and support.

c) A training session on the following subjects for the purchasing county's board of elections' members and no less than two and no more than six staff members chosen by the board of elections:

   i.   programming of all voting units and ancillary devices;

   ii.   tabulating results during the unofficial and official canvass;

   iii.   ensuring accuracy and integrity of results;

   iv.   preparing polling places and setting up the system for election day operation;

   v.   Training on accessibility options of the voting system

   vi.   Election day operating procedures;

   vii.   auditing procedures;

   viii.   conducting a recount;

   ix.   preserving records;

   x.   printing, designing, and formatting election reports;

   xi.   troubleshooting common issues;

   xii.   safeguarding and preventing tampering and unauthorized access to all parts of the Voting System; and

52

**Attachment E – Source Code Escrow Obligations for ES&S**

The Supplier must maintain an escrow agreement covering all source codes of the Voting System and/or EPB for a period of ten years from the date of delivery to and acceptance by a purchasing county board of elections. The Pennsylvania Secretary of the Commonwealth shall have the right to access the source codes in escrow subject to the conditions specified below in Section D(8)(d). The Supplier must pay all costs associated with 1) placing the codes in escrow and 2) verifying that the Supplier has placed the codes in escrow (note: the escrow agent conducts this verification and charges a separate fee for this service).

a. Source code. Simultaneously with delivery of the Voting System and/or EPB software to purchasing Members, the Supplier shall deliver a true, accurate and complete copy of all source codes relating to the software to an escrow agent.

b. Escrow. To the extent that Voting System and/or EPB software and/or any perpetually-licensed software include application software or other materials generally licensed by the Supplier, Supplier agrees to place in escrow with an escrow agent copies of the most current version of the source code for the applicable software that is included as a part of the Services, including all updates, improvements, and enhancements thereof from time to time developed by Supplier.

c. Escrow agreement. An escrow agreement must be executed by the parties, with terms acceptable to the Commonwealth prior to deposit of any source code into escrow.

d. Obtaining source code. Supplier agrees that upon the occurrence of any event or circumstance which demonstrates with reasonable certainty the inability or unwillingness of Supplier to fulfill its obligations to Commonwealth under this Contract, Commonwealth shall be able to obtain the source code of the then-current source codes related to Voting Systems software, EPB software, and/or any Supplier Property placed in escrow from the escrow agent.