# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JILL STEIN, et al.,

                                    Plaintiffs,

            v.

KATHY BOOCKVAR, in her official
capacity as Secretary of the Commonwealth,
and JONATHAN MARKS, in his official
capacity as Commissioner of the Bureau of
Commissions, Elections and Legislation,

                                    Defendants.

CIVIL ACTION

No. 16-cv-6287(PD)

---

**DECLARATION OF ROBERT A. WIYGUL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

I, Robert A. Wiygul, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1.      I am an attorney at the law firm Hangley Aronchick Segal Pudlin & Schiller, counsel for Defendants in this action.  I submit this Declaration in support of Defendants' Opposition to Plaintiffs' Motion to Enforce the Settlement Agreement.

2.      Attached as Exhibit 1 hereto is a true and correct copy of a portion of Jill Stein's twitter feed dated November 28, 2018, which was downloaded from https://twitter.com/drjillstein?lang=en.

3.      Attached as Exhibit 2 hereto is a true and correct copy of the transcript of the Hearing that took place in this matter on December 9, 2016.

4.      Attached as Exhibit 3 hereto is a true and correct copy of excerpts from the Consensus Study Report of the National Academies of Sciences, Engineering, and Medicine,

*Securing the Vote: Protecting American Democracy* (2018), which was downloaded from

https://www.carnegie.org/media/filer_public/34/9d/349d3207-d994-4838-8b79-

5f8d88e0e412/nas_report.pdf.

5.    Attached as Exhibit 4 hereto is a true and correct copy of a portion of Jennifer

Cohn's twitter feed dated November 29, 2018, which was downloaded from

https://twitter.com/jennycohn1?lang=en.

6.    Attached as Exhibit 5 hereto is a true and correct copy of a press release from the

Philadelphia Commissioners Office dated February 20, 2019, which was downloaded from

https://files7.philadelphiavotes.com/announcements/2019-02-20-

Philadelphia_City%20Commissioners_Approve.pdf#_ga=2.58593386.1950796126.1576181779-

1264225452.1575516017.

I declare under penalty of perjury under the law of the United States of America that the

foregoing is true and correct.

Executed on December 12, 2019.

_____
Robert A. Wiygul

2

# EXHIBIT 1

 **Dr. Jill Stein**🌻 ✔ @DrJillStein · 28 Nov 2018                                    ⌄

BREAKING: Huge victory for election integrity! We just settled our #recount lawsuit in Pennsylvania for a guarantee that PA will use paper ballots by 2020, followed in 2022 by post-election audits to verify the vote before results are certified. Details:

 **PA Recount Settlement a Victory for Voters Everyw...**

In a huge victory for election integrity, Jill Stein and plaintiffs settled their recount lawsuit in Pennsylvania for a guarantee that PA will use paper ballots by 2020, fol...

votingjustice.us

💬 258          ⟲ 747          ♡ 1.8K

# EXHIBIT 2

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3    JILL STEIN AND RANDALL REITZ        :   CIVIL NUMBER

4
               v.
5

6    PEDRO A. CORTES, IN HIS OFFICIAL
     CAPACITY AS SECRETARY OF THE
7    COMMONWEALTH AND JONATHAN MARKS
     IN HIS OFFICIAL CAPACITY AS
8    COMMISSIONER OF THE BUREAU OF
     COMMISSIONS, ELECTIONS,
9    AND LEGISLATION                     :   16-6287

10

11                              FRIDAY, DECEMBER 9, 2016
                                COURTROOM 6B
12                              PHILADELPHIA, PA 19106

13   _____
             BEFORE THE HONORABLE PAUL S. DIAMOND, J.
14   _____

                                HEARING
15   _____

16   APPEARANCES:

17   MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP
     GREGORY M. HARVEY, ESQUIRE
18   123 SOUTH BROAD STREET
     PHILADELPHIA, PA 19109
19
     COUNSEL FOR PLAINTIFFS
20
                         SUZANNE R. WHITE, RPR, FCRR, CM
21                       OFFICIAL COURT REPORTER
                       FIRST FLOOR U. S. COURTHOUSE
22                         601 MARKET STREET
                       PHILADELPHIA, PA 19106
23                          (215)627-1882

24   PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
25

2

```
 1      CONTINUED APPEARANCES:

 2      EMERY CELLI BRINCKERHOFF & ABADY, LLP
        ILANN M. MAAZEL, ESQUIRE
 3      ANDREW G. CELLI, ESQUIRE
        ALISON E. FRICK, ESQUIRE
 4      DOUGLAS E. LIEB, ESQUIRE
        600 FIFTH AVENUE, 10TH FLOOR
 5      NEW YORK, NY 10020

 6      COUNSEL FOR PLAINTIFFS

 7      LAWRENCE J. TABAS, ESQUIRE
        REBECCA L. WARREN, ESQUIRE
 8      OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
        ONE PENN CENTER, 19TH FLOOR
 9      1617 JFK BLVD
        PHILADELPHIA, PA 19103
10
        FOR THE INTERVENOR DEFENDANTS
11      ALL OF THE PENNSYLVANIA ELECTORS OF PRESIDENT-ELECT
        DONALD TRUMP AND VICE-PRESIDENT ELECT MICHAEL PENCE
12

13      KENNETH L. JOEL, ESQUIRE
        TIMOTHY E. GATES, ESQUIRE
14      OFFICE OF THE ATTORNEY GENERAL
        CIVIL LITIGATION
15      15TH FLOOR, STRAWBERRY SQUARE
        HARRISBURG, PA 17120
16
        COUNSEL FOR THE DEFENDANT, PEDRO CORTES
17
        SUE ANN UNGER, ESQUIRE
18      OFFICE OF THE ATTORNEY GENERAL
        LITIGATION SECTION
19      21 SOUTH 12TH STREET
        3RD FLOOR
20      PHILADELPHIA, PA 19107

21      COUNSEL FOR THE DEFENDANT, PEDRO CORTES

22

23

24

25
```

1               THE CLERK:  PLEASE REMAIN SEATED, COURT

2     IS NOW IN SESSION.

3               THE COURT:  PLEASE BE SEATED, EVERYBODY.

4               GOOD AFTERNOON.

5               ALL COUNSEL:  GOOD AFTERNOON, YOUR HONOR.

6               THE COURT:  WE ARE HERE FOR A HEARING ON

7     THE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE

8     RELIEF.

9               MR. MAAZEL.

10              MR. MAAZEL:  THANK YOU, YOUR HONOR.

11              THE COURT:  GOOD AFTERNOON.  I ASSUME YOU

12    WILL BE ACTING ON BEHALF OF THE PLAINTIFFS.

13              MR. MAAZEL:  I WILL, PRIMARILY.  A COUPLE

14    OF MY COLLEAGUES MAY DO A WITNESS, BUT YES, I WILL BE

15    THE PRIMARY PERSON.

16              THE COURT:  JUST AS LONG AS YOU DON'T

17    ALLOW MR. HARVEY TO SAY ANYTHING.  NICE TO SEE YOU, MR.

18    HARVEY.

19              MR. HARVEY:  THANK YOU, YOUR HONOR.

20              MR. MAAZEL:  YOUR HONOR, IF I MAY JUST

21    BRIEFLY INQUIRE AS TO OUR HOUR, FOR CROSS EXAMINATION OF

22    A WITNESS WE CALL, WOULD THAT BE COMING OUT OF OUR TIME

23    OR THE OTHER SIDE, SIR?

24              THE COURT:  YOUR TIME.  YOU ARE ASSUMING

25    THE OTHER SIDE KNOWS HOW TO CROSS EXAMINE AND WHAT THEY

```
 1      WILL ELICIT WILL BE HARMFUL TO YOU.  MY EXPERIENCE

 2      HERE -- NOT WITH THESE PARTICULAR LAWYERS, BUT GENERALLY

 3      INDICATES THAT SOMETIMES STUFF COMES OUT ON CROSS THAT

 4      IS AS DAMAGING TO THE PERSON ELICITING IT AS IT IS

 5      FAVORABLE.  SO, YES.  AND THE SAME GOES FOR THEIR

 6      WITNESSES.

 7                     MR. MAAZEL:  AND IF I MAY, I THINK I

 8      WOULD LIKE TO RESERVE MAYBE 10 OR 15 MINUTES FOR

 9      REBUTTAL AT THE END.

10                     THE COURT:  ABSOLUTELY.

11                     MR. MAAZEL:  THANK YOU, YOUR HONOR.

12      WOULD YOU PREFER I BE HERE OR --

13                     THE COURT:  YOU DON'T HAVE TO STAND.

14      WHEREVER YOU ARE MOST COMFORTABLE.

15                     MR. JOEL:  I'M SORRY, BEFORE WE -- I JUST

16      HAVE ONE QUESTION.

17                     THE COURT:  IDENTIFY YOURSELF.

18                     MR. JOEL:  I'M SORRY.  KENNETH JOEL FROM

19      THE ATTORNEY GENERAL'S OFFICE ON BEHALF OF THE

20      DEFENDANT.  I'M HERE WITH MY COLLEAGUE SUE ANN UNGER AND

21      ALSO MR. GATES FROM THE DEPARTMENT OF STATE.

22                     THE COURT:  GOOD TO SEE YOU, AGAIN,

23      MS. UNGER.

24                     MS. UNGER:  GOOD AFTERNOON, YOUR HONOR.

25                     MR. JOEL:  I JUST HAVE A QUICK QUESTION.
```

1       AS I'M SURE YOU'RE AWARE, WE HAVE RAISED SEVERAL

2       JURISDICTIONAL ISSUES.  I DIDN'T KNOW IF MAYBE YOU WANT

3       TO HAVE A LITTLE ARGUMENT ON THAT OR MAYBE HAVE THE

4       PLAINTIFFS PUT FORTH WHATEVER EVIDENCE THEY WANTED ON

5       THAT FIRST.

6                   THE COURT:  I'M GOING TO LET THE

7       PLAINTIFFS PROCEED, AS THEY SEE FIT.  I WILL RULE ON

8       EVERYTHING.  MY INTENTION IS NOT TO HOLD ANYBODY IN

9       SUSPENSE.  YOU HAVE GIVEN ME A GREAT DEAL OF MATERIAL,

10      WHICH I HAVE BEEN STUDYING AND HOPE TO CONTINUE TO STUDY

11      OVER THE NEXT TWO DAYS.  I HOPE TO ISSUE A DECISION

12      FIRST THING ON MONDAY MORNING.

13                  MR. JOEL:  THANK YOU, YOUR HONOR.

14                  THE COURT:  MR. MAAZEL.

15                  MR. MAAZEL:  THANK YOU, YOUR HONOR, AND

16      THANK YOU FOR HAVING US HERE AT THIS HEARING TODAY.

17                  AS YOU KNOW, WE REPRESENT MR. REITZ AND

18      JILL STEIN, A CANDIDATE FOR PRESIDENT ON THE GREEN PARTY

19      TICKET.  THIS IS THE SECOND CLOSEST PRESIDENTIAL

20      ELECTION IN THE HISTORY OF PENNSYLVANIA.  THE ONLY

21      CLOSER ELECTION IN THE HISTORY OF PENNSYLVANIA WAS

22      WHEN --

23                  THE COURT:  MR. HARVEY IS AN EXPERIENCED

24      HAND IN THIS COURTHOUSE AND UNDERSTANDS THAT OUR SOUND

25      RECORDING WON'T -- YOU DON'T EXIST IF YOU ARE NOT CLOSER

1    TO THE MICROPHONE.  WHY DON'T YOU REMAIN SEATED.  IT

2    WILL BE EASIER FOR ALL OF US TO HEAR YOU.

3              MR. MAAZEL:  THIS IS THE SECOND CLOSEST

4    PRESIDENTIAL ELECTION IN THE HISTORY OF PENNSYLVANIA.

5    THE ONLY CLOSER ELECTION WAS WILLIAM HARRISON, WHEN HE

6    BEAT MARTIN VAN BUREN IN 1840.  WE HAVE THOUSANDS OF

7    PEOPLE IN PENNSYLVANIA WHOSE VOTES ALMOST CERTAINLY DID

8    NOT COUNT.  AND IN THIS PENNSYLVANIA ELECTION REGIME,

9    THERE IS REALLY NOTHING THEY CAN DO ABOUT IT.  I JUST

10   WANT TO START BRIEFLY BY HIGHLIGHTING A COUPLE OF PEOPLE

11   WHO ARE IN OUR DECLARATIONS BEFORE THE COURT.

12              EXHIBIT 16 SETS FORTH THE DECLARATION OF

13   ANNA DURBIN, EXHIBIT 21, KIMBERLY KUPKA.  THESE TWO

14   INDIVIDUALS LIVE IN MONTGOMERY COUNTY.  THEY VOTED

15   THERE.  AND AS THEY BOTH CAST THEIR VOTES, A "NO VOTE"

16   BUTTON KEPT APPEARING.  THEY UNSELECTED THEIR

17   CANDIDATES, RESELECTED THE CANDIDATES, AND THIS "NO

18   VOTE" KEPT APPEARING.  AND WHEN BOTH OF THEM CAST THEIR

19   VOTE FOR THEIR CANDIDATES, THE "NO VOTE" BOX WAS LIT UP.

20              NOW, THIS DRE ELECTRONIC MACHINES THAT

21   THEY USED HAVE NO PAPER TRAIL.  THERE IS NO WAY FOR A

22   VOTER TO VERIFY THAT THEIR VOTE FOR THEIR SELECTED

23   CANDIDATE WAS ACTUALLY SELECTED.  THEY CAN ONLY TRUST

24   THE MACHINE, AND THEY HAD VERY STRONG REASON TO BELIEVE

25   THAT THOSE VOTES DID NOT COUNT.

1          WE KNOW NOW FROM THE MONTGOMERY BOARD OF

2     ELECTION'S WEBSITE, WHICH IS EXHIBIT 46, THAT OVER 4,000

3     PEOPLE IN MONTGOMERY COUNTY WERE REGISTERED A NO VOTES,

4     DID NOT VOTE FOR ANYBODY.  ALL 4,000 PEOPLE, 4,062

5     PEOPLE SUPPOSEDLY WENT TO THE POLLS, TOOK THEIR TIME TO

6     GO TO THE POLLS, FILLED OUT THEIR INFORMATION, PRESSED

7     THE BUTTON, DID EVERYTHING, AND SUPPOSEDLY DECIDED NOT

8     TO VOTE FOR A SINGLE CANDIDATE FOR A SINGLE OFFICE.

9     NOW, EITHER THAT IS THE CASE OR THE DRE MACHINES DID NOT

10    WORK, EITHER BECAUSE THEY WERE HACKED OR BECAUSE THEY

11    JUST DID NOT WORK.

12          SO WHAT COULD THESE VOTERS DO?  THE ONLY

13    REMEDY THEY'D REALLY HAVE IN PENNSYLVANIA IS TO SEEK A

14    RECOUNT OR A RECANVASS IN THEIR PRECINCT.  AND UNDER

15    PENNSYLVANIA LAW, THE DEADLINES FOR WHEN YOU CAN SEEK

16    RECOUNT DEPEND OR THEY ARE TIED TO HOW QUICKLY THAT

17    PARTICULAR COUNTY IS COUNTING THE VOTE.  NOW EVERY

18    COUNTY IS DIFFERENT, EVERY ELECTION IS DIFFERENT, AND

19    THERE IS NO WAY TO FIND OUT WHEN THE DEADLINE IS.

20    MONTGOMERY DID NOT PUBLISH THIS.  THE DEPARTMENT OF

21    STATE, WHICH IN THEORY SUPERVISES ALL OF THESE BOARDS OF

22    ELECTIONS, THEY HAD ABSOLUTELY NO IDEA WHEN THE DEADLINE

23    WAS TO SEEK A RECOUNT.

24          IN FACT, IN EXHIBIT 32 A, THEY SENT US A

25    CHART ON NOVEMBER 28TH, AND IN THAT CHART IT WAS

1    SUPPOSED TO SAY WHEN EACH COUNTY'S DEADLINE WAS WHEN

2    VOTES WERE COMPLETED OR NOT.  AND FOR MONTGOMERY THERE

3    WERE JUST BLANKS.  THEY HAD NO IDEA.  IN FACT, THE

4    DEPARTMENT OF STATE DID NOT KNOW FOR AT LEAST 20

5    COUNTIES WHEN THE COMPUTATIONS OF THE VOTE HAD BEEN

6    COMPLETED AND THEREFORE WHEN THE DEADLINES WERE.  SO

7    THESE VOTERS HAD NO IDEA FROM THEIR OWN GOVERNMENT WHEN

8    THEY SHOULD EVEN SEEK A RECOUNT.  NO ONE IS TELLING

9    THEM, IT IS NOT PUBLISHED.  EVEN THE DEPARTMENT OF STATE

10   DOES NOT KNOW.

11            SO WHAT DID THEY DO?  THEY FILL OUT THESE

12   SWORN PETITIONS ASKING FOR A RECOUNT.  THEY GO TO THE

13   TROUBLE OF GETTING THEM NOTARIZED.  THEY DROP THEM OFF

14   AT THE BOARD OF ELECTIONS IN THEIR COUNTY.  AND AT THE

15   BOARD OF ELECTIONS THEY ARE TOLD, AND THIS IS IN THEIR

16   DECLARATIONS, THEY ARE TOLD TOO LATE, THE DEADLINE

17   PASSED.  AND SO WHAT ARE THEY TO DO?  THEY JUST LEFT

18   THEM THERE AND HOPED THAT MAYBE THEY WOULD BE RECOUNTED

19   AND THEIR PETITIONS WOULD BE ACCEPTED.

20            THE COURT:  MR. MAAZEL, ARE THERE ANY --

21   PRESENTLY, AS YOU AND I SPEAK, ARE THERE ANY RECOUNT

22   PETITIONS BEING CONSIDERED IN ANY OF THE 67 COUNTIES OF

23   PENNSYLVANIA?

24            MR. MAAZEL:  YES.

25            THE COURT:  HOW MANY?

1                    MR. MAAZEL:  IN TERMS OF COURT

2      PROCEEDINGS OR JUST AT ANY STAGE?

3                    THE COURT:  EVERYTHING.  COURT

4      PROCEEDINGS, ELECTION COMMISSIONS, WHATEVER THE ENTITY

5      IS CALLED.

6                    MR. MAAZEL:  SO IN MONTGOMERY COUNTY,

7      THERE IS CURRENTLY --

8                    THE COURT:  YOU DON'T HAVE TO TICK THEM

9      OFF ONE BY ONE.  COLLECTIVELY, HOW MANY?

10                    MR. MAAZEL:  IT MUST BE APPROXIMATELY SIX

11      OR SEVEN.  I WOULD HAVE TO GO THROUGH EACH ONE.

12                    THE COURT:  THAT IS FINE.  YOU'VE

13      ANSWERED MY QUESTION.

14                    MR. MAAZEL:  AND SO IN THE MONTGOMERY

15      SITUATION, THERE WERE MANY PEOPLE IN THIS POSITION, OVER

16      200 PEOPLE WHO DROPPED OFF PETITIONS, DID NOT KNOW THE

17      DEADLINE.  AND THEN THE COUNTY BOARD -- THEY JUST SAT

18      THERE IN A PILE AT THE COUNTY BOARD.  AND THEN SOMEONE

19      IN THE STEIN CAMPAIGN HAD THE GOOD SENSE TO THEN TAKE

20      THOSE TO THE PROTHONOTARY IN COURT AND SAY, WELL, MAYBE

21      THEY WILL ACCEPT THEM.  AND THE COURT IMPOSED A $269.50

22      FEE PER PETITION, IN TOTAL $21,021, WHICH THE STEIN

23      CAMPAIGN PAID FOR ON BEHALF OF THESE VOTERS JUST SO

24      THEIR PETITIONS COULD BE HEARD SOMEWHERE.

25                    AND THEN THERE WAS A COURT HEARING.  NO

1    NOTICE WAS GIVEN TO ANY OF THE PETITIONERS UNTIL AFTER

2    THE HEARING WAS OVER.  AT THE HEARING, MY ESTEEMED

3    ADVERSARY ARGUED THAT YOU COULD NEVER HAVE A

4    COURT-ORDERED RECOUNT ANYWHERE --

5                    THE COURT:  MR. TABAS?

6                    WELCOME, MR. TABAS.  NICE TO SEE YOU

7    AGAIN.

8                    MR. TABAS:  GOOD AFTERNOON, YOUR HONOR.

9                    MR. MAAZEL:  MY ESTEEMED ADVERSARY,

10   MR. TABAS, ARGUED THAT THERE COULD NOT BE A SINGLE

11   COURT-ORDERED RECOUNT IN THIS PRECINCT OR ANY PRECINCT

12   UNLESS THERE WERE COURT-ORDERED RECOUNTS IN 27,000 --

13   I'M SORRY, 9,158 DISTRICTS BROUGHT BY 27,474 PEOPLE.

14                    IN SHORT, UNDER PENNSYLVANIA LAW,

15   ACCORDING TO THEIR ARGUMENT, UNLESS YOU HAVE A RECOUNT

16   PETITION IN EVERY SINGLE PRECINCT IN THE ENTIRE STATE,

17   YOU CAN'T HAVE ONE ANYWHERE.  AND THAT IS AT EXHIBIT 31

18   IN THE TRANSCRIPT AT PAGE 26.

19                    THE COURT THEN DENIED ALL THESE PETITIONS

20   WITHOUT EXPLANATION.  AND THE NET RESULT OF THE

21   EXPERIENCE OF THESE VOTERS IN MONTGOMERY, AND

22   PARTICULARLY THE TWO I JUST MENTIONED, IS THAT THEIR

23   VOTES ALMOST CERTAINLY WILL NOT COUNT AND THEY HAVE NO

24   RECOURSE AT ALL IN PENNSYLVANIA.

25                    THIS WOULD ALL BE EXTREMELY TROUBLING BY

1      ITSELF, BUT IT COMES IN THE CONTEXT OF A BROADER PICTURE

2      HERE, WHICH IS THAT WE HAVE MACHINES, DRE MACHINES AND

3      OPTICAL SCAN MACHINES, WHICH TOP COMPUTER EXPERTS ARE

4      ALL TELLING US, UNDER OATH AND OTHERWISE, ARE

5      VULNERABLE, THAT THEY ARE EASILY COMPROMISED, THAT THEY

6      ARE EASY TO HACK.

7                     AND WITH YOUR HONOR'S PERMISSION, WHAT I

8      WOULD LIKE TO DO IS TO CALL DR. ALEX HALDERMAN TO THE

9      STAND, WHO IS ONE OF THE LEADING COMPUTER SURVEY --

10                    THE COURT:  I'VE ORDERED ALL THE

11     WITNESSES SEQUESTERED.  PLEASE PRESENT DR. HALDERMAN.

12                    MR. MAAZEL:  THEN AFTER THAT, WE WILL

13     CONTINUE OUR PRESENTATION, IF THAT IS ACCEPTABLE.

14                    THE COURT:  IT'S YOUR PRESENTATION.

15                    MR. CELLI:  YOUR HONOR, I'M ANDREW CELLI.

16     I WILL BE EXAMINING THE WITNESS.

17                    THE COURT:  EXCELLENT.  YOU ALSO DON'T

18     HAVE TO STAND UP IF YOU DON'T WANT TO.

19                    MR. CELLI:  IF I'M NOT STANDING, I CAN'T

20     SPEAK LOUDLY.  ASK MY WIFE.

21                    THE COURT:  UNDERSTOOD.

22                    DR. HALDERMAN, PLEASE HAVE A SEAT.

23     WELCOME.

24                    DR. HALDERMAN:  THANK YOU.

25                    MR. CELLI:  MAY I PROCEED?

1                       THE COURT:  YOU MAY.

2                       MR. CELLI:  DR. HALDERMAN, GOOD

3      AFTERNOON.

4                       THE COURT:  WHY DON'T WE SWEAR THE

5      WITNESS, IF YOU WOULDN'T MIND STANDING, DOCTOR.

6                  J. ALEX HALDERMAN, PLAINTIFF WITNESS,

7      SWORN.

8                       THE CLERK:  STATE AND SPELL YOUR FULL

9      NAME FOR THE RECORD.

10                      THE WITNESS:  MY NAME IS JOHN ALEXANDER

11     HALDERMAN.  J-O-H-N.  A-L-E-X-A-N-D-E-R.

12     H-A-L-D-E-R-M-A-N.  J. ALEX, FOR SHORT.

13                      DIRECT EXAMINATION

14     BY MR. CELLI:

15     Q.      GOOD AFTERNOON, DR. HALDERMAN.

16     A.      GOOD AFTERNOON.

17     Q.      DR. HALDERMAN, COULD YOU BRIEFLY DESCRIBE YOUR

18     PROFESSIONAL AND EDUCATIONAL BACKGROUND TO THE COURT?

19     A.      I AM A PROFESSOR OF COMPUTER SCIENCE AND

20     ENGINEERING AT THE UNIVERSITY OF MICHIGAN.  AND I'M THE

21     DIRECTOR OF SOMETHING CALLED THE UNIVERSITY OF MICHIGAN

22     CENTER FOR COMPUTER SECURITY AND SOCIETY.

23                      I TEACH AND RESEARCH COMPUTER SECURITY,

24     INCLUDING THE SECURITY OF ELECTRONIC VOTING SYSTEMS AND

25     THE IMPLICATIONS OF STATE LEVEL ATTACKS.

```
 1                    I HAVE A PH.D. IN COMPUTER SCIENCE FROM
 2      PRINCETON UNIVERSITY, AND I HAVE AUTHORED APPROXIMATELY
 3      70 SCHOLARLY PUBLICATIONS IN THESE AREAS.
 4                    THE COURT:  I HAVE READ THE DOCTOR'S
 5      AFFIDAVIT AND THE VOLUMINOUS ATTACHMENTS AS WELL AS HIS
 6      CURRICULUM VITAE.  AND I ASSUME WITHOUT OBJECTION I'M
 7      PERFECTLY PREPARED TO QUALIFY HIM AS AN EXPERT IN
 8      FORENSIC COMPUTER SCIENCE.  DOES THAT SOUND RIGHT?
 9                    MR. CELLI:  WE WOULD ASK, YOUR HONOR,
10      THAT HE BE QUALIFIED IN COMPUTER SCIENCE AND IN
11      ELECTRONIC VOTING SYSTEM SECURITY.  HE HAS BEEN
12      PREVIOUSLY QUALIFIED IN THOSE FIELDS.
13                    THE COURT:  THAT'S FINE.  YOU ARE
14      QUALIFIED IN BOTH AREAS, DOCTOR.
15                    THE WITNESS:  THANK YOU, YOUR HONOR.
16                    MR. CELLI:  THANK YOU, YOUR HONOR.
17      BY MR. CELLI:
18      Q.    DR. HALDERMAN, YOU'VE SUBMITTED A DECLARATION IN
19      THIS CASE WHERE YOU DISCUSS THE PHENOMENON OF CYBER
20      ATTACKS OR HACKING, AND I THINK YOU USE THOSE TERMS
21      INTERCHANGEABLY.  DO YOU RECALL THAT?
22      A.    YES.
23      Q.    CAN YOU PLEASE TELL THE COURT WHAT YOU MEANT BY
24      CYBER ATTACKS OR HACKING.
25      A.    WELL, CYBER ATTACKS AND HACKING ARE BOTH WAYS TO
```

