# EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL STEIN, et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 16-cv-6287(PD) |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections and Legislation, | : | |
| Defendants. | : | |

## INTERVENORS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

# Table of Contents

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................. 3

   A.   Plaintiffs' Litigation Efforts to Advocate for  Voting Systems That Create a Paper Record ............................................................................................................ 3

   B.   The Acquisition of a New Voting System for Philadelphia ............................... 5

   C.   The Settlement Agreement and the Settling  Parties' Post-Settlement Agreement Conduct ........................................................................................................... 11

III.    ARGUMENT ............................................................................................... 15

   A.   Plaintiffs' Contract Arguments Fail ............................................................... 15

     1.   Plaintiffs' Motion Must Be Denied Because Their Proposed Contract Interpretation Is Contrary to the Unambiguous Terms of the Settlement Agreement ..................................................................................................... 15

     2.   To the Extent the Contract Is Ambiguous, the Conduct of the Parties Demonstrates the ExpressVote XL Satisfies the Parties' Understanding at the Time the Contract Was Signed (and for Eight Months Thereafter) ............................. 17

   B.   Laches Bars Plaintiffs' Requested Relief ........................................................ 18

   C.   Plaintiffs' Intended Interpretation of the Contract Would Be Unenforceable ................. 21

IV.    CONCLUSION ............................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Anela v. Pennsylvania Hous. Fin. Agency,* 690 A.2d 1157 (Pa. 1997)......................................... 21

*Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562 (E.D. Pa. 2009) ............ 16

*In re Bressman*, 874 F.3d 142 (3d Cir. 2017) ............................................................................... 19

*Kerrigan v. Philadelphia Bd. of Election*, No. 07-687, 2008 WL 3562521 (E.D. Pa. Aug. 14, 2008) ..................................................................................................................................... 20

*Lobolito, Inc. v. North Pocono School Dist.*, 562 Pa. 380 (2000) ................................................ 22

*Reynolds v. Sims*, 377 U.S. 533 (1964).......................................................................................... 20

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, LLC, 137 S. Ct. 954 (2017)............................................................................................................................................ 19

*Sprague v. Casey*, 550 A.2d 184 (1988) ........................................................................................ 19

**Statutes**

25 P.S. § 2621 ................................................................................................................................ 21

25 P.S. § 3031.1 ................................................................................................................. 15, 16, 21

**Other Authorities**

Adam Hermann, *Philly City Commissioners make contentious choice for new voting machines*, Philly Voice (Feb. 20, 2019)......................................................................................... 19

Cheryl Rougeux, *December Green Star from Pennsylvania: GPPA News Highlights: A Historic Victory for PA Voters!* ................................................................................................. 13

Claire Saska, Amid Controversy, City Commissioners Choose New Voting Machines, Phila. Magazine (Feb. 21, 2019 12:06 PM) ................................................................................ 19

Dave Davies, *Controversy swirls around new Philadelphia city voting system*, WHYY (Feb. 11, 2019)............................................................................................................................. 19

Emery Celli Brinckerhoff & Abady LLP, *Historic Settlement in Pennsylvania* (Nov. 29, 2018) ..................................................................................................................................... 12, 17

Emily Cook, Something Was Rotten in Pennsylvania (Apr. 23, 2019)......................................... 14

Jonathan Lai, *Commissioners select new voting machines for Philly over criticism from advocates*, Phila. Inquirer (Feb. 20, 2019).............................................................................. 13

Jonathan Lai, *Philadelphia's new voting machines had a mostly smooth start. Now for the big test.*, Phila. Inquirer (Nov. 11, 2019) .................................................................................. 15

Jonathan Lai, *Philly elections officials won't overturn controversial voting-machine decision*, Phila. Inquirer (Apr. 17, 2019) ................................................................................. 14

Miguel Martinez-Valle, *Exclusive First Look at Philadelphia's Controversial New Voting Machines*, NBC10 Phila. (Apr. 30, 2019 9:11 PM)................................................................. 14

## I.    INTRODUCTION

Several years ago, the City of Philadelphia and the Philadelphia County Board of Elections began planning for the acquisition of a new voting system to replace the Danaher electronic voting machines that had been used in the City since 2002.  This was a significant project in terms of time, effort, and the commitment of taxpayer funds that would involve many City Departments and was originally expected to be a three-year process.  After the 2016 election, the Commonwealth began encouraging counties to acquire new voting systems that would make a paper record of the vote in time for them to be used in the 2020 Presidential Election.  The Commonwealth's efforts included directives in early 2018 and, ultimately, the Settlement Agreement between the parties in this litigation on November 28, 2018.  In most relevant part, that agreement required that all newly certified machines in the Commonwealth provide a paper record of the votes cast.  As a result, the Board of Elections and the City moved forward on an accelerated timeline, compressing the process into a year and a half.  This was done to ensure the City's new voting system would be used no later than November 2019 because using a new system for the first time in a Presidential Election Cycle could impair the ability to run the election.

The City's process for acquiring these voting machines began in the Procurement Department with a Request for Information (RFI) and, on November 30, 2018, a Request for Proposals (RFP).  The Procurement Department reviewed the responses it received from vendors and ultimately suggested two substantially similar voting machines for the Board of Elections' determination.  Both systems had been recently certified by the Department of State for use in Pennsylvania.  Even on an accelerated basis, this process required two and a half months, not including the RFI process or the drafting of the RFP.  On February 19, 2019, the Board of Elections selected the ExpressVote XL for use in Philadelphia.

The City and the Board of Elections then moved forward with the myriad of tasks involved in implementing a new voting system.  These included negotiating a final contract, receiving delivery of 3,750 voting machines and testing each machine individually, training the City's 8,000 poll workers and translators to use the new machines, conducting demonstrations for the public on the new machines, acquiring a new climate-controlled warehouse to house the new machines, conducting a pilot-election to test procedures for the new machines, and numerous other duties that arise in relation to changing the mechanical infrastructure of an organization responsible for ensuring the orderly operation of over 1,700 divisions on election day.  The effort was herculean and ultimately successful.  On November 5, 2019, the City successfully used the ExpressVote XL in the General Election.

On the heels of this successful transition, the City was dismayed to learn three weeks later, on November 26, 2019, that Plaintiffs in this litigation had filed a motion with this Court seeking to have the ExpressVote XL decertified.  Were this to occur, the City would be unable to use the machines that the Commonwealth had certified two days after the Settlement Agreement was signed.  The City would be unable to use the machines on which it had spent millions of taxpayer dollars.  The City would be unable to use the machines which it had spent a year of coordinated efforts to implement.  And the Board of Elections would have no voting system other than the prior Danaher DRE machines available with which to conduct elections in Philadelphia.  In short, Plaintiffs' Motion, filed a year after the machines Philadelphia purchased were certified, poses a real threat to the ability of Philadelphians to exercise their franchise and would undermine and unwind all the work the City has done over the past 18 months.

Because the City and the Board of Elections share a concrete and immediate interest in Plaintiffs' Motion, we have sought to intervene in this action.  We do so because the harm to the

ability to conduct elections would be real and would entirely be caused by Plaintiffs' delay in seeking their requested relief.  Each step of the City's efforts to acquire its new voting system has been the subject of public attention.  Yet at no point until late July 2019, after nearly all the voting machines had been received and accepted, did Plaintiffs even raise the idea that the ExpressVote XL violated a private agreement they had reached with the Secretary to settle this litigation.  And Plaintiffs waited even longer – until three weeks after the November election – to come before this Court seeking relief.  Plaintiffs' delay creates the specter of a judicial fire drill that would not only harm the City and Board of Elections, it would also serve to undermine the confidence of the public in voting systems that meet the requirements of Pennsylvania law and have been properly acquired and effectively used by Philadelphia.

For the reasons set forth below, this Court should deny Plaintiffs' Motion, reject the requested relief, and not countenance Plaintiffs' delayed effort, which would create confusion and uncertainty at the polls.

## II.      BACKGROUND

### A.      Plaintiffs' Litigation Efforts to Advocate for <u>Voting Systems That Create a Paper Record</u>

Until the filing of our Motion to Intervene, neither the Philadelphia County Board of Elections nor the City were directly involved in this litigation.  The Philadelphia County Board of Elections, however, was the respondent to a December 2, 2016 petition filed by Jill Stein in the Philadelphia County Court of Common Pleas challenging the Board of Elections' denial of her request for forensic computer audit procedures with respect to the November 2016 General Election.  (Petition, *Stein v. Philadelphia County Bd. of Elections (Stein v. County Bd.)*, No. 161103335 (Ct. Comm. Pleas Phila.), attached hereto as Exhibit 1.)  Stein's petition argued that because Philadelphia utilized direct electronic recording ("DRE") machines for voting and

because those machines did not produce a paper record of the vote, Stein should be entitled to a "forensic examination" of the machines because, Stein argued, without such an audit there would be no way to know if machines had been hacked. (*Id*.) The Court of Common Pleas denied Stein's Petition on December 7, 2016. (*Stein v. County Bd.*, (Ct. Comm. Pleas Phila. Dec. 7, 2016), attached hereto as Exhibit 2.)

The Commonwealth's Opposition to Plaintiffs' Motion to Enforce Settlement Agreement ("Commw. Opp.") sets forth the factual background and procedural history of this litigation in detail. (Commw. Opp. (ECF 123) at 7-24). Intervenors incorporate that full history herein and highlight the most salient points relevant to this Opposition.

