UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JILL STEIN, RANDALL REITZ, ROBIN HOWE, SHANNON KNIGHT, and EMILY COOK,<br><br>     Plaintiffs,<br><br> -against-<br><br>KATHY BOOCKVAR, in her official capacity as Acting Secretary of the Commonwealth; and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation,<br><br>     Defendants. | No. 16-CV-6287 (PD) |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500

**PRELIMINARY STATEMENT**

Defendants acknowledge that the parties' Settlement Agreement requires voters to verify their own votes. Defendants acknowledge that the ExpressVote XL records each vote in a bar code. Defendants do not claim that voters can read bar code. Try as they might to draw a semantic distinction between a voter-verifiable *record* and a voter-verifiable *vote*, Defendants cannot change the basic facts. When a voter casts her vote on the ExpressVote XL, she cannot know whether the marking on the page that embodies her vote actually reflects her intentions. That deficiency is never true of a genuine paper ballot marked either by hand or with a marking device. For that reason and others, the ExpressVote XL does not comply with the Agreement.

Defendants make unfounded accusations of cynicism or worse on Plaintiffs' part, but the only bad-faith conduct here is their own sandbagging. At *no* time during the parties' extensive meet-and-confer process did Defendants raise any concerns about delay, waiver, or disruption that now form the principal basis for their opposition. And with good reason. *Defendants* delayed giving Plaintiffs access to ExpressVote XL testing videos for six months, notwithstanding at least nine requests from Plaintiffs. As Plaintiffs' expert representative wrote on March 7, 2019: "*Since many counties are looking to purchase machines, and their decisions might be better informed by public feedback, time is of the essence.*" But Defendants apparently did not care that counties were looking to purchase the machines, or that time was of the essence. Defendants delayed giving Plaintiffs access to the testing until June 2019. Then they themselves considered decertifying the system. When they didn't, Plaintiffs began the meet-and-confer process that led to this motion.

Plaintiffs diligently sought relevant information from Defendants, consistent with the information-sharing provisions of the parties' Agreement. Rather than precipitously seek court intervention, Plaintiffs responsibly waited until their expert had the opportunity to examine

1

the relevant information and until Defendants had finished considering a pending petition to decertify the ExpressVote XL. Defendants' misleading attempts to depict this conduct as anything other than responsible fail.

Defendants breached the parties' Agreement and have no valid defense to enforcement. The Court should order Defendants to specifically perform their obligations by decertifying the ExpressVote XL.

## ARGUMENT

### I. THE EXPRESSVOTE XL VIOLATES THE SETTLEMENT AGREEMENT

The parties agree that "Plaintiffs' Motion presents a straightforward issue of contractual interpretation" and "the unambiguous plain terms of the Settlement Agreement are all that is needed to resolve this dispute." Defs.' Opp'n 18. No parol evidence is needed to interpret the Agreement's unambiguous terms. The ExpressVote XL violates those terms.

#### A. The ExpressVote XL Does Not Allow Voters to Verify the Vote

Defendants concede that "the machine scans the barcodes to tabulate vote totals." Defs.' Opp'n 20. It is now an undisputed fact that the "vote" is the bar code, not the text. The question for the Court is whether, as a matter of contractual interpretation, the accompanying text on a summary card amounts to a "voter-verifiable" record of the vote. It does not.

As the Secretary of State concedes in her sworn declaration, a "voter-verifiable paper record[]" must be "confirmed by the voter who cast it." Boockvar Decl. ¶ 11. The "voter" must be able to "confirm" her own vote. *Id.* She needs to be able to tell that what has been marked on the page accurately reflects her will. With the ExpressVote XL, her vote is a barcode. She cannot read the barcode or understand the barcode. She cannot know whether the barcode accurately reflects her choice, as paragraph 2(b) of the Agreement requires.

