UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JILL STEIN, RANDALL REITZ, ROBIN HOWE, SHANNON KNIGHT, and EMILY COOK,<br><br>               Plaintiffs,<br><br>  -against-<br><br>KATHY BOOCKVAR, in her official capacity as Acting Secretary of the Commonwealth; and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation,<br><br>               Defendants. | No. 16-CV-6287 (PD) |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO MOTION TO INTERVENE BY CITY OF PHILADELPHIA AND PHILADELPHIA COUNTY BOARD OF ELECTIONS AND MOTION FOR LEAVE TO FILE AS *AMICUS CURIAE* BY ELECTION SYSTEMS & SOFTWARE**

Plaintiffs respond as follows to the Court's December 18 order (Dkt. #132) concerning the motion for leave to intervene of the City of Philadelphia and the Philadelphia County Board of Elections (collectively, the "Philadelphia Movants") and the motion for leave to file a brief as *amicus curiae* of Election Systems & Software ("ES&S").

## I.    PLAINTIFFS HAVE NO OPPOSITION TO THE COURT CONSIDERING *AMICUS* FILINGS

Plaintiffs do not oppose ES&S's motion for leave to file a brief as *amicus curiae*. Plaintiffs do not oppose the Court considering the submission of the Philadelphia Movants as a brief of *amici curiae*.

1

II.      **THE COURT SHOULD DENY THE MOTION TO INTERVENE**

       The Court should deny the Philadelphia Movants' motion to intervene for three

reasons.

       First, none of the cases cited by the Philadelphia Movants authorizes mandatory

or permissive intervention into proceedings to enforce a private agreement between contracting

parties.  The parties' Agreement in this case is a "private settlement agreement," not a so-ordered

"[c]onsent [d]ecree."  Agreement ¶ 12.  The parties agree in the merits briefing that the

Agreement is to be interpreted and enforced as a contract.  The Philadelphia Movants are not

parties to that contract.  Nor do they argue that they are intended third-party beneficiaries of the

contract.  This case is therefore unlike others in which nonparties sought to intervene prior to

court approval of a classwide settlement agreement, *see, e.g.*, *Benjamin ex rel. Yock v. Dep't of

Pub. Welfare*, 710 F.3d 938, 949-50 (3d Cir. 2012), or court approval of a consent decree, *United

States v. Alcan Aluminum, Inc.*, 25 F.3d 1174 (3d Cir. 1994).  Plaintiffs are aware of no authority

supporting the concept of third-party intervention into limited enforcement proceedings

concerning a private settlement agreement over which the court retained jurisdiction.

       Second, mandatory intervention is unwarranted because Defendants are

adequately representing the Philadelphia Movants' interests.  The (erroneous) gravamen of

Defendants' opposition to Plaintiffs' motion to enforce the settlement agreement is that

Plaintiffs' purported delay has resulted in unnecessary expenditure by counties like Philadelphia

County and jeopardizes the administration of the 2020 elections.  The Philadelphia Movants

make precisely the same arguments in their papers.  Indeed, all of the evidentiary support for the

Philadelphia Movants' arguments comes from materials previously filed by Defendants.  The

Philadelphia Movants need not be joined as parties to this action for the Court to protect the

interests they assert, if the Court deems it warranted.  *See Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (government agency "presumed adequate" as a representative of the interests it is asserting, "particularly where the concerns of the proposed intervenor . . . closely parallel those of the public agency").

Third, permissive intervention would be improper because there the Philadelphia Movants do not assert a claim or defense and provide no independent basis for federal subject-matter matter jurisdiction.  *See In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 338-39 (E.D. Pa. 2004) ("The requirements for permissive intervention are: (1) an independent basis of subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.").  Because the Philadelphia Movants are not parties to the Settlement Agreement, they have neither claims nor defenses to offer—just arguments in favor of Defendants' defenses.  To the extent the Philadelphia Movants' submission can be construed to assert claims or defenses, no independent basis of subject-matter jurisdiction exists for those claims or defenses.  The Philadelphia Movants do not present a federal question, and there is no diversity of parties.  The only basis for the Court's continued exercise of jurisdiction is its retention of jurisdiction to enforce the Settlement Agreement, to which the Philadelphia Movants are not parties.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).

Under the circumstances, consideration of the Philadelphia Movants' submission as a brief by *amici curiae* is more than sufficient to account for their asserted interests.  *See Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987) ("[A]lthough the District Attorney is not entitled to intervene as of right, we think it was entirely appropriate for the district court to permit the District Attorney to be heard on the terms of the consent decree, however his status may be otherwise legally characterized.").

III.   **THE PHILADELPHIA MOVANTS ARE RESPONSIBLE FOR THE CORRUPT RUSH TO BUY AND IMPLEMENT THE EXPRESSVOTE XL—BUT NOT FOR THE COSTS OF REPLACING IT**

In their putative opposition papers, the Philadelphia Movants portray themselves as responsible stewards of "taxpayer funds" who undertook "herculean" efforts to provide Philadelphia voters with new state-of-the-art voting machines, now purportedly jeopardized by Plaintiffs' efforts to enforce the Settlement Agreement.  *E.g.*, Philadelphia Opp'n (Dkt. #131-1) at 2.  This self-glorifying narrative bears little resemblance to reality.

After an exhaustive investigation, the Controller of the City of Philadelphia documented "significant issues with the procurement process" for the ExpressVote XL.  Ex. A at 2 (Controller's investigative report).  The Controller found:

- ES&S engaged in undisclosed lobbying of the Commissioners who chose the ExpressVote XL as Philadelphia's voting system.  *Id.* at 9-10.

- ES&S made campaign contributions to the Commissioners who chose the ExpressVote XL as Philadelphia's voting system, which ES&S failed to disclose on mandatory disclosure forms.  *Id.* at 11-13.  Such nondisclosures were considered *disqualifying* for other vendors competing for similar contracts, but not for ES&S.  *Id.* at 14.

- The Commissioners who chose the ExpressVote XL as Philadelphia's voting system had potential conflicts of interest.  *Id.* at 20.

- Commissioners lobbied and given money by ES&S exerted "pressure" on members of the technical selection committee to favor the ExpressVote XL.  *Id.* at 24.

- Even though the City Law Department and the Controller both concluded that Philadelphia's contract with ES&S was "voidable" because of ES&S's failure to make mandatory disclosures, the Board of Elections declined to exercise its right to void the contract.  *Id.* at 21-22.

- In awarding the contract to ES&S, the City violated its governing Best Value Guidelines for procurement.  *Id.* at 2, 6-7.

What's more, the Philadelphia Movants continued to press forward with their implementation of the ExpressVote XL even while a substantial petition to decertify the system

4

was pending before the Secretary of the Commonwealth between July and September of 2019.

*See* Philadelphia Opp'n 14 ("During that time Philadelphia continued and completed the work of

implementing its new voting system . . . ."). It did so despite the risk that the Secretary might

decertify the system. It did so despite the absence of any time pressure, as no requirement exists

that counties implement new voting systems until 2020. It did so even though other less

expensive, more reliable voting systems were better choices under its Best Value Guidelines for

procurement. And it did so against the advice of its own Law Department and Controller that it

could *void* its contract with ES&S because of ES&S's noncompliance with mandatory disclosure

requirements.

   In short, for whatever reason, Philadelphia seems to have been in a considerable

hurry to buy as many ExpressVote XL machines as possible, irrespective of the law or the

consequences. To blame Plaintiffs for this deeply flawed decision-making process is laughable.

   Fortunately, the contract between Philadelphia and ES&S contains clear language

that *ES&S*—not the taxpayer—bears responsibility for replacement costs if the Secretary of the

Commonwealth decertifies the ExpressVote XL. The contract provides:

> Equipment and Provider Software modifications or replacements
> necessary due to decertification by . . . the Commonwealth of
> Pennsylvania . . . ***must be provided to City at no cost or it must be***
> ***replaced with a certified system at no cost.*** [ES&S] shall be liable
> to City for any and all reasonable costs incurred to obtain and
> utilize such replacement voting systems and/or alternative voting
> methods for all elections occurring until the equipment is re-
> certified, reapproved or City terminates [the contract] for cause and
> procures new equipment.

Ex. B art. XII (emphasis added).

   Thus, if the Court orders Defendants to decertify the ExpressVote XL, ES&S will

bear the cost of providing Philadelphia with new, compliant voting systems. Philadelphia

taxpayers will not—at least assuming that Philadelphia chooses to assert its contractual rights this time around, rather than continue funneling millions of taxpayer dollars to political benefactors.

At least one other Pennsylvania county has already officially expressed its regret at having purchased the ExpressVote XL.  Yesterday, in a unanimous nonpartisan vote, the Northampton County Board of Elections expressed "no confidence" in the ExpressVote XL, given the lack of voter confidence in the system.  Ex. C.  Such an outcome should remind the Court that the democratic costs of continuing to use machines that do not instill voter confidence in the integrity of the result exceeds the economic cost of replacing them.

## IV.   THE PHILADELPHIA MOVANTS' FEW NEW ARGUMENTS ARE WRONG

ES&S's brief merits no response.  The Philadelphia Movants' legal arguments are almost entirely derivative of Defendants' and do not require a separate response.  Three narrow points warrant scrutiny, however.

First, the Philadelphia Movants are entirely wrong to call the parties' Settlement Agreement and its paper ballot requirement "aspirational."  Philadelphia Opp'n 16.  There is nothing aspirational about it.  The Secretary will only certify new voting systems if they use paper ballots.  Agreement ¶ 2(a).  The Secretary will also direct counties to implement new voting systems by 2020.  *Id.* ¶ 3.  Taken together, these requirements will result in every Pennsylvania voter using paper ballots in time for the 2020 elections.  *See id*.

Second, the Philadelphia Movants' suggestion that Plaintiffs should have challenged the ExpressVote XL based upon coverage in the *Philadelphia Inquirer* is inconsistent with the notice and information-sharing provisions of the parties' settlement agreement.  *Cf.* Philadelphia Opp'n 17-18.  The Agreement sets forth a clearly defined process for information-

sharing between the parties to enable Plaintiffs to monitor compliance with the Agreement. Defendants are required to make Plaintiffs aware of testing of voting systems and to provide Plaintiffs with an opportunity to be heard in connection with that testing.  *See* Agreement ¶¶ 14-15.  Consistent with the Agreement, Plaintiffs made repeated efforts over a course of many months to get testing videos of the ExpressVote XL that would enable their expert to evaluate the system.  It is understandable that the Philadelphia Movants, as nonparties, would be unaware of Plaintiffs' efforts and Defendants' stonewalling.  *See* Maazel Reply Decl. (Dkt. #133-1) Exs. A-D.  But media coverage is no substitute for the notice provisions of the Agreement.

Finally, the Philadelphia Movants have no legal basis for their suggestion that Plaintiffs' construction of the Settlement Agreement would render it unenforceable.  *See* Philadelphia Opp'n 21-22.  By law, the Secretary of the Commonwealth has the discretion to certify voting systems that comply with the Pennsylvania Election Code.  The Settlement Agreement circumscribes the Secretary's discretion and constrains the Secretary to approve only voting systems that use paper ballots, produce voter-verifiable records of each vote, and can support robust pre-certification auditing.  *See* Agreement ¶ 2.  The only question before the Court is what these terms mean.  The Philadelphia Movants cite no authority for the proposition that a public official cannot limit her office's discretion or commit to exercise that discretion in a certain manner by agreement.

## CONCLUSION

The Court should deny the Philadelphia Movants' motion to intervene and reject on the merits their arguments and ES&S's arguments as *amici*.

Dated: December 20, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP

_____/s/_____
Ilann M. Maazel, Esq.*
Douglas E. Lieb, Esq.*
600 Fifth Avenue, 10th Floor
New York, NY 10020
Phone: 212-763-5000
Fax: 212-763-5001
Email: imaazel@ecbalaw.com

* *Admitted pro hac vice*

MONTGOMERY McCRACKEN
WALKER & RHOADS LLP

John G. Papianou, Esq.
Brett Waldron, Esq.
1735 Market Street
Philadelphia, PA 19103
Phone: 215-772-7389

*Attorneys for Plaintiffs*

# Exhibit A

# Voting Technology Procurement Investigation





## City Controller
## Rebecca Rhynhart

Photo by M. Fischetti for VISIT PHILADELPHIA®

## VOTING TECHNOLOGY PROCUREMENT INVESTIGATION
## EXECUTIVE SUMMARY

In 2018, the Pennsylvania Department of State issued several directives to counties regarding the purchase of electronic voting machines and electronic voting machine examinations. These directives required that all new voting machines purchased to employ a voter-verifiable paper ballot or a voter-verifiable paper record of the votes cast by a voter, be certified by the United States Election Assistance Commission and the Pennsylvania Department of State prior to use in an election, and that these voter-verifiable systems must be selected by December 31, 2019.

As a result of these directives, Philadelphia's City Commissioners, a three member, popularly-elected bipartisan board charged with administering elections and voter registration for the City of Philadelphia in accordance with federal and state voter registration and election laws, began a process to upgrade and modernize its Election System infrastructure.

Prior to the selection of a vendor, the City Controller's Office began communicating concerns regarding the procurement process to the Chair of the City Commissioners, Lisa Deeley, specifically calling attention to the fast-tracked nature of the process, the lack of public input, and transparency issues. Shortly after the February 20 vote, and months before the execution of formal contracts with the selected vendors, ES&S and KNOWiNK, the Controller's Office launched an investigation into the procurement process to fulfill its obligation to prevent improper disbursements and assure strict accountability for the funds that would ultimately be disbursed.

The investigation sought to address concerns regarding the lawfulness, transparency, and fairness of the Request for Proposals and selection process, especially considering the cost of the purchase ($29 million) and the significance of the issue at hand. Over the last seven months, the Controller's Office conducted more than 20 interviews of individuals involved in the procurement and selection process, including City Commissioners Al Schmidt and Lisa Deeley and reviewed thousands of pages of documents. The investigation revealed several areas of concern.

