**Exhibit A**

# Voting Technology Procurement Investigation





# City Controller
# Rebecca Rhynhart

Photo by M. Fischetti for VISIT PHILADELPHIA®

## VOTING TECHNOLOGY PROCUREMENT INVESTIGATION
## EXECUTIVE SUMMARY

In 2018, the Pennsylvania Department of State issued several directives to counties regarding the purchase of electronic voting machines and electronic voting machine examinations. These directives required that all new voting machines purchased to employ a voter-verifiable paper ballot or a voter-verifiable paper record of the votes cast by a voter, be certified by the United States Election Assistance Commission and the Pennsylvania Department of State prior to use in an election, and that these voter-verifiable systems must be selected by December 31, 2019.

As a result of these directives, Philadelphia's City Commissioners, a three member, popularly-elected bipartisan board charged with administering elections and voter registration for the City of Philadelphia in accordance with federal and state voter registration and election laws, began a process to upgrade and modernize its Election System infrastructure.

Prior to the selection of a vendor, the City Controller's Office began communicating concerns regarding the procurement process to the Chair of the City Commissioners, Lisa Deeley, specifically calling attention to the fast-tracked nature of the process, the lack of public input, and transparency issues. Shortly after the February 20 vote, and months before the execution of formal contracts with the selected vendors, ES&S and KNOWiNK, the Controller's Office launched an investigation into the procurement process to fulfill its obligation to prevent improper disbursements and assure strict accountability for the funds that would ultimately be disbursed.

The investigation sought to address concerns regarding the lawfulness, transparency, and fairness of the Request for Proposals and selection process, especially considering the cost of the purchase ($29 million) and the significance of the issue at hand. Over the last seven months, the Controller's Office conducted more than 20 interviews of individuals involved in the procurement and selection process, including City Commissioners Al Schmidt and Lisa Deeley and reviewed thousands of pages of documents. The investigation revealed several areas of concern.

### ES&S ENGAGED WITH CITY COMMISSIONERS AS EARLY AS 2013

In July 2013, City Commissioner Al Schmidt visited ES&S's headquarters – the only visit by a commissioner to any potential voting machine vendor. Commissioner Schmidt stated that he visited on his own accord and did not seek reimbursement, however he could not recall any details regarding the trip, including who he talked to, who he met with, or who arranged the trip. During 2013, ES&S did not report any lobbyists with the Board of Ethics, but emails obtained during the investigation suggest that a lobbyist for ES&S was lobbying then-City Commissioners during this time. Notably, Commissioner Schmidt received two campaign contributions from ES&S's lobbying firm in April and October of 2013.

ES&S reported using a lobbying firm in January 2014, which coincides with the City Commissioners' efforts to modernize the City's election systems and resulted in a Request for Information for voting system modernizations being released in October 2014. In 2015, the City Commissioners requested $22 million in budget appropriations to modernize the election system.

Emails obtained in the investigation suggest that the budget request was developed with support from ES&S. The appropriation was not funded in that budget cycle and progress on this effort came to a halt, however lobbying efforts by ES&S did not. Since January 2014, ES&S spent more than $425,000 (as of the most recent filing) in lobbying expenses related to the City of Philadelphia, including $27,856 related to Commissioner Schmidt, specifically.

## ES&S FAILED TO DISCLOSE USE OF CONSULTANTS AND CONSULTANTS CAMPAIGN CONTRIBUTIONS

As part of its response to the RFP, ES&S was required to fill out a mandatory disclosure form and disclose any campaign contributions the business or its affiliated entities/persons made, the name of any consultants used to help in obtaining the contract and any campaign contributions the consultants made. On its mandatory disclosure form, ES&S did not disclose its use of lobbyists, the lobbyists' activities or the lobbyists' campaign contributions in its bid to win the contract for the purchase of new voting machines. Specifically, ES&S did not disclose that its lobbying firms, Duane Morris and Triad Strategies, made campaign contributions in 2017 and 2018 to Commissioners Schmidt and Deeley, two of the commissioners who had the final say in awarding the voting machine contract. This information was filed with the Ethics Board, as required, but was not disclosed as part of its mandatory disclosure form in its RFP response. Additionally, ES&S detailed lobbying activities to the Ethics Board, including repeated "direct communication" with Commissioner Schmidt, and "Direct Communications" regarding elections as recently as the July-September 2018 reporting period. The investigation found that the information provided on the disclosure was not reviewed and verified by the City. It is worth noting that as a result of this investigation's disclosure finding, ES&S agreed to a nearly $2.9 million penalty – the largest penalty in the City's history.

## CITY COMMISSIONERS POTENTIAL CONFLICT OF INTEREST

As stated previously, Commissioner Schmidt was the recipient of direct communication by ES&S's lobbyists repeatedly and both Commissioners Schmidt and Deeley received campaign contributions from ES&S's lobbyists in the years prior to selecting them as a vendor for the new voting machines. Despite this, both Commissioners Schmidt and Deeley signed Confidentiality and Conflict of Interest forms for the voting technology procurement process, agreeing to not "take official action, including but not limited to participation in the proposal review and selection process, that impacts [his] financial interests" and that "if any such relationship exists with an applicant who submitted a response to this RFP, I must disclose the relationship and disqualify myself from reviewing and evaluating any proposals submitted in response to this RFP."

