**Exhibit B**

City of Philadelphia
Procurement Department

# PROVIDER AGREEMENT

**THIS PROVIDER AGREEMENT** is made as of `May 13, 2019` (the "Effective Date") by and between the City of Philadelphia (the "City"), acting by and through its Procurement Department,  (referred to as "Department"), and Election Systems & Software, LLC ("Provider"), a Delaware limited liability company with its principal place of business at 11208 John Galt Boulevard, Omaha, Nebraska  68137.

## BACKGROUND

On February 20, 2019, under the authority granted to the Board of Elections under Article III. Section 302 of the Pennsylvania Election Code, the Philadelphia Board of Elections approved Provider's ExpressVote XL voting machines with the DS450 Tabulation System for use in Philadelphia elections. The City and Provider now desire that Provider furnish to the City, the Services, and Deliverables specified in Exhibit PA-1 and any attachments thereto (hereinafter, collectively referred to as "Exhibit PA-1"), and elsewhere in the Contract Documents, in accordance with the provisions of this Provider Agreement and all of the other documents and exhibits, which together constitute the Contract Documents as defined in the General Provisions. A copy of the General Provisions is attached hereto and incorporated herein by reference.

In consideration of the mutual obligations set forth herein, and intending to be legally bound, the City and Provider covenant and agree as follows:

## ARTICLE I:  GENERAL TERMS

1.1 **Incorporation of Background**.

The Background is incorporated by reference herein.

DocuSign Envelope ID: DED053E1-948E-48A0-8EB3-5F6BC74423CB

## ARTICLE II: DEFINITIONS

The following terms shall have the meanings set forth herein. Capitalized terms not otherwise defined herein shall have the meanings set forth in the General Provisions or in the text of this Provider Agreement.

2.1 **City User(s).**

"City User(s)" means the City's employees, agents, consultants and/or contractors whose duties require that they use and/or have access to the Services or Deliverables.

2.2 **CPU, Computer.**

"CPU" or "Computer" means computer Central Processing Unit.

2.3 **Deliverables.**

"Deliverables" means, collectively, the tangible items of work, as described in Exhibit PA-1 and elsewhere in this Provider Agreement, that Provider is required to furnish as part of its performance of this Provider Agreement, including, without limitation, all Equipment, Software, Documentation and Materials required under this Provider Agreement.

2.4 **Documentation.**

"Documentation" means technical manuals, user's manuals, operating instructions, training materials (except training videos created by Provider which will be considered works made for hire for the City) and other manuals and information published by Provider for the Equipment and Software, including, without limitation, such manuals and information that are set forth in Exhibit PA-1.

2.5 **Equipment.**

"Equipment" means Provider's proprietary hardware or other Provider proprietary equipment.

2.6 **Materials.**

"Materials" means, collectively, any and all materials and work product, tangible and intangible, prepared or developed by Provider in connection with the performance of this Provider Agreement, or for Provider by a Subcontractor in connection with the performance of this Provider Agreement , including but not limited to reports, records, documents, documentation, information, supplies, plans, original drawings, specifications, computations, sketches, renderings, arrangements, videos, pamphlets, advertisements, statistics, data, computer tapes, and software.

2.7     Provider Firmware

"Provider Firmware" means Provider's proprietary software which is included on the Equipment.

2.8     Provider Software

"Provider Software" means Provider's proprietary election software (including the Provider Firmware), all Updates delivered to City under this Provider Agreement, as set forth in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.9     **Services**.

 "Services" means the professional services and other services and work to be furnished by Provider under this Provider Agreement, as specified in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.10    **Software**.

"Software" means the Provider Software (including the Provider Firmware) and Third Party software, if any, to be furnished by Provider under this Provider Agreement, as set forth in Exhibit PA-1 and elsewhere in this Provider Agreement.

2.11    **Third Party Items**.

"Third Party Items" means hardware, equipment and software manufactured and developed by parties other than Provider.

2.12    **Event of Force Majeure**.

An "Event of Force Majeure" means an event that is beyond a Party's control, making performance of its obligations under this contract commercially impracticable, illegal, or impossible, including, but not limited to: war, riots, fire, flood, tornado, snow storm, wind storm hurricane, typhoon, earthquake, lightning, hail, explosion, prolonged shortage of energy supplies, transportation delays or interruptions, labor strikes or disputes, utility or communication interruptions and acts of a governmental authority prohibiting or impeding any party from performing its respective obligations under this Provider Agreement.

## ARTICLE III:
## TERM; TIME OF PERFORMANCE

3.1     **Initial Term**.

The initial term of this Provider Agreement shall commence on April 25, 2019 and shall terminate on April 24, 2020 (the "Initial Term"), or such earlier date as the City may

determine in accordance with Articles XI (Events of Default), XII (Remedies) and XIII (Termination) of the General Provisions.  In no event shall the Initial Term be longer than twelve (12) months.

3.2   **Additional Terms.**

This Provider Agreement may be amended by the City, in its sole discretion, in accordance with Section 2.2 (Additional Terms) of the General Provisions.  Except as stated otherwise in Exhibit PA-1 or elsewhere in this Provider Agreement, all terms and conditions applicable during the Initial Term shall apply to each Additional Term.

3.3   **Time and Schedule for Performance.**

Provider shall complete all Services and furnish all Deliverables within the time specified in Exhibit PA-1.  Provider shall carry out the work in accordance with the Schedule of Performance set forth in Exhibit PA-1.

## ARTICLE IV:
## SERVICES AND DELIVERABLES

4.1   **Services and Deliverables**.

Provider shall perform and furnish the Services and Deliverables that are described in Exhibit(s) PA-1 – PA-9 , in strict accordance with the descriptions of functionality and performance set forth in such Exhibit(s); the specifications, documentation, and other standards of performance set forth therein, and the Warranty Standards, as defined in Article VII (Warranty), below.

## ARTICLE V:  COMPENSATION

5.1   **Amount.**

As total compensation for all Services and Deliverables required under this Provider Agreement and accepted by the Responsible Official pursuant to Article VIII (Acceptance) below, the City covenants and agrees to pay to Provider: Twenty Eight Million, Nine Hundred Fifty Nine Thousand, Five Hundred and Two  Dollars ($28,959,502). Provider's compensation shall include all charges for shipping and delivery of the Equipment, Software, Documentation, and Deliverables at the City location designated in Exhibit PA-1. Notwithstanding anything in this Provider Agreement to the contrary, in no event shall the amount

DocuSign Envelope ID: DFD053E1-248E-48A0-8EB3-6E6BC74423CB

certified by the Finance Department for Services and Deliverables during the Initial Term or Additional Terms exceed the maximum amount of Thirty Five Million Dollars ($35,000,000) per term.

