<pre>
 1                 IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

    JILL STEIN, ET AL          :    CIVIL CASE NUMBER
 4              PLAINTIFFS      :
                                :
 5       VERSUS                 :    16-6287
                                :
 6    PEDRO A. CORTES, ET AL,   :
                DEFENDANTS      :
 7    ------------------------------------------------------

 8                        FEBRUARY 18, 2020
                          COURTROOM 14A
 9                        PHILADELPHIA, PA 19106

10    ------------------------------------------------------

11           BEFORE THE HONORABLE PAUL S. DIAMOND, J.
      ------------------------------------------------------

12                        EVIDENTIARY HEARING - DAY 1

13    APPEARANCES:

14    ILANN M. MAAZEL, ESQUIRE
      DOUGLAS E. LIEB, ESQUIRE
15    EMERY CELLI BRINKCKERHOFF & ABADY LLP
      600 FIFTH AVE, 10TH FLOOR NEW YORK, NY 10020
16    COUNSEL FOR THE PLAINTIFFS

17

                     LYNN GLIGOR, RMR
18             OFFICIAL COURT REPORTER
             ROOM 2609 U. S. COURTHOUSE
19                601 MARKET STREET
               PHILADELPHIA, PA 19106
20                 (856) 649-4774

21

22    PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

23

24

25
</pre>

```
1        CONTINUED APPEARANCES:

2        JOHN G. PAPIANOU, ESQUIRE
         MONTGOMERY MCCRACKEN WALKER RHOADS LLP
3        1735 MARKET STREET
         PHILADELPHIA, PA 19103
4
         COUNSEL FOR THE PLAINTIFFS
5

6        MARK ARONCHICK, ESQUIRE
         ROBERT WIYGUL, ESQUIRE
7        CHRISTINA MATTHIAS, ESQUIRE
         HANGLEY ARONCHICK SEGAL & PUDLIN
8        ONE LOGAN SQUARE, 27TH FLOOR
         18TH & CHERRY STREETS
9        PHILADELPHIA, PA 19103-6933

10       COUNSEL FOR THE DEFENDANTS

11
         BENJAMIN H. FIELD, ESQUIRE
12       DANIELLE E. WALSH, ESQUIRE
         MICHAEL WU-KUNG PFAUTZ, ESQUIRE
13       CITY OF PHILADELPHIA LAW DEPARTMENT
         1515 ARCH STREET, 15TH FLOOR
14       PHILADELPHIA, PA 19102

15       COUNSEL FOR THE CITY OF PHILADELPHIA

16

17

18

19

20

21

22

23

24

25
```

1                    (CLERK OPENS COURT.)

2                    THE COURT:  PLEASE BE SEATED, EVERYBODY.

3     GOOD MORNING.

4                    ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

5                    THE COURT:  OKAY.  MR. MAAZEL, I BELIEVE

6     YOU ARE UP.

7                    MR. MAAZEL:  GOOD MORNING, YOUR HONOR.

8     DO YOU WANT APPEARANCES FROM THE PARTIES OR --

9                    THE COURT:  NO, NO.  I THINK WE HAVE THAT

10    ALL DOWN, BUT IF YOU WOULD LIKE TO.

11                   MR. MAAZEL:  NO, I JUST WANTED TO CHECK,

12    YOUR HONOR.

13                   WE JUST, AS A COUPLE OF HOUSEKEEPING

14    MATTERS, WE HAVE THE PLAINTIFFS/DEFENDANTS JOINT EXHIBIT

15    BINDERS UP THERE FOR THE COURT, AS WELL AS FOR THE

16    WITNESSES, WHOEVER THE WITNESSES ARE.

17                   THE COURT:  OKAY.  GREAT.

18                   MR. MAAZEL:  AND I BELIEVE WE HAVE

19    AGREEMENT AMONG THE PARTIES THAT ALL OF THE EXHIBITS IN

20    THOSE BINDERS, WITH THE EXCEPTION OF PX 1016, ARE

21    AUTHENTIC.  WE DON'T HAVE AGREEMENT ON THE ADMISSIBILITY

22    BUT WE DO ON THE AUTHENTICITY OF THE DOCUMENTS, RIGHT?

23                   MR. WIYGUL:  YES.

24                   MR. MAAZEL:  YOUR HONOR, TO START OUR

25    PRESENTATION, WE WANTED TO SIMPLY MOVE A NUMBER OF

1    EXHIBITS INTO EVIDENCE, WHICH WE THOUGHT WOULD

2    STREAMLINE THE PROCESS.

3                    THE COURT:  OKAY.

4                    MR. MAAZEL:  AND I'LL GET A LIST.  THOSE

5    ARE JOINT EXHIBITS 1, 7 --

6                    THE COURT:  HOLD ON.

7                    MR. MAAZEL:  SURE.

8                    THE COURT:  IS THIS WHAT I ALREADY HAVE?

9    THE JOINT EXHIBIT 1 IS A SETTLEMENT AGREEMENT.  THAT'S

10   THE RIGHT BINDER?  THANK YOU, MR. LIEB.  WRONG BINDER?

11                   MR. MAAZEL:  YES.  THERE SHOULD BE

12   ANOTHER BINDER THAT SAYS JOINT EXHIBITS THAT I THINK

13   DEFENSE PROVIDED TODAY.  JOINT EXHIBIT 1 SHOULD BE

14   FEBRUARY 9, 2018 DIRECTIVE.

15                   THE COURT:  I HAVE IT.  OKAY.

16                   MR. MAAZEL:  WE WOULD LIKE TO MOVE INTO

17   EVIDENCE, YOUR HONOR, JOINT EXHIBIT 1.

18                   THE COURT:  WE CAN DO THESE ONE-BY-ONE

19   AND IF THE DEFENDANTS OR THE INTERVENORS HAVE ANY

20   OBJECTION, THEY CAN DO IT DOCUMENT BY DOCUMENT.

21                   MR. MAAZEL:  JOINT EXHIBIT NUMBER 1.

22                   MR. WIYGUL:  NO OBJECTION, YOUR HONOR.

23                   MR. MAAZEL:  7.

24                   MR. WIYGUL:  NO OBJECTION.

25                   MR. MAAZEL:  10.

```
1                    MR. WIYGUL:  NO OBJECTION.

2                    MR. MAAZEL:  11.

3                    MR. WIYGUL:  NO OBJECTION.

4                    MR. MAAZEL:  19.

5                    MR. WIYGUL:  NO OBJECTION.

6                    MR. MAAZEL:  23.

7                    MR. WIYGUL:  WE DO OBJECT TO THAT ONE,

8      YOUR HONOR.

9                    THE COURT:  ON WHAT GROUND?

10                   MR. WIYGUL:  I BELIEVE THAT THIS IS

11     PURPORTED TO BE A COPY OF A CONFIDENTIAL SETTLEMENT

12     CONFERENCE MEMO THAT PLAINTIFF SENT ON AN EX PARTE BASIS

13     TO THE MAGISTRATE JUDGE.  IT WAS NEVER SENT TO US.  IT

14     WASN'T SOMETHING THEY COMMUNICATED TO US AS PART OF THE

15     SETTLEMENT DISCUSSIONS.  SO WE BELIEVE IT'S IRRELEVANT,

16     IT DOES NOT INFORM THE QUESTION FOR THE COURT IN TERMS

17     OF THE INTERPRETATION OF THE SETTLEMENT AGREEMENT.

18                   THE COURT:  I WILL OVERRULE THAT.  IT

19     WILL BE ADMITTED.  GO AHEAD.

20                   MR. MAAZEL:  24.

21                   MR. WIYGUL:  NO OBJECTION.

22                   MR. MAAZEL:  25.

23                   THE COURT:  I'M SORRY?

24                   MR. MAAZEL:  25.

25                   THE COURT:  OKAY.
```

1                    MR. WIYGUL:  NO OBJECTION.

2                    MR. MAAZEL:  26.

3                    MR. WIYGUL:  NO OBJECTION.

4                    MR. MAAZEL:  27.

5                    MR. WIYGUL:  NO OBJECTION.

6                    MR. MAAZEL:  29.

7                    MR. WIYGUL:  NO OBJECTION.

8                    MR. MAAZEL:  30.

9                    MR. WIYGUL:  NO OBJECTION.

10                   MR. MAAZEL:  34.

11                   MR. WIYGUL:  NO OBJECTION.

12                   MR. MAAZEL:  38.

13                   MR. WIYGUL:  IT'S A LONG E-MAIL CHAIN.  I

14    THINK WE NEED TO KNOW MORE ABOUT HOW YOU ARE USING IT.

15                   THE COURT:  I'M SORRY, WHAT WAS THAT?

16                   MR. WIYGUL:  WE DON'T OBJECT TO CERTAINLY

17    THE AUTHENTICITY, YOUR HONOR.  IT'S A LONG, I THINK IT'S

18    LIKE A 14-PAGE E-MAIL CHAIN.

19                   THE COURT:  ARE YOU OBJECTING?

20                   MR. WIYGUL:  NO, NO, YOUR HONOR.

21                   THE COURT:  OKAY.  IT WILL BE ADMITTED.

22                   MR. MAAZEL:  40.

23                   MR. WIYGUL:  NO OBJECTION.

24                   MR. MAAZEL:  41.

25                   MR. WIYGUL:  NO OBJECTION.

```
1              MR. MAAZEL:  42.

2              MR. WIYGUL:  NO OBJECTION.

3              MR. MAAZEL:  43.

4              MR. WIYGUL:  NO OBJECTION.

5              MR. MAAZEL:  44.

6              MR. WIYGUL:  NO OBJECTION.

7              MR. MAAZEL:  45.

8              MR. WIYGUL:  NO OBJECTION.

9              MR. MAAZEL:  46.

10             MR. WIYGUL:  NO OBJECTION.

11             MR. MAAZEL:  47.

12             MR. WIYGUL:  NO OBJECTION.

13             MR. MAAZEL:  48.

14             MR. WIYGUL:  NO OBJECTION.

15             MR. MAAZEL:  49.

16             MR. WIYGUL:  NO OBJECTION.

17             MR. MAAZEL:  50.

18             MR. WIYGUL:  NO OBJECTION.

19             MR. MAAZEL:  51.

20             MR. WIYGUL:  NO OBJECTION.

21             MR. MAAZEL:  52.

22             MR. WIYGUL:  NO OBJECTION.

23             MR. MAAZEL:  57.

24             MR. WIYGUL:  NO OBJECTION.

25             THE COURT:  HOLD ON.  GO AHEAD.
```

```
 1                    MR. MAAZEL:  60.

 2                    MR. WIYGUL:  NO OBJECTION.

 3                    MR. MAAZEL:  AND THEN WE WOULD ALSO LIKE

 4      TO MOVE INTO EVIDENCE A FEW OF THE EXHIBITS IN THE

 5      PLAINTIFF'S EXHIBIT BINDER, YOUR HONOR.

 6                    THE COURT:  YES.

 7                    MR. MAAZEL:  PX 1001.

 8                    MR. WIYGUL:  NO OBJECTION.

 9                    MR. MAAZEL:  1002.

10                    MR. WIYGUL:  NO OBJECTION.

11                    MR. MAAZEL:  1006.

12                    MR. WIYGUL:  WHICH ONE?

13                    MR. MAAZEL:  1006.

14                    MR. ARONCHICK:  YOUR HONOR, I DON'T KNOW.

15      ON 1002 AND 1006, WE DON'T BELIEVE THESE ARE RELEVANT,

16      BUT YOU CAN'T DETERMINE THAT NOW IN THE CONTEXT OF

17      MOVING IN THESE EXHIBITS.  SO WE RESERVE OUR RELEVANCE

18      OBJECTION, I GUESS, WHEN THEY TRY TO USE THEM.

19                    THE COURT:  OKAY.

20                    MR. MAAZEL:  1010.

21                    MR. ARONCHICK:  SAME.  WE OBJECT TO THIS.

22      IT'S NOT ONLY NOT -- ON RELEVANCE, IT'S NOT CONNECTED TO

23      ANYTHING.  IT'S NOT A DOCUMENT THAT WAS EVEN INVOLVED IN

24      THE SETTLEMENT NEGOTIATIONS.

25                    THE COURT:  WHO CREATED THIS DOCUMENT?
```

1                    MR. MAAZEL:  RIGHT.  SO, YOUR HONOR, THIS

2       IS -- AND PERHAPS WE SHOULD RESERVE THIS FOR WHEN WE GET

3       TO THE WITNESS.

4                    THE COURT:  THAT'S FINE.

5                    MR. MAAZEL:  MAYBE THAT MAKES MORE SENSE.

6                    1012.

7                    MR. WIYGUL:  NO OBJECTION.

8                    MR. MAAZEL:  1013.

9                    MR. WIYGUL:  NO OBJECTION.

10                    MR. MAAZEL:  AND THAT'S IT FOR NOW, YOUR

11       HONOR.

12                    (JOINT EXHIBITS 1, 7, 10, 11, 19, 23-30,

13       30, 34, 38, 40-52, 57, 60 ADMITTED INTO EVIDENCE.)

14                    (PLAINTIFFS' EXHIBITS PX 1001, 1002,

15       1006, 1010, 1012, 1013 ADMITTED INTO EVIDENCE.)

16                    THE COURT:  OKAY.

17                    MR. MAAZEL:  YOUR HONOR, WOULD YOU LIKE

18       ME TO QUESTION FROM HERE OR --

19                    THE COURT:  WHEREVER.  YOU CAN REMAIN

20       SEATED, IT'S OKAY.  WHEREVER YOU'RE MOST COMFORTABLE.

21                    MR. ARONCHICK?

22                    MR. ARONCHICK:  JUST IN THE NATURE OF

23       HOUSEKEEPING.

24                    THE COURT:  YES.

25                    MR. ARONCHICK:  WE BROUGHT AN ELECTION

1   MACHINE HERE.  WE INTEND TO USE IT WHEN THE ES&S WITNESS

2   IS ON THE STAND, WHICH WILL BE LATER, BUT WE JUST WANTED

3   TO LET YOU KNOW IT WAS HERE.

4                   THE COURT:  I ASSUMED THAT'S WHAT IT WAS.

5   OKAY.

6                   MR. MAAZEL:  WE CALL AS OUR FIRST WITNESS

7   SECRETARY KATHY BOOCKVAR, YOUR HONOR.

8                   THE COURT:  VERY WELL.

9                   (WITNESS SWORN.)

10                  THE CLERK:  PLEASE STATE AND SPELL YOUR

11  NAME FOR THE RECORD.

12                  THE WITNESS:  SURE.  IT'S KATHY BOOCKVAR,

13  K-A-T-H-Y, B-O-O-C-K-V, LIKE IN VICTORY, A-R.

14                  THE COURT:  GOOD MORNING.

15                  THE WITNESS:  GOOD MORNING, YOUR HONOR.

16                       DIRECT EXAMINATION

17  BY MR. MAAZEL:

18  Q.      GOOD MORNING, SECRETARY BOOCKVAR.

19  A.      GOOD MORNING.

20  Q.      NICE TO SEE YOU AGAIN.

21  A.      YOU AS WELL.

22  Q.      YOU WERE APPOINTED THE ACTING SECRETARY OF THE

23  COMMONWEALTH ON JANUARY 5, 2019, IS THAT CORRECT?

24  A.      THAT'S CORRECT.

25  Q.      AND YOU WERE APPOINTED SECRETARY OF THE

1   COMMONWEALTH ON NOVEMBER 19, 2019, CORRECT?

2   A.      I WAS CONFIRMED, CORRECT.

3   Q.      AND THAT'S YOUR CURRENT POSITION?

4   A.      CORRECT.

5   Q.      AT THE TIME OF THE SETTLEMENT AGREEMENT, WHEN

6   THE SETTLEMENT AGREEMENT WAS SIGNED, YOU WERE A SENIOR

7   ADVISOR TO GOVERNOR WOLF, IS THAT CORRECT?

8   A.      THAT'S CORRECT.

9   Q.      SO YOU WERE NOT PART OF THE DEPARTMENT AT THAT

10  TIME?

11  A.      I WAS IN THE DEPARTMENT OF STATE, THAT'S WHERE I

12  WORKED, SO I WAS PART -- I'VE WORKED AS A PART OF THE

13  TEAM AT DEPARTMENT OF STATE.   BUT MY BOSS WAS THE

14  GOVERNOR.

15  Q.      AND YOU ATTENDED THE SETTLEMENT CONFERENCE WITH

16  JUDGE RICE IN THAT CAPACITY, CORRECT?

17  A.      I DID.

18  Q.      NOW, AS ACTING SECRETARY OR SECRETARY, DO YOU

19  SIGN ALL OF THE CERTIFICATIONS FOR VOTING SYSTEMS?

20  A.      I DO.

21  Q.      AND DO YOU HAVE TO PERSONALLY APPROVE THOSE

22  VOTING SYSTEMS?

23  A.      I DO.

24  Q.      OKAY.   AS YOU KNOW, WE HAD A SETTLEMENT IN THIS

25  LITIGATION, CORRECT?

```
 1    A.       CORRECT.

 2    Q.       AND HAVE YOU HAD A CHANCE TO REVIEW THAT

 3    SETTLEMENT AGREEMENT?

 4    A.       I HAVE.

 5    Q.       COULD YOU TURN TO JOINT EXHIBIT 30, WHICH IS IN

 6    EVIDENCE?

 7                     THE COURT:  I'M SORRY, WHAT IS THAT?

 8                     MR. MAAZEL:  30.

 9                     THE COURT:  JOINT EXHIBIT?

10                     MR. MAAZEL:  30, YOUR HONOR.

11                     THE COURT:  30.  OKAY.

12    BY MR. MAAZEL:

13    Q.       SECRETARY BOOCKVAR, IS THIS THE SETTLEMENT

14    AGREEMENT IN THIS CASE?

15    A.       YES.

16    Q.       AND THIS WAS SIGNED BY ALL PARTIES, CORRECT?

17    A.       YES.

18    Q.       AND IS IT FAIR TO SAY THAT THIS SETTLEMENT

19    AGREEMENT WAS THE RESULT OF A CAREFUL NEGOTIATION AND

20    DRAFTING PROCESS AMONG THE PARTIES?

21    A.       YES.

22    Q.       THIS IS OBVIOUSLY AN IMPORTANT AGREEMENT, YES?

23    A.       YES.

24    Q.       IT AFFECTS THE ENTIRE COMMONWEALTH?

25    A.       YES.
```

1    Q.      AND IT'S AN AGREEMENT THAT THE DEFENDANTS LOOKED

2    AT VERY CAREFULLY BEFORE SIGNING AND APPROVING, CORRECT?

3    A.      YES.

4    Q.      AND AM I CORRECT THAT AMONG THE PEOPLE WHO HAD

5    TO APPROVE THE SETTLEMENT AGREEMENT ON THE DEFENSE SIDE

6    WERE THE ATTORNEY GENERAL'S OFFICE?

7    A.      CORRECT.

8    Q.      AND MR. GATES, WHO WAS THE CHIEF COUNSEL FOR THE

9    DEPARTMENT OF STATE?

10   A.      CORRECT.

11   Q.      AND SECRETARY CORTES, THE THEN SECRETARY OF THE

12   COMMONWEALTH?

13   A.      HE IS ACTUALLY NOT A SIGNATORY TO THIS.

14   Q.      BUT HE WAS A DEFENDANT AND COUNSEL SIGNED ON HIS

15   BEHALF, CORRECT?

16   A.      CORRECT.

17   Q.      AND SO DID HE HAVE TO APPROVE THIS AGREEMENT, TO

18   YOUR KNOWLEDGE?

19   A.      TO MY KNOWLEDGE.

20   Q.      AND DID THE GOVERNOR ALSO HAVE TO APPROVE THIS

21   AGREEMENT?

22   A.      I CERTAINLY WAS INVOLVED ON THE GOVERNOR'S

23   BEHALF TO APPROVE THE AGREEMENT.

24   Q.      AND SO DID YOU PERSONALLY REVIEW THIS AGREEMENT

25   CAREFULLY BEFORE IT WAS SIGNED AND APPROVED?

1      A.      I DID.

2      Q.      IF WE COULD LOOK AT PARAGRAPH 2 OF THE

3   AGREEMENT.   DO YOU HAVE THAT IN FRONT OF YOU?

4      A.      I DO.

5      Q.      AND ON THE HEADING OF THIS IS:   VOTER-VERIFIABLE

6   PAPER BALLOTS FOR EVERY VOTER, CORRECT?

7      A.      CORRECT.

8      Q.      AND IT SETS FORTH A NUMBER OF REQUIREMENTS UNDER

9   THE SETTLEMENT AGREEMENT, CORRECT?

10      A.      CORRECT.

11      Q.      AND SO PARAGRAPH 2 READS:   THE SECRETARY WILL

12   ONLY CERTIFY NEW VOTING SYSTEMS FOR USE IN PENNSYLVANIA

13   IF THEY MEET THESE CRITERIA, RIGHT?

14      A.      CORRECT.

15      Q.      AND THE FIRST CRITERION IS THAT THE BALLOT ON

16   WHICH EACH VOTE IS RECORDED IS PAPER, CORRECT?

17      A.      YEP.

18      Q.      AND THE SECOND CRITERION IS THAT THEY PRODUCE A

19   VOTER-VERIFIABLE RECORD OF EACH VOTE, YES?

20      A.      YES.

21      Q.      AND A THIRD IS THAT THEY ARE CAPABLE OF

22   SUPPORTING THE ROBUST PRECERTIFICATION AUDITING PROCESS,

23   CORRECT?

24      A.      CORRECT.

25      Q.      AND THOSE ARE THREE -- WELL, WITHDRAWN.

1          THERE IS AN "AND" THERE BETWEEN 2B AND

2     2C, RIGHT?

