```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3
        JILL STEIN, ET AL          :     CIVIL CASE NUMBER
 4              PLAINTIFFS          :
                                    :
 5          VERSUS                  :     16-6287
                                    :
 6      PEDRO A. CORTES, ET AL,     :
                   DEFENDANTS       :

 7      ---------------------------------------------------

 8                          FEBRUARY 19, 2020
                            COURTROOM 14A
 9                          PHILADELPHIA, PA 19106

10      ---------------------------------------------------

11          BEFORE THE HONORABLE PAUL S. DIAMOND, J.
        ---------------------------------------------------

12                  EVIDENTIARY HEARING - DAY 2

13      APPEARANCES:

14      ILANN M. MAAZEL, ESQUIRE
        DOUGLAS E. LIEB, ESQUIRE
15      EMERY CELLI BRINCKERHOFF & ABADY LLP
        600 FIFTH AVE, 10TH FLOOR NEW YORK, NY 10020
16      COUNSEL FOR THE PLAINTIFFS

17
                    LYNN GLIGOR, RMR
18              OFFICIAL COURT REPORTER
            ROOM 2609 U. S. COURTHOUSE
19               601 MARKET STREET
             PHILADELPHIA, PA 19106
20               (856) 649-4774

21
        PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
22      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

23

24

25
```

```
1       CONTINUED APPEARANCES:

2       JOHN G. PAPIANOU, ESQUIRE
        MONTGOMERY MCCRACKEN WALKER RHOADS LLP
3       1735 MARKET STREET
        PHILADELPHIA, PA 19103
4
        COUNSEL FOR THE PLAINTIFFS
5

6       MARK ARONCHICK, ESQUIRE
        ROBERT WIYGUL, ESQUIRE
7       CHRISTINA MATTHIAS, ESQUIRE
        HANGLEY ARONCHICK SEGAL & PUDLIN
8       ONE LOGAN SQUARE, 27TH FLOOR
        18TH & CHERRY STREETS
9       PHILADELPHIA, PA 19103-6933

10      COUNSEL FOR THE DEFENDANTS

11
        BENJAMIN H. FIELD, ESQUIRE
12      DANIELLE E. WALSH, ESQUIRE
        MICHAEL WU-KUNG PFAUTZ, ESQUIRE
13      CITY OF PHILADELPHIA LAW DEPARTMENT
        1515 ARCH STREET, 15TH FLOOR
14      PHILADELPHIA, PA 19102

15      COUNSEL FOR THE CITY OF PHILADELPHIA

16

17

18

19

20

21

22

23

24

25
```

1          (CLERK OPENS COURT.)

2          THE COURT:  PLEASE BE SEATED EVERYBODY.

3  GOOD MORNING.

4          ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

5          THE COURT:  HOW WOULD THE PARTIES LIKE TO

6  PROCEED?

7          MR. MAAZEL:  WE ARE READY TO PROCEED THIS

8  MORNING FIRST WITH DR. HALDERMAN.

9          THE COURT:  OKAY, THAT'S FINE.

10          (WITNESS SWORN.)

11          THE WITNESS:  MY NAME IS J. ALEX,

12  A-L-E-X, HALDERMAN, H-A-L-D-E-R-M-A-N.

13          THE COURT:  WELCOME BACK, DOCTOR.

14          THE WITNESS:  THANK YOU, YOUR HONOR.

15              DIRECT EXAMINATION

16  BY MR. MAAZEL:

17  Q.      GOOD MORNING, DR. HALDERMAN.

18  A.      GOOD MORNING.

19  Q.      WHAT IS YOUR ROLE IN THIS CASE VIS-A-VIS THE

20  SELLER AGREEMENT?

21  A.      I AM THE STEIN PLAINTIFFS' DESIGNEE FOR PURPOSES

22  OF OBSERVING PENNSYLVANIA'S CERTIFICATION TESTING.

23  Q.      SO, WE KNOW THAT YOU HAVE APPEARED BEFORE JUDGE

24  DIAMOND IN THIS CASE BEFORE, BUT BRIEFLY, WHAT ARE YOUR

25  EDUCATIONAL AND PROFESSIONAL BACKGROUND?

1    A.    I AM A PROFESSOR OF COMPUTER SCIENCE AND

2    ENGINEERING AT THE UNIVERSITY OF MICHIGAN.  AND I HOLD A

3    PH.D. IN COMPUTER SCIENCE FROM PRINCETON.  AND MY

4    RESEARCH IS ABOUT COMPUTER SECURITY WITH AN EMPHASIS ON

5    THE SECURITY OF ELECTIONS.

6    Q.    ALL RIGHT.  AND DO YOU HAVE ANY ROLE TODAY

7    VIS-A-VIS ELECTION SECURITY IN THE UNITED STATES?

8    A.    YES.  I'VE -- SINCE 2016, I HAVE TESTIFIED TWICE

9    BEFORE CONGRESS ON THE SUBJECT OF ELECTION SECURITY AND

10    I AM CURRENTLY SERVING AS THE CO-CHAIR OF THE STATE OF

11    MICHIGAN'S ELECTION SECURITY ADVISORY COMMISSION.

12    Q.    WHO APPOINTED YOU TO THE SECURITY ADVISORY

13    COMMISSION?

14    A.    MICHIGAN'S SECRETARY OF STATE, JOCELYN BENSON.

15    Q.    THE KATHY BOOCKVAR OF MICHIGAN?

16    A.    I SUPPOSE YOU COULD SAY SO.

17    Q.    HAVE YOU EVER BEEN ADMITTED IN COURT AS AN

18    EXPERT IN ELECTION SECURITY?

19    A.    YES, I HAVE.

20            MR. MAAZEL:  TO THE EXTENT IT IS

21    NECESSARY, YOUR HONOR, WE WOULD JUST ASK THAT DR.

22    HALDERMAN BE DESIGNATED AS AN EXPERT --

23            THE COURT:  HIS DESIGNATION FROM THE 2016

24    HEARING IS STILL -- IT'S THE SAME CASE, BUT I WILL

25    REDESIGNATE HIM, UNLESS THE DEFENDANT HAS AN OBJECTION.

1          MR. WIYGUL:  NO OBJECTION, YOUR HONOR.

2          THE COURT:  VERY WELL.

3    BY MR. MAAZEL:

4    Q.     DR. HALDERMAN, CAN WE TURN TO JX 30, WHICH I

5    THINK EVERYBODY IN THE COURT BY NOW KNOWS IS THE

6    SETTLEMENT AGREEMENT IN THIS CASE, AND TO PAGE TWO.

7           AND DO YOU SEE THE SECTION IN 2A, THE

8    REQUIREMENT THAT THE BALLOT ON WHICH EACH VOTE IS

9    RECORDED IS PAPER?

10   A.     YES, I DO.

11   Q.     CAN YOU READ THE FOOTNOTE ATTACHED TO THAT

12   PARAGRAPH?

13   A.     THE FOOTNOTE SAYS, A VVPAT RECEIPT GENERATED BY

14   A DRE MACHINE IS NOT A PAPER BALLOT.

15   Q.     IS YOUR UNDERSTANDING THAT THE VVPATS ARE

16   PROHIBITED BY THE SELLING AGREEMENT?

17   A.     YES, IT IS.

18   Q.     AND WERE YOU HERE YESTERDAY FOR MR. GATES'

19   TESTIMONY WHERE HE SAID THAT DRE'S WITH VVPATS ARE A

20   LEMON?

21   A.     YES.

22   Q.     AND THAT ALL PARTIES UNDERSTOOD THAT IS NOT

23   PERMITTED BY THE SETTLEMENT AGREEMENT?

24   A.     I WAS HERE FOR THAT.

25   Q.     I WANT TO FOCUS ON THE EXPRESSVOTE XL.

1                    ARE YOU NOW -- DO YOU HAVE SOME

2      FAMILIARITY WITH THAT SYSTEM TODAY?

3      A.      YES.

4      Q.      AND CAN YOU TELL US FIRST, WHAT IS A DRE WITH A

5      VVPAT?

6      A.      SO A DRE, A DIRECT RECORDING ELECTRONIC VOTING

7      MACHINE WITH A VVPAT, A VOTER-VERIFIABLE PAPER AUDIT

8      TRAIL, IS A KIND OF VOTING MACHINE WHERE THE SAME SYSTEM

9      PHYSICALLY, LOGICALLY IS RESPONSIBLE FOR THE VOTER

10     CASTING THE VOTE, IS RESPONSIBLE FOR RECORDING THE VOTE,

11     AND IS RESPONSIBLE FOR TABULATING THE VOTES.

12     Q.      OKAY.  AND SO LOOKING AT THE EXPRESSVOTE XL, HOW

13     WOULD YOU DESCRIBE WHAT THAT SYSTEM IS VIS-A-VIS THE

14     CONCEPT OF A DRE WITH A VVPAT?

15     A.      WELL, KNOWING EVERYTHING I KNOW NOW, I WOULD SAY

16     THAT THE EXPRESSVOTE XL IS ABSOLUTELY A DRE WITH A

17     VVPAT.

18     Q.      WHY DO YOU THINK THAT?

19     A.      WELL, SO UNLIKE EVERY OTHER VOTING MACHINE THAT

20     IS CERTIFIED IN PENNSYLVANIA, THE EXPRESSVOTE XL HAS A

21     NUMBER OF CHARACTERISTICS THAT ARE JUST LIKE EVERY OTHER

22     DRE WITH VVPAT.  IT'S A SINGLE MACHINE THAT IS BOTH WHAT

23     THE VOTER IS INTERACTING WITH ON A TOUCHSCREEN TO CAST

24     THE VOTE, AND WHAT IS COUNTING THE VOTE.  IT OUTPUTS AN

25     ELECTRONIC RECORD OF THE VOTE THAT IS THE RESULT OF THE

1    ELECTION.

2                    THE MACHINE, IN ADDITION TO THAT, DOES

3    NOT SPIT OUT A BALLOT THAT THE VOTER CAN TAKE AND PUT

4    INTO A SEPARATE SYSTEM TO BE COUNTED, THE BALLOT IS

5    CAPTIVE BEHIND THE PANE OF GLASS, WHICH CAUSES ALL SORTS

6    OF ACCESSIBILITY PROBLEMS.  THE VOTER NEVER HAS A CHANCE

7    TO --

8                    THE COURT:  I'M SORRY.  HE ASKED YOU HOW

9    IT WAS A DRE.  YOU ARE GIVING US A GENERAL REVIEW OF THE

10   MACHINE.  A DRE, REMEMBERING YOUR TESTIMONY FROM THREE

11   YEARS AGO OR TWO-AND-A-HALF YEARS AGO, AND THE TESTIMONY

12   AT THIS HEARING, A DRE HAS NO PAPER RECORD AT ALL, ISN'T

13   THAT RIGHT?

14                    THE WITNESS:  SO --

15                    THE COURT:  IS THAT A YES OR A NO?

16                    THE WITNESS:  NO.

17                    THE COURT:  IT DOESN'T HAVE A PAPER

18   RECORD OR IT DOES?

19                    THE WITNESS:  YOUR HONOR, SOME DRE'S ARE

20   COMPLETELY PAPERLESS, AND THAT WAS PART OF THE SUBJECT

21   FROM THREE YEARS AGO.  OTHERS HAVE WHAT IS CALLED A

22   VVPAT, WHICH IS --

23                    THE COURT:  FORGET ABOUT THE VVPAT,

24   FORGET ABOUT THE VVPAT.  DOES A DRE WITHOUT A VVPAT HAVE

25   A PAPER RECORD?

1              THE WITNESS:  A DRE WITHOUT A VVPAT DOES

2    NOT.

3              THE COURT:  THANK YOU.

4    BY MR. MAAZEL:

5    Q.      AND MY QUESTION TO YOU, DR. HALDERMAN, IS HOW IS

6    A DRE WITH A VVPAT SIMILAR OR THE SAME AS THIS SYSTEM?

7    A.      SO I WAS DESCRIBING HOW THEY WERE FUNCTIONALLY

8    ONE AND THE SAME.  SO THE SAME MACHINE IS BEING USED TO

9    CAST AND COUNT THE VOTE.  THE PAPER RECORD IS NOT

10   SOMETHING THAT COMES OUT OF THE MACHINE, IT IS RETAINED

11   WITHIN THE MACHINE.  THE PAPER RECORD -- THE CONTENTS OF

12   THE PAPER RECORD ARE DETERMINED BY THE MACHINE BEFORE

13   THE VOTER EVEN HAS A CHANCE TO SEE IT.  THE PAPER

14   RECORDS ARE RETAINED IN ORDER.  AND IN THE CASE OF THE

15   XL, THE PAPER RECORD IS NOT A BALLOT IN THE TRADITIONAL

16   SENSE, IT IS A SUMMARY WHERE THE THING THAT THE MACHINE

17   IS ACTUALLY COUNTING IS NOT SOMETHING THAT THE VOTER CAN

18   SEE AND READ AT ALL, IT'S THE BARCODE.

19   BY THE COURT:

20   Q.      THE DRE WITH A VVPAT, WHAT IS THE MACHINE

21   READING?  IS IT READING THE RECEIPT?

22   A.      SO --

23   Q.      YES OR NO QUESTION, IS IT READING THE RECEIPT?

24   A.      OTHER DRE'S WITH VVPAT USUALLY ARE NOT READING

25   THE RECEIPT.

1    Q.       THEN HOW CAN YOU SAY THEY ARE THE SAME THING?

2    A.       WELL, SO THE QUESTION IS HOW IS THE MACHINE

3    RECORDING THE VOTE.  SO DIRECT RECORDING.  DIRECT

4    RECORDING IS A CONCEPT THAT PREDATES ALL OF THESE

5    ELECTRONIC SYSTEMS.  IT COMES FROM LEVER MACHINES, YOUR

6    HONOR.

7    Q.       I REMEMBER THEM.

8    A.       RIGHT.  THE TERM WAS INTRODUCED TO DISTINGUISH

9    LEVER MACHINES FROM SYSTEMS THAT INVOLVED A VOTER

10   MARKING A BALLOT IN A SEPARATE MACHINE THAT WAS

11   RECORDING THE BALLOT.

12              IN THIS MACHINE, THERE IS -- IT'S BEEN

13   ENGINEERED IN SUCH A WAY THAT A BALLOT IS PRINTED, A

14   BALLOT IS SCANNED INVISIBLY TO THE VOTER; AT LEAST

15   THAT'S HOW THE MACHINE IS SUPPOSED TO WORK IF IT'S NOT

16   HACKED, THAT IT IS PRINTING IT AND THEN SCANNING IT.

17   Q.       WHAT MACHINE ARE WE TALKING ABOUT?

18   A.       EXCUSE ME, THE XL, AND I AM TALKING ABOUT THE

19   XL'S SUMMARY CARD AS BEING PRINTED AND THEN IS BEING

20   SCANNED OUT OF VIEW OF THE VOTER BEFORE THE VOTER EVEN

21   SEES IT.  BUT THAT'S AN ENGINEERING DETAIL THAT IS

22   FUNCTIONALLY IRRELEVANT TO THE SECURITY OF THE MACHINE,

23   TO THE VOTER'S EXPERIENCE OF THE MACHINE.  IT'S A --

24   Q.       AS I UNDERSTAND THE SUBJECT MACHINE, THE VOTE IS

25   READ FROM A BARCODE THAT IS PRINTED ON -- CALL IT

1    ANYTHING BUT LATE FOR DINNER -- THE BALLOT, THE PAPER

2    RECORD, THE PAPER TRAIL, ISN'T THAT RIGHT?  IT READS THE

3    BARCODE ON WHAT I WILL CALL THE BALLOT, CORRECT?

4    A.      IF THE MACHINE IS WORKING THE WAY IT'S INTENDED

5    TO WORK --

6    Q.      PLEASE, WE WILL GET INTO YOUR MANY HYPOTHETICALS

7    LATER.  IF THE MACHINE IS -- THE SUBJECT MACHINE HERE,

8    ARE YOU WITH ME SO FAR?

9    A.      YES, YOUR HONOR.

10   Q.      THE MACHINE PRINTS OUT A BALLOT, THE MACHINE

11   READS THE BARCODE ON THE BALLOT, AND THAT'S HOW THE VOTE

12   IS RECORDED, OFF THE BARCODE, CORRECT?

13   A.      IF IT'S FUNCTIONING THE WAY IT'S INTENDED, YOU

14   ARE RIGHT, YOUR HONOR.

15   Q.      THANK YOU FOR THAT.

16                     A DRE, WHICH I ALSO REMEMBER, THE VOTER

17   PRESSES A BUTTON AND IT'S ELECTRONICALLY RECORDED,

18   PERIOD, CORRECT?  EVEN WITH A PAPER RECEIPT, CORRECT?

19   A.      THAT'S CORRECT.

20   Q.      ISN'T THAT NIGHT AND DAY?

21   A.      I -- RESPECTFULLY, I DISAGREE, YOUR HONOR.

22   BY MR. MAAZEL:

23   Q.      CAN YOU EXPLAIN, DR. HALDERMAN, WHY YOU

24   DISAGREE?

25   A.      WELL, I DISAGREE BECAUSE THE FACT THAT THE

1    MACHINE INTERNALLY IS DESIGNED TO PRINT A CODE THAT NO

2    ONE OTHER THAN THE MACHINE IS INTERPRETING.  AND THEN TO

3    SCAN THAT SAME CODE, THAT'S AN ENGINEERING GLITCH.  THAT

4    HAS NO RELEVANCE TO THE SECURITY OF THE SYSTEM TO THE

5    VOTER'S EXPERIENCE TO THE FACT THAT THESE --

6    BY THE COURT:

7    Q.      NOT AT ALL?  NO RELEVANCE AT ALL TO THE VOTER'S

8    EXPERIENCE?  IF I HIT A BUTTON, AND WE HAD TESTIMONY TO

9    THIS EFFECT, OR AT LEAST EVIDENCE TO THIS EFFECT

10   TWO-AND-A-HALF YEARS AGO.  IN A DRE MACHINE, IF I HIT A

11   BUTTON, IT MAY RECORD MY VOTE CORRECTLY, IT MAY NOT; I

12   HAVE NO INDICATION AT ALL WHETHER IT DOES.  NOW, PLEASE,

13   DON'T SAY IF IT'S FUNCTIONING PROPERLY.

14          THE XL MACHINE TELLS YOU WHAT THE BARCODE

15   SAYS, CORRECT?  IT SAYS HERE ARE YOUR CHOICES.  ISN'T

16   THAT RATHER -- AND IF THE VOTER SAYS NO, THAT'S NOT MY

17   CHOICE OR IF THE VOTER CHANGES HER MIND, THE VOTE DOES

18   NOT GET RECORDED AND SHE GETS TO CAST IT AGAIN, ISN'T

19   THAT CORRECT?

20   A.      RESPECTFULLY, YOUR HONOR, THE VVPAT WORKS THE

21   SAME WAY.

22   Q.      YES.  DOES IT RECORD THE RECEIPT, IS THAT THE

23   VOTE, OR IS THE VOTE ELECTRONICALLY RECORDED?

24   A.      IN BOTH CASES, THE VOTE IS ELECTRONICALLY

25   RECORDED, AND THERE IS A PAPER RECEIPT.

1    Q.      I'M SORRY.  HOW DOES ONE DO A RECOUNT OF A DRE

2    WITH OR WITHOUT A VVPAT?

3    A.      A DRE WITH A VVPAT CAN BE RECOUNTED BY --

4    Q.      I DIDN'T SAY HOW IT CAN BE.  A DRE RECOUNT -- IF

5    I AM USING THE WRONG TERMINOLOGY, PLEASE TELL ME.  BUT

6    THE MEMORY OF THE MACHINE IS IN ONE WAY OR ANOTHER

7    SCANNED, CORRECT?

8    A.      THE MEMORY CAN BE SCANNED WITH EITHER OF THESE

9    DEVICES OR THE PAPER RECEIPTS CAN BE REVIEWED.

10   Q.      THEY CAN BE REVIEWED, BUT THAT'S NOT HOW A

11   RECOUNT IS DONE WITH A DRE.

12   A.      IN SOME STATES THAT IS HOW --

13   Q.      IN PENNSYLVANIA?

14   A.      I DON'T KNOW WHAT PENNSYLVANIA'S DRE RECOUNT

15   PRACTICE IS, OR WERE, I'M SORRY, YOUR HONOR.

16   BY MR. MAAZEL:

17   Q.      DR. HALDERMAN, YOU MENTIONED THAT THIS

18   PARTICULAR MACHINE DETERMINES ELECTRONIC RECORD EVEN

19   BEFORE THE VOTER SEES THE PAPER THROUGH THE GLASS.  CAN

20   YOU EXPLAIN THAT?

21   A.      THAT'S RIGHT.  SO THE WAY THAT THE XL IS

22   DESIGNED, IT PRINTS THE BARCODES AND TEXT OF THE SUMMARY

23   CARD AND THEN SCANS THEM AND THEN DISPLAYS THE SUMMARY

24   CARD BEHIND THE GLASS FOR THE VOTER.

25   Q.      IS THAT -- ARE YOU AWARE OF OTHER VALID

1    BALLOT-MARKING DEVICES THAT DO THAT?

2    A.    NO, I AM NOT.

3    Q.    AND WHEN DID YOU LEARN THAT THIS PARTICULAR

4    DEVICE DETERMINES THE ELECTRONIC RECORD OF A VOTE BEFORE

5    THE VOTER EVEN SEES THE PAPER THROUGH THE GLASS?

6    A.    SO I LEARNED THAT FROM THE RESULTS OF

7    PENNSYLVANIA'S REEXAMINATION, I BELIEVE IN SEPTEMBER OF

8    LAST YEAR.

9    Q.    NOW, I BELIEVE, AND CORRECT ME IF I AM WRONG,

10   BUT I BELIEVE YOU ALSO TESTIFIED AS -- OR MAYBE YOU

11   DIDN'T.  DID YOU TESTIFY AS TO THE LOCATION OF THE

12   PRINTHEAD VIS-A-VIS THE VOTER LOOKING AT THE PIECE OF

13   PAPER THROUGH THE GLASS?

14   A.    DID I TESTIFY?  YES, IN MY DECLARATION.

15   Q.    OKAY.  LET ME ASK YOU THIS QUESTION:  THE

16   SETTLEMENT AGREEMENT IN SECTION 2C PROVIDES THAT THE

17   MACHINE MUST BE CAPABLE OF SUPPORTING THE ROBUST

18   PRECERTIFICATION AUDITING PROCESS.

19   A.    YES.

20   Q.    AND CAN YOU TELL US YOUR VIEW AS TO WHETHER THIS

21   PARTICULAR SYSTEM, THE XL SYSTEM, IS CAPABLE OF

22   SUPPORTING A ROBUST PRECERTIFICATION AUDITING PROCESS?

23   A.    I DO NOT BELIEVE THAT IT IS CAPABLE OF

24   SUPPORTING A ROBUST PRECERTIFICATION AUDITING PROCESS.

25   AND THE REASON FOR THAT IS BECAUSE OF THE DESIGN OF THE

1      MACHINE, IT'S FLAWED IN THE SENSE THAT THE PRINTHEAD,

2      THIS MECHANISM, IS CONTROLLED BY SOFTWARE RUNNING THE

3      MACHINE.   AND IF THAT SOFTWARE IS COMPROMISED, IT WOULD

4      BE POSSIBLE FOR THE MACHINE TO PRINT ON THE BALLOT AGAIN

5      AFTER THE VOTER HAS SEEN IT.   YOU COMPROMISE THE PAPER

6      -- EXCUSE ME, IT'S NOT A BALLOT, THE XL EVEN, IT'S A

7      SUMMARY CARD.   AND IF YOU COMPROMISE THE CONTENTS OF THE

8      SUMMARY CARDS THEN THAT PAPER TRAIL IS NOT GOING TO HAVE

9      INTEGRITY DURING AN AUDIT.   IF IT HAS BEEN CHANGED, ALL

10     OF THE RECORDS OF THE VOTE CAN BE CHANGED.

11     Q.      SO JUST SO I UNDERSTAND, AFTER THE VOTER SEES

12     THE PIECE OF PAPER THROUGH THE GLASS --

13     A.      YES.

14     Q.      -- THEY -- WHAT DO THEY DO, DO THEY PRESS A

15     BUTTON SAYING THIS IS MY VOTE OR WHAT DO THEY DO?

16     A.      THEY PRESS A BUTTON TO CAST THE VOTE, AND THE

17     SUMMARY CARD IS PULLED BACK THROUGH THE MACHINE, PAST

18     THE LOCATION OF THE PRINTHEAD AGAIN AND IS DEPOSITED

19     INTO A CONTAINER.

20     Q.      IS THAT TYPICAL OF BALLOT-MARKING DEVICES THAT

21     AFTER A VOTER APPROVES THEIR VOTE, THE PIECE OF PAPER

22     GOES THROUGH A PRINTHEAD THAT CAN PRINT ON THAT PIECE OF

23     PAPER?

24     A.      NO, IT'S CERTAINLY NOT TYPICAL.

25     Q.      I WOULD LIKE TO POINT OUT TO YOU --

1    BY THE COURT:

2    Q.      THE OTHER KINDS OF DEVICES, THEY USE SOFTWARE AS

3    WELL?

4    A.      IN -- YES, YES, THEY DO.

5    Q.      THE OTHER DEVICES THAT WERE CERTIFIED IN

6    PENNSYLVANIA?

7    A.      YES, YOUR HONOR.

8    Q.      AND THEY COULD BE SUBJECT -- THAT SOFTWARE COULD

9    BE SUBJECT TO TAMPERING AS WELL?

10   A.      YES, THEY COULD.

11             THE COURT:   OKAY.

12   BY MR. MAAZEL:

13   Q.      AND THOSE OTHER DEVICES THAT PRODUCE A PIECE OF

14   PAPER THAT YOU THEN HAVE IN YOUR HAND AND PUT INTO AN

15   OPTISCAN, CAN THAT PIECE OF PAPER BE CORRUPTED?

16   A.      NO, IT CAN'T.  AND THAT'S THE ENTIRE REASON WHY

17   A PAPER TRAIL AND POST-ELECTION AUDITS ARE SO IMPORTANT

18   BECAUSE IN A TRADITIONAL BALLOT-MARKING DEVICE AND

19   OPTICAL SCAN SYSTEM OR A HAND-MARKED OPTICAL SCAN

20   SYSTEM, THERE IS NO OPPORTUNITY FOR A CYBER ATTACK TO

21   LATER CHANGE THE CONTENTS OF THE BALLOT AFTER THE VOTER

22   HAS SEEN IT.

23   BY THE COURT:

24   Q.      HOW WOULD THE BALLOT LOOK IF IT PASSED THROUGH

25   THE PRINTHEAD AND -- AT SOME POINT I ASSUME SOMEONE IS

1      GOING TO ASK YOU HOW EASY AND HOW ACCESSIBLE THESE

2      MACHINES ARE AND WHETHER IT IS REALISTIC, AS I SAID IN

3      MY OPINION TWO-AND-A-HALF YEARS AGO, BORDERS ON THE

4      IRRATIONAL TO THINK THERE CAN BE MONKEYING AROUND, BUT

5      LET'S PUT THAT ASIDE FOR A MINUTE.  WHAT WOULD THE

6      BALLOT LOOK LIKE IF IT WAS PRINTED OVER?

7      A.      SO IF THE BALLOT WAS PRINTED OVER, IT MIGHT NOT

8      LOOK NOTICEABLY DIFFERENT FROM A BALLOT THAT HAD BEEN

9      PRINTED ONLY ONCE.  AND THE REASON FOR THAT IS THAT

10     ALTHOUGH THE MANUFACTURER TALKS ABOUT HOW UNDER NORMAL

11     OPERATION PERHAPS THERE IS NO SPACE TO PRINT SOMETHING

12     OVER IT, IF THE MACHINE HAS BEEN COMPROMISED, IT CAN

13     LEAVE SPACE THE FIRST TIME.

14                 THE COURT:  PLEASE TURN TO JOINT

15     EXHIBIT 57 AND PUT IT UP ON THE SCREEN.

16                 THE WITNESS:  ME?

17                 THE COURT:  NOT YOU.

18                 MR. WIYGUL, COULD YOU HAVE YOUR --

19                 MR. WIYGUL:  I THINK MS. FERRARI IS

20     WORKING ON IT RIGHT NOW, YOUR HONOR.

21     BY THE COURT:

22     Q.      ALL RIGHT.  THANK YOU.

23                 THAT'S WHAT AN XL BALLOT, I'LL CALL IT

24     THAT, LOOKS LIKE, CORRECT?

25     A.      THAT'S WHAT THE SUMMARY CARD LOOKS LIKE, THAT'S

1    CORRECT.

2    Q.      THANK YOU FOR THE CORRECTION.

3            NOW, YOU ARE TELLING ME THAT COULD BE

4    PRINTED OVER AND IT WOULDN'T BE OBVIOUS THAT IT WAS

5    PRINTED OVER?  WHERE IS THE SPACE?

6    A.      SO THE WAY THAT THIS IS PRINTED THE FIRST TIME

7    IS UNDER THE CONTROL OF THAT SAME SOFTWARE, YOUR HONOR,

8    WHICH MEANS THAT IT COULD LEAVE OFF PORTIONS OF IT THE

9    FIRST TIME.  THE VOTER --

10   Q.      I'M SORRY, WHERE IS THE MALWARE TAKING EFFECT,

11   IN THE FIRST PRINTING OR WHEN IT PASSES OVER AGAIN?  OR

12   DO YOU THINK THEY ARE BOTH INFECTED WITH THIS MYSTERIOUS

13   DISEASE?

14   A.      THE MACHINE IS ONE PHYSICAL AND LOGICAL UNIT,

15   YOUR HONOR.  IF IT IS --

16   Q.      IT IS LOGICAL.  NOT ALL THE TESTIMONY I HEAR IS.

17           WHERE IS THE SPACE?  YOU SAID IT WOULDN'T

18   BE OBVIOUS.  TO ME, THERE IS NO ROOM FOR ANYTHING IN

19   THERE.  THE NAMES OF THE CANDIDATES THE VOTER HAS CAST

20   ARE LISTED.  THE BARCODE IS ALL GIBBERISH TO ME.  BUT IF

21   THIS WERE PRINTED OVER, I DON'T KNOW HOW ANYBODY COULD

22   READ ANYTHING ON IT?

23   A.      EXCUSE ME, YOUR HONOR, MAYBE I AM NOT BEING

24   CLEAR.

25   Q.      I THINK YOU ARE BEING CLEAR.

1    A.       IF THE MACHINE IS -- IF THE MACHINE HAS BEEN

2    ATTACKED, THE ATTACKER CAN CHANGE IT SO THAT THE FIRST

3    TIME IT'S PRINTED IT LEAVES MORE SPACE.  AND THEN WHEN

4    IT GOES BACK, IT FILLS IT IN SO THAT THE BALLOT LOOKS

5    JUST LIKE THIS.  THE VOTER IS NOT GOING TO NOTICE

6    BECAUSE THE VOTER DOESN'T KNOW WHETHER THERE'S SUPPOSED

7    TO BE SPACE OR NOT.  SOMETIMES THERE IS SPACE.

8    Q.       WITH THE PENNSYLVANIA COUNTIES, AND I GUESS

9    THERE ARE THREE THAT HAVE USED THIS MACHINE IN THE MOST

10   RECENT ELECTION, WHICH WOULD HAVE BEEN NOVEMBER OF LAST

11   YEAR.  DO YOU KNOW WHETHER ANY OF THE AUDITS THAT HAVE

12   BEEN DESCRIBED TO US IN THIS HEARING SHOWED ADDITIONAL

13   SPACE?

14   A.       I DON'T KNOW, YOUR HONOR.

15   Q.       AND IF THERE WERE ADDITIONAL SPACE, THEN

16   WOULDN'T YOU HAVE -- SAY FOR ATTORNEY GENERAL, WOULDN'T

17   YOU HAVE ADDITIONAL SPACE?  IT SAYS, ATTORNEY GENERAL,

18   REP MORGAN WEST, SENIOR.  DOES THE MACHINE HAVE

19   WHITEOUT?  DOES IT WHITE IT OUT?  NO, OF COURSE NOT,

20   CORRECT?

21   A.       NO, OF COURSE NOT.

22   Q.       WHAT DOES IT DO, DOES IT PRINT OVER IT?

23   A.       SO IF THE VOTER, FOR INSTANCE, HAD MADE NO

24   SELECTION IN THAT RACE --

25   Q.       AH, WE ARE REFINING OUR ANSWER.  GO AHEAD.

1    A.       SO WHAT I AM -- WHAT I WANT TO POINT OUT IS THAT

2    ONE SCENARIO WHERE THIS IS POSSIBLE WOULD BE IN CASES

3    WHERE THE VOTER HAS MADE --

4    Q.       WHERE WE HAVE HERE, VOTED FOR REPRESENTATIVE

5    MORGAN WEST, SR., PRESUMABLY THE VOTER VOTED FOR SOMEONE

6    ON THE BALLOT.  SO YOU REALLY CAN'T HAVE A HYPOTHETICAL

7    WHERE THE VOTER ASKS TO LOOK AT HIS BALLOT AND HE OR SHE

8    HAS CAST NO VOTE.  SO LET'S ASSUME THE VOTER HAS VOTED

9    FOR REPRESENTATIVE MORGAN WEST, SR., AND THERE IS ALL

10   THE SPACE IN THE WORLD BETWEEN ATTORNEY GENERAL AND

11   GOVERNOR.  WHAT HAPPENS UNDER YOUR MALWARE SCENARIO,

12   YOUR HACKED SCENARIO, WHAT HAPPENS WHEN IT PASSES OVER

13   THE PRINTHEAD AGAIN?  WHAT HAPPENS TO REPRESENTATIVE

14   MORGAN WEST, SR. TO PRINT, WHAT HAPPENS TO IT?

15   A.       YOUR HONOR, THERE ARE ACTUALLY SEVERAL SCENARIOS

16   POSSIBLE.  AND EVEN UNDER YOUR HYPOTHETICAL, ONE

17   SCENARIO IS THAT THE BARCODE IS WRONG, EVEN THOUGH THE

18   NAME IS CORRECT.  ANOTHER SCENARIO IS THAT THE NAME IS

19   CORRECT AND THE MALWARE IS PROGRAMMED NOT TO CHEAT IF

20   THE VOTER HAS MADE A SELECTION FOR THAT RACE.  A LARGE

21   FRACTION OF VOTERS LEAVE VOTES BLANK IN CERTAIN RACES.

22   Q.       I AM SORRY, YOU HAVE LOST ME.  YOU SAID IT COULD

23   PASS OVER THE PRINTHEAD AND THE PRINTHEAD COULD ACTUALLY

24   PRINT OUT A CANDIDATE OTHER THAN THE ONE THE VOTER VOTED

25   FOR.  THAT'S WHAT I HEARD YOU SAY.

1          IF IT DOES THAT, WHAT HAPPENS TO THE

2     PRINT REPRESENTATIVE MORGAN WEST, SR.?

3     A.     SO --

4     Q.     WHAT HAPPENS TO IT?

5     A.     YOUR HONOR, IN THE CASE WHERE THE MACHINE HAS

6     PRINTED THE FIRST TIME, IT'S NOT GOING TO PRINT OVER IT.

7     Q.     WHAT IS IT GOING TO DO?  YOU JUST SAID IT WILL

8     PRINT IT.  THAT'S THE DANGER OF PASSING IT THROUGH THE

9     PRINTHEAD IS THAT IT CAN CHANGE THE VOTER'S VOTE.  HOW

10    DOES IT DO THAT?  DOES IT CROSS OUT -- BECAUSE WE ARE

11    GOING TO HAVE AN AUDIT AFTERWARDS AND SOMEONE IS GOING

12    TO LOOK AT IT AND SEE REPRESENTATIVE MORGAN WEST, SR.

13    AND WHAT ELSE, IS IT GOING TO BE CROSSED OUT?  WHAT IS

14    IT GOING TO BE?  WE ARE TALKING ABOUT WHAT ACTUALLY

15    HAPPENS, NOT SOME THEORETICAL POSSIBILITY.  WHAT IS

16    HAPPENING TO REPRESENTATIVE MORGAN WEST, SR.?  IT'S

17    STILL GOING TO BE THERE, ISN'T IT?

18    A.     SO, YOUR HONOR, IF IT'S BEEN PRINTED THERE THE

19    FIRST TIME, IT'S STILL GOING TO BE THERE.

20    Q.     SO HOW ON EARTH DOES THE MACHINE RECORD A

21    DIFFERENT VOTE OTHER THAN WHAT IS PRINTED?  IT CHANGES

22    THE BARCODE?

23    A.     SO IT COULD CHANGE THE BARCODE.

24    Q.     SO WHAT HAPPENS TO THE BARCODE UP TOP?

25    A.     IT --

1    Q.        DOES IT ERASE THOSE BARCODES UP TOP?  ARE THERE

2    GOING TO BE TWICE AS MANY BARCODES UP TOP?

3    A.        YOUR HONOR, IF THE BARCODE UP TOP IS OMITTED BY

4    THE MACHINE THE FIRST TIME IT PRINTS, ARE YOU GOING TO

5    NOTICE -- EXCUSE ME, RESPECTFULLY, I DON'T THINK MOST

6    VOTERS WILL NOTICE.

7    Q.        WHETHER OR NOT THE BARCODE IS THERE?

8    A.        WHETHER OR NOT THE BARCODE UP TOP IS THERE.

9    Q.        SO THE MALWARE, THIS IS -- THIS MALWARE IS

10   REALLY AN ACCOMPLISHED BIT OF MALWARE.  IT DOES NOT

11   SIMPLY CHANGE THE VOTE.  FIRST IT OMITS THE BARCODE, AND

12   IT THEN CREATES EXTRA SPACE, ALTHOUGH I DON'T KNOW WHY

13   IT WOULD NEED EXTRA SPACE IF THE CANDIDATE THAT IS BEING

14   VOTED FOR DOESN'T NECESSARILY CHANGE IN YOUR TESTIMONY,

15   BUT CREATES EXTRA SPACE.  THE MALWARE WAITS, LURKS AND

16   WAITS IN HIDING IN A DUCK BLIND, IF YOU WILL, FOR THE

17   VOTER TO VOTE.  IT THEN PRINTS THE BARCODE AND LEAVES --

18   IF REPRESENTATIVE MORGAN WEST, SR. IS WHAT THE PERSON

19   CAST HIS OR HER VOTE FOR AND HE AGREES TO IT, IT LEAVES

20   IT THERE.  AND THEN WHAT, IT PRINTS THE NAME OF ANOTHER

21   CANDIDATE IN THE BLANK SPACE OR JUST DOES NOT DO

22   ANYTHING AT ALL?  WHICH IS IT?

23   A.        I AM SORRY, I AM NOT SURE THAT I WAS ABLE TO

24   FOLLOW YOUR SCENARIO IN ITS ENTIRETY.

25   Q.        WELL, WE ARE SHARING EXPERIENCE TODAY.

1                    THE COURT:  WHY DON'T YOU GO AHEAD, MR.

2      MAAZEL.

3      BY MR. MAAZEL:

4      Q.      YOU WERE ASKED BY THE COURT WHETHER AN AUDIT

5      MIGHT CATCH SOME OF THE ANOMALIES THAT YOU ARE

6      DESCRIBING ARE POSSIBLE IF THERE IS MALWARE OR

7      MALFUNCTION, YES?

8      A.      YES.

9      Q.      AND IS IT YOUR -- I GUESS MY FIRST QUESTION IS,

10     IS IT YOUR UNDERSTANDING THAT THESE VOTES ARE ALWAYS

11     AUDITED BY THE COMMONWEALTH?

12     A.      IT'S MY UNDERSTANDING THAT THEY WERE NOT ALWAYS

13     AUDITED TO A HIGH LEVEL OF STATISTICAL CONFIDENCE.

14     Q.      OKAY.  AND IS YOUR UNDERSTANDING THE VAST

15     MAJORITY OF VOTES ARE JUST NEVER AUDITED AT ALL?

16     A.      OF BALLOTS THAT -- OR SUMMARY CARDS, THE VAST

17     MAJORITY IN EITHER CASE ARE NOT GOING TO BE INSPECTED.

18     Q.      IF THERE IS AN AUDIT OF A PARTICULAR SUMMARY

19     CARD, LIKE THE ONE HERE IN JOINT EXHIBIT 57, IS IT -- IS

20     EVEN THAT AUDIT ALWAYS GOING TO CATCH THE SCENARIO YOU

21     ARE DESCRIBING?

22     A.      SO NOT THE SCENARIO THAT I WAS EXPLAINING IN

23     WHICH THERE HAS BEEN A VOTE THAT HAS BEEN LEFT OFF, THAT

24     HAS BEEN FILLED IN ON THE SUMMARY CARD ON A SECOND PASS

25     THROUGH THE PRINTER.  NOT A CASE WHERE THE -- SO NOT

1    THAT CASE THAT I JUST DESCRIBED.

2    Q.      OKAY.  IF YOU COULD LOOK AT -- I NOW WANT TO

3    TURN TO THE QUESTION OF VOTER-VERIFIABLE.

4              COULD YOU TURN TO PLAINTIFFS' EXHIBIT --

5    I'M SORRY, JOINT EXHIBIT 60?

6    A.      JOINT EXHIBIT 60, YES.

7              MR. WIYGUL:  6-0?

8              MR. MAAZEL:  6-0, WHICH I BELIEVE, YOUR

9    HONOR, WE STIPULATED IN 107 IS THE -- IT'S FROM THE HART

10   VOTING SYSTEM.

11             THE WITNESS:  YES.

12   BY MR. MAAZEL:

13   Q.      AND DO YOU UNDERSTAND THIS TO BE A DOCUMENT

14   CREATED BY A HART BALLOT-MARKING DEVICE?

15   A.      YES, I DO.

16   Q.      OKAY.  AND IF IT'S POSSIBLE TO PUT THAT UP WITH

17   JX 57 NEXT TO EACH OTHER, IS THAT POSSIBLE?

18             LOOKING AT THE HART DOCUMENT, IS THAT IN

19   YOUR VIEW A VOTER-VERIFIABLE DOCUMENT?

20   A.      YOU ARE TALKING ABOUT THE JX 60 DOCUMENT?

21   Q.      YES.

22   A.      YES, THAT IS.

23   Q.      DO YOU BELIEVE THAT THE XL DOCUMENT, JX 57, IS A

24   VOTER-VERIFIABLE DOCUMENT?

25   A.      NO.  NO, IT'S NOT.

1    Q.    CAN YOU EXPLAIN WHY THE HART DOCUMENT IN YOUR

2    VIEW IS VOTER-VERIFIABLE BUT THE XL IS NOT?

3    A.    WELL, THE HART DOCUMENT IS A BALLOT IN THE FULL

4    SENSE IN THAT IT'S SHOWING ALL OF THE CHOICES.  AND THE

5    ENCODING OF THE VOTE IS SIMPLY WHAT THE VOTER CAN SEE

6    AND INTERPRET.  IT'S THE BOX THAT IS BUILT IN BY THE

7    VOTER'S NAME.

8              IN THE CASE OF THE ES&S BALLOT ON THE

9    LEFT ON THE SCREEN, THE VOTE AS IT'S ACTUALLY BEING READ

10    AND TABULATED IS SOME KIND OF ENCODING IN THOSE BARCODES

11    AT THE TOP.  IT'S SIMPLY SHOWING A SUMMARY OF THE

12    CHOICES THAT WERE ON THE -- THAT WERE ON THE SCREEN, ON

13    THE BALLOT PRESENTED ON THE SCREEN.  SO THE SUMMARY CARD

14    INSTEAD IS ONLY GIVING INDICATIVE TEXT OF WHAT IS

15    SUPPOSED TO, IF THE MACHINE IS FUNCTIONING CORRECTLY,

16    MATCH WHAT IS IN THOSE BARCODES.

17    Q.    IN THE XL SYSTEM, IS THERE ANY WAY FOR A VOTER

18    TO ATTEMPT TO MATCH THE BARCODE TO A SELECTION?

19    A.    NOT JUST AS A NORMAL HUMAN BEING UNAIDED BY

20    TECHNOLOGY.

21    Q.    I WANT TO TURN TO JX 12.

22    BY THE COURT:

23    Q.    ON THE HART BALLOT, THE ONE ON THE LEFT.

24    A.    YES, YOUR HONOR.

25    Q.    WHAT IS THE MACHINE READING?

1    A.      SO THE MACHINE IS READING WHETHER THOSE

2    RECTANGLES ARE FILLED IN OR NOT.

3    Q.      AND IT'S NOT READING THE PRINT?

4    A.      SO IT'S --

5    Q.      IT'S READING THE LOCATION OF THE RECTANGLE AND

6    WHETHER IT'S FILLED IN OR NOT, CORRECT?

7    A.      SOME OF THE HART SYSTEMS APPARENTLY, ACCORDING

8    TO THE STATE, DO OCR AND READ THE PRINT, BUT I DON'T

9    BELIEVE WHEN THEY ARE READING THE BALLOT THAT'S IN FRONT

10   OF YOU.

11   Q.      SO THAT IF THEY ARE FUNCTIONING PROPERLY, TO USE

12   A PHRASE, IT READS THE LOCATION OF THE FILLED-IN SPACE

13   AND THEN RECORDS IT, CORRECT?

14   A.      THAT IS CORRECT.

15   Q.      AND PRESUMABLY THE VOTER HAS NO IDEA WHETHER OR

16   NOT THE SOFTWARE HAS BEEN COMPROMISED AND IT'S RECORDING

17   IT CORRECTLY, RIGHT?

18   A.      SO THE --

19   Q.      HOW WOULD THE VOTER KNOW?

20   A.      HOW THE VOTER KNOW IF IT'S COMPROMISED OR NOT?

21   IN THE STRICTEST SENSE, THE VOTER CANNOT KNOW.

22   Q.      OKAY.  SO THAT IF IT'S COMPROMISED, IT --

23   PRESUMABLY THOSE MACHINES COULD BE SUBJECT TO MALWARE

24   WHERE A -- IF A PARTICULAR BOX WAS FILLED IN INDICATING

25   A CERTAIN VOTE AND THE MALWARE REPORTS A DIFFERENT VOTE,

1   COULDN'T IT?

2   A.      THAT IS CORRECT.

3               THE COURT:  OKAY.

4   BY MR. MAAZEL:

5   Q.      AND TO FOLLOW UP ON JUDGE DIAMOND'S QUESTION,

6   HOW IS THAT DIFFERENT IN THE XL AND THE HART SYSTEMS?

7   WHY IS THERE A DIFFERENCE BETWEEN THE TWO, EVEN GIVEN

8   YOUR ANSWERS TO THE LAST QUESTIONS?

9   A.      I THINK THE MOST SIGNIFICANT -- THE MOST

10  SIGNIFICANT DIFFERENCE BETWEEN THOSE TWO IS THAT IN THE

11  XL SYSTEM, THE -- NOTHING THAT THE VOTER HAS SEEN IS

12  EVER BEING READ BY -- HAS SEEN AND BEEN ABLE TO

13  INTERPRET IS EVER BEING READ BY THE MACHINE.  EVEN IF

14  IT'S FUNCTIONING CORRECTLY, THAT'S NOT EVER BEING READ

15  BY THE MACHINE.

16               IN THE HART SYSTEM, IF IT'S FUNCTIONING

17  CORRECTLY, THEN THE MARK THAT THE MACHINE IS READING IS

18  ONE THAT THE VOTER HAS BEEN ABLE TO DIRECTLY VERIFY WITH

19  THEIR SENSES.

20  BY THE COURT:

21  Q.      AND IF THE XL MACHINE IS READING -- IS WORKING

22  CORRECTLY, THE CHOICE OF CANDIDATE IS SOMETHING THE

23  VOTER CAN SEE, ISN'T THAT RIGHT, IF IT'S WORKING

24  PROPERLY?

25  A.      IF IT'S WORKING PROPERLY.

1    Q.      SO THERE IS REALLY NO DIFFERENCE BETWEEN THE

2    TWO.  IF THEY ARE WORKING PROPERLY, THE VOTER CAN SEE

3    THAT HER VOTE WAS PROPERLY RECORDED.  AND IF THEY ARE

4    NOT WORKING PROPERLY, THE VOTER COULD EASILY HAVE NO

5    IDEA.  ISN'T THAT RIGHT?

6    A.      IN BOTH CASES THERE IS A POSSIBILITY, YOUR

7    HONOR.

8    BY MR. MAAZEL:

9    Q.      SO IN BOTH CASES, IF IT'S NOT WORKING PROPERLY

10   AND THERE IS AN AUDIT, WHICH AUDIT IS MUCH MORE LIKELY

11   TO CATCH THE ERROR?

12                  MR. WIYGUL:  OBJECTION.

13                  THE COURT:  NO, HE CAN ANSWER THAT, IF HE

14   KNOWS.

15                  THE WITNESS:  SO AN AUDIT IS LIKELY TO

16   CATCH THE ERROR IN THE HART SYSTEM IF THE AUDIT IS

17   CONDUCTED IN A ROBUST WAY.  AND AN AUDIT IN THE XL

18   SYSTEM IS ONLY GOING TO CATCH THE ERROR IF THE MACHINE

19   WAS NOT AFFECTED AT THE TIME THAT THE BALLOT WAS

20   TABULATED, THAT THE -- EXCUSE ME, THAT THE VOTE WAS

21   CAST.  BECAUSE IF THE MACHINE HAS BEEN COMPROMISED

22   DURING THE VOTING PROCESS, WHAT IS PRINTED ON THE PAPER

23   COULD BE WRONG.

24   Q.      OKAY.

25                  THE COURT:  MR. MAAZEL, I HAVE ABSOLUTELY

1    NO IDEA WHAT THE MAN JUST SAID.

2    BY MR. MAAZEL:

3    Q.     CAN YOU PUT THAT INTO --

4              THE COURT:  ENGLISH?

5    BY MR. MAAZEL:

6    Q.     -- LAYMAN'S TERMS?

7    A.     ALL RIGHT.  LET ME TRY THAT AGAIN FOR EVERYONE'S

8    BENEFIT.

9              SO WE ARE CONSIDERING -- COULD YOU REPEAT

10   YOUR QUESTION, PLEASE, MR. MAAZEL, JUST TO CLARIFY WHAT

11   HYPOTHETICAL IN PARTICULAR WE ARE CONSIDERING?

12             THE COURT:  I THINK HE ASKED YOU WHICH

13   MISTAKE DURING AN AUDIT WOULD BE MORE LIKELY TO BE

14   CAUGHT, A MISTAKE -- CAUSED BY MALWARE IN BOTH

15   INSTANCES.  A MISTAKE TO THE XL BALLOT OR A MISTAKE TO

16   THE HART BALLOT.

17             IS THAT WHAT YOU ASKED?

18             MR. MAAZEL:  YES, YOUR HONOR.

19             THE COURT:  I UNDERSTAND.

20             THE WITNESS:  I THINK THE REASON THAT I

21   AM CONFUSED, AND PERHAPS WE ARE ALL CONFUSED, IS THAT IN

22   THE CASE OF THE XL, THE MALWARE ON THE VOTING MACHINE

23   CAN AFFECT BOTH HOW THE RECORD IS PRINTED AND HOW IT'S

24   TABULATED.  IT HAS CONTROL OVER BOTH PARTS OF THE

25   PROCESS BECAUSE IT'S ONE MACHINE DOING BOTH, JUST AS IN

1    OTHER VVPAT SYSTEMS.

2                   IN THE HART SYSTEM, THERE CAN BE SEPARATE

3    MACHINES THAT ARE THE BALLOT-MARKING DEVICE AND THE

4    SCANNER.   AND EACH OF THOSE MIGHT INDEPENDENTLY BE

5    COMPROMISED BY AN ATTACKER.

6                   SO IN THE CASE WHERE ONLY THE SCANNER IS

7    -- EXCUSE ME, ONLY THE -- IN THE CASE WHERE ONLY THE

8    HART BALLOT-MARKING DEVICE IS COMPROMISED, YOU DON'T

9    EVEN NEED TO GET TO THE STATE OF AN AUDIT FOR THE VOTER

10   TO HAVE HAD AN OPPORTUNITY TO NOTICE ANY ERROR IN THAT

11   PRINTOUT.

12                  IN THE CASE WHERE THE TABULATORS ARE BOTH

13   COMPROMISED, IN EITHER CASE YOU NEED A ROBUST AUDIT IN

14   ORDER TO CATCH ANY CHANGE TO THE RECORDED VOTE, BUT IT

15   HAS TO BE AN AUDIT THAT IS SUFFICIENTLY ROBUST IN THE

16   CASE OF THE XL TO BE CONSIDERING THE HUMAN MARKED

17   PORTION OF EVERY RACE.

18                  MR. MAAZEL:  UNLESS YOUR HONOR HAS MORE

19   QUESTIONS, I WAS GOING TO MOVE TO ANOTHER TOPIC.

20                  THE COURT:  NO I HAVE HAD QUITE ENOUGH.

21   YOU CAN MOVE ON.

22   BY MR. MAAZEL:

23   Q.     SO WE SAW SOME -- WE SAW THE EXHIBITS, THE

24   E-MAIL FROM MS. UNGER TO MYSELF ON SEPTEMBER 28, 2018.

25   DO YOU REMEMBER THAT TESTIMONY?

1    A.    YES, I DO.

2    Q.    ATTACHING AN E-POLL BOOK STATUS REPORT?

3    A.    YES, I DO.

4    Q.    CAN YOU JUST LOOK AT THAT REPORT AT JOINT

5    EXHIBIT 12?

6    A.    JOINT EXHIBIT 12 YOU SAID?

7              YES.

8    Q.    ACTUALLY, I'M SORRY, IF YOU COULD FIRST LOOK AT

9    JOINT EXHIBIT 14, MS. UNGER'S E-MAIL.  AND IN HER FIRST

10   BULLET POINT, SHE REFERS TO THE E-POLL BOOK STATUS

11   REPORT AND SAYS THAT THE DEPARTMENT EXPECTS THOSE

12   SYSTEMS WILL BE PRESENTED FOR EXAMINATION IN

13   PENNSYLVANIA, YES?

14              THE COURT:  I'M SORRY, WHAT ARE YOU

15   READING?

16              MR. MAAZEL:  JUST THE END OF THE FIRST

17   BULLET POINT, YOUR HONOR, JOINT EXHIBIT 14.

18              THE COURT:  YES, THANK YOU.

19              THE WITNESS:  YES, I SEE THAT.

20   BY MR. MAAZEL:

21   Q.    NOW, IF YOU CAN LOOK AT THE POLL REPORT WHICH

22   SHE SENT, YOU DID SEE A COPY OF THIS BACK IN LATE

23   SEPTEMBER, 2018 OR EARLY OCTOBER?

24   A.    YES, I DID.

25   Q.    THEREABOUTS.

1           AND CAN YOU JUST DESCRIBE WHAT THIS

2   DOCUMENT IS AS YOU UNDERSTAND IT?

3               THE COURT:  ARE WE TALKING ABOUT 14?

4               MR. MAAZEL:  12.

5               THE WITNESS:  SO THIS DOCUMENT, AS I

6   UNDERSTAND IT, WAS A LIST OF THE VOTING SYSTEM SUITES

7   THAT PENNSYLVANIA EITHER HAD CERTIFIED OR WAS

8   CONSIDERING TESTING.

9   BY MR. MAAZEL:

10  Q.      OKAY.  AND SO DOES THIS POLL BOOK REPORT TELL

11  YOU WHICH SPECIFIC SYSTEMS OR MODELS ARE BEING

12  CONSIDERED?

13  A.      WELL, EACH OF THESE -- THE COLUMN MARKED MODEL,

14  EACH OF THE ENTRIES HERE REFERS TO A VOTING SYSTEM

15  SUITE, WHICH IS A COLLECTION OF DIFFERENT MACHINES OFTEN

16  INCLUDING DRE'S AND PAPERLESS DRE'S AND OTHER THINGS

17  THAT -- AS WELL AS BALLOT-MARKING DEVICES, CENTRAL COUNT

18  SCANNERS, PRECINCT COUNT SCANNERS, ELECTION MANAGEMENT

19  SYSTEMS.  SO THEY ARE NOT REFERRING TO SPECIFIC SYSTEMS

20  BUT LARGE COLLECTIONS OF THEM.

21  Q.      SO WHEN YOU SEE SOMETHING LIKE, I DON'T KNOW,

22  CLEARVOTE 1.4.5, DOES THAT TELL YOU WHAT ACTUAL VOTING

23  SYSTEMS ARE BEING CONSIDERED OR WHAT MODELS ARE BEING

24  CONSIDERED?

25  A.      IT TELLS YOU AT BEST A SUPERSET OF THE ONES THAT

1     ARE GOING TO BE CONSIDERED.

2     Q.      OKAY.  YOU LOOKED AT THIS AND YOU PREPARED AN

3     E-MAIL WHICH YOU SENT TO MYSELF, IS THAT RIGHT?

4     A.      THAT'S CORRECT.

5     Q.      AND IF WE LOOK AT JOINT EXHIBIT 20, AN E-MAIL

6     THAT WAS IDENTIFIED AND SENT TO MS. UNGER ON OCTOBER 9,

7     2018.  DOES THAT INCLUDE A CUT AND PASTE, WHAT YOU SENT

8     ME?

9     A.      YES, I BELIEVE SO.

10    Q.      OKAY.  AND SO CAN YOU JUST TELL US WHAT THIS IS

11    THAT YOU SENT ME THAT I FORWARDED TO MS. UNGER?

12    A.      WELL, THESE WERE JUST SOME QUICK INITIAL

13    REACTIONS TO THE BROAD VOTING SYSTEM SUITES THAT ARE

14    LISTED IN THE OTHER DOCUMENT.  THIS WASN'T MEANT TO BE

15    AN ALL-ENCOMPASSING LIST OF OUR POTENTIAL PROBLEMS WITH

16    ALL OF THE EQUIPMENT.

17    Q.      OKAY.  IS THIS AN ANALYSIS OF ANY PARTICULAR

18    VOTING SYSTEM?

19    A.      NO, NOT EVEN THAT.  IT'S JUST SOME QUICK INITIAL

20    THOUGHTS.

21    Q.      OKAY.  AND IS THIS SOME SORT OF SUBSTITUTE FOR

22    SEEING THE TESTING OF A PARTICULAR SYSTEM OR SEEING THE

23    VIDEOS TESTING?

24    A.      NO, IT'S NOT.

25    Q.      WHY NOT?

1    A.      WELL, BECAUSE ACTUALLY WITNESSING OR

2    PARTICIPATING IN THE TESTING PROVIDES FAR MORE

3    INFORMATION ABOUT A, WHAT SYSTEMS AND CONFIGURATIONS OF

4    THOSE SYSTEMS ARE BEING CONSIDERED FOR USE; AND B, JUST

5    HOW THEY OPERATE.  THERE IS NO SUBSTITUTE FOR THAT JUST

6    BY HAVING A WHOLE SUITE OF SYSTEMS LISTED.

7    BY THE COURT:

8    Q.      DOCTOR, YOU TESTIFIED THAT IT WAS ONLY AFTER YOU

9    SAW THE VIDEO OF THE TEST, I GUESS IT WAS THE TESTING

10   VIDEO FROM SEPTEMBER OF 2018, THAT YOU REALIZED THAT THE

11   BALLOT CARD PASSES ACROSS THE PRINTHEAD AFTER THE PERSON

12   CASTS THEIR VOTE, CORRECT?

13   A.      EXCUSE ME, YOUR HONOR.

14   Q.      THAT'S NOT WHAT YOU TESTIFIED TO?

15   A.      I WAS REFERRING TO THE -- NOT A VIDEO IN THAT

16   CASE BUT TO THE REPORT THAT THE STATE ASKED ME FOR

17   INFORMATION.

18   Q.      YOU LEARNED THAT FOR THE FIRST TIME IN THE

19   REPORT, CORRECT?

20   A.      I LEARNED FOR THE FIRST TIME THAT THE MACHINE

21   SCANNED THE BALLOT BEFORE THE VOTER SAW IT.

22   Q.      SO THAT YOU SAY HERE, ANDREW APPEL RECENTLY

23   WROTE ABOUT ANOTHER CONFIGURATION OF THE EXPRESSVOTE IN

24   WHICH IT ASKS VOTERS WHETHER THEY WANT TO VERIFY THEIR

25   BALLOTS BEFORE PRINTING THEM.  DO YOU SEE THAT?

1    A.      YES, I DO.

2    Q.      IF THE VOTER SAYS YES, THEN THE MACHINE

3    NECESSARILY READS IT FIRST, DOESN'T IT?  AND IT PASSES

4    ACROSS THE PRINTHEAD.  IT PASSES ACROSS THE PRINTHEAD A

5    SECOND TIME, DOESN'T IT?

6    A.      RESPECTFULLY, YOUR HONOR, NO.  THAT'S REFERRING

7    TO ANOTHER CONFIGURATION OF THE MACHINE THAT IS NOT

8    CERTIFIED IN PENNSYLVANIA.  AND WHERE THE MACHINE

9    PRODUCES THE SUMMARY CARD AND DOESN'T WAIT FOR THE VOTER

10   TO LOOK AT IT OR NOT, IT JUST DEPOSITS IT INTO ITS

11   CONTAINER.

12   Q.      AND YOU WERE SAYING THAT'S AN ARRANGEMENT YOU

13   DISAPPROVED OF?

14   A.      THAT'S WHAT I WAS SAYING.

15           THE COURT:  OKAY.

16   BY MR. MAAZEL:

17   Q.      DO YOU SEE IN THE FIRST PARAGRAPH OF EXHIBIT 20,

18   JOINT EXHIBIT 20 --

19           THE COURT:  MAY I ASK ANOTHER QUESTION?

20   YOU SAY AT THE BOTTOM OF THAT PARAGRAPH, PA SHOULD

21   REQUIRE THE MACHINES TO BE CONFIGURED SO THAT EVERY

22   VOTER HAS AN OPPORTUNITY TO SEE THEIR BALLOT AFTER IT

23   HAS BEEN PRINTED?

24   A.      YES.

25   Q.      SO YOU ARE SAYING THAT THE VOTER MAKES THEIR

1      SELECTION, IT GETS PRINTED, AND THEN THE VOTER SEES IT.

2      AND THE PURPOSE OF THE VOTER SEEING IT IS TO VERIFY IT,

3      CORRECT?

4      A.      THAT'S CORRECT.  AND WHAT I --

5      Q.      WELL, WAIT.  DOESN'T THAT NECESSARILY MEAN IF

6      THE VOTER SEES IT AND VERIFIES IT, IT'S GOING TO PASS

7      BACK INTO THE MACHINE AFTERWARDS?  DOESN'T THAT

8      NECESSARILY MEAN THAT WHEN THE MACHINE GOBBLES UP THE

9      BALLOT CARD, SOMETHING COULD BE DONE TO THE BALLOT CARD?

10     A.      IT DOES NOT NECESSARILY MEAN THAT, YOUR HONOR,

11     BECAUSE IT DOESN'T -- THE MACHINE DOES NOT HAVE TO BE

12     DESIGNED IN A WAY THAT THE BALLOT GOES BACK PAST THE

13     PRINTHEAD AGAIN.

14     Q.      BUT YOU DIDN'T SAY THAT.  IT WAS CERTAINLY A

15     POSSIBILITY AT THE TIME YOU REVIEWED IT.  WHAT WAS

16     FOREMOST IN YOUR MIND WAS WHETHER OR NOT THE MACHINE

17     COULD DEFAULT, NOT SHOW THE VOTER HER VOTE, THAT WAS

18     WHAT WAS FOREMOST IN YOUR MIND?

19     A.      INDEED, THAT WAS WHAT WAS FOREMOST IN MY MIND.

20              THE COURT:  OKAY.

21     BY MR. MAAZEL:

22     Q.      THIS PARAGRAPH THAT THE COURT IS REFERRING TO,

23     ARE YOU REFERRING SPECIFICALLY TO THE EXPRESSVOTE XL

24     THAT IS AT ISSUE OF THIS MOTION?

25     A.      I AM REFERRING TO THE EXPRESSVOTE MACHINES

1    BROADLY, NOT TO THE XL SPECIFICALLY.  THE XL WAS A BRAND

2    NEW SYSTEM AT THE TIME.  I DON'T THINK ANYONE WAS

3    THINKING ABOUT THE XL SPECIFICALLY IN GREAT DETAIL.

4    MAYBE SOME PEOPLE WERE, BUT IT WAS CERTAINLY VERY NEW

5    FROM MY PERSPECTIVE, AND I WAS STILL LEARNING A LOT MORE

6    SUBSEQUENT TO THIS ABOUT THE WAY IT OPERATED.

7    Q.      AND DO DIFFERENT EXPRESSVOTES WORK IN DIFFERENT

8    WAYS?

9    A.      YES, THEY DO.  AND IN FACT, THEY CAN BE

10   CONFIGURED TO WORK IN DIFFERENT WAYS EVEN WITHIN THE

11   SAME MACHINE.  LIKE THIS AUTOCAST PROBLEM THAT WE ARE

12   TALKING ABOUT HERE IS ONE THAT BASICALLY IS NOT EVEN

13   VOTER-VERIFIABLE.

14   Q.      OKAY.  SO THIS ISSUE OF THE PIECE OF PAPER GOING

15   PAST THE PRINTHEAD, DID YOU HAVE ANY IDEA ABOUT THAT AS

16   OF OCTOBER 2018?

17   A.      I DIDN'T KNOW IT APPLIED TO THE XL.  THAT WAS

18   SOMETHING THAT HAD BEEN A COMPLAINT ABOUT OTHER

19   MANUFACTURERS' SYSTEMS.

20   Q.      OKAY.  AND SO AT THE BOTTOM OF PARAGRAPH 1 OF

21   JOINT EXHIBIT 20, THE BOTTOM OF THE FIRST PARAGRAPH.

22              THE COURT:  ARE YOU TALKING ABOUT A MORE

23   GRANULAR LIST?

24              MR. MAAZEL:  YES.

25              THE COURT:  OKAY.

1    BY MR. MAAZEL:

2    Q.      DO YOU SEE THE REFERENCE TO, PLAINTIFF IS

3    REQUESTING A MORE GRANULAR LIST OF PARTICULAR MACHINES,

4    ELECTION SYSTEMS BEING PROPOSED FOR CERTIFICATION?

5    A.      YES.

6    Q.      DID YOU EVER RECEIVE THAT SORT OF LIST?

7    A.      NO, I DID NOT.

8    Q.      OKAY.  I TAKE IT YOU UNDERSTAND THAT A

9    SETTLEMENT AGREEMENT WAS SIGNED IN THE NEXT MONTH?

10   A.      YES.

11   Q.      AND YOU WERE -- YOU TESTIFIED YOU WERE

12   DESIGNATED AS THE DESIGNEE FOR THIS PROCESS?

13   A.      YES.

14   Q.      AND THEN WAS THERE A PROCESS SET FORTH IN THE

15   SETTLEMENT AGREEMENT FOR HOW INFORMATION WOULD BE SENT

16   FROM THE DEPARTMENT TO YOU?

17   A.      MY UNDERSTANDING WAS THAT THEY WOULD CONTACT ME

18   WITH INFORMATION.

19   Q.      ALL RIGHT.  NOW, I AM NOT GOING TO GO THROUGH

20   EVERYTHING WE WENT THROUGH YESTERDAY WITH MS. KOTULA.  I

21   HAVE ALL OF THE E-MAIL CORRESPONDENCE.

22              BUT IF YOU DO LOOK AT PLAINTIFFS'

23   EXHIBIT 1001, IS THAT YOUR CORRESPONDENCE WITH MS.

24   KOTULA ABOUT, AMONG OTHER THINGS, GETTING VIDEOS AND --

25   A.      IS THAT IT ON THE SCREEN?

1    Q.    YES.

2    A.    YES, IF THAT'S THE EXHIBIT, THAT IS --

3    Q.    YOU CAN PULL IT IN FRONT OF YOU.   IT'S

4    PLAINTIFFS' EXHIBIT 1001, TAB 1.

5    A.    TAB 1, THANK YOU.   YES.

6    Q.    ALL RIGHT.   AND SO IS THIS YOUR CORRESPONDENCE

7    WITH MS. KOTULA BETWEEN OCTOBER 2018 AND NOVEMBER 2019?

8    A.    THIS IS MY ENTIRE CORRESPONDENCE WITH THE STATE.

9    Q.    OKAY.   NOW, DID MS. KOTULA EVER TELL YOU THAT

10   YOU WERE NOT ENTITLED UNDER THE SETTLEMENT AGREEMENT TO

11   SEE VIDEOS OF TESTING?

12   A.    NO, SHE DID NOT.   SHE OFFERED TO PROVIDE VIDEOS

13   OF THE TESTING.

14   Q.    AND DID SHE OFFER TO PROVIDE VIDEOS BEFORE OR

15   AFTER THE SETTLEMENT AGREEMENT WAS SIGNED?

16   A.    EVEN BEFORE IT WAS SIGNED.

17   Q.    WHEN DID YOU FIRST HEAR THAT MS. KOTULA HAD A

18   VIEW THAT PLAINTIFFS WERE NOT ENTITLED UNDER THE

19   SETTLEMENT AGREEMENT TO SEE VIDEOS?

20   A.    YESTERDAY WHEN SHE WAS TESTIFYING.

21   Q.    ALL RIGHT.   HOW MANY TIMES DID YOU ASK MS.

22   KOTULA BETWEEN JANUARY AND JUNE OF 2018 FOR TESTING

23   VIDEOS, APPROXIMATELY?

24   A.    I DON'T REMEMBER.   PROBABLY TEN TIMES OR SO.

25   Q.    I WANT TO FAST FORWARD SO WE DON'T HAVE TO COVER

1    THE GROUND WE COVERED YESTERDAY TO JUNE 5TH, 2018.  IS

2    THAT WHEN YOU RECEIVED THE ES&S VIDEOS FROM MS. KOTULA?

3    A.    LET ME CONSULT MY E-MAIL CHAIN.  BUT YES, I

4    BELIEVE SO.  YES.

5    Q.    OKAY.  AND ABOUT HOW MANY HOURS OF VIDEO DID MS.

6    KOTULA SEND YOU?

7    A.    I DON'T REMEMBER EXACTLY HOW MANY HOURS.  IT WAS

8    THREE-AND-A-HALF OR FOUR FULL DAYS WORK THAT HAD BEEN

9    VIDEOTAPED.

10    Q.    AND HOW MANY VIDEO CLIPS DID SHE SEND YOU?

11    A.    MUST HAVE BEEN 30 TO 40 VIDEO CLIPS, SOMETHING

12    LIKE THAT.  SOME OF THEM LASTING AN HOUR OR MORE.

13              MR. MAAZEL:  PERMISSION TO APPROACH, YOUR

14    HONOR?

15              THE COURT:  I BEG YOUR PARDON?

16              MR. MAAZEL:  PERMISSION TO APPROACH THE

17    WITNESS?

18              THE COURT:  ABSOLUTELY.

19              MR. MAAZEL:  THANK YOU.

20    BY MR. MAAZEL:

21    Q.    I JUST WANT TO SHOW YOU WHAT -- A FLASH DRIVE

22    THAT SAYS PX 1016.

23    A.    YES.

24    Q.    AND ARE THERE ANY INITIALS ON THERE?

25    A.    YES, THOSE ARE MY INITIALS ON THERE.

1    Q.      WHAT IS THIS FLASH DRIVE?

2    A.         THIS IS A FLASH DRIVE THAT I INSPECTED YESTERDAY

3    OR THE DAY BEFORE THAT HAD A COPY OF THE VIDEOS THAT THE

4    STATE PROVIDED OF THE ES&S SYSTEM.

5              MR. MAAZEL:   I MOVE PLAINTIFFS'

6    EXHIBIT 1016 INTO EVIDENCE.

7              MR. WIYGUL:   I AM GOING TO OBJECT, YOUR

8    HONOR, ON SEVERAL GROUNDS.   THE FIRST TIME WE LEARNED

9    THAT PLAINTIFFS INTENDED TO USE WHAT THEY ARE CALLING PX

10   1016 AS THEIR EXHIBIT WAS AFTER THE CLOSE OF BUSINESS ON

11   THURSDAY.   WE EXCHANGED -- STARTED EXCHANGING EXHIBITS

12   BACK IN JANUARY FOR THE HEARING WAS SCHEDULED THEN.   WE

13   HAD EXCHANGED EXHIBITS AND THEN THURSDAY AT 6 P.M. THEY

14   SAY WE HAVE ANOTHER EXHIBIT.

15             WE LOOKED AT IT, WE SAW IT WAS 61 VIDEOS

16   THAT APPEARED TO BE ABOUT 17 HOURS OF FOOTAGE TOTAL.   I

17   WENT BACK TO PLAINTIFFS' COUNSEL AND SAID THERE

18   LITERALLY ARE 61 VIDEOS.   CAN YOU TELL US WHICH ONES YOU

19   ACTUALLY INTEND TO USE SO THAT WE WANT TO REVIEW THEM

20   FOR AUTHENTICITY AND OTHER REASONS.

21             THEY WOULD NOT ANSWER THAT QUESTION.

22   THEY SAID WE DO INTEND TO MOVE ALL 61 VIDEOS INTO

23   EVIDENCE.   AND WE SAID WE DON'T HAVE TIME TO REVIEW

24   17 HOURS OF FOOTAGE BETWEEN NOW AND THE HEARING AND

25   AUTHENTICATE IT.   IT'S APPARENT JUST FROM THE STILL

1    SHOTS THAT ARE -- THAT STAND IN FOR EACH OF THE 61

2    VIDEOS, THAT SEEMS LIKE A DECENT AMOUNT OF THE FOOTAGE

3    REGARDING THE EXAMINATION OF THE MACHINES, OTHER THAN

4    THE XL MACHINE THAT IS AT ISSUE HERE.  SO WITH THAT, WE

5    MAY HAVE OTHER OBJECTIONS, DEPENDING ON WHAT THEY ARE

6    TRYING TO OFFER, BUT WE OBJECT.

7              THE COURT:  MR. MAAZEL.

8              MR. MAAZEL:  YOUR HONOR, THESE ARE THEIR

9    OWN VIDEOS.  SO THE IDEA --

10              THE COURT:  THEY ARE NOT COUNSEL'S

11    VIDEOS.

12              MR. MAAZEL:  IT'S THEIR CLIENTS.

13              THE COURT:  DID HE ACCURATELY DESCRIBE

14    YOUR RESPONSE, THAT YOU WOULD NOT TELL HIM WHAT YOU WERE

15    GOING TO USE AND YOU INTEND TO INTRODUCE THEM ALL?

16              MR. MAAZEL:  THAT'S NOT QUITE ACCURATE,

17    YOUR HONOR.

18              THE COURT:  WHAT IS ACCURATE?

19              MR. MAAZEL:  WHAT IS ACCURATE IS THAT WE

20    WOULD LIKE THIS TO BE IN EVIDENCE BECAUSE THESE ARE THE

21    VIDEOS THAT WERE SENT TO DR. HALDERMAN.  WE DON'T

22    ACTUALLY INTEND TO GO THROUGH THE VIDEOS NOW, BUT WE DO

23    THINK IT SHOULD BE IN EVIDENCE BECAUSE THESE ARE THE

24    VIDEOS THAT THEY PRODUCED TO HIM BACK IN JUNE.

25              THE COURT:  I'M SORRY, THE RECORD HERE IS

1    NOT INTENDED TO BE A MUSEUM.  WHAT PURPOSE WILL IT SERVE

2    IF IT'S IN EVIDENCE?  WHAT ARE YOU GOING TO USE IT FOR,

3    PARTICULARLY WHICH PARTS OF THE VIDEO ARE YOU GOING TO

4    USE?

5              WHY DON'T WE TAKE A BREAK AND SEE IF YOU

6    CAN WORK THAT OUT WITH MR. WIYGUL.  HOW MANY HOURS OF

7    VIDEO IS ON THIS THING?

8              MR. MAAZEL:  COUNSEL SAID 17 HOURS.  I

9    DON'T DISPUTE THAT.

10             THE COURT:  I AM NOT GOING TO ADMIT

11   17 HOURS OF VIDEO THAT THE OTHER SIDE HAS NOT BEEN GIVEN

12   THE OPPORTUNITY TO REVIEW.  IF YOU CAN WORK IT OUT WITH

13   MR. WIYGUL, FINE.  OTHERWISE, I AM GOING TO ASK YOU TO

14   PINPOINT PARTICULAR CLIPS, IF YOU WILL, OF THE VIDEO AND

15   I WILL DO THEM ONE BY ONE.  BUT I AM NOT GOING TO ALLOW

16   YOU TO INTRODUCE 17 HOURS OF STUFF THAT THEY HAVE NOT

17   HAD A CHANCE TO REVIEW BECAUSE BEFORE THEY WERE

18   RETAINED, OVER A YEAR BEFORE THEY WERE RETAINED, VIDEOS

19   WERE MADE.

20             (BRIEF RECESS TAKEN.)

21             THE COURT:  PLEASE BE SEATED.

22             YES, MR. MAAZEL.

23             MR. MAAZEL:  REGRETFULLY, YOUR HONOR, WE

24   HAVE NOT WORKED OUT AN ARRANGEMENT.  I WILL JUST SAY

25   THAT I BELIEVE DR. HALDERMAN HAS AUTHENTICATED THE

1   DOCUMENT THROUGH HIS TESTIMONY AND THE COURT WILL RULE.

2   AND WE UNDERSTAND WHATEVER THE COURT'S RULING IS AND WE

3   WILL MOVE ON.

4                THE COURT:  LET ME ASK MR. WIYGUL.

5                MR. WIYGUL:  YOUR HONOR, I JUST WANT TO

6   MAKE CLEAR FOR THE RECORD, YOUR HONOR, TO THE EXTENT WE

7   REACHED AN AGREEMENT, MY UNDERSTANDING FROM TALKING TO

8   MR. MAAZEL, I ASKED HIM ARE THERE PARTICULAR VIDEOS HE

9   WOULD LIKE US TO REVIEW RIGHT NOW, AND HE SAID NO.  MY

10  UNDERSTANDING IS THAT HIS ONLY POSITION IS HE WANTS TO

11  MOVE ALL OF THEM INTO EVIDENCE.

12               THE COURT:  ALL OR NOTHING, MR. MAAZEL?

13               MR. MAAZEL:  I JUST FEEL IT SHOULD BE A

14  PART OF THE RECORD.  THESE ARE THE VERY TESTING VIDEOS

15  THAT DR. HALDERMAN TRIED TO GET FROM THEIR CLIENT FOR

16  FIVE MONTHS AND I JUST --

17               THE COURT:  I HAVE ASKED YOU WHICH

18  PARTICULAR POINTS OR CLIPS IN THE VIDEO BEAR ON THIS

19  DISPUTE.  YOU HAVE DECLINED TO TELL ME.  I WILL NOT

20  ALLOW AN EXHIBIT THAT THE OTHER SIDE HAS NOT BEEN GIVEN

21  THE OPPORTUNITY TO REVIEW.  I WILL NOT ALLOW IT INTO

22  EVIDENCE IN ITS ENTIRETY.

23               MR. MAAZEL:  I UNDERSTAND YOUR RULING,

24  YOUR HONOR.

25  BY MR. MAAZEL:

1   Q.      DR. HALDERMAN, DID MS. KOTULA OR ANYONE FROM THE

2   DEPARTMENT EVER INFORM YOU THAT THE XL SYSTEM HAD BEEN

3   TESTED?

4   A.      NO.

5   Q.      DID MS. KOTULA OR ANYONE FROM THE DEPARTMENT

6   EVER TELL THAT YOU THE XL WAS GOING TO BE CERTIFIED?

7   A.      NO.

8   Q.      OR THAT IT HAD BEEN CERTIFIED?

9   A.      NO.

10  Q.      SO YOU TESTIFIED THAT IT WAS JUNE 5, 2019 WHEN

11  YOU RECEIVED THE ES&S TESTING VIDEOS, YES?

12  A.      YES.

13  Q.      AND WAS THERE ANYTHING HAPPENING IN YOUR LIFE IN

14  PARTICULAR IN JUNE OF 2019?

15  A.      YES, I GOT MARRIED ABOUT TWO WEEKS LATER.

16  Q.      AND AFTER YOUR WEDDING YOU DID WHAT?

17  A.      MY WIFE AND I TRAVELED FOR THE NEXT WEEK OR SO.

18  WE HAD A HONEYMOON I SUPPOSE, AND YES.

19  Q.      SO WHEN DID YOU REVIEW THESE 17 HOURS OR SO OF

20  VIDEOS THAT WERE GIVEN TO YOU?

21  A.      IT WAS IN THE BEGINNING OF JULY.

22  Q.      AND THE LETTER THAT THE PLAINTIFF SENT, THE

23  FIRST MEET AND CONFER LETTER TO THE DEFENDANTS WAS WHEN?

24  A.      WAS NOT LONG AFTER THAT.  IT WAS IN -- SOMETIME

25  IN JULY, I DON'T RECALL EXACTLY.

1    Q.      WAS IT, IN YOUR VIEW, IMPORTANT TO SEE THE

2    TESTING VIDEOS -- WITHDRAWN.

3                    WOULD IT HAVE BEEN ADVISABLE TO WRITE A

4    MEET AND CONFER LETTER TO THE DEFENDANTS ABOUT THIS

5    SYSTEM BEFORE SEEING THE VIDEOS?

6                    MR. WIYGUL:  OBJECTION.

7                    THE COURT:  I'M SORRY, I COULDN'T HEAR

8    YOUR QUESTION.

9    BY MR. MAAZEL:

10   Q.      WOULD IT BE ADVISABLE --

11                   THE COURT:  ADVISABLE?

12   BY MR. MAAZEL:

13   Q.      IN YOUR VIEW, WOULD IT BE --

14                   MR. MAAZEL:  I AM TRYING TO FIND A

15   NON-LEADING WAY TO SAY THIS, YOUR HONOR.

16                   THE COURT:  LEAD AWAY.

17   BY MR. MAAZEL:

18   Q.      WASN'T IT IMPORTANT TO SEE THE ES&S TESTING

19   VIDEOS BEFORE THE PLAINTIFFS SENT A LETTER TO THE

20   DEFENDANTS SAYING THAT THE SYSTEM WAS NOT COMPLIANT?

21                   MR. WIYGUL:  OBJECTION.

22                   THE COURT:  NO, HE CAN ANSWER THAT.

23                   THE WITNESS:  IN MY VIEW, IT WAS VERY

24   IMPORTANT THAT THE VIDEOS ARE -- THE ACTUAL

25   CERTIFICATION TESTS ARE A VERY RICH SOURCE OF -- AND

1     REALLY IRREPLACEABLE SOURCE TO ME OF INFORMATION ABOUT

2     HOW PENNSYLVANIA INTENDED TO USE THE MACHINES AND THE

3     WAY THAT THEY WORKED IN PRACTICE.

4     BY MR. MAAZEL:

5     Q.      IN YOUR VIEW, BASED UPON YOUR EXPERIENCE WITH

6     THE DEPARTMENT AND MS. KOTULA, DID THE PLAINTIFFS DELAY

7     BEFORE THE BEGINNING OF THE MEET AND CONFER PROCESS?

8                     MR. WIYGUL:  OBJECTION.

9                     THE COURT:  I'M SORRY, DID THE DEFENDANTS

10    DELAY?

11    BY MR. MAAZEL:

12    Q.      IN YOUR VIEW, DR. HALDERMAN, GIVEN THE

13    INTERACTION YOU HAD WITH THE DEPARTMENT AND MS. KOTULA,

14    DID THE PLAINTIFFS DELAY BEFORE STARTING THE MEET AND

15    CONFER PROCESS?

16                    MR. WIYGUL:  OBJECTION.

17                    THE COURT:  NO, OVERRULED.

18                    THE WITNESS:  I DON'T THINK THE

19    PLAINTIFFS DELAYED.  AS SOON AS I HAD THE INFORMATION

20    THAT WE HAD BEEN WAITING FOR FOR MONTHS, WE STARTED --

21    THERE WAS A VERY SHORT TIME BEFORE THE MEET AND CONFER

22    PROCESS BEGAN.

23    BY MR. MAAZEL:

24    Q.      DO YOU BELIEVE THAT ANYONE DELAYED?

25    A.      I CAN TELL YOU THAT ALL OF THIS COULD HAVE

1    HAPPENED MUCH SOONER HAD I HAD ACCESS TO THOSE VIDEOS

2    PROMPTLY AFTER WE REQUESTED THEM.

3         Q.    AND WHO WAS RESPONSIBLE FOR FAILING TO GIVE YOU

4    ACCESS TO THE VIDEOS?

5                   MR. WIYGUL:  OBJECTION.

6                   THE COURT:  IF HE KNOWS.  HE WAS HERE IN

7    COURT, HE CAN REPEAT WHAT HE HEARD IN COURT.

8                   THE WITNESS:  I BELIEVE THAT THE STATE

9    WAS RESPONSIBLE FOR THAT DELAY.

10   BY MR. MAAZEL:

11        Q.    BY THE WAY, YOU MENTIONED THERE WAS A

12   REEXAMINATION OF THIS XL SYSTEM I BELIEVE IN

13   SEPTEMBER OF 2019?

14        A.    I THINK THAT'S RIGHT, SEPTEMBER.

15        Q.    DID THE DEPARTMENT INVITE YOU TO THAT

16   RECERTIFICATION PROCESS?

17        A.    NO, IT DID NOT.

18        Q.    DID THEY TELL YOU WHERE OR WHEN IT WOULD BE?

19        A.    NO.

20        Q.    DID THEY EVER SEND YOU VIDEOS OF THE TESTING

21   THEY DID IN SEPTEMBER 2019 OF THE XL SYSTEM?

22        A.    NO.

23        Q.    JUST BEFORE WE CONCLUDE, DR. HALDERMAN, I JUST

24   WANT TO MAKE SURE WE HAVE A BASIC UNDERSTANDING OF THE

25   XL, IN LAYMAN'S TERMS.

1    A.    YES.

2    Q.    AM I CORRECT THAT THE VOTER MAKES A SELECTION,

3    THEN THE MACHINE PRINTS ON A PIECE OF PAPER, THEN IT

4    RECORDS THE VOTE, THEN THE VOTER HAS A CHANCE TO LOOK AT

5    THE PAPER TO SEE IF IT WAS CORRECT, AND THEN THE PAPER

6    GOES PAST THE PRINTHEAD, IS THAT CORRECT?

7    A.    THAT IS CORRECT.

8            MR. MAAZEL:  OKAY, NO FURTHER QUESTIONS.

9            MR. WIYGUL:  I AM GOING TO GO TO THE

10   PODIUM, IF THAT'S ALL RIGHT WITH YOU?

11           THE COURT:  THAT'S FINE.

12           CROSS-EXAMINATION

13   BY MR. WIYGUL:

14   Q.    GOOD AFTERNOON, DR. HALDERMAN, OR MORNING.  IT

15   IS STILL MORNING, EXCUSE ME, GOOD MORNING.

16   A.    I THINK I AM GLAD FOR THAT.

17   Q.    WE HAVE TALKED ABOUT VIDEOS A LOT IN THIS CASE.

18   AND YOU HAVE TALKED ABOUT IT IN YOUR DIRECT EXAMINATION,

19   AND I BELIEVE YOUR TESTIMONY WAS YOU RECEIVED THE VIDEOS

20   IN I BELIEVE THE RECORD SHOWS JUNE 5TH, CORRECT, OF

21   2018?

22   A.    THAT'S CORRECT.

23   Q.    AND THEN YOU HAD PERSONAL OBLIGATIONS, YOU WENT

24   ON A -- WAS IT A HONEYMOON?

25   A.    OF SORTS, YES.

1   Q.      AND THEN SO YOU GOT AROUND TO LOOKING AT THE

2   VIDEOS IN EARLY JULY, CORRECT?

3   A.      YES.

4   Q.      AND I KNOW YOUR COUNSEL WAS INTENT ON

5   ESTABLISHING THAT THAT HAPPENED BEFORE THEY FILED THEIR

6   INITIAL COMPLAINT ABOUT THE XL MACHINE AND ALLEGING THAT

7   IT VIOLATED THE SETTLEMENT AGREEMENT.  AND THAT LETTER

8   WAS FILED ON JULY 29TH, CORRECT?

9   A.      I BELIEVE THAT IS CORRECT.

10  Q.      YOU ARE FAMILIAR WITH THAT LETTER?

11  A.      I DON'T HAVE IT IN FRONT OF ME.

12                  PARDON ME?

13  Q.      ARE YOU FAMILIAR WITH THAT LETTER?

14  A.      I HAVE NOT SEEN IT IN SOME TIME.

15  Q.      WERE YOU CONSULTED BY PLAINTIFFS' COUNSEL BEFORE

16  THAT LETTER WAS SENT OUT?

17                  MR. MAAZEL:  OBJECTION.

18                  MR. WIYGUL:  JUST A YES OR NO, I DON'T

19  PLAN TO DELVE INTO THE DETAILS OF THE COMMUNICATION.

20                  MR. MAAZEL:  COMMUNICATIONS WITH THE

21  EXPERT ARE PRIVILEGED, YOUR HONOR.

22                  THE COURT:  NO, I DON'T WANT TO KNOW THE

23  SUBSTANCE OF THE COMMUNICATION.  YOU CAN ANSWER THAT.

24                  THE WITNESS:  WE DID SPEAK BETWEEN THE

25  TIME I REVIEWED THE VIDEOS AND THE LETTERS, WHEN THE

1    LETTER WAS SENT.

2                    MR. WIYGUL:  AND CAN WE PULL UP THAT

3    EXHIBIT, PLEASE.  LET'S SEE IF I CAN FIND THE NUMBER.

4                    MR. ARONCHICK:  43.

5                    MR. WIYGUL:  43.

6    BY MR. WIYGUL:

7    Q.      JOINT EXHIBIT 43, JX.

8                    YOU SAID YOU HAVE NOT SEEN THIS IN A

9    WHILE.  DOES THIS REFRESH YOUR MEMORY ABOUT THE CONTENT

10   OF THIS LETTER, DR. HALDERMAN?

11   A.      YES.

12   Q.      AND IN THIS LETTER, THERE IS ONLY ONE FEATURE OF

13   THE EXPRESSVOTE XL THAT IS THE SUBJECT OF PLAINTIFFS'

14   COMPLAINT, CORRECT?

15

16                   I CAN BE MORE SPECIFIC IF YOU WOULD LIKE.

17   A.      YES.

18   Q.      AND THAT IS THE FACT THAT THE XL PRINTS A BALLOT

19   OR WHATEVER YOU WANT TO CALL IT, A SUMMARY CARD WITH

20   BARCODES AND THE BARCODES ARE WHAT ARE SCANNED TO

21   TABULATE THE VOTE, CORRECT?

22   A.      IT APPEARS THAT'S THE FOCUS OF THE LETTER, YES.

23   Q.      WELL, IS THERE ANY OTHER FEATURE THAT IS A

24   PREDICATE FOR THE -- THE BASIS FOR THE COMPLAINT

25   PLAINTIFFS ARE MAKING UNDER THE SETTLEMENT AGREEMENT IN

1    THIS LETTER?

2    A.      I'M SORRY.  CAN YOU REPEAT THE QUESTION NOW THAT

3    I HAVE HAD A CHANCE TO --

4    Q.      IS THERE ANY OTHER FEATURE OF THE XL THAT IS THE

5    BASIS FOR ANY COMPLAINT THAT PLAINTIFFS RAISE IN THIS

6    JULY 29TH LETTER?

7    A.      OTHER THAN THE -- OTHER THAN -- EXCUSE ME, OTHER

8    THAN WHAT?

9    Q.      OTHER THAN WHAT IS DESCRIBED --

10            THE COURT:  DON'T YOU WANT TO ANSWER HIS

11   QUESTIONS, SIR?  IT'S SUCH A SIMPLE QUESTION.

12            ASK IT FOR A THIRD TIME.

13   BY MR. WIYGUL:

14   Q.      THIS LETTER.

15   A.      YES.

16   Q.      IT STATES THAT THE XL PRINTS VOTES IN BARCODE

17   FORM ON THE PAPER, CORRECT, AND THAT THE BARCODES ARE

18   WHAT ARE SCANNED TO TABULATE THE VOTE?

19            THE COURT:  WHY DON'T WE MAKE IT SIMPLE.

20   THE ONLY FEATURE OF THE XL SYSTEM THAT MR. MAAZEL SAYS

21   VIOLATES THE AGREEMENT IS THAT THE BARCODE IS WHAT IS

22   RECORDED AND NOT THE LINGUISTIC TEXT OF THE VOTE,

23   CORRECT?

24            THE WITNESS:  YES, I THINK WITH A

25   CLARIFICATION, YOUR HONOR.

1          THE COURT:  THANK YOU.

2    BY MR. WIYGUL:

3    Q.      YOU DIDN'T NEED TO WATCH THE VIDEOS THAT THE

4    STATE PROVIDED IN JUNE TO KNOW THAT THERE IS A BARCODE

5    PRINTED ON THE XL CALLED A PAPER RECORD TO TRY TO REACH

6    AGREEMENT, CORRECT?  YOU KNEW THAT BEFORE YOU WATCHED

7    THE VIDEOS?

8    A.      I DID, BUT WE DIDN'T KNOW WHAT OTHER FEATURES OF

9    THE XL MIGHT BE RELEVANT OR NOT.

10   Q.      THEY ARE NOT OTHER FEATURES MENTIONED HERE,

11   THERE IS JUST THIS ONE FEATURE, CORRECT?

12   A.      THAT IS WHAT THEY MENTIONED.

13   Q.      AND YOU HAD NOT WATCHED THE VIDEO AT THIS POINT?

14   A.      YES.

15   Q.      AND THE ONLY FEATURE MENTIONED HERE IS THE

16   BARCODE AND YOU KNEW ABOUT THAT BEFORE YOU WATCHED THE

17   VIDEO, CORRECT?

18   A.      I DID KNOW THAT BEFORE.

19   Q.      IN FACT, YOU KNEW THAT IN OCTOBER OF 2018 WHEN

20   YOU WERE PROVIDING FEEDBACK THROUGH MR. MAAZEL TO THE

21   DEFENDANTS ON THE EXPRESSVOTE MACHINES, CORRECT?

22   A.      YES, I BELIEVE I DID.

23   Q.      NOW, IN YOUR TESTIMONY IN ANSWER TO MR. MAAZEL'S

24   AND THE COURT'S QUESTIONS, YOU WERE QUITE ADAMANT THAT

25   -- CAN WE CALL UP JX 57, WHICH HAS BEEN ESTABLISHED

1     THAT'S AN EXAMPLE OF THE XL BALLOT, CORRECT?

2     A.     YES.

3     Q.     YOU WERE QUITE ADAMANT IN SAYING THAT THIS

4     SHOULD NOT BE CALLED A BALLOT, CORRECT?

5     A.     THAT'S RIGHT.   TECHNICALLY THIS IS A SUMMARY

6     CARD.

7     Q.     AND YOU ACTUALLY CORRECTED THE COURT WHEN THE

8     COURT REFERRED TO IT AS A BALLOT.   YOU SAID, YOUR HONOR,

9     THAT'S NOT RIGHT, IT'S ACTUALLY A SUMMARY CARD?

10    A.     THAT'S RIGHT.

11    Q.     HAVE YOU EVER REFERRED TO THIS TYPE OF BALLOT AS

12    A BALLOT -- I'M SORRY, HAVE YOU EVER REFERRED TO THIS

13    TYPE OF PAPER, THIS PAPER RECORD OF THE VOTE, AS A

14    BALLOT?

15    A.     I MIGHT HAVE WHEN SPEAKING IMPRECISELY.

16    Q.     WERE YOU SPEAKING IMPRECISELY IN THAT WAY WHEN

17    YOU WERE PROVIDING FEEDBACK THROUGH MR. MAAZEL TO THE

18    DEFENDANTS ABOUT THESE VERY MACHINES?

19    A.     I MIGHT HAVE.   I DON'T RECALL.

20    Q.     YOU BEGAN YOUR TESTIMONY BY ASSERTING THAT IN

21    YOUR VIEW THE EXPRESSVOTE XL SHOULD BE CLASSIFIED AS A

22    DRE WITH A VVPAT.   DO YOU REMEMBER THAT?

23    A.     YES.

24    Q.     AND THE COURT SPECIFICALLY ASKED YOU ABOUT DRE'S

25    IN PENNSYLVANIA AND WHETHER THE DRE'S THAT WERE IN USE

1    IN PENNSYLVANIA HAD VVPATS OR WHETHER THEY WERE NEWER

2    ELECTRONIC PAPERLESS MACHINES.   DO YOU REMEMBER THAT

3    QUESTION?

4    A.      YES.

5    Q.      AND I BELIEVE YOUR ANSWER WAS, CORRECT ME IF I'M

6    WRONG, I DON'T HAVE THE TRANSCRIPT, BUT I BELIEVE YOUR

7    ANSWER IS YOU DON'T KNOW THE ANSWER TO THAT, IS THAT

8    RIGHT?

9    A.      I THINK THE THING I SAID I DIDN'T KNOW THE

10   ANSWER TO WAS ABOUT THE AUDITING PROCEDURES THAT WERE

11   USED WITH DRE'S WITH VVPATS IN PENNSYLVANIA.

12   Q.      WHICH MEANS YOU DON'T KNOW WHETHER THE DRE'S IN

13   USE IN PENNSYLVANIA HAD VVPATS?

14   A.      I BELIEVE SOME OF THEM DID.

15   Q.      DO YOU REMEMBER -- YOU CAME INTO THIS CASE

16   PRETTY MUCH AT THE OUTSET, RIGHT.   THERE WAS A COMPLAINT

17   FILED RIGHT AFTER THE 2016 ELECTION, THERE WAS A

18   PRELIMINARY INJUNCTION HEARING THAT WAS SCHEDULED VERY

19   SHORTLY AFTER YOU CAME IN, AND I THINK YOU PROVIDED AN

20   AFFIDAVIT OR DECLARATION BEFOREHAND, BUT YOU DIDN'T

21   TESTIFY AT THAT PRELIMINARY INJUNCTION HEARING, CORRECT?

22   A.      YES, THAT'S CORRECT.

23   Q.      WASN'T THE WHOLE POINT OF WHAT PLAINTIFFS WERE

24   SEEKING AT THAT POINT, OR AT LEAST A GOOD CHUNK OF WHAT

25   THEY WERE SEEKING, A FORENSIC EXAMINATION OF THE DRE

1      MACHINES IN PENNSYLVANIA PRECISELY BECAUSE THERE WAS NO

2      PAPER RECORD?

3      A.      SOME OF THEM DIDN'T HAVE THE PAPER RECORD, AND I

4      DO BELIEVE THAT'S WHAT THE PLAINTIFFS WERE SEEKING.

5                      THE COURT:  DIDN'T YOU TESTIFY AT THE

6      PRELIMINARY INJUNCTION HEARING?

7                      THE WITNESS:  I DID, YOUR HONOR.

8                      THE COURT:  OKAY.

9      BY MR. WIYGUL:

10     Q.      CAN WE CALL UP PLAINTIFFS' COMPLAINT IN THIS

11     CASE WHICH I BELIEVE IS DX A.  YOU'VE SEEN THIS DOCUMENT

12     BEFORE, RIGHT?

13     A.      I HAVE BUT NOT FOR YEARS.

14     Q.      OKAY.  YOU HAD SEEN IT BEFORE YOU TESTIFIED AT

15     THE PRELIMINARY INJUNCTION HEARING, CORRECT?

16     A.      YES, I BELIEVE SO.

17     Q.      CAN WE GO TO PARAGRAPH 15, PLEASE.

18                     THE COURT:  15?

19                     MR. WIYGUL:  YES.

20     BY MR. WIYGUL:

21     Q.      AND CAN YOU BLOW THAT UP, PLEASE.

22                     SECOND SENTENCE SAYS, DRE MACHINES IN

23     PENNSYLVANIA DO NOT LEAVE A PAPER TRAIL ACCESSIBLE TO

24     VOTERS OR ANYONE ELSE.  VOTERS TOUCH BOXES ON A SCREEN

25     AND GET NO PAPER CONFIRMATION OF THEIR VOTE AND HOPE

1    THEIR VOTES ARE COUNTED ACCURATELY.

2                    DO YOU SEE THAT?

3    A.    YES.

4    Q.    AND CAN YOU GO TO PARAGRAPH 21, PLEASE.  SORRY,

5    CAN YOU BLOW THAT UP?

6                    THIS PARAGRAPH SAYS:  FOR COUNTIES THAT

7    USE DRE MACHINES, THERE IS NO PAPER BALLOT AND IT IS

8    IMPOSSIBLE FOR VOTERS TO VERIFY EVEN A SINGLE DRE VOTE

9    ON A PIECE OF PAPER.

10                   DO YOU SEE THAT?

11   A.    YES, I DO.

12   Q.    SO IT WAS CLEAR FROM PLAINTIFFS' COMPLAINT THAT

13   WHAT THEY WERE SEEKING OR PART OF WHAT THEY WERE SEEKING

14   WAS VOTING MACHINES THAT WOULD PROVIDE A PAPER TRAIL,

15   CORRECT, THAT COULD BE VERIFIED?

16   A.    FROM THEIR -- YES, THAT IS PART OF WHAT THEY

17   WERE SEEKING.

18   Q.    SO LET'S TALK A LITTLE BIT MORE ABOUT DRE'S WITH

19   VVPATS.  NOW, SOME BALLOT-MARKING DEVICES, I THINK YOU

20   EXPLAINED, THE VOTER INPUTS THEIR SELECTIONS ON A

21   TOUCHSCREEN, THE MACHINE THEN PRINTS A BALLOT OR PRINTS

22   A PAPER RECORD OF THE VOTE, IF YOU PREFER, CORRECT?

23   A.    SOME PRINT A BALLOT AND SOME PRINT A SUMMARY

24   CARD, THAT'S CORRECT.

25   Q.    A PAPER RECORD OF THE VOTE.  THEY ALL PRINT

1    PAPER RECORDS OF THE VOTE?

2    A.      YES.

3    Q.      AND SO FAR IN THIS DESCRIPTION, THAT DESCRIBES

4    THE EXPRESSVOTE XL MACHINE, CORRECT?

5    A.      YES.

6    Q.      AND THEN IN SOME MACHINES, THE MACHINE THEN

7    EJECTS THE BALLOT, RIGHT?

8    A.      IT --

9    Q.      THE PAPER RECORD?

10   A.      YES.

11   Q.      RIGHT.  AND THEN THE VOTER GOES ACROSS THE ROOM

12   OR WHEREVER THEY HAVE TO GO TO A SEPARATE OPTICAL SCAN

13   MACHINE, CORRECT?

14   A.      YES.

15   Q.      AND THEN INSERT THE BALLOT, AND THEN THE OPTICAL

16   SCAN MACHINE SCANS AND TABULATES THAT BALLOT, CORRECT?

17   A.      THAT'S CORRECT.

18   Q.      AND FOR HAND-MARKED PAPER BALLOT, THE SETUP

19   WOULD TYPICALLY BE THE VOTER GETS THE BALLOT THAT IS

20   BLANK, HAS NOT BEEN FILLED IN WITH SELECTIONS, THEY MARK

21   IT, AND THEN THEY TAKE IT TO AN OPTICAL SCAN MACHINE

22   WHICH SCANS THE BALLOT AND TABULATES THE VOTE, CORRECT?

23   A.      YES.

24   Q.      AND WHAT THE XL MACHINE DOES IS THAT SCANNING

25   FUNCTION, RATHER THAN HAVING THEM TAKE THE BALLOT ACROSS

1    THE ROOM, THE SCANNING FUNCTION IS PART OF THE SAME

2    MACHINE, CORRECT?

3                    MR. MAAZEL:  OBJECTION TO THE WORD

4    "BALLOT."

5                    MR. WIYGUL:  PAPER RECORD, I'M SORRY,

6    FORCE OF HABIT, YOUR HONOR.

7                    THE WITNESS:  THOSE FUNCTIONS ARE

8    INTEGRATED INTO THE SAME PHYSICAL AND LOGICAL UNIT.

9    BY MR. WIYGUL:

10   Q.      AND AGAIN, WHAT THE MACHINE IS SCANNING TO

11   TABULATE THE VOTE, AND BY THE MACHINE NOW I AM REFERRING

12   TO THE XL SPECIFICALLY, IS THAT PAPER RECORD?

13   A.      IS THE BARCODE, SPECIFICALLY.

14   Q.      ON THE PAPER RECORD?

15   A.      ON THE PIECE OF PAPER.

16   Q.      CORRECT?

17                   JUST AS AN OPTICAL SCAN MACHINE, WHEN YOU

18   FEED IN THE HAND-MARKED PAPER BALLOT IS SCANNING THE

19   MARKS AND LOOKING AT THE TIMING CODES AND BASED ON THAT

20   USING THE SOFTWARE TO DETERMINE HOW THAT VOTE SHOULD BE

21   TABULATED, CORRECT?

22   A.      SO -- YES.

23   Q.      OKAY.  YOU ARE AWARE THAT THERE IS ANOTHER

24   EXPRESSVOTE MACHINE BESIDES THE EXPRESSVOTE XL?

25   A.      AT LEAST ONE OTHER.

1    Q.        AND THE "XL" IN EXPRESSVOTE XL STANDS FOR EXTRA

2    LARGE, CORRECT?

3    A.        I DON'T KNOW WHAT IT STANDS FOR.

4    Q.        AND ANOTHER EXPRESSVOTE MACHINE IS EXPRESSVOTE

5    2.1, CORRECT?

6    A.        YES.

7    Q.        AND THAT'S PART OF THE SAME SUITE, RIGHT?

8    A.        YES.

9    Q.        CAN YOU CALL UP JX 56, PLEASE?

10                  THE COURT:  56?

11                  MR. WIYGUL:  56.

12   BY MR. WIYGUL:

13   Q.        AND I BELIEVE THE TESTIMONY HAS BEEN THAT THIS

14   IS AN EXAMPLE OF A PAPER VOTING RECORD PRODUCED BY THE

15   EXPRESSVOTE 2.1.  DO YOU HAVE ANY REASON TO DISPUTE

16   THAT?

17   A.        NO, I HAVE NO REASON TO DISPUTE THAT.

18   Q.        THE FORMAT OF THIS EXPRESSVOTE NON XL PAPER

19   RECORD IS THE SAME AS THE XL PAPER RECORD, RIGHT?  IN

20   FACT -- CAN YOU CLOSE THAT EXHIBIT 57?

21                  AND BY FORMAT I MEAN THAT THERE ARE

22   BARCODES AT THE TOP ON WHICH THE VOTER SELECTS --

23   THERE'S A MASTER BARCODE AND THEN THERE ARE BARCODES AND

24   CODING OF OTHER SELECTIONS, CORRECT?

25   A.        YES.

1    Q.      AND THEN PLAIN TEXT READABLE BY THE VOTER THAT

2    SAYS WHAT THE SELECTIONS ARE UNDERNEATH, CORRECT?

3    A.      THAT'S CORRECT.

4    Q.      AND THE FORMAT OF 56 AND 57, THE EXPRESSVOTE 2.1

5    AND THE EXPRESSVOTE XL, PAPER RECORD ARE THE SAME,

6    CORRECT?

7    A.      THE FORMAT IS THE SAME BUT THE MODALITY OF WHAT

8    THE VOTER DOES WITH IT IS COMPLETELY DIFFERENT.

9    Q.      I AM JUST ASKING YOU ABOUT THE PAPER RECORD IN

10   PARTICULAR.

11   A.      YES.

12   Q.      YOU AGREE THEY ARE THE SAME?

13   A.      YES.

14   Q.      IN TERMS OF THE MODALITIES AS YOU DESCRIBE IT,

15   THE EXPRESSVOTE 2.1 CAN BE CONFIGURED, AND IN FACT IN

16   SOME COUNTIES IN PENNSYLVANIA IS CONFIGURED, TO ACT AS

17   BOTH A BALLOT-MARKING DEVICE AND A TABULATOR, CORRECT?

18   A.      YES, IT CAN BE.

19   Q.      AND WHEN IT IS CONFIGURED IN THAT WAY, IT IS

20   SIMILARLY A HYBRID MACHINE IN THE WAY THAT THE XL IS,

21   CORRECT?

22   A.      THAT'S RIGHT, THAT THE XL CAN'T BE CONFIGURED

23   ANY OTHER WAY IN PENNSYLVANIA.

24   Q.      SO THE ANSWER IS YES, CORRECT?

25   A.      YES.

1    Q.       OKAY.  THE EXPRESSVOTE 2.1 MACHINE, AFTER THE

2    VOTER SAYS PRINT THE PAPER RECORD, THE MACHINE EJECTS

3    IT, RIGHT?

4    A.       YES.

5    Q.       OKAY.  THE VOTER CAN THEN INSPECT IT AND VERIFY

6    IT, CORRECT?

7    A.       YES, AND I THINK YOU ARE HITTING ON THE CRITICAL

8    DIFFERENCE.

9              THE COURT:  PLEASE, PLEASE, ANSWER THE

10   QUESTION THAT IS ASKED AND NOTHING MORE.

11             MR. WIYGUL:  I'M SORRY, YOUR HONOR.

12             THE COURT:  GO AHEAD.

13   BY MR. WIYGUL:

14   Q.       AND THEN THE VOTER, ONCE THE VOTER IS SATISFIED

15   THAT THE PAPER RECORD ACCURATELY REFLECTS HIS OR HER

16   VOTE INSERTS IT BACK INTO THE MACHINE, CORRECT?

17   A.       YES.

18   Q.       AND THEN THE MACHINE -- THE SAME MACHINE THAT IT

19   POPPED OUT OF THAT PRINTED IT, RIGHT?

20   A.       IT CAN BE THE SAME MACHINE.

21   Q.       AND IN FACT, IT'S THE SAME SLOT, RIGHT?  THE

22   VOTER INSERTS IT BACK INTO THE SAME SPOT IT POPS OUT OF?

23   A.       SO IT CAN BE THE SAME MACHINE OR THEY CAN INSERT

24   IT INTO A SCANNER, INTO A DS200.

25   Q.       AND IF THE VOTER INSERTS IT BACK INTO THE

1    MACHINE, THAT'S HOW IT'S CONFIGURED, THE VOTER INSERTS

2    IT INTO THE SAME SLOT THAT THE PRINTED PAPER RECORD IS

3    PRODUCED TO THE VOTER FROM?

4    A.      I BELIEVE THAT'S HOW IT WORKS, YES.

5    Q.      AND THEN THE MACHINE SCANS AND TABULATES THE

6    VOTE FROM THAT PAPER RECORD, CORRECT?

7    A.      YES.

8    Q.      ALL RIGHT.  SO THE XL, THE XL GENERALLY IS NOT

9    DESIGNED TO EJECT THE BALLOT FOR THE VOTER TO HANDLE,

10   CORRECT?

11   A.      IT CAN'T EJECT IT FOR THE VOTER TO HANDLE IN --

12   AND THEN COUNT IT IN THE PENNSYLVANIA CONFIGURATION.

13   Q.      THERE IS NO WAY IT CAN DO THAT?

14   A.      UNLESS THE VOTER SAYS THAT THEY WANT TO CANCEL

15   THE BALLOT, IT'S NOT GOING TO EJECT IT.

16   Q.      IF THE VOTER SAYS --

17   A.      AND EXCUSE ME, SUMMARY CARD.

18   Q.      LET ME ASK ONE QUESTION FIRST.  THE EXPRESSVOTE

19   2.1 THAT WE HAVE BEEN TALKING ABOUT CONFIGURED IN

20   TABULATOR MODE, IT IS YOUR POSITION THAT THAT IS ALSO A

21   DRE WITH A VVPAT OR DO YOU TAKE A DIFFERENT VIEW?

22   A.      I THINK THAT THAT IS -- IF -- THERE IS A CERTAIN

23   AMOUNT OF GRAY AREA BETWEEN THE TWO, AND THE XL IS -- MY

24   POSITION IS THAT THE XL IS NOT EVEN IN THE GRAY AREA.

25   THAT MAY BE IN A GRAY AREA.  I HAVE NOT THOUGHT ABOUT

1   THAT TERRIBLY DEEPLY YET.

2   Q.      SO YOUR ANSWER IS I DON'T KNOW FOR WHETHER THE

3   EXPRESSVOTE 2.1 IN TABULATOR MODE --

4                   THE COURT:  I THINK HIS ANSWER IS HE HAS

5   NOT MADE UP HIS MIND.

6                   THE WITNESS:  I THINK THAT'S PROBABLY

7   RIGHT.

8   BY MR. WIYGUL:

9   Q.      SO THE EXPRESS VOTE -- GOING BACK TO HOW THE

10  EXPRESSVOTE XL FUNCTIONS, IT GENERALLY DOES NOT EJECT

11  THE BALLOT, RIGHT?  HOWEVER, IT CAN EJECT THE BALLOT,

12  IT'S PHYSICALLY CAPABLE OF EJECTING THE BALLOT, CORRECT?

13  A.      AND IN FACT, LATER VERSIONS OF THE SOFTWARE THAN

14  ONCE CERTIFIED IN PENNSYLVANIA CAN BE USED IN THAT WAY,

15  THAT EJECTS THE BALLOT TO BE SCANNED SOMEWHERE ELSE,

16  WHICH IS -- IF IT'S SCANNED SOMEWHERE ELSE, NOT LIKE THE

17  VVPAT.

18  Q.      WHICH IS PROOF THAT THE HARDWARE ITSELF CAN BE

19  CABLE OF EJECTING THE BALLOT, CORRECT?

20  A.      YES, THOUGH IT CAN ALSO BE CONFIGURED NOT TO

21  SHOW THE BALLOT TO THE VOTER AT ALL.

22                  THE COURT:  SIR, WERE YOU HERE WHEN I

23  INDICATED THAT MR. GATES WAS ACTING LIKE A LAWYER AND

24  NOT A WITNESS?  HE WAS ADVOCATING FOR HIS SIDE.  WERE

25  YOU HERE FOR THAT?

1          THE WITNESS:  YES, I WAS.

2          THE COURT:   I WOULD ASK YOU TO BEAR THAT

3     ADMONITION IN MIND.

4          GO AHEAD.

5     BY MR. WIYGUL:

6     Q.     SINCE YOU MENTIONED THAT THOUGH, DR. HALDERMAN,

7     YOUR TESTIMONY WAS ALSO THAT THAT CONFIGURATION WHERE A

8     VOTER CAN OPT OUT OF HAVING THE OPPORTUNITY TO REVIEW

9     THEIR BALLOT HAD IT NOT BEEN CERTIFIED, THAT'S NOT

10    ALLOWED IN PENNSYLVANIA, CORRECT?

11    A.     THAT'S CORRECT.

12    Q.     SO I THINK WHERE WE WERE WAS THE XL MACHINE CAN

13    EJECT THE BALLOT TO BE HANDLED BY THE VOTER, CORRECT?

14    A.     NOT AS USED IN PENNSYLVANIA, NO.

15    Q.     I AM JUST ASKING WHETHER IT'S PHYSICALLY CAPABLE

16    OF DOING THAT?

17    A.     THE SAME HARDWARE IS PHYSICALLY CAPABLE.

18    Q.     AND IN FACT, THE VERSION OF THE XL THAT IS

19    CONFIGURED FOR USE IN PENNSYLVANIA DOES EJECT THE BALLOT

20    IN SOME CIRCUMSTANCES, CORRECT?

21    A.     THE SUMMARY CARD, AND IF THE VOTER -- IF THE

22    VOTER WISHES TO SPOIL IT AND NOT CAST IT.

23    Q.     AND WHEN IT'S EJECTED IN THOSE CIRCUMSTANCES,

24    ISN'T IT TRUE THAT IF THE VOTER THEN INSPECTS THE BALLOT

25    AND DECIDES ACTUALLY, YOU KNOW WHAT, I ACTED TOO

1    HASTILY, I AM ACTUALLY FINE WITH THIS, I WANT THIS TO BE

2    COUNTED AS MY VOTE, THEY CAN THEN INSERT IT BACK IN THE

3    MACHINE WHERE IT CAN BE TABULATED, CORRECT?

4    A.      I DON'T KNOW THE ANSWER TO THAT.

5    Q.      YOU DON'T KNOW THE ANSWER TO THAT.

6            ISN'T IT ALSO TRUE THAT IN LIEU OF THAT

7    THEY COULD TAKE THAT SAME BALLOT CARD TO ANOTHER

8    SCANNING MACHINE, A SEPARATE AND ES&S SCANNING MACHINE

9    AND HAVE IT TABULATED BY THAT SCANNING MACHINE?

10   A.      I DON'T KNOW THE ANSWER TO THAT IN THE

11   CONFIGURATION THAT PENNSYLVANIA USES.

12   Q.      OKAY.  SO AS I UNDERSTOOD YOUR DECLARATION,

13   SIR -- FIRST OF ALL, YOU DID SUBMIT A DECLARATION IN

14   SUPPORT OF THE PREVIOUS MOTION IN THIS PROCEEDING,

15   CORRECT?

16   A.      I DID.

17   Q.      I AM GOING TO RELY A LITTLE BIT MORE HEAVILY ON

18   YOUR DECLARATION BECAUSE I THINK IT WAS MORE LUCID TO ME

19   AND I COULD UNDERSTAND IT A LITTLE BIT MORE EASILY THAN

20   YOUR TESTIMONY TODAY, SO LET ME KNOW IF YOU THINK YOU

21   ARE SAYING SOMETHING DIFFERENT IN YOUR TESTIMONY TODAY

22   THAN YOU SAID IN YOUR DECLARATION.

23           AS I UNDERSTOOD YOUR DECLARATION, YOU

24   WERE IDENTIFYING THREE THEORETICAL VULNERABILITIES THAT

25   YOU SAW AS ARISING OUT OF THE DESIGN OF THE XL MACHINE.

1      IS THAT A FAIR CHARACTERIZATION OF YOUR VIEW?

2      A.      THE THREE -- YES.  DEPENDING ON WHAT YOU MEAN BY

3      THEORETICAL, BUT YES.

4      Q.      AND ONE OF THEM THAT YOU IDENTIFIED WAS -- AROSE

5      FROM THE FACT THAT THE XL MACHINE PRINTS AND SCANS

6      BARCODES, CORRECT?

7      A.      YES.

8      Q.      AND YOU THOUGHT IT WAS -- YOU SAID IT WOULD BE

9      FEASIBLE FOR MALWARE TO CAUSE THE MACHINE TO PRINT

10     BARCODES THAT DIDN'T CORRESPOND TO THE TEXT THAT WAS

11     PRINTED BELOW IN THAT VOTER-VERIFIABLE, CORRECT?

12     A.      YES.

13     Q.      SITTING HERE TODAY, YOU DON'T HAVE ANY EVIDENCE

14     THAT ANY EXPRESSVOTE XL MACHINE HAS ACTUALLY DONE THAT

15     IN ANY ELECTION, ISN'T THAT RIGHT?

16     A.      NO, I DON'T.

17     Q.      YOU TALKED EARLIER ABOUT AUDITS.  AND --

18             THE COURT:  IF IT'S NEVER HAPPENED, HOW

19     DO YOU KNOW IT'S POSSIBLE?

20             THE WITNESS:  WELL, BECAUSE THE

21     EXPRESSVOTE MACHINES ARE COMPLEX COMPUTER SYSTEMS, AND

22     WHAT GETS PRINTED THERE IS UNDER THE CONTROL OF THAT

23     COMPUTER SYSTEM.  AND EVERY COMPUTER SYSTEM OF

24     SUFFICIENT COMPLEXITY HAS HAD EXPLOITABLE

25     VULNERABILITIES BEFORE.

1                          THE COURT:  OKAY.

2      BY MR. WIYGUL:

3      Q.      AND JUST SO WE HAVE A SENSE OF HOW MANY

4      ELECTIONS WE ARE TALKING ABOUT, YOU DESCRIBED -- I THINK

5      IT WAS THREE, MAYBE IT WAS TWO ELECTIONS IN PENNSYLVANIA

6      WHERE THE XL HAS BEEN USED.  DO YOU RECALL THAT

7      TESTIMONY?

8      A.      I AM SORRY, FROM THE DECLARATION DO YOU MEAN?

9      Q.      NO, I MEAN FROM YOUR DIRECT TESTIMONY.  YOU

10     DESCRIBED, I DON'T KNOW IF IT WAS 2 OR 3 OR 4, BUT A

11     HANDFUL OF ELECTIONS WHERE YOU KNEW THE XL HAD BEEN USED

12     TO DATE, CORRECT?

13     A.      NO, I DON'T RECALL TESTIFYING ABOUT THAT.

14     Q.      STRIKE THAT.  I WILL ASK THE QUESTION.

15                     THE XL HAS BEEN CERTIFIED FOR USE IN

16     PENNSYLVANIA, CORRECT, WE KNOW THAT?

17     A.      YES.

18     Q.      IT HAS ALSO BEEN CERTIFIED FOR USE IN SEVERAL

19     OTHER STATES, CORRECT?

20     A.      YES.

21     Q.      AND IT HAS BEEN USED IN ELECTIONS IN

22     PENNSYLVANIA, CORRECT?

23     A.      ALL VERY RECENTLY, AND SINCE 2016 WHEN THE LAST

24     MAJOR ATTACKS ON AN ELECTION OCCURRED, TO MY KNOWLEDGE.

25     Q.      I UNDERSTAND THAT AS A YES.

1          IT HAS BEEN USED IN ELECTIONS IN OTHER

2     STATES, CORRECT?

3     A.     YES.

4     Q.     AND IT WAS -- IT HAD BEEN USED IN ELECTIONS

5     PRIOR TO THE SIGNING OF THE SETTLEMENT AGREEMENT IN THIS

6     CASE, CORRECT?

7     A.     I DON'T KNOW FOR SURE.

8     Q.     OKAY.  IN NONE OF THOSE ELECTIONS ARE YOU AWARE

9     OF THE EXPRESSVOTE XL EVER HAVING PRINTED BARCODES THAT

10    FAILED TO MATCH THE HUMAN READABLE TEXT, IS THAT RIGHT?

11    A.     I AM NOT AWARE THAT PEOPLE CHECKED IN THE VAST

12    MAJORITY OF THOSE CASES.

13    Q.     IN TERMS OF PEOPLE CHECKING, THERE HAS BEEN

14    TESTIMONY ABOUT A PILOT RISK-LIMITING AUDIT THAT

15    PHILADELPHIA PERFORMED IN CONJUNCTION WITH --

16    IMMEDIATELY FOLLOWING THIS PAST NOVEMBER GENERAL

17    ELECTION, CORRECT?

18    A.     YES.

19    Q.     AND IN FACT, I DON'T KNOW IF THIS CAME OUT IN

20    YOUR DIRECT TESTIMONY, BUT YOU ARE AFFILIATED WITH THE

21    UNIVERSITY OF MICHIGAN, IS THAT RIGHT?

22    A.     I AM.

23    Q.     YOU ARE A PROFESSOR THERE?

24    A.     I AM.

25    Q.     AND UNIVERSITY OF MICHIGAN WAS ACTUALLY ONE OF A

1    CONSORTIUM OF GROUPS AND MIGHT HAVE HAD I THINK IT WAS

2    THE AUDIT BRAIN TRUST THAT WAS INVOLVED IN THE DESIGN

3    AND IMPLEMENTATION OF THAT PILOT AUDIT IN PHILADELPHIA,

4    CORRECT?

5    A.    NO, I DON'T THINK THAT'S CORRECT THAT WE WERE,

6    AS AN ORGANIZATION, INVOLVED IN THAT.  I THINK THERE

7    MIGHT HAVE BEEN ONE PERSON WHO ACTUALLY IS A PH.D.

8    STUDENT WHO HAS A MICHIGAN AFFILIATION THAT WAS

9    INVOLVED, BUT I DON'T KNOW FOR SURE.

10   Q.    NOT JUST A PH.D. STUDENT, YOUR GRADUATE STUDENT

11   IN PARTICULAR, CORRECT?

12   A.    THAT'S CORRECT.

13   Q.    AND SO THAT -- WHEN TALKING -- WE'VE HEARD ABOUT

14   THE SIZE OF PHILADELPHIA AS A VOTING JURISDICTION.  YOU

15   DON'T DISPUTE THAT IT'S A RELATIVELY LARGE VOTING

16   JURISDICTION, RIGHT?

17   A.    IT IS LARGE.

18   Q.    SO THERE WAS A RISK-LIMITING PILOT AUDIT IN

19   PHILADELPHIA, AND THAT'S ONE OF THE ELECTIONS WHERE

20   THERE IS NO EVIDENCE OF ANY MISMATCH BETWEEN THE

21   BARCODES AND THE PRINTED TEXT, CORRECT?

22   A.    THAT'S CORRECT.

23   Q.    NOW, LET'S GO BACK TO TALKING ABOUT HAND-MARKED

24   BALLOTS AND OPTICAL SCAN MACHINES FOR A SECOND.

25         LET'S SAY THAT THERE IS HAND-MARKED

1      BALLOT AND I NEED TO FILL IN A BUBBLE NEXT TO EITHER --

2      I WILL BE ACCOMMODATING TO THE WITNESS, MICHIGAN OR OHIO

3      STATE.   SO THAT'S THE ELECTION.

4      A.      RIGHT.

5      Q.      AND I FILL IN THE BUBBLE NEXT TO MICHIGAN, I

6      WANT TO VOTE FOR MICHIGAN.   IT'S POSSIBLE THAT THE

7      SCANNING MACHINE, WHICH RUNS ON SOFTWARE, CORRECT?

8      A.      YES.

9      Q.      THE SCANNING MACHINE HAS BEEN HACKED SO IT SAYS

10     WHENEVER YOU SEE A BUBBLE FILLED IN AT THE COORDINATE

11     THAT HAPPENS TO BE NEXT TO THE MICHIGAN TEXT, WHICH IS

12     NOT READ BY THE SCANNING MACHINE, CORRECT, THE TEXT?

13     A.      THE BUBBLE IS WHAT IS SENSED.

14     Q.      SO THE MACHINE HAS BEEN PROGRAMMED TO SAY,

15     WHENEVER YOU SEE A BUBBLE THERE NEXT TO MICHIGAN, YOU

16     SHOULD COUNT THAT AS A VOTE FOR OHIO STATE.   THAT IS

17     FEASIBLE, CORRECT?   MALWARE COULD DO THAT.

18     A.      YES.

19     Q.      AND THE VOTER WOULD NOT HAVE ANY IDEA THAT THAT

20     HAD HAPPENED.   THERE IS NO REASON TO THINK THE VOTER

21     WOULD, RIGHT?

22     A.      THAT'S RIGHT.

23     Q.      AND THE PROTECTION THAT ONE WOULD HOPE THAT

24     MICHIGAN FANS WOULD HAVE IN A SITUATION LIKE THAT IS

25     FROM SOMETHING LIKE A POST-ELECTION AUDIT, CORRECT?

1    A.        THE PROTECTION COMES FROM TWO THINGS, FROM THE

2    VOTER KNOWING THAT THE BALLOT REFLECTS THEIR INTENT, AND

3    FROM THE AUDIT WITHOUT MACHINERY IN THE WAY, INSPECTING

4    A SUFFICIENT NUMBER OF THOSE BALLOTS TO BE CONFIDENT

5    THAT ALL OF THEM MATCHED -- THE WHOLE SET MATCHES THE

6    OUTCOME.

7    BY THE COURT:

8    Q.        HOW WOULD SOMEBODY GET MALWARE INTO ONE OF THESE

9    XL MACHINES, SAY THE ONE RIGHT THERE.  HOW WOULD THEY DO

10   THAT?

11   A.        WELL, SO THERE ARE A NUMBER OF WAYS THAT VOTING

12   MACHINE MALWARE CAN BE SPREAD.  IT CAN BE SPREAD PRIOR

13   TO -- IN THE MANUFACTURING PROCESS OF THE MACHINE IT

14   COULD POTENTIALLY BE SPREAD.  IT COULD BE POTENTIALLY

15   SPREAD WHEN ELECTION OFFICIALS ARE PROGRAMMING THE

16   MACHINE BEFORE THE ELECTION, WHEN THEY ARE LOADING THE

17   PROGRAMMING THAT TELLS IT HOW THE BALLOT IS LAID OUT AND

18   HOW IT SHOULD BE COUNTING THEM.  AND IT COULD BE

19   POTENTIALLY SPREAD BY SOMEONE WHO HAS PHYSICAL ACCESS TO

20   THE MACHINE.

21   Q.        THE MACHINES, 3,700 I THINK IS WHAT WAS SAID,

22   ARE IN THE POLLING PLACES IN PHILADELPHIA.  WHY DON'T

23   YOU ASSUME FOR A MOMENT THAT THEY HAVE BEEN SUBJECT TO

24   VARIOUS CHECKS.  WE MAY GET TESTIMONY ON THAT.  AS I

25   RECALL WE HAD A FAIR AMOUNT OF TESTIMONY ON THAT ON IN

1   2016.

2                 ONCE THE MACHINES ARE OUT BEFORE THE

3   POLLS OPEN, YOU ARE SAYING THAT SOMEONE WOULD HAVE TO

4   WHAT, GET INTO THE POLLING PLACE AND DO WHAT TO THE

5   MACHINE, PHYSICALLY DO WHAT TO THE MACHINE?

6   A.      SO IT IS POSSIBLE BEFORE THE POLLS HAVE EVEN

7   OPENED --

8   Q.      YOU REALLY DON'T WANT TO ANSWER THE QUESTION I

9   ASKED, DO YOU?

10                I AM TELLING YOU, IF SOMEONE WANTS TO

11  INSERT MALWARE INTO THE MACHINE, HOW WOULD HE OR SHE DO

12  IT?

13  A.      IF THEY HAVEN'T PRIOR TO THE OPENING OF THE

14  POLLS?

15  Q.      YES.

16  A.      SO AFTER THE MACHINE IS ALREADY IN THE POLLING

17  PLACE, THERE ARE A FEW DIFFERENT WAYS THAT I CAN IMAGINE

18  SOMEONE MIGHT --

19  Q.      YOU CAN IMAGINE SOMEONE MIGHT.

20  A.      THERE ARE --

21  Q.      YOU ARE UNAWARE OF ANYONE EVER HAVING ACTUALLY

22  DONE IT.  HAVE YOU EVER SEEN IT DONE?

23  A.      I DON'T.  I HAVE NO EVIDENCE THAT ANYONE HAS

24  EVER DONE THAT TO THESE MACHINES.

25  Q.      HAVE YOU EVER SEEN IT DONE AS AN EXPERIMENT?

1    A.      NO, I HAVEN'T.

2    Q.      SO YOU ARE GOING TO IMAGINE.  SO LET'S IMAGINE.

3    COULD WE TAKE THE -- MS. FERRARI, COULD YOU TAKE THE

4    VEIL OFF THE MACHINE?

5              MR. FIELD:  YOUR HONOR, THE MACHINE HAS

6    SEALS ON IT THAT ARE THERE AT THE START OF THE ELECTION

7    DAY.  MR. LYNCH CAN TAKE THOSE OFF SO THAT --

8              THE COURT:  I JUST WANT THE CURTAIN

9    REMOVED.

10             MR. FIELD:  THE CURTAIN IS LITERALLY

11   SEALED.

12             THE COURT:  THE CURTAIN IS SEALED?

13             MR. FIELD:  YES.

14             THE COURT:  SO THEY WOULD BE SEALED --

15   WELL, HE IS NOT TESTIFYING.

16             MR. FIELD:  WE CAN DOING THAT LATER, IF

17   YOU WANT.

18             THE COURT:  LET'S ASSUME FOR A MOMENT --

19   YOU CAN SIT DOWN.  IT'S OKAY.

20   BY THE COURT:

21   Q.      SO THE FIRST THING THE PERSON WOULD HAVE TO DO

22   IS BREAK THE SEAL ON THE TARP THAT IS COVERING THE

23   MACHINE, CORRECT?

24   A.      THAT'S CORRECT.

25   Q.      AND THEN DO WHAT?  HAVE YOU EVER OPENED UP ONE

1    OF THESE MACHINES YOURSELF?

2    A.      I HAVE NOT OPENED UP AN EXPRESSVOTE XL.  SO THIS

3    WOULD BE -- THIS IS THE FIRST TIME THAT I WOULD BE

4    SEEING IT OPENED UP LIKE THAT.  I HAVE BROKEN SEALS LIKE

5    THAT BEFORE, BUT...

6    Q.      OKAY.  WHY DON'T YOU GO ON?

7    A.      ONE THAT DOES NOT LEAVE EVIDENCE.

8                MR. WIYGUL:  THANK YOU, YOUR HONOR.

9    BY MR. WIYGUL:

10   Q.      I THINK WE WERE TALKING ABOUT THIS HYPOTHETICAL

11   MICHIGAN-OHIO STATE ELECTION CONDUCTED ON A HAND-MARKED

12   PAPER BALLOT FOR THE OPTICAL SCAN TABULATION, RIGHT?

13   A.      YES, I THINK SO.

14   Q.      DO YOU RECALL THE EXAMPLE?

15   A.      YES.

16   Q.      AND I THINK YOU HAD JUST TESTIFIED THAT THE WAY,

17   OR AT LEAST ONE OF THE WAYS THAT MICHIGAN FANS WOULD BE

18   PROTECTED IN A CIRCUMSTANCE LIKE THAT IS BY AN AUDIT

19   WHICH WOULD COMPARE BY MANUALLY INSPECTING WHERE THE

20   MARKS WERE, WERE THEY NEXT TO MICHIGAN OR OHIO STATE,

21   AND DOING A COUNT THAT WAY AND COMPARING THAT COUNT WITH

22   WHAT THE MACHINE COUNT WAS, CORRECT?

23   A.      WELL, THE AUDIT IS READING THE TEXT THAT THE

24   VOTER CAN SEE AND SEEING THAT THE OVAL IS FILLED IN,

25   YES.

1    Q.      YES.   THAT'S BASICALLY HOW THE AUDIT WORKS,

2    CORRECT?

3    A.      THAT'S WHAT THEY ARE SAYING.   YES.

4    Q.      AND THAT'S THE BASIC MECHANICS OF THE AUDIT.

5    A.      YES.

6    Q.      AND THERE'S STATISTICAL QUESTIONS ABOUT WHAT

7    DEGREE OF CONFIDENCE DO YOU WANT TO HAVE AND HOW FAR

8    APART IS THE VOTE AT THE OUTSET THAT HELPED YOU TO

9    DETERMINE WHAT THE RIGHT SAMPLE SIZE OF BALLOTS TO

10   INSPECT, CORRECT?

11   A.      THAT'S RIGHT.

12   Q.      AT THE END OF THE DAY, YOU ARE COMPARING THE

13   TEXT THAT A HUMAN BEING CAN READ WITH THE MACHINE COUNT,

14   CORRECT?

15   A.      YES.

16   Q.      SIMILARLY WHEN YOU DO AN AUDIT OF THE

17   EXPRESSVOTE XL OR THE EXPRESSVOTE 2.1 FOR THAT MATTER

18   BALLOT, YOU ARE COMPARING THE TEXT THAT THE VOTER IS

19   ABLE TO READ AND VERIFY WITH THE COUNTS IN THE MACHINE

20   AS PRODUCED BY THE SCANNED BARCODES, CORRECT?

21   A.      YOU ARE COMPARING THE -- YES, THAT'S CORRECT.

22   Q.      AND SO WHAT THE AUDIT IS DESIGNED TO DO, AMONG

23   OTHER THINGS, PERHAPS, IS TO IDENTIFY IF THERE IS A

24   MISMATCH BETWEEN THE INFORMATION CODED IN THE BARCODES

25   AND THE PLAIN TEXT SELECTIONS THAT THE VOTER HAS

1    VERIFIED, CORRECT?

2    A.        THAT MAY NOT BE THE DESIGN INTENT OF THE AUDIT.

3    THE DESIGN INTENT IS TO VERIFY THE ELECTION OUTCOME, IF

4    THAT IS HOW YOUR AUDIT IS FUNCTIONING, TYPICALLY, YES.

5    Q.        BUT IN THE COURSE OF CONDUCTING THAT AUDIT, I

6    THINK YOUR TESTIMONY WAS YOU ARE GOING TO BE COMPARING

7    THE MACHINE COUNT FROM THE BARCODE WITH THE MANUAL

8    INSPECTED COUNT FROM THE TEXT, RIGHT?

9    A.        YES, THAT'S CORRECT.

10   Q.        SO IF THERE WERE A DISCREPANCY, THAT WOULD BE

11   IDENTIFIED ALONG THE WAY, CORRECT?

12   A.        THAT'S RIGHT.

13   Q.        OKAY.  LET'S TALK ABOUT WHAT I UNDERSTOOD TO BE

14   THE SECOND THEORETICAL ISSUE THAT YOU RAISED IN YOUR

15   DECLARATION.  AND I AM JUST GOING TO CALL THAT FOR

16   SHORTHAND THE PRINTHEAD ISSUE.  YOU WILL UNDERSTAND WHAT

17   I MEAN BY THAT?

18   A.        YES.

19   Q.        THE DESIGN FEATURE THERE THAT YOU ARE FOCUSED ON

20   IS THE FACT THAT THE PAPER AFTER THE VOTER HAS VERIFIED

21   IT IN THE WINDOW, RIGHT, AND ON IT'S WAY TO THE BALLOT

22   BOX IT TRAVELS IN A PATH THAT TAKES IT UNDERNEATH THE

23   PRINTHEAD, CORRECT?

24   A.        YOU ARE ASSUMING THE VOTER HAS VERIFIED IT, BUT

25   YES.

1    Q.      OKAY.  THAT'S THE DESIGN FEATURE ON WHICH THIS

2    THEORETICAL VULNERABILITY IS BASED, CORRECT?

3    A.      YES.

4    Q.      YOU SAID IT WOULD BE FEASIBLE FOR MALWARE TO

5    CAUSE THE PRINTHEAD TO ADD ADDITIONAL RACES OR

6    SELECTIONS TO THE PAPER AFTER THE VOTER HAS REVIEWED IT.

7    THAT'S WHAT YOU SAID IN YOUR DECLARATION, CORRECT?

8    A.      YES.

9    Q.      IS THAT CONSISTENT WITH THE TESTIMONY YOU HAVE

10   GIVEN TODAY?

11   A.      YES.

12   Q.      NOW, YOU SEE -- YOU ACTUALLY DON'T SEE AN

13   EXAMPLE OF THIS IN EXHIBIT 57, YOU DON'T SEE AN EXAMPLE

14   OF A RACE WHERE THE VOTER HASN'T MADE THE SELECTION.

15   BUT IN THE IDENTICAL FORMAT BALLOT FOR THE 2.1 HERE,

16   THIS SAMPLE DOES SHOW EXAMPLES OF RACES IN WHICH THERE

17   IS AN UNDERVOTE, RIGHT, THE VOTER COULD HAVE MADE

18   ADDITIONAL SELECTIONS BUT CHOSE NOT TO?

19   A.      I'M SORRY, WHERE ARE YOU POINTING TO?

20   Q.      56, I'M SORRY, IS ON THE LEFT, 57 IS THE ONE ON

21   THE RIGHT.

22              SO MY POINT IS SIMPLY 57 DOES NOT SHOW US

23   AN EXAMPLE OF AN UNDERVOTE, THE VOTER HAS -- LOOKS LIKE,

24   AT LEAST, THE VOTER HAS MADE A SELECTION IN EVERY

25   OPPORTUNITY THEY HAVE.  BY CONTRAST, ON THE LEFT-HAND

1      EXAMPLE, THERE ARE EXAMPLES OF UNDERVOTES, CORRECT?

2      A.      I DON'T KNOW WHAT THE VOTER DID IN 57, BUT --

3      Q.      THAT'S WHAT THE PAPER REFLECTS, CORRECT?

4      A.      YES.

5      Q.      AND SO WHEN THAT HAPPENED, WHEN THE VOTER COULD

6      HAVE VOTED FOR MORE JUDGES OF THE COURT OF COMMON PLEAS

7      THAN IN FACT THEY DID, IT'S NOT BLANK, RIGHT, THE

8      MACHINE PRINTS IN NO SELECTION THERE?

9      A.      IF IT'S FUNCTIONING THE WAY IT'S INTENDED TO,

10     THAT'S RIGHT.

11     Q.      THAT'S HOW IT WAS DESIGNED AT LEAST TO FUNCTION

12     IN THIS SAMPLE ELECTION, CORRECT?

13     A.      THAT'S RIGHT.

14     Q.      THAT IS THE WAY IT CAN BE DESIGNED TO FUNCTION

15     IN PENNSYLVANIA ELECTIONS, CORRECT?

16     A.      WELL, IF THERE -- IF THE MACHINE HAS BEEN

17     INFECTED WITH MALWARE, THEN IT MIGHT JUST LEAVE THAT

18     BLANK.

19     Q.      THAT WAS NOT MY QUESTION, SIR.

20             IT CAN BE DESIGNED TO FUNCTION THAT WAY

21     IN PENNSYLVANIA ELECTIONS, CORRECT?

22     A.      YES, WHEN IT'S FUNCTIONING IN A NON-ATTACK

23     STATE.

24     Q.      IN FACT, IT HAS BEEN DESIGNED TO FUNCTION THAT

25     WAY IN PENNSYLVANIA ELECTIONS, CORRECT?

1    A.      YES.

2    Q.      SO THE THEORETICAL POSSIBILITY THAT YOU RAISE,

3    AND I JUST WANT TO MAKE SURE I UNDERSTAND, IS THAT THE

4    MACHINE, DESPITE BEING DESIGNED TO PRINT NO SELECTION,

5    RIGHT, WOULD, IN FACT, LEAVE A BLANK SPACE THERE.  AND

6    THE VOTER WOULD SEE THE BLANK SPACE AND THINK ALL IS

7    WELL.  AND THEN SOMEHOW THE MALWARE WOULD CAUSE THE

8    MACHINE TO PRINT BACK ON THE BALLOT ON ITS WAY TO THE

9    BALLOT BOX A SELECTION IN THAT BLANK SPACE?

10   A.      YES, THAT'S EXACTLY RIGHT.

11   Q.      SO THAT SCENARIO, AND I THINK THE COURT'S

12   QUESTIONING ELUCIDATED IT, BUT I JUST WANT TO BE CLEAR.

13   THAT SCENARIO -- EVEN THAT SCENARIO ONLY APPLIES IN

14   CASES WHERE THERE IS AN UNDERVOTE, CORRECT?

15   A.      WELL, THE MACHINE COULD ALSO LEAVE OFF ENTIRE

16   RACES AND SO FORTH.  THAT MIGHT BE SPOTTED BY THE VOTER,

17   THOUGH.

18   Q.      RIGHT.  IF THE VOTER WERE ACTUALLY VERIFYING

19   THAT THE RECORD REFLECTED HIS OR HER VOTE IT WOULD BE,

20   RIGHT?

21   A.      IF THEY WERE CAREFULLY VERIFYING IT.

22   Q.      SIMILARLY, THE VOTER COULD BE TOLD THAT WHEN HE

23   VOTES -- WHEN YOU DON'T VOTE IN A PLACE WHERE YOU COULD

24   VOTE, THE MACHINE IS GOING TO PRINT NO SELECTION.  YOU

25   SHOULD LOOK OUT FOR THAT, RIGHT?

1    A.       I AM NOT AWARE OF VOTERS THAT WERE BEING TOLD

2    THAT, BUT THEY COULD BE.

3    Q.       CLEARLY THEY COULD BE, RIGHT?

4    A.       YES, THEY COULD BE.

5    Q.       AND SO THEN IF A VOTER WAS CAREFULLY INSPECTING

6    THEIR BALLOT, IT WOULD SEE, WAIT A MINUTE, THERE IS A

7    BLANK SPACE THERE, CORRECT?

8    A.       THAT'S RIGHT.

9    Q.       OKAY.  IN THE VERY SELECTIONS WE HAVE TALKED

10   ABOUT IN WHICH THE EXPRESSVOTE XL MACHINE HAS BEEN USED,

11   ARE YOU AWARE OF ANY EVIDENCE THAT AN EXPRESSVOTE XL

12   MACHINE HAS EVER PRINTED ADDITIONAL SELECTIONS ON A

13   BALLOT AFTER THE VOTER HAS OPTED TO CAST HIS OR HER

14   VOTE?

15   A.       NO, I AM NOT.

16   Q.       THE THIRD THEORETICAL VULNERABILITY THAT YOU

17   HAVE IDENTIFIED HERE, AS I UNDERSTAND IT, HAS TO DO WITH

18   A SCANNING ISSUE, RIGHT?

19   A.       COULD YOU BE MORE --

20   Q.       SURE.  AS UNDERSTAND IT -- WELL, LET'S START

21   WITH THE DESIGN FEATURE THAT THIS THEORETICAL

22   VULNERABILITY YOU THINK ARISES FROM IS THE FACT THAT THE

23   MACHINE PRINTS THE BALLOT, PRINTS THE PAPER RECORD AND

24   THEN SCANS IT JUST AS IT IS BEING PRESENTED, JUST BEFORE

25   IT IS BEING PRESENTED TO THE VOTER FOR VERIFICATION,

1    RIGHT?

2    A.      YES.

3    Q.      AND IN FACT, THE WAY THE MACHINE IS DESIGNED,

4    THAT SCANNED INFORMATION AT THAT POINT IS HELD IN

5    TEMPORARY MEMORY, CORRECT?

6    A.      THAT'S A QUESTION I THINK BETTER DIRECTED AT THE

7    MANUFACTURER.

8    Q.      IS THE ANSWER YOU DON'T KNOW?

9    A.      THE INFORMATION -- THE ANSWER IS THAT THAT'S

10   WHAT ES&S HAS ASSERTED.

11   Q.      AND THEN IF THE VOTER DECIDES TO CAST HIS OR HER

12   VOTE, THE BALLOT GETS DROPPED IN THE COLLECTION BIN AND

13   THEN THE SCANNED INFORMATION FROM THE BARCODE GETS MOVED

14   OVER TO PERMANENT RECORD -- TO PERMANENT MEMORY AND

15   THAT'S THE TABULATION OF THE VOTE, IS THAT RIGHT?

16   A.      YES.

17   Q.      AND IF THE VOTER SAYS NO, THIS BALLOT IS NOT

18   RIGHT, EITHER IT DOES NOT MATCH WHAT I THOUGHT I ENTERED

19   OR I'VE DECIDED I DON'T ACTUALLY LIKE THESE SELECTIONS

20   AND I OPT TO SPOIL MY BALLOT, THE PAPER RECORD GETS

21   EJECTED, CORRECT?

22   A.      YES.

23   Q.      AND THEN THE MACHINE DOES NOT TABULATE THAT

24   INFORMATION THAT WAS IN TEMPORARY MEMORY, IT GETS

25   FLUSHED, CORRECT?

1    A.        THAT'S HOW IT'S SUPPOSED TO WORK.

2    Q.        WHEN YOU SAY IT WOULD BE FEASIBLE FOR MALWARE TO

3    CAUSE PAPER RECORDS THAT HAVE BEEN REJECTED BY VOTERS TO

4    BE TABULATED AS WELL AS THOSE THAT HAVE BEEN ACCEPTED BY

5    VOTERS?

6    A.        YES.

7    Q.        SITTING HERE TODAY, DO YOU HAVE ANY EVIDENCE OR

8    CAN YOU POINT TO ANY EVIDENCE THAT THAT'S ACTUALLY

9    HAPPENED WITH ANY XL MACHINE THAT HAS BEEN USED IN ANY

10   ELECTION?

11   A.        NO, I CAN'T.

12   Q.        AND IF THAT DID HAPPEN, THERE WOULD BE A

13   MISMATCH BETWEEN THE MACHINE COUNT OF THE VOTE AND WHAT

14   THE VOTE COUNT WOULD SHOW IF YOU MANUALLY INSPECTED THE

15   BALLOTS, CORRECT?

16   A.        WELL, NOT NECESSARILY.  IT COULD JUST FEED THE

17   BALLOT BACK INTO THE BALLOT BOX.

18   Q.        YOU ARE AWARE THAT THERE ARE PROCEDURES

19   GOVERNING SPOILED BALLOTS IN PENNSYLVANIA, CORRECT?

20   A.        I AM.

21   Q.        RIGHT.  AND YOU ARE AWARE THAT THE PROCEDURE

22   WHEN A VOTER OPTS TO SPOIL THE BALLOT IS NOT TO PLACE

23   THAT SPOILED BALLOT IN THE BALLOT BOX, CORRECT?

24   A.        I AM AWARE THAT'S THE PROCEDURE.

25   Q.        SO IF WE ASSUME THAT THE SPOILED BALLOTS, THE

1    PAPER RECORDS, ARE NOT IN THE BALLOT BOX, THEN IF THE

2    SCENARIO THAT YOU CONTEMPLATE WERE TO COME TO PASS,

3    THERE WOULD BE A MISMATCH BETWEEN THE MACHINE TABULATED

4    VOTES AND THE VOTES THAT WOULD BE TABULATED IF YOU WERE

5    TO COUNT THE BALLOTS BY HAND?

6    A.    I SEE.  SO YOU MEAN IF THE MACHINE JUST EJECTED

7    THE BALLOT TO HAVE IT PHYSICALLY SPOILED BUT MAINTAIN

8    THE DIFFERENT DIGITAL RECORD, YES.

9    Q.    I THINK WE ESTABLISHED AT THE OUTSET THAT YOU

10   STARTED WORKING WITH PLAINTIFFS MORE OR LESS AT THE

11   INCEPTION OF THIS LAWSUIT, CORRECT?

12   A.    THAT'S RIGHT.

13   Q.    YOU TESTIFIED AS AN EXPERT AT THE PRELIMINARY

14   INJUNCTION HEARING WHICH WAS IN DECEMBER OF 2016, RIGHT?

15   A.    I DID.

16   Q.    AND PLAINTIFFS CONTINUE TO CONSULT WITH YOU AS

17   THE LAWSUIT PROGRESSED?

18   A.    PERIODICALLY, THAT'S RIGHT.

19   Q.    AND WE ALREADY ESTABLISHED, I THINK, THAT

20   PLAINTIFFS IN THEIR PLEADINGS WERE -- COMPLAINED ABOUT,

21   AMONG OTHER THINGS, PAPERLESS DRE MACHINES IN

22   PENNSYLVANIA, CORRECT?

23   A.    YES.

24   Q.    AND PLAINTIFFS WANTED A PAPER TRAIL, CORRECT?

25   A.    YES, AMONG OTHER THINGS.

1    Q.      THAT WAS THE TERM THEY ACTUALLY USED IN THEIR

2    PLEADINGS REPEATEDLY, RIGHT?

3    A.      YES.

4    Q.      I WANT TO FAST FORWARD TO THE SETTLEMENT

5    DISCUSSIONS IN THIS CASE.

6            YOU ARE AWARE THAT IN SEPTEMBER OF 2018

7    THE COURT RULED ON DEFENDANT'S MOTION TO DISMISS

8    PLAINTIFFS' AMENDED COMPLAINT, RIGHT?

9    A.      YES.

10   Q.      AND THE COURT DISMISSED SOME OF PLAINTIFFS'

11   CLAIMS, BUT OTHERS WERE ALLOWED TO GO FORWARD?

12   A.      I AM ACTUALLY NOT FAMILIAR WITH THE DETAILS.

13   Q.      YOU ARE AWARE THAT THE LITIGATION DID NOT

14   TERMINATE AT THAT POINT?

15   A.      THAT'S RIGHT.

16   Q.      AFTER THAT RULING, THE PARTIES STARTED TO

17   DISCUSS THE POSSIBILITY OF SETTLEMENT IN EARNEST,

18   CORRECT?

19   A.      I WASN'T ACTUALLY PART OF THOSE DISCUSSIONS, BUT

20   THAT'S -- I UNDERSTAND THAT THAT'S WHAT HAPPENED.

21   Q.      SO THAT'S AN IMPORTANT POINT TO CLARIFY.  SO YOU

22   WERE NOT ACTUALLY PARTY TO THE DIRECT DISCUSSIONS

23   BETWEEN THE PLAINTIFFS AND DEFENDANTS, IS THAT RIGHT?

24   A.      I WAS NOT INVOLVED IN THE SETTLEMENT

25   NEGOTIATION.

1   Q.      BUT YOU DID WORK, AND AGAIN, I DON'T WANT

2   SPECIFIC COMMUNICATIONS, BUT YOU DID WORK GENERALLY WITH

3   PLAINTIFFS IN CONNECTION WITH THE SETTLEMENT

4   DISCUSSIONS, CORRECT?

5   A.      DID WORK GENERALLY WITH PLAINTIFFS?  I SUPPOSE.

6   Q.      ALL RIGHT.  WELL, IN FACT, I THINK WE HAVE

7   ALREADY REFERRED TO MS. UNGER'S SEPTEMBER 28TH E-MAIL IN

8   WHICH THE DEFENDANT SENT OVER A NUMBER OF DIFFERENT

9   DOCUMENTS PROVIDING INFORMATION ABOUT AN INITIATIVE THEN

10  UNDERWAY BY THE DEPARTMENT OF STATE TO TRANSITION AWAY

11  FROM PAPERLESS DRE'S AND TO PAPER RECORD --

12  VOTER-VERIFIABLE PAPER RECORD VOTING SYSTEMS.  YOU HEARD

13  TESTIMONY ABOUT THAT, RIGHT?

14  A.      I HEARD THE TESTIMONY, YEAH.

15  Q.      WERE YOU AWARE IN OCTOBER OF -- LET'S SAY AS OF

16  OCTOBER 9, 2018 THAT THE DEPARTMENT HAD UNDERTAKEN AN

17  INITIATIVE LIKE THE ONE WE HAVE HEARD TESTIMONY ABOUT?

18  A.      I'M SORRY, TO REPLACE ITS VOTING MACHINES?  YES.

19  Q.      YES.

20  A.      YES.

21  Q.      AND I DON'T THINK MR. MAAZEL ASKED YOU.  HAVE

22  YOU ACTUALLY SEEN THAT SEPTEMBER 28TH E-MAIL FROM MS.

23  UNGER WAS THAT FORWARDED TO YOU IN THAT

24  SEPTEMBER/OCTOBER 2018 TIME PERIOD?

25  A.      I'M SORRY, WHICH E-MAIL SPECIFICALLY ARE YOU

1    TALKING ABOUT?

2    Q.        SURE.   DO WE HAVE THAT HANDY?   YES, EXHIBIT 14,

3    JX 14.

4                      THE COURT:   WHAT IS THE NUMBER?

5                      MR. WIYGUL:   14, YOUR HONOR.

6    BY MR. WIYGUL:

7    Q.        THIS WAS THE E-MAIL THAT SUMMARIZED A NUMBER OF

8    DIFFERENT DOCUMENTS DESCRIBING THE INITIATIVE AND

9    ATTACHED THOSE DOCUMENTS.   DID YOU SEE THAT E-MAIL

10   AROUND THIS TIME?

11   A.        I DON'T KNOW.

12   Q.        YOU DON'T KNOW.   OKAY.

13                     WERE YOU IN THE COURTROOM FOR THE EARLIER

14   TESTIMONY WHERE WE SAW THAT ON, I BELIEVE IT WAS,

15   SEPTEMBER 19TH OF 2018, MR. MAAZEL HAD SENT AN E-MAIL TO

16   DEFENDANTS THAT SPECIFICALLY ASKED FOR, I THINK IT WAS,

17   A LIST OF THE MACHINES THAT PENNSYLVANIA WAS

18   CONTEMPLATING FOR CERTIFICATION?

19   A.        YES.

20   Q.        WERE YOU AWARE OF THAT E-MAIL AT THE TIME?

21   A.        NO.

22                     MR. MAAZEL:   IT WAS OCTOBER 9TH.

23                     MR. WIYGUL:   I AM TALKING ABOUT THE

24   EARLIER SEPTEMBER 19TH E-MAIL.   YOU CAN CALL IT UP IF

25   YOU WANT, IN WHICH YOU REQUESTED A LIST -- THAT'S WHEN

1    THE OCTOBER 5TH PHONE CALL WAS SCHEDULED AND YOU

2    REQUESTED A LIST OF --

3                   MR. MAAZEL:   SORRY.   I WAS JUST TRYING TO

4    UNDERSTAND --

5                   THE COURT:   I AM NOT SURE WHAT DOCUMENT

6    YOU ARE TALKING ABOUT.   DO YOU HAVE A NUMBER?

7                   MR. WIYGUL:   YES.   I CAN GET ONE.   I

8    BELIEVE IT'S 11, YOUR HONOR.

9                   THE COURT:   DEFENDANTS' EXHIBIT?

10                  MR. WIYGUL:   YES.

11   BY MR. WIYGUL:

12   Q.      I BELIEVE THIS IS ALREADY IN EVIDENCE.   DO YOU

13   SEE MR. MAAZEL SAYS:   IF YOU GET US A LIST OF THE

14   MACHINES UNDER CONSIDERATION IN THE NEXT COUPLE OF

15   WEEKS, THAT WOULD BE VERY HELPFUL.

16                  DO YOU SEE THAT?

17   A.      I SEE THAT.

18   Q.      WERE YOU AWARE OF THAT E-MAIL AROUND THE TIME IT

19   WENT OUT?

20   A.      NO.

21   Q.      YOUR TESTIMONY WAS THAT YOU DID RECEIVE A COPY

22   OF JX 12, HOWEVER, RIGHT, WHICH IS THE SEPTEMBER 21ST,

23   2018 -- I WILL CALL IT THE VOTING SYSTEM STATUS REPORT.

24   IT'S ACTUALLY TITLED PENNSYLVANIA VOTING SYSTEM AND

25   ELECTRONIC POLL BOOK REPORT.

1    A.    YES.

2    Q.    YOU RECEIVED THAT ON OR AROUND SEPTEMBER 28TH,

3    IS THAT RIGHT?

4    A.    I SUPPOSE SO.

5    Q.    WE KNOW IT WAS IN ADVANCE OF THE OCTOBER 9TH

6    E-MAIL, RIGHT?

7    A.    THAT'S RIGHT.

8    Q.    THIS PURPORTS TO PROVIDE, IF WE LOOK AT THE TOP,

9    A SNAPSHOT OF RECENT AND UPCOMING ACTIONS TAKEN BY THE

10    DEPARTMENT OF STATE REGARDING THE EXAMINATION AND

11    CERTIFICATION OF VOTING SYSTEMS AND THE APPROVAL OF

12    ELECTRONIC POLL BOOKS.   CORRECT?

13    A.    YES.

14    Q.    AND THEN YOU SEE THERE'S A -- THE NEXT SECTION

15    UNDER CERTIFIED SYSTEMS AND SYSTEMS UNDER TEST TELLS THE

16    READER THAT FOR MORE INFORMATION ABOUT THESE VOTING

17    SYSTEMS, AMONG OTHER THINGS, THAT HAVE BEEN CERTIFIED OR

18    APPROVED BY THE DEPARTMENT OF STATE, PLEASE REFER TO THE

19    DEPARTMENT OF STATE'S VOTING SYSTEMS PAGE.   DO YOU SEE

20    THAT?   IT'S ON PAGE 1 OF THE DOCUMENT IN THE MIDDLE.

21    A.    YES.

22    Q.    AND THEN THERE'S A HYPERLINK THERE, CORRECT?

23    APPEARS TO BE A HYPERLINK.

24    A.    APPEARS TO BE A HYPERLINK.   I DON'T KNOW IF IT

25    WORKS IN THE PDF OR NOT.

1    Q.        DID YOU CLICK ON THAT HYPERLINK WHEN YOU GOT

2    THIS DOCUMENT?

3    A.        NO, I DID NOT.

4    Q.        DID YOU EVER GO TO THE DEPARTMENT OF STATE'S

5    WEBSITE AT ANY POINT BETWEEN WHEN YOU RECEIVED THIS

6    DOCUMENT AND NOVEMBER 28, 2018, WHEN THE SETTLEMENT

7    AGREEMENT WAS CERTIFIED RECEIVED -- SORRY -- WAS SIGNED

8    TO SEE WHAT INFORMATION ABOUT VOTING MACHINES, AS

9    DESCRIBED IN THIS DOCUMENT, YOU COULD FIND?

10   A.        I DON'T RECALL.

11   Q.        AND STARTING TOWARD THE BOTTOM OF THE PAGE

12   THERE'S A LIST OF ELECTRONIC VOTING SYSTEMS, CORRECT?

13   A.        YES.

14   Q.        AND THE LIST INCLUDES THE NAME OF THE

15   MANUFACTURER OF EACH SYSTEM AND THE MODEL NUMBER OF EACH

16   SYSTEM; IS THAT RIGHT?

17   A.        THAT'S RIGHT.

18   Q.        AND IT PROVIDES THE STATUS OF PENNSYLVANIA'S

19   TESTING OF EACH SYSTEM; IS THAT RIGHT?

20   A.        YES, THERE IS SOME DESCRIPTION.

21   Q.        AND MAYBE I MISHEARD YOU.  I THOUGHT YOU SAID

22   SOMETHING IN YOUR DIRECT TESTIMONY TO THE EFFECT THAT

23   YOU HAD NEVER BEEN TOLD BY PLAINTIFFS ABOUT TESTING THAT

24   HAD BEEN PERFORMED ON --

25                        THE COURT:  NEVER BEEN TOLD BY

1     DEFENDANTS?

2                    MR. WIYGUL:  YES.

3                    THE COURT:  YOU SAID PLAINTIFFS.

4                    MR. WIYGUL:  I'M SORRY.  I MEANT --

5                    THE COURT:  MR. MAAZEL WAS ABOUT TO

6     OBJECT ON PRIVILEGE GROUNDS.

7                    MR. WIYGUL:  THANK YOU, YOUR HONOR.  YES.

8     I KNEW I WOULD MAKE THAT SLIP AT SOME POINT.

9     BY MR. WIYGUL:

10    Q.     I THOUGHT YOU HAD TESTIFIED THAT YOU HAD NEVER

11    BEEN TOLD BY DEFENDANTS ABOUT TESTING THAT HAD BEEN

12    CONDUCTED ON THE EVS 6021 SYSTEM.

13    A.     I THOUGHT THE QUESTION WAS WHETHER THE TESTING

14    HAD BEEN COMPLETED.

15    Q.     OKAY.  SO YOU WILL AGREE WITH ME THAT THE

16    DEFENDANTS DID INFORM YOU THROUGH THIS DOCUMENT THAT

17    THERE HAD BEEN TESTING -- WELL, AT THIS POINT, AT THE

18    TIME OF THE DOCUMENT, SEPTEMBER 21ST, IT WAS

19    CONTEMPLATED.  BUT BY THE TIME YOU RECEIVED THE

20    DOCUMENT, IT WAS ALREADY COMPLETED, CORRECT?

21    A.     I HAD NO REASON TO KNOW WHETHER IT HAD BEEN

22    COMPLETED OR NOT.

23    Q.     YOU KNEW IT WAS SCHEDULED TO START ON

24    SEPTEMBER 24TH, CORRECT?

25                    THE COURT:  IF YOU CLICK THE HYPERLINK OR

1    IF YOU BROUGHT UP THE DEPARTMENT OF STATE WEBSITE, WOULD

2    YOU HAVE FOUND OUT WHETHER OR NOT THE TESTING WAS

3    COMPLETED?

4                    THE WITNESS:  I DON'T KNOW.  I DON'T KNOW

5    WHETHER THAT WAS UPDATED AT THE TIME OR NOT.

6                    THE COURT:  YOU DON'T KNOW.  YOU DON'T

7    KNOW IF IT WAS UPDATED.

8                    THE WITNESS:  I DON'T KNOW HOW OFTEN THIS

9    WAS UPDATED.

10                   THE COURT:  YOU HAVE HEARD TESTIMONY THAT

11   IT'S UPDATED EVERY MONTH AROUND THE TIME THE EVENT

12   HAPPENED.  YOU HEARD THAT TESTIMONY, DIDN'T YOU, FROM

13   MRS. BOOCKVAR OR WAS IT MR. --

14                   MR. WIYGUL:  I BELIEVE IT WAS, AMONG

15   OTHER PEOPLE, MS. KOTULA YESTERDAY.

16                   THE COURT:  MS. KOTULA.  YOU HEARD THAT

17   TESTIMONY.

18                   THE WITNESS:  I DID.

19                   THE COURT:  SIR, YOU ARE A COMPUTER

20   EXPERT DEALING WITH ELECTION COMPUTER SYSTEMS, CORRECT?

21                   THE WITNESS:  YES, YOUR HONOR.

22                   THE COURT:  AND YOU ARE TELLING ME UNDER

23   OATH THAT YOU DON'T KNOW WHETHER OR NOT YOU CHECKED THE

24   SITE OF THE STATE AGENCY WHOSE ACTIONS YOU ARE PASSING

25   ON, YOU ARE OPINING ON?  THAT'S WHAT YOU ARE TELLING ME

1       UNDER OATH?

2                    THE WITNESS:  YOUR HONOR, I HAVE THIS

3       DOCUMENT THAT WAS DATED SEPTEMBER 21ST, AND THAT'S THE

4       INFORMATION THAT I HAD WHEN --

5                    THE COURT:  I SEE.

6                    THE WITNESS:  -- WHEN -- AT THE TIME YOU

7       ARE DESCRIBING --

8                    THE COURT:  OKAY.  GO AHEAD.

9                    THE WITNESS:  -- WAS THE INFORMATION THE

10      STATE PROVIDED.

11                   THE COURT:  GO ON, MR. WIYGUL.

12      BY MR. WIYGUL:

13      Q.      SO THIS DOCUMENT PROVIDES NAME OF THE

14      MANUFACTURER, MODEL NUMBER, STATUS OF TESTING, RIGHT?

15      A.      YES.

16      Q.      AND ONE OF THE SYSTEMS LISTED IS THE ES&S EVS

17      6000/6021, CORRECT?

18      A.      YES.

19      Q.      THAT'S ACTUALLY A LISTING OF TWO VERSIONS OF THE

20      SYSTEM, RIGHT?

21      A.      THAT'S RIGHT.

22      Q.      6000 AND 6021?

23      A.      THAT'S RIGHT.

24      Q.      AND EACH OF THE VOTING SYSTEMS HERE INCLUDE A

25      NUMBER OF DIFFERENT COMPONENTS.  YOU'VE TESTIFIED TO

1    THAT, CORRECT?

2    A.      THAT'S RIGHT.

3    Q.      THE EXPRESSVOTE XL VOTING MACHINE IS A COMPONENT

4    OF BOTH THE EVS 6000 AND THE 6021 VOTING SYSTEM, RIGHT?

5    A.      IT IS.

6    Q.      AND YOU KNEW THAT IN OCTOBER OF 2018, CORRECT?

7    A.      I SUPPOSE I DID.  MY RECOLLECTION IS ACTUALLY

8    RATHER FUZZY, BUT I THINK IT'S REASONABLE.

9    Q.      NOW, THERE IS NO DIFFERENCE IN THE HARDWARE

10   BETWEEN THE EVS 6000 AND THE EVS 6021, RIGHT?

11   A.      I DON'T THINK SO, NO.  IT'S THE SOFTWARE.

12   Q.      THE DIFFERENCE IS THE SOFTWARE, RIGHT?

13   A.      YES.

14   Q.      IF YOU WANTED TO GET INFORMATION ABOUT SPECIFIC

15   COMPONENTS, INCLUDING EACH OF THE VOTING SYSTEMS THAT'S

16   LISTED IN THIS DOCUMENT, YOU COULD VISIT THE

17   MANUFACTURER'S WEBSITE, CORRECT?

18   A.      YES.

19   Q.      YOU COULD ALSO GO TO THE EAC'S WEBSITE, RIGHT?

20   WE'VE HEARD TESTIMONY ABOUT THE EAC.  LET ME BACK UP.

21   EAC, YOU HEARD THE TESTIMONY, IS A FEDERAL BODY THAT IS

22   RESPONSIBLE FOR THE FEDERAL CERTIFICATION OF VOTING

23   SYSTEMS, CORRECT?

24   A.      THAT'S CORRECT.

25   Q.      AND YOU ARE AWARE THAT UNDER PENNSYLVANIA LAW IN

1    ORDER FOR A VOTING SYSTEM TO BE CERTIFIED FOR USE IN

2    PENNSYLVANIA, IT HAS TO BE CERTIFIED BOTH BY THE EAC AND

3    BY PENNSYLVANIA, CORRECT?

4    A.      YES, I AM AWARE OF THAT.

5    Q.      AND THE EAC TESTS SYSTEMS FOR, AMONG OTHER

6    THINGS, SECURITY, CORRECT?

7    A.      YES.

8    Q.      AND PENNSYLVANIA TESTS VOTING SYSTEMS FOR, AMONG

9    OTHER THINGS, SECURITY, CORRECT?

10   A.      IT DOES.

11   Q.      SO FORGIVE ME.  MY NEXT QUESTION, I DON'T THINK

12   I ASKED IT YET, WAS ANOTHER PLACE YOU COULD GO IF YOU

13   WANTED INFORMATION ABOUT THE SPECIFIC COMPONENTS OF EACH

14   OF THESE VOTING SUITES OR SYSTEMS HERE, YOU COULD GO TO

15   THE EAC'S WEBSITE, CORRECT?

16   A.      YES.  ALTHOUGH THE 6021 I DON'T THINK HAD BEEN

17   CERTIFIED AT THE TIME.  I AM NOT SURE WHAT INFORMATION

18   WAS AVAILABLE.

19   Q.      BUT THE 6000 HAD BEEN CERTIFIED, CORRECT?

20   A.      HAD BEEN.

21   Q.      AND YOU JUST TESTIFIED THAT THE HARDWARE

22   COMPONENTS ARE THE SAME, CORRECT?

23   A.      THE HARDWARE IS.  THE SOFTWARE IS DIFFERENT.

24   Q.      ONE OF THE HARDWARE COMPONENTS IS THE

25   EXPRESSVOTE XL.

1    A.      THAT'S TRUE.

2    Q.      AND ALL OF THE DESIGN FEATURES THAT YOU

3    IDENTIFIED EARLIER, THOSE HAVE TO DO WITH THE HARDWARE,

4    RIGHT?

5    A.      THEY HAVE TO DO WITH THE HARDWARE AND SOFTWARE.

6    Q.      WELL, BUT SOFTWARE COMPONENT'S MALWARE COULD GET

7    THEM TO DO THINGS THEY ARE NOT DESIGNED TO DO, RIGHT?

8    A.      THAT'S CORRECT.

9    Q.      BUT IT'S THE HARDWARE THAT YOU BELIEVE MAKES

10   THAT POSSIBLE.

11   A.      IT'S THE HARDWARE AND THE MODE OF OPERATION THAT

12   MAKES IT POSSIBLE.

13   Q.      DID YOU GO, AT THIS POINT IN TIME WHEN YOU

14   RECEIVED THIS DOCUMENT, TO THE EAC'S WEBSITE TO SEE WHAT

15   INFORMATION YOU COULD GLEAN ABOUT THE VARIOUS COMPONENTS

16   OF THESE SYSTEMS?

17   A.      I DON'T RECALL WHETHER I DID OR NOT.

18   Q.      LET'S GO TO JX 8, PLEASE.

19              THE COURT:  8?

20              MR. WIYGUL:  8, YES.  IT IS IN EVIDENCE.

21   BY MR. WIYGUL:

22   Q.      I THINK THIS HAS BEEN STIPULATED, BUT I WILL

23   JUST ASK YOU, THIS IS A COPY OF THE CERTIFICATE OF

24   CONFORMANCE ISSUED BY THE EAC FOR THE ES&S EVS 6000

25   SYSTEM, CORRECT?

1    A.        IT APPEARS TO BE, YES.

2    Q.        AND THIS IS DATED JULY 2ND, 2018, CORRECT?

3    A.        YES.

4    Q.        THAT WOULD BE SEVERAL MONTHS BEFORE OCTOBER 9TH.

5    A.        YES.

6    Q.        AND IF YOU LOOK PAST THE INITIAL CERTIFICATION

7    PAGE, THERE IS THEN WHAT I WILL DESCRIBE AS A REPORT,

8    BUT THERE IS A DOCUMENT THAT DESCRIBES THE

9    CERTIFICATION, DESCRIBES THE SYSTEM IN SOME DETAIL,

10   CORRECT?

11   A.        YES.

12   Q.        AND IF WE LOOK AT THAT PAGE, STILL THE

13   CERTIFICATION, AND WE GO DOWN TOWARD THE BOTTOM, YOU SEE

14   THERE'S A SYSTEM OVERVIEW SECTION?

15   A.        YES.

16   Q.        AND THEN THE DOCUMENT GOES ON TO LIST THE

17   COMPONENTS OF THE SYSTEM, CORRECT?

18   A.        YES.

19   Q.        AND IT STARTS WITH THE SOFTWARE, WHICH IS CALLED

20   ELECTIONWARE, IS THAT RIGHT?

21   A.        YES.

22   Q.        AND IF YOU TURN THE PAGE, THE VERY NEXT

23   COMPONENT LISTED IS THE EXPRESSVOTE XL, CORRECT?

24   A.        YES.

25   Q.        AND IT'S DESCRIBED AS:  A HYBRID PAPER-BASED

1    POLLING PLACE VOTING DEVICE THAT INCORPORATES THE

2    PRINTING OF THE VOTER'S SELECTIONS AS A CAST VOTE RECORD

3    AND TABULATION SCANNING INTO A SINGLE UNIT.   DO YOU SEE

4    THAT?

5    A.      YES, I DO.

6    Q.      AND THEN THERE'S SOMETHING CALLED THE

7    EXPRESSTOUCH SYSTEM.   DO YOU SEE THAT?

8    A.      YES.

9    Q.      AND THAT'S DESCRIBED AS A DRE, IS THAT RIGHT?

10   A.      YES.

11   Q.      AND PENNSYLVANIA DID NOT CERTIFY THE

12   EXPRESSTOUCH SYSTEM, IS THAT RIGHT?

13   A.      NO, IT DIDN'T CERTIFY IT.

14   Q.      AND THEN THERE ARE TWO COMPONENTS DESCRIBED AS

15   THE EXPRESSVOTE HARDWARE 1.0 AND THE EXPRESSVOTE

16   HARDWARE 2.1.   DO YOU SEE THAT?

17   A.      YES.

18   Q.      AND SO THOSE ARE DIFFERENT VERSIONS OF

19   ESSENTIALLY THE SAME MACHINE, RIGHT?

20   A.      YES.

21   Q.      AND LIKE THE XL MACHINE, I THINK WE HAVE

22   ESTABLISHED THIS ALREADY, BUT THE EXPRESSVOTE 2.1 IS

23   ALSO DESCRIBED AS A HYBRID PAPER-BASED POLLING PLACE

24   VOTING DEVICE, CORRECT?

25   A.      YES.

1   Q.      AND WE HAVE ESTABLISHED THEN, LIKE THE XL, IT

2   CAN BE CONFIGURED TO BOTH PRINT THE BALLOT AND THEN SCAN

3   AND TABULATE THE BALLOT, CORRECT?

4   A.      YES.  WELL, WAIT.  WHAT DID YOU SAY, TO BOTH

5   PRINT THE BALLOT OR TO SCAN AND TABULATE?

6   Q.      NO.  I SAID "AND."  PRINT THE BALLOT, PRINT THE

7   PAPER RECORD, AND THEN THE SAME MACHINE CAN ALSO SCAN

8   AND TABULATE THE PAPER RECORD.

9   A.      OH, I SEE.  YES, YOU ARE REFERRING TO JUST ONE

10  SINGLE CONFIGURATION.

11  Q.      OF THE 2.1?

12  A.      YES.

13  Q.      AND THEN THE DOCUMENT GOES ON TO IDENTIFY THE

14  OTHER COMPONENTS OF THE SYSTEM, CORRECT?

15  A.      YES.  I COUNT TEN OR A DOZEN COMPONENTS.

16  Q.      DID YOU GO TO THE EAC'S WEBSITE AND VIEW THIS

17  DOCUMENT IN OCTOBER OF 2018?

18  A.      I DON'T RECALL.  I'M SORRY.

19  Q.      AND CAN WE GO BACK TO JX 57.

20          I JUST WANT TO BE CLEAR.  I THINK YOU

21  TESTIFIED TO THIS ALREADY.  THIS IS THE EXAMPLE OF THE

22  XL BALLOT, AND WE TALKED ABOUT THE FORMAT, AND YOU

23  TESTIFIED YOU KNEW THIS WAS THE FORMAT OF THE BALLOT IN

24  OCTOBER OF 2018, CORRECT, THE PAPER RECORD?

25  A.      I AM NOT SURE THAT I DID AT THE TIME KNOW THAT

1    THIS WAS THE FORMAT OF THE BALLOT.

2    Q.    YOU KNEW THAT THE BALLOT HAD BARCODES ON IT.

3           MR. MAAZEL:  OBJECTION TO THE WORD

4    "BALLOT," YOUR HONOR.

5           MR. WIYGUL:  PAPER RECORD.  THANK YOU.

6           THE WITNESS:  I KNEW THAT IT USED THE

7    SUMMARY STYLE PAPER RECORD.

8    BY MR. WIYGUL:

9    Q.    SO YOU KNEW AT THE TIME THAT IT USED THE SUMMARY

10   STYLE PAPER RECORD?

11   A.    YES.

12   Q.    THE XL MACHINE WE'RE TALKING ABOUT.

13   A.    I'M NOT SURE THAT I -- YES, I DID KNOW THAT IT

14   WAS A SUMMARY STYLE PAPER RECORD.

15   Q.    OKAY.  AND I THINK YOUR TESTIMONY EARLIER WAS

16   YOU ALSO KNEW THAT IT HAD BARCODES PRINTED ON IT.

17   A.    I THINK THAT'S CORRECT.

18   Q.    AND YOU ALSO KNEW THAT THE WAY THAT THE MACHINE

19   TABULATED THE VOTE WAS BY SCANNING THE BARCODE.

20   A.    BY SCANNING THE BARCODE.  I THINK THAT'S

21   CORRECT.

22   Q.    ALL OF THAT WAS KNOWN BY YOU IN OCTOBER OF 2018.

23   A.    WELL, I AM TRYING TO THINK WHETHER THAT -- I

24   DON'T KNOW FOR SURE WHETHER I KNEW THAT IT SCANNED THE

25   BARCODE AND DIDN'T READ THE TEXT.  I DON'T THINK I KNEW

1    THAT AT THE TIME, ACTUALLY.

2    Q.        OKAY.

3              THE COURT:  YOU WERE ADVISING.

4              THE WITNESS:  BUT I MAY BE INCORRECT.

5              THE COURT:  YOU WERE ADVISING -- I DON'T

6    WANT TO KNOW THE SUBSTANCE OF IT, BUT YOU WERE ADVISING

7    COUNSEL OF YOUR OPINIONS ALL THROUGH THIS PERIOD OR

8    PERIODICALLY.

9              THE WITNESS:  I WAS CONSULTED BY COUNSEL.

10             THE COURT:  YOU SEEM TO HAVE KNOWN

11   VIRTUALLY NOTHING ABOUT THE MACHINE ACCORDING TO YOUR

12   PRESENT LACK OF RECOLLECTION.  WHAT ON EARTH DID YOU

13   TELL THEM?  YOU DIDN'T KNOW IF THERE WAS A BARCODE.  YOU

14   ARE NOT SURE IF YOU KNEW THAT IT WAS A SUMMARY CARD.

15   YOU DON'T REMEMBER IF YOU CONSULTED THE EAC SITE.  YOU

16   DON'T RECALL IF YOU CONSULTED THE DEPARTMENT OF STATE

17   SITE.  DID YOU CONSULT THE MANUFACTURER'S SITE OR DON'T

18   YOU RECALL THAT EITHER?

19             THE WITNESS:  I DON'T RECALL.

20             THE COURT:  OKAY.

21   BY MR. WIYGUL:

22   Q.        THAT WAS -- YOU SAID YOU'RE NOT -- MAY BE FUZZY

23   ON THE DETAILS OF THE XL AT THE TIME.  WE AGREE THAT --

24   A.        WHAT I SAID WAS THAT I DON'T KNOW WHEN I LEARNED

25   FOR CERTAIN THAT IT ONLY SCANS THE BARCODE.  IT DOESN'T

1    CONSIDER THE TEXT.

2    Q.      OKAY.  WOULD YOU AGREE WITH ME THAT IT WOULD BE

3    ODD IF THERE WERE A PAPER RECORD THAT PRINTED -- I DON'T

4    KNOW HOW MANY BARCODES ARE UP THERE, AND DIDN'T SCAN THE

5    BARCODE?

6    A.      THERE ARE OTHER BMDS THAT PERFORM OCR AND

7    ACTUALLY MAKE SURE THAT THE TEXT IS CORRECT.

8    Q.      DO THEY ALSO INCLUDE 30 SOMETHING ODD DIFFERENT

9    BARCODES ON THE PAPER RECORD?

10   A.      THERE ARE REASONS YOU MIGHT WANT TO DO THAT

11   ENGINEERING WISE FOR COMPATIBILITY.

12   Q.      DO THE ONES YOU'RE AWARE OF INCLUDE ALSO 30

13   DIFFERENT BARCODES ON THE PAPER RECORD?

14   A.      THIS IS THE ONLY ONE I AM AWARE OF.

15   Q.      THIS ONE SCANS THE BARCODES TO TABULATE THE

16   VOTE.

17   A.      YES, IT DOES.

18   Q.      THE EXPRESSVOTE 2.1 MACHINE YOU TESTIFIED TO,

19   THAT HAS THE SAME BALLOT FORMAT, CORRECT?

20   A.      I BELIEVE SO, YES.

21   Q.      THE EXPRESSVOTE 2.1 HAS BEEN IN USE FOR LONGER

22   THAN THE XL, CORRECT?

23   A.      I DON'T KNOW FOR SURE.

24   Q.      YOU DON'T KNOW?

25   A.      I DON'T KNOW FOR SURE.  I BELIEVE -- I DON'T

1    KNOW THE RELATIVE DATES OF INTRODUCTION OF 2.1

2    SPECIFICALLY AND THE XL.

3    Q.    YOU CAN'T SAY WHETHER IT WAS INTRODUCED EARLIER.

4    A.    THERE WERE EXPRESSVOTES INTRODUCED EARLIER.

5    Q.    EXPRESSVOTES USING THIS FORMAT BALLOT?

6    A.    YES, THAT'S RIGHT.

7    Q.    DID YOU KNOW THAT THE EXPRESSVOTE -- AS OF

8    OCTOBER 2018, CAN YOU SAY WITH MORE CERTAINTY THAT YOU

9    KNEW THAT THE EXPRESSVOTE BALLOT NOT ONLY CONTAINED

10   BARCODES BUT TABULATED THE VOTE BY SCANNING THE

11   BARCODES?

12              MR. MAAZEL:  OBJECTION TO COUNSEL'S

13   REPEATED INSERTION OF THE WORD "BALLOT."

14              THE COURT:  YOU HAVE A STANDING

15   OBJECTION.

16              THE WITNESS:  EXCUSE ME.  DID I KNOW THAT

17   THE EXPRESSVOTE COUNTED BY -- I AM SORRY.  YOUR QUESTION

18   WAS --

19   BY MR. WIYGUL:

20   Q.    MY QUESTION WAS, YOU ACKNOWLEDGE THAT THE

21   EXPRESSVOTE HAD BEEN IN USE LONGER THAN THE XL, CORRECT?

22   A.    YES.

23   Q.    AND YOU KNEW THAT?

24   A.    YES.

25   Q.    AND YOU KNEW THAT THE EXPRESSVOTE 2.1 HAD

1  BARCODES, OR THE EXPRESSVOTE MACHINE PAPER RECORDS HAD

2  BARCODES, CORRECT?

3  A.      YES.

4  Q.      AND SO MY QUESTION IS:  CAN YOU SAY WITH MORE

5  CERTAINTY THAN YOU COULD SAY APPARENTLY ABOUT THE XL

6  MACHINE, THAT YOU KNEW IN OCTOBER 2018 THAT THE

7  EXPRESSVOTE, NOT XL, PAPER RECORDS WERE SCANNED AND THAT

8  WAS THE METHOD BY WHICH THOSE VOTES WERE TABULATED?  BY

9  THE BARCODE.

10  A.      THAT THEY WERE SCANNED BY THE BARCODE?  I CAN'T

11  SAY FOR ABSOLUTE CERTAINTY.  I THINK IT'S A REASONABLE

12  INFERENCE THOUGH, IF YOU WANT.

13  Q.      BY THE WAY, YOU HAD ACTUALLY VISITED ES&S IN

14  OMAHA, NEBRASKA IN JULY OF 2018, CORRECT?

15  A.      I HAD.  THEY INVITED ME.

16  Q.      AND YOU WERE SHOWN ES&S VOTING SYSTEMS, CORRECT?

17  A.      I WAS.

18  Q.      THAT WAS THE WHOLE PURPOSE OF THE VISIT.

19  A.      YES.

20  Q.      YOU HAD AN OPPORTUNITY TO PUT YOUR HANDS ON THE

21  MACHINES AND THEN ACTUALLY TRY THEM OUT YOURSELF,

22  CORRECT?

23  A.      I GOT TO TRY AN XL.

24  Q.      YOU DID?

25  A.      I DID.

1    Q.        AND YOU PRINTED A BALLOT, PRINTED A PAPER

2    RECORD?

3    A.        I VOTED ON IT AND -- IN FRONT OF THEIR EXECUTIVE

4    TEAM AND THE MACHINE -- THE MACHINE JUST WHISKED THE

5    BALLOT AWAY WITHOUT SHOWING IT TO ME.  IT DIDN'T GIVE ME

6    ANY CHANCE TO REVIEW IT AT ALL.  AND I WAS ASSURED BY

7    THE EXECUTIVES THAT, NO, THAT WAS NOT HOW THEY INTENDED

8    TO TEST IT.  THAT WAS SOME MODE THAT WAS NOT REALLY

9    GOING TO SEE WIDESPREAD USE.  AND INSTEAD THEY TOLD ME

10   THEY'D SHOW ME ANOTHER DEMONSTRATION LATER IN WHICH IT

11   WOULD ACTUALLY GIVE ME MY BALLOT SO THAT I COULD REVIEW

12   IT, JUST LIKE THE NON-XL VERSION DID.  BUT THAT SECOND

13   DEMONSTRATION NEVER HAPPENED.

14   Q.        ALL RIGHT.  I THINK YOUR ANSWER WAS YES, YOU

15   TRIED THE XL MACHINE.  AND YOU WERE THERE FOR ABOUT FOUR

16   HOURS, CORRECT?

17   A.        MAYBE LONGER THAN THAT.

18   Q.        OKAY.  WAS THE XL MACHINE THE ONLY MACHINE YOU

19   TRIED?

20   A.        NO.  I HAD TRIED AN EXPRESSVOTE AS WELL.

21   Q.        DO YOU SEE THE BALLOT THAT WAS PRINTED FROM THAT

22   EXPRESSVOTE MACHINE?

23   A.        I SAW THE BALLOT.

24   Q.        IDENTICAL TO THE BALLOT PRINTED FROM THE

25   EXPRESSVOTE XL, AS WE HAVE ESTABLISHED.

1        MR. MAAZEL:   STANDING OBJECTION.

2    BY MR. WIYGUL:

3    Q.        PAPER RECORD.

4    A.        THE PAPER RECORD FROM -- DID I SEE -- I SAW THAT

5    -- I KNEW THAT THEY WERE THE SAME FORMAT.

6    Q.        AND WHAT HAPPENED IN THE DEMONSTRATION OF THE XL

7    WHERE IT DIDN'T SHOW YOU THE BALLOT, THAT WAS THE

8    CONFIGURATION THAT YOU HAVE ALREADY SAID IS FORBIDDEN IN

9    PENNSYLVANIA, CORRECT?

10   A.        THAT WAS THE CONFIGURATION THAT I OBJECTED TO

11   AND THAT PENNSYLVANIA FORBADE.

12   Q.        SO YOU REVIEWED THE VOTING SYSTEMS LISTED ON JX

13   12.  THAT'S THE VOTING SYSTEM STATUS REPORT, CORRECT?

14   A.        I'M SORRY, JX 12?

15   Q.        YES.

16   A.        I REVIEWED THE LIST OF VOTING SYSTEMS.

17   Q.        AND YOU PROVIDED FEEDBACK ON THEM, RIGHT?

18   A.        I PROVIDED INITIAL -- MY INITIAL THOUGHTS ABOUT

19   THE SUITES OF SYSTEMS ON THIS LIST.

20   Q.        CAN WE GO TO JX 20, PLEASE.

21            FIRST, WE HAVE SEEN THIS BEFORE, RIGHT?

22   A.        YES.

23   Q.        AND YOU SAW THIS AROUND THE TIME IT WAS SENT?

24   A.        NO.  I DID NOT SEE THIS UNTIL WE WERE PREPARING

25   FOR THE HEARING NOW.

1    Q.       MR. MAAZEL'S FIRST LINE, HE SAYS:  HERE ARE SOME

2    FEEDBACK BEFORE OUR CALL THIS AFTERNOON.  YOU DISAGREE

3    WITH HIS CHARACTERIZATION?

4    A.       WITH HIS -- IT IS SOME FEEDBACK, THAT'S RIGHT.

5    Q.       AND YOU SAID YOU WERE PROVIDING -- IN YOUR

6    TESTIMONY THIS MORNING, YOU SAID "QUICK INITIAL

7    THOUGHTS"?  WAS THAT THE PHRASE YOU USED?

8    A.       THAT'S RIGHT.

9    Q.       DO YOU SAY THAT ANYWHERE?  WELL, FIRST OF ALL,

10   LET'S JUST ESTABLISH THE E-MAIL.  THE FIRST PARAGRAPH OF

11   THIS E-MAIL IS FROM MR. MAAZEL, RIGHT?  HE WROTE IT, AS

12   FAR AS YOU KNOW?

13   A.       YES, AS FAR AS I KNOW.

14   Q.       AND THEN HE SAYS:  IN ADDITION THE FOLLOWING IS

15   FROM ALEX HALDERMAN.  DO YOU SEE THAT?

16   A.       YES.

17   Q.       AND THEN IS IT TRUE THAT EVERYTHING BETWEEN "THE

18   FOLLOWING IS FROM ALEX HALDERMAN" AND THE "TALK SOON"

19   VALIDATION AT THE END, THAT'S SOMETHING THAT YOU WROTE,

20   CORRECT?

21   A.       THAT'S COPIED FROM SOMETHING I WROTE.

22   Q.       EVERY WORD OF THAT, I JUST WANT TO BE CLEAR, IS

23   WHAT YOU WROTE?

24   A.       I BELIEVE SO.

25                THE COURT:  WHY DON'T YOU LOOK AT IT

1    CAREFULLY AND TELL US WHETHER YOU CAN ACTUALLY GIVE US A

2    YES OR NO ANSWER.

3                    THE WITNESS:  YES.  AND JUST TO BE CLEAR,

4    MY UNCERTAINTY IS THAT THIS IS SOMETHING THAT WAS COPIED

5    FROM SOMETHING I WROTE.

6                    THE COURT:  IT'S CUT AND PASTED FROM

7    SOMETHING YOU WROTE, CORRECT?

8                    THE WITNESS:  CUT AND PASTED FROM

9    SOMETHING I WROTE A LONG TIME AGO, AND I ASSUME WITHOUT

10   MODIFICATION.

11                   THE COURT:  WELL, IS IT MODIFIED?

12                   THE WITNESS:  I DON'T KNOW BECAUSE I

13   DON'T HAVE WHAT I WROTE TWO YEARS AGO.

14                   THE COURT:  IS EVERYTHING YOU SAY HERE

15   TRUE AND CORRECT?  EVERYTHING THAT IS HERE YOU SAID,

16   CORRECT?

17                   THE WITNESS:  I BELIEVE SO, YES.

18                   MR. MAAZEL:  YOUR HONOR, JUST TO

19   SHORT-CIRCUIT, WE CAN STIPULATE THAT EVERYTHING FROM "I

20   REVIEWED THE VOTING SYSTEMS" TO BELOW THE TOP -- ABOVE

21   THE TOP STAVE IS A CUT AND PASTE.

22                   THE COURT:  SO DR. HALDERMAN WROTE IT.

23                   MR. MAAZEL:  THAT'S CORRECT.

24                   THE WITNESS:  OKAY, IF YOU SAY SO.

25   BY MR. WIYGUL:

1    Q.      WITH THAT STIPULATION -- NOWHERE IN THESE

2    PARAGRAPHS THAT YOU WROTE DO YOU SAY THAT THESE ARE JUST

3    YOUR QUICK INITIAL THOUGHTS, CORRECT?

4    A.      THAT'S NOT IN THOSE PARAGRAPHS, NO.

5    Q.      YOU DON'T SAY ANYTHING REMOTELY LIKE THAT,

6    CORRECT?

7    A.      NO.

8    Q.      ALL RIGHT.  AND IN FACT --

9    A.      WELL, I SAY SOMETHING LIKE THAT.

10   Q.      DON'T YOU ACTUALLY SAY:  I REVIEWED THE VOTING

11   SYSTEMS THAT PENNSYLVANIA IS CONSIDERING AND I DON'T

12   DISAPPROVE OF ANY OF THEM IN THEIR ENTIRETY?  RIGHT?

13   A.      THAT'S RIGHT.

14   Q.      THE NEXT SENTENCE IS:  ALL OF THEM THAT USE

15   PAPER BALLOTS CAN BE USED WITH REASONABLE SECURITY AND

16   IMPLEMENTED IN VOTER-VERIFIED PAPER BALLOTS AND ROBUST

17   MANUAL AUDITS.  DO YOU SEE THAT?

18   A.      YES.

19   Q.      THERE IS NO ASTERISK ATTACHED TO THAT SENTENCE,

20   CORRECT?

21   A.      "CAN BE USED" ARE THE IMPORTANT WORDS THERE,

22   BUT, YES.

23   Q.      ALL OF THEM CAN BE USED WITH REASONABLE

24   SECURITY, CORRECT?

25   A.      THERE IS A WAY TO USE ALL OF THEM WITH

1    REASONABLE SECURITY.

2    Q.      YOU DID NOT SAY, SIR, WELL, SUBJECT TO MORE

3    EVALUATION AND TESTING INFORMATION, AND MIGHT BE THE

4    CASE THAT ALL OF THEM CAN BE USED WITH REASONABLE

5    SECURITY.  YOU SAID:  ALL OF THEM CAN BE USED WITH

6    REASONABLE SECURITY, IMPLEMENTED AND VERIFIED PAPER

7    BALLOTS AND ROBUST MANUAL AUDITS.

8    A.      WHAT I MEANT, IF I MAY SAY, IS THAT AT A HIGH

9    LEVEL THESE ARE SYSTEMS THAT WILL PRODUCE A BALLOT THAT

10   IS VERIFIED BY THE VOTER, THAT CAN THEN BE INDEPENDENTLY

11   SCANNED OR THEY CAN SCAN A HANDMARKED BALLOT, AND THAT

12   CAN BE ROBUSTLY AUDITED.  AND THAT IS THE CONFIGURATION

13   THAT IS NOT ON -- IT'S NOT JUST MY VIEW -- CONSENSUS

14   VIEW OF THE NATIONAL ACADEMIES, IS REQUIRED FOR A SYSTEM

15   TO BE SECURE THAT CAN MAKE A SYSTEM SECURE.  THAT'S THE

16   POINT.

17   Q.      THAT MAY BE WHAT YOU HAD IN YOUR HEAD, BUT NONE

18   OF THAT APPEARS ON THE PAGE HERE, CORRECT?

19   A.      I THINK THAT'S WHAT I WAS TRYING TO COMMUNICATE

20   IN THAT SECOND SENTENCE BUT --

21   Q.      OKAY.  LET'S GO BACK UP TO THE FIRST PARAGRAPH

22   BY MR. MAAZEL.  HE SAYS AFTER THAT FIRST SENTENCE WE

23   SAW:  THE LIST OF MODELS IN THE PA VOTING SYSTEM AND

24   ELECTRONIC POLL BOOK REPORT INCLUDES A SUITE OF ELECTION

25   SYSTEMS.  AND HE POINTS OUT THAT SOME OF THE COMPONENTS

1      DON'T USE PAPER BALLOTS, CORRECT?

2      A.      YES.

3      Q.      AND HE GIVES ONE EXAMPLE OF SUCH A COMPONENT AND

4      THAT IS THE HART INTERCIVIC VERITY VOTING, VERITY TOUCH,

5      CORRECT?

6      A.      YES.

7      Q.      AND HE DESCRIBES THAT AS A PAPERLESS DRE SYSTEM,

8      CORRECT?

9      A.      YES.

10     Q.      AND IN FACT PENNSYLVANIA DID NOT CERTIFY THE

11     VERITY TOUCH, IS THAT RIGHT?

12     A.      YES.

13     Q.      IT DIDN'T EVEN CONSIDER IT FOR EXAMINATION.

14     A.      THAT'S RIGHT.

15     Q.      AND DEFENDANTS MADE CLEAR TO PLAINTIFFS DURING

16     THE SETTLEMENT NEGOTIATIONS THAT UNDER THE DEPARTMENT'S

17     INITIATIVE TO TRANSITION TO VOTER-VERIFIABLE PAPER

18     RECORD VOTING SYSTEMS, THE DEPARTMENT WOULD NOT BE

19     CERTIFYING ANY DRE'S.  CORRECT?

20              MR. MAAZEL:  OBJECTION, YOUR HONOR.

21     THERE IS NO WAY FOR HIM TO KNOW WHAT HAPPENED IN THE

22     NEGOTIATIONS.

23              THE COURT:  IF HE KNOWS.

24              THE WITNESS:  I DON'T KNOW.

25     BY MR. WIYGUL:

1    Q.      OKAY.   AND THEN WE ESTABLISHED MR. MAAZEL SAYS

2    -- INTRODUCES THE REST OF THE E-MAIL, WHICH COMES FROM

3    YOU, RIGHT?

4    A.      YES.

5    Q.      AND WE TALKED ABOUT THE FIRST SENTENCE.   YOU

6    REVIEWED THE VOTING SYSTEMS THAT PA IS CONSIDERING.   YOU

7    WERE REFERRING THERE TO THE VOTING SYSTEMS LISTED IN THE

8    SEPTEMBER 21ST DOCUMENT, JX 12, THAT WE LOOKED AT

9    EARLIER, CORRECT?

10   A.      TO THE HIGH LEVEL SUITES, THAT'S RIGHT.

11   Q.      AND YOU SAY:  I DON'T DISAPPROVE OF ANY OF THEM

12   IN THEIR ENTIRETY.   ALL OF THEM THAT USE PAPER BALLOTS

13   CAN BE USED WITH REASONABLE SECURITY IF IMPLEMENTED WITH

14   VOTER-VERIFIED PAPER BALLOTS AND ROBUST MANUAL AUDITS,

15   RIGHT?

16   A.      YES.

17   Q.      SO ONE THING THAT IS CLEAR FROM THIS E-MAIL IS

18   THAT IF A VOTING SYSTEM DOES NOT USE A PAPER BALLOT,

19   IT'S UNACCEPTABLE TO PLAINTIFFS, CORRECT?

20              MR. MAAZEL:  OBJECTION, YOUR HONOR.

21              THE COURT:  OVERRULED.

22              THE WITNESS:  IS THAT CLEAR FROM THIS

23   E-MAIL?  I'M NOT SURE.

24   BY MR. WIYGUL:

25   Q.      YOU DON'T KNOW?

1              LET ME ASK THE QUESTION ANOTHER WAY.  ARE

2   YOU TRYING TO COMMUNICATE THAT VOTING SYSTEMS THAT DON'T

3   USE PAPER BALLOTS ARE ACCEPTABLE TO YOU, THAT THEY

4   SHOULD BE CERTIFIED IN PENNSYLVANIA?

5   A.      SO PLAINTIFFS -- IT'S CLEAR FROM THIS THAT THERE

6   HAVE TO BE PAPER BALLOTS.  IS THAT WHAT YOU ARE LOOKING

7   FOR?

8   Q.      YES.  IT IS CLEAR FROM THIS THAT PLAINTIFFS'

9   POSITION IS THAT THERE HAVE TO BE PAPER BALLOTS IN ORDER

10  FOR A VOTING SYSTEM TO BE ACCEPTABLE TO PLAINTIFFS,

11  CORRECT?

12  A.      YES.  YES.

13  Q.      OKAY.  AND AGAIN, THE E-MAIL PROVIDES ONE

14  EXAMPLE OF A VOTING SYSTEM THAT DOES NOT USE PAPER

15  BALLOTS, AND THAT'S A PAPERLESS DRE SYSTEM, CORRECT?

16              MR. MAAZEL:  OBJECTION, ASKED AND

17  ANSWERED.

18              THE COURT:  OVERRULED.

19              THE WITNESS:  YES.

20  BY MR. WIYGUL:

21  Q.      IN THE NEXT PARAGRAPH OF YOUR PORTION OF THE

22  E-MAIL YOU SAY:  THAT SAID, THERE ARE FEATURES OF EACH

23  OF THESE VOTING SYSTEMS -- THE "THAT SAID" IS "EVEN

24  THOUGH WE DON'T DISAPPROVE OF ANY OF THEM IN THEIR

25  ENTIRETY" -- NONETHELESS THERE ARE FEATURES OF EACH OF

1     THESE VOTING SYSTEMS THAT CAN RENDER THEM UNSAFE IF

2     ACTIVATED.

3                    DID I READ THAT RIGHT?

4     A.     YES.

5     Q.     THE NEXT SENTENCE SAYS:  PERHAPS YOU CAN URGE

6     PENNSYLVANIA TO CERTIFY THEM WITH RESTRICTIONS THAT

7     PROHIBIT THESE DANGEROUS FUNCTIONS.

8     A.     YES.

9     Q.     WHO IS THE "YOU" IN THAT LAST SENTENCE.  IS THAT

10    MR. MAAZEL?

11    A.     YES.

12    Q.     SO YOU WERE SUGGESTING TO MR. MAAZEL THAT HE

13    COULD URGE PENNSYLVANIA TO CERTIFY THESE SYSTEMS WITH A

14    RESTRICTION, CORRECT?

15    A.     THAT IF THEY WERE TO CERTIFY THEM, THESE

16    FEATURES SHOULD BE RESTRICTED.  THAT'S WHAT I MEANT BY

17    THAT.

18    Q.     YOU SAID:  PERHAPS YOU CAN URGE PENNSYLVANIA TO

19    CERTIFY THEM, CORRECT?

20    A.     WELL, TO INCLUDE RESTRICTIONS OF THESE FEATURES.

21    Q.     YOU DON'T SAY YOU SHOULD TELL PENNSYLVANIA NOT

22    TO CERTIFY THESE SYSTEMS.

23    A.     I DON'T SAY THAT.

24    Q.     THEN THERE'S A COLON AND YOU GO ON TO LIST THE

25    SPECIFIC DANGEROUS FUNCTIONS AND THE RESTRICTIONS THAT

1    YOU ARE REFERRING TO, CORRECT?

2    A.       YES.  I LIST SOME OF MY -- SOME CONCERNS.  THIS

3    WAS NEVER MEANT TO BE AN ALL-INCLUSIVE LIST.

4    Q.       DO YOU SAY SOME CONCERNS, SIR, OR DO YOU SAY YOU

5    CAN URGE -- PERHAPS YOU CAN URGE PA TO CERTIFY THEM WITH

6    RESTRICTIONS THAT PROHIBIT THESE DANGEROUS FUNCTIONS,

7    COLON?

8    A.       I DON'T SAY THAT ON THE SCREEN HERE, NO.

9    Q.       AND THEN YOU GO ON TO LIST THE DANGEROUS

10   FUNCTIONS YOU'RE REFERRING TO.  YOU SAY NOW SOME OF

11   THEM.  BUT WE CAN AGREE YOU LIST DANGEROUS FUNCTIONS,

12   CORRECT?

13   A.       YES.

14   Q.       LET'S LOOK AT THE PARAGRAPH WHERE YOU TALK ABOUT

15   THE ES&S EXPRESSVOTE MACHINES.  CAN YOU BLOW THAT ONE

16   UP, JUST THAT PARAGRAPH UP, PLEASE.

17            FIRST OF ALL, THIS IS THE ENTIRETY OF

18   WHAT YOU SAY ABOUT THE ES&S SYSTEM IN THIS E-MAIL,

19   CORRECT?

20   A.       YES.

21   Q.       YOU SAY:  THE ES&S EXPRESSVOTE MACHINES CAN WORK

22   AS TRADITIONAL BALLOT-MARKING DEVICES, BUT IT'S ALSO

23   POSSIBLE TO CONFIGURE THEM IN WAYS THAT DEFEAT THE

24   PURPOSE OF THE PAPER TRAIL.  I HAVE SEEN THEM SET UP TO

25   PRINT THE BALLOT BUT NOT SHOW IT TO THE VOTE AT ALL,

1    RIGHT?

2    A.      YES, IT SHOULD.

3    Q.      -- AT ALL, THE MACHINE JUST SCANS IT INTERNALLY

4    AND STORES IT IN A BALLOT BOX.  THIS MEANS THERE IS

5    PAPER, BUT IT'S NOT VOTER-VERIFIED, SO IT'S OF NO USE IN

6    AN AUDIT.  ANDREW -- AND IS IT APPEL OR APPEL?

7    A.      APPEL.

8    Q.      ANDREW APPEL RECENTLY WROTE THAT ANOTHER

9    CONFIGURATION OF THE EXPRESSVOTE IN WHICH IT ASKS VOTERS

10   WHETHER THEY WANT TO VERIFY THEIR BALLOTS BEFORE

11   PRINTING THEM AND ONLY ALLOWS THE VOTER TO INSPECT THE

12   PAPER IF THEY SAY YES.  AND ANDREW EXPLAINED AND YOU

13   PROVIDED A LINK TO A WEB PAGE, CORRECT?

14   A.      YES.

15   Q.      AND THAT'S WHERE MR. APPEL EXPLAINS WHAT YOU ARE

16   DESCRIBING, CORRECT?

17   A.      YES, THAT'S RIGHT.

18   Q.      THIS ALSO DEFEATS THE VALUE OF AN AUDIT SINCE

19   MALWARE COULD BE PROGRAMMED CHEAT ONLY IF THE VOTER OPTS

20   NOT TO SEE THE PAPER.  PENNSYLVANIA SHOULD REQUIRE THE

21   MACHINES TO BE CONFIGURED SO THAT EVERY VOTER HAS AN

22   OPPORTUNITY TO SEE THEIR COMPLETED BALLOT AFTER IT'S

23   PRINTED.

24   A.      THAT'S RIGHT.

25   Q.      WE'VE ESTABLISHED THAT PENNSYLVANIA DID IN FACT

1    IMPLEMENT THAT REQUIREMENT, CORRECT?

2    A.      THAT'S RIGHT.

3    Q.      AND WHEN YOU REFERRED TO THE EXPRESSVOTE

4    MACHINES AT THE TOP, YOU WERE REFERRING TO THE

5    EXPRESSVOTE XL AND THE OTHER EXPRESSVOTE MACHINE, A

6    NON-XL THAT WE TALKED ABOUT WHEN WE WERE LOOKING AT THE

7    EAC CERTIFICATION EARLIER, CORRECT?

8    A.      I THINK THAT'S PROBABLY RIGHT.  BUT I SAY

9    EXPRESSVOTE AND SOME OF THESE CONCERNS APPLY TO BOTH.

10    Q.      WELL, YOU WOULD AGREE WITH ME THAT CERTAINLY IT

11    WOULD HAVE BEEN REASONABLE FROM WHERE YOU SIT FOR

12    DEFENDANTS TO CONCLUDE THAT YOU WERE REFERRING TO THE XL

13    MACHINE, IS THAT RIGHT?

14    A.      I DON'T KNOW.  I DON'T KNOW WHETHER THAT WOULD

15    BE REASONABLE OR NOT.  I DON'T SAY THE XL.

16    Q.      LET'S SEE IF WE CAN FURTHER ILLUMINATE THAT

17    QUESTION.  CAN YOU LOOK AT JX 21, PLEASE.

18            THIS IS ALREADY IN EVIDENCE.  THIS IS THE

19    -- I WILL CALL IT AN ARTICLE.  BUT IF YOU CLICK ON THAT

20    LINK THAT YOU PROVIDED, THIS IS WHAT -- THE WEB PAGE YOU

21    WOULD BE TAKEN TO AND SEE THIS ARTICLE?

22    A.      THAT'S RIGHT.

23    Q.      AND THIS IS BY MR. APPEL?

24    A.      BY DR. APPEL.

25    Q.      DR. APPEL.  HE IS A PRINCETON PROFESSOR, IS THAT

1    RIGHT?

2    A.       THAT'S RIGHT.   HE IS A PROFESSOR OF COMPUTER

3    SCIENCE AT PRINCETON.

4    Q.       AND I ASSUME, BASED ON WHAT YOU WROTE IN THE

5    E-MAIL, YOU WERE FAMILIAR WITH HIM AT THE TIME?

6    A.       YES.

7    Q.       YOU CONSIDER HIM AN AUTHORITY IN THE FIELD OF

8    VOTING SYSTEM SECURITY?

9    A.       I DO.

10   Q.       DID YOU AT THE TIME?

11   A.       YES.

12   Q.       DID YOU FOLLOW HIS WORK?

13   A.       AT LEAST PERIODICALLY.

14   Q.       YOU CONSIDER HIM A PEER AS AN ACADEMICIAN?

15   A.       YES.

16   Q.       WHAT IS THIS FREEDOM -- WELL, FIRST OF ALL, THIS

17   IS -- THIS APPEARS ON A WEBSITE CALLED FREEDOM TO

18   TINKER.   IS THAT RIGHT?

19   A.       YES.

20   Q.       WHAT IS THIS WEBSITE?

21   A.       IT'S A BLOG MAINTAINED BY THE PRINCETON CENTER

22   FOR INFORMATION TECHNOLOGY POLICY.

23   Q.       AND WHO -- I THINK THE RIGHT VERB TO USE IN THE

24   BLOG IS -- POSTS?

25   A.       I GUESS SO.

1    Q.      I WILL DEFER TO YOU ON THAT ONE CLEARLY, BUT WHO

2    POSTS ON THIS BLOG?

3    A.      IT'S MAINLY FACULTY AND OTHER ACADEMICS AT

4    PRINCETON.

5    Q.      SO MORE PEER ACADEMICIANS OF YOURS?

6    A.      YES.

7    Q.      IN FACT, YOU'VE POSTED ARTICLES ON THIS WEBSITE,

8    RIGHT?

9    A.      I HAVE, YES.

10   Q.      AND THIS IS A WEBSITE THAT YOU MONITOR?

11   A.      PERIODICALLY.  NOT -- IT DOES NOT GET PUSHED

12   INTO MY IN-BOX OR ANYTHING.

13   Q.      YOU OBVIOUSLY SAW IT ON THIS PARTICULAR

14   OCCASION.

15   A.      I HAD, YES.

16   Q.      DO YOU RECALL HOW YOU CAME UPON THIS ARTICLE?

17   A.      NO, I DON'T.

18   Q.      LET'S LOOK AT THE FIFTH PARAGRAPH, AND THE TEXT

19   IS QUITE SMALL, SO LET'S BLOW IT UP.  THAT'S GREAT.

20           AND JUST TO BE CLEAR, THIS IS -- WHAT IS

21   DESCRIBED IN THIS ARTICLE IS WHAT -- IS THE ISSUE THAT

22   YOU WERE SUMMARIZING IN THAT PARAGRAPH THAT WE LOOKED AT

23   FROM THE OCTOBER 9TH E-MAIL, CORRECT?

24   A.      SORRY.  I AM JUST TRYING TO READ IT, AND IT IS

25   QUITE SMALL IN BOTH VERSIONS.

1    Q.        MAYBE WE CAN START WITH THE TITLE, RIGHT?  IT'S

2    SERIOUS DESIGN FLAW.

3    A.        YES.

4    Q.        THIS IS "PERMISSION TO CHEAT."  THIS IS THE --

5    THIS IS THE LONG FORM VERSION OF WHAT YOU WERE

6    SUMMARIZING IN YOUR -- IN THE OCTOBER E-MAIL, CORRECT?

7    A.        THAT'S RIGHT.

8    Q.        OKAY.  AND THAT'S WHY YOU LINKED TO THIS

9    ARTICLE, CORRECT?  FOR MORE DETAILS SEE HERE.

10   A.        YES.

11   Q.        SO IN THIS PARAGRAPH, IT SAYS -- I AM STARTING

12   IN THE MIDDLE HERE -- ES&S HAS A LINE OF VOTING SYSTEMS

13   CALLED EXPRESSVOTE.  DO YOU SEE THAT?

14   A.        I AM SORRY.  CAN YOU --

15   Q.        SURE.  THANK YOU.

16   A.        THANK YOU VERY MUCH.  YES.

17   Q.        ALL RIGHT.  AND THE NEXT SENTENCE SAYS:  SOME OF

18   THESE ARE OPTICAL SCANNERS WHICH DR. APPEL THINKS ARE

19   FINE, AND OTHERS ARE COMBINATION MACHINES, BASICALLY A

20   BALLOT-MARKING DEVICE AND AN OPTICAL SCANNER ALL ROLLED

21   INTO ONE.  DO YOU SEE THAT?

22   A.        YES.

23   Q.        WHAT DR. APPEL IS CALLING A COMBINATION MACHINE,

24   WE SAW THAT REFERRED TO IN THE EAC REPORT AS A HYBRID

25   MACHINE, CORRECT?

1    A.      IN THE EAC REPORT AS A HYBRID MACHINE?

2    Q.      IN THE EAC CERTIFICATION REPORT FOR THE EVS

3    6000.

4    A.      I AM NOT SURE WE POINTED THAT OUT.  I WILL TAKE

5    YOUR WORD FOR IT THAT IT'S IN THERE.

6    Q.      DO YOU UNDERSTAND THOSE TERMS TO BE REFERRING TO

7    THE SAME THING?

8    A.      YES.

9    Q.      AND THAT IS A FACT THAT THERE ARE TWO FUNCTIONS

10   IN THIS ONE MACHINE, THERE'S THE BALLOT-MARKING FUNCTION

11   AND THEN THERE'S THE SCANNING/TABULATION FUNCTION?

12   A.      YES.

13   Q.      OKAY.  ALL RIGHT.  LET'S GO TO -- AND THEN --

14   SORRY.  JUST TO BE CLEAR, THIS ARTICLE DESCRIBES THE

15   ISSUE THAT YOU HIGHLIGHT IN YOUR E-MAIL, WHICH, TO BE

16   SPECIFIC, IS THAT THE MACHINES CAN BE CONFIGURED IN A

17   WAY THAT ALLOWS THE VOTER TO OPT OUT OF HAVING THE

18   OPPORTUNITY TO REVIEW THEIR BALLOT, THE PAPER RECORD,

19   BEFORE IT'S CAST, CORRECT?

20   A.      BEFORE IT'S EVEN PRINTED, I BELIEVE.

21   Q.      OKAY.  BUT -- AND SO IF CONFIGURED THAT WAY,

22   THEY CAN SAY BASICALLY I AM JUST GOING TO INPUT MY

23   SELECTIONS ON THE SCREEN.  I KNOW YOU ARE GOING TO PRINT

24   A BALLOT.  I DON'T CARE.  I DON'T WANT TO SEE IT.  I

25   WON'T SEE IT.  JUST CAST THE VOTE AS I ELECTRONICALLY --

1    RIGHT?

2    A.        THAT'S WHAT IT IS REFERRING TO.

3    Q.        AND THAT'S A PROBLEM IN PARTICULAR THAT ARISES

4    FROM CERTAIN CONFIGURATIONS OF THESE HYBRID MACHINES OR

5    COMBINATION MACHINES, CORRECT?

6    A.        ONLY OF CERTAIN HYBRID OR COMBINATION MACHINES.

7    Q.        CAN WE LOOK AT THE LAST PARAGRAPH ON THE FIRST

8    PAGE.

9               JOHNSON COUNTY SHOULD NOT HAVE BOUGHT

10   THESE MACHINES.  IF THEY ARE GOING TO USE THEM, THEY

11   MUST INSIST THAT ES&S DISABLE THIS "PERMISSION TO CHEAT"

12   FEATURE.

13              SO JUST TO BE CLEAR, "PERMISSION TO

14   CHEAT" IS DR. APPEL'S SHORTHAND FOR THE OPT-OUT FEATURE

15   WE JUST TALKED ABOUT.

16   A.        THAT'S RIGHT, YES.

17   Q.        SO ARE YOU REFERRING -- ARE YOU AWARE OF JOHNSON

18   COUNTY PURCHASING CERTAIN ES&S MACHINES?

19   A.        FROM -- ON THE BASIS OF THIS BLOG POST.

20   Q.        AND THOSE WERE EXPRESSVOTE 2.1 MACHINES,

21   CORRECT?

22   A.        I DON'T KNOW.

23   Q.        YOU DON'T KNOW?

24   A.        NO, I DON'T KNOW WHICH ONE.

25   Q.        OKAY.  ARE YOU AWARE THAT THERE'S A LINK IN THIS

1    ARTICLE TOWARD THE, SAY, TWO-THIRDS OF THE WAY DOWN, TO

2    A VIDEO?

3    A.    I AM AWARE THAT THERE IS A LINK.  I NEVER

4    FOLLOWED IT.

5    Q.    YOU NEVER FOLLOWED IT?

6    A.    THAT'S RIGHT.

7    Q.    AND IF I WERE TO TELL YOU THAT IF YOU CLICK ON

8    THIS LINK, IT SHOWS YOU A VIDEO OF WHAT APPEARS TO BE

9    POLL WORKERS OR VOTING OFFICIALS FROM JOHNSON COUNTY

10   DEMONSTRATING THE EXPRESSVOTE MACHINE THAT IS BEING

11   REFERRED TO HERE.  YOU WOULD NOT KNOW BECAUSE YOU NEVER

12   CLICKED ON THAT LINK?

13   A.    I WOULD NOT KNOW BECAUSE I NEVER CLICKED ON THE

14   LINK, BUT I --

15   Q.    WELL, IF YOU HAD CLICKED ON THE LINK, WOULDN'T

16   YOU HAVE EXPECTED TO SEE THE EXACT MACHINE THAT WAS

17   BEING DESCRIBED IN THIS ARTICLE?

18   A.    I AM SORRY.  YES, IF IT DESCRIBES THAT THE LINK

19   IS A VIDEO OF THE MACHINE.

20   Q.    OKAY.  IT SAYS THIS IS A DEMONSTRATION.  SO YOU

21   WOULD ALSO EXPECT TO SEE WHAT THE BALLOT LOOKED LIKE,

22   CORRECT?

23   A.    YES, I SUPPOSE SO, IF IT'S A BALLOT, BUT IT'S A

24   SUMMARY.

25              THE COURT:  YOU DON'T HAVE TO SUPPOSE.

1    IF YOU WOULD JUST LOOK AT THE PARAGRAPH THAT SAYS "THIS

2    VIDEO SHOWS."

3                    THE WITNESS:  YES.  I HAVE NO REASON TO

4    DOUBT THAT I WOULD.

5                    THE COURT:  YOU HAVE NO REASON TO DOUBT

6    THAT YOU WOULD?  I GUESS THAT'S AN ANSWER.

7                    GO AHEAD.

8    BY MR. WIYGUL:

9    Q.      WELL, EVEN WITHOUT HAVING LOOKED AT THE VIDEO,

10   YOU KNOW FROM THE DESCRIPTION IN THE ARTICLE THAT IT'S

11   EITHER GOING TO BE THE EXPRESSVOTE NON-XL MACHINE OR THE

12   EXPRESSVOTE XL MACHINE, CORRECT?

13   A.      YES.

14   Q.      OKAY.

15   A.      YES.  IT'S AN EXPRESSVOTE MACHINE OF SOME KIND.

16   Q.      LET'S TURN TO THE SECOND PAGE.

17                   BEFORE WE GET THERE, I'M SORRY, AND I AM

18   PARTICULARLY SORRY TO MS. FERRARI, BUT IF WE GO BACK TO

19   THE EARLIER PAGE, DR. APPEL REFERS TO THE PAPER THAT

20   GETS INSERTED INTO THE EXPRESSVOTE -- AND I GUESS WE

21   DON'T HAVE TESTIMONY AS TO WHICH ONE IT IS -- BUT THE

22   EXPRESSVOTE MACHINE -- IS A BLANK BALLOT, CORRECT?

23   A.      YES.

24   Q.      SO IF WE LOOK AT THE TOP --

25   A.      HE'S WRITING FOR A LAY AUDIENCE, BUT --

1   Q.    WELL, THIS WAS THE ARTICLE THAT YOU FORWARDED TO

2   THE DEFENDANTS TWO DAYS BEFORE THE SETTLEMENT

3   CONFERENCE, CORRECT?

4   A.    THAT'S RIGHT.

5   Q.    SO --

6           THE COURT:  WAS DR. APPEL A FACULTY

7   MEMBER WHEN YOU WERE GETTING YOUR PH.D.?

8           THE WITNESS:  YES.

9           THE COURT:  DID YOU STUDY UNDER HIM AT

10   PRINCETON?

11           THE WITNESS:  I WORKED WITH HIM WHILE I

12   WAS AN UNDERGRADUATE.

13           THE COURT:  AS AN UNDERGRADUATE.  SO YOU

14   COULD DESCRIBE HIM AS A MENTOR OF YOURS?

15           THE WITNESS:  I SUPPOSE SO.

16   BY MR. WIYGUL:

17   Q.    COULD YOU BLOW UP THE FIRST PARAGRAPH OR TWO ON

18   THE SECOND PAGE, PLEASE.

19           THE COURT:  MR. WIYGUL, WHY DON'T WE TAKE

20   A SHORT BREAK.  WE WILL HAVE LUNCH.  SINCE MR. ARONCHICK

21   DOES NOT EAT LUNCH, THE REST OF US WILL HAVE LUNCH.

22   WHENEVER YOU RING THE LUNCH BELL, MR. MAAZEL.

23           MR. MAAZEL:  THANKS, YOUR HONOR.  CAN I

24   ASK FOR AN APPROXIMATION OF HOW MUCH WE HAVE OF THIS

25   WITNESS TO PLAN?

1              MR. WIYGUL:  I WOULD SAY PROBABLY --

2      MAYBE 20 MINUTES.

3              MR. MAAZEL:  OKAY.  I THINK IT WOULD BE

4      PREFERABLE TO FINISH THIS WITNESS BEFORE LUNCH.

5              THE COURT:  I WILL BE GUIDED BY YOU, MR.

6      MAAZEL.

7              (SHORT BREAK.)

8              THE COURT:  PLEASE BE SEATED.

9              CONTINUE, MR. WIYGUL.

10             MR. WIYGUL:  THANK YOU, YOUR HONOR.

11     BY MR. WIYGUL:

12     Q.      DR. HALDERMAN, BEFORE THE BREAK, I THINK YOUR

13     MOST RECENT TESTIMONY WAS SOMETHING TO THE EFFECT OF,

14     YOU THOUGHT THE REASON WHY DR. APPEL REFERRED TO THE

15     EXPRESSVOTE PAPER RECORDS AS BALLOTS WAS BECAUSE HE WAS

16     WRITING FOR A LAY AUDIENCE?

17     A.      YES.  I THINK THAT'S RIGHT, A GENERAL AUDIENCE.

18     Q.      IS THAT BECAUSE THE -- CALLING THE EXPRESSVOTE

19     PAPER RECORD BALLOTS WOULD BE CONSISTENT WITH THE

20     ORDINARY LAY UNDERSTANDING OF THE TERM "BALLOT"?

21     A.      WELL, I THINK IT'S -- THAT DISTINCTION IS NOT

22     REALLY THE ONE THAT HE IS TRYING TO GET AT HERE.

23             THE COURT:  WHAT IS THE NAME OF THIS

24     PUBLICATION?

25             THE WITNESS:  FREEDOM TO TINKER.

1                      THE COURT:   YOU REALLY THINK THAT FREEDOM

2      TO TINKER IS READ BY A LAY AUDIENCE?

3                      THE WITNESS:   IT'S READ BY A VERY WIDE

4      AUDIENCE.

5                      THE COURT:   IS IT?

6                      THE WITNESS:   YES.

7                      THE COURT:   HOW WIDE?

8                      THE WITNESS:   I CANNOT TELL YOU.   I DON'T

9      HAVE THE STATISTICS.   BUT I KNOW WHEN I WRITE FOR IT,

10     THERE ARE -- MOST OF THE PEOPLE WHO PROVIDE FEEDBACK ARE

11     NONTECHNOLOGISTS.

12                     THE COURT:   NONTECHNOLOGISTS.

13                     THE WITNESS:   SO IT'S A TECHNOLOGY

14     ORIENTED -- TECHNOLOGY AND POLICY ORIENTED BLOG.

15                     THE COURT:   IT'S WRITTEN BY FACULTY AT

16     PRINCETON, IS THAT RIGHT?

17                     THE WITNESS:   IN GENERAL.

18                     THE COURT:   AND YOU THINK IT'S TARGETED

19     TO A LAY AUDIENCE, IS THAT RIGHT?

20                     THE WITNESS:   THAT'S RIGHT.

21                     THE COURT:   LIKE THE INQUIRER?   NO.   MORE

22     SOPHISTICATED THAN THE PEOPLE WHO READ THE INQUIRER, IF

23     THAT'S POSSIBLE?

24                     THE WITNESS:   YES.

25                     THE COURT:   GO ON.

1    BY MR. WIYGUL:

2    Q.      CAN WE BLOW UP -- I THINK WE STARTED WITH THE

3    FIRST COUPLE OF PARAGRAPHS OF THE SECOND PAGE.   GREAT.

4              AND THAT'S THE -- YOU CAN TAKE OFF THE

5    TOP ONE IF THAT MAKES IT MORE READABLE.

6              SECOND PAGE BEGINS:   UNION COUNTY NEW

7    JERSEY AND THE ENTIRE STATE OF DELAWARE ARE (TO THE BEST

8    OF MY KNOWLEDGE) IN THE PROCESS OF PURCHASING

9    EXPRESSVOTE XL MACHINES, WHICH ARE LIKE THE TOUCHSCREENS

10   SHOWN IN THE VIDEO BUT WITH A MUCH LARGER SCREEN THAT

11   CAN SHOW THE WHOLE BALLOT.   THERE'S THAT WORD "BALLOT"

12   AGAIN, RIGHT?

13   A.      YES.

14   Q.      THE WHOLE BALLOT, AND THIS TIME USED

15   SPECIFICALLY IN REFERENCE TO THE EXPRESSVOTE XL,

16   CORRECT?

17   A.      THERE IT'S TALKING ABOUT WHAT IS ON THE SCREEN.

18   Q.      OKAY.   AND HE SAYS:   NEW JERSEY AND DELAWARE

19   SHOULD NOT BUY THESE MACHINES.   IF THEY INSIST ON BUYING

20   THEM, THEY MUST DISABLE THE "PERMISSION TO CHEAT"

21   FEATURE.   RIGHT?

22   A.      YES.

23   Q.      SO DR. APPEL IS SAYING THAT THE SAME -- WHAT HE

24   CALLED "PERMISSION TO CHEAT," WHICH I HAVE BEEN CALLING

25   THE OPT-OUT FEATURE, OPT-OUT CONFIGURATION -- THAT

1    AFFECTS OR IS ENDEMIC TO THE EXPRESSVOTE MACHINE NON-XL,

2    PRESUMABLY.   NOW DO YOU AGREE THAT BEFORE WHEN HE'S

3    TALKING ABOUT JOHNSON COUNTY, HE IS NOT TALKING ABOUT

4    THE XL?

5    A.      YES.

6    Q.      OKAY.   THAT'S HOW YOU INFER FROM THE CONTEXT,

7    CORRECT?

8    A.      I WOULD INFER THAT FROM THE CONTEXT, READING IT

9    NOW.

10   Q.      YOU WOULD PRESUME THE DEFENDANTS WOULD INFER THE

11   SAME?

12   A.      I DON'T KNOW IF DEFENDANTS READ THIS OR NOT.

13   Q.      DIDN'T YOU INTEND FOR THEM TO READ IT?

14   A.      NO.   I HAD NO IDEA ANY OF THIS WAS GOING TO BE

15   PASSED ON VERBATIM TO THE DEFENDANTS.

16   Q.      ALL RIGHT.   AND THEN HE GOES ON --

17            THE COURT:   WAIT, WAIT, WAIT, WAIT, WAIT.

18   YOU HAD NO IDEA THAT ANY OF THIS WAS GOING TO BE PASSED

19   ON TO THE DEFENDANTS.   THAT'S EXACTLY WHAT YOU JUST

20   SAID.

21            THE WITNESS:   VERBATIM.

22            THE COURT:   YET YOU SAID:   THAT SAID,

23   THERE ARE FEATURES -- YOU CAN URGE PA TO CERTIFY THEM

24   WITH RESTRICTIONS.   YOU KNEW SOME OF IT WAS GOING TO BE

25   PASSED ON.   YOU ARE TELLING MR. MAAZEL TO PASS IT ON,

1    AREN'T YOU?

2                    THE WITNESS:  I AM --

3                    THE COURT:  SO YOU KNEW THAT SOME OF IT

4    WAS GOING TO BE PASSED ON.

5                    THE WITNESS:  THAT SOME OF IT WAS GOING

6    TO BE PASSED ON.  I DIDN'T KNOW THAT THIS WOULD BE CUT

7    AND PASTED.

8    BY MR. WIYGUL:

9    Q.    SO IT'S CLEAR NOW FROM WHAT WE HAVE SEEN THAT IN

10   THIS ARTICLE, WHICH WAS LINKED TO IN THE PARAGRAPH ABOUT

11   THE EXPRESSVOTE MACHINES, THAT WENT TO DEFENDANTS, DR.

12   APPEL IS TALKING ABOUT A SINGLE PROBLEM, RIGHT, WHICH HE

13   CALLED "PERMISSION TO CHEAT" AND I HAVE CALLED OPT-OUT.

14   RIGHT?

15   A.    THAT'S RIGHT.

16   Q.    HE IS SAYING IT AFFECTS TWO DIFFERENT MACHINES,

17   CORRECT?

18   A.    THAT'S WHAT HE IS SAYING, YES.

19   Q.    AND BOTH OF THOSE ARE CALLED EXPRESSVOTE.  ONE

20   OF THEM HAS A MODIFIER AT THE END, CORRECT?

21   A.    THAT'S RIGHT.

22   Q.    IF YOU GO BACK TO JX 20, WHICH IS THE

23   OCTOBER 9TH E-MAIL, YOUR PARAGRAPH BEGINS BY REFERRING

24   TO THE ES&S EXPRESSVOTE MACHINES, PLURAL, CORRECT?

25   A.    YES.

1   Q.      SO NOW HAVING REVIEWED THAT ARTICLE, DO YOU

2   AGREE WITH ME THAT IT WOULD HAVE BEEN PERFECTLY

3   REASONABLE FOR DEFENDANTS TO READ WHAT YOU WROTE IN THAT

4   OCTOBER 9TH E-MAIL AND ASSUME THAT YOU WERE REFERRING TO

5   THE EXPRESSVOTE XL MACHINE?

6   A.      I SUPPOSE SO.

7   Q.      OKAY.  NOW, DR. APPEL, AS WE SAW HERE, URGES

8   JOHNSON COUNTY AND THEN HE URGES THE OTHER JURISDICTIONS

9   THAT HE THOUGHT WERE LOOKING AT THE EXPRESSVOTE XL.  HE

10  EXPRESSLY URGES THEM NOT TO BUY THOSE MACHINES BECAUSE

11  OF THIS FEATURE, CORRECT?

12  A.      YES.

13  Q.      YOU DON'T SAY THAT IN YOUR OCTOBER 9TH E-MAIL,

14  IN THE PORTION OF THE OCTOBER 9TH E-MAIL THAT REFLECTS

15  YOUR WRITING, CORRECT?

16  A.      NO, I DON'T SAY THAT.

17  Q.      IN FACT, YOU SUGGEST THAT THE XL MACHINE -- OR

18  YOU SUGGEST THAT THE EXPRESSVOTE MACHINES, TO USE YOUR

19  WORDS, BE CERTIFIED WITH RESTRICTIONS, CORRECT?

20  A.      IF THEY WERE TO BE CERTIFIED, THEY SHOULD HAVE

21  THESE RESTRICTIONS.  THAT'S WHAT --

22  Q.      YOU SUGGEST THAT MR. MAAZEL URGE PENNSYLVANIA TO

23  CERTIFY THEM WITH RESTRICTIONS.  THOSE WERE YOUR WORDS,

24  CORRECT?

25  A.      THAT'S WHAT IT SAYS, BUT WHAT THAT MEANS, AND I

1   DON'T KNOW HOW MR. MAAZEL INTERPRETED IT, BUT WHAT I

2   INTENDED FOR HIM TO FORM IN HIS MIND WAS NOT TO URGE

3   PENNSYLVANIA TO ADOPT THE MACHINES, BUT TO SAY IF

4   PENNSYLVANIA IS TO ADOPT THESE MACHINES, THEY SHOULD

5   HAVE RESTRICTIONS.

6   Q.      YOU DEFINITELY DID NOT SAY URGE PENNSYLVANIA NOT

7   TO ADOPT THESE MACHINES.

8   A.      I DIDN'T SAY THAT, NO.

9   Q.      NOW, CAN WE LOOK AT THE BLOG POST AGAIN BY DR.

10  APPEL AND LET'S LOOK AT THE WAY HE DESCRIBES THE PAPER

11  RECORDS, TO USE THE GENERIC TERM THAT I THINK IS

12  UNOBJECTIONABLE IN THE SETTING, CREATED BY THE

13  EXPRESSVOTE MACHINES.  AND IF WE LOOK AT -- LOOK AT THE

14  SECOND TO LAST PARAGRAPH ON THE FIRST PAGE.  ALL RIGHT.

15              HE REFERS TO THEM AS -- LET'S LOOK AT THE

16  SECOND SENTENCE -- AS A BALLOT, CORRECT?

17  A.      YES.

18  Q.      IF IT'S THE LATTER -- THERE'S ANOTHER VERSION.

19  THANK YOU.

20  A.      HE IS REFERRING TO WHAT THE MACHINE SAYS ON ITS

21  SCREEN.  HE IS NOT REFERRING TO THE PIECE OF PAPER THAT

22  COMES OUT AS A BALLOT.

23  Q.      HOW ABOUT THE LAST SENTENCE WHERE HE TALKS ABOUT

24  PRINTING THOSE VOTES ON THE PAPER BALLOT.  HE IS

25  REFERRING THERE TO THE PIECE OF PAPER, IS HE NOT?

1   A.        YES, HE IS, BUT FOR MORE GENERAL AUDITS.

2   Q.        AND HE IS NOT ONLY CALLING IT A BALLOT.  HE IS

3   CALLING IT A PAPER BALLOT.

4   A.        FOR PURPOSES OF THIS DISCUSSION THAT HE IS

5   MAKING THE DISTINCTION, IT'S NOT REALLY VERY RELEVANT.

6   Q.        AND NOW I GRANT YOU BASED ON THE CONTEXT WE HAVE

7   ESTABLISHED THAT THIS PART OF THE ARTICLE HE IS TALKING

8   ABOUT NOT THE XL, BUT THE OTHER EXPRESSVOTE MACHINE,

9   CORRECT?

10  A.        OKAY.

11  Q.        RIGHT?  ALTHOUGH WE WERE AGREED THAT IT PRINTS

12  THE SAME BALLOT AS THE XL DOES, THE PAPER RECORD, THE

13  SAME PAPER RECORD.

14  A.        YES, PAPER RECORD.

15  Q.        NOW LET'S LOOK AT THE SECOND PAGE.  HERE HE IS

16  TALKING EXPRESSLY -- HERE HE IS TALKING SPECIFICALLY

17  ABOUT THE EXPRESSVOTE XL, CORRECT?

18  A.        YES.

19  Q.        IF WE LOOK AT THE SECOND PARAGRAPH ON THAT PAGE,

20  AND YOU LOOK AT NUMBERED ITEM 6, HE IS REFERRING

21  SPECIFICALLY TO THE PIECE OF PAPER -- PAPER RECORD FROM

22  THE -- PRINTED FROM THE EXPRESSVOTE XL MACHINE AS A

23  PAPER BALLOT, CORRECT?

24  A.        YES.  HE IS SAYING, WAIT FOR THE PAPER TO BE

25  EJECTED, WHICH DOESN'T ACTUALLY HAPPEN IN PENNSYLVANIA

1     WE NOW KNOW, BUT THAT GIVES --

2     Q.      HE IS NOT ACTUALLY SAYING WAIT FOR THE PIECE OF

3     PAPER.  HE IS SAYING WAIT FOR THE PAPER BALLOT.

4     A.      HE WRITES THAT, YES.

5     Q.      AND NOW LET'S LOOK BACK AT YOUR E-MAIL, JX 20.

6     DO YOU RECALL AT THE OUTSET YOU WERE VERY ADAMANT IN

7     CORRECTING THE JUDGE ON HIS TERMINOLOGY THAT THIS SHOULD

8     BE CALLED NOT A BALLOT, RIGHT?  ALL RIGHT.  LET'S LOOK

9     AT THE WAY YOU REFER TO IT.  CAN YOU BLOW UP JUST THAT

10    ES&S PARAGRAPH, PLEASE.

11                  FIRST OF ALL, YOU REFER TO IT AS A

12    "BALLOT-MARKING DEVICE," RIGHT?

13    A.      YES.

14    Q.      AND THEN YOU REFER TO "THE PAPER TRAIL."

15    A.      YES.

16    Q.      AND THEN YOU TALK ABOUT "PRINTING THE BALLOT."

17    RIGHT?

18    A.      YES.

19    Q.      AND THEN YOU TALK ABOUT A "BALLOT BOX"?

20    A.      YES.

21    Q.      AND THEN YOU TALK ABOUT A COUPLE LINES DOWN THE

22    RIGHT BALLOTS, VERIFYING THE BALLOTS BEFORE PRINTING

23    THEM, "THEM" THE BALLOTS, RIGHT?

24    A.      THAT'S REFERRING TO WHAT IS ON THE SCREEN.

25    Q.      YES, BUT THEN YOU PRINT THEM AND THEN THEY ARE

1    PAPER, RIGHT?

2    A.       WELL, IT WOULD BE VERY AWKWARD TO WRITE THAT IN

3    A DIFFERENT WAY BUT --

4    Q.       THAT'S OKAY BECAUSE YOU ALREADY REFERRED TO IT

5    AS A BALLOT IN OTHER PLACES.

6    A.       THAT'S WHAT IT SAYS IN THE E-MAIL.

7    Q.       AND YOU REFER TO IT AS THE PAPER IN OTHER

8    PLACES, RIGHT?

9    A.       YES.

10   Q.       AND THEN LASTLY YOU REFERRED TO IT AS THE

11   "COMPLETED BALLOT" AFTER IT HAS BEEN PRINTED, RIGHT?   SO

12   NO AMBIGUITY THERE.   YOU ARE REFERRING TO A PIECE OF

13   PAPER, NOT SOMETHING ON THE SCREEN.

14   A.       THAT'S WHAT IT SAYS.

15   Q.       OKAY.

16   A.       HOWEVER IMPRECISELY WORDED.

17   Q.       AGAIN, THIS IS THE E-MAIL THAT PLAINTIFFS CHOSE

18   TO SEND PROVIDING FEEDBACK FROM THEIR EXPERT ON THE

19   MACHINES THE DEFENDANTS WERE CONTEMPLATING

20   CERTIFICATION, THE MACHINES THAT PLAINTIFFS SPECIFICALLY

21   ARE REQUESTING FROM DEFENDANTS.

22            MR. MAAZEL:   OBJECTION.

23            THE COURT:   HE DIDN'T MAKE THE DECISION

24   TO SEND IT, SO HE DOES NOT HAVE TO ANSWER THAT.

25            MR. WIYGUL:   OKAY.

1    BY MR. WIYGUL:

2    Q.      THIS WAS SENT -- NO QUESTION ABOUT THIS.   YOUR

3    WORDS HERE WERE SENT TWO DAYS BEFORE THE SETTLEMENT

4    CONFERENCE, CORRECT?

5    A.      I DON'T KNOW WHEN THE SETTLEMENT CONFERENCE WAS.

6    Q.      IF I TELL YOU IT HAS BEEN STIPULATED TO TAKE

7    PLACE ON OCTOBER 11TH, YOU'LL AGREE, TWO DAYS

8    BEFOREHAND.

9    A.      OKAY.

10   Q.      DID YOU AT ANY POINT BETWEEN THIS OCTOBER 9TH

11   E-MAIL AND OCTOBER 12TH, THE MORNING OF OCTOBER 12TH, BY

12   WHICH TIME IT HAS BEEN ESTABLISHED THAT THE LANGUAGE IN

13   WHAT BECAME PARAGRAPH 2 AND 3 OF THE SETTLEMENT

14   AGREEMENT WAS DECIDED -- AT ANY POINT IN THAT PERIOD DID

15   YOU EVER COMMUNICATE TO DEFENDANTS ACTUALLY THIS --

16   THESE EXPRESSVOTE PAPER RECORDS, I WAS SPEAKING LOOSELY

17   WHEN I DESCRIBED THEM AS BALLOTS, AND I THINK THAT DR.

18   APPEL WAS SPEAKING LOOSELY WHEN HE DESCRIBED THEM AS

19   PAPER BALLOTS?

20   A.      NO.

21   Q.      TO YOUR KNOWLEDGE, DID PLAINTIFFS EVER SAY THAT

22   TO DEFENDANTS?

23                    MR. MAAZEL:  OBJECTION.

24                    THE WITNESS:  I WAS NOT PART OF THE THOSE

25   DECISIONS.

1                          THE COURT:  OVERRULED.

2                          THE WITNESS:  SO, NO --

3                          THE COURT:  YOU DON'T KNOW?

4                          THE WITNESS:  I HAVE NO IDEA.

5                          THE COURT:  OKAY.

6       BY MR. WIYGUL:

7       Q.        NOW, EXPRESSVOTE BALLOTS -- EXPRESSVOTE PAPER

8       RECORDS --

9       A.        THANK YOU.

10      Q.        -- THEY WERE NOT THE ONLY PAPER RECORDS ON A

11      VOTING SYSTEM -- EXCUSE ME.  THEY WERE NOT THE ONLY

12      PAPER RECORDS PRINTED BY A VOTING DEVICE THAT WAS LISTED

13      ON THE SEPTEMBER 21ST VOTING SYSTEM STATUS REPORT THAT

14      YOU REVIEWED.  THEY WERE NOT THE ONLY EXAMPLE OF

15      MACHINES THAT PRINTED BALLOTS WITH ONLY THE VOTER'S

16      SELECTION, RATHER THAN THE WHOLE MENU OF OPTIONS,

17      CORRECT?

18      A.        NO, I DON'T THINK SO.  THERE ARE DOZENS OF

19      MACHINES THAT ARE IN CONFIGURATIONS ON THAT LIST.

20      Q.        I THINK YOU REFERRED TO THAT AS A SUMMARY

21      BALLOT, IS THAT RIGHT?

22      A.        AS IT'S -- HAVE I EVER REFERRED TO IT?

23      Q.        YES.  I AM TRYING TO SEE IF WE CAN AGREE ON SOME

24      NOMENCLATURE FOR REFERENCE.

25      A.        SO I THINK A VALID -- WHAT ARE -- WHAT HAVE WE

1    BEEN CALLING IT, A PRINTOUT, I THINK, OR A SUMMARY CARD

2    IS PROBABLY THE MOST SPECIFIC NOMENCLATURE.

3              THE COURT:  CALL IT ANYTHING BUT LATE FOR

4    DINNER.  BUT LET'S MOVE.

5    BY MR. WIYGUL:

6    Q.     LET'S LOOK AT JX 59, WHICH I BELIEVE IS IN

7    EVIDENCE.

8              THE COURT:  59?

9              MR. WIYGUL:  YES, 59.

10   BY MR. WIYGUL:

11   Q.     AND THIS -- THERE HAS BEEN TESTIMONY THIS IS AN

12   EXAMPLE OF A BALLOT PRODUCED BY -- EXCUSE ME -- A PAPER

13   RECORD PRODUCED BY A HART BALLOT-MARKING DEVICE,

14   CORRECT?

15   A.     YES.

16   Q.     AND YOU DON'T HAVE ANY OBJECTION -- I CAN CALL

17   IT A HART BALLOT-MARKING DEVICE.  BUT SOMEHOW YOU DON'T

18   WANT ME TO CALL IT PRINTED TO MARK THE BALLOT, IS THAT

19   RIGHT?

20   A.     A BALLOT-MARKING DEVICE IS THE TERM FOR THE

21   PIECES OF EQUIPMENT THAT PRINT THESE THINGS.

22   Q.     "THESE THINGS" THAT ARE NOT BALLOTS?

23   A.     WHATEVER YOU WANT TO CALL THEM.

24   Q.     THIS IS ALSO AN EXAMPLE, RIGHT -- FIRST OF ALL,

25   THIS IS AN EXAMPLE OF A PAPER RECORD PRINTED BY A

1    BALLOT-MARKING DEVICE THAT IS ONE OF THE COMPONENTS OF

2    THE SYSTEMS THAT WAS LISTED IN THE SEPTEMBER 21ST

3    REPORT, RIGHT?

4    A.      IT IS.

5    Q.      AND THIS IS ALSO WHAT YOU I THINK WERE REFERRING

6    TO AS A SUMMARY CARD.  IT DOESN'T PRINT THE WHOLE MENU

7    OF OPTIONS, CORRECT?

8    A.      THAT'S RIGHT.

9    Q.      ALL RIGHT.  CAN YOU LOOK AT JX 54, PLEASE.

10                 THIS IS -- I THINK THE TESTIMONY HAS BEEN

11   THIS IS AN EXAMPLE OF A DOMINION -- A PAPER RECORD

12   PRINTED BY A DOMINION BALLOT-MARKING DEVICE, CORRECT?

13   A.      YES.

14   Q.      AND THIS -- THAT DOMINION BALLOT-MARKING DEVICE

15   WAS ALSO ONE OF THE COMPONENTS OF THE SYSTEMS LISTED ON

16   THE SEPTEMBER 21ST REPORT, RIGHT?

17   A.      YES, YES.

18   Q.      AND LIKEWISE, IT DOESN'T PRINT THE WHOLE MENU OF

19   OPTIONS.

20   A.      THAT'S RIGHT.

21   Q.      AND CAN WE LOOK AT JX 62, ON THE RIGHT.

22                 THIS IS -- I BELIEVE THE TESTIMONY HAS

23   BEEN, AND IF NOT YOU CAN CONFIRM IT FOR ME, THIS IS AN

24   FOR EXAMPLE OF A PAPER RECORD PRINTED BY A UNISYN

25   BALLOT-MARKING DEVICE.

1    A.      YES.   THERE HAS BEEN TESTIMONY TO THAT EFFECT.

2    Q.      I THOUGHT THERE WAS.   OKAY.   AND THIS IS ALSO --

3    THIS DEVICE IS ALSO A COMPONENT OF ONE OF THE SYSTEMS

4    THAT WAS LISTED ON THE SEPTEMBER 21ST REPORT, RIGHT?

5    A.      THAT'S RIGHT.   THE COMPONENTS THAT PRINT

6    DIFFERENT STYLES.

7    Q.      SIMILARLY, DOES NOT PRINT A FULL MENU OF

8    OPTIONS, CORRECT?

9    A.      YES, THAT'S CORRECT.

10   Q.      SO BY MY COUNT NOW IF WE TAKE THE EXPRESSVOTE

11   2.1 AND THE EXPRESSVOTE XL THAT WE AGREED WERE

12   COMPONENTS OF THE EVS SYSTEM ON THE REPORT, THERE ARE

13   FIVE DIFFERENT EXAMPLES OF BALLOT-MARKING DEVICES ON THE

14   LIST, RIGHT, OR COMPONENTS OF THE SYSTEMS ON THE LIST,

15   THAT PRINT SUMMARY CARDS, AS YOU CALL THEM, CORRECT?

16   A.      YES.

17   Q.      NOT ONCE IN YOUR E-MAIL DID YOU EVER OBJECT TO

18   THAT, CORRECT?

19   A.      IN THAT NONEXHAUSTIVE LIST OF POTENTIAL

20   PROBLEMS, THAT'S RIGHT.

21   Q.      THE EXPRESSVOTE BALLOTS ALSO WERE NOT THE ONLY

22   BALLOTS WHERE THE VOTE IS TABULATED FROM A HUMAN

23   READABLE CODE, CORRECT?

24   A.      THAT'S CORRECT.

25   Q.      ALL RIGHT.   SO THAT'S ALSO TRUE OF --

1    A.    I'M SORRY -- A HUMAN READABLE CODE?

2    Q.    I'M SORRY.   HUMAN UNREADABLE CODE.

3    A.    YOU MEAN UNREADABLE CODE.

4    Q.    HUMAN INSCRUTABLE CODE.

5    A.    THAT'S RIGHT.

6    Q.    SO THE UNISYN SYSTEM IS ANOTHER -- EXCUSE ME,

7    THE UNISYN PAPER RECORD IS ANOTHER EXAMPLE OF THAT,

8    RIGHT?

9    A.    I AM ACTUALLY NOT WILLING TO SAY THAT THAT IS A

10   HUMAN UNREADABLE CODE IN THIS CASE, BUT --

11   Q.    AND JUST SO WE ARE ON THE SAME PAGE, SO TO

12   SPEAK, YOU ARE REFERRING -- BY THE CODE WE ARE REFERRING

13   TO -- WE'RE TALKING ABOUT THIS --

14   A.    IT'S A CODE.   IT'S A CODE OF SOME KIND.

15   Q.    OKAY.   I CAN'T READ THAT.   ARE YOU TELLING ME

16   YOU CAN READ THAT, SIR?

17   A.    WE COULD PROBABLY TRAIN YOU TO READ IT.

18   Q.    OKAY.   DO YOU THINK THE AVERAGE VOTER --

19   A.    THE AVERAGE VOTER CAN'T.

20   Q.    -- IN THE POLLING PLACE IS ABLE TO READ THAT?

21   A.    I WILL CONCEDE THAT.

22   Q.    THAT THE AVERAGE VOTER IS NOT ABLE TO READ THAT?

23   A.    YES.

24   Q.    AND THE DOMINION BALLOT-MARKING DEVICE THAT WE

25   WERE JUST LOOKING AT, I BELIEVE IT'S 54, THAT'S ANOTHER

1    EXAMPLE OF A DEVICE FOR WHICH THE VOTE IS TABULATED

2    BASED ON A HUMAN UNREADABLE CODE, CORRECT?

3    A.      THAT'S RIGHT.

4    Q.      IN THIS CASE IT'S A QR CODE, CORRECT?

5    A.      AND AN ENCRYPTED ONE AT THAT, YES.

6    Q.      SO THAT'S FOUR SYSTEMS BY MY COUNT, FOUR DEVICES

7    THAT ARE COMPONENTS OF THE LIST THAT WAS SENT TO YOU AND

8    THAT YOU REVIEWED AND PROVIDED FEEDBACK ON THAT USE

9    HUMAN INSCRUTABLE CODING OF SOME SORT, AT LEAST TO THE

10   AVERAGE HUMAN BEING, TO TABULATE THE VOTE.

11   A.      THAT'S FOUR, THAT'S CORRECT.

12   Q.      YOU NEVER OBJECTED TO THAT IN YOUR E-MAIL,

13   CORRECT?

14   A.      I DIDN'T.

15   Q.      AND YOU NEVER OBJECTED TO EITHER THE SUMMARY

16   CARD OR THE USE OF A CODE TO TABULATE THE VOTE AT ANY

17   POINT BEFORE THE SETTLEMENT AGREEMENT WAS SIGNED,

18   CORRECT?

19   A.      I DON'T BELIEVE SO.

20   Q.      CAN WE LOOK AT DX N, AS IN NANCY, PLEASE.

21           THE PARTIES HAVE STIPULATED TO THE

22   AUTHENTICITY OF THIS EXHIBIT.  THIS IS A PORTION OF A

23   TWITTER FEED FROM THE PLAINTIFF DR. JILL STEIN'S TWITTER

24   ACCOUNT.

25           MR. MAAZEL:  YOUR HONOR, CAN I BE HEARD

1    ON THIS DOCUMENT WHICH IS NOT IN EVIDENCE.

2              MR. WIYGUL:  IT'S NOT IN EVIDENCE, THAT'S

3    TRUE.

4              THE COURT:  SURE.

5              MR. MAAZEL:  SO THIS INCLUDES A TWEET

6    FROM DR. STEIN.  WE DO NOT OBJECT TO THAT COMING INTO

7    EVIDENCE.  IT ALSO INCLUDES A WHOLE BUNCH OF -- I AM NOT

8    SURE IF THEY ARE TWEETS OR WHAT THEY ARE, BUT SOMETHING

9    -- SOME SERIES OF COMMENTS BY A WOMAN NAMED JENNIFER

10   COHN.

11             THE COURT:  YES, I SEE IT.

12             MR. MAAZEL:  AND I OBJECT TO THIS ON

13   HEARSAY.  I OBJECT TO THIS ON RELEVANCE.  GOD KNOWS HOW

14   MANY PEOPLE RESPOND TO DR. STEIN'S TWEETS, PROBABLY

15   THOUSANDS.  AND THE IDEA THAT WE CAN INTRODUCE IN COURT

16   TWEETS OR RESPONSES JUST PERSONS -- I CAN'T SEE HOW THIS

17   IS ADMISSIBLE ANYWAY.

18             MR. WIYGUL:  MAY I ADDRESS THE HEARSAY

19   OBJECTION, YOUR HONOR?

20             THE COURT:  SURE.

21             MR. WIYGUL:  YOU'LL NOTE THAT THERE IS A

22   DISCUSSION AMONG THE REPLIES HERE BETWEEN JENNIFER COHN

23   AND A MAN BY THE NAME OF DAVE SCHWAB.  AND THE

24   PLAINTIFFS HAVE STIPULATED THAT DAVE SCHWAB WAS AT THIS

25   TIME DR. STEIN'S COMMUNICATIONS DIRECTOR.  AND SO WE

1       THINK HE IS CLEARLY -- COMES WITHIN THE STATEMENT OF A

2       PARTY OPPONENT.  AND EVEN BEYOND THAT, IT WOULD BE

3       RELEVANT TO SHOW WHAT KNOWLEDGE PLAINTIFFS HAD OR WHAT

4       THEY ARE ON NOTICE OF AT THE RELEVANT TIME REGARDING THE

5       MACHINE.

6                    THE COURT:  I WILL OVERRULE THE

7       OBJECTION.  I WON'T ACCEPT IT FOR THE TRUTH OF WHAT WAS

8       ASSERTED, BUT FOR THE PLAINTIFFS' STATE OF MIND

9       CERTAINLY.

10      BY MR. WIYGUL:

11      Q.      SO DR. HALDERMAN, IF --

12                   THE COURT:  OTHER THAN THE STEIN

13      DECLARATION ITSELF, WHICH IS AT THE TOP.

14                   MR. WIYGUL:  YOUR HONOR, MAY I CLARIFY AS

15      TO MR. SCHWAB WHO IS --

16                   THE COURT:  SCHWAB'S STATEMENTS ARE THE

17      STATEMENTS OF A PARTY OPPONENT AND CAN BE CONSIDERED FOR

18      THE TRUTH.  WHAT HE IS RESPONDING TO, I WILL -- FOR THE

19      STATE OF KNOWLEDGE THAT THE PLAINTIFFS HAVE.  I CANNOT

20      SAY THAT MS. COHN'S STATEMENTS ARE TRUE, BUT WHATEVER

21      THEY SAY, MR. SCHWAB AND BY EXTENSION THE PLAINTIFF KNEW

22      ABOUT THEM.

23      BY MR. WIYGUL:

24      Q.      SO THIS -- YOU CAN SEE DR. STEIN'S TWEET IS

25      DATED NOVEMBER 28, 2018.  DO YOU SEE THAT?

1     A.     YES, I DO.

2     Q.     AND THAT WAS THE DATE OF THE SETTLEMENT

3     AGREEMENT IN THIS CASE, RIGHT?

4     A.     YES.

5     Q.     AND IN FACT HER TWEET IS HERALDING THAT

6     SETTLEMENT AGREEMENT, CORRECT?

7     A.     YES.

8     Q.     AND THEN IF YOU LOOK ON THE SECOND PAGE, DO YOU

9     SEE THAT'S WHERE THERE ARE SOME TWEETS BY DAVE SCHWAB AT

10    THE TOP?

11    A.     I DO.

12    Q.     HE IS THE ONE WE HAVE ESTABLISHED -- THE PARTIES

13    HAVE STIPULATED WAS DR. STEIN'S COMMUNICATIONS DIRECTOR.

14    AND THEN THERE'S A TWEET BY JENNIFER COHN.  DO YOU SEE

15    THAT?

16    A.     I DO.

17    Q.     DO YOU KNOW WHO JENNIFER COHN IS?

18    A.     I DON'T REALLY.  SHE IS -- I HAVE HEARD THAT SHE

19    IS SOME LAWYER AND ELECTION INTEGRITY ADVOCATE, I

20    SUPPOSE.  SHE TWEETS VERY, VERY FREQUENTLY.

21    Q.     SHE'S PROLIFIC.

22    A.     SHE'S VERY PROLIFIC.  I THINK I MAY WELL HAVE

23    HER MUTED ON TWITTER.

24    Q.     SHE IS A VOCAL ADVOCATE FOR HAND-MARKED PAPER

25    BALLOTS IN PARTICULAR, CORRECT?

1    A.       I SUPPOSE.

2    Q.       SHE HAD A PIECE THAT WAS RECENTLY PUBLISHED IN

3    THE NEW YORK REVIEW OF BOOKS.  ARE YOU AWARE OF THAT

4    PIECE?

5    A.       I DON'T KNOW.

6    Q.       HERE SHE IS SAYING -- SHE SAYS:  IF IT ISN'T

7    HAND MARKED, EXCEPT FOR ADA USE, IT'S A SCAM.  AND THEN

8    SHE EMBEDS A TWEET AND THIS IS NOVEMBER 29TH.  SHE SAYS:

9    I HATE TO BE DEBBIE DOWNER, BUT THIS AGREEMENT,

10   REFERRING I THINK TO THE SETTLEMENT AGREEMENT IN THIS

11   CASE, ALLOWS PENNSYLVANIA TO BUY AWFUL UNIVERSAL USE

12   TOUCH SCREEN BALLOT MARKERS AND SCANNERS THAT GENERATE

13   THE COMPUTER MARKED SO-CALLED PAPER BALLOTS WITH

14   BARCODES THAT I HAVE BEEN WARNING ABOUT.

15               DO YOU SEE THAT?

16   A.       I SEE THAT.

17   Q.       SHE IS CLEARLY TALKING HERE ABOUT EXACTLY THE

18   SORT OF HYBRID BALLOT-MARKING DEVICES.  SHE CALLS THEM

19   UNIVERSAL USE THAT WE HAVE BEEN DISCUSSING IN THIS CASE,

20   RIGHT?

21               MR. MAAZEL:  OBJECTION.

22               THE COURT:  OVERRULED.

23               THE WITNESS:  THAT WOULD ENCOMPASS THOSE

24   DEVICES, I THINK.

25   Q.       AND SHE IS MAKING CLEAR IN RESPONSE TO DR.

1    STEIN'S COMMUNICATIONS DIRECTOR TWEET THAT SHE OBJECTS

2    TO THE PAPER RECORDS PRODUCED BY THESE SYSTEMS BECAUSE

3    AT LEAST AMONG OTHER REASONS THEY USE BARCODES, RIGHT?

4    A.      THAT'S ONE OF HER OBJECTIONS.

5    Q.      AND THEN IF WE TURN THE PAGE, I THINK THERE'S A

6    REPRINT OF THAT SAME EMBEDDED TWEET ABOUT DEBBIE DOWNER

7    AT THE TOP, AND THEN YOU SEE A RESPONSE BY DAVE SCHWAB,

8    SEVERAL RESPONSES BY DAVE SCHWAB.

9    A.      I SEE THAT.

10   Q.      HE IS DEFENDING THE SETTLEMENT AGAINST MS.

11   COHN'S CRITICISM, CORRECT?

12   A.      YES.

13   Q.      AND AT THE BOTTOM OF THAT PAGE HE SAYS -- AND

14   THIS IS OFTEN HOW TWEETS ARE DONE, RIGHT, BECAUSE YOU

15   ARE LIMITED TO A CERTAIN NUMBER OF CHARACTERS AND YOU

16   WILL OFTEN HAVE A MULTI-TWEET RESPONSE AND THEN THE

17   WRITER WILL INDICATE THAT BY PUTTING THE "1/2/" THAT WE

18   SEE HERE, RIGHT?

19   A.      YES.

20   Q.      YOU RECOGNIZE THAT CONVENTION?

21   A.      YES.

22   Q.      SO IF WE LOOK AT THE 4/ TWEET, HE SAYS:  ON THE

23   QUESTION OF WHETHER BALLOT-MARKING DEVICES BMD'S ARE

24   GOOD OR BAD, EXPERTS HAVE WIDELY DIVERGENT OPINIONS.

25           DO YOU SEE THAT?

1    A.      YES.

2    Q.      SO DAVE SCHWAB IS CLEARLY AWARE THAT THE

3    SETTLEMENT AGREEMENT PERMITS BALLOT-MARKING DEVICES.

4    THAT'S HOW YOU READ THIS TWEET, DON'T YOU?

5    A.      BALLOT-MARKING DEVICES ENCOMPASSES QUITE A LOT.

6    Q.      OKAY.

7    A.      INCLUDING NOT ONLY MACHINES LIKE THE --

8    Q.      YES IS THE ANSWER, IS THAT RIGHT?

9    A.      YES.

10   Q.      IF WE GO TO THE NEXT PAGE, HE GOES -- FIRST

11   TWEET THERE IS HE IS TALKING ABOUT SOME OF THE BENEFITS

12   THAT BALLOT-MARKING DEVICES HAVE, CORRECT, THE FIRST

13   SENTENCE?

14   A.      YES.

15   Q.      AND THEN THE NEXT TWEET HE SAYS: BARCODES

16   SPECIFICALLY HAVE BEEN A LIGHTNING ROD FOR CRITICISM,

17   BUT THE ACTUAL RISKS ARE SMALL SO LONG AS POST-ELECTION

18   AUDITS MANUALLY VERIFY THE HUMAN READABLE TEXT ON THE

19   BALLOT.  DO YOU SEE THAT?

20   A.      YES, I DO.

21   Q.      SO MR. SCHWAB IS CLEARLY DEFENDING THE FACT THAT

22   THE SETTLEMENT AGREEMENT ALLOWS THE USE OF

23   BALLOT-MARKING DEVICES THAT USE BARCODES TO TABULATE THE

24   VOTES, ISN'T HE?

25            MR. MAAZEL:  OBJECTION.

1          THE COURT:  OVERRULED.

2          THE WITNESS:  CAN YOU REPEAT THAT?

3    BY MR. WIYGUL:

4    Q.       MR. SCHWAB HERE IS CLEARLY DEFENDING THE FACT

5    THAT THE SETTLEMENT AGREEMENT ALLOWS THE USE OF

6    BALLOT-MARKING DEVICES THAT PRINT PAPER RECORDS WITH

7    BARCODES TO TABULATE THE VOTES.

8    A.       WELL, BUT IN THE NEXT TWEET HE IS SAYING

9    SOMETHING THAT MODIFIES THAT.

10   Q.       CAN YOU JUST ANSWER MY QUESTION ABOUT THE TWEET

11   THAT WE JUST LOOKED AT?

12   A.       WITHOUT THE CONTEXT OF THE SUBSEQUENT MESSAGE?

13   Q.       HE IS REFERRING TO PAPER RECORDS PRODUCED BY

14   BALLOT-MARKING DEVICES WITH THE PAPER RECORDS THAT HAVE

15   BARCODES, RIGHT?

16   A.       YES, HE IS.

17   Q.       HE IS SAYING THE RISKS ARE SMALL SO LONG AS

18   POST-ELECTION AUDITS MANUALLY VERIFY THE HUMAN READABLE

19   TEXT IN THE BALLOT.

20   A.       HE SAYS THAT.

21   Q.       AND THEN YOU MENTION THE NEXT TWEET AND IN FACT

22   THAT'S YOUR TWITTER USER NAME, THAT HASHTAG AT THE

23   BOTTOM, RIGHT?

24   A.       THAT'S RIGHT.

25   Q.       AND THAT MEANS THAT YOU GET A NOTIFICATION OF

1    THAT TWEET, CORRECT?

2    A.     I DON'T READ THOSE NOTIFICATIONS.

3    Q.     THAT WASN'T MY QUESTION, SIR.

4    A.     YES.

5    Q.     AND THEN THERE IS AN ENSUING RESPONSE BY

6    JENNIFER COHN, CORRECT, TO MR. SCHWAB'S TWEETS?

7    A.     YES.

8    Q.     OKAY.  AND THEN IF YOU GO TO A COUPLE OF PAGES

9    FORWARD, THE ONE THAT STARTS WITH 6 -- -

10   A.     YES.

11   Q.     -- SHE SAYS -- SHE IS REFERRING TO JURISDICTIONS

12   THROUGHOUT THE COUNTRY THAT FLOCK TO BUY THE UNIVERSAL

13   USE TOUCHSCREEN BALLOT MARKERS THAT GENERATE THE

14   BARCODED SUMMARY CARDS, RIGHT?

15   A.     YES.

16   Q.     AGAIN, SHE IS REFERRING TO THE PAPER RECORDS

17   THAT THE XL AND THE OTHER EXPRESSVOTE MACHINE AND I

18   GUESS THE DOMINION USES A QR CODE, AND UNISYN USES A

19   CODE.  THEY ALL USE CODES TO TABULATE THE VOTE, RIGHT?

20   A.     I AM SORRY.  THE LIST OF THINGS THAT YOU SAID?

21   Q.     CAN WE AGREE THAT SHE IS REFERRING TO --

22              MR. MAAZEL:  YOUR HONOR, CAN I OBJECT?

23              THE COURT:  WAIT, WAIT.  ASK YOUR

24   QUESTION.

25              MR. WIYGUL:  I WILL WITHDRAW THE OTHER

1    QUESTION.

2              THE COURT:  OKAY.

3    BY MR. WIYGUL:

4    Q.      CAN WE AGREE THAT MS. COHN IS REFERRING TO HERE,

5    AT LEAST PERHAPS AMONG OTHER THINGS, THE KINDS OF PAPER

6    RECORDS THAT ARE PRODUCED BY THE EXPRESSVOTE AND THE

7    EXPRESSVOTE XL?

8    A.      YES, THE BARCODES AND SUMMARY CARDS.

9              MR. MAAZEL:  CAN I JUST BE HEARD BRIEFLY,

10   YOUR HONOR, WITH RESPECT TO THE LAST TWO PAGES OF THIS

11   EXHIBIT?

12             THE COURT:  YES.

13             MR. MAAZEL:  AND IT'S THAT THERE APPEAR

14   TO BE A WHOLE SERIES OF, I GUESS, TWEETS BY JENNIFER

15   COHN, I DON'T KNOW, 20 OF THEM, MANY OF THEM.  BUT THERE

16   IS NO EVIDENCE THAT DAVE SCHWAB OR ANYONE AFFILIATED

17   WITH THE PLAINTIFFS READ THOSE, IN SHORT.

18             THE COURT:  I THINK THAT'S A FAIR

19   INFERENCE ON THE BACK AND FORTH, THAT HE LOOKED AT THEM.

20             GO AHEAD.

21   BY MR. WIYGUL:

22   Q.      CAN WE SKIP TO THE JENNIFER COHN TWEET THAT

23   STARTS 15/.

24   A.      YES.

25   Q.      SO SHE IS CONTINUING HERE HER ATTACK ON THE

1    SETTLEMENT AGREEMENT, CORRECT?

2    A.      YES.

3    Q.      OKAY.  SHE SAYS:  ALTHOUGH I ADMIRE THAT -- AND

4    THAT'S YOUR USER NAME AGAIN, RIGHT?

5    A.      YES.

6    Q.      THAT'S AS IF SHE SAID DR. HALDERMAN?

7    A.      YES.

8    Q.      ALTHOUGH I ADMIRE DR. HALDERMAN'S WORK

9    EXPLAINING THE MANY WAYS IN WHICH TOUCHSCREEN VOTING

10   MACHINES GET HACKED, I HAVE REFERENCED HIS WORK MANY

11   TIMES IN MY ARTICLES, I'VE NEVER SEEN HIM MENTION THE

12   GLARING CONCERNS WITH THESE UNIVERSAL USE TOUCHSCREEN

13   BALLOT MARKERS.  DO YOU SEE THAT?

14   A.      YES.

15   Q.      AND THEN SHE GOES ON TO SAY:  WHICH IS VERY

16   CONCERNING IF HE IS THE ONE WHO IS GOING TO ADVISE

17   PENNSYLVANIA AS TO WHAT TYPES OF SYSTEMS TO CERTIFY?

18   A.      YES.

19   Q.      AND YOU TESTIFIED BEFORE THAT YOU WERE AWARE

20   THAT AT LEAST SOME OF THE SYSTEMS THAT PENNSYLVANIA WAS

21   CONSIDERING CERTIFYING USED SOME -- WHAT YOU CALL

22   SUMMARY CARD BALLOTS WITH BARCODES TO TABULATE THE VOTE.

23   YOU WERE AWARE OF THAT AT THE TIME OF THE SETTLEMENT.

24   A.       THAT SOME OF THE MACHINES IN THOSE SUITES.  I

25   DIDN'T KNOW WHICH SPECIFIC MACHINES WERE BEING

1    CONSIDERED FOR CERTIFICATION.

2    Q.       AND THEN CAN WE GO TO 27/, PLEASE.

3              AND SHE IS CONTINUING.  SHE SAID:  I

4    CERTAINLY HOPE THAT -- AGAIN THERE IS YOUR TWEETER USER

5    NAME -- DR. HALDERMAN AND OTHERS WILL STEP UP AND

6    ADDRESS WHAT SHOULD BE THE ELEPHANT IN THE ROOM,

7    BARCODED SUMMARY CARDS AND UNIVERSAL USE TOUCHSCREEN

8    BALLOT MARKERS ARE ANATHEMA TO ELECTION INTEGRITY.  DO

9    YOU SEE THAT?

10   A.       YES.

11   Q.       CAN WE TURN TO 30/ -- THERE IS NO SLASH HERE,

12   JUST A PERIOD, BUT CONTINUING ON WITH THE SAME TWITTER

13   SCREEN, HERE SHE IS REFERRING TO THE JURISDICTIONS THAT

14   WE SAW BEFORE THAT HAD SELECTED EITHER THE EXPRESSVOTE

15   NON-XL OR THE EXPRESSVOTE XL MACHINE, CORRECT?

16   A.       YES.

17   Q.       IN FACT, SHE IS CITING TO THE VERY FREEDOM TO

18   TINKER ARTICLE THAT YOU HAD SENT TO MR. MAAZEL WHO SENT

19   IT TO ON TO DEFENDANTS, CORRECT?

20   A.       YES.

21   Q.       AND THEN 31:  IT CERTAINLY APPEARS TO ME THAT

22   PENNSYLVANIA WILL BE NEXT, UNLESS OF COURSE PEOPLE LIKE

23   YOU -- AND THERE IS YOUR TWITTER USER NAME AGAIN, RIGHT

24   -- MAKE A CONCERTED EFFORT TO HELP STOP IT.  THANKS FOR

25   READING.

1                    RIGHT?

2     A.      YES.

3     Q.      AND THIS WAS NOVEMBER 29, 2018, WHICH WAS THE

4     DAY AFTER THE SETTLEMENT AGREEMENT WAS SIGNED, CORRECT?

5     A.      YES, I THINK THAT'S THE RIGHT DATE.

6     Q.      SPECIFICALLY EXHORTING YOU AND THE PLAINTIFFS TO

7     TAKE SOME SORT OF ACTION AND SPECIFICALLY CRITICIZING

8     THE SETTLEMENT AGREEMENT BECAUSE IT ALLOWS, ON HER

9     READING AT LEAST, FOR THE CERTIFICATION OF MACHINES THAT

10    PRODUCE SUMMARY CARDS WITH BARCODES, IS THAT RIGHT?

11    A.      SHE HAS A VARIETY OF CONCERNS, BUT, YES.

12    Q.      THAT'S -- THOSE OF SOME OF THEM, RIGHT?  AND WE

13    SAW MR. MAAZEL'S TWEET EARLIER FROM I THINK IT WAS THE

14    SAME DAY OR MAYBE THE DAY BEFORE, WHERE HE SAID WE ARE

15    GOING TO BE WATCHING CLOSELY TO MAKE SURE PENNSYLVANIA

16    IMPLEMENTS THE TERMS OF THE SETTLEMENT AGREEMENT.  DO

17    YOU REMEMBER THAT?

18    A.      YES, I SAW THAT.

19    Q.      NOW, WE TALKED ABOUT THIS PRINTHEAD ISSUE,

20    RIGHT?  YOU KNOW WHAT I AM REFERRING TO THERE, THE FACT

21    THAT IN YOUR VIEW IT'S THEORETICALLY POSSIBLE THAT THE

22    EXPRESSVOTE XL COULD PRINT ADDITIONAL SELECTIONS ON THE

23    BALLOT AFTER THE VOTER HAS VERIFIED IT AND CAST HIS OR

24    HER VOTE?

25    A.      YES.

1    Q.       AND THAT DESIGN FEATURE, THAT WAS KNOWN ABOUT IN

2    THE PUBLIC DOMAIN LONG BEFORE PLAINTIFFS EVER RAISED IT

3    WITH DEFENDANTS IN THIS CASE, ISN'T THAT RIGHT?

4    A.       WELL, I AM NOT SURE IF IT WAS CONFIRMED THAT THE

5    XL SUFFERED FROM THAT FLAW.

6    Q.       LET'S LOOK AT DX II, PLEASE.

7    A.       I AM SORRY, WHERE?

8    Q.       IT'S SHOULD BE IN THE DX.

9              THE COURT:  I THINK IT'S THE VERY LAST

10   TAB.

11             MR. WIYGUL:  IT LOOKS LIKE ROMAN NUMERAL

12   II.

13             THE WITNESS:  THANK YOU, YOUR HONOR.

14   YES.

15             MR. LIEB:  YOUR HONOR, THIS AGAIN IS NOT

16   IN EVIDENCE.  I WOULD JUST ASK THAT COUNSEL TRY TO MOVE

17   DOCUMENTS IN EVIDENCE BEFORE PUTTING THEM ON THE SCREEN,

18   NOT AFTER.

19             MR. WIYGUL:  THAT'S A FAIR POINT.  AND IF

20   I HAVE NOT ALREADY, I DON'T KNOW IF I MOVED INTO

21   EVIDENCE THE DR. STEIN TWITTER FEED, BUT IF I HAVE NOT,

22   I WOULD LIKE TO DO THAT.

23             THE COURT:  SUBJECT TO MR. MAAZEL'S

24   OBJECTION, IT WILL BE ADMITTED.

25             (DEFENSE EXHIBIT DX N IS ADMITTED INTO

1     EVIDENCE.)

2               THE COURT:  AND YOU ARE MOVING THROUGH

3     THIS?

4               MR. WIYGUL:  I AM ALSO MOVING IN DX II,

5     YOUR HONOR.

6               THE COURT:  ARE YOU OBJECTING, MR.

7     MAAZEL?

8               MR. MAAZEL:  I AM, YOUR HONOR, ON HEARSAY

9     GROUNDS.

10              MR. WIYGUL:  I DON'T PLAN TO USE IT FOR

11    THE TRUTH OF THE MATTER, YOUR HONOR.

12              THE COURT:  JUST FOR THE STATE OF

13    KNOWLEDGE.

14              MR. WIYGUL:  CORRECT.

15              THE COURT:  AND YOU STIPULATE TO THE

16    AUTHENTICITY, IS THAT RIGHT, MR. MAAZEL?

17              MR. MAAZEL:  YES, YOUR HONOR.

18              THE COURT:  YOUR OBJECTION IS OVERRULED.

19    IT WILL BE ADMITTED SUBJECT TO THE LIMITATION.

20              MR. WIYGUL HAS A CASE.  LET'S STATE IT.

21              MR. WIYGUL:  THANK YOU, YOUR HONOR.

22              (DEFENSE EXHIBIT DX II ADMITTED INTO

23    EVIDENCE.)

24    BY MR. WIYGUL:

25    Q.     DR. HALDERMAN, WE ARE BACK NOW AT THE FREEDOM TO

1    TINKER WEBSITE, CORRECT?

2    A.      THAT'S RIGHT.

3    Q.      AND THIS IS AN ARTICLE THAT WAS AGAIN POSTED BY

4    DR. APPEL, CORRECT?

5    A.      THAT'S RIGHT.

6    Q.      IT'S A DIFFERENT ARTICLE THOUGH, RIGHT?

7    A.      YES.

8    Q.      THIS ONE WAS POSTED OCTOBER 16, 2018, CORRECT?

9    A.      THAT'S RIGHT.

10   Q.      AND THE PREVIOUS ONE WAS POSTED -- THE ONE THAT

11   YOU SENT TO MR. MAAZEL WHO SENT IT ON TO DEFENDANTS, WAS

12   POSTED SEPTEMBER 14, 2018.  RIGHT?

13   A.      THAT'S RIGHT.

14   Q.      SO THIS IS STILL -- OCTOBER 16TH IS ABOUT SIX

15   WEEKS BEFORE THE SETTLEMENT AGREEMENT WAS SIGNED,

16   CORRECT?

17   A.      YES, THAT'S -- THAT SOUNDS ABOUT RIGHT.

18   Q.      AND LET'S LOOK AT THE VERY -- THE VERY TOP

19   SENTENCE THERE RIGHT BEFORE THE BIG IMAGE.  IT SAYS:

20   THE DOMINION IMAGECAST EVOLUTION LOOKS LIKE A PRETTY

21   GOOD VOTING MACHINE.  DO YOU SEE THAT?

22   A.      YES.

23   Q.      THEN WE HAVE TO GO UNDERNEATH THE IMAGE WITH A

24   "BUT."  BUT IT HAS A SERIOUS FLAW.  AFTER YOU MARK YOUR

25   BALLOT, AFTER YOU REVIEW YOUR BALLOT, THE VOTING MACHINE

1    CAN PRINT MORE VOTES ON IT!

2                  DO YOU SEE THAT?

3    A.    YES.

4                  MR. MAAZEL:  YOUR HONOR, IF THIS IS

5    COMING IN FOR STATE OF MIND, SHOULDN'T WE FIRST

6    ESTABLISH IF THE PLAINTIFFS OR DR. HALDERMAN HAD ANY

7    KNOWLEDGE OF THIS ARTICLE?

8                  THE COURT:  NO.

9    BY MR. WIYGUL:

10   Q.    AND THE NEXT SENTENCE:  FORTUNATELY, THIS DESIGN

11   FLAW HAS BEEN PATENTED BY A RIVAL COMPANY, ES&S, WHICH

12   SUED TO PREVENT DOMINION FROM SELLING THIS BAD DESIGN.

13   UNFORTUNATELY, THAT MEANS ES&S CAN STILL SELL MACHINES

14   (SUCH AS THEIR EXPRESSVOTE ALL-IN-ONE) INCORPORATING

15   THIS DESIGN MISTAKE.

16                  DO YOU SEE THAT?

17   A.    YES.

18   Q.    OKAY.  AND YOU WILL AGREE WITH ME THAT PEOPLE

19   OFTEN REFER TO -- IN THE INDUSTRY AND CERTIFICATION

20   DOCUMENTS REFER TO THE KINDS OF HYBRID MACHINES LIKE THE

21   EXPRESSVOTE AND THE EXPRESSVOTE XL AS ALL-IN-ONE

22   MACHINES?

23   A.    YES.

24                  THE COURT:  MR. MAAZEL, HE IS OFFERING IT

25   FOR WHAT THE STATE OF PUBLIC KNOWLEDGE WAS.  YOUR CLIENT

1    SAID THAT HE DIDN'T THINK IT WAS IN THE PUBLIC DOMAIN.

2    YOUR CLIENT'S OWN DESCRIPTION IS THAT THIS IS A LAY

3    DOCUMENT.   IT CERTAINLY GOES TO WHETHER OR NOT THESE

4    CONCERNS WERE PUBLICLY AVAILABLE AND EXPRESSED AND

5    ACCESSIBLE TO PEOPLE LIKE YOUR CLIENT.

6                   GO AHEAD.

7    BY MR. WIYGUL:

8    Q.      AND IF WE TURN THE PAGE -- TO PAGE 2, MORE

9    DESCRIPTION OF THIS ISSUE.   AND I WANT TO LOOK AT THE

10   PARAGRAPH JUST UNDER THE IMAGE AGAIN ON PAGE 2, PLEASE.

11   A.      YES.

12   Q.      STARTING WITH "COMBINING THE BMD SCANNER." DO

13   YOU SEE THAT?

14   A.      YES.

15   Q.      AND HE TALKS SPECIFICALLY ON -- FOUR SENTENCES

16   INTO THAT, "FROM THE DIAGRAM OF THE PAPER PATH."  DO YOU

17   SEE THAT?

18   A.      YES.

19   Q.      FROM THE DIAGRAM OF THE PAPER PATH ABOVE, IT'S

20   PRETTY CLEAR THAT THE SAME BIDIRECTIONAL PAPER PATH

21   CONTAINS BOTH THE SCANNER AND THE PRINTER.   THAT MEANS

22   IT CAN CAST MORE VOTES ONTO YOUR BALLOT.

23                   DO YOU SEE THAT?

24   A.      YES.

25   Q.      THAT'S THE -- THAT IS THE PAPER PATH ISSUE THAT

1   YOU POINT TO IN THE XL DESIGN, CORRECT?

2   A.     YES, ESSENTIALLY.

3   Q.     NEITHER YOU NOR ANY OTHER PLAINTIFFS'

4   REPRESENTATIVE TO YOUR KNOWLEDGE EVER CONTACTED THE

5   DEFENDANTS TO SAY, WAIT, YOU CAN'T CERTIFY THE

6   EXPRESSVOTE MACHINE BECAUSE OF THIS PAPER PATH ISSUE,

7   CORRECT?

8   A.     I WAS WAITING TO WITNESS THE CERTIFICATION

9   TESTING.

10              THE COURT:  IS THAT A YES OR A NO?

11              THE WITNESS:  TO MY KNOWLEDGE, NO.

12  BY MR. WIYGUL:

13  Q.     LET'S LOOK AT DX L, AS IN LARRY.

14              MR. WIYGUL:  I WILL START BY MOVING THIS

15  INTO EVIDENCE, YOUR HONOR.  THE PARTIES HAVE STIPULATED

16  TO AUTHENTICITY.

17              MR. MAAZEL:  SAME REASONS, YOUR HONOR.  I

18  OBJECT BOTH ON HEARSAY AND --

19              THE COURT:  I THINK THE ONLY REASON YOU

20  OBJECTED WAS HEARSAY.

21              MR. MAAZEL:  OBJECTION TO HEARSAY.

22  BY MR. WIYGUL:

23  Q.     THIS IS ANOTHER ARTICLE IN FREEDOM TO TINKER,

24  CORRECT?

25  A.     YES.

1    Q.    BY DR. APPEL, CORRECT?

2    A.    YES.

3    Q.    THIS ONE COMES ABOUT A WEEK AFTER THE ONE WE

4    JUST LOOKED AT.

5    A.    YES.

6    Q.    OCTOBER 22ND, RIGHT?

7    A.    YES.

8    Q.    NOW WE ARE TALKING FIVE WEEKS BEFORE THE

9    SETTLEMENT AGREEMENT WAS SIGNED, CORRECT?

10   A.    YES.

11   Q.    ALL RIGHT.  AND IN THIS ONE -- IN THIS ARTICLE

12   BY DR. APPEL HE IS ESSENTIALLY REITERATING, MAYBE

13   ELABORATING A BIT ON THE PAPER PATH ISSUE THAT HE

14   DESCRIBED IN THE ARTICLE WE JUST LOOKED AT, CORRECT?

15   A.    THAT'S RIGHT.

16   Q.    HE SPECIFICALLY REFERS TO THE ES&S EXPRESSVOTE,

17   CORRECT?

18   A.    I SEE THAT IN HERE, YES.

19   Q.    AND HE SAYS IN THE FIRST BULLET:  ANY VOTING

20   MACHINE WHOSE PHYSICAL HARDWARE CAN PRINT VOTES ONTO THE

21   BALLOT AFTER THE LAST TIME THE VOTER SEES THE PAPER IS

22   NOT A VOTER VERIFIED PAPER BALLOT SYSTEM, AND IS NOT

23   ACCEPTABLE.

24          IS THAT WHAT HE SAYS?

25   A.    YES, IT IS.

1    Q.       WOULD IT BE FAIR TO SAY THAT THAT'S PRETTY MUCH

2    A ONE-SENTENCE ENCAPSULATION OF A PORTION OF THE

3    TESTIMONY THAT YOU GAVE DURING YOUR DIRECT EXAMINATION?

4    A.       I SUPPOSE IT MIGHT BE.

5    Q.       AND AGAIN, NOTHING WAS SAID TO DEFENDANTS TO

6    YOUR KNOWLEDGE BEFORE THE SETTLEMENT AGREEMENT TO THE

7    EFFECT OF THIS ISSUE MEANS EXPRESSVOTE MACHINES SHOULD

8    NOT BE CERTIFIED.

9    A.       TO MY KNOWLEDGE, NOTHING WAS SAID.

10   Q.       NOW --

11            THE COURT:  DID YOU SEE THIS AT THE TIME

12   OF ITS PUBLICATION?

13            THE WITNESS:  I HAVE SEEN THIS.  I --

14   PROBABLY SOME AMOUNT OF TIME AFTER THE PUBLICATION WHEN

15   I NEXT RETURNED TO THE SITE.

16            THE COURT:  AND THE PREVIOUS, THE ONE

17   FROM -- THIS IS OCTOBER 22ND -- THE ONE FROM

18   OCTOBER 16TH, DID YOU SEE THAT?

19            THE WITNESS:  YES.

20            THE COURT:  OKAY.

21   BY MR. WIYGUL:

22   Q.       FOR THE BENEFIT OF EVERYONE I AM NEARLY

23   CONCLUDED, DR. HALDERMAN, BUT CAN WE LOOK NOW -- FAST

24   FORWARD IN TIME.  THIS IS OCTOBER 2018 BEFORE THE

25   SETTLEMENT AGREEMENT WAS SIGNED.  LET'S NOW GO TO

1    MID-JULY 2019, WHICH IS SOME 10, 8, 9 MONTHS AFTER THE

2    SETTLEMENT AGREEMENT HAS BEEN SIGNED.  AND LOOK AT JX

3    42, WHICH I BELIEVE IS ALREADY IN EVIDENCE.

4                    THE COURT:  I THINK THIS IS IN EVIDENCE,

5    IS THAT RIGHT, MR. MAAZEL?

6                    MR. MAAZEL:  YES.

7    BY MR. WIYGUL:

8    Q.        AND THIS IS A COPY OF THE PETITION FOR

9    RE-EXAMINATION OF THE EXPRESSVOTE XL THAT WAS FILED ON

10   THIS DATE, CORRECT?

11   A.        YES.

12   Q.        THIS WAS FILED BY -- WELL, IT WAS NOT FILED BY

13   THE PLAINTIFFS, CORRECT?

14   A.        THAT'S RIGHT.  IT WASN'T BY THE PLAINTIFFS.

15   Q.        IN FACT, IT WAS STIPULATED THAT THE FIRST TIME

16   THE PLAINTIFFS RAISED AN OBJECTION ABOUT THE

17   CERTIFICATION OF THE EXPRESSVOTE XL WAS JULY 29TH.  YOU

18   ARE AWARE OF THAT, CORRECT?

19   A.        I AM AWARE OF THAT.

20   Q.        LET'S LOOK AT -- IF WE SEE THERE IS A LETTER AND

21   THEN THERE'S A PAGE THAT SAYS PETITION PAGES, AND THEN

22   THERE'S THE ACTUAL PETITION.  DO YOU SEE THAT?

23   A.        YES.

24   Q.        SO IT'S CAPTIONED "ATTACHMENT" AT THE TOP.  DO

25   YOU SEE THAT?

1   A.      YES.

2   Q.      AND IT PURPORTS TO IDENTIFY A NUMBER OF WHAT THE

3   PETITIONERS DESCRIBED AS DEFICIENCIES OF THE EXPRESSVOTE

4   XL, CORRECT?

5   A.      YES.

6   Q.      ACTUALLY IF YOU FLIP THROUGH HERE, I THINK THERE

7   ARE TEN PURPORTED DEFICIENCIES, RIGHT?

8   A.      YES.

9   Q.      THE FIRST ONE IS ON PAGE 1.  AND IF WE LOOK AT

10  THE MIDDLE PARAGRAPH THERE UNDER THE BLOCK QUOTE, THE

11  POLL QUOTE, IT'S TALKING ABOUT HOW THE EXPRESSVOTE XL

12  EXPOSES -- NOW THEY ARE CALLING IT A BALLOT CARD, CAST

13  BY THE VOTER TO AN INTERNAL PRINTER PRIOR TO TABULATION

14  AND IMPOUNDMENT.

15              DO YOU SEE THAT?

16  A.      YES.

17  Q.      AND THEN THEY GO ON TO SAY:  A MALFUNCTIONING OR

18  MANIPULATING EXPRESSVOTE XL COULD ADD, MODIFY OR

19  INVALIDATE VOTES AFTER THE VOTER HAS VIEWED, CONFIRMED

20  AND CAST THEIR BALLOT.  DO YOU SEE THAT?

21  A.      YES.

22  Q.      THIS IS THE SAME ISSUE THAT YOU WERE TALKING

23  ABOUT IN YOUR DIRECT TESTIMONY, CORRECT?

24  A.      YES.

25  Q.      IN FACT, THESE PETITIONERS HAVE A FOOTNOTE

1    CITATION TO THIS ISSUE, REFERRING TO THIS ISSUE, AND

2    THEY SPECIFICALLY CITE, AMONG OTHER THINGS, THE TWO

3    FREEDOM TO TINKER ARTICLES THAT WE JUST LOOKED AT,

4    CORRECT?

5    A.       YES, I SEE THAT.

6    Q.       NOW, INTERESTINGLY ENOUGH, IF WE LOOK AT THE

7    LAST PAGE OF THIS PETITION, THERE IS A DEFICIENCY THAT

8    -- ALLEGED DEFICIENCY WITH THE EXPRESSVOTE XL THAT

9    PETITIONERS SAY VIOLATES THE STEIN SETTLEMENT.  THAT'S

10   THE SETTLEMENT WE ARE TALKING ABOUT, RIGHT?

11   A.       YOU ARE REFERRING TO -- I SEE.

12   Q.       LET ME --

13   A.       YES, I SEE THAT.  YES.

14   Q.       SO THEY ACTUALLY HIGHLIGHT AN ISSUE THAT IN

15   PETITIONERS' VIEW WAS A VIOLATION OF THE SETTLEMENT

16   AGREEMENT WE ARE HERE TO TALK ABOUT TODAY, CORRECT?

17   A.       THEY DO.

18   Q.       THAT ISSUE THAT THEY SAY VIOLATES THE STEIN

19   SETTLEMENT IS NOT THE PRINTHEAD ISSUE THAT WE HAVE JUST

20   BEEN DISCUSSING, CORRECT?  IT'S A DIFFERENT ISSUE.

21   A.       THAT'S RIGHT.  THAT'S A DIFFERENT ISSUE.

22   Q.       AND WHEN PETITIONERS HERE TALKED ABOUT WHAT I AM

23   REFERRING TO AS THE PRINTHEAD ISSUE, THEIR ISSUE NUMBER

24   1, ON PAGE 1 OF 12, THEY DON'T ALLEGE THAT THAT ISSUE IS

25   A VIOLATION OF THE STEIN SETTLEMENT, DO THEY?

1     A.       I DON'T BELIEVE THEY DO, NO.

2     Q.       NOW, PLAINTIFFS SENT THEIR JULY 29, 2019 LETTER,

3     THAT WOULD BE APPROXIMATELY TWO WEEKS AFTER THIS

4     PETITION WAS FILED, CORRECT?

5     A.       I THINK THAT'S RIGHT.

6     Q.       AND WHEN PLAINTIFFS SENT THEIR JULY 29TH LETTER,

7     THEY KNEW ABOUT THE PETITION FOR RE-EXAMINATION, RIGHT?

8                    MR. MAAZEL:  OBJECTION.

9                    THE COURT:  IF HE KNOWS.

10                    THE WITNESS:  I THINK SO, YES.

11                    MR. WIYGUL:  WILL COUNSEL STIPULATE TO

12     THAT FACT?

13                    THE COURT:  WHAT FACT?

14                    MR. WIYGUL:  THE FACT THAT AT THE TIME

15     PLAINTIFFS SUBMITTED THEIR JULY 29TH COMPLAINT TO THE

16     DEFENDANTS, THEY, THE PLAINTIFFS, WERE AWARE OF THE

17     PETITION FOR REEXAMINATION?

18                    MR. MAAZEL:  I THINK YOU NEED TO EXAMINE

19     THE WITNESS.

20                    MR. WIYGUL:  WELL, I REFER TO YOUR

21     OPENING BRIEF IN THIS MATTER, MR. MAAZEL.  IT SAYS ON

22     PAGE 3, QUOTE:  AWARE THAT THE REQUEST FOR REEXAMINATION

23     WAS PENDING ON JULY 29, 2019, PLAINTIFFS NOTIFIED THE

24     DEFENDANTS, ET CETERA, ET CETERA.

25                    MR. MAAZEL:  IN THAT CASE, WE WILL

1    STIPULATE.

2                    MR. WIYGUL:   THANK YOU FOR THE

3    ACCOMMODATION.

4    BY MR. WIYGUL:

5    Q.      DESPITE THE FACT THAT, AS HAS NOW BEEN

6    STIPULATED, PLAINTIFFS KNEW ABOUT THE PETITION FOR

7    RE-EXAMINATION, WHICH LISTS THE PRINTHEAD ISSUE, AS WE

8    HAVE SEEN, THEIR JULY 29TH LETTER, WHICH WE CAN PULL UP,

9    WHICH IS JX 43, DID NOT IDENTIFY THE PRINTHEAD ISSUE AS

10   A VIOLATION OF THE SETTLEMENT AGREEMENT, DID IT?

11   A.      NO, IT DIDN'T.

12   Q.      IT DIDN'T MENTION THE PRINTHEAD ISSUE AT ALL,

13   DID IT?

14   A.      NO, IT DIDN'T.

15   Q.      OKAY.  AND THAT LETTER ALSO DIDN'T ASSERT THAT

16   THE XL CERTIFICATION WAS A VIOLATION OF THE SETTLEMENT

17   AGREEMENT BECAUSE THE XL PAPER RECORDS SHOULD NOT BE

18   CONSIDERED PAPER BALLOTS WITHIN THE MEANING OF THE

19   SETTLEMENT AGREEMENT, ISN'T THAT RIGHT?  DOESN'T MENTION

20   THAT EITHER.

21   A.      NO.  WE HAVE ALREADY ESTABLISHED ONLY AS TO THE

22   ONE POINT.

23   Q.      NOTWITHSTANDING THE FACT THAT PLAINTIFFS HAD

24   BEEN, TO USE MR. MAAZEL'S TERMS, WATCHING CLOSELY TO

25   ENSURE THAT THE SETTLEMENT AGREEMENT WAS COMPLIED WITH,

1    IS THAT RIGHT?

2                    MR. MAAZEL:  OBJECTION.

3                    THE COURT:  YOU ARE MAKING ARGUMENT

4    THROUGH THE WITNESS.  WHY DON'T YOU MOVE ON.

5                    MR. WIYGUL:  IF I CAN JUST HAVE ONE

6    MOMENT, YOUR HONOR.

7                    THE COURT:  SURE.

8                    (PAUSE.)

9                    MR. WIYGUL:  NO FURTHER QUESTIONS, YOUR

10   HONOR.

11                   THE COURT:  VERY WELL.

12                   MR. WIYGUL:  AND I APOLOGIZE FOR MY

13   TERRIBLE TIME ESTIMATE.

14                   THE COURT:  LAWYER TIME.  I UNDERSTAND

15   IT.

16                   REDIRECT EXAMINATION

17   BY MR. MAAZEL:

18   Q.      TO YOUR KNOWLEDGE, DR. HALDERMAN, DOES THIS --

19   DOES JENNIFER COHN HAVE ANY EXPERTISE IN VOTING SYSTEMS,

20   AS FAR AS YOU KNOW?

21   A.      I DON'T BELIEVE SO.

22   Q.      ALL OF THOSE TWEETS OR WHATEVER THOSE WERE THAT

23   COUNSEL SHOWED YOU, DID YOU SEE ANY OF THOSE TWEETS?

24   A.      NO, NOT BEFORE WE WERE PREPARING FOR THE HEARING

25   TODAY.

1    Q.      OKAY.  DO YOU HAVE ANY EVIDENCE THAT ANY OF THE

2    PLAINTIFFS EVER SAW ANY OF THESE TWEETS BY THIS PERSON

3    NAMED JENNIFER COHN?

4    A.      NO.

5    Q.      DO YOU HAVE ANY IDEA HOW MANY HUNDREDS OR

6    THOUSANDS OF REPLIES JILL STEIN GETS WHEN SHE SENDS OUT

7    A TWEET?

8    A.      NO, I HAVE NO IDEA.

9    Q.      YOU WERE ASKED ABOUT A PILOT RISK-LIMITING AUDIT

10    THAT OCCURRED IN PHILADELPHIA IN 2019.  DO YOU REMEMBER

11    THAT QUESTION?

12    A.      YES.

13    Q.      AND THAT WAS A CONNECTION WITH THE XL BEING

14    USED, YES?

15    A.      YES.

16    Q.      AND I BELIEVE COUNSEL POINTED OUT THAT THE XL

17    NOW HAS BEEN USED AT LEAST A COUPLE OF TIMES IN A COUPLE

18    OF PLACES.

19    A.      THAT'S RIGHT.

20    Q.      AND THAT PARTICULAR PILOT AUDIT IN PHILADELPHIA,

21    THAT OCCURRED IN AN OFF-YEAR MUNICIPAL ELECTION, IS THAT

22    RIGHT?

23    A.      I BELIEVE SO, YES.

24    Q.      SO OTHER THAN THAT ONE PILOT RISK-LIMITING AUDIT

25    IN A SINGLE JURISDICTION IN AN OFF-YEAR MUNICIPAL

1    ELECTION, ARE YOU AWARE OF ANY RISK-LIMITING AUDITS THAT

2    HAVE EVER BEEN DONE FOR THE EXPRESSVOTE XL?

3    A.    I DON'T THINK I AM AWARE OF OTHERS, NO.

4    Q.    OKAY.

5    A.    I'M NOT AWARE OF OTHERS.

6    Q.    AS AN EXPERT IN ELECTION SECURITY, IS A SINGLE

7    PILOT AUDIT IN AN OFF-YEAR ELECTION IN A SINGLE

8    JURISDICTION A SUFFICIENT BASIS IN EVIDENCE TO CONCLUDE

9    THAT MALWARE CAN AFFECT THE XL?

10   A.    NO, OF COURSE NOT.

11   Q.    WHY NOT?

12   A.    BECAUSE WHETHER -- EVEN IF AN AUDIT COULD SHOW

13   ERRORS IF THEY HAVE OCCURRED, THE QUESTION IS WHETHER

14   ANYONE HAS TRIED TO ATTACK THE MACHINE IN A WAY THAT

15   WOULD INDUCE THOSE ERRORS.  AND IN AN OFF-YEAR ELECTION

16   I THINK THE ODDS THAT A SOPHISTICATED ATTACKER LIKE A

17   FOREIGN COUNTRY WOULD WANT TO HACK THE MACHINE ARE

18   PRETTY LOW.

19                MR. WIYGUL:  OBJECTION, SPECULATIVE.

20                THE COURT:  I WILL OVERRULE IT.

21   BY MR. MAAZEL:

22   Q.    AND I JUST WANTED TO FOLLOW UP ON A QUESTION

23   THAT JUDGE DIAMOND ASKED YOU EARLIER, WHICH IS HOW CAN

24   MALWARE INFECT THESE MACHINES.  AND I BELIEVE YOU

25   TESTIFIED THAT THERE WERE AT LEAST THREE TIMES WHEN THAT

1    COULD HAPPEN.  ONE WAS IN THE MANUFACTURING STAGE; ONE

2    WAS AT THE PROGRAMMING STAGE; AND ONE WAS AT THE

3    PHYSICAL POLLING PLACE.  IS THAT WHAT YOU TESTIFIED TO?

4    A.      THAT'S WHAT I TESTIFIED.

5    Q.      WHEN YOU WERE REFERRING TO MALWARE IN THE

6    MANUFACTURING STAGE, CAN YOU JUST EXPLAIN THAT?

7    A.      SURE.  THE SOFTWARE THAT IS RUNNING ON THE

8    DEVICES IS LOADED AT THE FACTORY OR BEFORE THE MACHINES

9    ARE DELIVERED, AND AN ATTACKER WHO WAS ABLE TO

10   COMPROMISE SOME STAGE OF THE SUPPLY CHAIN COULD BE ABLE

11   TO CHANGE THAT SOFTWARE BEFORE THE MACHINES ARE USED FOR

12   THE FIRST TIME IN PENNSYLVANIA.

13   Q.      AND IN SUCH A CASE, WHAT PERCENTAGE OF MACHINES

14   COULD BE AFFECTED?

15   A.      POTENTIALLY ALL OF THEM.

16              MR. WIYGUL:  OBJECTION.

17              THE COURT:  NO.  I THINK THIS IS REALLY

18   THE HEIGHT OF SPECULATION, BUT I WILL OVERRULE THE

19   OBJECTION.

20   BY MR. MAAZEL:

21   Q.      ALL RIGHT.  AND YOU ALSO SAID THAT THE

22   PROGRAMMING --

23              THE COURT:  DO YOU KNOW ANYTHING AT ALL

24   ABOUT SECURITY ARRANGEMENTS?  WHAT IS THE COMPANY, THE

25   -- I WILL CALL IT THE ES&S COMPANY -- DO YOU HAVE ANY

1    KNOWLEDGE AT ALL OF THEIR SECURITY ARRANGEMENTS?

2              THE WITNESS:  YES, I DO HAVE SOME

3    KNOWLEDGE.

4              THE COURT:  BECAUSE THEY LET YOU IN?

5              THE WITNESS:  FOR BETTER OR FOR WORSE.

6              THE COURT:  YES.  WHEN YOU ARE NOT THERE,

7    AT NIGHT, DO YOU HAVE ANY KNOWLEDGE AT ALL OF WHAT THEIR

8    SECURITY ARRANGEMENTS ARE?

9              THE WITNESS:  I AM SORRY, YOUR HONOR?

10              THE COURT:  DO YOU KNOW WHAT THE SECURITY

11    -- YOU SAY IN THE MANUFACTURING PROCESS.  DO YOU KNOW

12    WHAT THE SECURITY ARRANGEMENTS ARE DURING THE

13    MANUFACTURING PROCESS?

14              THE WITNESS:  I WOULD HAVE TO SPECULATE.

15              THE COURT:  WELL, THAT HAS NOT STOPPED

16    YOU BEFORE, HAS IT?  YOUR ANSWER IS NO, ISN'T THAT

17    RIGHT?

18              THE WITNESS:  DO I HAVE ANY KNOWLEDGE AT

19    ALL?  ALL RIGHT.  NO.

20              THE COURT:  ALL RIGHT.

21    BY MR. MAAZEL:

22    Q.     AND YOU ALSO TESTIFIED THAT THE ES&S -- I'M

23    SORRY.  YOU ALSO TESTIFIED THAT MACHINES COULD BE

24    INFECTED AT THE PROGRAMMING STAGE.  COULD YOU EXPLAIN

25    WHAT YOU MEAN BY THAT?

1                    MR. WIYGUL:  OBJECTION.

2                    THE COURT:  OVERRULED.

3                    THE WITNESS:  ALL RIGHT.  SO DURING THE

4    LEAD-UP TO EVERY ELECTION, ELECTION WORKERS HAVE TO

5    INSTALL THE -- WHAT'S SOMETIMES CALLED BALLOT

6    PROGRAMMING ONTO EVERY ONE OF THE EXPRESSVOTE MACHINES.

7    THIS IS INFORMATION ABOUT WHO IS ON THE BALLOT, HOW THE

8    BALLOT SHOULD BE COUNTED, THE CONFIGURATION FOR THE

9    MACHINE.  THAT IS PREPARED AT SOME CENTRAL LOCATION,

10   DEPENDING ON THE JURISDICTION, EITHER BY THE

11   JURISDICTION OR BY ES&S.  THAT BALLOT PROGRAMMING IS

12   COPIED TO THE INDIVIDUAL MACHINES ON A REMOVABLE MEMORY

13   DEVICE.  I THINK IT'S A USB STICK FOR THE XL'S.  IT IS

14   POSSIBLE THAT BY TAMPERING WITH THAT BALLOT PROGRAMMING,

15   AN ATTACKER COULD CAUSE MALWARE TO INFECT THE MACHINES.

16   Q.     YOU WERE ASKED BY COUNSEL ABOUT YOUR STATE OF

17   KNOWLEDGE OF VARIOUS POSTINGS BY OTHER PEOPLE.  DO YOU

18   REMEMBER THOSE QUESTIONS?

19   A.     YES.

20   Q.     SO LET ME ASK YOU ABOUT YOUR STATE OF KNOWLEDGE

21   ABOUT OTHER EXPERTS IN THE FIELD.  ARE YOU THE ONLY

22   ELECTION EXPERT THAT BELIEVES THAT VOTING SYSTEMS CAN BE

23   HACKED?

24                   MR. WIYGUL:  OBJECTION.

25                   THE COURT:  OVERRULED.

1                    THE WITNESS:  NO, ABSOLUTELY NOT.  IT'S

2    NOT JUST MY OPINION.  THIS IS THE CONSENSUS VIEW OF THE

3    NATIONAL ACADEMIES.

4    BY MR. MAAZEL:

5    Q.      THE NATIONAL ACADEMIES OF WHAT?

6    A.      SCIENCE, ENGINEERING AND MEDICINE.

7    Q.      AND I TAKE IT THAT ONE OF THE REASONS -- WELL,

8    WITHDRAWN.

9                    AND IS IT FAIR THAT A PRIMARY REASON WHY

10   THERE ARE AUDITS IN THE FIRST PLACE IS BECAUSE MALWARE

11   CAN INFECT MACHINES?

12   A.      THAT'S RIGHT.  IF WE COULD MAKE VOTING MACHINES

13   THAT COULD NOT BE HACKED, WE WOULD NOT NEED TO HAVE A

14   PAPER TRAIL AND AUDITS TO CONFIRM THAT THEY WERE WORKING

15   PROPERLY.

16                   MR. MAAZEL:  I HAVE NO FURTHER QUESTIONS,

17   YOUR HONOR.

18                   MR. WIYGUL:  NOTHING FURTHER, YOUR HONOR.

19                   THE COURT:  VERY WELL.  WE WILL BREAK FOR

20   LUNCH.

21                   MR. ARONCHICK:  IF THIS IS ACCEPTABLE TO

22   MY COLLEAGUES AND YOU, MR. BAUMERT, WE WOULD BE CALLING

23   IN OUR CASE IS SCHEDULED.  HE STAYED HERE OVERNIGHT.  HE

24   IS SCHEDULED TO GO BACK LATER ON.  IF IT'S ACCEPTABLE,

25   RATHER THAN GO TO MS. KOTULA AND FINISH HER AND THEN THE

1    REST OF HIS WITNESSES, COULD WE TAKE MR. BAUMERT OUT OF

2    TURN?

3                      THE COURT:  DO YOU HAVE A PROBLEM WITH

4    THAT?

5                      MR. MAAZEL:  OF COURSE NOT, YOUR HONOR.

6                      THE COURT:  AND I DON'T EITHER.  THAT'S

7    CERTAINLY OKAY.  THANK YOU.

8                      (LUNCHEON RECESS TAKEN.)

9                      THE COURT:  PLEASE BE SEATED, EVERYBODY.

10   GOOD AFTERNOON.

11                     ALL COUNSEL:  GOOD AFTERNOON.

12                     THE COURT:  MR. WIYGUL.

13                     MR. WIYGUL:  YOUR HONOR, AT THIS POINT WE

14   ARE PREPARED TO CALL MR. DEAN BAUMERT FROM ES&S TO GIVE

15   TESTIMONY, AND OUR THOUGHT WAS THAT MR. BAUMERT COULD

16   DEMONSTRATE THE MACHINE IF IT PLEASES THE COURT.  AND

17   THE QUESTION I WOULD POSE TO THE COURT IS HOW MUCH OF

18   THE MACHINE SETUP PRIOR TO THE ACTUAL VOTER EXPERIENCE

19   PART OF THE DEMONSTRATION DOES THE COURT WANT ON THE

20   RECORD?  AND I ASK BECAUSE --

21                     THE COURT:  MR. MAAZEL WANTED TO PRESENT

22   WITNESSES.  HE HAS MADE A NUMBER OF CHALLENGES TO THE

23   MACHINE.  HE WANTED TO CALL FRUSTRATED VOTERS WHO HAD

24   DIFFICULTY WITH THE MACHINE AND THEY DESCRIBED THEIR

25   DIFFICULTIES.  AND SO I WANTED TO SEE HOW THE MACHINE

1   WORKS TO ADDRESS THOSE PROBLEMS AND GENERALLY TO

2   UNDERSTAND HOW THE MACHINE WORKS AND WHAT A VOTER SEES

3   WHEN SHE WALKS INTO THE POLLING PLACE, WHAT A VOTER

4   DOES, HOW THE MACHINE IS PUT TOGETHER.  IF HE COULD

5   ADDRESS -- I MEAN, DR. HALDERMAN TALKED ABOUT HACKING.

6   I HEAR A LOT ABOUT THAT EVERYWHERE.  YOU CAN'T BLOW

7   SMOKE INTO THE MACHINE'S EAR.  WHAT WOULD ONE HAVE TO

8   DO?  MANY OF THESE THINGS WERE ADDRESSED BY THE DOCTOR

9   WHOSE NAME I DON'T REMEMBER WHO TESTIFIED FOR THE

10  COMMONWEALTH, THE OPPOSING EXPERT.  WOULD YOU HAPPEN TO

11  REMEMBER HIS NAME?

12              MR. MAAZEL:  DR. SHAMOS.

13              THE COURT:  SHAMOS, RIGHT.  WITH RESPECT

14  TO DIFFERENT MACHINES, THE DRE MACHINES.  AND HE HELD --

15  AS I RECALL, HE HAD WRITTEN SOME OF THE SECURITY

16  REQUIREMENTS.  TO THE EXTENT THAT MR. BAUMERT COULD

17  ADDRESS THAT AS WELL, I WOULD BE GRATEFUL.  AND I WANT

18  TO LOOK AT THE MACHINE.  SO I WILL COME DOWN AND COMMUNE

19  WITH THE MACHINE AT THE APPROPRIATE TIME.

20              MR. WIYGUL:  I GUESS THE QUESTION THAT I

21  HAVE FOR YOU, YOUR HONOR, IS THAT THERE IS A PROLOGUE TO

22  THE VOTER EXPERIENCE WHERE THE SEALS WILL BE BROKEN AND

23  THE COVER WILL BE TAKEN OFF AND TURNED ON AND SET UP.

24  MY UNDERSTANDING IS THAT PROCESS TAKES ABOUT FIVE

25  MINUTES.  THE VOTER DOES NOT SEE ANY OF THAT HAPPEN.

1            THE COURT:  NO.  BUT THAT ADDRESSES THE

2    SECURITY CONCERNS THAT I RAISED WITH DR. HALDERMAN.

3            MR. WIYGUL:  WE CAN PUT THAT ON THE

4    RECORD.

5            THE COURT:  ABSOLUTELY.

6            MR. WIYGUL:  MR. BAUMERT CAN COME UP.

7            THE COURT:  WE CAN PUT IT ALL ON THE

8    RECORD.

9            MR. WIYGUL:  VERY GOOD.

10           WITH THAT, YOUR HONOR, IF IT PLEASE THE

11   COURT, WE WOULD CALL DEAN BAUMERT TO THE STAND.

12           (DEAN BAUMERT, PLAINTIFF WITNESS SWORN.)

13           THE CLERK:  PLEASE STATE AND SPELL YOUR

14   NAME FOR THE RECORD.

15           THE WITNESS:  IT IS DEAN BAUMERT.

16   D-E-A-N.  B, AS IN BOY, A-U M, AS IN MARY, E-R-T.

17           THE COURT:  PLEASE BE SEATED.

18           DIRECT EXAMINATION

19   BY MR. WIYGUL:

20   Q.     GOOD AFTERNOON, MR. BAUMERT.

21   A.     GOOD AFTERNOON.

22   Q.     HOW ARE YOU CURRENTLY EMPLOYED, SIR?

23   A.     I AM EMPLOYED AS A PRODUCT MANAGER FOR ELECTION

24   SYSTEMS AND SOFTWARE, ALSO KNOWN AS ES&S.

25   Q.     WHEN DID YOU FIRST JOIN ES&S?

1    A.    IT WAS IN SEPTEMBER OF 2007, SO I HAVE BEEN WITH

2    THEM ABOUT 12-AND-A-HALF YEARS.

3    Q.    YOUR CURRENT ROLE IS THE PRINCIPAL PRODUCT

4    MANAGER?

5    A.    THAT IS CORRECT.

6    Q.    WHAT ARE YOUR -- GENERALLY SPEAKING, YOUR

7    RESPONSIBILITIES IN THAT ROLE?

8    A.    I HAVE SOME SPECIFIC RESPONSIBILITIES AND SOME

9    BROADER ONES.  SOME OF THE MORE SPECIFIC ONES IS, I AM

10    THE PRODUCT MANAGER RESPONSIBLE FOR ALL TOUCHSCREEN

11    VOTING SYSTEMS, WHETHER THEY -- SO ANYTHING THAT ALLOWS

12    YOU TO MAKE VOTE SELECTIONS AND CAST VOTES.  SO I AM THE

13    PRODUCT MANAGER FOR THOSE TOUCHSCREEN SYSTEMS, AND I AM

14    ALSO, JUST KIND OF A BROADER -- I HAVE EXPERIENCE WITH A

15    NUMBER OF THE SYSTEMS.  SO I DO SOME WORK WITH

16    UNDERSTANDING STANDARDS AND JUST GENERAL PRODUCT MANAGER

17    DUTIES.

18    Q.    AND COULD YOU BE A LITTLE BIT MORE GRANULAR -- I

19    THINK IS THE WORD OF THE DAY -- COULD YOU BE MORE

20    GRANULAR ABOUT WHAT YOU ARE -- YOU SAY YOU HAVE

21    RESPONSIBILITIES AS PRODUCT MANAGER FOR THE SYSTEMS.

22    WHAT EXACTLY ARE THOSE RESPONSIBILITIES?

23    A.    YEAH.  THERE'S PROBABLY TWO THINGS.  SO ONE

24    THING IS, I AM -- I HAVE BEEN TASKED A NUMBER OF TIMES

25    IN MY TIME WITH ES&S TO TAKE A CONCEPT AND DRIVE IT ALL

1    THE WAY FROM AN IDEA FOR A PRODUCT ALL THE WAY TO A

2    PRODUCT THAT IS MARKETED AND SOLD.  SO I MANAGE BRINGING

3    IN THE REQUIREMENTS IN ALL THE DIFFERENT AREAS OF THE

4    SYSTEM THAT USE CASE MODELS, YOU KNOW, SECURITY,

5    USABILITY, AND I BRING THOSE ALL TOGETHER AND I LEAD THE

6    DEVELOPMENT, MAKING SURE THAT AS IT'S DEVELOPED IT MEETS

7    THOSE REQUIREMENTS AND THAT IT'S A PRODUCT THAT OUR

8    CUSTOMERS WANT TO BUY.

9              THE COURT:  WHILE I STILL HAVE THIS IN MY

10    HEAD AND I DON'T THINK THIS IS THE WITNESS TO TESTIFY TO

11    IT, BUT THE REQUEST IS THAT I ORDER THE SECRETARY TO

12    DECERTIFY THESE MACHINES.  I WOULD LIKE TO HEAR

13    EVIDENCE, AND IT SEEMS TO ME IT SHOULD BE BY

14    STIPULATION, AND I DON'T THINK IT INVOLVES ANY

15    PROPRIETARY ANYTHING, WHAT THE CITY SPENT ON THESE

16    MACHINES, WHAT THEIR REPLACEMENT WOULD COST WITH

17    WHATEVER OTHER MACHINES, AND IF ALL THAT HAS TO BE DONE

18    IS IT HAS TO BE REPROGRAMMED, WHATEVER THAT MEANS, WHAT

19    THE COST OF THAT WOULD BE, WHAT THE TIME REQUIRED WOULD

20    BE AND EXACTLY HOW IT WOULD HAVE TO BE DONE.  OKAY?

21              MR. WIYGUL:  YES, THANK YOU, YOUR HONOR.

22    I AGREE THIS IS PROBABLY NOT THE WITNESS.

23              THE COURT:  NO.  THIS IS NOT THE WITNESS.

24    AS I HEAR HIM TESTIFY TO PRODUCT DEVELOPMENT AND SO

25    FORTH, HE CAN PROBABLY ANSWER SOME OF THOSE QUESTIONS,

```
 1   BUT HE IS REALLY NOT THE WITNESS TO DO IT.  IT DOES SEEM
 2   TO ME THAT AT LEAST SOME OF THIS, FOR INSTANCE, WHAT THE
 3   CITY PAID, IT'S PUBLIC KNOWLEDGE, I WOULD THINK, AND
 4   THAT COULD BE STIPULATED TO.  WHAT REPLACEMENT MACHINES
 5   WOULD COST, ONLY AN ESTIMATE BECAUSE IT'S THE LOWEST
 6   RESPONSIBLE BIDDER PROCESS.  I UNDERSTAND THAT, BUT AT
 7   LEAST SOME ROUGH COMPARISON IF IT CAN BE DONE.
 8   DISCLOSING WHAT WAS IN THE COMPETING BIDS MAY NOT BE
 9   ALLOWABLE.  I UNDERSTAND THAT.  BUT THESE ARE SOME OF
10   THE THINGS IT SEEMS TO ME I HAVE TO THINK ABOUT.  THE
11   GRANTING OF RELIEF.  YOU TALK ABOUT FEDERALISM IN A
12   FEDERAL COURT, THAT IT'S SOMEHOW UNSEEMLY AND I
13   UNDERSTAND YOUR ARGUMENT FOR THE FEDERAL COURT TO TELL
14   THE CITY HOW TO RUN ITS ELECTIONS, BUT IT'S ALSO A
15   QUESTION OF I PRESUMABLY TELL THE CITY HOW TO SPEND ITS
16   MONEY AND I JUST WANT TO KNOW HOW MUCH.
17   BY MR. WIYGUL:
18   Q.     ALL RIGHT.  MR. BAUMERT, OTHER THAN YOUR CURRENT
19   POSITION AS PRINCIPAL PRODUCT MANAGER, HAVE YOU HELD
20   OTHER POSITIONS AT ES&S?
21   A.     I HAVE.
22   Q.     WHAT ARE THOSE?
23   A.     JUST KIND OF GO THROUGH MY WORK TIMELINE WITH
24   ES&S.  I STARTED WITH ES&S AS A TITLE OF SENIOR PROJECT
25   MANAGER CONSULTANT.  IT'S A SENIOR LEVEL PROJECT
```

1    CONSULTANT.  I WAS BROUGHT IN TO PROJECT MANAGE THE

2    DEVELOPMENT OF VOTING MACHINES, HARDWARE TYPE MACHINES.

3    SO FIRST PROJECT ACTUALLY SPENT SOME TIME WORKING ON THE

4    FEASIBILITY OF A DRE REPLACEMENT TO BE USED IN

5    INTERNATIONAL MARKETS.  I THEN -- WHEN WE DECIDED --

6    CHOSE NOT TO DO THAT, I THEN LED AS A PROJECT MANAGER

7    THE DEVELOPMENT OF THE ELECTION SYSTEMS AND SOFTWARES'

8    DS850 HIGH SPEED CENTRAL SCANNER.  SO -- AGAIN, FROM

9    CONCEPT, PROTOTYPING, DESIGN, DEVELOPMENT, TESTING,

10   CERTIFICATION, FIRST USES, ALL THAT.

11                FROM THERE I WAS BOTH A PROJECT MANAGER

12   AND PRODUCT MANAGER FOR SOME DEVELOPMENT AROUND OUR

13   PRECINCT SCANNERS.  I WAS THEN THE FULL PRODUCT MANAGER

14   FOR OUR BALLOT TABULATION SYSTEMS, SO OUR DS LINE

15   HIGH-SPEED SCANNER AND PRECINCT SCANNER.

16                AND I THEN WENT AND PROJECT MANAGED THE

17   DEVELOPMENT OF THE ORIGINAL EXPRESSVOTE, SO WHAT WE'VE

18   REFERRED AS THE 1.0.

19                AFTER THAT I LAUNCHED THE DEVELOPMENT OF

20   OUR MIDRANGE CENTRAL SCANNER FOR THE COMPANY.

21                I THEN, AFTER THAT, WAS A PRODUCT MANAGER

22   IN CHARGE OF THE DS SYSTEMS, AND THEN AS MY CURRENT ROLE

23   I DID -- I WAS THE PRODUCT MANAGER FOR THE EXPRESSVOTES

24   AND THEN WORKED AS THE PRODUCT MANAGER TO DEVELOP THE

25   EXPRESS TOUCH DRE AND THE EXPRESSVOTE XL.

1            AND THAT KIND OF BRINGS US -- SO I AM

2    CURRENTLY RESPONSIBLE FOR BOTH EXPRESSVOTES, THE 1.0 AND

3    THE 2.1, THE EXPRESSVOTE XL, AND THE EXPRESS TOUCH DRE.

4            THE COURT:  BACK UP A SECOND.  AND IF ANY

5    OF THIS IS NOT PUBLICLY AVAILABLE INFORMATION, IT'S NOT

6    IMPORTANT ENOUGH TO MY DECISION TO COMPEL ITS

7    DISCLOSURE.

8    BY THE COURT:

9    Q.     WHAT DOES ES&S STAND FOR?

10   A.     ES&S?

11   Q.     IS THAT YOUR EMPLOYER?

12   A.     YEAH.  ELECTION SYSTEMS AND SOFTWARE, YES.

13   Q.     IS IT A PUBLICLY-TRADED COMPANY OR IS IT

14   PRIVATELY HELD?

15   A.     IT IS PRIVATELY HELD.  I DON'T KNOW IF IT WOULD

16   BE WE CONSIDERED CLOSELY HELD.

17   Q.     PRIVATELY HELD?

18   A.     YES.

19   Q.     IS IT PUBLIC INFORMATION HOW BIG THE COMPANY IS?

20   A.     IT IS, YES.

21   Q.     HOW BIG IS THE COMPANY?

22   A.     APPROXIMATELY 500 PEOPLE.

23   Q.     AND IS ITS SOLE BUSINESS THE DESIGN,

24   MANUFACTURE, DISTRIBUTION OF VOTING MACHINES AND

25   EVERYTHING THAT GOES ALONG WITH VOTING MACHINES?

1   A.      YES.  KIND OF SOUP TO NUTS.  EVERYTHING -- MOST

2   EVERYTHING INVOLVED WITH VOTING.  THERE'S A FEW LITTLE

3   SIDE AREAS THAT WE DON'T DO, BUT ELECTRONIC POLL VOTES,

4   VOTER REGISTRATION, BALLOT PRINTING, CODING SERVICES,

5   SOUP TO NUTS.

6   Q.      YOUR ENTIRE BUSINESS IS VOTING.

7   A.      AND ONLY VOTING -- AND ONLY ELECTIONS.

8   Q.      OKAY.  AND HOW LONG HAS IT BEEN IN EXISTENCE?

9   A.      IN ITS CURRENT FORM IT WAS -- ES&S IS THE

10  FORMATION OF A COMPANY -- FROM A COMPANY CALLED AMERICAN

11  INFORMATION SERVICES AND BUSINESS RECORDS, THE ELECTION

12  DIVISION OF BUSINESS RECORDS CORPORATION.  THOSE TWO

13  DIFFERENT COMPANIES HAVE BEEN AROUND SINCE THE EARLY

14  '70S.  WHEN THEY MERGED, THAT BECAME ELECTION SYSTEMS

15  AND SOFTWARE BY 1998.

16  Q.      AND THE COMPANY, ES&S -- I WILL REFER TO AS THE

17  COMPANY.  THE COMPANY DOES BUSINESS WITH HOW MANY

18  ENTITIES?  I ASSUME IN SOME INSTANCES -- WELL, IN

19  PENNSYLVANIA, IT'S PENNSYLVANIA THAT CERTIFIES THE

20  MACHINES, BUT THE MUNICIPALITIES PURCHASE THE MACHINES.

21  SO I WILL JUST SAY, HOW MANY ENTITIES -- HOW MANY

22  CUSTOMERS DOES THE COMPANY HAVE?

23  A.      THOUSANDS.  I THINK I WOULD HAVE TO LOOK AT MY

24  -- LOOK AT MY --

25  Q.      THESE ARE ALL GOVERNMENTAL ENTITIES?

1   A.      YES.  SO THEY WOULD BE -- IN SOME CASES IT IS A

2   STATE OR A COMMONWEALTH, SO IF WE HAVE A STATEWIDE DEAL.

3   IN MANY CASES THEY ARE COUNTIES.  IN SOME PLACES THEY

4   ARE CITIES, SO NEW YORK CITY IS A CUSTOMER.  AND SO

5   GENERALLY CITIES, COUNTIES, STATES, AND ABOUT 40 SOME

6   STATES.  THOUSANDS OF CLIENTS.

7   Q.      ANY FOREIGN COUNTRIES?

8   A.      WE DO A SIGNIFICANT BUSINESS IN CANADA.

9   Q.      IN CANADA?

10  A.      AND WE MAY -- I AM NOT SURE.  AT ONE POINT WE

11  WERE STILL SUPPORTING DRE'S IN FRANCE, BUT I THINK THAT

12  HAS SINCE GONE AWAY.

13              THE COURT:  OKAY.  I'M SORRY, MR. WIYGUL.

14              MR. WIYGUL:  THAT'S OKAY, YOUR HONOR.

15  BY MR. WIYGUL:

16  Q.      DO YOU HOLD ANY COLLEGE OR UNIVERSITY DEGREES?

17  A.      YES.  I HAVE A BACHELOR'S AND MASTER'S IN

18  ELECTRICAL ENGINEERING.

19  Q.      AND CAN YOU JUST VERY BRIEFLY DESCRIBE YOUR WORK

20  EXPERIENCE PRIOR TO JOINING ES&S?

21  A.      YEAH.  RIGHT OUT OF COLLEGE I WORKED IN

22  TECHNICAL ENVIRONMENTS, MANUFACTURING AND ENGINEERING

23  ENVIRONMENTS, BOTH IN THE DEFENSE SYSTEMS AND IN THE

24  COMMERCIAL WORLD.  AND IN THOSE AREAS DEALT WITH MIL

25  STANDARDS AND ISO 9000 ENVIRONMENTS, BUT ENGINEERING AND

1    SOME TECHNICAL PROJECT LEAD.

2             FROM THERE I WORKED FOR A RETAILER WHICH

3    EVENTUALLY WAS ACQUIRED BY A FORTUNE 500 RETAILER.  I

4    MANAGED -- PRIMARILY DURING THAT TIME I MANAGED THEIR

5    STORE RETAIL SYSTEMS.  SO I HAD RESPONSIBILITIES FOR

6    CASH REGISTER SYSTEMS, SERVERS, NETWORKS, WIRELESS

7    NETWORKS, AND THEN DATA TRANSFERS BACK AND FORTH.  I

8    THEN DID SOME WORK ON THEIR CORPORATE SYSTEMS, SO

9    LOGISTIC SYSTEMS, RETAIL -- MERCHANDISING SYSTEMS, HR,

10   FINANCE.  AT ONE POINT I DID A LOT OF GETTING SYSTEMS TO

11   MAKE SURE -- I DID PHARMACY SYSTEMS SO HIPAA

12   REQUIREMENTS.  I DID FINANCIAL SYSTEMS, THE SARBANES

13   OXLEY REQUIREMENT.  WE DID CREDIT CARD INFORMATION, SO

14   PAYMENT CARD INDUSTRY, PCI TYPE STANDARDS.  SO DID A

15   NUMBER OF THOSE, MANAGED EQUIPMENT DEPOTS AND CALL

16   CENTERS AND A NUMBER OF DIFFERENT THINGS.

17            AND THEN FROM THERE TOOK THE JOB AT

18   ELECTION SYSTEMS AND SOFTWARE.

19   BY THE COURT:

20   Q.      HOW OLD ARE YOU?

21   A.      PARDON ME?

22   Q.      HOW OLD ARE YOU?

23   A.      I AM 52.

24   Q.      AND HOW LONG HAVE YOU BEEN WORKING, I WILL JUST

25   SAY, IN COMPUTERS, ALL THE THINGS YOU HAVE JUST

1    DESCRIBED, HOW MANY YEARS BACK DOES THAT GO?

2    A.       MY COMPUTER BASED EXPERIENCE WOULD HAVE STARTED

3    IN APPROXIMATELY '98.

4                    THE COURT:  OKAY.

5    BY MR. WIYGUL:

6    Q.       YOU ALREADY MENTIONED YOUR INVOLVEMENT WITH THE

7    EXPRESSVOTE XL MACHINE IN PARTICULAR.  AND I BELIEVE

8    YOUR TESTIMONY WAS ALONG THE LINES OF YOU LED THE

9    DEVELOPMENT AND THE IMPLEMENTATION OF THAT MACHINE, IS

10   THAT FAIR?

11   A.       YES.

12   Q.       WHAT EXACTLY DID THAT ROLE ENTAIL?

13   A.       MY PRIMARY RESPONSIBILITY WAS -- WE HAD THE

14   EXPRESSVOTE AS A PRODUCT.  AND THAT'S THE -- I THINK

15   MOST PEOPLE IN THE COURT ARE FAMILIAR WITH IT.  AND IT

16   WAS A GOOD PRODUCT.  IT WAS DOING WELL IN THE MARKET,

17   BUT WHEN WE BROUGHT IT TO THE NORTHEAST, THE NORTHEAST

18   CUSTOMERS WHO WERE FORMER LEVER MACHINE AREAS SAID, WE

19   LOVE THE MACHINE, BUT WE HAVE FULL FACE -- SOME HAD FULL

20   FACE REQUIREMENTS, SOME HAD FULL FACE DESIRES, AND SO

21   THEY SAID WE LOVE IT.  MAKE IT BIGGER.

22                    THE COURT:  FULL FACE.  I AM NOT SURE

23   WHAT THAT MEANS.

24                    THE WITNESS:  FULL FACE IS THE ATTEMPT TO

25   REPRESENT THE ENTIRE BALLOT ON THE SCREEN AT A SINGLE

1    TIME, SO SIMILAR TO A LEVER MACHINE.

2                    THE OTHER THING IS THEY LIKED -- BECAUSE

3    OF THAT FULL FACE, IT GIVES THEM A VERY EFFICIENT, VERY

4    FAST VOTING EXPERIENCE, ESPECIALLY IF YOU'RE VOTING DOWN

5    PARTY LINES, SO PARTY ROWS OR PARTY COLUMNS, DEPENDING

6    ON WHICH LEVER MACHINE YOU HAD BACK IN THE DAY FOR THAT.

7    BY MR. WIYGUL:

8    Q.      SO IN YOUR ROLE DEVELOPING AND IMPLEMENTING THE

9    EXPRESSVOTE MACHINE, DO YOU HAVE ANY INVOLVEMENT IN THE

10   DESIGN OF THE FEATURES OF THE MACHINE?

11   A.      YEAH.  I HAD AN INTIMATE INVOLVEMENT IN EVERY

12   PORTION OF BOTH THE, YOU KNOW, THE OPERATING SYSTEM WE

13   CHOSE, THE DEVELOPMENT ENVIRONMENT WE CHOSE, THE

14   SECURITY FEATURES, THE HARDWARE DESIGN -- YOU KNOW,

15   HARDWARE DESIGN, HARDWARE CONTROLS, EVEN THE COLOR,

16   EVERY SINGLE PART OF IT, WHICH IS ACTUALLY THE HARDEST

17   PART.

18   Q.      WE HAVE HEARD SOME DESCRIPTION OF THE

19   EXPRESSVOTE XL MACHINE FROM OTHER WITNESSES.  BUT I

20   WOULD LIKE YOU TO TELL THE COURT, IF YOU COULD PLEASE,

21   HOW WOULD YOU DESCRIBE THE EXPRESSVOTE XL?

22   A.      THERE'S TWO PRETTY TYPICAL TERMS THAT I AM

23   COMFORTABLE WITH.  ONE IS A HYBRID MACHINE, SO IT

24   COMBINES WHAT HAS TYPICALLY BEEN A BALLOT-MARKING DEVICE

25   AND A PAPER SCANNER/TABULATOR.  SO THE BALLOT-MARKING

1    DEVICE, MAKE YOUR SELECTIONS ON A TOUCHSCREEN, AND PRINT

2    OUT YOUR SELECTIONS, AND THEN THE BALLOT TABULATOR --

3    SCANNER/TABULATOR BEING SCAN THE PIECE OF PAPER, TAKE

4    THE DATA OFF OF THE PAPER, APPLY THE ELECTION RULES AND

5    THEN CREATE A DATA FILE THAT HAS BEEN ADDED UP TO GET

6    THE RESULTS.

7    Q.    DID YOU SAY THERE WAS ANOTHER TERM?

8    A.    THE SECOND TERM IS A UNIVERSAL VOTING MACHINE,

9    AND THAT IS BASICALLY ANYBODY -- ANY VOTER CAN USE IT.

10   SO A STANDARD VOTER WHO HAS ALL OF THEIR FACILITIES, ALL

11   THE WAY TO A QUADRIPLEGIC COULD VOTE ON THAT MACHINE

12   WITH THE PROPER EQUIPMENT, WHICH IS CERTIFIED, AND THEN,

13   YOU KNOW, LOW COGNITIVE, LOW LITERACY VOTERS WITH ALL OF

14   THE ADA ASSISTIVE ABILITIES.

15   Q.    HAVE YOU HEARD THE TERM "DRE WITH VVPAT" OR

16   "VVPAT"?

17   A.    YES, I AM VERY FAMILIAR WITH THE TERM.

18   Q.    IS THE EXPRESSVOTE XL A DRE WITH VVPAT?

19   A.    IT IS NOT.

20   Q.    CAN YOU EXPLAIN WHY?

21   A.    WELL, A DRE IN ITS NATURE, AND THIS IS FROM THE

22   TIME I -- BACK IN 2007 WHEN WE WERE LOOKING AT

23   DEVELOPING A DRE, TO FAST FORWARD JUST A FEW YEARS AGO

24   WHEN WE ACTUALLY BUILT ONE, THE DRE WAS A DEVICE THAT

25   YOU MADE YOUR SELECTIONS, AND THE SELECTIONS AS THEY

1    WERE ENTERED WERE DIRECTLY RECORDED, THUS THE NAME

2    DIRECT RECORD ELECTRONIC, DIRECTLY RECORDED INTO THE

3    PERMANENT MEMORY.  SO WHAT YOU STORE IS WHAT YOU

4    ENTERED.

5                   AND THE VVPAT IS AN AUDIT TRAIL THAT IS

6    SOMEWHAT DISCONNECTED.  IT'S BASICALLY -- IT'S LIKE A

7    CASH REGISTER RECEIPT IN THAT IT'S PRINT IN GENERAL.

8    THE ONE THAT ELECTION SYSTEMS AND SOFTWARE HAD, IT WOULD

9    PRINT THE SELECTIONS AS YOU MADE THEM, AND IT WOULD, YOU

10   KNOW, INVALIDATE THEM, BUT IT WOULD RECORD THE

11   ELECTRONIC DATA SEPARATELY, INDEPENDENTLY OF THE PIECE

12   OF PAPER.  AND A DRE, THE PIECE OF PAPER, IS ONLY USED

13   AS AN AUDIT TRAIL.  IT IS NOT ACTUALLY USED FOR

14   TABULATION OR STORING OF THE DATA IN ANY FASHION.

15   Q.      CAN YOU JUST CARRY THAT THROUGH AND DESCRIBE

16   WHAT ARE THE FEATURES OF THE EXPRESSVOTE XL, THAT VVPAT

17   MAKE IT NOT A DRE?

18   A.      THE EXPRESSVOTE XL, IT DOES ALLOW YOU TO MAKE

19   YOUR SELECTIONS ON THE SCREEN OR USING ONE OF THE

20   ASSISTIVE TECHNOLOGIES.  BUT THE KEY DIFFERENCE IS THE

21   TABULATED DATA COMES FROM SCANNING INFORMATION OFF OF

22   THE PIECE OF PAPER.  SO THAT GOES BACK TO THAT DUAL ROLE

23   OF THE HYBRID MACHINE, WHERE IT IS -- AT ITS HEART, PART

24   OF IT IS A SCANNER/TABULATOR.  SCAN THE PIECE OF PAPER,

25   TABULATE AND STORE THE DATA THAT COMES FROM THE PIECE OF

1       PAPER.

2       Q.      AND TYPICALLY THE PAPER RECORD PRODUCED BY THE

3       EXPRESSVOTE XL WOULD BE SCANNED AND TABULATED IN THE

4       EXPRESSVOTE XL MACHINE, IS THAT RIGHT?

5       A.      YES, THAT'S CORRECT.

6       Q.      IS IT -- IS THAT THE ONLY WAY YOU COULD SCAN AND

7       TABULATE THE PAPER RECORDS FOR USE OTHER THAN THE

8       EXPRESSVOTE XL?

9       A.      IT IS NOT.

10      Q.      CAN YOU EXPLAIN WHAT THE ALTERNATIVES ARE.

11      A.      YEAH.  ALL OF OUR PAPER SCANNER/TABULATORS HAVE

12      THE SAME TABULATION ENGINE AND THEY SCAN THE BALLOT.  SO

13      THEY SCAN AN IMAGE AND THAT IMAGE IS THEN PUT INTO A

14      PROCESSING SOFTWARE MODULE.  WE CALL IT OUR IMAGE

15      PROCESSING MODULE.  AND THAT MODULE IS IN THE XL, IT IS

16      IN THE OUR DS200 PRECINCT SCANNER, IT'S IN OUR DS450 AND

17      DS850 CENTRAL SCANNERS, AND THEY ALL DO EXACTLY THE SAME

18      THING WITH ESSENTIALLY THE SAME CODE, AND THAT IS THEY

19      PULL THE DATA OFF OF THE PIECE OF PAPER, THEY GENERATE A

20      DATA FILE, AND THEN THEY EITHER -- THEY STORE AND THEN

21      SUBSEQUENTLY -- STORE AND TABULATE AND SUBSEQUENTLY

22      AGGREGATE THAT RECORD.  SO THAT WHOLE PORTION OF IT IS

23      IDENTICAL ACROSS ALL OF OUR PAPER BALLOT SCANNERS.

24      Q.      WE HAVE HEARD TESTIMONY ABOUT AN EXPRESSVOTE 2.1

25      MACHINE, AND I THINK YOU MENTIONED THAT EARLIER.

1    A.      YES.

2    Q.      IS THAT ANOTHER EXAMPLE -- I DON'T KNOW IF YOU

3    CALL IT A UNIVERSAL VOTING SYSTEM OR SOMETHING?

4    A.      IT IS BOTH A HYBRID.  IT IS CAPABLE OF BEING

5    BOTH A HYBRID, AND IT IS A UNIVERSAL VOTING MACHINE.

6    Q.      AND WE'VE HEARD TESTIMONY THAT THE PAPER RECORDS

7    CREATED BY THE EXPRESSVOTE 2.1 MACHINE LOOK IDENTICAL TO

8    THOSE CREATED BY THE EXPRESSVOTE XL.

9    A.      YES.  THEY ARE IDENTICAL.

10   Q.      AND IF IT'S NOT PROPRIETARY, WHAT DOES THE XL

11   STAND FOR?

12   A.      THE XL IS BASED -- LIKE SOMEBODY MENTIONED,

13   EXTRA LARGE.  IT IS A FUNCTIONALLY SIMILAR VERSION OF

14   THE EXPRESSVOTE, JUST BIGGER.

15   Q.      NOW, WE HAVE AN EXPRESSVOTE XL MACHINE IN THE

16   COURTROOM, IS THAT RIGHT?

17   A.      THAT IS CORRECT.  OVER ON THE OTHER SIDE OF THE

18   JUDGE'S DESK IS AN EXPRESSVOTE XL.

19              MR. WIYGUL:  AND WITH THE COURT'S

20   PERMISSION, I WOULD ASK MR. BAUMERT TO COME DOWN OFF THE

21   STAND AND MAYBE NARRATE HOW THE MACHINE CAN BE SET UP,

22   AND THEN WALK THROUGH A DEMONSTRATION FOR THE COURT OF

23   THE VOTING PROCESS.

24              THE COURT:  THAT'S FINE.  WOULD YOU LIKE

25   TO MOVE OVER TO THE OTHER SIDE?  LET'S GET THE

1    STENOGRAPHER SET UP.  AND OBVIOUSLY IF YOU CAN'T HEAR,

2    YOU WILL LET US KNOW.

3              THE WITNESS:  SO THE EXPRESSVOTE XL, IT

4    BASICALLY HAS THREE PARTS.  IT HAS WHAT IS BASICALLY A

5    CUSTOM 32-INCH TABLET PC.  IT'S LIKE A BIG IPAD.  IT HAS

6    A SCANNER, PRINTER, WHAT WE CALL A PPM OR PAPER PATH

7    MODULE, AND THEN IT HAS A CART.  AND THE CART HAS

8    STORAGE AREA, AND IT HAS BATTERY BACKUPS INSIDE THE

9    BOTTOM OF HERE.  SO BATTERIES, BASICALLY WATER TYPE OF

10   BATTERIES, IT'S SEALED LEAD ACID BATTERIES.  THE CART

11   ALLOWS IT TO BE WHEELED IN AND LOCKED INTO PLACE AND SO

12   IT'S -- THIS WOULD BE -- AND IT WAS SET UP BY THE CITY

13   PHILADELPHIA STAFF TO BE KIND OF COVERED AND SEALED AS

14   IT WOULD ARRIVE AT A POLL SITE.  AND THAT IS, THERE IS A

15   COVER THAT IS MEANT REALLY TO STAY IN PLACE AND PREVENT

16   BEING ABLE TO DO ANYTHING SIGNIFICANT WITH CERTAIN PARTS

17   OF THE MACHINE -- CERTAIN PARTS OF THE TABLET.

18             AND SO WHAT A POLL WORKER WOULD DO, AND I

19   HAVE ALREADY DONE THIS.  I ACTUALLY CHECKED THE SEALS

20   WHEN THEY PUT THEM ON WITH THE NUMBER AND THEN CAME IN

21   THIS MORNING, CHECKED THEM AGAIN TO MAKE SURE NOBODY IS

22   MONKEYING WITH MY BABY HERE.  SO THEY WOULD -- THEY ARE

23   GOING TO TAKE THAT AND JUST BREAK IT OR CUT IT.  AND

24   THEY WOULD THEN TAKE THIS, RECORD THE SEAL NUMBER, AND

25   THEN HAVE THAT AND KEEP THAT AS AN ARTIFACT FOR THE

1   ELECTION.  AND THAT'S REALLY INTO THE PROCEDURES, THAT'S

2   A PRETTY COMMON WAY FOR EVERYBODY TO DO IT.

3              AND SO WITH THAT SEAL BROKEN, IT IS NOW

4   POSSIBLE, AND I DON'T KNOW IF YOU SAW THE STRAP, THAT'S

5   WHAT THE SEAL WAS THROUGH.

6              THE COURT:  SORT OF LIKE A SADDLE.

7              THE WITNESS:  YEAH, EXACTLY.

8              AND SO FROM THERE, THIS PORTION CAN BE

9   LIFTED OFF.  THERE IS ALSO A SIMILAR COVER FOR THE PAPER

10  PATH MODULE WITH A LITTLE HOOD THAT GOES OVER THE CARD

11  BIN TO PREVENT WATER FROM GETTING IN IT.

12             AND SO THIS -- LET ME MAKE SURE.  JUST

13  FOR THE PURPOSES OF THE DEMONSTRATION, THERE IS A KEY IN

14  HERE I JUST WANT TO MAKE SURE I DON'T LOSE.  SO THIS IS

15  THE UNIT.  AND ALSO IN HERE -- SO IF YOU WANT TO TAKE A

16  LOOK AT THE BACK, THERE IS A STORAGE AREA.  I AM GOING

17  TO BREAK THE SEAL IN THERE AS WELL.  AND THE NUMBERS ARE

18  VERY SIMILAR SO IT'S EASY TO REMEMBER.  SO THIS WOULD

19  HAVE -- THIS COULD BE USED TO STORE --

20             THE COURT:  YOU ARE PUTTING A KEY IN.

21  MAY I SEE THE KEY?

22             THE WITNESS:  YES.  IT'S A BARREL KEY, SO

23  A LITTLE MORE SECURE.

24             THE COURT:  IT'S A LOCK THAT IS MORE

25  DIFFICULT TO PICK?

1          THE WITNESS:  YES.

2          SO -- AND IN HERE I HAVE SOME OF MY

3    GOODIES.  SO A POLL PLACE COULD HAVE THEIR CARD STOCK.

4    THERE IS ALSO -- THE ADA, WHAT THEY CALL AN AUDIO

5    TACTILE INTERFACE.  SO THIS IS WHAT AN ADA VOTER,

6    WHETHER THEY BE BLIND, MOTOR IMPAIRED, A NUMBER OF

7    DIFFERENT THINGS, BUT IT HAS THE ABILITY TO USE BUTTONS

8    TO LISTEN TO AND NAVIGATE THE BALLOT.  IT HAS THE

9    ABILITY TO -- HERE IS THE HEADPHONES THAT THIS GETS

10   PLUGGED INTO.  IF WE CHOOSE TO DO THAT, I WILL HOOK

11   SPEAKERS UP SO YOU CAN HEAR THE AUDIO.  IT ALSO HAS A

12   TWO-SWITCH INTERFACE, SO THEY CAN USE A ROCKER PADDLE,

13   WHICH IS BASICALLY A TWO BUTTON THING WHERE YOU CAN

14   NAVIGATE FORWARD IN THE BALLOT, SELECT FORWARD, FORWARD,

15   FORWARD.  SO GO TO THE FIRST CONTEST -- AND THEY CAN

16   NAVIGATE AROUND JUST USING TWO BUTTONS.  OR THEY COULD

17   USE A SIP AND PUFF, WHICH IS YOU NAVIGATE THE SAME WAY,

18   BUT YOU BLOW IN, I BELIEVE, TO NAVIGATE FORWARD; YOU SIP

19   TO MAKE YOUR SELECTION.  SO THUS A QUADRIPLEGIC TRULY

20   COULD VOTE ON THIS MACHINE, AND HAS.

21          AND THAT IS -- THERE ARE SPARE MEDIA IN

22   HERE, AND I DON'T KNOW WHAT THAT IS.  I THINK THAT MIGHT

23   BE A SUPPLY BAG.  SO IN THE PART HERE ARE EITHER TWO OR

24   FOUR SEALED LEAD ACID BATTERIES.  TWO BATTERIES GIVE

25   SEVEN HOURS OF LIFE, AND THAT IS FOR THE FULL FUNCTION

1    OF THE MACHINE, AND FOUR BATTERIES WOULD GIVE 14 TO

2    16 HOURS OF FULL USE.  AND THAT IS RUNNING HARD,

3    PRINTING OFTEN -- PRINTING OFTEN.  SO --

4            THE COURT:  THERE IS NO CHALLENGE ABOUT

5    THE HANDICAP ACCESSIBILITY OF THESE MACHINES, IS THERE?

6            MR. MAAZEL:  NO.

7            THE COURT:  I DON'T ANTICIPATE WE ARE

8    GOING TO NEED ANY OF THAT.

9            THE WITNESS:  OKAY.  SO THERE IS ALSO AN

10   ACTIVITY LIGHT THAT CAN BE SEEN FROM A POLL WORKER'S

11   POINT OF VIEW, SO THEY CAN POINT IT IN ANY DIRECTION AND

12   AS THE VOTING IS GOING ON -- THE VOTE SESSION STARTS,

13   THE LIGHT GOES ON.  THE VOTE SESSION ENDS, THE LIGHT

14   GOES OFF.  AND WHEN THERE'S AN ERROR, THE LIGHT BLINKS.

15   SO JUST ANOTHER WAY -- IF THEY POINT IT TOWARD THEM IN

16   THIS WAY ACROSS THE WAY AND THEY MAY NOT BE ABLE TO HEAR

17   THE ALERT INDICATORS FROM ACROSS THE POLL ROOM.

18           THE COURT:  ARE THE ALERTS AUDIBLE?

19           THE WITNESS:  YES.  SO IT BINGS AND BEEPS

20   AND A NUMBER OF DIFFERENT THINGS.  IT'S QUITE ANNOYING

21   WHEN THEY ARE TESTING THOSE.

22           SO THE OTHER THING -- THE OTHER PLACE

23   THAT IT IS SEALED IS THERE IS A FRONT -- ON THE FRONT OF

24   THE MACHINE OR ON THE TOP OF THE MACHINE, OF THE TABLET,

25   IS A COMPARTMENT, AND THAT IS ALSO LOCKED AND SEALED.

1    IT IS LOCKED IN THE FRONT BUT IS SEALED IN THE BACK.

2    AND THE PURPOSE OF THE SEAL BEING IN THE BACK SO THAT AS

3    THE MACHINE IS OPEN FOR VOTING, IT'S DIFFICULT TO GET

4    BACK BEHIND THERE AND MONKEY WITH THE CONTENTS OF THIS

5    COMPARTMENT DURING THE VOTING PROCESS.

6             ALSO, THE SCREEN JUST ADJUSTS.  SO IF YOU

7    HAVE A STANDING VOTER, YOU WOULD ADJUST IT LIKE THIS.

8    IF IT'S A SEATED VOTER, IT WOULD BE DOWN LIKE THAT.  SO

9    WE WILL MOVE IT UP JUST TO MAKE IT A LITTLE EASIER TO

10   VIEW.

11            SO THIS IS -- THE ONLY OTHER THING WE

12   WOULD DO IS WE WOULD PLUG IT IN.  IT DOESN'T HAVE TO BE

13   PLUGGED IN BECAUSE OF THE BATTERY.  ALL OF THAT IS

14   WORKING AS IT SHOULD.

15            MR. MAAZEL:  YOUR HONOR, I KNOW THIS IS

16   NOT OUR EXAMINATION.  WHILE WE ARE ALL STANDING HERE, IF

17   I -- MAY I ASK THE WITNESS TO EITHER REPEAT OR GIVE A

18   LITTLE BIT MORE DESCRIPTION OF WHAT IS IN THE WHITE

19   COMPARTMENT AT THE TOP.

20            THE COURT:  SURE.

21            THE WITNESS:  WE WILL, YES.

22            THE COURT:  AFTER HE PLUGS IT IN.

23            THE WITNESS:  YES.  SO THE UNIT IS

24   PLUGGED IN.  THE POLL WORKER CHECKS TO MAKE SURE THE

25   LIGHT -- THE GREEN LIGHT IS ON INDICATING THAT IT HAS

1    POWER, AND WE ALSO SEE IT'S STARTING TO COME TO LIFE,

2    SAYING, I HAVE POWER, I HAVE A FULL BATTERY, BUT I AM

3    NOT TURNED UP YET.

4              SO THE POLL WORKER WOULD RECORD AND BREAK

5    THE SEAL FROM THE BACK.  SO THIS ONE WAS PUT THROUGH

6    THERE AND LOCKED.  AND SO THAT SEAL.  AND NOW THEY ARE

7    ABLE TO UNLOCK THIS.  SO UNDERNEATH HERE, FIRST OF ALL,

8    IS A POWER BUTTON.  SO I AM GOING TO GO AHEAD AND HIT IT

9    SO THAT IT IS TURNING ON WHILE I DESCRIBE SOME OF THE

10   OTHER THINGS.  SO THAT'S TURNING ON THE UNIT.  UNLIKE

11   SOME OF THE SYSTEMS ON THE MARKET, WE PUT THE POWER

12   BUTTON BEHIND A LOCKED AND SEALED DOOR.  NOT ALL VOTING

13   SYSTEMS DO.

14             WE ALSO HAVE HERE WHAT WE TERM IN ES&S AS

15   A MODE BUTTON.  SO THE TWO MODES BEING VOTING AND

16   SUPERVISORY FUNCTIONS.  AND UNDER THE SUPERVISORY MENU,

17   THERE ARE -- IT'S A LOWER LAYER OF ADMIN FUNCTIONS THAT

18   ARE PROTECTED UNDER DIFFERENT CREDENTIALS.

19             THERE ARE ALSO A COUPLE OF -- A FEW USB

20   PORTS, THREE TO BE EXACT.  AND IN ONE OF THEM IS THE

21   MEDIA THAT WAS USED TO LOAD THE ELECTION ONTO THE

22   SYSTEM.

23             SO IF I MAY, I WILL GO INTO JUST A LITTLE

24   BIT OF DETAIL OF HOW WE PREPARE THIS MACHINE TO RUN THE

25   ELECTION.  SO THE SUITE OF PRODUCTS, EVS 6021 AS WE HAVE

1    DISCUSSED THEM, AND ALL OF OUR SUITES HAVE AN ELECTION

2    MANAGEMENT SYSTEM.  THE TERM IN THE INDUSTRY IS

3    GENERALLY EMS.  AND OUR EMS SYSTEM IS CALLED

4    ELECTIONWARE.  AND WHAT IT DOES IS IT TAKES ALL THE

5    CANDIDATE AND CONTEST INFORMATION AND THE JURISDICTIONAL

6    -- SO IF WE ARE STILL DOING PENNSYLVANIA STRAIGHT PARTY,

7    THEY WOULD SELECT -- USE PENNSYLVANIA STRAIGHT PARTY.

8    IT FORMATS THE BALLOTS.  THERE ARE MODULES TO LAY OUT

9    THE BALLOT AND -- AS TO HOW IT WILL APPEAR ON THE

10   SCREEN, TO LAY OUT THE BALLOT AS IT WILL APPEAR ON A

11   PAPER BALLOT, GET ALL OF THAT CONFIGURATION AND, YOU

12   KNOW, DIFFERENT OPTIONS, WHETHER THERE IS A PASS CODE TO

13   OPEN THE POLLS OR NOT.  PHILLY CHOOSES TO HAVE THAT PASS

14   CODE IN PLACE.  AND ALL OF THOSE THINGS ARE BUNDLED AND

15   ENCRYPTED AND WRITTEN TO A USB MEDIA, AND THAT USB MEDIA

16   IS SIMPLY TO TRANSFER THE ELECTION DEFINITION OVER TO

17   THE MACHINE.

18              IT ALSO CREATES WHAT WE CALL AN EQC

19   MEDIA, WHICH IS AN ELECTION QUALIFICATION CODE.  AND

20   THAT'S A SEPARATE PIECE OF USB MEDIA THAT IS USED TO PUT

21   THE ENCRYPTION KEYS AND THE SPECIFIC ELECTION THAT ARE

22   GOING TO BE ON THE MACHINE.  SO YOU TRANSFER THOSE

23   ENCRYPTION KEYS ON TO THE MACHINE, AND THEN YOU TRANSFER

24   THE ELECTION DEFINITION AND CONFIGURATION INFORMATION,

25   AND THE MACHINE USES THOSE KEYS TO UNENCRYPT IT.

1        SO ONCE THE ELECTION IS LOADED ONTO THE

2    MACHINE AND THE MACHINE HAS EVERYTHING IT NEEDS, THIS

3    USB STICK IS REALLY NOT USED.  IT JUST SITS IN THE

4    MACHINE UNTIL IT IS -- UNTIL IT IS TO BE USED TO

5    TRANSFER VOTE DATA AND RESULTS BACK OFF OF THE MACHINE.

6        SO IN SOME OF OUR OTHER PREVIOUS SYSTEMS,

7    THIS USB MEDIA WAS ACTUALLY THE DATA DRIVE OF THE

8    MACHINE.  IN THIS CASE IT SIMPLY TRANSFERS ELECTION

9    DEFINITION ON, AND TAKES RESULTS BACK OFF.  OTHERWISE IT

10   JUST SITS IN THE MACHINES.

11       THESE USB PORTS ARE LOCKED DOWN SO THEY

12   ARE -- THE WHOLE MACHINE IS PROGRAMMED TO ONLY RECOGNIZE

13   OUR PARTICULAR TYPE OF USB STICK.  AND SO IT MAKES SURE

14   THAT IT IS ONLY THAT KIND OF STICK THAT IT IS PROGRAMMED

15   FOR THE SPECIFIC FUNCTION THAT YOU ARE PERFORMING.  SO

16   IF YOU ARE TRYING TO LOAD AN ELECTION IN AND YOU TRY TO

17   STICK AN EQC STICK IN, IT KNOWS THE DIFFERENCE AND WILL

18   ONLY LET YOU DO WHAT THAT STICK ALLOWS.

19       THEN IT VERIFIES THE DIGITAL SIGNATURE OF

20   THE DATA, WHICH IS A MEANS OF DETERMINING THAT THE DATA

21   HAS NOT BEEN CHANGED SINCE IT WAS SENT FROM THE TRUSTED

22   SOURCE AND THAT IT IS FROM THE TRUSTED SOURCE, BEING OUR

23   SPECIFIC ELECTION MANAGEMENT SYSTEM.  SO IT CHECKS TO

24   MAKE SURE THAT THAT DATA HAS GOOD INTEGRITY.  AND THEN

25   IT LOADS THAT DATA IN ENCRYPTED FORM ONTO THE INTERNAL

1    DATA DRIVES, THE INTERNAL HARD DRIVE, SOLID STATE

2    DRIVES, AND IT STORES IT THERE ENCRYPTED.

3              FROM THERE, AS IT IS NEEDED, IT IS

4    UNENCRYPTED INTO VOLATILE MEMORY, SO -- AND WE CAN TALK

5    ABOUT EXACTLY WHAT THAT IS, D-RAM FOR TECHNICAL PEOPLE.

6    AND THAT TYPE OF MEMORY IF THE MACHINE IS SHUT OFF, ALL

7    THAT DATA JUST GOES AWAY SO IT IS REALLY NOT VULNERABLE.

8              SO LET ME SEE -- SO THE -- THERE ARE KIND

9    OF LAYERS OF SECURITY DEALING WITH THOSE USB STICKS.  IF

10   YOU TRY TO PLUG A KEYBOARD IN, IT WILL IGNORE IT.  IF

11   YOU TRY TO PLUG A STICK FROM WALMART IN, IT WILL IGNORE

12   IT.  AND ANYTHING THAT IT DOESN'T KNOW WHAT IT IS AND AS

13   A CERTIFIED PART OF THE SYSTEM, IT WILL IGNORE IT.

14   SO --

15             THE COURT:  AS FAR AS YOU KNOW, WHO SETS

16   THIS UP AT THE POLLING PLACE, POLL WORKERS?

17             THE WITNESS:  IT IS POLL WORKERS, YES.

18             THE COURT:  THEY ARE TRAINED BY ES&S?

19             THE WITNESS:  NO.  GENERALLY -- WE CAN

20   TRAIN POLL WORKERS, BUT GENERALLY WE TRAIN THE CUSTOMER,

21   AND THE CUSTOMER TRAINS THE POLL WORKERS.

22             THE COURT:  SO REPRESENTATIVES FROM THE

23   CITY ARE TRAINED BY YOU?

24             THE WITNESS:  YES.

25             THE COURT:  OKAY.

1              THE WITNESS:  IT WOULD BE WHAT WE CALL A

2     TRAIN THE TRAINER TYPE OF SITUATION.  AND WE TEND --

3     NOW, WE WILL DO ANYTHING FOR MONEY.  SO WE TEND TO -- IF

4     A CUSTOMER REALLY WANTS US TO -- WANTS US TO TRAIN --

5              MR. MAAZEL:  I FINISHED MY CROSS.

6              MR. WIYGUL:  I WANT THE RECORD TO REFLECT

7     THE LAUGHTER.

8              THE COURT:  IT'S A BUNCH OF LAWYERS.

9              THE WITNESS:  BUT GENERALLY, FROM A

10    TRAINING STANDPOINT, POLL WORKER TRAINING IS VERY

11    JURISDICTIONAL.  THEIR TERMINOLOGY, THEIR PROCEDURES,

12    ALL OF THAT.  SO FOR US TO LEARN EXACTLY ALL OF THE

13    NUANCES OF EVERY PARTICULAR CUSTOMER AND TURN THAT INTO

14    TRAINING MATERIALS IS BEYOND THE SCOPE OF THE BUSINESS

15    WE WANT TO BE IN.  SO WE WILL TRAIN THE VERY TECHNICAL

16    DETAILS OF THE OPERATION OF OUR SYSTEM, AND WE WILL HELP

17    THEM TURN THAT INTO JURISDICTIONAL-SPECIFIC TRAINING.

18              THE COURT:  OKAY.

19              THE WITNESS:  AND SO WHAT WE HAVE GONE

20    THROUGH NOW IS JUST -- WE HAVE POWERED THE MACHINE UP.

21    WE HAVE A CHALLENGE ACCESS CODE THAT WE NEED TO ENTER.

22    SO I WILL GO AHEAD AND ENTER THAT, AND IT IS A VERY

23    GENERIC ONE.  SO RIGHT NOW WHAT IT IS DOING, IT IS --

24    FROM THE INTERNAL HARD DRIVE, IT IS POLLING THAT

25    ELECTION DEFINITION, CHECKING THE SIGNATURE ON TO MAKE

1    SURE IT STILL HAS NOT BEEN TAMPERED WITH, AND THEN

2    EXPLODING THAT INTO D-RAM.  AND NOW IT IS AVAILABLE, ALL

3    OF THAT ELECTION DEFINITION INFORMATION IS AVAILABLE TO

4    THE MACHINE.

5              THIS IS A GENERAL STATUS SCREEN THAT

6    COMES UP, AND REALLY A VOTER -- A POLL WORKER IS GOING

7    TO BE TOLD, LOOK FOR GREEN CHECK MARKS.  IF YOU SEE ANY

8    YELLOW OR RED, CALL FOR SUPPORT.  SO IT HAS SOME GENERAL

9    INFORMATION.  AND IN OUR CASE, WHERE -- THE POLLS ARE

10   ALREADY OPEN.  GENERALLY WHAT WOULD HAPPEN THOUGH IS

11   THEY WOULD HIT OPEN POLLS.  IT WOULD AUTOMATICALLY PRINT

12   THE ZERO TAPE, AND IT WOULD -- IT WOULD ACTUALLY

13   CHALLENGE THEM FOR A PASS CODE.  IT WOULD AUTOMATICALLY

14   PRINT THE ZERO TAPE, AND IT WOULD THEN GO TO THIS

15   SCREEN.

16              THE COURT:  ZERO TAPE?

17              THE WITNESS:  A ZERO TAPE IS A RESULTS

18   TAPE.  IT SHOWS THE VOTING RESULTS ARE ZERO.  SO ON OUR

19   MACHINES IF THEY ARE -- A ZERO TAPE CAN ONLY BE PRINTED

20   IF THE POLLS HAVE NOT BEEN OPEN, AND A RESULTS TAPE CAN

21   ONLY BE PRINTED IF THE POLLS HAVE BEEN CLOSED.  SO THERE

22   ARE SOME PROTECTIONS, AND THERE IS ALSO -- WE ALSO HAVE

23   SOME FEATURES WHERE WE -- NOT ONLY DO WE PRINT THAT

24   RESULTS TAPE THAT SHOWS ALL ZEROS, BUT WE STORE AND

25   DIGITALLY SIGN A COPY OF IT ONTO THE MACHINE.  IF THEY

1      LOSE THAT PAPER COPY, THEY CAN GO IN AND REPRINT A COPY.

2      IT'S NOT ACTUALLY REGENERATED AGAIN, BECAUSE THE MACHINE

3      WOULD HAVE VOTES ON IT, BUT THE ZERO TAPE IS STORED

4      DIGITALLY ON THERE AS ANOTHER ARTIFACT OF THE ELECTION.

5      AND IT SHOWS WHEN THE POLLS OPENED AND THAT KIND OF

6      THING.

7                  SO I AM GOING TO GO AHEAD AND GO INTO

8      VOTING AND NOW THE MACHINE IS READY TO VOTE.  THEY WOULD

9      CLOSE THIS -- ALSO, ONE THING I WOULD SAY IS THIS IS THE

10     REPORT PRINTER HERE, ACCESS TO THAT.  YOU HAVE TO HAVE

11     THIS OPEN TO -- YOU HAVE TO HAVE THIS ACCESS DOOR TO THE

12     PRINTER, IS ONLY ACCESSIBLE IF YOU HAVE THIS COMPARTMENT

13     OPEN.  SO A VOTER CAN'T WALK UP TO IT AND STEAL THE

14     PAPER ROLL, NOT THAT THEY WOULD IN PHILADELPHIA.  BUT --

15                 THE COURT:  PERHAPS IN NEW YORK.

16                 THE WITNESS:  DEFINITELY IN NEW YORK.  SO

17     THEY ALSO HAVE -- WE HAVE JUST SOME MECHANICAL FEATURES.

18     SO YOU CAN'T PRY UP THIS SIDE.  THERE'S A PLASTIC HOOK

19     THAT YOU WOULD HAVE TO BREAK.  WHEN YOU PUT THE KEY IN

20     AND PULL IT UP FROM THE MIDDLE, IT FLEXES THE DOOR AND

21     RELEASES THAT HOOK.  SO THE POLL WORKER WOULD NOW LOCK

22     THAT, COME AROUND, RECORD THE NUMBER OF THE SEAL, PUT

23     THE SEAL INTO PLACE, AND THEY ARE OFF AND RUNNING.

24                 ANY QUESTIONS TO THIS POINT?

25                 THE COURT:  WELL, UNFORTUNATELY, THE ONLY

1    PERSON WHO CAN ASK YOU QUESTIONS RIGHT NOW IS MR.

2    WIYGUL.

3                    THE WITNESS:  I'M SORRY.  I AM IN DEMO

4    MODE HERE.

5                    MR. WIYGUL:  I DON'T HAVE ANY QUESTIONS

6    AT THIS POINT.  THANK YOU.

7                    THE WITNESS:  OKAY.  SO WE HAVE JUST KIND

8    OF GONE THROUGH A VERY BASIC RUN-THROUGH OF THE SETUP OF

9    THE MACHINE.  WE CAN NOW VOTE.  AND SO THE CARD THAT WE

10   HAVE HERE, THERE IS SOME CONTENTION AS TO WHAT THIS IS.

11   AT THE MOMENT IN ES&S TERMINOLOGY, THIS WOULD BE

12   REFERRED TO AS AN ACTIVATION CARD BECAUSE IT IS WHAT IS

13   USED TO ACTIVATE THE VOTE SESSION TO ALLOW THE VOTER TO

14   START.

15                   ONCE IT IS MARKED, WE WOULD REFER TO IT

16   AS THE BALLOT, BECAUSE -- AND THAT -- AND WE WOULD BRAG

17   ABOUT THE FACT THAT THE ACTIVATION CARD HAS NOW BEEN

18   CONSUMED.  YOU CANNOT ACTIVATE ANOTHER VOTE SESSION WITH

19   IT.  SO THAT'S KIND OF ONE OF THE BENEFITS OF THE WAY WE

20   DO IT.

21                   THE COURT:  SO THE VOTER HAS TO INSERT

22   THAT CARD?

23                   THE WITNESS:  IT IS UP TO THE

24   JURISDICTION.  THE VOTER COULD.  A POLL WORKER COULD,

25   BECAUSE UNTIL THEY ACTUALLY START MAKING SELECTIONS,

1      THERE IS REALLY NOTHING PRIVATE YET THAT HAS BEEN

2      ENCOUNTERED GENERALLY.  AGAIN, THAT'S JURISDICTIONS.

3                    THE COURT:  IN PHILADELPHIA, AS FAR AS

4      YOU KNOW, THE POLL WORKER WOULD INSERT THE CARD AND THEN

5      TELL THE VOTER TO COME INTO THE BOOTH, OR WOULD THE

6      VOTER DO IT.  IF YOU DON'T KNOW --

7                    THE WITNESS:  I WOULD -- I AM NOT SURE IF

8      I CAN ANSWER THAT SPECIFICALLY.

9                    MR. ARONCHICK:  THAT WOULD BE ANOTHER

10     WITNESS.

11                   THE WITNESS:  SO THEY WILL BE ABLE TO

12     TELL YOU, BUT IT ALSO DEPENDS ON WHETHER OR NOT THERE

13     ARE MULTIPLE BALLOTS ON THE MACHINE.  SO IN A PRIMARY

14     ELECTION, YOU KNOW, IF THERE IS A DEMOCRATIC BALLOT AND

15     A REPUBLICAN BALLOT, EITHER YOU PRINT THE INFORMATION ON

16     THE CARD THAT AUTOMATICALLY TELLS THE MACHINE WHICH.  SO

17     IT WOULD BE A BARCODE THAT WOULD TELL THE MACHINE PULL

18     UP THIS BALLOT OR YOU WOULD PUT A BLANK CARD IN AND A

19     POLL WORKER WOULD MAKE THE SELECTION BASED ON WHAT THEIR

20     VOTER AUTHORIZATION SLIP OR WHATEVER THEY USE FOR

21     INDICATING WHAT PARTY THEY ARE IN.  AND THEN DIFFERENT

22     CUSTOMERS IN DIFFERENT STATES ARE REALLY TOUCHY ABOUT

23     WHETHER THE POLL WORKER ACTUALLY TOUCHES THE SCREEN WHEY

24     THEY ARE INTERACTING JUST FOR PERCEPTION SAKE.

25                   THE COURT:  HOW LONG IS THAT CARD?

1                    THE WITNESS:  THIS CARD IS 14 INCHES.

2                    THE COURT:  HOW WIDE ACROSS?

3                    THE WITNESS:  IT IS HALF OF A LETTER, SO

4     IT'S FOUR AND A QUARTER.  AND A COUPLE OF THINGS ABOUT

5     THE CARD.  IT IS ALWAYS THE SAME LENGTH AS THE OVAL

6     FILLED BALLOT IF YOU ARE USING BOTH IN THE ELECTION.  IT

7     IS A LIMITATION OF OUR SYSTEM.  AND IT'S ABOUT THE SAME

8     WEIGHT.  THE GOAL WAS TO MAKE THIS PAPER -- WHEN PEOPLE

9     THINK OF THERMAL STOCK, THEY THINK OF FLIMSY RECEIPT

10    TAPE.  THIS IS ACTUALLY THE SAME WEIGHT AND THICKNESS AS

11    OUR REGULAR PAPER BALLOT STOCK.  IT IS THERMAL PAPER, SO

12    IT HAS A COATING ON ONE SIDE.  THAT'S -- ONE OF THE

13    BENEFITS IS IT'S THERMALLY PRINTED, SO THERE IS A

14    PRINTHEAD THAT, FOR LACK OF A BETTER TERM, BURNS THE

15    IMAGE OF THE VOTE SELECTIONS ON TO THE CARD, AND SO

16    THERE IS ONLY A COATING ON ONE SIDE, SO WE HAVE A LITTLE

17    TACTILE INDICATOR ON THE CORNER AND IT WILL ONLY ACCEPT

18    IT IN THAT ORIENTATION.  SO IF YOU TRY TO INSERT IT

19    WRONG, IT'S GOING TO SQUAWK AT YOU, AND IT'S GOING TO

20    RESET ITSELF.

21                   THE COURT:  AND IT SAYS CARD CANNOT BE

22    READ.

23                   THE WITNESS:  RIGHT.  AND THERE'S

24    ADDITIONAL INFORMATION.  A POLL WORKER COULD PULL UP AS

25    TO WHY, BUT GENERALLY IT JUST MAKES SURE THE CORNER CUT

1    IS ON THE RIGHT SIDE, AND THAT IS VERY SPECIFICALLY SO

2    THAT YOU CAN'T TRY TO PRINT IT ON THE SIDE THAT DOESN'T

3    HAVE THE COATING BECAUSE IT WOULDN'T PRINT.

4              SO I THINK, AS HAS BEEN MENTIONED, THERE

5    IS A LITTLE BIT OF A DIFFERENCE BETWEEN WHEN THE PAPER

6    PATH PULLS IN THE CARD, THE FIRST THING IT'S DOING IS

7    IT'S EVALUATING THAT CARD TO MAKE SURE IT DOESN'T

8    ALREADY HAVE SELECTIONS ON IT.  BECAUSE IT IS POSSIBLE

9    TO TAKE ANY CARD FROM ANY PROGRAM MACHINE AND TAKE IT

10   OVER TO A DIFFERENT MACHINE THAT IS PROGRAMMED WITH THE

11   SAME INFORMATION AND INSERT IT, LOOK AT YOUR CHOICES,

12   LOOK AT THE SUMMARY OF YOUR CHOICES AND CAST IT, IF YOU

13   WOULD LIKE.

14             SO I THINK IT HAS BEEN SAID BEFORE, THE

15   PRINTHEAD IS LIFTED UP SO WE CAN MOVE THE PAPER AT HIGH

16   SPEED - HIGHER SPEED.  THERE ARE A FEW THINGS.  ONE IS

17   MAKE THE VOTE SESSION AS FAST AS POSSIBLE.  IN THIS

18   ELECTION, WHICH IS A DEMONSTRATION ELECTION THAT THE

19   CITY OF PHILADELPHIA USES FOR SOME OF THEIR TRAINING AND

20   OUTREACH, IT HAS TWO LANGUAGES.  SO THIS IS THE POINT

21   WHERE A POLL WORKER, IF THEY WERE INVOLVED IN THE

22   PROCESS, WOULD STEP AWAY.  A POLL WORKER COULD -- OR A

23   VOTER COULD SELECT THEIR LANGUAGE.

24             MR. WIYGUL:  CAN I INTERRUPT WITH ONE

25   QUESTION?

1                    THE WITNESS:  YES.

2                    MR. WIYGUL:  YOU TALKED A LITTLE BIT

3       ABOUT PRIVACY.  ARE THE FEATURES OF THE MACHINE THAT YOU

4       HAVE NOT DESCRIBED YET ALLOW FOR VOTER PRIVACY?

5                    THE WITNESS:  YEAH.  THE ONE THING IS

6       SIMILAR TO THE OLD LEVER MACHINES, IT HAS A CURTAIN THAT

7       CAN BE PUT UP.  IT'S REALLY HARD TO DEMONSTRATE THE

8       MACHINE WHEN THE CURTAIN IS UP FOR OBVIOUS REASONS, BUT

9       THE VOTER WOULD BE INSIDE THE CURTAIN.

10                   THE COURT:  AND THE TWO LANGUAGES IN THIS

11      PARTICULAR CONFIGURATION ARE ENGLISH AND SPANISH?

12                   THE WITNESS:  CORRECT.  IT CAN DO UP TO,

13      I THINK, 12 LANGUAGES.

14                   AND EVEN IF THEY, YOU KNOW, I ALWAYS SAY

15      THERE IS A MEANS OF -- IF YOU GET INTO THE BALLOT, WE

16      HAVE VOTERS THAT SAY I AM GOING TO VOTE IN SPANISH THIS

17      TIME AND THEN THEY GET TO THE REALLY LONG QUESTIONS AND

18      THEY SAY I DON'T KNOW SPANISH, SO THEY CAN SWITCH DURING

19      THE VOTING SESSION AND THEY CAN SWITCH BACK TO ENGLISH

20      OR VICE VERSA.

21                   SO THE VOTER WOULD THEN BEGIN THE

22      PROCESS.  THIS IS AGAIN A FAIRLY STRAIGHTFORWARD BALLOT.

23      AND SO IN ITS NORMAL FORM, IT IS A GRID TYPE BALLOT FOR

24      THE PARTISANS, SO DEPENDING ON AGAIN ON THE

25      JURISDICTION.  PENNSYLVANIA TENDS TO USE PARTY COLUMNS.

1    IN OTHER PLACES THEY WILL USE THE DEMOCRAT, AND THE

2    PARTIES WILL BE ON THE SIDE AND THE CONTEST WILL BE ON

3    THE TOP, AND WHICH THEY CHOOSE, IRONICALLY ENOUGH, JUST

4    HAS TO DO WITH WHICH LEVER MACHINE THEY USED TO HAVE

5    BACK IN THE DAY THAT KIND OF SET THEIR PRECEDENTS.

6              SO HERE IF I WANTED TO JUST BLOW DOWN THE

7    DEMOCRATIC SIDE, I WOULD JUST GO TAP, TAP.  AND ON THIS

8    PARTICULAR ELECTION THERE IS ONLY VOTES FOR ONE CONTEST.

9    SO IF I WANT TO CHANGE MY VOTE TO SOMEONE ELSE, I CAN

10   SAY, I LIKE ALL OF THOSE DEMOCRATS EXCEPT FOR TINA FEY.

11   SHE DRIVES ME NUTS.  SO I'M GOING TO SWITCH OVER TO

12   CLIFF LEE.  AND IT WILL TOGGLE OVER TO THAT.  IF IT WAS

13   A VOTE FOR MORE THAN ONE, SAY, VOTE FOR THESE THREE

14   COUNCILMEN AND YOU SELECTED THREE AND YOU WENT TO VOTE

15   FOR A FOURTH, IT WOULD GIVE YOU AN ALERT THAT SAYS YOU

16   HAVE TO DESELECT ONE OF YOUR CHOICES BEFORE YOU ARE

17   ALLOWED.  SO IT WILL NOT LET YOU OVERVOTE.  THERE ARE

18   UNDERVOTE PROTECTIONS ALSO THAT YOU CAN TURN ON FOR SOME

19   OR ALL OF THE RACES.  SO IT'S -- IN OTHER AREAS OF THE

20   COUNTRY, IT'S NOT UNCOMMON TO HAVE THE UNDERVOTE WARNING

21   TURNED ON FOR PRESIDENT AND GOVERNOR AND THE THREE OR

22   FOUR MOST IMPORTANT RACES.  AND DOGCATCHER AND ALL OF

23   THOSE NOT, BUT YOU CAN TURN IT ON FOR ALL OF THEM.

24              THE COURT:  LIKE IN PHILADELPHIA IT'S --

25   AT LEAST IN AN OFF-YEAR ELECTIONS, AS THEY ARE CALLED,

1    THOSE ARE WHEN THE JUDICIAL RACES USUALLY TAKE PLACE,

2    AND YOU WILL VOTE FOR, SAY, FIVE COMMON PLEAS COURT

3    JUDGES AND THERE ARE 30 CANDIDATES.  THE MACHINE COULD

4    BE PROGRAMMED TO ALLOW YOU TO VOTE FOR ONLY ONE AND THE

5    MACHINE CAN BE PROGRAMMED TO REQUIRE YOU TO VOTE FOR

6    FIVE?

7              THE WITNESS:  I KNOW THAT IT CAN BE

8    PROGRAMMED TO ALLOW YOU TO VOTE FEWER THAN ALLOWED

9    SELECTIONS.  I DON'T KNOW IF WE -- I DON'T THINK THERE

10   IS ANY JURISDICTIONS THAT REQUIRE YOU TO VOTE.

11             THE COURT:  SO IT ALLOWS FOR BULLET

12   VOTING.

13             THE WITNESS:  YES.  AND THERE'S SAME

14   PROTECTIONS FOR A BLANK BALLOT.  SO IF YOU JUST BLEW

15   THROUGH AND SOME VOTERS COME IN.  THE ONLY REASON THEY

16   ARE VOTING IS TO NOT AGE OFF THE VOTER ROLLS.  THEY WILL

17   COME IN AND CAST A BLANK BALLOT, WHICH IS AMAZING.  BUT

18   THEY DON'T CARE ABOUT THIS ELECTION, BUT THEY KNOW IF

19   THEY DON'T VOTE THIS TIME THEY'RE GOING TO DROP OFF FOR

20   THE ELECTION THEY DO CARE ABOUT.  SO IT IS -- BUT IN

21   SOME PLACES THEY DON'T ALLOW A BLANK BALLOT OR THEY WANT

22   TO WARN OF A BLANK BALLOT.  ALL OF THOSE ARE THINGS THAT

23   BECAUSE OF THE USER INTERFACE CAN BE PROGRAMMED TO

24   PROMPT A VOTER THAT SAID HEY, BECAUSE IT'S POSSIBLE THAT

25   THEY WOULD HIT A -- HIT SOMETHING ON THE TOUCHSCREEN BY

1    ACCIDENT, AND WE DON'T WANT THAT TO BE A MISTAKE THAT

2    THEY CAN'T CHANGE.

3            SO I WENT AHEAD AND VOTED THE PARTISAN --

4    ACTUALLY WHAT I'LL DO, I AM GOING TO DESELECT THAT ONE,

5    AND I AM GOING TO GO AHEAD AND I'M GOING TO WRITE IN MY

6    BUDDY BOB, BECAUSE BOB IS A GOOD GUY.  AND NOW IT HAS

7    BOB AS A WRITE-IN.

8            MR. WIYGUL:  CAN WE ALSO -- FOR

9    DEMONSTRATION PURPOSES, CAN WE LEAVE A RACE BLANK, AN

10   UNDERVOTE?

11           THE WITNESS:  YES.  SO I'M GOING TO -- I

12   DON'T REALLY LIKE CLIFF LEE ANY MORE, SO I LEFT ONE

13   BLANK.  I DID A WRITE-IN.  ON THE QUESTIONS I AM GOING

14   TO VOTE YES AND NO.  I AM NOT SURE WHAT THOSE ARE, LIKE

15   SOME VOTERS.  AND I'M GOING TO -- NOW THIS IS REQUIRED

16   BY THE EAC, THE FEDERAL STANDARDS THAT SAY IF YOU ARE

17   GOING TO PRINT LIKE THIS, YOU HAVE TO GIVE THEM A

18   WARNING THAT THIS IS -- IT'S MORE DIFFICULT TO GET OUT

19   FROM THIS.  ALL OF THESE USER PROMPTS THAT THE VOTER

20   SEES ARE CUSTOMIZABLE.  SO IF THERE IS PARTICULAR

21   JURISDICTIONAL LANGUAGE AND THEY'RE ALL ONLY IN MULTIPLE

22   LANGUAGES DEPENDING ON -- SO IF I RETURN TO THE BALLOT

23   AND I CHANGE MY LANGUAGE TO SPANISH, AND THEN I GO TO

24   PRINT, IT'S GOING TO GIVE ME THE SAME IN THE OTHER

25   LANGUAGE.  SO I DON'T SPEAK SPANISH.  SO I'M GOING TO

1    CHANGE IT BACK.  AND SO I'M GOING TO PRINT.  I DO WANT

2    TO PRINT.  I AM HAPPY WITH WHAT THE SELECTIONS I HAVE

3    MADE.  AND YOU NOTICE THE PAPER MOVES SLOWER, THE

4    MACHINE IS A LITTLE NOISIER BECAUSE THAT'S THAT THERMAL

5    PRINTER KICKING IN.  AND IT IS FAIRLY NOTICEABLE, AND IT

6    IS GOING TO ALLOW YOU THEN TO SEE WHAT YOU HAVE SEEN UP

7    ON THE EXHIBIT SCREEN, AND THAT IS SOME INFORMATION

8    ABOUT THE ELECTION AND WHAT BALLOT THEY WERE VOTING, THE

9    BARCODES, WHICH I CAN EXPLAIN IN MORE DETAIL LATER, AND

10   THE HUMAN READABLE TEXT.  THE WRITE-IN, BOB, HAS A

11   LITTLE ARROW, SO IF THEY ARE REALLY GOING AND COUNTING

12   THE WRITE-INS FROM THE PAPER, IT MAKES THOSE A LITTLE

13   EASIER TO FIND.  AND THE -- LET ME SEE, AND IN THE STATE

14   TREASURER'S RACE, IT SAYS NO SELECTION.  SO REGARDLESS

15   IF THERE IS A VOTE FOR 12, IF I DON'T VOTE FOR ANY OF

16   THE JUDGES, AND I HAD TO VOTE -- I COULD HAVE VOTE FOR

17   12, IT WILL HAVE 12 NO SELECTIONS.  THESE CAN BE

18   PROGRAMMED, SO IT IS READY TO GO.  IF I DIDN'T LIKE IT,

19   PHILLY HAS THIS SET UP TO SAY SPOIL.

20                I AM GOING TO CAST THIS ONE.  AND YOU

21   HEARD -- YOU SAW THE PAPER MOVE AND YOU HEARD WHAT IT

22   SOUNDED LIKE.  AND SO A LITTLE HIGHER PITCH SOUND

23   BECAUSE IT IS MOVING FASTER AND NOT THAT HMMM OF THE

24   THERMAL PRINTER GOING, AND IT HAS DEPOSITED IT INTO THE

25   BIN.  THE BIN IS PROTECTED AND SO THE PAPER PATH MODULE

1    HAS -- POINTING TO THE SIDE HERE, THERE IS AN AREA WHERE

2    THE TEXTURE HAS BEEN TAKEN OFF OF THE PLASTIC SO THAT A

3    SECURITY SEAL, SO RIGHT THERE YOU CAN SEE -- FEEL IT'S

4    SMOOTH WHEREAS THIS IS A LITTLE ROUGHER.  THAT SECURITY

5    SEAL WOULD THEN GO ON THERE.  WHEN YOU PULL IT OFF, IT'S

6    OBVIOUS, IT LEAVES JUNK ON THE THING.

7                SO AT THE END OF THE NIGHT AND AT VARIOUS

8    TIMES THIS CAN BE OPENED.  AND AT THE END OF THE NIGHT

9    AFTER THEY HAVE CLOSED THE POLLS, YOU CAN REMOVE THIS

10   BIN.  THE KEY IS IN THE WAY HERE.  SOMEBODY WAS SMART

11   ENOUGH TO PUT A KEY IN HERE IN CASE I LOST THE FIRST

12   ONE, WHICH I ALMOST DID.  THIS IS THE BIN THIS GOES

13   INTO.  THE MAIN ACCESS TO THE BIN, THE PLACE WHERE THEY

14   WOULD LIFT THE BIG DOOR OPEN TO TAKE THE BALLOTS OUT FOR

15   STORING PURPOSES OR FOR DISCARDING, IS ALSO SEALED, AND

16   THERE IS A PLACE TO SEAL.  THERE IS A LITTLE TRAP DOOR

17   THAT OPENS UP WHEN YOU SNAP THE BIN INTO PLACE.  THE

18   CARDS DROP INTO THERE, AND THERE IS A WAY TO SEAL THAT.

19   YOU CAN ALSO PUT A TAPE SEAL ACROSS.

20               SO THIS VERY EASILY SNAPS INTO PLACE, AND

21   ONCE IT IS IN PLACE, THE RELEASE LEVER FOR THAT IS

22   LOCKED AND SEALED, AND THE ACCESS TO THE DOORS IS

23   BASICALLY NOT ACCESSIBLE.  ALSO IN HERE IS IF SOMEBODY

24   -- THEIR KID IS HOLDING THEIR CARD FOR THEM AND THEY

25   SMEAR GRAPE JELLY ON IT AND GOES IN AND IT SMEARS ACROSS

1       SOMETHING, A TECHNICIAN OR A PROPERLY TRAINED PERSON --

2       AND IT DOESN'T LIKE THAT I AM IN HERE.  IT'S GIVING ME

3       AN ERROR THAT SAYS I AM NOT GOING TO LET YOU DO ANYTHING

4       BECAUSE THE PAPER PATH IS OPEN, BUT I CAN COME IN HERE.

5       I CAN WIPE THIS DOWN.  IF THIS GETS DIRTY, I CAN CLEAN

6       THAT.

7                    AND THEN IN THE BACK IS THE PRINTHEAD AND

8       THE SCANNER.  SO -- AND WE CAN TALK ABOUT THAT IN

9       CONJUNCTION WITH SOME OF THE THREAT QUESTIONS.  SO THOSE

10      CAN BE EASILY CLEANED, BUT THEN WHEN THEY ARE SNAPPED

11      SHUT, THE MACHINE, THE PAPER PATH DOES A QUICK SELF

12      CHECK THAT SAYS OKAY, YOU SNAPPED ME SHUT, I AM GOING TO

13      RUN A LITTLE SEQUENCE TO MAKE SURE I AM HAPPY AGAIN.

14      AND I AM OFF AND RUNNING.  I WILL LOCK THIS.  AND IF MY

15      PROCEDURES SAY, I WILL SEAL IT BACK AS WELL.

16                   SO THAT IS THE BASIC OPERATION OF THE

17      MACHINE.

18                   THE COURT:  COULD YOU SPOIL A BALLOT?

19                   THE WITNESS:  I COULD.

20                   MR. WIYGUL:  MR. BAUMERT, DO YOU WANT TO

21      DEMONSTRATE THE LIGHT FUNCTION?  MAYBE WE CAN PUT THAT

22      IN THE VIEW OF MORE PEOPLE.

23                   THE WITNESS:  OKAY.  AND I AM GOING TO GO

24      THROUGH THIS VERY QUICKLY.  BUT I WILL DESCRIBE WHAT I

25      AM DOING.  THE LIGHT COMES ON AND SO START VOTING.

1    VOTE.  LET'S GO DOWN HERE AND HIT PRINT.  YES, I WANT TO

2    PRINT.  SO THERE I CAN LOOK AND SEE THAT NO SELECTION --

3    I WANTED TO VOTE FOR MY BUDDY AS THE AUDITOR.  SO I AM

4    GOING TO HIT SPOIL.  AND IT'S GOING TO ASK ME, ARE YOU

5    SURE?  AND I CAN EITHER RETURN BACK TO THE PROCESS AND

6    CONTINUE ON OR I CAN TRULY SPOIL IT.  AND RIGHT NOW, THE

7    VOTER IS NOT GOING TO KNOW ANYTHING OTHER THAN THEY HAVE

8    TO GO GET A POLL WORKER TO HELP THEM.  THE POLL WORKER

9    WOULD COME IN AND SILENCE THE ALARM.  THEY ARE GOING TO

10   SAY YES, THAT'S WHAT I WANT TO DO.  THEY ARE GOING TO

11   CONTINUE.  THEY ARE GOING TO HAVE THE POLL WORKER STEP

12   ASIDE -- THE VOTER STEP ASIDE AND THEY ARE GOING TO

13   ENTER A PASS CODE.  AND THE BALLOT IS VISIBLE, BUT THE

14   VOTER HAS INDICATED THAT THEY DON'T WANT -- THAT'S NOT

15   HOW THEY WANTED TO VOTE.  SO I DON'T KNOW HOW THEY WANT

16   TO VOTE.  I CAN LOG A REASON WHY.  SO IF IT'S A VOTER

17   REQUEST OR IF A VOTER JUST WALKED AWAY AND THE MACHINE

18   WAS SITTING THERE IDLE FOR LONG ENOUGH, IT WILL MAKE YOU

19   FOLLOW THIS PROCEDURE.  AND AT THIS POINT THE VOTER --

20   THEY HAVE A CHOICE.  IT SAID SPOIL, BUT THIS CARD IS NOT

21   REALLY SPOILED UNTIL THE POLL WORKERS DO THE PROCEDURE

22   FOR SPOILING THIS BALLOT.  SO IT WOULD BE SIMILAR TO

23   WHERE IF I FILLED IN OVALS ON AND OVAL-FILLED BALLOT AND

24   WALKED OVER TO THE LITTLE BALLOT SCANNER AND IT SAID YOU

25   HAVE OVERVOTED THIS CONTEST, AND IT KICKS IT BACK TO ME.

1    AND I CHOOSE TO HAVE IT KICKED BACK TO ME.  I CAN LOOK

2    AT THAT AND GO, SCREW IT AND JUST PUT IT IN AND CAST THE

3    BALLOT.

4              SO RIGHT NOW, I CAN PUT THIS CARD BACK IN

5    AND I CAN SCAN IT AND CAST IT, OR I CAN HAND IT TO THE

6    POLL WORKER AND THEY CAN FOLLOW THEIR PROCEDURE FOR

7    SPOILING THE BALLOT, AND WE PROBABLY RECOMMEND THAT THEY

8    COLOR THROUGH ONE OF THE BARCODES JUST TO MAKE SURE.

9              THE COURT:  RECAST IT IF YOU WOULD.

10             THE WITNESS:  I CAN, YES.

11             SO AGAIN, EVERY TIME I INSERT A CARD,

12   IT'S GOING TO SCAN TO SEE WHAT IS ON THE CARD.  IN THIS

13   CASE IT SAW A MASTER BARCODE SO IT KNOWS IT HAS BEEN

14   VOTED AND HERE IS THE SUMMARY OF WHAT I VOTED.

15             MR. WIYGUL:  AT THIS POINT, CAN YOU

16   CHANGE THOSE SELECTIONS?

17             THE WITNESS:  YOU CANNOT.  THERE IS A

18   SUMMARY SCREEN YOU CAN TURN ON.  THERE IS ONE AVAILABLE

19   FOR THE ADA VOTERS WHERE BEFORE THEY HAVE PRINTED, THEY

20   CAN TOUCH THIS AND IT CAN GO BACK TO THAT PARTICULAR

21   CONTEST AND CHANGE A VOTE.  BUT NOW THE ONLY WAY TO

22   CHANGE IT AGAIN IS TO EJECT IT AND HAVE THE SPOIL

23   PROCEDURE FOLLOWED.  SO THE REASON IT WAS DONE THIS WAY

24   IS BECAUSE A LOT OF JURISDICTIONS REALLY LIKE THE CHAIN

25   OF CUSTODY PROTECTIONS FOR THE PIECE OF PAPER.

1            THE COURT:  SO IF I HIT PRINT BALLOT, IT

2  WILL SIMPLY GO INTO THE BIN?

3            THE WITNESS:  YES.  AND IT IS CAST.

4            THE COURT:  OKAY.

5            THE WITNESS:  AND THE WAY THE LOGIC OF

6  THE MACHINE WORKS, ANY TIME THE CARD COMES OUT THE

7  FRONT, THE VOTE DATA IS DESTROYED, IS ERASED IN THE

8  WORKING MEMORY.  ANY TIME IT GOES IN THE BACK, OUT THE

9  BACK, THAT IS, YOU KNOW -- AND WE CAN GO THROUGH EXACTLY

10  THE PROCESS FOR HOW THE BALLOT IS SCANNED AND HOW IT'S

11  -- THE DATA IS USED AND HOW IT IS STORED.  BUT THE DATA

12  HAS TO BE STORED TO PERMANENT MEMORY BEFORE THE CARD IS

13  EJECTED.  OTHERWISE, YOU RUN THE RISK OF EJECTING THE

14  CARD INTO THE BIN, SO IT'S AN UNCOUNTED CARD INTO A

15  BALLOT -- BIN OF COUNTED CARDS AND THEN FOR SOME REASON

16  THE MACHINE MALFUNCTIONS AND YOU CAN'T STORE IT.  SO YOU

17  NEVER, EVER WANT THAT TO HAPPEN.  YOU NEED THE DATA

18  COMMITTED PROPERLY AND YOU KNOW IT'S COMMITTED.  THEN

19  YOU JUST PHYSICALLY EJECT THE CARD.

20            MR. WIYGUL:  MR. BAUMERT, CAN YOU SHOW

21  THE COURT THE SPECIFIC LOCATION OF THE PRINTER AND

22  SCANNER.

23            THE WITNESS:  I COULD, YES.

24            SO AS WE SHOWED HERE, I AM GOING TO OPEN

25  THIS BACK UP AGAIN AND SO A SECOND RELEASE.  SO THE

```
 1      PRINTER -- AND SO, YOUR HONOR, IF YOU WANT TO LOOK

 2      INSIDE THERE THE TAN STRIP HERE IS THE PRINTER.  AND THE

 3      LITTLE GLASS HERE IS WHAT IS A CONTACT IMAGE SENSOR.  IT

 4      IS A SCANHEAD THAT REQUIRES ITS OWN SCANNER.  THERMAL

 5      PRINTER.  AND SO AS IT IS PRINTED -- AS IT IS PRINTED IS

 6      IMMEDIATELY SCANNED.  AND THE REASON WE DO THAT IS

 7      BECAUSE -- AND WHEN WE GO THROUGH THE WHOLE PROCEDURE,

 8      WE CHECK TO MAKE SURE THAT WHAT THE VOTER ENTERED IS

 9      WHAT WE READ BACK FROM THE CARD.  AND IF WE DON'T, WE

10      EJECT THE CARD AND WE DRAW AN ERROR.  AND IT'S VERY EASY

11      TO DEMONSTRATE.  YOU PUT A PIECE OF SCOTCH TAPE OVER IT

12      SO IT CAN'T PRINT THE BARCODE.  SO IF THEY CANNOT READ

13      THE BARCODES RELIABLY, THEY ARE NOT FULLY TO BE READ AND

14      THEY DON'T MATCH OR THEY'RE INVALID, OUR SCANNING WOULD

15      SEE THAT AND WOULD END THE VOTE SESSION BECAUSE IT KNOWS

16      THAT IT CAN'T TABULATE IT PROPERLY.  SIMILAR TO WHERE IF

17      YOU TOOK THE CARD AND YOU SCRATCHED IT OUT, AND TRIED TO

18      STICK IT INTO ONE OF OUR PRECINCT SCANNERS OR A STANDARD

19      BALLOT YOU HAVE COLORED THROUGH THE CODE CHANNEL, IT'S

20      GOING TO KICK IT OUT, AND SAY, I CAN'T READ IT, GO GET A

21      POLL WORKER.  SO THAT ALLOWS US TO DO WHAT WE CALL A

22      PRINT VALIDATION, MAKE SURE THAT IT PRINTED -- THE

23      BARCODES PRINTED WITH THE DATA THAT MATCHES WHAT THE

24      VOTER ENTERED.  SO --

25                 MR. WIYGUL:  THAT IS ALL I HAVE IN TERMS
```

1   OF THE MACHINE.  I DON'T KNOW IF YOUR HONOR HAS

2   QUESTIONS.

3                  THE COURT:  IS THIS YOUR WITNESS OR

4   YOURS?  NO, NO.  THIS WILL BE YOUR WITNESS?

5                  MR. LIEB:  I AM EXAMINING, YES, FOR THE

6   PLAINTIFFS.

7                  THE COURT:  I DON'T WANT TO STEAL YOUR

8   OWN THUNDER ON CROSS.  IS THERE ANYTHING OF A MORE

9   BENIGN NATURE YOU WANT TO ASK.

10                  MR. LIEB:  JUST FOR PURPOSES AT LEAST FOR

11  THE MOMENT FOR DEMONSTRATION, THERE HAS BEEN DISCUSSION

12  OF THE PRINTHEAD LIFTING.

13                  THE WITNESS:  YES.

14                  MR. LIEB:  IS IT POSSIBLE TO SHOW US

15  MECHANICALLY WHAT IS MEANT BY THE PRINTHEAD LIFTED?

16                  THE WITNESS:  I DON'T KNOW IF IT IS

17  BECAUSE YOU HAVE TO KIND OF LOOK AT THE SIDE.  SO THAT

18  WOULD PROBABLY BE SOMETHING YOU HAVE TO DO VIA DRAWINGS,

19  VIA TECHNICAL DRAWINGS OF THE MACHINE.

20                  THE COURT:  IT WON'T LIFT WITH THE DOORS

21  OPEN?

22                  THE WITNESS:  IT WILL NOT OPERATE WITH

23  THE DOORS OPEN BECAUSE THAT'S A SECURITY FEATURE.

24                  THE COURT:  ALL RIGHT.

25                  MR. LIEB:  I THINK IT WAS INDICATED

1    YESTERDAY IN THE TESTIMONY THAT SOMEHOW PENNSYLVANIA WAS

2    ABLE TO DETERMINE THAT IT WAS LIFTING.  I WAS NOT AT

3    THAT EXAMINATION, SO I DON'T KNOW HOW THEY DID THAT.

4              THE COURT:  THIS HEARING IS NOT GOING TO

5    END TODAY AND IF YOUR EMPLOYER HAS A VIDEO OF THAT, IF

6    YOU COULD PROVIDE IT -- IF COUNSEL COULD PROVIDE IT TO

7    COUNSEL FOR BOTH SIDES HERE, I ASSUME THAT'S BETTER THAN

8    NOTHING, IF THERE IS A VIDEO.

9              MR. LIEB:  YES, YOUR HONOR.

10             MR. WIYGUL:  THE VIDEO SHOWS THE

11   PRINTHEAD MECHANISM.

12             THE COURT:  I ASSUME.  IT WOULD HAVE TO

13   BE SPECIALLY ARRANGED SO THAT THERE IS A CAMERA THERE.

14   IF YOU DON'T HAVE IT, THAT'S OKAY.  I AM NOT REQUESTING

15   TO YOU CREATE EVIDENCE.

16             THE WITNESS:  I AM NOT A LAWYER.  BUT

17   THESE THERMAL PRINTERS, THEY ARE REALLY MEANT FOR

18   ROLL-FED STOCK.  SO LIKE THIS THERMAL PRINTER, LIKE THE

19   CASH REGISTER RECEIPT, THEY ARE REALLY MEANT TO ALWAYS

20   HAVE PAPER IN THEM.  SO FEEDING -- AS WE LEARNED WHEN WE

21   DEVELOPED THE EXPRESSVOTE, FEEDING CARD STOCK IN AND OUT

22   OF A PRINTER WHERE THE HEAD IS DOWN ON THE ROLLER THAT

23   PUSHES THE PAPER UP AGAINST THE PRINTHEAD IS VERY

24   DIFFICULT.  SO -- AND IF YOU DO IT AT TOO HIGH A SPEED,

25   IT JAMS.  IF YOU DON'T INTRODUCE IT AT THE RIGHT TIME,

1    IT JAMS.  AND SO REALLY IT TURNED OUT TO BE SOMEWHAT OF

2    A SECURITY FEATURE.  BUT LIFTING THE PRINTHEAD WAS A

3    PRACTICAL MATTER, BECAUSE PASSING PAPER IN AND OUT OF A

4    PRINTHEAD LIKE THAT IN BOTH DIRECTIONS WITH NO CATCH

5    POINTS AND TIMING EVERYTHING PERFECTLY IS HARD.

6              AND SO WE JUST -- THE PEOPLE WHO DESIGNED

7    THIS JUST SAID, LIFT THE HEAD OUT OF THE WAY AND SHOOT

8    THE PAPER THROUGH AT HIGH SPEED SO THAT -- AND THE ONLY

9    TIME -- SO THE PAPER COMES IN, THE PRINTHEAD LANDS DOWN

10   ON THE PAPER, AND THEN IT PRINTS.  AND THERE ARE SENSORS

11   THAT INDICATE WHETHER THE PRINTHEAD IS DOWN, AND SO THIS

12   THING IS KIND OF A SELF-CONTAINED LITTLE

13   PRINTER/SCANNER, AND WE ARE JUST SENDING, JUST HAVE A

14   LIBRARY THAT SENDS VERY SIMPLE COMMANDS TO IT THAT SAYS

15   PRINT, EJECT, THAT KIND OF THING.  THIS PART OF IT HAS

16   NO ELECTION KNOWLEDGE.  IT PRINTS WHAT WE WANT AND

17   EJECTS THE WAY WE WANT IT TO GO.

18             THE COURT:  ANYTHING ELSE FOR NOW, MR.

19   LIEB?

20             MR. LIEB:  IS IT POSSIBLE TO REOPEN THE

21   PRINTHEAD COMPARTMENT?

22             THE WITNESS:  YES, ABSOLUTELY.

23             MR. LIEB:  BASED ON YOUR VISUAL OPERATION

24   AND KNOWLEDGE OF THE DESIGN OF THE SYSTEM, IS IT FAIR TO

25   SAY THAT THE SCANNER AND PRINTHEAD ARE ABOUT AN INCH