**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| JILL STEIN, et al., | : |
|  | : CIVIL ACTION |
| Plaintiffs, | : |
|  | : |
| v. | : No. 16-cv-6287(PD) |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections and Legislation, | : |
|  | : |
|  | : |
|  | : |
| Defendants. | : |
|  | : |

**DEFENDANTS' AND INTERVENORS' POST-HEARING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 2

III.  PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN TO ESTABLISH
     THAT DEFENDANTS HAVE BREACHED THE SETTLEMENT AGREEMENT ....... 3

     A.  The Secretary's Certification of the ExpressVote XL Was Consistent with the
         Unambiguous Terms of the Settlement Agreement ................................................ 3

         1.  The ballot on which each ExpressVote XL vote is recorded is paper ....... 3

         2.  The ExpressVote XL's paper records are not a VVPAT receipt
             generated by a DRE machine .................................................... 5

         3.  The ExpressVote XL produces a voter-verifiable record of each vote ....... 6

         4.  The ExpressVote XL is capable of supporting a robust pre-certification
             audit .......................................................................... 8

     B.  The Parol Evidence Confirms That the Secretary's Certification of the
         ExpressVote XL Was Consistent with the Terms of the Settlement Agreement ... 9

     C.  Any Ambiguities in the Settlement Agreement Must Be Construed Against
         Plaintiffs .......................................................................... 14

IV.  THE REQUESTED RELIEF IS BARRED BY THE DOCTRINE OF LACHES .......... 15

V.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH HEAVILY
    AGAINST GRANTING THE REQUESTED INJUNCTION ......................................... 20

VI.  PLAINTIFFS ARE ACTING WITH UNCLEAN HANDS ............................................. 23

VII.  CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adapt of Phila. v. Phila. Hous. Auth.*,
No. 98-4609, 2005 WL 3274431 (E.D. Pa. Aug. 25, 2005) ......................................................3

*In re Bayside Prison Litig.*,
331 F. App'x 987 (3d Cir. 2009) ....................................................................................18, 19

*In re Bressman*,
874 F.3d 142 (3d Cir. 2017).................................................................................................15

*Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*,
369 F. App'x 340 (3d Cir. 2010) .........................................................................................11

*Colorcon, Inc. v. Lewis*,
792 F. Supp. 2d 786 (E.D. Pa. 2011) ..................................................................................15

*In re Diet Drug Prod. Liab. Litig.*,
525 F. App'x 140 (3d Cir. 2013) ......................................................................................3, 9

*Espenshade v. Espenshade*,
729 A.2d 1239 (Pa. Super. Ct. 1999) ..................................................................................12

*Kripp v. Kripp*,
849 A.2d 1159 (Pa. 2004) .....................................................................................................3

*N.L.R.B. v. Metro. Regional Council of Carpenters*,
316 F. App'x. 150 (3d Cir. 2009) ...........................................................................15, 18, 19

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945).............................................................................................................23

*Riley v. Taylor*,
227 F.3d 261 (3d Cir. 2001).................................................................................................18

*Romero v. Allstate Ins. Co.*,
158 F.Supp. 3d 369 (E.D. Pa. 2016) ...................................................................................23

*Sun Co. v. Pa. Tpk. Comm'n*,
708 A.2d 875 (Pa. Commw. Ct. 1998) ................................................................................15

*Swiss Reins. Am. Corp. v. Airport Indus. Park, Inc.*,
325 F. App'x 59 (3d Cir. 2009) ........................................................................................5, 6

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) ................................................................................20

*Wert v. Manorcare of Carlisle PA, LLC*,
    124 A.3d 1248 (Pa. 2015) ...................................................................................15

**Other Authorities**

https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-
    Digital-Proclamation.pdf .....................................................................................21

https://www.inquirer.com/health/coronavirus/coronavirus-2020-pa-primary-
    electoin-20200313.html .......................................................................................21

https://www.newsweek.com/georgia-postpones-presidential-primary-after-
    coronavirus-fears-becoming-second-state-move-its-1492361 ............................21

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-
    national-emergency-concerning-novel-coronavirus-disease-covid-19-
    outbreak/ ..............................................................................................................21

Restatement (Second) of Contracts § 206 ...............................................................15

I.    **INTRODUCTION**

In their original response to Plaintiffs' Motion to Enforce the Settlement Agreement

(ECF 112), Defendants[1] demonstrated that:

- The Settlement Agreement's terms are not ambiguous, and the ExpressVote XL complies with them (ECF 123 at 19-27);

- To the extent that the Court concludes that the Settlement Agreement's terms are ambiguous, parol evidence overwhelmingly supports the conclusion that certification of the ExpressVote XL was not a breach of those terms (*id.* at 27-28);

- Plaintiffs' allegations that the ExpressVote XL has security flaws are erroneous, unfounded speculation, and are irrelevant to the question of whether the ExpressVote XL complies with the Settlement Agreement (*id.* at 28-31);

- Because Plaintiffs inexplicably waited a year after the ExpressVote XL's certification to file their Motion, causing great prejudice to Defendants and the three counties that had purchased the ExpressVote XL, the doctrine of laches precludes relief (*id.* at 31-35);

- Entry of the requested injunction would disrupt future elections, inflict severe harm on the citizens of Pennsylvania, and constitute improper federal court interference in the state elections process (*id.* at 35-38); and

- Plaintiffs have come to court with unclean hands (*id.* at 38-39).

The Court has given Plaintiffs ample opportunity to rebut Defendants' points and meet

their burden of showing that the certification of the ExpressVote XL breached the Settlement

Agreement.  After a two-and-a-half-day evidentiary hearing, at which Plaintiffs called exactly

one witness of their own (who offered no credible evidence in support of Plaintiffs' position), it

is clear that Plaintiffs are farther from meeting this burden than ever.  Plaintiffs have no

persuasive argument that the Settlement Agreement's terms are ambiguous, and have presented

---

[1] This Brief is jointly submitted by Defendants and Intervenors, who are referred to collectively as "Defendants" herein.  Defendants and Intervenors each re-assert and preserve their respective arguments set forth in their earlier responses to Plaintiffs' Motion to Enforce the Settlement Agreement (*see, e.g.*, ECF 123, 131, 135), including arguments that were not the subject of the evidentiary presentation requested by the Court (*see* ECF 136 ¶ 4) and are thus not addressed in this Brief.

nothing that calls into question Defendants' mountain of parol evidence showing that the ExpressVote XL complies with those terms.  Plaintiffs have failed to adduce any evidence that the ExpressVote XL's alleged "security flaws" exist anywhere outside the imagination of their computer science expert, J. Alex Halderman; in fact, Dr. Halderman's testimony was implausible and speculative.  Plaintiffs presented no credible excuse for their one-year delay in filing their Motion, and no meaningful response to Defendants' overwhelming evidence that decertification of the ExpressVote XL would wreak havoc on upcoming elections.

