# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JILL STEIN, et al., | : |
| | : |
| Plaintiffs, | : CIVIL ACTION |
| | : |
| v. | : No. 16-cv-6287(PD) |
| | : |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections and Legislation, | : |
| | : |
| Defendants. | : |

### DEFENDANTS' AND INTERVENORS' RESPONSE TO CORRECT CERTAIN ERRORS IN PLAINTIFFS' POST-HEARING SUBMISSIONS

The purpose of proposed findings of fact is to organize, interpret, and summarize the evidence of record; it is not to rewrite the testimony or invent "evidence" that was not presented at the hearing. In their Proposed Findings of Fact ("Pls. FoF"), however, Plaintiffs have taken liberties with the record that go beyond zealous advocacy. Similarly, Plaintiffs have misstated elements of the law in their Proposed Conclusions of Law ("Pls. CoL") (ECF 180). Defendants and Intervenors (together, "Defendants") submit this limited Response to address some of Plaintiffs' most egregious misstatements.

### I. PLAINTIFFS' MISSTATEMENTS OF FACT

The misstatements listed here are either directly at odds with the record or materially misleading:[1]

---

[1] Defendants do not attempt to address all their disagreements with Plaintiffs' submissions here; instead, they rely on their Proposed Findings of Fact ("Defs. FoF") and brief (ECF 182).

1. **"In [the] original certification of the XL … [the Secretary] referred repeatedly to the [paper record produced by the ExpressVote XL] as a 'vote summary card' … In contrast, the Secretary refers to [a piece of paper with contest options] as a 'ballot' or 'paper ballot.'"  (Pls. FoF ¶¶ 14-15.)**

Plaintiffs fail to acknowledge that the "original certification of the XL" also expressly referred to the ExpressVote XL's paper record, as well as the identical paper records of the ExpressVote 2.1, as "paper ballots."  (*See, e.g.*, JX 34 at 31, 32, Attachment B at 19.)

2. **"[T]here is no evidence that Plaintiffs or Plaintiffs' counsel *ever* called the paper [record] produced by an XL a ballot or a paper ballot."  (Pls. FoF ¶ 30.)**

That is flatly untrue.  Plaintiffs' counsel's October 9, 2018 email, sent two days before the settlement conference, included language from Plaintiffs' expert referring to the paper records produced by the ExpressVote XL and the ExpressVote 2.1 as "ballots" and "paper ballots."  (*See* JX 20.)

3. **"As even [Secretary of the Commonwealth] Boockvar admitted, 'you can have a voter verifiable record of a vote that is not a paper ballot.'"  (Pls. FoF ¶ 49.)**

In fact, Plaintiffs' counsel said these words, not the Secretary.  The Secretary responded by saying only "presumably."  (2/18/20 Tr. 15:17-20.)  Contrary to Plaintiffs' misleading presentation, the Secretary never suggested – and certainly never admitted – that voter-verifiable *paper* records of a vote (including the XL's paper records) would not be paper ballots.

4.      **Plaintiffs assert that Defendants' "only apparent response" to Plaintiffs' contention that the ExpressVote XL violates the Settlement Agreement because it tabulates votes by scanning barcodes printed on the paper records, "is that, even though the XL does not produce a voter-verifiable record of each vote, neither do other voting systems."  (Pls. FOF ¶ 77.)**

This assertion is manifestly false.  Defendants did show that, during the settlement negotiations, Plaintiffs knew that the Department was considering *other* systems that used human-inscrutable coding to tabulate the votes, but Plaintiffs did not object.  (*See* Defs. FOF ¶¶ 103-104, 107.)  This fact supports Defendants' interpretation of the Settlement Agreement, but it is far from Defendants' "only response," "apparent" or otherwise, to Plaintiffs' "barcodes" argument.  First, Defendants showed, through extensive evidence and argument, that the ExpressVote XL does, in fact, produce a voter-verifiable record of each vote.  (*See, e.g.*, ECF 123, at 20-21; 2/18/20 Tr. 233:7-234:2 (Gates); DX F at 42-43; Defs. FoF ¶¶ 152-161.)  Second, Defendants showed that Plaintiffs themselves knew during the settlement negotiations that the ExpressVote XL – as well as the ExpressVote 2.1 – tabulated the vote by scanning barcodes printed on its paper ballots, yet Plaintiffs never objected to that fact at any point before July 29, 2019.  (*See* Defs. FoF ¶¶ 89, 105, 195.)

5.      **"[Dean] Baumert [of Elections Systems and Software] acknowledges that both 'hardware malfunction' and 'software malfunction' happen notwithstanding ES&S's 'best efforts.'"  (Pls. FoF ¶ 97.)**

In fact, Mr. Baumert testified that software and hardware malfunctions "*can* happen." (2/19/20 Tr. 262:4-12 (Baumert) (emphasis added); *see also id.* at 262:21-24 (answering question whether "all election systems … have vulnerabilities" by stating that "all election systems *could* have vulnerabilities" (emphasis added)).)  This is an important distinction because Plaintiffs were unable to establish that any of the highly theoretical vulnerabilities they posited were anything more than "spectral fears" (ECF 55, at 30).

