UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

JILL STEIN, RANDALL REITZ, ROBIN HOWE, SHANNON KNIGHT, and EMILY COOK,

                Plaintiffs,

  -against-

KATHY BOOCKVAR, in her official capacity as Acting Secretary of the Commonwealth; and JONATHAN MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation,

                Defendants.

No. 16-CV-6287 (PD)

## PLAINTIFFS' REPLY TO DEFENDANTS' AND INTERVENORS' "RESPONSE TO CORRECT" CERTAIN ALLEGED ERRORS IN PLAINTIFFS' POST-HEARING SUBMISSIONS

Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, PA 19103
(215) 772-1500

Pursuant to the Court's Order dated March 23, 2020, Dkt. 189, Plaintiffs submit the following response to Defendants' and Intervenors' "response to correct certain errors in Plaintiffs' post-hearing submissions,"[1] in which they contest portions of approximately 11 of Plaintiffs' 221 proposed findings of fact.

First, given that Defendants/Intervenors submitted this application without prior Court approval, one can certainly infer that they do **not** (because they cannot) challenge Plaintiffs' remaining 210 proposed findings of fact. Having spent the time and resources to challenge some findings, the rest remain undisputed.[2]

Second, Defendants'/Intervenors' submission is no more than an opposition brief, filled with argument, masquerading as a supplemental factual presentation. It reflects, if anything, their anxiety over the state of the actual record—a record that compels granting the Plaintiffs' motion to enforce the Agreement.

Plaintiffs stand by each and every one of the facts in their proposed findings of fact, Dkt. #180, including the portions of 11 disputed by Defendants/Intervenors. All of these proposed findings are rooted in the record in this case, not the record that Defendants wish existed.

**FACTS IN THE RECORD**

1. **In its original certification of the XL on November 30, 2018, Defendants again referred repeatedly to the XL document as a "vote summary card." In contrast, when a ballot-marking device ("BMD") produces a paper ballot, *i.e.*, a piece of**

---

[1] Transcripts from the evidentiary hearing are referred to by date and page. "JX" refers to joint exhibits in evidence. "PX" refers to Plaintiffs' exhibits in evidence. "DX" refers to Defendants' exhibits in evidence. "Stip" refers to the stipulations previously submitted to the Court by the parties.

[2] *See, e.g.*, *Bridges v. Colvin*, 136 F. Supp. 3d 620, 626 (E.D. Pa. 2015) (treating portion of motion to which party did not respond as uncontested).

**paper with contest options, the Secretary refers to the document as a "ballot" or "paper ballot."**

This is true. *See* JX 34 (original certification) at 5 ¶ 2 ("allowing all voters to cast vote summary card," "[t]he voter can print the vote summary card," "[o]nce printed, the ExpressVote XL internally processes the vote summary card for tabulation."); *see* 2/18 Tr. 144-45 (Boockvar).

As noted, defendants and their counsel conceded that the XL produces a "vote summary card" or "summary card" well over 20 times, on at least 5 different occasions, including:

- The Secretary's original certification, JX 34;
- The Secretary's September 3, 2019 recertification, JX 45 at 3, 7, 9, 10, 11, 12;
- Chief Counsel Tim Gates's September 12, 2019 meet-and confer letter, JX 47 at 1 ¶ 1; 2/18 Tr. 169-70 (Gates);
- Mr. Gates's October 30, 2019 meet-and-confer letter, JX 49, 2/18 Tr. 171-73 (Gates); and
- Even at the hearing, 2/18 Tr. 33:21-23 (Boockvar) ("Q: Joint Exhibit 57, Secretary, is the vote summary card generated by the XL, correct? A: Correct.").

Having conceded some 25-30 times in two official documents, two letters prepared in anticipation of possible litigation to enforce the settlement agreement, and in sworn testimony that the XL document is actually a vote summary card, it is true that the Secretary managed not to concede the point for the XL, twice. *See* JX 34 at 32 & Attachment B at 19.

Plaintiffs are also correct in stating: "In contrast, when a ballot-marking device ("BMD") produces a paper ballot, *i.e.*, a piece of paper with contest options, the Secretary refers

3

to the document as a 'ballot' or 'paper ballot.'" *See, e.g.*, JX 52 (Clearballot Clearvote); PX 1002 at 6 ¶¶ 1-2,  21 ¶ 1, 22 ¶ 3, 23 ¶¶ 1, 3 (Clearballot Clearvote); 2/18 Tr. 19-21 (Boockvar) (Clearballot Clearvote); JX 60 (Hart Verity Touch Writer); PX 1006 at 6 ¶ 2 (Hart Verity Touch Writer).