1     DESCRIBE ATTEMPTS BY A MALICIOUS PARTY, THAT IS AN

2     ATTACKER, TO MANIPULATE THE BEHAVIOR OF A COMPUTER

3     SYSTEM, SUCH AS AN ELECTRONIC VOTING SYSTEM, IN ORDER TO

4     GET SOME BEHAVIOR THAT THE ATTACKER DESIRES.

5     Q.     AND IN YOUR DECLARATION, DR. HALDERMAN, YOU

6     DESCRIBE THAT IN PENNSYLVANIA THERE ARE TWO DIFFERENT

7     ELECTRONIC VOTING TECHNOLOGIES THAT ARE USED, IS THAT

8     CORRECT?

9     A.     YES.

10    Q.     CAN YOU DESCRIBE FOR THE COURT WHAT THOSE

11    TECHNOLOGIES ARE?

12    A.     THERE ARE OPTICAL SCAN VOTING SYSTEMS IN

13    PENNSYLVANIA WHERE A VOTER FILLS OUT A PAPER BALLOT AND

14    IT GETS SCANNED INTO A MACHINE THAT IS A COMPUTER VOTING

15    MACHINE.  AND THERE ARE WHAT ARE CALLED DRE, OR DIRECT

16    RECORDING ELECTRONIC VOTING MACHINES.  THESE ARE

17    COMPUTERS THAT RECORD THE ONLY RECORD OF THE VOTE IN A

18    COMPUTER MEMORY.

19    Q.     THANK YOU.

20          HAVE YOU FORMED AN OPINION, DR.

21    HALDERMAN, AS TO WHETHER THE ELECTRONIC VOTING

22    TECHNOLOGIES THAT ARE USED IN THE COMMONWEALTH OF

23    PENNSYLVANIA ARE VULNERABLE TO CYBER ATTACKS OR TO

24    HACKING?

25    A.     YES, I HAVE.

1    Q.       AND WHAT IS YOUR OPINION ON THAT SUBJECT?

2    A.       I BELIEVE THEY ARE VULNERABLE.  IN FACT, I

3    BELIEVE THAT PENNSYLVANIA'S VOTING TECHNOLOGY ARE AMONG

4    THE MOST VULNERABLE VOTING SYSTEMS IN THE COUNTRY.

5    Q.       WHAT IS THE BASIS FOR THAT OPINION, SIR?

6    A.       WELL, PENNSYLVANIA USES TOUCH SCREEN VOTING

7    MACHINES AND OTHER KINDS OF DRE'S THROUGH MUCH OF THE

8    COMMONWEALTH.  AND THERE ARE SIX KINDS OF THOSE MACHINES

9    IN USE IN THE STATE, SIX DIFFERENT MODELS.  EVERY ONE OF

10   THESE MODELS HAS BEEN STUDIED EXTENSIVELY BY COMPUTER

11   SECURITY EXPERTS, INCLUDING ME.  AND WE HAVE FOUND

12   VULNERABILITIES IN EVERY MODEL OF MACHINE THAT WOULD

13   ALLOW AN ATTACKER TO SUBVERT THE SECURITY OF THE SYSTEM,

14   TO SPREAD MALICIOUS CODE OR OTHER FORMS OF ATTACK INTO

15   THE VOTING MACHINES AND COMPROMISE THEIR SECURITY,

16   PERHAPS CHANGING VOTES, FOR EXAMPLE, OR EVEN SABOTAGING

17   THE MACHINES IN OTHER WAYS.

18   Q.       COULD YOU TELL THE COURT IN LAY TERMS PRECISELY

19   HOW A CYBER ATTACKER OR HACKER WOULD ACCESS THESE

20   MACHINES AND WHAT THAT PERSON COULD DO?

21   A.       WELL, THERE ARE TWO WAYS THAT -- TWO PRIMARY

22   WAYS AN ATTACKER MIGHT TRY TO COMPROMISE THE VOTING

23   MACHINES.  ONE IS IF AN ATTACKER GETS PHYSICAL ACCESS TO

24   THE MACHINE, THEY CAN TRY TO CHANGE THE PROGRAMMING IN

25   THE MACHINE BY TAMPERING WITH THE STORAGE DEVICE, THE

1    COMPUTER CHIPS OR OTHER STORAGE DEVICE IN THE MACHINE.

2              BUT I THINK MAYBE MORE RELEVANT TO OUR

3    PRESENT PURPOSES, THERE ARE POSSIBLE, THERE ARE WAYS

4    THAT A REMOTE ATTACKER CAN ALSO INJECT MALICIOUS CODE

5    INTO THE VOTING MACHINES USED IN PENNSYLVANIA, EVEN

6    THOUGH THE MACHINES THEMSELVES ARE NOT DIRECTLY

7    CONNECTED TO THE INTERNET.  AND THAT IS BECAUSE THE

8    MACHINES ARE PROGRAMMED BEFORE ELECTION DAY WITH THE

9    DESIGN OF THE BALLOT.  THERE ARE FILES THAT ARE COPIED

10   INTO THE MACHINES THAT SAY WHO'S ON THE BALLOT AND WHAT

11   ARE THE RACES AND SO FORTH.  AND THOSE FILES ARE CREATED

12   ON OTHER COMPUTERS, EXTERNAL TO THE POLLING PLACE, THAT

13   ARE OPERATED BY THE COUNTIES OR BY OUTSIDE VENDORS.  IF

14   THOSE OUTSIDE COMPUTERS THAT ARE USED TO PROGRAM THE

15   BALLOT DESIGN ARE ATTACKED, AN ATTACKER CAN MANIPULATE

16   THE FILES THAT ARE COPIED ON TO THE VOTING MACHINES TO

17   DEFINE THE RACES AND THE BALLOT.  THESE FILES ARE COPIED

18   INTO THE MACHINES WITH A REMOVABLE STORAGE DEVICE, LIKE

19   A USB STICK OR A CARD SIMILAR TO THE ONE IN YOUR DIGITAL

20   CAMERA, AND AN ATTACK CAN TRAVEL INTO THE MACHINES,

21   PRIOR TO THE ELECTION, ON THOSE CARDS THAT ARE USED TO

22   PROGRAM THE BALLOT.

23   Q.     SIR, HAVE YOU FORMED AN OPINION AS TO THE

24   LIKELIHOOD THAT ELECTRONIC VOTING SYSTEMS IN

25   PENNSYLVANIA WERE SUBJECTED TO CYBER ATTACKS OR HACKING

1    IN THE 2016 ELECTION CYCLE?

2    A.      YES, I HAVE.

3    Q.      WHAT IS YOUR OPINION?

4    A.      I THINK THERE IS A SIGNIFICANT POSSIBILITY THAT

5    THE MACHINES IN PENNSYLVANIA WERE SUBJECT TO SUCH AN

6    ATTACK.

7    Q.      WHAT IS THE BASIS FOR THAT, DR. HALDERMAN?

8    A.      WELL, LOOK, THIS ELECTION WAS DIFFERENT FROM

9    PREVIOUS PRESIDENTIAL ELECTIONS IN THAT THERE HAS BEEN

10   AN UNPRECEDENTED LEVEL OF CYBER ATTACK ACTIVITY AIMED

11   QUITE OBVIOUSLY AT INTERFERING WITH THE PRESIDENTIAL

12   ELECTION.  WE HAD OVER THE SUMMER THE ATTACK ON THE

13   DEMOCRATIC NATIONAL COMMITTEE THAT LED TO THE SELECTIVE

14   LEAK OF THEIR E-MAIL.  ATTACK ON JOHN PODESTA, HILLARY

15   CLINTON'S CAMPAIGN MANAGER, TO LEAK HIS E-MAIL AS WELL.

16   ATTACKS AGAINST THE VOTER REGISTRATION SYSTEMS OPERATED

17   BY TWO DIFFERENT STATES, ARIZONA AND ILLINOIS, AND

18   REPORTED ATTACKS AGAINST MANY OTHER STATES' ELECTION

19   SYSTEMS PRIOR TO ELECTION DAY.

20                THE FEDERAL GOVERNMENT, THE INTELLIGENCE

21   AGENCIES AND DEPARTMENT OF HOMELAND SECURITY HAVE LINKED

22   THESE ATTACKS TO A FOREIGN COUNTRY.  THEY SAY ONLY HIGH

23   RANKING RUSSIAN OFFICIALS COULD HAVE ORDERED SUCH

24   ATTACKS.

25                NOW, WE ARE LIVING IN A TIME WHEN THESE

1    ATTACKS, CYBER ATTACKS LIKE THIS, STATE SPONSORED BY

2    FOREIGN GOVERNMENTS, ARE MORE AND MORE COMMON.  YOU READ

3    ABOUT THIS EVERY DAY IN THE PAPER, BUT WE HAVE NEVER

4    SEEN A PRESIDENTIAL ELECTION THAT HAS BEEN SO AFFECTED

5    BY THIS.

6              COUPLE THAT, THAT WE KNOW A FOREIGN

7    GOVERNMENT IS TRYING TO INTERFERE WITH THE ELECTION,

8    WITH THE SURPRISING RESULTS.  AND SO THE RESULTS OF THE

9    ELECTION, WHICH DID NOT MATCH PREELECTION POLLS THAT WAS

10   SURPRISING TO MANY PEOPLE AND I THINK THERE IS A

11   SIGNIFICANT POSSIBILITY THAT WE WERE ATTACKED.  AND IF I

12   WERE AN ATTACKER, PUTTING MYSELF INTO THE POSITION OF AN

13   ATTACKER, AS I DO IN MY ROLE AS A SECURITY RESEARCHER, I

14   THINK PENNSYLVANIA IS CERTAINLY A STATE I WOULD WANT TO

15   ATTACK IF I WANTED TO CHANGE THE OUTCOME OF A

16   PRESIDENTIAL ELECTION.

17   Q.     WHY IS THAT?

18   A.     BECAUSE PENNSYLVANIA IS -- WAS A STATE WITH VERY

19   CLOSE POLLING DATA.  SO YOU WOULD ONLY NEED TO

20   MANIPULATE A RELATIVELY SMALL FRACTION OF THE RESULT IN

21   ORDER TO CHANGE THE OUTCOME, AND BECAUSE PENNSYLVANIA

22   ALSO USES BADLY INSECURE TECHNOLOGY THAT HAS BEEN SHOWN

23   IN STUDIES TIME AND AGAIN TO BE VULNERABLE.

24   PENNSYLVANIA ALSO HAS A LARGE NUMBER OF ELECTORAL

25   COLLEGE VOTES.  AND SO BY ATTACKING PENNSYLVANIA, I

1    THINK PENNSYLVANIA WOULD SIMULTANEOUSLY BE A RELATIVELY

2    EASY STATE TO ATTACK AND ONE THAT WOULD GET A LOT OF

3    VALUE FOR AN ATTACKER WHO WANTED TO SWING THE NATIONAL

4    OUTCOME.

5    Q.    DR. HALDERMAN, CAN YOU DESCRIBE FOR THE COURT

6    THE KINDS OF MISCHIEF THAT COULD BE CAUSED BY A CYBER

7    ATTACK ON THE ELECTION SYSTEM IN PENNSYLVANIA?

8    A.    WELL, I THINK THAT AN ATTACKER WHO WANTED TO TRY

9    TO MANIPULATE THE ELECTION SYSTEM IN PENNSYLVANIA COULD,

10   BY MANIPULATING THE SOFTWARE ON INDIVIDUAL VOTING

11   MACHINES, SPREADING FROM AN INFECTION INTO THESE

12   ELECTION MANAGEMENT SYSTEMS INTO THE INDIVIDUAL VOTING

13   MACHINES, COULD -- REALLY COULD ARBITRARILY CHANGE

14   VOTES.  SO WE ARE TALKING ABOUT COMPUTER SOFTWARE THAT

15   IS CRAFTED BY AN ATTACKER RUNNING INSIDE THE VOTING

16   MACHINES BECAUSE IT'S SPREAD INTO THEM WITH THE BALLOT

17   PROGRAMMING.

18            NOW, THAT KIND OF ATTACK IS NOT LIMITED

19   TO -- IS VIRTUALLY UNLIMITED IN WHAT IT CAN DO TO THE

20   REPORTED RESULTS.  FOR INSTANCE, I COULD VERY SIMPLY, TO

21   GIVE A SIMPLE EXAMPLE, I COULD PROGRAM IT TO SHIFT 5

22   PERCENT OF VOTES FROM THE REPUBLICAN CANDIDATE TO THE

23   DEMOCRATIC CANDIDATE, AND I COULD FURTHERMORE PROGRAM IT

24   TO TRY TO HIDE FROM PREELECTION TESTING.

25   Q.    DR. HALDERMAN, YOU MENTIONED -- JUST A POINT OF

1   CLARITY, YOU MENTIONED THE ELECTION MANAGEMENT SYSTEM,

2   AND I THINK YOU MENTIONED THE VOTING MACHINES.  COULD

3   YOU TELL THE COURT WHAT THE DIFFERENCE IS BETWEEN THOSE

4   TWO TERMS?

5   A.    THE ELECTION MANAGEMENT SYSTEMS ARE THE

6   COMPUTERS THAT ARE USED TO CREATE THE BALLOT DESIGN

7   PROGRAMMING THAT IS GOING TO BE INSTALLED ON ALL THE

8   VOTING MACHINES ON ELECTION DAY AND ALSO USED TO

9   TABULATE VOTES FROM MANY DIFFERENT VOTING MACHINES AND

10  ADD THEM UP AFTER THE ELECTION.  SO THIS IS A DISTINCT

11  COMPUTER OFTEN OPERATED BY A COUNTY OR OPERATED BY AN

12  OUTSIDE VENDOR FOR THE COUNTY.

13  Q.    DR. HALDERMAN, YOU UNDERSTAND THAT DECEMBER 13TH

14  IS THE DEADLINE FOR PENNSYLVANIA AND OTHER STATES TO

15  DESIGNATE ELECTORS TO THE ELECTORAL COLLEGE, RIGHT?

16  A.    YES, I DO.

17  Q.    IN YOUR PROFESSIONAL JUDGMENT, WOULD IT BE

18  POSSIBLE TO DETERMINE THAT PENNSYLVANIA'S ELECTRONIC

19  VOTING SYSTEM HAD BEEN HACKED PRIOR TO THAT

20  DECEMBER 13TH DEADLINE?

21  A.    YES, I DO.

22  Q.    AND HOW WOULD YOU GO ABOUT DOING THAT?

23  A.    WELL, IF YOU -- IF I WERE DOING THIS, WHAT I

24  WOULD DO, GIVEN THE LIMITED TIME, IS I WOULD CONCENTRATE

25  EFFORTS ON TWO THINGS.  FIRST, WHERE WE HAVE PAPER

1    BALLOTS, I WOULD WANT TO SEE THAT AT LEAST SOME OF THOSE

2    PAPER BALLOTS ARE RECOUNTED, BECAUSE THE PAPER BALLOTS

3    REPRESENT SOMETHING THAT THE VOTER TOUCHED DIRECTLY THAT

4    COULD NOT LATER BE MANIPULATED BY A CYBER ATTACK.  SO

5    JUST COMPARING IN A SAMPLE OF LOCATIONS WHAT IS ON THE

6    PAPER BALLOTS TO WHAT THE COMPUTERS REPORTED CAN TELL US

7    IF THE COMPUTERS WERE MANIPULATED.  BUT BECAUSE MOST OF

8    PENNSYLVANIA'S VOTES ARE CAST WITHOUT A PAPER BALLOT,

9    THE DRE VOTING MACHINES THAT I MENTIONED THAT HAVE

10   THESE -- THAT HAVE BEEN SHOWN TO BE VULNERABLE IN

11   RESEARCH, ACCOUNT FOR SOMETHING LIKE 70 PERCENT OF VOTES

12   IN PENNSYLVANIA, WE NEED A DIFFERENT STRATEGY TO DETECT

13   CYBER ATTACKS AGAINST THOSE MACHINES.

14              AND WHAT I WOULD DO INSTEAD OF -- SINCE

15   THERE IS NOTHING TO RECOUNT, I WOULD TRY TO DO DIGITAL

16   FORENSICS ON THE ELECTION EQUIPMENT ITSELF.  GIVEN THE

17   LIMITED TIME, I THINK THE MOST IMPORTANT PLACE TO DO

18   FORENSICS IS THE ELECTION MANAGEMENT SYSTEM COMPUTERS,

19   BECAUSE THEY ARE AT WHAT WE MIGHT CALL A CHOKE POINT

20   THROUGH WHICH A MALICIOUS ATTACK WOULD SPREAD TO

21   MACHINES AT THE PRECINCTS.

22              SO I DON'T THINK WE NECESSARILY NEED TO

23   LOOK AT EVERY ELECTION MANAGEMENT SYSTEM COMPUTER IN THE

24   STATE, BUT JUST A SAMPLE OF THEM WOULD BE ENOUGH TO VERY

25   QUICKLY BE ABLE TO DETECT A CYBER ATTACK IF ONE

1    OCCURRED.  I MIGHT START WITH SAY THE LARGEST COUNTY

2    THAT USES EACH KIND OF ELECTION TECHNOLOGY BECAUSE THAT

3    WOULD BE -- IF I WERE THE ATTACKER, ONCE AGAIN, THAT

4    WOULD BE WHERE I WOULD TARGET TO GET THE MOST POTENTIAL

5    VOTES CHANGED FOR A SINGLE INTRUSION.

6    Q.        APPROXIMATELY HOW LONG WOULD IT TAKE IN YOUR

7    PROFESSIONAL JUDGMENT TO CONDUCT A SAMPLING REVIEW OF

8    THE SORT YOU JUST DESCRIBED?

9    A.        WELL, I THINK WE COULD REACH -- WE COULD

10   POTENTIALLY REACH A CONCLUSION THAT THERE WAS MALICIOUS

11   ACTIVITY IN AS LITTLE AS A DAY OR TWO.  AND THEN IF

12   MALICIOUS ACTIVITY WERE DETECTED, THEN WE WOULD GO -- WE

13   WOULD HAVE TO DETERMINE, BASED ON WHAT IT WAS, WHAT TO

14   DO NEXT.  BUT IF WE FOUND -- BUT WE COULD FIND EVIDENCE

15   OF TAMPERING VERY QUICKLY.

16                   MR. CELLI:  I HAVE NOTHING FURTHER.

17                   THE COURT:  THANK YOU.

18                   MR. CELLI:  THANK YOU, DOCTOR.

19                   THE COURT:  MS. UNGER.

20                   MR. JOEL.

21                   MR. JOEL:  IS IT OKAY IF I SIT HERE?

22                   THE COURT:  ABSOLUTELY.

23                   MR. JOEL:  THANK YOU.

24                   THE COURT:  PLEASE PUT THE MICROPHONE AS

25   CLOSE TO YOU AS POSSIBLE, AND SPEAK UP.

```
1                    MR. JOEL:  IS THAT OKAY?

2                    THE COURT:  THAT'S GREAT.

3                    CROSS EXAMINATION

4       BY MR. JOEL:

5       Q.      DR. HALDERMAN, HI.  MY NAME IS KENNETH JOEL.

6       I'M WITH THE OFFICE OF ATTORNEY GENERAL, AND I'M

7       REPRESENTING THE DEFENDANTS IN THIS CASE.  I HAVE A FEW

8       QUESTIONS FOR YOU.

9                    I LOOKED AT YOUR AFFIDAVIT, AND I DON'T

10      KNOW IF YOU HAVE IT THERE WITH YOU OR NOT BUT --

11                   THE COURT:  DO YOU HAVE IT?

12                   THE WITNESS:  I DON'T HAVE A COPY IN

13      FRONT OF ME.

14                   THE COURT:  I HAPPEN TO HAVE A COPY IN

15      FRONT OF ME.  DO YOU HAVE AN EXTRA, MR. JOEL?

16                   ALL RIGHT.  YOU CAN HAVE MINE, DOCTOR.  I

17      WILL TELL YOU WHAT.  WHY DON'T YOU TAKE -- I WILL GIVE

18      YOU THE PLEASURE OF DEALING WITH THE BOOK I HAVE BEEN

19      DEALING WITH.

20                   THE WITNESS:  THANK YOU, YOUR HONOR.

21                   THE COURT:  YOU ARE QUITE WELCOME.

22      BY MR. JOEL:

23      Q.      DOCTOR, I JUST HAD A FEW QUESTIONS ABOUT THIS

24      AND IT KIND OF RUNS THROUGHOUT.  BUT IF YOU LOOK AT

25      PARAGRAPH 10, I'M SEEING, IF A FOREIGN GOVERNMENT, IS
```

```
 1     THAT CORRECT?

 2     A.      YES.

 3     Q.      ONE MIGHT EXPECT.  THAT'S CORRECT?

 4     A.      YES.

 5     Q.      ATTACKERS MIGHT PROBE?

 6     A.      YES.

 7     Q.      TO FIND WAYS?

 8     A.      YES.

 9     Q.      MIGHT SPREAD?

10     A.      YES.

11     Q.      SOME STATES?

12     A.      YES.

13     Q.      NO VISIBLE SIGNS?

14     A.      YES.

15     Q.      WOULD EXPECT?

16     A.      YES.

17     Q.      IF YOU LOOK AT PARAGRAPH 12, JUST AS ANOTHER

18     EXAMPLE.  INITIAL COMPUTER IS ALMOST?

19     A.      WHERE ARE YOU READING THAT?  I'M SORRY.

20     Q.      SIX LINES DOWN.

21     A.      YES.

22     Q.      BEGINNING IN THE NEXT SENTENCE, IF?

23     A.      YES.

24     Q.      MIDWAY THROUGH THAT SENTENCE, CAN?

25     A.      YES.
```