- Plaintiffs' Complaint initiating this litigation was filed on December 5, 2016, concurrent with Plaintiffs' efforts in the Commonwealth's courts to obtain recount and computer audit procedures. (*See* Mem. (ECF 55) at 5-7. The Complaint started with one of Plaintiffs' primary grievances, that the DRE machines used in Pennsylvania (including those used in Philadelphia), did not provide a "paper trail", leaving voters to "hope their votes were counted accurately." (Compl. (ECF 1) ¶¶ 1, 15.)

- On December 12, 2016, this Court denied Plaintiffs' request for a preliminary injunction for several reasons. In most relevant part, this Court held that the DRE voting machines used in Pennsylvania had been in use prior to the 2016 Presidential Election and, therefore, Plaintiffs could have acted sooner rather than waiting "well past the eleventh hour" to seek their relief. Mem. at 20-21. The Court denied the claim on the basis of laches, describing the judicial process resulting from Plaintiffs' delay as "unnecessary and unfair to all concerned." (*Id.*)

- Plaintiffs filed their Amended Complaint on February 14, 2017. The Amended Complaint again raised concerns that voters in Pennsylvania voted on "DRE machines with no paper trail" and that as a result there was "no way for election officials to verify those choices in the case of a recount." (Am. Compl. (ECF 71) ¶¶ 24-25.)

- Over the next year and a half, the Plaintiffs and Defendants briefed motions to dismiss and addressed procedural issues with the Court. The Court then granted the Commonwealth's Motion to Dismiss in part. Ultimately, the Court dismissed all of Plaintiffs' claims arising from the 2016 election and their Due Process claim that they were denied their state-law right to a recount. (Sept. 7, 2018 Order (ECF 98) at 40.) The Court denied the Motion to Dismiss the Plaintiffs' First Amendment claims under the Election Code, finding that the selection of certain voting

machines prone to malfunctioning or hacking could expose voters to an unconstitutional risk that their vote might not be counted. (*Id.* at 38.) Notably, the Court reiterated its previous finding that the "fear of vote tampering in Pennsylvania during the 2016 Presidential election 'borders on the irrational'". (*Id.* at 34 (citing Mem. at 31).) However, because a claim under the First Amendment can arise where there is an unconstitutional risk of hacking or malfunctioning, and Defendants were silent on the DRE and optical scan machines' risk of error, the Court allowed these claims to proceed to discovery. (*Id.* at 34-37.)

- The parties then engaged in settlement discussions and resolved this litigation by executing the Settlement Agreement on November 28, 2018 that now serves as the basis of Plaintiffs' Motion to Enforce Settlement Agreement. (Settlement Agreement (ECF 108-1)).

### B.       The Acquisition of a New Voting System for Philadelphia

Concurrent with the year and a half period during which Plaintiffs and Defendants addressed motions to dismiss before this Court, the Department of State began a campaign to encourage counties in the Commonwealth to accelerate the acquisition of new voting systems to ensure that by the Presidential Election in 2020, voters would use machines that provided a paper record for voter verification and audit purposes. (*See*, *e.g.*, Statement of Governor Tom Wolf (Feb. 9, 2018), https://www.governor.pa.gov/newsroom/governor-wolf-statement-directive-new-voting-machines-paper-record/ (commending the Pennsylvania Department of State's new directive requiring new voting machines to have a voter-verifiable paper ballot or paper record of votes cast); Statement of Acting Secretary of State Robert Torres (April 2, 2018), https://www.media.pa.gov/Pages/State-Details.aspx?newsid=276 (directing Pennsylvania's counties to have voter-verifiable paper record voting systems in place no later than December 31, 2019, and preferably by the November 2019 general election).)

Since 2002 (and prior to November 2019), Philadelphia had been utilizing Danaher Direct Recording Electronic (DRE) voting machines that did not generate a paper record that voters could review and verify before casting their vote. (Lynch Decl. (ECF 123-2) ¶ 4; *see* Boockvar Decl. (ECF 123-1) ¶ 10.) Recognizing the need to modernize voting equipment and

ensure reviewable and auditable paper records, Philadelphia had begun to plan for acquiring a new voting system by 2022.  (Lynch Decl. ¶ 4.)  Given the Governor and Department of State's advisories during 2018, Philadelphia accelerated its timeline and took on the monumental task of transitioning to a new voting system by November 2019.

The first step in the acquisition of Philadelphia's new voting system was the procurement process which, on its own, required 16 months to complete.  (Nesmith-Joyner Decl. (ECF 123-3) ¶ 5.)  Due the complexities of the contract, eight separate City departments were involved in the procurement process, including the City Commissioners, the Procurement Department, the Office of Internet Technology, the Chief Administration Office, the Office of the Director of Finance, City Council, the Law Department, and the Mayor's Office.  (*Id*. ¶ 6.)  First, the City obtained authorization for the expenditure of $30 million for the new machines, allowing the procurement process to formally begin in February 2018.  (*Id*. ¶ 7.)  Following Governor Wolf's directive, an aggressive timeline was established to have a new voting system in place by the November 2019 general election.  (*Id*. ¶ 8.)  On June 4, 2018, the City issued a Request for Information (RFI) to allow respondents to submit information for the City to consider in preparing their Request for Proposal (RFP) to allow vendors to bid on the contract.  (*Id*. ¶¶ 9-10.)  Upon receiving the information at the close of the RFI in July, the Board of Elections began to draft a Request for Proposal that would ultimately require review and approval by the Procurement Department and then the Local Contract Opportunity Review Committee.  (*Id*. ¶¶ 13-14.)

As this drafting process was occurring, the State was taking steps to certify voting machines that would be compliant with the Governor's voter-verifiable paper record directive. Between September 25 and 28, 2018 the ES&S EVS 6021 (which includes the ExpressVote XL)

was tested by the State, with the official certification being issued by Acting Secretary Robert Torres on November 30, 2018. (Boockvar Decl., Ex. 1 at 11.) On this same day, the Request for Proposal was publicly posted. (Nesmith-Joyner Decl. ¶ 15.) Proposals were due to the City by December 28, 2018 and then required a review by the selection committee approved by the Procurement Commissioner. (*Id*. ¶¶ 15-16.) This was substantial work; the Committee met at least 10 times to review and score the competing proposals. (*Id*. ¶ 18.) Ultimately, two proposals, including one from ES&S, were submitted to the Procurement Commissioner on February 12, 2019. (*Id*.) This information was provided to the Board of Elections for the selection of the most appropriate voting system for the City of Philadelphia. (*Id*. ¶ 19.) At the meeting of the Commissioners on February 20, 2019, the Philadelphia Board of Elections selected the ES&S ExpressVote XL, a voting system certified by the State as safe for use by voters, to replace the Danaher DRE voting machines. (Lynch Decl., ex. 1 at 2; Boockvar Decl. ¶ 76.)

However the selection process was only a part of the work. After February 20, 2019, the City had to negotiate a final contract with ES&S, and the Board of Elections, along with other City Departments, had to implement the new voting system. The transition to the system required myriad activities including: training poll workers and interpreters on new equipment, familiarizing voters with new machines, pre-testing all new machines, ensuring poll places can logistically accommodate new machines and selecting new polling places if necessary, securing appropriate storage space for new machines, procuring any new equipment to ensure compatibility with new machines, conducting pilot elections using new machines, and testing chain of custody. (*Id*. ¶¶ 9-22.)

7

Philadelphia assumed this herculean effort and completed its preparation for the new voting systems in record time – at the expense of countless hours of manpower from City employees.  First and foremost, Philadelphia needed to safeguard the new machines that they spent millions of dollars acquiring.  Not only did the Board need to arrange for a new warehouse lease that would accommodate the larger size of the machines, but with the introduction of the paper ballot system, also needed to account for a climate-controlled environment that would preserve the condition of the ballots.  (*Id*. ¶ 9.)  The warehouse selected had to be retrofitted for additional power outlets and have the floor sealed to limit dust.  (*Id*.)  Every one of these individual steps required going through the City's procurement process.  (*Id*.)

From April to August 2019 the Board received 29 shipments containing between 60 and 240 of the new ExpressVote XL machines.  (*Id*., ex. 2 at 2.)  In total, 3,750 machines were received on 49 trucks during this period.  (*Id*.)  Upon receipt, the Board was tasked with testing each individual machine for physical defects and proper functionality.  (*Id*. ¶¶ 10-11.)  With testing taking approximately one hour per machine, 3,750 hours of manpower were spent completing this step.  (*Id*. ¶ 11.)  Introducing the new equipment also required Philadelphia to re-evaluate established polling locations.  Since the size and ability to move up and down stairs differed from the previous machines, an individual analysis of over 800 polling locations had to occur prior to implementation.  (*Id*. ¶ 22.)  This resulted in the need to move several poll locations for logistical accommodation.  (*Id*.)  The City also had to expend additional resources purchasing new secure computer systems, upgrading internet speed connections, and purchasing optical scanners that would be compatible with the new voting systems.  (*Id*. ¶ 12.)

With the logistical framework in place, Philadelphia turned to the essential steps of training its poll workers and familiarizing the voters with the new machines.  Thousands of hours

were committed to this operation to provide for a smooth and orderly transition to the new system. To reach the more than 1 million registered voters in the City of Philadelphia, the Board performed 827 demonstrations over the course of five months at a multitude of public spaces including City Hall, public schools, libraries, block parties, recreation centers, nursing homes, swimming pools, and civic group meetings. (*Id*., ex. 3 at 3.) Each demonstration resulted in the Board having to plan for staffing the event and arranging transportation for the equipment. (*Id.* ¶ 17.) It was also crucial that the poll workers and translators receive robust training so that they could properly assist voters on election day. The number of registered voters, and the 831 polling locations, necessitate nearly 8,000 poll workers and translators for the City. (*Id.* ¶¶ 31-32.) Accordingly, the Board held over 100 training sessions, utilizing each day of the week, including weekends, in July and August of 2019. (*Id.* ¶ 20.) The amount of time and money dedicated to these demonstrations and trainings cannot be overstated.