Similarly, the National Academy of Sciences report now introduced and relied upon by Defendants to define a "paper ballot" defines "voter-verifiable" as "*human-readable* in a manner that is easily accessible for inspection and review by the voter without any computer intermediary." Wiygul Decl. Ex. 3 at 42-43 (emphasis added). Here, the barcode is not "human-readable . . . without any computer intermediary." *Id.* at 42. Lodged inside the machine, the summary card is also not "easily accessible for inspection and review by the voter." *Id.*

For purposes of this section of the Agreement, it is irrelevant whether an audit might count the words on the summary card. *Cf.* Defs.' Opp'n 20-21. First, Defendants admit that the barcode, not the words, is counted as the vote. *See id.* at 20. Second, the whole point of a "statistical" audit, *id.*, is that most votes are never audited. Even if an auditing system audits some votes by counting words, for unaudited votes, the barcodes control. Third and most important, irrespective of whether a vote is audited, the purpose of the relevant provision of the Agreement is to give each *voter* the ability to verify her own vote—not a faceless after-the-fact auditor she never meets. *See* Agreement ¶ 2(b). Such voter verification has independent value. It gives each voter confidence that her vote was counted correctly and helps ensure that her individual vote is counted accurately.

Contrary to Defendants' assertion, Plaintiffs' construction of the Agreement does not render the words "record of" (in "voter-verifiable record of each vote") meaningless surplusage. Those words convey that a "record" of the voter's intent must be preserved. It is Defendants who render language of the Agreement mere surplusage. By arguing that *auditor* verification suffices, *see* Defs.' Opp'n 20-21, Defendants read "voter" out of the key term "voter-verifiable." Pursuant to the Agreement, the *voter* herself must be able to verify her vote.

Even Defendants admit it. *See* Boockvar Decl. ¶ 11 (a "voter-verifiable paper record[]" must be "confirmed by the voter who cast it").

Defendants are also wrong to suggest that Plaintiffs' construction of the agreement would disqualify optical scan systems. *Cf.* Defs.' Opp'n 21-22. Of course Plaintiffs understand that software plays a role in counting votes in any modern voting system. *Cf. id.* at 22 & n.4. Defendants confuse voter verification of the *vote* with voter verification of how the vote is counted. With a true paper ballot and an optical scanner, the voter can be 100 percent sure that the physical mark on the page, which will then be counted by the machine, reflects his will. With the ExpressVote XL, he cannot. The question under Paragraph 2(b) of the Agreement is whether the voter can know whether the marks on the paper correspond to his intent. Whether the machine then counts the vote accurately is another matter.

**B.      The ExpressVote XL Does Not Use Paper Ballots**

The Agreement contains two references to paper ballots. First, it provides that "[t]he Secretary will only certify new voting systems for use in Pennsylvania if . . . [t]he ballot on which each vote is recorded is paper." Agreement ¶ 2(a). Second, it provides that "[t]he Secretary will continue to direct each county in Pennsylvania to implement these voting systems by the 2020 primaries, so that each Pennsylvania voter in 2020 uses a voter-verifiable paper ballot." *Id.* ¶ 3. Contrary to Defendants' suggestion that Plaintiffs are somehow interpreting these two terms differently, or using the latter to "control[]" the meaning of the former, Defs.' Opp'n 24-25, these two references have the same meaning: Voting systems certified for use in Pennsylvania must use paper ballots.

"The Agreement shall be construed and interpreted according to the law of the Commonwealth of Pennsylvania." Agreement ¶ 23. As set forth in Plaintiffs' moving papers, the ExpressVote XL plainly does not use a "paper ballot," as defined in the Pennsylvania

4

Election Code.  *See* Moving Br. 9-10.  Even Defendants concede that the ExpressVote XL does not use a "paper ballot" within the meaning of the Pennsylvania Election Code.[1]  *See* Defs.' Opp'n 24-25; 25 P.S. § 3031.1.  Why Defendants believe that a settlement agreement concerning election administration in Pennsylvania, governed by Pennsylvania law, does not adopt the meaning of "paper ballot" set forth in the Pennsylvania Election Code is mysterious.