### ES&S ENGAGED WITH CITY COMMISSIONERS AS EARLY AS 2013

In July 2013, City Commissioner Al Schmidt visited ES&S's headquarters – the only visit by a commissioner to any potential voting machine vendor. Commissioner Schmidt stated that he visited on his own accord and did not seek reimbursement, however he could not recall any details regarding the trip, including who he talked to, who he met with, or who arranged the trip. During 2013, ES&S did not report any lobbyists with the Board of Ethics, but emails obtained during the investigation suggest that a lobbyist for ES&S was lobbying then-City Commissioners during this time. Notably, Commissioner Schmidt received two campaign contributions from ES&S's lobbying firm in April and October of 2013.

ES&S reported using a lobbying firm in January 2014, which coincides with the City Commissioners' efforts to modernize the City's election systems and resulted in a Request for Information for voting system modernizations being released in October 2014. In 2015, the City Commissioners requested $22 million in budget appropriations to modernize the election system.

Emails obtained in the investigation suggest that the budget request was developed with support from ES&S. The appropriation was not funded in that budget cycle and progress on this effort came to a halt, however lobbying efforts by ES&S did not. Since January 2014, ES&S spent more than $425,000 (as of the most recent filing) in lobbying expenses related to the City of Philadelphia, including $27,856 related to Commissioner Schmidt, specifically.

ES&S FAILED TO DISCLOSE USE OF CONSULTANTS AND CONSULTANTS CAMPAIGN CONTRIBUTIONS

As part of its response to the RFP, ES&S was required to fill out a mandatory disclosure form and disclose any campaign contributions the business or its affiliated entities/persons made, the name of any consultants used to help in obtaining the contract and any campaign contributions the consultants made. On its mandatory disclosure form, ES&S did not disclose its use of lobbyists, the lobbyists' activities or the lobbyists' campaign contributions in its bid to win the contract for the purchase of new voting machines. Specifically, ES&S did not disclose that its lobbying firms, Duane Morris and Triad Strategies, made campaign contributions in 2017 and 2018 to Commissioners Schmidt and Deeley, two of the commissioners who had the final say in awarding the voting machine contract. This information was filed with the Ethics Board, as required, but was not disclosed as part of its mandatory disclosure form in its RFP response. Additionally, ES&S detailed lobbying activities to the Ethics Board, including repeated "direct communication" with Commissioner Schmidt, and "Direct Communications" regarding elections as recently as the July-September 2018 reporting period. The investigation found that the information provided on the disclosure was not reviewed and verified by the City. It is worth noting that as a result of this investigation's disclosure finding, ES&S agreed to a nearly $2.9 million penalty – the largest penalty in the City's history.

CITY COMMISSIONERS POTENTIAL CONFLICT OF INTEREST

As stated previously, Commissioner Schmidt was the recipient of direct communication by ES&S's lobbyists repeatedly and both Commissioners Schmidt and Deeley received campaign contributions from ES&S's lobbyists in the years prior to selecting them as a vendor for the new voting machines. Despite this, both Commissioners Schmidt and Deeley signed Confidentiality and Conflict of Interest forms for the voting technology procurement process, agreeing to not "take official action, including but not limited to participation in the proposal review and selection process, that impacts [his] financial interests" and that "if any such relationship exists with an applicant who submitted a response to this RFP, I must disclose the relationship and disqualify myself from reviewing and evaluating any proposals submitted in response to this RFP."

PROCUREMENT PROCESS ISSUES

A number of concerns were outlined with the procurement process, including the rushed nature of the procurement process, selection committee members feeling pressured to select ES&S, lack of procedures to ensure the integrity of the procurement process, and the lack of overall transparency in the procurement process.

Overall, this report shows significant issues with the procurement process for the new voting system, including not following Best Value Guidelines.

The Controller's Office began an investigation into the procurement process for the City of Philadelphia's (the "City") new voting system shortly after February 20, 2019, when the Philadelphia City Commissioners ("City Commissioners") awarded Election Systems & Software, LLC ("ES&S") and KNOWiNK, LLC ("KNOWiNK") with contracts for the City's new voting machines and electronic poll books, respectively. These contracts were awarded following a procurement process that was initiated on June 4, 2018. The Controller's Office's investigation, which spanned approximately seven months and which included the review of thousands of pages of documents and hours of witnesses interviews, revealed a procurement process that sacrificed a thoughtful, fair, and transparent process. The issues discussed below reflect areas of concern regarding the voting system procurement process, including the Controller's Office's discovery of ES&S's failure to disclose its use of consultants with respect to the two City Commissioners who voted to select the new voting machines. This revelation eventually led to the imposition of a $2,895,950 penalty against ES&S as a result of the disclosure violation. This report seeks to identify the various areas of concern with respect to the voting system procurement process that the investigation has uncovered, in an effort to improve the integrity and transparency of the City's procurement process going forward.

A.    **BACKGROUND**

1.    **The Beginning of the Voting Machine Modernization Process**

The City's efforts to modernize its election system began in 2014. Throughout that year, the City engaged in research which culminated in the development of a Request for Information ("RFI") for Voting System Modernization in October 2014. The start of the City's journey to modernize its legacy voting system also coincided with the beginning of ES&S's long history of lobbying activity and contacts with the City. In 2015, the City Commissioners requested $22

million in budget appropriations to purchase new voting machines.  However, the appropriation was not funded in that budget cycle and progress on this effort came to a halt.

### 2.      Department of State Directives

On February 9, 2018, the Pennsylvania Department of State issued a "Directive Concerning the Purchase of Electronic Voting Systems."  Under the directive, all voting systems purchased on or after February 9, 2018 must employ "a voter-verifiable paper ballot or a voter-verifiable paper record of the votes cast by a voter."

On April 2, 2018, the Pennsylvania Department of State issued a "Directive Concerning the Conduct of Electronic Voting System Examinations by the Commonwealth of Pennsylvania issued by the Secretary of the Commonwealth."  The directive mandated that all electronic voting systems be certified by the United States Election Assistance Commission and the Pennsylvania Department of State prior to use in an election, and set forth the procedure for vendors to have their voting systems examined in the Commonwealth of Pennsylvania.[1]

Ten days later, on April 12, 2018, the Pennsylvania Secretary of State instructed the counties to select "voter-verifiable paper record voting systems" by Dec. 31, 2019.  The Secretary encouraged the counties to aim to have the machines in place for the November 2019 general election, but only mandated the selection of the machines by the end of 2019.  The State predicated this announcement on the recent allocation of federal monies appropriated for election security by Congress.

### 3.      Philadelphia Issues Requests for Information and Proposals

---

[1] This directive was revised on June 12, 2018.  The revised directive did not impact the certification requirement, but made certain revisions to the prerequisites for vendors who wished to have their voting machines examined by the Department of State.

On June 4, 2018, the Office of Innovation and Technology ("OIT"), on behalf of the City Commissioners, issued an RFI to prospective vendors in an effort to replace the City's current Danaher 1242 Voting Machines[2] and paper polling books as part of an initiative to "upgrade and modernize its Election System infrastructure."   The RFI marked the beginning of the City's procurement process to acquire new voting machines and electronic poll books with the goal of having the new voting system in place for the November 2019 primary election.   Six voting machine vendors submitted a response to the RFI, including ES&S and Dominion Voting Systems ("Dominion").

On November 30, 2018, the City (again through the City Commissioners and OIT) issued a Request for Proposals ("RFP") to prospective voting machine vendors.[3]   The RFP included an anticipated procurement schedule, which imposed a proposal submission deadline of December 28, 2018, applicant demos from January 14, 2019-January 17, 2019, and applicant selection on February 13, 2019.

The RFP provided that the applicants would be evaluated based under the City's Best Value guidelines, where "[c]ost to the City is a material factor, but not the sole or necessarily the determining factor in Proposal evaluation."   Instead, the City would award the contract "to the Applicant whose Proposal the City determines, in its sole discretion, is the most advantageous to the City and in the City's best interest."

Among the purposes of the Best Value Guidelines is transparency with the procurement process to the extent fully feasible.   Transparency is key to "proving the best value for the City."

---

[2] The City purchased these voting machines in 2002.

[3] The RFP was issued on the same date that ES&S's EVS 6.0.2.1 Express Vote XL voting machine was certified by the Department of State.

The criteria and scoring used to evaluate a contractor is meant to be shared in a "transparent and clear manner." The Best Value process protects the integrity of the procurement by avoiding favoritism, ethical misconduct and by promoting transparency.

The RFP also included a section entitled "City Audit." This section specifically set forth the City Controller's authority to audit the performance of the Contractor under the Contract. The power of audit extends from the initial term through the term of the contract, and extends five years after the termination of the contract. If requested by the Controller, the Contractor must submit all documentation regarding expenditures or fees incurred pursuant to the Contract. This clearly aligns with the City Controller's power to prevent the improper disbursement of City funds by investigating the propriety of any requisition.

In December 2018, the City received RFP responses from three voting machine vendors (ES&S, Dominion, and Hart Intercivic, Inc.), and four electronic poll book vendors (ES&S, KNOWiNK, LLC, Tenex Software Solutions, Inc. ("Tenex"), and Robis Elections, Inc.).

## B.    THE INVESTIGATION

Shortly after the February 20 vote, and months before the execution of formal contracts with ES&S and KNOWiNK, the Controller's Office launched an investigation into the procurement process for the ES&S voting machines to fulfill the obligation of the City Controller to prevent improper disbursements and assure strict accountability for the funds that would ultimately be disbursed to ES&S and KNOWiNK out of the City Treasury. The objective of the investigation was to explore and assuage any concerns regarding the RFP and selection process, especially in light of the sum and significance of the expenditure at issue.

On April 1, 2019, pursuant to the investigatory and audit powers of the City Controller under sections 6-402, 8-101, and 8-409 of the Charter, as well as the RFP, the Controller's Office

issued subpoenas for documents to the City Commissioners, OIT, and the Procurement Department (the "City Entities") pertaining to the selection process of the ES&S Express XL voting machines.  Specifically, the Controller's Office requested information pertaining to the RFI for Election Systems, the RFP for Election Systems, Best Value Bidding Scoring Sheet for the Election Systems Procurement Process, and details of the Selection Committee.  On May 3, 2019, the Controller's Office issued follow-up subpoenas to the City Entities.  The Controller's Office also served additional subpoenas on City Commissioners Lisa Deeley ("Deeley"), Al Schmidt ("Schmidt"), and Anthony Clark ("Clark") in their individual capacities, as well as ES&S.

During the investigation, the Controller's Office conducted more than 20 interviews of individuals involved in the procurement and selection process pursuant to the City Controller's authority under Section 6-402 of the Charter, in order to ensure a thorough understanding of the process, and to allow the Controller's Office to determine the propriety of any payments under the voting systems contracts.

The procurement process for the new voting machines is one of the City's first substantial contracts under the Best Value Guidelines.  As such, the manner in which the process was carried out and evaluated will undoubtedly set the tone for future Best Value contracts.  As discussed above, the Best Value Guidelines recognize the importance of preserving the "integrity of the Procurement process."  The guidelines prohibit any individual from participating on the "Procurement Committee for a particular project if such individual is not cleared of any conflict of interests," and establishes that "City employees must adhere to all applicable law…If a conflict of interest becomes known through the course of the proposal selection process, the

Committee member must disclose the conflict and disqualify him- or herself from participation in the process immediately."

Based on the investigation, the Controller's Office has identified areas of concern regarding the adherence to these principals, as discussed below.

### B1. ES&S ENGAGED WITH CITY COMMISSIONERS AS EARLY AS 2013

As mentioned above, the City and City Commissioners previously attempted to replace its current voting infrastructure. Throughout 2014, the City engaged in research which culminated in the development of an RFI for Voting System Modernization in October 2014. The start of the City's journey to modernize its legacy voting system also coincided with the beginning of ES&S's lobbying activity and contacts with the City.

Specifically, Commissioner Schmidt visited ES&S headquarters in July 2013. It is worth noting that Commissioner Schmidt is the only Commissioner to visit a potential vendor's headquarters and ES&S is the only potential vendor that Commissioner Schmidt visited.  During his interview, Commissioner Schmidt stated that he visited ES&S on his own accord, and did not seek reimbursement, in order to learn about new voting machine technology.[4]  Commissioner Schmidt could not recall other details related to his visit to ES&S headquarters – including who he spoke with to arrange the visit, who he was in contact with from ES&S at the time of his trip, and who he met with at ES&S headquarters.  Additionally, on April 16, 2013 and again on October 31, 2013, Duane Morris (ES&S's lobbying firm) donated $1,000 to Friends of Al Schmidt ("Friends"), a political action committee ("PAC") formed to support Al Schmidt's

---

[4] Schmidt stated that he never sought reimbursement for any of his expenses as a City Commissioner.  In contrast, Schmidt sought reimbursement for various expenses in connection with his campaign, including for T-shirts, office materials, meals, political materials, travel, software and meetings.

campaign for re-election as City Commissioner. for a total of $2,000 in contributions.  ES&S did not report a lobbyist during this time, however the Controller's Office obtained emails during the investigation that suggest that Alan Kessler (employee of Duane Morris, lobbyist for ES&S as of 2014) had engaged with then City Commissioners on behalf of ES&S as early as March 2013.[5]

On January 21, 2014, a former Chief Deputy Commissioner for Commissioner Schmidt, forwarded a letter (dated January 17, 2014,[6]) via e-mail, outlining the Commissioners' budget request for voting machine funding, and lists a total of 12 examples of counties and municipalities that utilize optical scan technology; interestingly, all 12 examples were of ES&S machines.  Another email from 2014 obtained through the course of this investigation references an earlier phone call between Alan Kessler and a City official during which they discussed "the information requested by the Commissioners from ES&S, which aided in the preparation of their budget request."

Since January 2014, ES&S has spent over $428,032 in lobbying expenditures related to the City of Philadelphia.  It is worth noting that while Commissioner Schmidt was able to recall the technical specifications and features of the prospective voting machines during an interview, he seemed to have difficulty remembering that the vendor of the voting machine that he had selected was ES&S, despite having visited ES&S headquarters and despite the fact that ES&S had spent more than $27,856 over a period of years for Direct Communications with Commissioner Schmidt.

---

[5] The emails were from current or former employees and officials.