## PROCUREMENT PROCESS ISSUES

A number of concerns were outlined with the procurement process, including the rushed nature of the procurement process, selection committee members feeling pressured to select ES&S, lack of procedures to ensure the integrity of the procurement process, and the lack of overall transparency in the procurement process.

Overall, this report shows significant issues with the procurement process for the new voting system, including not following Best Value Guidelines.

The Controller's Office began an investigation into the procurement process for the City of Philadelphia's (the "City") new voting system shortly after February 20, 2019, when the Philadelphia City Commissioners ("City Commissioners") awarded Election Systems & Software, LLC ("ES&S") and KNOWiNK, LLC ("KNOWiNK") with contracts for the City's new voting machines and electronic poll books, respectively.  These contracts were awarded following a procurement process that was initiated on June 4, 2018.  The Controller's Office's investigation, which spanned approximately seven months and which included the review of thousands of pages of documents and hours of witnesses interviews, revealed a procurement process that sacrificed a thoughtful, fair, and transparent process.  The issues discussed below reflect areas of concern regarding the voting system procurement process, including the Controller's Office's discovery of ES&S's failure to disclose its use of consultants with respect to the two City Commissioners who voted to select the new voting machines.  This revelation eventually led to the imposition of a $2,895,950 penalty against ES&S as a result of the disclosure violation.  This report seeks to identify the various areas of concern with respect to the voting system procurement process that the investigation has uncovered, in an effort to improve the integrity and transparency of the City's procurement process going forward.

## A.    BACKGROUND

### 1.    The Beginning of the Voting Machine Modernization Process

The City's efforts to modernize its election system began in 2014.  Throughout that year, the City engaged in research which culminated in the development of a Request for Information ("RFI") for Voting System Modernization in October 2014.  The start of the City's journey to modernize its legacy voting system also coincided with the beginning of ES&S's long history of lobbying activity and contacts with the City.  In 2015, the City Commissioners requested $22

million in budget appropriations to purchase new voting machines.  However, the appropriation was not funded in that budget cycle and progress on this effort came to a halt.

### 2.    Department of State Directives

On February 9, 2018, the Pennsylvania Department of State issued a "Directive Concerning the Purchase of Electronic Voting Systems."  Under the directive, all voting systems purchased on or after February 9, 2018 must employ "a voter-verifiable paper ballot or a voter-verifiable paper record of the votes cast by a voter."

On April 2, 2018, the Pennsylvania Department of State issued a "Directive Concerning the Conduct of Electronic Voting System Examinations by the Commonwealth of Pennsylvania issued by the Secretary of the Commonwealth."  The directive mandated that all electronic voting systems be certified by the United States Election Assistance Commission and the Pennsylvania Department of State prior to use in an election, and set forth the procedure for vendors to have their voting systems examined in the Commonwealth of Pennsylvania.[1]

Ten days later, on April 12, 2018, the Pennsylvania Secretary of State instructed the counties to select "voter-verifiable paper record voting systems" by Dec. 31, 2019.  The Secretary encouraged the counties to aim to have the machines in place for the November 2019 general election, but only mandated the selection of the machines by the end of 2019.  The State predicated this announcement on the recent allocation of federal monies appropriated for election security by Congress.

### 3.    Philadelphia Issues Requests for Information and Proposals

---

[1] This directive was revised on June 12, 2018.  The revised directive did not impact the certification requirement, but made certain revisions to the prerequisites for vendors who wished to have their voting machines examined by the Department of State.

On June 4, 2018, the Office of Innovation and Technology ("OIT"), on behalf of the City Commissioners, issued an RFI to prospective vendors in an effort to replace the City's current Danaher 1242 Voting Machines[2] and paper polling books as part of an initiative to "upgrade and modernize its Election System infrastructure."   The RFI marked the beginning of the City's procurement process to acquire new voting machines and electronic poll books with the goal of having the new voting system in place for the November 2019 primary election.   Six voting machine vendors submitted a response to the RFI, including ES&S and Dominion Voting Systems ("Dominion").

On November 30, 2018, the City (again through the City Commissioners and OIT) issued a Request for Proposals ("RFP") to prospective voting machine vendors.[3]   The RFP included an anticipated procurement schedule, which imposed a proposal submission deadline of December 28, 2018, applicant demos from January 14, 2019-January 17, 2019, and applicant selection on February 13, 2019.

The RFP provided that the applicants would be evaluated based under the City's Best Value guidelines, where "[c]ost to the City is a material factor, but not the sole or necessarily the determining factor in Proposal evaluation."   Instead, the City would award the contract "to the Applicant whose Proposal the City determines, in its sole discretion, is the most advantageous to the City and in the City's best interest."

Among the purposes of the Best Value Guidelines is transparency with the procurement process to the extent fully feasible.   Transparency is key to "proving the best value for the City."

---

[2] The City purchased these voting machines in 2002.

[3] The RFP was issued on the same date that ES&S's EVS 6.0.2.1 Express Vote XL voting machine was certified by the Department of State.

The criteria and scoring used to evaluate a contractor is meant to be shared in a "transparent and clear manner." The Best Value process protects the integrity of the procurement by avoiding favoritism, ethical misconduct and by promoting transparency.