    5.2    **<u>Manner of Payment</u>.**

    (a)    Payment shall be made after Provider's timely submission of invoices to the Responsible Official, in the number, form and content acceptable to the Responsible Official, accompanied by such additional supporting data and documentation as the Responsible Official may require. All payments to Provider are contingent upon satisfactory performance of the terms and conditions of this Provider Agreement. Payments shall be made in accordance with the Milestone Payment Schedule as set forth in Exhibit PA-1, shall be due and payable within forty-five (45) calendar days from the date of City's receipt of Provider's corresponding invoice by electronic mail transmission, and shall be subject to the provisions of §17-1702 of The Philadelphia Code. Payment shall not be due or owing from the City to Provider for any of the Services and/or Deliverables comprising a Milestone, as set forth in the Milestone Payment Schedule, unless or until the City has issued its written statement of Conditional Acceptance for the Milestone in accordance with Section 8.1, *Conditional Acceptance*. Provider shall submit its final invoice not more than sixty (60) days from completion of the Services and delivery of Deliverables. All payments to Provider shall be by checks drawn by the City Treasurer.

    (b)    The City reserves the right to withhold or offset against any funds payable to Provider for any invoice for which the Responsible Official asserts a discrepancy exists or for Provider's failure to satisfactorily perform the terms of the Provider Agreement, as determined solely by the City.

    (c)    Provider's invoices shall be submitted by electronic mail transmission to the following:

| Melissa A. Scott | Nick Custodio |
|---|---|
| Senior Project Manager, OIT | Deputy Commissioner, Office of City Commissioners |
| Melissa.A.Scott@phila.gov | Nick.Custodio@phila.gov |
| With A Copy To: | ITProcurement@phila.gov |

DocuSign Envelope ID: DED053E12-218E-48A0-8EB3-5E6BC74483CB

5.3 **Retainage for Provider Agreement Compliance.**

The City shall retain twenty five percent (25%) of each payment due to Provider until all Services and Deliverables are completed in accordance with this Provider Agreement and are Finally Accepted by City in accordance with Article VIII (Acceptance), below. All such retained amounts shall constitute the final payment due hereunder and shall become due and payable thirty (30) days following such Final Acceptance.

**ARTICLE VI:**
**LICENSE; CONDITIONS OF USE; TITLE**

6.1 **Power to License.**

Provider represents and covenants that it has full power and authority to grant the rights granted by this Provider Agreement to the City with respect to all Software and other Deliverables furnished, without the consent of any other person or entity, and that such rights are irrevocable.

6.2 **License.**

Subject to the terms and conditions of this Provider Agreement, and except as stated otherwise in Section 6.5 below, Provider hereby grants, and shall require its Subcontractors to grant, to the City a non-exclusive, non-transferable, license to use all Software, Documentation, and other Deliverables that are proprietary to Provider or to a Subcontractor (collectively, the "Provider's Licensed Products").

6.3 **Third Party Licenses.**

6.4 **Conditions of Use.**

Provider represents, and the City acknowledges such representation, that the Software and Documentation contains valuable proprietary information. Except as stated otherwise in Exhibit PA-1, the City's use of the Software and Documentation shall be subject to the following conditions:

(a)      The City may copy the Software and Documentation for safekeeping or backup purposes; may make additional copies of the Software for use by the City Users as provided in Exhibit PA-1; and may make additional copies of Documentation for use by the City Users;

(b)      The City shall not reverse engineer, decompile, disassemble, re-engineer or otherwise create, attempt to create, or permit, allow or assist others to create, the source code or the structural framework for part or all of the Software, except as required through judicial process or as necessary to conduct an audit or reconstruction of an election;

(c)      The City shall not cause or permit any use, display, loan, publication, transfer of possession, sublicensing or other dissemination of the Software or Documentation, in whole or in part, to or by any third party including, but not limited to, any transfer of possession to, or use of the Software or Documentation by any third party to perform any services for the City (including, but not limited to, any coding, programming or ballot layout services) without Provider's prior written consent; or

(d)      The City shall not allow a third party to cause or permit any copying, reproduction or printing of any output generated by the Software (except finished ballots by ballot printers selected by the City) in which Provider owns or claims any proprietary intellectual property rights (e.g. copyright, trademark, patent pending or patent), including, but not limited to, any ballot shells or ballot code stock.

Notwithstanding the foregoing restrictions set forth in Sections 6.4(c) and (d), the City may do the following:

(i)      Sell or otherwise transfer ownership of the Equipment to one or more other counties or municipalities located within the Commonwealth of Pennsylvania;

(ii)      Transfer Provider Software to one or more other counties or municipalities located within the Commonwealth of Pennsylvania, subject to such jurisdiction(s) entering into an appropriate license agreement with, and paying corresponding license fees to, Provider;

(iii)      Subject to an appropriate and agreed upon protective order, produce Software or Documentation in response to a valid discovery request issued pursuant to a subpoena issued by a court or legislative body of competent jurisdiction or in response to a Right To Know Law Request to the extent

DocuSign Envelope ID: DF0053F1-218E-48A0-8EB3-5F6BC74429CB

such Software or Documentation is not otherwise exempt from disclosure thereunder; and

(iv)     Utilize output generated by the Software in order to report election results and/or produce ballot images as part of the City's conduct of elections or in response to a Right To Know Law Request to the extent that such ballot images are not otherwise exempt from disclosure thereunder.

6.5     **Title; Ownership of Materials.**

(a)     Title and copyright to all Software and any reproductions thereof shall remain with Provider, or where not proprietary to Provider, with the person(s) or entity(ies) that have title and copyright thereto.