3     A.     YES.

4     Q.     SO THESE ARE THREE SEPARATE REQUIREMENTS,

5     CORRECT?  A, B AND C?

6     A.     YES.  THEY'RE INTERRELATED SEPARATE

7     REQUIREMENTS.

8     Q.     BUT A AND B AND C ARE EACH SEPARATE REQUIREMENTS

9     THAT THE DEFENDANTS MUST MEET, CORRECT?

10    A.     YEP.

11    Q.     AND ALTHOUGH THEY MAY BE INTERRELATED, THEY ARE

12    DIFFERENT REQUIREMENTS, CORRECT?

13    A.     THEY EACH ADD A DIFFERENT PART TO THE PROCESS.

14    AND, YOU KNOW, THEY WERE A CONTINUATION OF THE PATH THAT

15    WE WERE ALREADY ON.

16    Q.     OKAY.  WELL, WE'LL GET TO THAT IN A MINUTE.

17          BUT, FOR EXAMPLE, YOU CAN HAVE A

18    VOTER-VERIFIABLE RECORD OF A VOTE THAT IS NOT A PAPER

19    BALLOT, CORRECT?

20    A.     PRESUMABLY.

21    Q.     BUT THE SETTLEMENT AGREEMENT REQUIRES BOTH PAPER

22    BALLOT AND A VOTER-VERIFIABLE RECORD OF THE VOTE,

23    CORRECT?  A AND B, CORRECT?

24          MR. ARONCHICK:  OBJECTION.

25          THE COURT:  SUSTAINED.  I CAN READ.

1                         MR. MAAZEL:  OKAY.

2       BY MR. MAAZEL:

3       Q.      NOW, ONE OF THE CERTIFICATIONS THAT YOU APPROVED

4       AS ACTING SECRETARY WAS SOMETHING CALLED THE CLEARBALLOT

5       CLEARVOTE 1.5.

6                         MR. ARONCHICK:  OBJECTION.

7                         MR. MAAZEL:  WHICH IS --

8                         THE COURT:  THIS IS WHAT YOU OBJECTED TO

9       PREVIOUSLY?

10                        MR. ARONCHICK:  YES.

11                        MR. MAAZEL:  NO, THIS IS NOT.  HE DIDN'T

12      OBJECT, YOUR HONOR.

13                        THE COURT:  WELL, LET ME -- I AM NOT SURE

14      WHERE YOU ARE GOING WITH THIS, BUT I WILL LET YOU START.

15                        MR. MAAZEL:  OKAY.

16      BY MR. MAAZEL:

17      Q.      COULD YOU PLEASE TURN TO PLAINTIFF'S

18      EXHIBIT 1002?

19      A.      THAT IS TAB 2?

20      Q.      YES.

21                        AND THIS IS A REPORT OF THE SECRETARY

22      DATED MARCH 22, 2019 THAT YOU SIGNED, CORRECT?

23      A.      CORRECT.

24      Q.      AND WHEN YOU ANALYZED THESE REPORTS, YOU USED

25      CERTAIN TERMINOLOGY BASED ON THE TYPE OF VOTING SYSTEM

1    YOU ARE REVIEWING, CORRECT?

2    A.    YES.

3    Q.    SO DIFFERENT BALLOT-MARKING DEVICES CREATE

4    DIFFERENT TYPES OF PAPER, IS THAT FAIR?

5    A.    SURE.

6    Q.    AND SOME BALLOT-MARKING DEVICES PRODUCE A PIECE

7    OF PAPER THAT SHOWS CONTEST OPTIONS.

8    A.    YOU ARE SAYING SOME?

9    Q.    GENERALLY.

10   A.    HAVE ALL THE DIFFERENT CHOICES, YES.

11   Q.    YES.

12             OTHER BALLOT-MARKING DEVICES LIKE THIS XL

13   SYSTEM AT ISSUE IN THIS MOTION DO SOMETHING A LITTLE

14   DIFFERENT, RIGHT?  THEY DON'T SHOW CONTEST OPTIONS?

15   A.    THEY SHOW THE SELECTIONS THAT THE VOTER HAS

16   MADE.

17   Q.    SO THEY'RE DIFFERENT TYPES OF PAPER THE

18   DIFFERENT BALLOT-MARKING DEVICES PRODUCE, RIGHT?

19   A.    CORRECT.

20   Q.    AND THEN IN YOUR CERTIFICATION REPORTS,

21   DEPENDING ON THE TYPE OF PAPER THAT IS PRODUCED, YOU

22   USED DIFFERENT TERMINOLOGY TO DESCRIBE WHAT THAT PAPER

23   IS, RIGHT?

24   A.    WELL, SOMETIMES -- OFTENTIMES IT'S WHAT THE

25   MANUFACTURER REFERS TO IT AS.  SO YOU OFTEN SEE

1      DIFFERENT TERMINOLOGY USED FOR WHAT MAY ACTUALLY LOOK

2      VERY SIMILAR.

3      Q.      SO I WANT TO FOCUS ON THIS CLEARBALLOT, WHICH

4      YOUR OFFICE APPROVED, WHICH IS EXHIBIT 2, YES?

5      A.      YES.

6              MR. MAAZEL:  AND I WOULD LIKE TO MOVE

7      THIS INTO EVIDENCE, YOUR HONOR, TO SHOW THE TERMINOLOGY

8      THAT WAS USED FOR A DIFFERENT BALLOT-MARKING DEVICE,

9      WHICH IS AN ADMISSION AS TO WHAT THE DEFENDANTS --

10             THE COURT:  I KNOW WHAT YOUR OBJECTION

11     IS, MR. ARONCHICK, AND I THINK IT GOES MORE TO WEIGHT

12     THAN ADMISSIBILITY.  I WILL CONSIDER IT FOR WHATEVER IT

13     IS WORTH.

14             MR. MAAZEL:  OKAY.

15     BY MR. MAAZEL:

16     Q.      SO THIS IS AN OFFICIAL CERTIFICATION, IS THAT

17     RIGHT?

18     A.      IT IS.

19     Q.      AND THIS WAS PREPARED CAREFULLY BY THE

20     SECRETARY, I ASSUME?

21     A.      IT WAS PREPARED BY SOMEBODY OTHER THAN THE

22     SECRETARY, BUT I DID REVIEW IT.

23     Q.      YES.  AND THIS IS AN ACCURATE DOCUMENT, TO YOUR

24     KNOWLEDGE?

25     A.      IT IS.

1    Q.      AND IT'S AN OFFICIAL DOCUMENT?

2    A.      IT IS.

3    Q.      NOW, THIS -- IF WE CAN TURN TO PAGE 6 OF THE

4    EXHIBIT, THE END OF THE FIRST PARAGRAPH.  DO YOU SEE

5    THAT THE DEPARTMENT REFERRED TO THE PIECE OF PAPER

6    PRODUCED BY THIS MACHINE AS, QUOTE, A MARKED PAPER

7    BALLOT?

8    A.      I DO.  WE USE THAT TERMINOLOGY A LOT.

9    Q.      WELL, I AM JUST ASKING ABOUT THIS DOCUMENT.

10             AND SO IT SAYS THAT THE OUTPUT IS A

11   MARKED PAPER BALLOT, CORRECT?

12   A.      IT DOES.

13   Q.      AND IN THE NEXT PARAGRAPH, YOU WROTE, QUOTE:

14   THE CLEARCAST TABULATOR IS A PRECINCT COUNT BALLOT

15   SCANNING SOLUTION THAT PROCESSES HAND-MARKED PAPER

16   BALLOTS, YES?

17   A.      YES.

18   Q.      AND ON PAGE 21 --

19   A.      IT ALSO SAYS IN BALLOTS PRINTED BY CLEARACCESS.

20             THE COURT:  I'M SORRY?

21             THE WITNESS:  SORRY.  HE READ ONE PART OF

22   THE SENTENCE, SO I JUST WANTED TO MAKE SURE THE WHOLE

23   SENTENCE WAS MENTIONED.

24             THE COURT:  WHICH SENTENCE?

25             THE WITNESS:  HE SAID IT MENTIONS

1          PROCESSES HAND-MARKED PAPER BALLOTS.  SO I JUST WAS

2     CONTINUING THE REST OF THE SENTENCE.  AND BALLOTS

3     PRINTED BY CLEARACCESS ACCESSIBLE BALLOT-MARKING DEVICE.

4                    THE COURT:  OKAY.

5     BY MR. MAAZEL:

6     Q.        AND THEN AT PAGE 21, IN THE TOP PARAGRAPH, YOUR

7     OFFICE WROTE, QUOTE:  THE TYPICAL VOTING EXPERIENCE

8     INVOLVES THE VOTER MAKING SELECTIONS ON CLEARACCESS TO

9     MARK THEIR BALLOT, PRINTING THEIR BALLOT, USING AN OKI

10    1432 PRINTER, AND THEN SCANNING THEIR PRINTED BALLOT ON

11    CLEARCAST TO CAST THE BALLOT, CORRECT?

12    A.        CORRECT.

13    Q.        AND THIS IS A DEVICE WHERE YOU MAKE YOUR

14    SELECTIONS ON A SCREEN AND THEN IT PRINTS A BALLOT,

15    RIGHT?

16    A.        CORRECT.

17    Q.        AND THAT'S WHAT YOU CALLED IT?

18    A.        YEAH.  AGAIN, WE CALLED IT THAT ALL THE TIME.

19    Q.        OKAY.

20    A.        IN LOTS OF DIFFERENT MACHINES IN EVERY PRESS

21    RELEASE WE EVER PUT OUT AND EVERY TESTIMONY WE EVER

22    GAVE.

23    Q.        AND I THINK I WILL SPARE US EVERY REFERENCE TO

24    BALLOT OR PRINTED BALLOT, BUT THERE ARE MANY REFERENCES

25    TO BALLOTS OR PRINTED BALLOTS IN THIS DOCUMENT, CORRECT?

1          MR. ARONCHICK:  OBJECTION.

2          THE COURT:  IS THAT CORRECT?

3          THE WITNESS:  I MEAN, I'D HAVE TO GO

4    THROUGH THE ENTIRE DOCUMENT, BUT SO FAR --

5          THE COURT:  IT'S ALL RIGHT.  YOU DON'T

6    HAVE TO GUESS.  MOVE ALONG.

7    BY MR. MAAZEL:

8    Q.     I'LL JUST GIVE YOU ONE MORE EXAMPLE.  ON PAGE

9    23, IN THE MIDDLE PARAGRAPH, IT SAYS:  ALL VOTERS USE

10   CLEARACCESS TO MARK THEIR BALLOT AND PRINT THEIR BALLOT

11   USING THE OKI 1432 PRINTER, RIGHT?

12   A.     YES.

13   Q.     NOW, IF WE COULD LOOK AT WHAT IS NOW IN

14   EVIDENCE, I BELIEVE, THAT IS JOINT EXHIBIT 52.  AND IN

15   CONNECTION TO THAT, SECRETARY, IF YOU COULD ALSO LOOK AT

16   NUMBER 99 OF THE STIPULATION, WHICH I BELIEVE YOU HAVE

17   THE STIPULATIONS IN FRONT OF YOU.  SHOULD BE IN THE

18   POCKET OF THE JOINT EXHIBITS BINDER.  THIS WILL JUST

19   HELP ORIENT YOU TO THIS EXHIBIT.

20   A.     I'M SORRY, WHICH BINDER AM I IN?

21   Q.     IF YOU LOOK AT THE JOINT EXHIBITS BINDER, THERE

22   SHOULD BE A POCKET THAT HAS THE STIPULATIONS.  DO YOU

23   SEE THAT?

24   A.     YES.

25          THE COURT:  DOES THIS SAY MARKED AS

1      EXHIBIT JX 52 AS AN EXAMPLE OF THE PAPER DOCUMENT USED

2      WITH THE CLEARBALLOT VOTING SYSTEM?

3                    MR. MAAZEL:  YES, YOUR HONOR.

4                    THE COURT:  OKAY.

5      BY MR. MAAZEL:

6      Q.      AND SO WHAT I AM GETTING AT IS, JOINT EXHIBIT 52

7      IS AN EXAMPLE OF THE BALLOT PRODUCED BY THE CLEARBALLOT

8      DEVICE, RIGHT?

9      A.      IT APPEARS TO BE SO, YES.

10     Q.      AND THIS DOCUMENT CONTAINS CHOICES, CONTEST

11     OPTIONS, RIGHT?

12     A.      YES.

13     Q.      AND THAT IS ACTUALLY PRINTED OUT BY THE

14     CLEARBALLOT-MARKING DEVICE, YES?

15     A.      YES.

16     Q.      OKAY.  IF YOU COULD NOW TURN TO PLAINTIFF'S

17     EXHIBIT 1006.

18     A.      WHAT TAB?

19     Q.      TAB 6 OF THE PLAINTIFF'S BINDER.  AND THIS IS A

20     SEPARATE SYSTEM THAT YOU, AS ACTING SECRETARY, APPROVED

21     ON JUNE 13, 2019?

22     A.      YES.

23     Q.      AND IT INCLUDES AN APPROVAL FOR SOMETHING CALLED

24     THE VERITY TOUCH WRITER, A HART SYSTEM?

25     A.      OKAY.

1    Q.        IS THAT RIGHT?

2    A.        I MEAN, IT'S A LARGER SYSTEM, IT'S THE VERITY

3    VOTING 2.3.4.

4    Q.        OKAY.   WHICH IS A HART SYSTEM?

5    A.        YES.

6    Q.        WHICH IS A DIFFERENT MANUFACTURER FROM ES&S, FOR

7    EXAMPLE?

8    A.        CORRECT.

9    Q.        AND THE SUITE OF PRODUCTS DESCRIBED IN THIS

10   CERTIFICATION INCLUDES THE HART VERITY TOUCH WRITER,

11   RIGHT?

12   A.        YES.

13   Q.        AND THAT'S ANOTHER BALLOT-MARKING DEVICE?

14   A.        YES.

15   Q.        THAT'S ANOTHER DEVICE WHERE A MACHINE -- YOU

16   MAKE SELECTIONS ON A MACHINE AND IT PRINTS OUT A

17   DOCUMENT, RIGHT?

18   A.        YES.

19   Q.        AND ON PAGE 6 OF THIS CERTIFICATION, IN THE END

20   OF THE SECOND FULL PARAGRAPH, IT SAYS, QUOTE, THE

21   PRINTED BALLOT WITH VOTER SELECTION IS SCANNED BY THE

22   VERITY SCAN USING THE SAME ALGORITHM USED FOR TABULATING

23   HAND-MARKED PAPER BALLOTS.

24            DO YOU SEE THAT SENTENCE?

25   A.     I DO.

1                     MR. ARONCHICK:   YOUR HONOR, SAME

2       OBJECTION.

3                     THE COURT:   SAME RULING.   I'LL TAKE IT

4       FOR WHAT IT'S WORTH.

5       BY MR. MAAZEL:

6       Q.       AND SO HERE AGAIN YOU ARE REFERRING TO THE

7       DOCUMENT PRODUCED BY THE BALLOT-MARKING DEVICE AS,

8       QUOTE, A PRINTED BALLOT, YES?

9       A.       YES.   AGAIN, CONSISTENT WITH WHAT WE DID

10      REGULARLY.

11      Q.       AND IF WE LOOK AT JOINT EXHIBIT 60.

12                    MR. MAAZEL:   AND IF YOU NEED TO LOOK AT

13      THE STIPULATION, THIS WOULD BE 107, YOUR HONOR.

14                    THE COURT:   AND IT'S STIPULATED THAT THIS

15      IS THE --

16                    MR. MAAZEL:   THE HART.

17                    THE COURT:   -- THE HART EXAMPLE OF A

18      BALLOT?

19                    MR. MAAZEL:   YES.

20      BY MR. MAAZEL:

21      Q.       AND SO, SECRETARY, THIS IS THE DOCUMENT, JOINT

22      EXHIBIT 60, THAT IS THE BALLOT PRODUCED BY THIS HART

23      VERITY BALLOT-MARKING DEVICE, YES?

24      A.       OKAY.   YES.

25      Q.       AND THIS, AGAIN, CONTAINS CONTEST OPTIONS?

1    A.      YES.

2    Q.     IT LOOKS LIKE A TRADITIONAL PAPER BALLOT USED BY

3    PEOPLE WHEN THEY DON'T USE A BALLOT-MARKING DEVICE AT

4    ALL, YES?

5                MR. ARONCHICK:  OBJECTION.

6                THE COURT:  SUSTAINED.

7    BY MR. MAAZEL:

8    Q.     NOW, YOU ALSO HAVE A RECERTIFICATION REPORT FOR

9    THE ES&S EXPRESSVOTE XL THAT IS THE ISSUE OF THIS

10   MOTION, RIGHT?

11              MR. ARONCHICK:  OBJECTION.

12              THE COURT:  IF SHE KNOWS.  DO YOU KNOW?

13              THE WITNESS:  I MEAN, MY UNDERSTANDING IS

14   THAT THIS CASE IS NOT SPECIFICALLY RELATED TO THE

15   RECERTIFICATION.  THAT THIS IS RELATED TO THE SETTLEMENT

16   AGREEMENT.

17              THE COURT:  WHY DON'T YOU ASK A DIFFERENT

18   QUESTION.

19              MR. MAAZEL:  SURE.

20   BY MR. MAAZEL:

21    Q.     IF YOU COULD TURN TO JOINT EXHIBIT 45, WHICH IS,

22   I BELIEVE, IN EVIDENCE.  IS THIS A CERTIFICATION OR A

23   RECERTIFICATION FOR THE EXPRESSVOTE XL?

24    A.      IT IS.

25    Q.     AND DID YOU SIGN THIS AS ACTING SECRETARY OF THE

1    COMMONWEALTH ON SEPTEMBER 3RD, 2019?

2    A.       I DID.

3    Q.       AND THIS IS AN OFFICIAL DOCUMENT?

4    A.       IT IS.

5    Q.       AND IT IS A TRUTHFUL AND ACCURATE DOCUMENT?

6    A.       IT IS.

7    Q.       AND THIS WAS THE DOCUMENT THAT ALLOWED COUNTIES

8    SUCH AS PHILADELPHIA TO USE THE XL SYSTEM, CORRECT?

9                    MR. ARONCHICK:   OBJECTION.

10                    THE COURT:   IF SHE KNOWS.

11                    THE WITNESS:   NO.   THEY WERE ALREADY

12   USING THE SYSTEM.

13   BY MR. MAAZEL:

14   Q.       WELL --

15   A.       OR THEY HAD ALREADY SELECTED THE SYSTEM.   SORRY.

16   Q.       IN THIS REPORT, YOU HAD DECERTIFIED THE XL

17   SYSTEM, THEN NO COUNTY COULD USE IT, IS THAT RIGHT?

18   A.       NO.   WE HAD NEVER DECERTIFIED THE SYSTEM.

19   Q.       I UNDERSTAND.   BUT IF, IN THIS REPORT, THE

20   SECRETARY DID DECERTIFY THE SYSTEM, THEN PHILADELPHIA

21   AND OTHER COUNTIES COULD NOT USE IT, CORRECT?

22   A.       THAT'S CORRECT.   IF WE HAD DECERTIFIED, THAT

23   WOULD BE CORRECT.

24   Q.       AND SO IF WE TURN TO PAGE 3 OF YOUR

25   CERTIFICATION, RECERTIFICATION, THERE'S A PARAGRAPH

```
1       CALLED EXPRESSVOTE XL?

2       A.      YES.

3       Q.      AND IN THE FIFTH LINE -- I'M SORRY, THE FOURTH

4       LINE, YOU WROTE, QUOTE, THE INTEGRATED THERMAL PRINTER

5       PRINTS THE VOTER'S CHOICES ON A VOTER-VERIFIABLE PAPER

6       VOTE SUMMARY RECORD AND THE SYSTEM SCANS AND SAVES AN

7       IMAGE OF THE PRINTED VOTE SUMMARY RECORD.

8                       THAT'S WHAT YOU WROTE?

9       A.      I DIDN'T WRITE IT, BUT, YES.

10      Q.      THAT'S WHAT YOU SIGNED?

11      A.      CORRECT.

12      Q.      THAT'S WHAT YOUR OFFICE APPROVED?

13      A.      CORRECT.

14      Q.      AND SO IN THIS CASE YOU REFERRED TO THE PIECE OF

15      PAPER THAT COMES THROUGH THE XL AS A, QUOTE, PAPER VOTE

16      SUMMARY OF RECORD, YES?

17      A.      YES.  AND, AGAIN, AS I MENTIONED --

18      Q.      THAT'S A YES OR NO QUESTION.

19      A.      -- EARLIER, IT'S BECAUSE THAT'S WHAT ES&S CALLS

20      IT IN THEIR SYSTEM.

21                      THE COURT:  SHE CAN EXPLAIN HER ANSWER

22      AFTER SHE ANSWERS YES OR NO, WHICH IS WHAT SHE DID.

23                      MR. MAAZEL:  I UNDERSTAND, YOUR HONOR.

24      BY MR. MAAZEL:

25      Q.      AND IN THE NEXT LINE, YOU REFERRED -- OR YOUR
```

1     OFFICE, AGAIN, REFERRED TO THE DOCUMENT AS A VOTE

2     SUMMARY RECORD, YES?

3     A.      I'M SORRY.  IN THE FOLLOWING LINE, IS THAT WHAT

4     YOU SAID?

5     Q.      YES.

6     A.      YES.

7     Q.      AND ON PAGE 7, IN THE SIXTH LINE FROM THE TOP, I

8     BELIEVE, YOUR OFFICE WROTE, QUOTE, THE XL PRINTS THE

9     VOTER'S CHOICES ON A PAPER VOTE SUMMARY RECORD USING A

10    THERMAL PRINTER, YES?

11    A.      AGAIN, YES.  THE SAME LANGUAGE THAT THE ES&S

12    SYSTEM DESCRIBES IT AS.

13    Q.      BUT THIS DOCUMENT WAS CREATED BY YOUR OFFICE,

14    NOT BY ES&S, YES?

15    A.      YES.

16    Q.      AND YOUR OFFICE DESCRIBED THIS PIECE OF PAPER AS

17    A VOTE SUMMARY RECORD ABOUT 23 TIMES IN THIS DOCUMENT,

18    IS THAT RIGHT?

19                    MR. ARONCHICK:  OBJECTION.

20                    THE WITNESS:  I HAVEN'T COUNTED.

21                    THE COURT:  WOULD IT BE FAIR TO SAY YOU

22    REFER TO IT SEVERAL TIMES?

23                    THE WITNESS:  YES.

24                    THE COURT:  IN THAT WAY?

25                    THE WITNESS:  YES, THANK YOU.

1      BY MR. MAAZEL:

2      Q.      AND NOT ONCE IN THIS ENTIRE DOCUMENT DOES YOUR

3      OFFICE EVER CALL THIS PIECE OF PAPER A PAPER BALLOT,

4      ISN'T THAT RIGHT?

5      A.      I'D HAVE TO REVIEW THE ENTIRE DOCUMENT.

6      Q.      OKAY.

7      A.      HOWEVER, WHEN WE PUT OUT OUR PRESS RELEASE ABOUT

8      PHILADELPHIA SELECTING THIS SYSTEM, WE REFER TO IT AS A

9      VOTER-VERIFIABLE PAPER BALLOT.

10              MR. MAAZEL:   I JUST OBJECT TO THAT AS

11     NONRESPONSIVE.

12              THE COURT:   OVERRULED.

13     BY MR. MAAZEL:

14     Q.      THE XL PRODUCES A PIECE OF PAPER THAT, UNLIKE

15     THE HART AND UNLIKE THE CLEARBALLOT THAT WE LOOKED AT A

16     MINUTE AGO, DOES NOT SHOW CONTEST OPTIONS, AM I RIGHT?

17     A.      CORRECT.   THE PAPER BALLOT OF MANY OF OUR

18     SYSTEMS DOES NOT SHOW THE CONTEST OPTIONS.

19     Q.      I AM JUST REFERRING TO THE XL SPECIFICALLY DOES

20     NOT SHOW CONTEST OPTIONS?

21     A.      CORRECT.   LIKE I SAID, LIKE MANY OTHER SYSTEMS.

22     Q.      AND, NOW, YOU HAVE TESTIFIED THAT YOU CALLED

23     THIS PIECE OF PAPER A VOTE SUMMARY RECORD BECAUSE THAT'S

24     WHAT ES&S CALLS THEM?

25     A.      I BELIEVE ES&S CALLS IT SOMETHING LIKE VOTE

1    SUMMARY RECORD.

2    Q.    ARE YOU REQUIRED IN YOUR OFFICIAL CERTIFICATION

3    TO USE THE TERMINOLOGY OF THE MANUFACTURER?

4    A.    REQUIRED, NO.  I MEAN, STATUTORILY IT'S NOT THAT

5    EXPLICIT.

6    Q.    YOU CAN USE THE LANGUAGE THAT YOU BELIEVE IS

7    APPROPRIATE IN YOUR OWN OFFICIAL DOCUMENT, RIGHT?

8    A.    WELL, I TRUST OUR VOTING SYSTEMS ANALYST TO USE

9    THE LANGUAGE THAT SHE THINKS IS CONSISTENT WITH THE

10   SYSTEM.

11   Q.    OKAY.  WHO WAS YOUR VOTING SYSTEMS ANALYST?

12   A.    WHO IS IT?  SHE IS A STAFF PERSON.

13   Q.    WHO WAS YOUR VOTING SYSTEMS ANALYST FOR THIS

14   RECERTIFICATION OF THE XL?

15   A.    THE SAME PERSON THAT HAS BEEN THE VOTING SYSTEM

16   ANALYST FOR THE LAST -- FOR ALL THESE SYSTEMS.  HER NAME

17   IS SINDHU.

18   Q.    SINDHU?

19   A.    SINDHU RAMACHANDRAN.

20   Q.    AND YOU TRUST MS. RAMACHANDRAN'S WORK?

21   A.    I DO.

22   Q.    AND YOU APPROVE OF IT?

23   A.    I DO.

24   Q.    AND SO WHEN SHE CALLED IT A VOTE SUMMARY RECORD,

25   YOU APPROVED THAT AND YOU HAD NO QUALMS ABOUT DOING SO,

1    CORRECT?

2    A.      AGAIN, WHAT MATTERED WAS THE THINGS THAT WERE

3    REQUIRED FOR CERTIFICATION AND THAT WE REQUIRED UNDER

4    OUR DIRECTIVES.  SO IT WAS A VOTER-VERIFIABLE PAPER

5    BALLOT VOTING SYSTEM THAT MET SECURITY STANDARDS AND

6    ACCESSIBILITY TESTING.  SO YES.

7    Q.      OKAY.  ARE YOU FAMILIAR WITH THE NATIONAL

8    INSTITUTE OF STANDARDS AND TECHNOLOGY?

9    A.      YES.

10   Q.      WERE YOU FAMILIAR WITH THAT BACK WHEN THE

11   SETTLEMENT AGREEMENT WAS SIGNED?

12   A.      FAMILIAR WITH IT AS AN ORGANIZATION, SURE.

13   Q.      AND IT'S A FEDERAL AGENCY?

14   A.      IT'S -- IS IT AN AGENCY?  WHAT IS THE DEFINITION

15   OF AGENCY?

16   Q.      WELL, WHAT DO YOU UNDERSTAND THE NATIONAL

17   INSTITUTE OF STANDARDS AND TECHNOLOGY TO BE?

18   A.      TO BE HONEST WITH YOU, I AM NOT REALLY SURE WHAT

19   THE SCOPE OF WHAT THEY DO IS.  I KNOW THAT THEY ARE

20   INVOLVED IN TECHNOLOGY IN SOME REGARDS.  BUT HONESTLY, I

21   DON'T KNOW.

22   Q.      WHAT DID YOU UNDERSTAND THAT -- AND IT'S ALSO

23   REFERRED TO AS NIST, YES?

24   A.      YES.

25   Q.      DID YOU UNDERSTAND THAT NIST DEVELOPS GUIDELINES

1    AND BEST PRACTICES FOR ELECTION SECURITY?

2    A.       AGAIN, I AM NOT FAMILIAR WITH WHAT THEIR EXACT

3    SCOPE IS, NO.

4    Q.       WELL, DID YOU KNOW THAT THEY WERE A FEDERAL

5    AGENCY THAT CERTIFIED VOTING SYSTEMS FOR THE FEDERAL

6    GOVERNMENT?

7    A.       WELL, THE EAC DOES CERTIFICATION OF VOTING

8    SYSTEMS FOR THE FEDERAL GOVERNMENT, SO I'M NOT AWARE OF

9    NIST DOING THEIR OWN CERTIFICATIONS, BUT --

10                   THE COURT:  THE EAC?

11                   THE WITNESS:  SO THE FEDERAL ELECTION

12   ASSISTANCE COMMISSION IS THE FEDERAL AGENCY -- SORRY,

13   YOUR HONOR -- THAT DOES THE ACTUAL CERTIFICATIONS OF

14   VOTING SYSTEMS.  SO PENNSYLVANIA LAW REQUIRES BOTH

15   FEDERAL EAC CERTIFICATION AS WELL AS PENNSYLVANIA

16   CERTIFICATION.

17   BY MR. MAAZEL:

18   Q.       AND ARE YOU AWARE THAT NIST ADVISES THE EAC IN

19   THEIR WORK?

20   A.       I WAS NOT AWARE OF THAT.

21   Q.       OKAY.  WERE YOU FAMILIAR WITH THE NIST ELECTION

22   GLOSSARY DEFINING TERMS?

23                   MR. ARONCHICK:  OBJECTION.

24                   THE COURT:  IF SHE WAS FAMILIAR WITH IT?

25                   MR. MAAZEL:  THAT'S MY QUESTION.

1                    THE WITNESS:  AT THE TIME OF THE

2    SETTLEMENT AGREEMENT, NO.

3    BY MR. MAAZEL:

4    Q.      WHEN DID YOU BECOME FAMILIAR WITH THAT?

5    A.      WITHIN THE LAST COUPLE OF WEEKS.

6    Q.      DOES PENNSYLVANIA USE ABSENTEE BALLOTS?

7    A.      WE DO.

8    Q.      AND THOSE ARE FOR PEOPLE WHO CANNOT MAKE IT TO

9    THE POLLS FOR VARIOUS REASONS?

10    A.      SO ABSENTEE, YES.  WE DID JUST PASS ACT 77 IN

11    THE FALL, WHICH ALSO ALLOWS MAIL-IN VOTING FOR PEOPLE

12    WHO DON'T -- WITHOUT AN EXCUSE.

13    Q.      AND THOSE ARE PAPER BALLOTS?

14    A.      THEY ARE.

15    Q.      AND THOSE CONTAIN CONTEST OPTIONS?

16    A.      THEY DO.

17    Q.      IF WE CAN SHOW YOU JOINT EXHIBIT 57.

18              MR. MAAZEL:  WHICH, YOUR HONOR, CONNECTS

19    TO STIPULATION 104.

20    BY MR. MAAZEL:

21    Q.      JOINT EXHIBIT 57, SECRETARY, IS THE VOTE SUMMARY

22    CARD GENERATED BY THE XL, CORRECT?

23    A.      CORRECT.

24    Q.      AND IS THAT THE TYPE OF DOCUMENT YOU WOULD EVER

25    SEND TO AN ABSENTEE VOTER?

1    A.     I DON'T SEND BALLOTS TO ABSENTEE VOTERS, BUT

2    THIS DOES NOT LOOK LIKE ABSENTEE BALLOTS.

3    Q.     OKAY.  I MEAN, PLAINLY, A PIECE OF PAPER LIKE

4    THIS, AN ABSENTEE VOTER CANNOT VOTE ON IT, RIGHT?

5    A.     WELL, IT'S A DIFFERENT THING.  THERE'S --

6    Q.     LET ME ASK A DIFFERENT QUESTION.

7             DO YOU USE PROVISIONAL BALLOTS IN

8    PENNSYLVANIA?

9    A.     WE DO.

10    Q.     AND, JUST BRIEFLY, WHAT IS A PROVISIONAL BALLOT?

11    A.     A PROVISIONAL BALLOT IS FOR CIRCUMSTANCES WHERE

12    THE, FOR EXAMPLE, IF A VOTER GOES INTO A POLLING PLACE

13    AND THEIR NAME IS NOT IN THE DISTRICT REGISTER AND THEY

14    CANNOT IDENTIFY, FOR EXAMPLE, THE RIGHT PRECINCT WHERE

15    THEY SHOULD GO TO, THEY HAVE THE OPPORTUNITY TO VOTE ON

16    A PROVISIONAL BALLOT, WHICH MAY OR MAY NOT BE COUNTED

17    LATER, DEPENDING ON WHETHER THEY WERE DETERMINED

18    ELIGIBLE OR NOT.

19    Q.     AND IS A PROVISIONAL BALLOT A PAPER BALLOT?

20    A.     IT IS.

21    Q.     AND IT CONTAINS CONTEST OPTIONS?

22    A.     IT DOES.

23    Q.     NOW, WE DISCUSSED AT THE BEGINNING OF YOUR

24    TESTIMONY THAT ONE OF THE REQUIREMENTS, IN ADDITION TO

25    THE PAPER BALLOT REQUIREMENT, IS VOTER VERIFIABILITY OF

1    THE VOTE.  DO YOU REMEMBER THAT?

2    A.    I'M SORRY, CAN YOU ASK THAT QUESTION AGAIN?

3    Q.    LET'S LOOK AGAIN AT JOINT EXHIBIT 30.  AND SO

4    PARAGRAPH 2A REQUIRES THAT ANY VOTING SYSTEM PRODUCE A,

5    QUOTE, VOTER-VERIFIABLE RECORD OF EACH VOTE, YES?

6    A.    THAT'S 2B.

7    Q.    I'M SORRY, 2B?

8    A.    YES.

9    Q.    AND VOTER-VERIFIABLE MEANS VERIFIABLE BY THE

10    VOTER, YES?

11    A.    CORRECT.

12    Q.    IT DOES NOT MEAN VERIFIABLE BY SOME AUDITOR IF

13    EVER, IT MEANS VERIFIABLE BY THE ACTUAL VOTER, YES?

14    A.    CORRECT.

15    Q.    AND WHAT THE VOTER IS SUPPOSED TO VERIFY UNDER

16    THE SETTLEMENT AGREEMENT IS THEIR VOTE, YES?

17    A.    CORRECT.  OR AT LEAST THEIR SOON-TO-BE-VOTE.

18    TECHNICALLY IT'S NOT A VOTE UNTIL THEY CAST IT.

19    Q.    THE XL -- THE VOTE SUMMARY RECORDS THAT THE XL

20    PRODUCES CONTAINS BARCODES, YES?

21    A.    IT DOES.

22    Q.    AND IT ALSO CONTAINS WORDS?

23    A.    YES.

24    Q.    AND IF WE COULD JUST LOOK AGAIN AT JOINT

25    EXHIBIT 57.  THE BARCODES ARE AT THE TOP AND THE WORDS

1    ARE BELOW, YES?

2    A.        CORRECT.

3    Q.        AND THE WORDS ARE SUPPOSED TO BE THE SELECTION

4    THAT THE VOTER MADE.  IN THIS CASE, REPRESENTATIVE

5    KIMBERLY JONES AND JAMES COLLINS, YES, AND OTHERS.

6    A.        THOSE ARE THE TWO AT THE TOP, YES.

7    Q.        BUT AM I CORRECT THAT THE XL ACTUALLY TABULATES

8    AND COUNTS AS THE VOTE THE BARCODES?

9    A.        SIMILAR TO EVERY VOTING SYSTEM CERTIFIED IN

10   PENNSYLVANIA, WHICH ALL USE, EXCEPT FOR ONE

11   CONFIGURATION OF ONE SYSTEM, THEY ALL USE EITHER

12   BARCODES, QR CODES OR TIMING MARKS OR SENSORS, YES.

13   Q.        SECRETARY, DOES THE XL COUNT THE BARCODES OR THE

14   WORDS AS THE VOTE?

15   A.        I JUST ANSWERED, YES.

16                  MR. ARONCHICK:   OBJECTION.

17   BY MR. MAAZEL:

18   Q.        BARCODES?

19   A.        YES.  CONSISTENT WITH WHAT EVERY SINGLE VOTING

20   SYSTEM EXCEPT FOR ONE CONFIGURATION OF ONE SYSTEM DOES.

21   Q.        AND CAN A VOTER READ A BARCODE?

22   A.        NOT WITHOUT A BARCODE READER.

23   Q.        OKAY.  DO YOU PROVIDE BARCODE READERS TO VOTERS

24   WHEN THEY COME TO THE POLLS?

25   A.        WE DON'T.  WE ALSO DON'T PROVIDE QR CODE READERS

1      OR TIME MARK READERS OR SENSOR READERS.

2      Q.      CAN A VOTER UNDERSTAND A BARCODE?

3      A.      SIMILAR TO QR CODE OR TIMING MARKS OR SENSORS,

4      NO.

5      Q.      CAN THE VOTER VERIFY THAT THE BARCODE REFLECTS

6      THAT VOTER'S VOTE?

7      A.      WITHOUT A READER, NO.

8      Q.      NOW, SOMETIMES YOUR DEPARTMENT HAS TO DECERTIFY

9      A VOTING SYSTEM, YES?

10     A.      YES.

11     Q.      AND WHAT ARE THE VARIOUS REASONS THAT YOUR

12     DEPARTMENT WOULD HAVE TO DECERTIFY A VOTING SYSTEM?

13     A.      WELL, IF IT WAS DETERMINED, FOR EXAMPLE, IN

14     ANOTHER STATE TO BE THAT IT'S NOT MEETING ONE OF -- SO

15     IF IT'S NOT CAPABLE OF ACCURACY, IF IT'S DECERTIFIED BY

16     THE FEDERAL EAC, I MEAN, IT COULD BE A HOST OF REASONS

17     THAT IT NO LONGER CAN BE SAFELY USED BY THE VOTERS OF

18     PENNSYLVANIA.

19     Q.      SOMETIMES DECERTIFICATION MUST HAPPEN VERY

20     QUICKLY, YES?

21     A.      INFREQUENTLY, THANK GOODNESS, BUT YES.

22     Q.      AND WOULD YOU AGREE THAT, IN THOSE SITUATIONS,

23     THAT IT'S IMPORTANT FOR COUNTIES TO BE RESILIENT AND

24     FLEXIBLE IN THEIR RESPONSE TO YOUR DECERTIFICATION

25     ORDER?

1    A.        IT'S ALWAYS IMPORTANT.

2    Q.        WOULD IT BE ACCEPTABLE FOR A COUNTY TO SAY TO

3    YOUR OFFICE, IF YOU DECERTIFY A SYSTEM, WE NEED 18 TO

4    24 MONTHS TO GET A NEW SYSTEM IN PLACE?  IS THAT

5    ACCEPTABLE?

6    A.        NOT IF IT WAS SOMETHING THAT REQUIRED IMMEDIATE

7    DECERTIFICATION.

8    Q.        IN FACT, THERE HAVE BEEN EXAMPLES IN

9    PENNSYLVANIA WHERE YOUR DEPARTMENT DECERTIFIED SYSTEMS,

10   YES?

11   A.        CORRECT.

12   Q.        FOR EXAMPLE, IN DECEMBER 2007, THERE WAS A

13   SYSTEM THAT YOU DECERTIFIED THAT WAS USED IN

14   NORTHAMPTON, LACKAWANNA AND WAYNE COUNTIES, YES?

15   A.        YES.  AND WE HAD HAD NOTICE BACK IN AUGUST, AND

16   THE COUNTIES HAD NOTICE BACK IN AUGUST OF THAT YEAR THAT

17   THIS WAS LIKELY COMING.

18   Q.        THE DECISION TO DECERTIFY THAT SYSTEM OCCURRED

19   IN DECEMBER 2007, YES?

20   A.        IT DID, BUT I THINK IT WAS TEMPORARILY SUSPENDED

21   EARLIER.

22   Q.        AND THOSE THREE COUNTIES WERE ABLE, IN TIME FOR

23   A PRESIDENTIAL PRIMARY IN APRIL OF 2008, TO ACQUIRE NEW

24   EQUIPMENT AND TRAIN THEMSELVES AND THEIR POLL WORKERS IN

25   TIME FOR A PRESIDENTIAL PRIMARY, CORRECT?

1   A.      YES.  OF COURSE, THE LARGEST OF THOSE THREE

2   COUNTIES WAS MAYBE 200-AND-SOME-ODD THOUSAND VOTERS.

3   Q.      WE WILL GET TO THE SIZE OF THE COUNTIES IN A

4   MOMENT.

5           BUT IT IS A FACT THAT BETWEEN

6   DECEMBER 2007, WHEN YOUR OFFICE MADE THE DECISION, AND

7   APRIL OF 2008, THAT THOSE THREE COUNTIES ALL DECERTIFIED

8   ONE SYSTEM AND TOOK A NEW SYSTEM AND TRAINED THEIR POLL

9   WORKERS AND DID A PRESIDENTIAL PRIMARY.  THAT IS A FACT,

10  YES?

11  A.      YES.

12  Q.      FOUR MONTHS, YES?

13  A.      NO.  AGAIN, I THINK IT'S AUGUST WAS WHEN WE

14  TEMPORARILY SUSPENDED USE OF THE SYSTEM.  SO THEY HAD

15  ABOUT EIGHT MONTHS.

16  Q.      THOSE THREE COUNTIES COLLECTIVELY CONTAIN ABOUT

17  40 PERCENT OF THE POPULATION OF PHILADELPHIA, YES?

18  A.      I'M SORRY?

19  Q.      THOSE THREE COUNTIES, NORTHAMPTON, LACKAWANNA

20  AND WAYNE, COLLECTIVELY ARE ABOUT 40 PERCENT OF THE

21  POPULATION OF PHILADELPHIA, YES?

22  A.      I'M NOT -- I DON'T WANT TO CONFIRM THAT WITHOUT

23  DOING THE MATH.

24  Q.      THERE WAS ANOTHER EXPERIENCE WHERE THE VERY SAME

25  SYSTEM, VOTING SYSTEM WAS DECERTIFIED IN VIRGINIA, YES?

1                       MR. ARONCHICK:  OBJECTION.

2                       THE COURT:  WHICH VERY SAME VOTING

3       SYSTEM?

4                       MR. MAAZEL:  THE SAME -- I'M SORRY.  THE

5       SAME SYSTEM THAT WAS DECERTIFIED IN NORTHAMPTON,

6       LACKAWANNA AND WAYNE.

7                       THE COURT:  AND YOU ARE SAYING THE SAME

8       THING HAPPENED IN VIRGINIA?

9                       MR. MAAZEL:  I MEAN, THAT'S --

10                      THE COURT:  THAT'S YOUR QUESTION?

11                      MR. MAAZEL:  THAT'S MY QUESTION.

12                      THE COURT:  GIVE ME AN IDEA OF WHEN.

13                      MR. MAAZEL:  OKAY.

14      BY MR. MAAZEL:

15      Q.      SECRETARY BOOCKVAR, WHICH PROGRAM ARE WE TALKING

16      ABOUT THAT WAS DECERTIFIED IN NORTHAMPTON, LACKAWANNA

17      AND WAYNE?

18      A.      IS THAT THE WINVOTE?

19      Q.      I'M ASKING YOU.

20      A.      I -- YOU KNOW, YES, I BELIEVE IT WAS THE

21      WINVOTE.

22      Q.      AND WAS THAT SAME SYSTEM, THE WINVOTE,

23      DECERTIFIED IN VIRGINIA IN THE SAME TIME PERIOD?

24      A.      SO I AM NOT SURE OF THE EXACT TIME PERIOD.  AND

25      I WAS NOT IN VIRGINIA AND I WAS NOT EVEN IN THE

1      DEPARTMENT OF STATE.  BUT TO MY KNOWLEDGE, I BELIEVE

2      THAT IT HAD HAPPENED IN VIRGINIA PREVIOUSLY.

3      Q.      OKAY.  AND YOU ACTUALLY GAVE TESTIMONY IN A 2019

4      SENATE STATE GOVERNMENT HEARING ABOUT VIRGINIA, DIDN'T

5      YOU?

6      A.      I THINK I SAID THAT IT HAD ALSO BEEN DECERTIFIED

7      IN WRITTEN TESTIMONY.

8      Q.      YES.  AND THAT SYSTEM WAS DECERTIFIED IN

9      VIRGINIA TWO MONTHS BEFORE AN ELECTION, CORRECT?

10     A.      TO MY KNOWLEDGE, YES.

11     Q.      THAT WAS YOUR TESTIMONY TO THE SENATE, YES?

12     A.      CORRECT.

13     Q.      SO WITHIN TWO MONTHS, VIRGINIA MANAGED TO

14     DECERTIFY THAT WIN SYSTEM AND GET A NEW SYSTEM UP AND

15     RUNNING IN TIME FOR THE ELECTION, CORRECT?

16     A.      SO, AGAIN, I DON'T WANT TO -- THEY MAY HAVE ALSO

17     HAD A PERIOD WHERE THEY TEMPORARILY SUSPENDED, BUT I

18     THINK TECHNICALLY FROM THE TIME THAT THEY DECERTIFIED

19     IT, YES.  AND AGAIN, IT WAS DECERTIFIED BY THE EAC AND

20     THERE WERE SEVERE PROBLEMS.  SO THIS IS NOT SOMETHING

21     THAT WE RECOMMEND.  BUT IN EMERGENCIES, YES, THERE HAVE

22     BEEN CIRCUMSTANCES LIKE THAT WHERE THEY HAVE HAD TO DO

23     IT.

24     Q.      YOU SIGNED A DECLARATION IN THIS CASE, YES?

25     A.      YES.

1     Q.     I MEAN IN THIS MOTION, AS PART OF THIS MOTION?

2     A.     YES.

3     Q.     AND I PRESUME YOU PREPARED THAT DECLARATION

4     CAREFULLY?

5     A.     YES.

6     Q.     AND YOU SIGNED THAT UNDER OATH, OBVIOUSLY?

7     A.     I'M SORRY?

8     Q.     AND YOU SIGNED THAT UNDER OATH?

9     A.     YES.

10     Q.     AND YOU CHOSE YOUR WORDS CAREFULLY, BECAUSE YOU

11     WANTED TO BE TRUTHFUL AND ACCURATE WITH THE COURT, YES?

12     A.     YES.

13     Q.     AND YOU REPRESENTED TO THE COURT IN YOUR

14     DECLARATION --

15     A.     CAN YOU TELL ME WHAT TAB WE ARE ON, PLEASE?

16     Q.     IF I COULD JUST ASK YOUR MEMORY OF THIS, AND

17     THEN IF WE NEED TO WE'LL SHOW YOU THE DOCUMENT TO

18     REFRESH YOUR RECOLLECTION.

19     BUT YOU TOLD THE COURT THAT YOU BELIEVED

20     IT WAS TOO LATE TO REPLACE THE EXPRESSVOTE XL IN TIME

21     FOR THE 2020 PRIMARY IN APRIL 28TH OF 2020, YES?

22     A.     SO I DON'T REMEMBER THE EXACT WORDS THAT I USED,

23     BUT SOMETHING TO THE EFFECT OF THAT.

24     Q.     IF YOU COULD --

25     A.     IT WOULD BE GOOD FOR ME TO LOOK AT IT.

1    Q.      SURE.   IF YOU COULD LOOK AT DEFENDANT EXHIBIT Y.

2    A.      I'M SORRY, WHICH ONE?

3    Q.      DEFENDANT EXHIBIT Y.   AND IF YOU COULD LOOK AT

4    YOUR PARAGRAPH 80 TO REFRESH YOUR RECOLLECTION.

5    A.      I'M SORRY, WHICH PARAGRAPH?

6    Q.      PARAGRAPH 80.

7    A.      YES.

8    Q.      AND SO YOU REPRESENTED TO THE COURT THAT IT

9    WOULD NOT BE POSSIBLE TO REPLACE THE XL MACHINES IN TIME

10   FOR APRIL 28, 2020, YES?

11   A.      YES.

12   Q.      YOU DID NOT SAY TO THE COURT THAT IT WOULD BE

13   IMPOSSIBLE TO REPLACE THOSE XL MACHINES IN TIME FOR THE

14   GENERAL ELECTION, DID YOU?

15   A.      DID I SAY THAT?

16   Q.      IT'S NOWHERE IN YOUR DECLARATION, IS IT?

17   A.      I DON'T THINK IT'S IN MY DECLARATION.   I DO

18   BELIEVE IT, THOUGH.

19   Q.      SECRETARY, YOU ALSO SAID IN YOUR DECLARATION

20   THAT NORTHAMPTON COUNTY SELECTED THE XL ON MARCH 6,

21   2019, YES?