Indeed, Plaintiffs' entire litigation strategy buttresses Defendants' argument that Plaintiffs have come to court with unclean hands, and therefore are not entitled to relief. Plaintiffs declined to present the testimony of anyone from their side of the "v" – client or lawyer – who actually participated in the settlement negotiations, even though the Court changed its schedule to give them the opportunity to do so.  They failed to provide any evidence whatsoever of key facts that only they could know, such as the date they learned of the certification of the ExpressVote XL.  Their computer science expert – whom Plaintiffs had supposedly charged with monitoring Defendants' compliance with the Settlement Agreement – testified that he had not taken even the most basic steps to inform himself about the voting machines that the Secretary certified.  Plaintiffs have demonstrated inexcusable disregard for the smooth operation of the Commonwealth's election system and an inexcusable lack of diligence in protecting their rights under the Settlement Agreement; their unclean hands bar a grant of the relief they seek.

## II.    BACKGROUND

Defendants incoroporate by reference the factual background sections of their initial briefs opposing Plaintiffs' Motion (ECF 123, at 4-18; ECF 131-1, at 3-15), as well as Defendants' and Intervenors' Proposed Findings of Fact ("FoF"), which are being submitted alongside this brief.

III.   **PLAINTIFFS HAVE FAILED TO CARRY THEIR BURDEN TO ESTABLISH THAT DEFENDANTS HAVE BREACHED THE SETTLEMENT AGREEMENT**

As the parties seeking to enforce the Settlement Agreement, Plaintiffs bear the burden of proving that the Secretary's certification of the ExpressVote XL was a breach of Defendants' obligations. *Adapt of Phila. v. Phila. Hous. Auth.*, No. 98-4609, 2005 WL 3274431, at *3 (E.D. Pa. Aug. 25, 2005).  As a matter of law and fact, Plaintiffs have not come close to carrying that burden, and their motion must therefore be denied.

A.   **The Secretary's Certification of the ExpressVote XL Was Consistent with the Unambiguous Terms of the Settlement Agreement**

Interpretation of the Settlement Agreement is subject to basic principles of contract interpretation. *In re Diet Drug Prod. Liab. Litig.*, 525 F. App'x 140, 142 (3d Cir. 2013).  The Settlement Agreement is to be construed according to Pennsylvania law.  (JX 30 ¶ 23.)  Under Pennsylvania law, "in interpreting an agreement, the court must ascertain the intent of the parties." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).  Where the terms of a contract are "clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Id.*  As set forth in Defendants' previous brief, which is incorporated by reference (*see* ECF 123, at 19-27), the dispositive terms of the Settlement Agreement unambiguously authorized the Secretary to certify the ExpressVote XL.  Plaintiffs' arguments to the contrary are meritless.

1.   **The ballot on which each ExpressVote XL vote is recorded is paper**

First, the "ballot on which each [ExpressVote XL] vote is recorded is paper."  (JX 30 ¶ 2.a.)  As reflected in numerous dictionary definitions, the term "ballot" has an unambiguously broad meaning encompassing any instrument, including a sheet of paper, that a voter uses to cast her vote.  (*See* ECF 123, at 23-24.)  It is undisputed that the ExpressVote XL records each vote on a piece of paper.  (FoF ¶ 171; 2/18/20 Tr. 283:1-23.)  Consistent with this usage, in a

3

communication Plaintiffs sent to Defendants only two days before the settlement conference at which the parties agreed to the relevant terms of the settlement agreement (FoF ¶¶ 82, 135; JX 20), Plaintiffs' own expert, Dr. Halderman, repeatedly referred to the XL's paper records as "ballots" (FoF ¶¶ 86-87, 119-20; JX 20).[2]  Indeed, this email made clear that Dr. Halderman considered the XL's paper records to be "paper ballots."  (FoF ¶¶ 120, 163.)  Moreover, in this same email, Dr. Halderman provided a link to an article by one of his mentors, Princeton Professor of Computer Science Andrew Appel, which was posted on a blog maintained by the Princeton Center for Information Technology Policy; the primary contributors to the blog are faculty and other academics at Princeton.  (FoF ¶ 163; JX 21; 2/19/20 Tr. 116:16—118:6, 124:6-15, 126:13-16.)  That article, too, expressly referred to the XL's paper records as "paper ballots." (FoF ¶ 163; JX 21; 2/19/20 Tr. 132:15-133:4.)  This usage was consistent with the *Securing the Vote* report by the National Academies of Sciences, Engineering, and Medicine, which was cited and discussed in settlement communications that Defendants sent to Plaintiffs.  (FoF ¶¶ 24-25, 72, 76, 163.)  That report sets forth a specific definition of "paper ballot" that clearly encompasses the paper records produced by the XL machine: "original records that are produced by … a ballot-marking device, which are human-readable … (i.e., voter-verifiable), countable by machine (such as a scanner) or by hand, and which may be recounted or audited by manual examination of the human-readable portion of the ballot."  (DX F at 42-43.)  In short, whether viewed through the prism of ordinary lay meaning embodied in dictionary definitions, or through

---

[2] Nor was this the only time Dr. Halderman used the term "ballot" in a way that contradicts Plaintiffs' current insistence that the term applies only to records that show the entire menu of options available to the voter.  In a January 2019 email to Defendants' counsel, Dr. Halderman described the "summary" voting record produced by a Hart ballot-marking device (BMD) as a "ballot" – notwithstanding that, like the XL's record, it contained only the voter's selections rather than the entire menu of options.  (JX 34; 2/18/20 Tr. 283:2-285:10; JX 59.)  In fact, Dr. Halderman referred to this type of record not just as a "ballot," but as a "paper ballot."  (JX 34.)

the usage of experts in the field of voting systems, the XL's paper records unambiguously qualify as "paper ballots."[3]  *See Swiss Reins. Am. Corp. v. Airport Indus. Park, Inc.*, 325 F. App'x 59, 65 (3d Cir. 2009) ("[E]ven when a contract is unambiguous, Pennsylvania law allows courts to consider evidence of custom and usage.").