6.      **The Secretary's counsel "forwarded a 'voting system and electronic poll book report,' that was inaccurate and misleading in multiple respects" because it included a list of "suites" of voting systems that did not enumerate the "actual voting systems … in [each] suite."  (Pls. FoF ¶ 121.)**

The assertion that the status report was "inaccurate and misleading" is spurious. Plaintiffs knew that the report listed "suites" or "systems," not each suite's individual components, and that information about the particular components in each suite was available on the websites of the manufacturers and the Election Assistance Commission ("EAC").  (*See, e.g.*, JX 20.)  Indeed, *the status report itself provided a link to the portion of the EAC's website containing this information.*  (JX 12, at 1; 2/19/20 Tr. 311:13-17, 312:10-18 (Kotula).) Inexplicably, Plaintiffs' expert was unable to say at the hearing whether he had, in fact, consulted these resources at any point during the settlement negotiations.  (2/19/20 Tr. 88:8-89:10, 95:13-17, 100:10-19 (Halderman).)  In any event, the evidence indicates that Plaintiffs were, in fact, aware of the components of the suites listed in the Department's status report.  (*See, e.g.*, JX 20 (statement by Plaintiffs' counsel that the "Hart Intercivic Verity Voting [suite] includes the Verity Touch").)

7.      **The Department of State's Kathleen Kotula "admitted" that "Defendants failed to invite Plaintiffs' designee to observe the certification process of the XL, as required under the [Settlement] Agreement."  (Pls. FoF ¶ 134.)**

That is plainly false.  The Settlement Agreement states that Defendants are required only to "ensure that the Plaintiffs are made aware of all *currently scheduled, and future scheduled*, Commonwealth on-site certification testing for Voting Systems."  (JX 30 (emphasis added).) The agreement was signed and took effect on November 28, 2018, months *after* the certification examinations of the ExpressVote XL.   (*See* Defs. FoF ¶ 212; JX 34.)

4

8.      **Kathleen Kotula "invented excuse[s]" for the time it took the Department to produce video of the examination of the ES&S voting systems to Plaintiffs.  (Pls. FoF ¶ 145.)**

This is an outrageous and completely unfounded accusation.  No evidence suggested that

Ms. Kotula's explanation of the timeline for producing the videos was anything other than

genuine and entirely accurate.  (See 2/18/20 Tr. 266:14-267:19, 279:4-281:3 (Kotula).)  Indeed,

Ms. Kotula's testimony is uncontroverted.

9.      **Plaintiffs' expert, Dr. Halderman, "did not learn about key features of the XL until he saw the [testing] videos [in July 2019], or later."  (Pls. FoF ¶ 165.)**

Plaintiffs do not provide any citation for this assertion, and it is not supported by the

record.   Certainly, if Dr. Halderman had learned about any of the XL features at issue from the

examination videos, Plaintiffs would undoubtedly have provided testimony to that effect; they

did not.  Further, the record makes clear that Plaintiffs, including their expert consultant, Dr.

Halderman, knew about the features of the XL that are central to their motion before the

Settlement Agreement was signed.  (*See* Defs. FoF ¶¶ 96-114.)

10.     **Plaintiffs' expert, Dr. Halderman, "did not learn about [the printhead] issue until he received the testing videos."  (Pls. FoF ¶ 166.)**

In support of this assertion, Plaintiffs cite only Dr. Halderman's testimony, on direct

examination, that he had earlier heard only that the alleged "printhead issue" "had been a

complaint about other manufacturers' systems," *i.e.*, the systems of manufacturers other than

ES&S.  (Pls. FoF ¶ 166; 2/19/20 Tr. 36:14-19.)  Inexplicably, Plaintiffs fail to acknowledge any

of Dr. Halderman's testimony on cross-examination, which unmistakably showed that the

testimony cited by Plaintiffs was wrong.  On cross-examination, Dr. Halderman admitted that his

mentor, Dr. Appel, had publicized, in two articles published in October 2018, that the "printhead

issue" *was applicable to the "ES&S ... ExpressVote all-in-one."* (DX II (emphasis added);

*accord* DX L; *see* 2/19/20 Tr. 153:19-154:5, 155:4-161:9.)  Dr. Halderman further admitted that

he was aware of both of these articles at or around the time of their publication.  (2/19/20 Tr.

161:11-19.)

   11.   **"It is undisputed that ES&S bears the financial consequences of decertification."  (Pls. CoL 19; *see* Pls. FoF ¶¶ 92, 187.)**

   This assertion is far from "undisputed."  Plaintiffs did not present any evidence on this

point as to two of the three Pennsylvania counties that have purchased the ExpressVote XL.

With respect to Philadelphia County, at most the evidence shows that there would be a contract

dispute between ES&S and Philadelphia as to indemnity if the Court grants the relief Plaintiffs

seek, with no certainty as to when or how that dispute would be resolved.  (2/19/20 Tr. 322:19-

20 (Court's comment that there would likely be litigation over the question of indemnification);

*id.* at 335:22-336:14 (Nesmith-Joyner).)