Defendants do not even attempt to contradict this point in their "response to correct."

**2.  There is no evidence that Plaintiffs or Plaintiffs' counsel *ever* called the paper produced by an XL a ballot or a paper ballot.**

This is true. *See* Transcript of hearing and all exhibits in evidence, *passim*. In stark contrast to Defendants' many admissions, *see supra*, nowhere in the record is there *any* evidence that any Plaintiff or any counsel for Plaintiffs ever referred to the XL document as a "ballot" or a "paper ballot." Not in the settlement negotiations. Not at the settlement conference. Not in Plaintiffs' mediation memo. Not in a tweet or a press release. Not in the meet and confer letters. Not in the meet and confer conversations. A slew of witnesses for the Secretary testified at the hearing, yet no one ever suggested that Plaintiffs or their counsel referred to this XL document as a ballot or paper ballot even once.

Having failed to point to any statement by Plaintiffs or their counsel, Defendants instead focus on Dr. Halderman, who is neither a Plaintiff nor Plaintiffs' counsel, did not participate in any settlement discussions, and "was not involved in the settlement negotiation." 2/19 Tr. 32:10-20, 84:16-25 (Halderman). In JX 20, the single document referred to by Defendants, even Dr. Halderman does not refer to the "ExpressVote XL" or the "XL," nor write that any ExpressVote system uses a "paper ballot." Dr. Halderman did write, however, that some

unspecified "ExpressVote machines can work as traditional ballot marking devices" and use a "ballot." *Id.*

    **3.    As even Boockvar admitted, "you can have a voter verifiable record of a vote that is not a paper ballot."**

Again, true. Here is the transcript: "Q: "But, for example, you can have a voter verifiable record of a vote that is not a paper ballot. A: Presumably." 2/18 Tr. 15:17-20 (Boockvar). If Secretary Boockvar's answer to the question were "no," as Defendants apparently now wish it had been, she would have said so. Secretary Boockvar knew one can have a record of a vote (such as the XL document) that is not a paper ballot.

The Agreement requires both. JX 30.

    **4.    Defendants' only apparent response is that, even though the XL does not produce a voter-verifiable record of each vote, neither do other voting systems.**

The indisputable thrust of Defendants' response on the XL's lack of a voter-verifiable paper record is that other voting systems, including paper ballots with optical scanners, may also use timing marks, bar codes, or other human-unreadable marks to read ballots. *See, e.g.*, 2/18 Tr. 36:7-12 (Boockvar) (volunteering this fact nonresponsively); *id.* at 37:2-4 (Boockvar) (same); *id.* at 155:16-23 (Boockvar) (same); *id.* at 112-20 (Boockvar) (extensive testimony on friendly cross). This position ignores the difference between using codes to *interpret* the meaning of a voter's mark and recording the vote in a code that the voter cannot understand. With other systems, the vote is the mark that the voter can verify with his or her own senses. With the XL, the vote *is* the bar code, and the machine does not read anything that the voter has seen. *See* 2/19 Tr. 26:9-20 (Halderman).

Defendants' semantic argument about whether this is their "only" response, or instead simply a theme of multiple separate responsive points, is just that—argument. And it is not worth the Court's time.

**5. Apart from hacking, Baumert acknowledges that both "hardware malfunction" and "software malfunction" happen notwithstanding ES&S's "best efforts."**

This is exactly what Mr. Baumert admitted at the hearing. 2/19 Tr. 262:4-12. Defendants' response is argument, not an attempt to "correct" anything.

**6. On September 28, 2018, Unger forwarded a "voting system and electronic poll book report," that was inaccurate and misleading in multiple respects. JX 12. First, the report in column two lists "model[s]" that are not models but "suites" of systems containing "a number of different configurations that can be used for voting." 2/18 Tr. 80:20-81:1 (Boockvar). Looking at JX 12, it is impossible to know which actual voting systems are in which suite. *Id.***

True. The report lists "models." But as Defendants now concede, they are not models at all. They are suites, an umbrella of possible, multiple voting systems. They do not specify which voting systems might be used, much less how those systems were proposed to be configured. *See*, *e.g.*, 2/19 Tr. 36:7-9 (Halderman) ("different ExpressVotes work in different ways"); *id.* at 36:9-11 ("they can be configured to work in different ways even within the same machine.").