1    Q.        DOCTOR, WITH REGARDS TO -- AND I DIDN'T SEE

2    ANYTHING IN YOUR AFFIDAVIT OR YOUR DECLARATION ABOUT

3    THIS, DO YOU HAVE ACTUAL HANDS-ON EXPERIENCE WITH ALL OF

4    THE DRE'S THAT ARE USED IN PENNSYLVANIA?

5    A.        I BELIEVE I HAVE TAKEN APART THREE OF THE

6    DIFFERENT MODELS AND EXAMINED MOST OF THE INTERNAL WIRES

7    AND COMPONENTS BY HAND MYSELF, YES.

8    Q.        DOCTOR, AS YOU WERE TESTIFYING, I HEARD SOME

9    OTHER WORDS SUCH AS PERHAPS, POSSIBILITY.  AM I CORRECT

10   THAT AS YOU SIT HERE TODAY, YOU HAVE NO EVIDENCE THAT

11   ANY MACHINE IN THE COMMONWEALTH OF PENNSYLVANIA WAS

12   COMPROMISED IN SUCH A WAY AS TO ALTER ANY VOTE?

13   A.        THAT IS INDEED WHAT THE FORENSIC EXAMINATION I'M

14   TALKING ABOUT WOULD SEEK TO FIND.

15                    THE COURT:  SIR, PLEASE, DON'T ARGUE WITH

16   THE WITNESS.  IS THAT A YES OR A NO?

17                    THE WITNESS:  I DON'T REMEMBER THE SENSE

18   OF --

19                    THE COURT:  ASK THE QUESTION.

20                    MR. JOEL:  HAPPY TO.

21   BY MR. JOEL:

22   Q.        AS YOU SIT HERE TODAY, IT IS TRUE THAT YOU HAVE

23   NO EVIDENCE THAT ANY MACHINE IN PENNSYLVANIA, VOTING

24   MACHINE OR ELECTRONIC SYSTEM THAT YOU TALKED ABOUT, HAS

25   BEEN COMPROMISED IN SUCH A WAY AS TO ALTER ANY VOTE?

1    A.      YES.

2    Q.      AND I THOUGHT I READ SOMEWHERE IN THE MATERIALS

3    THAT YOU HAD A RECENT POST WHERE YOU WERE ASKED ABOUT

4    WHETHER OR NOT THE ELECTION RESULTS WERE HACKED.  IS

5    THAT ACCURATE?

6    A.      I DON'T BELIEVE IN WHICH I WAS ASKED.

7    Q.      DID YOU HAVE A POST IN WHICH YOU SAID THE ANSWER

8    TO THAT -- WHETHER OR NOT THE ELECTION WAS HACKED, THE

9    VOTING MACHINES WERE HACKED, YOUR ANSWER WAS PROBABLY

10   NOT.  DO YOU REMEMBER THAT?

11   A.      YES.

12                  MR. JOEL:  I DON'T HAVE ANYTHING ELSE.

13   THANK YOU.  I DON'T KNOW IF MR. TABAS DOES OR NOT.

14                  MR. TABAS:  JUST FOR THE RECORD, LAWRENCE

15   TABAS ON BEHALF OF THE INTERVENORS WHICH INCLUDES THE

16   PRESIDENT ELECT AND THE OTHER INTERVENORS.

17                  CROSS EXAMINATION

18   BY MR. TABAS:

19   Q.      MR. HALDERMAN, FOLLOWING UP ON MR. JOEL'S

20   QUESTION, ISN'T IT TRUE THAT YOU ACTUALLY WROTE AN

21   ARTICLE ON NOVEMBER 23RD, 2016 IN MEDIUM, IN WHICH YOU

22   STATED:  WERE THIS YEAR'S DEVIATIONS FROM PREELECTION

23   POLLS THE RESULT OF A CYBER ATTACK?

24                  PROBABLY NOT.  I BELIEVE THE MOST LIKELY

25   EXPLANATION IS THAT THE POLLS WERE SYSTEMATICALLY WRONG,

1    RATHER THAN THE ELECTION WAS HACKED.  END OF QUOTE.

2    A.      YES, THAT IS WHAT I WROTE.

3    Q.      SO MR. HALDERMAN, THEN, ISN'T IT TRUE THAT AS OF

4    TODAY YOU CANNOT STATE TO A REASONABLE DEGREE OF

5    CERTAINTY THAT THE PENNSYLVANIA VOTING SYSTEMS WERE IN

6    FACT HACKED FOR THIS 2016 ELECTION?

7    A.      YES.

8                    MR. TABAS:  NO FURTHER QUESTIONS, YOUR

9    HONOR.

10                   THE COURT:  DOCTOR, IS THERE ANYTHING

11   THAT YOU HAVE TESTIFIED TO THIS AFTERNOON, OTHER THAN

12   THE RESULT OF THE VOTE ON NOVEMBER 8TH, ANYTHING AT ALL

13   YOU HAVE TESTIFIED TO TODAY THAT YOU DID NOT KNOW BEFORE

14   NOVEMBER 8TH?

15                   THE WITNESS:  DIDN'T KNOW BEFORE

16   NOVEMBER 8TH?  NO, I DON'T THINK SO.

17                   THE COURT:  ANY FURTHER QUESTIONS?

18                   MR. CELLI:  JUST A QUICK ONE, YOUR HONOR.

19                   THE COURT:  VERY WELL.

20                   REDIRECT EXAMINATION

21   BY MR. CELLI:

22   Q.    DR. HALDERMAN, THE QUESTION ABOUT THE POST THAT

23   YOU WROTE, WHERE YOU SAID, WAS THE ELECTION HACKED,

24   PROBABLY NOT.  COULD YOU EXPLAIN WHAT YOU MEANT WHEN YOU

25   SAID THAT AND WHAT IN FACT THE ARTICLE SAYS.

1    A.       YES.   SO THAT ARTICLE WAS TALKING ABOUT NOT THAT

2    THE -- SO THAT ARTICLE IS COMPARING TWO DIFFERENT

3    POSSIBILITIES.   RIGHT?   WE HAVE AN ELECTION THIS YEAR

4    THAT HAD A SURPRISING RESULT TO MANY PEOPLE.   AND IN

5    FACT THE POLLS BEFORE THE ELECTION WERE WRONG IN A

6    SIGNIFICANT WAY.   AND ONE OF TWO THINGS IS POSSIBLE.

7              EITHER THE POLLS WERE WRONG, RIGHT, AND

8    THE ELECTION RESULT IS CORRECT, AND I THINK THAT IS

9    SIGNIFICANTLY LIKELY.   BUT I ALSO THINK A SIGNIFICANT

10   LIKELIHOOD EXISTS THAT THERE WAS A CYBER ATTACK

11   BECAUSE --

12              THE COURT:   I'M SORRY.   I'M SORRY.   I

13   THINK THE QUESTION WAS, HOW DO YOU EXPLAIN -- WHEN YOU

14   WERE ASKED WAS THE VOTE HACKED, YOU SAID PROBABLY NOT.

15   I'M NOT HEARING AN EXPLANATION FOR THAT.

16              THE WITNESS:   I'M SORRY.   I AM GETTING TO

17   THAT.   IF I'M BEING UNCLEAR, I APOLOGIZE.

18              THE COURT:   NOT UNCLEAR PERHAPS, BUT YOU

19   ARE TAKING A LONG TIME TO GET THERE.

20              THE WITNESS:   I'M SORRY, YOUR HONOR.

21   THERE ARE TWO POSSIBILITIES HERE, THAT THE POLLS WERE

22   WRONG OR THAT THERE WAS A CYBER ATTACK.   AND I DO THINK

23   THAT THE MORE LIKELY OF THOSE TWO IS THAT THE POLLS WERE

24   WRONG.   BUT I DON'T THINK THAT A CYBER ATTACK IS MUCH

25   LESS LIKELY THAN THAT.   AND THAT IS WHY I PUT IT THAT

1  WAY.  THE ENTIRE ARTICLE IS ABOUT WHY THE LIKELIHOOD OF

2  A CYBER ATTACK IS SO SIGNIFICANT THAT WE ABSOLUTELY NEED

3  TO INVESTIGATE THE AVAILABLE EVIDENCE IN ORDER TO MAKE

4  SURE THAT ONE DIDN'T OCCUR.

5           THE COURT:  SO -- IF I'M WRONG, PLEASE

6  DON'T HESITATE TO CORRECT ME.  AS I HEAR YOUR TESTIMONY,

7  YOU ARE SAYING IT'S MORE LIKELY THAN NOT THAT THERE WAS

8  NO HACK, BUT THAT STILL LEAVES A SIGNIFICANT POSSIBILITY

9  THAT THERE COULD HAVE BEEN A HACK.

10           THE WITNESS:  THAT IS WHAT I'M SAYING.

11  YES, YOUR HONOR.

12           THE COURT:  ANYTHING FURTHER?

13           CAN I HAVE MY BOOK BACK?  THANK YOU,

14  DOCTOR.  UNLESS YOU PLAN ON CALLING THE DOCTOR AGAIN, HE

15  IS FREE TO STAY IF HE WANTS TO OR HE CAN RETURN TO ANN

16  ARBOR.  IT'S HIS DECISION.

17           MR. MAAZEL:  THANK YOU, YOUR HONOR.

18           SO I WOULD LIKE TO CONTINUE WITH WHAT I

19  THINK IS -- ARE THE FUNDAMENTAL LEGAL PRINCIPLES, REALLY

20  FIVE, THAT I THINK GUIDE YOUR HONOR'S DECISION IN THIS

21  PRELIMINARY INJUNCTION.

22           THE FIRST IS THAT VOTERS DON'T JUST HAVE

23  THE RIGHT TO VOTE.  THEY HAVE THE RIGHT TO VOTE -- THEY

24  HAVE THE RIGHT TO HAVE THEIR VOTE COUNT, WHICH IS THE

25  CLASSIC CASE IN A NUMBER OF OTHER U.S. SUPREME COURT

1      CASES.

2                      THE COURT:  MOVE THE MICROPHONE A LITTLE

3      CLOSER AND SPEAK INTO IT.  WE JUST GOT ELECTRICITY HERE

4      IN PHILADELPHIA.

5                      MR. MAAZEL:  THANK YOU, YOUR HONOR.

6                      THE SECOND PRINCIPLE IS THAT THE COURT

7      MUST WEIGH THE BURDENS ON THE RIGHT TO HAVE THE VOTE

8      COUNT VERSUS THE PRECISE INTERESTS IDENTIFIED BY THE

9      STATE, AND WHETHER THOSE INTERESTS REQUIRE THOSE RIGHTS

10     TO BE BURDENED, AND THAT IS THE THIRD CIRCUIT HOLDING IN

11     ROGERS.

12                     THE THIRD IS THAT STATE INTERESTS ARE

13     LESS IMPORTANT IN PRESIDENTIAL ELECTIONS.  THAT IS THE

14     ANDERSON CASE.

15                     THE FOURTH IS THAT WE HAVE TO LOOK AT ALL

16     THE BURDENS IN COMBINATION, NOT IN ISOLATION, WHICH IS

17     THE CONSTITUTION PARTY CASE.

18                     AND THE FIFTH AND PERHAPS THE MOST

19     IMPORTANT IS THAT WHEN A STATE PROVIDES A RIGHT TO A

20     RECOUNT AS PENNSYLVANIA DOES, AS THE SIXTH CIRCUIT HELD

21     IN STEIN V THOMAS ABOUT TEN HOURS AFTER OUR BRIEF WAS

22     FILED, IT IS CLEAR THAT THE STATE CANNOT USE ARBITRARY

23     OR UNREASONABLE PROCEDURAL RULES TO MAKE THAT RIGHT A

24     NULLITY.  AND WITH THE COURT'S PERMISSION I WOULD LIKE

25     TO HAND THIS CASE UP TO THE COURT BECAUSE IT JUST CAME

1     DOWN.

2                    THE COURT:  SURE.

3                    MR. MAAZEL:  THE KEY LANGUAGE, YOUR

4     HONOR, I THINK IS THE BOTTOM OF PAGE 5 AND THE TOP OF

5     PAGE 6 WHERE THE SIXTH CIRCUIT HELD THAT ONCE THERE IS A

6     STATE RIGHT TO A RECOUNT, THE STATE CANNOT USE ARBITRARY

7     OR UNREASONABLE PROCEDURAL RULES TO MAKE THAT RIGHT A

8     NULLITY.  AND I WOULD SUBMIT, YOUR HONOR, THAT THAT IS

9     EXACTLY WHAT HAS HAPPENED AND IS HAPPENING IN

10    PENNSYLVANIA.

11                   THE COURT:  AS I UNDERSTAND, AND AGAIN,

12    AS I SAID TO THE DOCTOR, CORRECT ME IF I'M WRONG, THERE

13    HAS BEEN A LOT OF INFORMATION TO ABSORB IN NOT VERY MUCH

14    TIME.  AS I UNDERSTAND YOUR CONSTITUTIONAL TORT THEORY,

15    IS THE APPLICATION OF THE ELECTION CODE, IN PARTICULAR

16    THE COMMONWEALTH COURT'S DECISION TO REQUIRE A MILLION

17    DOLLAR BOND, WAS EFFECTIVELY A DECISION TO NOT TO ALLOW

18    YOU A RECOUNT IN VIOLATION OF, AND AGAIN, IF I'M WRONG

19    PLEASE TELL ME, EQUAL PROTECTION, SUBSTANTIVE DUE

20    PROCESS AND THE FIRST AMENDMENT.

21                   MR. MAAZEL:  I THINK THAT IS A SMALL

22    PIECE OF IT, YOUR HONOR, BUT THERE REALLY -- THERE ARE

23    SEVEN BURDENS ON THE RIGHT TO HAVE THE VOTE COUNT THAT I

24    WANT TO IDENTIFY AND THEY NEED TO BE LOOKED AT IN

25    COMBINATION.

1           THE FIRST IS THAT WE KNOW AND IT'S NOT

2   DISPUTED ON THIS RECORD THAT MANY OF THESE DRE MACHINES

3   DID NOT WORK.  IN MONTGOMERY, IT'S SIMPLY IMPOSSIBLE

4   THAT 4,062 PEOPLE SHOWED UP AND DECIDED NOT TO VOTE.

5   AND WE HAVE AFFIDAVITS FROM MULTIPLE PEOPLE SAYING A "NO

6   VOTE" BUTTON CAME UP WHEN THEY TRIED TO VOTE FOR PEOPLE.

7   THAT IS NUMBER ONE.

8           NUMBER TWO, WE HAD THE EVIDENCE SUCH AS

9   IT IS THAT THESE MACHINES ARE VULNERABLE, THEY ARE

10  HACKABLE, THEY ARE EASY TO PENETRATE.  AND THAT IS NOT

11  JUST THE OPINION OF DR. HALDERMAN.

12          IT'S THE OPINION OF HARRI HURSTI.  HIS

13  DECLARATION'S IN THE RECORD, HE SAID THE MACHINES ARE

14  EASILY HACKED.  IT'S ELEMENTARY TO HACK THEM.  AND IN

15  PARAGRAPH 28, YOU DON'T EVEN NEED A BACHELOR'S DEGREE

16  LEVEL OF SKILL TO HACK THEM.

17          WE HAVE THE OPINION OF DUNCAN BUELL IN

18  HIS DECLARATION.  HE'S THE LEADING EXPERT ON INVOTRONICS

19  WHICH IS USED IN 25 COUNTIES IN THE STATE, WHERE HE SAYS

20  THAT THAT STRUCTURE USES A NAIVE EVEN JUVENILE PASSWORD

21  STRUCTURE.  THAT IS AT PARAGRAPH 13.

22          DANIEL LOPRESTI, CANDICE HOKE.  I WON'T

23  GO THROUGH ALL THE DECLARATIONS.  BUT THEY ALL SAY MORE

24  OR LESS THE SAME THING.

25          THE COURT:  I HAVE READ THEM.

1          MR. MAAZEL:  THEY ALL SAY THAT THESE

2    MACHINES REALLY ARE ANTIQUATED.  THEY USE OLD

3    TECHNOLOGY.  THEY ARE VERY VULNERABLE.  SO THAT IS

4    REALLY THE SECOND, I WOULD SAY, OF THE SEVEN BURDENS

5    THAT I AM IDENTIFYING TODAY FOR YOUR HONOR.

6          THE THIRD IS THAT THERE IS NO PAPER TRAIL

7    AT ALL.  THERE IS NO WAY FOR A VOTER TO VERIFY THAT HIS

8    OR HER VOTE COUNTED IN THE 50 COUNTIES THAT USE DRE

9    MACHINES.  YOU GO TO A RITE AID AND YOU BUY TOOTHPASTE,

10   AND YOU GET A RECEIPT TO SHOW THAT YOU BOUGHT IT.  HERE

11   WHEN YOU GO TO A DRE MACHINE TO CAST YOUR VOTE FOR

12   PRESIDENT OF THE UNITED STATES, YOU HAVE NOTHING.  THERE

13   IS JUST NO WAY TO VERIFY THAT THE MACHINE WORKED.

14          THE FOURTH IS THE IMMENSE DIFFICULTY TO

15   GO THROUGH ANY PROCEDURE IN THE STATE OF PENNSYLVANIA TO

16   SEE IF YOUR VOTE COUNTED.  I BREAK THAT DOWN INTO A FEW

17   DIFFERENT PIECES.

18          ONE IS THAT THERE IS NO WAY TO KNOW WHEN

19   YOU NEED TO REQUEST THE RECOUNT, THERE IS NO NOTICE OF

20   THE DEADLINES.  AND I TOUCHED ON THIS BRIEFLY BEFORE,

21   BUT I MEAN NOTICE IS JUST A BETTER DUE PROCESS IDEA,

22   FROM MATTHEWS V ELDRIDGE, PRISON CASES, SCHOOL CASES.

23   IF THERE IS MAYBE ONE PROCEDURAL DUE PROCESS IDEA THAT

24   IS COMMON TO EVERY CASE, IT'S NOTICE.  AND IN THIS CASE,

25   THERE IS NO NOTICE.  EVERY COUNTY COUNTS AT DIFFERENT

1    RATES.  EVERY COUNTY COUNTS DIFFERENTLY IN DIFFERENT

2    ELECTIONS.  NOTHING IS PUBLISHED, AND THEN THE COUNTIES

3    DISAGREE AS TO WHEN THE DEADLINE IS.  IS IT WHEN THE

4    VOTES ARE COUNTED OR IS IT FIVE DAYS AFTER?

5                SO IN LEHIGH THEY ACCEPT RECOUNT REQUESTS

6    FIVE DAYS AFTER COMPLETION OF THE VOTE.  IN BUCKS IT HAS

7    TO BE THE COMPLETION OF THE VOTE.  IN ALLEGHENY IT'S

8    FIVE DAYS AFTER.  IN LANCASTER IT'S COMPLETION OF THE

9    VOTE.  IT ALL DEPENDS ON THE WHIM OF THE COUNTY AND THE

10   MOMENT.  THIS IS NOT A RATIONAL SYSTEM THAT CAN BE

11   DEFENDED.  AND I THINK IT IS NOTABLE THAT NONE OF THE

12   DEFENDANTS DEFEND IT.

13               THERE IS NO PRECISE STATE INTEREST THAT

14   CAN JUSTIFY GIVING NO NOTICE WHATSOEVER TO VOTERS AS TO

15   WHEN THEY CAN SEEK A RECOUNT.  AND IT'S THEIR BURDEN TO

16   IDENTIFY A PRECISE STATE INTEREST UNDER THE THIRD

17   CIRCUIT CASE LAW.  THEY DON'T IDENTIFY ANY INTEREST AND

18   THERE CAN BE NONE, THERE CAN BE NO INTEREST IN HIDING

19   THE BALL FROM THE VOTER.  SO THAT IS THE FOURTH BURDEN.

20               AND JUST BY WAY OF EXAMPLE, IN EXHIBIT 4,

21   WE HAVE THE DECLARATION OF MR. ALMQUIST, AND HE

22   DESCRIBES QUITE A SCENE WHEN HE TRIED TO GET HIS RECOUNT

23   PETITION FILED.  HE FIRST WENT TO -- PARAGRAPH 4, I'M

24   SORRY, PARAGRAPH 5, HE WENT FIRST TO ELECTION SERVICES,

25   WHICH IS THE COUNTY BOARD.  THEY TOLD HIM GO TO THE

1    COUNTY CLERK.  HE WENT TO THE COUNTY CLERK.  HE WAS TOLD

2    TO GO TO THE COUNTY SOLICITOR.  HE WENT TO THE COUNTY

3    SOLICITOR.  THEY SAID NO, YOU NEED TO GO TO THE COURT TO

4    THE PROTHONOTARY'S OFFICE.  HE WENT TO THE

5    PROTHONOTARY'S OFFICE.  THEY SAID NO, YOU NEED TO GO

6    BACK TO THE COUNTY BOARD.

7                    THE COURT:  WE'RE PROBABLY THE ONLY STATE

8    IN THE UNION THAT HAS THE OFFICE OF PROTHONOTARY, WHICH

9    IS WHY NO ONE KNOWS HOW TO PRONOUNCE IT.

10                    MR. MAAZEL:  I HAVE BEEN HERE FOR TWO

11   WEEKS, AND I STILL CAN'T PRONOUNCE IT.  THANK YOU, YOUR

12   HONOR.  PROTHONOTARY.

13                    AND THEN WHEN HE WAS THERE, FINALLY THE

14   PROTHONOTARY -- I WON'T SAY THE WORD AGAIN.

15                    THE COURT:  MR. HARVEY WILL GIVE YOU

16   ELOCUTION LESSONS AFTER THE HEARING TODAY.

17                    MR. MAAZEL:  HE WAS TOLD TO FILL OUT A

18   COVER SHEET TO MAKE A PROPOSED ORDER TO PAY $324 IN

19   FILING FEES, PAYABLE IN CASH OR CASHIER'S CHECK AND THAT

20   WAS AT 3:30 AND IT WAS DUE AT 4 O'CLOCK.  SO IT'S JUST

21   -- IT'S AN IMPOSSIBLE SYSTEM FOR VOTERS TO ACTUALLY SEEK

22   RECOUNTS.

23                    THE NEXT BURDEN THAT I BELIEVE IS

24   SIGNIFICANT IS NOT JUST THE LACK OF NOTICE, BUT THE

25   BURDEN ITSELF OF HAVING ANYTHING CLOSE TO A STATEWIDE

1    RECOUNT, WE NEED TO HAVE OVER 9,000 PETITIONS FILED BY

2    OVER 27,000 PEOPLE, EQUALLY DIVIDED THROUGHOUT THE STATE

3    IN A MATTER OF WEEKS.  I MEAN IT'S AN ABSOLUTELY

4    INSURMOUNTABLE BURDEN.  IT CAN'T BE DONE.  IT HAS NEVER

5    BEEN DONE, AND NOT ONLY DO THEY NEED TO FILE, THEY NEED

6    TO GET THEIR NOTARY STAMP.  THEY NEED TO PERHAPS TRAVEL

7    HUNDREDS OF MILES TO THE NEAREST OFFICE.  THESE BURDENS

8    ARE FAR LESS SEVERE THAN FOR EXAMPLE THE CONSTITUTION

9    PARTY CASE IN THE THIRD RD CIRCUIT WHERE FEWER

10   SIGNATURES WERE NEEDED IN A FIVE-MONTH PERIOD, AND THEY

11   WERE NOT REQUIRED EVENLY DIVIDED THROUGHOUT THE STATE.

12   I MEAN, THE BURDEN IS IMPOSSIBLE AND I THINK ACTUALLY

13   IT'S VERY INTERESTING THAT THE PENNSYLVANIA SENATE

14   MAJORITY CAUCUS FILED THEIR AMICUS BRIEF.  I DON'T KNOW

15   IF YOUR HONOR HAS HAD A CHANCE TO READ THAT YET.

16                 THE COURT:  I'VE READ ALL THE BRIEFS.

17                 MR. MAAZEL:  THEIR BRIEFS WERE VERY

18   INTERESTING BECAUSE THEY SAY WE MADE A CHOICE TO MAKE IT

19   IMPOSSIBLE.  THEY DESCRIBED THE RECOUNT PROCESS AS

20   ONEROUS AND THEY SAY THAT IT'S A, QUOTE, INTENTIONAL

21   CHOICE AT PAGE 4.  THEY WANT TO IT BE ALMOST IMPOSSIBLE.

22   IT'S ALMOST AS IF THE SENATE MAJORITY CAUCUS CAME TO

23   COURT AND SAID --

24                 THE COURT:  IF PENNSYLVANIA HAD NO

25   PROVISION AT ALL FOR A RECOUNT, COULD PENNSYLVANIA DO

1    THAT?

2                    MR. MAAZEL:  IT WOULD BE A DIFFERENT

3    CASE, YOUR HONOR.

4                    THE COURT:  OH, BELIEVE ME.  I UNDERSTAND

5    THAT.  BUT COULD PENNSYLVANIA SIMPLY SAY WE ARE NOT

6    GOING TO PROVIDE FOR A RECOUNT.  WE WILL HAVE AN

7    ELECTION AND THAT IS IT.  WOULD THAT VIOLATE SOME

8    PROVISION OF THE FEDERAL CONSTITUTION?

9                    MR. MAAZEL:  PROBABLY NOT.  AND

10   PENNSYLVANIA COULD ALSO SAY, NO ONE IN PENNSYLVANIA HAS

11   A RIGHT TO VOTE FOR PRESIDENT.  BUT ONCE PENNSYLVANIA

12   HAS --

13                   THE COURT:  I REALLY DON'T THINK THE TWO

14   ARE IN THE LEAST SIMILAR.

15                   MR. MAAZEL:  WELL, IN THE SENSE THAT

16   ONCE --

17                   THE COURT:  IN THE SENSE THAT THEY ARE

18   NOT IN THE LEAST SIMILAR, IT'S NOT A GOOD ANALOGY.

19                   MR. MAAZEL:  I GUESS MY POINT, AND MAYBE

20   I DID NOT MAKE IT WELL, IS THAT THE LEGISLATURE, AS THE

21   SIXTH CIRCUIT HAS SAID AND OTHER COURTS, ONCE THE

22   LEGISLATURE MAKES A DETERMINATION THAT VOTERS IN THAT

23   STATE HAVE A CERTAIN RIGHT, THEN THE CONSTITUTION KICKS

24   IN AND THAT RIGHT HAS TO BE EXERCISED IN A WAY THAT

25   COMPORTS WITH DUE PROCESS AND THE FIRST AMENDMENT AND

1    EQUAL PROTECTION.

2                    IN THIS CASE, THERE IS A RIGHT, AT LEAST

3    IN THEORY ON PAPER, TO SEEK RECOUNTS, BUT IN PRACTICE

4    IT'S IMPOSSIBLE.

5                    THE NEXT BURDEN I IDENTIFY ARE THE FEES.

6    AT $50 --

7                    THE COURT:  THAT IS NOT IMPOSSIBLE IN

8    EVERY CASE.  MR. HARVEY HAS DONE IT.  NOT FOR A WHILE, I

9    GUESS.  MR. HARVEY HAS DONE IT.  HE MADE A BIT OF -- IN

10   THE VIEW OF SOME OFFICE HOLDERS -- A NUISANCE OF HIMSELF

11   DOING IT.

12                   MR. MAAZEL:  AND LOOK, IN THE STATEWIDE

13   RACE, JUST THE $50 FEE PER PETITION IS ALREADY A HALF

14   MILLION DOLLARS.  THE RECORD ESTABLISHES THAT COURTS ARE

15   REQUIRING THE FILING OF 9,158 LAWSUITS TO BRING THESE

16   COURT-ORDERED RECOUNTS.  AND THEY ARE IMPOSING FILING

17   FEES OF 2 AND $300.  THOSE FEES ARE MORE LIKE

18   TWO-AND-A-HALF OR $3 MILLION.

19                    IN THE 3RD CIRCUIT CASE --

20                   THE COURT:  ARE YOU EQUATING, IF

21   PENNSYLVANIA LAW SAID THAT ONLY CAUCASIANS COULD SEEK A

22   RECOUNT, I COULD SEE HOW YOU WOULD SAY THAT WOULD

23   VIOLATE EQUAL PROTECTION.  YOU ARE EQUATING THAT WITH

24   PENNSYLVANIA SAYING THE 67 COUNTIES ARE GOING TO

25   DETERMINE THEIR OWN RECOUNT PROCEDURES AND ENFORCE THEIR

1      OWN RECOUNT PROCEDURES RESULTING IN A PATCHWORK OF 67

2      DIFFERENT PROCEDURES -- SETS OF PROCEDURES.  ARE YOU

3      -- THAT IS WHAT I'M HEARING YOU SAY.  YOU ARE SAYING

4      THAT DISCRIMINATION ON THE BASIS OF RACE OF A RIGHT ONCE

5      STATUTORILY AFFORDED IS THE SAME AS DISCRIMINATION ON

6      THE BASIS OF COUNTY OF RESIDENCE?

7                    MR. MAAZEL:  WELL, IT'S ONLY THE SAME IN

8      THE SENSE THAT THEY BOTH INVOLVE EQUAL PROTECTION

9      CLAUSE.  BUT IT'S NOT JUST BASED ON THE COUNTY OF

10     RESIDENCE.  IT'S THE OVERALL BURDEN PLACED ON VOTERS TO

11     BE ABLE TO EXERCISE --

12                    THE COURT:  HAVE YOU EVER DRIVEN THROUGH

13     A SPEED TRAP WHERE YOU GO THROUGH ONE TOWNSHIP AND THE

14     SPEED LIMIT IS 20 MILES AN HOUR, YOU GO THROUGH ANOTHER

15     TOWNSHIP AND IT'S 25 MILES AN HOUR, THEN YOU GO BACK TO

16     ANOTHER TOWNSHIP AND IT'S 20 MILES AN HOUR AGAIN, AND

17     IT'S THAT SECOND -- THIRD TOWNSHIP THAT ALL THE TICKETS

18     ARE HANDED OUT?  IS THAT SOMEHOW IRRATIONAL BECAUSE EACH

19     COUNTY DECIDES THIS IS HOW FAST WE WANT PEOPLE TO DRIVE

20     IN OUR TOWNSHIP?

21                    MR. MAAZEL:  IT'S NOT QUITE MY ARGUMENT,

22     YOUR HONOR.  MY ARGUMENT IS THAT WHEN YOU ADD UP ALL THE

23     BURDENS ON VOTERS IN PENNSYLVANIA, THOSE VOTERS -- THOSE

24     BURDENS COLLECTIVELY SO BURDEN THE RIGHT TO MAKE SURE

25     THAT YOUR VOTE COUNTED THAT IT VIOLATES THESE THREE

1    CLAUSES OF THE CONSTITUTION.

2              AND I WOULD JUST LOOK AT THE THIRD

3    CIRCUIT CASE IN BELITSKUS WHERE CANDIDATES WERE CHARGED

4    A FILING FEE OF BETWEEN 5 AND $100, AND THE THIRD

5    CIRCUIT SAID, AND I QUOTE, THAT CLEARLY VIOLATES THE

6    EQUAL PROTECTION CLAUSE.  A FILING FEE OF 5 TO $100.  I

7    MEAN THAT IS A WALK IN THE PARK COMPARED TO OUR CASE.

8    THE HOOPS THAT VOTERS HAVE TO GO THROUGH TO JUST ATTEMPT

9    TO SEE IF THEIR VOTE COUNTED ARE FAR GREATER.  I MEAN,

10   IT'S IN A WHOLLY DIFFERENT CATEGORY FROM EVEN THE

11   BELITSKUS CASE WHERE THE THIRD CIRCUIT SAID IT WAS A

12   CLEAR VIOLATION AND THAT THAT 5 TO $100 FEE WAS A,

13   QUOTE, SEVERE BURDEN.

14             SO JUST THE LAST WORD I WANT TO ADDRESS

15   AND I DO WANT TO RESERVE A LITTLE BIT OF TIME.

16             THE COURT:  YOU WANTED TO RESERVE

17   15 MINUTES.  THAT IS WHAT YOU'VE GOT LEFT.

18             MR. MAAZEL:  I WILL TRY TO WRAP UP HERE,

19   YOUR HONOR.

20             THE COURT:  IT'S YOUR 15 MINUTES.

21             MR. MAAZEL:  THE LAST BURDEN REALLY IS

22   UNIQUE TO DRE'S AND THAT IS THAT BECAUSE THERE ARE NO

23   PAPER BALLOTS THERE IS NO WAY TO EXAMINE THEM.  AND THE

24   ONLY WAY TO EXAMINE IF THE MACHINES ARE COMPROMISED IS

25   THROUGH A FORENSIC EXAMINATION.  THE STATE SAYS AT PAGE

1    8 OF THEIR BRIEF THAT NO ONE DOES THAT FORENSIC

2    EXAMINATION, NEITHER THE COUNTY BOARDS AND NOT VOTERS

3    AND NOT CANDIDATES, THAT NO ONE HAS THAT RIGHT.  AND

4    THAT REALLY IS THE WAY TO MAKE SURE THAT YOUR VOTE

5    COUNTED IN A DRE DISTRICT WHERE THERE IS NO PAPER

6    BALLOT.

7                    I JUST WANT TO SAY ONE BRIEF THING ABOUT

8    REMEDY AND THEN I WILL STOP FOR NOW.  AND THAT IS THAT

9    THE REMEDY WE ARE SEEKING IS REALLY NOT ON THE

10   PRELIMINARY INJUNCTION MOTION WHAT THE DEFENDANTS

11   DESCRIBE.  WE ARE SIMPLY SEEKING TWO THINGS.  ONE IS A

12   FORENSIC EVALUATION OF THE DRE CENTRAL COMPUTER SYSTEM

13   IN SIX COUNTIES, AND WE NAMED THEM IN DR. HALDERMAN'S

14   DECLARATION, ONE COUNTY PER EACH OF THE SIX DRE SYSTEMS

15   USED IN THE STATE.  THAT'S AN EXAMINATION THAT CAN TAKE

16   PLACE IN ONE TO TWO DAYS.  IT'S JUST COPYING A HARD

17   DRIVE.  IT IS DONE IN CIVIL DISCOVERY ALL THE TIME.

18   IT'S FORENSIC IMAGING.  IT CAN BE DONE AT THE EXPENSE OF

19   THE STEIN CAMPAIGN.  IT CAN BE DONE UNDER THE

20   SUPERVISION OF A COUNTY BOARD.  IT CAN BE WRAPPED UP BY

21   MONDAY.  THERE IS NO REASON WHY THIS CAN'T BE DONE BY

22   MONDAY.  SO THERE IS REALLY NO TIMING ISSUE.  AND THEN

23   AS TO -- IT WOULD NOT AFFECT A SINGLE VOTE, BY THE WAY,

24   IN THE SENSE THAT IT WOULD NOT TOUCH A DRE MACHINE.

25                    AND THE OTHER RELIEF, WE'VE ASKED FOR A

1    MANUAL RECOUNT IN OPTICAL SCAN COUNTIES.  AND REALLY

2    WHAT WE WOULD REQUEST, I THINK GIVEN THE EXIGENCIES OF

3    TIME, IS SIMPLY A RECOUNT OF ONE PRECINCT IN EACH OF THE

4    19 OPTICAL SCAN COUNTIES THAT HAVE NOT HAD A RECOUNT.

5    AND THAT CAN BE DONE -- I MEAN, ONE PRECINCT, YOU CAN DO

6    THAT COUNT IN TWO HOURS.  IF THAT WERE DONE EVEN

7    TOMORROW, EACH COUNTY SPENDING TWO HOURS DOING THAT SORT

8    OF A COUNT, WE WOULD HAVE A CROSS CHECK AGAINST THE

9    MACHINES.  SO WE WOULD HAVE A MUCH BETTER SENSE, DID THE

10   OPTICAL SCAN MACHINES WORK OR NOT?

11            SO WITH THAT I WILL STOP FOR NOW, AND I

12   THANK YOUR HONOR FOR THE TIME AND LOOK FORWARD TO THE

13   END OF THE PRESENTATION.

14            THE COURT:  MS. UNGER, MR. JOEL.

15            MR. JOEL:  YES, YOUR HONOR.  I THINK WHAT

16   I WOULD LIKE TO DO, IF POSSIBLE, IS RESERVE FIVE MINUTES

17   OF MY 45 AT THE END FOR SORT OF A CLOSING AND AN

18   ARGUMENT AND GET RIGHT INTO OUR WITNESSES, IF THAT'S

19   OKAY.

20            THE COURT:  OKAY.

21            MR. JOEL:  WE WOULD CALL DR. SHAMOS.

22            THE COURT:  MR. MAAZEL, I WANT TO BE

23   CLEAR, IF DR. HALDERMAN STAYS IN THE COURTROOM DURING

24   THIS TESTIMONY, I'M NOT GOING TO LET YOU CALL HIM AGAIN.

25            MR. MAAZEL:  THAT WAS NOT MY INTENTION,

1       YOUR HONOR.

2                       THE COURT:  OKAY.

3                       PLEASE SWEAR THE WITNESS.

4                       MICHAEL SHAMOS, DEFENSE WITNESS, SWORN.

5                       THE CLERK:  STATE AND SPELL YOUR FULL

6       NAME FOR THE RECORD.

7                       THE WITNESS:  MICHAEL.  I-M-I-A-N.

8       S-H-A-M-O-S.

9                       DIRECT EXAMINATION

10      BY MR. JOEL:

11      Q.       GOOD AFTERNOON, DR. SHAMOS.  WHAT IS YOUR

12      CURRENT POSITION?

13      A.       MY CURRENT POSITION IS -- I HAVE THE TITLE OF

14      DISTINGUISHED CAREER PROFESSOR IN THE SCHOOL OF COMPUTER

15      SCIENCE AT CARNEGIE MELLON UNIVERSITY IN PITTSBURGH.

16      Q.       HOW LONG HAVE YOU DONE THAT?

17      A.       WELL, I HAVE BEEN AFFILIATED WITH CARNEGIE

18      MELLON SINCE 1975.

19      Q.       JUST BRIEFLY TELL US WHAT YOUR EDUCATION IS.

20      A.       WELL, I STARTED OUT IN PHYSICS AT PRINCETON, GOT

21      AN UNDERGRADUATE DEGREE IN PHYSICS.  THEN WENT TO VASSAR

22      COLLEGE WHILE I WAS WORKING FOR IBM, NEAR POUGHKEEPSIE,

23      NEW YORK.  GOT A MASTER'S IN PHYSICS.  THEN DURING

24      VIETNAM I SERVED AS AN OFFICER IN THE UNITED STATES

25      PUBLIC HEALTH SERVICE AT THE NATIONAL INSTITUTES OF

1    HEALTH IN BETHESDA, MARYLAND AND GOT A DEGREE IN

2    TECHNOLOGY OF MANAGEMENT FROM AMERICAN UNIVERSITY.

3              THEN I WENT TO YALE UNIVERSITY, WHICH HAD

4    JUST STARTED A COMPUTER SCIENCE DEPARTMENT.  I WAS THERE

5    BETWEEN 1972 AND 1975.  I GOT THREE DEGREES DURING THAT

6    TIME.  AND ULTIMATELY GOT A PH.D. FROM YALE AND WAS

7    HIRED BY CARNEGIE MELLON UNIVERSITY IN THEIR COMPUTER

8    SCIENCE DEPARTMENT.  WHILE I WAS TEACHING THERE, I GOT A

9    J.D. LAW DEGREE FROM DUQUESNE UNIVERSITY IN PITTSBURGH.

10             MR. JOEL:  MAY I APPROACH, YOUR HONOR?

11             THE COURT:  BEG YOUR PARDON?

12             MR. JOEL:  MAY I APPROACH THE WITNESS?

13             THE COURT:  SURE.

14   BY MR. JOEL:

15   Q.     DR. SHAMOS, IN THE INTEREST OF TIME, TO TRY TO

16   EXPEDITE SOME OF THIS, IS YOUR CV IN THAT PACKET THAT I

17   JUST GAVE YOU, WHICH HAS BEEN MARKED AS D 5?

18             THE COURT:  I HAVE NOT SEEN THIS BEFORE,

19   BUT I HAVE TAKEN A QUICK LOOK AT IT AND I HAVE HEARD DR.

20   SHAMOS'S TESTIMONY.  IS THERE ANY OBJECTION TO MY

21   QUALIFYING -- JUST TO SAVE TIME, TO MY QUALIFYING THE

22   DOCTOR AS AN EXPERT IN WHAT FIELD, DOCTOR?

23             THE WITNESS:  THE FIELD IS ELECTRONIC

24   VOTING AND PARTICULARLY THE ELECTRONIC VOTING PROVISIONS

25   OF THE PENNSYLVANIA ELECTION CODE.

1                    THE COURT:  ANY OBJECTION?

2                    MR. TABAS:  NO OBJECTION, YOUR HONOR.

3                    MS. FRICK:  WE WOULD OBJECT IF HE IS

4     TRYING TO BE QUALIFIED IN THE FIELDS OF CYBER SECURITY

5     OR COMPUTER SECURITY BUT....

6                    THE COURT:  I'M SORRY.  YOUR NAME IS --

7                    MS. FRICK:  I'M SORRY.  MY NAME IS ALISON

8     FRICK FOR PLAINTIFFS.

9                    THE COURT:  MS. FRICK.

10                   DOCTOR, WOULD YOU AGAIN SAY WHAT IT IS,

11    YOU ARE QUALIFIED AS AN EXPERT IN ELECTRONIC VOTING AND

12    IN THE PENNSYLVANIA ELECTION CODE?

13                   THE WITNESS:  IN THE ELECTRONIC VOTING

14    PROVISIONS OF THE PENNSYLVANIA ELECTION CODE.

15                   THE COURT:  THAT IS ALL HE IS BEING

16    QUALIFIED IN.  IS THERE ANY OBJECTION?

17                   MS. FRICK?  THERE IS NO OBJECTION.

18                   THE COURT:  VERY WELL.  HE WILL BE SO

19    QUALIFIED.  PLEASE CONTINUE.

20                   MR. JOEL:  THANK YOU, YOUR HONOR.

21    BY MR. JOEL:

22    Q.      JUST TO HIGHLIGHT ONE ASPECT, DR. SHAMOS, WERE

23    YOU A STATUTORILY ASSIGNED EXAMINER FOR THE COMMONWEALTH

24    OF PENNSYLVANIA AS IT RELATES TO OUR VOTING MACHINES?

25    A.      YES.  BEGINNING IN 1980 WITH THE PASSAGE OF THE

1    ELECTRONIC VOTING SECTION OF THE ELECTION CODE, THE

2    SECRETARY OF THE COMMONWEALTH WAS REQUIRED TO NAME THREE

3    EXAMINERS PURSUANT TO STATUTE TO EXAMINE VOTING SYSTEMS

4    SUBMITTED FOR CERTIFICATION IN PENNSYLVANIA.  I WAS ONE

5    OF THOSE EXAMINERS FOR -- CONTINUOUSLY FOR THE FIRST

6    20 YEARS, FROM 1980 TO 2000.  AND THEN LATER ON I DID IT

7    AGAIN FOR FIVE YEARS.

8    Q.      AND IN CONNECTION WITH YOUR WORK, HAVE YOU HAD

9    THE OPPORTUNITY TO STUDY AND EXAMINE THE VARIOUS DRE'S

10   THAT ARE IN USE WITHIN THE COMMONWEALTH?

11   A.      YES.  I HAVE EXAMINED ALL OF THE DIFFERENT

12   ELECTRONIC VOTING SYSTEMS THAT ARE USED IN PENNSYLVANIA,

13   INCLUDING BOTH DRE'S AND OPTICAL SCANNERS.

14   Q.      WERE YOU INVOLVED -- ARE YOU FAMILIAR WITH THE

15   CASE, THE BANFIELD CASE.

16   A.      VERY.

17   Q.      WERE YOU INVOLVED IN THAT AS AN EXPERT?

18   A.      YES, I WAS.

19   Q.      JUST BRIEFLY WHAT WAS THE RESULT OF THAT AND

20   WHAT WAS YOUR ROLE?

21   A.      WELL, THE ALLEGATION WAS MADE THAT THE VOTING

22   SYSTEMS USED IN PENNSYLVANIA ARE SO INSECURE THAT THEY

23   DEPRIVE PENNSYLVANIA VOTERS OF THEIR CONSTITUTIONAL

24   RIGHT TO HAVE THEIR VOTES BE COUNTED.  AND I WAS AN

25   EXPERT FOR THE COMMONWEALTH, AND WE SUCCESSFULLY

1    RESISTED THAT ACCUSATION.

2    Q.      AND DID THAT CASE GO ON FOR SOME TIME?

3    A.      IT WENT ON FOR A VERY LONG TIME, ULTIMATELY MADE

4    IT TO THE SUPREME COURT OF PENNSYLVANIA.

5    Q.      IN ADDITION TO THE BANFIELD CASE, AM I CORRECT

6    THAT YOU TESTIFIED AS AN EXPERT SEVERAL TIMES WITH

7    REGARDS TO ELECTRONIC VOTING MACHINES?

8    A.      MULTIPLE TIMES, THAT'S CORRECT.  IN TWO KINDS OF

9    CASES, SOME PATENT CASES, AND OTHERS SIMILAR TO THIS ONE

10   IN WHICH THE CHALLENGE WAS BEING RAISED AGAINST THE USE

11   OF ELECTRONIC VOTING.

12   Q.      LET'S GET RIGHT TO THAT THEN.  HAVE YOU HAD AN

13   OPPORTUNITY TO REVIEW THE EXPERT DECLARATIONS AND

14   AFFIDAVITS PROVIDED BY THE PLAINTIFFS IN THIS CASE?

15   A.      YES, I REVIEWED ALL OF THEM.

16   Q.      AND HOW ABOUT THE COMPLAINT THAT THEY FILED AND

17   THE FACTUAL ALLEGATIONS AND THAT SORT OF STUFF?

18   A.      I'VE REVIEWED ALL OF THE FILINGS IN THIS CASE

19   EXCEPT THE MOTIONS FOR PRO HAC ADMISSION.

20   Q.      VERY GOOD.

21              THE COURT:  YOU REALLY DENIED YOURSELF A

22   REAL TREAT.

23              MR. JOEL:  THERE WERE A LOT OF THOSE.

24   BY MR. JOEL:

25   Q.      ARE YOU AWARE -- BASED ON THAT REVIEW OF THE

1    SCENARIOS THAT PLAINTIFFS ARE POSITING AS IT RELATES TO

2    WHY THEY BELIEVE THAT MALWARE CAN BE PUT ON A MACHINE

3    AND THAT SORT OF STUFF?

4    A.    YES, I'M FAMILIAR WITH THEM.  I DON'T KNOW WHAT

5    WAS TESTIFIED TO TODAY BUT....

6    Q.    I UNDERSTAND THAT.  SO LET ME TICK THROUGH --

7    YOU ARE AWARE WHAT THEY PUT FORWARD IN THEIR AFFIDAVITS

8    BECAUSE YOU READ THOSE?

9    A.    YES.

10   Q.    SO IS IT YOUR UNDERSTANDING THAT ONE OF THOSE

11   SCENARIOS IS THAT MALWARE COULD BE PUT ON THE VOTING

12   MACHINES AND THEN I GUESS REMAIN AFTER THE FACT?

13   A.    YES, THAT IS ONE OF THE SCENARIOS.

14   Q.    DO YOU HAVE AN OPINION AS TO WHETHER OR NOT

15   THAT, GIVEN YOUR KNOWLEDGE OF THE ELECTRONIC VOTING

16   MACHINES, THE DRE'S IN THE COMMONWEALTH, DO YOU HAVE AN

17   OPINION AS TO WHETHER OR NOT THAT IS LIKELY OR EVEN

18   POSSIBLE?

19              MS. FRICK:  OBJECTION, YOUR HONOR.  HE

20   HAS NOT BEEN --

21              THE COURT:  OVERRULED.

22              THE WITNESS:  YES, I DO.

23   BY MR. JOEL:

24   Q.    DO YOU HOLD THAT OPINION TO A REASONABLE DEGREE

25   OF CERTAINTY IN YOUR FIELD?

1    A.      YES.

2    Q.      WHAT IS THAT OPINION?

3    A.      OKAY.  SO LET'S BE VERY SPECIFIC ABOUT THIS.

4             IF YOU GET A MACHINE OF ANY KIND INTO A

5    LABORATORY AND YOU ARE ALLOWED UNFETTERED ACCESS TO IT,

6    YOU CAN PLAY AROUND WITH IT AND HACK IT, YOU CAN BREAK

7    INTO ANYTHING.  THE QUESTION IS WHETHER THE SAME KINDS

8    OF MANIPULATIONS WOULD BE POSSIBLE OR PRACTICAL IN A

9    REAL ELECTION GIVEN THE WAY THE VOTING MACHINES ARE

10   STORED, PREPARED FOR USE, TESTED, AND TABULATIONS DONE

11   AND I DON'T THINK IT'S POSSIBLE.

12   Q.      PLEASE EXPLAIN WHY NOT.

13   A.      OKAY.  SO IF THERE IS MALWARE THAT IS PRESENT ON

14   A MACHINE BEFORE THE ELECTION, THEN WHEN WE TRY TO TEST

15   THE MACHINE TO DETERMINE WHETHER OR NOT IT'S GOING TO

16   COUNT VOTES CORRECTLY, IT SHOULD FAIL.  AFTER THE

17   ELECTION, IT SHOULD ALSO FAIL.  IF IT IS THE TYPE OF

18   MALWARE THAT IS SENSITIVE TO TIME, THAT IS IT LOOKS AT

19   THE CLOCK THAT IS ON THE VOTING MACHINE AND SO THAT IT

20   ONLY BEHAVES IMPROPERLY DURING THE ELECTION, THEN THAT

21   KIND OF BEHAVIOR CAN BE TESTED THROUGH A PROCESS CALLED

22   PARALLEL TESTING AND RULED OUT.

23             FURTHERMORE, IF THE MALWARE REMAINS ON

24   THE MACHINE AFTER THE ELECTION, THEN IT'S SIMPLICITY

25   ITSELF TO DETERMINE IF THE MALWARE IS STILL THERE BY

1    COMPARING WHAT'S REFERRED TO AS THE HASH FUNCTION OF THE

2    SOFTWARE WITH RECORDED AND STORED HASH FUNCTIONS IN

3    GOVERNMENTAL LIBRARIES.

4    Q.      AND AS IT RELATES TO THE ABILITY TO PUT THIS

5    MALWARE ON THE CENTRALIZED COMPUTER WHERE THE ELECTION

6    SYSTEM INFORMATION IS STORED?

7    A.      YES.  BUT LET ME FINISH THE PREVIOUS ANSWER.

8    Q.      SURE.  I'M SORRY.  GO AHEAD.

9    A.      BECAUSE WE WERE TALKING ABOUT THE POSSIBILITY OF

10   INFECTING ONE MACHINE.  IT TAKES TIME TO DO THAT.  IT

11   TAKES ACCESS TO THE MACHINE.  ONE HAS TO BREAK SEALS, DO

12   THINGS TO THE MACHINE AND THEN APPLY COUNTERFEIT SEALS

13   BACK TO THE MACHINE IN SUCH A WAY THAT NOBODY NOTICES

14   WHAT IS GOING ON.  AND TO DO THIS TO ANY SIGNIFICANT

15   NUMBER OF MACHINES REQUIRES AN INCREDIBLY LONG TIME.  I

16   DID A CALCULATION EARLIER THIS YEAR AND FOUND THAT IT

17   WOULD TAKE FOUR MONTHS TO DO IT FOR THE DRE MACHINES

18   THAT ARE USED IN MY COUNTY, ALLEGHENY COUNTY.  NOBODY

19   HAS UNFETTERED ACCESS TO THE MACHINE WAREHOUSE FOR FOUR

20   MONTHS WITHOUT BEING OBSERVED.

21                NOW, THE NEXT QUESTION ABOUT THE

22   CENTRAL -- ABOUT THE CENTRAL COMPUTERS.  SO BY CENTRAL

23   COMPUTER WE MEAN A MACHINE THAT IS OPERATED BY A COUNTY

24   AND IS USED PRIMARILY FOR THE PURP -- ACTUALLY FOR

25   SEVERAL PURPOSES.  ONE IS TO MAINTAIN A DATABASE OF THE

1    VARIOUS BALLOT STYLES THAT ARE GOING TO BE USED AT THE

2    POLLING PLACES IN THAT PRECINCT.  ANOTHER THING THAT IT

3    DOES IS, IT MAINTAINS TYPICALLY TABULATION SOFTWARE SO

4    THAT THE RESULTS OF THE ELECTION CAN BE TABULATED IN A

5    CENTRALIZED PLACE SO OVERALL TOTALS CAN BE OBTAINED.

6              THOSE MACHINES, THEY ARE OPERATED UNDER

7    DIFFERENT PROTOCOLS AND PROCESSES IN THE DIFFERENT

8    COUNTIES IN THE STATE.  BUT TYPICALLY THE CENTRAL

9    ELECTION MACHINE IS DEDICATED SOLELY TO THAT PURPOSE AND

10   IS ONLY TURNED ON A FEW TIMES A YEAR.  IT'S NEVER

11   CONNECTED TO THE INTERNET.  AND IT'S NEVER USED FOR ANY

12   OTHER PURPOSE, UNDERSTANDING THAT THE SOFTWARE THAT RUNS

13   ON THE VOTING MACHINES THEMSELVES DOES NOT COME FROM

14   THAT COMPUTER.  AND FURTHERMORE, THE TABULATIONS OF

15   THOSE COMPUTERS DO UNOFFICIAL ONLY, AND THEY ARE USED

16   FOR REPORTING TO THE PRESS ON ELECTION NIGHT.  THEY ARE

17   NOT USED TO DETERMINE WHO THE WINNER OF AN ELECTION IS.

18   Q.      AND WHAT IS A PEB?

19   A.      PEB IS AN ABBREVIATION FOR PORTABLE ELECTRONIC

20   BALLOT.  IT'S A CARTRIDGE ABOUT THE SIZE OF A PACK OF

21   CIGARETTES THAT IS USED WITH THE IVOTRONIC VOTING

22   MACHINES.  WHEN A VOTER PRESENTS THEMSELVES AT THE

23   POLLING PLACE AND ASKS TO VOTE, IF -- AFTER THEY SIGN

24   IN, THEY ARE ESCORTED TO ONE OF THE MACHINES BY A POLL

25   WORKER.  THE POLL WORKER HAS ONE OF THESE PEB'S THAT HAS

1       THE APPROPRIATE BALLOT STYLE FOR THAT PARTICULAR

2       ELECTION THAT THE VOTER IS QUALIFIED TO VOTE IN.   FOR

3       PRESIDENTIAL ELECTION, EVERYONE GETS THE SAME ONE.   BUT

4       FOR PRIMARIES, FOR EXAMPLE, YOU CAN ONLY VOTE IN THE

5       PRIMARY FOR WHICH YOU ARE A REGISTERED VOTER.   SO A

6       DEMOCRAT WOULD GET A DIFFERENT PEB THAN THE REPUBLICAN

7       WOULD.   THE VOTER DOES NOT TOUCH THESE.   THEY ARE

8       INSERTED IN THE MACHINE.   THEY CONTAIN -- IN THAT USAGE

9       THEY ONLY CONTAIN DATA, TELLING THE NAMES OF THE

10      CANDIDATES, THE PARTIES THEY ARE AFFILIATED WITH AND

11      FUNDAMENTALLY GRAPHIC INFORMATION ABOUT HOW THE BALLOT

12      IS TO APPEAR ON THE SCREEN.

13      Q.      THERE IS NO SOFTWARE ON THOSE?

14      A.      WELL, THEY HAVE SOFTWARE ON THEM BECAUSE THEY

15      HAVE TO INTERACT WITH THE MACHINE BUT THEY DON'T HAVE

16      SOFTWARE THAT IS THEN UPLOADED TO THE MACHINE.

17              THE COURT:   WHEN I GO TO VOTE IN

18      PHILADELPHIA, FOR INSTANCE, I HAVE NOTICED IN -- WHEN I

19      WAIT ON LINE IN THE PRIMARY, THE PEOPLE AT THE POLL WILL

20      CALL OUT A POLITICAL PARTY OF THE VOTER PRESUMABLY, AND

21      SOMEBODY WILL PULL ALMOST WHAT LOOKS LIKE AN INK

22      CARTRIDGE OUT OF THE MACHINE AND INSERT ANOTHER ONE.

23      THEN WHEN THE PARTY CHANGES, THEY WILL PULL OUT THE INK

24      CARTRIDGE AND INSERT THE FIRST ONE.   IS THAT WHAT YOU

25      ARE TALKING ABOUT?

```
 1                      THE WITNESS:  THAT'S RIGHT.  IT'S

 2       DIFFERENT IN PHILADELPHIA THAN IT IS IN PITTSBURGH.

 3                      THE COURT:  ALWAYS.

 4                      THE WITNESS:  THE CONCEPT IS THE SAME.

 5       BY MR. JOEL:

 6       Q.       AND WHEN WE -- WHEN WE ARE TALKING ABOUT THE

 7       CENTRALIZED COMPUTER AND THE PEB'S, WHEN WE ARE ON --

 8       WHEN THE MACHINES ARE OPENED, IS THERE THE ABILITY TO

 9       HAVE THAT MACHINE ACCEPT NEW SOFTWARE?

10       A.       WELL, YOU MEAN OPEN FOR VOTING?

11       Q.       YES.

12       A.       THE POLLS BEING OPEN, NO.

13                      SO THE CENTRAL COMPUTER IS WHERE I SAID

14       EARLIER IS THE DATABASE OF ALL OF THE CANDIDATES AND

15       OFFICES AND QUESTIONS, WHATEVER IS GOING TO BE ON THE

16       BALLOTS IN ANY OF THE POLLING PLACES IN THAT COUNTY,

17       THEY ARE GOING TO BE IN A DATABASE ON THE CENTRAL

18       MACHINE.  THE CENTRAL MACHINE IS THEN USED TO MAKE -- TO

19       PUT THAT DATA ONTO PEB'S WHICH ARE THEN DISTRIBUTED TO

20       THE POLLING PLACES SO THEY HAVE THE APPROPRIATE BALLOT

21       STYLES.  THAT IS ONE USE OF THE PEB'S.

22                      ANOTHER USE OF THE PEB'S IS ALSO TO

23       DISTRIBUTE NEW VERSIONS OF SOFTWARE.  WHEN THERE IS A

24       MAINTENANCE RELEASE, FOR EXAMPLE, THAT HAS BEEN APPROVED

25       BY THE SECRETARY OF THE COMMONWEALTH, THE WAY THAT IS
```