Finally, in late August, the Board utilized its staff of approximately 100 employees to conduct a pilot election using 80 new machines spread out at different polling locations throughout the City. (*Id.* ¶ 21.) The pilot allowed the board to test new procedures with the ExpressVote XL, the delivery process, and other logistical operations. (*Id.*) Most importantly, following sample voting, the Board conducted testing of the post-election process. (*Id.*) The conversion to paper ballots imposed a need for new chain of custody procedures, which required testing prior to implementing the new systems. (*Id.*) Additionally, the Board was able to test the new computers in conducting post-election procedures. (*Id.*)

As a result of these efforts, the ExpressVote XL was able to be utilized for the first time in the City during the November 2019 general election. A robust pretesting process of all machines, along with randomized follow up screening, was performed on every machine used on

election day.  (*Id.* ¶¶ 23-24.)  These machines were subsequently sealed, tracked, and recorded at each polling location.  (*Id.* ¶ 25.)  Across the 831 polling locations 304,553 votes were cast, with the Board receiving fewer complaints than it had during the preceding election.  (*Id.* ¶ 26.)  The Board conducted two audits following the election, one as required by state statute, and an additional risk-limiting audit pilot in collaboration with experts from the State, U.S. Election Assistance Commission, the University of Michigan, Brennan Center for Justice at NYU School of Law, the Democracy Fund, VotingWorks, and Verified Voting.  (*Id.* ¶ 27.)  The Board is currently in preparation for the 2020 election cycle, in which Philadelphia intends to again utilize the newly purchased ExpressVote XL voting machines.[1]  (*Id.* ¶ 29.)

The City and Board of Elections learned of the Plaintiffs' November 26, 2019 filing and requested relief for decertification of the ExpressVote XL to this Court shortly after it was filed. The City and the Board of Elections determined that decertification would not only result in an enormous financial loss to the City, but would likely cause the Board of Elections to be incapable of conducting orderly elections in Philadelphia during the Presidential election cycle. Replacing 3,750 machines before the 2020 election cycle would be nothing short of impossible at this point, leading to confusion and the potential disenfranchisement of over one million registered voters in the City.  (Lynch Decl. ¶¶ 30-33; Nesmith-Joyner Decl. ¶¶ 22-29; Boockvar Decl. ¶¶ 78-84.)  And the time, money, personnel, and resources that the City and the Board devoted to replacing the DRE voting system will all be for naught.

---

[1] Next year, Philadelphia expects to begin the process of fully decommissioning the Danaher DRE machines used from 2002 through Spring 2019.  Other than those DRE machines, Philadelphia has no voting system currently available that could be used in either April 2020 or November 2020 in the event Plaintiffs were to obtain the relief they seek.

**C.     The Settlement Agreement and the Settling
    Parties' Post-Settlement Agreement Conduct**

The Settlement Agreement was reached through an October 11, 2018 settlement

conference, (Boockvar Decl. ¶ 60), and signed on November 28, 2018, (Settlement Agreement at

10-11[2]).  There are two separate paragraphs of the Settlement Agreement most relevant to

Plaintiffs' Motion.  Paragraph 2 states that:

> The Secretary will only certify new voting systems for use in Pennsylvania if they
> meet these criteria:
> a.  The ballot on which each vote is recorded is paper[3];
> b.  They produce a voter-verifiable record of each vote; and
> c.  They are capable of supporting a robust pre-certification auditing
>     process.

(Settlement Agreement at 3).  Paragraph 2 further includes a footnote clarifying the requirement

that each vote be recorded on paper.  That footnote explains that "[a] VVPAT receipt generated

by a DRE machine is not a paper ballot."  (*Id.* at 3 n.3.)   Paragraph 3 states:

> The Secretary will *continue* to direct each county in Pennsylvania to implement
> these voting systems by the 2020 primaries, so that every Pennsylvania voter in
> 2020 uses a voter-verifiable paper ballot.

(*Id.* ¶ 3 (emphasis added).)

In addition to these two terms, the Agreement includes a notification provision requiring

Plaintiffs to notify Defendants if they "have a reasonable basis to believe that Defendants are in

non-compliance with a material term of this Agreement."  (*Id.* ¶ 14.)  The Agreement also

provides that it is a "private settlement agreement" and not a "consent decree," (*id.* ¶¶ 10, 11),

and that if any term of the agreement is determined to be invalid, the remaining provisions will

not be affected or impaired, (*id.* ¶ 24).

---

[2] Citations to page numbers of ECF documents correspond to the ECF header pagination.

Plaintiffs' counsel announced the Agreement on their firm's website on November 29, 2018.  In that announcement, Lead Counsel for Plaintiffs, Ilann M. Maazel stated, "We will be watching closely to ensure Pennsylvania implements every one of these important election reforms."  Emery Celli Brinckerhoff & Abady LLP, *Historic Settlement in Pennsylvania* (Nov. 29, 2018), https://www.ecbalaw.com/historic-settlement-in-pennsylvania/ [hereinafter ECBA Announcement]).  At the same time, devotees of hand-counted, hand-marked paper ballots argued on social media that the Agreement would permit use of systems like the ExpressVote XL.  (*See, e.g.*, Wiygul Decl., ex. 4 (ECF 123-7) (Twitter thread beginning with "I hate to be Debbie Downer, but this agreement allows PA to buy awful 'universal use' touchscreen ballot markers and scanners, which generate the COMPUTER marked so-called 'paper ballots' w/barcodes that I've been warning about.")).  Nonetheless, Plaintiff Stein publicized the Agreement as a victory through a press release and on her Twitter feed.  (*See* @DrJillStein, Nov. 30, 2018 Tweet, attached hereto as Exhibit 3.)  In that same Twitter post, an individual asked what Stein's response was to the above-cited critic.  (*See* @medellinemil Dec. 2, 2018 Tweet, attached hereto as Exhibit 4 (commenting on Plaintiff Stein's November 30, 2018 tweet).)

Two days after the Settlement Agreement was signed, one day after Mr. Maazel stated that he would be watching Pennsylvania's performance "closely," and the same day Plaintiff Stein publicization of the Agreement on her Twitter feed resulted in a comment raising specific questions about machines like the ExpressVote XL, the Secretary of State of the Commonwealth of Pennsylvania certified the ES&S system—including the ExpressVote XL machine. (Boockvar Decl. ¶ 60).  The Green Party of Pennsylvania also publicized the Agreement, with Plaintiff Emily Cook stating in a December 2018 update that:

> [t]his settlement moves Pennsylvania closer to verifiable elections but it will be up
> to us, the voter, to ensure that counties purchase machines that not only use paper

ballots but purchase machines that are untamperable and transparent.  We must remain vigilant while the state composes their working committee.  We want to be sure that monied interests don't interfere in this process as the committee creates standards for the machines.  It's all about the machines.

(Cheryl Rougeux, *December Green Star from Pennsylvania: GPPA News Highlights: A Historic Victory for PA Voters!*, https://www.gp.org/december_green_star (last visited Dec. 17, 2019)).

As part of the certification, the Secretary issued a report.  That report clearly stated the Secretary's determination that the "ExpressVote XL create[s] *a paper ballot* based on a voter's selections, which is tabulated when the voter affirms that he/she is ready to cast a vote." (Boockvar Decl., Ex. 1, at 24 (emphasis added).)  And the Secretary made clear that to the extent there is a conflict between the text and the electronically recorded vote totals, or between the textual record of the vote and the barcode record, the voter-verified textual record on the paper ballots will control.  (Boockvar Decl. ¶¶ 35-36.)

Importantly, Plaintiffs did not notify the Secretary in November or December 2018 that they believed the certification of the ExpressVote XL breached the Settlement Agreement. Nor did they seek to raise the issue in this Court.  Instead, they waited a year to file the instant Motion.  During that year, Philadelphia engaged in the extensive work described above including:

- Receiving responses to the RFP at the end of December 2018, (Nesmith-Joyner Decl. ¶¶ 15-17);

- The Procurement Commissioner sending a recommendation from the City to the Board of Elections on February 12, 2019, (*id.* ¶ 18);

- The Board of Elections deciding that the ES&S ExpressVote XL were appropriate for use in Philadelphia on February 20, 2019, in a much publicized public hearing;[3]

---

[3] *See, e.g.*, Jonathan Lai, *Commissioners select new voting machines for Philly over criticism from advocates*, Phila. Inquirer (Feb. 20, 2019), https://www.inquirer.com/politics/philadelphia/philly-new-voting-machines-paper-ballots-20190220.html.

- Receiving and demonstrating the ExpressVote XL machines on April 29, 2019;[4]

- The Board of Elections indicating that it would not reverse the February 20, 2019 determination;[5] and

- Demonstrating and publicizing the new machines throughout the summer to ensure that the public and the local election board workers had all the information necessary for a fair and orderly election day (Lynch Decl. ¶¶ 13-16).