While no parol evidence is necessary to construe the Agreement, Defendants' own admissions confirm the plain meaning.  Defendant Commissioner of Elections Jonathan Marks admitted on behalf of the Pennsylvania Department of State that the pieces of paper used in the ExpressVote XL are "ballot cards," not "paper ballots."  *See* Reply Declaration of Kevin Skoglund dated Dec. 17, 2019 ¶ 4.  That admission is consistent with Defendants' conspicuous use of language other than "paper ballot"—most frequently, "vote summary record"—in their official records certifying the ExpressVote XL.  *E.g.*, Moving Declaration of Ilann Maazel dated Nov. 25, 2019 ("Maazel Moving Decl.", Dkt. #112-1) Ex. B at 3.

C. **The ExpressVote XL Does Not Support Robust Precertification Auditing**

Defendants' attempt to wave away as "theoretical" the possibility that the ExpressVote XL might be hacked is both unsupported and irrelevant.  The parties' Agreement requires robust precertification auditing of election returns to increase public confidence that results are unaffected by any malfunction or malfeasance, no matter how ostensibly "theoretical."  *See* Agreement ¶ 5.

As virtually every reputable election integrity expert recognizes, election systems can always be hacked and can always malfunction.  The ExpressVote XL is no exception.  Defendants' contrary position is reminiscent of their discredited pre-settlement litigation position

---

[1] As anyone who has ever voted in New York City knows, Defendants' assertion that using a paper ballot in Philadelphia would be impracticable because there are too many candidates in too many races is dubious.  *Cf.* Defs.' Opp'n 23-24 n.5.

that machines not connected to the Internet cannot be hacked. *Cf.* Wiygul Decl. Ex. 2 at 51:10-11 (testimony of Michael I. Shamos that direct-recording electronic voting machine cannot be hacked because "it's never connected to the Internet"). That position has been roundly debunked by experts in the field and in thorough findings by U.S. District Judge Totenberg in the Northern District of Georgia. *See Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1354-56, 1401-11 (N.D. Ga. 2019) (surveying "mounting tide of research and testing by the nation's leading cybersecurity experts in election cybersecurity" and finding that requiring Georgia voters to vote on non-auditable direct-recording electronic voting machines likely infringed their constitutional right to vote).

Plaintiffs' more specific concerns about the ExpressVote XL are indeed supported by "admissible evidence": the declaration of Plaintiffs' expert, J. Alex Halderman. *Cf.* Defs.' Opp'n 26. Defendants are also wrong to argue that the ExpressVote XL cannot be hacked to perform additional printing when the summary card passes back under the printhead after the voter has reviewed it and cast his ballot. *Cf. id.* at 27. The text on the ballot card is "intentionally printed to allow no blank spaces between the selections made by the voter" *when the machine is functioning properly*. *Id.* The relevant question for auditing purposes, however, is what happens when the machine is *not* functioning properly. The same malware that causes the printhead to print extra marks on the second pass can also cause it to leave extra space in which to make those marks on the first pass. Voters do not know that the summary card is supposed to print without blank spaces, so they will think nothing of it if the summary card has blank spaces when they review it.

Most important, the entire point of requiring risk-limiting audits before certifying election results is to detect and prevent instances of malfunction or malfeasance, including those

6

that are theoretical, unpredictable, or are not even conceived of by election officials or voting system designers until they occur.  *See* Defs.' Br. 26-27.  Audits compare machine results with paper results to rule out to a sufficient degree of confidence any hacking or error—likely, theoretical, or otherwise.  The odds that a hacker will use any particular method to disrupt the voting system's operations is beside the point.  The ExpressVote XL does not meet this standard because the printed results do not necessarily match the voter's intention and are capable of being altered after the voter sees them.  True paper ballots visibly marked by hand or device and counted by an optical scanner do not have this problem.