[6] Three days earlier, Alan Kessler officially registered as a lobbyist, and Duane Morris as a lobbying firm, for ES&S.

Additionally, in 2018, representatives from Commissioners Schmidt and Deeley's offices, along with OIT, visited two voting locations to observe their primary elections. Once again, both locations – Monongalia County, West Virginia and St. Louis County, Missouri, used ES&S voting machines.

### B2. ES&S's FAILURE TO DISCLOSE USE OF CONSULTANTS AND FAILURE TO DISCLOSE CONSULTANTS' CONTRIBUTIONS

Through the Best Value Guidelines, the City seeks to ensure the integrity of the Procurement process by maintaining the following standards throughout the Procurement process:

i)  avoid favoritism toward vendors, suppliers, or contractors;

ii)  avoid ethical misconduct by City employees and officials;

iii)  provide a fair and equal, yet competitive, proposal process for all potential vendors, suppliers, or contractors;

iv)  promote transparency in the selection process; and

v)  keep all information obtained throughout the selection process confidential.

These standards serve as a guide for every step of the procurement process. As a part of the RFP response for the voting machines, each applicant vendor was required to complete an online Mandatory Campaign Contribution Disclosure form, providing information about any contributions "the Applicant and *other affiliated organizations* (emphasis added) or individuals have made." To assist the applicants, an Information on Disclosure Requirements – FAQs sheet was provided in PHL Contracts. Information that MUST be disclosed, includes: any campaign contributions the business or any affiliated entity/persons made, the name of any consultant(s) used to help in obtaining the contract, and any campaign contributions the consultant(s) made.

On December 19, 2018, in the RFP response for ES&S, Richard J. Jablonski (Vice President of Finance for ES&S), reported the following information on the Mandatory Campaign Contribution Disclosure form (as found in PHL Contracts):

1) No affiliate(s) of the Applicant [ES&S] made ANY campaign contributions in the two years prior to the RFP application deadline;

2) No affiliate(s) of the Applicant [ES&S] solicited or served as an intermediary for ANY campaign contributions in the two years prior to the RFP application deadline;

3) No consultant(s) were used in the year prior to the RFP application deadline (applicants were instructed to: "Please be sure to refer to the definition of Consultant before completing [the] form).

Chapter 17-1400 of the Philadelphia Code defines a Consultant as:

> Any Person used by an Applicant or Contractor to assist in obtaining a Non-Competitively Bid Contract through direct or indirect communication by such Person with any City Agency or and City officer or employee, if the communication is undertaken by such Person in exchange for, or with the understanding of receiving, payment from the Applicant or Contractor or any other Person; provided, however, that "Consultant" shall not include a fulltime employee of the Applicant or Contractor.

Despite filing the Mandatory Campaign Contribution Disclosure Form claiming that ES&S did not use a consultant in connection with the voting machines procurement process, the information revealed during the investigation has shown that ES&S did, in fact, engage in lobbying activity in 2017 and 2018, in direct contravention of the company's assertions in the disclosure form.  Specifically, on April 25, 2017, ES&S registered with the City's Board of Ethics for the January – March quarter.[7]   In its registration, ES&S listed Alan Kessler as a

---

[7] It should be noted that Duane Morris gave Al Schmidt a campaign contribution of $500 during this same period, on March 6, 2017.

lobbyist, along with Kessler's law firm, Duane Morris, LLP, which was listed as a lobbying firm. ES&S also listed Roy Wells of Triad Strategies, LLP, as a lobbyist.[8] The registration listed the total expenditures for Direct Communications as $6,500, with all lobbying expenditures totaling $19,500 for that period.   The only communications listed are Direct Communications with Commissioner Schmidt, in reference to the City's Capital Budget.

On July 18, 2017, ES&S again listed Alan Kessler as a lobbyist, along with Duane Morris, and Roy Wells and Triad Strategies.   For April – June 2017, ES&S listed $7,606 in expenditures for Direct Communications, and a total of $22,500 in lobbying expenditures. Again, the only communications that ES&S listed were Direct Communications with Commissioner Schmidt.

For the July – September 2017 lobbying expense report, ES&S listed the same lobbyists/lobbying firms as above, with a total of $22,500 in expenses.   However, there were no communications listed.   Notably, Richard Jablonski, ES&S's VP of finance (who signed ES&S's Mandatory Contribution Disclosure Form as discussed above), also signed off on the July – September 2017 lobbying expense report.

For the October – December 2017[9] period, ES&S's lobbying expense reports only listed Direct Communications with Commissioner Schmidt regarding the City's capital budget.   The total lobbying expenses for the period were $4,250.

---

[8] It appears that Alan Kessler was the actual filer of each expense report, however an ES&S executive signed off on each report as well.

[9] December 28, 2018 was the RFP response deadline.  Accordingly, this period starts to capture more potential direct conflicts, as it is within the one-year look back window for use of "consultants."

The January – March 2018 and April – June 2018 lobbying expense reports show that ES&S had lobbying expenses, but that those expenses did not exceed $2,500 during either period.

The July – September 2018 lobbying expenses for ES&S totaled $18,125 with $3,125 for Direct Communications.  The Lobbying Category for the Direct Communications was listed as "Elections."  For the following two periods, which ran from October 2018 – March 2019, ES&S listed Indirect Communications only, and each three-month period listed $15,000 in lobbying expenses. [10]

ES&S's failure to disclose must be considered in light of recent disqualifications in other procurement processes.  This past spring, the administration disqualified a minority-owned business, U.S. Facilities, from bidding on a contract due to its failure to disclose political donations.[11] The administration justified the disqualification by pointing to U.S. Facilities's failure to disclose three political contributions in 2017 totaling less than $500.[12]  Mike Dunn, a spokesman for the mayor stated that the City has little discretion to overlook these kinds of violations, and that "these laws are well-known for their strict, mandatory requirements for disclosing political contributions and the resulting consequences for non-compliance." *The Philadelphia Tribune*, 4/28/19.

---

[10] Dominion listed Triad Strategies as a registered lobbying firm between March 4, 2015 and December 31, 2015, but did not list any lobbyists or lobbying firms after December 31, 2015.

[11] Another company withdrew its bid due to a similar failure to disclose violation.

[12] It was later discovered that an additional $1500 in contributions were not disclosed, however the administration noted that the dollar amount is not relevant regarding mandatory disclosures.

Similarly, ES&S also failed to disclose recent political campaign contributions from its consultants, which ES&S failed to identify in its Mandatory Campaign Contribution Disclosure Form, to Commissioners Schmidt and Deeley, the two officials who had the final say in awarding a $29 million contract to ES&S.  Specifically, in February 2018, Duane Morris and Triad Strategies (registered lobbying firms for ES&S), contributed $1,000 and $250 respectively, to Friends.  The previous year, Duane Morris also contributed $500 to Friends.  ES&S likewise failed to disclose a campaign contribution of $500 made by Triad Strategies on March 29, 2018, to Deeley 15, a PAC established to support Commissioner Deeley's bid for re-election as a City Commissioner.  As discussed above, Commissioner Schmidt may have also had Direct Communications with ES&S lobbyists within the last year, according to ES&S's self-reported financial disclosures which were submitted to the City's Ethics Board.  As noted above, after advising the City of ES&S's failure to disclose its use of consultants, the City imposed a $2,895,950 penalty in accordance with the terms of the contract.

### B3. CANDIDACY ISSUES

The timing and circumstances surrounding Commissioners Schmidt and Deeley's vote to select ES&S as the voting machine contract winner, as well as the circumstances surrounding the selection of replacement commissioners in light of Commissioners Schmidt and Deeley's bids for re-election, also raise concerns.

### a.   ES&S and KNOWiNK Awarded the Voting Systems Contracts

On February 12, 2019, the Selection Committee that was charged with reviewing the responses to the RFP, submitted its recommendations regarding its suggested vendors to Monique Nesmith-Joyner, Interim Procurement Commissioner.  On the same date, the City

Commissioners issued a media advisory announcing that the proposed February 13 vote on the new voting machines would be postponed until February 20.

In the interim, on February 15, 2019, the Honorable Idee C. Fox, President Judge of the Philadelphia Court of Common Pleas ("Judge Fox"), issued an administrative order titled "In Re: Appointment of Court of Common Pleas Judges to serve as City Commissioners on the Philadelphia County Election Board for the 2019 Primary, General Special Elections pursuant to 25 P.S. § 2641." In the Order, Judge Fox appointed substitute City Commissioners for Commissioners Schmidt and Deeley. On the same day, however, Judge Fox vacated the Order through a second order with no explanation. There is no docket information available from the Court to explain the genesis of, or communications concerning these orders.

The day after Judge Fox's two orders concerning the replacement of Commissioners Schmidt and Deeley under the Pennsylvania Election Code, on February 16, 2019, Nesmith-Joyner submitted a letter to Commissioners Schmidt, Deeley, and Clark, advising them that the Selection Committee recommended further negotiations with two voting machine vendors, ES&S and Dominion, and two electronic poll book vendors, KNOWiNK and Tenex, which the Committee identified as having the highest scores pursuant to the RFP evaluation process. Additionally, Nesmith-Joyner recommended that the Commissioners vote to authorize negotiations with a secondary vendor in the event the primary vendor was unable to perform as expected. On February 20, the City Commissioners, including Commissioner Schmidt and Deeley, voted to select ES&S's Express XL voting machine as the recipient of the City's voting machine contract and KNOWiNK as the recipient of the City's electronic poll book contract.

16

### b.  Lisa Deeley and Al Schmidt Run for Re-election

That same evening of February 20, 2019, mere hours after the City Commissioners' vote, Commissioner Deeley stated her intention to seek re-election to the office of Philadelphia City Commissioners at a pre-planned reception.  This reception was promoted on Facebook as early as January 24, 2019, and shared by Commissioner Deeley on her personal Facebook account as early as February 16, 2019.  The public advertisement for the reception contained a header that announced "DEELEY for Commissioner" and solicited contributions to "benefit Lisa Deeley," which could be made online at https://secure.actblue.com/donate/lisa-deeley-2-20-19, or by check, payable to Deeley 15.  The advertisement also spotlighted "Special Guest The Hon. Edward G. Rendell."  Notably, Hon. Rendell signed a letter dated February 19, 2019, a day *before* the reception and the vote, endorsing Commissioner Deeley for reelection.

On February 21, 2019, the day after her campaign reception and her vote in favor of the machines, Commissioner Deeley submitted a letter to Judge Fox, informing the judge that she was running for re-election as City Commissioner.  As a result, Judge Fox entered an order on the same date appointing Common Pleas Judge Giovanni Campbell to serve as Interim Chairman of the Board of Elections on behalf of Commissioner Deeley.

On February 22, 2019, Commissioner Schmidt submitted a letter to Judge Fox, advising Judge Fox that he was no longer able to serve on the Board of Elections as he, like Commissioner Deeley, was running for re-election as a City Commissioner.  On that same date, Judge Fox appointed Common Pleas Judge Vincent Furlong to serve temporarily on the Board of Elections on behalf of Commissioner Schmidt.  Neither the February 21 nor the February 22 orders by Judge Fox referenced the nearly identical order entered and rescinded on February 15, that replaced Commissioners Schmidt and Deeley as Commissioners.

### c. Deeley and Schmidt's Campaign Activities

The Pennsylvania Election Code provides that "*whenever* a member of the board of county commissioners[13] is a candidate for nomination or election to any public office, the President Judge of the Court of Common Pleas *shall* appoint a judge or an elector of the county to serve in his stead."  The Election Code defines the term "candidate" as "any individual who seeks nomination or election to public office."  In another section, the Election Code provides that "an individual shall be deemed to be seeking nomination or election to such office if he has:

> (1) Received a contribution or made an expenditure or has given his consent for any other person or committee to receive a contribution or make an expenditure, for the purpose of influencing his nomination or election to such office, whether or not the individual has made known the specific office for which he or she will seek nomination or election at the time the contribution is received or the expenditure is made; or

> (2) Taken the action necessary under the laws of the Commonwealth to qualify himself for nomination or election to such office.

Both Commissioners Schmidt and Deeley engaged in various campaign-related activities prior to the date of the vote, including receiving campaign contributions, making campaign expenditures, circulating nominating petitions, and making their candidacy for reelection publicly known through social media.

Commissioner Deeley's Campaign Finance Report, which identifies her as a candidate for City Commissioner in the May 21, 2019 primary, reveals that Commissioner Deeley received 26 contributions between February 1 and February 20, 2019, totaling $9,500, from individuals, a law firm, and various PACs and labor unions.  Commissioner Deeley also recorded 70

---

[13] City Commissioners are ex-officio members of the Board of County Commissioners/Board of Elections pursuant to Phila. Code § 2-112 (4).

expenditures between January 4 and February 20, totaling $27,647, for various Democratic Wards, food for meetings and events, event venues, PAC, a campaign finance lawyer, other consultants, transportation, office, and miscellaneous services and contributions.

Similarly, Commissioner Schmidt's Campaign Finance Report reveals that between January 7 and February 20, 2019, Commissioner Schmidt received 6 contributions totaling $6,421 from individuals and the Republican City Committee.  From January 9 to January 20, 2019, Commissioner Schmidt also recorded 13 expenditures totaling $10,645 for loans, food and events for "political meetings," office services, contributions, the Republican City Committee, and the South Philadelphia Republican Victory Fund.[14]

The Commissioners, as members of the Board of Elections, are empowered to exercise all powers granted to them and perform all duties imposed upon them, including purchasing voting machines, but only when decided by a majority vote *of all members.* If Commissioners Schmidt and Deeley were in fact candidates under Section 3241 of the Election Code, it would seem that they should have been disqualified from serving as "members" of the Board of Elections under state law, and thus ineligible to participate in selecting the City's new voting systems.   While the law appears to be unsettled with respect to Commissioners Schmidt and Deeley's status as candidates prior to the February 20, 2019 vote to select the City's new voting system – in keeping with the Best Value Guidelines and its focus on transparency – even if they

---

[14] The receipt of contributions, making of campaign-related expenditures, and soliciting and obtaining of signatures, may be sufficient to render Schmidt and Deeley candidates under Sections 3241(a)(1) and (a)(2) of the Election Code.  *See also McMenamin v. Tartaglione*, 590 A.2d 802, 810 (Pa. Commw. Ct. 1991) (evidence of demands, solicitations, and receipt of a contribution, or making expenditures for a campaign is critical to the question of whether an individual was a "candidate.").  *See* 25 P.S. § 2641 (requiring the President Judge of the Court of Common Pleas to replace a member of the board of Commissioners whenever the individual becomes a candidate).

were not "candidates" under the Election Code at the time of the vote, it would seem to have been a reasonable and prudent course of action for Commissioner Schmidt and Deeley to have recused themselves prior to the vote to prevent an actual conflict of interest or the appearance of a conflict of interest.