The RFP also included a section entitled "City Audit." This section specifically set forth the City Controller's authority to audit the performance of the Contractor under the Contract. The power of audit extends from the initial term through the term of the contract, and extends five years after the termination of the contract. If requested by the Controller, the Contractor must submit all documentation regarding expenditures or fees incurred pursuant to the Contract. This clearly aligns with the City Controller's power to prevent the improper disbursement of City funds by investigating the propriety of any requisition.

In December 2018, the City received RFP responses from three voting machine vendors (ES&S, Dominion, and Hart Intercivic, Inc.), and four electronic poll book vendors (ES&S, KNOWiNK, LLC, Tenex Software Solutions, Inc. ("Tenex"), and Robis Elections, Inc.).

## B.    THE INVESTIGATION

Shortly after the February 20 vote, and months before the execution of formal contracts with ES&S and KNOWiNK, the Controller's Office launched an investigation into the procurement process for the ES&S voting machines to fulfill the obligation of the City Controller to prevent improper disbursements and assure strict accountability for the funds that would ultimately be disbursed to ES&S and KNOWiNK out of the City Treasury. The objective of the investigation was to explore and assuage any concerns regarding the RFP and selection process, especially in light of the sum and significance of the expenditure at issue.

On April 1, 2019, pursuant to the investigatory and audit powers of the City Controller under sections 6-402, 8-101, and 8-409 of the Charter, as well as the RFP, the Controller's Office

issued subpoenas for documents to the City Commissioners, OIT, and the Procurement Department (the "City Entities") pertaining to the selection process of the ES&S Express XL voting machines.  Specifically, the Controller's Office requested information pertaining to the RFI for Election Systems, the RFP for Election Systems, Best Value Bidding Scoring Sheet for the Election Systems Procurement Process, and details of the Selection Committee.  On May 3, 2019, the Controller's Office issued follow-up subpoenas to the City Entities.  The Controller's Office also served additional subpoenas on City Commissioners Lisa Deeley ("Deeley"), Al Schmidt ("Schmidt"), and Anthony Clark ("Clark") in their individual capacities, as well as ES&S.

During the investigation, the Controller's Office conducted more than 20 interviews of individuals involved in the procurement and selection process pursuant to the City Controller's authority under Section 6-402 of the Charter, in order to ensure a thorough understanding of the process, and to allow the Controller's Office to determine the propriety of any payments under the voting systems contracts.

The procurement process for the new voting machines is one of the City's first substantial contracts under the Best Value Guidelines.  As such, the manner in which the process was carried out and evaluated will undoubtedly set the tone for future Best Value contracts.  As discussed above, the Best Value Guidelines recognize the importance of preserving the "integrity of the Procurement process."  The guidelines prohibit any individual from participating on the "Procurement Committee for a particular project if such individual is not cleared of any conflict of interests," and establishes that "City employees must adhere to all applicable law…If a conflict of interest becomes known through the course of the proposal selection process, the

Committee member must disclose the conflict and disqualify him- or herself from participation in the process immediately."

Based on the investigation, the Controller's Office has identified areas of concern regarding the adherence to these principals, as discussed below.

### B1. ES&S ENGAGED WITH CITY COMMISSIONERS AS EARLY AS 2013

As mentioned above, the City and City Commissioners previously attempted to replace its current voting infrastructure. Throughout 2014, the City engaged in research which culminated in the development of an RFI for Voting System Modernization in October 2014. The start of the City's journey to modernize its legacy voting system also coincided with the beginning of ES&S's lobbying activity and contacts with the City.

Specifically, Commissioner Schmidt visited ES&S headquarters in July 2013. It is worth noting that Commissioner Schmidt is the only Commissioner to visit a potential vendor's headquarters and ES&S is the only potential vendor that Commissioner Schmidt visited. During his interview, Commissioner Schmidt stated that he visited ES&S on his own accord, and did not seek reimbursement, in order to learn about new voting machine technology.[4] Commissioner Schmidt could not recall other details related to his visit to ES&S headquarters – including who he spoke with to arrange the visit, who he was in contact with from ES&S at the time of his trip, and who he met with at ES&S headquarters. Additionally, on April 16, 2013 and again on October 31, 2013, Duane Morris (ES&S's lobbying firm) donated $1,000 to Friends of Al Schmidt ("Friends"), a political action committee ("PAC") formed to support Al Schmidt's

---

[4] Schmidt stated that he never sought reimbursement for any of his expenses as a City Commissioner. In contrast, Schmidt sought reimbursement for various expenses in connection with his campaign, including for T-shirts, office materials, meals, political materials, travel, software and meetings.

campaign for re-election as City Commissioner. for a total of $2,000 in contributions.  ES&S did not report a lobbyist during this time, however the Controller's Office obtained emails during the investigation that suggest that Alan Kessler (employee of Duane Morris, lobbyist for ES&S as of 2014) had engaged with then City Commissioners on behalf of ES&S as early as March 2013.[5]

On January 21, 2014, a former Chief Deputy Commissioner for Commissioner Schmidt, forwarded a letter (dated January 17, 2014,[6]) via e-mail, outlining the Commissioners' budget request for voting machine funding, and lists a total of 12 examples of counties and municipalities that utilize optical scan technology; interestingly, all 12 examples were of ES&S machines.  Another email from 2014 obtained through the course of this investigation references an earlier phone call between Alan Kessler and a City official during which they discussed "the information requested by the Commissioners from ES&S, which aided in the preparation of their budget request."