(b)     Upon payment in full by the City, all Equipment and Materials provided under this Provider Agreement shall be the sole and absolute property of the City and the City shall have all right, title, and interest thereto and unrestricted use thereof.  To the extent that any Materials developed by or for Provider embody a copyrightable work (including, but not limited to, a "compilation" as that term is used in 17 U.S.C. §101, as amended), the City and Provider agree that such copyrightable work(s) shall be considered as one or more "works made for hire" by Provider for the City, as that term is used in 17 U.S.C. §§101 and 201(b), as amended.  To the extent that any Materials developed by or for Provider embody one or more copyrightable works but are neither a "compilation" nor any other form of "work made for hire," Provider hereby assigns, and agrees to execute instruments evidencing such assignment, all copyrights in all of such works to the City.  All the foregoing terms and conditions of this Section 6.5(b) shall apply to all Materials furnished to Provider by a Subcontractor (in this Article VI only, the "Subcontractor Deliverables").  Provider shall obtain from its Subcontractors the assignment of all copyrights and other rights in the Subcontractor Deliverables that may be necessary for Provider to comply with all terms and conditions of this Section 6.5(b) with respect to the Subcontractor Deliverables.

(c) Software, Documentation, Deliverables and Materials owned by the City:

Any training videos created for the City of Philadelphia related to this Provider Agreement.

## ARTICLE VII: WARRANTY

7.1     **Warranty; Warranty Standards**.

Subject to the City's timely payment of annual certified technician program, firmware and software license and maintenance and support fees, for a period of five (5) years following the City's Final Acceptance of the Equipment and Software in accordance with Article VIII ("Acceptance") below, and with the option to renew for up to an additional 7 years subject to the City's timely payment of annual certified technician program, firmware and software maintenance and support fees, (the "Warranty Period(s)"), Provider warrants that all Software, Documentation, other Deliverables, and Services shall be free from material defects and errors and shall function together as an integrated system in conformance with (1)-(5) following (collectively the "Warranty Standards"): (1) the descriptions of functionality and performance and all other standards of performance set forth in Exhibit PA-1 and elsewhere in the Provider Agreement; (2) the Documentation; (3) Provider's most current specifications for the Software; (4) any applicable design documents prepared by Provider under the Provider Agreement, as approved and accepted by the City; and (5) all acceptance and/or test criteria or standards of performance specified in Article VIII (Acceptance) below, and or in Exhibit PA-1, including, without limitation, any such criteria or standards of performance set forth in any "Test Plan(s)" (as defined in Article VIII (Acceptance) below) that are accepted and approved by the City. Unless a Consumable (as hereinafter defined) is found to be defective in materials or workmanship upon initial use by the City within any documented usage periods as prescribed by Provider or a third party manufacturer, the warranty shall not include the repair or replacement of any Equipment components that are consumed in the normal course of operating the Equipment, including printer ribbons, printer cartridges, paper rolls, ballots or ballot cards, batteries, removable media storage devices or marking devices (collectively, "Consumables"). The City shall notify Provider of any defective Consumables within thirty (30) calendar days after discovery of the defect and Provider shall provide a like kind replacement as soon as reasonably practicable. Any repaired or replaced item of Equipment or Software shall be warranted only for the unexpired term of the Warranty Period. All replaced components of the Equipment or Software will become the property of Provider. This warranty is effective provided that (a) the City notifies Provider as soon as reasonably practicable, but in no event later than thirty (30) calendar days of the discovery of the failure of performance or defect and is otherwise in compliance with its obligations hereunder, (b) the Equipment or

Software to be repaired or replaced has not been repaired, changed, modified or altered except as authorized or approved by Provider, (c) the Equipment or Software to be repaired or replaced is not damaged as a result of accident, theft, vandalism, neglect, abuse, use which is not in accordance with instructions or specifications furnished by Provider or an Event of Force Majeure , and (d) the City has installed and is using the most recent Update provided to it by Provider that is required to correct a bug or defect and does not otherwise solely constitute optional enhancements available to the City.  This warranty is void for any units of Equipment which: (i) have not been stored or operated in a temperature range according the specifications provided in Exhibit PA-1, (ii) have been severely handled so as to cause mechanical damage to the unit, or (iii) have been operated or handled in a manner inconsistent with reasonable treatment of an electronic product.

Provider has previously entered into an agreement to license to KNOWiNK the specifications necessary for KNOWiNK's electronic pollbook to interface with Provider's ExpressVote XL activation card printer (the "License Agreement").  Subject to KNOWiNK not being in default under the License Agreement, Provider will continue to license to KNOWiNK the specifications needed to enable KNOWiNK's electronic pollbook to interface with Provider's ExpressVote XL during the Warranty Period. Provider will further enter into a Customer Addendum with KNOWiNK, as defined in the License Agreement, for the City of Philadelphia. Provider warrants that pursuant to the License Agreement, it grants KNOWiNK a license of its specifications which, if used properly by KNOWiNK, shall allow KNOWiNK to interface with Provider's activation card printer. Provider further covenants that it will work in good faith with KNOWiNK during the Warranty Period, to enable KNOWiNK to utilize Provider's specifications to interface with Provider's activation card printer.

     7.2   **Defects and Errors**.

     (a)   During the Warranty Period, Provider shall furnish materials and Services necessary to correct material defects and errors in the Software Documentation or Deliverables and cause it to operate in accordance with the Warranty Standards at no cost to the City.  Provider shall  respond to and commence diagnosis to correct errors, defects, and non-conformances with the Warranty Standards following notice by the City in accordance with the standards set forth in the Service Level Schedule attached hereto at Exhibit PA-5, which notice may be by telephone, or email in accordance with email and telephone number provided by Section 19.1 (Notice) below.

Provider shall correct errors, defects and non-conformances with the Warranty Standards in accordance with Section 8.2 below.

(b)      For purposes of this Article VII, a "material" defect or error shall be any defect, error, or failure to conform to the Warranty Standards that prevents the tabulation, accumulation and reporting of election results using or relying on the Equipment and/or Software, or that would prevent the performance of functions or features of the Equipment and/or Software on which the tabulation, accumulation and reporting of election results depend.