22                     THE COURT:  PARAGRAPH 77.

23                     THE WITNESS:  THANK YOU, YOUR HONOR.

24                     YES, THAT'S WHEN THEY TOOK THEIR OFFICIAL

25   VOTE.

1    BY MR. MAAZEL:

2    Q.      AND NORTHAMPTON USED THE SYSTEM ON NOVEMBER 4TH,

3    YES?

4    A.      YES.  BUT, AGAIN, NORTHAMPTON COUNTY WAS

5    STUDYING ITS OPTIONS AND IN THE PROCESS OF SELECTION

6    LONG BEFORE THEY TOOK THEIR VOTE.

7    Q.      SECRETARY, THAT'S APPROXIMATELY EIGHT MONTHS

8    FROM WHEN NORTHAMPTON SELECTED THE SYSTEM TO WHEN THEY

9    USED IT IN A GENERAL ELECTION, CORRECT?

10   A.      FROM WHEN THEY TOOK THEIR OFFICIAL VOTE, YES.

11   Q.      IT'S ACTUALLY MORE THAN EIGHT MONTHS.  BUT IN

12   ANY EVENT, IF WE COULD ALSO LOOK AT STIPULATION NUMBER

13   60.

14   A.      ACTUALLY, THEY USED IT IN NOVEMBER OF 2019,

15   NORTHAMPTON COUNTY.  SO THAT'S NOT FAR MORE THAN EIGHT

16   MONTHS, OR WHATEVER IT WAS THAT YOU SAID.  BUT

17   REGARDLESS, THEY HAD STARTED LONG BEFORE THAT.  SO, YOU

18   KNOW, IT TOOK THEM PROBABLY A YEAR FROM WHAT -- THE TIME

19   THAT THEY STARTED STUDYING IT TO WHEN THEY ACTUALLY USED

20   IT.

21   Q.      I UNDERSTAND THAT COUNTIES STUDY ALL SORTS OF

22   SYSTEMS.  BUT THE ACTUAL SELECTION, WE CAN AGREE, WAS

23   MARCH 6TH, YES?

24   A.      YES.  THAT'S WHEN THEY VOTED.

25   Q.      AND THEN STIPULATION 60, IF YOU COULD LOOK AT

1       THAT.

2       A.      I'M SORRY, STIPULATION 60?

3       Q.      YES.

4       A.      IN A DIFFERENT BINDER?

5       Q.      THAT'S THE LIST OF STIPULATIONS YOU HAVE THERE

6       SEPARATELY.

7       A.      WHICH BINDER?

8       Q.      IT'S THAT DOCUMENT THERE.

9       A.      OKAY.

10      Q.      PARAGRAPH 60.

11              AND SO IT IS STIPULATED THAT THE CITY OF

12      PHILADELPHIA SIGNED A CONTRACT WITH ES&S FOR THE XL ON

13      MAY 13, 2019, YES?

14      A.      YES.

15      Q.      AND ELECTION DAY LAST YEAR WAS NOVEMBER 5, 2019?

16      A.      YES.

17      Q.      AND I THINK IT'S ALSO STIPULATED AT PARAGRAPH 86

18      THAT THAT WAS -- THE ELECTION OCCURRED 176 DAYS AFTER

19      PHILADELPHIA SELECTED THE ES&S SYSTEM?

20      A.      I'M SORRY, I'M LOST.  WHICH DOCUMENT ARE WE IN?

21      Q.      SURE.  IF YOU CAN JUST LOOK AT STIPULATION 86.

22      A.      OKAY.

23      Q.      SO IT WAS 176 DAYS FROM THE DAY THAT

24      PHILADELPHIA SIGNED THE ES&S CONTRACT TO WHEN THEY USED

25      THE SYSTEM IN GENERAL ELECTION.  THAT IS STIPULATED.  DO

1    YOU UNDERSTAND THAT?

2    A.      I UNDERSTAND THAT.

3    Q.      AND DO YOU ALSO UNDERSTAND THAT IT'S 258 DAYS

4    FROM TODAY UNTIL THE GENERAL ELECTION THIS YEAR?

5    A.      I ALSO UNDERSTAND THAT IT TOOK A YEAR FOR

6    PHILADELPHIA TO GET TO THE POINT OF SIGNING THAT

7    CONTRACT, SO --

8    Q.      IF YOU COULD ANSWER MY QUESTION, SECRETARY.

9    A.      YES.

10   Q.      IT'S 258 DAYS FROM TODAY UNTIL THE GENERAL

11   ELECTION IN NOVEMBER, YES?

12   A.      IF THAT'S BEEN STIPULATED TO, THEN YES.

13            THE COURT:  IT HASN'T.  AND I DON'T

14   EXPECT YOU TO SIT THERE AND COUNT.

15            BUT IF YOU REPRESENT IT, I WILL ACCEPT

16   IT.

17            MR. MAAZEL:  THAT IS MY REPRESENTATION,

18   YOUR HONOR.

19            THE COURT:  ALL RIGHT.

20   BY MR. MAAZEL:

21   Q.      IN ANY EVENT, WE CAN CERTAINLY AGREE THAT WE ARE

22   IN FEBRUARY AND NOT MAY, AND SO WE HAVE A FEW MORE

23   MONTHS AT LEAST BETWEEN TODAY AND THE GENERAL ELECTION

24   AS BETWEEN MAY 2019 AND NOVEMBER 2019.  THAT'S --

25            THE COURT:  YOU ARE MAKING ARGUMENT

1       THROUGH THE WITNESS.  AND THE WITNESS IS MAKING ARGUMENT

2       BACK THROUGH YOU.  SO PERHAPS --

3                       MR. MAAZEL:  ALL RIGHT.

4       BY MR. MAAZEL:

5       Q.      IN ADDITION, IT IS STIPULATED THAT WE FILED THIS

6       MOTION NOVEMBER 26, 2019.  IT WAS LAST NOVEMBER WE FILED

7       THIS, YES?

8                       MR. ARONCHICK:  OBJECTION.

9                       THE COURT:  SUSTAINED.

10                      MR. MAAZEL:  OKAY.

11      BY MR. MAAZEL:

12      Q.      DO YOU HAVE CONFIDENCE IN THE COMPETENCE OF THE

13      PHILADELPHIA BOARD OF ELECTIONS?

14      A.      I DO.

15      Q.      DO YOU BELIEVE THEY KNOW HOW TO RUN AN ELECTION?

16      A.      I DO.

17      Q.      DO YOU BELIEVE THEY KNOW HOW TO SWITCH SYSTEMS

18      WHEN NECESSARY?

19      A.      WITH ADEQUATE TIME, YES.

20                      MR. MAAZEL:  I HAVE NO FURTHER QUESTIONS.

21      THANK YOU.

22                      THE COURT:  MR. ARONCHICK.

23                      CROSS EXAMINATION

24      BY MR. ARONCHICK:

25      Q.      SECRETARY BOOCKVAR, WOULD YOU, FOR A START, TURN

```
 1        TO PLAINTIFF'S EXHIBIT -- I'M SORRY, JOINT EXHIBIT 34.

 2     AND CAN WE PUT --

 3                    MR. ARONCHICK:  YOUR HONOR, COULD MS.

 4     FERRARI JUST PUSH THE BUTTON ON THE SCREEN?

 5                    THE COURT:  SURE.  DO YOU NEED THE LIGHTS

 6     DIMMED?

 7                    MR. ARONCHICK:  I DON'T THINK SO.

 8                    THE COURT:  WE HAVE BEEN SITTING FOR AN

 9     HOUR.  WHY DON'T WE TAKE A SHORT BREAK AND WE WILL GET

10     THE MACHINE RUNNING.

11                    (SHORT RECESS TAKEN.)

12                    THE COURT:  PLEASE BE SEATED.

13                    MR. ARONCHICK:  YOUR HONOR?

14                    THE COURT:  MR. ARONCHICK.

15                    MR. ARONCHICK:  YES.  FOR EFFICIENCY, CAN

16     WE MOVE OUR EXHIBITS IN NOW?

17                    THE COURT:  SURE.

18                    MR. ARONCHICK:  I KNOW IT'S NOT OUR CASE

19     YET.  BUT MR. WIYGUL IS GOING TO GO THROUGH THE LIST AND

20     I WILL PICK UP WITH THE EXAMINATION.

21                    THE COURT:  OKAY.  THAT'S FINE.  LET ME

22     JUST GET THE RIGHT LINE.

23                    MR. WIYGUL:  MOSTLY JX, YOUR HONOR.

24                    THE COURT:  PARDON?

25                    MR. WIYGUL:  MOSTLY JX, IT WILL BE.  I'M
```

1       SORRY.

2                       THE COURT:  YES.  OKAY.

3                       MR. WIYGUL:  YOUR HONOR, WE MOVE INTO

4       EVIDENCE, JX 4.

5                       MR. MAAZEL:  OBJECTION TO THAT, YOUR

6       HONOR.

7                       THE COURT:  I'M NOT SURE.  IS THIS THE

8       RIGHT BINDER, DXAA 2?

9                       MR. WIYGUL:  NO.  IT SHOULD BE JX.

10                      MR. ARONCHICK:  JOINT EXHIBITS.

11                      THE COURT:  OH, THE JOINT EXHIBITS.  I'M

12      SORRY.

13                      MR. WIYGUL:  YES.

14                      THE COURT:  I'M SORRY.  4?

15                      MR. WIYGUL:  JX 4 WAS OUR FIRST ONE.

16                      THE COURT:  HOLD ON.  PENNSYLVANIA

17      DEPARTMENT OF STATE INVITES BIDS ON NEW PAPER RECORD

18      VOTING SYSTEMS?

19                      MR. WIYGUL:  YES.

20                      THE COURT:  AND YOU'RE OBJECTING?

21                      MR. MAAZEL:  YES, YOUR HONOR.

22                      THE COURT:  ON WHAT GROUNDS?

23                      MR. MAAZEL:  RELEVANCE.

24                      THE COURT:  OVERRULED.  IT WILL BE

25      ADMITTED.

1                    MR. WIYGUL:  JX 5.

2                    MR. MAAZEL:  NO OBJECTION.

3                    THE COURT:  IT WILL BE ADMITTED.

4                    MR. WIYGUL:  I BELIEVE JX 7 HAS ALREADY

5      BEEN ADMITTED, SO I MOVE TO JX 8.

6                    THE COURT:  8.  ANY OBJECTION?

7                    MR. MAAZEL:  WE OBJECT, YOUR HONOR.  IT'S

8      A DIFFERENT VOTING SYSTEM.  I JUST DON'T UNDERSTAND THE

9      RELEVANCE.

10                   THE COURT:  GEE, I DO.  OVERRULED.

11                   MR. WIYGUL:  JX 12, YOUR HONOR.

12                   MR. MAAZEL:  NO OBJECTION.

13                   THE COURT:  IT WILL BE ADMITTED.

14                   MR. WIYGUL:  JX 13.

15                   THE COURT:  OKAY.  ANY OBJECTION?

16                   MR. MAAZEL:  NO OBJECTION.

17                   THE COURT:  IT WILL BE ADMITTED.

18                   MR. WIYGUL:  JX 14.

19                   MR. MAAZEL:  NO OBJECTION.

20                   THE COURT:  IT WILL BE ADMITTED.

21                   MR. WIYGUL:  JX 15.

22                   MR. MAAZEL:  NO OBJECTION.

23                   THE COURT:  IT WILL BE ADMITTED.

24                   MR. WIYGUL:  JX 16.

25                   MR. MAAZEL:  NO OBJECTION.

1          THE COURT:  IT WILL BE ADMITTED.

2          MR. WIYGUL:  JX 17.

3          MR. MAAZEL:  NO OBJECTION.

4          THE COURT:  IT WILL BE ADMITTED.

5          MR. WIYGUL:  JX 18.

6          MR. MAAZEL:  NO OBJECTION.

7          THE COURT:  IT WILL BE ADMITTED.

8          MR. WIYGUL:  JX 19 -- I'M SORRY.  THAT

9    HAS ALREADY BEEN -- JX 20.

10          MR. MAAZEL:  NO OBJECTION.

11          THE COURT:  IT WILL BE ADMITTED.

12          MR. WIYGUL:  JX 21.

13          MR. MAAZEL:  NO OBJECTION.

14          THE COURT:  IT WILL BE ADMITTED.

15          MR. WIYGUL:  JX 33.

16          MR. MAAZEL:  NO OBJECTION.

17          THE COURT:  IT WILL BE ADMITTED.

18          MR. WIYGUL:  AND THEN, YOUR HONOR, MOVING

19    TO THE DX EXHIBITS, D AS IN DAVID.

20          THE COURT:  YES.

21          MR. WIYGUL:  MOVE FOR ADMISSION OF DX F,

22    YOUR HONOR.

23          THE COURT:  F AS IN FRED?

24          MR. WIYGUL:  YES.

25          THE COURT:  SECURING THE VOTE FOR

1       PROTECTING AMERICAN DEMOCRACY, THE NATIONAL ACADEMY

2       PRESS.  ANY OBJECTION?

3                       MR. MAAZEL:  YEAH.  THE SAME REASON THEY

4       OBJECTED, I ASSUME, TO THE NIST.

5                       THE COURT:  AND I OVERRULED THEIRS?

6                       MR. WIYGUL:  NO, I DON'T THINK --

7                       MR. ARONCHICK:  YOU RESERVED ON THAT, BUT

8       I THINK THIS IS MUCH MORE RELEVANT, AND I CAN CONNECT

9       THEM.

10                      THE COURT:  I WILL OVERRULE BOTH

11      OBJECTIONS.  THEY WILL BE ADMITTED.

12                      GO AHEAD.

13                      MR. WIYGUL:  DX M AS IN MARY, YOUR HONOR.

14                      MR. MAAZEL:  NO OBJECTION.

15                      THE COURT:  IT WILL BE ADMITTED.

16                      MR. WIYGUL:  WE MAY HAVE MORE LATER, YOUR

17      HONOR, BUT THAT'S ALL FOR NOW.  THANK YOU.

18                      THE COURT:  OKAY.

19                      (JOINT EXHIBITS 4, 5, 8, 12-18, 20, 21,

20      33 ADMITTED INTO EVIDENCE.)

21                      (DEFENSE EXHIBITS DX F AND M ADMITTED

22      INTO EVIDENCE.)

23                      MR. ARONCHICK:  OKAY.

24      BY MR. ARONCHICK:

25      Q.      SECRETARY BOOCKVAR, WILL YOU TURN TO JOINT

1      EXHIBIT 34, JX 34?

2      A.      YES.

3      Q.      OKAY.  MY COLLEAGUE IN HIS EXAMINATION REFERRED

4      YOU TO CERTAIN CERTIFICATIONS, DO YOU RECALL THAT, OF

5      THE CLEARVOTE AND THE HART VERITY AND THE RE-EXAMINATION

6      OF THE XL, RIGHT?

7      A.      YES.

8      Q.      OKAY.  HE DID NOT SHOW YOU THE ACTUAL

9      CERTIFICATION OF THE XL SYSTEM, DID HE?

10             MR. MAAZEL:  OBJECTION.

11             THE WITNESS:  NO.

12     BY MR. ARONCHICK:

13     Q.      ALL RIGHT.  IS THIS THAT CERTIFICATION?

14     A.      YES.

15     Q.      ALL RIGHT.  WHAT IS THE DATE OF THE

16     CERTIFICATION?

17     A.      NOVEMBER 30, 2018.

18     Q.      IS THAT TWO DAYS AFTER THE SETTLEMENT AGREEMENT

19     WAS SIGNED?

20     A.      YES.

21     Q.      WAS THIS CERTIFICATION POSTED ONLINE?

22     A.      YES.

23     Q.      WAS IT --

24             MR. MAAZEL:  OBJECTION TO THE LEADING,

25     YOUR HONOR.

```
 1                    THE COURT:  OVERRULED.  GO AHEAD.

 2      BY MR. ARONCHICK:

 3      Q.      WAS IT AVAILABLE TO THE PUBLIC?

 4      A.      YES.

 5      Q.      OKAY.  AND THIS IS A CERTIFICATION YOU REVIEWED

 6      AND APPROVED?

 7      A.      CORRECT.

 8      Q.      OKAY.  WOULD YOU TURN TO PAGE 32.

 9                    THE COURT:  I RECOGNIZE THAT IN THE EYES

10      OF THE LAW IT IS HIS WITNESS.  AND IF IT COMES TO

11      SOMETHING OTHER THAN THESE KINDS OF HOUSEKEEPING

12      QUESTIONS AND YOU OBJECT, I WILL LIKELY SUSTAIN.

13                    MR. MAAZEL:  I UNDERSTAND.

14      BY MR. ARONCHICK:

15      Q.      PAGE 32.  AT THE TOP OF THE PAGE THERE'S A

16      DESCRIPTION THERE, IS THERE NOT, OF THE EXPRESSVOTE XL?

17      A.      YES.

18      Q.      WOULD YOU PLEASE READ IT?

19      A.      EXPRESSVOTE XL ALLOWS THE VOTER TO VALIDATE THE

20      PAPER BALLOT THROUGH A GLASS WINDOW BEFORE CASTING.

21      Q.      AND WHY IS THE WORD "PAPER BALLOT" USED THERE?

22      A.      AS I WAS TESTIFYING EARLIER, WE USE THE WORD ALL

23      THE TIME TO DESCRIBE THE PAPER, THE VOTER-VERIFIABLE

24      PAPER, AND THIS EVIDENCES THAT.

25      Q.      WOULD YOU TURN TO EXHIBIT 56 THAT YOUR -- 57,
```

1    I'M SORRY, THAT WAS SHOWN TO YOU ON DIRECT.

2    A.    I'M SORRY?

3    Q.    JX 57.

4    A.    56 OR 57?

5    Q.    57, I'M SORRY.

6    A.    YES.

7    Q.    THAT'S IT ON THE SCREEN THERE?

8    A.    YES.

9    Q.    ALL RIGHT.  IS THIS THE PAPER BALLOT THAT YOU

10   ARE REFERRING TO ON PAGE 32 OF YOUR CERTIFICATION?

11   A.    YES.

12   Q.    IS THIS THE RECORD THAT THE XL MACHINE PRODUCES

13   FOR VOTER VERIFICATION?

14   A.    YES.

15   Q.    OKAY.  NOW, WOULD YOU GO TO -- WOULD YOU TURN

16   TO -- LET ME START WITH THIS.

17                YOU WERE AT THE SETTLEMENT CONFERENCE OF

18   OCTOBER 11, 2018?

19   A.    I WAS.

20   Q.    BEFORE THAT SETTLEMENT CONFERENCE, DID THE

21   PLAINTIFFS SEND A TERM SHEET OR A PROPOSED TERM SHEET

22   FOR THE SETTLEMENT?

23   A.    I WAS NOT SHOWN A TERM SHEET UNTIL WE WALKED IN

24   TO THE SETTLEMENT CONFERENCE.

25   Q.    THEY BROUGHT IT TO THE CONFERENCE?

1    A.      CORRECT.

2    Q.      I'M SORRY.

3            OKAY.  TURN TO JX 24.

4    A.      YES.

5    Q.      IS THAT THE TERM SHEET YOU RECALL SEEING AT THE

6    CONFERENCE?

7    A.      YES.

8    Q.      OKAY.  AND WE HAVE THAT UP.  NOW, AFTER THE

9    CONFERENCE, DO YOU RECALL THAT THE PLAINTIFFS SENT A

10   REVISED TERM SHEET OR A TERM SHEET REFLECTING SOME OF

11   THE DISCUSSIONS AT THE CONFERENCE?

12   A.      YES.

13   Q.      AND THAT IS JX -- WOULD YOU TURN TO JX 25.  IS

14   THAT THE TERM SHEET THAT WAS SENT SHORTLY AFTER THE

15   CONFERENCE?

16   A.      YES.

17   Q.      ALL RIGHT.  I WANT TO FOCUS ON JUST ONE PORTION,

18   FOR THE MOMENT.  WE WILL COME BACK TO THE OTHER PARTS OF

19   THIS DOCUMENT, OR AT LEAST THE FINAL DOCUMENT LATER, BUT

20   ONE PORTION.  DID THE DEPARTMENT HAVE A PRIMARY OR

21   CENTRAL GOAL THAT THEY -- AND A PRINCIPLE THAT THEY

22   WANTED TO ACHIEVE IN CONNECTION WITH THIS SETTLEMENT?

23   A.      YES.

24   Q.      WHAT WAS IT?

25   A.      SO WE WERE -- WE HAD ALREADY, EARLIER THAT YEAR,

1    STARTED ON A PATH TO REQUIRE THAT ALL COUNTIES REPLACE

2    THEIR AGING VOTING SYSTEMS WITH NEW SYSTEMS THAT

3    EMPLOYED A VOTER-VERIFIABLE PAPER BALLOT SYSTEM AND ALSO

4    MET UPDATED SECURITY STANDARDS AND ACCESSIBILITY TESTING

5    AS WELL.  AND SO OUR GOAL WAS, IF WE COULD SETTLE THE

6    CASE CONSISTENT WITH THE PATH THAT WE WERE ALREADY ON,

7    THAT WAS A GOOD GOAL.  THAT WAS THE PRIMARY GOAL.

8    Q.    OKAY.  SO LOOK AT THE TERM SHEET THAT THE

9    PLAINTIFFS PROVIDED AT THAT CONFERENCE, PARAGRAPH 3.

10              MR. ARONCHICK:  CAN YOU HIGHLIGHT

11   PARAGRAPH 3 ON THE SCREEN, PLEASE.

12              THE COURT:  THIS IS DOCUMENT 24?

13              MR. ARONCHICK:  I'M SORRY, YES, 24, JX

14   24.

15   BY MR. ARONCHICK:

16   Q.    ALL RIGHT.  AND THEN THE CORRESPONDING

17   PARAGRAPH, WOULD THAT BE, IN THE NEXT TERM SHEET THAT

18   CAME OUT, PARAGRAPH 2 ON JX 25?

19   A.    YES.

20              MR. ARONCHICK:  CAN YOU HIGHLIGHT THAT,

21   BOTH OF THOSE?  NO, NO, PARAGRAPH 3 ON JX 24.  ALL

22   RIGHT.  AND THEN PARAGRAPH 2 FROM JX 25.

23   BY MR. ARONCHICK:

24   Q.    SECRETARY BOOCKVAR, WAS A CHANGE MADE FROM THE

25   LANGUAGE THE PLAINTIFFS PROPOSED TO THE LANGUAGE THAT

1    THE DEPARTMENT -- OR THE COMMONWEALTH INSISTED ON IN

2    THIS PARAGRAPH?

3    A.    YES.

4    Q.    WOULD YOU EXPLAIN TO THE COURT WHAT THAT CHANGE

5    IS AND WHY IT WAS MADE?

6    A.    YES.  SO AS YOU COULD SEE, IT'S THE CHANGE "WILL

7    REQUIRE" TO "WILL CONTINUE TO DIRECT."  AGAIN, THERE WAS

8    ONLY ONE WAY THAT WE WERE GOING TO ENTER INTO THIS

9    SETTLEMENT AGREEMENT.  AND THAT WAS TO CONTINUE ON A

10   PATH THAT WE HAD ALREADY STARTED EARLIER THIS YEAR IN

11   APRIL.  WELL, REALLY, TECHNICALLY, DECEMBER THE PREVIOUS

12   YEAR, BUT OFFICIALLY IN APRIL.  SO WE REQUIRED THAT THIS

13   CHANGE BE MADE TO INDICATE, CONSISTENT WITH OUR

14   DISCUSSIONS, THAT WE WERE CONTINUING ON A PATH WE HAD

15   ALREADY SET.

16   Q.    AND IS THAT LANGUAGE, OF WILL CONTINUE TO

17   DIRECT, AND WE CAN TURN TO IT IF YOU WANT, WAS THAT IN

18   THE FINAL SIGNED AGREEMENT?

19   A.    YES.

20   Q.    OKAY.  AND THE FINAL SIGNED AGREEMENT IS JX 30?

21   A.    CORRECT.

22   Q.    ALL RIGHT.  SO I WANT TO THEN ASK YOU SOME

23   QUESTIONS ABOUT THIS PATH.

24            BUT LET US START HERE:  DO YOU RECALL, ON

25   OR ABOUT ROUGHLY THE DATE THAT THE DEPARTMENT ENTERED

1    INTO -- OR AT LEAST APPROACHED THE PLAINTIFFS ABOUT

2    SETTLEMENT IN THE STEIN LITIGATION?

3    A.       SO I THINK AFTER THE MOTION IN SEPTEMBER -- IN

4    LATE SEPTEMBER, I THINK WAS WHEN.

5    Q.       OF 2018?

6    A.       OF 2018, YES.

7    Q.       DID YOU -- WERE YOU IN CHARGE OF THAT SETTLEMENT

8    PROCESS AS A CLIENT?

9    A.       I WAS THE PRIMARY CLIENT INVOLVED IN THE

10   PROCESS.  THE ACTING SECRETARY WAS ALSO INVOLVED.

11   Q.       AND YOU HAD LAWYERS THAT WERE WORKING FOR YOU IN

12   CONNECTION WITH THAT SETTLEMENT?

13   A.       CORRECT.

14   Q.       AND THAT WOULD BE MR. GATES AND MS. KOTULA?

15   A.       CORRECT.

16   Q.       AND THEY WERE WORKING WITH THE ATTORNEY

17   GENERAL'S OFFICE, MS. UNGER?

18   A.       CORRECT.

19   Q.       ALL RIGHT.  DID YOU GIVE ANY DIRECTION TO THE

20   LAWYERS AS TO WHAT THEY SHOULD INFORM THE PLAINTIFFS

21   ABOUT THIS INITIATIVE THAT YOU HAD GOING THAT WAS GOING

22   TO BE PART OF THE SETTLEMENT DISCUSSIONS?

23   A.       YES.

24   Q.       AND WHAT WAS THAT DIRECTION THAT YOU TOLD THE

25   LAWYERS?

1  A.      SO I WANTED TO BE VERY CLEAR WHAT THE PATH WAS

2  THAT WE WERE ALREADY ON.   AND SO WE PROVIDED -- SO WE

3  WERE -- I DIRECTED THE ATTORNEYS TO PROVIDE TO THE

4  PLAINTIFFS INFORMATION THAT WOULD MAKE IT CLEAR WHAT

5  THAT PATH ENTAILED.

6                  DO YOU WANT ME TO CONTINUE?

7  Q.      CAN YOU TURN TO JX 14.

8                  THE COURT:  14?

9                  MR. ARONCHICK:  14.

10 BY MR. ARONCHICK:

11 Q.      DO YOU RECOGNIZE THIS E-MAIL?

12 A.      I DO.

13 Q.      AND WHAT IS IT?  EXPLAIN TO THE COURT WHAT IS

14 GOING ON HERE.

15 A.      SO THIS IS THE E-MAIL THAT SUE ANN UNGER FROM

16 THE ATTORNEY GENERAL'S OFFICE --

17                 MR. ARONCHICK:  I'M SORRY, DO YOU HAVE JX

18 14?