### 2.  The ExpressVote XL's paper records are not a VVPAT receipt generated by a DRE machine

A footnote to Paragraph 2.a of the Settlement Agreement specifies that "[a] VVPAT receipt generated by a DRE machine is not a paper ballot."  (JX 30 at 2 n.3.)  As previously shown, this exception – the only example of a paper record that would not qualify as a "paper ballot" that the parties ever discussed or agreed to (FoF ¶ 168) – further belies Plaintiffs' newfound narrow construction of "paper ballot" and the criterion in Paragraph 2.a, as that construction would render the exclusion superfluous.  (*See* ECF 123 at 25-26.)  Furthermore, the evidence adduced at the hearing made clear that the paper records produced by the XL are *not* VVPATs generated by a DRE machine.  A DRE, or direct-recording electronic machine, is a voting device in which the voter inputs her selections electronically and those selections are directly recorded into the machine's memory.  (FoF ¶¶ 2-3.)  A DRE with a VVPAT, or voter verifiable paper audit trail, is a DRE with a component added that prints a "receipt" or paper copy of the official electronic vote.  (FoF ¶ 41.)  A DRE with a VVPAT does not scan the receipt

---

[3] In support of the narrower definition of "paper ballot" they urge, Plaintiffs point only to a definition in the Pennsylvania Election Code and a document that purports to be a "draft" of a glossary by the National Institute of Standards and Technology (NIST.)  (*See* PX 1010.)  But the uncontroverted record shows that the parties never discussed the Election Code's technical definition during the settlement negotiations or intended to incorporate it into the Settlement Agreement.  (FoF ¶¶ 128, 149.)  Similarly, Plaintiffs never referred to the draft NIST glossary or its definitions at any point during the settlement discussions, and Defendants were not aware of the draft glossary prior to the filing of Plaintiffs' motion.  (FoF ¶¶ 130, 189.)  Indeed, Plaintiffs failed to adduce any evidence that *Plaintiffs* were aware of this draft glossary at the time of the settlement, nor any evidence that the draft glossary was in the public domain – or even existed – at the relevant time.

to tabulate the vote; the vote, as with a DRE without a VVPAT, is tabulated directly from the voter's electronic selections.  (FoF ¶ 319.)

In stark contrast, the XL machine records the voter's selections on a paper ballot.  (FoF ¶¶ 318-19.)  The paper ballot is the official record of the vote (FoF ¶¶ 159, 314), and the paper ballot is what is scanned by the XL machine to tabulate the vote.  (FoF ¶¶ 318-19.)  Although the XL machine has a scanning/tabulating functionality built into it, the same ballot could be scanned by a separate tabulating machine (as part of a recount process or otherwise).  (*Id.*)  In short, the XL machine is a ballot-marking device with a built-in scanner/tabulator, allowing the ballot to be scanned and tabulated without the need for the voter to take it to a different, separately located machine (FoF ¶ 40), whereas a DRE with a VVPAT, like all DREs, tabulates the vote by directly recording the voter's electronically registered selections into the machine's electronic memory (the paper receipt is not scanned and plays no part in vote tabulation) (FoF ¶ 41).  The difference, as the Court's questioning at the hearing suggested, is "night and day." (2/19/20 Tr. 10:20.)

### 3.    The ExpressVote XL produces a voter-verifiable record of each vote

The ExpressVote XL also "produce[s] a voter-verifiable record of each vote."  (JX 30 ¶ 2.b.)  As the plain language of this criterion makes clear, this requirement mandates a paper record that a voter can review and verify before casting her vote.  (FoF ¶ 152.)  The XL manifestly meets this requirement because it produces a human-readable text record of each voter's selections on its paper records.  (*See* FoF ¶ 154; JX 57; 2/18/20 Tr. 91:2-17, 233:7-234:2.)  Furthermore, the Secretary has required that the machines be configured so that the voter is shown and may verify that human-readable text record before casting her ballot.  (FoF ¶ 155.) And as the in-court demonstration of the ExpressVote XL made clear beyond dispute, the XL

does, in fact, give each voter the opportunity to verify her vote before she decides to cast it.  (FoF ¶ 313; 2/19/20 Tr. 190:19-216:19.)

Plaintiffs' argument that the XL does not "produce a voter-verifiable record of each vote" because its tabulator scans the barcode record of the vote, rather than the human-readable text record, is without merit.  First, it ignores that the text record is the official record of the vote, and is the record that is used for purposes of audits and recounts.  (FoF ¶ 314; 2/18/20 Tr. 115:8-116:21; *see also* DX F, at 42-43 (*Securing the Vote* report's definition of "paper ballot," explaining that such a ballot can record information in a form allowing tabulation by machine scanner, so long as a "human-readable portion of the cast paper ballot provides the basis for audits and recounts").)

Second, even if the barcode were, in some metaphysical sense, "the vote" (as Plaintiffs seem to suggest), Plaintiffs' argument would still ignore that the Settlement Agreement requires only that a voting system produce a "voter-verifiable *record* of each vote."  As noted, the XL's paper records do exactly that.  Plaintiffs' assertion that it is theoretically possible that the barcode records might not match the text records is nothing more than a "spectral fear[]" unsupported by any evidence.  (*See* ECF 55, at 30 (Court's opinion appraising Plaintiffs' earlier assertions that voting machines could have been hacked).)  There is no evidence that such a mismatch has ever occurred in any election or test involving the ExpressVote XL machine, nor any evidence that such a mismatch is a remotely realistic scenario given the design and security measures at issue.  (FoF ¶¶ 329-30.)[4]

---

[4] Indeed, the uncontroverted evidence indicates that the theoretical possibility of a mismatch between the vote tabulated by a scanning machine and the voter-verifiable text record is, if anything, more likely to be realized in a hand-marked paper ballot system than in an election conducted with the XL machine.  (2/19/20 Tr. 239:24-241:16.)

Third, Plaintiffs' argument proves too much, as the record makes clear that hand-marked paper-ballot systems (Plaintiffs' preferred alternative), like all voting systems used in Pennsylvania, also tabulate the vote based on human-inscrutable coding.  (FoF ¶ 55, 58-59, 61.) For example, when optical-scan machines read hand-marked ballots, to tabulate the vote, they are not reading the text next to the voter's marks (the filled-in ovals); rather, they are detecting the location of those marks and, based on human-inscrutable timing marks and software, determining which candidates should be credited with votes.  (FoF ¶¶ 59, 61; 2/18/20 Tr. 112:3-115:3, 119:18-21; 2/19/20 Tr. 238:18-239:16.)  In the case of both hand-marked paper ballots and elections conducted on the XL, audits can be conducted to ensure that the machine-tabulated vote totals correspond with the voter-verifiable text records.  (FoF ¶¶ 61-62; 2/18/20 Tr. 116:16-118:4; 2/19/20 Tr. 74:10-76:12.)