## II.   PLAINTIFFS' MISSTATEMENTS OF LAW

   Plaintiffs also misstate the law with respect to at least two significant issues.

### A.   Plaintiffs' Request for Relief Is Subject to the Equitable Standards Governing Injunctions

   Plaintiffs contend that the Court should not consider equitable factors such as the balance

of hardships and the public interest (*see generally* ECF 123, at 35-37) because "[a]n order

directing a contracting party to specifically perform its obligations under a settlement agreement

is not a permanent injunction and the legal standard for issuing a permanent injunction does not

apply."  (Pls. COL at 2.)  The sole authority Plaintiffs cite for this proposition is *Saber v.*

*FinanceAmerica Credit Corp.*, 843 F.2d 697 (3d Cir. 1988), which opined that an order for

specific performance is not an injunction appealable under 28 U.S.C. § 1292(a)(1).  *See id.* at

702.

As an initial matter, Plaintiffs misstate the date of the *Saber* opinion; it was issued in

1988, not "1998."  (*See* Pls. COL at 3.)  That is significant because subsequent Third Circuit

decisions make clear that the proposition Plaintiffs purport to extract from *Saber* is an incorrect

statement of the law.  The very next year, in *Cohen v. Board of Trustees of the University of*

*Medicine and Dentistry of New Jersey*, 867 F.2d 1455 (3d Cir. 1989), the Third Circuit <u>expressly</u>

<u>rejected and overruled</u> that proposition.  *See id.* at 1468 ("[T]o the extent that [earlier Third

Circuit case law] suggests that an order granting specific performance of a contract, a form of

relief sought by the claimant, can be enforced pendent lite by contempt, but is not appealable

under section 1292(a)(1), we expressly disapprove that suggestion, and hereby overrule it.").  As

the *Cohen* court pointed out, "specific enforcement of contractual undertakings by an order

against the person *has [long] been regarded as a classic form of equitable relief.*  It is a form of

relief available under Fed. R. Civ. P. 65(a), and if it is granted the order falls within section

1292(a)(1)."  *Id.* (emphasis added).  This holding is consistent with other decisions recognizing

that orders granting specific performance are subject to well-settled principles of equity such as

the ones invoked by Defendants here.  *See Texas v. New Mexico*, 482 U.S. 124 (1987) ("Specific

performance is never demandable as a matter of absolute right, but as one which rests entirely in

judicial discretion, to be exercised, it is true, according to the settled principles of equity, but not

arbitrarily and capriciously, and always with reference to the facts of the particular case.  *Specific*

*performance will not be compelled if under all the circumstances it would be inequitable to do*

*so.*"  (internal quotation marks and citation omitted) (emphasis added)); *accord Petry v.*

*Tanglwood Lakes, Inc.*, 522 A.2d 1053, 1056-57 (Pa. 1987) (specific performance orders can be entered only after "weighing of the equities").

### B.      Federalism Concerns Militate Against Granting the Relief Plaintiffs Seek

Plaintiffs cite *Berne Corp. v. Government of Virgin Islands*, 105 F. App'x 324 (3d Cir. 2004), for the proposition that "[n]o federalism concerns are present here." (Pls. COL at 3.) But *Berne* is plainly not on point. As its title suggests, no federalism issues were implicated in *Berne* because that case involved not a state but rather a federal territory. The question in *Berne* was instead whether the separation-of-powers doctrine barred federal courts from issuing a specific performance order against the Government of the Virgin Islands. *See id.* at 328-29. Defendants, by contrast, are not arguing that the Court lacks jurisdiction to enter a specific-performance order. Rather, Defendants have cited case law showing that, where a grant of mandatory permanent injunctive relief by a federal court would threaten to undermine a state's ability to administer its election process – as the relief sought by Plaintiffs here would do, particularly if granted on the timeline Plaintiffs demand – principles of federalism weigh strongly in favor of denying the injunction. (*See* ECF 123, at 37-38 (citing cases).) Plaintiffs have failed to cite any contrary authority.

8

## III.    CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

CITY OF PHILADELPHIA LAW
DEPARTMENT Marcel S. Pratt, City Solicitor

By:____*/s/ Mark A. Aronchick*_____
    Mark A. Aronchick
    Robert A. Wiygul
    Christina C. Matthias
    One Logan Square, 27th Floor
    Philadelphia, PA 19103
    (215) 568-6200

TUCKER LAW GROUP

    Joe H. Tucker
    Dimitrios Mavroudis
    1801 Market Street, Suite 2500
    Philadelphia, PA  19103
    (215) 875-0609

*Counsel for Defendants*

By: ___*/s/ Benjamin Field*_____
BENJAMIN H. FIELD (PA ID No. 204569)

    Divisional Deputy City Solicitor
    DANIELLE WALSH (PA ID No. 312438)
    Deputy City Solicitor
    MICHAEL PFAUTZ (PA ID No. 325323)
    Assistant City Solicitor
    Affirmative & Special Litigation
    CITY OF PHILADELPHIA LAW DEPARTMENT
    1515 Arch Street, 15th Floor
    Philadelphia, PA 19102
    (215) 683-5024

*Counsel for Intervenors*