Defendants' "response to correct" is no more than a rehash of their argument from their first brief concerning what was supposedly available on the EAC website, and a link to the website.

**7.     As Kathleen Kotula admitted, Defendants failed to invite Plaintiffs' designee to observe the certification process of the XL, as required under the Agreement.**

True. Ms. Kotula admitted (as she had to) that Defendants never invited Dr. Halderman to observe the certification process for the EVS 6021, which includes the XL. 2/19 Tr. 309:24-310:8 (Kotula) ("Q: Ms. Kotula, did you or anyone for Defendants ever invite Dr. Halderman to observe the certification process of the EVS 6021 system? A: No.").

Defendants again (improperly) make a legal argument, claiming they had no obligation to invite Plaintiffs' designee, because they certified the XL after the Agreement was signed, and testing occurred before. They are wrong. Paragraphs 4(a-b) of the Agreement are not limiting paragraphs; they do not obviate Defendants' obligation to invite Plaintiffs' designee to "observe the certification process." JX 30 ¶ 4. Defendants could and should have given Dr. Halderman videos of the testing, as was the parties' practice both before and after the Agreement. They could have told Dr. Halderman about the impending certification. They could have told Plaintiffs' counsel. Instead they failed to inform Plaintiffs, their counsel, or their designee, secretly certifying the XL without working "collaboratively" (JX 30 ¶ 4) or *at all* with Plaintiffs.[3]

**8.     Kotula . . . invented excuses for failing to respond.**

True. *See* 2/18 Tr. 263-74 (Kotula); PX 1001 *passim*. For example, even though ES&S testing was open to the public, Kotula delayed producing the testing videos for months, supposedly to "work with the vendors first to review the videos for proprietary information." PX

---

[3] *See* Stip ¶ 44 ("Defendants did not communicate the certification of the EVS 6.0.2.1 system to Plaintiffs."); 2/18 Tr. 264:21-265:12 (Kotula) (Failure to mention anything about ES&S to Dr. Halderman before certification of EVS 6.0.2.1.); *id.* at 185:15-21 (Gates) (Never told plaintiffs.); *id.* at 185:25-186:8 (Gates) (same); *id.* at 264-65 (Kotula) (Never mentioned ES&S to Halderman.); 2/19 Tr. 44:8-9 (Halderman) (same).

1001 at 17. But there is no "proprietary information" in a video of a proceeding *open to the public*. That is, respectfully, an invented excuse.

9.  **Dr. Halderman did not learn about key features of the XL until he saw the videos, or later.**

True. 2/19 Tr. 36:14-19 (Halderman) (did not know or learn about the printhead issue in October 2018); *id.* 13:3-7 (learned that the XL makes an electronic record of the vote before the voter sees the paper when he read Defendants' September 2019 recertification report.).

10. **Dr. Halderman "did not learn about [the printhead] issue until he received the testing videos."**

True. 2/19 Tr. 36:14-19 (Halderman). It is also true that, on cross-examination, Defendants elicited that at some undetermined point, Dr. Halderman became aware of two articles that referred, *inter alia*, to a printhead issue in an unspecified ExpressVote machine "in one configuration." *Id.* at 153-161; DX L; DX II.

11. **"It is undisputed that ES&S bears the financial consequences of decertification."**

Though this statement is not quoted from Plaintiffs' proposed findings of fact, it is plainly true as to Philadelphia County. "Equipment and Provider Software modifications or replacements necessary due to decertification . . . by the Commonwealth of Pennsylvania . . . must be provided to City at no cost or it must be replaced with a certified system at no cost." PX 1004 art. XII. This language is crystal clear. No party or *amicus*, at the hearing or in any submission, has disputed its plain and obvious meaning. That the City of Philadelphia Law Department would characterize this language, for which it presumably bargained, as "at most"

8

creating a "contract dispute" reflects a derogation of its duty to protect the City and its taxpayers. The language is clear: ES&S is responsible for replacement and bears the cost. The City's willingness to obfuscate that fact for perceived temporary litigation advantage is astonishing.

As to the two other counties that purchased the XL, both are surely aware of these proceedings—unless the Secretary failed to inform them of pending legal proceedings that might result in the decertification of the voting system they are now using—yet neither chose to intervene to assert any injury or other interest. If Defendants believe that alleged financial injury to those counties is a basis to deny Plaintiffs' motion, it was Defendants' burden to introduce evidence of such injury. Defendants did not do so. The only record evidence on this point is the Philadelphia contract, which supports the inference that the other counties either have similar provisions in their contracts or could have bargained for similar provisions but failed to do so.