1    INSTALLED IN THE DIFFERENT VOTING MACHINES IS TO OPEN

2    THEM UP IN A DIFFERENT MODE THAN IS USED DURING THE

3    ELECTION, THEY ARE OPENED IN MAINTENANCE MODE.  THEN THE

4    PEB IS INSERTED AND IT OVERWRITES THE SOFTWARE THAT IS

5    ON THE MACHINE.  THIS CANNOT BE DONE DURING AN ELECTION

6    BECAUSE WHEN THE POLLS HAVE BEEN OPENED, IT WILL NOT GO

7    INTO THE MODE THAT ALLOWS NEW SOFTWARE TO BE UPLOADED.

8    ONE WOULD HAVE TO CLOSE THE POLLS.  AND WHEN YOU CLOSE

9    THE POLLS, OF COURSE A TOTALS TAPE IS PRODUCED.  I'M

10   IMAGINING A SCENARIO IN WHICH A VOTER WALKS INTO A

11   POLLING PLACE WITH ONE OF THESE -- A FORGED PEB IN HIS

12   POCKET WITH THE INTENTION OF CHANGING THE SOFTWARE ON

13   THE VOTING MACHINE.  IN ORDER TO MAKE THAT WORK, HE

14   WOULD TO HAVE CLOSE THE POLLS AND CAUSE THAT TOTALS TAPE

15   TO BE PRODUCED.  THEN HE WOULD HAVE TO OPEN THE POLLS.

16   AND WHEN HE OPENS THE POLLS, THERE IS ANOTHER TAPE THAT

17   IS PRODUCED CALLED A ZERO TAPE TO PROVE THAT THERE ARE

18   NO VOTES ON THE MACHINE.  THAT TAPE HAS TO BE SIGNED BY

19   THE JUDGES OF ELECTION.  SO THERE IS NO CONCEIVABLE WAY

20   THAT A VOTER HIMSELF COULD DO ANYTHING LIKE THIS BECAUSE

21   HE IS NOT THE JUDGE OF ELECTION.  WE ARE GOING TO NOTICE

22   IF IN THE MIDDLE OF AN ELECTION, THE VOTING MACHINE

23   STARTS PRINTING ITS TOTALS TAPE.

24   Q.      MOVING ON TO ANOTHER SCENARIO, THIS SUPER

25   SOPHISTICATED MALWARE THAT WILL DISAPPEAR AT THE END.

1      DO YOU HAVE AN OPINION AS TO WHETHER THE DRE'S AND THE

2      OTHER VOTING MACHINES IN THE COMMONWEALTH ARE -- WHETHER

3      THAT IS A LIKELY SCENARIO OR A POSSIBLE SCENARIO TO HAVE

4      HAPPEN --

5      A.    YES.

6      Q.    -- TO ALTER AN ELECTION?

7      A.    I DO.

8              MS. FRICK:  OBJECTION, YOUR HONOR.  THIS

9      GOES BEYOND THE SCOPE OF HIS EXPERTISE.

10            THE COURT:  OVERRULED.

11     BY MR. JOEL:

12     Q.    DO YOU HAVE THAT OPINION WITHIN A REASONABLE

13     DEGREE OF CERTAINTY IN YOUR FIELD?

14     A.    YES.

15     Q.    WHAT'S YOUR OPINION?

16     A.    THIS SCENARIO WAS DREAMED UP SOMEWHERE AROUND

17     TEN YEARS AGO.  IT CAME UP FIRST IN -- AT THE OFFICE OF

18     THE SECRETARY OF STATE OF CALIFORNIA.  AND I HAD A

19     CONFERENCE CALL WITH THE EXAMINERS FOR CALIFORNIA OVER

20     THIS VERY SCENARIO.  AND THEY ASKED ME WHETHER THERE WAS

21     ANY WAY OF PREVENTING IT OR AT LEAST DETECTING IT IF IT

22     OCCURRED.  AND THAT IS WHERE I BASICALLY DEVISED THE

23     METHOD NOW CALLED PARALLEL TESTING, IN WHICH A NUMBER OF

24     MACHINES WOULD BE SEQUESTERED DURING THE ELECTION.  THEY

25     WOULD BE OPENED AS NORMAL AS IF THEY WERE GOING TO BE

1    VOTED ON BY REAL VOTERS.  BUT INSTEAD OF BEING VOTED ON

2    BY REAL VOTERS, THEY WOULD BE VOTED ON BY COUNTY

3    EMPLOYEES FOLLOWING A PARTICULAR SCRIPT OF EXACTLY WHOM

4    SHOULD BE VOTED FOR.  AND THE IDEA IS WE WOULD KNOW IN

5    ADVANCE WHAT THE TOTALS WOULD BE IF THOSE BALLOTS WERE

6    CAST THAT WAY.  AND THEN DURING THE ELECTION, ALL DAY

7    LONG, UNTIL THE POLLS CLOSE, THE COUNTY EMPLOYEES VOTE

8    ON THESE MACHINES.  AND AT THE END, WHAT WE'LL DO IS WE

9    WILL PRINT THE TOTALS TAPE.  NOW LET'S SUPPOSE THERE WAS

10   MALWARE IN THERE THAT ERASED ITSELF AT THE CLOSE OF

11   POLLS SO WE CAN'T DO A FORENSIC EXAMINATION AND

12   DETERMINE WHETHER OR NOT THAT PARTICULAR SOFTWARE IS IN

13   THERE.  UNLESS -- IF THE MALWARE WERE GOING TO BE

14   SWAPPING VOTES, THEN WE WOULD GET THE WRONG TOTALS.

15              I HAVE ALSO CHALLENGED MY COLLEAGUES WHO

16   HAVE COME UP WITH THIS SCENARIO, TO WRITE DOWN, SHOW ME

17   A SOFTWARE ARCHITECTURE THAT WOULD ACTUALLY PERMIT THIS

18   TO BE DONE.  WHAT THEY SAY IS ESSENTIALLY WE DON'T HAVE

19   TO DO THAT.  ALL WE HAVE TO DO IS HAVE YOU PROVE TO US

20   THAT IT CAN'T BE DONE.  AND ONE OF THE THINGS YOU WOULD

21   HAVE TO DO OF COURSE IS YOU CAN'T WILLY-NILLY MOVE VOTES

22   FROM ONE PARTY OR ONE CANDIDATE TO ANOTHER AT WILL.  THE

23   REASON IS THAT TREMENDOUS SUSPICION WOULD BE RAISED

24   IMMEDIATELY IF THE VOTES WERE SUFFICIENTLY OUT OF WHACK

25   IN A PARTICULAR PRECINCT EVEN, LET ALONE A COUNTY.

1    WHICH MEANS THAT THIS SUPER WONDERFUL MALWARE HAS TO

2    HAVE WITHIN IT A DATABASE OF ALL OF THE PRECINCTS IN

3    PENNSYLVANIA AND KNOW EXACTLY AS OF ELECTION DAY HOW

4    MUCH IT'S POSSIBLE TO MOVE THE VOTE WITHOUT PEOPLE

5    GETTING SUSPICIOUS.  AS WE KNOW FROM POLLING WHETHER OR

6    NOT SOMEONE IS LIKELY TO WIN THE ELECTION, THE

7    ASSESSMENT OF THAT CHANGES TREMENDOUSLY DURING THE DAYS

8    LEADING UP TO THE ELECTION.  SO IF THIS MALWARE IS

9    SOMEHOW IMPLANTED IN THE MACHINE LONG IN ADVANCE OF THE

10   ELECTION, IT CAN'T POSSIBLY OPERATE PROPERLY.

11                  ANOTHER THING THAT I'VE CHALLENGED THEM

12   WITH, AND NOBODY HAS COME UP WITH AN ANSWER TO IT, IS TO

13   ACTUALLY SHOW ME THIS CODE THAT WE CANNOT DETECT AS

14   PRESENT IN THE MACHINE AFTER THE ELECTION.  WE CAN

15   CERTAINLY DETECT THAT IT IS PRESENT IN THE MACHINE

16   BEFORE THE ELECTION, BECAUSE IT HAS NOT HAD A CHANCE TO

17   ERASE ITSELF.  I CHALLENGED THEM AGAIN TO TELL ME HOW

18   ONE WOULD EVER INTRODUCE THIS MALWARE INTO A SUFFICIENT

19   NUMBER OF VOTING MACHINES TO CAUSE ANY REAL CHANGE IN

20   THE ELECTION.  NOBODY HAS EVER BEEN ABLE TO COME UP WITH

21   THAT.  NO ONE HAS EVER WRITTEN ABOUT IT EVEN.

22   Q.     YOU'VE MENTIONED A COUPLE OF TIMES LOGS AND

23   PRINTOUTS AND THINGS LIKE THAT.  AND I JUST WANT TO MAKE

24   SURE THAT THIS IS COVERED.  DO YOU UNDERSTAND ONE OF THE

25   POSITIONS THE PLAINTIFFS ARE TAKING IS THAT THE DRE'S

1    ARE PAPERLESS?

2    A.      YES.  THE WORD IS USED FREQUENTLY AND

3    PEJORATIVELY TO DESCRIBE ELECTRONIC VOTING MACHINES.

4    Q.      ARE THESE ELECTRONIC VOTING MACHINES PAPERLESS?

5    A.      THERE IS NOT A SINGLE PAPERLESS VOTING MACHINE

6    IN PENNSYLVANIA, AND I DON'T KNOW OF ANY IN THE REST OF

7    THE COUNTRY.  IN FACT, IT'S A REQUIREMENT OF THE

8    PENNSYLVANIA ELECTION CODE THAT EVERY MACHINE BE CAPABLE

9    OF MAINTAINING A PERMANENT PHYSICAL RECORD OF EVERY VOTE

10   CAST.  AND WE IN THE DEPARTMENT OF STATE, WHEN I WAS

11   DOING EXAMINATIONS, INTERPRETED PERMANENT PHYSICAL

12   RECORD TO MEAN PAPER OR ITS EQUIVALENT, NOT AN

13   ELECTRONIC RECORD IN FIRMWARE.

14   Q.      I WOULD LIKE TO TALK TO YOU ABOUT ANOTHER

15   SCENARIO POSITED, THE RUSSIANS HACKING OF THE DNC IN

16   ARIZONA AND ILLINOIS AND THAT THING.  DO YOU HAVE AN

17   OPINION AS TO THE LIKELIHOOD OF WHETHER THAT WOULD HAVE

18   HAPPENED?

19   A.      WELL, I'M NOT GIVING YOU AN OPINION ON WHETHER

20   THE RUSSIANS HACKED THE DNC OR NOT.  I THINK YOU ARE

21   ASKING ME WHETHER THE RUSSIANS COULD HAVE HACKED THE

22   VOTING SYSTEM OF PENNSYLVANIA.

23   Q.      SURE.

24   A.      AS FAR AS I KNOW, THE DNC DOES NOT RUN

25   PENNSYLVANIA ELECTIONS.  AS FAR AS I KNOW, THE SERVER

1    THAT WAS HACKED INTO AT THE DNC WAS AN E-MAIL SERVER.

2    WE DON'T CONDUCT ELECTIONS IN PENNSYLVANIA VIA E-MAIL.

3    SO NOBODY HAS TOLD ME IN THIS RUSSIAN HACK SCENARIO

4    EXACTLY WHAT IT WOULD BE THAT THEY WOULD BE HACKING.

5    THERE IS NOT A CENTRAL PLACE IN PENNSYLVANIA THAT HAS A

6    COMPUTER THAT YOU COULD HACK THAT WOULD CHANGE THE

7    OUTCOME OF AN ELECTION.   THERE ARE CENTRAL COMPUTERS

8    THAT MAINTAIN RECORDS OF REGISTERED VOTERS.   THAT IS A

9    DIFFERENT SCENARIO.

10   Q.      WHILE WE ARE TALKING ABOUT IT, IN PENNSYLVANIA,

11   IS IT YOUR UNDERSTANDING THAT THE ELECTION PROCESS IS

12   VERY DECENTRALIZED DOWN TO THE COUNTY AND EVEN PRECINCT

13   LEVEL?

14   A.      WELL, IT IS DECENTRALIZED IN MOST OF THE

15   COUNTRY.   ELECTIONS ARE CONDUCTED COUNTY BY COUNTY IN

16   THE UNITED STATES, AND I THINK THERE ARE ABOUT SOMETHING

17   LIKE 3,150 COUNTIES.

18                MS. FRICK:   OBJECTION, YOUR HONOR.   THIS

19   GOES BEYOND THE SCOPE OF HIS EXPERTISE.

20                THE COURT:   OVERRULED.

21                THE WITNESS:   IN PENNSYLVANIA WE HAVE A

22   NUMBER OF DIFFERENT TYPES OF VOTING SYSTEMS COMING FROM

23   DIFFERENT MANUFACTURERS THAT ARE USED IN GEOGRAPHICALLY

24   DISPARATE PARTS OF THE STATE.

25                THE COURT:   BEFORE YOU CONTINUE, I

1    APOLOGIZE.  JUST IN LIGHT OF MS. FRICK'S OBJECTIONS, I

2    ASSUME YOU ARE MOVING TO ADMIT THE AFFIDAVIT OF DR.

3    SHAMOS AND HIS REPORT?

4                   MR. JOEL:  YES, YOUR HONOR.  I WAS GOING

5    TO DO IT AT THE CLOSE OF HIS TESTIMONY, BUT, YES.

6                   THE COURT:  I'M LARGELY OVERRULING YOUR

7    OBJECTIONS, MS. FRICK, BASED ON WHAT I HAVE SEEN IN

8    THESE DOCUMENTS.

9                   GO ON, DOCTOR.  I APOLOGIZE.  THEY WILL

10   BE ADMITTED.

11                   THE WITNESS:  WHERE WERE WE?

12   BY MR. JOEL:

13   Q.     YOU WERE TALKING ABOUT THE DECENTRALIZED

14   NATURE --

15                   THE COURT:  ALL OVER -- LARGELY

16   DECENTRALIZED ALL OVER THE COUNTRY.

17                   THE WITNESS:  AND IT'S DECENTRALIZED ALSO

18   IN PENNSYLVANIA.  THERE IS NO CENTRAL PLACE THAT ONE

19   COULD ATTACK THAT WOULD INFECT THESE VARIOUS COMPLETELY

20   DIFFERENT VOTING SYSTEMS THAT ARE DISTRIBUTED BY TOTALLY

21   DIFFERENT MANUFACTURERS.  ONE WOULD HAVE TO ATTACK, IF

22   ANYTHING, THE INDIVIDUAL COUNTIES.  AS I SAID BEFORE,

23   WHAT YOU WOULD BE ATTACKING THERE, AND I'M NOT SURE HOW

24   YOU WOULD DO IT BECAUSE THEY ARE NOT CONNECTED TO THE

25   INTERNET.  BUT EVEN IF YOU WERE ABLE TO ATTACK THE

1    COUNTY CENTRAL COMPUTER, THAT IS NOT AN EFFECTIVE WAY TO

2    GET MALWARE DOWN TO ANY OF THE VOTING MACHINES.

3    BY MR. JOEL:

4    Q.     LET'S TALK ABOUT THE STUXNET.  ARE YOU AWARE

5    THAT THAT IS ONE OF THE SCENARIOS THAT PLAINTIFFS ARE

6    POSITING?

7                   MS. FRICK:  I'M SORRY, YOUR HONOR.  I

8    HAVE TO OBJECT.

9                   THE COURT:  WELL IT'S IN ONE OF YOUR

10   AFFIDAVITS SO I'M GOING TO OVERRULE IT.

11                  THE WITNESS:  YES.

12   BY MR. JOEL:

13   Q.     DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THAT

14   IS A POSSIBLE WAY TO AFFECT THE PENNSYLVANIA VOTING

15   MACHINES SUCH THAT VOTES WOULD BE ALTERED?

16   A.     YEAH, I DO HAVE AN OPINION.

17   Q.     IS THAT WITHIN A REASONABLE DEGREE OF CERTAINTY

18   IN YOUR FIELD?

19   A.     YES.

20   Q.     WHAT IS THE OPINION?

21   A.     OKAY.  WELL, LET'S LOOK AT WHAT HAPPENED WITH

22   STUXNET.  SO FOR YEARS THE OPPONENTS OF ELECTRONIC

23   VOTING HAVE BEEN STYMIED BY THE IDEA THAT IF A MACHINE

24   IS NOT CONNECTED TO THE INTERNET, THEN NORMAL HACKING

25   TECHNIQUES WILL NOT GET TO IT.  AFTER STUXNET THEY GOT

1    AN IDEA, WHICH IS, AND STUXNET PROVES, THAT YOU CAN

2    INFECT A MACHINE EVEN IF IT IS NOT CONNECTED TO THE

3    INTERNET AND NEVER IN ITS LIFE HAS BEEN CONNECTED TO THE

4    INTERNET.  I AGREE WITH THAT.

5              SO WHAT THE STUXNET WORM WAS, IT WAS

6    MALWARE THAT WAS INSERTED AT THE MANUFACTURER.  IT WAS

7    SIEMENS, WHO WAS THE MANUFACTURER OF THE IRANIAN

8    CENTRIFUGES.  BECAUSE IT WAS INFECTED AND NO TESTING WAS

9    DONE, THE WORM MADE IT INTO IRANIAN CENTRIFUGES.  IT

10   ACTUALLY MADE IT INTO MANY OTHER CENTRIFUGES, TOO, BUT

11   WAS PROGRAMMED TO ONLY ATTACK THE IRANIAN ONES.

12             NOW, THIS IS NOT FEASIBLE HERE, WITH

13   VOTING SYSTEMS, FOR SEVERAL REASONS.  FIRST OF ALL, WE

14   DID NOT JUST GO BUY THESE SYSTEMS YESTERDAY, AND SO THIS

15   -- IF SUCH A WORM EXISTS IN VOTING SYSTEMS IT IS THERE

16   NOW.  AND IT WOULD BE DISCOVERED DURING THE INDEPENDENT

17   TESTING AUTHORITY TESTING.  AND IF IT HAD BEEN

18   INTRODUCED AFTER THAT, THEN THERE WOULD HAVE TO BE A NEW

19   VERSION OF THE SOFTWARE ACTUALLY PHYSICALLY DELIVERED TO

20   EACH MACHINE.  SO IT'S THE SAME THING AS HAVING TO GO

21   AND MODIFY 4200 MACHINES IN A PARTICULAR COUNTY.  THERE

22   IS NO PRACTICAL WAY IN WHICH IT COULD CAN BE DONE,

23   ALTHOUGH YES, IT'S TRUE, THE IRANIAN CENTRIFUGES WERE

24   NOT CONNECTED TO THE INTERNET.

25   Q.     AND IN REVIEWING THE PLAINTIFFS' MATERIALS, WAS

1    THERE SOME ARTICLE IN THERE ABOUT UKRAINE AND THEIR

2    ELECTION?

3    A.      YES, THERE WAS.

4    Q.      DOES THAT HAVE ANY IMPACT IN YOUR CONCLUSIONS

5    THAT THE VOTING MACHINES HERE IN THE COMMONWEALTH ARE

6    NOT SUSCEPTIBLE TO HACKING -- AN ALTERATION?

7    A.      YEAH, I READ THAT ARTICLE.  AND BASICALLY WHAT

8    IT SAID WAS THAT THERE WERE SUSPICIONS THAT THE RUSSIANS

9    ATTACKED WHAT'S REFERRED TO IN THE UKRAINE AS THE

10   CENTRAL ELECTION COMMISSION.  SO THE CENTRAL ELECTION

11   COMMISSION IS A PLACE FROM WHICH INFORMATION ABOUT THE

12   ELECTION IS DISTRIBUTED ALL THROUGH THE COUNTRY.  WE

13   DON'T HAVE ANYTHING LIKE THAT.  SO THERE IS NO CENTRAL

14   PLACE THAT ONE COULD GO AND ATTACK IN SUCH A MANNER.

15   IT'S SIMILAR TO THE RUSSIAN DNC HACK SCENARIO.

16   Q.      SO JUST TO SUMMARIZE, I HAVE ONE MORE EXHIBIT TO

17   SHOW YOU.  IS IT YOUR OPINION THAT THESE SCENARIOS

18   POSITED BY PLAINTIFF ARE NOT POSSIBLE AS A WAY OF

19   INFECTING AND AFFECTING THE VOTES HERE IN THE

20   COMMONWEALTH?

21   A.      WELL, IT'S TOUGH TO SAY THAT SOMETHING IS

22   IMPOSSIBLE.

23   Q.      I DID NOT SAY IMPOSSIBLE.  I SAID IS IT

24   POSSIBLE?

25   A.      I THINK THAT IS THE OPPOSITE OF IMPOSSIBLE.  BUT

1    I THINK THE IDEA IS THAT -- MY FEELING IS THAT THE

2    SCENARIOS THAT HAVE BEEN POSITED ARE APPROXIMATELY AS

3    LIKELY AS THE FACT THAT ANDROIDS FROM OUTER SPACE ARE

4    LIVING AMONGST US AND PASSING AS HUMANS.  IT MIGHT BE

5    POSSIBLE, YET THERE IS NOT ANY EVIDENCE THAT IT IS

6    HAPPENING.

7    Q.      AND YOU SAID IT WAS YOUR FEELING.  IS THAT ALSO

8    YOUR EXPERT OPINION?

9    A.      YES.

10                   MR. JOEL:  MAY I APPROACH ONE MORE TIME,

11   YOUR HONOR?

12                   THE COURT:  YES.

13   BY MR. JOEL:

14   Q.      SHOWING YOU WHAT HAS BEEN MARKED AS D 6.  CAN

15   YOU IDENTIFY FOR US WHAT THOSE ARE AND THE SIGNIFICANCE

16   OF THEM?

17   A.      YES.  SO THESE ARE THE REPORTS THAT THE

18   SECRETARY OF THE COMMONWEALTH IS REQUIRED TO FILE UPON

19   CERTIFYING A VOTING SYSTEM, AND THERE ARE SIX OR SEVEN

20   OF THESE.  ALL OF THE VOTING SYSTEMS IN PENNSYLVANIA,

21   USED IN PENNSYLVANIA WERE SUBJECTED TO RECERTIFICATION

22   IN 2012, I THINK AS A RESULT OF THE BANFIELD CASE, NOT

23   BECAUSE IT WAS ORDERED BUT BECAUSE THE SECRETARY OF THE

24   COMMONWEALTH THOUGHT THAT IT WOULD BE PRUDENT TO DO

25   THAT.  SO THESE ARE THE SECRETARY'S REPORTS FROM ALL OF

1     THOSE EXAMINATIONS.

2     Q.     AND THOSE ARE FOR THE MACHINES, THE DRE'S THAT

3     ARE -- WERE IN USE IN THIS LAST ELECTION?

4     A.     YES.

5     Q.     ALL OF THEM WERE CERTIFIED AS BEING APPROPRIATE

6     TO USE FOR THE ELECTION?

7     A.     YES.  IN FACT, VIRTUALLY ALL OF THESE BEGIN WITH

8     A PARAGRAPH THAT TALKS ABOUT THE EXAMINATION THAT I DID

9     OF THOSE SYSTEMS SOME YEARS EARLIER, AND THEN DISCUSSION

10    ABOUT WHAT WAS DONE SUBSEQUENTLY DURING THE

11    RE-EXAMINATION EXAMS.

12              MR. JOEL:  I WOULD MOVE FOR THE ADMISSION

13    OF D 6, AND WITH THAT I HAVE NO MORE QUESTIONS FOR YOU.

14              THE COURT:  ANY OBJECTION?

15              MS. FRICK:  NO OBJECTION, YOUR HONOR.

16              MR. TABAS:  NONE, YOUR HONOR.

17              THE COURT:  VERY WELL.  IT WILL BE

18    ADMITTED.

19              (DEFENSE EXHIBIT D 6, ADMITTED INTO

20    EVIDENCE.)

21              THE COURT:  DO YOU HAVE ANY QUESTIONS FOR

22    THIS WITNESS, MR. TABAS?

23              MR. TABAS:  NO, I DON'T, YOUR HONOR.

24              THE COURT:  MS. FRICK.

25              MS. FRICK:  THANK YOU.

```
 1                        THE COURT:  THIS COUNTS AGAINST THEIR

 2       TIME.

 3                        MS. FRICK:  I'M WELL AWARE.

 4                        THE COURT:  SO SPEAK SLOWLY.

 5                        CROSS EXAMINATION

 6       BY MS. FRICK:

 7       Q.        GOOD AFTERNOON, DR. SHAMOS.

 8       A.        GOOD AFTERNOON.

 9       Q.        AM I PRONOUNCING YOUR NAME CORRECTLY?

10       A.        YES, YOU ARE.

11       Q.        MR. SHAMOS, YOU SAID THAT YOU HAVE TESTIFIED IN

12       A NUMBER OF CASES BEFORE, IS THAT RIGHT?

13       A.        YES.

14       Q.        AND IN SOME OF THOSE CASES YOU'VE TESTIFIED AS

15       AN EXPERT FOR SEQUOIA, IS THAT RIGHT?

16       A.        IN PATENT CASES, YES.

17       Q.        AND SEQUOIA IS A MANUFACTURER OF VOTING

18       MACHINES?

19       A.        YES.

20       Q.        THEY MANUFACTURE MACHINES THAT ARE USED IN

21       PENNSYLVANIA, IS THAT RIGHT?

22       A.        YES.

23       Q.        AND YOU HAVE BEEN PAID BY SEQUOIA FOR THAT

24       TESTIMONY, RIGHT?

25       A.        YES, I HAVE.
```