Despite this, Plaintiffs did not assert their newly found belief that the ExpressVote XL that Philadelphia had procured and implemented violated the Settlement Agreement to the Secretary for eight full months, until July 29, 2019. (Maazel Decl., ex. C. (ECF 112-1).) They made this assertion in a letter that was sent only after a separate group petitioned the Department of State to reconsider the certification of the ExpressVote XL on July 17, 2019.[6] That petition argued that the ExpressVote XL violates the Settlement Agreement. (Maazel Decl., ex. B at 43). And Plaintiffs waited another four months to raise their challenge with this Court. During that time Philadelphia continued and completed the work of implementing its new voting system, and successfully used the system in the November 2019 election. (Lynch Decl. ¶ 26; *see also* Jonathan Lai, *Philadelphia's new voting machines had a mostly smooth start. Now for the big*

---

[4] *See*, *e.g.*, Miguel Martinez-Valle, *Exclusive First Look at Philadelphia's Controversial New Voting Machines*, NBC10 Phila. (Apr. 30, 2019 9:11 PM), https://www.nbcphiladelphia.com/ news/local/a-close-look-at-philadelphia_s-controversial-new-voting-machines_philadelphia/173295/

[5] *See*, *e.g.*, Jonathan Lai, *Philly elections officials won't overturn controversial voting-machine decision*, Phila. Inquirer (Apr. 17, 2019), https://www.inquirer.com/politics/election/ philadelphia-voting-machines-purchase-judges-city-commissioners-overturn-20190417.html

[6] Notably, Plaintiff Emily Cook posted an article regarding the litigation and Agreement on the Green Party US website on April 23, 2019, that focuses on the audit provisions of the agreement and makes no mention of the issues cited in the July 17, 2019 petition. (Emily Cook, Something Was Rotten in Pennsylvania (Apr. 23, 2019), https://www.gp.org/rotten_in_pennsylvania [hereinafter Cook Post].)

*test.*, Phila. Inquirer (Nov. 11, 2019), https://www.inquirer.com/politics/philadelphia/philly-voting-machines-2020-election-20191111.html.)

## III.     ARGUMENT

In their Opposition, the Commonwealth has capably and amply refuted each of the points Plaintiffs raise and rather than repeat those arguments, Intervenors join in the Commonwealth's arguments and incorporate them as if set forth herein.

In addition, Intervenors highlight and clarify a few points also made by the Commonwealth and introduce additional arguments explaining why Plaintiffs' requested relief must be denied.

### A.     Plaintiffs' Contract Arguments Fail

#### 1.     Plaintiffs' Motion Must Be Denied Because Their Proposed Contract Interpretation Is Contrary to the Unambiguous Terms of the Settlement Agreement

Plaintiffs assert that their Motion is purely a matter of contract interpretation.  (Pls.' Mot. (ECF 112) at 9.)  But if that is the case, this Court need not concern itself with Plaintiffs' arguments about how the machines work, what defines a vote, or any of the other attempts in their Motion to introduce extraneous information.  Rather, this Court need only consider the plain and unambiguous language of the Settlement Agreement.

Paragraph 2 of the Settlement Agreement requires that "[t]he ballot on which each vote is recorded is paper" and modifies this with Footnote 3 which explains that "A VVPAT receipt generated by a DRE machine is not a paper ballot."  (Settlement Agreement ¶ 2 & n.3.)  Plaintiffs cannot credibly dispute that the ExpressVote XL records each vote on paper.  Rather, Plaintiffs seek to import into the agreement a definition from the Pennsylvania Election Code that is referenced nowhere in the Agreement and is contradicted by the agreement itself.  (*See* Pls.' Mot. at 14 (citing 25 P.S. § 3031.1 (defining "Paper ballot")).)  As an initial matter,

Paragraph 2 which purports to place specific limitations on the Secretary's certification of voting systems does not use the term "paper ballot" other than to clarify in Footnote 3 that a "VVPAT receipt" is not a "paper ballot."  As the Commonwealth explained, were Plaintiffs correct and "paper ballot" was meant in the agreement to have the specific definition set forth in the Election Code,[7] the clarification set forth in Footnote 3 would have been superfluous.  (*See* Commw. Opp. at 31 (citing *Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 579 (E.D. Pa. 2009)).).  The Parties' need to include Footnote 3 for clarification makes clear that neither "recorded on paper" nor "paper ballot" as used in the Agreement are imbued with the specific and technical definition set forth in the Election Code.  Under these clear terms, the ExpressVote XL records the vote on paper and, therefore, certification of it cannot be said to breach that term of the Settlement Agreement.

Paragraph 3 is no more helpful to Plaintiffs' argument.  As the Commonwealth explained, Paragraph 3 sets forth a plain language shorthand for the *criteria* identified in Paragraph 2.  (Commw. Opp. at 30.)  Equally important is the fact that Paragraph 3 refers back to the direction the Secretary had been giving to counties – that they use machines that produce paper records – and commits the Secretary to continuing such direction.  Paragraph 3 does not require the Secretary to change and limit the direction to only machines that use "paper ballots" as defined by 25 P.S. § 3031.1, and Paragraph 3 does not directly limit the criteria for certification.  Rather, it is aspirational and requires the Secretary to "continue" to "direct" each county to implement the new voting systems with voter-verifiable paper ballots by 2020.  The record reflects that the Secretary did continue to do that.

---

[7] Had the Parties intended that definition, they could have referenced it in the Agreement.

2.     **To the Extent the Contract Is Ambiguous, the Conduct of the Parties Demonstrates the ExpressVote XL Satisfies the Parties' Understanding at the Time the Contract Was Signed (and for Eight Months Thereafter).**

As the Commonwealth explained, the Settlement Agreement was entered into at a time Plaintiffs were aware the ExpressVote XL was about to be certified and had provided comments to the Department of State regarding limitations on certification for use of that machine in Pennsylvania.  (Commw. Opp. at 17-21.)  The day after the Settlement Agreement was signed, counsel for Plaintiffs was quoted in a press statement explaining that "[w]e will be watching closely to ensure Pennsylvania implements every one of these important election reforms."  (*See* ECBA Announcement.)  And the very next day, the Secretary certified the ExpressVote XL for use in Pennsylvania.  The possibility of that certification was already a topic of discussion among hand marked paper ballot advocates and had been raised in Plaintiff Jill Stein's Twitter feed discussion of the Settlement Agreement. Were the Secretary's certification of the ExpressVote XL in violation of the Settlement Agreement as it was understood by the parties at that time, Plaintiffs could have objected then.  They did not.

Nor did Plaintiffs raise this argument at any time over the next several months when the City and the Board of Elections selected, contracted for, and implemented the ES&S voting system.  This was a process of significant public interest that received meaningful coverage in newspapers including the Philadelphia Inquirer.  (*See supra* notes 5-7).  Concurrent with this process, Plaintiff Emily Cook was writing about the significance of the Settlement Agreement and the audit procedures for election security in Pennsylvania.  (*See supra* note 8).  Nonetheless, Plaintiffs raised no objection to the Board of Elections actions.  Nor did they write to the Secretary claiming that the certification of the ExpressVote XL was in violation of the Settlement Agreement.  In fact, they remained silent until late July 2019 and did not raise the

issue with this Court until three weeks after the ExpressVote XL had been used successfully during the 2019 General Election in Philadelphia.

Plaintiffs' conduct, including refraining from filing a motion with this Court for over a year, reflects the plain language of the Settlement Agreement and the Parties' clear understanding of the terms of that agreement. The ExpressVote XL was and is among the types of voting machines and systems which can be certified by the Secretary under the Agreement. To the extent the Court need look beyond the plain language, it need look no further than Plaintiffs' actions – or lack thereof – to see what the agreement was understood to mean when it was signed.

### B.      Laches Bars Plaintiffs' Requested Relief

Plaintiffs maintain that under the terms of the Agreement, the Secretary cannot certify the ExpressVote XL for use in Pennsylvania. With that in mind, it is impossible to understand how Plaintiffs stood idly by while the Secretary certified the ExpressVote XL two days after the Agreement was signed. It is also impossible to understand how Plaintiffs continued to sit on their hands while counties in Pennsylvania, including Philadelphia, went through the process of procuring, implementing, and using the ExpressVote XL in their elections. Plaintiffs remained silent while Philadelphia's process for acquiring and decision about voting machines was the subject of significant press coverage. And they did so for a substantial period of time. Plaintiffs waited eight months before raising the issue at all with the Secretary, and a year before seeking relief from this Court. During that time, the City and the Board of Elections went through the entire procurement process and successfully used the new machines in the November 2019 election.

Because their delay in commencing the suit was inexcusable and unreasonable and because Intervenors would be prejudiced as a result, the doctrine of laches applies and Plaintiffs'

requested equitable relief – to the extent their recently realized interpretation of the Agreement were accepted in the first place – must be denied.

As the Third Circuit has explained, the equitable defense of laches protects against "unreasonable, prejudicial delay in commencing suit." *In re Bressman*, 874 F.3d 142, 149 (3d Cir. 2017) (quoting *SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, LLC, 137 S. Ct. 954, 960 (2017)). Under Pennsylvania law, "[l]aches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another." *Sprague v. Casey*, 550 A.2d 184, 187–88 (1988) (citation omitted). And the elements in both the Third Circuit and Pennsylvania courts are substantially the same: inexcusable delay and prejudice resulting from the delay. *See In re Bressman*, 874 F.3d at 149; *Sprague*, 550 A.2d at 188.