## II. PLAINTIFFS' CHALLENGE IS TIMELY AND PRUDENTLY BROUGHT, AND THE COURT CAN CRAFT RELIEF TO AVOID POTENTIAL DISRUPTION

Defendants' accusations of undue delay come out of left field.  If Defendants really believed that Plaintiffs were putting the 2020 elections in jeopardy or had somehow consented to the use of the ExpressVote XL in Pennsylvania, Defendants would and should have said so in the parties' extensive meet-and-confer process.  They did not.  Defendants did not raise these issues in private good-faith discussions because their accusations rest upon a materially misleading *post hoc* narrative at odds with reality.  For many months, Plaintiffs repeatedly tried to get relevant information about the ExpressVote XL from Defendants, consistent with the letter and spirit of the Agreement.  Defendants stonewalled.  Plaintiffs responsibly waited until their expert had an opportunity to assess the system—and until the Commonwealth resolved a pending petition to decertify it—before coming to Court.  That course of action was prudent, reasonable, and appropriate.

### A. Defendants Present a Highly Misleading Narrative

Defendants' misleading narrative ignores their months of stonewalling Plaintiffs' requests for relevant information, as well as Defendants' own potential decertification of the

7

system.  Plaintiffs reasonably and prudently declined to rush to court until they fully understood the functioning of the ExpressVote XL and until other proceedings concerning the system were resolved.

The parties' Agreement contains mandatory information-sharing provisions. When Defendants intend to conduct on-site certification testing of new voting systems, Defendants "shall ensure" that Plaintiffs are made aware of the testing.  Agreement ¶ 4(a). Plaintiffs "will appoint a person to attend" any such testing, and "the representative may provide written or oral comments to the Secretary concerning the certification of any Voting Systems" during the testing or for a reasonable period after the testing.  *Id.* ¶ 4(b).  Dr. Halderman participated as Plaintiffs' representative under the Agreement.

Defendants certified the ExpressVote XL shortly after the Agreement, without giving Plaintiffs or Dr. Halderman the opportunity either to be present for any testing of the system or to witness a video of the testing.  In January 2019, Defendants permitted Dr. Halderman to witness on-site testing of *other* systems.  *See* Reply Declaration of Ilann Maazel dated Dec. 19, 2019 ("Maazel Reply Decl.") Ex. A.  On **January 29, 2019**, Dr. Halderman also asked Defendants to provide video of the ExpressVote XL testing, as well as for other systems he had not personally observed.  *See id.*  Dr. Halderman wrote: "Most of my feedback concerns issues that I think warrant further testing . . . .  Certainly some of those issues are shared by other vendors' systems [including, e.g., the ExpressVote XL], and I hope to have a chance to go back and review the videos from those tests so I can provide similar feedback."  *Id.*

Defendants did not respond.  They did not provide Dr. Halderman a video of the ExpressVote XL testing in January.

On **February 21**, per the Agreement, Dr. Halderman again requested to see the video of the ExpressVote XL testing. *See id.* Again, Defendants failed to give the video, stating: "Regarding the videos, we have to work with the vendors first to review the videos for proprietary information." *Id.*

On **March 7**, Dr. Halderman wrote *again*: "I'm writing again to ask when the other videos will be available for review. *Since many counties are looking to purchase machines, and their decisions might be better informed by public feedback, time is of the essence.*" *Id.* (emphasis added). Again, Defendants failed to produce the testing video. In late March and early April, Dr. Halderman sought the videos yet again, with no response. *See id.*

On **May 9**, 2019, Plaintiffs' counsel was forced to intervene and again requested the testing video. *See* Maazel Reply Decl. Ex. B. Defendants promised to "check in." *Id.* On **May 16**, Defendants said that they would upload the ES&S videos to a file transfer platform "next." *Id.* On **May 28** and **June 4**, Dr. Halderman twice more requested the ES&S videos. *See* Maazel Reply Decl. Ex. C. Not until **June 5** did Defendants finally provide video of the operation and certification testing of the ExpressVote XL for Plaintiffs' review. *See id.* Ex. D. That testing had taken place on September 25-28, 2018. Boockvar Decl. ¶ 58. It took six months to produce the videos after the execution of the Settlement Agreement, and at least nine requests from Plaintiffs, for Defendants to produce the videos.