### d. Potential Conflicts of Interest

The combination of Commissioners Schmidt and Deeley's receipt of contributions from ES&S lobbyists and their campaign activities prior to their selection of ES&S to receive the voting machines contract also raise potential concerns under § 20-607 of the Philadelphia Code and the Best Value Guidelines.  § 20-607 requires any "officer" (defined as any elected person in a city and/or county position) who has a financial interest in a contract to disclose the conflict and disqualify themselves.  Likewise, the Best Value Guidelines, provides, "[i]f a conflict of interest becomes known through the course of the proposal selection process, the Committee member must disclose the conflict and disqualify him- or herself from participation in the process immediately."  While Commissioners Deeley and Schmidt did not directly participate in the selection committee, to ensure public confidence in the process, the Best Value Guidelines' focus on fairness and transparency would seem to extend to them as the individuals charged with rendering the final decision of which vendor to award the voting machines contract to.  These are issues potential conflicts of interest that require further review by the appropriate agencies.

During their interviews, Commissioners Schmidt and Deeley both stated that they signed confidentiality/conflict of interest forms in connection with their involvement in the procurement process and as required under the Best Value Guidelines.  Specifically, Commissioner Schmidt signed a conflict of interest form on July 16, 2018, while Commissioner Deeley signed a conflict of interest form on July 26, 2018. At the time of certification, Commissioners Schmidt and

Deeley did not disclose any conflicts or potential conflicts. During their interviews, Commissioners Schmidt and Deeley stated, however, that they disclosed their potential conflicts, namely the contributions from ES&S lobbyists, by submitting their campaign finance reports. However, they were not required to supplement their conflict of interest forms with any supporting documentation, and the forms themselves did not have an area to list any conflicts of interest.

### B4. The Acting Board of Elections Votes to Continue the Contract

On May 13, 2019, despite having raised concerns about the procurement process with the City Solicitor and other members of the City's Law Department ("Law Department"), the City nevertheless formally executed a contract with ES&S for the procurement of 3,750 voting machines.  On June 5, 2019, the City formally executed a contract with KNOWiNK for the procurement of 3,550 electronic poll books.  In the interim, the Controller's Office continued to conduct interviews and review documents in an effort to form a more thorough understanding of the voting system procurement process.

In a letter to the Law Department dated July 18, 2019, the Controller's Office set forth specific concerns regarding ES&S's failure to disclose its use of consultants as well as the candidacy issues discussed above.[15]   After receiving the Controller's Office's letter, the Law Department agreed that the Controller's Office was justified in withholding payment under ES&S's contract, and further advised that ES&S's voting machine contract was voidable due to ES&S's lack of disclosures.  In an August 9, 2019 letter to the acting Board of Elections,

---

[15] On July 8, 2018, the Controller's Office provided information to Law regarding its disclosure finding in an in-person meeting. Law requested those findings be provided in writing. The Controller's Office provided the findings via a letter on July 18. However, prior to receiving the July 18 letter, the Law Department had already informed ES&S of the disclosure issue.

Procurement Commissioner Nesmith-Joyner recommended that the Board of Elections continue the voting machines contract in part due to the time and financial expense that had already gone into the process, as well as the time constraints given the Governor's mandate of having an updated voting system by 2020. It is worth noting that during her interview, Nesmith-Joyner stated that a lobbyist for a voting machines vendor giving campaign contributions directly to the City Commissioners who are ultimately responsible for selecting the winning vendor was not consistent with Best Value Guidelines. On August 15, 2019, the acting Board of Elections voted to continue ES&S's contract despite being made aware of this new information.

### B5. ADDITIONAL AREAS OF CONCERN

In addition to the issues discussed above, the investigation has revealed additional areas of concern regarding the procurement process as well as the Controller's Office's ability to conduct a thorough and timely investigation.

#### a. Procurement Process Concerns

The investigation revealed a number of concerns regarding the voting system procurement process as outlined below.

#### 1. The Process Was Rushed

There was consensus amongst the vast majority of individuals who were interviewed in connection with their involvement in the RFI/RFP process and the selection committee that that the voting system procurement process was conducted on an extremely tight timeline, which

hindered a thoughtful and deliberate procurement process.  Numerous individuals described the process as being "rushed," in order to meet the Governor's mandate.[16]

### 2. Procurement Commissioner's Recommendations Not Followed

As noted previously, Interim Procurement Commissioner Nesmith-Joyner, recommended that the City Commissioners award a primary contract for the voting machines and the electronic poll books, and that the Commissioners also authorize negotiations with a secondary vendor in the event that the primary vendor was unable to perform as anticipated.

Nesmith-Joyner's letter also included the selection committee's final scores for the voting machines and the electronic poll books.  Notably, Tenex scored slightly higher than KNOWiNK, according to the selection committee.  However, the Commissioners voted to award the contract to KNOWiNK, and as with the voting machines, did not vote to authorize negotiations with a secondary vendor in the event that KNOWiNK was unable to perform as anticipated.  During their interviews, neither Commissioners Schmidt nor Deeley were able to articulate why they had chosen KNOWiNK over Tenex.

Despite the Procurement Commissioner's recommendation, the Commissioners did not vote to authorize a secondary vendor.  During her interview, Commissioner Deeley stated that a back-up vendor would not have been feasible given the time constraints involved in the procurement process (which is surprising given the fact that the Procurement Commissioner likely considered the impact of time constraints in crafting her recommendation).  Commissioner

---

[16] Despite being one of the largest counties in the Commonwealth, Philadelphia completed the procurement process and selected its new voting systems in a little over a year, while other smaller counties throughout the Commonwealth are still in the process of selecting new systems.

Schmidt on the other hand, simply stated that the Procurement Commissioner's proposal for a secondary vendor did not seem to make sense, but was unable to elaborate further.

### 3. Pressure to select ES&S

The lobbying activity, and lack of disclosures discussed above, is particularly concerning given the sentiment of at least two selection committee members, who expressed a feeling that representatives from the City Commissioner's Office were putting pressure on the members of the selection committee to select ES&S for the voting machine contract.   One committee member explained that there was a greater emphasis on the ES&S voting machine, and that representatives from the Commissioners' Office provided a disproportionate amount of information related to the capabilities of the ES&S machine in comparison to the information provided on the other vendors.  This information also raises concerns when viewed through the lens of ES&S's history of lobbying and contacts with the City dating back to 2013.

### 4. Lack of procedures to ensure integrity and transparency of the process

The interviews revealed a great deal of confusion about who was ultimately responsible for ensuring the integrity of the procurement process.   Witnesses from the Procurement Department stated that their department was responsible for collecting the conflict of interest forms in connection with the procurement process.  However, other interviews revealed that the Chief Integrity Officer also collected some of the forms, yet there was no established repository for consolidation of the conflict of interest forms.  Nor was there an individual or agency that was tasked with ensuring that the information on the forms was accurate.  A Deputy Chief Administrative Officer ("DCAO"), who was interviewed explained that the CAO was asked to assist in the due diligence review for this particular contract, as it was the City's first substantial use of the Best Value process (although he does not normally review due diligence materials for

Best Value contracts).  The DCAO explained that he reviews the due diligence forms to ensure that there are no deficiencies on the forms, but does not conduct further investigation unless he observes an irregularity or is directed to do so.

As with the candidacy and conflict of interest questions discussed above, the importance of clear, established procedures and documentation with respect to potential conflicts cannot be overstated, particularly in light of the emphasis on transparency in the Best Value Guidelines. Procedures must be developed to clearly establish when and how to report potential conflicts of interest, and there must be an individual or group of individuals tasked with addressing and documenting any potential conflicts of interest.

### b. Impediments to a Thorough and Expeditious Investigation

Throughout the investigation, the Controller's Office has encountered numerous delays in the production of subpoenaed documents and scheduling of witness interviews.    Indeed, until the voting system contracts were officially conformed, the Controller's Office had limited access to documents and information related to the voting system selection committee.  In preparation for the interviews of the City Commissioners and their deputies, the Controller's Office informed the Law Department that it intended to place the witnesses under oath pursuant to the City Controller's authority under the Charter, and to explore questions regarding the Commissioners' campaigns for re-election.[17]  After numerous discussions with the Law Department, and in the interest of moving forward with the investigation, the Controller's Office agreed to significantly

---

[17] Although questions regarding the Commissioners' campaigns technically fell outside the scope of the Commissioners' duties, such information was critical to a thorough understanding of the circumstances surrounding the selection of the voting machines and poll books.

limit its questions regarding the Commissioner's campaigns and agreed not to seek to place the witnesses under oath.

Just as the Best Value Guidelines with its focus on fairness and transparency serves as the cornerstone for the procurement process, those same principles should likewise guide the interactions between the various City agencies involved in an investigation such as the one undertaken by the Controller's Office. A more collaborative and transparent process would not only have improved the efficiency of the investigation, but also serves to assure the citizens of Philadelphia that the City's myriad agencies are working in concert with the common goal of ensuring the integrity, fairness, and transparency of the voting machines procurement process as well as future procurement processes.

## C. CONCLUSION

The Controller's Office has compiled a brief list of recommendations to improve the processes and procedures to clarify and strengthen the Best Value Guidelines.

- When the selection committee or the procurement commissioner make recommendations, they should be followed. If they are not followed by the department or selection committee, a justification of the decision to deviate from the recommended action should be provided in a written memo.

- Any deviations from the guidelines or process by the Procurement Department, contracting department or selection committee should be documented in writing and kept.

- Currently, disclosures are self-reported and no formal process is in place for the verification of disclosures. Mandatory Disclosure forms, especially for Best Value Procurement, should be reviewed and verified for accuracy and a formal

process established for verifying the disclosures. That process should include comparing disclosure forms with filings to the Board of Ethics.

- Language in the Disclosure Eligibility FAQ form should be made more clear, stating that a lobbyist is a consultant, and vice-versa, and providing a definition for consultant and lobbyist to ensure clarity.

- Currently, conflicts of interest are also self-reported and use a standard form affirming that the signer does not have any conflicts. A questionnaire should accompany the form that, when filled out, would provide additional detail regarding possible conflicts of interest. Additionally, an outside determination of whether there is a conflict of interest or the appearance of a conflict of interest should be made by an entity or individual other than the person who is self-reporting. A process should be established, memorialized and followed that establishes an external conflict of interest review. Prior contact with responding firms, previous employment with a potential vendor, any financial interests, including contributions from the potential vendors' consultants/lobbyists, should be disclosed in relation to the conflict of interest form(s).

These recommendations largely address small changes that should occur to ensure the process is better in the future. In any procurement process, the City should strive for transparency and a process that encourages confidence that the decision-making is in the best interest of taxpayers. In this case, the City and City Commissioners have fallen short of that expectation.

# Exhibit B

City of Philadelphia
Procurement Department

# PROVIDER AGREEMENT

**THIS PROVIDER AGREEMENT** is made as of May 13, 2019 (the "Effective Date") by and between the City of Philadelphia (the "City"), acting by and through its Procurement Department, (referred to as "Department"), and Election Systems & Software, LLC ("Provider"), a Delaware limited liability company with its principal place of business at 11208 John Galt Boulevard, Omaha, Nebraska  68137.

## BACKGROUND

On February 20, 2019, under the authority granted to the Board of Elections under Article III. Section 302 of the Pennsylvania Election Code, the Philadelphia Board of Elections approved Provider's ExpressVote XL voting machines with the DS450 Tabulation System for use in Philadelphia elections. The City and Provider now desire that Provider furnish to the City, the Services, and Deliverables specified in Exhibit PA-1 and any attachments thereto (hereinafter, collectively referred to as "Exhibit PA-1"), and elsewhere in the Contract Documents, in accordance with the provisions of this Provider Agreement and all of the other documents and exhibits, which together constitute the Contract Documents as defined in the General Provisions. A copy of the General Provisions is attached hereto and incorporated herein by reference.

In consideration of the mutual obligations set forth herein, and intending to be legally bound, the City and Provider covenant and agree as follows:

## ARTICLE I:  GENERAL TERMS

1.1    **Incorporation of Background**.

The Background is incorporated by reference herein.

## ARTICLE II: DEFINITIONS

The following terms shall have the meanings set forth herein. Capitalized terms not otherwise defined herein shall have the meanings set forth in the General Provisions or in the text of this Provider Agreement.

2.1    **City User(s).**

"City User(s)" means the City's employees, agents, consultants and/or contractors whose duties require that they use and/or have access to the Services or Deliverables.

2.2    **CPU, Computer.**

"CPU" or "Computer" means computer Central Processing Unit.

2.3    **Deliverables.**

"Deliverables" means, collectively, the tangible items of work, as described in Exhibit PA-1 and elsewhere in this Provider Agreement, that Provider is required to furnish as part of its performance of this Provider Agreement, including, without limitation, all Equipment, Software, Documentation and Materials required under this Provider Agreement.

2.4    **Documentation.**

"Documentation" means technical manuals, user's manuals, operating instructions, training materials (except training videos created by Provider which will be considered works made for hire for the City) and other manuals and information published by Provider for the Equipment and Software, including, without limitation, such manuals and information that are set forth in Exhibit PA-1.

2.5    **Equipment.**

"Equipment" means Provider's proprietary hardware or other Provider proprietary equipment.