Since January 2014, ES&S has spent over $428,032 in lobbying expenditures related to the City of Philadelphia.  It is worth noting that while Commissioner Schmidt was able to recall the technical specifications and features of the prospective voting machines during an interview, he seemed to have difficulty remembering that the vendor of the voting machine that he had selected was ES&S, despite having visited ES&S headquarters and despite the fact that ES&S had spent more than $27,856 over a period of years for Direct Communications with Commissioner Schmidt.

---

[5] The emails were from current or former employees and officials.

[6] Three days earlier, Alan Kessler officially registered as a lobbyist, and Duane Morris as a lobbying firm, for ES&S.

Additionally, in 2018, representatives from Commissioners Schmidt and Deeley's offices, along with OIT, visited two voting locations to observe their primary elections. Once again, both locations – Monongalia County, West Virginia and St. Louis County, Missouri, used ES&S voting machines.

### B2. ES&S's FAILURE TO DISCLOSE USE OF CONSULTANTS AND FAILURE TO DISCLOSE CONSULTANTS' CONTRIBUTIONS

Through the Best Value Guidelines, the City seeks to ensure the integrity of the Procurement process by maintaining the following standards throughout the Procurement process:

i)      avoid favoritism toward vendors, suppliers, or contractors;

ii)     avoid ethical misconduct by City employees and officials;

iii)    provide a fair and equal, yet competitive, proposal process for all potential vendors, suppliers, or contractors;

iv)    promote transparency in the selection process; and

v)     keep all information obtained throughout the selection process confidential.

These standards serve as a guide for every step of the procurement process. As a part of the RFP response for the voting machines, each applicant vendor was required to complete an online Mandatory Campaign Contribution Disclosure form, providing information about any contributions "the Applicant and *other affiliated organizations* (emphasis added) or individuals have made." To assist the applicants, an Information on Disclosure Requirements – FAQs sheet was provided in PHL Contracts. Information that MUST be disclosed, includes: any campaign contributions the business or any affiliated entity/persons made, the name of any consultant(s) used to help in obtaining the contract, and any campaign contributions the consultant(s) made.

On December 19, 2018, in the RFP response for ES&S, Richard J. Jablonski (Vice President of Finance for ES&S), reported the following information on the Mandatory Campaign Contribution Disclosure form (as found in PHL Contracts):

1) No affiliate(s) of the Applicant [ES&S] made ANY campaign contributions in the two years prior to the RFP application deadline;

2) No affiliate(s) of the Applicant [ES&S] solicited or served as an intermediary for ANY campaign contributions in the two years prior to the RFP application deadline;

3) No consultant(s) were used in the year prior to the RFP application deadline (applicants were instructed to: "Please be sure to refer to the definition of Consultant before completing [the] form).

Chapter 17-1400 of the Philadelphia Code defines a Consultant as:

> Any Person used by an Applicant or Contractor to assist in obtaining a Non-Competitively Bid Contract through direct or indirect communication by such Person with any City Agency or and City officer or employee, if the communication is undertaken by such Person in exchange for, or with the understanding of receiving, payment from the Applicant or Contractor or any other Person; provided, however, that "Consultant" shall not include a fulltime employee of the Applicant or Contractor.

Despite filing the Mandatory Campaign Contribution Disclosure Form claiming that ES&S did not use a consultant in connection with the voting machines procurement process, the information revealed during the investigation has shown that ES&S did, in fact, engage in lobbying activity in 2017 and 2018, in direct contravention of the company's assertions in the disclosure form.  Specifically, on April 25, 2017, ES&S registered with the City's Board of Ethics for the January – March quarter.[7]   In its registration, ES&S listed Alan Kessler as a

---

[7] It should be noted that Duane Morris gave Al Schmidt a campaign contribution of $500 during this same period, on March 6, 2017.

lobbyist, along with Kessler's law firm, Duane Morris, LLP, which was listed as a lobbying firm. ES&S also listed Roy Wells of Triad Strategies, LLP, as a lobbyist.[8] The registration listed the total expenditures for Direct Communications as $6,500, with all lobbying expenditures totaling $19,500 for that period.   The only communications listed are Direct Communications with Commissioner Schmidt, in reference to the City's Capital Budget.

On July 18, 2017, ES&S again listed Alan Kessler as a lobbyist, along with Duane Morris, and Roy Wells and Triad Strategies.   For April – June 2017, ES&S listed $7,606 in expenditures for Direct Communications, and a total of $22,500 in lobbying expenditures. Again, the only communications that ES&S listed were Direct Communications with Commissioner Schmidt.

For the July – September 2017 lobbying expense report, ES&S listed the same lobbyists/lobbying firms as above, with a total of $22,500 in expenses.   However, there were no communications listed.   Notably, Richard Jablonski, ES&S's VP of finance (who signed ES&S's Mandatory Contribution Disclosure Form as discussed above), also signed off on the July – September 2017 lobbying expense report.

For the October – December 2017[9] period, ES&S's lobbying expense reports only listed Direct Communications with Commissioner Schmidt regarding the City's capital budget.   The total lobbying expenses for the period were $4,250.

---

[8] It appears that Alan Kessler was the actual filer of each expense report, however an ES&S executive signed off on each report as well.