7.3      **Limitation.**

**THE FOREGOING WARRANTY IS MADE EXPRESSLY IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THIS ARTICLE VII SHALL LIMIT OR ALTER PROVIDER'S INDEMNIFICATION AND OTHER OBLIGATIONS PROVIDED IN ARTICLE VIII (INDEPENDENT CONTRACTOR; INDEMNIFICATION) OF THE GENERAL PROVISIONS AND ARTICLES XVI (PATENT, COPYRIGHT AND OTHER PROPRIETARY RIGHTS INDEMNITY) AND XVIII (CENTURY DATE STANDARD AND YEAR 2000 COMPLIANCE) AND SECTION 6.1 (POWER TO LICENSE) OF THIS PROVIDER AGREEMENT.**

## ARTICLE VIII: ACCEPTANCE

8.1      **Acceptance.**

(a)      Conditional Acceptance.  Within thirty (30) days following Provider's completion of all Services and Deliverables comprising a Milestone set forth in the Milestone Payment Schedule (Attachment 1 to Exhibit PA-1), the City shall issue its written statement of Conditional Acceptance to Provider for the Milestone, provided that all such work comprising the Milestone conforms to the Warranty Standards as defined in Article VII (Warranty) above and successfully completes all applicable Conditional Acceptance Tests (as defined in Section 8.1(c) (Acceptance Tests; Test Plans) below).  Payment shall not be due or owing from the City to Provider for any of the Services and/or Deliverables comprising a Milestone unless or until the City has issued its written statement of Conditional Acceptance for the Milestone.

(b)     <u>Final Acceptance</u>.  Within thirty (30) days following successful completion of Final Acceptance Tests (as defined in Section 8.1(c) (Acceptance Tests; Test Plans) below), the completion of all other Services and Deliverables required under this Provider Agreement, and the certification of the City's November 2019 election using the Services and Deliverables provided by the Provider,  the City shall issue its written statement of Final Acceptance of the Services and Deliverables, provided that the Services and Deliverables (1) function together as an integrated system in conformity to the Warranty Standards and (2) meet all performance standards and criteria set forth in the Test Plan(s) for the Final Acceptance Tests, as accepted and approved by the City. Provider shall not be deemed to have performed the Services and Deliverables, nor shall the payment of retainage for contract compliance be due to Provider, unless and until the Services and Deliverables have been Finally Accepted by the City in writing after the certification of the City's November 2019 election using Services and Deliverables from Provider.

Notwithstanding the paragraph above, if an Event of Force Majeure occurs prior to the November 2019 election, making the use of the Provider's Equipment, Services and Deliverables, impossible or impractical in November of 2019, Final Acceptance Tests shall only occur after certification of the first primary or general election in which the City uses Provider's Services, Deliverables and Equipment.

(c)     <u>Acceptance Tests; Test Plans</u>.  The Services and Deliverables comprising each Milestone in the Milestone Payment Schedule shall be subject to conditional acceptance testing as approved and accepted by the City (the "Conditional Acceptance Tests"), and the Services and Deliverables as an integrated system shall be subject to final acceptance testing as approved and accepted by the City (the "Final Acceptance Tests").  No Conditional or Final Acceptance Test or other test of the Services and Deliverables shall commence unless and until Provider has delivered and the City has accepted and approved a written plan or plans setting forth a test method and criteria and standards of performance that must be satisfied for the test to be successful  (the "Test Plan(s)").  The Test Plan(s) shall be Deliverables under this Provider Agreement.

8.2     **Conformance; Correction Period**.

If the City determines that any Services or Deliverables do not conform to the Warranty Standards and/or other conditions of Acceptance set forth above in this Article VIII, and notifies Provider of such non-conformance, Provider shall have the lesser of either (a) a period of

thirty (30) days after the City's notice to remedy the non-conformance(s) or such other period of time upon which the parties agree, or (b) the period of time between the City's notice to remedy and 5 days prior to the next general or primary election, unless a different period of time is agreed upon by the parties ("Correction Period"). If the non-conformance(s) are not completely remedied within the Correction Period, the Services and Deliverables may, at the City's sole discretion, be rejected, in whole or in part; upon return of the rejected Deliverables to Provider, the City shall have no further payment or other obligation to Provider with respect thereto and in addition to any other remedies that may be available to the City under the Provider Agreement, may terminate the Provider Agreement and/or exercise its remedies under Articles XI (Events of Default), XII (Remedies) and XIII (Termination) of the General Provisions.

## ARTICLE IX:
## MAINTENANCE AND SUPPORT SERVICES

9.1     **Term and Cost of Maintenance and Support Services**.

Provider will furnish maintenance and support services for the costs as described in Exhibit PA-1.

## ARTICLE X:
## DEPOSIT OF DOCUMENTATION

10.1     **Deposit of Source Code**.



10.2   **Custodian**.

10.3   **Escrow Agreement**.

Provider shall designate the City as a preferred beneficiary under its existing escrow agreement with the Custodian set forth above. Upon designation of the City as a preferred beneficiary under Provider's existing escrow agreement with the Custodian, this Provider Agreement shall be deemed modified to incorporate the escrow agreement and to replace Sections 10.1 (Deposit of Source Code) and 10.2 (Custodian) above and 10.4 (Source Code Statement) below by the terms and conditions thereof.

## ARTICLE XI: PROVIDER SOFTWARE UPDATES

During the Initial Term and any renewals thereof, Provider may provide new releases, upgrades or maintenance patches to the Provider Software, together with appropriate Documentation ("Updates") at no cost to the City on a schedule defined by Provider. Upon notification from Provider, the City is responsible for obtaining any upgrades or purchases of Third Party Items required to operate the Updates as well as the cost of any replacements, retrofits or modifications to the Equipment which may be necessary in order to operate the Updates. All

Updates shall be deemed to be Provider Software for purposes of this Provider Agreement upon delivery. The City may install the Updates in accordance with Provider's recommended instructions or may request that Provider install the Updates. Provider may charge the City at its then-current rates to (i) install the Updates; (ii) train the City on Updates, if such training is requested by the City; or (iii) provide maintenance and support on the Provider Software that is required as a result of the City's failure to timely or properly install an Update. The City shall not hold Provider responsible for any claim, damage, loss, judgment, penalty, cost, amount paid in settlement or fee which is caused by the City's failure to install and use the most recent Update provided to it at no cost by Provider. If the City proposes changes in the Provider Software to Provider, such proposals will become Provider's property. Provider may, in its sole discretion, elect to make or not to make such changes without reference or compensation to the City or any third party. Provider represents to the City that the Updates will comply with all applicable state law requirements at the time of delivery. The Provider shall be responsible for ensuring that it provided only certified versions of Provider Software in accordance with applicable law to the City. The City shall pay Provider for any Update which is required due to a change in state or local law. In the event that any Updates are required due to changes in state or local law, Provider reserves the right to charge the City for the following:

(i)     the actual and documented total cost of any Third Party Items that are required in order to operate the Updates;  and/or

(ii)    the actual and documented total cost of any replacements, retrofits or modifications to the Equipment contracted for herein that may be developed and offered by Provider in order for such Equipment to remain compliant with applicable laws and regulations; and

The City shall pay Provider the agreed upon costs incurred for the design, development and certification of any Update created solely for the City which is required due to a change in City law or is otherwise requested or required by the City.