19                 THE COURT:  I BEG YOUR PARDON?

20                 MR. ARONCHICK:  DO YOU HAVE JX 14?

21                 THE COURT:  I'M ON JX 14.

22                 MR. ARONCHICK:  OKAY.  YOU WERE LOOKING,

23 AND I COULD NOT TELL IF YOU WERE THERE.

24                 THE COURT:  NO, NO, I AM THERE.

25                 THE WITNESS:  THANK YOU FOR GIVING ME

1    THAT OPPORTUNITY TO TAKE THAT DRINK.

2                SO THIS IS THE E-MAIL FROM SUE ANN UNGER

3    FROM THE ATTORNEY GENERAL'S OFFICE TO PLAINTIFFS'

4    COUNSEL WITH FIVE -- SORRY, FIVE ATTACHMENTS THAT WERE,

5    YOU KNOW, KIND OF PIECES OF THE STORY TO HELP EXPLAIN

6    WHAT WE WERE REQUIRING OF THE COUNTIES, WHAT PATH WE

7    WERE ON, WHAT THE TIMELINE WAS, THAT THEY WOULD FULLY

8    UNDERSTAND WHAT WE WERE SEEKING IN THE SETTLEMENT.

9    BY MR. ARONCHICK:

10   Q.      AND LOOK AT THE FIRST SENTENCE OF THE FIRST

11   PARAGRAPH.

12   A.      YES.

13   Q.      COULD YOU -- WHY WAS IT PHRASED THIS WAY?  WHY

14   DID YOU WANT MS. UNGER TO SAY THIS?

15   A.      SO, YOU KNOW, WE WERE ALL -- WE WERE HOPING THAT

16   WE WOULD -- THAT THE PATH WE WERE ALREADY ON WOULD BE

17   SUFFICIENT FOR SETTLEMENT.  THERE WAS GOING TO BE --

18   THERE WERE GOING TO BE SETTLEMENT DISCUSSIONS THE

19   FOLLOWING WEEK.  SO WE WANTED TO MAKE SURE THAT THE

20   DOCUMENTS WERE FORWARDED IN ADVANCE OF THOSE DISCUSSIONS

21   SO THAT THERE WAS CLARITY ABOUT THE PIECES OF THE

22   DISCUSSION FOR SETTLEMENT PURPOSES.

23   Q.      OKAY.  NOW, THIS PATH, OR THIS INITIATIVE, WHEN

24   DID IT START FROM THE COMMONWEALTH'S POINT OF VIEW?

25   A.      SO APPROXIMATELY DECEMBER OF 2017 THERE WAS A

1    VOTING SYSTEM VENDOR FORM WHERE THE DEPARTMENT OF STATE

2    INVITED VOTING SYSTEM VENDORS TO COME TO HARRISBURG WHO

3    WERE INTERESTED IN SUBMITTING SYSTEMS FOR CERTIFICATION

4    IN PENNSYLVANIA AND FOR THE DEPARTMENT OF STATE TO

5    ANSWER QUESTIONS.  AND THIS WAS ALSO, YOU KNOW,

6    ANNOUNCED TO COUNTIES SO THEY UNDERSTOOD THAT THIS

7    WAS -- COUNTY ELECTION DIRECTORS AND PERSONNEL, SO THAT

8    THEY UNDERSTOOD THAT THIS DISCUSSION WAS HAPPENING.

9    Q.      ALL RIGHT.  SO WHAT WAS THE GOAL OF THIS NEW

10   INITIATIVE STARTING IN AROUND DECEMBER 2017?

11   A.      SO THE GOAL WAS THAT ALL OF PRIOR VOTING SYSTEMS

12   IN THE FIELD, WHICH ALL WERE 10, 15, IN SOME CASES

13   30 YEARS OLD, WOULD BE UPGRADED, WOULD BE REPLACED BY

14   NEW VOTING SYSTEMS MEETING NEW CERTIFICATION STANDARDS.

15   AND ALL PROVIDING A VOTER-VERIFIABLE PAPER BALLOT.

16   Q.      AND WHAT KIND OF ELECTRONIC SYSTEMS WERE IN THE

17   FIELD AT THAT POINT?

18   A.      SO -- IN USE?  SO IN 50 COUNTIES, THEY WERE

19   USING DRE MACHINES.

20   Q.      WHAT IS A DRE MACHINE?

21   A.      DIRECT RECORDING ELECTRONIC MACHINES.  THOSE

22   ARE -- DO YOU WANT ME TO EXPLAIN?

23   Q.      BRIEFLY.

24   A.      DRE MACHINES ARE SYSTEMS THAT THE VOTE -- SO

25   IT'S AN ELECTRONIC MACHINE THAT THE VOTE IS BOTH

1    REGISTERED AND RECORDED ELECTRONICALLY.  SO THE OFFICIAL

2    VOTE OF RECORD IS AN ELECTRONIC CAPTURE OF THE VOTE.

3    Q.     AND WHAT WAS THE DEPARTMENT'S CHANGE?  WHAT WAS

4    THE FOCUS OF THE NEW INITIATIVE?

5    A.     THE NEW INITIATIVE, WE REFUSED TO CERTIFY DRE'S

6    ANY LONGER.  SO NO DRE'S WERE EVEN CONSIDERED FOR

7    CERTIFICATION AFTER THAT.  EVERY VOTING SYSTEM THAT WAS

8    CERTIFIED IN PENNSYLVANIA HAD TO EITHER BE ONE OF TWO

9    DIFFERENT TYPES.  EITHER HAND-MARKED PAPER BALLOT

10   SYSTEMS THAT THEN WERE FED INTO A SCANNER, OR WHAT ARE

11   CALLED BALLOT-MARKING DEVICES, WHICH ARE -- USE A

12   MACHINE TO PRINT A PAPER AND THE PAPER IS THE OFFICIAL

13   VOTE OF RECORD.

14   Q.     SO THEY WERE THE TWO TYPES OF MACHINES THAT WERE

15   PART OF THIS INITIATIVE?

16   A.     CORRECT.

17   Q.     APPROXIMATELY, IF YOU REMEMBER, HOW MANY VENDORS

18   WERE THERE AT THAT TIME THAT WERE DEMONSTRATING THOSE

19   MACHINES?

20   A.     FIVE.

21   Q.     AND WHAT ARE THEIR NAMES?

22   A.     DOMINION, ES&S, HART, UNISYN AND CLEARBALLOT.

23   Q.     NOW, IN THE MS. UNGER E-MAIL, ONE OF THE ITEMS,

24   BULLET NUMBER 2, COULD YOU READ THAT AND EXPLAIN -- JUST

25   READ IT FOR THE MOMENT.  THIS IS ONE OF THE ITEMS THAT

1    WAS SENT OVER TO MR. MAAZEL'S GROUP.

2    A.        E-MAIL DATED FEBRUARY 9, 2018, FROM COMMISSIONER

3    MARKS TO THE COUNTY BOARD OF ELECTIONS WITH A DIRECTIVE

4    INFORMING THEM THAT ALL VOTING SYSTEMS PURCHASED ON OR

5    AFTER FEBRUARY 9, 2018, MUST BE OF THE TYPE THAT EMPLOYS

6    A VOTER-VERIFIABLE PAPER BALLOT OR A VOTER-VERIFIABLE

7    PAPER RECORD OF THE VOTES CAST BY A VOTER.

8    Q.        ALL RIGHT.   WOULD YOU TURN TO JX NUMBER 3 -- I'M

9    SORRY, NUMBER 1.   SORRY, NUMBER 1.   IS THIS THE

10   DIRECTIVE THAT WAS SENT OVER TO MR. MAAZEL?

11   A.        YES.

12   Q.        AND WOULD YOU READ WHAT THIS DIRECTIVE IS

13   DIRECTING IN CONNECTION WITH THE PURCHASE OF NEW

14   MACHINES?

15   A.        SURE.   IT SAYS:   PURCHASE OF RESILIENT

16   ELECTRONIC VOTING SYSTEMS OR ON AFTER FEBRUARY 9, 2018.

17   TO ENSURE THAT THE NEXT GENERATION OF THE COMMONWEALTH'S

18   VOTING SYSTEMS CAN CONFORM TO ENHANCED STANDARDS

19   CONCERNING RESILIENCY, AUDITABILITY AND SECURITY, ALL

20   VOTING SYSTEMS PURCHASED ON OR AFTER FEBRUARY 9, 2018

21   MUST BE OF THE TYPE THAT EMPLOYS A VOTER-VERIFIABLE

22   PAPER BALLOT OR A VOTER-VERIFIABLE PAPER RECORD OF THE

23   VOTES CAST BY A VOTER.

24   Q.        ALL RIGHT.   LET'S STOP THERE.   WHY IS THERE AN

25   OR BETWEEN THOSE TWO CONCEPTS, VOTER-VERIFIABLE PAPER

1    BALLOT OR A VOTER-VERIFIABLE PAPER RECORD?

2    A.      SO THE WORDS ARE USED INTERCHANGEABLY.  AND WE

3    WANTED TO BE CLEAR THAT THERE WAS -- YOU KNOW, THAT PART

4    OF THIS SYSTEM WERE BALLOT-MARKING DEVICES, HAND-MARKED

5    PAPER BALLOTS, BUT THEY ALL PRODUCE THE PAPER THAT IS

6    THE OFFICIAL VOTE OF RECORD.

7    Q.      OKAY.  AND WOULD YOU TURN TO -- AFTER MS.

8    UNGER'S E-MAIL --

9             THE COURT:  JUST A SECOND.  WHAT DO YOU

10   MEAN BY RESILIENCY?

11            THE WITNESS:  SO RESILIENCY REFERS --

12   REALLY THE PAPER ALLOWS FOR RESILIENCY IN MANY CASES,

13   BUT IT'S AT LEAST ONE EXAMPLE OF RESILIENCY.  SO IF

14   THERE IS A BLACKOUT AND THERE'S -- THE BATTERY BACKUP

15   FOR THE MACHINE RUNS OUT, THAT THERE IS THE ABILITY TO

16   UTILIZE PAPER, YOU KNOW, THERE'S A BALLOT BOX THAT'S

17   PART OF THE SYSTEMS THAT CAN BE USED TO ACTUALLY

18   REGISTER THE VOTES.  THE OLD SYSTEMS WERE REALLY

19   BREAKING DOWN, NOT HAVING THAT RESILIENCY THAT WE WERE

20   LOOKING FOR.

21            THE COURT:  OKAY.  THANK YOU.  I'M SORRY,

22   MR. ARONCHICK.

23            MR. ARONCHICK:  NO PROBLEM.

24   BY MR. ARONCHICK:

25   Q.      BACK TO MS. UNGER'S E-MAIL OF SEPTEMBER 28, 2018

1    SENDING THE INFORMATION TO MR. MAAZEL.  WOULD YOU LOOK

2    AT THE THIRD BULLET POINT.  WHAT IS THIS ITEM THAT WAS

3    SENT TO MR. MAAZEL?  COULD YOU READ IT AND EXPLAIN WHAT

4    IT IS?

5    A.       E-MAIL DATED APRIL 12, 2018, FROM COMMISSIONER

6    MARKS TO COUNTY BOARDS OF ELECTIONS WITH A PRESS RELEASE

7    INFORMING COUNTIES THAT THEY MUST HAVE VOTER-VERIFIABLE

8    PAPER RECORD VOTING SYSTEMS SELECTED NO LATER THAN

9    DECEMBER 31, 2019, AND PREFERABLY IN PLACE BY THE

10   NOVEMBER 2019 GENERAL ELECTION.

11   Q.       WOULD YOU TURN TO JX NUMBER 6 -- I'M OFF AGAIN.

12   NUMBER 5.  WHAT IS THIS?

13   A.       THIS IS THE E-MAIL REFERRED TO IN THAT E-MAIL OR

14   IN THAT LETTER, WHICH COMMISSIONER JONATHAN MARKS, WHO

15   IS NOW DEPUTY SECRETARY, SENT TO ELECTION DIRECTORS AND

16   PERSONNEL IN PENNSYLVANIA ANNOUNCING THAT WE WERE NOW

17   SETTING A TIMELINE FOR THAT VOTING SYSTEM UPGRADE.  SO

18   WE, AS IT MENTIONED IN THAT LETTER, WE DIRECTED ALL

19   COUNTIES THAT THEY NEEDED TO SELECT NEW VOTING SYSTEMS

20   THAT ALL HAD VOTER-VERIFIABLE PAPER BALLOTS, PAPER

21   RECORDS, AS -- IN ADVANCE OF -- THEY HAD TO MAKE THEIR

22   SELECTIONS BY DECEMBER 31, 2019, EMPLOY THEM BY APRIL OF

23   2020, BUT PREFERABLY BY NOVEMBER OF 2019.  AND IT ALSO

24   MAKES NOTE THAT WE HAD GOTTEN FEDERAL FUNDS, THAT WE

25   WERE ALLOCATING 100 PERCENT OF THEM TO THE COUNTIES FOR

1     THIS PURPOSE.  AND WE WERE ALSO GOING TO BE HOLDING AN

2     OPEN-TO-THE-PUBLIC VENDOR DEMO ON APRIL 26TH.

3     Q.      WHO WERE ALL OF THE E-MAIL RECIPIENTS ON THIS

4     LONG LIST ON THIS E-MAIL?

5     A.      THESE ARE ELECTION DIRECTORS AND VARIOUS

6     ELECTION PERSONNEL THROUGHOUT PENNSYLVANIA.

7     Q.      AND TURNING TO THE SECOND PAGE.  THE SECOND

8     PARAGRAPH REFERS TO A VENDOR DEMONSTRATION OCCURRING ON

9     APRIL 26TH?

10    A.      CORRECT.

11    Q.      OF 2018?

12    A.      YES.

13    Q.      WAS THAT OPEN TO THE PUBLIC?

14    A.      IT WAS.

15    Q.      AND WHAT -- AND DID THAT ACTUALLY HAPPEN?

16    A.      YES.

17    Q.      AND WHO PRESENTED?  DO YOU RECALL WHO -- WHICH

18    COMPANIES CAME AND PRESENTED MACHINES?

19    A.      ALL FIVE CAME.

20    Q.      THE FIVE YOU MENTIONED BEFORE?

21    A.      CORRECT.

22    Q.      AND THIS FOURTH PARAGRAPH REFERS TO DISCUSSIONS

23    WITH YOU OVER THE PAST SEVERAL MONTHS.  CAN YOU JUST

24    BRIEFLY EXPLAIN WHAT THAT IS REFERRING TO?

25    A.      SURE.  SO AS I MENTIONED, DECEMBER 2017 WAS SORT

1   OF, YOU KNOW, MANY WAYS THE FIRST OFFICIAL KICKOFF OF

2   THIS TRANSITION INITIATIVE TO NEW VOTING SYSTEMS, BUT

3   THERE WERE MANY CONVERSATIONS AND MEETINGS AND

4   DISCUSSIONS WITH THE COUNTIES ABOUT THE PLANS FOR THIS,

5   THAT WE HADN'T SET AN ACTUAL DATE FOR THE TIMELINE UNTIL

6   THIS TIME.  BUT, FOR EXAMPLE -- DO YOU WANT ME JUST TO

7   GIVE YOU SOME EXAMPLES OF --

8   Q.      JUST BRIEFLY.

9   A.      SO, FOR EXAMPLE, IN MARCH, THE END OF MARCH

10  2018, THERE WAS A -- THE ELECTION DIRECTORS IN

11  PENNSYLVANIA ARE SORT OF SPLIT INTO TWO CONFERENCES, THE

12  EASTERN CONFERENCE AND WESTERN CONFERENCE.  THERE WAS,

13  YOU KNOW, A WESTERN CONFERENCE AT THE END OF MARCH THAT

14  I WAS AT, AND MULTIPLE OTHER PEOPLE FROM THE DEPARTMENT

15  OF STATE, WHERE WE TALKED TO THE COUNTIES ABOUT THE

16  PLANS, ABOUT THE TIMELINE, WHAT TIMELINES WOULD BE

17  FEASIBLE, WHAT WAS PART OF THIS, SO THAT WAS --

18  Q.      DID YOU EXPLAIN TO THE COUNTIES AT THESE

19  MEETINGS THE TYPES OF VOTING MACHINES THAT THE

20  DEPARTMENT WANTED TO SEE THEM CONSIDER?

21  A.      YES.

22  Q.      BOTH THE OPTICAL SCAN MACHINES AND THE DRE

23  MACHINES.

24              MR. MAAZEL:  OBJECT TO THE LEADING, YOUR

25  HONOR.

1                    THE WITNESS:  CORRECT.  WE TALKED ABOUT

2     HAND-MARKED PAPER BALLOTS AND BALLOT-MARKING DEVICES,

3     YES.

4     BY MR. ARONCHICK:

5     Q.      NOW, BY THE WAY, AT THIS POINT IN TIME, WERE YOU

6     IN CHARGE OF THIS INITIATIVE?

7     A.      YES.

8     Q.      TURN TO THE NEXT PAGE.  THERE IS AN ACTUAL PRESS

9     RELEASE.  DO YOU SEE THAT?

10    A.      YES.

11    Q.      READ THE FIRST PARAGRAPH.

12    A.      ACTING SECRETARY OF STATE ROBERT TORRES TODAY

13    INFORMED PENNSYLVANIA'S COUNTIES TO HAVE

14    VOTER-VERIFIABLE PAPER RECORD VOTING SYSTEMS SELECTED NO

15    LATER THAN DECEMBER 31, 2019, AND PREFERABLY IN PLACE BY

16    THE NOVEMBER 2019 GENERAL ELECTION.

17    Q.      ALL RIGHT.  I SEE A REFERENCE TO

18    VOTER-VERIFIABLE PAPER RECORD VOTING SYSTEMS.  THAT'S

19    DIFFERENT WORDS THAN WERE USED IN THE PREVIOUS

20    DIRECTIVES THAT WE READ.  WOULD YOU EXPLAIN WHY THOSE

21    WORDS WERE USED?

22    A.      SURE.  AGAIN, PAPER RECORD, PAPER BALLOT, PAPER

23    TRAIL, YOU WILL FIND, IF YOU EXAMINE PRESS RELEASES,

24    TESTIMONY, YOU KNOW, ANY NUMBER OF CONVERSATIONS THAT WE

25    HAD THROUGHOUT THE LAST TWO YEARS, THEY WERE USED

1    INTERCHANGEABLY.

2    Q.      OKAY.  GO BACK TO MS. UNGER'S E-MAIL JX 14.

3    ANOTHER DOCUMENT THAT WAS SENT TO MR. MAAZEL IS THE

4    FOURTH BULLET POINT.  CAN YOU READ THAT AND EXPLAIN

5    BRIEFLY WHAT THAT IS, WHAT WAS SENT TO MR. MAAZEL?

6    A.      REVISED EXAMINATION DIRECTIVE TO VOTING SYSTEM

7    VENDORS ABOUT THE TYPES OF VOTING SYSTEMS THAT WILL BE

8    ACCEPTED FOR EXAMINATION, SEE PARAGRAPH THREE OF

9    DIRECTIVE, WHICH INCLUDES A NEW SECURITY STANDARD,

10   ATTACHMENT E, THAT REINFORCES THE FEBRUARY 9TH DIRECTIVE

11   THAT ALL VOTING SYSTEMS PURCHASED ON OR AFTER FEBRUARY

12   9TH, 2018 IN PENNSYLVANIA MUST BE OF THE TYPE THAT

13   EMPLOYS A VOTER-VERIFIABLE PAPER RECORD OR

14   VOTER-VERIFIABLE -- SORRY.  SEE, THERE I GO -- BALLOT OR

15   RECORD OF THE VOTES CAST BY A VOTER.

16              DO YOU WANT ME TO EXPLAIN WHAT THAT IS?

17   Q.      YES.

18   A.      SO WE PUT OUT -- SO THIS WAS THE REVISED

19   VERSION, BUT BACK EARLIER IN APRIL, WE HAD PUT OUT THE

20   INITIAL VERSION OF WHAT IS CALLED AN IFB, WHICH IS

21   INVITATION FOR BID, WHICH IS LIKE AN RFP.  AND IT'S

22   BASICALLY A STATEWIDE CONTRACT THAT ALLOWS -- AND A

23   STATEWIDE PROCUREMENT PROCESS THAT ALLOWS THE COUNTIES

24   NOT TO HAVE TO DO THEIR OWN RFP PROCESS.  SO WE HAD MADE

25   SOME REVISIONS TO THE ORIGINAL VERSION THAT INCLUDED

1      EXPANDED PROTECTIONS ON FOREIGN OWNERSHIP AND OTHER

2      THINGS TO MAKE IT EASIER FOR COUNTIES TO PROCURE THROUGH

3      THIS VEHICLE SHOULD THEY CHOOSE.

4             AND THIS PARAGRAPH MAKES REFERENCE TO THE

5      FACT THAT THAT -- YOU KNOW WHAT, I'M SORRY.  I MAY BE

6      THINKING ABOUT THE THING THAT COMES THE FOLLOWING

7      MONDAY.  I APOLOGIZE.  I TAKE ALL THAT BACK.

8             THIS WILL APPLY TO WHAT COMES NEXT

9      PROBABLY IN YOUR LINE OF QUESTIONING.

10     Q.    I WAS GOING TO STOP YOU THERE.  BUT WOULD YOU

11     EXPLAIN WHAT THE DOCUMENT IS --

12     A.    YES.  WHAT ACTUALLY THIS IS?

13     Q.    -- NUMBER --

14             THE COURT:  WAIT, WAIT, WAIT.  LET HIM

15     FINISH THE QUESTION.

16             THE WITNESS:  I'M SORRY.  OKAY.

17     BY MR. ARONCHICK:

18     Q.    EXPLAIN THE FOURTH BULLET POINT DOCUMENT AND

19     THEN WE'LL TURN TO IT SO THAT WE CAN ACTUALLY LOOK AT

20     THAT.

21     A.    APOLOGIES.  SO THIS ACTUALLY REFERS TO, WE

22     CREATED A NEW SECURITY STANDARD IN PENNSYLVANIA.  AS I

23     MENTIONED EARLIER, UNDER PENNSYLVANIA LAW ALL VOTING

24     SYSTEMS NEED TO BE CERTIFIED, BOTH BY THE FEDERAL EAC

25     AND BY THE STATE.  SO IN THE STATE, WE CREATED NEW

1    SECURITY STANDARDS TO UPGRADE THE TESTING THAT WAS

2    INVOLVED FOR EVERY NEW SYSTEM TO BE CERTIFIED.  AND THIS

3    REFERS TO THE DIRECTIVE THAT WENT TO ALL VENDORS THAT

4    ATTACHED THE NEW SECURITY STANDARD.

5    Q.      WOULD YOU TURN TO JX EXHIBIT 7.  IS THIS THE

6    DIRECTIVE THAT WAS SENT OVER TO MR. MAAZEL ON

7    SEPTEMBER 28, 2018?

8    A.      IT IS.

9    Q.      AND IT'S THE ONE THAT WAS -- THAT IS REFERRED TO

10   IN THE FOURTH BULLET POINT, CORRECT?

11   A.      CORRECT.

12   Q.      IS THIS A PUBLIC -- WAS THIS A PUBLICLY

13   AVAILABLE DOCUMENT?

14   A.      YES.

15   Q.      WHERE WAS IT POSTED?

16   A.      IT WAS POSTED ON OUR WEBSITE.  IT WAS ALSO

17   E-MAILED OUT TO COUNTIES, TO VENDORS, TO STAKEHOLDERS.

18   LOTS OF FOLKS.

19   Q.      ALL RIGHT.  AND THIS -- WAS THIS DOCUMENT GOING

20   TO GOVERN THE SECURITY REVIEWS OF THE NEW VOTING

21   SYSTEMS?

22                  MR. MAAZEL:  OBJECTION, LEADING.

23                  THE WITNESS:  YES.

24                  THE COURT:  YEAH.

25   BY MR. ARONCHICK:

1    Q.       WHAT WAS THE RELATIONSHIP OF THIS DOCUMENT TO

2    THE SECURITY REVIEWS IN YOUR INITIATIVE?

3    A.       SO --

4                    THE COURT:  GO AHEAD.  HE JUST ASKED THE

5    SAME QUESTION A LITTLE DIFFERENTLY TO SATISFY ALL THE

6    LAWYERS IN THE ROOM.  GO AHEAD.

7                    THE WITNESS:  THANK YOU, YOUR HONOR.

8                    THIS -- AGAIN, THIS LAYS OUT THE

9    DIRECTIVE TO THE VOTING SYSTEM VENDORS TO INFORM THEM

10   THAT FROM THERE FORWARD, ALL EXAMINATIONS WERE GOING TO

11   SET THESE STANDARDS FOR TESTING, SECURITY TESTING.

12   BY MR. ARONCHICK:

13   Q.       NOW, THE BULLET IN THE E-MAIL TO MR. MAAZEL

14   REFERS TO AN ATTACHMENT E IN THIS DIRECTIVE.  WOULD YOU

15   TURN TO ATTACHMENT E?

16                   MR. ARONCHICK:  WHICH, YOUR HONOR, IS

17   ABOUT IN THE MIDDLE OF THE DOCUMENT.  AND IT STARTS WITH

18   PAGE NUMBER 1 IN THE MIDDLE.

19                   THE COURT:  IS IT THE BLANK FORM?

20                   MR. ARONCHICK:  LET'S SEE IF WE CAN ALL

21   GET TO THE SAME PLACE.  THERE IS MAYBE --

22                   THE COURT:  I SEE IT.  THAT'S ATTACHMENT

23   B.  I'M SORRY.  I HAVE IT.  IT BEGINS WITH A SUMMARY?

24                   MR. ARONCHICK:  YES.

25                   THE COURT:  OKAY.

1       BY MR. ARONCHICK:

2       Q.       DO YOU HAVE THAT?

3       A.       YES, THANK YOU.

4       Q.       OKAY.   WHAT IS THIS, FOR EXAMPLE?   WHAT IS THAT?

5       FOR STARTERS, WHAT IS ATTACHMENT E?

6       A.       I'M SORRY, WHAT IS EXHIBIT E OR ATTACHMENT E?

7       Q.       ATTACHMENT E, WHAT IS IT?

8       A.       SO THIS IS THE ACTUAL SECURITY STANDARD THAT

9       WAS -- THE NEW SECURITY STANDARD THAT WAS ATTACHED TO

10      THE DIRECTIVE.

11      Q.       WOULD YOU TURN TO PAGE 2, NUMBER 2, ASSUMPTIONS.

12      A.       YES.

13      Q.       READ THE SECOND ASSUMPTION THAT IS IN THIS

14      DOCUMENT.

15      A.       ALL VOTING SYSTEMS PURCHASED ON OR AFTER

16      FEBRUARY 9, 2018, IN PENNSYLVANIA MUST BE OF THE TYPE

17      THAT EMPLOYS A VOTER-VERIFIABLE PAPER BALLOT OR A

18      VOTER-VERIFIABLE PAPER RECORD OF THE VOTES CAST BY A

19      VOTER.

20      Q.       AND THIS WAS PART OF THE INITIATIVE THAT YOU'VE

21      BEEN TESTIFYING TO?

22      A.       CORRECT.

23      Q.       ALL RIGHT.   AND TURN TO PAGE 5.   THERE IS A

24      SERIES OF CONFIRMATIONS.   WOULD YOU GO TO

25      CONFIRMATION -- WHAT HAS TO BE CONFIRMED?

1    A.        CONFIRM THAT THE VOTING SYSTEM PROVIDES A

2    MECHANISM FOR THE VOTER TO VALIDATE THE CONTENTS OF THE

3    BALLOT BEFORE IT IS CAST, IRRESPECTIVE OF THE MECHANISM

4    USED FOR CASTING THE VOTE.

5                        KEEP GOING?

6    Q.        KEEP GOING.

7    A.        THE SYSTEM MUST SUPPORT A VOTER-VERIFIABLE PAPER

8    BALLOT OR VOTER-VERIFIABLE PAPER RECORD WHICH CAN BE

9    USED BY ELECTION OFFICIALS TO VERIFY THE ELECTION

10   RESULTS.

11   Q.        WOULD YOU EXPLAIN WHY THIS CONFIRMATION WAS

12   WORDED IN THIS FASHION?

13   A.        AGAIN, YOU KNOW, AS YOU CAN SEE, IN THE FIRST

14   SENTENCE, IT ACTUALLY USES THE WORD BALLOT FOR BOTH.  SO

15   IT'S -- WE WANTED TO BE CLEAR THAT ANY MECHANISM CAN BE

16   USED, WHETHER IT'S A BALLOT-MARKING DEVICE, HAND-MARKED

17   PAPER BALLOT.  SO IRRESPECTIVE OF THE MECHANISM USED, IT

18   NEEDS TO PROVIDE AN OPPORTUNITY FOR THE VOTER TO VERIFY

19   THE VOTE BEFORE IT'S CAST.

20   Q.        OKAY.  NOW, LET'S GO BACK -- ONE OTHER THING I

21   WANTED TO BRING TO THE COURT'S ATTENTION.  WOULD YOU

22   TURN TO APPENDIX A, WHICH IS PAGE 19, APPENDIX TO THIS

23   ATTACHMENT.  DO YOU SEE THAT'S A RISK ASSESSMENT PLAN?

24   A.        YES.

25   Q.        WOULD YOU EXPLAIN WHAT THIS IS?

1    A.        SO THIS IS, YOU KNOW, A DETAILED DOCUMENT THAT

2    GOES THROUGH -- IT'S A TOOL USED TO HELP PROTECT THE

3    ACCURACY, INTEGRITY AND SECURITY OF ELECTIONS OF A

4    PARTICULAR VOTING SYSTEM.  SO TO EVALUATE THE SEVERITY

5    OF RISK, IT LOOKS AT CALCULATED RISKS, IT DESCRIBES

6    THOSE RISKS.  IF YOU SEARCH THROUGH IT, YOU CAN SEE IT

7    HAS QUALITATIVE VALUES ABOUT WHETHER IT'S VERY HIGH

8    RISK, HIGH, MODERATE, LOW, VERY LOW.  THE DESCRIPTIONS.

9    YOU KNOW, IT HAS YOU LOOK AT PROBABILITY, IMPACT,

10   ADVERSE IMPACT.  AND, YOU KNOW, AGAIN, AS TO WALK

11   THROUGH THE PROCESS OF EVALUATING EVERY SYSTEM AND

12   HOLDING IT TO THESE HIGHER STANDARDS.

13   Q.        IS THERE A DIFFERENCE BETWEEN CALCULATED RISK

14   AND THEORETICAL RISK?

15   A.        ABSOLUTELY.  I MEAN, THERE IS --

16   Q.        CAN YOU EXPLAIN?

17   A.        SURE.  I MEAN, CALCULATED RISKS ARE I THINK

18   DEFINED HERE.  CALCULATED RISKS ARE RISKS THAT THE

19   EXAMINER CAN DETERMINE THE SYSTEM'S GREATEST

20   VULNERABILITIES IN ACTUALITY.  HYPOTHETICAL RISKS COULD

21   BE ANYTHING, RIGHT?  I MEAN, YOU KNOW, THERE'S ANY

22   NUMBER OF THEORIES THAT SOMEBODY COULD COME UP WITH THAT

23   -- IT'S LITERALLY IMPOSSIBLE TO IDENTIFY EVERY SINGLE

24   THEORETICAL POSSIBLE RISK THAT COULD EXIST.  AND SO THIS

25   WAS A VERY SPECIFIC WAY TO GUIDE THE EXAMINER THROUGH

1      CALCULATED RISKS, RISKS THAT COULD BE IDENTIFIED,

2      ASSESSED, YOU KNOW, QUALITATIVELY, AND HOW TO GO THROUGH

3      THAT PROCESS.

4      Q.      ALL RIGHT.  LET'S GO BACK TO MS. UNGER'S E-MAIL

5      TO GO TO ANOTHER BULLET POINT OF INFORMATION YOU WERE

6      BRINGING TO MR. MAAZEL'S ATTENTION IN SEPTEMBER OF 2018

7      ABOUT YOUR INITIATIVE.

8                   WOULD YOU GO TO THE FIRST BULLET POINT?

9      A.      I FOUND IT.

10     Q.      EXHIBIT JX 14.

11     A.      YES.

12     Q.      WHAT IS THE FIRST BULLET?  WHAT IS THAT DOCUMENT

13     THAT YOU ARE SENDING TO MR. MAAZEL?

14     A.      SO THE STATUS, SO -- IF THIS IS THE PENNSYLVANIA

15     VOTING SYSTEM AND E POLL BOOK STATUS REPORT.  SO THIS

16     WAS A REGULAR STATUS REPORT THAT THE DEPARTMENT OF STATE

17     PUT OUT THAT IDENTIFIED ALL THE SYSTEMS THAT WERE -- HAD

18     PUT THEMSELVES FORTH FOR EITHER BEING INTERESTED IN

19     CERTIFICATION OR WERE IN THE PROCESS OF CERTIFICATION OR

20     HAD BEEN CERTIFIED, AND IDENTIFIED THE STATUS OF THOSE

21     EXAMINATIONS, BOTH WITH THE FEDERAL EAC AND WITH THE

22     STATE.

23     Q.      OKAY.  WOULD YOU TURN TO JX 12.

24     A.      YES.

25     Q.      THIS IS A SEPTEMBER 21, 2018 DOCUMENT?

1    A.      YES.

2    Q.      WHAT IS THIS DOCUMENT?

3    A.      SO THIS IS THAT STATUS REPORT THAT I WAS JUST

4    DESCRIBING.   THIS IS THE ONE -- WE PUT IT OUT

5    APPROXIMATELY MONTHLY.   IT WAS POSTED ON OUR WEBSITE, IT

6    WAS DISTRIBUTED TO COUNTIES, IT WAS DISTRIBUTED TO

7    STAKEHOLDERS, PUBLICLY AVAILABLE TO WHOMEVER WANTED IT.

8              DO YOU WANT ME TO TALK THROUGH IN MORE

9    DETAIL?

10   Q.      I WANT TO JUST GO THROUGH EACH OF THE SECTIONS

11   BRIEFLY.   THE MIDDLE OF THE FIRST PAGE, IT SAYS:

12   CERTIFIED SYSTEMS AND SYSTEMS UNDER TEST.

13             DO YOU SEE THAT?

14   A.      YES.

15   Q.      WOULD YOU EXPLAIN WHAT IT IS THAT'S UNDER THAT

16   HEADING AND THEN FOLLOWING IT?

17   A.      SO THIS WAS TO MAKE IT CLEAR THAT FOR -- IN

18   ADDITION TO WHATEVER IS IN THIS STATUS REPORT, THAT

19   THERE IS LOTS OF OTHER ADDITIONAL INFORMATION AVAILABLE.

20   SO IT SAYS, FOR INFORMATION ABOUT VOTING SYSTEMS AND E

21   POLL BOOKS THAT HAVE BEEN CERTIFIED, YOU COULD CLICK ON

22   THAT LINK, WHERE IT SAYS HERE, AND IT WOULD BRING YOU TO

23   THAT VOTING SYSTEMS PAGE ON OUR WEBSITE.

24             IN ADDITION, AS YOU CAN SEE, UNDERNEATH

25   IT, IT SAYS:   FOR THOSE UNDERGOING CERTIFICATION TESTING

1    AT THE FEDERAL LEVEL, YOU COULD CLICK ON THOSE LINKS AND

2    IT WOULD GIVE YOU, IN GREAT DETAIL, INFORMATION ABOUT

3    THOSE -- THE SYSTEMS AND ALL THEIR COMPONENTS AS WELL,

4    AND THE STATUS OF CERTIFICATION.

5    Q.      ALL RIGHT.  AND THEN THE SNAPSHOT, THE

6    DEPARTMENT OF STATE'S SYSTEMS UNDER TEST SNAPSHOT.

7    A.      YES.

8    Q.      WHAT ARE THESE ITEMS THAT ARE LISTED IN THESE

9    BOXES?

10    A.      SO AS YOU CAN SEE, IT SHOWS YOU THE MANUFACTURER

11    OF THE VOTING SYSTEM THAT IS EITHER EXPRESSED AN

12    INTEREST IN CERTIFICATION OR UNDERGOING THE TESTING

13    PROCESS.  IT SHOWS YOU THE MODEL NUMBERS, THE EXACT

14    MODEL NUMBER THAT HAS BEEN SUBMITTED FOR CONSIDERATION

15    IN PENNSYLVANIA.  AND THEN IT SHOWS YOU THE STATUS

16    UPDATE OF WHAT'S CURRENTLY HAPPENING.

17    Q.      ALL RIGHT.  AND THE SECOND ONE IS THE ES&S

18    SYSTEM?

19    A.      CORRECT.

20    Q.      WHAT IS THAT MODEL NUMBER?

21    A.      SO THAT'S THE EVS 6000/6021.

22    Q.      WHAT IS THAT?

23    A.      SO IT WAS ORIGINALLY SUBMITTED TO PENNSYLVANIA

24    FOR THE EVS 6000.  AND THEN DUE TO BASICALLY UPGRADES

25    THAT THEY HAD TO DO TO THE SYSTEM, AS IT SAYS HERE,

1    FIXES TO ANOMALIES, THEY RESUBMITTED THE SYSTEM AS 6021.

2    SO IT'S BASICALLY THE SAME SYSTEM BUT JUST WITH SOME --

3    THEY SAY NOT TO USE THE WORD FIX IN ELECTIONS, SO SOME

4    IMPROVEMENTS TO THE SYSTEM.

5              THE COURT:  OR LITIGATION, IT'S A BAD

6    WORD TO USE.  I'M SORRY.

7              THE WITNESS:  AND SO THIS -- SO THAT'S

8    THE CURRENT SYSTEM THAT'S SUBJECT OF LITIGATION TODAY.

9    BY MR. ARONCHICK:

10   Q.      AND WOULD YOU TURN TO THE THIRD PAGE.

11   DEPARTMENT OF STATE UPCOMING ACTIONS IS ANOTHER SECTION?

12   A.      CORRECT.

13   Q.      WHAT IS THIS SECTION MEANT TO TELL THE READER?

14   A.      SO THAT TELLS YOU WHAT'S COMING NEXT.  SO AS YOU

15   COULD SEE, THE ES&S EVS 6021 WAS GOING TO BE -- HAD A

16   DUE DATE, WAS BEING SCHEDULED FOR EXAMINATION

17   SEPTEMBER 24TH TO 28TH.  AND IT WAS IN THE TEST PLANNING

18   PROCESS.  AND YOU CAN SEE THE DESCRIPTION OF THAT

19   UNDERNEATH.

20   Q.      DOES -- WHAT IS A SUITE OF VOTING SYSTEMS, WHEN

21   THAT WORD IS USED, A SUITE OF VOTING SYSTEMS?

22   A.      SO A SUITE OF VOTING SYSTEMS CAN MEAN SLIGHTLY

23   DIFFERENT THINGS FOR EACH SYSTEM OR SUITE THAT'S

24   SUBMITTED FOR CERTIFICATION.  BUT ESSENTIALLY IT'S A

25   NUMBER OF DIFFERENT CONFIGURATIONS THAT CAN BE USED FOR

1   VOTING.  SO, FOR EXAMPLE, YOU MIGHT HAVE A PAID-FOR-HOUR

2   SCENARIO.  IN PENNSYLVANIA, YOU MIGHT HAVE A SYSTEM THAT

3   ALLOWS FOR HAND-MARKED PAPER BALLOT VOTING.  I MEAN, ALL

4   OF THEM WOULD HAVE SOME COMPONENT THAT ALLOWED FOR

5   HAND-MARKED PAPER BALLOT VOTING.  AND SCANNERS, YOU

6   WOULD SOME BALLOT-MARKING DEVICES.  SOME MIGHT HAVE

7   MULTIPLE CHOICES OF BALLOT-MARKING DEVICES OR MULTIPLE

8   CHOICES OF SCANNERS, BUT ALL OF THOSE DIFFERENT

9   CONFIGURATIONS ARE PART OF ONE SYSTEM OR SUITE.

10  Q.      AND HOW WOULD A READER DETERMINE WHAT ARE THE

11  COMPONENTS OF, SAY, THE EVS 6021 SUITE?

12  A.      SO IF YOU GO BACK TO THAT FIRST PAGE AGAIN, THE

13  LINKS THAT ARE THERE WILL TAKE YOU -- YOU COULD DO THAT

14  ON THE, YOU KNOW, IF YOU'RE TALKING ABOUT ES&S, YOU CAN