### 4. The ExpressVote XL is capable of supporting a robust pre-certification audit

As the above discussion makes clear, the XL machine also satisfies the third requirement of Paragraph 2 of the Settlement Agreement: it is "capable of supporting a robust pre-certification auditing process."  (JX 30 ¶ 2.c.)  The human-readable, voter-verifiable text records on the XL's paper ballot allows for robust pre-certification audits.  (FoF ¶ 175; 2/18/20 Tr. 91:5-17, 233:7-234:7.)  Indeed, the uncontroverted record shows that the XL's records actually *have* supported a robust pre-certification audit, namely, the pilot risk-limiting audit conducted by Philadelphia following the November 2018 general election.  (FoF ¶ 176.)

Plaintiffs' argument that the XL is *not* capable of supporting robust pre-certification audits rests exclusively, once again, on their theoretical supposition that the machines could somehow be "hacked" to (a) cast rejected votes, *i.e.*, electronically tabulate votes scanned from a certain ballot, even though the voter opted to spoil the paper ballot itself, or (b) somehow print

additional or different selections on the ballot after the voter has already verified it.  But, as noted above, Plaintiffs have failed to produce any evidence that the spectral possibilities they conjure have or realistically could come to pass, let alone that they could occur in a manner that would not be detected in an audit.  (FoF ¶¶ 324-339.)[5]

    **B.**     **<u>The Parol Evidence Confirms That the Secretary's Certification of the ExpressVote XL Was Consistent with the Terms of the Settlement Agreement</u>**

Where a "written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties." *Diet Drugs*, 525 F. App'x at 142.  The parol evidence in this case, as developed at the evidentiary hearing, only further confirms that the Secretary's certification of the ExpressVote XL was consistent with the terms of the Settlement Agreement as understood by the parties at the time they entered into it.

The record makes clear that Defendants clearly communicated to Plaintiffs during the settlement discussions, and Plaintiffs agreed, that the Settlement Agreement would incorporate the voting-system requirements set forth in a Department of State initiative – namely, to phase out DREs and transition to voter-verifiable paper-record voting systems – that had begun late December 2017 and was well underway at the time the parties' settlement discussions began in September 2018.  (FoF ¶¶ 71, 138-39, 179-80.)  That is why, during those discussions, Defendants educated Plaintiffs about what that initiative entailed, by sending Plaintiffs numerous documents detailing the new voting-machine requirements.  (FoF ¶¶ 71-77, 180.)  Those documents made clear that Defendants were using the term "paper ballot" not in any narrow sense but rather as equivalent to "paper record" and consistent with the definition in the *Securing*

---

[5] Indeed, Plaintiffs' expert, Dr. Halderman, agreed that, if an XL machine somehow tabulated votes from ballots voters had opted to spoil, that would cause a discrepancy between the machine-tabulated vote count and the vote count based on the paper ballots in the ballot bins, which a robust audit would detect.  (2/19/20 Tr. 82:2-83:8.)

*the Vote* report – namely, to describe voting systems (whether utilizing hand-marked paper ballots or ballot-marking devices like the XL) in which the official record of the vote was a voter-verifiable paper record.  (FoF ¶¶ 26, 76, 117, 186, 187.)

Indeed, if there were any doubt that the voting-machine requirements in the Settlement Agreement are co-extensive with the requirements in the Department's pre-existing initiative, it was dispelled at the Settlement Conference.  There, Defendants insisted upon – and Plaintiffs accepted – a important revision to the terms drafted by Plaintiffs: this revision specified that the Settlement Agreement required the Secretary only to "*continue* to direct each county … to implement the[] [voter-verifiable paper-record] voting systems" mandated by the pre-existing initiative.  (FoF ¶¶ 142, 180.)  As the uncontroverted evidence shows, Defendants required this revision to make clear, consistent with the parties' earlier discussions, that the Settlement Agreement was not imposing any restrictions on the types of voting machines that could be certified in Pennsylvania beyond those imposed by the Department's pre-existing initiative. (FoF ¶ 143.)  If Plaintiffs had rejected that revision, Defendants would not have agreed to settle. (FoF ¶ 144.)

The parties' objectively manifested intent is further confirmed by their discussions regarding the particular voting systems Pennsylvania was then considering for certification.  In September 2018, Plaintiffs asked Defendants to provide them with a list of the voting machines Defendants were then considering certifying under the Department's initiative.  (FoF ¶ 79.)  On September 28, 2018, Defendants sent Plaintiffs a list of the voting systems under consideration, which included the system of which the ExpressVote XL is a component.  (FoF ¶ 80.)  In a telephone call on or around October 5, 2018, Plaintiffs' counsel advised that Plaintiffs' expert, Dr. Halderman, was reviewing the machines under consideration to perform a "lemon check,"

*i.e.*, to determine – and inform Defendants – whether Plaintiffs believed any of the machines should not be certified.  (FoF ¶ 81.)  Plaintiffs then provided Dr. Halderman's feedback on the machines to Defendants in an email dated October 9, 2018 – two days before the settlement conference at which the relevant terms were agreed to.  (FoF ¶¶ 82, 135; JX 20.)  This feedback included specific comments on the "ExpressVote machines" – that is, the ExpressVote XL and another ExpressVote device that produced an identically formatted paper voting record – and also linked to Dr. Appel's article discussing those two machines.  (FoF ¶¶ 86-89, 305; JX 20; JX 21.)  Both Dr. Halderman's comments, and Dr. Appel's article, described the XL's paper records as "paper ballots."  (JX 20; JX 21.)  And at no point during the settlement discussions did Plaintiffs ever suggest that such records should *not* be considered paper ballots for purposes of the Settlement Agreement.  (FoF ¶ 127-129, 186, 188-89; 2/19/20 Tr. 135:10-20.)

Moreover, far from objecting to certification of the ExpressVote XL, Dr. Halderman expressly suggested that Plaintiffs' counsel "*urge PA to certify them* [the ExpressVote machines]" with a restriction that would ensure XL machines would be configured to provide each voter an opportunity to review and verify her ballot before casting her vote.  (JX 20 (emphasis added).)  As noted, it is undisputed that the Secretary imposed that restriction when certifying the XL.  (FoF ¶ 90.)  In sum, Plaintiffs clearly indicated that the ExpressVote XL passed Dr. Halderman's "lemon check."  Defendants reasonably understood, based on Plaintiffs' objective manifestations of their own intent, that Plaintiffs did not object to certification of the ExpressVote XL.[6]  (FoF ¶ 181; 2/18/20 Tr. 223:9-13, 230:7-16.)  *See Cal. Sun Tanning USA,*

---

[6] In their arguments, Plaintiffs have emphasized their counsel's request, in the October 9 email, for "a more granular list of which particular machines/election systems are being proposed for certification."  (JX 20.)  But the uncontroverted evidence, including evidence of communications between the parties after the October 9 email, shows that Plaintiffs sought that information because they wanted assurance that Pennsylvania would not certify any DRE machines, which

*Inc. v. Elec. Beach, Inc.*, 369 F. App'x 340, 346 (3d Cir. 2010) ("In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter") (quoting *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999)).