\* \* \*

The portions of 11 findings of fact Defendants challenge are true, well-documented, and based on the record. Plaintiffs' remaining 210 findings of fact are uncontested. These findings compel granting Plaintiffs' motion to enforce the agreement.

**PLAINTIFFS' LEGAL ARGUMENTS ARE CORRECT**

Defendants' accusation that Plaintiffs "misstate the law" fares no better. Apparently not content with two previous rounds of merits briefing, defense counsel now seek an excuse to offer yet more erroneous legal argument in support of their position.

### A. A Motion to Enforce a Settlement Agreement Is Not a Motion for a Permanent Injunction

For months, Defendants have been well aware of Plaintiffs' position that the legal standard for a permanent injunction does not apply on a motion for specific performance of a settlement agreement that the court retained jurisdiction to enforce. *See* Dkt. #133 at 13-14 (making this argument). At no time, including in their post-hearing brief, have Defendants cited any authority *establishing* that the Court must apply the permanent injunction test on this motion. They simply assume it is so and cite generic case law on injunctions from other contexts. *Cf. TD Bank, N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (summary judgment). The assumption is wrong. *See Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, 369 F. App'x 340 (3d Cir. 2010) (affirming order granting specific performance of settlement agreement, without applying four-factor permanent injunction standard).

The principle of law that an order requiring a party to specifically perform its obligations under a settlement agreement is not *per se* an injunction, expressed in *Saber v. FinanceAmerica Credit Corp.*, 843 F.2d 697 (3d Cir. 1988), is correct. The Third Circuit itself continues to cite this language from *Saber* approvingly. *See Silva v. Easter*, 403 F. App'x 695, 699 (3d Cir. 2010) (quoting *Saber*). The Third Circuit has also held, contrary to the suggestion in *Saber*, that an order granting specific performance is interlocutorily appealable under 28 U.S.C. § 1292(a)(1), but that issue is not relevant here.

Defendants also make a fuss of the fact that specific performance is equitable relief, as if it were somehow revelatory. At no time have Plaintiffs questioned the 1L-contracts-class proposition that specific performance is equitable in nature.

### B. No Federalism Concerns Exist Here

Defendants and Intervenors do not bother making a federalism argument in their post-hearing brief. Instead, they drop a footnote citing back to Defendants' brief opposing the motion. *See* Dkt. #182-1 at 20 n.9 (citing Dkt. #123 at 37-38). As Plaintiffs have previously pointed out, however, *see* Dkt #133 at 14 & n.4, none of the cases cited by Defendants involves states or state officials who *consented to federal enforcement of a settlement agreement*, as Defendants did here.

Plaintiffs' discussion of *Berne Corp. v. Gov't of Virgin Islands*, 105 F. App'x 324 (3d Cir. 2004) is entirely correct. That case, unlike every one cited by Defendants and Intervenors, concerns a motion to specifically enforce a settlement agreement over which a federal court retained jurisdiction. *Id.* at 330. There, as a defense to enforcement, the Government of the Virgin Islands asserted that separation of powers (a core constitutional principle) prevented the district court from ordering it to appropriate funds. *Id.* The Third Circuit disagreed, holding that separation of powers did not bar relief because "the Settlement Agreement itself provided that the District Court retained jurisdiction to supervise and enforce its terms." *Id.* at 331. The same logic applies here as to federalism, another core constitutional principle. Defendants cannot consent to federal enforcement of the agreement as a material term of the parties' bargain, then turn around and argue that the federal court lacks the constitutional authority to enforce the agreement.

Dated: March 30, 2020

                                              EMERY CELLI BRINCKERHOFF & ABADY LLP

                                                          /s/

                                              Ilann M. Maazel, Esq.*
                                              600 Fifth Avenue, 10th Floor
                                              New York, NY 10020
                                              Phone: 212-763-5000
                                              Fax: 212-763-5001
                                              Email: imaazel@ecbalaw.com

                                              \* *Admitted pro hac vice*

                                              MONTGOMERY McCRACKEN WALKER & RHOADS LLP

                                              John G. Papianou, Esq.
                                              Brett Waldron, Esq.
                                              1735 Market Street
                                              Philadelphia, PA 19103
                                              Phone: 215-772-7389

                                              *Attorneys for Plaintiffs*