1    Q.       YOU HAVE BEEN PAID HUNDREDS OF THOUSANDS OF

2    DOLLARS, RIGHT?

3    A.       ULTIMATELY, YES.

4    Q.       AND YOU EXPECT TO BE PAID HUNDREDS OF THOUSANDS

5    OF DOLLARS IN THE FUTURE FOR YOUR WORK WITH SEQUOIA,

6    RIGHT?

7    A.       IF I DO ANY.  THERE AREN'T ANY -- I HAVE NO

8    CURRENT CASES INVOLVING SEQUOIA.

9    Q.       WERE YOU -- HAD YOU WORKED AS AN EXPERT FOR

10   SEQUOIA IN 2006?

11   A.       NO.

12   Q.       WHEN WAS THE FIRST TIME THAT YOU WORKED AS AN

13   EXPERT FOR SEQUOIA?

14   A.       I THINK I CAN HELP YOU WITH THIS LINE OF

15   QUESTIONING BY TELLING YOU THAT SINCE ACCEPTING ANY

16   MONEY FROM ANY ELECTION SYSTEM VENDOR, I HAVE NOT

17   PERFORMED ANY VOTING SYSTEM EXAMINATIONS EITHER FOR THAT

18   VENDOR OR FOR A DIFFERENT VENDOR.

19   Q.       SO WERE YOU A PAID EXPERT FOR SEQUOIA IN 2006?

20   A.       NO.  THAT IS A CONSEQUENCE OF THE ANSWER I JUST

21   GAVE.

22   Q.       WHEN WAS THE FIRST TIME THAT YOU WERE A PAID

23   EXPERT FOR SEQUOIA?

24   A.       I DON'T RECALL, BUT IT WAS AFTER 2006.

25   Q.       HAVE YOU EVER BEEN DENIED TENURE AS A COMPUTER

1        SCIENCE PROFESSOR?

2        A.      NO.

3        Q.      AT CARNEGIE MELLON?

4        A.      NO.

5                        THE COURT:  I'M SORRY.  IF YOU HAD

6        QUESTIONS ABOUT HIS EXPERTISE, YOU SHOULD HAVE ASKED

7        THEM BEFORE I QUALIFIED HIM.  I WOULD ASK YOU TO MOVE ON

8        TO THE SUBSTANCE OF HIS TESTIMONY.

9                        MS. FRICK:  YES, I AM MOVING ON, YOUR

10       HONOR.

11       BY MS. FRICK:

12       Q.      IN 2004, YOU TESTIFIED BEFORE CONGRESS, IS THAT

13       RIGHT?

14       A.      YES.

15       Q.      AND YOU SAID THERE:  I'M HERE TODAY TO OFFER MY

16       OPINION THAT THE SYSTEM WE HAVE FOR TESTING AND

17       CERTIFYING VOTING EQUIPMENT IN THIS COUNTRY IS NOT ONLY

18       BROKEN, BUT IT IS VIRTUALLY NONEXISTENT.  IS THAT RIGHT?

19       A.      THAT'S RIGHT.

20       Q.      AND IN 2006 YOU TESTIFIED AGAIN BEFORE CONGRESS,

21       RIGHT?

22       A.      YES.

23       Q.      YOU REPEATED THAT OPINION.  YOU SAID THAT YOU

24       REAFFIRM IT.  IS THAT RIGHT?

25       A.      THAT'S RIGHT.

1    Q.      NOW, DO YOU REMEMBER GIVING AN INTERVIEW TO THE

2    HILL, IT'S A PUBLICATION, IN 2014?

3    A.      I DON'T RECALL IT, BUT I DON'T DENY THAT I DID

4    IT.

5    Q.      YOU WERE ASKED ABOUT POTENTIAL HACKING OF VOTING

6    MACHINES.  AND YOU SAID -- ISN'T IT TRUE THAT YOU TOLD

7    THE HILL THAT IT WOULD BE POSSIBLE TO STEAL A COUPLE

8    HUNDRED VOTES FOR YOUR GUY.  IS THAT RIGHT?

9    A.      YES.  YES.  THERE ARE MANY WAYS OF DOING THAT,

10   WHETHER THE ELECTION IS AN ELECTRONIC ONE OR A PAPER

11   ONE.

12   Q.      AND ARE YOU AWARE THAT THIS MORNING PRESIDENT

13   OBAMA ORDERED A REVIEW OF ALL EVIDENCE OF HACKING INTO

14   THIS ELECTION?

15   A.      YES, I AM.

16   Q.      AND WOULD YOU SAY THAT HE HAD THE SAME FACTUAL

17   BASIS FOR ORDERING THAT REVIEW AS HE WOULD HAVE HAD HE

18   ORDERED A REVIEW OF WHETHER ALIENS ARE LIVING AMONG US?

19   A.      IF THERE WERE EVIDENCE THAT ALIENS WERE LIVING

20   AMONG US, I WOULD THINK IT INCUMBENT UPON THE PRESIDENT

21   TO HAVE THAT INVESTIGATED.

22   Q.      I TAKE IT BY THAT ANSWER YOU AGREE THAT THERE IS

23   EVIDENCE OF HACKING IN THIS ELECTION?

24   A.      THERE IS EVIDENCE THAT ATTEMPTS HAVE BEEN MADE

25   TO ACCESS VOTING CENTRALIZED COMPUTERS IN THE UNITED

1      STATES.

2      Q.      YOU AGREE THERE IS EVIDENCE THAT THERE HAS BEEN

3      HACKING IN THIS ELECTION?

4      A.      NO.  I DON'T AGREE WITH THAT.  I AGREE THERE IS

5      EVIDENCE THAT ATTEMPTS HAVE BEEN MADE.  IN FACT, THERE

6      IS NO EVIDENCE THAT ANYTHING WAS HACKED.

7      Q.      NOW, THE DRE MACHINES THAT ARE USED IN

8      PENNSYLVANIA USE REMOVABLE MEDIA, IS THAT RIGHT?

9      A.      AMONG NONREMOVABLE MEDIA ALSO, THEY DO HAVE

10     REMOVABLE MEDIA, THAT IS TRUE.

11     Q.      THAT REMOVABLE MEDIA INCLUDES THINGS LIKE MEMORY

12     CARTRIDGES, RIGHT?

13     A.      YES.

14     Q.      THE CARTRIDGES HAVE THE BALLOT INFORMATION ON

15     THEM?

16     A.      WELL, SO SOME DO, SOME DON'T.  THE PEB'S THAT WE

17     WERE TALKING DO HAVE BALLOT INFORMATION ON THEM, YES.

18     Q.      BUT FOR THE OTHER MACHINES THAT DON'T USE PEB'S,

19     THERE ARE MEMORY CARTRIDGES THAT HAVE THE BALLOT

20     INFORMATION ON THEM, RIGHT?

21     A.      THERE ARE MEMORY CARTRIDGES.  THE QUESTION IS

22     WHETHER THOSE ARE INSERTED FOR INDIVIDUAL VOTERS OR

23     WHETHER THEY ARE INSERTED AT THE BEGINNING OF THE

24     ELECTION.  BUT THERE CERTAINLY ARE MEMORY CARTRIDGES

25     THAT HAVE BALLOT INFORMATION, YES.

1   Q.      THAT BALLOT INFORMATION, WHETHER IT IS FROM

2   MEMORY CARTRIDGES OR FOR PEB'S, AS YOU TESTIFIED, IS

3   PROGRAMMED AT A CENTRAL ELECTION MANAGEMENT COMPUTER,

4   RIGHT?

5   A.      YES, BUT THAT BALLOT INFORMATION IS DATA.  IT'S

6   NOT CODE.

7   Q.      I UNDERSTAND.  MY QUESTION IS, AND THAT -- WHERE

8   IT IS PROGRAMMED CAN BE THE COUNTY'S CENTRAL ELECTION

9   MANAGEMENT COMPUTER, RIGHT?

10  A.      IT USUALLY IS.

11  Q.      AND AFTER THE ELECTION, THE PEB'S AND THE --

12  AND/OR THE MEMORY CARTRIDGES, DEPENDING ON THE TYPE OF

13  MACHINE, CARRY THE VOTE TALLIES BACK TO THE CENTRAL

14  COMPUTER MACHINE.

15  A.      FOR UNOFFICIAL PURPOSES ONLY.

16  Q.      THOSE CARTRIDGES CAN SPREAD A VIRUS, CAN'T THEY?

17  A.      NO.

18  Q.      WELL, YOU KNOW WHAT A FLASH DRIVE IS, RIGHT?

19  A.      YES.

20  Q.      YOU KNOW THAT IF YOU PUT A FLASH DRIVE INTO A

21  COMPUTER WITH A VIRUS, THAT VIRUS CAN INFECT THE FLASH

22  DRIVE, RIGHT?

23  A.      IT CERTAINLY DEPENDS ON THE OPERATING SYSTEM,

24  THE ARCHITECTURE AND THE CONFIGURATION OF THE MACHINE.

25  IT CAN'T HAPPEN WITH PEB'S.

1    Q.       MY QUESTION IS, ON FLASH DRIVES, WHETHER WHEN

2    YOU PUT A FLASH DRIVE INTO A MACHINE, IT CAN INFECT THE

3    FLASH DRIVE?

4    A.       IN A HYPOTHETICAL CONTEXT OUTSIDE OF

5    PENNSYLVANIA'S VOTING SYSTEMS, YES, IT CAN.

6    Q.       WHEN YOU THEN TAKE THAT FLASH DRIVE TO A NEW

7    COMPUTER, YOU CAN INFECT THAT NEW COMPUTER WITH THE

8    VIRUS FROM THE FIRST COMPUTER.  RIGHT?

9    A.       AGAIN IN A CONTEXT TOTALLY OUTSIDE OF

10   PENNSYLVANIA'S VOTING SYSTEMS, YES, THAT IS POSSIBLE.

11   Q.       AND SO LET ME GO BACK TO YOUR EXPERTISE HERE.

12   YOU ARE NOT AN EXPERT IN COMPUTER SCIENCE, IS THAT

13   RIGHT?

14   A.       WELL, I WAS NOT QUALIFIED HERE TODAY AS ONE, BUT

15   I CERTAINLY AM ONE.

16   Q.       FOR PURPOSES OF TODAY'S HEARING YOU ARE NOT ONE,

17   AS WE HAVE AGREED?

18   A.       MAYBE YOU SHOULD NOT ASK ME QUESTIONS ABOUT IT

19   THEN.

20               THE COURT:  ALL RIGHT.  ALL RIGHT.  ALL

21   RIGHT.  ASK ANOTHER QUESTION, PLEASE.

22               MS. FRICK:  I'M GETTING TO MY QUESTION,

23   YOUR HONOR.

24   BY MS. FRICK:

25   Q.       THE QUESTION IS WHETHER IT'S POSSIBLE FOR MEMORY

1       CARTRIDGES, JUST LIKE OTHER REMOVABLE MEDIA, TO SPREAD A

2       VIRUS FROM A MACHINE TO MACHINE.

3       A.       AND I ANSWERED YES, TOTALLY OUTSIDE THE CONTEXT

4       OF PENNSYLVANIA'S VOTING SYSTEMS.

5                       THE COURT:  I HAVE REVIEWED THE DOCTOR'S

6       CV AND I'M PERFECTLY PREPARED TO QUALIFY HIM AS AN

7       EXPERT IN COMPUTER SCIENCE, AND I DO SO.  YOU CAN ASK

8       HIM ANYTHING YOU WANT, MS. FRICK.

9       BY MS. FRICK:

10      Q.       OKAY.

11                      NOW SPREADING A VIRUS IN THE METHOD THAT

12      WE JUST TALKED ABOUT THAT YOU AGREED WAS POSSIBLE DOES

13      NOT REQUIRE AN INTERNET CONNECTION, RIGHT?

14      A.       TOTALLY OUTSIDE THE CONTEXT OF PENNSYLVANIA'S

15      VOTING SYSTEMS, YES, IT DOESN'T.

16      Q.       THANK YOU.  I WOULD APPRECIATE IT IF YOU JUST

17      ANSWER MY QUESTIONS.

18                      THAT IS WHY WE WENT -- THAT IS WHAT WE

19      HAVE ALREADY ESTABLISHED THROUGH THE STUXNET VIRUS,

20      RIGHT?  THERE WAS NO INTERNET CONNECTION WITH THE

21      CENTRIFUGES, CORRECT?

22      A.       YES, I TESTIFIED TO THAT.

23      Q.       EXACTLY.

24                      NOW THE SOFTWARE ON THE ELECTRONIC VOTING

25      MACHINES GETS UPDATED FROM TIME TO TIME.  I BELIEVE YOU

1    TESTIFIED TO THAT?

2    A.      THAT IS TRUE.

3    Q.      AND THAT UPDATE COMES FROM THE MANUFACTURER?

4    A.      WELL, ULTIMATELY IT DOES COME FROM THE

5    MANUFACTURER, ALTHOUGH IT IS TESTED BY THE INDEPENDENT

6    TESTING AUTHORITY, AND IN GENERAL, THE DISTRIBUTION OF

7    THE SOFTWARE COMES FROM THEM.  OTHERWISE IT WOULD BE

8    POSSIBLE TO DO A BAIT AND SWITCH.  THE VENDOR COULD SEND

9    GOOD SOFTWARE TO THE INDEPENDENT TESTING AUTHORITY.

10   UPON GETTING A CERTIFICATION FROM THEM, IT COULD THEN

11   SEND BAD SOFTWARE TO THE JURISDICTIONS.  SO TO PREVENT

12   THAT, IT'S THE ITA THAT DISTRIBUTES THE SOFTWARE.

13   Q.      THE ITA, YOU SAID, RUNS TESTS ON THESE UPDATES,

14   RIGHT?

15   A.      YES.

16   Q.      AND DOES IT DO A FORENSIC EXAMINATION OF THE

17   CODE?

18   A.      YES.

19   Q.      AND THEN THAT -- AND THEN HAVE YOU EVER BEEN

20   PRESENT FOR WHEN THOSE UPDATES ARE DISTRIBUTED?

21   A.      I'M TRYING TO RECALL.  I DON'T THINK SO.  I

22   MEAN, IF YOU MEAN DISTRIBUTED FOR ACTUAL USE IN A

23   COUNTY, NO.  I HAVE DONE IT AT THE SECRETARY OF THE

24   COMMONWEALTH'S OFFICE DURING OUR EXAMINATIONS, BUT NOT

25   IN AN ACTUAL PRECINCT, NO.

1    Q.      HAVE YOU BEEN PRESENT FOR THE TESTING OF THOSE

2    SOFTWARE UPDATES?

3    A.      YES.

4    Q.      AND CAN YOU DESCRIBE WHAT THAT TESTING IS?

5    A.      YES.  I'M NOT -- I DON'T DO IT COMMONLY, BUT WE

6    DID A COMPLETE FORENSIC REVIEW IN SARASOTA COUNTY,

7    FLORIDA IN WHICH SIX COMPUTER SCIENTISTS SAT IN A ROOM

8    FOR FIVE DAYS EXAMINING CODE, COMPILING PORTIONS OF

9    CODE, TESTING CODE, COMPUTING HASH FUNCTIONS, ET CETERA.

10   Q.      THAT WAS IN SARASOTA, FLORIDA, IS THAT RIGHT?

11   A.      YES.

12   Q.      NOW THE OPERATING SYSTEMS ON THE CENTRAL

13   ELECTION MANAGEMENT COMPUTERS, THEY NEED TO GET UPDATED

14   FROM TIME TO TIME AS WELL, RIGHT?

15   A.      YES.

16   Q.      AND THOSE UPDATES TO THE OPERATING SYSTEMS ARE

17   DOWNLOADED FROM THE INTERNET?

18   A.      I THINK THEY ARE OFTEN ARE.  THAT CAN'T BE DONE

19   ON THE CENTRAL COMPUTER THAT IS USED IN THE COUNTY

20   BECAUSE IT'S NOT ALLOWED TO BE CONNECTED TO THE

21   INTERNET.  SO IT HAS TO BE THROUGH REMOVABLE MEDIA.

22   Q.      SO IT WOULD BE DOWNLOADED FROM THE INTERNET ON

23   TO SOME OTHER COMPUTER, IS THAT RIGHT?

24   A.      NOT NECESSARILY.  A DVD MIGHT BE OBTAINED FROM

25   THE DISTRIBUTOR OF THE OPERATING SYSTEM.

1    Q.     BUT YOU ALSO SAID IT COULD BE DOWNLOADED FROM

2    THE INTERNET AND TRANSFERRED BY REMOVABLE MEDIA,

3    CORRECT?

4    A.     NO.  WHAT I SAID WAS, OUTSIDE THE CONTEXT OF THE

5    PENNSYLVANIA SYSTEMS.  IF YOU MEAN CAN YOU HAVE A NEW

6    VERSION OF AN OPERATING SYSTEM DOWNLOADED OVER THE

7    INTERNET?  YES.  BUT THAT IS NOT PERMITTED IN

8    PENNSYLVANIA.  IT'S EXPRESSLY AGAINST THE -- I CAN READ

9    YOU THE STATEMENTS IN THE CERTIFICATION -- CERTIFICATION

10    DOCUMENTS.  IT'S FORBIDDEN BY THE SECRETARY OF THE

11    COMMONWEALTH.

12    Q.    SO THE UPDATES TO THE OPERATING SYSTEMS ON THE

13    CENTRAL MANAGEMENT COMPUTERS COME ONLY FROM THE

14    MANUFACTURER.  IS THAT YOUR TESTIMONY?

15    A.    NO.  THERE ARE DIFFERENT MANUFACTURERS.  THERE

16    IS A MANUFACTURER OF THE OPERATING SYSTEM AND THERE IS A

17    MANUFACTURER OF THE ELECTION MANAGEMENT SYSTEM.  I

18    THOUGHT YOU WERE REFERRING TO THE OPERATING SYSTEM, LIKE

19    FOR EXAMPLE, WINDOWS 10, SOMETHING LIKE THAT.  THAT

20    COMES FROM MICROSOFT.

21    Q.    RIGHT.  AND THAT UPDATE IS DOWNLOADED FROM THE

22    INTERNET, RIGHT?  THAT IS WHAT YOU TESTIFIED?

23    A.    NO.  IT CAN BE.  THAT IS WHAT -- I DO IT AT HOME

24    THAT WAY.  BUT THAT IS NOT THE WAY PEOPLE WHO RUN THE

25    CENTRAL COMPUTERS IN COUNTIES IN PENNSYLVANIA DO IT

1      BECAUSE --

2                     THE COURT:  WE HAVE GONE THROUGH THIS --

3                     THE WITNESS:  -- THEY ARE FORBIDDEN TO DO

4      IT.

5                     THE COURT:  WE HAVE GONE THROUGH THIS

6      SEVERAL TIMES.  PLEASE MOVE ON.

7                     MS. FRICK:  YOUR HONOR, I DON'T BELIEVE I

8      HAVE AN ACTUAL ANSWER FOR HOW THE --

9                     THE COURT:  I BELIEVE YOU HAVE YOUR

10     ANSWER.  I'M DIRECTING YOU TO MOVE ON.

11     BY MS. FRICK:

12     Q.      NOW, HAVE YOU PERSONALLY PARTICIPATED IN THE

13     UPDATE OF OPERATING SYSTEMS ON THE CENTRAL MANAGEMENT

14     COMPUTERS?

15     A.      I DON'T RECALL HAVING DONE SO.

16     Q.      WHAT ABOUT THE UPDATES TO THE ELECTION

17     MANAGEMENT SOFTWARE ITSELF?

18     A.      I HAVE SEEN IT DONE.  AGAIN, WE DID IT IN THE

19     SECRETARY OF THE COMMONWEALTH'S OFFICE.  I DIDN'T DO IT

20     AT A COUNTY ELECTION BOARD.

21     Q.      AND WHEN THE OPERATING -- I'M SORRY, NOT THE

22     OPERATING SYSTEMS.  WHEN THE ELECTION MANAGEMENT SYSTEMS

23     ARE UPDATED, THOSE COME FROM -- THOSE UPDATES COME FROM

24     THE MANUFACTURER.  IS THAT WHAT YOU TESTIFIED?

25     A.      NO, THEY COME FROM THE ITA.

1    Q.        WHICH GETS THEM FROM THE MANUFACTURER, RIGHT?

2    A.        WELL --

3                   THE COURT:  YOU REALLY ARE REPEATING

4    OURSELVES.

5                   MS. FRICK:  I'M SORRY, YOUR HONOR.  I

6    BELIEVE MY FIRST LINE OF QUESTIONS WAS ABOUT THE

7    OPERATING SYSTEM.  AND I'M TRYING TO UNDERSTAND THE

8    CENTRAL MANAGEMENT --

9                   THE COURT:  I BELIEVE WE ARE REPEATING

10   OURSELVES.

11                  MS. FRICK:  I'LL MOVE ON, YOUR HONOR.

12                  THE COURT:  IF YOU DON'T STOP, I'M GOING

13   TO END YOUR CROSS EXAMINATION.

14                  MS. FRICK:  I WILL MOVE ON, YOUR HONOR.

15   BY MS. FRICK:

16   Q.        NOW, I BELIEVE YOU TESTIFIED, OR IT'S IN THE

17   PAPERS THAT WERE SUBMITTED ALONG WITH YOUR TESTIMONY,

18   THAT YOU ANALYZED THE FIRMWARE IN THE PENNSYLVANIA

19   MACHINES IN 2006, IS THAT RIGHT?

20   A.        I DON'T THINK IT SAYS THAT IN THE MOVING PAPERS.

21   I DID AN EXAMINATION OF THE VOTING SYSTEMS THAT WERE

22   THEN CURRENTLY UNDER CERTIFICATION IN PENNSYLVANIA IN

23   2006.  I DIDN'T DO PERSONALLY A FORENSIC EXAMINATION OF

24   THE FIRMWARE.

25   Q.        HAVE YOU EVER DONE A PERSONAL FORENSIC

1    EXAMINATION OF THE FIRMWARE?

2    A.        YES, IN SARASOTA COUNTY.

3    Q.        BUT FOR VOTING SYSTEMS USED IN PENNSYLVANIA, YOU

4    HAVE NEVER DONE THAT?

5    A.        NO, I HAVEN'T.  I RELIED ON THE ITA REPORTS.

6    Q.        AND SINCE 2006 HAVE YOU EVER EXAMINED THE VOTING

7    SYSTEMS USED IN PENNSYLVANIA?

8    A.        I DON'T RECALL WHETHER I DID ANY IN 2007, BUT I

9    HAVEN'T -- I CERTAINLY HAVE NOT DONE ANY SINCE 2007.

10   Q.        SO WOULD YOU AGREE THAT IN GENERAL, TECHNOLOGY

11   HAS CHANGED SINCE 2007?

12   A.        THAT IS A REALLY GENERAL STATEMENT.  WHAT KIND

13   OF TECHNOLOGY ARE YOU TALKING ABOUT?

14   Q.        WELL, WOULD YOU AGREE WITH THE GENERAL STATEMENT

15   THAT TECHNOLOGY HAS CHANGED?

16             THE COURT:  I WILL ACCEPT THAT TECHNOLOGY

17   HAS CHANGED SIGNIFICANTLY IN THE LAST TEN YEARS.

18   BY MS. FRICK:

19   Q.        SO WE CAN AGREE THAT IT HAS CHANGED

20   SIGNIFICANTLY.  WOULD YOU AGREE THAT CYBER SECURITY

21   THREATS HAVE CHANGED SIGNIFICANTLY SINCE 2007.

22   A.        YES, I THINK PEOPLE HAVE DEVISED CLEVERER

23   MECHANISMS FOR INFECTING COMPUTERS.

24   Q.        YOU WOULD AGREE THAT BEFORE THIS YEAR THERE HAD

25   NEVER BEEN WIDESPREAD REPORTS OF CYBER ATTACKS OR

1    HACKING DURING A PRESIDENTIAL ELECTION BEFORE?

2    A.      I'M NOT AWARE OF SUCH REPORTS PREVIOUSLY, NO.

3    Q.      NOW, YOU TESTIFIED AT THE BEGINNING OF YOUR

4    TESTIMONY THAT IF YOU TOOK A MACHINE INTO A LAB UNDER

5    PERFECT CONDITIONS, YOU COULD ALWAYS BREAK INTO THESE

6    MACHINES, RIGHT?

7    A.      YES.

8    Q.      HAVE YOU EVER PERSONALLY HACKED INTO THESE

9    MACHINES?

10   A.      YES.

11   Q.      WHEN DID YOU DO THAT?

12   A.      OH, I WOULD TYPICALLY DO IT DURING LUNCHTIME

13   AT -- WHEN WE DID OUR EXAMINATIONS AND THE VENDOR WAS

14   NOT PRESENT SO THEY COULD NOT SEE WHAT I WAS DOING.

15   Q.      AND YOU COULD HACK THESE MACHINES DURING YOUR

16   LUNCH HOUR, RIGHT?

17   A.      WELL, I WAS AN EXAMINER.  I WAS ALLOWED TO OPEN

18   THE MACHINES.  I COULD DO ANYTHING I WANTED TO THEM.

19   NOBODY WAS OBSERVING ME, BECAUSE I WAS TRYING TO TEST

20   WHETHER THEY WERE SECURE OR NOT.

21   Q.      AND YOU TESTIFIED BEFORE THAT IT WOULD TAKE TOO

22   LONG FOR SOMEBODY ELSE WHO WAS NOT A SECURITY EXAMINER

23   TO HACK INTO THE MACHINES, RIGHT?

24   A.      I DON'T THINK I MADE ANY COMMENT ABOUT WHETHER

25   THE PERSON WAS AN EXAMINER OR NOT.  WHAT I THINK I SAID

1     WAS THAT MACHINES IN ACTUAL USE ARE NOT SITTING ON A

2     TABLE THE WAY THEY ARE AT THE SECRETARY'S OFFICE WHEN WE

3     DO AN EXAM.  THEY ARE CLOSED UP, THEY ARE SEALED UP,

4     THEY ARE LOCKED.  SO THE PROCESS OF GAINING ACCESS TO

5     SUCH A MACHINE AND INSERTING NEW SOFTWARE IN IT UNDER

6     THOSE CONDITIONS IS MUCH MORE DIFFICULT.  IT INVOLVES

7     THE BREAKING OF SEALS, DOING THINGS, YOU HAVE TO KNOW

8     WHAT YOU ARE DOING, AND THEN APPLYING A COUNTERFEIT SEAL

9     AT THE END SO NOBODY IS ANY THE WISER.  IT TAKES TIME TO

10    DO THAT.

11    Q.     UNDERSTOOD.  NOW THE MACHINES ARE STORED --

12    BETWEEN ELECTIONS ARE STORED IN SOME SECURE WAREHOUSE,

13    IS THAT RIGHT?

14    A.     THEY ARE STORED IN A WAREHOUSE.  I KNOW SOME OF

15    THE SECURITY MECHANISMS THAT ARE USED TO PROTECT THE

16    WAREHOUSE, BUT I DON'T KNOW ALL OF THEM.

17    Q.     AT SOME POINT THE MACHINES ARE TAKEN TO THE

18    POLLING PLACES, RIGHT?

19    A.     THAT'S RIGHT.

20    Q.     THEY HAVE TO BE DELIVERED THERE?

21    A.     YES.

22    Q.     AND THE LOCATION OF THE POLLING PLACES ARE

23    WIDELY PUBLICIZED, RIGHT?

24    A.     NO.  IN MANY CASES DECADES IN ADVANCE, YES.

25    Q.     THAT'S RIGHT.  AND THE VOTING MACHINES ARE NOT

1    DELIVERED TO EACH POLLING PLACE ON THE MORNING OF THE

2    ELECTION, ARE THEY?

3    A.      NO, THAT IS OBVIOUSLY NOT FEASIBLE.

4    Q.      SO THEY ARE DELIVERED A WEEK AHEAD OF TIME?

5    A.      IT DEPENDS ON THE COUNTY.  IT DEPENDS ON LOTS OF

6    THINGS.

7    Q.      THEY ARE DELIVERED AT LEAST A FEW DAYS AHEAD OF

8    TIME?

9    A.      THAT'S RIGHT.

10   Q.      THE POLLING PLACES ARE PLACES LIKE SCHOOLS,

11   CHURCHES, LIBRARIES, BUILDINGS LIKE THAT, RIGHT?

12   A.      YES.  IN CALIFORNIA THEY ARE PEOPLE'S PRIVATE

13   HOMES EVEN.

14   Q.      AND MOST OF THOSE PLACES DON'T HAVE 24-HOUR

15   SECURITY, DO THEY?

16   A.      THAT'S CORRECT.

17   Q.      AND THEY DON'T HAVE ARMED GUARDS STANDING OUT

18   FRONT, DO THEY?

19   A.      NO.

20                   THE COURT:  YOU ARE MAKING ARGUMENT.

21   BY MS. FRICK:

22   Q.      YOU HAVE HEARD OF CALIFORNIA'S TOP TO BOTTOM

23   REVIEW OF ELECTRONIC VOTING MACHINES, RIGHT?

24   A.      YES.

25   Q.      AND THAT REVIEW WAS LED BY THE CALIFORNIA

1    SECRETARY OF STATE?

2    A.      YES.

3    Q.      AND IT WAS CONDUCTED BY -- IT WAS A REVIEW

4    CONDUCTED BY COMPUTER SCIENTISTS?

5    A.      THERE WERE CERTAINLY COMPUTER SCIENTISTS ON THE

6    PANEL, YES.

7    Q.      FOLLOWING THE REVIEW, CALIFORNIA DECERTIFIED

8    CERTAIN ELECTRONIC VOTING SYSTEMS, RIGHT?

9    A.      YES.  WE CAN TALK ABOUT THE POLITICS OF THAT IF

10   YOU WOULD LIKE, BUT THE ANSWER IS YES.

11   Q.      NOW, THE STATE BANNED THE USE OF THOSE MACHINES

12   IN ELECTIONS BECAUSE THE STATE DETERMINED AFTER ITS

13   REVIEW THAT THESE MACHINES WERE TOO UNRELIABLE, RIGHT?

14   A.      NO.  BECAUSE THE SECRETARY OF STATE IS AN

15   ELECTED OFFICE IN CALIFORNIA, AND SHE RAN ON THE

16   PLATFORM THAT SHE WAS GOING TO GET RID OF THE CURRENT

17   VOTING MACHINES.  THAT IS WHY IT WAS DONE.

18   Q.      THE SECRETARY OF STATE'S REPORT AUTHORED BY THE

19   COMPUTER SCIENTISTS FOUND THAT THESE MACHINES WERE

20   UNRELIABLE, RIGHT?

21   A.      YES, BUT SHE WAS NOT OBLIGED TO ACCEPT THOSE.

22   Q.      THANK YOU.

23           PENNSYLVANIA VOTERS USE MACHINES THAT

24   CALIFORNIA HAS BANNED, CORRECT?

25   A.      YES.

1    Q.       LEHIGH COUNTY, FOR EXAMPLE, USES A MACHINE

2    BANNED BY CALIFORNIA, RIGHT?

3    A.       YES.

4    Q.       AND WASHINGTON COUNTY DOES?

5                 THE COURT:  YOU ARE NOT GOING THROUGH ALL

6    67 COUNTIES.

7                 MS. FRICK:  I'M NOT, YOUR HONOR.  I'M

8    JUST GIVING A COUPLE OF EXAMPLES.

9                 THE WITNESS:  I DON'T ACTUALLY KNOW WHICH

10   SYSTEM WASHINGTON COUNTY USES, BUT I CAN'T DISPUTE IT.

11   BY MS. FRICK:

12   Q.       IN FACT, ABOUT A MILLION PENNSYLVANIA VOTERS ARE

13   REGISTERED IN COUNTIES THAT RELY ON MACHINES THAT

14   CALIFORNIA HAS DECERTIFIED, RIGHT?

15   A.       YES.  WE DON'T LIVE IN CALIFORNIA.

16                 THE COURT:  YOU HAVE NOW USED UP ALL THE

17   COMMONWEALTH'S TIME.  NO.  NO.  GO AHEAD.

18   BY MS. FRICK:

19   Q.       YOU TESTIFIED THAT -- I BELIEVE YOU USED THE

20   WORD "TYPICALLY" THE CENTRAL COMPUTERS IN THE COUNTY

21   OFFICES ARE DEDICATED SOLELY TO THE PURPOSE OF

22   ELECTIONS, AND THEY ARE NOT CONNECTED TO THE INTERNET,

23   RIGHT?

24   A.       RIGHT.

25   Q.       BUT THAT DOES NOT MEAN ALWAYS, RIGHT?  TYPICALLY

1    DOES NOT MEAN ALWAYS?

2    A.      THAT'S RIGHT.  IT MEANS THAT THEY ARE SUPPOSED

3    TO NOT DO IT, BUT IT'S POSSIBLE THAT THEY MAY BREAK THE

4    RULES ESTABLISHED BY THE SECRETARY.

5    Q.      NOW, YOU SAID THAT YOU AGREED WITH -- IN

6    TESTIMONY THAT PEB'S DISTRIBUTE NEW SOFTWARE, RIGHT?

7    A.      UNDER THE CONDITIONS THAT I TESTIFIED ABOUT,

8    YES.

9    Q.      AND SO THE PEB'S CAN OVERRIDE THE SOFTWARE ON

10   THE MACHINE, RIGHT?

11   A.      UNDER THE CONDITIONS I DISCUSSED, YES.

12   Q.      YOU TALKED ABOUT PARALLEL TESTING.  DO YOU

13   RECALL THAT TESTIMONY?

14   A.      YES.

15   Q.      DID PARALLEL TESTING TAKE PLACE IN ANY COUNTIES

16   THIS YEAR AFTER THE ELECTION?

17   A.      I ONLY KNOW ABOUT PENNSYLVANIA.  I DON'T KNOW

18   ABOUT OTHER STATES.

19   Q.      MY QUESTION IS ABOUT PENNSYLVANIA.

20   A.      YES.  IT TOOK PLACE IN ALLEGHENY COUNTY.

21   Q.      WHAT OTHER COUNTIES?

22   A.      I DON'T KNOW OF ANY OTHERS.

23   Q.      IS IT REQUIRED TO TAKE PLACE STATE-WIDE?

24   A.      NO.

25   Q.      WAS IT REQUIRED TO TAKE PLACE IN ALLEGHENY

1    COUNTY?

2    A.    WELL, IT DEPENDS ON WHAT YOU MEAN BY REQUIRED.

3    Q.    IS THERE A STATE LAW REQUIRING THAT IT TAKE

4    PLACE?

5    A.    YOU MEAN SEPARATELY IN ALLEGHENY COUNTY FROM THE

6    OTHER COUNTIES IN THE STATE?

7    Q.    CORRECT.

8    A.    NO.

9    Q.    SO THERE IS NO STATE LAW REQUIRING PARALLEL

10    TESTING TO TAKE PLACE?

11    A.    THAT'S RIGHT.

12    Q.    SO ISN'T IT TRUE THAT NOBODY THIS YEAR HAS DONE

13    A POST-ELECTION INSPECTION OF THE DATA AND THE CODE ON

14    THE MACHINES USED IN THIS ELECTION?

15    A.    I DON'T KNOW THAT.

16    Q.    IN PENNSYLVANIA?

17    A.    I DON'T KNOW THAT.  I WOULD NOT KNOW THAT.

18    Q.    YOU WOULD NOT KNOW THAT BECAUSE IT'S NOT

19    SOMETHING THAT YOU PARTICIPATED IN, RIGHT?

20    A.    I HAVEN'T, NO.

21    Q.    YOU HAVE NOT HEARD OF ANYONE ELSE PARTICIPATING

22    IN SUCH -- IN SUCH A REVIEW?

23    A.    NO.

24           MS. FRICK:  THANK YOU.  THAT IS ALL I

25    HAVE.

1                    THE COURT:  I WILL GIVE YOU, MR. MAAZEL,

2       AN EXTRA FIVE MINUTES.

3                    MR. JOEL:  I HAVE NO REDIRECT, YOUR

4       HONOR.  I WAS UNDER THE IMPRESSION THAT THE CROSS WAS

5       COUNTING AGAINST THEIR TIME.

6                    THE COURT:  NO, NO.  BUT I WILL GIVE YOU

7       -- YOU ASKED FOR FIVE MINUTES FOR REBUTTAL.

8                    MR. JOEL:  I HAVE NO REDIRECT.

9                    THE COURT:  DID YOU HAVE ANY OTHER

10      WITNESSES YOU WANTED TO CALL?

11                   MR. JOEL:  NO, NO.

12                   THE COURT:  VERY WELL.  THANK YOU.

13                   THE WITNESS:  YOU ARE WELCOME, YOUR

14      HONOR.

15                   THE COURT:  BUT I WILL GIVE -- SO YOU ARE

16      OUT OF TIME AND I WILL GIVE MR. MAAZEL 20 MINUTES

17      INSTEAD OF 15, BECAUSE I'M GOING TO GIVE HIM AN EXTRA

18      FIVE MINUTES.

19                   MR. TABAS.

20                   THE WITNESS:  YOUR HONOR, ARE THERE MORE

21      FACT WITNESSES, OR DO I HAVE TO GO OUTSIDE?

22                   THE COURT:  DO YOU INTEND TO RECALL THIS

23      WITNESS?

24                   MR. JOEL:  NO, I DON'T, YOUR HONOR.

25                   THE COURT:  YOU DON'T HAVE TO GO OUTSIDE.

1                    MR. TABAS:  GOOD AFTERNOON, YOUR HONOR.

2                    THE COURT:  GOOD AFTERNOON.

3                    MR. TABAS:  I'M HERE ON BEHALF OF THE

4      INTERVENORS WHICH INCLUDE THE PRESIDENT ELECT, THE

5      VICE-PRESIDENT ELECT OF THE UNITED STATES AND THE

6      ELECTORS THAT WERE PLEDGED TO THEM AS PART OF THE

7      ELECTION THAT WAS HELD ON NOVEMBER 8TH.

8                    YOUR HONOR, I WILL, IN MY ARGUMENT, BE

9      REFERRING TO SOME CASES THAT WE DID NOT CITE IN OUR

10     BRIEF BECAUSE OF A DECISION THAT CAME DOWN YESTERDAY IN

11     THE MICHIGAN FEDERAL COURT RELATING TO A CASE BROUGHT

12     ALSO BY PLAINTIFF STEIN THAT IS RELEVANT TO TODAY.  SO I

13     HAVE GIVEN COPIES OF THOSE CASES TO COUNSEL FOR MS.

14     STEIN AND TO THE STATE.  I HAVE A PACKAGE OF THEM FOR

15     THE COURT AS WELL, IF I CAN GIVE THEM TO THE COURT

16     REPORTER.

17                   THE COURT:  ACTUALLY JUST GIVE THEM TO MY

18     DEPUTY, PLEASE.  THANK YOU.

19                   MR. TABAS:  YOUR HONOR, JUST ALSO BEFORE

20     I GET INTO MY ARGUMENT, I HAVE A COUPLE OF HOUSEKEEPING

21     MATTERS IN RESPONSE TO THE ISSUES THAT WERE MENTIONED BY

22     MR. MAAZEL DURING HIS PRESENTATION.  HE REFERRED TO THE

23     SITUATION IN MONTGOMERY COUNTY AND MADE REFERENCE TO A

24     FACT THAT THERE WERE 4,000 PLUS VOTERS WHO DID NOT VOTE

25     AT ALL.  OF COURSE, HE HAD NO WITNESSES OR ANYTHING TO

```
1     ESTABLISH THAT.  I DID NOT CHALLENGE IT AT THE TIME

2     BECAUSE I DIDN'T THINK IT WAS NECESSARY TO, BUT THE

3     REASON I DID NOT, YOUR HONOR, IS BECAUSE MR. MAAZEL HAS

4     NOT FURTHER PURSUED WHAT HE SHOULD HAVE AND INQUIRED AS

5     TO WHAT THAT TERM NO VOTES MEANS IN MONTGOMERY COUNTY

6     AND THE OTHER 66 COUNTIES IN PENNSYLVANIA.  THAT IS

7     SIMPLY THE REFERENCE TO THE NUMBER OF UNDER VOTES THAT

8     WERE CAST ON A MACHINE.  IT MAY SAY NO VOTES, BUT IF HE

9     HAD INQUIRED, HE WOULD HAVE FOUND OUT THAT IT'S UNDER

10    VOTES.

11                    THE COURT:  I'M SORRY.  IT HAS BEEN A

12    LONG TIME SINCE 2000.  WHAT IS AN UNDER VOTE?

13                    MR. TABAS:  AN UNDER VOTE IS LET'S SAY

14    YOU CAN VOTE FOR FIVE PEOPLE --

15                    THE COURT:  IF SOMEBODY DOES NOT CAST A

16    VOTE FOR EVERY OFFICE, EVERY OFFICE FOR WHICH A PERSON

17    MAY VOTE.  SO IF THERE ARE FIVE ROW OFFICES, AND THE

18    PERSON VOTES FOR ONLY FOUR, THAT IS AN UNDER VOTE?

19                    MR. TABAS:  THAT WOULD BE AN UNDER VOTE,

20    THE SAME AS IF, LET'S SAY YOU DID NOT CAST A VOTE FOR

21    THE ATTORNEY GENERAL'S OFFICE AT ALL, THAT WOULD BE AN

22    UNDER VOTE.  AND THEN THERE IS SUCH A THING AS AN OVER

23    VOTE BUT THAT IS WHEN YOU VOTE FOR TOO MANY PEOPLE.  BUT

24    THAT IS A DIFFERENT ISSUE.

25                    THE COURT:  OKAY.
```