Intervenors see no explanation that can excuse Plaintiffs delay here. Each step in this process was known and publicized. This included the decision of the Philadelphia Board of Elections on February 20, 2019 to acquire the ExpressVote XL for use in the November 2019 general election.[8] Had the Plaintiffs truly believed that the Board's decision was in violation of the Department of State's directive to purchase voting systems with voter-verifiable paper records, in addition to seeking redress in front of this Court, they could have acted accordingly at the time of the decision by working with a registered voter in Philadelphia to challenge a

---

[8] (*See, e.g.*, Claire Saska, Amid Controversy, City Commissioners Choose New Voting Machines, Phila. Magazine (Feb. 21, 2019 12:06 PM) https://www.phillymag.com/news/2019/02/21/new-voting-machines-philadelphia/; Dave Davies, *Controversy swirls around new Philadelphia city voting system*, WHYY (Feb. 11, 2019), https://whyy.org/articles/controversy-swirls-around-new-philadelphia-city-voting-system/; Adam Hermann, *Philly City Commissioners make contentious choice for new voting machines*, Philly Voice (Feb. 20, 2019), https://www.phillyvoice.com/philly-new-voting-machines-paper-ballot-city-commissioners/; Lai, *supra* note 3.)

decision of the County Board of Elections in the Court of Common Pleas.[9]  Instead, and without

explanation or excuse, the Plaintiffs waited an additional nine months to file their Motion to

Enforce the Settlement Agreement as a workaround.

And the prejudice to the City and the Board of Elections that has resulted from Plaintiffs

delay is palpable.  The City conducted a large procurement project and entered into a multi-

million-dollar contract for its new voting system.  Had Plaintiffs not delayed, those efforts and

taxpayer funds could have been directed in a manner that accounted for Plaintiffs' challenge to

the ExpressVote XL.  Similarly, the Board of Elections, responsible for ensuring fair and orderly

elections, implemented and trained poll workers and voters on a new voting system and utilized

the system in the November 2019 election, all before Plaintiffs filed their Motion.  The City and

the Board of Elections would now be prejudiced because purchasing and implementing a new

voting system before the April primary election is simply not feasible this late in the game.

(Lynch Decl. ¶¶ 30-33; Nesmith-Joyner Decl. ¶¶ 22-29; Boockvar Decl. ¶¶ 78-84.)  Nor is

attempting to introduce a different voting system in a Presidential general election feasible as

doing so in a high turnout election of national importance "could be a disaster." (Jan.10, 2019 Tr.

of Philadelphia County Board of Elections at 3:23-4:2, attached hereto as Exhibit 5.)  In such

circumstances, equitable restraint and caution are required to mitigate the impact of the requested

relief on fair and orderly elections.  *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (equitable

considerations can justify withholding requested relief in election cases).  Here, Plaintiffs

requested relief—the decertification of the ExpressVote XL—raises the very real specter that

Philadelphia would be unable to conduct fair and orderly elections for either the 2020 Primary

---

[9] *See, e.g., Kerrigan v. Philadelphia Bd. of Election*, No. 07-687, 2008 WL 3562521, at *7 (E.D. Pa. Aug. 14, 2008) (decision of the City Commissioners regarding polling place relocation can be appealed to Philadelphia Court of Common Pleas under 2 Pa. C.S. § 752).

Election or the 2020 General Election.  The delay, therefore, is particularly damaging to both the City and the Philadelphia Board of Elections.  Importantly, had Plaintiffs not waited to again create a "judicial fire drill," (Mem. at 20), and had they raised their claims when the Secretary first certified the ExpressVote XL, the City and the Board of Elections could have participated in this case then or awaited further determination on the certification of those machines.  Plaintiffs did not do so, and their Motion should be denied because of their inexplicable delay and the real harm that would be caused to the City, the Board of Elections, and voters.

## C.    Plaintiffs' Intended Interpretation of the Contract Would Be Unenforceable

The gravamen of Plaintiffs' Motion is that this Court should adopt a reading of the Settlement Agreement that limits the types of voting machines the Secretary may certify under the Pennsylvania Election Code to only those machines which utilize a "paper ballot" as that term is defined in the Electronic Voting Systems section of the Election Code.  *See* 25 P.S. § 3031.1.  This would significantly narrow the Secretary's discretion, and such a determination is the province of the legislature and not something the Secretary could effectuate through a private Settlement Agreement.  *See, e.g. Anela v. Pennsylvania Hous. Fin. Agency,* 690 A.2d 1157, 1159 (Pa. 1997) ("[A]n agency cannot invest itself with authority or powers not fairly or properly within the legislative grant.").  The Secretary has an obligation under the Election Code "[t]o examine and reexamine voting machines, and to approve or disapprove them for use in this state, in accordance with the provisions of this act."  25 P.S. § 2621.  That legislative grant certainly requires the Secretary to make discretionary determinations about voting machines.  It does not, however, grant the Secretary rulemaking power, much less the power to determine that entire categories of machines, which are contemplated within the statute and that otherwise meet

21

security and accessibility requirements, cannot be certified at all.[10]  Because Plaintiffs' proposed

interpretation of Paragraphs 2 and 3 of the Settlement Agreement would raise serious concerns

about whether those terms were binding, and this Court should strive to give effect to all

provisions of the agreement, the Commonwealth's interpretation is clearly the preferred, and

correct, one.

## IV.    CONCLUSION

For all the reasons set forth above, Intervenors respectfully request that this Court deny

the Plaintiffs' Motion to Enforce the Settlement Agreement.


Dated: December 17, 2019                                    /s/ Benjamin H. Field
                                                           Divisional Deputy City Solicitor
                                                           Attorney I.D. No. 204569
                                                           1515 Arch Street, 15th Floor
                                                           Philadelphia, PA 19102
                                                           Phone: (215) 683-5024
                                                           Fax:    (215) 683-5299
                                                           Benjamin.Field@phila.gov

---

[10] Were Plaintiffs' interpretation of the Settlement Agreement correct, it would also raise the
question of whether a successor administration and Secretary can be bound by a prior
administration and Secretary.  *See Lobolito, Inc. v. North Pocono School Dist.*, 562 Pa. 380, 389
(2000).  Here, the current Secretary has determined that the ExpressVote XL meets the
requirements of the Election Code.  An additional, extra-legislative requirement should not be
enforced to override the Secretary's exercise of statutorily defined discretionary duties.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the date set forth below, I served a true and correct copy of the foregoing Memorandum of Law upon all counsel of record as a result of filing such document(s) electronically.  Such document is therefore available for viewing and/or downloading pursuant to the Court's ECF system and is served pursuant to FRCP Rule 5(b) and Local Civil Rule 5.1.2.




BY:   <u>/s/ Benjamin Field</u>
      Divisional Deputy City Solicitor

Dated: December 17, 2019

# EXHIBIT "1"

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA, PENNSYLVANIA

Jill Stein                                                      Docket No.:
v.
Philadelphia County Board of Elections          ELECTION MATTER

*Filed and Attested by the Office of Judicial Records 02 DEC 2016 02:44 pm C. FORTE*

## PARTIAL APPEAL OF DECISION OF PHILADELPHIA BOARD OF ELECTIONS UNDER 25 P.S. § 3157

COMES NOW Appellant Jill Stein, by and through her counsel Gregory M. Harvey, Esq., and files this appeal and in support thereof avers as follows:

1.      Jurisdiction of this Court is founded upon 25 P.S. § 3157, which provides for an appeal to the Court of Common Pleas from "any order or decision" of a County Board of Elections "regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under" 25 P.S. §§ 3261, 3262, and 3263.

2.      On November 22, 2016, Appellant Jill Stein, a presidential candidate in the 2016 election, publicly called for a recount of the election results in Pennsylvania and announced a grassroots fundraising and organizing campaign in support of that recount.

3.      In response to that call, and based upon leading technical experts' well-founded concerns about the integrity of electronic voting equipment, thousands of Pennsylvania voters have requested recounts in their precincts to ensure that the results of the 2016 Election accurately reflect the will of the voters and are untainted by systemic error or malfeasance. The only way to ensure the accuracy and integrity of the vote is through a recount.

4.      On Monday, November 28, 2016, thousands of voters throughout the Commonwealth petitioned their local Boards of Elections for recounts or recanvasses of the election results in their districts under 25 P.S. § 3154(e). These efforts are continuing.

5.      Before Philadelphia finished computing the vote, 297 Philadelphia voters filed

petitions in the Philadelphia Board of Elections (the "Board") for a recount under 25 P.S.

§ 3154(e) (the "Petitions").  On December 1, the Board met at a public hearing and found that

282 of the petitions met the statutory requirements under Section 3154(e).  Petitioner Jill Stein

does not challenge the rejection of the remaining 15 petitions.

6.      The 282 voters represent three or more electors from each of 75 election districts

(from 21 wards) in Philadelphia.  The Board then voted to recount and recanvass the vote in

those 75 election districts.  The recount is scheduled to begin today.  Petitioner supports that

decision of the Board and is not appealing it.  There can be no dispute that the 282 voters

complied with the election code and that the recount should proceed in those 75 districts.

7.      *In addition*, the 282 voters each requested that the Board permit a forensic

examination of the DRE electronic voting system as part of the recount.  Ex. A (example of

blank petition with supporting materials, submitted by each petitioner to the Board).  This is

required, *inter alia*, under 25 P.S. § 2650(c) ("Any candidate, attorney or watcher present at any

recount of ballots or recanvass of voting machines *shall be entitled to examine . . . the voting*

*machine and to raise any objections regarding the same*, which shall be decided by the county

board, subject to appeal, in the manner provided by this act.")  (Emphasis added.)

8.      Prior to the public hearing of the Board, counsel for Ms. Stein requested that the

Board should permit her, as a candidate for President, to "examine . . . the voting machine."  25

P.S. § 2650(c).  Ex. B (letter to Philadelphia Board of Elections).  At the hearing, counsel for Ms.

Stein orally renewed the request.  Without explanation, the Board denied the request.

9.      Petitioner Stein appeals this denial.  The Board's denial of the request for a

forensic examination as part of the recount was an "order or decision of any county board

2

regarding the computation or canvassing of the returns of any primary or election." *See* 25 P.S. § 3157.