To challenge the ExpressVote XL in court, before even seeing Defendants' testing, would have been irresponsible. It was reasonable and responsible for Plaintiffs to have their expert designee observe and understand the ExpressVote XL before challenging it in court.[2]

---

[2] Defendants attempt to spin Dr. Halderman's comments in an October 9, 2018 email from Plaintiffs' counsel into some kind of admission of compliance with an as-yet-nonexistent Settlement Agreement, the material terms of which had not been agreed upon. But those

9

Plaintiffs also acted prudently in not seeking immediate judicial intervention in the summer of 2019.  On July 16, 2019, a group of Pennsylvania voters petitioned the Secretary of the Commonwealth to decertify the ExpressVote XL, triggering a mandatory reexamination of the system under 25 P.S. § 3031.5.  *See* Maazel Moving Decl. Ex. B at 14-15.  In response to the decertification petition, Defendants conducted additional testing of the ExpressVote XL on unspecified dates in the summer of 2019.  *See* Boockvar Decl. ¶ 67; Maazel Moving Decl. Ex. B at 9-11 (describing the reexamination).  The parties' Settlement Agreement requires Defendants to provide Plaintiffs with notice of and the ability to participate in all "on-site" certification testing.  Agreement ¶ 4.  Perhaps for this very reason, Defendants held the additional testing of the ExpressVote XL *offsite*.  Defendants provided Plaintiffs with no notice of the recertification testing of the ExpressVote XL and no opportunity to participate.

Had Plaintiffs rushed to court while Defendants considered decertifying the system themselves, Defendants surely would have argued that Plaintiffs acted precipitously and that the Court should stay its hand.  Recognizing that reality, Plaintiffs provided Defendants with notice of noncompliance on July 29, 2019 to begin the mandatory meet-and-confer process under the parties' Agreement.  *See* Maazel Moving Decl. Ex. C; Agreement ¶¶ 14-15.

The Agreement gave Defendants 30 days to respond.  *See* Agreement ¶ 15.  After their time to respond to Plaintiffs had elapsed, but before responding, Defendants recertified the ExpressVote XL on September 3, 2019.  Maazel Moving Decl. Ex. B.  After 45 days had elapsed, on September 12, 2019, Defendants finally responded to Plaintiffs' letter of noncompliance.  Maazel Moving Decl. Ex. D.  Defendants' suggestion that Plaintiffs engaged in bad-faith delay by complying with the Agreement and not seeking judicial relief before

---

comments pertain by their terms to the ES&S ExpressVote, *not* the ExpressVote XL, which is a different voting system.  *Cf.* Unger Decl. Ex. 4.

Defendants responded is absurd.  *Cf.* Defs.' Opp'n 32 & n.9.  After Defendants responded on September 12, Plaintiffs continued the meet-and-confer process in a good faith effort to persuade Defendants to decertify the system.  *See* Maazel Moving Decl. Exs. E, F, J (letters and emails by the parties dated October 1, October 30, November 10, and November 13).

When all of Plaintiffs' efforts to resolve the issue with Defendants failed, Plaintiffs sought judicial relief on November 26, 2019.  That timeline was again eminently reasonable.  *See Wheels Mechanical Contracting & Supplier, Inc. v. West Jefferson Hills Sch. Dist.*, 156 A.3d 356, 363-64 (Pa. Commw. Ct. 2017) (collecting cases to show two-month delay insufficient for laches); *cf. Stlip v. Hafer*, 718 A.2d 290, 135 (Pa. 1998) (finding laches due to eight-year delay).  Giving Defendants time to engage in a meet-and-confer process is not bad faith.  It is responsible lawyering.  It was also required by the Agreement itself.