2.6    **Materials.**

"Materials" means, collectively, any and all materials and work product, tangible and intangible, prepared or developed by Provider in connection with the performance of this Provider Agreement, or for Provider by a Subcontractor in connection with the performance of this Provider Agreement , including but not limited to reports, records, documents, documentation, information, supplies, plans, original drawings, specifications, computations, sketches, renderings, arrangements, videos, pamphlets, advertisements, statistics, data, computer tapes, and software.

2.7     Provider Firmware

"Provider Firmware" means Provider's proprietary software which is included on the Equipment.

2.8     Provider Software

"Provider Software" means Provider's proprietary election software (including the Provider Firmware), all Updates delivered to City under this Provider Agreement, as set forth in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.9     **Services**.

"Services" means the professional services and other services and work to be furnished by Provider under this Provider Agreement, as specified in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.10    **Software**.

"Software" means the Provider Software (including the Provider Firmware) and Third Party software, if any, to be furnished by Provider under this Provider Agreement, as set forth in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.11    **Third Party Items**.

"Third Party Items" means hardware, equipment and software manufactured and developed by parties other than Provider.

2.12    **Event of Force Majeure**.

An "Event of Force Majeure" means an event that is beyond a Party's control, making performance of its obligations under this contract commercially impracticable, illegal, or impossible, including, but not limited to: war, riots, fire, flood, tornado, snow storm, wind storm hurricane, typhoon, earthquake, lightning, hail, explosion, prolonged shortage of energy supplies, transportation delays or interruptions, labor strikes or disputes, utility or communication interruptions and acts of a governmental authority prohibiting or impeding any party from performing its respective obligations under this Provider Agreement.

## ARTICLE III:
## TERM; TIME OF PERFORMANCE

3.1     **Initial Term**.

The initial term of this Provider Agreement shall commence on April 25, 2019 and shall terminate on April 24, 2020 (the "Initial Term"), or such earlier date as the City may

determine in accordance with Articles XI (Events of Default), XII (Remedies) and XIII (Termination) of the General Provisions.  In no event shall the Initial Term be longer than twelve (12) months.

      3.2    **Additional Terms**.

This Provider Agreement may be amended by the City, in its sole discretion, in accordance with Section 2.2 (Additional Terms) of the General Provisions.  Except as stated otherwise in Exhibit PA-1 or elsewhere in this Provider Agreement, all terms and conditions applicable during the Initial Term shall apply to each Additional Term.

      3.3    **Time and Schedule for Performance**.

Provider shall complete all Services and furnish all Deliverables within the time specified in Exhibit PA-1.  Provider shall carry out the work in accordance with the Schedule of Performance set forth in Exhibit PA-1.

**ARTICLE IV:**
**SERVICES AND DELIVERABLES**

      4.1    **Services and Deliverables**.

Provider shall perform and furnish the Services and Deliverables that are described in Exhibit(s) PA-1 – PA-9 , in strict accordance with the descriptions of functionality and performance set forth in such Exhibit(s); the specifications, documentation, and other standards of performance set forth therein, and the Warranty Standards, as defined in Article VII (Warranty), below.

**ARTICLE V:  COMPENSATION**

      5.1    **Amount**.

As total compensation for all Services and Deliverables required under this Provider Agreement and accepted by the Responsible Official pursuant to Article VIII (Acceptance) below, the City covenants and agrees to pay to Provider: Twenty Eight Million, Nine Hundred Fifty Nine Thousand, Five Hundred and Two  Dollars ($28,959,502). Provider's compensation shall include all charges for shipping and delivery of the Equipment, Software, Documentation, and Deliverables at the City location designated in Exhibit PA-1. Notwithstanding anything in this Provider Agreement to the contrary, in no event shall the amount

certified by the Finance Department for Services and Deliverables during the Initial Term or Additional Terms exceed the maximum amount of   Thirty Five Million Dollars ($35,000,000) per term.

5.2   **Manner of Payment.**

(a)   Payment shall be made after Provider's timely submission of invoices to the Responsible Official, in the number, form and content acceptable to the Responsible Official, accompanied by such additional supporting data and documentation as the Responsible Official may require.  All payments to Provider are contingent upon satisfactory performance of the terms and conditions of this Provider Agreement.  Payments shall be made in accordance with the Milestone Payment Schedule as set forth in Exhibit PA-1, shall be due and payable within forty-five (45) calendar days from the date of City's receipt of Provider's corresponding invoice by electronic mail transmission, and shall be subject to the provisions of §17-1702 of The Philadelphia Code.  Payment shall not be due or owing from the City to Provider for any of the Services and/or Deliverables comprising a Milestone, as set forth in the Milestone Payment Schedule, unless or until the City has issued its written statement of Conditional Acceptance for the Milestone in accordance with Section 8.1, *Conditional Acceptance*.  Provider shall submit its final invoice not more than sixty (60) days from completion of the Services and delivery of Deliverables.   All payments to Provider shall be by checks drawn by the City Treasurer.

(b)   The City reserves the right to withhold or offset against any funds payable to Provider for any invoice for which the Responsible Official asserts a discrepancy exists or for Provider's failure to satisfactorily perform the terms of the Provider Agreement, as determined solely by the City.

(c)   Provider's invoices shall be submitted by electronic mail transmission to the following:

| Melissa A. Scott | Nick Custodio |
| --- | --- |
| Senior Project Manager, OIT | Deputy Commissioner, Office of City Commissioners |
| Melissa.A.Scott@phila.gov | Nick.Custodio@phila.gov |
| With A Copy To: | ITProcurement@phila.gov |

5.3    **Retainage for Provider Agreement Compliance.**

The City shall retain twenty five percent (25%) of each payment due to Provider until all Services and Deliverables are completed in accordance with this Provider Agreement and are Finally Accepted by City in accordance with Article VIII (Acceptance), below.  All such retained amounts shall constitute the final payment due hereunder and shall become due and payable thirty (30) days following such Final Acceptance.

**ARTICLE VI:**
**LICENSE; CONDITIONS OF USE; TITLE**

6.1    **Power to License.**

Provider represents and covenants that it has full power and authority to grant the rights granted by this Provider Agreement to the City with respect to all Software and other Deliverables furnished, without the consent of any other person or entity, and that such rights are irrevocable.

6.2    **License.**

Subject to the terms and conditions of this Provider Agreement, and except as stated otherwise in Section 6.5 below, Provider hereby grants, and shall require its Subcontractors to grant, to the City a non-exclusive, non-transferable,  license to use all Software, Documentation, and other Deliverables that are proprietary to Provider or to a Subcontractor (collectively, the "Provider's Licensed Products").

6.3    **Third Party Licenses.**

6.4    **Conditions of Use.**

Provider represents, and the City acknowledges such representation, that the Software and Documentation contains valuable proprietary information.  Except as stated otherwise in Exhibit PA-1, the City's use of the Software and Documentation shall be subject to the following conditions:

(a)     The City may copy the Software and Documentation for safekeeping or backup purposes; may make additional copies of the Software for use by the City Users as provided in Exhibit PA-1; and may make additional copies of Documentation for use by the City Users;

(b)     The City shall not reverse engineer, decompile, disassemble, re-engineer or otherwise create, attempt to create, or permit, allow or assist others to create, the source code or the structural framework for part or all of the Software, except as required through judicial process or as necessary to conduct an audit or reconstruction of an election;

(c)     The City shall not cause or permit any use, display, loan, publication, transfer of possession, sublicensing or other dissemination of the Software or Documentation, in whole or in part, to or by any third party including, but not limited to, any transfer of possession to, or use of the Software or Documentation by any third party to perform any services for the City (including, but not limited to, any coding, programming or ballot layout services) without Provider's prior written consent; or

(d)     The City shall not allow a third party to cause or permit any copying, reproduction or printing of any output generated by the Software (except finished ballots by ballot printers selected by the City) in which Provider owns or claims any proprietary intellectual property rights (e.g. copyright, trademark, patent pending or patent), including, but not limited to, any ballot shells or ballot code stock.

Notwithstanding the foregoing restrictions set forth in Sections 6.4(c) and (d), the City may do the following:

(i)     Sell or otherwise transfer ownership of the Equipment to one or more other counties or municipalities located within the Commonwealth of Pennsylvania;

(ii)    Transfer Provider Software to one or more other counties or municipalities located within the Commonwealth of Pennsylvania, subject to such jurisdiction(s) entering into an appropriate license agreement with, and paying corresponding license fees to, Provider;

(iii)   Subject to an appropriate and agreed upon protective order, produce Software or Documentation in response to a valid discovery request issued pursuant to a subpoena issued by a court or legislative body of competent jurisdiction or in response to a Right To Know Law Request to the extent

such Software or Documentation is not otherwise exempt from disclosure thereunder; and

(iv)    Utilize output generated by the Software in order to report election results and/or produce ballot images as part of the City's conduct of elections or in response to a Right To Know Law Request to the extent that such ballot images are not otherwise exempt from disclosure thereunder.

6.5    **Title; Ownership of Materials.**

(a)    Title and copyright to all Software and any reproductions thereof shall remain with Provider, or where not proprietary to Provider, with the person(s) or entity(ies) that have title and copyright thereto.

(b)    Upon payment in full by the City, all Equipment and Materials provided under this Provider Agreement shall be the sole and absolute property of the City and the City shall have all right, title, and interest thereto and unrestricted use thereof.  To the extent that any Materials developed by or for Provider embody a copyrightable work (including, but not limited to, a "compilation" as that term is used in 17 U.S.C. §101, as amended), the City and Provider agree that such copyrightable work(s) shall be considered as one or more "works made for hire" by Provider for the City, as that term is used in 17 U.S.C. §§101 and 201(b), as amended.  To the extent that any Materials developed by or for Provider embody one or more copyrightable works but are neither a "compilation" nor any other form of "work made for hire," Provider hereby assigns, and agrees to execute instruments evidencing such assignment, all copyrights in all of such works to the City.  All the foregoing terms and conditions of this Section 6.5(b) shall apply to all Materials furnished to Provider by a Subcontractor (in this Article VI only, the "Subcontractor Deliverables").  Provider shall obtain from its Subcontractors the assignment of all copyrights and other rights in the Subcontractor Deliverables that may be necessary for Provider to comply with all terms and conditions of this Section 6.5(b) with respect to the Subcontractor Deliverables.

(c) Software, Documentation, Deliverables and Materials owned by the City:

Any training videos created for the City of Philadelphia related to this Provider Agreement.

## ARTICLE VII: WARRANTY

7.1     **Warranty; Warranty Standards**.

Subject to the City's timely payment of annual certified technician program, firmware and software license and maintenance and support fees, for a period of five  (5) years following the City's Final Acceptance of the Equipment and Software in accordance with Article VIII ("Acceptance") below, and with the option to renew for up to an additional 7 years subject to the City's timely  payment of annual certified technician program, firmware and software maintenance and support fees,  (the "Warranty Period(s)"), Provider warrants that all Software, Documentation, other Deliverables, and Services shall be free from material defects and errors and shall function together as an integrated system in conformance with (1)-(5) following (collectively the "Warranty Standards"):  (1) the descriptions of functionality and performance and all other standards of performance set forth in Exhibit PA-1 and elsewhere in the Provider Agreement; (2) the Documentation; (3) Provider's most current specifications for the Software; (4) any applicable design documents prepared by Provider under the Provider Agreement, as approved and accepted by the City; and (5) all acceptance and/or test criteria or standards of performance specified in Article VIII (Acceptance) below, and or in Exhibit PA-1, including, without limitation, any such criteria or standards of performance set forth in any "Test Plan(s)" (as defined in Article VIII (Acceptance) below) that are accepted and approved by the City.  Unless a Consumable (as hereinafter defined) is found to be defective in materials or workmanship upon initial use by the City within any documented usage periods as prescribed by Provider or a third party manufacturer, the warranty shall not include the repair or replacement of any Equipment components that are consumed in the normal course of operating the Equipment, including printer ribbons, printer cartridges, paper rolls, ballots or ballot cards, batteries, removable media storage devices or marking devices (collectively, "Consumables"). The City shall notify Provider of any defective Consumables within thirty (30) calendar days after discovery of the defect and Provider shall provide a like kind replacement as soon as reasonably practicable.  Any repaired or replaced item of Equipment or Software shall be warranted only for the unexpired term of the Warranty Period. All replaced components of the Equipment or Software will become the property of Provider.  This warranty is effective provided that (a) the City notifies Provider as soon as reasonably practicable, but in no event later than thirty (30) calendar days of the discovery of the failure of performance or defect and is otherwise in compliance with its obligations hereunder, (b) the Equipment or

Software to be repaired or replaced has not been repaired, changed, modified or altered except as authorized or approved by Provider, (c) the Equipment or Software to be repaired or replaced is not damaged as a result of accident, theft, vandalism, neglect, abuse, use which is not in accordance with instructions or specifications furnished by Provider or an Event of Force Majeure , and (d) the City has installed and is using the most recent Update provided to it by Provider that is required to correct a bug or defect and does not otherwise solely constitute optional enhancements available to the City.  This warranty is void for any units of Equipment which: (i) have not been stored or operated in a temperature range according the specifications provided in Exhibit PA-1, (ii) have been severely handled so as to cause mechanical damage to the unit, or (iii) have been operated or handled in a manner inconsistent with reasonable treatment of an electronic product.

Provider has previously entered into an agreement to license to KNOWiNK the specifications necessary for KNOWiNK's electronic pollbook to interface with Provider's ExpressVote XL activation card printer (the "License Agreement").  Subject to KNOWiNK not being in default under the License Agreement, Provider will continue to license to KNOWiNK the specifications needed to enable KNOWiNK's electronic pollbook to interface with Provider's ExpressVote XL during the Warranty Period. Provider will further enter into a Customer Addendum with KNOWiNK, as defined in the License Agreement, for the City of Philadelphia. Provider warrants that pursuant to the License Agreement, it grants KNOWiNK a license of its specifications which, if used properly by KNOWiNK, shall allow KNOWiNK to interface with Provider's activation card printer. Provider further covenants that it will work in good faith with KNOWiNK during the Warranty Period, to enable KNOWiNK to utilize Provider's specifications to interface with Provider's activation card printer.

7.2   **Defects and Errors**.