[9] December 28, 2018 was the RFP response deadline.   Accordingly, this period starts to capture more potential direct conflicts, as it is within the one-year look back window for use of "consultants."

The January – March 2018 and April – June 2018 lobbying expense reports show that ES&S had lobbying expenses, but that those expenses did not exceed $2,500 during either period.

The July – September 2018 lobbying expenses for ES&S totaled $18,125 with $3,125 for Direct Communications.  The Lobbying Category for the Direct Communications was listed as "Elections."  For the following two periods, which ran from October 2018 – March 2019, ES&S listed Indirect Communications only, and each three-month period listed $15,000 in lobbying expenses. [10]

ES&S's failure to disclose must be considered in light of recent disqualifications in other procurement processes.  This past spring, the administration disqualified a minority-owned business, U.S. Facilities, from bidding on a contract due to its failure to disclose political donations.[11] The administration justified the disqualification by pointing to U.S. Facilities's failure to disclose three political contributions in 2017 totaling less than $500.[12]  Mike Dunn, a spokesman for the mayor stated that the City has little discretion to overlook these kinds of violations, and that "these laws are well-known for their strict, mandatory requirements for disclosing political contributions and the resulting consequences for non-compliance." *The Philadelphia Tribune*, 4/28/19.

---

[10] Dominion listed Triad Strategies as a registered lobbying firm between March 4, 2015 and December 31, 2015, but did not list any lobbyists or lobbying firms after December 31, 2015.

[11] Another company withdrew its bid due to a similar failure to disclose violation.

[12] It was later discovered that an additional $1500 in contributions were not disclosed, however the administration noted that the dollar amount is not relevant regarding mandatory disclosures.

Similarly, ES&S also failed to disclose recent political campaign contributions from its consultants, which ES&S failed to identify in its Mandatory Campaign Contribution Disclosure Form, to Commissioners Schmidt and Deeley, the two officials who had the final say in awarding a $29 million contract to ES&S.  Specifically, in February 2018, Duane Morris and Triad Strategies (registered lobbying firms for ES&S), contributed $1,000 and $250 respectively, to Friends.  The previous year, Duane Morris also contributed $500 to Friends.  ES&S likewise failed to disclose a campaign contribution of $500 made by Triad Strategies on March 29, 2018, to Deeley 15, a PAC established to support Commissioner Deeley's bid for re-election as a City Commissioner.  As discussed above, Commissioner Schmidt may have also had Direct Communications with ES&S lobbyists within the last year, according to ES&S's self-reported financial disclosures which were submitted to the City's Ethics Board.  As noted above, after advising the City of ES&S's failure to disclose its use of consultants, the City imposed a $2,895,950 penalty in accordance with the terms of the contract.

### B3. CANDIDACY ISSUES

The timing and circumstances surrounding Commissioners Schmidt and Deeley's vote to select ES&S as the voting machine contract winner, as well as the circumstances surrounding the selection of replacement commissioners in light of Commissioners Schmidt and Deeley's bids for re-election, also raise concerns.

#### a.  ES&S and KNOWiNK Awarded the Voting Systems Contracts

On February 12, 2019, the Selection Committee that was charged with reviewing the responses to the RFP, submitted its recommendations regarding its suggested vendors to Monique Nesmith-Joyner, Interim Procurement Commissioner.  On the same date, the City

Commissioners issued a media advisory announcing that the proposed February 13 vote on the new voting machines would be postponed until February 20.

In the interim, on February 15, 2019, the Honorable Idee C. Fox, President Judge of the Philadelphia Court of Common Pleas ("Judge Fox"), issued an administrative order titled "In Re: Appointment of Court of Common Pleas Judges to serve as City Commissioners on the Philadelphia County Election Board for the 2019 Primary, General Special Elections pursuant to 25 P.S. § 2641." In the Order, Judge Fox appointed substitute City Commissioners for Commissioners Schmidt and Deeley. On the same day, however, Judge Fox vacated the Order through a second order with no explanation. There is no docket information available from the Court to explain the genesis of, or communications concerning these orders.

The day after Judge Fox's two orders concerning the replacement of Commissioners Schmidt and Deeley under the Pennsylvania Election Code, on February 16, 2019, Nesmith-Joyner submitted a letter to Commissioners Schmidt, Deeley, and Clark, advising them that the Selection Committee recommended further negotiations with two voting machine vendors, ES&S and Dominion, and two electronic poll book vendors, KNOWiNK and Tenex, which the Committee identified as having the highest scores pursuant to the RFP evaluation process. Additionally, Nesmith-Joyner recommended that the Commissioners vote to authorize negotiations with a secondary vendor in the event the primary vendor was unable to perform as expected. On February 20, the City Commissioners, including Commissioner Schmidt and Deeley, voted to select ES&S's Express XL voting machine as the recipient of the City's voting machine contract and KNOWiNK as the recipient of the City's electronic poll book contract.

### b.  Lisa Deeley and Al Schmidt Run for Re-election

That same evening of February 20, 2019, mere hours after the City Commissioners' vote, Commissioner Deeley stated her intention to seek re-election to the office of Philadelphia City Commissioners at a pre-planned reception.  This reception was promoted on Facebook as early as January 24, 2019, and shared by Commissioner Deeley on her personal Facebook account as early as February 16, 2019.  The public advertisement for the reception contained a header that announced "DEELEY for Commissioner" and solicited contributions to "benefit Lisa Deeley," which could be made online at https://secure.actblue.com/donate/lisa-deeley-2-20-19, or by check, payable to Deeley 15.  The advertisement also spotlighted "Special Guest The Hon. Edward G. Rendell."  Notably, Hon. Rendell signed a letter dated February 19, 2019, a day *before* the reception and the vote, endorsing Commissioner Deeley for reelection.