## ARTICLE XII:
## SOFTWARE DESCRIPTIONS,
## EQUIPMENT COMPATIBILITY,
## COMPLIANCE WITH LAWS

Provider shall submit to the City, upon written request, a statement identifying all application and operating system software and the computer hardware with and on which the Software is compatible and will operate in accordance with specifications. Subject to the City's obligations in accordance with Article XI above, Provider warrants to the City that the Equipment and Software sold and licensed under this Provider Agreement will comply with all applicable requirements of federal and state election laws and regulations that are mandatory and effective during the Initial Term and any Additional Term of this Provider Agreement and will have been certified by the appropriate state authorities for use in the Commonwealth of Pennsylvania. The Equipment and Provider Software, including all components will be provided to the City with a hardened network for the election management software ("EMS"), in accordance with the guidelines of the United States Election Assistance Commission and any applicable guidelines in the Commonwealth of Pennsylvania. During the Initial Term and any Additional Term of this Provider Agreement, in the event the City fails to maintain EMS in the hardened network or allows any internal or external access to the hardened network, the City agrees to assume any and all liability therefor.

Provider is subject to all current and future directives issued by the Secretary of State of the Commonwealth of Pennsylvania ("Secretary"). Provider is also subject to an audit and/or investigation of its company and manufacturing facilities to ensure compliance with the Secretary's approval or certification of its equipment.

Equipment and Provider Software modifications or replacements necessary due to decertification by either the Election Assistance Commission or the Commonwealth of Pennsylvania or a field issue or anomaly occurring in any fielded system in the United States that impacts the casting or tabulation of votes by City's Equipment and Provider Software must be provided to City at no cost or it must be replaced with a certified system at no cost. Provider shall

be liable to City for any and all reasonable costs incurred to obtain and utilize such replacement voting systems and/or alternative voting methods for all elections occurring until the equipment is re-certified, reapproved or City terminates this Provider Agreement for cause and procures new equipment.

**ARTICLE XIII:**
**RISK OF LOSS OR DAMAGE**

13.1    **Risk of Loss or Damage**.

Provider and its insurers will relieve the City, for the period from the commencement of Provider's performance through the City's Final Acceptance of the Services and Deliverables (except Equipment) required under the Provider Agreement, as provided in Article VIII (Acceptance) above, from all risks of loss or damage to the Software, Documentation and other Deliverables (except Equipment) by providing the City with a replacement copy thereof, upon written request by the City. Should it become necessary, during this period, to replace a tape, disk, or other media containing Software, due to damage, loss, defective equipment, or other such causes, there will be no charge for such replacement except for media and delivery costs; provided, however, that this Section 13.1 shall not obligate Provider to furnish installation or other services not provided in the Provider Agreement. Risk of loss for the Equipment shall pass to the City upon delivery to the City's designated location.

**ARTICLE XIV: CHANGES**

14.1 **Changes in Scope of Services and Deliverables**.

At any time during the Initial Term or any Additional Term of this Provider Agreement, the City may make changes in any of the Services and Deliverables, within the general scope of the Provider Agreement as set forth in Article IV (Services and Deliverables) of this Provider Agreement, including, without limitation, the addition or deletion of Services and Deliverables, and changes in the time of performance. All such changes shall be by written order or request, as shown on the Project Change Control Form, an example of which is attached as Exhibit PA-8 to this Provider Agreement,  signed by the Responsible Official ("Change Order"). If, in the judgment of the City, any such change causes an increase or decrease in the cost or the time required for the performance of the Provider Agreement, an equitable adjustment of the contract amount and/or time of performance will be made, subject to the following conditions:  (a)

In no event shall the City be liable to Provider for additional compensation for any alleged change to the work for which the City has not issued a Change Order; (b) any claim by Provider for such additional compensation or for an extension of the time of performance to perform a Change Order must be made in writing within ten (10) calendar days from the date on which Provider received the Change Order in accordance with Section 19.1 (Notice) below.

 14.2 **Extension of Time of Performance**.

  Provider shall be entitled to a reasonable extension of the time of performance, the length of which shall be determined by the City, for delays to its performance that are in no way the fault or responsibility of Provider; provided, however, that no such extension shall be granted unless a written request, setting forth in detail the grounds therefor, is received by the City within ten (10) calendar days following the events giving rise to such alleged delay.  Provider's sole and exclusive remedy for costs or damages arising from any delay to its performance, whether or not caused by any act or omission of the City, Provider, or others, shall be an extension of the time of performance, and in no event shall Provider be entitled to payment or compensation of any kind from the City for any such costs or damages.

**ARTICLE XV:**
**INSURANCE, SURETY BONDS**

 15.1 **Insurance**.

  Unless otherwise approved by the City's Risk Management Division in writing, Provider shall, at its sole cost and expense, procure and maintain, or cause to be procured and maintained, in full force and effect, the types and minimum limits of insurance specified below, covering Provider's performance of the Services and furnishing of the Deliverables.  Provider shall procure, or cause to be procured, all insurance from reputable insurers admitted to do business on a direct basis in the Commonwealth of Pennsylvania or otherwise acceptable to the City.  All insurance herein, except the Professional Liability Insurance, shall be written on an "occurrence" basis and not a "claims-made" basis.  In no event shall Provider perform any Services or other work until Provider has delivered or caused to be delivered to the City's Risk Management Division the required evidence of insurance coverages.  All insurance coverages shall provide for at least thirty (30) days prior written notice to be given to the City in the event coverage is materially changed, cancelled or non-renewed.  The City, its officers, employees, and agents, shall

be named as additional insureds on the General Liability Insurance policy.  Provider's certificate of insurance shall include a statement to the effect that the coverage afforded the City and its officers, employees and agents, as additional insureds, will be primary to any other coverage available to them and that no act or omission of the City, its officers, employees or agents shall invalidate the coverage.