15  DO IT ON THE ES&S WEBSITE, YOU CAN DO IT ON DEPARTMENT

16  OF STATE WEBSITE, YOU CAN DO IT ON EAC WEBSITE, LOOK AT

17  THE DIFFERENT COMPONENTS, YOU COULD LOOK AT DETAILS OF

18  THE DIFFERENT COMPONENTS OF THE CONFIGURATIONS AND FIND

19  OUT EVERYTHING YOU WANT TO KNOW.

20  Q.      AND IF THE READER WANTED TO GO -- TO DETERMINE

21  WHAT WAS IN THE EVS 6021 SUITE AT THIS TIME, DO YOU KNOW

22  IF THEY WOULD HAVE SEEN THAT ONE OF THE ITEMS WAS THE

23  EXPRESSVOTE XL?

24  A.      YES.

25  Q.      WAS THAT PART OF THE SUITE?

1      A.      IT WAS.

2      Q.      NOW, LOOKING AT PAGE 3, THERE IN THE MIDDLE

3      COLUMN OF UPCOMING ACTIONS, THERE IS -- THERE ARE A

4      SERIES OF DATES OF EXAMINATIONS FOR EACH OF THE SYSTEMS

5      REFERENCED.  WHAT WERE THESE DATES?  WHAT WAS HAPPENING

6      ON EACH OF THESE DATES?

7      A.      I'M SORRY, WHICH TAB ARE YOU ON?

8      Q.      I'M SORRY, NUMBER 12, PAGE 3, MIDDLE COLUMN.

9      A.      YOU ARE ASKING ME -- I'M SORRY, WHAT THE DATES

10     WERE THAT --

11     Q.      YEAH.  WHAT IS THE SIGNIFICANCE OF THESE DUE

12     DATES THAT WERE IN THAT COLUMN?

13     A.      OH.  SO THE TESTING WAS I THINK LITERALLY

14     HAPPENING -- WHAT'S THE DATE OF THE E-MAIL?

15     Q.      MS. UNGER'S E-MAIL IS SEPTEMBER THE 28TH.

16     A.      OKAY.  SO IT WAS -- IT HAD JUST HAPPENED THAT

17     WEEK, THE TESTING.

18     Q.      FOR THE ES?

19     A.      FOR THE ES&S 6021.

20     Q.      AND THEN THE FOLLOWING DATES FOR THE OTHER

21     SYSTEMS WERE GOING TO HAPPEN IN THE SUBSEQUENT WEEKS?

22     A.      CORRECT.

23     Q.      AND THIS WAS INFORMATION RELAYED TO MR. MAAZEL

24     ON SEPTEMBER 28, 2018?

25     A.      CORRECT.

1    Q.        LET'S GO BACK TO THE -- THAT E-MAIL, JX 14.   THE

2    FIFTH BULLET POINT OF INFORMATION GIVEN TO MR. MAAZEL'S

3    TEAM.

4    A.        YES.

5    Q.        WHAT IS THAT?

6    A.        SO THAT'S WRITTEN TESTIMONY FROM SEPTEMBER 25,

7    2018, SO THAT SAME WEEK, THAT COMMISSIONER MARKS

8    PRESENTED TO THE SENATE STATE GOVERNMENT COMMITTEE,

9    WHICH CONTAINED AN OVERVIEW OF THE STATE PROCESS AND

10   TIMELINES FOR VOTING SYSTEM REPLACEMENT.

11   Q.        AND WOULD YOU TURN TO JX 13.   WHAT IS THIS?

12   A.        THIS IS THAT WRITTEN TESTIMONY REFERRED TO.

13   Q.        SEPTEMBER 25, 2018 TESTIMONY?

14   A.        CORRECT.

15   Q.        TO THE SENATE STATE GOVERNMENTS COMMITTEE?

16   A.        CORRECT.

17   Q.        DID YOU REVIEW THIS TESTIMONY BEFORE MR. MARKS'

18   TESTIMONY?

19   A.        I DID.

20   Q.        DID YOU REVIEW THIS ACTUAL DOCUMENT?

21   A.        THE WRITTEN TESTIMONY?

22   Q.        MR. MARKS' TESTIMONY?

23   A.        YES.

24   Q.        OKAY.   I WANT TO JUST POINT OUT A COUPLE OF

25   THINGS IN YOUR -- ASK YOU TO POINT OUT A COUPLE OF

1    THINGS.  LOOK AT THE FIRST PAGE, THE LAST PARAGRAPH ON

2    THE FIRST PAGE.  WHAT IS BEING CONVEYED TO THE STATE

3    SENATE ABOUT THE TYPES OF MACHINES AND RECORDS INVOLVED

4    IN THE STATE'S INITIATIVE?

5    A.    SO --

6              MR. MAAZEL:  OBJECTION, YOUR HONOR.  SHE

7    IS NOT THE WITNESS WHO TESTIFIED HERE, SO SHE IS JUST

8    TALKING ABOUT WHAT SOMEONE ELSE --

9              THE COURT:  OVERRULED.

10            THE WITNESS:  SO THIS -- WE WERE -- WE

11    BASICALLY WANTED TO -- WE WERE TRYING TO --

12    BY MR. ARONCHICK:

13    Q.    FIRST READ IT.

14    A.    OKAY, SORRY.

15              THESE EXPERTS, INCLUDING PROFESSIONALS IN

16    NATIONAL SECURITY INTELLIGENCE, COMPUTER SCIENCE,

17    ELECTIONS AND MORE, HAVE URGED STATES TO ACT AS QUICKLY

18    AS POSSIBLE TO REPLACE OLDER VOTING MACHINES WITH VOTING

19    SYSTEMS THAT PRODUCE A PAPER RECORD THAT VOTERS CAN

20    VERIFY, WHICH ENABLE ROBUST POST-ELECTION AUDITS.

21              DO YOU WANT ME TO KEEP GOING?

22    Q.    NO, THAT'S FINE.

23              AND AGAIN, WHAT VOTING SYSTEMS WAS MR.

24    MARKS REFERRING TO?

25    A.    SO THIS WAS, AGAIN, WHAT -- THEY WERE ALL --

1    WHETHER IT WAS HAND-MARKED PAPER BALLOTS OR

2    BALLOT-MARKING DEVICES, AS LONG AS IT PRODUCED A PAPER

3    RECORD THAT WAS THE OFFICIAL RECORD OF THE VOTE, THE

4    VOTER CAN VERIFY AND THAT ENABLED THE AUDITS AFTER THE

5    FACT, THAT WAS WHAT MATTERED.

6    Q.       OKAY.  AND GO TO THE TOP OF THE NEXT PAGE.  AND

7    TAKE YOUR TIME.  SLOWLY READ THROUGH THIS PARAGRAPH, IF

8    YOU WILL.

9    A.       THE STEM SECTOR AND OTHER PROFESSIONAL FIELDS

10   ALSO STRONGLY URGE THESE ACTIONS.  THIS MONTH THE

11   NATIONAL ACADEMIES OF SCIENCES, ENGINEERING AND MEDICINE

12   ISSUED A REPORT SECURING THE VOTE PROTECTING AMERICAN

13   DEMOCRACY.  THE REPORT ASSESSES CURRENT TECHNOLOGY AND

14   STANDARDS FOR VOTING AND RECOMMENDS STEPS THAT FEDERAL,

15   STATE AND LOCAL GOVERNMENTS' ELECTION ADMINISTRATORS,

16   AND VENDORS OF VOTING TECHNOLOGY SHOULD TAKE TO IMPROVE

17   THE SECURITY OF ELECTION INFRASTRUCTURE, INCLUDING THAT

18   ALL ELECTIONS SHOULD BE CONDUCTED WITH PAPER BALLOTS BY

19   2020 AND STATES SHOULD MANDATE RISK-LIMITING AUDITS

20   WITHIN A DECADE.  ADDITIONALLY --

21            DO YOU WANT ME TO KEEP GOING?

22   Q.       YES.

23   A.       ADDITIONALLY, MULTIPLE COURTS HAVE ISSUED

24   DECISIONS IN RECENT WEEKS INDICATING THAT STATES AND

25   COUNTIES HAVE FAILED TO HEED THESE CHANGED STANDARDS FOR

1    SECURITY AND CONTINUE TO EMPLOY PAPERLESS DRE VOTING

2    MACHINES, MAY VIOLATE VOTERS' FEDERAL CONSTITUTIONAL

3    RIGHTS.   PENNSYLVANIA IS ONE OF ONLY A HANDFUL OF STATES

4    REMAINING THAT USE ALL OR PRIMARILY PAPERLESS VOTING

5    SYSTEMS.

6    Q.     OKAY.   WHAT IS THE POINT OF CONVEYING THIS

7    INFORMATION TO THE STATE SENATE?

8    A.     SO WE WERE AT THIS POINT, YOU KNOW, I GUESS

9    CLOSE TO SIX MONTHS IN SINCE WE HAD SET THE TIMELINE.

10   AND WE REALLY WANTED TO BUILD SUPPORT IN THE LEGISLATURE

11   FOR THIS INITIATIVE.   AND THEREBY ALSO HOPE TO BUILD

12   SUPPORT FOR FUNDING FOR THE INITIATIVE FROM THE

13   LEGISLATURE, SO WE WERE -- AND ALSO WITH THE COUNTIES AS

14   WELL.

15          SO THIS -- AT THIS PARTICULAR HEARING,

16   THERE WAS ALSO A COUNTY ELECTION DIRECTOR WHO WAS

17   TESTIFYING AS WELL.   AND SO WE WANTED TO MAKE IT CLEAR

18   THAT THIS WAS A NATIONAL MOVEMENT, THIS WAS NOT ISOLATED

19   IN PENNSYLVANIA, THIS WAS WELL FOUNDED BASED ON NATIONAL

20   SECURITY, YOU KNOW, EXPERTS IN LAW, TECHNOLOGY, COMPUTER

21   SCIENCE AND SO FORTH, WHO WERE ALL ADVISING THAT, BY

22   2020, VOTERS BE VOTING ON VOTING SYSTEMS THAT PROVIDED A

23   VOTER-VERIFIABLE PAPER BALLOT SYSTEM.   AND THAT IT BE

24   AUDITABLE AS WELL.

25   Q.     NOW, THE SECURING THE VOTE REPORT THAT YOU

1    REFERRED TO HERE, WHY DID YOU REFER TO THAT PARTICULAR

2    REPORT?

3    A.      WELL, IT WAS, YOU KNOW, IT'S -- THE NATIONAL

4    ACADEMIES, YOU KNOW, HAVE A REALLY STRONG MIX OF

5    COMPUTER SCIENCE, LAW, ELECTIONS, OTHER TECHNOLOGY

6    EXPERTS, WHO ALL CAME TOGETHER TO MAKE THIS

7    RECOMMENDATION.  AND WE TOOK IT SERIOUSLY.

8    Q.      AND WAS THE DEPARTMENT FOLLOWING THESE

9    RECOMMENDATIONS FROM THIS REPORT IN ITS INITIATIVE?

10   A.      WE WERE.

11            MR. MAAZEL:  OBJECTION, LEADING, YOUR

12   HONOR.

13   BY MR. ARONCHICK:

14   Q.      WHAT WAS THE RELATIONSHIP BETWEEN THIS REPORT

15   AND THE DEPARTMENT'S INITIATIVES?

16   A.      WE USED IT A LOT AS -- IN OUR ADVOCACY.

17   BECAUSE, AGAIN, ANY OPPORTUNITY WE HAD TO MAKE IT CLEAR

18   THAT WE WERE NOT MAKING THIS UP, THIS WASN'T SOMETHING

19   THAT, YOU KNOW, WASN'T NECESSARY, THAT THERE WERE

20   EXPERTS ACROSS THE COUNTRY WHO WERE DEMONSTRATING WHY

21   THIS NEEDED TO BE THE SCENARIO, THAT WE UPGRADE IN

22   PENNSYLVANIA, AND THAT'S WHY WE WERE FOLLOWING IT.

23   Q.      RIGHT.  AND WOULD YOU TURN TO DX -- THIS IS A

24   DIFFERENT BOOK -- DX F.  DO YOU HAVE THAT?

25   A.      I DO.

1    Q.      ARE THESE EXCERPTS FROM THE SECURING THE VOTE

2    REPORT THAT YOU JUST REFERRED TO?

3    A.      YES.

4    Q.      YOU REFERRED TO EXPERTS IN LAW AND TECHNOLOGY

5    THAT WERE PART OF THIS REPORT?

6    A.      YES.

7    Q.      WOULD YOU TURN TO SMALL VII?

8    A.      YES.

9    Q.      COMMITTEE ON SCIENCE, TECHNOLOGY AND LAW?

10   A.      YES.

11   Q.      WHO WERE THE CO-CHAIRS OF THAT COMMITTEE?

12   A.      DAVID BALTIMORE, PRESIDENT EMERITUS, AND ROBERT

13   ANDREWS MILLIKAN, PROFESSOR OF BIOLOGY AT CALTECH.  AND

14   DAVID TATEL, JUDGE OF THE U.S. COURT OF APPEALS FOR THE

15   D.C. CIRCUIT.

16   Q.      AND THEN THE OTHER NAMES, I GUESS, THEY CAN

17   SPEAK FOR THEMSELVES THERE.

18           DID THIS REPORT ADDRESS THE ROLE OF PAPER

19   IN ELECTIONS?

20   A.      YES.

21   Q.      WOULD YOU TURN TO WHAT IS PAGE 42.  IT'S -- AT

22   THE TOP OF THE PAGE IT SAYS 42, OR ALSO PAGE 151 AND

23   167.  DO YOU HAVE THAT?

24   A.      I DO.

25   Q.      A COUPLE OF PAGES IN?

1    A.      YES.

2    Q.      ALL RIGHT.  AND THIS IS ABOUT THE ROLE OF PAPER

3    IN ELECTIONS?

4    A.      YES.

5    Q.      WOULD YOU READ THE DEFINITION OF PAPER BALLOTS

6    THAT THE SECURING THE VOTE REPORT ISSUED, THE REPORT

7    THAT YOU ARE TELLING THE SENATE ABOUT AND THAT YOU TOLD

8    MR. MAAZEL ABOUT?  READ THE DEFINITION ON PAPER BALLOTS.

9    A.      SO IT SAYS:  PAPER BALLOTS DEFINED.  BECAUSE

10   RECORDS OF BALLOTS MAY TAKE MANY FORMS, IT IS IMPORTANT

11   TO CLEARLY DEFINE WHAT IS MEANT BY PAPER BALLOT.  FOR

12   THE PURPOSES OF THIS REPORT, REFERENCES TO PAPER BALLOTS

13   REFER TO ORIGINAL RECORDS THAT ARE PRODUCED BY HAND OR A

14   BALLOT-MARKING DEVICE WHICH ARE HUMAN READABLE IN A

15   MANNER THAT IS EASILY ACCESSIBLE FOR INSPECTION AND

16   REVIEW BY THE VOTER WITHOUT ANY COMPUTER INTERMEDIARY,

17   I.E., VOTER-VERIFIABLE, ACCOUNTABLE BY MACHINE, SUCH AS

18   A SCANNER OR BY HAND, AND WHICH MAY BE RECOUNTED OR

19   AUDITED BY MANUAL EXAMINATION OF THE HUMAN READABLE

20   PORTION OF THE BALLOT.

21           DO YOU WANT ME TO KEEP READING?

22   Q.      SURE.

23   A.      A PAPER BALLOT-BASED VOTING SYSTEM MAKES THE

24   PAPER BALLOT THE OFFICIAL BALLOT OF RECORD OF THE

25   VOTER'S EXPRESSED INTENTIONS.  OTHER REPRESENTATIONS,

1  E.G., AN ELECTRONIC REPRESENTATION PRODUCED BY A

2  SCANNER, ARE DERIVATIVE AND ARE NOT VOTER-VERIFIABLE.

3  THE HUMAN READABLE PORTION OF THE CAST PAPER BALLOT

4  PROVIDES THE BASIS FOR AUDITS AND RECOUNTS.

5  Q.      AND WAS -- WHAT WAS THE SIGNIFICANCE OF THIS

6  DEFINITION IN THE DEPARTMENT'S INITIATIVE?

7  A.      SO THIS WAS CONSISTENT WITH HOW WE WERE -- WITH

8  OUR INITIATIVE.  SO WE WERE CERTIFYING SYSTEMS THAT

9  INCLUDED BOTH HAND-MARKED PAPER BALLOTS AND

10 BALLOT-MARKING DEVICES, WHICH IS CONSISTENT WITH THIS.

11 AND, AGAIN, AND EVERY BALLOT HAD TO HAVE THE HUMAN

12 READABLE COMPONENT OF THE BALLOT, SO THAT THE VOTER --

13 NOT ONLY THE VOTER COULD VERIFY THE HUMAN READABLE

14 COMPONENT, BUT ALSO THE ELECTION OFFICIALS FOR THE AUDIT

15 AFTER THE FACT.  AND THAT THIS WOULD BE THE OFFICIAL

16 VOTE OF RECORD, WAS THE PAPER.

17 Q.      AND SO EARLIER WHEN I ASKED YOU RIGHT AT THE

18 BEGINNING TO READ THE ACTUAL CERTIFICATION OF THE ES&S

19 MACHINE THAT INCLUDED THE XL, THE NOVEMBER 30

20 CERTIFICATION, EXHIBIT 34.  DO YOU RECALL THAT?

21 A.      YES.

22 Q.      AND WE READ THAT THE XL HAD A PAPER BALLOT

23 MATERIAL BEHIND THE GLASS?

24 A.      CORRECT.

25 Q.      IS THAT CONSISTENT WITH THIS DEFINITION?

1    A.      IT IS.

2    Q.      AND WOULD YOU LOOK AT EXHIBIT 57 ONCE MORE,

3    JX-57?

4    A.      YES.

5    Q.      WOULD YOU EXPLAIN TO THE COURT HOW THIS DOCUMENT

6    RELATES TO THE DEFINITION OF PAPER BALLOT THAT YOU JUST

7    READ FROM THE SECURING THE VOTE REPORT?

8    A.      SURE.  SO THIS IS AN ORIGINAL RECORD PRODUCED

9    BY -- AND I AM JUST KIND OF LOOKING AT THE WORDS IN THE

10   MAAZEL REPORT -- IT'S AN ORIGINAL RECORD PRODUCED BY A

11   BALLOT-MARKING DEVICE, WHICH, AS YOU CAN SEE, IS HUMAN

12   READABLE.  AND AS IT IS DESCRIBED IN THE CERTIFICATION

13   REPORT, IT COMES BEFORE THE GLASS FOR THE VOTER TO

14   VERIFY.  AND IT'S THE HUMAN READABLE TEXT THAT'S THE

15   OFFICIAL VOTE OF RECORD.  SO FOR AUDITS OR RECOUNTS, THE

16   WORDS WOULD BE COMPARED TO THE TABULATED RESULTS FROM

17   ELECTION NIGHT.

18   Q.      OKAY.  AND ONE MORE QUESTION ABOUT SECURING THE

19   VOTE EXCERPT.  TURN TO THE PAGE JUST BEFORE THE ONE YOU

20   JUST READ, THIS WOULD BE PAGE 41, OR 150 AND 167 AT THE

21   TOP.  DO YOU SEE THAT?

22   A.      YES.

23   Q.      ARE THERE DEFINITIONS HERE FOR HAND-MARKED PAPER

24   BALLOT SYSTEMS?

25   A.      YES.

1    Q.    AND COUNTING PAPER BALLOT SYSTEMS?

2    A.    YES.

3    Q.    COULD YOU REFER THE COURT AND READ WHAT THE

4    DEFINITIONS ARE IN THIS REPORT AND HOW THE WORDS ARE

5    USED?

6    A.    STARTING FROM WHICH ONE?

7    Q.    START WITH MACHINE MARKED PAPER BALLOT.

8    A.    OKAY.  MACHINE MARKED PAPER BALLOT SYSTEMS.  A

9    GROWING NUMBER OF JURISDICTIONS ARE USING ELECTRONIC

10    BALLOT MARKING DEVICES, BMD'S, WHICH USE ELECTRONIC

11    DEVICES TO MARK PAPER BALLOTS ACCORDING TO VOTER'S

12    INSTRUCTIONS.  THE PAPER BALLOTS ARE USUALLY COUNTED BY

13    OPTICAL SCANNERS.

14    HAND-COUNTED PAPER BALLOTS.  A SMALL

15    NUMBER OF JURISDICTIONS CONTINUE TO MANUALLY COUNT PAPER

16    BALLOTS CAST IN POLLING PLACES.

17    Q.    NOW, GOING BACK TO MS. UNGER'S E-MAIL, WHICH WAS

18    DX -- JX, I'M SORRY, 14.  YOU'VE NOW ADDRESSED THE FIVE

19    BULLET POINTED ITEMS THAT WERE SENT TO THE PLAINTIFF'S

20    TEAM IN ADVANCE OF THE SETTLEMENT DISCUSSIONS?

21    A.    YES.

22    Q.    DID -- WAS THERE ALSO ANOTHER DOCUMENT THAT WAS

23    PROMISED TO BE SENT TO THE PLAINTIFF'S TEAM A COUPLE OF

24    DAYS LATER?

25    A.    YES.

1    Q.      WHAT IS THAT?

2    A.      THAT'S THE IFP THAT I STARTED TO DESCRIBE

3    EARLIER?

4    Q.      WOULD YOU POINT TO THE PART OF THE DOCUMENT THAT

5    YOU ARE REFERRING TO?

6    A.      SURE.  AT THE VERY BOTTOM, IT SAYS:  I ALSO

7    EXPECT TO OBTAIN A CONTRACT TO FORWARD ON MONDAY TO

8    WHICH COUNTIES CAN BUY VOTING SYSTEMS.  IT CONTAINS SOME

9    REQUIREMENTS THAT WE EXPECT THAT PLAINTIFFS WOULD

10   SUPPORT.

11   Q.      AND THEN WOULD YOU TURN TO JX 17 --

12   A.      YES.

13   Q.      -- AND 18, BOTH OF THEM.

14   A.      OKAY.

15   Q.      WHAT ARE THESE DOCUMENTS?

16   A.      SO 17 IS THE COVER E-MAIL.

17   Q.      THIS IS THE FOLLOWING MONDAY?

18   A.      CORRECT, SORRY.  MONDAY, OCTOBER 1ST.  AND THIS

19   IS THE E-MAIL THAT SUE ANN UNGER SENT TO PLAINTIFF'S

20   COUNSEL WITH THAT COOPERATING PURCHASING AGREEMENT

21   REFERRED TO AT THE BOTTOM OF THE PRIOR LETTER.

22   Q.      OKAY.  AND NOW, THIS WOULD BE THE PLACE WHERE

23   YOU COULD PERHAPS BRIEFLY EXPLAIN TO THE COURT WHAT IS

24   THIS DOCUMENT.

25   A.      SURE.  SO THIS IS THE IFB THAT I WAS REFERRING

1   TO, INVITATION FOR BIDS, THAT'S LIKE AN RFP PROCESS.

2   AND THIS SETS UP WHAT'S REFERRED TO AS A COSTARS

3   AGREEMENT, SO IT'S A STATEWIDE CONTRACT THAT ALLOWS

4   COUNTIES, RATHER THAN GOING THROUGH THEIR OWN

5   PROCUREMENT PROCESS, HAVE THE OPTION OF PROCURING

6   THROUGH THE STATEWIDE CONTRACT INSTEAD.  AND WE -- DO

7   YOU WANT ME TO KEEP DESCRIBING?

8   Q.      YEAH, SURE.

9   A.      SO THIS IFB ALSO INCLUDED E POLL BOOKS, BUT

10  THAT'S NOT RELEVANT FOR THE CURRENT LITIGATION.  BUT IT

11  ALSO ESTABLISHED, YOU KNOW, TECHNICAL REQUIREMENTS, YOU

12  KNOW, PROTECTIONS TO THE COUNTIES FOR PARTICULAR -- LIKE

13  MAINTENANCE COVERAGE.  AS I MENTIONED EARLIER, WE HAD IN

14  THERE INFORMATION ABOUT FOREIGN OWNERSHIP.  SO IT HAS A

15  LOT IN THERE.  BUT PRIMARILY, IT WAS A VEHICLE FOR

16  VENDORS AND COUNTIES TO UNDERSTAND.  AND ALL THE

17  COMPONENTS THAT WERE REQUIRED OF THE VOTING SYSTEMS AND

18  HOW THEY COULD PROCURE IT THROUGH THIS STATEWIDE

19  CONTRACT.

20  Q.      WOULD YOU TURN TO PAGE 7 OF 29, WHICH IS IN THE

21  MIDDLE, AGAIN, I MEAN THE FIRST, I DON'T KNOW, 15 OR SO

22  PAGES AREN'T NUMBERED AND THEN THERE'S A NUMBERING THAT

23  STARTS -- I'LL TRY TO GET EVERYBODY THERE -- AFTER THE

24  TERMS AND CONDITIONS.  IT'S CALLED COSTARS CONTRACT,

25  SPECIAL CONTRACT TERMS AND CONDITIONS.  STARTS PAGE 1 OF

1    29, SORT OF ABOUT 15 PAGES IN.

2    A.    GOT IT.

3    Q.    DO YOU SEE THAT?

4    A.    YES.

5    Q.    OKAY.  SO I JUST WANT TO GO OVER A COUPLE OF

6    ITEMS IN HERE.  AGAIN, THIS WHOLE CONTRACT WAS SENT TO

7    MR. MAAZEL'S TEAM?

8    A.    CORRECT.

9    Q.    ALL THE DETAILS?

10    A.    CORRECT.

11    Q.    AND IT WAS ALSO PUBLIC, MADE PUBLIC?

12    A.    YES.

13    Q.    POSTED PUBLICLY?

14    A.    YES.

15    Q.    OKAY.  SO PAGE 7 OF 29, SECTION B, BID

16    RESPONSIVENESS REQUIREMENTS.  DO YOU SEE THAT?

17    A.    YES.

18    Q.    WOULD YOU READ THE 1A MINIMUM TECHNICAL

19    REQUIREMENT THAT BIDDERS HAVE TO MEET?

20    A.    BIDDERS MUST PROVIDE VOTING SYSTEM SOLUTIONS

21    THAT INCLUDE A VOTER-VERIFIABLE PAPER RECORD.  THE

22    BIDDER MUST DESCRIBE AND PROVIDE DOCUMENTATION OF ITS

23    ABILITY TO SUPPLY AND SERVICE ITS VOTING SYSTEM FOR THE

24    DURATION OF THE SYSTEM'S LIFE EXPECTANCY.

25    Q.    ALL RIGHT.  AND THEN THERE'S SOME DETAILS.  BUT

1    GO TO PAGE 10.   THE VOTING SYSTEM AND EPB REQUIREMENTS?

2    A.      YES.

3    Q.      WHAT IS THE REQUIREMENT UNDER 1A, SMALL II?

4    A.      ONLY TOUCH SCREEN UNITS WITH A VOTER-VERIFIABLE

5    PAPER RECORD ARE ALLOWED.

6    Q.      AND WHY ARE YOU USING THESE WORDS, THE MINIMUM

7    AND THE TECHNICAL REQUIREMENTS?

8    A.      AGAIN, THE -- I MEAN THIS USES -- THIS USES THE

9    WORD RECORD, WHICH IS USED INTERCHANGEABLY WITH BALLOT.

10   WHAT MATTERS HERE IS THAT THE VOTER IS PRESENTED WITH

11   THE OPPORTUNITY TO VERIFY THEIR VOTE BEFORE THE VOTE IS

12   CAST.

13   Q.      THEN PAGE 11, THERE'S ANOTHER VOTING SYSTEM

14   REQUIREMENT IN 2C.

15   A.      I'M SORRY, WHICH PAGE?

16   Q.      PAGE 11.

17   A.      OKAY.

18   Q.      2C?

19   A.      YES.

20   Q.      RESILIENCY, THE COURT ASKED ABOUT RESILIENCY.

21   WHAT IS THAT REQUIREMENT?

22   A.      SO THE VOTING MACHINE MUST ADHERE TO THE

23   STANDARDS CONCERNING RESILIENCY, AUDITABILITY AND

24   SECURITY, AND MUST BE OF THE TYPE THAT EMPLOYS A

25   VOTER-VERIFIABLE PAPER BALLOT OR VOTER-VERIFIABLE PAPER

1   RECORD OF THE VOTES CAST BY A VOTER.

2   Q.      OKAY.  SO THIS DOCUMENTATION, ALL OF THIS

3   DOCUMENTATION WAS SENT OVER TO MR. MAAZEL ON OR -- BY,

4   ON OR OCTOBER 1, 2018, CORRECT?

5   A.      CORRECT.

6   Q.      NOW, I'M NOT GOING TO GO THROUGH THE DETAILS

7   WITH YOU OF THE BACK AND FORTH OF THE NEGOTIATIONS THAT

8   ENSUED, BECAUSE YOU HAD LAWYERS THAT DID THAT, RIGHT?

9   A.      CORRECT.

10  Q.      MR. GATES, MS. KOTULA, WHO WILL TESTIFY SHORTLY.

11                  I WANT TO MOVE FORWARD TO THE

12  OCTOBER 11TH SETTLEMENT CONFERENCE WITH MAGISTRATE RICE

13  THAT YOU WERE AT, CORRECT?

14  A.      CORRECT.

15  Q.      ALL RIGHT.  DID -- AT THE CONFERENCE YOU WERE

16  AT, DID ANY MEMBER OF THE PLAINTIFFS' TEAM SAY TO YOU,

17  WE ARE NOT GOING TO SETTLE ON THE BASIS OF AN INITIATIVE

18  THAT INCLUDES BALLOT-MARKING DEVICES?

19  A.      NEVER.

20  Q.      DID THEY EVER SAY TO YOU, WE ARE NOT LOOKING AT

21  ANY BROAD DEFINITION OF PAPER BALLOT, WE HAVE A VERY

22  NARROW DEFINITION AND THAT'S THE BASIS WE ARE GOING TO

23  SETTLE?

24                  MR. MAAZEL:  OBJECTION, LEADING.

25                  THE COURT:  OVERRULED.  THAT'S A KEY

1     QUESTION.  I DON'T KNOW HOW ELSE HE CAN ASK IT.

2                    THE WITNESS:  SO WE VERY CLEARLY DEFINED

3     THE MEANING OF THE TERMS IN THE CONTRACT, BOTH WHAT IT

4     INCLUDED AND WHAT IT DIDN'T INCLUDE.  THAT WAS

5     ALL-INCLUSIVE.  SO WHAT WAS DISCUSSED WAS THAT THE PATH

6     WE WERE ALREADY ON WAS ACCEPTABLE TO ALL PARTIES

7     INVOLVED.  AND AGAIN, WE MADE THAT VERY CLEAR BY THE USE

8     OF THE WORD CONTINUE TO DIRECT.  AND BY PROVIDING THE

9     PLAINTIFFS LOTS AND LOTS OF INFORMATION ABOUT EXACTLY

10    WHAT WAS INCLUDED ON THAT PATH.

11                    SO WHAT WAS KEY -- AND, AGAIN, THIS IS

12    SPELLED OUT IN THE SETTLEMENT AGREEMENT, IS THAT EVERY

13    SYSTEM HAD TO EMPLOY PAPER.  THE PAPER WAS THE OFFICIAL

14    VOTE OF RECORD THAT THE VOTER COULD VERIFY, THAT THIS

15    WAS AGAIN -- AND MAYBE I SHOULD PULL UP THE ACTUAL

16    AGREEMENT, SO I'M USING THE --

17                    THE COURT:  I'M SORRY.  YOUR ANSWER TO

18    THE QUESTION IS NO, THEY NEVER SAID THIS IS THE

19    DEFINITION OF BALLOT?

20                    THE WITNESS:  SORRY, YOUR HONOR, YES.

21                    THE COURT:  OKAY.

22    BY MR. ARONCHICK:

23    Q.     YES, THE ANSWER IS NO.

24    A.     YES, THE ANSWER IS NO.  SORRY.  THE ANSWER IS

25    NO.  WHAT WAS DISCUSSED IS WHAT IS -- WHAT ARE THE

1     TERMS.  ONLY -- THE ONLY THINGS THAT WERE DISCUSSED ARE

2     THE LANGUAGE IN THE SETTLEMENT AGREEMENT, NOT ANY OTHER

3     DEFINITION OF PAPER BALLOT.

4     Q.     ALL RIGHT.  DID -- AT THE SETTLEMENT CONFERENCE

5     THAT YOU WERE AT, DID THE PLAINTIFFS -- ANY MEMBER OF

6     THE PLAINTIFF TEAM SAY, WE ARE USING THE DEFINITION OF

7     PAPER BALLOT IN THE ELECTION CODE AS THE BASIS OF OUR

8     SETTLEMENT?

9     A.     NEVER.

10    Q.     WAS THE DEFINITION IN THE ELECTION CODE EVEN

11    DISCUSSED AT THIS SEPTEMBER 11TH -- I'M SORRY --

12    OCTOBER 11TH SETTLEMENT CONFERENCE?

13    A.     NO.

14    Q.     WERE YOU EVER TOLD IN ANY WAY AT THE

15    OCTOBER 11TH SETTLEMENT CONFERENCE THAT THE XL MACHINE

16    WAS A PROBLEM?

17    A.     NEVER.  NEVER AT THE SETTLEMENT CONFERENCE.

18    Q.     WERE YOU EVER TOLD AT ANY FASHION AT THE

19    SETTLEMENT CONFERENCE THAT THEY WILL ONLY SETTLE ON THE

20    BASIS OF HAND-MARKED PAPER BALLOTS OR PAPER BALLOTS THAT

21    HAVE CHOICES ON THE FACE OF THE PAPER DOCUMENT?

22    A.     NO.

23    Q.     WERE YOU EVER TOLD THAT -- WAS THERE EVER ANY

24    DISSENT REGISTERED TO YOU ABOUT THE DEPARTMENT'S

25    INITIATIVE AS YOU HAVE EXPLAINED IT THAT WAS GOING ON

1  FOR ABOUT NINE OR TEN MONTHS AT THAT POINT?

2  A.      NO.   IT WAS COMPLETELY AGREED UPON THAT THE PATH

3  WE WERE ON, WHICH AGAIN INVOLVED BALLOT-MARKING DEVICES

4  AND HAND-MARKED PAPER BALLOTS, BOTH WERE INCLUDED AS

5  PART OF THE PATH, AND THAT AS LONG AS THERE WAS A

6  VOTER-VERIFIABLE PAPER RECORD THAT WAS AUDITABLE,

7  REVIEWABLE BY THE VOTER BEFORE THEY CAST THEIR VOTE AND

8  AUDITABLE AFTER THE FACT, THAT THERE WAS NO DISAGREEMENT

9  WHATSOEVER ABOUT THOSE TERMS.

10  Q.      WAS THERE ANY MENTION IN ANY WAY AT THAT OCTOBER

11  CONFERENCE THAT YOU WERE AT, OCTOBER 11TH, THAT THE

12  PAPER RECORD THAT WE SAW, JX EXHIBIT 57, WOULD NOT BE

13  DEEMED A PAPER BALLOT BY THE PLAINTIFFS FOR THE PURPOSE

14  OF THEIR SETTLEMENT AGREEMENT?

15  A.      SO THE EXHIBIT YOU REFERRED TO IS THE ES&S XL

16  PAPER BALLOT?

17  Q.      YES.

18  A.      THERE WAS NEVER AN INDICATION BY PLAINTIFFS THAT

19  THAT WOULD NOT BE ACCEPTABLE, NO.

20  Q.      AND AT THIS OCTOBER 11TH CONFERENCE, OR ANY TIME

21  THEREAFTER, DID THE PLAINTIFFS EVER TELL YOU, WE WANT TO

22  DISCUSS THE TERMS THAT ARE USED BY NIST, THE NATIONAL

23  INSTITUTE OF SCIENCE AND TECHNOLOGY?

24  A.      NO.   THE FIRST I HEARD OF THAT WAS IN CONNECTION

25  WITH THIS LITIGATION IN THE LAST COUPLE OF WEEKS WHEN I

1   SAW THE EXHIBIT LIST.

2   Q.      OKAY.  NOW, AFTER THE OCTOBER 11TH SETTLEMENT

3   CONFERENCE, DID THERE COME A TIME THAT THE SETTLEMENT

4   AGREEMENT WAS ACTUALLY SIGNED?

5   A.      YES.

6   Q.      AND THAT WAS NOVEMBER 28, 2018?

7   A.      YES.

8   Q.      AND THAT IS EXHIBIT 30?

9   A.      YES.

10  Q.      OKAY.  BETWEEN OCTOBER 11TH AND NOVEMBER 28TH,

11  DID THE DEPARTMENT POST ANOTHER VOTING SYSTEMS REPORT,

12  AT LEAST ANOTHER VOTING SYSTEMS REPORT?

13  A.      I BELIEVE SO.

14  Q.      ALL RIGHT.  WOULD YOU TURN TO DX M, DEFENSE

15  EXHIBIT M.  IS THIS A REPORT THAT WAS POSTED BEFORE THE

16  SIGNING OF THE SETTLEMENT AGREEMENT?

17  A.      YES.

18  Q.      WHAT IS THE DATE?

19  A.      OCTOBER 31, 2018.

20  Q.      ALL RIGHT.  AND THIS IS IN THE SAME FORMAT AS

21  THE ONE WE PREVIOUSLY LOOKED AT?

22  A.      CORRECT.

23  Q.      AND IT WAS GIVEN TO MR. MAAZEL'S TEAM?

24  A.      CORRECT.

25  Q.      ALL RIGHT.  SO LET'S TURN TO THE FIRST PAGE.

1    WHAT DOES IT SAYS ABOUT THE ES&S SYSTEM?

2    A.      IT SAYS THE ES&S 6021, IT SAYS:  TESTING,

3    COMPLETE.  AND FINAL CERTIFICATION REPORT AND PAPERWORK

4    IN PROGRESS.

5    Q.      OKAY.  THE TESTING THAT WE ARE REFERRING TO,

6    WHAT IS THAT TESTING?

7    A.      SO THAT'S THE -- IN THE PRIOR STATUS REPORT,

8    WHEN IT SAID TESTING WAS SCHEDULED FOR, I THINK

9    SEPTEMBER 24TH TO 28TH, THAT'S THE STATE TESTING TO

10   THE -- BY THE EXAMINER.

11   Q.      ALL RIGHT.  TO YOUR KNOWLEDGE, DID THE

12   PLAINTIFFS EVER ASK YOU FOR ANY -- BEFORE THE SETTLEMENT

13   AGREEMENT WAS SIGNED, FOR ANY RECORD OF WHAT HAPPENED AT

14   THE TESTING?

15   A.      NOT TO MY KNOWLEDGE, NO.

16   Q.      FOR ANY VIDEO RECORDING OF THE TESTING?

17   A.      BEFORE THE SETTLEMENT?

18   Q.      BEFORE THE SETTLEMENT WAS SIGNED?

19   A.      NO.

20   Q.      THE 6021 SYSTEM WHERE THE TESTING IS COMPLETE,

21   DID THAT INCLUDE THE XL?

22   A.      YES.

23   Q.      THAT'S THE SUBJECT OF THIS CASE?

24   A.      CORRECT.

25   Q.      AND BY THE WAY, THE DEPARTMENT WENT ON TO

1    DESCRIBE ON PAGE 2 AND 3 PREVIOUS ACTIONS BY THE

2    DEPARTMENT OF STATE SINCE THE PREVIOUS STATUS REPORT?

3    A.    YES.

4    Q.    AND YOU GO ON TO TALK ABOUT ALL THE OTHER

5    SYSTEMS THAT ARE UNDER REVIEW OR HAVE BEEN COMPLETED?

6    A.    CORRECT.

7    Q.    THERE'S A WHOLE LIST OF COMPLETIONS IN THE

8    COLUMN THERE, IS THAT CORRECT?

9    A.    YES.

10   Q.    ALL OF THIS INFORMATION ABOUT WHAT SYSTEMS WERE

11   REVIEWED, TESTED, COMPLETED, ALL OF THAT WAS AVAILABLE

12   TO THE PLAINTIFFS BEFORE THEY SIGNED THE SETTLEMENT

13   AGREEMENT?

14   A.    CORRECT.

15   Q.    IS THAT CORRECT?

16   A.    YES.

17   Q.    DID THE PLAINTIFFS EVER SAY, WE ARE NOT SIGNING

18   THIS SETTLEMENT AGREEMENT IF THE XL IS PART OF THIS

19   SYSTEM?

20   A.    NEVER.

21   Q.    OR PART OF THE INITIATIVE?

22   A.    NO.

23   Q.    LET'S TURN TO ANOTHER DOCUMENT.  GO TO JX 29 --

24   28, I'M SORRY.