In other ways, too, the October 9, 2018 email demonstrates that Plaintiffs' current objections to certain features of the XL's paper records are meritless – if not, in fact, made in bad faith. Dr. Halderman had visited ES&S, the manufacturer of the ExpressVote XL, in July 2018, and had had a chance to observe the operation of the ExpressVote XL and the smaller ExpressVote 2.1 machine. (FoF ¶¶ 97, 320.) Dr. Halderman knew in October 2018 that both ExpressVote machines produce so-called "summary" ballots (that contain the voter's selections but not the entire menu of options) with human-inscrutable barcodes that are scanned to tabulate the vote. (FoF ¶ 101, 105.) Although Dr. Halderman equivocated about whether he knew at the time that the XL scans the barcodes to tabulate the vote, the evidence indicates that he did know that fact – or, at the very least, must have strongly suspected it. (FoF ¶ 105.)

What is more, the ExpressVote machines were not the only components of the voting systems on the list Defendants sent to Plaintiffs (*see* JX 12) that produce so-called summary ballots and which use human-inscrutable codes to tabulate the votes. As Dr. Halderman admitted, at least three other ballot-marking devices on that list – manufactured by Hart, Dominion, and Unisyn – also record votes on paper records that do not contain the whole menu

---

assurance Defendants provided. (FoF ¶¶ 91-92.) In any event, Plaintiffs' argument is a red herring. Whatever uncertainty they may have had about whether Pennsylvania was considering certain *other* machines for certification, it is undeniable – based on the face of Dr. Halderman's comments in the October 9, 2018 email – that Plaintiffs understood that Pennsylvania might certify the ExpressVote XL. That is, of course, why Dr. Halderman provided feedback on that specific machine, and supported the XL's certification subject to a restriction that the Secretary implemented. (*See* JX 20.)

of options.  (FoF ¶ 103.)  And at least two other ballot-marking devices on the list –
manufactured by Unisyn and Dominion – print human-inscrutable coding (together with the
voter-verifiable text) that is scanned to tabulate the vote.  (FoF ¶ 107.)  Yet neither Dr.
Halderman nor any other Plaintiffs' representative ever suggested to Defendants, at any point
during the settlement negotiations, that summary ballots or the use of human-inscrutable coding
to tabulate votes was objectionable or would not be permitted under the Settlement Agreement.
(FoF ¶¶ 103-109.)  To the contrary, based on the undisputed evidence of the parties'
communications, the only reasonable conclusion is that the parties understood and agreed that
such features were in no way inconsistent with the requirements of the Settlement Agreement.

Plaintiffs' communications with critics of the Settlement Agreement only underscore that
conclusion.  On November 28, 2018, the day the Settlement Agreement was signed, Plaintiff Jill
Stein sent out a tweet heralding the Agreement.  (DX N.)  The very next day, Jennifer Cohn, a
vocal advocate of hand-marked paper ballots (2/19/20 Tr. 144:17-145:1), responded with a tweet
of her own, asserting that "th[e] agreement allows PA to buy" what she described as "awful
'universal use' touchscreen ballot markets and scanners, which generate the COMPUTER
marked so-called 'paper ballots' with barcodes that I've been warning about."  (DX N, at 3.)
Later in the same tweet thread, she described these same "so-called 'paper ballots'" (to use
Cohn's words) as "barcoded summary cards."  (*Id.* at 4-7, 12.)  Cohn was clearly referring to
ballot marking devices such as the ExpressVote XL.  (2/19/20 Tr. 145:6-24, 150:4-8; *see also id.*
at 186:18-187:14.)  Indeed, Cohn specifically identified "ExpressVote XL machines" as an
example, linking to, and excerpting, the same Freedom to Tinker article by Dr. Appel that Dr.
Halderman had referenced in the October 9 email to Defendants.  (DX N, at 13.)

Dr. Stein's communications director, Dave Schwab (Fact. Stip. ¶ 41 (ECF 167)), responded to Cohn's criticism and defended the Settlement Agreement. (DX N, at 3-4; 2/19/20 Tr. 146:5-12.) Significantly, Schwab did *not* deny that the Settlement Agreement allowed for certification of machines, like the XL, that used so-called "barcoded summary cards." Quite to the contrary, Schwab defended the Settlement Agreement by pointing out, among other things, that *criticism of barcode-tabulation is overblown* "so long as post-election audits manually verify the human-readable text on the ballot." (DX N, at 4; FOF ¶¶ 194-95.) Plaintiffs' statements immediately after signing the Settlement Agreement are thus directly at odds with the position they now take. Dismayingly, it is apparent that Plaintiffs' current assertions – namely, that the Settlement Agreement somehow reflects the parties' mutual intent to *prohibit* voting machines that do not print the entire menu of options, or use barcodes to tabulate the vote – have not been advanced in good faith.

### C.   Any Ambiguities in the Settlement Agreement Must Be Construed Against Plaintiffs

Defendants respectfully submit that, given the language and structure of the Settlement Agreement, as well as all of the parol evidence adduced at the hearing, the relevant terms of the Settlement Agreement are unambiguous – and unambiguously authorize the Secretary to certify the ExpressVote XL. But to the extent that, after considering all of this evidence, the Court finds any material term ambiguous, it should construe that ambiguity against Plaintiffs.

First, the uncontroverted evidence shows that the relevant terms of the Agreement – including the specific terms with respect to which the Court requested evidence (*see* ECF 136 ¶ 4a ("paper ballot," "voter-verifiable record of each vote," and "capable of supporting a robust pre-certification auditing process")) – were drafted by Plaintiffs. (FoF ¶ 141; *see also* FoF ¶¶ 142-148.) Under Pennsylvania law, "[a]ny ambiguities shall be construed against the contract

drafter." *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1260 (Pa. 2015); *accord Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 798 (E.D. Pa. 2011) (quoting *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878–79 (Pa. Commw. Ct. 1998)) ("under the rule of *contra proferentem*, any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable."); Restatement (Second) of Contracts § 206 (ambiguous words in a contract should be construed "against the party who supplies the words").

Second, despite being given every opportunity to do so – including a month-long continuance to allow Plaintiffs to be represented by counsel who were not also fact witnesses (*see* ECF 161 ¶¶ 4-8 (January 17, 2020 Order); ECF 163, at 13:6-16:3 (January 16, 2020 Tele. Conf.)) – Plaintiffs failed to call a single witness (from their side of the case) who was involved in direct communications with the Defendants during settlement negotiations and could provide testimony about these communications or the parties' intentions regarding the terms used in the Settlement Agreement. "[I]t is settled 'that when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge.'" *N.L.R.B. v. Metro. Regional Council of Carpenters*, 316 F. App'x. 150, 157 n.8 (3d Cir. 2009).