1     MR. TABAS:  IN ADDITION, MR. MAAZEL SAID

2 THAT THERE WERE SEVERAL, MAYBE AS MANY AS SIX RECOUNTS

3 STILL PENDING IN PENNSYLVANIA.  FROM PERSONAL KNOWLEDGE,

4 BECAUSE THAT IS ALL I HAVE BEEN INVOLVED WITH SINCE

5 NOVEMBER 8TH, THERE IS ONLY ONE THAT IS CURRENTLY

6 PENDING.  64 OF OUR COUNTIES HAVE CERTIFIED THE RESULTS,

7 I HAVE CONFIRMED WITH THE DEPARTMENT OF STATE YESTERDAY.

8 ONE WILL CERTIFY TOMORROW AT 11:00 AM.  THE REMAINING

9 TWO WILL CERTIFY ON MONDAY.

10     THE COURT:  I DON'T THINK WHAT THE TWO OF

11 YOU ARE SAYING IS AT ALL INCONSISTENT.  WHY DON'T YOU GO

12 ON?

13     MR. TABAS:  THANKS.

14     THEN I WOULD LIKE TO ADDRESS ONE OF THE

15 POINTS THAT MR. MAAZEL HAS MADE AS PART OF HIS ARGUMENT,

16 PART OF HIS SEVEN REASONS FOR WHY THIS COURT SHOULD

17 GRANT THE EXTRAORDINARY RELIEF REQUESTED.

18     AND HE TALKS ABOUT THE FACT THAT THE

19 RULES FOR RECOUNTS, ELECTION CONTESTS ARE CONFUSING,

20 THEY'RE UNKNOWN, THEY'RE ARBITRARY HE SAID TODAY.  HE

21 REFERRED TO ACTUALLY INTERESTINGLY ENOUGH PROBLEMS WITH

22 THE PROTHONOTARY, WHICH IS NOT ONLY DIFFICULT TO

23 PRONOUNCE, BUT SOMETIMES VERY DIFFICULT TO SPELL AS

24 WELL.  BUT MR. MAAZEL SHOULD BECOME FAMILIAR AND I WOULD

25 ASK THE COURT TO TAKE -- TO REVIEW THE DECISION OF IN

1    RE:  PHILADELPHIA DEMOCRATIC MAYORALTY PRIMARY ELECTION

2    CONTEST FROM BACK IN 1979.  IT'S IN THE PACKAGE THAT I

3    PROVIDED TO THE COURT.  INTERESTINGLY ENOUGH, MR. HARVEY

4    WAS COUNSEL FOR ONE OF THE PARTIES IN THAT CASE AND

5    ACTUALLY IN THE SAME ROLE THAT I AM TODAY, OPPOSING

6    EFFORTS IN AN ELECTION CONTEST MATTER.  IN THAT DECISION

7    -- IT WAS A COMMON PLEAS COURT DECISION BUT IT CITED A

8    VERY WELL-KNOWN, A VERY HIGHLY REGARDED STATE SUPREME

9    COURT DECISION, MADIGAN APPEAL DEALING WITH SUCH ISSUES

10   AS RECOUNTS IN ELECTION CONTESTS.  IN THAT CASE, IN THE

11   DEMOCRATIC MAYORAL CASE, THE PARTIES SEEKING TO

12   CHALLENGE THE ELECTION GOT MISINFORMATION FROM A

13   PROTHONOTARY AND MADE MISTAKES AND FILED INCORRECTLY THE

14   CHALLENGES TO THE ELECTION CONTEST.

15                    THE COURT SAID THAT COUNSEL FOR

16   PETITIONERS CANNOT BE PERMITTED TO RELY ON

17   MISINFORMATION FROM THE PROTHONOTARY'S OFFICE WHEN A

18   READING OF THE STATUTE WOULD HAVE SUPPLIED COUNSEL WITH

19   THE CORRECT INFORMATION.  THE COURT WENT ON TO SAY THAT

20   WHERE THERE IS A STATUTE WHICH DOES SET FORTH IN CLEAR

21   AND CONCISE TERMS THE REQUIREMENTS FOR PROCEEDING,

22   COUNSEL'S RELIANCE UPON MISINFORMATION FROM THE

23   PROTHONOTARY CANNOT JUSTIFY HER FAILURE TO PROPERLY FILE

24   HER CHALLENGE.  AND IF COUNSEL HAD DONE THE RESEARCH AND

25   HAD REVIEWED THE CASE LAW AND HAD ACTUALLY REVIEWED THE

1   VARIOUS STATUTORY PROVISIONS, THEY WOULD HAVE SEEN THAT

2   THERE WAS A VERY CLEAR PROCESS IN PENNSYLVANIA FOR DOING

3   RECOUNTS, RECANVASSES AND ELECTION CONTESTS.  IT'S NOT

4   REALLY 67 SEPARATE ONES.  THE PROVISIONS IN THE ELECTION

5   CODE APPLY TO ALL 67 OF THE COUNTIES.

6           SO NOW, YOUR HONOR, I GO INTO A FEW

7   BROADER POINTS.  JILL STEIN, WHO IS ONE OF THE TWO

8   PLAINTIFFS HERE TODAY, WHO GARNERED LESS THAN 1 PERCENT

9   OF THE VOTES CAST OF ABOUT 6 MILLION IN PENNSYLVANIA, IS

10  SEEKING, AS THEY HAVE SAID TODAY, NOT ONLY A RECOUNT IN

11  MANY COUNTIES, BUT THEY ARE ALSO SEEKING THIS FORENSIC

12  EXAMINATION.  TO BE HONEST, YOUR HONOR, WE BELIEVE THE

13  HEART OF THE PLAINTIFF'S MOTIVE IN REALLY BRINGING THIS

14  CASE, AND ALL THE POST-ELECTION CASES THAT THEY BROUGHT

15  THESE LAST FEW WEEKS, IS A COMMENT THEY MADE ON PAGE 2

16  OF THEIR MEMORANDUM OF LAW, QUOTE:  A MAJORITY OF THE

17  MACHINES VOTED FOR DONALD TRUMP IN PENNSYLVANIA, END OF

18  QUOTE.

19           THEIR DISAPPOINTMENT IN THAT REALITY IS

20  WHAT IS DRIVING THEIR UNSUBSTANTIATED CLAIMS IN AN

21  EFFORT TO DELAY THE ELECTORAL COLLEGE WHICH MUST MEET ON

22  DECEMBER 19TH OF THIS YEAR TO CAST ITS BALLOTS.

23           THE COURT:  IF PENNSYLVANIA'S VOTE IS NOT

24  CERTIFIED BY DECEMBER 13TH, WHAT HAPPENS?

25           MR. TABAS:  IF IT IS NOT, THERE IS A

1    GREAT RISK THAT THE MATTER WILL THEN FLOW EITHER TO THE

2    LEGISLATURE OF PENNSYLVANIA, WHO MAY HAVE TO SELECT

3    ELECTORS FOR THE STATE OF PENNSYLVANIA.  BUT ALL OF THE

4    PEOPLE IN PENNSYLVANIA, THE MILLIONS OF VOTERS WHO DID

5    VOTE FOR THE 20 ELECTORS FOR THE PRESIDENT ELECT AND

6    VICE-PRESIDENT ELECT WILL HAVE BEEN COMPLETELY

7    DISENFRANCHISED BY THAT.  THAT IS WHAT BUSH VERSUS GORE

8    RECOGNIZED.  THAT IS WHERE AT LEAST FIVE OF THE JUSTICES

9    STATED THAT ALL STATE PROCEDURES DEALING WITH CHALLENGES

10   TO AN ELECTION FOR A STATE THAT HAS OPTED INTO THE

11   FEDERAL SAFE HARBOR UNDER 3 U.S.C. SECTION 5, AND

12   PENNSYLVANIA HAS OPTED IN, MUST CEASE.  IN THAT YEAR, IT

13   WAS DECEMBER 12TH.  THIS YEAR IT'S DECEMBER 13TH.  IT

14   MUST CEASE.  THAT IS BINDING PRECEDENT OF THE UNITED

15   STATES SUPREME COURT.

16              THE COURT:  IF -- HOW LONG WOULD A

17   STATEWIDE RECOUNT TAKE, 67 COUNTIES TAKE?

18              MR. TABAS:  WELL, HAVING BEEN INVOLVED IN

19   ONE FOR THE CURRENT PRESIDENT JUDGE OF THE SUPERIOR

20   COURT, WHICH WE WON, IT TOOK -- IT WAS DECEMBER 30TH, I

21   BELIEVE.  MR. HARVEY WAS ALSO IN THAT MATTER.  HE RAN

22   INTO FEDERAL COURT ALSO ON I THINK IT WAS THE 29TH --

23              THE COURT:  HE KEEPS TURNING UP LIKE A

24   BAD PENNY.

25              MR. TABAS:  HE WAS KEEPING ME BUSY RIGHT

1    THROUGH THE END OF THE YEAR.

2             THE COURT:  I UNDERSTAND.

3             YET THE PLAINTIFFS ARE SAYING WHAT THEY

4    REALLY WANT IS A MUCH NARROWER SLICE THAN THAT.  IT

5    WOULD TAKE ONLY A DAY.

6             MR. TABAS:  YOUR HONOR, I HAVE DONE THIS.

7    I HAVE NOT DONE IT AS LONG AS MR. HARVEY, WHO'S PROBABLY

8    HAS BEEN DOING ELECTION LAW SINCE THE DAYS OF WILLIAM

9    PENN PROBABLY, BUT I HAVE DONE THIS FOR QUITE SOME TIME.

10    AND I'LL TELL YOU SOMETHING.  THERE IS ONE THING THAT IS

11    CERTAIN, IT WILL NOT TAKE A DAY.  AND FOR THEM TO EVEN

12    COME IN NOW, THEY HAVE HAD SO MANY SHIFTING CLAIMS AND

13    ARGUMENTS.  THEY CREATED THE DELAY THAT PUT US HERE

14    TODAY.  THIS ELECTION ENDED ON THE 8TH.

15             THE COURT:  I HAVE NOT ASKED PLAINTIFFS

16    ABOUT THAT.  I INTEND TO.  WHY THEY WAITED UNTIL THE

17    LAST DAY UNDER THE LAW TO RAISE THEIR CHALLENGE, BUT GO

18    AHEAD.

19             MR. TABAS:  THERE WERE MANY OPPORTUNITIES

20    FOR THEM TO DO OTHER THINGS PRIOR TO THE DATE THEY DID

21    FILE IT AND THE DATE THAT THEY GOT HERE.

22             JUST -- BRIEFLY, THE OTHER THING THAT I

23    WANT TO POINT OUT TO THE COURT IS, AFTER THEY FILED THE

24    COMPLAINT IN THIS COURT THIS MONDAY, THE PLAINTIFFS

25    THROUGH THE PARTIES THAT THEY HAVE CONTROLLED,

```
 1      SUPERVISED, FINANCED, CORRALLED AND ENCOURAGED AND WITH

 2      THE SAME ATTORNEYS THAT ARE SITTING HERE TODAY AND WITH

 3      SIMILAR EXPERT WITNESSES, ALSO HAVE RAISED THE VERY SAME

 4      ISSUES THAT ARE BEFORE YOUR HONOR IN THE PHILADELPHIA

 5      COUNTY COURT OF COMMON PLEAS, ALLEGHENY COUNTY COURT OF

 6      COMMON PLEAS, PREVIOUSLY ALSO IN MONTGOMERY COUNTY AS

 7      WELL.  IN THE DAYS BETWEEN MONDAY AND TODAY, THE

 8      PHILADELPHIA COURT OF COMMON PLEAS JUST YESTERDAY TURNED

 9      DOWN THEIR REQUEST FOR A FORENSIC EXAMINATION.

10                  THE COURT:  I READ JUDGE FLETMAN'S

11      OPINION.

12                  MR. TABAS:  THAT WAS TWO DAYS AGO.  THAT

13      WAS MY FAULT.  TWO DAYS AGO.  YESTERDAY JUDGE JAMES IN

14      ALLEGHENY COUNTY, THE SAME THING, ISSUED AN ORDER

15      TURNING THEM DOWN, BOTH SAYING THERE IS NO RIGHT.  THE

16      STATUTE, THE LEGISLATURE HAS PROVIDED FOR NO RIGHT OF A

17      FORENSIC EXAMINATION AS REQUESTED.  SO EVEN WHILE THEY

18      ARE ASKING YOU FOR THAT, THEY ARE ALSO SIMULTANEOUSLY

19      ASKING THESE OTHER COURTS, THAT THE MONTGOMERY COUNTY

20      COURT TURNED THEM DOWN AS WELL, AND THEY RECENTLY

21      APPEALED THAT I BELIEVE YESTERDAY.

22                  SO THEY ARE NOT ONLY FORUM SHOPPING.

23      THEY ARE FORUM AVOIDANCE.

24                  THE COURT:  ANY DECISION BY THE MICHIGAN

25      SUPREME COURT?  CAN ANYBODY TELL ME?
```

```
 1                    MR. TABAS:  YES.  AND I DID -- WE GOT IT
 2      IN TIME YESTERDAY THAT I COULD PUT IT INTO OUR BRIEF.
 3      WHAT HAPPENED IS THE MICHIGAN COURT OF APPEALS, FEDERAL
 4      COURT OF APPEALS.
 5                    THE COURT:  I'M AWARE OF WHAT THE SIXTH
 6      CIRCUIT HAS DONE.  I'M AWARE OF WHAT THE MICHIGAN COURT
 7      OF APPEALS HAS DONE.  MY UNDERSTANDING WAS THERE WAS
 8      REVIEW BEING SOUGHT IN THE MICHIGAN SUPREME COURT.
 9      MR. MAAZEL IS NODDING.  HAS THE MICHIGAN SUPREME COURT
10      ACTED YET?
11                    MR. TABAS:  TO THE BEST OF MY KNOWLEDGE,
12      NO.  THE DISTRICT COURT THOUGH --
13                    THE COURT:  I UNDERSTAND WHAT THE
14      DISTRICT COURT DID.
15                    MR. TABAS:  YOU KNOW WHAT THEY DID.
16                    THE COURT:  I KNOW.  I KNOW WHAT JUDGE
17      GOLDSMITH, I GUESS, DID.
18                    I'M LOOKING AT PLAINTIFFS COUNSEL TABLE,
19      NO DECISION YET OUT OF MICHIGAN?
20                    MR. MAAZEL:  NOT THAT I'VE HEARD.  AS OF
21      THE MOMENT I WALKED INTO THIS COURTROOM.
22                    THE COURT:  IF YOU GUYS DON'T KNOW, I'M
23      SATISFIED THAT THERE IS NO DECISION YET.
24                    GO ON, MR. TABAS.
25                    MR. TABAS:  THANK YOU, YOUR HONOR.
```

1          CLEARLY, I THINK THAT IT GOES WITHOUT

2     QUESTION AND THE SECRETARY WHO UNFORTUNATELY DID NOT

3     HAVE A CHANCE TO DO MUCH OF AN ARGUMENT UNTIL THE END,

4     STATED ALSO CLEARLY IN HIS BRIEF, AS WE DID, THAT THERE

5     HAS BEEN A COMPLETE FAILURE TO ALLEGE ANY FACTS WHICH IF

6     PROVEN WOULD HAVE CHANGED THE OUTCOME OF THE ELECTION

7     CERTAINLY AS TO MS. STEIN, AND SHE CERTAINLY COULD HAVE

8     NO INTEREST IN CHANGING THE RESULTS FOR MS. CLINTON

9     BECAUSE SHE WAS RUNNING AGAINST MS. CLINTON.

10          BUT I WANT TO REFER -- THE MICHIGAN

11    FEDERAL COURT DECISION THAT DID COME DOWN RELEASING THE

12    TRO IS IMPORTANT BECAUSE THAT LEADS ME TO GO INTO A

13    BRIEF DESCRIPTION OF THE PENNSYLVANIA STATUTORY PROCESS

14    FOR THESE CHALLENGES THAT WERE AVAILABLE TO THE

15    PLAINTIFFS HERE IN THIS CASE.  THE FACT OF THE MATTER IS

16    SHE CANNOT POINT TO ANY ACTS OF FRAUD, AS WE HAVE BEEN

17    SAYING THROUGHOUT THIS.  BUT THE ENTIRE CLAIM THAT SHE

18    IS MAKING FOR RELIEF IN ALL OF HER PLEADINGS INCLUDING

19    THE PLEADINGS HERE, EVEN THOUGH THEY CITE THE

20    CONSTITUTIONAL PROVISION IS -- BASICALLY ONLY EMANATES

21    FROM STATE LAW.  THERE IS NO CLAIM BY THE PLAINTIFFS,

22    ANYWHERE OTHER THAN THOSE PROVISIONS, THAT THERE IS ANY

23    STATUTORY FEDERAL RIGHT TO THE RELIEF THAT THEY ARE

24    SEEKING.  AND THE MICHIGAN U.S. DISTRICT COURT IN THE

25    EASTERN DISTRICT YESTERDAY CONCLUDED THAT AS WELL.

1                    BUT MORE IMPORTANTLY, THAT COURT IN THE

2       DECISION YESTERDAY WENT THROUGH THE ANALYSIS OF THE ROLE

3       OF THE STATE IN POST ELECTION CHALLENGES.  IN CITING

4       BUSH VERSUS GORE, NUMBER ONE, THEY WENT THROUGH AND

5       ACKNOWLEDGED THAT THE SUPREME COURT STATED THAT THE

6       FEDERAL COURTS WILL NOT INTERFERE WITH THE PROCESS BY

7       WHICH THE CONSTITUTION HAS GIVEN TO THE LEGISLATURES OF

8       THE STATE THE POWER TO HANDLE THE ELECTION OF ELECTORS

9       TO THE ELECTORAL COLLEGE.  THAT IS A CONSTITUTIONAL

10      RIGHT DELEGATED TO THE LEGISLATURE.  OUR LEGISLATURE HAS

11      GONE THROUGH AND IN OUR STATUTE WE HAVE THE PROVISIONS

12      OF HOW THE ELECTORS ARE TO BE ELECTED TO THE ELECTORAL

13      COLLEGE.  IN BUSH ONE, THE SUPREME COURT SAID THAT IS

14      NOT A PROCESS TO BE INTERFERED WITH BY THE FEDERAL

15      COURTS.

16                    AND OUR PROCESS HAS BEEN IN PLACE FOR

17      QUITE SOME TIME, AND THERE IS A BASIC HISTORY OF CASE

18      LAW THAT SUPPORTS AND SETS FORTH CLEARLY WHAT MUST BE

19      DONE.  I CITE IT IN REFERENCE TODAY THE MADIGAN CASE,

20      THE SUPREME COURT OF PENNSYLVANIA AND ALSO THE

21      PHILADELPHIA MAYORALTY ONE AND THEY CITE NUMEROUS CASES

22      AS WELL.  THERE IS A QUITE CLEAR PROCESS THAT ANYONE CAN

23      FOLLOW IN ORDER TO GET POST ELECTION RELIEF.

24                    AND IMPORTANTLY, ONE OF THE CASES THAT WE

25      CITED OF THE SUPREME COURT OF PENNSYLVANIA IN THE CASE

1    OF IN RE:  JONES, THE REASON FOR ALL THIS IS, YOUR

2    HONOR, IS BECAUSE THERE IS A MAJOR PUBLIC POLICY REASON

3    WHY ELECTION CONTESTS HAVE TO BE DECIDED EXPEDITIOUSLY

4    BECAUSE OF THE ABILITY TO HAVE TRANSFER OF POWER, HAVE

5    GOVERNMENT CONTINUE AND TO BE EFFECTIVE IN THIS

6    PARTICULAR WAY.

7                 I WANT TO ALSO MOVE ON BRIEFLY TO THE

8    ISSUE OF STANDING, YOUR HONOR.  WE BELIEVE -- THE

9    INTERVENORS BELIEVE THAT THIS COURT LACKS JURISDICTION

10   OVER THIS CASE ENTIRELY BECAUSE THE PLAINTIFFS HAVE NO

11   STANDING.  NOW I HAVE ARGUED SOME OTHER POINTS FIRST

12   BEFORE I GOT TO YOUR JURISDICTIONAL ONE, I APOLOGIZE,

13   BUT I THOUGHT THE BACKGROUND WOULD BE HELPFUL.  STEIN

14   HERSELF HAS NOT BEEN ABLE TO ASSERT, NOR CAN YOU FIND IT

15   IN ANY ONE OF HER PLEADINGS ANYWHERE, ANY ACTUAL INJURY

16   OR EVEN AN IDENTIFIABLE POTENTIAL HARM.  SHE HAS TO,

17   UNDER THE STANDARD OF WITTMAN -- AND I'M GOING TO HAVE

18   TROUBLE PRONOUNCING THE DEFENDANT IN WITTMAN,

19   PERSONHUBALLAH, WHATEVER, BUT WE HAVE CITED IT.

20                 UNDER THAT DECISION OF THE U.S. SUPREME

21   COURT, SHE HAS TO BE ABLE TO PROVE THAT SHE HAS AN

22   INJURY TRACEABLE TO THE CONDUCT LIKELY TO BE ADDRESSED

23   BY A FAVORABLE OUTCOME.  SHE HAS NONE.  SHE HAS NOT

24   ASSERTED ONE.  THEREFORE SHE HAS NO INJURY FOR WHICH SHE

25   CAN HAVE STANDING.  AND NOTABLY NOWHERE IN ANY OF HER

1    PLEADINGS DID STEIN SAY SHE WILL WIN OR MIGHT WIN.  IN

2    FACT, SHE HAS THIS GENERAL ALLEGATION OF MAYBE DOING

3    GOOD TO FIND OUT WHO DID THE VOTERS REALLY VOTE FOR.

4    AND ALSO AS THE SUPREME COURT OF THE UNITED STATES HELD

5    IN LUJAN VERSUS THE DEFENDERS OF WILDLIFE CASE, WHICH WE

6    CITED, THAT YOU CANNOT SIMPLY COME IN AND HAVE STANDING

7    BECAUSE YOU HAVE A GENERALLY AVAILABLE GRIEVANCE ABOUT

8    GOVERNMENT.  I THINK IT'S PROBABLY COMMON THAT MANY

9    PEOPLE HAVE SUCH A GRIEVANCE.  BUT YOU HAVE TO SHOW HARM

10   TO YOURSELF OR THE LIKELIHOOD OF THAT.

11            NOW WRIGHTS, HE HAS ABSOLUTELY NO

12   STANDING BECAUSE HE HAS PLEADED NO FACTS WHATSOEVER THAT

13   WOULD SHOW THAT HIS VOTE WAS NOT COUNTED.

14            SO ON THAT BASIS, YOUR HONOR, THE LACK OF

15   STANDING I WOULD SUGGEST TO THIS COURT DEPRIVES THIS

16   COURT OF JURISDICTION OVER THIS MATTER, AND IT SHOULD BE

17   -- PRELIMINARY INJUNCTION SHOULD BE CERTAINLY DENIED FOR

18   THAT BASIS AND I WOULD ALSO ASK THAT THE CASE BE

19   DISMISSED AS WELL.

20            THE PLAINTIFFS CLEARLY, YOUR HONOR, DO

21   NOT MEET THE STANDARDS FOR A PRELIMINARY INJUNCTION.

22   AND I'M NOT HERE ON THE MOTION BY THE WAY FOR -- TO

23   DISMISS.  I'M ONLY IN A RESPONSE TO THE PI.  THERE IS NO

24   LIKELIHOOD OF SUCCESS ON THE MERITS.  I THINK THEIR

25   STRONGEST ARGUMENT THEY BELIEVE THEY COULD HAVE MADE WAS

1      THROUGH THE EXPERTS TODAY, AND I THINK THAT WAS

2      COMPLETELY SHOWN TO HAVE NO MERIT AND NO VALUE,

3      CERTAINLY NO ALLEGATIONS OF ANYTHING IN PENNSYLVANIA

4      REGARDING THE MACHINES, NONE WHATSOEVER FROM THEIR OWN

5      EXPERT.

6                      STEIN HERSELF, IN AN ARTICLE THAT SHE

7      RECENTLY WAS INTERVIEWED FOR IN COSMOPOLITAN MAGAZINE,

8      NOT SOMETHING I USUALLY READ, BUT WE DID CITE IT AND I

9      GAVE YOU THE LINK.

10                     THE COURT:  AT LEAST AS INTERESTING AS

11     THE PRO HAC MOTION.

12                     MR. TABAS:  I BETTER NOT COMMENT THERE.

13     I WILL GET IN TROUBLE.  SHE QUOTED.  THIS IS STEIN

14     HERSELF, REGARDING THE -- WHY DID SHE WITHDRAW THE

15     PENNSYLVANIA ELECTION CONTEST?  QUOTE:  WELL, THE

16     PROBLEM WAS NOT THAT IT WAS TOO EXPENSIVE, BUT IT WAS A

17     DEAD END COURSE OF ACTION, END QUOTE.  SHE WENT ON TO

18     SAY:  THEN THERE IS THE OTHER ISSUE OF THE POLITICAL

19     ENTRENCHED COURT SYSTEM WHERE THEY PUT THE RECOUNT

20     CAMPAIGN IN AN IMPOSSIBLE SITUATION BY CALLING FOR A

21     COURT DATE THAT WOULD REQUIRE EVIDENCE ABOUT THE

22     PROBLEMS WITH THE VOTING SYSTEM BEFORE WE WOULD HAVE THE

23     EVIDENCE, END OF QUOTE.  SO SHE IS ADMITTING SHE HAD NO

24     EVIDENCE TO EVEN BRING THE CLAIM.

25                     THEN IN THE COMMONWEALTH COURT CASE, SHE

1   ASKS FOR A CONTINUANCE AND IN THE CONTINUANCE FURTHER

2   ADMITTED THAT THERE WAS NO EVIDENCE FOR THE CLAIM.  THAT

3   IS WHY THEY NEEDED IT.

4              NOW LET ME GET QUICKLY TO THE TIMELINE

5   BECAUSE I BELIEVE THAT THERE HAS BEEN COMPLETELY

6   UNREASONABLE DELAY HERE, WHICH WOULD BE GROUNDS TO DENY

7   THE PRELIMINARY INJUNCTION.  I MENTIONED THAT ON

8   NOVEMBER 8TH WAS THE ELECTION.  BETWEEN NOVEMBER 9TH AND

9   THE 13TH THEY TOOK NO STEPS WHATSOEVER TO ASSERT ANY

10  CLAIMS THAT THEY COULD HAVE HAD UNDER THE ELECTION CODE.

11  IN FACT THEY TOOK NO STEPS THAT THEY COULD HAVE TAKEN

12  PRIOR TO THE ELECTION.  THERE ARE AT LEAST THREE

13  PROVISIONS UNDER THE ELECTION CODE FOR STEPS THAT A

14  CANDIDATE AND POLITICAL PARTIES CAN TAKE TO EXAMINE

15  VOTING MACHINES AND TO RAISE ALL OF THESE ISSUES.  THEY

16  HAVE NEVER DONE ANY OF THAT.

17              THEIR EXPERT AND THEY ADMIT THAT THEY

18  HAVE KNOWN ABOUT THESE PROBLEMS FOR YEARS, BUT THEY

19  WAITED UNTIL THIS LAST MINUTE NOW TO DO IT.  ON

20  NOVEMBER 14TH BY LAW IN PENNSYLVANIA, THE OFFICIAL

21  COMPUTATION OF THE BALLOTS AND THE VOTES TAKE PLACE, IN

22  ALL 67 COUNTIES.  DID NOT RAISE ANY CONCERNS THROUGHOUT

23  THAT WHOLE PROCESS THAT IS OPEN TO THE PUBLIC, TO WHICH

24  THEY ARE ALLOWED TO HAVE WATCHERS PRESENT.  EVEN

25  LAWYERS, THEY COULD EVEN -- IT'S A GOOD THING FOR

1    LAWYERS.  THEY CAN MAKE A LIVING.  THEY COULD GO DOWN

2    AND WATCH IT.  DID NONE OF THAT.

3                    THEN, ON NOVEMBER 28TH, THE LAST POSSIBLE

4    DAY TO FILE ELECTION CONTEST, THEY FILED ONE.  IT'S TWO

5    PAGES.  TWO PAGES.  THERE WAS A THIRD PAGE.  IT WAS

6    BASICALLY A SIGNATURE LINE AND SO FORTH OF LEARNED

7    COUNSEL.  THE ELECTION CONTEST DID NOT EVEN RAISE ANY

8    CONSTITUTIONAL CLAIM WHATSOEVER.  IT CONTAINED NO

9    EVIDENCE OF ACTING.  IN FACT, THEY WENT ON AND BASICALLY

10   ADMITTED IN THE ELECTION CONTEST THAT IT WAS A PLACE

11   HOLDER.  THEY SAID HERE WE ARE JUST FILING BECAUSE OF

12   THE DEADLINE AND WE ARE IN SEARCH OF EVIDENCE, A FISHING

13   EXPEDITION, AS THE STATE HAD SAID.  BUT THAT IS

14   COMPLETELY IN VIOLATION OF THE STATUTORY REQUIREMENTS OF

15   THE ELECTION CODE UNDER 3456, 3457, 3458.

16                    NOVEMBER 29TH, THE COMMONWEALTH COURT

17   PROMPTLY SCHEDULED HEARINGS IN THAT MATTER.  NEXT TWO

18   DAYS LATER THEY ASKED FOR A CONTINUANCE OF THREE DAYS.

19   THE COURT EVEN GAVE THEM A PARTIAL CONTINUANCE AND SAID,

20   FINE, ON DECEMBER 5TH, MONDAY THE 5TH, YOU WILL HAVE

21   ORAL ARGUMENT.  HERE ARE SOME ISSUES I WANT YOU TO

22   ADDRESS.  I WILL GIVE YOU TO THE 8TH OF DECEMBER TO PUT

23   ON YOUR EVIDENCE, WHICH WOULD HAVE BEEN TODAY, YOUR

24   HONOR.

25                    WHAT DID THEY DO?  BY THE WAY, THE COURT

1    EVEN WENT A COUPLE OF STEPS FURTHER.  THEY ALSO SET THE

2    BOND AT A MILLION DOLLARS, THAT'S CORRECT.  BUT THE

3    COURT MADE IT CLEAR IN THE ORDER.  ANY OF THE PARTIES

4    CAN GO INTO THE COURT AND SEEK THE RIGHT TO MODIFY IT

5    UPON GOOD CAUSE SHOWN.  THEY DID NOT DO THAT, BUT THE

6    COURT DID SOMETHING UNUSUAL.  THEY KEPT THE COMMONWEALTH

7    COURT E-FILE SYSTEM OPEN THROUGH THE WEEKEND, DIRECTED

8    THE CHIEF CLERK TO GIVE US HIS E-MAIL AND PHONE NUMBER

9    SO THAT IF WE WANTED TO FILE PLEADINGS ON THOSE ISSUES

10    OVER THE WEEKEND, THEY COULD BE ACCEPTED AND DISTRIBUTED

11    TO THE PARTIES.  NOW, I WILL TELL YOU THEY DID FILE

12    SOMETHING.  ON SATURDAY NIGHT AT 5 PM THEY FILED TO

13    WITHDRAW, AND THE COURT CLOSED THE CASE.

14    THEY HAD A PRESS CONFERENCE ON SUNDAY THE

15    6TH SAYING THEY WERE GOING TO COME IN AND VISIT YOUR

16    HONOR AND FILE A COMPLAINT, WHICH THEY DID THIS PAST

17    MONDAY.

18    THE COURT:  SUNDAY WAS NOT THE 6TH.  THE

19    4TH.

20    MR. TABAS:  THE 4TH.  THE DAYS HAVE BEEN

21    FLYING BY, YOUR HONOR.

22    SO NOW WE HAVE GOTTEN TO THIS WHOLE

23    PROCESS, AND HERE WE ARE TODAY, ON THE EVE OF THE

24    FEDERAL SAFE HARBOR DEADLINE.  THE BUSH VERSUS GORE, THE

25    MAJORITY CLEARLY SAID ALL PROCESSES HAVE TO END, AND

1    THEY ARE ABOUT TO END; AS THEY SAID THERE IS ONE LEFT,

2    IT WILL FINISH THIS WEEKEND, ALL CERTIFICATIONS WILL BE

3    IN.

4              THIS IS A VERY CLEAR AND SEVERE DELAY

5    WHICH FEDERAL COURTS HAVE ROUTINELY RECOGNIZED IS THE

6    BASIS FOR DENYING PRELIMINARY INJUNCTIONS.  IN FACT,

7    THIS VERY COURT SAID NOT TOO LONG AGO THAT IN THE CASE

8    OF THE PENNSYLVANIA DEMOCRATIC PARTY VERSUS THE

9    REPUBLICAN PARTY AND MR. TRUMP, ET AL:  DILATORY CONDUCT

10   WEIGHS DECIDEDLY AGAINST GRANTING THE EXTRAORDINARY

11   RELIEF IT SEEKS ESPECIALLY WHERE HERE THERE IS AN

12   ELECTION LOOMING.  THAT WAS THE DAY BEFORE.

13             THIS COURT SAID THAT AN UNREASONABLE

14   DELAY IS BASIS FOR DENYING INJUNCTIVE RELIEF, DELAY

15   KNOCKS THE BOTTOM OUT OF ANY CLAIM OF THE IMMEDIATE AND

16   IRREPARABLE INJURY.  YOUR HONOR, I THOUGHT THAT WAS WELL

17   PUT.

18             THE COURT:  THANK YOU.

19             MR. TABAS:  THAT IS WHERE WE ARE HERE

20   TODAY.  THEN FINALLY, YOUR HONOR, I WILL CONCLUDE, THE

21   SAFE HARBOR, I JUST WANT TO GO BACK TO THAT AGAIN.  THIS

22   IS THE MOST CRITICAL PART.

23             PENNSYLVANIA MUST CERTIFY THE ELECTORS BY

24   DECEMBER 13TH.  IN FACT, IT WOULD BE BEST IF THEY WERE

25   ALL CERTIFIED ON THE 12TH TO THE SECRETARY OF THE

1    COMMONWEALTH WHO HAS TO PRESENT THE RESULTS TO THE

2    GOVERNOR.  THE GOVERNOR ACTUALLY IS IN CHARGE OF

3    CERTIFYING THE ELECTORS.  THIS IS UNDER 3 U.S.C. SECTION

4    5.  THE ELECTORS MUST MEET BY LAW, BY FEDERAL LAW BY

5    DECEMBER 19TH TO CAST THEIR BALLOT.  PENNSYLVANIA AS I

6    SAID PARTICIPATES IN THE SAFE HARBOR.  JUST A QUICK

7    REVIEW OF EVEN TITLE 25 SECTION 3191 TO 3194.  IT'S BEEN

8    IN PLACE FOR YEARS.  SO HERE WE ARE, ONE BUSINESS DAY,

9    TWO BUSINESS DAYS BEFORE THE DEADLINE, THE HARM TO THE

10   INTERVENORS IS IRREPARABLE BECAUSE THE FAILURE TO

11   CERTIFY WILL DISENFRANCHISE ALL OF THOSE VOTERS IN

12   PENNSYLVANIA WHO HAVE VOTED FOR THOSE ELECTORS.

13                 THERE HAVE BEEN NO PERCEPTIBLE CHANGE IN

14   THOSE FEW COUNTIES WHERE THERE HAVE BEEN SOME RECOUNTS

15   AND RECANVASSES.  BUSH VERSUS GORE, AND I WILL END ON

16   THIS, HAS SAID QUITE CLEARLY, THAT ANY CONTROVERSY

17   LEADING TO CONCLUSIVE SELECTION OF ELECTORS MUST END,

18   AND THAT YEAR IT WAS DECEMBER 12TH.  THE SUPREME COURT

19   SAID, AND THIS WAS THE MAJORITY, THIS WAS BUSH TWO, THAT

20   STATUTE, REFERRING TO 3 U.S.C. SECTION 5, IN TURN

21   REQUIRES THAT ANY CONTROVERSY OR CONTEST THAT IS

22   DESIGNED TO LEAD TO A CONCLUSIVE SELECTION OF ELECTORS

23   TO BE COMPLETED BY DECEMBER 12TH, WHICH THIS YEAR WOULD

24   BE THE 13TH.

25                 SO FOR THOSE REASONS WE WOULD ASK THAT

```
1        THE COURT DENY THE REQUEST FOR PRELIMINARY INJUNCTION IN

2        THIS MATTER.  THANK YOU, YOUR HONOR.

3                    THE COURT:  THANK YOU.

4                    MR. MAAZEL.

5                    MR. MAAZEL:  YOUR HONOR, I THINK I MAY

6        STAND AT THE PODIUM.

7                    THE COURT:  THAT IS FINE.

8                    MR. MAAZEL:  I THINK ONE THING THAT IS

9        INTERESTING ABOUT TODAY'S ARGUMENT IS ACTUALLY HOW

10       LITTLE IS IN DISPUTE.

11                   IF WE GO TO THE SEVEN BURDENS THAT WE

12       HAVE DISCUSSED EARLIER.  THE FIRST QUESTION OF --

13                   THE COURT:  IF YOU DON'T MIND.  WHY DON'T

14       YOU ADDRESS TIMELINESS FIRST.

15                   WHY DID YOU WAIT UNTIL NOVEMBER 28TH?

16                   MR. MAAZEL:  SURE.  SO THERE ARE A NUMBER

17       OF REASONS, YOUR HONOR.

18                   THE FIRST IS THAT FOR VOTERS TO GO

19       THROUGH THIS PENNSYLVANIA PROCESS THE VOTERS HAVE TO DO

20       IT.  IT'S A HUGE GRASSROOTS MOVEMENT.  I MEAN THERE ARE

21       OVER 1300 PEOPLE WHO MOBILIZED AND WHO WENT TO SEEK

22       THESE PETITIONS.  THAT HAD TO HAPPEN FIRST REALLY BEFORE

23       JILL STEIN COULD COME TO FEDERAL COURT BECAUSE WE HAD TO

24       DO OUR BEST TO WORK THROUGH THE STATE --

25                   THE COURT:  I DID NOT ASK YOU WHY YOU
```