        10.      This appeal is timely filed within two days of the Board's December 1 decision.

        11.      As a candidate for President, Petitioner has standing to bring this appeal as an "aggrieved person" within the meaning of Election Code Section 1407(a), 25 P.S. § 3157(a); *see In re Canvass of Absentee Ballots of November 4, 2003 General Election*, 839 A.2d 451, 457 (Pa. Cmwlth. 2003), *rev'd on other grounds* 843 A.2d 1223 (Pa. 2004) (state political party had standing to challenge the Allegheny County election Board's decisions concerning the post-election canvassing of absentee ballots because the election Code specifically allowed candidates to appoint "watchers" to insure integrity of voting process, and without standing to challenge the board's decisions, the right to appoint watchers would be meaningless).

        12.      For the reasons set forth in this Appeal, in the attached Memorandum of Law in Support of the Appeal, and the affidavits attached in support of the appeal (attached as Exs. C, D, E, F, G, & H), Petitioner Jill Stein requests that she be permitted to perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount.

Case ID: 161103335

Respectfully submitted,

Dated: December 2, 2016

Gregory M. Harvey
PA Attorney ID 4445
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Phone: 215-772-7684
Fax: 215-772-7620
Email: gharvey@mmwr.com

Of counsel:
Andrew G. Celli*
Ilann M. Maazel*
Alison E. Frick*
Douglas E. Lieb*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

* Not admitted in PA; motion for pro hac
vice admission forthcoming

4

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA, PENNSYLVANIA

Jill Stein                                    Docket No.:
v.
Philadelphia County Board of Elections        ELECTION MATTER

## MEMORANDUM OF LAW IN SUPPORT OF PARTIAL APPEAL OF DECISION OF PHILADELPHIA BOARD OF ELECTIONS UNDER 25 P.S. § 3157

"Nothing can be more vital towards the accomplishment of an honest and just selection than the ascertainment of the intention of the voter." *Appeal of McCracken*, 370 Pa. 562, 566 (1952). Two hundred eight-two voters in 75 precincts in Philadelphia have come forward to ensure that their votes and the votes of their fellow citizens are counted accurately and fairly. Presidential candidate Jill Stein supports that effort. But it is not enough to recanvass votes on a machine. The candidates are entitled by statute to forensically examine the direct recording electronic ("DRE") electronic voting system used in these 75 precincts.

### Jill Stein Is Statutorily "Entitled" to "Examine" the DRE Electronic Voting System

"*Any candidate*, attorney or watcher present at any recount of ballots or recanvass of voting machines *shall be entitled to examine . . . the voting machine and to raise any objections regarding the same*, which shall be decided by the county board, subject to appeal, in the manner provided by this act." 25 P.S. § 2650(c) (italics added.) The statute does not define "examine," but plainly an examination is considerably more searching than watching a recanvass. To examine means "to inspect closely," to "test the condition of," to "inquire into carefully." http://www.merriam-webster.com/dictionary/examine.

Philadelphia uses a DRE electronic voting system. Jill Stein is entitled under the statute to "test the condition" of the DRE system, and to "inspect" it "closely." That necessarily

*requires* a forensic examination of the DRE software, removable media, and electronic management system. The only way to "test the condition" of the DRE system is to examine the software and electronic audit logs of the system. A meaningful examination requires access to the electronic components that record and tally votes: electronic firmware, software, audit logs, and the contents of removable media that move back and forth between election management computers and DREs—in other words, a forensic examination by computer scientists who have studied electronic voting systems.

"Paperless DRE voting machines do not create any physical record of each vote, so forensic examination of the equipment is the only way to assures that the machines were not manipulated in a cyberattack." Affidavit of J. Alex Halderman attached to the Petitions ("Halderman Aff.") Ex. A ¶ 15. An observer watching a recanvassing is like a doctor watching a patient. In neither case can anyone give a clean bill of health. It would be election malpractice.

Finally, there is no reason why a forensic examination should itself compromise the vote tally. As an initial matter, a great deal of the examination can be done simply by examining the central election management system, before deciding whether it is even necessary to examine the machines themselves.

In an optical scan county, a candidate can examine the paper ballots, which are the best record of the intent of the voter. The DRE, however, does not use any paper ballot. There is no paper record to examine. Only the DRE system can be examined.

The statute is plain, as is the duty of the Board. Ms. Stein, by her representatives, is entitled to examine the DRE voting system used in Philadelphia. The time for that examination is *now*, during the "recount." 25 P.S. § 2650(c). We have top computer experts ready to do so, on one day's notice, under the supervision of the Board of Elections or this Court.

Case ID: 161103335

Ms. Stein will even pay for these experts.  The only thing standing between a voter and the

election result is the DRE system.  The system must be examined. 25 P.S. § 2650(c).

***The Circumstances of the 2016 Presidential Election Require a Forensic Analysis of the DRE Machines***

Jill Stein has no obligation to explain or justify her demand to examine the DRE

voting system: it is her statutory right. 25 P.S. § 2650(c).  Nevertheless, Ms. Stein and these 282

voters have good reason to demand a forensic examination in this 2016 election.

The 2016 presidential election was subject to unprecedented cyber attacks

intended to interfere with the election.  Attackers infiltrated the voter registration

systems of two states, Illinois and Arizona, and stole voter data.  Attackers attempted to breach

election offices in more than 20 other states.  Attackers broke into the email

system of the Democratic National Committee.  The Director of Intelligence and Department of

Homeland Security are "confident" that a foreign government engaged in hacking "to interfere

with the US elections process." *See* Ex. A Halderman Aff. ¶ 6 & attached exhibits.

In addition, experts have repeatedly documented in peer-reviewed and state-

sponsored research that American voting machines—including *these* voting machines—have

serious security problems. Voting machines are computers with reprogrammable software.  An

attacker who can modify that software by infecting the machines with malware can cause the

machines to provide any result of the attacker's choosing.  In just a few seconds, anyone can

install vote-stealing malware on a voting machine that silently alters the electronic records of

every vote. *See* Halderman Aff. ¶ 9.

Practically speaking, it is not possible to determine with certainty the absence of

malicious software hiding within what might appear to be many thousands of lines of legitimate

7

Case ID: 161103335

software code. *See* Affidavit of Poorvi L. Vora ¶ 13. Whether voting machines are connected to the Internet is irrelevant. Sophisticated attackers such as nation-states have developed a variety of techniques to attack non-Internet-connected systems. Shortly before each election, poll workers copy the ballot design from a regular desktop computer in a government office (or at a company that services the voting machines) and use removable media (akin to the memory card in a digital camera) to load the ballot design onto each machine. That initial computer is almost certainly not well enough secured to guard against attacks by foreign governments. If technically sophisticated attackers infect that computer, they can spread vote-stealing malware to every voting machine in the area.

   Most voting machines also have reprogrammable software ("firmware") that can in many cases be manipulated well in advance of the election to introduce vote-stealing malware. Technically sophisticated attackers can accomplish this with ease. Halderman Aff. ¶ 10; *see also* Affidavit of Dan S. Wallach ¶ 7 ("Combine the patience and resourcefulness of a nation-state adversary with the unacceptably poor state of security engineering in our voting systems," and it becomes "entirely reasonable to consider attacks against our voting systems to be within the feasible scope of our adversaries' capabilities"); Affidavit of Ronald L. Rivest ¶ 8 ("We have learned the hard way that almost any computer system can be broken into by a sufficiently determined, skillful, and persistent adversary. There is nothing special about voting systems that magically provides protection against attack.")

   While the vulnerabilities of American voting machines have been known for some time, states' responses to these vulnerabilities have been patchy and inconsistent at best. "Many states, including Pennsylvania, continue to use out-of-date machines that are known to be insecure." Halderman Aff. ¶ 11.

*The DRE Machines in Philadelphia Are Particularly Vulnerable*

The paperless direct recording electronic (DRE) machines that Philadelphia uses—the Danaher Shouptronic 1242—are outdated and vulnerable to fraud and tampering. *See generally* Supp. Halderman Aff[1]; Lopresti Aff.[2] The 1242 was first marketed in the early 1980s, when most of the country was still using IBM punch card vote tabulators. Though innovative in its time, the Shouptronic 1242 lacks even the inadequate security features of more advanced touch screen DRE machines developed by other companies in later years—systems that have been decertified by other states after examinations by computer security experts revealed serious vulnerabilities to tampering.

This model of machine was introduced in the early 1980s and has not had its security features updated in more than 30 years. Cyber attacks have become significantly more sophisticated during that time, and the security features in the machine are unlikely to be able to defend against today's attackers. Researchers at Lehigh University have analyzed the Shouptronic's computer architecture and shown that it is constructed in a very similar manner to the Sequoia AVC Advantage, a well-studied DRE with serious security vulnerabilities.[3] This computer architecture subjects the machines to many of the same attacks. Attackers can replace the machines' ROM chips to cause the machines to output fraudulent results. The machines' design makes it extremely likely that malware can infect the machines via the removable memory cartridges that are used to program the ballot design and retrieve vote totals. The

---

[1] "Halderman Supp. Aff." refers to the Supplemental Affidavit of J. Alex Halderman, dated November 30, 2016, attached.

[2] "Lopresti Aff." refers to the Affidavit of Daniel Lopresti, dated November 29, 2016, attached.

[3] https://verifiedvoting.org/downloads/2008Danaher1242-full.pdf

Case ID: 161103335

Shouptronic has also already been problematic in past elections,[4] malfunctioning and causing significant delays in voting multiple times in Pennsylvania, Tennessee, and Ohio.