  **B.** **Defendants Sandbag Plaintiffs**

Presumably because they know their unfair and misleading narrative does not withstand factual scrutiny, Defendants *never* suggested until their opposition papers that Plaintiffs needed to move faster if they wanted to challenge the ExpressVote XL or avoid disrupting impending elections.  Defendants' failure to raise these issues until now calls into question their good faith and the seriousness of their claims.

From late July through November of 2019, the parties repeatedly conferred in writing and by phone about the ExpressVote XL.  Plaintiffs understood that process—conducted between undersigned counsel for Plaintiffs and Timothy E. Gates, Chief Counsel of the Pennsylvania Department of State—as a good-faith effort to work through a disagreement about whether the ExpressVote XL complied with the Agreement.  Plaintiffs made clear in writing as early as July 29 that they intended to seek relief from the Court if the parties could not resolve their dispute.  *At no time* during that extensive meet-and-confer process did Defendants suggest

11

that Plaintiffs were too late to object to the certification of the ExpressVote XL. *See* Maazel Moving Decl. Exs. C-F (parties' exchange of letters). At no time did Defendants claim that Plaintiffs had waived any challenge to the ExpressVote XL or consented to its certification. *See id*. At no time did Defendants tell Plaintiffs that Plaintiffs needed to act urgently to avoid disrupting elections in 2020. *See id*. Only now do Defendants, through a newly appeared phalanx of private litigation counsel, complain the first time about delay and disruption.

Had Defendants raised these issues on any previous occasion, Plaintiffs would have listened in good faith and responded as appropriate. That is exactly what the meet-and-confer process required by the Agreement is for. *See* Agreement ¶¶ 14-15. Defendants' failure to confer about any of these issues belies the professed gravity of their concerns.

  **C.**  **Disruption Can Be Avoided**

Finally, contrary to Defendants' baseless accusations, Plaintiffs understand the need to administer elections in an orderly manner and have no desire to disrupt voting in 2020. The whole point of this case, the Settlement Agreement, and Plaintiffs' enforcement motion is to ensure that all Pennsylvania voters' votes are counted. The Court can craft appropriate relief to minimize any such disruption. *Cf.* Defs.' Opp'n 33-37.

For instance, if a preponderance of the evidence shows that counties already using the ExpressVote XL cannot replace the system in time to administer the April 28, 2020 primaries, the Court can order Defendants to specifically perform their obligations under the Agreement by decertifying the ExpressVote XL in time for the November 2020 general election, *11 months* from now. *See Curling*, 397 F. Supp. 3d at 1407-12 (denying preliminary injunction against DREs in August 2019 as to 2019 general elections but granting injunction as to March 2020 primary elections). Other remedial options also exist, particularly if the City of Philadelphia and the Philadelphia County Board of Elections are joined as intervenors subject to

the remedial power of the Court.  *See* Dkt. #131.  Because Philadelphia already uses a central optical scanner to count paper absentee and provisional ballots, the Court could order that paper ballots be made available to voters alongside the ExpressVote XL for the 2020 primaries, to provide all voters who wish to use a genuine voter-verifiable paper ballot the opportunity to do so.  Given that Philadelphia election workers are already trained in the use of a central optical scanner, transitioning directly to a system of paper ballots with central scanning may also be feasible.  The Court may wish to hold a hearing to explore appropriate remedial alternatives.

### III.   DEFENDANTS' REMAINING PROCEDURAL ARGUMENTS FAIL

In a last-ditch effort to avoid accountability, Defendants toss in a kitchen sink of arguments suggesting that the Court cannot enforce the Agreement despite their noncompliance.  Defendants' attempts to dodge enforcement fail.  The only appropriate remedy for Defendants' breach is precisely what Plaintiffs seek: an order of this Court requiring Defendants to specifically perform their obligations under the Agreement.  Such an order is not a permanent injunction, raises no federalism concerns, and is entirely appropriate under the circumstances.