(a)   During the Warranty Period, Provider shall furnish materials and Services necessary to correct material defects and errors in the Software Documentation or Deliverables and cause it to operate in accordance with the Warranty Standards at no cost to the City.  Provider shall  respond to and commence diagnosis to correct errors, defects, and non-conformances with the Warranty Standards following notice by the City in accordance with the standards set forth in the Service Level Schedule attached hereto at Exhibit PA-5, which notice may be by telephone, or email in accordance with email and telephone number provided by Section 19.1 (Notice) below.

Provider shall correct errors, defects and non-conformances with the Warranty Standards in accordance with Section 8.2 below.

(b)     For purposes of this Article VII, a "material" defect or error shall be any defect, error, or failure to conform to the Warranty Standards that prevents the tabulation, accumulation and reporting of election results using or relying on the Equipment and/or Software, or that would prevent the performance of functions or features of the Equipment and/or Software on which the tabulation, accumulation and reporting of election results depend.

7.3   **Limitation.**

**THE FOREGOING WARRANTY IS MADE EXPRESSLY IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THIS ARTICLE VII SHALL LIMIT OR ALTER PROVIDER'S INDEMNIFICATION AND OTHER OBLIGATIONS PROVIDED IN ARTICLE VIII (INDEPENDENT CONTRACTOR; INDEMNIFICATION) OF THE GENERAL PROVISIONS AND ARTICLES XVI (PATENT, COPYRIGHT AND OTHER PROPRIETARY RIGHTS INDEMNITY) AND XVIII (CENTURY DATE STANDARD AND YEAR 2000 COMPLIANCE) AND SECTION 6.1 (POWER TO LICENSE) OF THIS PROVIDER AGREEMENT.**

## ARTICLE VIII: ACCEPTANCE

8.1   **Acceptance.**

(a)     <u>Conditional Acceptance</u>.   Within thirty (30) days following Provider's completion of all Services and Deliverables comprising a Milestone set forth in the Milestone Payment Schedule (Attachment 1 to Exhibit PA-1), the City shall issue its written statement of Conditional Acceptance to Provider for the Milestone, provided that all such work comprising the Milestone conforms to the Warranty Standards as defined in Article VII (Warranty) above and successfully completes all applicable Conditional Acceptance Tests (as defined in Section 8.1(c) (Acceptance Tests; Test Plans) below).   Payment shall not be due or owing from the City to Provider for any of the Services and/or Deliverables comprising a Milestone unless or until the City has issued its written statement of Conditional Acceptance for the Milestone.

(b)    <u>Final Acceptance</u>.  Within thirty (30) days following successful completion of Final Acceptance Tests (as defined in Section 8.1(c) (Acceptance Tests; Test Plans) below), the completion of all other Services and Deliverables required under this Provider Agreement, and the certification of the City's November 2019 election using the Services and Deliverables provided by the Provider,  the City shall issue its written statement of Final Acceptance of the Services and Deliverables, provided that the Services and Deliverables (1) function together as an integrated system in conformity to the Warranty Standards and (2) meet all performance standards and criteria set forth in the Test Plan(s) for the Final Acceptance Tests, as accepted and approved by the City. Provider shall not be deemed to have performed the Services and Deliverables, nor shall the payment of retainage for contract compliance be due to Provider, unless and until the Services and Deliverables have been Finally Accepted by the City in writing after the certification of the City's November 2019 election using Services and Deliverables from Provider.

Notwithstanding the paragraph above, if an Event of Force Majeure occurs prior to the November 2019 election, making the use of the Provider's Equipment, Services and Deliverables, impossible or impractical in November of 2019, Final Acceptance Tests shall only occur after certification of the first primary or general election in which the City uses Provider's Services, Deliverables and Equipment.

(c)    <u>Acceptance Tests; Test Plans</u>.  The Services and Deliverables comprising each Milestone in the Milestone Payment Schedule shall be subject to conditional acceptance testing as approved and accepted by the City (the "Conditional Acceptance Tests"), and the Services and Deliverables as an integrated system shall be subject to final acceptance testing as approved and accepted by the City (the "Final Acceptance Tests").  No Conditional or Final Acceptance Test or other test of the Services and Deliverables shall commence unless and until Provider has delivered and the City has accepted and approved a written plan or plans setting forth a test method and criteria and standards of performance that must be satisfied for the test to be successful  (the "Test Plan(s)").  The Test Plan(s) shall be Deliverables under this Provider Agreement.

8.2    **Conformance; Correction Period**.

If the City determines that any Services or Deliverables do not conform to the Warranty Standards and/or other conditions of Acceptance set forth above in this Article VIII, and notifies Provider of such non-conformance, Provider shall have the lesser of either (a) a period of

thirty (30) days after the City's notice to remedy the non-conformance(s) or such other period of time upon which the parties agree, or (b) the period of time between the City's notice to remedy and 5 days prior to the next general or primary election, unless a different period of time is agreed upon by the parties ("Correction Period").  If the non-conformance(s) are not completely remedied within the Correction Period, the Services and Deliverables may, at the City's sole discretion, be rejected, in whole or in part; upon return of the rejected Deliverables to Provider, the City shall have no further payment or other obligation to Provider with respect thereto and in addition to any other remedies that may be available to the City under the Provider Agreement, may terminate the Provider Agreement and/or exercise its remedies under Articles XI (Events of Default), XII (Remedies) and XIII (Termination) of the General Provisions.

## ARTICLE IX:
## MAINTENANCE AND SUPPORT SERVICES

9.1     **Term and Cost of Maintenance and Support Services**.

Provider will furnish maintenance and support services for the costs as described in Exhibit PA-1.

## ARTICLE X:
## DEPOSIT OF DOCUMENTATION

10.1     **Deposit of Source Code**.



10.2   **Custodian**.

10.3   **Escrow Agreement**.

Provider shall designate the City as a preferred beneficiary under its existing escrow agreement with the Custodian set forth above.  Upon designation of the City as a preferred beneficiary under Provider's existing escrow agreement with the Custodian, this Provider Agreement shall be deemed modified to incorporate the escrow agreement and to replace Sections 10.1 (Deposit of Source Code) and 10.2 (Custodian) above and 10.4 (Source Code Statement) below by the terms and conditions thereof.

## ARTICLE XI: PROVIDER SOFTWARE UPDATES

During the Initial Term and any renewals thereof, Provider may provide new releases, upgrades or maintenance patches to the Provider Software, together with appropriate Documentation ("Updates") at no cost to the City on a schedule defined by Provider.  Upon notification from Provider, the City is responsible for obtaining any upgrades or purchases of Third Party Items required to operate the Updates as well as the cost of any replacements, retrofits or modifications to the Equipment which may be necessary in order to operate the Updates.   All

Updates shall be deemed to be Provider Software for purposes of this Provider Agreement upon delivery. The City may install the Updates in accordance with Provider's recommended instructions or may request that Provider install the Updates. Provider may charge the City at its then-current rates to (i) install the Updates; (ii) train the City on Updates, if such training is requested by the City; or (iii) provide maintenance and support on the Provider Software that is required as a result of the City's failure to timely or properly install an Update. The City shall not hold Provider responsible for any claim, damage, loss, judgment, penalty, cost, amount paid in settlement or fee which is caused by the City's failure to install and use the most recent Update provided to it at no cost by Provider. If the City proposes changes in the Provider Software to Provider, such proposals will become Provider's property. Provider may, in its sole discretion, elect to make or not to make such changes without reference or compensation to the City or any third party. Provider represents to the City that the Updates will comply with all applicable state law requirements at the time of delivery. The Provider shall be responsible for ensuring that it provided only certified versions of Provider Software in accordance with applicable law to the City. The City shall pay Provider for any Update which is required due to a change in state or local law. In the event that any Updates are required due to changes in state or local law, Provider reserves the right to charge the City for the following:

(i)      the actual and documented total cost of any Third Party Items that are required in order to operate the Updates;  and/or

(ii)     the actual and documented total cost of any replacements, retrofits or modifications to the Equipment contracted for herein that may be developed and offered by Provider in order for such Equipment to remain compliant with applicable laws and regulations; and

The City shall pay Provider the agreed upon costs incurred for the design, development and certification of any Update created solely for the City which is required due to a change in City law or is otherwise requested or required by the City.

**ARTICLE XII:
SOFTWARE DESCRIPTIONS,
EQUIPMENT COMPATIBILITY,
COMPLIANCE WITH LAWS**

Provider shall submit to the City, upon written request, a statement identifying all application and operating system software and the computer hardware with and on which the Software is compatible and will operate in accordance with specifications.  Subject to the City's obligations in accordance with Article XI above, Provider warrants to the City that the Equipment and Software sold and licensed under this Provider Agreement will comply with all applicable requirements of federal and state election laws and regulations that are mandatory and effective during the Initial Term and any Additional Term of this Provider Agreement and will have been certified by the appropriate state authorities for use in the Commonwealth of Pennsylvania.  The Equipment and Provider Software, including all components will be provided to the City with a hardened network for the election management software ("EMS"), in accordance with the guidelines of the United States Election Assistance Commission and any applicable guidelines in the Commonwealth of Pennsylvania.  During the Initial Term and any Additional Term of this Provider Agreement, in the event the City fails to maintain EMS in the hardened network or allows any internal or external access to the hardened network, the City agrees to assume any and all liability therefor.

Provider is subject to all current and future directives issued by the Secretary of State of the Commonwealth of Pennsylvania ("Secretary"). Provider is also subject to an audit and/or investigation of its company and manufacturing facilities to ensure compliance with the Secretary's approval or certification of its equipment.

Equipment and Provider Software modifications or replacements necessary due to decertification by either the Election Assistance Commission or the Commonwealth of Pennsylvania or a field issue or anomaly occurring in any fielded system in the United States that impacts the casting or tabulation of votes by City's Equipment and Provider Software must be provided to City at no cost or it must be replaced with a certified system at no cost. Provider shall

be liable to City for any and all reasonable costs incurred to obtain and utilize such replacement voting systems and/or alternative voting methods for all elections occurring until the equipment is re-certified, reapproved or City terminates this Provider Agreement for cause and procures new equipment.

## ARTICLE XIII:
## RISK OF LOSS OR DAMAGE

13.1   **Risk of Loss or Damage**.

Provider and its insurers will relieve the City, for the period from the commencement of Provider's performance through the City's Final Acceptance of the Services and Deliverables (except Equipment) required under the Provider Agreement, as provided in Article VIII (Acceptance) above, from all risks of loss or damage to the Software, Documentation and other Deliverables (except Equipment) by providing the City with a replacement copy thereof, upon written request by the City.  Should it become necessary, during this period, to replace a tape, disk, or other media containing Software, due to damage, loss, defective equipment, or other such causes, there will be no charge for such replacement except for media and delivery costs; provided, however, that this Section 13.1 shall not obligate Provider to furnish installation or other services not provided in the Provider Agreement.  Risk of loss for the Equipment shall pass to the City upon delivery to the City's designated location.

## ARTICLE XIV: CHANGES

14.1 **Changes in Scope of Services and Deliverables**.

At any time during the Initial Term or any Additional Term of this Provider Agreement, the City may make changes in any of the Services and Deliverables, within the general scope of the Provider Agreement as set forth in Article IV (Services and Deliverables) of this Provider Agreement, including, without limitation, the addition or deletion of Services and Deliverables, and changes in the time of performance.  All such changes shall be by written order or request, as shown on the Project Change Control Form, an example of which is attached as Exhibit PA-8 to this Provider Agreement,  signed by the Responsible Official ("Change Order").  If, in the judgment of the City, any such change causes an increase or decrease in the cost or the time required for the performance of the Provider Agreement, an equitable adjustment of the contract amount and/or time of performance will be made, subject to the following conditions:  (a)

In no event shall the City be liable to Provider for additional compensation for any alleged change to the work for which the City has not issued a Change Order; (b) any claim by Provider for such additional compensation or for an extension of the time of performance to perform a Change Order must be made in writing within ten (10) calendar days from the date on which Provider received the Change Order in accordance with Section 19.1 (Notice) below.

    14.2   **Extension of Time of Performance**.

        Provider shall be entitled to a reasonable extension of the time of performance, the length of which shall be determined by the City, for delays to its performance that are in no way the fault or responsibility of Provider; provided, however, that no such extension shall be granted unless a written request, setting forth in detail the grounds therefor, is received by the City within ten (10) calendar days following the events giving rise to such alleged delay. Provider's sole and exclusive remedy for costs or damages arising from any delay to its performance, whether or not caused by any act or omission of the City, Provider, or others, shall be an extension of the time of performance, and in no event shall Provider be entitled to payment or compensation of any kind from the City for any such costs or damages.

## ARTICLE XV:
## INSURANCE, SURETY BONDS

    15.1   **Insurance.**

        Unless otherwise approved by the City's Risk Management Division in writing, Provider shall, at its sole cost and expense, procure and maintain, or cause to be procured and maintained, in full force and effect, the types and minimum limits of insurance specified below, covering Provider's performance of the Services and furnishing of the Deliverables. Provider shall procure, or cause to be procured, all insurance from reputable insurers admitted to do business on a direct basis in the Commonwealth of Pennsylvania or otherwise acceptable to the City. All insurance herein, except the Professional Liability Insurance, shall be written on an "occurrence" basis and not a "claims-made" basis. In no event shall Provider perform any Services or other work until Provider has delivered or caused to be delivered to the City's Risk Management Division the required evidence of insurance coverages. All insurance coverages shall provide for at least thirty (30) days prior written notice to be given to the City in the event coverage is materially changed, cancelled or non-renewed. The City, its officers, employees, and agents, shall

be named as additional insureds on the General Liability Insurance policy. Provider's certificate of insurance shall include a statement to the effect that the coverage afforded the City and its officers, employees and agents, as additional insureds, will be primary to any other coverage available to them and that no act or omission of the City, its officers, employees or agents shall invalidate the coverage.

   (a)   WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE

      (1)   Workers' Compensation: Statutory limits

      (2)   Employers' Liability: $100,000 Each Accident - Bodily Injury by Accident; $100,000 Each Employee - Bodily Injury by Disease; and $500,000 Policy Limit - Bodily Injury by Disease.