On February 21, 2019, the day after her campaign reception and her vote in favor of the machines, Commissioner Deeley submitted a letter to Judge Fox, informing the judge that she was running for re-election as City Commissioner.  As a result, Judge Fox entered an order on the same date appointing Common Pleas Judge Giovanni Campbell to serve as Interim Chairman of the Board of Elections on behalf of Commissioner Deeley.

On February 22, 2019, Commissioner Schmidt submitted a letter to Judge Fox, advising Judge Fox that he was no longer able to serve on the Board of Elections as he, like Commissioner Deeley, was running for re-election as a City Commissioner.  On that same date, Judge Fox appointed Common Pleas Judge Vincent Furlong to serve temporarily on the Board of Elections on behalf of Commissioner Schmidt.  Neither the February 21 nor the February 22 orders by Judge Fox referenced the nearly identical order entered and rescinded on February 15, that replaced Commissioners Schmidt and Deeley as Commissioners.

### c. Deeley and Schmidt's Campaign Activities

The Pennsylvania Election Code provides that "***whenever*** a member of the board of county commissioners[13] is a candidate for nomination or election to any public office, the President Judge of the Court of Common Pleas ***shall*** appoint a judge or an elector of the county to serve in his stead."  The Election Code defines the term "candidate" as "any individual who seeks nomination or election to public office."  In another section, the Election Code provides that "an individual shall be deemed to be seeking nomination or election to such office if he has:

> (1) Received a contribution or made an expenditure or has given his consent for any other person or committee to receive a contribution or make an expenditure, for the purpose of influencing his nomination or election to such office, whether or not the individual has made known the specific office for which he or she will seek nomination or election at the time the contribution is received or the expenditure is made; or

> (2) Taken the action necessary under the laws of the Commonwealth to qualify himself for nomination or election to such office.

Both Commissioners Schmidt and Deeley engaged in various campaign-related activities prior to the date of the vote, including receiving campaign contributions, making campaign expenditures, circulating nominating petitions, and making their candidacy for reelection publicly known through social media.

Commissioner Deeley's Campaign Finance Report, which identifies her as a candidate for City Commissioner in the May 21, 2019 primary, reveals that Commissioner Deeley received 26 contributions between February 1 and February 20, 2019, totaling $9,500, from individuals, a law firm, and various PACs and labor unions.  Commissioner Deeley also recorded 70

---

[13] City Commissioners are ex-officio members of the Board of County Commissioners/Board of Elections pursuant to Phila. Code § 2-112 (4).

expenditures between January 4 and February 20, totaling $27,647, for various Democratic Wards, food for meetings and events, event venues, PAC, a campaign finance lawyer, other consultants, transportation, office, and miscellaneous services and contributions.

Similarly, Commissioner Schmidt's Campaign Finance Report reveals that between January 7 and February 20, 2019, Commissioner Schmidt received 6 contributions totaling $6,421 from individuals and the Republican City Committee. From January 9 to January 20, 2019, Commissioner Schmidt also recorded 13 expenditures totaling $10,645 for loans, food and events for "political meetings," office services, contributions, the Republican City Committee, and the South Philadelphia Republican Victory Fund.[14]

The Commissioners, as members of the Board of Elections, are empowered to exercise all powers granted to them and perform all duties imposed upon them, including purchasing voting machines, but only when decided by a majority vote *of all members.* If Commissioners Schmidt and Deeley were in fact candidates under Section 3241 of the Election Code, it would seem that they should have been disqualified from serving as "members" of the Board of Elections under state law, and thus ineligible to participate in selecting the City's new voting systems. While the law appears to be unsettled with respect to Commissioners Schmidt and Deeley's status as candidates prior to the February 20, 2019 vote to select the City's new voting system – in keeping with the Best Value Guidelines and its focus on transparency – even if they

---

[14] The receipt of contributions, making of campaign-related expenditures, and soliciting and obtaining of signatures, may be sufficient to render Schmidt and Deeley candidates under Sections 3241(a)(1) and (a)(2) of the Election Code. *See also McMenamin v. Tartaglione*, 590 A.2d 802, 810 (Pa. Commw. Ct. 1991) (evidence of demands, solicitations, and receipt of a contribution, or making expenditures for a campaign is critical to the question of whether an individual was a "candidate."). *See* 25 P.S. § 2641 (requiring the President Judge of the Court of Common Pleas to replace a member of the board of Commissioners whenever the individual becomes a candidate).

were not "candidates" under the Election Code at the time of the vote, it would seem to have been a reasonable and prudent course of action for Commissioner Schmidt and Deeley to have recused themselves prior to the vote to prevent an actual conflict of interest or the appearance of a conflict of interest.