    (a)    WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE

        (1)    Workers' Compensation: Statutory limits

        (2)    Employers' Liability:  $100,000 Each Accident - Bodily Injury by Accident; $100,000 Each Employee - Bodily Injury by Disease; and $500,000 Policy Limit - Bodily Injury by Disease.

        (3)    Other states insurance including Pennsylvania.

    (b)    GENERAL LIABILITY INSURANCE

        (1)    Limit of liability:  $1,000,000 per occurrence combined single limit for bodily injury (including death) and property damage liability; $1,000,000 advertising injury; $2,000,000 general aggregate and $1,000,000 aggregate for products and completed operations.  The City may require higher limits of liability if, in the City sole discretion, the potential risk warrants.

        (2)    Coverage: Premises operations; blanket contractual liability; personal injury liability; products and completed operations; independent contractors; employees and volunteers as additional insureds; cross liability; and broad form property damage (including completed operations).

    (c)    AUTOMOBILE LIABILITY INSURANCE

        (1)    Limit of liability: $1,000,000 per occurrence combined single limit for bodily injury (including death) and property damage liability.

        (2)    Coverage:  Owned, non-owned and hired vehicles.

    (d)    PROFESSIONAL LIABILITY INSURANCE

(1)    Limit of liability: $1,000,000 with a deductible not to exceed $50,000.

(2)    Coverage: Errors and omissions including liability assumed under Provider Agreement.

(3)    Professional Liability Insurance may be written on a claims-made basis provided that coverage for occurrences happening during the performance of the Services required under this Provider Agreement shall be maintained in full force and effect under the policy or "tail" coverage for a period of at least two (2) years after completion of the Services.

(e)    **CYBER LIABILITY INSURANCE:**

(1)    Limit of Liability: $1,000,000 Per Claim/Aggregate.

(2)    Coverage: Information security and privacy liability that arise from the Agreement, including but not limited to: data while in transit or in the possession of any third parties hired by the Provider (such as data back-up services) to electronic system; loss of, damage to or destruction of electronic data breaches arising from the unauthorized access or exceeded access; or malicious code, viruses, worms or malware; electronic business income and extra expense as a result of the inability to access website due to a cyber attack or unauthorized access; Privacy Notification Extra Expense Coverage (including Credit Monitoring Expense).

(3)    Insurance may be written on a claims-made basis provided that any retroactive date applicable to coverage under the policy precedes the effective date of this Agreement; and that continuous coverage will be maintained or an Extended Discovery Period will be purchased for a period of at least two (2) years after expiration or termination of this Agreement.

15.2    **Evidence of Insurance Coverage.**

Certificates of insurance evidencing the required coverages must specifically reference the City contract number for which they are being submitted. The original certificate of insurance must be submitted to the City's Risk Manager at the following address:

DocuSign Envelope ID: DFD053F126185-49A0855B-5EBB6744J2CB

The City of Philadelphia
Office of the Director of Finance
Division of Risk Management
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1579
(Fax No.: 215-686-1705).

A copy of the certificate of insurance shall be submitted to the Responsible Official at the address of the Department set forth in Section 19.1 (Notice) below. Both submissions must be made at least ten (10) days before work is begun and at least ten (10) days before each Additional Term. The City, in its sole discretion, may waive the ten (10) day requirement for advance documentation of coverage in such situations where such waiver will benefit the City, but under no circumstances shall Provider actually begin work (or continue work, in the case of an Additional Term) without providing the required evidence of insurance. The actual endorsement adding the City as an additional insured must specifically reference the City contract number and be submitted to the City's Risk Management Division at the above address. The City reserves the right to require Provider to furnish certified copies of the original policies of all insurance required under the Provider Agreement at any time upon (10) days written notice to Provider.

15.3    **Self-Insurance.**

Provider may not self-insure any of the coverages required under the Provider Agreement without the prior written approval of the Responsible Official and the City's Risk Manager. In the event that Provider desires to self-insure any of the coverages listed above, it shall submit to the Responsible Official and the City's Risk Management Division, prior to Provider's commencement of Services or furnishing of any Deliverables hereunder, a certified copy of Provider's most recent audited financial statement, and such other evidence of its qualifications to act as a self-insurer (e.g., state approval) as may be requested by the Responsible Official or the City's Risk Manager. In the event the City grants such approval, Provider understands and agrees that the City, its officers, employees, and agents shall be entitled to receive the same coverages and benefits under Provider's self-insurance program that they would have received had the insurance requirements set forth above been satisfied by a reputable insurer admitted and duly authorized to do business in the Commonwealth of Pennsylvania or otherwise acceptable to the City. If at the time of commencement of the Term of this Provider Agreement, Provider self-insures its professional liability and/or workers' compensation and employers' liability coverage,

Provider may, in lieu of the foregoing, furnish to the City a current copy of the state certification form for self-insurance or a current copy of the State Insurance Commissioner's letter of approval, whichever is appropriate. The insurance (including self-insurance) requirements set forth herein are not intended and shall not be construed to modify, limit, or reduce the indemnifications made in this Provider Agreement by Provider to the City, or to limit Provider's liability under this Provider Agreement to the limits of the policies of insurance (or self-insurance) required to be maintained by Provider hereunder.

15.4    **Performance Bond.**

Prior to commencing performance of the Provider Agreement, Provider shall furnish to the City a fully executed original performance bond, as prepared by the City and in a form approved by the City Solicitor, in an amount equal to fifty (50) per cent of the total payment amount set forth in Section 5.1 (Amount) above, and having as surety thereon such surety company or companies as are approved by and acceptable to the City.

**ARTICLE XVI:**
**PATENT, COPYRIGHT AND OTHER**
**PROPRIETARY RIGHTS INDEMNITY**

16.1    **Indemnification**.

(a)    Provider warrants that to the best of its knowledge, all Provider Software, Documentation, Services, and Deliverables do not and will not infringe upon or violate any patent, copyright, trade secret or other proprietary rights of any third party.  In the event of any claim, suit or action by any third party against the City, the City shall promptly notify Provider in writing and Provider shall defend such claim, suit or action at Provider's expense, and Provider shall indemnify the City against any actual and documented loss, cost, damage, expense or liability arising out of such claim, suit or action (including, without limitation, reasonable litigation costs and counsel fees) whether or not such claim, suit or action is successful.