25               MR. ARONCHICK:  YOUR HONOR, THIS IS NOT

1    IN EVIDENCE.  CAN I MOVE THIS IN EVIDENCE AT THIS POINT?

2    THIS IS AN EAC OFFICIAL DOCUMENT OF THE ES&S EVS 6021

3    CERTIFICATION.

4                    THE COURT:  MR. MAAZEL?

5                    MR. MAAZEL:  NO OBJECTION.

6                    THE COURT:  IT WILL BE ADMITTED.

7                    (JOINT EXHIBIT JX 28 ADMITTED INTO

8    EVIDENCE.)

9    BY MR. ARONCHICK:

10   Q.      FIRST OF ALL, WHAT IS THE DATE OF THIS DOCUMENT?

11   A.      NOVEMBER 12, 2018.

12   Q.      ALL RIGHT.  AND I AM REFERRING TO JX 28.  DO YOU

13   HAVE THAT THERE?

14   A.      I DO.

15   Q.      OKAY.  WHAT IS THIS?

16   A.      SO THIS IS THE -- AS I MENTIONED EARLIER,

17   PENNSYLVANIA LAW REQUIRES BOTH FEDERAL EAC CERTIFICATION

18   AS WELL AS STATE CERTIFICATION.  THE STATE CAN'T CERTIFY

19   THE SYSTEM UNTIL AFTER THE FEDERAL GOVERNMENT HAS DONE

20   SO.  SO THIS WAS THE ES&S CERTIFICATION BY THE EAC.

21   Q.      OKAY.  AND WOULD YOU TURN TO PAGE 2.  IS THERE A

22   REFERENCE TO THE EXPRESSVOTE XL AS PART OF THE

23   CERTIFICATION?

24   A.      YES.  ON THE TOP OF PAGE 2.

25   Q.      ALL RIGHT.

1   A.        IT SAYS:  EXPRESSVOTE XL.  EXPRESSVOTE XL IS A

2   HYBRID PAPER-BASED POLLING PLACE VOTING DEVICE THAT

3   PROVIDES A FULL FACE TOUCHSCREEN VOTE CAPTURE THAT

4   INCORPORATES THE PRINTING OF THE VOTER'S SELECTIONS AS A

5   CAST VOTE RECORD AND TABULATION SCANNER INTO -- SCANNING

6   INTO A SINGLE UNIT.

7   Q.        OKAY.  AND IS THIS A PUBLIC DOCUMENT?

8   A.        YES.

9   Q.        WAS IT POSTED ON OR AROUND THE TIME OF

10  NOVEMBER 12, 2018, BEFORE THE SETTLEMENT AGREEMENT WAS

11  SIGNED?

12  A.        IT WAS.

13  Q.        WAS IT AVAILABLE TO THE PLAINTIFFS?

14  A.        YES.

15  Q.        AND DID YOU EVER GET -- BEFORE THE SETTLEMENT

16  AGREEMENT WAS SIGNED, EVER ANY DISCUSSION YOU RECALL AT

17  ANY POINT THAT, EVEN THOUGH THE EAC HAS NOW CERTIFIED

18  THE EXPRESSVOTE XL, THEY ARE NOT SETTLING ON THE BASIS

19  OF THAT CERTIFICATION?

20  A.        NO.

21  Q.        NOW, THE SETTLEMENT AGREEMENT OF SEPTEMBER --

22  I'M SORRY -- NOVEMBER 28TH, CAN WE GO TO THE EXHIBIT 30,

23  JX 30.  YOU ADDRESSED TO THE COURT WHAT IS NOW PARAGRAPH

24  3 EARLIER IN THIS SETTLEMENT AGREEMENT.  DO YOU SEE

25  PARAGRAPH 3?

1    A.       YES.

2    Q.       AND IT HAS THE SAME LANGUAGE:  THE SECRETARY

3    WILL CONTINUE?

4    A.       CORRECT.

5    Q.       THAT WAS -- CONTINUED TO BE PART OF THE

6    SETTLEMENT AGREEMENT, CORRECT?

7    A.       YES.

8    Q.       WOULD THE -- WOULD YOU HAVE SETTLED IF THERE WAS

9    NOT THAT LANGUAGE?

10   A.       ABSOLUTELY NOT.

11   Q.       WHY?

12   A.       BECAUSE WE WERE ALREADY WELL INTO THIS

13   INITIATIVE.  WE HAD -- THE COUNTIES WERE WORKING ON THIS

14   INITIATIVE, WE WERE WORKING ON FUNDING FOR THIS

15   INITIATIVE.  WE HAD PROVIDED THE EAC FOR THE FEDERAL

16   FUNDING OUR, YOU KNOW, PROGRAM NARRATIVE, EXPLAINING THE

17   INITIATIVE.  WE WERE WELL ALONG THE WAY.  AND WE

18   STRONGLY BELIEVED IN THE INITIATIVE AND WHAT IT

19   CONTAINED.  SO WE WERE NOT GOING TO SETTLE.

20   Q.       SECTION 2.  SECTION 2 HAS THE THREE ITEMS THAT

21   MY COLLEAGUE ADDRESSED TO YOU ON DIRECT?

22   A.       CORRECT.

23   Q.       DO THOSE THREE ITEMS COVER THE PAPER RECORDS

24   THAT WERE IN THE MACHINES THAT WERE PART OF THIS

25   INITIATIVE?

1    A.      YES.

2                     MR. MAAZEL:   OBJECTION, LEADING.

3                     THE COURT:   OVERRULED.

4    BY MR. ARONCHICK:

5    Q.      AND IN SPECIFIC, DO THEY COVER THE XL PAPER

6    RECORD?

7    A.      THEY DO.

8    Q.      WOULD YOU GO THROUGH AND EXPLAIN TO THE COURT

9    HOW THAT IS SO?

10   A.      SURE.  SO, AGAIN, THE BALLOT IS ON PAPER, SO WE

11   HAVE SEEN THE BALLOT.  IT IDENTIFIES THE SELECTIONS MADE

12   BY THE VOTER.  WELL, THAT KIND OF GOES TO B, WHICH,

13   AGAIN, EXPLAINS THE INTERRELATEDNESS OF THIS

14   DESCRIPTION.  THEY PRODUCE A VOTER-VERIFIABLE RECORD OF

15   EACH VOTE.  AND I'LL NOTE THAT WE USE BALLOT IN THE

16   FIRST SENTENCE, RECORD IN THE SECOND SENTENCE.  AGAIN,

17   THEY ARE USED INTERCHANGEABLY.  AND THAT THESE PAPER

18   RECORDS OR PAPER BALLOTS ARE CAPABLE OF SUPPORTING A

19   ROBUST PRECERTIFICATION AUDITING PROCESS.

20   Q.      ALL RIGHT.  IS THERE AN EXCEPTION TO THE CONCEPT

21   OF A PAPER BALLOT IN THIS SETTLEMENT AGREEMENT?

22   A.      YES.

23   Q.      AND WHAT IS THAT EXCEPTION?

24   A.      SO THE FOOTNOTE, YOU COULD SEE, SAYS:  THE ONE

25   EXCEPTION IS A VVPAT RECEIVED GENERATED BY A DRE MACHINE

1    IS NOT A PAPER BALLOT.

2    Q.      WOULD YOU EXPLAIN THAT ONE EXCEPTION?

3    A.      SURE.  SO DRE -- SOME DRE MACHINES, SOMEWHERE

4    ALONG THE WAY, THEY STARTED ADDING, YOU KNOW, COMPONENTS

5    TO IT THAT ALLOWED FOR -- VVPAT STANDS FOR VOTER

6    VERIFIED PAPER AUDIT TRAIL.  AND SO IT, BASICALLY, IS A

7    PAPER COPY OF THE ELECTRONIC VOTE.  BUT THE OFFICIAL

8    VOTE OF RECORD IS ELECTRONIC.  AND THE PAPER IS NOT A

9    BALLOT.  AND IT'S NOT THE OFFICIAL VOTE OF RECORD, IT'S

10   BASICALLY A RECEIPT.  WE NEVER USED THE SYSTEM IN

11   PENNSYLVANIA.  AND WE HAD ALREADY DECIDED WE WERE NOT

12   CERTIFYING ANY DRE'S AGAIN, BECAUSE WE DIDN'T WANT THE

13   VOTE TO BE ELECTRONIC, WE WANTED THE VOTE TO BE PAPER.

14   SO THIS WAS NOT AT ALL CONTROVERSIAL, BECAUSE WE HAD

15   ALREADY DECIDED WE WERE NOT CERTIFYING DRE MACHINES AT

16   ALL WITH OR WITHOUT VVPATS.

17   Q.      NO OTHER EXCEPTIONS TO THE CONCEPT OF PAPER

18   BALLOT IN THIS SETTLEMENT AGREEMENT?

19   A.      CORRECT.

20           THE COURT:  IF I MAY.  THIS FOOTNOTE,

21   FOOTNOTE 4, DO YOU REMEMBER WHO SUGGESTED -- IF YOU

22   REMEMBER, WHO, IF ANYONE, SUGGESTED THAT YOU EXCLUDE THE

23   DRE RECEIPT?

24           THE WITNESS:  FOR THE PURPOSE OF THE

25   SETTLEMENT CONVERSATIONS?  I BELIEVE IT WAS PLAINTIFFS.

1    I THINK THAT WAS IN THERE FROM THE PLAINTIFF.

2                    THE COURT:  SO THEY SAID THEY DIDN'T

3    WANT -- THEY WANTED IT CLEAR THAT THIS WAS NOT A BALLOT

4    AS REFERRED TO IN PARAGRAPH 2A, WHICH IS WHERE THE

5    FOOTNOTE IS.

6                    THE WITNESS:  CORRECT.  THAT WAS THE ONE

7    EXCEPTION THAT THEY REQUESTED AND WE AGREED TO.

8    BY MR. ARONCHICK:

9    Q.      OKAY.  NOW, AFTER --

10                   THE COURT:  MR. ARONCHICK, IT'S -- WE

11   WILL GO AS LATE AND AS LONG AS WE NEED TO, INCLUDING

12   ANOTHER DAY IF WE NEED TO.  CAN YOU ESTIMATE, ONLY

13   ESTIMATE, HOW MUCH MORE TIME YOU WILL NEED WITH THIS

14   WITNESS?

15                   MR. ARONCHICK:  YES.  PROBABLY

16   15 MINUTES.