In sum, because Plaintiffs have manifestly failed to establish that the Secretary's certification of the ExpressVote XL breached the terms of the Settlement Agreement, their motion to enforce must be denied.

## IV.     THE REQUESTED RELIEF IS BARRED BY THE DOCTRINE OF LACHES

Quite apart from the fact that Plaintiffs' contractual-interpretation arguments are completely lacking in merit, the relief they request is barred by the doctrine of laches. This doctrine applies where a party unreasonably delays in seeking judicial intervention such that the opposing party is thereby prejudiced. *See In re Bressman*, 874 F.3d 142, 149 (3d Cir. 2017). As

Defendants have already demonstrated, Plaintiffs inexplicably waited a year to seek relief from this Court.  (*See* ECF 123, at 31-35.)  It is undisputed that the Secretary certified the ExpressVote XL on November 30, 2018, and that Plaintiffs did not file their motion until November 26, 2019.  (Fact. Stip. ¶¶ 43, 83.)  Indeed, Plaintiffs did not even *assert* that the XL's certification violated the Settlement Agreement until July 29, 2019.  (Fact Stip. ¶ 72.)  Even then, the only objection Defendants raised was that the XL tabulated votes by scanning barcodes printed together with the voter-verifiable text records (JX 43) – a fact that, as discussed above, Plaintiffs knew before the Settlement Agreement was signed (just as they knew, and did not object, that other machines Pennsylvania was considering for certification also tabulated votes based on human-inscrutable coding).  (*See supra* pages 12-13.)  During the extended period of Plaintiffs' inaction, several Pennsylvania counties moved forward with purchases of ExpressVote XL systems.  (FoF ¶¶ 233-259, 267; ECF 123, at 32.)  Facing the Department of State's December 31, 2019 deadline for replacement of DRE machines (*see* JX 5), these counties expended significant funds and time on reviewing and procuring ExpressVote XL machines, and training personnel and educating voters in their use.  (FoF ¶¶ 233-262; ECF 123, at 32.)

Based on the evidence submitted during the parties' earlier briefing on Plaintiffs' motion, the Court held that "[D]efendants ha[d] made out more than a prima facie case of prejudicial delay that the plaintiffs must explain."  (ECF 163, at 3:18-22 (Tr. of Jan. 16, 2020 Tele. Conf.); *accord* ECF 161 ¶ 2 (January 17, 2020 Order).)  Accordingly, the Court directed the parties to "be prepared to call witnesses (and present evidence) who can address … [w]hy … Plaintiffs wait[ed] until November 26, 2019 to file their Motion to Enforce the Agreement."  (ECF 136 ¶ 4.g.)

Far from explaining Plaintiffs' delay, the evidence presented at the hearing revealed that the excuses Plaintiffs proffered in their briefing were complete red herrings that lacked any good-faith basis in fact.  First, Plaintiffs have made much of the fact that Defendants did not directly communicate the November 30, 2018 certification of the ExpressVote XL, suggesting that many months may have elapsed before they learned of it.  This excuse rings hollow given the record developed at the hearing.  Plaintiffs were informed *before* the Settlement Agreement was signed that Pennsylvania was in the final stages of examining the system containing the XL machine, and that its certification was imminent.  (FoF ¶¶ 80-86; JX 12.)  In fact, Defendants provided the Plaintiffs a status report on the certification of that system (among others), which informed the reader that more information on the Department's voting-machine certification process could be found on the Department's website; the report even included a link to that information.  (FoF ¶¶ 80, 85; JX 12.)  Not only was the report certifying the ExpressVote XL posted on the Department's website on or about November 30, 2018 (FoF ¶¶ 203-203), but the Department posted additional, periodic status reports on its website both before and after the XL's certification, first (before certification) confirming that certification was imminent and then (after certification) repeatedly noting that it had taken place.  (FoF ¶¶ 37, 50, 94, 205; DX M, DX S, DX T, DX U; 2/18/20 Tr. 237:24-238:21, 285:23-288:5.)  And that is not to mention the numerous other materials, such as press releases, reporting the certification of the XL.  (FoF ¶ 204.)  In sum, any assertion that Plaintiffs did not know of the XL's certification at the time it occurred or shortly thereafter, is simply implausible – particularly given Plaintiffs' counsel's public statement, on November 29, 2018 (the day after the Settlement Agreement was signed and the day before the XL was certified), that they would "be watching closely to ensure Pennsylvania implements every one of [the Settlement Agreement's requirements]."  (JX 33.)

As the Secretary aptly noted, "you [would] pretty much have to be living under a rock to not have seen that [the ExpressVote XL] was certified."  (FoF ¶ 208.)

Perhaps even more significantly, *Plaintiffs never offered any testimony or other evidence as to when they actually learned of the XL's certification*.  Such information is obviously uniquely in their possession.  The law is well settled that "[w]here relevant information … is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it."  *In re Bayside Prison Litig.*, 331 F. App'x 987, 991 (3d Cir. 2009) (quoting *Riley v. Taylor*, 227 F.3d 261, 283 (3d Cir. 2001)); *accord Metro. Regional Council*, 316 F. App'x. at 157 n.8.  This principle is fully applicable here, and the Court should conclude that Plaintiffs knew of the XL's certification at or around the time it occurred.

The second excuse Plaintiffs proffered for their delay is equally spurious.  In their briefing and during the hearing, Plaintiffs spent an inordinate amount of time attempting to criticize Defendants for their purported delay in providing Dr. Halderman with a copy of videos of the functional examination of the ExpressVote XL machine.  Plaintiffs argued that the fact that Dr. Halderman did not receive those videos until early June 2019 somehow excuses their year-long delay in filing their motion.  *But Plaintiffs failed to put forward <u>any</u> evidence that anything in the videos in any way altered, or even informed, Plaintiffs' understanding of any of the features of the ExpressVote XL raised in their Motion.*[7]  For this reason alone, the Court

---

[7] Indeed, invited to identify specific portions of the videos they believed relevant to these proceedings, Plaintiffs refused, instead urging the Court to accept approximately 17 hours of examination footage into evidence.  The Court properly rejected this ploy.  (FoF ¶ 223; 2/19/20 Tr. 40:5-43:22; *see also id.* 41:25-42:1 (noting that "the record here in not intended to be a museum")).)

should find that the video issue is a sham that is irrelevant to this proceeding.  *See Bayside*, 331 F. App'x at 991; *Metro. Regional Council*, 316 F. App'x. at 157 n.8.  (*See also* FoF ¶ 210-225.)