1    FILED HERE ON DECEMBER 5TH, I ASKED WHY, IF INDEED YOU

2    FILED A PLACEHOLDER ON NOVEMBER 28TH, WHY DIDN'T YOU

3    FILE A PLACEHOLDER ON NOVEMBER 9TH?

4                     MR. MAAZEL:  WELL, I MEAN, THE PROBLEM

5    WITH THE WHOLE PLACEHOLDER ISSUE IS THAT THE STATES

6    ACTUALLY REQUIRES US TO FILE AS SOON AS WE DID.  WE

7    FILED ON THE LAST DAY BECAUSE WE HAD TO.

8                     THE COURT:  I UNDERSTAND THAT BUT YOU ARE

9    NOT ONLY ASKING FOR AN EMERGENCY INJUNCTION, ALTHOUGH NO

10   ONE HAS POINTED IT OUT, YOU ARE ASKING FOR A MANDATORY

11   INJUNCTION, WHICH IS EVEN HARDER TO GET, AND ONE COULD

12   SAY THAT YOU, NOT YOU PERSONALLY BUT YOU, SAT ON YOUR

13   RIGHTS FOR SOME THREE WEEKS NECESSITATING WHAT JUDGE

14   PAPPERT CALLS, IN RULING AGAINST A SIMILAR TACTIC BY THE

15   STATE REPUBLICAN PARTY, A JUDICIAL FIRE DRILL.

16                     I HAVE WORKED ON NOTHING ELSE SINCE I GOT

17   THIS ON DECEMBER 5TH, AND I WILL BE LUCKY TO GET MY

18   OPINION OUT AND GIVE EVERYBODY THE CHANCE TO BE HEARD ON

19   DECEMBER 12TH.  HAD YOU FILED TWO OR THREE WEEKS

20   EARLIER, NONE OF THAT WOULD HAVE BEEN NECESSARY AND IT

21   WOULD ALSO SUGGEST, CONFIRM THE IDEA OF A REAL EMERGENCY

22   WARRANTING THE ISSUANCE OF A MANDATORY INJUNCTION.

23                     MR. MAAZEL:  HERE I THINK, YOUR HONOR, IS

24   THE KEY DIFFERENCE.  I BELIEVE IT WOULD HAVE BEEN

25   IRRESPONSIBLE THE DAY AFTER THE ELECTION TO FILE A

1    CONTEST BECAUSE USUALLY YOU ARE SUPPOSED TO FILE A

2    CONTEST OF A CERTIFIED ELECTION.  THERE HAS TO BE

3    SOMETHING --

4                    THE COURT:  WHY DID YOU WAIT TWO WEEKS

5    AFTER THE CERTIFICATION?  THE ELECTION WAS CERTIFIED ON

6    NOVEMBER 14TH.

7                    MR. MAAZEL:  IT WAS -- IT SHOULD HAVE

8    BEEN BUT IT HAS NOT BEEN.  TO THIS DAY, THE ELECTION HAS

9    NOT BEEN CERTIFIED BECAUSE COUNTIES HAVE BEEN COUNTING A

10   LOT SLOWER THAN THEY ARE REQUIRED TO UNDER PENNSYLVANIA

11   LAW SO WE WERE PUT IN THIS VERY ODD POSITION OF HAVING

12   TO FILE A CONTEST EVEN ON THE LAST DAY.  WHEN I SAY "WE"

13   I MEAN THE VOTERS OF PENNSYLVANIA.  EVEN BEFORE THERE

14   REALLY WAS AN ELECTION TO CONTEST AND THAT IS PART OF

15   OUR ARGUMENT TODAY, IS THAT THIS STATUTE PUTS VOTERS AND

16   CANDIDATES IN AN IMPOSSIBLE SITUATION.

17                   THE COURT:  WOULD YOU AGREE WITH ME THAT

18   PRECLUDING PENNSYLVANIA FROM COMPLYING WITH THE

19   DECEMBER 13TH CERTIFICATION WOULD DISENFRANCHISE ALL OF

20   PENNSYLVANIA'S VOTERS?

21                   MR. MAAZEL:  AND THAT IS CERTAINLY NOT

22   OUR INTENT.

23                   THE COURT:  BUT ISN'T THAT SOMETHING THAT

24   I HAVE TO THINK ABOUT IN BALANCING THE EQUITIES?

25                   MR. MAAZEL:  WE CERTAINLY HAVE TO

1    CONSIDER TIMING, I APPRECIATE THAT POINT, YOUR HONOR.

2                THE COURT:  HERE IT'S DISENFRANCHISEMENT?

3                MR. MAAZEL:  WHICH IS RELATED TO TIMING,

4    I AGREE WITH YOUR HONOR.

5                THE COURT:  HAD YOU FILED A WEEK OR TWO

6    EARLIER, NONE OF THIS WOULD HAVE BEEN NECESSARY.  MY

7    CLERKS WOULD REMEMBER WHAT THEIR APARTMENTS LOOK LIKE

8    AND WHAT IT IS LIKE TO SLEEP.  ALL OF THIS COULD HAVE

9    BEEN DONE AT A MUCH SANER PACE.

10                MR. MAAZEL:  WELL, I CERTAINLY HAVE

11    SOMETHING IN COMMON WITH YOUR CLERKS, YOUR HONOR.  I'M

12    AFRAID TO SAY AS DO ALL MY COLLEAGUES HERE, INCLUDING

13    MR. HARVEY.

14                THE COURT:  ESPECIALLY MR. HARVEY.

15                MR. MAAZEL:  LOOK, TO COME TO FEDERAL

16    COURT I THINK WAS VERY IMPORTANT FOR US TO HAVE A RECORD

17    OF WHAT HAPPENED IN THE STATE COURT, AND VOTERS DID

18    THEIR ABSOLUTE BEST TO WORK WITHIN THE STATE SYSTEM.

19    THEY WORKED WITHIN THE ELECTION CODE.  THEY TRIED TO

20    FILE THESE PETITIONS.  THEY -- YOU KNOW, IN 16 COUNTIES,

21    OVER 1300 PEOPLE.  I THINK OVER 375 PETITIONS.  THIS WAS

22    AN INCREDIBLE AMOUNT OF WORK AND WHEN IT BECAME CLEAR

23    THAT THERE IS ABSOLUTELY NOTHING THAT VOTERS --

24                THE COURT:  THIS IS NOT THE FIRST

25    CHALLENGE TO AN ELECTION THAT HAS EVER BEEN FILED IN

1      PENNSYLVANIA.  AND THEY ARE GENERALLY FILED BEFORE THE

2      LAST DAY, EVEN IN STATEWIDE ELECTIONS, EVEN IN STATEWIDE

3      ELECTIONS WHERE, IN YOUR VIEW, ALL 67 COUNTIES DO THINGS

4      DIFFERENTLY.  BUT HERE WHERE WE HAVE A COLD, HARD

5      PROVISION THAT WILL DISENFRANCHISE 6 MILLION PEOPLE,

6      YOUR CLIENTS WAITED UNTIL NOVEMBER 28TH TO PROCEED,

7      MAKING IT ALMOST IMPOSSIBLE TO COMPLY EVEN IF YOU HAD

8      GOTTEN THE RELIEF YOU WANTED FROM THE COMMONWEALTH

9      COURT, IT WOULD HAVE BEEN ALMOST IMPOSSIBLE TO COMPLY

10     WITH THE DECEMBER 13TH CUTOFF.

11                    MR. MAAZEL:  THIS IS, I THINK, A PROBLEM

12     REALLY CREATED -- I DON'T THINK IT IS CREATED BY THE

13     PLAINTIFFS IN THIS CASE.  I THINK IT'S A PROBLEM CREATED

14     BY THE STATUTORY SCHEME IN PENNSYLVANIA, BECAUSE -- AND

15     THE REALITY OF ALL OF THESE COUNTIES COUNTING VOTES LONG

16     AFTER THEY SHOULD, AND SO THE IDEA THAT WE ARE SUPPOSED

17     TO -- THAT VOTERS GO INTO COURT.

18                    THE COURT:  I MEAN I ASKED YOUR EXPERT

19     WITNESS, IS THERE ANYTHING YOU HAVE TESTIFIED TO THAT

20     YOU DIDN'T KNOW BEFORE NOVEMBER 8TH?  HE SAID, NO.  I

21     HAVE LOOKED THROUGH EVERYTHING YOU HAVE SUBMITTED.  ALL

22     OF THIS STUFF YOU WERE WELL AWARE OF WELL BEFORE THE

23     ELECTION.  YOU HAVE LEARNED NOTHING OTHER THAN THE FACT

24     THAT ONE CANDIDATE WON AND THREE CANDIDATES LOST.

25                    MR. MAAZEL:  I MEAN, CERTAINLY SOMETHING

1    THAT I KNOW AT LEAST, YOUR HONOR, THAT WE CERTAINLY DID

2    NOT KNOW BEFORE THE ELECTION IS JUST HOW UNBELIEVABLY

3    DIFFICULT IT IS FOR ORDINARY VOTERS TO BE ABLE TO MAKE

4    SURE THEIR VOTES COUNT UNDER THIS ELECTION REGIME.

5              I DON'T THINK AN EFFORT LIKE THIS HAS

6    ACTUALLY EVER TAKEN PLACE, AN ATTEMPTED STATEWIDE VOTER

7    INITIATED RECOUNT.  I COULD BE WRONG BUT NOBODY HAS

8    POINTED ME TO ONE AND I THINK THAT THE RECORD DEVELOPED

9    THROUGH THAT EFFORT IS A VERY IMPORTANT PART OF THE

10    RECORD IN THIS CASE.  YOU KNOW, WE WOULD NOT HAVE KNOWN

11    ABOUT ALL OF THE SECRET SHIFTING DEADLINES IN THESE

12    COUNTIES.

13              THE COURT:  IF I CREDIT THE DEFENDANTS'

14    EXPERT AND DISCREDIT YOURS, YOU ARE OUT-OF-COURT, AM I

15    RIGHT?

16              MR. MAAZEL:  WELL, WE HAVE FIVE SO I

17    THINK YOU WOULD HAVE TO DISCREDIT ALL FIVE.

18              THE COURT:  JUST TALKING ABOUT THE TWO

19    EXPERTS THAT ARE HERE TODAY.  IF I CREDIT THE

20    DEFENDANTS' EXPERT AND THAT MEANS I NECESSARILY

21    DISCREDIT YOUR EXPERT, YOU ARE OUT-OF-COURT, CORRECT?

22              MR. MAAZEL:  I ACTUALLY DON'T AGREE WITH

23    THAT, YOUR HONOR.  WE WOULD HAVE A HARDER CASE BUT HERE

24    IS WHY I BELIEVE THAT --

25              THE COURT:  WELL, A DIPLOMATIC ANSWER BUT

1    I REALLY DON'T SEE HOW, IF I FIND THAT THE POSSIBILITY

2    OF HACKING THE PENNSYLVANIA ELECTION VOTING MACHINES IS

3    RIGHT UP THERE WITH SEEING ELVIS AGAIN, WHICH IS KIND OF

4    WHAT THE DEFENDANTS' EXPERT SAID.  IF I CREDIT THAT, HOW

5    DO YOU HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS?  HOW

6    DO YOU MAKE OUT IMMEDIATE IRREPARABLE HARM?  HOW DO YOU

7    SHOW THAT A BALANCE OF THE EQUITIES, SIX MILLION PEOPLE

8    DIVESTED OF THEIR VOTES VERSUS A SPECULATION OF HACKING?

9              MR. MAAZEL:  NO QUESTION.  I AGREE WITH

10   YOUR HONOR.  I CONCEDE IT WOULD BE A HARDER CASE, MAYBE

11   EVEN A MUCH HARDER CASE.  BUT THAT SAID, WE WOULD STILL

12   HAVE THE REALITY OF VOTERS HAVING NO WAY TO VERIFY THEIR

13   OWN VOTES IN THESE DRE MACHINES WHICH IS -- THE GREAT

14   MAJORITY OF THE STATES DO NOT DO ANYTHING LIKE THAT, AND

15   THEN THEIR COMPLETE AND UTTER INABILITY TO HAVE ANY

16   METHOD IN PENNSYLVANIA TO MAKE SURE THEIR VOTES COUNTED

17   WHEN THEY CAN'T VERIFY IT IN ANY WAY THEMSELVES WITH A

18   PAPER BALLOT.

19              NOW, THAT WOULD BE A HARDER CASE IN AND

20   OF ITSELF THAN THE CASE WE HAVE TODAY.  I DO CONCEDE

21   THAT BUT IT STILL IS AN ENORMOUS BURDEN PLACED UPON THE

22   PENNSYLVANIA VOTER TO BE ABLE TO MAKE SURE THEIR VOTES

23   COUNTED IN SOME MEANINGFUL WAY.  IT'S STILL, I

24   BELIEVE -- THERE WAS A HARDER CASE, WOULD VIOLATE WHAT

25   THE SIXTH CIRCUIT SAID A FEW DAYS AGO, WHICH IS IF YOU

1      ARE GOING TO GIVE VOTERS A RIGHT, YOU CAN'T BURDEN IT TO

2      THE EXTENT THAT THEY ARE UNABLE TO EXERCISE THAT RIGHT.

3      THAT IS EXACTLY THE STATUTORY SCHEME HERE AND THE

4      REALITY ON THE GROUND.  I MEAN WHEN I READ THAT LINE IN

5      THE SIXTH CIRCUIT, THAT TO A TEE DESCRIBES EXACTLY WHAT

6      HAS HAPPENED IN PENNSYLVANIA.  AND THAT IS THE RECORD

7      THAT WE HAVE DEVELOPED AND THAT IS WHY WE ULTIMATELY HAD

8      TO GO TO COURT.  I WISH WE HAD COME A LITTLE EARLIER BUT

9      THE RECORD HAD NOT BEEN DEVELOPED EARLIER.

10               SO IT'S ALL -- THIS IS WHY I BELIEVE THE

11     THIRD CIRCUIT HAS SAID WE HAVE TO LOOK AT EVERYTHING IN

12     COMBINATION.  IF WE REMOVE THE PIECE OF MR. HALDERMAN,

13     THE COMBINATION IS WEAKER THAN WITH HIM, I DO CONCEDE

14     THAT, BUT THERE'S STILL A COMBINATION OF FACTORS THAT IS

15     AT LEAST AS BURDENSOME AS A $5 FILING FEE THAT THE 3RD

16     CIRCUIT SAID VERY CLEARLY VIOLATES THE EQUAL PROTECTION

17     CLAUSE.  AND I JUST WANT TO ADD THAT THERE IS NO

18     DISPUTE, I MEAN ONE THING THAT IS REMARKABLE HERE IS

19     THAT THERE IS REALLY NO DISPUTE THAT I HAVE HEARD IN THE

20     PAPERS OR IN TODAY'S ARGUMENT AS TO THE COMPLETE LACK OF

21     NOTICE TO VOTERS.  THERE IS NO DISPUTE AS TO THE

22     IMPOSSIBILITY OF VOTERS DOING ANYTHING CLOSE TO A

23     STATE-WIDE RECOUNT.  THERE IS NO DISPUTE ABOUT THAT.

24     THERE IS NO DISPUTE AS TO THE MASSIVE FEES --

25               THE COURT:  IF THERE IS NO HACKING OF THE

1    VOTE, DO YOU STILL HAVE A CASE?

2              WITH ALL OF THOSE BURDENS, WITH THOSE

3    MEDIOCRE MACHINES, AND THE BYZANTINE NATURE OF

4    PENNSYLVANIA'S 67 COUNTIES AND 67 COUNTY COMMISSIONERS,

5    EACH OF WHOM THINKS HE IS GENGHIS KHAN OR SHE IS GENGHIS

6    KHAN, IF THERE IS NO HACKING, HOW DO YOU STILL HAVE A

7    CASE?

8              MR. MAAZEL:  LET'S JUST START WITH

9    MONTGOMERY COUNTY.

10              MR. TABAS SAID THOSE ARE UNDER VOTES.  I

11    DO URGE YOUR HONOR TO LOOK AT EXHIBIT 46.  THERE WERE

12    ACTUALLY 420,000 UNDER VOTES MEANING PEOPLE WHO DID NOT

13    VOTE FOR EVERY SINGLE THING INCLUDING CONSTITUTIONAL

14    AMENDMENTS AND THE LIKE, BUT THERE WERE 4,087 -- BEFORE

15    I SAID 4,062.  ACTUALLY 4,087.

16              THE COURT:  I FORGIVE YOU.

17              MR. MAAZEL:  4,087 NO VOTES; NOT UNDER

18    VOTES.  NO VOTES.  THAT IS THE LAST PAGE OF EXHIBIT 46.

19    SO WE KNOW OR WE DON'T KNOW, WE CAN SAY ALMOST TO

20    100 PERCENT CERTAINTY, CERTAINLY MORE PROBABLE THAN NOT,

21    PROBABLY WAY BEYOND CLEAR AND CONVINCING EVIDENCE THAT

22    4,087 PEOPLE DID NOT JUST SHOW UP AND DECIDE NOT TO VOTE

23    FOR ANYBODY OR ANYTHING AT ALL.  THEY JUST WANTED TO BE

24    THERE.  THAT IS IN COMBINATION WITH THE FIVE OR SIX

25    AFFIDAVITS WE HAVE IN THE RECORD THAT ESTABLISHED THAT

1    PEOPLE WERE TRYING TO PICK CANDIDATES AND THE NO BUTTON

2    KEPT SHOWING UP.  SO THAT IS EVIDENCE.  THAT IS

3    DISTURBING, THE IDEA THAT OVER 4,000 PENNSYLVANIA VOTERS

4    HAD BEEN DISENFRANCHISED AND THERE IS ACTUALLY NOTHING

5    THEY CAN DO IN THE STATE SYSTEM TO DEAL WITH THAT.  THEY

6    CAN'T TAKE A RECOUNT, THEY CAN'T RECANVASS.  NOTHING

7    THAT IS MEANINGFUL.  IN AND OF ITSELF THAT IS, IN OUR

8    VIEW, A CONSTITUTIONAL VIOLATION AND THOSE PEOPLE ARE

9    BEING DISENFRANCHISED.  WE DON'T WANT TO DISENFRANCHISE

10   ALL OF PENNSYLVANIA, THAT IS NOT OUR GOAL HERE.  WE

11   WOULD LIKE TO GET THIS RELIEF.

12              THE COURT:  WHAT CAN I DO FOR THOSE --

13   HOW MANY PEOPLE WAS IT, 4,000?

14              MR. MAAZEL:  4,087.

15              THE COURT:  WHAT CAN I DO FOR THEM?  THE

16   ELECTION HAS BEEN HELD.  WHAT IS IT THAT I CAN -- YOU

17   HAVE ASKED FOR A FORENSIC EXAMINATION OF THOSE MACHINES.

18   THE FORENSIC EXAMINATION SAYS YES, 4,000 VOTES WERE NOT

19   RECORDED?  WHAT IS IT THAT I DO?  WHAT IS IT THAT YOU

20   ARE ASKING ME TO DO THAT I CAN DO TO CORRECT THAT?

21              MR. MAAZEL:  THAT FORENSIC EXAMINATION

22   MAY WELL SAY WE FOUND THE MALWARE THAT CHANGED VOTES

23   FROM X CANDIDATE.

24              THE COURT:  NO, NO, NO.  THOSE 4,000.  I

25   CAN'T DO ANYTHING ABOUT THAT.  IF, IN FACT, VOTES HAVE

1      NOT BEEN RECORDED AND THERE IS NO RECORD AS YOU SAY,

2      THEN THERE IS NO JUDICIAL REMEDY THAT I CAN THINK OF, IS

3      THERE?

4                     MR. MAAZEL:  I THINK THERE IS, YOUR

5      HONOR.

6                     THE COURT:  WHAT IS THAT?

7                     MR. MAAZEL:  YOU ARE RIGHT THAT THERE IS

8      NO PAPER BALLOT TO LOOK AT, WHICH IS A PROBLEM.  THAT

9      MAKES THIS A SOMEWHAT DIFFERENT CASE FROM SOME OTHER

10     CASES BUT -- AND I'M NO COMPUTER EXPERT, BUT IF A

11     COMPUTER EXPERT LOOKS INSIDE THE CODE AND SEES, IF VOTE

12     FOR CERTAIN PERSON, THEN NO VOTE.  THEN IT'S CERTAINLY

13     POSSIBLE TO SAY, FOR A FACT FINDER SUCH AS YOUR HONOR TO

14     BE ABLE TO SAY, THOSE VOTES ACTUALLY SHOULD BE COUNTED

15     FOR CERTAIN PERSON.  IT'S THE ONE AND ONLY --

16                     THE COURT:  THAT IS NOT -- THAT IS A

17     PROCESS IN ADDITION TO THE QUICK LOOK THAT YOU ARE

18     PROPOSING, CORRECT?

19                     MR. MAAZEL:  IT'S SOMETHING THAT COULD BE

20     RESOLVED ON MONDAY.

21                     THE COURT:  WELL, WHAT COULD BE RESOLVED

22     IS THE -- WHAT YOU VIEW AS THE FORENSIC AUDIT OF SOME

23     NUMBER OF MACHINES.  WHETHER OR NOT SOMEBODY CAN DIVINE

24     WHAT A VOTER, THE PERSON A VOTED WANTED TO VOTE FOR WHEN

25     SHE GOT THE NO, IS AN ENTIRELY SEPARATE PROCESS,

1    CORRECT?

2              MR. MAAZEL:  IT'S RELATED BUT IT IS

3    SEPARATE, YES.

4              THE COURT:  THAT WILL CERTAINLY TAKE US

5    PAST DECEMBER 13TH, CORRECT?

6              MR. MAAZEL:  WELL, LET'S PUT IT THIS WAY.

7              THE COURT:  LET'S PUT IT MY WAY.  IT WILL

8    CERTAINLY TAKE US PAST DECEMBER 13TH?

9              MR. MAAZEL:  I THINK IT'S POSSIBLE.  I

10    DON'T KNOW WHAT THE FORENSIC EXAMINATION WILL SHOW.  I

11    DON'T --

12              THE COURT:  IF THE FORENSIC EXAMINATION

13    SHOWS A NEED FOR FURTHER EXAMINATION AND THE FORENSIC

14    EXAMINATION TAKES ONE TO TWO DAYS, AND I'M GIVING YOU

15    THE BENEFIT OF THE DOUBT, THAT IT BEGINS ON MONDAY

16    MORNING AFTER MY DECISION, ASSUMING THAT I RULE IN YOUR

17    FAVOR AND THE THIRD CIRCUIT DOES NOT STAY MY DECISION,

18    THAT IS DONE ON MONDAY.  IT HAS TO BE CERTIFIED ON

19    TUESDAY.  IT CAN'T BE CERTIFIED ON TUESDAY, CAN IT?

20              MR. MAAZEL:  I THINK IF IT WERE MONDAY TO

21    TUESDAY, IT WOULD BE EXTREMELY DIFFICULT.  I WOULD LIKE

22    TO MAKE A POINT IN RESPONSE TO THAT, YOUR HONOR.

23              THE COURT:  PLEASE.

24              MR. MAAZEL:  WHICH IS, IF THERE IS A

25    FORENSIC EXAMINATION AND IT SHOWS THAT THERE WAS MALWARE

1    ON THE CENTRAL COMPUTER SYSTEMS OF SIX COUNTIES IN

2    PENNSYLVANIA THAT AFFECTED WHO -- THE ACCURATE TALLY OF

3    THE VOTE.  IF WE LEARN THAT THERE WAS THIS SORT OF

4    HACKING AND FRAUD IN THE STATE, I THINK THERE WOULD BE

5    SERIOUS QUESTIONS AT THAT POINT ABOUT WHETHER IT WOULD

6    BE PROPER.  THEN THE QUESTION IS, WHO ARE WE

7    DISENFRANCHISING?  ARE WE DISENFRANCHISING THE

8    PENNSYLVANIA VOTERS WHO VOTED FOR ONE CANDIDATE OR THE

9    OTHER?  IS THERE A SERIOUS QUESTION AS TO WHO THE

10   ELECTORS SHOULD BE?  WE SHOULD KNOW THAT.  I MEAN, IT

11   SEEMS TO ME THE ALTERNATIVE CAN'T BE TO DEPRIVE US OF

12   THAT INFORMATION, BECAUSE THAT WOULD DISENFRANCHISE THE

13   PEOPLE WHO ACTUALLY VOTED FOR A CERTAIN CANDIDATE AND SO

14   I JUST DON'T THINK THE -- THE ALTERNATIVE IS WORSE.

15            THE COURT:  DARE I SAY YOU ARE OUT OF

16   TIME?  IF YOU CAN CONCLUDE, I WOULD BE VERY GRATEFUL.

17            MR. MAAZEL:  OF COURSE.

18            I WOULD JUST, IN CONCLUSION, SAY THAT THE

19   GREAT MAJORITY OF OUR RECORD IS UNDISPUTED.

20            THIS IS A REGIME THAT IS UNFAIR TO

21   PENNSYLVANIA VOTERS.  IT REALLY SUBVERTS OUR DEMOCRACY

22   AND I WOULD RESPECTFULLY REQUEST THAT YOU GRANT THE

23   PRELIMINARY INJUNCTION.  THANK YOU, YOUR HONOR.

24            THE COURT:  THANK YOU, MR. MAAZEL.

25            MR. JOEL:  FIVE MINUTES.

1                    THE COURT:  ALL RIGHT.

2                    MR. JOEL:  MIGHT EVEN TAKE LESS.

3                    THE COURT:  WHAT IS THE COMMONWEALTH'S

4    POSITION AS TO HOW LONG JUST THE HAND RECOUNT WOULD

5    TAKE?

6                    MR. JOEL:  DEPENDS ON THE NUMBER OF

7    PRECINCTS AND I MEAN --

8                    MS. UNGER:  OUR WITNESS WHO CAN TESTIFY

9    TO THAT IS OUTSIDE.  WE CAN GET THE ANSWER WITHIN A

10   MINUTE.

11                   THE COURT:  I GUESS WHAT I'M ASKING IS,

12   CAN ANY RELIEF BE AFFORDED THAT IS BEING REQUESTED HERE

13   WITHOUT BUTTING UP AGAINST THE DECEMBER 13TH DATE?

14                   MR. JOEL:  IT'S OUR POSITION, IT REALLY

15   CAN'T.

16                   THE COURT:  THAT ANSWERS MY QUESTION.

17                   MR. JOEL:  I THINK THE ONLY -- I JUST

18   WANT TO MAKE A FEW VERY QUICK POINTS.  ONE, TO HIGHLIGHT

19   THE FACT THAT WHEN DR. HALDERMAN WAS ON THE STAND, HE

20   CONCEDED HACKING PROBABLY NOT.

21                   THE COURT:  IS YOUR EXPERT STILL HERE?

22                   MR. JOEL:  YES.

23                   THE COURT:  THERE HE IS.

24                   I WOULD LIKE TO HEAR -- UNLESS THE

25   PARTIES HAVE AN OBJECTION, I WOULD LIKE TO HEAR FROM

```
1    BOTH EXPERTS ON THE LENGTH OF TIME THAT WOULD BE

2    NECESSARY TO GRANT VARIOUS FORMS OF RELIEF AND -- WHY

3    DON'T WE TAKE A SHORT BREAK SO THE PARTIES CAN TALK TO

4    THEIR WITNESSES BEFORE THEY CALL THEM, WHICH IS USUALLY

5    A GOOD IDEA.

6                    THE CLERK:  ALL RISE.

7                    (BREAK TAKEN.)

8                    THE CLERK:  ALL RISE.

9                    THE COURT:  PLEASE BE SEATED.  I WOULD

10   LIKE TO HEAR FROM DR. HALDERMAN FIRST.  THERE IS NO NEED

11   TO SEQUESTER THE WITNESSES FOR THIS TESTIMONY.

12   DR. HALDERMAN, PLEASE TAKE THE STAND.

13                   MR. CELLI:  DID YOU WANT TO QUESTION?

14                   THE COURT:  I WILL QUESTION.

15   BY THE COURT:

16   Q.     PLEASE, YOU ARE STILL UNDER OATH, DOCTOR.

17   A.     YES, YOUR HONOR.

18                   THE COURT:  MR. MAAZEL, THE LEAST FORM OF

19   RELIEF YOU WANT IS A MANUAL RECOUNT OF WHAT?

20                   MR. MAAZEL:  A MANUAL RECOUNT OF ONE

21   PRECINCT PER OPTICAL SCAN COUNTY EXCEPT FOR CHESTER,

22   WHERE THEY ARE ALREADY DOING RECOUNTING.

23                   THE COURT:  SO HOW MANY HAND RECOUNTS

24   WOULD THAT BE?  HOW MANY OPTICAL SCAN COUNTIES ARE

25   THERE?
```

1                     MR. TABAS:   17.

2      BY THE COURT:

3      Q.      HOW LONG DO YOU THINK THAT WOULD TAKE, DOCTOR?

4                     IS THAT WITHIN YOUR AREA OF EXPERTISE, A

5      HAND RECOUNT OF OPTICAL SCAN COUNTIES?  IT DOES NOT

6      SOUND LIKE IT.

7      A.      NO, I DON'T KNOW.

8      Q.      SO YOU DON'T KNOW?

9      A.      NO, I DON'T KNOW.

10                    THE COURT:  THE OTHER FORM OF RELIEF YOU

11     ARE LOOKING FOR IS?

12                    MR. MAAZEL:  IS A FORENSIC EXAMINATION OF

13     THE CENTRAL COMPUTER SYSTEMS OF SIX COUNTIES.

14                    THE COURT:  ANY SIX IN PARTICULAR?

15                    MR. MAAZEL:  WELL, THE IDEA WAS -- I DO

16     HAVE A LIST HERE.

17                    IT WAS SIX COUNTIES, EACH REPRESENTING

18     THE SIX TYPE OF DRE MACHINES AND THE IDEA WAS TO PICK

19     THE BIGGEST COUNTY THAT USES THAT MACHINE.

20                    THE COURT:  WITH THAT UNFORTUNATELY VERY

21     VAGUE GUIDELINE, DOCTOR.

22                    MR. MAAZEL:  I DO HAVE THE LIST HERE, I

23     APOLOGIZE.

24     BY THE COURT:

25     Q.      DO YOU KNOW ONE PENNSYLVANIA COUNTY FROM

1    ANOTHER?

2    A.      YES, I WAS BORN IN BUCKS COUNTY.

3    Q.      CONGRATULATIONS.  GO AHEAD.

4              THE COURT:  PLEASE GIVE THE NAMES OF THE

5    COUNTIES.

6              MR. MAAZEL:  THEY ARE PHILADELPHIA,

7    ALLEGHENY, MONTGOMERY, LANCASTER, YORK AND WASHINGTON.

8              THE COURT:  AND YOU WANT TO DO WHAT?

9              MR. MAAZEL:  A FORENSIC EXAMINATION OF

10   THE CENTRAL COMPUTER SYSTEM IN EACH OF THOSE SIX.

11   BY THE COURT:

12   Q.      HOW LONG DO YOU THINK THAT WILL TAKE?

13   A.      WE ARE PREPARED TO START IMMEDIATELY OR IN THE

14   MORNING ANYWAY WITH SIX DIFFERENT TEAMS TO DO THAT.  I

15   BELIEVE THAT WE COULD COMPLETE BY MONDAY MORNING A

16   FORENSIC EXAMINATION THAT WOULD HAVE A SUBSTANTIAL

17   PROBABILITY OF REVEALING ANY ELECTION --

18   Q.      SO IF YOU BEGAN AT 11 O'CLOCK ON MONDAY, WHEN DO

19   YOU THINK YOU WOULD BE DONE --

20   A.      11 O'CLOCK ON MONDAY.  I THINK IF WE DIDN'T

21   SLEEP, IT WOULD -- WE COULD FINISH SOMETIME LATE ON

22   TUESDAY, BUT WE ARE PREPARED TO START EARLIER THAN THAT,

23   OF COURSE.

24              THE COURT:  OKAY.  THANK YOU, DOCTOR.

25              MR. JOEL:  DR. SHAMOS.

1                    THE COURT:  DR. SHAMOS.  YOU ARE STILL

2      UNDER OATH.

3                    THE WITNESS:  YES, YOUR HONOR.

4      BY THE COURT:

5      Q.       DO YOU FEEL COMPETENT TO OFFER AN EXPERT OPINION

6      ON HOW LONG IT WOULD TAKE TO DO THE HAND RECOUNT OF ONE

7      PRECINCT IN ALL 17 COUNTIES WHERE THEY IS ARE STILL

8      MANUAL VOTING?

9      A.       YES.  I PARTICIPATED IN HAND RECOUNT IN TEXAS.

10     Q.       HOW LONG DO YOU THINK THAT RECOUNT WOULD TAKE?

11     A.       OKAY.  SO DOING A HAND RECOUNT, THERE ARE TWO

12     PHASES.

13                    FIRST, THE RECRUITING OF THE PEOPLE WHO

14     ARE GOING TO BE DOING THE RECOUNT AND THEIR TRAINING,

15     TELLING THEM WHAT TO DO.

16                    AND THEN THERE IS THE PROCESS OF ACTUALLY

17     DOING IT, WHICH DEPENDS, OF COURSE, ON THE TOTAL NUMBER

18     OF BALLOTS THAT WERE CAST AND THE TOTAL NUMBER OF PEOPLE

19     THAT ARE AVAILABLE TO DO SUCH A RECOUNT.

20                    OF COURSE, THE PROBLEM WITH SUCH RECOUNTS

21     IS NO MATTER HOW MANY TIMES YOU DO THEM, YOU NEVER GET

22     THE SAME ANSWER TWICE.

23                    THE COURT:  CAN SOMEONE NAME THE 17

24     COUNTIES?

25                    CAN WE HAVE ANY AGREEMENT AMONG AND

```
1       BETWEEN COUNSEL AS TO THE NUMBER OF BALLOTS THAT WOULD

2       HAVE TO BE RECOUNTED BY HAND?

3                   MR. CELLI:  I CAN.  I CAN NAME --

4                   THE COURT:  I'M NOT SURE THAT OUR

5       STENOGRAPHER CAN HEAR ANYTHING YOU ARE SAYING.

6                   MR. CELLI:  EXHIBIT 1 TO THE

7       DEFENDANTS' --

8                   THE COURT:  ONCE MORE WITH FEELING,

9       PLEASE.

10                  MR. CELLI:  EXHIBIT 1 TO THE DEFENDANTS'

11      PAPERS IS A MAP OF THE COMMONWEALTH WHICH SHOWS ALL OF

12      THE COUNTIES.

13                  THE COURT:  YES.

14                  MR. CELLI:  IT SAYS THAT THERE ARE 13

15      OPTICAL SCAN COUNTIES.

16                  THE COURT:  MR. TABAS SAYS 17.

17                  MR. TABAS:  I THOUGHT IT WAS 17.  I SAID

18      THAT BASED ON WHAT MR. MARKS HAD TOLD -- THE

19      COMMISSIONER HAD TOLD ME.

20                  THE COURT:  ARE WE DEALING WITH TENS OF

21      THOUSANDS OF VOTES?

22                  MR. CELLI:  NO.  ONE PRECINCT PER.  WE

23      ARE ACTUALLY IN AGREEMENT BECAUSE THERE ARE SOME

24      COUNTIES ACCORDING TO THE MAP THAT THE DEFENDANTS PUT IN

25      THAT HAVE BOTH DRE AND OPTICAL SCAN.
```

1                    THE COURT:   I JUST WANT TO KNOW HOW MANY

2       BALLOTS WOULD HAVE TO BE RECOUNTED.

3                    MR. HARVEY SAYS NO MORE THAN 1500.

4                    MR. HARVEY:   TO DO ONE PRECINCT IN EACH

5       COUNTY, YOUR HONOR, WOULD REQUIRE COUNTING NO MORE THAN

6       1500 PAPER BALLOTS IN EACH COUNTY.

7                    THE COURT:   WE ARE NOT TALKING ABOUT MORE

8       THAN 20,000 BALLOTS AT MOST, ALL TOGETHER.

9                    MR. HARVEY:   THEY ARE ALL TO BE COUNTED

10      IN DIFFERENT PLACES AND IN MY EXPERIENCE --

11                   THE COURT:   I'M SORRY, MR. HARVEY.   YOU

12      ARE NOT AN EXPERT.

13                   MR. HARVEY:   ALL RIGHT.

14      BY THE COURT:

15      Q.      DOCTOR...

16      A.      YOUR HONOR.

17      Q.      COUNTING BETWEEN 15 AND 20,000 BALLOTS IN

18      BETWEEN 13 TO 17 COUNTIES WHICH WE DON'T HAVE AGREEMENT,

19      HOW LONG WOULD THAT TAKE, HAND COUNT?

20      A.      THE WAY I'M LOOKING AT IT IS THAT IF YOU HAD

21      SEPARATE TEAMS IN EACH ONE OF THE COUNTIES THEY WOULD BE

22      WORKING SIMULTANEOUSLY.   IF YOU ARE JUST LOOKING AT THE

23      TOTAL CHRONOLOGICAL TIME I THINK YOU COULD PROBABLY

24      COUNT 1500 BALLOTS BY HAND IN A DAY, A LONG DAY.

25      Q.      A LONG DAY.

1                  SO IF THEY WERE PREPARED TO GET STARTED

2    ON MONDAY MORNING --

3                  THE COURT:  MR. MAAZEL, DO YOU HAVE 17

4    TEAMS OF PEOPLE WHO HAVE BEEN TRAINED IN HAND COUNTING

5    BALLOTS THAT ARE PREPARED TO GET STARTED FIRST THING

6    MONDAY?

7                  MR. MAAZEL:  I BELIEVE, YOUR HONOR,

8    USUALLY IT IS THE COUNTY BOARD THAT ORGANIZES THOSE.

9                  THE COURT:  SO WE DON'T HAVE ANYTHING

10   BECAUSE THE COUNTY BOARD --

11   BY THE COURT:

12   Q.      SO FIRST, THE COUNTY BOARD WOULD HAVE TO

13   ORGANIZE IT AND ONCE IT DID ORGANIZE IT AND THE COUNTING

14   STARTED, IT WOULD TAKE A FULL DAY?

15   A.      YES, YOUR HONOR.

16   Q.      IN YOUR EXPERIENCE, HOW LONG DOES IT TAKE IN

17   PENNSYLVANIA FOR THE COUNTY BOARDS TO SELECT PEOPLE TO

18   DO A HAND RECOUNT?

19   A.      I DON'T HAVE BACKGROUND IN THAT.

20                 THE COURT:  OKAY.  NOW, REMIND ME AGAIN,

21   MR. MAAZEL, THE FORENSIC AUDIT YOU WANT IS WHAT?

22                 MR. MAAZEL:  IT IS A FORENSIC AUDIT OF

23   THE CENTRAL ELECTION MANAGEMENT SYSTEM OF THESE

24   COUNTIES.  IT'S BASICALLY COPYING A HARD DRIVE.

25                 THE COURT:  OF HOW MANY COUNTIES?

```
 1                    MR. MAAZEL:  SIX.

 2                    THE COURT:  SIX COUNTIES.  AND YOU NAMED

 3     THE SIX INCLUDING PHILADELPHIA?

 4                    THE WITNESS:  YES, SIMULTANEOUSLY.

 5     BY THE COURT:

 6     Q.      HOW LONG WOULD SUCH A FORENSIC AUDIT TAKE IN

 7     YOUR EXPERT OPINION, DOCTOR?

 8     A.      WELL, I DON'T AGREE THAT THAT IS THE FORENSIC

 9     AUDIT.  THAT IS THE NECESSARY PREPARATION TO DO A

10     FORENSIC AUDIT, WHICH IS, YOU CAN'T TAKE THE VOTING

11     MACHINE ITSELF BECAUSE ONCE IT HAS BEEN OUT OF THE

12     CUSTODY OF THE COUNTY IT IS NOT SAFE FOR USE IN AN

13     ELECTION ANYMORE.  SO WHAT YOU DO IS YOU MAKE A COPY OF

14     THE HARD DRIVE THAT IS ON THE MACHINE.  THEN THAT HARD

15     DRIVE HAS TO BE SUBJECTED TO A FORENSIC EXAMINATION, AND

16     I DON'T KNOW WHAT THEY ARE ACTUALLY LOOKING FOR.  IF

17     THEY ARE LOOKING FOR THE PRESENCE OF CERTAIN MALWARE --

18     Q.      THEY ARE LOOKING FOR BAD ACTS, MISCONDUCT,

19     TAMPERING, HACKING.

20     A.      IT'S DIFFICULT FOR ME TO IMAGINE HOW THERE COULD

21     BE A FORENSIC EXAMINATION THAT WOULD REVEAL, FOR

22     EXAMPLE, THE VERY SCENARIO THAT THEY POSIT, WHICH IS

23     THIS MALWARE WHICH ERASES ITSELF AFTER IT HAS DONE ITS

24     BAD WORK.  THAT WOULD NOT BE REVEALED IN SUCH A FORENSIC

25     AUDIT.
```

1   Q.      SO YOU ARE SAYING NO AMOUNT OF TIME?

2   A.      NOT FOR THAT SCENARIO.

3   Q.      WHAT SCENARIO?

4   A.      THE SCENARIO --

5   Q.      WHAT SCENARIO -- WHAT KIND OF AUDIT COULD BE

6   CONDUCTED IN LESS THAN A DAY?  WHAT KIND OF FORENSIC

7   AUDIT COULD BE CONDUCTED IN LESS THAN A DAY?

8   A.      THE ONLY THING THAT I COULD SEE BEING DONE IN

9   LESS THAN A DAY WOULD BE A BITWISE COMPARISON.  BIT FOR

10  BIT OF --

11  Q.      OF THE AMOUNT OF INFORMATION?

12  A.      -- OF WHAT THE SOFTWARE ON THE MACHINE SHOULD BE

13  VERSUS WHAT IT ACTUALLY IS.

14  Q.      THAT IS IT?

15  A.      BUT THE PROBLEM IS, THAT IS A PARTICULAR

16  PROGRAM.  THAT DOES NOT COUNT EVERYTHING GOING ON IN THE

17  OPERATING SYSTEM, ET CETERA, SO I'M NOT SURE WHAT WOULD

18  BE REVEALED BY SUCH A QUICK AUDIT.

19              THE COURT:  OKAY.  THANK YOU, DOCTOR.

20  MR. JOEL, YOU HAVE FIVE MINUTES LEFT IF YOU CARE TO

21  SPEAK.

22              MR. JOEL:  I'LL ACCEDE IT, YOUR HONOR.

23  THANK YOU.

24              THE COURT:  I HAVE ORDERED THAT NO

25  ADDITIONAL PAPERS BE FILED BECAUSE THE LAST ONE OF THESE

```
1        I HAD WHICH WAS A MONTH AGO PEOPLE WERE FILING THINGS UP

2     UNTIL 1:30 IN THE MORNING THAT I HAD TO RULE.  AND SO IF

3     YOU FEEL YOU HAVE TO FILE SOMETHING, I BELIEVE MY CLERK

4     HAS MADE IT EASY FOR YOU TO CONTACT HIM, BEN, AND PLEASE

5     CALL BEN, HE KNOWS HOW TO GET HOLD OF ME.  IF THERE IS

6     SOMETHING YOU REALLY FEEL -- I REALLY WOULD LIKE TO GET

7     THIS DONE BY MONDAY MORNING, WHICH IS GOING TO BE HARD

8     IF YOU FILE NEW ARGUMENTS AND SO FORTH.  BUT IF YOU

9     FEEL -- IF YOU FEEL YOU REALLY HAVE TO DO IT, PLEASE

10    CALL MY CLERK AND I WILL GIVE YOU A VERY, VERY PROMPT

11    RULING.

12                   ANYTHING FURTHER?

13                   MR. JOEL:  NO, YOUR HONOR, NOT FROM THE

14    COMMONWEALTH.

15                   MR. TABAS:  NO, YOUR HONOR.

16                   MR. MAAZEL:  NOT FROM THE PLAINTIFFS.

17    THANK YOU VERY MUCH, YOUR HONOR.

18                   THE COURT:  MY THANKS TO ALL COUNSEL.  I

19    KNOW JUST HOW HARD YOU HAVE ALL BEEN WORKING.  I HOPE

20    YOUR CLIENTS APPRECIATE ALL YOUR HARD WORK AS MUCH AS I

21    DO.  THANK YOU.

22                   THE CLERK:  ALL RISE.

23                   (COURT ADJOURNED 4:10 P.M.)

24

25
```

1

2

3

4

5              I CERTIFY THAT THE FOREGOING IS A CORRECT

6     TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

7     ABOVE-ENTITLED MATTER.

8

9     DATE                      OFFICIAL COURT REPORTER

10                              SUZANNE R. WHITE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I    N    D    E    X

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3    J. ALEXANDER HALDERMAN

4       BY MR. CELLI         12       --       27        --

5       BY MR. JOEL          --       23       --        --

6       BY MR. TABAS         --       26       --        --

7

8    MICHAEL SHAMOS

9       BY MR. JOEL          43       --       --        --

10      BY MS. FRICK         --       66       --        --

11

12   EXHIBITS MARKED                         PAGE

13   D 6                                     65

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 3

# Securing the Vote

## Protecting American Democracy

Committee on the Future of Voting:
Accessible, Reliable, Verifiable Technology

Committee on Science, Technology, and Law

Policy and Global Affairs

Computer Science and Telecommunications Board

Division on Engineering and Physical Sciences

A Consensus Study Report of

*The National Academies of*
SCIENCES · ENGINEERING · MEDICINE

THE NATIONAL ACADEMIES PRESS
*Washington, DC*
**www.nap.edu**

Copyright National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS**     500 Fifth Street, NW     Washington, DC 20001

This activity was supported with grants to the National Academy of Sciences from the Carnegie Corporation of New York (#G-16-53637) and the William and Flora Hewlett Foundation (#G-2016-5031) and with funds from National Academy of Sciences' W. K. Kellogg Foundation Fund and the National Academies of Sciences, Engineering, and Medicine's Presidents' Circle Fund. Any opinions, findings, conclusions, or recommendations expressed in this publication do not necessarily reflect the views of any organization or agency that provided support for the project.