### *Forensic Analysis of the DRE System Is the Only Way to Determine Whether They Were Compromised*

"Voting equipment that might yield forensic evidence of an attack includes voting machines, removable media, and election management system computers. All of these must be forensically analyzed to ensure the integrity of the result." Halderman Aff. ¶ 15. "Paperless DRE voting machines do not create any physical record of each vote, so *forensic examination of the equipment is the only way to assure that the machines were not manipulated in a cyberattack.*" *Id.* (emphasis added).

Without a forensic evaluation, a recanvass would simply involve a review of the "ballot images" retrieved from computer memory—images that are created by the exact same code that creates the vote tally in the machine. This is like seeking a second opinion from the same doctor. It is virtually useless. Only a forensic examination of the DRE system would allow examiners to determine whether or not the information stored in the computer memory in those systems represents an accurate record of the votes cast on those machines. Lopresti Aff. ¶¶ 15, 17.

---

[4] https://w2.eff.org/Activism/E-voting/infosheets2006/ELECTronic1242.pdf

Case ID: 161103335

*This Court and the Board Have the Power to Grant This Relief*

The Board has broad powers to ensure there is no fraud in an election.  First, the Board has a statutory duty "to inspect systematically and thoroughly the conduct of primaries and elections in the several election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted."  25 P.S. § 2642(g).  The Board also has the duty "[t]o investigate election frauds, irregularities and violations of this act," and "[t]o perform such other duties as may be prescribed by law."  25 P.S. § 2642 (i, o).  A forensic examination of the DRE voting system serves all of these purposes: it is a way "to inspect systematically and thoroughly the conduct" of this election in these districts to ensure it was "honestly, efficiently, and uniformly conducted."  25 P.S. § 2642(g).  It serves the requirement to investigate potential "election fraud."  25 P.S. § 2642 (i).

Lest there be *any* doubt about the Board's power and obligation to permit this forensic examination, one need only look at the holding of the Supreme Court in *McCracken*, 370 Pa. 562.  Mere canvassing of the DRE voting machines is insufficient to fulfill the Board's "apparent and impelling" duty to ascertain[] *for whom* votes were cast."  *Id.* at 566. (emphasis in original).  As the Pennsylvania Supreme Court held, "[i]n the computation of the vote, [the Board's] functions are not limited to those of a humanized adding machine. The Board is not a multiple comptometer."  *Id.* at 565.  Rather, the Pennsylvania Election Code is "a *highly remedial statute* which should be *liberally construed* in order to secure a proper computation of the votes cast at an election."  *In re Recount of Ballots of Rome Twp., Crawford Cty.*, 397 Pa. 331, 332 (1959).

"There could scarcely be a duty more apparent and impelling on an Election Board than that of ascertaining *for whom* votes were cast."  *McCracken*, 370 Pa. at 565 (emphasis

11

Case ID: 161103335

in original).  In this case, in this election, and with these DRE machines, the *only* way to ensure

the integrity of the vote in this county is a forensic exam.

**Conclusion**

        For all of these reasons, the Board's decision denying a forensic examination of

the DRE voting system used in these 75 precincts should be reversed, and the Court should

permit Jill Stein's representatives to examine the DRE voting system, under the supervision of

the Board or the Court.

Respectfully submitted,

Dated: December 2, 2016

Gregory M. Harvey
PA Attorney ID 4445
Montgomery McCracken Walker & Rhoads LLP
123 South Broad Street
Philadelphia, PA 19109
Phone: 215-772-7684
Fax: 215-772-7620
Email: gharvey@mmwr.com

Of counsel:
Andrew G. Celli*
Ilann M. Maazel*
Alison E. Frick*
Douglas E. Lieb*
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

*Not admitted in PA; motion for pro hac
vice admission forthcoming*

12

# EXHIBIT "2"

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

RECEIVED

DEC 0 7 2016

OFFICE OF JUDICIAL
RECORDS

STEIN                                    :
                                         :
        v.                               :        No. 161103335
                                         :
PHILADELPHIA COUNTY BOARD                :
OF ELECTIONS                             :

        AND NOW, this 7th day of December 2016, upon consideration of the partial appeal of

petitioner, it is hereby ORDERED that the appeal is DENIED and the decision of the

Philadelphia County Board of Elections is AFFIRMED. The reasons for denial are set forth in

the attached opinion.

                                        BY THE COURT:

                                        _Abbe  F. Fl_____
                                        Abbe F. Fletman, Judge

Stein Vs Philadelphia C-ORDRF

16110333500016

Case No: 161103335

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)   12/07/2016

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
CIVIL TRIAL DIVISION

STEIN                                           :
                                                :
        v.                                      :        No. 161103335
                                                :
PHILADELPHIA COUNTY BOARD                       :
OF ELECTIONS                                    :

OPINION

Before the Court is the partial appeal of appellant Jill Stein of the decision of the

Philadelphia County Board of Elections (the "Board") not to permit a forensic examination of the

electronic voting system Philadelphia employs.  For the reasons explained below, the Court

affirms the Board's decision and dismisses Dr. Stein's appeal.

FACTS

Appellant Jill Stein was a presidential candidate in the federal election held on November

8, 2016.  Before the Board finished computing the vote, 297 Philadelphia voters filed petitions

(the "Petitions") for a recount under 25 P.S. § 3154(e)(West 2004).  Each of the Petitions

requested that "a reasonable subset of the DRE [direct-recording electronic voting system]

machines be forensically analyzed by appropriate computer experts for potential tampering,

malware, and/or hacking."  *See* Ex. A to Appellant's Partial Appeal of Decision of Philadelphia

Board of Elections (December 2, 2016) (the "Appeal").  At a public meeting on December 1,

2016, the Board announced that its staff had evaluated the Petitions and determined that 282 of

them met the requirements of the Pennsylvania Election Code.  Based on those Petitions, the

Board voted to recanvass and recount the votes in 75 of the City's 1,686 polling divisions.

In advance of the December 1st Board meeting, Dr. Stein requested that the Board allow

"forensic examination by independent experts of the election management computers and a

sampling of the electronic voting machines and movable media used in the 2016 general election."  November 30, 2016 letter from Ilann M. Maazel to Deputy Commissioner Fred Voigt, attached as Ex. B to the Appeal.  The Board heard argument by counsel to Dr. Stein and counsel for the electors for President Elect Donald Trump, Vice President Elect Mike Pence and the Republican Party of Pennsylvania.  The Board denied Dr. Stein's request.[1]

Dr. Stein timely appealed the Board's denial to this Court on December 2, 2016.[2]  Dr. Stein's Appeal requested that "she be permitted to perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount."  Appeal at ¶ 12.  The Court heard argument on December 6, 2016.

## DISCUSSION

Dr. Stein argues that she is entitled to the requested forensic examination under Section 2650(c) of the Election Code, which provides: "Any candidate, attorney or watcher present at any recount of ballots or recanvass of voting machines shall be entitled to examine the ballots, or the voting machine and to raise any objections regarding the same, which shall be decided by the county board, subject to appeal, in the manner provided by this act."  25 P.S. § 2650(c)(West 2004).  Dr. Stein is mistaken.

Our country is based on a federal system in which individual states govern the voting process within their borders.[3]  The Legislature in this Commonwealth has enacted a comprehensive Election Code that entrusts the integrity of elections to the Secretary of the

---

[1] The Board did not announce its reasoning.

[2] This Court has jurisdiction over this appeal pursuant to 25 P.S. § 3157 (West 2004), which provides for an appeal to the Court of Common Pleas from "any order or decision" of a County Board of Elections "regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under" 25 P.S. §§ 3261, 3262 and 3263.

[3] The conduct of elections, of course, is also governed by the Constitution and federal voting statutes.  The relief requested in this appeal, however, rests solely upon state law.

2

Commonwealth and county election boards.  The Secretary of the Commonwealth, after

examination, must approve any electronic voting system before it may be put to use.  *Id.* at §

3031.7.  Further, it is the Board's solemn duty to "inspect systematically and thoroughly the

conduct of . . . elections . . . to the end that . . . elections may be honestly, efficiently, and

uniformly conducted."  *Id.* at § 2642(g).  The Board further is compelled to "investigate election

frauds, irregularities and violations of this act. . . ."  *Id.* at § 2642(i).

      The Election Code further requires the Board to test the "central automatic tabulating

equipment" both before and after the election.  *Id.* at § 3031.14(a).  Each political party or body

represented on the ballot is permitted to be present during the testing of the vote tabulating

equipment, the actual counting of ballots and the recounting or recanvassing of ballots."  *Id.* at

§§ 2650(c) and 3031.14(b)(2).  They also are permitted to have "a technically qualified person"

there "to make independent tests of the equipment prior to, during, and following the vote count;

Provided, however, That such testing shall in no way interfere with the official tabulation of the

ballots and district totals cards."  *Id.* at § 3031.14(b)(2).  Nothing in the record evidences whether

Dr. Stein took advantage of these provisions, which allowed her representatives, including those

with technical knowledge, to be present during the testing of the vote tabulating equipment.

      Section 2650(c) is part of a provision entitled, "Watchers or attorneys at sessions of

county board; candidates may be present".  Subsection (a) provides that "[a]ny party or political

body or body of citizens . . . entitled to have watchers at any . . . election" shall also be entitled to

appoint watchers "at any recount of ballots or recanvass of voting machines. . . ."  *Id.* at §

2650(a).  It is in this context that § 2650(c) entitles "[a]ny candidate, attorney or watcher present

at any recount of ballots or recanvass of voting machines" to "examine . . . the voting machine

and to raise any objections regarding the same. . . ."  *Id.*  Section 2650(c), by its own terms, is

limited to examination of **voting machines.** When a court is called upon to interpret a statute, "[t]he best indication of legislative intent is the plain language of the statute." *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013). This statute simply does not mandate or allow a candidate to "perform a forensic examination of the DRE electronic voting system used in the 75 election districts that are the subject of the Board-ordered recount." Appeal at ¶ 12.