<u>The Permanent Injunction Test Does Not Apply</u>.  Defendants' invocation of the traditional test for the issuance of a permanent injunction is inexplicable.  *Cf.* Defs.' Opp'n 35-37.  An order requiring a party to specifically perform its obligations under a settlement agreement is not a permanent injunction.  *See Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697, 702 (3d Cir. 1998) ("A settlement agreement is a contract, and an order enforcing a contract is ordinarily described as an order for specific performance. . . .  The fact that a specific date for compliance is attached to an order for specific performance of the settlement agreement does not by itself transform the enforcement order into a mandatory injunction."); *see also* Settlement Agreement ¶ 14 (setting forth meet-and-confer requirements "[p]rior to seeking specific performance from the Court").  Defendants cite no authority for the proposition that the

requirements for a permanent injunction apply when a party seeks enforcement of settlement agreement over which a district court has retained jurisdiction. None of the cases cited by Defendants involves a settlement agreement.[3]

No Federalism Concerns. Defendants' federalism arguments have no force. Defendants *expressly agreed* that this Court—a federal court—would retain jurisdiction to enforce the parties' Agreement. *See* Agreement ¶ 13. Defendants consented to federal remedies for any breach of their obligations. Indeed, federal enforcement is a material term of the parties' bargain. Unlike in the cases cited by Defendants, none of which involve a state's voluntary acceptance of federal enforcement,[4] no federalism concerns apply here. *See Berne Corp. v. Gov't of Virgin Islands*, 105 F. App'x 324, 330-31 (3d Cir. 2004) (rejecting separation-of-powers concerns raised by territorial government that consented to federal court enforcement of settlement agreement and was found in breach).

Plaintiffs Come with Clean Hands. Defendants have zero evidence—let alone the clear and convincing evidence the law requires—for their malicious accusation that Plaintiffs are trying to "disrupt preparations for the 2020 elections and sow doubts in the minds of voters." Defs.' Opp'n 39; *see Romero v. Allstate Ins. Co.*, 158 F. Supp. 3d 369, 378 (E.D. Pa. 2016) (unclean hands defense requires clear and convincing evidence). Most of the Plaintiffs *are* Pennsylvania voters. Even assuming they should have acted more quickly, a few months of

---

[3] *See, e.g.*, *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (considering injunction after finding of liability on copyright infringement at summary judgment); *Snyder v. Millersville Univ.*, Civ. No. 07-1660, 2008 WL 5093140 (E.D. Pa. Dec. 3, 2008) (Diamond, J.) (verdict on liability after bench trial).

[4] *See Page v. Bartels*, 248 F.3d 175, 195-96 (3d Cir. 2001) (weighing temporary restraining order against New Jersey redistricting); *Republican Party v. Cortes*, 218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) (denying preliminary injunction in constitutional challenge to geographic restrictions on poll watchers).

litigation delay is hardly the sort of "unconscionable act" to which the unclean hands defense applies. *Romero*, 158 F. Supp. 3d at 375. For high state officials to accuse Pennsylvania voters of engaging in a cynical ploy to disenfranchise themselves is as offensive as it is unsupported.

## CONCLUSION

The Court should find Defendants in breach of the Settlement Agreement and order them to comply with it by decertifying the ExpressVote XL. To the extent the Court finds it necessary, the Court can tailor any such order to avoid disruption to upcoming elections, including by making it effective before the general election in November 2020.

Dated: December 19, 2019

          EMERY CELLI BRINCKERHOFF &
          ABADY LLP

                /s/
          Ilann M. Maazel, Esq.*
          Douglas E. Lieb, Esq.*
          600 Fifth Avenue, 10th Floor
          New York, NY 10020
          Phone: 212-763-5000
          Fax: 212-763-5001
          Email: imaazel@ecbalaw.com

          * *Admitted pro hac vice*

          MONTGOMERY McCRACKEN
          WALKER & RHOADS LLP

          John G. Papianou, Esq.
          Brett Waldron, Esq.
          1735 Market Street
          Philadelphia, PA 19103
          Phone: 215-772-7389

          *Attorneys for Plaintiffs*