      (3)   Other states insurance including Pennsylvania.

   (b)   GENERAL LIABILITY INSURANCE

      (1)   Limit of liability: $1,000,000 per occurrence combined single limit for bodily injury (including death) and property damage liability; $1,000,000 advertising injury; $2,000,000 general aggregate and $1,000,000 aggregate for products and completed operations. The City may require higher limits of liability if, in the City sole discretion, the potential risk warrants.

      (2)   Coverage: Premises operations; blanket contractual liability; personal injury liability; products and completed operations; independent contractors; employees and volunteers as additional insureds; cross liability; and broad form property damage (including completed operations).

   (c)   AUTOMOBILE LIABILITY INSURANCE

      (1)   Limit of liability: $1,000,000 per occurrence combined single limit for bodily injury (including death) and property damage liability.

      (2)   Coverage: Owned, non-owned and hired vehicles.

   (d)   PROFESSIONAL LIABILITY INSURANCE

DocuSign Envelope ID: DED053F1-918E-49A0-BFB3-876B974432CB

   (1)  Limit of liability: $1,000,000 with a deductible not to exceed $50,000.

   (2)  Coverage: Errors and omissions including liability assumed under Provider Agreement.

   (3)  Professional Liability Insurance may be written on a claims-made basis provided that coverage for occurrences happening during the performance of the Services required under this Provider Agreement shall be maintained in full force and effect under the policy or "tail" coverage for a period of at least two (2) years after completion of the Services.

 (e)  CYBER LIABILITY INSURANCE:

   (1)  Limit of Liability: $1,000,000 Per Claim/Aggregate.

   (2)  Coverage: Information security and privacy liability that arise from the Agreement, including but not limited to: data while in transit or in the possession of any third parties hired by the Provider (such as data back-up services) to electronic system; loss of, damage to or destruction of electronic data breaches arising from the unauthorized access or exceeded access; or malicious code, viruses, worms or malware; electronic business income and extra expense as a result of the inability to access website due to a cyber attack or unauthorized access; Privacy Notification Extra Expense Coverage (including Credit Monitoring Expense).

   (3)  Insurance may be written on a claims-made basis provided that any retroactive date applicable to coverage under the policy precedes the effective date of this Agreement; and that continuous coverage will be maintained or an Extended Discovery Period will be purchased for a period of at least two (2) years after expiration or termination of this Agreement.

15.2 **Evidence of Insurance Coverage.**

   Certificates of insurance evidencing the required coverages must specifically reference the City contract number for which they are being submitted. The original certificate of insurance must be submitted to the City's Risk Manager at the following address:

The City of Philadelphia
Office of the Director of Finance
Division of Risk Management
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1579
(Fax No.: 215-686-1705).

A copy of the certificate of insurance shall be submitted to the Responsible Official at the address of the Department set forth in Section 19.1 (Notice) below. Both submissions must be made at least ten (10) days before work is begun and at least ten (10) days before each Additional Term. The City, in its sole discretion, may waive the ten (10) day requirement for advance documentation of coverage in such situations where such waiver will benefit the City, but under no circumstances shall Provider actually begin work (or continue work, in the case of an Additional Term) without providing the required evidence of insurance. The actual endorsement adding the City as an additional insured must specifically reference the City contract number and be submitted to the City's Risk Management Division at the above address. The City reserves the right to require Provider to furnish certified copies of the original policies of all insurance required under the Provider Agreement at any time upon (10) days written notice to Provider.

    15.3    **Self-Insurance.**

Provider may not self-insure any of the coverages required under the Provider Agreement without the prior written approval of the Responsible Official and the City's Risk Manager. In the event that Provider desires to self-insure any of the coverages listed above, it shall submit to the Responsible Official and the City's Risk Management Division, prior to Provider's commencement of Services or furnishing of any Deliverables hereunder, a certified copy of Provider's most recent audited financial statement, and such other evidence of its qualifications to act as a self-insurer (e.g., state approval) as may be requested by the Responsible Official or the City's Risk Manager. In the event the City grants such approval, Provider understands and agrees that the City, its officers, employees, and agents shall be entitled to receive the same coverages and benefits under Provider's self-insurance program that they would have received had the insurance requirements set forth above been satisfied by a reputable insurer admitted and duly authorized to do business in the Commonwealth of Pennsylvania or otherwise acceptable to the City. If at the time of commencement of the Term of this Provider Agreement, Provider self-insures its professional liability and/or workers' compensation and employers' liability coverage,

Provider may, in lieu of the foregoing, furnish to the City a current copy of the state certification form for self-insurance or a current copy of the State Insurance Commissioner's letter of approval, whichever is appropriate. The insurance (including self-insurance) requirements set forth herein are not intended and shall not be construed to modify, limit, or reduce the indemnifications made in this Provider Agreement by Provider to the City, or to limit Provider's liability under this Provider Agreement to the limits of the policies of insurance (or self-insurance) required to be maintained by Provider hereunder.

15.4    **Performance Bond.**

Prior to commencing performance of the Provider Agreement, Provider shall furnish to the City a fully executed original performance bond, as prepared by the City and in a form approved by the City Solicitor, in an amount equal to fifty (50) per cent of the total payment amount set forth in Section 5.1 (Amount) above, and having as surety thereon such surety company or companies as are approved by and acceptable to the City.

## ARTICLE XVI:
## PATENT, COPYRIGHT AND OTHER
## PROPRIETARY RIGHTS INDEMNITY

16.1    **Indemnification.**

(a)    Provider warrants that to the best of its knowledge, all Provider Software, Documentation, Services, and Deliverables do not and will not infringe upon or violate any patent, copyright, trade secret or other proprietary rights of any third party.  In the event of any claim, suit or action by any third party against the City, the City shall promptly notify Provider in writing and Provider shall defend such claim, suit or action at Provider's expense, and Provider shall indemnify the City against any actual and documented loss, cost, damage, expense or liability arising out of such claim, suit or action (including, without limitation, reasonable litigation costs and counsel fees) whether or not such claim, suit or action is successful.

(b)    Provider will not, however, be responsible for such loss, cost, damage, expense or liability if infringement is finally determined by a court of competent jurisdiction to be the sole result of (1) the City's modification of the Software or its use of the Software in a manner not intended by the Parties, that is not compliant with its federal and state certified configuration, or that is not otherwise clearly contemplated by this Provider Agreement; (2) the City's failure to

use corrections or enhancements made available by Provider that do not materially alter the functionality of the Software as it exists at the time furnished; (3) the City's distribution or marketing of the Software to third parties for revenue producing purposes (which is strictly prohibited under Provider's licensing terms); or (4) the act or omission of the third party supplier of a software product used in combination with the Software but not furnished by Provider under this Provider Agreement.  Prior to such final determination, however, Provider shall remain fully responsible, at its expense, for the defense and indemnification of any infringement claim in accordance with this Article XVI; provided, that if the claimed infringement is finally determined to be solely the result of one or more of (1)-(4), the City will reimburse Provider for its reasonable expenses (including reasonable litigation costs and attorneys fees) incurred therein.

16.2    **Infringing Software**.

If the Provider Software is, or in Provider's reasonable judgment is likely to be, held to constitute an infringing product, Provider shall at its expense and option either: (1) procure the right for the City to continue using the Provider Software, (2) replace the Provider Software with a non-infringing equivalent, (3) modify the Provider Software to make it non-infringing, provided that the modification does not materially alter the functionality of the Provider Software or the City agrees to and accepts the modification in writing; or (4) in the event Provider is ordered by a court of competent jurisdiction to remove the Provider Software, and all right of appeal or stay is exhausted as to such order, accept return of the Provider Software and refund to the City a prorated amount paid by the City to Provider pursuant to this Provider Agreement based upon the number of full months remaining within the term for which the City has previously paid a license fee for the Provider Software.

16.3    **Exclusive Remedy**.

The foregoing remedies constitute the City's sole and exclusive remedies and Provider's entire liability with respect to infringement of proprietary rights.  To receive the foregoing indemnity, the City must promptly notify Provider in writing of an infringement claim or suit, provide reasonable cooperation (at Provider's expense), and full authority to Provider to defend or settle the claim or suit.  Provider will have no obligation to indemnify the City under any settlement made without its written consent.

16.4    **Relationship with Section 8.2 (Indemnification) of the General  Provisions.**

The indemnification requirements set forth in this Article XVI apply only to the specific subject matter hereof.  With respect to any and all other losses, costs (including, but not limited to, litigation and settlement costs and counsel fees), claims, suits, actions, damages, liability and expenses, subject to the following provisions of this Section 16.4, the requirements set forth in Section 8.2 (Indemnification) of the General Provisions shall apply.  (a) Neither the City nor Provider, its partners, principles, and employees shall be liable for more than the greater of $500,000 or one times the total contract amount for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the Software, Services and Deliverables provided hereunder.  Notwithstanding the foregoing, this limitation shall not apply to liability for damages resulting from loss of life, bodily injury or damage to real and/or tangible personal property and/or infringement of proprietary right, as set forth in Article X of the Provider Agreement.  (b) Nothing herein shall waive or amend any defense or immunity that the City, its officers, agents or employees may have under the PA Political Subdivision Tort Claims Act, 42 Pa.C.S.A. 8541 et. seq.

By entering into this Provider Agreement, the City agrees to accept responsibility for (a) the selection of, use of and results obtained from any equipment, software or services not provided by Provider and used with the Equipment or Software, with the exception of the responsibilities related to KNOWiNK, LLC described in Section 7.1 of this Provider Agreement; or (b) user errors, voter errors or problems encountered by any individual in voting that are not otherwise a result of the failure of Provider to perform.  Provider shall not be liable under this Provider Agreement for any claim, damage, loss, judgment, penalty, cost, amount paid in settlement or fee that is caused by (c) the City's failure to properly install and use the most recent Update provided to it by Provider before the City's next election following Provider's provision of the Update to the City, or (d) the City's election not to receive, or to terminate, the hardware maintenance services or the software license and maintenance and support services available hereunder.  The parties hereby specifically agree that this Section 16.2 of the Provider Agreement shall control to the extent of any conflict with Section 8.2 of the General Provisions.  The parties hereby specifically agree that this Section 16.4 of the Provider Agreement shall control to the extent of any conflict with Section 8.2 of the General Provisions.

## ARTICLE XVII:
## <u>CONFIDENTIALITY</u>

17.1     <u>**Non-Disclosure**</u>.

Provider and its employees, agents, Subcontractors, suppliers, and any person or entity acting on its behalf (i) will maintain in strict confidentiality all of the "City Data," as defined and set forth in Section 17.2; (ii) will not, without the City's written permission, divulge, disclose, communicate, or distribute any of the City Data to any person or entity except as may be strictly necessary to perform the Provider Agreement; (iii) will not, without the City's written permission, in any way use any of the City Data for their businesses or other advantage or gain (except as may be necessary to perform the Provider Agreement), including, without limitation, any use of the City Data in any presentation, demonstration, or proposal to perform work, to the City or to others, that may be conducted or created as part of their business activities or otherwise; (iv) will, immediately upon the City's Final Acceptance of the Services and Deliverables required under the Provider Agreement under Article VIII (Acceptance) above, return all City Data to the City, destroy any and all copies of any City Data that are in their possession, whether on paper or in electronic or other form, and if requested by the City in writing, will certify in writing that there has been full compliance with this Section 17.1.

17.2     <u>**The City Data**</u>.

Except as provided otherwise in this Section 17.2, the City Data shall include any and all of the following, whether in electronic, microfilm, microfiche, video, paper, or other form, and any copies or reproductions thereof:

(a)     Any and all other records, documents, and data furnished by the City to Provider in relation to the work required under the Provider Agreement; and

(b)     All Materials and other work product(s) and items of work specifically created by Provider for the City as part of the work required under the Provider Agreement.

The City Data shall not, however, include any information which:

·     Was known to Provider, prior to the commencement of its performance of the Provider Agreement, free of any obligation to keep it confidential, and/or is proprietary to Provider; or

· Was generally known to the public at the time of receipt by Provider, or becomes generally known to the public through no act or omission of Provider; or

· Was independently developed by Provider without knowledge or use of any City Data; or

· Is required to be disclosed by law or judicial process.

17.3    The terms and conditions of this Article XVII shall be in addition to, and not in lieu of, the terms and conditions set forth in Article IX (Confidentiality) of the General Provisions.

17.4    In the event of any actual or threatened breach of any of the provisions of this Article XVII, and in addition to any other remedies that may be available to the City in law or equity, the City shall be entitled to a restraining order, preliminary injunction, permanent injunction, and/or other appropriate relief to specifically enforce the terms of this Article XVII. Provider agrees that a breach of the terms of this Article XVII would cause the City injury not compensable in monetary damages alone, and that the remedies provided herein are appropriate and reasonable.

17.5    Provider's obligations set forth in this Article XVII shall survive the termination of the Provider Agreement.

## ARTICLE XVIII:
## DATE STANDARD

Provider represents and warrants that all Provider Software furnished under the Provider Agreement will conform to the following City of Philadelphia Century Date Standard:

(a)    <u>General Integrity</u>.  No value for "current date" will cause interruptions in the operation of the Provider Software after any date.

(b)    <u>Date Integrity</u>.  All manipulations of time-related data (including, without limitation, dates, durations, days of the week, month, and the year) will produce results that conform to Provider's specifications for the Provider Software for all valid date values within the application domain.

(c)    <u>Source code</u>.  Source code for the Provider Software shall comply with the standard set forth in Federal Information Processing Standard Publication 4-2 (FIPS PUB 4-2), *Representation of Calendar Date for Information Interchange*, and other relevant and current date standards

Provider shall, at no cost to the City, repair any Provider Software that does not conform to the standards set forth in (a)-(c) and cause it to conform to such standards, or shall replace the Provider Software with software that does conform to such standards.