### d. Potential Conflicts of Interest

The combination of Commissioners Schmidt and Deeley's receipt of contributions from ES&S lobbyists and their campaign activities prior to their selection of ES&S to receive the voting machines contract also raise potential concerns under § 20-607 of the Philadelphia Code and the Best Value Guidelines.  § 20-607 requires any "officer" (defined as any elected person in a city and/or county position) who has a financial interest in a contract to disclose the conflict and disqualify themselves.  Likewise, the Best Value Guidelines, provides, "[i]f a conflict of interest becomes known through the course of the proposal selection process, the Committee member must disclose the conflict and disqualify him- or herself from participation in the process immediately."  While Commissioners Deeley and Schmidt did not directly participate in the selection committee, to ensure public confidence in the process, the Best Value Guidelines' focus on fairness and transparency would seem to extend to them as the individuals charged with rendering the final decision of which vendor to award the voting machines contract to.  These are issues potential conflicts of interest that require further review by the appropriate agencies.

During their interviews, Commissioners Schmidt and Deeley both stated that they signed confidentiality/conflict of interest forms in connection with their involvement in the procurement process and as required under the Best Value Guidelines.  Specifically, Commissioner Schmidt signed a conflict of interest form on July 16, 2018, while Commissioner Deeley signed a conflict of interest form on July 26, 2018. At the time of certification, Commissioners Schmidt and

Deeley did not disclose any conflicts or potential conflicts. During their interviews, Commissioners Schmidt and Deeley stated, however, that they disclosed their potential conflicts, namely the contributions from ES&S lobbyists, by submitting their campaign finance reports. However, they were not required to supplement their conflict of interest forms with any supporting documentation, and the forms themselves did not have an area to list any conflicts of interest.

### B4. The Acting Board of Elections Votes to Continue the Contract

On May 13, 2019, despite having raised concerns about the procurement process with the City Solicitor and other members of the City's Law Department ("Law Department"), the City nevertheless formally executed a contract with ES&S for the procurement of 3,750 voting machines. On June 5, 2019, the City formally executed a contract with KNOWiNK for the procurement of 3,550 electronic poll books. In the interim, the Controller's Office continued to conduct interviews and review documents in an effort to form a more thorough understanding of the voting system procurement process.

In a letter to the Law Department dated July 18, 2019, the Controller's Office set forth specific concerns regarding ES&S's failure to disclose its use of consultants as well as the candidacy issues discussed above.[15] After receiving the Controller's Office's letter, the Law Department agreed that the Controller's Office was justified in withholding payment under ES&S's contract, and further advised that ES&S's voting machine contract was voidable due to ES&S's lack of disclosures. In an August 9, 2019 letter to the acting Board of Elections,

---

[15] On July 8, 2018, the Controller's Office provided information to Law regarding its disclosure finding in an in-person meeting. Law requested those findings be provided in writing. The Controller's Office provided the findings via a letter on July 18. However, prior to receiving the July 18 letter, the Law Department had already informed ES&S of the disclosure issue.

Procurement Commissioner Nesmith-Joyner recommended that the Board of Elections continue the voting machines contract in part due to the time and financial expense that had already gone into the process, as well as the time constraints given the Governor's mandate of having an updated voting system by 2020. It is worth noting that during her interview, Nesmith-Joyner stated that a lobbyist for a voting machines vendor giving campaign contributions directly to the City Commissioners who are ultimately responsible for selecting the winning vendor was not consistent with Best Value Guidelines. On August 15, 2019, the acting Board of Elections voted to continue ES&S's contract despite being made aware of this new information.

### B5. ADDITIONAL AREAS OF CONCERN

In addition to the issues discussed above, the investigation has revealed additional areas of concern regarding the procurement process as well as the Controller's Office's ability to conduct a thorough and timely investigation.

#### a. Procurement Process Concerns

The investigation revealed a number of concerns regarding the voting system procurement process as outlined below.

#### 1. The Process Was Rushed

There was consensus amongst the vast majority of individuals who were interviewed in connection with their involvement in the RFI/RFP process and the selection committee that that the voting system procurement process was conducted on an extremely tight timeline, which

hindered a thoughtful and deliberate procurement process.  Numerous individuals described the process as being "rushed," in order to meet the Governor's mandate.[16]

### 2. Procurement Commissioner's Recommendations Not Followed

As noted previously, Interim Procurement Commissioner Nesmith-Joyner, recommended that the City Commissioners award a primary contract for the voting machines and the electronic poll books, and that the Commissioners also authorize negotiations with a secondary vendor in the event that the primary vendor was unable to perform as anticipated.

Nesmith-Joyner's letter also included the selection committee's final scores for the voting machines and the electronic poll books.  Notably, Tenex scored slightly higher than KNOWiNK, according to the selection committee.  However, the Commissioners voted to award the contract to KNOWiNK, and as with the voting machines, did not vote to authorize negotiations with a secondary vendor in the event that KNOWiNK was unable to perform as anticipated.  During their interviews, neither Commissioners Schmidt nor Deeley were able to articulate why they had chosen KNOWiNK over Tenex.

Despite the Procurement Commissioner's recommendation, the Commissioners did not vote to authorize a secondary vendor.  During her interview, Commissioner Deeley stated that a back-up vendor would not have been feasible given the time constraints involved in the procurement process (which is surprising given the fact that the Procurement Commissioner likely considered the impact of time constraints in crafting her recommendation).  Commissioner

---

[16] Despite being one of the largest counties in the Commonwealth, Philadelphia completed the procurement process and selected its new voting systems in a little over a year, while other smaller counties throughout the Commonwealth are still in the process of selecting new systems.