(b)    Provider will not, however, be responsible for such loss, cost, damage, expense or liability if infringement is finally determined by a court of competent jurisdiction to be the sole result of (1) the City's modification of the Software or its use of the Software in a manner not intended by the Parties, that is not compliant with its federal and state certified configuration, or that is not otherwise clearly contemplated by this Provider Agreement; (2) the City's failure to

use corrections or enhancements made available by Provider that do not materially alter the functionality of the Software as it exists at the time furnished; (3) the City's distribution or marketing of the Software to third parties for revenue producing purposes (which is strictly prohibited under Provider's licensing terms); or (4) the act or omission of the third party supplier of a software product used in combination with the Software but not furnished by Provider under this Provider Agreement.  Prior to such final determination, however, Provider shall remain fully responsible, at its expense, for the defense and indemnification of any infringement claim in accordance with this Article XVI; provided, that if the claimed infringement is finally determined to be solely the result of one or more of (1)-(4), the City will reimburse Provider for its reasonable expenses (including reasonable litigation costs and attorneys fees) incurred therein.

16.2    **Infringing Software**.

If the Provider Software is, or in Provider's reasonable judgment is likely to be, held to constitute an infringing product, Provider shall at its expense and option either: (1) procure the right for the City to continue using the Provider Software, (2) replace the Provider Software with a non-infringing equivalent, (3) modify the Provider Software to make it non-infringing, provided that the modification does not materially alter the functionality of the Provider Software or the City agrees to and accepts the modification in writing; or (4) in the event Provider is ordered by a court of competent jurisdiction to remove the Provider Software, and all right of appeal or stay is exhausted as to such order, accept return of the Provider Software and refund to the City a prorated amount paid by the City to Provider pursuant to this Provider Agreement based upon the number of full months remaining within the term for which the City has previously paid a license fee for the Provider Software.

16.3    **Exclusive Remedy**.

The foregoing remedies constitute the City's sole and exclusive remedies and Provider's entire liability with respect to infringement of proprietary rights.  To receive the foregoing indemnity, the City must promptly notify Provider in writing of an infringement claim or suit, provide reasonable cooperation (at Provider's expense), and full authority to Provider to defend or settle the claim or suit.  Provider will have no obligation to indemnify the City under any settlement made without its written consent.

16.4    **Relationship with Section 8.2 (Indemnification) of the General  Provisions.**

The indemnification requirements set forth in this Article XVI apply only to the specific subject matter hereof.  With respect to any and all other losses, costs (including, but not limited to, litigation and settlement costs and counsel fees), claims, suits, actions, damages, liability and expenses, subject to the following provisions of this Section 16.4, the requirements set forth in Section 8.2 (Indemnification) of the General Provisions shall apply.  (a) Neither the City nor Provider, its partners, principles, and employees shall be liable for more than the greater of $500,000 or one times the total contract amount for any actions, damages, claims, liabilities, costs, expenses or losses in any way arising out of or relating to the Software, Services and Deliverables provided hereunder.  Notwithstanding the foregoing, this limitation shall not apply to liability for damages resulting from loss of life, bodily injury or damage to real and/or tangible personal property and/or infringement of proprietary right, as set forth in Article X of the Provider Agreement.  (b) Nothing herein shall waive or amend any defense or immunity that the City, its officers, agents or employees may have under the PA Political Subdivision Tort Claims Act, 42 Pa.C.S.A. 8541 et. seq.

By entering into this Provider Agreement, the City agrees to accept responsibility for (a) the selection of, use of and results obtained from any equipment, software or services not provided by Provider and used with the Equipment or Software, with the exception of the responsibilities related to KNOWiNK, LLC described in Section 7.1 of this Provider Agreement; or (b) user errors, voter errors or problems encountered by any individual in voting that are not otherwise a result of the failure of Provider to perform.  Provider shall not be liable under this Provider Agreement for any claim, damage, loss, judgment, penalty, cost, amount paid in settlement or fee that is caused by (c) the City's failure to properly install and use the most recent Update provided to it by Provider before the City's next election following Provider's provision of the Update to the City, or (d) the City's election not to receive, or to terminate, the hardware maintenance services or the software license and maintenance and support services available hereunder.  The parties hereby specifically agree that this Section 16.2 of the Provider Agreement shall control to the extent of any conflict with Section 8.2 of the General Provisions.  The parties hereby specifically agree that this Section 16.4 of the Provider Agreement shall control to the extent of any conflict with Section 8.2 of the General Provisions.

## ARTICLE XVII:
## CONFIDENTIALITY

17.1    **Non-Disclosure**.

Provider and its employees, agents, Subcontractors, suppliers, and any person or entity acting on its behalf (i) will maintain in strict confidentiality all of the "City Data," as defined and set forth in Section 17.2; (ii) will not, without the City's written permission, divulge, disclose, communicate, or distribute any of the City Data to any person or entity except as may be strictly necessary to perform the Provider Agreement; (iii) will not, without the City's written permission, in any way use any of the City Data for their businesses or other advantage or gain (except as may be necessary to perform the Provider Agreement), including, without limitation, any use of the City Data in any presentation, demonstration, or proposal to perform work, to the City or to others, that may be conducted or created as part of their business activities or otherwise; (iv) will, immediately upon the City's Final Acceptance of the Services and Deliverables required under the Provider Agreement under Article VIII (Acceptance) above, return all City Data to the City, destroy any and all copies of any City Data that are in their possession, whether on paper or in electronic or other form, and if requested by the City in writing, will certify in writing that there has been full compliance with this Section 17.1.

17.2    **The City Data**.

Except as provided otherwise in this Section 17.2, the City Data shall include any and all of the following, whether in electronic, microfilm, microfiche, video, paper, or other form, and any copies or reproductions thereof:

(a)    Any and all other records, documents, and data furnished by the City to Provider in relation to the work required under the Provider Agreement; and

(b)    All Materials and other work product(s) and items of work specifically created by Provider for the City as part of the work required under the Provider Agreement.