17                   THE COURT:  AND I ASSUME THAT YOU HAVE

18   RECROSS?

19                   MR. MAAZEL:  YES, YOUR HONOR.

20                   THE COURT:  WOULD IT BE PRUDENT FOR US TO

21   BREAK FOR LUNCH NOW?  I WILL BE GUIDED BY THE PARTIES.

22                   MR. ARONCHICK:  I DON'T EAT LUNCH.  I

23   MEAN, I WOULD PREFER, I MEAN, IF WE COULD USE AS MUCH OF

24   THE COURT'S TIME AS POSSIBLE.

25                   THE COURT:  FINE.  AND I WOULD PREFER NOT

1      TO HAVE THE SECRETARY HERE ANYWAY.  ARE YOU ALL RIGHT

2      WITH THAT, MR. MAAZEL?  DO YOU EAT LUNCH?

3                     MR. MAAZEL:  I DO EAT LUNCH, YOUR HONOR.

4      I THINK IT WOULD BE A GOOD IDEA TO TRY TO FINISH THIS

5      WITNESS.

6                     THE COURT:  I THINK THAT'S GREAT.  OKAY.

7                     PLEASE GO ON.

8      BY MR. ARONCHICK:

9      Q.     SO EARLIER I ASKED YOU ABOUT JX 34, THE

10     CERTIFICATION OF THE XL?

11     A.     YES.

12     Q.     AND JUST SINCE IT HAS BEEN A LITTLE WHILE, JUST

13     TO REFRESH, PAGE 32.  DO YOU SEE THE REFERENCE TO THE

14     EXPRESSVOTE XL?

15     A.     YES.

16     Q.     I WILL READ IT.  IT ALLOWS THE VOTER TO VALIDATE

17     THE PAPER BALLOT THROUGH A GLASS WINDOW.

18                     DO YOU SEE THAT?

19     A.     YES.

20     Q.     OKAY.  DID YOU, AFTER THIS CAME OUT, RECEIVE --

21     GET -- DID IT COME TO YOUR ATTENTION ANY OBJECTION FROM

22     THE PLAINTIFFS ABOUT THIS CERTIFICATION DOCUMENT THAT

23     CAME OUT TWO DAYS AFTER THE SETTLEMENT AGREEMENT?

24     A.     NO.

25     Q.     ALL RIGHT.  NOW, TURN TO JX 33.  ARE YOU

1       FAMILIAR WITH THIS PRESS RELEASE FROM THE EMERY CELLI

2       FIRM?

3       A.      I AM.

4       Q.      THAT'S MR. MAAZEL'S FIRM?

5       A.      YES.

6       Q.      THE THIRD PARAGRAPH HAS A QUOTATION FROM MR.

7       MAAZEL HIMSELF.  DO YOU SEE THAT?

8       A.      YES.

9       Q.      I WILL READ IT.  IT SAYS:  WE WILL BE WATCHING

10      CLOSELY TO ENSURE THAT PENNSYLVANIA IMPLEMENTS EVERY ONE

11      OF THESE IMPORTANT ELECTION REFORMS.

12                      DO YOU SEE THAT?

13      A.      YES.

14      Q.      WE WILL BE WATCHING CLOSELY.

15                      DID MR. MAAZEL, TWO DAYS LATER, CALL YOU

16      UP AND SAY, UH-UH, THERE IS SOMETHING WRONG WITH THIS

17      CERTIFICATION REPORT?

18      A.      NO, NEVER.

19      Q.      WHEN IS THE FIRST TIME YOU HEARD FROM MR.

20      MAAZEL'S FIRM ABOUT THIS CERTIFICATION REPORT?

21      A.      IT WAS FOLLOWING THE REQUEST FOR RECERTIFICATION

22      OR RE-EXAMINATION OF THE VOTING SYSTEM THE FOLLOWING

23      SUMMER BY OTHER PARTIES.

24      Q.      AND THEN AFTER THAT, MR. MAAZEL'S FIRM?

25      A.      CORRECT.

1    Q.        APPROXIMATELY NINE OR TEN MONTHS LATER?

2    A.        YES, CORRECT.

3    Q.        OKAY.  NOW, I WANT TO GO TO -- IN YOUR TESTIMONY

4    TO MR. MAAZEL, YOU TALKED ABOUT QR CODES, TIMING MARKS.

5    DO YOU REMEMBER THOSE CONCEPTS?

6    A.        YES.

7    Q.        AND HE WAS -- YOU WERE ADDRESSING THEM.  I WOULD

8    LIKE TO -- FOR THE -- BRIEFLY, FOR THE COURT'S

9    UNDERSTANDING, WHAT YOU MEANT BY THOSE CONCEPTS.  SO CAN

10   WE START OFF AND GO TO EXHIBIT JX 55.

11   A.        YES.

12   Q.        WHAT IS THIS?

13   A.        THIS IS AN AGREED-UPON STIPULATION.

14   Q.        THIS IS -- IN THE STIPULATION, IT'S AGREED THAT

15   THIS IS A HAND-MARKED PAPER BALLOT FOR THE ES&S SYSTEM.

16   A.        OKAY.

17   Q.        OKAY?

18   A.        YES.  102.

19             MR. ARONCHICK:  ALL RIGHT.  YOUR HONOR,

20   ONCE MORE, THIS WE HAD NOT YET MOVED INTO EVIDENCE.  CAN

21   I MOVE IT INTO EVIDENCE AT THIS TIME?

22             MR. MAAZEL:  WHAT IS IT?

23             MR. ARONCHICK:  55.

24             MR. MAAZEL:  NO OBJECTION, YOUR HONOR.

25             THE COURT:  IT WILL BE ADMITTED.

1         (JOINT EXHIBIT JX 55 ADMITTED INTO

2    EVIDENCE.)

3    BY MR. ARONCHICK:

4    Q.      SO THIS IS THE HAND-MARKED PAPER BALLOT, RIGHT?

5    A.      CORRECT.

6    Q.      OKAY.   YOU TESTIFIED BEFORE THAT EVEN

7    HAND-MARKED PAPER BALLOTS WITHOUT THE SCAN MACHINES,

8    VOTES ARE TABULATED ELECTRONICALLY, IS THAT CORRECT?

9    A.      CORRECT.

10   Q.      ALL RIGHT.   CAN YOU EXPLAIN, LOOKING AT THIS

11   DOCUMENT, HOW THAT IS SO AND WHAT ARE THE MARKS ON THIS

12   DOCUMENT THAT DEMONSTRATE THAT?

13   A.      SURE.   AND CAN I GIVE A LITTLE CONTEXT AS WELL?

14   Q.      YES.

15   A.      SO AS I WAS DESCRIBING EARLIER, EACH VOTING

16   SYSTEM OR SUITE HAS SEVERAL COMPONENTS THAT CAN BE USED.

17   SO, IN PENNSYLVANIA, WE HAVE, YOU KNOW, IF YOU TAKE THE

18   FIVE DIFFERENT -- WE CERTIFIED EIGHT VOTING SYSTEMS WITH

19   MULTIPLE CONFIGURATIONS, SO SAY THERE'S SOMEWHERE

20   BETWEEN 20 AND 25 DIFFERENT CONFIGURATION COMPONENTS

21   THAT COULD BE USED.   SO EVERY ONE OF THE SYSTEMS IN

22   PENNSYLVANIA, WHETHER IT'S HAND-MARKED PAPER BALLOT OR

23   BALLOT-MARKING DEVICE, EXCEPT FOR ONE OF THOSE 20 TO

24   25-SOME-ODD CONFIGURATIONS, EVERY ONE UTILIZES EITHER

25   BARCODES, QR CODES OR TIMING MARKS TO TABULATE THE

1     VOTES.

2                    SO, FOR EXAMPLE, THIS BALLOT, YOU COULD

3     SEE THE LINES AROUND THE BALLOT.  SO PICTURE -- FROM THE

4     TABULATOR POINT OF VIEW, THE TABULATOR DOES NOT SEE ANY

5     OF THOSE WORDS.  IT'S AS IF IT'S A BLANK PAGE.  THE

6     WORDS ARE LITERALLY NOT SEEN BY THE MACHINE.  WHAT THE

7     MACHINE SEES OR READS IS, IT'S KIND OF LIKE A GRID.  SO

8     WHERE THE CIRCLE IS MARKED, THIS BALLOT DOES NOT SHOW

9     ACTUALLY THE MARKING, BUT THE INTERSECTION OF THE TOP

10    GRID AND THE BOTTOM GRID, I THINK OF IT AS LIKE, YOU

11    KNOW, WHEN YOU'RE IN HIGH SCHOOL AND, YOU KNOW --

12                    THE COURT:  ALGEBRA OR GEOMETRY.

13                    THE WITNESS:  YEAH.  MY DAUGHTER IS A

14    MATH MAJOR, NOT ME.

15    BY MR. ARONCHICK:

16    Q.        WE ARE GOING TO POINT TO JUST AN OPEN CIRCLE.

17    A.        YOU MISSED THE THEATRICAL.

18                    THE COURT:  THE BOTTOM, THE LOWER LEFT.

19                    THE WITNESS:  SO, BASICALLY -- OH, THERE

20    YOU GO.  SO THAT DOT AND THE DOT BELOW IT MEANS

21    SOMETHING TO THE COMPUTER THAT THEN KNOWS TO ALLOCATE A

22    VOTE FOR THIS CASE, THIS IS WHEN WE STILL HAD STRAIGHT

23    PARTY TICKET IN PENNSYLVANIA, SO THEY WERE VOTING

24    STRAIGHT PARTY DEMOCRAT.

25                    THE COURT:  SO IT TAKES THE VOTER'S MARK

1    AND DETERMINES ITS COORDINATES AND RECORDS THE VOTE

2    BASED ON THE COORDINATES?

3                     THE WITNESS:  CORRECT.

4    BY MR. ARONCHICK:

5    Q.     AND NOW -- SO THAT'S A HAND-MARKED PAPER BALLOT.

6    LET'S TURN TO 56 AND 57, JX 56 AND JX 57.  ONCE MORE,

7    WHAT ARE THESE DOCUMENTS?

8    A.     SO 56 IS THE PAPER DOCUMENT AS PART OF THE

9    EXPRESSVOTE 2.1.  AND 57 IS THE PAPER DOCUMENT AS PART

10   OF THE EXPRESSVOTE XL.

11   Q.     ALL RIGHT.  WOULD YOU EXPLAIN -- ONE OF THE

12   COURT'S QUESTION FOR THIS HEARING WAS --

13                     MR. MAAZEL:  I'M SORRY, 56 IS NOT IN

14   EVIDENCE.

15                     MR. ARONCHICK:  I'M SORRY.  THANK YOU.

16                     CAN WE MOVE 56 INTO EVIDENCE ALSO?

17                     MR. MAAZEL:  NO OBJECTION.

18                     THE COURT:  ALL RIGHT.  SINCE YOU

19   SUGGESTED IT, YES, IT WILL BE ADMITTED.

20                     (JOINT EXHIBIT JX 56 ADMITTED INTO

21   EVIDENCE.)

22   BY MR. ARONCHICK:

23   Q.     ONE OF THE COURT'S QUESTIONS IN LEADING UP TO

24   THIS HEARING WAS HOW VOTES ARE TABULATED AND COLLECTED.

25   YOU JUST EXPLAINED THAT ON THE HAND-MARKED PAPER BALLOT,

1    HOW THEY ARE TABULATED.  HOW ARE THEY TABULATED ON THESE

2    DOCUMENTS?

3    A.        SO ON THESE DOCUMENTS, IT'S THE BARCODE.  SO

4    EACH OF THESE BARCODES -- SO THE TOP BARCODE IS WHAT IS

5    CALLED A MASTER BARCODE.  AND THAT HAS INFORMATION ABOUT

6    THE ELECTION, THE PRECINCT, THE -- YOU KNOW, TELLS IT

7    SORT OF THE CONTEXT WITH WHICH TO READ.  AND THEN EACH

8    OF THESE INDIVIDUAL BARCODES CORRESPONDS TO A VOTE

9    SELECTION BY THE VOTER.  SO WHERE IT SAYS:

10   REPRESENTATIVE KIMBERLY JONES FOR PRESIDENT,

11   VICE-PRESIDENT OF THE UNITED STATES, THAT CORRESPONDS TO

12   ONE OF THESE BARCODES AND SO FORTH.

13   Q.        OKAY.  NOW, THAT'S HOW THE VOTES ARE TABULATED.

14   WHAT IS THE OFFICIAL RECORD OF THE VOTE?

15   A.        SO THE HUMAN READABLE PLAIN TEXT IS THE OFFICIAL

16   VOTE OF RECORD.  SO FOR A RECOUNT OR AN AUDIT, AND, YOU

17   KNOW, PHILADELPHIA ACTUALLY DID THIS THIS YEAR AS A

18   PILOT, AND EVEN FOR THEIR STATUTORY AUDIT, THEY WENT

19   THROUGH AND PULLED THE BALLOTS REQUIRED AND WENT THROUGH

20   AND HAND READ THE NAMES SELECTED BY THE VOTERS TO AUDIT

21   THE BALLOTS.

22   Q.        ALL RIGHT.  AND THEN WOULD YOU TURN TO JX 54.

23                 THE COURT:  IF I CAN --

24                 MR. ARONCHICK:  I'M SORRY.

25                 THE COURT:  YOU MEAN THAT THEY COMPARED

1      THE LINGUISTIC VOTE WITH WHAT THE COMPUTER RECORDED?

2                   THE WITNESS:  CORRECT.

3                   THE COURT:  WAS THERE ANY DISCONNECT?

4      DID THEY FIND ANY MARGIN OF ERROR?

5                   THE WITNESS:  THE AUDIT CONFIRMED THE

6      OUTCOME OF THE ELECTION.  AND THE AUDIT -- SO THERE WERE

7      TWO AUDITS THIS YEAR.  SO THERE'S A STATUTORY -- IT'S

8      NOT TECHNICALLY CALLED AN AUDIT.  IT'S A STATISTICAL --

9      NOW I'M FORGETTING THE EXACT LANGUAGE.

10                  MR. ARONCHICK:  RECOUNT.

11                  THE WITNESS:  RECOUNT.  BUT IT REQUIRES

12     THE LESSER OF 2 PERCENT OR 2000 BALLOTS.  SO THAT'S

13     STILL ON THE BOOKS IN THE STATUTES.  AND SO THEY DID

14     THAT BY LOOKING AT THE WORDS ON THE BALLOTS.  AND THEN

15     THEY ALSO VOLUNTEERED TO PILOT WHAT WE REFER TO AS

16     RISK-LIMITING AUDITS, WHICH IS ONE OF THE THINGS THAT WE

17     ARE EXPLORING IN PENNSYLVANIA FOR FUTURE ELECTIONS.  AND

18     SO PHILADELPHIA AND MERCER COUNTY WERE BOTH PART OF THE

19     FIRST VOLUNTEERS FOR THIS PILOT.  SO THEY -- THERE'S A

20     -- THIS IS, YOU KNOW, KIND OF FUN, MATHEMATICAL,

21     STATISTICIAN STUFF, BUT THERE'S MATHEMATICAL

22     CALCULATIONS THAT ARE DONE BASED ON HOW MUCH THE WINNER

23     WINS AN ELECTION, AND SO IT BASICALLY TELLS YOU HOW MANY

24     BALLOTS ARE NEEDED TO BE A STATISTICALLY SIGNIFICANT

25     SAMPLE.

1                    SO IN ADDITION TO THE 2 PERCENT STATUTORY

2        AUDIT, THEY ALSO PILOTED THIS RISK-LIMITING AUDIT.  AND

3        BOTH CONFIRMED THE OUTCOME OF THE ELECTION AS RECORDED

4        ON ELECTION NIGHT.

5                    DOES THAT MAKE SENSE?

6                    THE COURT:  OKAY.

7        BY MR. ARONCHICK:

8        Q.       ALL RIGHT.  WOULD YOU TURN TO JX 54.  THIS IS

9        STIPULATED TO BE A DOCUMENT FROM THE DOMINION

10       BALLOT-MARKING DEVICE.

11       A.       YES.

12       Q.       WOULD YOU EXPLAIN HOW VOTES ARE TABULATED ON

13       THIS DOCUMENT?

14       A.       SO THIS QR CODE ON THE TOP LEFT.

15                    MR. ARONCHICK:  I'M SORRY, ONE MORE TIME.

16       MY COLLEAGUE HAS REMINDED ME THAT I HAVE NOT YET MOVED

17       THIS INTO EVIDENCE EITHER.

18                    MR. MAAZEL:  NO OBJECTION.

19                    THE COURT:  IT WILL BE ADMITTED.

20                    (JOINT EXHIBIT JX 54 ADMITTED INTO

21       EVIDENCE.)

22       BY MR. ARONCHICK:

23       Q.       GO AHEAD.

24       A.       SO THIS QR CODE IS WHAT IS READ BY THE MACHINE.

25       Q.       WHERE IS THE QR CODE?

1    A.        THE SQUARE THING IN THE UPPER LEFT.

2    Q.        ALL RIGHT.  AND HOW DOES THAT WORK?

3    A.        SO, AGAIN, IT HAS THE MATERIALS NEEDED TO INFORM

4    THE MACHINE.  WHAT ARE THE -- WHAT THE BALLOT STYLE IS,

5    THE PRECINCT AND THE SELECTIONS MADE BY THE VOTER.

6    Q.        OKAY.  AND THEN TURN TO --

7                   THE COURT:  I'M SORRY, YOU'RE SAYING THAT

8    THE DOMINION MACHINE RECORDS THE VOTE BASED ON WHAT'S IN

9    THE QR CODE?

10                   THE WITNESS:  CORRECT.

11                   THE COURT:  OKAY.

12                   THE WITNESS:  SO -- YEAH.  AND IF I MAY,

13    JUST TO ELABORATE.  SO, AGAIN, WHEN I WAS SAYING EARLIER

14    THAT ONLY ONE CONFIGURATION OF ONE SYSTEM, SO LITERALLY

15    THERE'S ONE PIECE OF ONE SYSTEM IN PENNSYLVANIA THAT IS

16    CERTIFIED THAT ACTUALLY LOOKS AT ALL AT THE HUMAN

17    READABLE TEXT.  AND NO COUNTY IN PENNSYLVANIA SELECTED

18    THAT SYSTEM.  SO EVERY SYSTEM IN USE IN PENNSYLVANIA

19    USES EITHER A CODE, WHETHER IT'S A QR CODE, A BARCODE OR

20    TIMING MARKS OR SENSOR, THAT BASICALLY RELATES TO A

21    GRID.

22    BY MR. ARONCHICK:

23    Q.        BY THE WAY, THE SYSTEM THAT YOU ARE REFERRING

24    TO, THAT WOULD BE JX 59, THAT'S THAT DOCUMENT, THE HART?

25    A.        CORRECT.  THIS IS -- SO THIS -- FOR THIS -- THIS

1        IS THE ONE, HART IS, AGAIN, DIFFERENT CONFIGURATIONS OF

2        THE HART SYSTEM.   THIS PARTICULAR CONFIGURATION ALLOWS

3        FOR WHAT IS CALLED OPTICAL CHARACTER RECOGNITION.   BUT

4        NO COUNTY SELECTED THIS.   AND, IN PART, THAT'S BECAUSE

5        THE MANUFACTURER ACTUALLY HAS LESS CONFIDENCE IN THE

6        ACCURACY OF THE OPTICAL CHARACTER RECOGNITION.   THE

7        TABULATION OF THE BARCODES AND QR CODES AND TIMING MARKS

8        IS -- HAS BEEN SHOWN, AT LEAST TO DATE, TO BE MORE

9        ACCURATE THAN ANY OPTICAL CHARACTER RECOGNITION.   AND

10       THIS PARTICULAR SYSTEM WOULD ONLY WORK IN A COUNTY THAT

11       CHOSE TO USE ALL ABOUT MARKING DEVICES, BECAUSE IT DOES

12       NOT READ HAND-MARKED PAPER BALLOTS.   AND SO IF YOU

13       WANTED -- SO BASICALLY IF YOU WANTED TO ALLOW SOME

14       VOTERS TO USE HAND-MARKED PAPER BALLOTS, AND ONLY HAVE

15       BALLOT-MARKING DEVICES FOR PEOPLE WITH DISABILITIES, YOU

16       WOULD NEED TO HAVE TWO SEPARATE SCANNERS IN EVERY

17       POLLING PLACE.   SO IT'S JUST NOT A FEASIBLE SOLUTION FOR

18       COUNTIES AS HAS BEEN INDICATED BY THE FACT THAT NOBODY

19       CHOSE IT.

20                       MR. ARONCHICK:   ALL RIGHT.   AND CAN WE

21       MOVE THIS INTO EVIDENCE WITH NO OBJECTION?

22                       MR. MAAZEL:   59?

23                       MR. ARONCHICK:   YES.

24                       MR. MAAZEL:   NO OBJECTION.

25                       THE COURT:   IT WILL BE ADMITTED.

1              (JOINT EXHIBIT JX 59 ADMITTED INTO

2     EVIDENCE.)

3     BY MR. ARONCHICK:

4     Q.      AND THEN ONE MORE.  WOULD YOU TURN TO JX 62,

5     WHICH ALSO I WOULD LIKE TO MOVE INTO EVIDENCE.  THIS

6     IS --

7              MR. MAAZEL:  NO OBJECTION.

8              MR. ARONCHICK:  THIS IS FROM THE UNISYN

9     SYSTEM.

10             THE COURT:  IT WILL BE ADMITTED.

11             (JOINT EXHIBIT JX 62 ADMITTED INTO

12    EVIDENCE.)

13             MR. ARONCHICK:  THANK YOU.

14    BY MR. ARONCHICK:

15    Q.      SECRETARY BOOCKVAR, WOULD YOU PLEASE EXPLAIN TO

16    THE COURT THIS DOCUMENT, WHICH IS FROM THE UNISYN

17    SYSTEM, HOW ARE VOTES TABULATED -- THIS IS A DIFFERENT

18    METHOD -- HOW ARE VOTES TABULATED FROM THIS DOCUMENT?

19    A.      SO YOU CAN SEE THE CODES -- WAIT.  THIS IS --

20    I'M SORRY, THIS IS WHICH ONE?

21             MR. ARONCHICK:  PUT THE WHOLE DOCUMENT

22    ON.

23             THE WITNESS:  THIS IS 62?  THIS IS THE

24    UNISYN.  YEAH.  SO THESE CODES AT THE BOTTOM, THE

25    COMBINATION OF CODES ARE WHAT IS READ.

1    BY MR. ARONCHICK:

2    Q.      IS THAT CALLED AN INCA VOTE?

3    A.      I BELIEVE SO, YES.

4    Q.      A DIFFERENT SYSTEM FOR TABULATING?

5    A.      RIGHT.

6    Q.      OKAY.  SO BY THE WAY, I WANT TO TURN TO MY LAST

7    AREA OF QUESTIONING TO YOU, BUT ONE QUESTION THAT I

8    FORGOT.

9               UNDER HAVA, HELP AMERICA VOTE ACT?

10   A.      YES.

11   Q.      ARE BALLOT-MARKING DEVICES REQUIRED IN ALL

12   JURISDICTIONS?

13   A.      YES.  EVERY PRECINCT HAS TO HAVE AT LEAST ONE

14   ADA ACCESSIBLE UNIT, WHICH ARE BALLOT-MARKING DEVICES IN

15   THIS CASE.  IT HISTORICALLY HAS A LOT --

16   Q.      AND THE XL IS ALSO HAVA COMPLIANT?

17   A.      CORRECT.  SO ONE OF THE ADVANTAGES OF THE XL IS

18   THAT IT PROVIDES THE SAME SYSTEM FOR EVERY VOTER, WHICH

19   REALLY CAN'T BE OVERSTATED, I GUESS, BECAUSE THE -- I

20   MEAN, HONESTLY, THE -- HAVA MEANT WELL, RIGHT?  THEY

21   WANTED TO MAKE SURE THAT VOTERS WITH DISABILITIES HAD

22   ACCESSIBLE VOTING SYSTEMS.  BUT THE SYSTEM THAT WAS SET

23   UP, WHERE THERE WOULD BE SEPARATE MACHINES THAT WERE FOR

24   PEOPLE WITH DISABILITIES, HAS NEVER BEEN EFFECTIVE FOR

25   VOTERS WITH DISABILITIES.

1          FIRST OF ALL, BECAUSE YOU HAVE TO SELF

2     IDENTIFY AS HAVING TO A DISABILITY, WHICH A LOT OF

3     VOTERS DON'T WANT TO DO.  IT POTENTIALLY VIOLATES

4     SECRECY, BECAUSE IF YOU ONLY HAVE, SAY, ONE PERSON IN A

5     PRECINCT OR TWO PEOPLE IN A PRECINCT WHO ARE USING THE

6     SYSTEM, EVERYBODY KNOWS HOW THOSE PEOPLE VOTE.  AND, YOU

7     KNOW, FOR THOSE OF US WHO, LIKE MY EYESIGHT IS NOT WHAT

8     IT USED TO BE, I WOULD LIKE TO USE A BALLOT-MARKING

9     DEVICE.  BUT I DON'T ACTUALLY HAVE THAT OPTION, BECAUSE

10    IF I DON'T SELF IDENTIFY AS A PERSON WITH DISABILITY,

11    THEN I AM USING MACHINES THAT ARE NOT EASY FOR ME TO

12    USE.

13          SO THERE'S A LOT OF REASONS WHY HAVING

14    ONE VOTING SYSTEM THAT POLL WORKERS ARE TRAINED ON, THAT

15    VOTERS UNDERSTAND HOW TO USE, AND EVERYBODY CAN USE,

16    SUPPORTS SECRECY FOR EVERY VOTER, ACCESSIBILITY FOR

17    EVERY VOTER, AND, YOU KNOW, USABILITY FOR EVERY VOTER.

18    Q.     AND THAT WAS AN OPTION BUILT INTO THE

19    COMMONWEALTH'S INITIATIVE?

20    A.     CORRECT.

21    Q.     NOT REQUIRED -- BY THE WAY, CAN THE COMMONWEALTH

22    DIRECT THE COUNTIES TO PURCHASE CERTAIN SYSTEMS?

23    A.     NO.  THAT'S THE COUNTY'S AUTHORITY.

24    Q.     SO YOU GAVE THE COUNTY CHOICES IN YOUR

25    INITIATIVE?

1    A.        CORRECT.  SO WE CERTIFY THE SYSTEMS AND THEN

2    THEY CAN CHOOSE AMONG THE CERTIFIED SYSTEMS.

3    Q.        OKAY.  NOW, MY COLLEAGUE ASKED YOU A SERIES OF

4    QUESTIONS ABOUT THE FEASIBILITY OF PHILADELPHIA IN

5    PARTICULAR HAVING DIFFERENT VOTING DEVICES OR VOTING

6    MACHINES FOR THE UPCOMING 2020 GENERAL ELECTION.  FIRST

7    OF ALL, YOU ARE NOW THE SECRETARY OF THE COMMONWEALTH,

8    IS THAT POSSIBLE?

9    A.        I THINK IT WOULD BE VERY, VERY, VERY DIFFICULT.

10   EXTREMELY DIFFICULT.  AND --

11   Q.        WOULD YOU EXPLAIN WHY?

12   A.        SO -- WELL, FIRST OF ALL, YOU KNOW, NO NEED TO

13   SAY THIS, BUT PHILADELPHIA IS THE LARGEST COUNTY IN THE

14   STATE, HAS OVER 1 MILLION VOTERS, IN ADDITION HAS SOME

15   1,700-SOME-ODD PRECINCTS, APPROXIMATELY 8,000 POLL

16   WORKERS.  SO THE IMMENSE SIZE OF THIS ENDEAVOR IS

17   OVERWHELMING.  AND I HAVE TO SAY, I WAS -- WE DID

18   THIS -- WE STARTED THIS PROJECT IN 2018 VERY

19   INTENTIONALLY SO THAT COUNTIES COULD HAVE THE OPTION OF

20   GETTING THIS DONE IN 2019.  AND PHILADELPHIA REALLY

21   EXPEDITED, IN EVERY WAY IT POSSIBLY COULD, ITS RESEARCH

22   PROCESS, ITS RFP, EVERY STEP THEY TOOK THEY DID AS

23   QUICKLY AS THEY COULD.  AND IT STILL TOOK THEM 18 MONTHS

24   TO DO IT.  AND THAT'S IN A NON-PRESIDENTIAL YEAR.  AND

25   THAT'S IN A YEAR BEFORE ACT 77 TOOK PLACE.

1    Q.       LET'S BREAK THAT DOWN FOR THE COURT.

2    A.       OKAY.

3    Q.       FIRST OF ALL, WHAT'S THE SIGNIFICANCE THAT THEY

4    TOOK 18 MONTHS IN A NON-PRESIDENTIAL YEAR FOR THE

5    ABILITY TO CHANGE SYSTEMS IN A PRESIDENTIAL YEAR?

6    A.       SO, I MEAN, EVERYTHING TAKES LONGER, TAKES MORE

7    RESOURCES, TAKES MORE PREPARATIONS IN A PRESIDENTIAL

8    YEAR THAN ANY OTHER YEAR.  SO 2019 WAS THE LEAST -- YOU

9    KNOW, WAS THE SORT OF -- NO DISRESPECT TO ANYBODY THAT

10   WAS ON THE BALLOT IN 2019, BUT IT'S A VERY DIFFERENT

11   MAGNITUDE, BOTH FOR THE NUMBER OF VOTERS THAT ARE

12   SHOWING UP AND THE AMOUNT OF ATTENTION BEING PAID, THE

13   AMOUNT OF PRESSURE THAT IS PUT ON THE POLL WORKERS, THE

14   VOTERS, THE INFORMATION NEEDED IS FAR GREATER IN A

15   PRESIDENTIAL YEAR.

16            SO IN ADDITION, THIS YEAR IS ESPECIALLY

17   HUGE BECAUSE ON OCTOBER 31ST THE GOVERNOR SIGNED ACT 77

18   INTO LAW, WHICH MAKES MORE CHANGES TO VOTING LAWS IN

19   PENNSYLVANIA THAN ANY LAW IN OVER 80 YEARS.  SO WE

20   CHANGED THE VOTER REGISTRATION DEADLINE.  WE NOW ALLOW

21   FOR BY -- MAIL-IN VOTING, WHICH ALLOWS ANYBODY TO VOTE

22   BY PAPER, YOU KNOW, WHETHER OR NOT THEY HAVE AN EXCUSE,

23   AS IT USED TO BE FOR ABSENTEE.  WE REQUIRE THAT EVERY

24   COUNTY ALLOW IN-PERSON MAIL-IN -- MAIL-IN IS SORT OF THE

25   WRONG EXPRESSION IN THIS TERM, BUT EVERY COUNTY NOW HAS

1    TO ALLOW VOTERS TO WALK IN TO THEIR ELECTION OFFICES,

2    WHETHER IT'S A WEEK, TWO WEEKS, THREE WEEKS, FOUR WEEKS

3    BEFORE AN ELECTION DAY, AND CAN IN PERSON VOTE BEFORE

4    ELECTION DAY.

5              IT ELIMINATES STRAIGHT-PARTY TICKET

6    VOTING.  I MEAN, A WHOLE HOST OF THINGS THAT ARE

7    REQUIRED BY THE PRIMARY STATE, BY EACH COUNTY, THAT FOR

8    THE FIRST TIME ARE TAKING EFFECT THIS APRIL.  AND IT IS

9    A TREMENDOUS AMOUNT OF WORK TO BE DONE AND IS TAKING A

10   LOT OF ATTENTION, AS IT SHOULD BE, BY THE COUNTIES AND

11   THE DEPARTMENT OF STATE.

12   Q.      ALL RIGHT.  AND JUST BRIEFLY, MY COLLEAGUE

13   STARTED YOUR -- A TIME CLOCK WHEN PHILADELPHIA ACTUALLY

14   SIGNED A CONTRACT FOR VOTING MACHINES IN MAY OF LAST

15   YEAR.  WHAT IS THE ACTUAL -- FROM YOUR EXPERIENCE IN

16   PHILADELPHIA, WHEN DOES THE ACTUAL TIME CLOCK TICKING IN

17   SELECTING A NEW SYSTEM START?

18   A.      SO FOR PHILADELPHIA IN PARTICULAR?

19   Q.      YES.

20   A.      SO THEY -- SO WHEN WE ANNOUNCED IN APRIL THE

21   TIMELINE --

22   Q.      APRIL 2018?

23   A.      -- APRIL 12, 2018, YES.  SO I STARTED TRAVELING

24   AROUND THE STATE LITERALLY THAT DAY MEETING WITH

25   COUNTIES TO WALK THEM THROUGH WHAT WE WERE INVOLVING,

1    YOU KNOW, WHAT THE INITIATIVE ENTAILED AND SO FORTH.

2    PHILADELPHIA, I THINK, WAS -- WITHIN A WEEK OF THAT

3    APRIL 12TH THAT I MET WITH THEM.  AND, YOU KNOW, AND SO

4    I WOULD SAY, IN MANY WAYS, THEIR KIND OF ACTIVE PROCESS

5    STARTED THEN, FOR ME TO WALK THROUGH THIS IS WHAT IS

6    INVOLVED, THIS IS WHAT WE ARE LOOKING FOR.  THEY

7    IMMEDIATELY TURNED AROUND AND BY JUNE HAD ISSUED AN RFI

8    TO GET INFORMATION FROM VENDORS WHO WERE INTERESTED.  I

9    KNOW THAT I WENT TO A PUBLIC MEETING -- WELL, ACTUALLY,

10   I DON'T EVEN KNOW IF IT WAS PUBLIC.  I WAS INVITED TO

11   SPEAK AT A MEETING IN AUGUST WHERE THEY HAD

12   REPRESENTATIVES OF -- YOU KNOW, THEY NEEDED TO EXPLORE

13   STORAGE AND, YOU KNOW, COST, PRETTY MUCH EVERYTHING

14   INVOLVED THAT GOES INTO HAVING A NEW SYSTEM OF DIFFERENT

15   SHAPES, SIZES, MANNERS, POLL WORKER TRAINING, ALL THAT.

16             AND I WAS THERE TO KIND OF GIVE THE

17   STATE'S PERSPECTIVE ON WHERE IT SHOULD BE GOING.  THEN

18   BY, I THINK NOVEMBER OR DECEMBER OF 2018, I THINK

19   NOVEMBER THEY HAD ISSUED AN RFP.  AND AS I RECALL, THEY

20   WERE REQUIRING THAT SYSTEMS BE AVAILABLE BY THE

21   FOLLOWING FEBRUARY SO THAT THEY COULD THEN VOTE IN

22   FEBRUARY TO SELECT THE SYSTEM, WHICH THEN THEY

23   IMPLEMENTED IN NOVEMBER.  SO BETWEEN FEBRUARY -- SO, YOU

24   KNOW, IF YOU ARE STARTING APRIL OF 2018, FEBRUARY OF

25   2019 IS WHEN THEY ACTUALLY VOTED.  AND THEN BETWEEN

1    FEBRUARY OF 2019 AND NOVEMBER OF 2019, THERE WERE

2    HUNDREDS, THAT I COULD TELL, OF POLL WORKER TRAININGS,

3    PUBLIC EDUCATION, YOU KNOW, FIGURING OUT STORAGE, ALL OF

4    THE COMPONENTS THAT GO INTO IT.  IT WAS A HUGE, HUGE,

5    HUGE AMOUNT OF WORK.

6    Q.     ALL RIGHT.  AND SINCE THAT TIME, THE

7    COMMONWEALTH HAS CERTIFIED NEW SYSTEMS, IS THAT CORRECT?

8    A.     CORRECT.

9    Q.     SYSTEMS THAT PHILADELPHIA WASN'T EXAMINING AT

10   THAT TIME?

11              MR. MAAZEL:  OBJECTION, LEADING, YOUR

12   HONOR.

13   BY MR. ARONCHICK:

14   Q.     OR DO YOU KNOW IF PHILADELPHIA WAS EXAMINING AT

15   THAT TIME?

16   A.     WELL, WHY DON'T I SAY IT THIS WAY.  ADDITIONAL

17   SYSTEMS WERE CERTIFIED AFTER THE TIME THAT THEY WERE --

18   THAT THEY VOTED, SO I CAN'T --

19              THE COURT:  THE PHILADELPHIA VOTE?  THE

20   ELECTION COMMISSIONERS VOTED TO SELECT THE MACHINE?

21              THE WITNESS:  CORRECT.

22              THE COURT:  THAT'S THE VOTE YOU ARE

23   REFERRING TO?

24              THE WITNESS:  CORRECT, CORRECT.  SORRY.

25   BY MR. ARONCHICK:

1    Q.        MONTGOMERY COUNTY, IN THE STIPULATIONS --

2    ALTHOUGH YOU WEREN'T ASKED, BUT THEY ARE IN THE

3    STIPULATIONS.   THERE WAS SOME REFERENCE THAT MONTGOMERY

4    COUNTY PICKED THE SYSTEM AND HAD, YOU KNOW, A SMALL

5    NUMBER OF DAYS, OR LESS DAYS THAN FROM NOW TO NOVEMBER

6    AND THEN PUT THE SYSTEM IN PLACE.   WHAT ACTUALLY

7    HAPPENED IN MONTGOMERY COUNTY?

8    A.        SO MONTGOMERY COUNTY ACTUALLY HAD DECIDED BEFORE

9    WE ISSUED OUR APRIL 12TH DIRECT MANDATE TO THE COUNTIES.

10   THEY HAD ALREADY DECIDED THAT THEY WANTED TO CHANGE

11   THEIR VOTING SYSTEMS.   SO THEY HAD -- SO AS I MENTIONED,

12   THE APRIL 12TH WAS THE DATE THAT WE ISSUED THE MANDATE.

13   THEY HAD ALREADY, IN FEBRUARY OF 2018, DONE AN OPEN

14   HOUSE FOR THE VENDORS, FOR THE FIVE VENDORS WHO WERE

15   INTERESTED IN POSSIBLY BIDDING IN MONTGOMERY COUNTY.   SO

16   THEY HAD STARTED IN FEBRUARY OF 2018.   THEY WERE

17   ORIGINALLY HOPING TO ACTUALLY ROLL OUT THE NEW SYSTEMS

18   IN NOVEMBER OF 2018, BUT WEREN'T ABLE TO GET IT DONE IN

19   TIME.   SO THEY ENDED UP DOING IT IN THE PRIMARY, MAY OF

20   2019.

21                SO -- AND MONTGOMERY COUNTY NOT ONLY HAS

22   HALF THE NUMBER OF VOTERS OF PHILADELPHIA, BUT, MORE

23   IMPORTANTLY, HAS A QUARTER OF THE NUMBER OF PRECINCTS,

24   SO APPROXIMATELY A QUARTER OF THE NUMBER OF POLL

25   WORKERS, WHICH, AGAIN, CAN'T BE OVERSTATED HOW DIFFERENT

```
 1    THAT IS.  BECAUSE IF YOU'RE TALKING ABOUT OUTFITTING

 2    430-SOME-ODD POLLING PLACES, WHICH IS WHAT MONTGOMERY

 3    COUNTY HAS, VERSUS 1700 THAT PHILLY HAS, THAT THAT'S

 4    THAT MANY MORE POLL WORKERS NEED TO BE EDUCATED, THAT

 5    MANY MORE -- YOU KNOW, THERE'S ALL KINDS OF QUEUEING

 6    THEORIES IN EVERY POLLING PLACE, YOU KNOW, POLL WORKER

 7    TRAINING THAT NEEDS TO BE -- THEY NEED TO BE SET UP IN

 8    CERTAIN WAYS.  SO, OBVIOUSLY, HAVING FOUR TIMES AS MANY

 9    POLLING PLACES IS A SIGNIFICANTLY HIGHER BURDEN.

10              MR. ARONCHICK:  ALL RIGHT.  THANK YOU,

11    SECRETARY.  I HAVE NO FURTHER QUESTIONS.

12              THE COURT:  MR. ARONCHICK ASKED YOU

13    WHETHER IT WOULD BE POSSIBLE FOR PHILADELPHIA TO, IF YOU

14    DECERTIFIED THE SUBJECT MACHINES, 6021 MACHINE, WOULD IT

15    BE POSSIBLE FOR PHILADELPHIA -- WHAT EFFECT IT WOULD

16    HAVE, ACTUALLY PUT IT THAT WAY, BUT HE ASKED WHETHER IT

17    WOULD BE POSSIBLE TO CERTIFY A NEW MACHINE AND PUT IT IN

18    PLACE, TRAIN PERSONNEL BY THE NOVEMBER ELECTION.  I

19    DON'T WANT TO PUT WORDS IN YOUR MOUTH, BUT I HEARD YOU

20    SAY IT WOULD BE EXCEEDINGLY DIFFICULT --

21              THE WITNESS:  IT WOULD BE -- AND,

22    HONESTLY, I DON'T EVEN KNOW WHETHER IT'S FEASIBLE,

23    BECAUSE I DON'T KNOW WHETHER THE -- I'M SORRY, DID I

24    INTERRUPT YOU?

25              THE COURT:  YOU DIDN'T.  WHAT ABOUT THE
```

1      PRIMARY ELECTION?

2                  THE WITNESS:   OH.   I MEAN, NO QUESTION.

3      BUT EVEN FOR --

4                  THE COURT:   NO QUESTION WHAT?

5                  THE WITNESS:   NO QUESTION IT WOULD NOT BE

6      POSSIBLE.

7                  THE COURT:   SO IF YOU DECERTIFY THE

8      MACHINE, IF I ORDERED YOU TO DECERTIFY THE MACHINE AND

9      THAT ORDER DOES NOT STAY, IT WAS ACTUALLY -- YOU

10     ACTUALLY HAD TO DO IT, SO LET'S SAY IN A WEEK OR TWO I

11     ORDERED YOU TO DECERTIFY THE MACHINE AND YOU DID, WOULD

12     THERE BE A PRIMARY ELECTION IN THE CITY?

13                THE WITNESS:   YOU KNOW, I MEAN, THERE

14     WOULD HAVE TO BE SOMETHING THAT MADE IT HAPPEN.   BUT,

15     YOUR HONOR, THE -- I CAN'T OVERSTATE THE -- HOW MUCH

16     I -- REALLY, THE CHAOS THAT WOULD ENSUE, FRANKLY.   THE

17     VOTERS WHO JUST LEARNED A NEW MACHINE, THEY WOULD HAVE

18     TO HAVE SOME -- SOMETHING -- SOME ABILITY TO VOTE.

19                THE COURT:   WHEN IS THE PRIMARY?

20                THE WITNESS:   APRIL 28TH.

21                THE COURT:   AND TODAY IS FEBRUARY 18TH.

22     SO THAT IF MARCH 1ST YOU DECERTIFIED THE MACHINES, AGAIN

23     I ASK, WOULD WE HAVE A PRIMARY ELECTION IN THE CITY?

24                THE WITNESS:   I DON'T KNOW HOW THAT WOULD

25     WORK.   BUT THERE WOULD HAVE TO BE SOME ABILITY FOR

1    VOTERS TO VOTE.

2                   THE COURT:  HOW?  THE CITY, PRESUMABLY,

3    WOULD HAVE TO GO THROUGH, IF YOU KNOW, WOULD HAVE TO GO

4    THROUGH ITS BIDDING PROCESS?  IT WOULD HAVE TO BID OUT

5    NEW MACHINES?  IS THAT A YES OR A NO?

6                   THE WITNESS:  I THINK MAYBE IT'S A BETTER

7    QUESTION FOR PHILADELPHIA, BECAUSE WE ARE NOT DIRECTLY

8    INVOLVED IN THEIR PROCUREMENT PROCESS.

9                   THE COURT:  JUST AS FAR AS YOU KNOW.  IF

10   YOU DON'T KNOW, YOU CAN SAY YOU DON'T KNOW.

11                  THE WITNESS:  YES, MY ASSUMPTION IS THAT

12   THEY WOULD HAVE TO GO THROUGH A NEW PROCUREMENT PROCESS.

13                  THE COURT:  AND THE MACHINES THAT

14   PHILADELPHIA WOULD BE AT LIBERTY TO BID OUT WOULD BE

15   MACHINES THAT YOU HAVE APPROVED OR CERTIFIED?

16                  THE WITNESS:  CORRECT.

17                  THE COURT:  AND AS YOU HAVE DESCRIBED IT,

18   AS LEAST AS I HEARD YOUR TESTIMONY, ALL THE MACHINES

19   THAT ARE BEING USED RIGHT NOW BY COUNTIES THROUGHOUT THE

20   COMMONWEALTH SUFFER FROM THE SAME FAILING OR FAILINGS

21   THAT THE EXPRESS XL MACHINE APPARENTLY SUFFERS FROM,

22   THEY HAVE THE SAME -- THEY DO THE SAME THING, THEY DON'T

23   READ PRINT, THEY READ A GRID OR THEY READ A BARCODE OR A

24   QR CODE OR SOMETHING LIKE THAT.

25                  THE WITNESS:  CORRECT.  I WOULDN'T CALL

1      THEM FAILINGS, BUT I UNDERSTAND WHY YOU DO.  SO THAT

2      CHARACTERISTIC IS SHARED BY ALL OF THE VOTING SYSTEMS.

3                     THE COURT:  SO WHAT COULD YOU REPLACE

4      THEM WITH THAT WOULD NOT BE SUBJECT TO THE SAME

5      COMPLAINT THAT I AM HEARING HERE TODAY?

6                     THE WITNESS:  WELL, YOU KNOW, I THINK

7      UNDER -- YOU KNOW, UNDER ACT 77, TECHNICALLY, REGARDLESS

8      OF THE SCENARIO, PEOPLE CAN VOTE BY MAIL-IN BALLOT, BUT

9      THAT'S NOT --

10                    THE COURT:  THAT WOULD BE IT?  THAT'S

11     WHAT WE WOULD HAVE TO DO?  HAND COUNT THE MAIL BALLOTS?

12                    THE WITNESS:  IT'S A GOOD QUESTION, YOUR

13     HONOR.  IT'S -- IT'S -- YOU KNOW, AND EVEN JUST FROM --

14     AND, AGAIN, THIS IS ANOTHER -- THIS WOULD BE A QUESTION

15     FOR THE MANUFACTURERS.  I DON'T KNOW THAT ANY

16     MANUFACTURER COULD EVEN PRODUCE THE MACHINES, AND THIS

17     IS IN TIME FOR NOVEMBER, FORGETTING ABOUT APRIL.

18                    THE COURT:  NO, I'M TALKING ABOUT THE

19     PRIMARY.

20                    THE WITNESS:  YEAH, YEAH.  I DON'T KNOW

21     THAT ANY MANUFACTURER AT THIS POINT COULD PRODUCE THE

22     NUMBER OF SYSTEMS THAT WOULD NEED TO BE HAD BY

23     PHILADELPHIA.

24                    THE COURT:  HOW MANY MACHINES DO WE HAVE

25     IN THE CITY, GIVE OR TAKE?

1           THE WITNESS:  I DON'T RECALL.  LET'S SEE,

2    IF WE HAVE 1700, I THINK 1700 POLLING PLACES.  THIS MAY

3    BE A BETTER QUESTION FOR THE CITY, BUT I THINK IT'S

4    PROBABLY ABOUT TWO PER AND THEN THEY PROBABLY ORDERED A

5    NUMBER MORE, SO --

6           THE COURT:  10,000, 15,000?

7           THE WITNESS:  I DON'T KNOW.  I AM GOING

8    TO HAVE TO DEFER THIS QUESTION, I'M SORRY, TO THE CITY.

9           THE COURT:  MR. FIELD?

10          MR. FIELD:  I BELIEVE THE NUMBER IS

11   3,850.

12          THE COURT:  3,850.  YOU CAN CHALLENGE

13   THAT, MR. MAAZEL, I JUST WANTED A BALL PARK.

14          MR. MAAZEL:  OKAY.

15          THE COURT:  MR. MAAZEL, DO HAVE ANY

16   QUESTIONS FOR THIS WITNESS?

17          MR. MAAZEL:  COULD WE JUST HAVE A

18   FIVE-MINUTES BREAK BEFORE THE REDIRECT?

19          THE COURT:  ABSOLUTELY.

20          (BRIEF RECESS.)

21          THE COURT:  PLEASE BE SEATED.  HAVE A

22   SEAT.

23          LET'S RESUME.  MR. MAAZEL.

24          MR. MAAZEL:  THANK YOU, YOUR HONOR.

25               REDIRECT EXAMINATION

1    BY MR. MAAZEL:

2    Q.      SECRETARY BOOCKVAR, YOU TESTIFIED IN RESPONSE TO

3    YOUR COUNSEL'S QUESTIONING ABOUT A NUMBER OF DOCUMENTS

4    YOU SENT IN ADVANCE OF THE SETTLEMENT CONFERENCE.  DO

5    YOU REMEMBER THAT QUESTIONING?

6    A.      YES.

7    Q.      AND YOU INCLUDED THE E-MAIL FROM MS. UNGER?

8    A.      YES.

9    Q.      AND SOME DIRECTIVES YOU DESCRIBED.

10   A.      YOU WANT TO DESCRIBE WHAT WAS SENT?

11   Q.      AND YOU WENT OVER SOME DIRECTIVES AS WELL THAT

12   WERE SENT IN ADVANCE, YES?

13   A.      THERE WERE LIKE FIVE OR SIX DIFFERENT DOCUMENTS

14   THAT WERE SENT, YES.

15   Q.      AND IF WE JUST START WITH JX 14, MS. UNGER'S

16   SEPTEMBER 28, 2018 E-MAIL.

17   A.      YES.

18   Q.      YOU NOTED THAT, IN THE SECOND BULLET POINT, SHE

19   REFERRED TO A DIRECTIVE FROM COMMISSIONER MARKS

20   REQUIRING A VOTER-VERIFIABLE PAPER BALLOT OR A

21   VOTER-VERIFIABLE PAPER RECORD OF VOTES, CORRECT?

22   A.      SO THE DIRECTIVE IS NOT FROM COMMISSIONER MARKS.

23   BUT -- THE E-MAIL IS FROM COMMISSIONER MARKS.  BUT THE

24   DEPARTMENT OF STATE DIRECTIVE THAT REQUIRED FROM THERE

25   FORWARD VOTER-VERIFIABLE PAPER RECORD VOTING SYSTEMS,

1    YES.

2    Q.      WELL, IN MS. UNGER'S E-MAIL AND IN THE

3    DIRECTIVE, YOU ALWAYS USED THE TERM "VOTER-VERIFIABLE

4    PAPER BALLOT" OR A "VOTER-VERIFIABLE PAPER RECORD,"

5    CORRECT?

6    A.      SO THEY ARE MENTIONED AS EQUIVALENTS.

7    Q.      SECRETARY, I AM JUST ASKING IF THE WORDS YOU ARE

8    USING --

9    A.      YES, AND I AM ANSWERING.   THEY'RE MENTIONED AS

10   EQUIVALENTS.

11              THE COURT:  WAIT, WAIT, WAIT.   SECRETARY,

12   IT'S A YES OR NO QUESTION.   IF YOU WANT TO EXPLAIN YOUR

13   ANSWER AFTER YOU SAY YES OR NO, THAT'S FINE.

14              ASK THE QUESTION AGAIN.

15              MR. MAAZEL:  THANK YOU, YOUR HONOR.

16   BY MR. MAAZEL:

17   Q.      MS. UNGER WROTE THAT THE DIRECTIVE REQUIRED,

18   QUOTE, A VOTER-VERIFIABLE PAPER BALLOT OR A

19   VOTER-VERIFIABLE PAPER RECORD OF VOTES CAST, RIGHT?

20   A.      CORRECT.

21   Q.      AND IN THE DIRECTIVE SHE REFERRED TO, WHICH IS

22   JX 1, IF YOU COULD TURN TO THAT.   THIS WAS THE FEBRUARY

23   9, 2018 DIRECTIVE, CORRECT?

24   A.      CORRECT.

25   Q.      AND IT USES THE LANGUAGE THAT THE SECRETARY WAS

1    REQUIRING, QUOTE, A VOTER-VERIFIABLE PAPER BALLOT OR A

2    VOTER-VERIFIABLE PAPER RECORD, CORRECT?

3    A.       CORRECT.

4    Q.       AND THAT "OR" LANGUAGE WAS CONSISTENTLY USED BY

5    THE SECRETARY BEFORE THE SETTLEMENT AGREEMENT, CORRECT?

6                 MR. ARONCHICK:  OBJECTION.

7                 THE COURT:  SUSTAINED.  I'M AWARE OF

8    THAT.  AND WHAT THE USE OF THE DISJUNCTIVE MEANS IS

9    SOMETHING YOU WOULD -- AND I GUESS MR. ARONCHICK

10   DISAGREES, BUT IT'S GOING TO BE MY INTERPRETATION IN THE

11   END THAT CONTROLS.  YOU'RE FREE TO ASK HER WHAT SHE

12   MEANT.  SHE'S ALREADY SAID WHY THEY USE THE DISJUNCTIVE.

13   I DON'T THINK YOU'LL AGREE WITH THAT INTERPRETATION OF

14   THE USE OF THE DISJUNCTIVE.

15                 MR. MAAZEL:  I WILL MOVE ON TO MY FINAL

16   QUESTION IN THIS LINE.

17   BY MR. MAAZEL:

18   Q.       WHICH IS, IN THE SETTLEMENT AGREEMENT, WHICH IS

19   JX 30, IF YOU CAN PUT THAT IN FRONT OF YOU, SECRETARY,

20   IN PARAGRAPH 2, AND THIS IS THE ACTUAL AGREEMENT SIGNED

21   BY THE PARTIES.  IN PARAGRAPH 2, THERE IS NO "OR"

22   LANGUAGE, IS THERE?  INSTEAD IT'S AN "AND," AM I

23   CORRECT?

24   A.       YOU ARE SAYING BETWEEN A, B AND C?

25   Q.       THAT'S RIGHT.  THE SETTLEMENT AGREEMENT, AS

1    OPPOSED TO THE DIRECTIVE AND EVERYTHING AND ALL OF THOSE

2    E-MAILS THAT WERE SENT BEFORE THE SETTLEMENT CONFERENCE,

3    THE ACTUAL SETTLEMENT AGREEMENT SIGNED BY OUR SIDE AND

4    YOUR SIDE DOES NOT HAVE AN "OR," DOES IT?

5    A.        WELL, YOU ARE TALKING ABOUT A, B AND C, WHICH

6    ARE DIFFERENT THAN THE WORDS "PAPER BALLOT" OR "PAPER

7    RECORD," BUT --

8                   THE COURT:  I CAN READ IT DOES NOT HAVE

9    THE WORD "OR" IN THERE.

10   BY MR. MAAZEL:

11   Q.        CAN YOU POINT US TO A SINGLE DOCUMENT,

12   SECRETARY, PREDATING THE SETTLEMENT IN WHICH THE

13   COUNTIES WERE DIRECTED THAT THEY NEEDED PAPER BALLOTS,

14   QUOTE, PAPER BALLOTS ONLY?  CAN YOU POINT ME TO A SINGLE

15   DIRECTIVE THAT DID NOT HAVE THAT "OR" LANGUAGE, YES OR

16   NO?

17   A.        I AM SURE THAT I COULD.  CAN I DO IT RIGHT NOW

18   WHILE I AM ON THE STAND?  NO.

19   Q.        AND YOU DID HAVE AN OPPORTUNITY TO PREPARE FOR

20   TODAY'S TESTIMONY WITH COUNSEL, YES?

21   A.        DO I -- WILL I HAVE TIME TO LOOK THROUGH THE

22   BINDERS SO I CAN IDENTIFY THE LOCATIONS?

23                   YES, I HAD TIME TO PREPARE.  AND YES, I

24   THINK THERE WERE MANY, MANY TIMES THROUGHOUT THE COURSE

25   OF THIS INITIATIVE BEFORE, DURING AND AFTER, THAT WE

1  HAVE USED JUST THE WORD PAPER BALLOT.  FOR EXAMPLE, THE

2  PRESS RELEASE ABOUT MONTGOMERY COUNTY AND PHILADELPHIA

3  COUNTY, SAME PRESS RELEASE, ONE HAND-MARKED PAPER BALLOT

4  SYSTEM, ONE XL SYSTEM, BOTH USED THE WORDS "PAPER

5  BALLOT."

6          VARIOUS TESTIMONY.  VARIOUS -- I DID

7  COUNTLESS POWERPOINT PRESENTATIONS WHERE I USED THE WORD

8  "PAPER BALLOT" AND OTHER PRESENTATIONS WHERE I USED THE

9  WORD "PAPER RECORD."  OTHER PRESENTATIONS WHERE I USED

10 THE WORD "PAPER TRAIL."  THESE ARE USED INTERCHANGEABLY.

11 Q.      SECRETARY, CAN YOU POINT US TO A SINGLE

12 DIRECTIVE --

13 A.      DIRECTIVE?

14 Q.      -- ISSUED BY THE SECRETARY THAT SAID YOU MUST

15 USE PAPER BALLOTS ONLY, AS OPPOSED TO PAPER BALLOTS OR

16 VOTER-VERIFIABLE PAPER RECORDS?  IS THERE A RECORD, TO

17 YOUR KNOWLEDGE?

18 A.      NOT AT THIS TIME, I CANNOT POINT YOU TO THAT.

19 Q.      WE CAN AGREE THAT THE PIECE OF PAPER IN THE VOTE

20 SUMMARY CARD, IT COMES OUT OF AN XL --

21          THE COURT:  WOULD YOU TAKE A LOOK, MR.

22 MAAZEL, AT -- I GUESS IT'S JOINT EXHIBIT 13.  YES, JOINT

23 EXHIBIT 13, PAGE 2.  THIS IS A STATEMENT OR WRITTEN

24 TESTIMONY OF YOUR PREDECESSOR, IS THAT RIGHT, MADAM

25 SECRETARY?

1              THE WITNESS:  THIS IS JONATHAN MARKS, WHO

2       IS THE CURRENT DEPUTY SECRETARY, WHO AT THE TIME WAS

3       COMMISSIONER.

4              THE COURT:  OH, SORRY.

5              THE WITNESS:  YEAH.  THAT'S OKAY.

6              THE COURT:  AND DID YOU TESTIFY YOU

7       REVIEWED THIS BEFORE IT WAS SUBMITTED?

8              THE WITNESS:  YES, AND I WROTE SOME OF

9       THIS AS WELL.

10             THE COURT:  AND WHO WROTE, SHOULD BE

11      CONDUCTED WITH PAPER BALLOTS BY 2020?

12             THE WITNESS:  I BELIEVE I WROTE THAT

13      PARAGRAPH, WHICH, AGAIN, THIS WAS LANGUAGE THAT WE WERE

14      USING IN MULTIPLE DIFFERENT -- LIKE WE HAD PROVIDED

15      INFORMATION TO THE LEGISLATURE, AS WELL --

16      VOTER-ASSISTIVE LEGISLATURE, AS WELL, BUT TO COUNTIES

17      AND SO FORTH.  SO THIS WAS LANGUAGE I TOOK FROM OTHER

18      DOCUMENTS AS WELL.

19             THE COURT:  OKAY.

20      BY MR. MAAZEL:

21      Q.     WE AGREE THAT YOU ARE FAMILIAR WITH THE

22      PENNSYLVANIA ELECTION CODE, YES?

23      A.     YES.

24      Q.     AND YOU KNOW WHAT A PAPER BALLOT IS UNDER THE

25      PENNSYLVANIA ELECTION CODE?

1    A.        I KNOW THAT THERE'S A DEFINITION OF PAPER BALLOT

2    THAT IS UNDERNEATH THE ELECTRONIC VOTING SYSTEMS, IF

3    THAT'S WHAT YOU ARE REFERRING TO.

4    Q.        AND DO WE AGREE THAT THE DOCUMENT JX 57 PRODUCED

5    BY XL IS NOT A PAPER BALLOT WITHIN THE MEANING OF THE

6    PENNSYLVANIA ELECTION CODE?

7    A.        SO THE LANGUAGE -- THE DEFINITION THAT IS IN THE

8    ELECTION CODE IS VERY VAGUE AND BROAD.  SO, YES, IT'S

9    NOT TREATED -- THE XL PAPER BALLOT IS NOT TREATED AS

10   THOSE WORDS ARE USED UNDER THE ELECTION CODE.

11   Q.        SO JUST SO I HAVE A CLEAR ANSWER.  IS THE XL

12   DOCUMENT THAT WE SAW, JX 57, IS THAT A PAPER BALLOTS

13   UNDER THE PENNSYLVANIA ELECTION CODE?

14   A.        SO ELECTRONIC VOTING SYSTEMS DON'T ACTUALLY HAVE

15   TO HAVE PAPER BALLOT UNDER THE ELECTION CODE.  SO THE

16   XL -- AND THAT'S PART OF WHAT, YOU KNOW, THE BANFIELD

17   CASE ESTABLISHED AS WELL.  SO DOES IT -- IS THE XL PAPER

18   BALLOT USED IN THE WAY THAT THOSE WORDS ARE USED ON THE

19   ELECTION CODE?  NO.

20   Q.        AND IT WAS THE DEFENDANTS WHO DRAFTED THE

21   SETTLEMENT AGREEMENT, YES?

22   A.        THE DEFENDANTS?  WHO --

23   Q.        YES.

24   A.        OH, THE SETTLEMENT AGREEMENT OR THE TERM SHEET?

25   Q.        THE SETTLEMENT AGREEMENT.  THAT'S STIP NUMBER

1      37.