In fact, the uncontroverted record shows that Plaintiffs knew about most, if not all, of the ExpressVote XL features at issue *before the Settlement Agreement was signed*.  As shown above, that is true with respect to the fact that the XL prints a so-called "summary" ballot and tabulated the votes from barcodes.  (*See supra* page 12.)  And it is also true with respect to the fact that the XL's paper records pass back under printhead after they are printed and verified and on their way to the collection bin.  (FoF ¶¶ 112-14; DX II; DX L.)  Indeed, Dr. Halderman expressly admitted that he had read Dr. Appel's articles publicizing this fact at or around the time of their publication in October 2018.  (2/19/20 Tr. 161:11-19.)

Compounding the inexcusability of their delay, Plaintiffs did not even assert the "printhead" issue in their July 29, 2019 "notice of breach" letter to Defendants (*see* FoF ¶¶ 227-29; JX 43) – *despite the fact that another group had, two weeks earlier, raised the same issue in their Petition for Reexamination (citing the same two Dr. Appel articles discussed above)* (*see* FoF ¶ 226; JX 42, at 1 of 12 & n.1)*, and despite the fact that Plaintiffs were concededly aware of the Petition at the time they sent their July 29, 2019 letter* (*see* FoF ¶ 229).  The obvious inference is that Plaintiffs themselves did not believe that that design feature precluded certification of the ExpressVote XL.[8]

---

[8] The Petition for Reexamination asserted that one – and only one – of the ten purported deficiencies it raised was a violation of the *Stein* Settlement Agreement.  (*See* JX 42, at 12 of 12 (contending that the ExpressVote XL does not provide a "paper ballot" within the meaning of the Settlement Agreement because its paper record prints only the "voter's selection[s]" and does not contain the entire menu of "options").)  Notably, the Petition did *not* contend that the "printhead" issue disqualified the ExpressVote XL from certification.  (*Id.* at 1 of 1.)  Plaintiffs had apparently reached the same conclusion when they sent their July 29, 2019 letter.

In sum, not only does the evidence adduced at the hearing plainly fail to overcome Defendants' prima facie showing of inexcusable prejudicial delay; it confirms the laches bar and, indeed, raises troubling questions about whether Plaintiffs acted in good faith in bringing and prosecuting their motion.

## V.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH HEAVILY AGAINST GRANTING THE REQUESTED INJUNCTION

Even putting aside the issues above, the extraordinary relief Plaintiffs seek – a mandatory injunction requiring the Secretary to decertify a voting system in use in three different Pennsylvania counties – cannot be granted.  The balance of harms and the public interest both weigh heavily against decertification of the ExpressVote XL prior to the November 2020 election, or, realistically, at any time before the Settlement Agreement expires at the end of 2022. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (injunction requires a showing, *inter alia*, that "the balance of hardships tips in [Plaintiffs'] favor" and that "an injunction would not disserve the public interest").  (*See also* ECF 123, at 35-37.)[9]

Transitioning to a new voting system in the City of Philadelphia prior to the 2020 General Election would be nothing short of impossible.  To comply with the Department's February 2018 directive to put new voting systems with voter-verifiable paper ballots in place by 2020, the City engaged in a "huge amount of work," expediting this transition "in every way it possibly could."  (FoF ¶262; 2/18/20 Tr. 124:20-23, 128:4-5.)  And yet the transition still took the City 18 months, even with Board of Elections staff working seven days a week, sometimes 12 hours a day.  (FoF ¶¶ 257, 262.)  The City was able to effect the transition on this compressed timeline only because 2019 was a non-presidential election year, with fewer registrations to

---

[9] Particularly in light of the enormous harm that would result if Plaintiffs' request for a permanent injunction is granted, principles of federalism also counsel strongly against federal court intervention in the Commonwealth's elections process, as outlined in Defendants' pre-hearing brief.  (ECF 123, at 37-38.)

process, lower voter turnout, and crucially, no new election statute.  (FoF ¶¶ 264, 289-96; 2/18/20 Tr. 124:18-126:11.)

Unlike the 2019 election cycle, the City is now grappling with an anticipated sky-high turnout election.  During the 2016 presidential election cycle, the Board processed three times as many voter registrations as it did in the 2019 cycle (FoF ¶¶ 289, 292), and similar high volumes are expected this year (FoF ¶ 295).  Moreover, the Board must contend with the new mandates of Act 77.  (FoF ¶ 264.)  Act 77 makes more changes to Pennsylvania's voting laws than any law in over 80 years by, among other things, introducing no-excuse mail-in voting and compressing the timeline to process voter registrations.  (2/18/20 Tr. 125:16-126:11.)  The Board has had to devote significant personnel resources to ensure compliance with these new obligations; staff responsible for the 2019 voting system transition has been reassigned to Act 77 implementation.[10]  (FoF ¶¶ 296-98.)  Requiring the City to transition to yet another voting system, just months after it moved to the ExpressVote XL, in less than half the time, while also facing these added burdens, would wreak havoc, threatening to disenfranchise at least some of the City's voters.  (FoF ¶¶ 299-300, 304; 2/18/20 Tr. 124:3-10.)  This is the very reason the

---

[10] In recent weeks, COVID-19 has been identified as a pandemic and has caused major disruptions to everyday life across Pennsylvania and the nation.  Although no evidence about this disease was presented at the hearing, the Court may take judicial notice that as of March 15, 2020, both the federal and the state governments have issued declarations of emergency; at least two other states have postponed their primary elections; and county boards of elections are considering steps to protect poll workers and voters from infection during the upcoming primary election.  It appears safe to assume that the pandemic will put additional strains on the capacities of county Boards of Elections.  See https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (national state of emergency); https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf (Pennsylvania state of emergency); https://www.newsweek.com/georgia-postpones-presidential-primary-after-coronavirus-fears-becoming-second-state-move-its-1492361 (postponement of Georgia and Louisiana primary elections); https://www.inquirer.com/health/coronavirus/coronavirus-2020-pa-primary-electoin-20200313.html (describing challenges facing Pennsylvania boards of elections).

Department urged counties to transition to a new voting system in 2019 and the Board followed the Department's recommendation.  (FoF ¶¶ 263, 291.)