International Standard Book Number-13:   978-0-309-47647-8
International Standard Book Number-10:   0-309-47647-X
Library of Congress Control Number:   2018952779
Digital Object Identifier:   https://doi.org/10.17226/25120

Additional copies of this publication are available for sale from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

Copyright 2018 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Suggested citation: National Academies of Sciences, Engineering, and Medicine. 2018. *Securing the Vote: Protecting American Democracy*. Washington, DC: The National Academies Press. doi: https://doi.org/10.17226/25120.

Copyright National Academy of Sciences. All rights reserved.

*The National Academies of*
## SCIENCES · ENGINEERING · MEDICINE

The **National Academy of Sciences** was established in 1863 by an Act of Congress, signed by President Lincoln, as a private, nongovernmental institution to advise the nation on issues related to science and technology. Members are elected by their peers for outstanding contributions to research. Dr. Marcia McNutt is president.

The **National Academy of Engineering** was established in 1964 under the charter of the National Academy of Sciences to bring the practices of engineering to advising the nation. Members are elected by their peers for extraordinary contributions to engineering. Dr. C. D. Mote, Jr., is president.

The **National Academy of Medicine** (formerly the Institute of Medicine) was established in 1970 under the charter of the National Academy of Sciences to advise the nation on medical and health issues. Members are elected by their peers for distinguished contributions to medicine and health. Dr. Victor J. Dzau is president.

The three Academies work together as the **National Academies of Sciences, Engineering, and Medicine** to provide independent, objective analysis and advice to the nation and conduct other activities to solve complex problems and inform public policy decisions. The National Academies also encourage education and research, recognize outstanding contributions to knowledge, and increase public understanding in matters of science, engineering, and medicine.

Learn more about the National Academies of Sciences, Engineering, and Medicine at **www.nationalacademies.org**.

Copyright National Academy of Sciences. All rights reserved.

*The National Academies of*
## SCIENCES · ENGINEERING · MEDICINE

**Consensus Study Reports** published by the National Academies of Sciences, Engineering, and Medicine document the evidence-based consensus on the study's statement of task by an authoring committee of experts. Reports typically include findings, conclusions, and recommendations based on information gathered by the committee and the committee's deliberations. Each report has been subjected to a rigorous and independent peer-review process and it represents the position of the National Academies on the statement of task.

**Proceedings** published by the National Academies of Sciences, Engineering, and Medicine chronicle the presentations and discussions at a workshop, symposium, or other event convened by the National Academies. The statements and opinions contained in proceedings are those of the participants and are not endorsed by other participants, the planning committee, or the National Academies.

For information about other products and activities of the National Academies, please visit www.nationalacademies.org/about/whatwedo.

Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON THE FUTURE OF VOTING: ACCESSIBLE, RELIABLE, VERIFABLE TECHNOLOGY

*Co-chairs*

**LEE C. BOLLINGER**, President, Columbia University
**MICHAEL A. McROBBIE**, President, Indiana University

*Members*

**ANDREW W. APPEL**, Eugene Higgins Professor of Computer Science, Princeton University

**JOSH BENALOH**, Senior Cryptographer, Microsoft Research

**KAREN COOK (NAS)**, Ray Lyman Wilbur Professor of Sociology; Director of the Institute for Research in the Social Sciences (IRiSS); and Vice-Provost for Faculty Development and Diversity, Stanford University

**DANA DeBEAUVOIR**, Travis County Clerk, County of Travis, TX

**MOON DUCHIN**, Associate Professor of Mathematics and Founding Director, Program in Science, Technology, and Society, Tufts University

**JUAN E. GILBERT**, Andrew Banks Family Preeminence Endowed Professor and Chair of the Computer and Information Science and Engineering Department, University of Florida

**SUSAN L. GRAHAM (NAE)**, Pehong Chen Distinguished Professor Emerita, Computer Science Division, Department of Electrical Engineering and Computer Sciences, University of California, Berkeley

**NEAL KELLEY**, Registrar of Voters and Chief of Elections, County of Orange, CA

**KEVIN J. KENNEDY**, Director and General Counsel (retired), Wisconsin Government Accountability Board

**NATHANIEL PERSILY**, James B. McClatchy Professor of Law, Stanford Law School

**RONALD L. RIVEST (NAS/NAE)**, Institute Professor, Department of Electrical Engineering and Computer Science, Massachusetts Institute of Technology

**CHARLES STEWART III**, Kenan Sahin Distinguished Professor of Political Science, Massachusetts Institute of Technology

*v*

Copyright National Academy of Sciences. All rights reserved.

*Staff*

**ANNE-MARIE MAZZA,** Study Director and Senior Director, Committee on Science, Technology, and Law

**JON EISENBERG,** Senior Director, Computer Science and Telecommunications Board

**STEVEN KENDALL,** Program Officer, Committee on Science, Technology, and Law

**KAROLINA KONARZEWSKA,** Program Coordinator, Committee on Science, Technology, and Law

**WILLIAM J. SKANE,** Consultant Writer

**CLARA SAVAGE,** Financial Officer, Committee on Science, Technology, and Law

Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON SCIENCE, TECHNOLOGY, AND LAW

*Co-chairs*

**DAVID BALTIMORE** (**NAS/NAM**), President Emeritus and Robert Andrews Millikan Professor of Biology, California Institute of Technology

**DAVID S. TATEL**, Judge, U.S. Court of Appeals for the District of Columbia Circuit

*Members*

**THOMAS D. ALBRIGHT** (**NAS**), Professor and Director, Vision Center Laboratory and Conrad T. Prebys Chair in Vision Research, Salk Institute for Biological Studies

**ANN ARVIN** (**NAM**), Lucile Packard Professor of Pediatrics and Microbiology and Immunology; Vice Provost and Dean of Research, Stanford University

**JOE S. CECIL**, Project Director (retired), Program on Scientific and Technical Evidence, Division of Research, Federal Judicial Center

**R. ALTA CHARO** (**NAM**), Warren P. Knowles Professor of Law and Bioethics, University of Wisconsin at Madison

**HARRY T. EDWARDS**, Judge, U.S. Court of Appeals for the District of Columbia Circuit

**CHARLES ELACHI** (**NAE**), Professor of Electrical Engineering and Planetary Science, Emeritus, California Institute of Technology

**JEREMY FOGEL**, Director, Federal Judicial Center

**HENRY T. GREELY**, Deane F. and Kate Edelman Johnson Professor of Law and Professor, by courtesy, of Genetics, Stanford University

**MICHAEL IMPERIALE**, Arthur F. Thurnau Professor of Microbiology and Immunology University of Michigan

**ROBERT S. LANGER** (**NAS/NAE/NAM**), David H. Koch Institute Professor, Massachusetts Institute of Technology

**GOODWIN LIU**, Associate Justice, California Supreme Court

**JUDITH MILLER**, Independent Consultant

**JENNIFER MNOOKIN**, Dean and David G. Price and Dallas P. Price Professor of Law, University of California, Los Angeles School of Law

**MARTINE A. ROTHBLATT**, Chairman and Chief Executive Officer, United Therapeutics

**JOSHUA R. SANES** (**NAS**), Professor of Molecular and Cellular Biology and Paul J. Finnegan Family Director, Center for Brain Science, Harvard University

Copyright National Academy of Sciences. All rights reserved.

**WILLIAM B. SCHULTZ**, Partner, Zuckerman Spaeder LLP
**SUSAN S. SILBEY**, Leon and Anne Goldberg Professor of Humanities,
    Professor of Sociology and Anthropology, and Professor of
    Behavioral and Policy Sciences, Massachusetts Institute of Technology
**DAVID C. VLADECK**, A.B. Chettle, Jr., Professor of Law, Georgetown
    University Law Center
**SUSAN WESSLER (NAS)**, University of California President's Chair
    and Distinguished Professor of Genetics, University of California,
    Riverside

*Staff*

**ANNE-MARIE MAZZA**, Senior Director
**STEVEN KENDALL**, Program Officer
**KAROLINA KONARZEWSKA**, Program Coordinator

Copyright National Academy of Sciences. All rights reserved.

# COMPUTER SCIENCE AND TELECOMMUNICATIONS BOARD

*Chair*

**FARNAM JAHANIAN,** Carnegie Mellon University

*Members*

**LUIZ BARROSO,** Vice President of Engineering, Google, Inc.
**STEVEN M. BELLOVIN (NAE),** Percy K. and Vida L. W. Hudson
    Professor of Computer Science, Columbia University
**ROBERT F. BRAMMER,** President and Chief Executive Officer,
    Brammer Technology, LLC
**DAVID E. CULLER (NAE),** Professor of Electrical Engineering and
    Computer Science, University of California, Berkeley
**EDWARD FRANK,** Chief Executive Officer, Cloud Parity, Inc.
**LAURA M. HAAS (NAE),** Dean, College of Information and Computer
    Sciences, University of Massachusetts, Amherst
**MARK A. HOROWITZ (NAE),** Yahoo! Founders Chair, Electrical
    Engineering and Computer Science, Stanford University
**ERIC HORVITZ (NAE),** Distinguished Scientist and Director, Microsoft
    Research
**VIJAY KUMAR (NAE),** Nemirovsky Family Dean, School of Engineering
    and Applied Sciences, University of Pennsylvania
**BETH MYNATT,** Distinguished Professor and Executive Director
    Institute for People and Technology, Georgia Institute of Technology
**CRAIG PARTRIDGE,** Chief Scientist, Raytheon BBN Technologies
**DANIELA RUS (NAE),** Andrew and Erna Viterbi Professor of Electrical
    Engineering and Computer Science and Director of the Computer
    Science and Artificial Intelligence Laboratory, Massachusetts Institute
    of Technology
**FRED B. SCHNEIDER (NAE),** Samuel B. Eckert Professor of Computer
    Science and Chairman, Department of Computer Science, Cornell
    University
**MARGO SELTZER,** Herchel Smith Professor of Computer Science and
    the Faculty Director of the Center for Research on Computation and
    Society, Harvard University
**MOSHE VARDI (NAS, NAE),** Karen Ostrum George Distinguished
    Service Professor in Computational Engineering and Director of the
    Ken Kennedy Institute for Information Technology, Rice University

Copyright National Academy of Sciences. All rights reserved.

*Staff*

**JON EISENBERG,** Senior Director
**LYNETTE I. MILLETT,** Associate Director and Director, Forum on
   Cyber Resilience
**EMILY GRUMBLING,** Program Officer
**KATIRIA ORTIZ,** Associate Program Officer
**JANKI PATEL,** Senior Program Assistant
**SHENAE BRADLEY,** Administrative Assistant
**RENEE HAWKINS,** Financial and Administrative Manager

*x*

Copyright National Academy of Sciences. All rights reserved.

*40* *SECURING THE VOTE*

Principal voting system, by county



**FIGURE 3-4** Voting systems across the United States.
SOURCE: Desilver, Drew, "On Election Day, Most Voters Use Electronic or Optical-Scan Ballots," Pew Research Center, November 8, 2016. Pew Research Center created the figure using data from the Verified Voting Foundation.

---

**BOX 3-1**
**Overview of Vote Casting and Tabulation Methods**

**Systems in Use in Federal Elections**

*Hand-Marked "Optical" Scan Paper Ballot Systems.* Voters mark paper ballots that are subsequently recorded electronically by scanning devices. On most scanned ballots, voters indicate their selections by filling in an oval or completing an arrow. Ballots may either be scanned on precinct-based optical scan systems in a polling place (precinct count) or collected in a ballot box to be scanned at a central location (central count). The original generation of optical ballot scanners used one row of optical sensors, one sensor per ballot column, to detect the voters' marks. Newer ballot scanners, sometimes referred to as "digital scanners," store an electronic image of each ballot [a "cast vote record" (CVR)], which can be used later if auditing of the election process is required.[a] The original generation

Copyright National Academy of Sciences. All rights reserved.

### BOX 3-1 Continued

of ballot scanners used infrared sensors to detect ballot marks, giving rise to the generic term "optical scanner." Optical scanners are still used even though newer image-processing technologies are available.

***Direct Recording Electronic (DRE) Systems***. Voters use an electronic interface to record their votes directly into a computer's memory (e.g., onto a memory cartridge or memory card). That computer counts the vote. A keyboard is typically provided to allow entry of write-in votes, though older models have a paper roll behind a small opening where voters record write-in votes using a pen.

The first generation of DREs used a push-button interface, while later systems use a touchscreen interface or a dial interface.[b]

Some DREs are equipped with a voter-verifiable paper audit trail (VVPAT) feature that prints the voter's selections on paper and allows voters to confirm their selections by inspecting this paper before their votes are cast. The paper record is preserved and, depending on state election codes, may serve as the ballot of record in the event of an audit or recount.

***Machine-Marked Paper Ballot Systems***. A growing number of jurisdictions are using electronic "ballot-marking devices" (BMDs), which use electronic devices to mark paper ballots according to voters' instructions. The paper ballots are usually counted by optical scanners.

***Hand Counted Paper Ballots***. A small number of jurisdictions continue to manually count paper ballots cast in polling places.

**Systems No Longer In Use In Federal Elections**

***Punch Card Voting Systems***. Those systems employed a card (or cards) and a small clipboard-sized device for recording votes. Voters marked their choice by punching holes in the cards with a punch device. After voting, the voter either placed the ballot in a ballot box for later tabulation or the ballot was fed into a vote-tabulating device at the precinct. No jurisdictions used punch card voting systems in federal elections in 2016.

***Mechanical Lever Voting Machines***. First introduced in the 1890s, mechanical lever machines were used in many states during the 20th century. Voters would make choices by flipping levers and their selections were tabulated on machine counters similar to automobile odometers. As recently as 1996, mechanical lever machines were used by 20.7 percent of registered voters in the United States. Since 2010, no mechanical lever voting machines have been used in federal elections.

_____

[a] Some scanners also store a digital photograph of the ballot.
[b] See Jones, Douglas W. and Barbara Simons, *Broken Ballots: Will Your Vote Count?* (Stanford: Center for Language and Information, 2012), pp. 91-101.

Copyright National Academy of Sciences. All rights reserved.

**BOX 3-2**
**The Role of Paper in Elections**

Until the widespread adoption of mechanical lever machines in the mid-20th century, hand-marked paper had been the most common medium upon which a voter cast a ballot. The cast paper ballot provided a physical record that could be examined in instances where a recount or other reconciliatory action was required. With the advent of mechanical lever machines, no record of a voter's choices was permanently stored, either on paper or mechanically—the only effect of casting a vote was to increment mechanical counters that accumulated the choices made by voters on a particular machine. Mechanical lever machines were popular where they were used. However, these machines were prone to breakdowns that could go undetected until balloting had ended.

Before the passage of the Help America Vote Act (HAVA), it was common for jurisdictions with lever machines to adopt electronic systems when they considered upgrading their voting systems. HAVA provided an impetus for jurisdictions that had previously used lever machines to adopt Direct Recording Electronic systems (DREs), either to provide accessible options for those with disabilities, or to replace paper-based systems altogether. The rapid growth in the prominence of DREs brought greater voice to concerns about their use, particularly their vulnerability to software malfunctions and external security risks. And as with the lever machines that preceded them, without a paper record, it is not possible to conduct a convincing audit of the results of an election.

Many electronic voting systems utilize paper as part of their operation. As discussed in Box 3-1, voters may mark paper ballots that are subsequently recorded electronically by scanning devices. Alternatively, ballot-marking devices may be used to mark paper ballots according to voters' instructions. In the case of DREs, there is no physical (i.e., paper) ballot. Instead, the ballot exists only in electronic form.

Problems arise when a voter does not actually verify his or her ballot, especially when the ballot is being tabulated by a computer that has a software flaw or is infected with malware (see Chapter 5). A ballot that is "voter marked" is by definition voter verified. Voters can verify that the selections on hand-marked ballots or on paper ballots produced by BMDs reflect their intended choices before their votes are tabulated. With DREs, voters may similarly verify their selections using a voter-verifiable paper audit trail (VVPAT) (see Box 3-1)—provided that the DRE is equipped with this feature. The information on a VVPAT may accurately present a voter's selections, but VVPATs exist independently of the record maintained in the DRE's computer memory. In most cases it is the electronic record, and not the VVPAT, that is used for vote tabulation.[a]

**Paper Ballots Defined**

Because records of ballots may take many forms, it is important to clearly define what is meant by "paper ballot." For the purposes of this report, references to paper ballots refer to original records that are produced by hand or a ballot-marking device, which are human-readable in a manner that is easily accessible for inspection and review by the voter without any computer intermediary (i.e.,

Copyright National Academy of Sciences. All rights reserved.

voter-verifiable), countable by machine (such as a scanner) or by hand, and which may be recounted or audited by manual examination of the human-readable portion of the ballot.

A paper ballot–based voting system makes the paper ballot the official "ballot of record" of the voter's expressed intentions. Other representations (e.g., an electronic representation produced by a scanner) are derivative and are not voter-verifiable. The human-readable portion of the cast paper ballot provides the basis for audits and recounts.

**The Challenges of Paper Ballots**

The use of hand-marked paper ballots can introduce voting errors. Voters may inadvertently make stray marks that can be misread by optical scanners. Voters using hand-marked paper ballots may accidentally skip a race or vote for multiple candidates in a race and thereby invalidate their vote for that particular race.[b] Counting paper ballots can be tedious, leading to vote-count errors.[c]

Paper ballots are not immune to fraud. Fraud may occur through ballot theft, destruction, or substitution, by ballot-box stuffing, or by the addition of marks to ballots after a voter finishes voting.[d]

Paper ballots can present logistical challenges when used in vote centers and in early voting, especially in densely populated, metropolitan areas. In vote centers and in early voting, every jurisdiction-specific ballot "style" that might conceivably be requested by a voter in a jurisdiction must be available at every voting site. In smaller jurisdictions, this functional requirement can be satisfied by having a physical inventory of every ballot style that might be requested at a site, through what is known as a "pick-and-pull" system. In larger jurisdictions that might have hundreds of ballot styles, maintaining a complete, secure inventory of ballot styles in every voting location may be logistically impossible or cost-prohibitive. One solution to this problem is a "ballot-on-demand" system, where appropriate ballots are printed on the spot for every voter. However, certain ballot-on-demand systems are costly and can put significant strain on the electrical systems of buildings hosting these systems.[e]

Electronic voting systems introduce challenges in and of themselves. Such systems are, for example, more costly than systems that use paper exclusively. Technical support for such systems is often necessary and adds to their cost over time. Such systems may also be more prone to breakdowns, are subject to technological obsolescence, and as is discussed in Chapter 5, vulnerable to cyberattacks and other threats. Furthermore, electronic systems must be stored in secure locations when not in use.

---

[a] As noted in Box 3-1, in some states, when a VVPAT is produced by a DRE, the VVPAT may be used as the ballot of record for election contests and recounts.

Research suggests that DRE VVPATs tend not to be voter verified. This suggests that VVPATs may be of little value as a check on the accuracy of DREs. See, e.g., Everett, S. P., "The Usability of Electronic Voting Machines and How Votes Can Be Changed Without Detection," doctoral dissertation, Rice University, Houston, Texas and Campbell, Bryan A. and Michael D. Byrne, "Now Do Voters Notice Review Screen Anomalies? A Look at Voting System Usability," *Proceedings of EVT/WOTE,* 2009.

*continued*

Copyright National Academy of Sciences. All rights reserved.

*SECURING THE VOTE*

---

**BOX 3-2 Continued**

Research on the rate of voter verification of BMD ballots relative to the rate of verification of VVPATs or voter-marked paper ballots has been limited.

[b] Voters may also accidentally skip races when using DREs (see Chapter 4).

[c] For a discussion of the inherent weaknesses in human vote counting, see Goggin, Stephen N., Michael D. Byrne, and Juan E. Gilbert, "Post-election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence," *Election Law Journal: Rules, Politics, and Policy*, 2012, Vol. 11, No. 1, pp. 36-51. A recount or audit can make use of limited software (e.g., spreadsheets) to assist in the counting.

Dr. Gilbert is a member of the committee that authored the current report.

[d] Such fraud provided motivation for the adoption of mechanical lever voting machines in the late 19th century.

[e] Power usage is determined by the type of printer required to produce the desired ballot. In instances where a printer must create an entire blank ballot certified to meet particular specifications using paper of a specific quality, be digitally readable, and be assigned a unique serial number, the necessary printer may draw significantly more power than is typical for printers used to print only voter selections on archival thermal paper.

---

**TABLE 3-1** Types of Voting Systems Used in the United States in 2016

| Voting System | Percent of U.S. Counties Using System |
|---|---|
| Hand Counted Paper Ballot | 1.54% |
| Optical Scan | 62.78% |
| Electronic (DRE or BMD) | 32.85% |
| Mixed | 2.69% |

SOURCE: Brace, Kimball, President, Election Data Services, Inc., "The Election Process from a Data Perspective," presentation to the Presidential Advisory Commission on Election Integrity, September 12, 2017, Manchester, NH, available at: https://www.electiondataservices.com/wp-content/uploads/2017/09/BracePresentation2PenseCommAmended.pdf.

ally counted or voted with a mixture of systems (see Table 3-1). In many instances, marked ballots are submitted by mail and tabulated at a central location.

HAVA requires that each polling place used in a federal election

be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) [29] as for other voters . . . through the use of at least one

---

[29] Participation also includes the ability to cause one's own ballot selections to be recorded, verifying that one's ballot selections are correctly recorded, and the casting of one's self-verified ballot.

Copyright National Academy of Sciences. All rights reserved.

**EXHIBIT 4**

 **Jennifer Cohn**
@jennycohn1

 **Follow**    ˅

I hate to be Debbie Downer, but this
agreement allows PA to buy awful
"universal use" touchscreen ballot
markers and scanners, which. generate
the COMPUTER marked so-called "paper
ballots" w/ barcodes that I've been
warning about. Vote suppressors like
Brian Kemp love them... 1/

---

**Dr. Jill Stein**  @DrJillStein

BREAKING: Huge victory for election integrity! We just settled our #recount
lawsuit in Pennsylvania for a guarantee that PA will use paper ballots by
2020, followed in 2022 by post-election audits to verify the vote before
results are certified. Details: votingjustice.us/pa_recount_set...

---

7:04 AM - 29 Nov 2018

**1,950** Retweets  **2,358** Likes        

 148    ⟲ 2.0K    ♡  2.4K



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018                    ⌄

And why does PA get to kick the manual audit ball down the road until 2022?
WTH? If we keep congratulating officials for refusing to use HAND marked paper
ballots (counted by hand or on scanners) & postponing manual audits, we are
doomed. 2/

　🗨 15　　♻ 238　　♡ 478



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018                    ⌄

3/ Here is my sourced article about the many dangers of these new universal use
touchscreen ballot markers.



**States are flocking to buy the new "universal use" touchscreen ballo...**

By Jennifer Cohn, May 13, 2018

medium.com

　🗨 7　　♻ 196　　♡ 309



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

4/

> **Jennifer Cohn** @jennycohn1
>
> 10/ As with VVPATs, a recent study (awaiting peer review) shows that most voters don't review summary cards and won't notice errors if they do. nybooks.com/daily/2018/11/...
>
> Show this thread

🗨 1          ⟲ 80          ♡ 163



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

5/ The all-in-one version of these touchscreen ballot markers include what IT expert Andrew Appel calls a "permission to cheat" feature bc the machine can tell when voters decide NOT to review the computer marked "paper ballot" & flip those votes.

> **Jennifer Cohn** @jennycohn1
>
> You might want to watch out for the permission to cheat feature... IT expert Andrew Appel's words, not mine. twitter.com/jennycohn1/sta... 2/

🗨 1          ⟲ 132          ♡ 202



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

6/ No manual audit in the world would be able to detect this cheating. And yet watch everyone in the media congranulate Stein for this terrible settlement.

🗨 7          ⟲ 107          ♡ 196



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

7/ @VerifiedVoting and lawmakers will no doubt praise this awful agreement as well.

🗨 2          ⟲ 71          ♡ 141



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

8/ One of my articles about the use of ExpressVote touchscreen ballot markers in Kansas and the many problems they caused & have the potential to cause.



**Kobach's Kansas Victory Tainted by...Kobach's Ele...**

By Jennifer Cohn Kris Kobach, Kansas's top election official, recently declared victory in the highly publicized Republican gubernatorial primary in Kansas, surpassin...

legacy.tyt.com

💬 1        🔁 88        ♡ 143



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

9/ The same vendor executive who ushered in a generation of paperless touchscreen voting in Georgia is pushing HARD to get Georgia and jurisdictions throughout the US to buy the ExpressVote touchscreen ballot markers.



**Trump'sREALHistory - #DemCast** @heartfulmom

29. Guess who's promoting ES&S Express Vote Barcode System?

She's baaaack! Kathy Rogers...

💬 3        🔁 120        ♡ 172



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

10/ As I said, Brian Kemp in Georgia is champing at the bit to buy ES&S's ExpressVote touchscreen ballot markers, which should put all voters on high alert.



**Trump'sREALHistory - #DemCast** @heartfulmom

28. 2009: ES&S buys Diebold's Election Systems.

2018: Guess which system Kemp wants to install next?

 3          ⟲ 125          ♡ 164



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

Here, @MarilynRMarks1 illustrates what these computer marked summary cards, which almost everyone calls "paper ballots," look like and how they function. The PA agreement would allow these. The most corrupt US election officials seem to want these. twitter.com/marilynrmarks1... 11/



**Marilyn Marks** @MarilynRMarks1

1/ This is the voting system card that Kemp likes and SB403 is permitting. There are barcode votes counted that humans cannot read. The message list to voters that is supposed to list what they voted is not scanned or...

Show this thread

○ 4          ⟲ 133          ♡ 155



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

12/ Kobach's appointee in Kansas's most populous county recommended these barcode ballot markers & got them, despite concerns raised by EI advocates. The machines then scandalized the county by causing enormous problems in the Kansas gubernatorial primary.



**Kobach's Kansas Victory Tainted by...Kobach's Ele…**

By Jennifer Cohn Kris Kobach, Kansas's top election official, recently declared victory in the highly publicized Republican gubernatorial primary in Kansas, surpassin...

legacy.tyt.com

  2           97           130



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

13/ We need hand marked paper ballots counted either (a) by hand or (b) on scanners, w/ Risk Limiting Audits & a transparent chain of custody between election night & the audit. Touchscreens only for ADA use and no barcodes on the ballots. The PA agreement requires none of this.



🗨 12    ↻ 198    ♡ 313



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

14/ If Kemp's and Kobach's endorsements aren't enough to convince you, there's also Ohio's new Republican Secretary of State, @FrankLaRose, who authored and pushed through a bill that has enabled funds to go toward the purchase of these things.

---

**Jennifer Cohn** @jennycohn1

I knew it. Ohio is joining the dangerous stampede to replace their touchscreen voting machines not with hand marked paper ballots and scanners, but rather with barcoded "summary cards" from touchscreen ballot marking devices like the ES&S ExpressVote. 1/ wcbe.org/post/franklin-...

Show this thread

---

🗨 4          ⟲ 79          ♡ 135



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

15/ Although few are aware of this impending train wreck caused by LaRose's bill (@LuluFriesdat & I tried to stop the bill earlier this year), many have noted w/ alarm LaRose's recent decision to add Ken Blackwell of Ohio 2004 infamy 2 his transition team.

---

**Bebe**   @BebeOhio

OH just elected a new Secretary of State. He has put Ken Blackwell on his transition team. Blackwell was SOS of OH in 2004 and was knee deep in the cheating. Sadly, OH will be really tough for the Dem candidate in 2020.

---

🗨 2          ⟲ 68          ♡ 112



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

16/ Thread about LaRose, Blackwell, and Ohio 2004.

> **Jennifer Cohn** @jennycohn1
>
> People may think that what went down in Ohio in the 2004 presidential election is old news, & that we shouldn't discuss it. They are wrong. The man at the center of it all, former Ohio Secretary of State Ken Blackwell, is BACK & assisting OH's new Secty of State. God help us. 1/ …
>
> Show this thread

   ♡ 4    ⟲ 64    ♡ 100



**Jennifer Cohn** @jennycohn1 · 29 Nov 2018

17/ Related Sourced thread.

> **Jennifer Cohn** @jennycohn1
>
> No, manual audits CANNOT remedy the risks of barcoded summary cards (which vendors and officials call "paper ballots") from "universal use" touchscreen ballot markers, which @DrJillStein's Pennsylvania settlement agreement allows. See thread below. twitter.com/jennycohn1/sta…

   ♡ 7    ⟲ 51    ♡ 87



**Jennifer Cohn** @jennycohn1 · 17 Dec 2018

18/ Here is the settlement agreement.
d3n8a8pro7vhmx.cloudfront.net/jillstein/page…

   ♡ 1    ⟲ 12    ♡ 25



**Jennifer Cohn** @jennycohn1 · 17 Dec 2018

19/ Here's an article dated AFTER Stein's settlement agreement. As you can see, PA officials interpret the agreement to mean that touchscreen ballot marking systems are allowed in lieu of hand marked ballots & scanners.

> **Jennifer Cohn** @jennycohn1
>
> "While [PA] voters may still end up using an ELECTRONIC SCREEN to make their ballot selections, that machine will spit out a paper record that will then be scanned..." Uh, why?? #VendorBoondoggle cc: @PittCyber @DePasqualePA 1/ cumberlink.com/news/local/com...
>
> Show this thread

🗨 1          ⟲ 19          ♡ 38



**Jennifer Cohn** @jennycohn1 · 17 Dec 2018

20/ The only touchscreen ballot marking systems sold for "universal use" are the ones with the barcodes. The most popular version is the ES&S ExpressVote that I keep warning about. Unisyn has one too. And Dominion Voting. All would have the same issues.



🗨 3          ⟲ 22          ♡ 43



**Jennifer Cohn** @jennycohn1 · 17 Dec 2018 ⌄

21/ Proponents of these touchscreen systems sometimes say they are important to avoid problems resolving unclear hand marks during hand recounts or audits. But that simply isn't a sufficient concern given the many glaring problems w/ these systems.

> **Jennifer Cohn** @jennycohn1
>
> In the Minnesota 2008 hand recount, the intent of all but 14 hand marked paper ballots out of 2.9 million was resolved unanimously by a bipartisan panel. 5/ sos.state.mn.us/media/3078/min...
>
> Show this thread

💬 4      ⟲ 34      ♡ 61

# EXHIBIT 5



# C I T Y   C O M M I S S I O N E R S   O F F I C E

Lisa M. Deeley, Chairwoman
Anthony Clark, Commissioner
Al Schmidt, Vice Chair

FOR IMMEDIATE RELEASE
February 20, 2019

Contact: Nick Custodio
Office: 215- 686-3460
Cell:    814-470-1069
nick.custodio@phila.gov

### Philadelphia City Commissioners Approve New Voter-Verifiable Paper Ballot Voting System and New Electronic Poll Books
*Philadelphia meets Governor's deadline and secures future elections*

Philadelphia, PA – This morning at their regularly scheduled meeting the Philadelphia City Commissioners voted to approve a new voter-verifiable paper ballot voting system to be implemented in the November 2019 General Election. In April of 2018, the Department of State, in conjunction with Governor Wolf, informed all 67 of Pennsylvania's counties that they must have a voter-verifiable paper record voting system selected no later than December 31, 2019, and preferably in place for use in the November 2019 General Election. With their selection, this morning, of the Election Systems & Software, LLC ExpressVote XL the City of Philadelphia has met the Governor's selection deadline.

"Today is a momentous day," said City Commissioner Chair Lisa Deeley. "Today, we voted to give the City's voters a secure and resilient system with an auditable voter-verifiable paper-ballot. We look forward to the next steps which are educating our poll workers and voters. I hope everyone will come out to our public trainings." Vice Chair, Commissioner Al Schmidt echoed her comments saying that "It's critically important that we make voting easier and equally accessible for all Philadelphians while also considering the need for a secure, resilient voting system. Every voter in Philadelphia should be confident that their ballots are cast securely, and their votes are counted accurately, and our new, auditable paper ballot system will help ensure that."

The ExpressVote XL is certified by both the federal Election Assistance Commission and the Pennsylvania Department of State. All systems certified by the Department of State meet the requirements of the security experts at the University of Pittsburgh and The Blue Ribbon Commission On Pennsylvania's Election Security. The ExpressVote XL will also produce a paper ballot with human readable text, that can be verified by a voter before they cast their vote, can be counted in the event of a recount, and can be audited as per the new risk limiting audit procedures being developed by the state.

In her remarks before the vote, Commissioner Deeley applauded activists who supported hand-marked paper ballots for their passion and their feedback, which contributed to the process. However, the Commissioners choose to stick with an all machine method of voting because of voters' preference for the current style of voting on full-faced machines, the short timeline to retrain poll workers and voters, and the concerns of disability advocates that implementing hand-marked paper ballots would treat voters with disabilities unequally by requiring them to use a separate voting system.

The Commissioners also voted to select KNOWiNK, LLC as the vendor for the new electronic poll books. This modernization of the check-in process will replace the old paper poll books, speed up check-in time, and allow Philadelphia to adapt to any proposed changes in election law. The electronic poll books will be implemented in the November 2019 General Election along with the new voting system. The Commissioners will begin training the poll workers this summer and begin public demonstrations of the new systems as soon as possible.

*The Philadelphia City Commissioners are a three-member bipartisan board of elected officials in charge of elections and voter registration for the City of Philadelphia. The three Commissioners are Chairwoman Lisa Deeley (D), Anthony Clark (D), and Vice Chair Al Schmidt (R).*

###