In 1980, the General Assembly amended the Election Code to allow the use of electronic voting systems, which include DREs. 25 P.S. §§ 3031.1-3031.22 (electronic voting systems). The Legislature could have enacted legislation providing candidates with unbridled rights to examine electronic voting systems before, during and after elections. It did not and has not. This Court will not impose requirements the Legislature has not seen fit to establish.

This is especially true when, as in this case, there is absolutely no evidence of any voting irregularities. To the contrary, the elected and appointed officials charged with safeguarding our voting system, uniformly maintain its integrity. Secretary of State Pedro A. Cortés publicly stated before the election that "[a]ll of the voting systems in use in Pennsylvania have been examined and certified to federal and state standards." Remarks by Secretary of State Pedro A. Cortés Press Conference, October 20, 2016.[4] More specifically, the Board's review of the 75 recanvassed divisions in Philadelphia revealed no discrepancies in the electronic tallies. Dr. Stein's brief cites cyber-attacks in Arizona and Illinois, and against the Democratic National Committee, but none affecting the voting system in Philadelphia.

Dr. Stein further raises concerns about hacking by a foreign government to interfere with the U.S. election process. *See* Ex. A to the Appeal, Halderman Aff. ¶ 6 & attached exhibits.

---

[4] Respondent, the Republican State Committee of Pennsylvania, entered Secretary Cortés's remarks into evidence as R-1 at the December 6, 2016 hearing.

These instances, while of course of concern, do not establish any wrongdoing in Philadelphia and do not compel a different result.

Indeed, just last year our Supreme Court address the security of electronic voting systems in *Banfield v. Cortes,* 110 A.3d 115 (Pa. 2015). In affirming the Commonwealth Court's decision upholding the Secretary of State's certification of the use of DREs in Pennsylvania elections, the Court noted that "all voting systems are imperfect and not immune from tampering. . . ." *Id.* at 174. In that case, the Secretary had determined that the DREs satisfied the Election Code's requirements. *Id.* As those appellants had not alleged fraud, bad faith, an abuse of discretion, or an arbitrary decision, the Supreme Court declined to disturb the Secretary's administrative discretion. *Id.* Similarly, in this case, appellants have raised no specter of fraud, bad faith, abuse of discretion or arbitrariness. Accordingly, this Court will not disturb the Board's decision.

### CONCLUSION

"The needs of our democracy require accurate and rapid ascertainment of the people's will. And it is for that reason that the Legislature has entrusted the County Board of Elections with plenary powers in the administration of the election code." *Appeal of McCracken,* 88 A.2d 787, 788 (Pa. 1952). The Philadelphia Board of Elections, after a public hearing, determined not to allow a forensic review that the Election Code does not require. For all the foregoing reasons, the Court affirms the decision of the Philadelphia Board of Elections and dismisses the appeal of appellant Jill Stein.

Abbe F. Fo⎯⎯⎯⎯
                                                                J.

Dated: December 7, 2016

# EXHIBIT "3"



**Dr. Jill Stein** 🌻 ✓
13.7K Tweets

**Follow**

← 

🌐 blackagendareport.com

💬 21          🔁 154          ♡ 278          ⬆️

**Dr. Jill Stein** 🌻 ✓ @DrJillStein · Nov 30, 2018

PA settlement deal in #recount lawsuit is a big step towards a nationwide ban on "black box" paperless voting machines, which 1 in 4 US voters are still required to use despite their demonstrated vulnerability to hacking, tampering, & error.

Jill Stein Touts Historic Victory for Pennsylvania Voters
Electronic voting machines are prone to failures. In a 2015 report, the Brennan Center for Justice detailed how these systems are "often ...
🔗 truthdig.com

💬 15          🔁 209          ♡ 424          ⬆️

# EXHIBIT "4"

## More replies

 **Emil Medellin** @medellinemil · Dec 2, 2018

Replying to @DrJillStein

And your response to @jennycohn1 's critique?

twitter.com/drjillstein/st...

twitter.com/jennycohn1/sta...

#ElectionIntegrity #Voting #VotingMachines

>  **Jennifer Cohn** @jennycohn1 · Nov 29, 2018
>
> I hate to be Debbie Downer, but this agreement allows PA to buy awful "universal use" touchscreen ballot markers and scanners, which. generate the COMPUTER marked so-called "paper ballots" w/ barcodes that I've been warning about. Vote suppressors like Brian Kemp love them... 1/
> twitter.com/DrJillStein/st...
>
> Show this thread

        ⟲        ♡        

# EXHIBIT "5"

- - - - -

January 10, 2019

- - - - -

COMMISSIONERS PRESENT:

  LISA DEELEY, CHAIRWOMAN
  AL SCHMIDT, COMMISSIONER
  ANTHONY CLARK, COMMISSIONER
  SETH BLUESTEIN, DEPUTY COMMISSIONER
  NICK CUSTODIO, DEPUTY COMMISSIONER


HELD AT:

  Delaware and Spring Garden Streets
  Philadelphia, Pennsylvania


          REPORTED BY: Kathryn R. Doyle
          Strehlow & Associates, Inc.
             (215)504-4622

1       CHAIRWOMAN DEELEY:  Good evening.   Thank

2   you everyone for coming out tonight. It is

3   great to see people who share our interest in

4   the future and our elections.

5       We are here tonight to talk about

6   upgrading our voting technology. The

7   replacement of our aging voting system is not

8   something that we decided to act upon yesterday

9   or last month. This has been a long-term goal

10  of the City Commissioners, dating back to

11  before I was sworn into office in 2016.

12      The previous Election Board worked to

13  draft a request for information and to get a

14  bond question placed on the ballot, from which

15  $22 million was placed in the capital budget

16  for this purpose.

17      I would like to thank my colleagues,

18  Commissioner Clark and Commissioner Schmidt,

19  for their work on that, along with former Mayor

20  Nutter and former Commissioner Singer.

21      We returned to this effort with renewed

22  urgency in late 2017, before any action had

23  been taken by the Department of State or the

24  Governor. Our goal was, and still is, to

1    purchase new voting equipment that is secure

2    and easy to use for Philadelphia voters.  And

3    that would include a voter verifiable,

4    auditable paper trail and new electronic poll

5    books.

6         For a voting municipality the size of

7    Philadelphia, with complex procurement and

8    contracting procedures, this process usually

9    takes 3 years.

10        For example, the State of Delaware just

11   wrapped up their 3 year process to replace

12   their Danaher machines.

13        After the Governor's announcement and

14   subsequent directives from the Department of

15   State, we had to start from scratch when we

16   were limited to choosing just one certified

17   system.

18        Subsequently, in meetings with the

19   Department of State and the Governor's staff,

20   it was communicated that they wish Philadelphia

21   to move to a new system by 2020 and that

22   decertification was on the table.

23        Getting new machines in 2020, in the midst

24   of the busiest election of the four-year cycle

1   and with such national importance, could be a

2   disaster.

3        As such, we will be looking to roll out

4   new voting equipment this November 2019. This

5   means our three-year timeframe has become a

6   one-year timeframe.

7        With the RFP we released in November, we

8   are assessing our ability to meet this

9   ambitious goal.

10       Many people in city government think that

11   we are crazy, but I am determined to make this

12   happen if we are able to.

13       For this timeline to be feasible and

14   realistic, we need to decide on new voting

15   technology by February. This leaves time for us

16   to acquire the machines, public education, and

17   to train all of our City's many poll workers.

18       I am on Twitter and I am on Facebook, and

19   I know that some people are unhappy about the

20   process. Believe me, we are unhappy too.

21       Originally, we had wanted to have the

22   vendors come in and do demos all over the City,

23   so voters could touch and test the different

24   options. But that is just not possible under

1   the new timetable.

2        Instead, I wanted to do community meetings

3   all over the City to talk about the responses

4   we got from the RFP. But that is not possible

5   because of the City's procurement rules. All we

6   are permitted to say about the RFP responses

7   while they are being evaluated is that we

8   received 6 responses.

9        In fact, myself and my fellow

10  Commissioners are not allowed to even see the

11  responses until the scoring committee has

12  finished their process, which needs to be

13  completed before we can vote on anything.

14       But before we hear from the scoring

15  committee, we want to hear from members of the

16  public. We want all of you to have a chance to

17  tell us, your elected City Commissioners, what

18  you would like to see in our next voting

19  system.

20       I also ask that you please do not forget

21  about electronic poll books, which I am

22  particularly passionate about.

23       Electronic poll books will revolutionize

24  the voting experience in Philadelphia --

1      everyone for being here.  We'll be back again

2      on Saturday.  Have a great evening.

3                    -   -   -   -   -

4   (Whereupon the hearing concluded at 6:53 p.m.)

5                    -   -   -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2          C E R T I F I C A T I O N

3

4                  I, hereby certify that the

5          proceedings and evidence noted are

6          contained fully and accurately in the

7          stenographic notes taken by me in the

8          foregoing matter, and that this is a

9          correct transcript of the same.

10

11          _____

12          Kathryn Doyle
            Court Reporter - Notary Public
13

14

15                  (The foregoing certification of

16          this transcript does not apply to any

17          reproduction of the same by any means,

18          unless under the direct control/or

19          supervision of the certifying reporter.)

20

21

22

23

24