**ARTICLE XIV:**
**<u>MISCELLANEOUS PROVISIONS</u>**

19.1    **<u>Notice</u>.**

Any notice required or permitted to be given under the Provider Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, sent by registered or certified United States mail, return receipt requested, or by computer modem addressed as follows:

IF TO THE CITY:

> Attn.:  Melissa A. Scott,
>   Senior Project Manager, OIT
>   1234 Market Street, 18th Floor
> Philadelphia, PA 19107


E-Mail
:      Melissa.A.Scott@phila.gov


IF TO PROVIDER:

Election Systems & Software, LLC
11208 John Galt Boulevard
Omaha, Nebraska  68137
Attn.:  Office of General
Counsel                     Fax No.:  (402) 970-
1291                  E-Mail :legal@essvote.com

19.2    **Interpretation; Order of Precedence.**

In the event of a conflict or inconsistency between the terms of this Provider Agreement and any term, condition or provision contained in any Exhibit hereto, or any attachment to such Exhibit (including, without limitation, any Proposal of Provider), the terms of this Provider Agreement shall govern.

19.3    **Other Provisions.**

Other provisions, including, without limitation, MBEC participation commitments and exceptions to the General Provisions of the Provider Agreement, are set forth in the following Exhibits attached to this Provider Agreement, and incorporated in the Provider Agreement by reference:

(1)     **Exhibit PA-1:**      Statement of Work

*Exhibit PA-1 Attachments:*

(i)      Attachment 1: Milestone Payment Schedule

(ii)     Attachment 2: Project Schedule

(iii)    Attachment 3: Weekly Status Report

(iv)     Attachment 4: Customer Site Survey

(v)      Attachment 5: Installation-Checklist ExpressVote

(vi)     Attachment 6: Installation-Checklist- DS450

(vii)    Attachment 7: User Conditional Acceptance Testing

(viii)   Attachment 8: Training Acknowledgement Form

(ix)     Attachment 9: EMS Network Installation Checklist

(x)      Attachment 10: EMS Standalone Checklsit

(xi)     Attachment 11: RACI Chart

(2)     **Exhibit PA-2:**      MBEC Participation Commitments

(3)     **Exhibit PA-3:**      Exceptions to General Provisions

(4)     **Exhibit PA-4:**      Pricing Schedule

(5)     **Exhibit PA-5:**      Service Level Schedule

(6)     **Exhibit PA-6:**      Certified Technician Hardware Maintenance Services and Software License

(7)     **Exhibit PA-7:**      Third Party Software

|   | (8) | **Exhibit PA-8:** | Project Change Control Form |
|---|-----|-------------------|------------------------------|
|   | (9) | **Exhibit PA-9:** | Maintenance and Support Services |

19.4    <u>**Acknowledgement of the General Provisions**</u>.

Provider specifically acknowledges that Provider has read and understands the terms and conditions contained in the General Provisions and acknowledges that by executing this Provider Agreement, Provider will be legally bound by all the terms of this Provider Agreement, including, but not limited to, those set forth in the General Provisions that are not otherwise amended in Exhibit PA-3, Exceptions to General Provisions.


*---  The Remainder of This Page Is Intentionally Left Blank  ---*

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound by all of the Contract Documents, have caused this Provider Agreement to be executed by their respective duly authorized officers as of the date in the first paragraph of this Provider Agreement.

APPROVED AS TO FORM                          **THE CITY OF PHILADELPHIA**

MARCEL S. PRATT, CITY SOLICITOR       Through:

Per: *Christopher Malcarney* _____   By: *M Nesmith Joyner* _____
5BC3FBB0FBFB465...                            31897B77B8C4BB...

Name: Christopher Malcarney                Name: Monique Nesmith-Joyner, Interim Commiss...

Title: Divisional Deputy City Solicitor   Title: Interim Procurement Commissioner

**ELECTION SYSTEMS & SOFTWARE, LLC**

By: *Richard J. Jablonski* _____
3E3BC949720E400...

Name: Richard J. Jablonski

Title: VP of Finance

Witness

By: *Eric Anderson* _____
41E88ABA028749E...

Name: Eric Anderson

Title: Vice President and General Counsel



# City of Philadelphia Contract Routing Slip

**Approve as to Form – Attorney Upload Additional Document(s) – Optional**

Click the attachment icon to upload additional documentation, if required.

**Finance Certification**

Click the attach icon to upload the Endorsement Sheet.



**Finance Review**

x        Approved by Finance.

# Exhibit C

12/20/2019     No confidence: Northampton County election board 'extremely disappointed' in machines it selected - The Morning Call

Case 2:16-cv-06287-PD Document 134 Filed 12/20/19 Page 71 of 81

SECTIONS       **ONLY $2 FOR 20 WEEKS**
SALE ENDS 1/6       LOG IN



Troubling health care trend: They have medical insurance but can't use it...



Anonymous letter makes accusations about five Pleasant Valley basketball...

LVHN formalizes acquire Coc

BREAKING NEWS     VARSITY     THINGS TO DO

LEHIGH VALLEY NEWS     NEWS

# No confidence: Northampton County election board 'extremely disappointed' in machines it selected

By **TOM SHORTELL**
THE MORNING CALL   |   DEC 19, 2019

  

WINTER SALE     **ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW

SAVE NOW



Richard Kessler, Northampton County Voter Registration employee, demonstrates the ExpressVote XL voting machine in August 2018. In March 2019, the county's election commission voted 3-2 to use the machines in future elections. (Tom Shortell / Morning Call file photo)

A month after widespread problems plagued the general election, the Northampton County Election Commission Board voted 4-0 to express no confidence in its new election machines.

At the same meeting Thursday evening, representatives of the county's Democratic and Republican committees called on the county to move away from the machines and perform an independent analysis of the results.

inRead invented by Teads

WINTER SALE

ONLY $2 FOR 20 WEEKS
Hurry, sale ends 1/6

SAVE NOW



ADVERTISEMENT

"We believe the problems the machines exhibited this year will make it virtually impossible to restore voters' confidence heading into 2020. We'd recommend avoiding that by not using them again," said Democratic Chair Matthew Munsey.

Despite the bipartisan condemnation of the machines, it's unclear how county residents will cast their vote in the upcoming presidential elections. Richard Santee, the board's solicitor, said the decision to reject these machines must be made in conjunction with Northampton County Council and Executive Lamont McClure. Some council members have demanded a refund on the machines, though McClure has continued to stand by them.

**PAID POST**     What Is This? 

WINTER SALE     **ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW



SAVE NOW

Explore automated investing strategies with an Intuitive Investor® account from Wells Fargo Advisors.

**SEE MORE**

Sponsored Content by 

Even if there was universal agreement, it would be logistically difficult to swap systems in time for the April 28 primary. The board, council and McClure's administration would have to reach a consensus on getting rid of the machines, selecting a new system, purchasing it, training staff and delivering the machines to the polls in less than four months.

[More News] Mom kills 5-year-old daughter in murder-suicide, state police say »

"I can't imagine what we are going to do between now and April," said Council President Ron Heckman, who attended the meeting as a member of the public. "What's the alternative?"

As many as 30% of Northampton County's ExpressVote XL voting machines had flawed touch screens that prevented voters from selecting candidates listed on the edge of the ballot. At the same time, machines failed to electronically count any votes for some candidates in cross-filed races. The most prominent example was county judicial candidate Abe Kassis, whose digital votes were undercounted by tens of thousands.

The county wound up relying on paper backups produced by the voting machines.

WINTER SALE

**ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW

SAVE NOW

Adam Carbullido, a senior vice president with ES&S, apologized to the members of the commission, saying the company failed to properly configure the touch screens and the ballot. The problems should have been caught during pre-election testing, but company employees failed to provide thorough training to the county and failed to catch the mistake themselves. **Carbullido made a similar apology to County Council and the public last week**.

[More News] Easton Arts Academy CEO fired, principal takes over »

That was little consolation to members of the board, which selected the ExpressVote XL by a 3-2 vote in March. Maudeania Hornik, a Republican, said she still likes the concept of the machines but questioned how the county could rely on them now.

inRead invented by Teads



ADVERTISING

"I fought for your machines. Now I'm extremely disappointed. I feel like I've been played," said Hornik, the only member of the board who will be returning next year.

WINTER SALE

ONLY $2 FOR 20 WEEKS
Hurry, sale ends 1/6

SAVE NOW

SAVE NOW

test before the election. This year, however, the county did not conduct full testing; not every candidate's button on every machine was checked as a result.

"If every machine was tested by hand, I don't see how this would have happened. It would have set off alarm bells," she said.

[More News] The story of Bethlehem's Christmas 'cucumber,' and why it's gone »

Hunter's barbs weren't saved just for Carbullido. She raised old criticisms of the McClure administration, saying it limited the board's work by narrowing its choices down to two machines. Months before the commission met to review their options, **McClure identified the ExpressVote XL as his recommended choice**. The board exists so politicians and elected officials do not have too much control in how their constituents cast their votes.

"It was clearly communicated to us that this was the machine. None of the commission members were even informed" they could go to down to Harrisburg to review the various machines on the market, Hunter said.

She sparred throughout the night with Charles Dertinger, the county's director of administration, who argued the machines worked because of the paper backups, a feature that was unavailable under the old machines. Counties that relied on systems where voters cast paper ballots, including Lehigh County, experienced long lines and privacy issues, he said.

WINTER SALE                ONLY $2 FOR 20 WEEKS
                           Hurry, sale ends 1/6

                                  SAVE NOW

ADVE

"Had we been one of those counties, we would be on the other side of making this argument. 'Had we only gone with this other voting system, this wouldn't have happened,'" Dertinger said.

[More News] Candidates already circling two Lehigh Valley seats opening in state Legislature »

Some of Dertinger's comments raised the board's concerns in basic functions of county operations. Some precincts, he said, could not be informed of the machine problems on Election Day because election workers did not own cellphones or did not answer calls.

"We do not have a phone number for anyone in each polling place," Dertinger said.

When asked after the meeting if the administration had any comment on the no confidence vote, Dertinger said. "We are going to have to work to restore confidence. That's it."

Tom Shortell

WINTER SALE    **ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW

No confidence - Northampton County board chairman extremely disappointed in machine it selected - The Morning Call
SAVE NOW

graduate of St. Bonaventure University, Shortell wil

### Dad Takes Photo Of Kid With Matthew Broderick, Failing To Notice Who's In The Background
BridesBlush | Sponsored

### 27 Christmas Gifts That Are Selling Like Hot Cakes
2019 Gift Guide | Sponsored

### 8 Reasons Why You Should Try Bombas Socks
Bombas | Sponsored

### New Renderings Show What Historical Figures Actually Looked Like In Real Life
History101 | Sponsored

### How To Gain Energy Without Going To The Gym
LCR Health | Sponsored

### PICTURES: Two people killed in fiery crash on Route 378 in Bethlehem
Two people were killed in a crash on Route 378 southbound in Bethlehem late Wednesday night, according to the Lehigh County Coroner's Office.
The Morning Call

### 'The Real Housewives' most attention-seeking moments
NY Daily News

### 17 Gadgets Selling Out Super Fast This Year
Gadgets World | Sponsored

### Katie Holmes Is Selling Her California Home
Work + Money | Sponsored

### WATCH: See how traffic will flow at reconstructed Route 100 intersection
This video animation shows how traffic will flow at the reconstructed intersection of Route 100 and Penn Drive in Upper Macungie Township. Instead of making left turns, motorists will be directed to take wide jughandle-like …
The Morning Call

### Lehigh Valley election roundup: Machine issues prompt Northampton to re-scan ballots; Allentown Mayor Ray O'Connell gets to drop 'interim' from title

WINTER SALE    ONLY $2 FOR 20 WEEKS
Hurry, sale ends 1/6

SAVE NOW

## First Call Newsletter - The Morning Call

Daily

Start the day with the stories you need to know delivered to your inbox from the Morning Call.

| | SUBSCRIBE |
|---|---|

### Missing Californians found dead at Pennsylvania rest stop

Two people who had been reported missing in California have been found dead at a Pennsylvania rest stop.

The Morning Call

ADVERTISEMENT

**LATEST**

Easton Arts Academy CEO fired, principal takes over

1h



WINTER SALE    ONLY $2 FOR 20 WEEKS
Hurry, sale ends 1/6

SAVE NOW

12/20/2019 No confidence: Northampton County election board 'extremely disappointed' in machines it selected - The Morning Call

Case 2:16-cv-06287-PD Document 134 Filed 12/20/19 Page 80 of 81

SAVE NOW

Troubling health care trend: They have medical high deductibles

2h



No confidence: Northampton County election board 'extremely disappointed' in machines it selected

DEC 19, 2019



Workers install 26-ton bridge connecting Easton's Simon Silk Mill and Karl Stirner Arts Trail

DEC 19, 2019



# You May Like

Sponsored Links by Taboola

**Baby Has Never Eaten Sugar Or Carbs. Wait Till You See Her Today**

SoGoodly

**Sam's Club Has It all. Like, All Of It**

Sam's Club

**Born Billionaires: Kyra Sedgwick is One of the Richest Heirs in America**

Investing.com

**Shop Chriselle Lim's ultimate holiday look now.**

The Chriselle Factor

ADVERTISEMENT



WINTER SALE

**ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW

**Models don eye-popping looks in tap**

NY Daily News

---

**Incredible $29.99 Pocket-Sized Blood Sugar Meter is Taking The US By Storm**

DarioHealth | *Sponsored*

**How To Properly Empty Your Bowels Every Morning - Top Surgeon Explains How**

Gundry MD | Supplements | *Sponsored*

---

**8 rushed to hospital in crash after Upper Macungie Township man loses consciousness behind the wheel, police say**

An Upper Macungie Township man careened through a red light and smashed into two vehicles on Hamilton Boul at Breinigsville Road.

**The Morning Call**

**Time-lapse: Snow squall passes over Allentown**

WATCH: Time-lapse video as a snow squall moves through downtown Allentown on Wednesday, Jan. 30, 2019. (Monica Cabrera / The Morning Call)

**The Morning Call**

---

## Download our mobile app
## Subscribe for unlimited access

About Us

Archives

About Our Ads

Local Print Ads

Sitemap

TAG disclosure

Contact Us

Place an Ad

Privacy Policy

Terms of

Service

Feedback

Copyright © 2019, The Morning Call

---

WINTER SALE

**ONLY $2 FOR 20 WEEKS**
Hurry, sale ends 1/6

SAVE NOW