Schmidt on the other hand, simply stated that the Procurement Commissioner's proposal for a secondary vendor did not seem to make sense, but was unable to elaborate further.

### 3. Pressure to select ES&S

The lobbying activity, and lack of disclosures discussed above, is particularly concerning given the sentiment of at least two selection committee members, who expressed a feeling that representatives from the City Commissioner's Office were putting pressure on the members of the selection committee to select ES&S for the voting machine contract.  One committee member explained that there was a greater emphasis on the ES&S voting machine, and that representatives from the Commissioners' Office provided a disproportionate amount of information related to the capabilities of the ES&S machine in comparison to the information provided on the other vendors.  This information also raises concerns when viewed through the lens of ES&S's history of lobbying and contacts with the City dating back to 2013.

### 4. Lack of procedures to ensure integrity and transparency of the process

The interviews revealed a great deal of confusion about who was ultimately responsible for ensuring the integrity of the procurement process.  Witnesses from the Procurement Department stated that their department was responsible for collecting the conflict of interest forms in connection with the procurement process.  However, other interviews revealed that the Chief Integrity Officer also collected some of the forms, yet there was no established repository for consolidation of the conflict of interest forms.  Nor was there an individual or agency that was tasked with ensuring that the information on the forms was accurate.  A Deputy Chief Administrative Officer ("DCAO"), who was interviewed explained that the CAO was asked to assist in the due diligence review for this particular contract, as it was the City's first substantial use of the Best Value process (although he does not normally review due diligence materials for

Best Value contracts).  The DCAO explained that he reviews the due diligence forms to ensure that there are no deficiencies on the forms, but does not conduct further investigation unless he observes an irregularity or is directed to do so.

As with the candidacy and conflict of interest questions discussed above, the importance of clear, established procedures and documentation with respect to potential conflicts cannot be overstated, particularly in light of the emphasis on transparency in the Best Value Guidelines. Procedures must be developed to clearly establish when and how to report potential conflicts of interest, and there must be an individual or group of individuals tasked with addressing and documenting any potential conflicts of interest.

### b. Impediments to a Thorough and Expeditious Investigation

Throughout the investigation, the Controller's Office has encountered numerous delays in the production of subpoenaed documents and scheduling of witness interviews.    Indeed, until the voting system contracts were officially conformed, the Controller's Office had limited access to documents and information related to the voting system selection committee.  In preparation for the interviews of the City Commissioners and their deputies, the Controller's Office informed the Law Department that it intended to place the witnesses under oath pursuant to the City Controller's authority under the Charter, and to explore questions regarding the Commissioners' campaigns for re-election.[17]  After numerous discussions with the Law Department, and in the interest of moving forward with the investigation, the Controller's Office agreed to significantly

---

[17] Although questions regarding the Commissioners' campaigns technically fell outside the scope of the Commissioners' duties, such information was critical to a thorough understanding of the circumstances surrounding the selection of the voting machines and poll books.

limit its questions regarding the Commissioner's campaigns and agreed not to seek to place the witnesses under oath.

Just as the Best Value Guidelines with its focus on fairness and transparency serves as the cornerstone for the procurement process, those same principles should likewise guide the interactions between the various City agencies involved in an investigation such as the one undertaken by the Controller's Office. A more collaborative and transparent process would not only have improved the efficiency of the investigation, but also serves to assure the citizens of Philadelphia that the City's myriad agencies are working in concert with the common goal of ensuring the integrity, fairness, and transparency of the voting machines procurement process as well as future procurement processes.

## C. CONCLUSION

The Controller's Office has compiled a brief list of recommendations to improve the processes and procedures to clarify and strengthen the Best Value Guidelines.

- When the selection committee or the procurement commissioner make recommendations, they should be followed. If they are not followed by the department or selection committee, a justification of the decision to deviate from the recommended action should be provided in a written memo.

- Any deviations from the guidelines or process by the Procurement Department, contracting department or selection committee should be documented in writing and kept.

- Currently, disclosures are self-reported and no formal process is in place for the verification of disclosures. Mandatory Disclosure forms, especially for Best Value Procurement, should be reviewed and verified for accuracy and a formal

process established for verifying the disclosures. That process should include comparing disclosure forms with filings to the Board of Ethics.

- Language in the Disclosure Eligibility FAQ form should be made more clear, stating that a lobbyist is a consultant, and vice-versa, and providing a definition for consultant and lobbyist to ensure clarity.

- Currently, conflicts of interest are also self-reported and use a standard form affirming that the signer does not have any conflicts. A questionnaire should accompany the form that, when filled out, would provide additional detail regarding possible conflicts of interest. Additionally, an outside determination of whether there is a conflict of interest or the appearance of a conflict of interest should be made by an entity or individual other than the person who is self-reporting. A process should be established, memorialized and followed that establishes an external conflict of interest review. Prior contact with responding firms, previous employment with a potential vendor, any financial interests, including contributions from the potential vendors' consultants/lobbyists, should be disclosed in relation to the conflict of interest form(s).

These recommendations largely address small changes that should occur to ensure the process is better in the future. In any procurement process, the City should strive for transparency and a process that encourages confidence that the decision-making is in the best interest of taxpayers. In this case, the City and City Commissioners have fallen short of that expectation.