The City Data shall not, however, include any information which:

·    Was known to Provider, prior to the commencement of its performance of the Provider Agreement, free of any obligation to keep it confidential, and/or is proprietary to Provider; or

· Was generally known to the public at the time of receipt by Provider, or becomes generally known to the public through no act or omission of Provider; or

· Was independently developed by Provider without knowledge or use of any City Data; or

· Is required to be disclosed by law or judicial process.

17.3    The terms and conditions of this Article XVII shall be in addition to, and not in lieu of, the terms and conditions set forth in Article IX (Confidentiality) of the General Provisions.

17.4    In the event of any actual or threatened breach of any of the provisions of this Article XVII, and in addition to any other remedies that may be available to the City in law or equity, the City shall be entitled to a restraining order, preliminary injunction, permanent injunction, and/or other appropriate relief to specifically enforce the terms of this Article XVII. Provider agrees that a breach of the terms of this Article XVII would cause the City injury not compensable in monetary damages alone, and that the remedies provided herein are appropriate and reasonable.

17.5    Provider's obligations set forth in this Article XVII shall survive the termination of the Provider Agreement.

## ARTICLE XVIII:
## DATE STANDARD

Provider represents and warrants that all Provider Software furnished under the Provider Agreement will conform to the following City of Philadelphia Century Date Standard:

(a)    <u>General Integrity</u>.  No value for "current date" will cause interruptions in the operation of the Provider Software after any date.

(b)    <u>Date Integrity</u>.  All manipulations of time-related data (including, without limitation, dates, durations, days of the week, month, and the year) will produce results that conform to Provider's specifications for the Provider Software for all valid date values within the application domain.

(c)  <u>Source code</u>.  Source code for the Provider Software shall comply with the standard set forth in Federal Information Processing Standard Publication 4-2 (FIPS PUB 4-2), *Representation of Calendar Date for Information Interchange*, and other relevant and current date standards

Provider shall, at no cost to the City, repair any Provider Software that does not conform to the standards set forth in (a)-(c) and cause it to conform to such standards, or shall replace the Provider Software with software that does conform to such standards.

## ARTICLE XIV:
## <u>MISCELLANEOUS PROVISIONS</u>

19.1  **Notice.**

Any notice required or permitted to be given under the Provider Agreement shall be given in writing and shall be personally delivered by hand with receipt obtained, by a national overnight express carrier (such as Federal Express), by facsimile, sent by registered or certified United States mail, return receipt requested, or by computer modem addressed as follows:

IF TO THE CITY:

Attn.:  Melissa A. Scott,
          Senior Project Manager, OIT
          1234 Market Street, 18th Floor
          Philadelphia, PA 19107

E-Mail
:        Melissa.A.Scott@phila.gov

IF TO PROVIDER:

Election Systems & Software, LLC
11208 John Galt Boulevard
Omaha, Nebraska  68137
Attn.:  Office of General
Counsel                    Fax No.:  (402) 970-
1291            E-Mail :legal@essvote.com

19.2    **Interpretation; Order of Precedence.**

In the event of a conflict or inconsistency between the terms of this Provider Agreement and any term, condition or provision contained in any Exhibit hereto, or any attachment to such Exhibit (including, without limitation, any Proposal of Provider), the terms of this Provider Agreement shall govern.

19.3    **Other Provisions.**

Other provisions, including, without limitation, MBEC participation commitments and exceptions to the General Provisions of the Provider Agreement, are set forth in the following Exhibits attached to this Provider Agreement, and incorporated in the Provider Agreement by reference:

(1)    **Exhibit PA-1:**        Statement of Work

*Exhibit PA-1 Attachments:*

(i)    Attachment 1: Milestone Payment Schedule

(ii)    Attachment 2: Project Schedule

(iii)    Attachment 3: Weekly Status Report

(iv)    Attachment 4: Customer Site Survey

(v)    Attachment 5: Installation-Checklist ExpressVote

(vi)    Attachment 6: Installation-Checklist- DS450

(vii)    Attachment 7: User Conditional Acceptance Testing

(viii)    Attachment 8: Training Acknowledgement Form

(ix)    Attachment 9: EMS Network Installation Checklist

(x)    Attachment 10: EMS Standalone Checklsit

(xi)    Attachment 11: RACI Chart

(2)    **Exhibit PA-2:**        MBEC Participation Commitments

(3)    **Exhibit PA-3:**        Exceptions to General Provisions

(4)    **Exhibit PA-4:**        Pricing Schedule

(5)    **Exhibit PA-5:**        Service Level Schedule

(6)    **Exhibit PA-6:**        Certified Technician Hardware Maintenance Services and Software License

(7)    **Exhibit PA-7:**        Third Party Software

        (8)      **Exhibit PA-8:**      Project Change Control Form

        (9)      **Exhibit PA-9:**      Maintenance and Support Services

19.4    <u>**Acknowledgement of the General Provisions**</u>.

Provider specifically acknowledges that Provider has read and understands the terms and conditions contained in the General Provisions and acknowledges that by executing this Provider Agreement, Provider will be legally bound by all the terms of this Provider Agreement, including, but not limited to, those set forth in the General Provisions that are not otherwise amended in Exhibit PA-3, Exceptions to General Provisions.

*--- The Remainder of This Page Is Intentionally Left Blank ---*

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound by all of the Contract Documents, have caused this Provider Agreement to be executed by their respective duly authorized officers as of the date in the first paragraph of this Provider Agreement.

APPROVED AS TO FORM                    THE CITY OF PHILADELPHIA

MARCEL S. PRATT, CITY SOLICITOR        Through:

Per: _Christopher Malcarney_____       By: _M Nesmith-Joyner_____
        5BC3FBB0FBFB465...                    31897B877B8C4BB...

Name: Christopher Malcarney            Name: Monique Nesmith-Joyner, Interim Commiss

Title: Divisional Deputy City Solicitor   Title: Interim Procurement Commissioner


                                       ELECTION SYSTEMS & SOFTWARE, LLC

                                       By: _Richard J. Jablonski_____
                                              3E3BC949720E400...

                                       Name: Richard J. Jablonski

                                       Title: VP of Finance

                                       Witness

                                       By: _Eric Anderson_____
                                              41E88ABA028749E...

                                       Name: Eric Anderson

                                       Title: Vice President and General Counsel