2      A.          THAT I DON'T KNOW.   I MEAN, I KNOW THE TERM

3      SHEET IS BASICALLY THE -- WHAT THE SETTLEMENT AGREEMENT

4      IS BASED ON.

5                       THE COURT:   WHO DRAFTED THE TERM SHEET,

6      AS FAR AS YOU KNOW?

7                       THE WITNESS:   THE PLAINTIFFS.

8      BY MR. MAAZEL:

9      Q.          AND THEN THE SETTLEMENT AGREEMENT WAS DRAFTED, I

10     THINK WE HAVE IN STIP NUMBER 37, BY THE DEFENDANTS, YES?

11     A.          I DON'T KNOW THE ANSWER TO THAT QUESTION.

12                      THE COURT:   IF YOU SAY THAT'S THE

13     STIPULATION, THAT'S FINE.

14     BY MR. MAAZEL:

15     Q.          AND STIPULATION NUMBER 37 REFERS TO THE DRAFT

16     SENT BY MS. UNGER, WHICH IS JX 29.   CAN WE TURN TO THAT

17     FOR A MOMENT?   AND THAT IS THE FIRST DRAFT OF THE

18     SETTLEMENT AGREEMENT SENT BY DEFENSE COUNSEL, CORRECT?

19     A.          I DON'T KNOW WHETHER IT'S THE FIRST DRAFT.   IT

20     DOES APPEAR TO BE A DRAFT SENT BY SUE ANN UNGER TO YOU.

21     Q.          AND IF WE TURN TO PARAGRAPH 23?

22                      THE COURT:   PARAGRAPH 23.

23     BY MR. MAAZEL:

24     Q.          PARAGRAPH 23 OF THE SETTLEMENT AGREEMENT, THE

25     DRAFT.

```
1                    THE COURT:  WHAT EXHIBIT NUMBER?

2                    MR. MAAZEL:  I'M SORRY, IT'S EXHIBIT 29,

3       JOINT EXHIBIT 29, PARAGRAPH 23.

4                    THE COURT:  THANK YOU.

5       BY MR. MAAZEL:

6       Q.      PARAGRAPH 23 CONTAINS A CHOICE OF LAW PROVISION,

7       CORRECT, SECRETARY?

8       A.      YES.

9       Q.      AND THAT IS A CHOICE OF LAW REQUIRING THAT THE

10      LAW OF PENNSYLVANIA CONTROL, YES?

11      A.      YES.

12      Q.      AND THAT WAS A PARAGRAPH THAT WAS INSERTED BY

13      THE DEFENDANTS, YES?

14      A.      I CAN'T ANSWER THAT QUESTION.

15      Q.      WELL, THERE WAS NO CHOICE OF LAW PROVISION IN

16      THE TERM SHEET.  CAN WE AGREE ON THAT OR SHOULD WE LOOK

17      AT THE TERM SHEET?

18      A.      WE WOULD HAVE TO LOOK AT THE TERM SHEET.

19                   THE COURT:  IF YOU TELL ME THERE WAS

20      NONE, I WILL ACCEPT THAT.

21                   MR. MAAZEL:  THERE WAS NONE, YOUR HONOR.

22      BY MR. MAAZEL:

23      Q.      NOW, MY COLLEAGUE OR COUNSEL MR. ARONCHICK

24      POINTED OUT TO YOU ONE OF THE CERTIFICATION DOCUMENTS

25      FOR THE XL WHICH WAS JOINT EXHIBIT 34.  COULD YOU LOOK
```

1    AT THAT?

2    A.    YES.

3    Q.    AND I POINT OUT TO YOU THE RE-EXAMINATION OR

4    RECERTIFICATION REPORT, WHICH WAS JX 45, YES?

5    A.    YES, IF YOU SAY SO.

6    Q.    AND YOU REMEMBER THAT IN YOUR RECERTIFICATION

7    REPORT, YOUR OFFICE CALLED THIS PIECE OF PAPER A VOTE

8    SUMMARY CARD OVER 20 TIMES, YES?

9    A.    THAT'S WHAT YOU ASKED ME TODAY.

10    Q.    IN ANY EVENT, A NUMBER OF TIMES?

11    A.    YES, I THINK THAT'S WHAT YOU --

12    Q.    AND IN PLAINTIFF'S EXHIBIT 34, WHICH YOUR

13    COUNSEL SHOWED YOU, I JUST WANT TO POINT OUT A PAGE THAT

14    HE DID NOT POINT OUT TO YOU, WHICH IS PAGE 5.  HAVE WE

15    LOOKED AT THAT YET TODAY?

16    A.    NO.

17    Q.    AND IT'S THE DESCRIPTION OF THE EXPRESSVOTE XL,

18    YES?

19    A.    YES.

20    Q.    AND IN PART IT'S YOUR OFFICE'S DESCRIPTION, YES?

21    A.    IT'S -- YEAH.  IT'S PART OF THE CERTIFICATION

22    REPORT.  SO I DON'T KNOW WHETHER IT'S OUR OFFICE'S

23    DESCRIPTION OR IF IT CAME FROM DOCUMENTS IN THE XL

24    DOCUMENTATION.

25    Q.    WELL, BUT THIS IS YOUR DOCUMENT.  THIS IS YOUR

1    OFFICIAL RECORD.

2    A.      YOU ASKED WHETHER IT WAS OUR DESCRIPTION.  AND I

3    AM TELLING YOU, IT'S IN OUR REPORT.

4    Q.      ALL THE WORDS IN THIS DOCUMENT ARE WRITTEN BY

5    REPRESENTATIVES OF THE SECRETARY OF THE COMMONWEALTH,

6    YES?

7    A.      SO, AGAIN, THESE EXACT WORDS, I DON'T KNOW IF

8    THEY COME DIRECTLY FROM AN ES&S DOCUMENT OR WHETHER

9    THEY'RE WRITTEN BY AN EMPLOYEE.  I CAN TELL YOU THEY ARE

10   IN OUR CERTIFICATION REPORT, WHICH IS AN OFFICIAL

11   REPORT.

12   Q.      AND IN LINE 5, YOUR OFFICE WROTE, QUOTE:  THIS

13   DEVICE CAN SERVE ALL VOTERS, INCLUDING THOSE WITH

14   SPECIAL NEEDS, ALLOWING ALL VOTERS TO CAST VOTE SUMMARY

15   CARDS ANONYMOUSLY, CORRECT?

16   A.      THAT'S WHAT THIS SAYS, YES.

17   Q.      AND FOUR LINES FROM THE BOTTOM OF THAT

18   PARAGRAPH, YOUR OFFICE WROTE, QUOTE:  THE VOTER CAN

19   PRINT THE VOTE SUMMARY CARD ONCE THEY ARE READY TO CAST

20   THEIR VOTE, YES?

21   A.      CORRECT.

22   Q.      AND THEN YOU WROTE, QUOTE:  ONCE PRINTED, THE

23   EXPRESSVOTE XL INTERNALLY PROCESSES THE VOTE SUMMARY

24   CARD FOR TABULATION, YES?

25   A.      YES.

1    Q.      SO IN BOTH THE ORIGINAL CERTIFICATION AND THE

2    RECERTIFICATION OF THE XL, YOUR OFFICE REPEATEDLY

3    REFERRED TO THAT PIECE OF PAPER, JX 57, AS A VOTE

4    SUMMARY CARD, YES?

5    A.      AGAIN, THAT'S THE LANGUAGE USED BY ES&S TO

6    DESCRIBE THE PIECE OF PAPER.

7    Q.      I AM JUST SHOWING YOU YOUR DOCUMENT.  IT'S

8    NOT --

9    A.      AND I AM ANSWERING YOUR QUESTION.

10   Q.      OKAY.  YOUR COUNSEL POINTED TO, I BELIEVE IT WAS

11   DEFENDANT F, A SECURING THE VOTE DOCUMENT, YES?

12   A.      YES.

13   Q.      AND NOW, THE DEFENDANTS NEVER ACTUALLY PRODUCED

14   THIS DOCUMENT TO THE PLAINTIFFS AT ANY POINT, RIGHT?

15               THE COURT:  IF YOU KNOW.

16               THE WITNESS:  I DON'T KNOW.

17               MR. MAAZEL:  OKAY.

18   BY MR. MAAZEL:

19   Q.      I MEAN, YOU REFERRED TO IT, BUT DO YOU HAVE ANY

20   KNOWLEDGE THAT THE DEFENSE COUNSEL EVER SAID, BY THE

21   WAY, THIS IS THE DEFINITION OF PAPER BALLOT THAT WE ARE

22   USING?  DO YOU HAVE ANY KNOWLEDGE OF THAT?

23   A.      I DON'T KNOW.

24   Q.      IF I COULD SHOW YOU NOW PX 1010 AND 1011.

25               MR. MAAZEL:  WHICH I BELIEVE ARE IN

1      EVIDENCE.  THIS IS THE NIST DOCUMENTS, YOUR HONOR.

2                      THE WITNESS:  I'M SORRY --

3                      THE COURT:  WHERE ARE WE?

4                      MR. MAAZEL:  PX 1010 AND 11, WHICH ARE

5      TABS 10 AND 11 IN THE PLAINTIFFS' BINDER.

6                      THE COURT:  1010 AND 11.  I GOT IT.

7                      MR. ARONCHICK:  YOUR HONOR, I RENEW MY

8      OBJECTION TO --

9                      THE COURT:  I WOULD LIKE TO KNOW WHAT 10

10     IS.  WHO AUTHORED IT?

11                     MR. MAAZEL:  NIST, THIS ORGANIZATION

12     NIST, I BELIEVE THIS IS.  AND SO IF WE TURN TO 1011 --

13                     MR. ARONCHICK:  YOUR HONOR --

14                     THE COURT:  I WILL LET HIM QUESTION HER

15     ON IT.

16                     MR. ARONCHICK:  I JUST --

17                     THE COURT:  SHE SAID SHE DOESN'T KNOW

18     ABOUT THIS, BUT I WILL STILL LET HIM QUESTION HER ON

19     THIS.

20                     MR. ARONCHICK:  THIS IS A DRAFT.  HE SAID

21     WHO AUTHORED IT --

22                     THE COURT:  IT SAYS:  ELECTION

23     TERMINOLOGY GLOSSARY - DRAFT.  AGAIN, YOUR OBJECTION I

24     THINK CORRECTLY GOES TO THE WEIGHT.

25     BY MR. MAAZEL:

1    Q.        AND IF WE LOOK AT EXHIBIT 1011, THIS NATIONAL

2    INSTITUTE OF SCIENCE AND TECHNOLOGY ADVISES EAC, WHICH

3    YOU REFERRED TO IN YOUR TESTIMONY BEFORE, YES?

4              MR. ARONCHICK:  OBJECTION.

5              THE COURT:  THAT'S NOT, I BELIEVE, WHAT

6    SHE SAID.  I THINK SHE SAID THAT SHE HAD NEVER HEARD OF

7    THE NIST AND DIDN'T KNOW.

8              MR. MAAZEL:  I'M SORRY, I SAID IT WRONG.

9    BY MR. MAAZEL:

10   Q.        YOU UNDERSTAND WHAT THE EAC IS AND YOU TESTIFIED

11   ABOUT THE EAC, CORRECT?

12   A.        CORRECT.

13   Q.        OKAY.  AND IF WE COULD TURN TO THE NIST ELECTION

14   TERMS GLOSSARY DOCUMENT, WHICH IS PLAINTIFF'S

15   EXHIBIT 1010.  IF YOU CAN TURN TO PAGE 27 OF 43, THE

16   DEFINITION OF PAPER BALLOT.

17              THE COURT:  YOU MEAN SETTLEMENT 44?  I

18   HAVE 44.

19              THE WITNESS:  I DO TOO.

20   BY MR. MAAZEL:

21   Q.        IN ANY EVENT, IT'S WHERE THE DEFINITION OF PAPER

22   BALLOT IS.  DO YOU SEE THAT?

23   A.        I SEE IT.

24   Q.        OKAY.  AND IT SAYS, QUOTE:  A PIECE OF PAPER OR

25   MULTIPLE SHEETS OF PAPER ON WHICH ALL CONTEST OPTIONS OF

1    A GIVEN BALLOT STYLE ARE PRINTED.

2                    DO YOU SEE THAT DEFINITION?

3    A.    I SEE IT.  I HAVE NEVER HEARD IT BEFORE.

4    Q.    AND IS, USING THAT DEFINITION OF PAPER BALLOT,

5    IS THE DOCUMENT GENERATED BY THE XL A PAPER BALLOT?

6                    THE COURT:  THAT'S AN ARGUMENT YOU ARE

7    MAKING TO ME.  AND IT IS NOT, UNDER THIS DEFINITION.

8                    MR. MAAZEL:  OKAY.

9    BY MR. MAAZEL:

10   Q.    BY THE WAY, THIS DEFINITION HERE, DO YOU

11   UNDERSTAND THIS DEFINITION, THIS NIST DEFINITION TO

12   BE -- WITHDRAWN.

13                    THE COURT:  I MAY NOT HAVE HEARD HER SAY

14   IT BECAUSE YOU WERE TALKING OVER EACH OTHER, BUT SHE

15   SAID SHE'S NEVER SEEN IT BEFORE.

16                    MR. MAAZEL:  I UNDERSTAND.

17   BY MR. MAAZEL:

18   Q.    YOU GAVE SOME TESTIMONY ABOUT THE SETTLEMENT

19   CONFERENCE.  DO YOU REMEMBER THAT TESTIMONY?

20   A.    I DO.

21   Q.    THERE WAS NO DISCUSSION ABOUT THE XL SYSTEM AT

22   THE CONFERENCE, WAS THERE?

23   A.    NO.

24   Q.    THERE WAS NO DISCUSSION ABOUT ANY SPECIFIC

25   VOTING SYSTEM AT THE CONFERENCE, WAS THERE?

1    A.        CORRECT.  ASIDE FROM THAT FOOTNOTE EXCEPTION OF

2    THAT TYPE OF SYSTEM.

3    Q.        OKAY.  THERE WAS MENTION OF BARCODES IN THE

4    SETTLEMENT CONFERENCE, WAS THERE?

5    A.        NO.

6    Q.        THERE WAS NO MENTION OF VOTE SUMMARY CARDS AT

7    THE CONFERENCE, WAS THERE?

8    A.        NO.

9              THE COURT:  WAS THERE ANY MENTION OF THE

10   EFFORT THAT THE COMMONWEALTH HAD BEGUN SOME MONTHS

11   BEFORE AND WORKING THIS INTO THAT EFFORT?

12             THE WITNESS:  YES, ABSOLUTELY.  THAT WAS

13   THE WHOLE BASIS OF WHAT THE SETTLEMENT WAS CONDITIONED

14   UPON.

15             THE COURT:  I UNDERSTAND THAT THAT WAS,

16   AND YOU'VE TESTIFIED TO THAT, BUT DID YOU OR ANYBODY ON

17   YOUR SIDE MAKE CLEAR THAT THE SETTLEMENT HAD TO WORK

18   INTO WHAT THE COMMONWEALTH HAD ALREADY STARTED TO DO IN

19   THE WAY OF REPLACING VOTING MACHINES?

20             THE WITNESS:  YES, YOUR HONOR.  IN FACT,

21   THAT'S WHY I WAS THERE.  I INSISTED ON BEING AT THAT

22   SETTLEMENT CONFERENCE BECAUSE I WANTED TO MAKE SURE IT

23   WAS VERY CLEAR EXACTLY THE PATH THAT WE WERE ALREADY ON,

24   AND THAT IT WAS COMMUNICATED TO THE PLAINTIFFS.  AND IT

25   WAS.  AND WE REACHED AGREEMENT BASED ON THE COMMON

1    UNDERSTANDING OF THOSE TERMS.

2    BY MR. MAAZEL:

3    Q.     BY THE WAY, THE VAST MAJORITY OF THIS CONFERENCE

4    WAS WITH BOTH SIDES IN DIFFERENT ROOMS, RIGHT?

5    A.     MOST OF IT, YES.

6    Q.     YOU WERE IN THE COURTROOM OF JUDGE RICE AND WE

7    WERE IN ANOTHER ROOM?

8    A.     CORRECT.

9    Q.     MAYBE A JURY ROOM OR SOME OTHER ROOM, YES?

10   A.     CORRECT.  BUT MOST OF THAT ACTUALLY WAS RELATING

11   TO THE OTHER PIECES OF THE SETTLEMENT AGREEMENT.  WE

12   WENT INTO THE POST-ELECTION AUDITS.  WE CAME TO AN

13   AGREEMENT ABOUT THE PATH WE WERE ALREADY ON WITH THE

14   VOTING SYSTEMS UPGRADE MOSTLY BEFORE THAT POINT WHEN WE

15   WERE SEPARATED.

16   Q.     OKAY.

17            THE COURT:  IF I DIDN'T KNOW BETTER, I'D

18   SAY YOU WERE TESTIFYING, MR. MAAZEL.

19            MR. ARONCHICK:  YOUR HONOR, I WAS GOING

20   TO OBJECT, BUT I FIGURED --

21            MR. MAAZEL:  I AM JUST ASKING LEADING

22   QUESTIONS, YOUR HONOR.

23            THE COURT:  OKAY.

24   BY MR. MAAZEL:

25   Q.     CAN YOU LOOK AT THE STIPULATION PARAGRAPH 34,

1    PLEASE?

2    A.      WHAT TAB?

3    Q.      THE STIPULATIONS.

4              THE COURT:  THE STIPULATIONS?

5              MR. MAAZEL:  YES.  I'M SORRY, STIPULATION

6    NUMBER 44.

7              THE COURT:  WHAT TAB NUMBER IS THAT?

8              MR. MAAZEL:  I AM NOT POINTING TO AN

9    EXHIBIT NOW, YOUR HONOR, JUST THE STIPULATIONS.

10             THE COURT:  YEAH, WHAT TAB NUMBER IS IT?

11             MR. MAAZEL:  IT'S NOT A TAB NUMBER.  IT'S

12   THE SEPARATE STIPULATIONS.  DOES YOUR HONOR HAVE THOSE?

13             THE COURT:  IT'S ALL RIGHT, IF YOU COULD

14   JUST READ IT.

15             MR. MAAZEL:  OKAY.  SO STIPULATION 44

16   SAYS:  DEFENDANTS -- QUOTE, DEFENDANTS DID NOT

17   COMMUNICATE THE CERTIFICATION OF THE EVS 6021 SYSTEMS TO

18   PLAINTIFF.

19             THE WITNESS:  OKAY.  MY PARAGRAPH 34 IS

20   DIFFERENT.  AM I ON THE WRONG DOCUMENT?

21   BY MR. MAAZEL:

22   Q.      44.

23   A.      44.  OKAY, SORRY.  ASK AWAY.

24   Q.      SO IT IS A STIPULATED FACT THAT, QUOTE,

25   DEFENDANTS DID NOT COMMUNICATE THE CERTIFICATION OF THE

1      EVS 6021 SYSTEM TO PLAINTIFFS, CORRECT?

2      A.      THAT'S WHAT IT SAYS HERE.

3      Q.      AND THAT IS TRUE, YES?

4      A.      I DID NOT PERSONALLY COMMUNICATE THE

5      CERTIFICATION OF THE 6021 SYSTEM TO PLAINTIFFS.

6      Q.      OKAY.  AND THAT SYSTEM INCLUDES THE XL, YES?

7      A.      CORRECT.

8      Q.      AND SO DEFENDANTS NEVER TOLD THE PLAINTIFFS THAT

9      THEY HAD CERTIFIED THE XL, CORRECT?

10     A.      THERE HAVE BEEN MULTIPLE DISCUSSIONS, INCLUDING

11     THE REPORTS, THE STATUS REPORTS, THAT SAID WE WERE ON

12     THE VERGE, LITERALLY --

13             THE COURT:  ALL YOU CAN DO IS SAY WHAT

14     YOU KNOW.  DID YOU EVER COMMUNICATE IT?

15             THE WITNESS:  I DID NOT.

16             THE COURT:  THAT IT WAS CERTIFIED?

17             THE WITNESS:  NO.

18             THE COURT:  OKAY.

19     BY MR. MAAZEL:

20     Q.      ARE YOU AWARE OF ANYONE ON THE DEFENSE SIDE WHO

21     EVER SAID IN NOVEMBER 2018, DECEMBER 2018, JANUARY 2019,

22     FEBRUARY 2019, ARE YOU AWARE OF ANYONE ON THE DEFENSE

23     SIDE WHO SAID TO THE PLAINTIFFS, BY THE WAY, WE

24     CERTIFIED THE 6021 SYSTEM?

25     A.      I DID NOT.

1    Q.       ARE YOU AWARE OF ANYONE ELSE WHO DID?

2    A.       I DON'T KNOW.  I KNOW THAT THERE WAS A LOT OF

3    INFORMATION COMING OUT, A LOT OF MATERIALS, A LOT OF

4    PRESS RELEASES.  YOU PRETTY MUCH HAVE TO BE LIVING UNDER

5    A ROCK TO NOT HAVE SEEN THAT THIS WAS CERTIFIED.

6    Q.       I AM ASKING A SPECIFIC QUESTION.

7               THE COURT:  I THINK HER ANSWER IS NO, SHE

8    DOES NOT KNOW.

9    BY MR. MAAZEL:

10   Q.       OKAY.  AND THE SETTLEMENT AGREEMENT AT JX 30 --

11   A.       WHICH ONE?

12              THE COURT:  EXHIBIT 30.

13   BY MR. MAAZEL:

14   Q.       IN PARAGRAPH 4, IT SETS FORTH THE WAY IN WHICH

15   PLAINTIFFS WERE SUPPOSED TO BE ABLE TO MONITOR WHAT THE

16   SECRETARY WAS DOING WITH RESPECT TO THE CERTIFICATION OF

17   SYSTEMS, CORRECT?

18   A.       IT SETS FORTH -- DO YOU WANT TO POINT ME TO A

19   PARTICULAR PARAGRAPH?

20   Q.       WELL, LET ME FINISH.

21              DEFENDANTS WERE SUPPOSED TO ALLOW THE

22   PLAINTIFFS -- DESIGNATE THE PLAINTIFFS TO OBSERVE THE

23   CERTIFICATION PROCESS.

24              MR. ARONCHICK:  OBJECTION, BEYOND THE

25   SCOPE.

```
 1                    THE COURT:  NO.  I WILL LET HIM DO IT,

 2   BUT I -- AS I INDICATED, I DON'T WANT TO HAVE TO BRING

 3   HER BACK.

 4                    CAN YOU ASK THE QUESTION AGAIN?  I THINK

 5   YOU ARE ASKING HER TO STATE YOUR READING OF THIS

 6   PARAGRAPH.  AND IT'S ONE I HAPPEN TO SHARE, BUT I AM NOT

 7   SURE WHAT YOU ARE ASKING HER, BUT GO AHEAD.

 8                    MR. MAAZEL:  OKAY.  I CAN MOVE TO MY NEXT

 9   LINE.  YOU ARE THE FACT FINDER, YOUR HONOR, SO...

10                    THE COURT:  YES.

11   BY MR. MAAZEL:

12   Q.     YOU TESTIFIED IN RESPONSE TO YOUR COUNSEL'S

13   QUESTIONS THAT -- I BELIEVE YOU TESTIFIED THAT THE WORDS

14   ON THE XL DOCUMENT ARE THE OFFICIAL VOTE OF RECORD.

15   A.     CORRECT.

16   Q.     OKAY.  BUT ON MY DIRECT, YOU ADMITTED THAT THE

17   MACHINE COUNTS THE BARCODES, CORRECT?

18   A.     ON ELECTION NIGHT, ALL THE SYSTEMS IN

19   PENNSYLVANIA THAT ARE BEING USED BY THE COUNTIES ARE

20   TABULATED BY EITHER A BARCODE, A QR CODE, TIMING MARKS

21   OR SENSORS.

22   Q.     I AM TALKING ABOUT THE XL.

23   A.     THAT IS ONE OF THE ALL.

24   Q.     SO FOR THE XL --

25                    THE COURT:  I BELIEVE THE SECRETARY'S
```

1    TESTIMONY WAS, IN THE EVENT OF AN AUDIT OR RECOUNT, THE

2    ACTUAL VOTE IS THE TEXTUAL VOTE, IS THAT RIGHT?

3              THE WITNESS:  CORRECT.

4              THE COURT:  SO THAT'S THE ACTUAL VOTE.

5    WHEN YOU SAY YOUR -- AND THIS IS OBVIOUSLY THE HEART OF

6    THE DISPUTE.  YOU ARE SAYING THAT, AS FAR AS YOU KNOW,

7    THE BARCODE REFLECTS THE ACTUAL VOTE?

8              THE WITNESS:  I'M SORRY, ARE YOU ASKING

9    ME, YOUR HONOR?

10             THE COURT:  YES.

11             THE WITNESS:  SO YOU ARE ASKING ME IF THE

12   BARCODE REFLECTS THE --

13             THE COURT:  WHEN YOU SAY THE ACTUAL VOTE

14   IS THE LISTED VOTE.

15             THE WITNESS:  CORRECT.

16             THE COURT:  MR. MAAZEL POINTS OUT, WELL,

17   WHAT'S ACTUALLY COUNTED IS THE BARCODE.

18             THE WITNESS:  SO ON ELECTION NIGHT --

19             THE COURT:  THERE IS NO QUESTION.

20             THE WITNESS:  YEAH.

21             THE COURT:  THAT IS CORRECT.  WHAT IS

22   COUNTED IS THE BARCODE, CORRECT?

23             THE WITNESS:  CORRECT.

24             THE COURT:  SO THAT'S WHAT'S ACTUALLY

25   COUNTED UNLESS THERE IS A CAUSE FOR THERE TO BE A

```
 1    RECOUNT?

 2                THE WITNESS:  PLUS THE MANDATORY

 3    STATUTORY AUDITS.

 4                THE COURT:  AND THE VARIOUS AUDITS.

 5                THE WITNESS:  YES.

 6                THE COURT:  AND HAVE YOU SEEN ANY

 7    EVIDENCE AT ALL THAT SUGGESTS THERE IS A DISCONNECT

 8    BETWEEN THE BARCODE -- THAT THE BARCODE INACCURATELY

 9    REFLECTS WHAT -- THE CANDIDATES THE VOTER VOTED FOR?

10                THE WITNESS:  NO, I HAVEN'T.

11    BY MR. MAAZEL:

12    Q.      AND FOR EVERY VOTE THAT IS NOT AUDITED, WHICH IS

13    THE VAST MAJORITY OF VOTES, CORRECT?

14    A.      SO IF YOU ARE LOOKING AT THE STATUTORY AUDIT, IF

15    YOU'RE TALKING ABOUT 2 PERCENT, THEN YES.

16    Q.      SO THE VAST MAJORITY OF VOTES NEVER MAKE IT TO

17    AN AUDIT.  THEY ARE JUST COUNTED BY THE MACHINE, YES?

18    A.      CORRECT.

19    Q.      AND IN THAT CASE, THE BARCODE IS THE VOTE IN

20    EVERY SINGLE CASE, RIGHT?

21                THE COURT:  YOU ARE MAKING ARGUMENT AND I

22    UNDERSTAND.  I UNDERSTAND.

23                MR. MAAZEL:  OKAY.

24                THE COURT:  IT'S NOT THAT I DIDN'T

25    BELIEVE YOU AND MR. ARONCHICK WHEN YOU DESCRIBED HOW
```

```
1        MUCH TIME YOU WERE GOING TO NEED, BUT IT IS NOW AN

2        HOUR-AND-A-HALF AFTER I ASKED THE QUESTION, BUT GO

3        AHEAD.

4                      MR. MAAZEL:  I AM ON MY LAST AREA, YOUR

5        HONOR.

6                      THE COURT:  IT WILL BE DINNER SOON FOR

7        YOU.

8                      THE WITNESS:  I DO EAT LUNCH.

9                      THE COURT:  AS DO I.

10                      IT'S THE SECRET TO MR. ARONCHICK'S

11       SUCCESS IS THAT HE DOESN'T EAT LUNCH.

12                      MR. ARONCHICK:  I TOOK 17 MINUTES.  THE

13       REST IS ALL HIM.

14                      THE COURT:  ALL RIGHT.

15       BY MR. MAAZEL:

16       Q.        YOU WERE ASKED, IS IT POSSIBLE FOR PHILADELPHIA

17       TO -- IF YOU WERE TO DECERTIFY THE SYSTEM TOMORROW,

18       WOULD IT BE POSSIBLE FOR PHILADELPHIA TO HAVE A NEW

19       SYSTEM UP BY GENERAL ELECTION.  DO YOU REMEMBER THAT

20       QUESTION?

21       A.        I DO REMEMBER THE QUESTION.

22       Q.        AND YOU SAID -- YOU DIDN'T SAY IT WOULD BE

23       IMPOSSIBLE, YOU SAID IT WOULD BE DIFFICULT.  THAT WAS

24       YOUR WORD.

25       A.        NO.  I THINK I SAID EXTREMELY OR SOME VERY
```

1       STRONG ADJECTIVE DIFFICULT.

2       Q.      VERY DIFFICULT, BUT NOT IMPOSSIBLE, CORRECT?

3       A.      SO THEN I THINK LATER CONTINUED THAT HONESTLY, I

4       WASN'T EVEN SURE IF THE MANUFACTURERS COULD PRODUCE THE

5       SYSTEMS IN TIME FOR NOVEMBER.  SO I DON'T KNOW THAT IT

6       IS FEASIBLE.

7       Q.      EVERYTHING YOU TESTIFIED TO TODAY ABOUT THE

8       NUMBER OF POLLING PLACES, THE NUMBER OF VOTERS,

9       EVERYTHING YOU TESTIFIED TO THAT MIGHT MAKE IT DIFFICULT

10      TO REPLACE THE SYSTEM, YOU KNEW ALL OF THAT WHEN YOU

11      SIGNED YOUR DECLARATION IN OPPOSITION TO THIS MOTION,

12      CORRECT?

13      A.      YES.

14      Q.      IF THE SECRETARY DECERTIFIED THE XL TOMORROW,

15      WHEN, IN YOUR VIEW, SHOULD PHILADELPHIA BE ABLE TO USE A

16      DIFFERENT SYSTEM?

17      A.      I MEAN, I WOULD PROBABLY RECOMMEND ANOTHER

18      18 MONTHS.

19      Q.      SO GENERAL ELECTION 2021?

20      A.      YES.

21      Q.      AND, IN FACT, THE VERY FIRST TIME YOU EVER EVEN

22      MENTIONED THE POSSIBILITY OF GETTING NEW SYSTEMS TO

23      PHILADELPHIA, YOU SAID IN YOUR TESTIMONY, WAS IN

24      FEBRUARY -- I'M SORRY, WAS IN APRIL OF 2018, YES?

25      A.      I'M SORRY, CAN YOU ASK THAT --

1    Q.        THE VERY FIRST MEETING YOU EVER HAD WITH

2    PHILADELPHIA SUGGESTING THAT THERE MIGHT BE SOME NEW

3    REQUIREMENT IN THE FUTURE WAS APRIL 2018.

4    A.        CORRECT.

5    Q.        AND BY NOVEMBER 2019, THEY HAD A NEW SYSTEM,

6    THEY VOTED, THEY HAD PROCUREMENT, THEY HAD A NEW SYSTEM,

7    THEY TRAINED PEOPLE AND THEY USED THE XL IN

8    NOVEMBER 2019, CORRECT?

9    A.        I THINK I ALREADY TESTIFIED TO THAT.

10                MR. MAAZEL:  I HAVE NO FURTHER QUESTIONS,

11   YOUR HONOR.

12                MR. ARONCHICK:  NO FURTHER QUESTIONS,

13   YOUR HONOR.

14                THE COURT:  SECRETARY BOOCKVAR, THANK YOU

15   VERY MUCH.

16                THE WITNESS:  THANK YOU, YOUR HONOR.

17                THE COURT:  WE WILL RESUME AT 3 O'CLOCK.

18   I WOULD ASK -- I WILL BE GUIDED BY THE PARTIES AS TO HOW

19   LATE YOU WANT TO GO TODAY.  I DON'T KNOW HOW MANY MORE

20   WITNESSES.  I AM NOT HOLDING YOU, I THINK YOU NAMED SIX

21   OR SEVEN WITNESSES.  I DON'T KNOW HOW MANY YOU ARE

22   ACTUALLY GOING TO CALL.  BUT WE WILL SEE.  I DON'T KNOW

23   IF, BY THE END OF THE DAY TODAY, WHETHER ANOTHER DAY IS

24   NECESSARY.  AND IF SO, IF THE PARTIES CAN TELL ME WHEN

25   THAT DAY IS, I WILL ADJUST MY SCHEDULE ACCORDINGLY.