The effects of the previous transition and the new Act 77 requirements will continue to tax the Board's resources even beyond the 2020 election cycle.  All of the steps that the Procurement Department and Board of Elections took during the last transition were critical to ensure that the process occurred responsibly and with as little confusion among poll workers and voters as possible.  (FoF ¶¶ 233-262.)  If the City were forced to replace the ExpressVote XL, it would be essential to follow these same steps to ensure adequate training and preparation. Further, switching to yet *another* voting system with different procedures for operation in such a short period of time would cause even greater confusion, particularly for the predominantly elderly poll workers responsible for operating these systems on election day.  (FoF ¶¶ 280, 282, 300, 304; 2/18/20 Tr. 129:21-131:18.)  Plaintiffs' preferred hand-marked paper-ballot system, in particular, would drastically change the current voting system, requiring new procedures and extensive retraining of employees, poll workers, and the general public.  Additionally, the counties would need to procure new ballot marking devices for each of the precincts to ensure accessibility for disabled voters, (FoF ¶¶ 39, 270), thus necessitating two procurement processes and implementation plans.

Like the City of Philadelphia, the other two counties that have purchased the ExpressVote XL dedicated significant effort and resources to selecting, acquiring, and preparing to use this voting system in the 2020 elections.  (FoF ¶¶ 16, 267-68.)  There is no evidence that ES&S would indemnify or reimburse either of these counties if the ExpressVote XL is decertified. (FoF ¶¶ 301-303.)  Decertification of the ExpressVote XL before the November 2020 general election or at any time in the next few years would risk a practical and financial disaster for these

three counties, would impede the Department's efforts to ensure the integrity of elections, and would badly disserve the public, resulting in chaos at the polls and potential voter disenfranchisement.[11]

## VI. PLAINTIFFS ARE ACTING WITH UNCLEAN HANDS

Plaintiffs' requested equitable relief should also be denied because Plaintiffs have acted inequitably and in bad faith in pursuing litigation that threatens to undermine the ability of several Pennsylvania counties to carry out the 2020 November presidential election and potentially disenfranchise hundreds of thousands of voters across Pennsylvania. The equitable doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Romero v. Allstate Ins. Co.*, 158 F.Supp. 3d 369, 375 (E.D. Pa. 2016) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). The doctrine "applies not only to fraudulent and illegal transactions, but also to unscrupulous practices, oppressive conduct, or unconscientious conduct" that "bear[s] on the subject of the litigation." *Id.* at 377.

Plaintiffs' conduct here plainly meets that standard. Their actions go well beyond even inexcusable "unconscientious[ness]," *see id.* at 377, crossing the line into bad faith:

- Before signing the Settlement Agreement in November 2018, Plaintiffs knew full well that Defendants were considering certification of the ExpressVote XL. (FoF ¶¶ 79-95.)

- At that same time, Plaintiffs were also aware of the features of the ExpressVote XL on which their current breach-of-Agreement arguments are based. Yet at no time prior to July 29, 2019 – after *another* group complained about them – did Plaintiffs ever object to any of these features or suggest that they violated the requirements in the Settlement Agreement.

---

[11] There is no evidence that Montgomery County's timeline for obtaining new voting systems in 2019 or three small counties' process for replacing the Winvote system in 2008 shed any light on the timeline for replacing the ExpressVote XL. (FoF ¶¶ 265-66.)

- o Plaintiffs were aware in October 2018 that the ExpressVote XL, like other voting systems they also knew Plaintiffs were considering, created paper records that displayed only the voter's selections rather than all of the options, and that human-unreadable codes, printed along with the human-readable text records, were used to tabulate the votes.  (FoF ¶¶ 100-109; *see also* DX N.)

- o Plaintiffs were aware in October 2018 that the ballots printed by the ExpressVote XL passed back under the printhead after being presented to the voter for verification.  (FoF ¶¶ 111-114.)

- Despite themselves referring, *in their settlement communications with Defendants*, to the ExpressVote XL's paper records as "ballots" and, indeed, "paper ballots" (JX 20, 21), Plaintiffs now argue that Defendants should have known that such records were, in fact, neither "ballots" nor "paper ballots."  For this assertion, Plaintiffs rely on two particular definitions (a draft NIST glossary and the Pennsylvania Election Code) that, as shown by the uncontroverted evidence, the parties never discussed.  (FoF ¶¶ 128, 130-31, 149.)  (For that matter, there is no evidence that Plaintiffs were even aware of either definition at the relevant time.)

- Plaintiffs wasted the Court's and the other parties' resources by raising disingenuous arguments that they knew were red herrings.

- o Plaintiffs suggested that, despite the wealth of information in the public domain – including information and status reports posted on the Department of State's own website (the existence of which Defendants made Plaintiffs aware of) – they did not learn of the ExpressVote XL's certification until long after it occurred.  But despite being afforded every opportunity to provide evidence to this effect, Plaintiffs never did so.  (*See supra* pages 17-18.)  The only logical conclusion is that Plaintiffs were, in fact, well aware of the XL's certification at or around the time it occurred.

- o After Defendants raised a laches defense in their opposition to the motion, Plaintiffs suggested, for the first time, that they had been unable to assert their objections to the ExpressVote XL until after they had received videos of the XL's certification examination.  But despite ample opportunity, Plaintiffs never provided *any evidence whatsoever* that they learned about any of the XL features at issue by reviewing the videos.  (*See supra* pages 18-19.)  To the contrary, as discussed above, the record belies any such assertion.

Plaintiffs' inequitable conduct has not simply squandered the resources of the Court and

Defendants and Intervenors (each of which exists to serve the interests of the public).  It has

threatened to disrupt preparations for the 2020 elections and sow unjustified doubts in the minds of voters. As Defendants stated in their earlier brief, whether Plaintiffs have acted recklessly or cynically, they should be barred under principles of equity from obtaining the requested injunctive relief.

## VII.    CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

CITY OF PHILADELPHIA LAW
DEPARTMENT Marcel S. Pratt, City Solicitor

By: */s/ Mark A. Aronchick*
    Mark A. Aronchick
    Robert A. Wiygul
    Christina C. Matthias
    One Logan Square, 27th Floor
    Philadelphia, PA 19103
    (215) 568-6200

TUCKER LAW GROUP

    Joe H. Tucker
    Dimitrios Mavroudis
    1801 Market Street, Suite 2500
    Philadelphia, PA  19103
    (215) 875-0609

*Counsel for Defendants*

By:   */s/ Benjamin H. Field*
BENJAMIN H. FIELD (PA ID No. 204569)

    Divisional Deputy City Solicitor
    DANIELLE WALSH (PA ID No. 312438)
    Deputy City Solicitor
    MICHAEL PFAUTZ (PA ID No. 325323)
    Assistant City Solicitor
    Affirmative & Special Litigation
    CITY OF PHILADELPHIA LAW DEPARTMENT
    1515 Arch Street, 15th Floor
    Philadelphia, PA 19102
    (215) 683-5024

*Counsel for Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2020, I caused the foregoing Defendants' and Intervenors' Post-Hearing Brief in Opposition to Plaintiffs' Motion to Enforce the Settlement Agreement to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Mark A. Aronchick*       
Mark Aronchick
